UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

───────────────────────────────

UNITED STATES OF AMERICA,

        - v. -

S. KENNETH LEECH II,

               Defendant.

───────────────────────────────

)
)
)
)
)
)
)
)
)
)

24 Cr. 658 (GHW)

 

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
S. KENNETH LEECH II'S OMNIBUS PRETRIAL MOTION**

 

Dated: August 22, 2025
      New York, New York

MORVILLO, ABRAMOWITZ
GRAND, IASON & ANELLO, P.C.
Jonathan S. Sack
Jeremy H. Temkin
Joshua Bussen
Nathaniel Sobel
Samuel W. Magaram
565 Fifth Avenue
New York, NY 10017
(212) 856-9600 (telephone)
(212) 856-9494 (facsimile)

*Attorneys for Defendant S. Kenneth Leech II*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

DISCUSSION ..................................................................................................................... 3

I.      The Court Should Order the Government to Provide a Bill of Particulars Identifying
        the Allegedly Unlawful Trades and Alleged Misstatements ............................................. 3

        A.      Relevant Facts ...................................................................................................... 4

                1.      The Indictment ..................................................................................... 4

                2.      The Investing Strategies at Issue Differed Significantly ........................... 6

                3.      The Government's Discovery Productions ............................................... 9

                4.      The Government Rejects Mr. Leech's Request for Particulars ................. 9

        B.      Applicable Law ................................................................................................. 10

        C.      The Court Should Order the Government to Identify the Allegedly Fraudulent
                Trades ............................................................................................................. 13

                1.      Neither the Indictment Nor the Discovery Identifies the Allegedly
                        Fraudulent Trades ............................................................................... 13

                2.      Without Particulars, Mr. Leech Will Be Unable to Answer the
                        Charges ............................................................................................. 14

                3.      The Government Cannot Escape Its Obligation to Provide Sufficient
                        Notice to Mr. Leech by Relying on "Scheme Liability" ......................... 18

                4.      The Government's Disclosure Obligations Reinforce the Need for
                        Particulars ......................................................................................... 19

        D.      The Government Should Be Ordered to Identify All Alleged Misstatements or
                Omissions ......................................................................................................... 20

II.     The Allegation of a $1.2 Billion Differential Should Be Stricken as Surplusage ........... 22

III.    The Court Should Order the Government to Provide Discovery and Should
        Conduct a Hearing to Determine Whether the Government's Deficient Taint Team
        Process Warrants Relief ....................................................................................... 23

        A.      Relevant Facts ................................................................................................... 24

                1.      Western's Outside Counsel Investigation ............................................. 24

                2.      The SEC's Investigation ..................................................................... 25

   3. The Search Warrants ....................................................................... 25

   4. The Government's Flawed Taint Team Process ........................................ 26

  B. Applicable Law ......................................................................................... 31

  C. The Government's Deficient Taint Team Process Resulted in the Prosecution Team Accessing Privileged Communications ........................................ 35

  D. This Court Should Order the Government to Produce Discovery and Should Hold an Evidentiary Hearing to Determine the Nature and Scope of the Government's Violation of Mr. Leech's Rights ..................................... 36

IV. The Court Should Dismiss Count Five for Lack of Venue ................................ 38

CONCLUSION ............................................................................................................. 42

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                              **Page(s)**

*Brady v. Maryland*,
    373 U.S. 83 (1963) ........................................................................................................ 19, 20

*In re Ethics Investigation of Allegations Raised by UDF*,
    No. 22-MC-01-O, 2023 WL 3327251 (N.D. Tex. Feb. 6, 2023) ...................................... 33, 34

*In re Sealed Search Warrant & Application for a Warrant by Tel. or Other Reliable Elec. Means*,
    11 F.4th 1235 (11th Cir. 2021) ............................................................................................. 34

*In re Search Warrants*,
    No. 21 Civ. 04968 (SDG), 2021 WL 5917983 (N.D. Ga. Dec. 15, 2021) ............................. 34

*In re Search Warrant Issued June 13, 2019*,
    942 F.3d 159 (4th Cir. 2019) ................................................................................................ 32

*In re Terrorist Bombings of U.S. Embassies in E. Afr.*,
    552 F.3d 93 (2d Cir. 2008) ............................................................................................ 11, 12

*Kastigar v. United States*,
    406 U.S. 441 (1972) ............................................................................................................. 37

*Leka v. Portuondo*,
    257 F.3d 89 (2d Cir. 2001) ................................................................................................... 20

*Smith v. O'Grady*,
    312 U.S. 329 (1941) ............................................................................................................. 10

*United States v. Avenatti*,
    559 F. Supp. 3d 274 (S.D.N.Y. 2021) ............................................................................ 33, 34

*United States v. Bickle*,
    10 Cr. 00565, 2011 WL 3798225 .................................................................................. 37, 38

*United States v. Bin Laden*,
    92 F. Supp. 2d 225 (S.D.N.Y. 2000) ............................................................................. 11, 12

*United States v. Bin Laden*,
    146 F. Supp. 2d 373 (S.D.N.Y. 2001) .................................................................................. 40

*United States v. Bortnovsky*,
    820 F.2d 572 (2d Cir. 1987) ........................................................................................ passim

*United States v. Cabrales*,
    524 U.S. 1 (1998) ................................................................................................................. 39

iv

*United States v. Candella*,
   487 F.2d 1223 (2d Cir. 1973) ................................................................. 40, 41

*United States v. Carson*,
   No. 09 Cr. 77 (C.D. Cal. May 18, 2009) ....................................................... 18

*United States v. Chierchio*,
   No. 20 Cr. 306 (NGG), 2022 WL 523603 (E.D.N.Y. Feb. 22, 2022) .............. 12, 14

*United States v. Combs*,
   No. 24 Cr. 542 (AS), 2025 WL 485377 (S.D.N.Y. Feb. 12, 2025) ..................... 34

*United States v. Coplan*,
   703 F.3d 46 (2d Cir. 2012) ............................................................ 39, 41, 42

*United States v. Davidoff*,
   845 F.2d 1151 (2d Cir. 1988) ..................................................................... 11

*United States v. Esformes*,
   16 Cr. 20549 (RNS), 2018 WL 5919517 (S.D. Fla. Nov. 13, 2018) ................... 37

*United States v. Feng Ling Liu*,
   No. 12 Cr. 934 (RA), 2014 WL 101672 (S.D.N.Y. Jan. 10, 2014) ..................... 33

*United States v. Finnerty*,
   No. 05 Cr. 393 (DC) (S.D.N.Y. Nov. 15, 2005) .............................................. 13

*United States v. Finnerty*,
   474 F. Supp. 2d 530 (S.D.N.Y. 2007) ........................................................... 22

*United States v. Fortenberry*,
   89 F.4th 702 (9th Cir. 2023) ....................................................................... 42

*United States v. Gallo*,
   654 F. Supp. 463 (E.D.N.Y. 1987) ................................................................ 10

*United States v. Grant*,
   No. 04 Cr. 207 (BSJ), 2004 WL 1171258 (S.D.N.Y. May 25, 2004) .................. 33

*United States v. Hawit*,
   No. 15 Cr. 252 (PKC), 2017 WL 663542 (E.D.N.Y. Feb. 17, 2017) ................... 17

*United States v. John*,
   477 F. App'x 570 (11th Cir. 2012) ................................................................ 42

*United States v. Johnson*,
   No. 17 Cr. 0482 (JSR) (S.D.N.Y. Oct. 11, 2017) ......................................... 11, 19

v

*United States v. Kaplan*,
   No. 02 Cr. 883 (DAB), 2003 WL 22880914 (S.D.N.Y. Dec. 5, 2003) ................................. 32

*United States v. Kelly*,
   420 F.2d 26 (2d Cir. 1969) ..................................................................................... 10

*United States v. Khalil*,
   No. 22 Cr. 20200 (MAG), 2024 WL 3160668 (E.D. Mich. June 25, 2024) .......................... 12

*United States v. Landji*,
   No. 18 Cr. 601 (PGG), 2021 WL 5402288 (S.D.N.Y. Nov. 18, 2021) ................................. 37

*United States v. Miller*,
   808 F.3d 607 (2d Cir. 2015) ..................................................................................... 41

*United States v. Murgio*,
   209 F. Supp. 3d 698 (S.D.N.Y. 2016) ......................................................................... 11

*United States v. Nachamie*,
   91 F. Supp. 2d 565 (S.D.N.Y. 2000) ..................................................................... passim

*United States v. Neill*,
   952 F. Supp. 834 (D.D.C. 1997).......................................................................... 32, 35

*United States v. Rajaratnam*,
   No. 09 Cr. 1184 (RJH), 2010 WL 2788168 (S.D.N.Y. July 13, 2010) ................................. 13

*United States v. Ramirez*,
   420 F.3d 134 (2d Cir. 2005) ..................................................................................... 40

*United States v. Ramirez*,
   609 F.3d 495 (2d Cir. 2010) ..................................................................................... 13

*United States v. Rigas*,
   490 F.3d 208 (2d Cir. 2007) ..................................................................................... 11

*United States v. Ritchey*,
   605 F. Supp. 3d 891 (S.D. Miss. June 3, 2022) ......................................................... 32, 34

*United States v. Rodriguez–Moreno*,
   526 U.S. 275 (1999) ............................................................................................... 39

*United States v. Saavedra*,
   223 F.3d 85 (2d Cir. 2000) ....................................................................................... 42

*United States v. Savin*,
   00 Cr. 45 (RWS), 2001 WL 243533 (S.D.N.Y. Mar. 7, 2001) ........................................... 12

*United States v. Scarpa,*
   913 F.2d 993 (2d Cir. 1990) ......................................................................... 23

*United States v. Sharma,*
   No. 18 Cr. 340 2019 WL 3802223 (S.D.N.Y. Aug. 13, 2019) ................................. 32

*United States v. Schwimmer,*
   924 F.2d 443 (2d Cir. 1991) ................................................................. 36, 37

*United States v. Siddiqi,*
   No. 06 Cr. 377 (SWK),  2007 WL 549420 (S.D.N.Y. Feb. 21, 2007) ............................. 17, 21

*United States v. Smith,*
   641 F.3d 1200 (10th Cir. 2011) ................................................................... 42

*United States v. Sullivan,*
   No. 17 Cr. 00104 (JMS), 2020 WL 1815220 (D. Haw. Apr. 9, 2020) ......................... 37

*United States v. Thomas,*
   981 F. Supp. 2d 229 (S.D.N.Y. 2013) ............................................................ 20

*United States v. Tournant,*
   No. 22 Cr. 276, 2023 WL 5276776 (S.D.N.Y. Aug. 15, 2023) ........................... 36, 37

*United States v. Trie,*
   21 F. Supp. 2d 7 (D.D.C. 1998) .............................................................. 21, 22

*United States v. Tzolov,*
   642 F.3d 314 (2d Cir. 2011) ...................................................................... 39

*United States v. Vaid,*
   No. 16 Cr. 763 (LGS), 2017 WL 3891695 (S.D.N.Y. Sept. 5, 2017) ...................... 17

*United States v. Weigand,*
   482 F. Supp. 3d 224 (S.D.N.Y. 2020) ........................................................... 38

## Statutes & Constitutional Provisions

7 U.S.C. § 6o .......................................................................................... 4

7 U.S.C. § 9 ....................................................................................... 4, 5

7 U.S.C. § 13 .................................................................................... 4, 5

15 U.S.C. § 78j ...................................................................................... 4

15 U.S.C. § 78ff ..................................................................................... 4

15 U.S.C. § 80b-6 ............................................................................................. 4

15 U.S.C. § 80b-17 ........................................................................................... 4

18 U.S.C. § 2 .............................................................................................. 4, 5

18 U.S.C. § 1001 ..................................................................................... passim

U.S. Const. art. III, § 2, cl. 3 ......................................................................... 39

U.S. Const. amend. VI ............................................................................. 10, 39

**Regulations**

17 C.F.R. § 180.1 ............................................................................................ 5

17 C.F.R. § 240.10b-5 ..................................................................................... 4

**Rules**

Fed. R. Crim P. 7 .......................................................................................... 11

Fed. R. Crim. P. 12 .................................................................................. passim

Fed. R. Crim. P. 18 ....................................................................................... 39

**Other Authorities**

Elizabeth Williams, *Attorney-Client Privilege: Use of Taint or Filter Teams in Federal Investigations and Prosecutions*, 74 A.L.R. Fed. 3d Art. (2022) ............................................... 34

Charles Stein & John Gittelsohn, *This Bond Manager Isn't a Household Name, But He Beats 98% of His Peers*, Bloomberg (Dec. 22, 2017) ........................................... 6

*Federal Practice & Procedure: Criminal* § 128 n.39 (5th ed.) .................................... 23

Fixed Income Analyst Society, Inc., Hall of Fame, *S. Kenneth Leech Chief Investment Officer Western Asset Management Company* ................................................... 2

Frank J. Fabozzi, *The Handbook of Fixed Income Securities* (2021) ............................. 8

James Chen, *Treasury Bond: Overview of U.S.-Backed Debt Securities*,

Investopedia (updated Aug. 3, 2025),..........................................................................15

Jason Fernando, *Understanding Derivatives: A Comprehensive Guide to Their Uses and Benefits* (updated Aug. 14, 2025), .........................................................................15

Morningstar, *Morningstar Announces 2004 Fund Manager of the Year Awards* (Jan. 3, 2005) .............................................................................................1

Morningstar, *Morningstar Announces 2014 U.S. Fund Manager of the Year Award Winners* (Jan. 21, 2015) ...................................................................................2

Press Release, Legg Mason, Inc., *Western Asset CIO Advocates for Unconstrained Fixed Income Investing*, PR Newswire (Oct. 23, 2014) .......................................................2

Press Release, U.S. Attorney's Office for the Southern District of New York, *Former Chief Investment Officer of Global Bond Investment Firm Charged With Over $600 Million Investment Adviser Fraud* (Nov. 25, 2024) ...........................................................18

## PRELIMINARY STATEMENT

Defendant S. Kenneth Leech II respectfully submits this memorandum of law in support of his omnibus pretrial motion seeking orders (1) directing the government to provide a bill of particulars; (2) striking surplusage from the Indictment; (3) granting Mr. Leech discovery and a hearing regarding the nature and extent of the government's intrusion on privileged communications in connection with its review of materials obtained through search warrants; and (4) dismissing Count Five of the Indictment for lack of venue.

Mr. Leech is a distinguished fixed income professional with over 40 years of experience. He joined the Pasadena, California-based Western Asset Management Company[1] ("Western") in 1990 when it had approximately $5 billion in assets under management ("AUM"). Mr. Leech was instrumental in its growth into a leading institutional and retail fixed-income asset manager with over $380 billion in AUM and 600 employees, as of September 2023. (Temkin Decl. ¶ 4).[2] From 2013 through August 2024, Mr. Leech served as either Western's chief investment officer ("CIO") or co-CIO. Among other honors, Mr. Leech advised the United States Department of the Treasury as a member of its Borrowing Committee from 2002 to 2004, was named "manager of the year" by Morningstar in 2004 and 2014 and by Institutional Investor in 2013, and was inducted into the Fixed-Income Analysts Society's Hall of Fame in 2007.[3]

---

[1] Western Asset Management Company is a global investment firm specializing in fixed-income securities. The company manages assets for a diverse client base, including pension funds, corporations, governments, and individual investors. Since 2020, Western has been a subsidiary of Franklin Templeton.

[2] "Temkin Decl." refers to the Declaration of Jeremy H. Temkin in Support of Defendant S. Kenneth Leech II's Omnibus PreTrial Motion.

[3] *See* Morningstar, *Morningstar Announces 2004 Fund Manager of the Year Awards* (Jan. 3, 2005), https://newsroom.morningstar.com/newsroom/news-archive/press-release-

The Indictment alleges that Mr. Leech perpetrated a 33 month-long cherry-picking scheme from early 2021 to late 2023 in which he favored certain investment strategies at the expense of others.  He did this, the Indictment alleges, by allocating U.S. Treasury futures and options trades on the basis of their unrealized first-day performance.

This omnibus motion seeks four forms of relief.  *First*, Mr. Leech placed more than 33,000 trades during the nearly three years at issue, but the Indictment fails to specify which of those trades were fraudulently allocated or even how many trades were misallocated.  The Indictment further alleges that Mr. Leech made false and misleading statements and omissions to investors without specifying them.  Because the discovery does not provide this information, which is essential to prepare for trial, the Court should direct the government to provide a bill of particulars specifying the trades and statements it alleges were part of the fraud charged in the Indictment.  Absent particulars, the burden of proof will impermissibly be shifted to the defense.

*Second*, the Court should strike as surplusage the Indictment's allegation that trades allocated by Mr. Leech yielded "net first day *gains* of over $600 million" to one set of accounts and "net first day *losses* of over $600 million" to another set of accounts.  (Indictment ¶ 5).[4] Because the government does not claim that every trade that resulted in *unrealized* first day gains

---

details/2005/Morningstar-Announces-2004-Fund-Manager-of-the-Year-Awards/default.aspx; Morningstar, *Morningstar Announces 2014 U.S. Fund Manager of the Year Award Winners* (Jan. 21, 2015), https://www.morningstar.com/funds/announcing-morningstar-fund-managers-year-2014; Fixed Income Analyst Society, Inc., Hall of Fame, *S. Kenneth Leech Chief Investment Officer Western Asset Management Company*, https://fiasi.org/2007-hall-of-fame/s-kenneth-leech/ (last visited Aug. 21, 2025); Press Release, Legg Mason, Inc., *Western Asset CIO Advocates for Unconstrained Fixed Income Investing*, PR Newswire (Oct. 23, 2014), https://www.prnewswire.com/news-releases/western-asset-cio-advocates-for-unconstrained-fixed-income-investing-896335788.html.

[4] The terms "first day gain" and "first day loss" used in the Indictment refer to the *unrealized* first-day performance of trades.

or *unrealized* first day losses was misallocated, this allegation is irrelevant, misleading, and unfairly prejudicial.

*Third*, in connection with its investigation, the government obtained Mr. Leech's personal emails, text messages, and other materials through search warrants served on Apple and Google. Despite being aware that Mr. Leech was represented by counsel, the government chose not to consult counsel before initiating its review of the search warrant returns, and instead employed a flawed "taint team" review process. As a result, the government improperly accessed more than 200 privileged documents obtained from Mr. Leech's Google account, and potentially hundreds of additional privileged documents from his Apple account. The Court should order discovery and hold an evidentiary hearing to assess the nature and full extent of the government's violation of Mr. Leech's rights and grant appropriate relief.

*Fourth*, Count Five of the Indictment charges Mr. Leech with having made false statements during testimony before the staff of the Securities and Exchange Commission (the "SEC"). That testimony was given in Los Angeles in connection with an investigation conducted by the SEC's Los Angeles Regional Office. Because the allegedly false statements were made in the Central District of California, not the Southern District of New York, Count Five should be dismissed for lack of venue.

## DISCUSSION

### I.    The Court Should Order the Government to Provide a Bill of Particulars Identifying the Allegedly Unlawful Trades and Alleged Misstatements

The Court should direct the government to identify which trades it alleges Mr. Leech misallocated. Without those particulars, Mr. Leech would bear the impossible burden of preparing to address and explain each of the more than 33,000 U.S. Treasury futures and options

trades identified in discovery.  The need for particulars in this case is reinforced by the fact that demonstrating that any given trade was properly allocated is a time-consuming and expert-intensive exercise that requires analyzing a bevy of factors, including complex fixed-income risk metrics, market conditions, and news events in light of emails, chats, and other documents produced by the government.  Because trades are interrelated in their effects and cannot be viewed in isolation, addressing any single trade also requires analyzing that trade in the context of other trades placed for the relevant portfolio on the day in question.  Quite simply, it is not possible for the defense to prepare to defend each of Mr. Leech's over 33,000 trades at trial.

Further, in view of the Indictment's allegation that Mr. Leech "mad[e] an untrue statement of material fact and omitt[ed] to state a material fact necessary in order to make the statements made . . . not misleading," (Indictment ¶ 28), the Court should also direct the government to identify: (1) any untrue statements the government alleges Mr. Leech made and (2) any statements the government alleges Mr. Leech made that were rendered false or misleading by a material omission.

### A.    Relevant Facts

#### 1.    The Indictment

The five-count Indictment in this case was filed on November 25, 2024.  It alleges chiefly that Mr. Leech violated the securities and commodities laws by engaging in a "cherry picking" scheme "[b]etween in or about 2021 and October 2023" (the "relevant period").[5]  (Indictment

---

[5] Count One charges Mr. Leech with investment advisor fraud in violation of 15 U.S.C. §§ 80b-6 & 80b-17 and 18 U.S.C. § 2.  Count Two charges Mr. Leech with securities fraud in violation of 15 U.S.C. §§ 78j(b) & 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2.  Count Three charges Mr. Leech with commodity trading advisor fraud in violation of 7 U.S.C. §§ 6o & 13(a)(5) and 18 U.S.C. § 2.  Count Four charges Mr. Leech with commodities fraud in violation of 7 U.S.C. §§

¶ 1).  According to the Indictment, during this nearly three-year period, Mr. Leech sought to "bolster" Western client accounts following the Macro Opportunities ("Macro Opps") strategy at the expense of accounts following Western's flagship Core and Core Plus strategies (together, the "Core Strategies").  (*Id.* ¶¶ 2–3).  The Indictment also alleges that Mr. Leech "engaged in a similar scheme to bias allocations in favor of two" specific client accounts.  (*Id.* ¶ 6).

The Indictment alleges that Mr. Leech "was responsible for making trades on behalf of different portfolios and then assigning those trades to a particular portfolio—a process generally known as 'allocation.'"  (*Id.* ¶ 2).  It further alleges that during the period at issue, Mr. Leech would "routinely wait[] hours after making his trades . . . to make his allocations, which provided him the opportunity to observe how his trades had performed before deciding where to allocate them."  (*Id.* ¶ 4).  It then claims that Mr. Leech "used that ability to see how the market moved to support Macro Opps by awarding it better performing trades, while hiding worse performing trades in the Core Strategies."  (*Id.*).

The Indictment does not identify any specific trades that were purportedly misallocated.  Rather, it claims that the U.S. Treasury futures and options trades Mr. Leech "allocated specifically to Macro Opps had net first day *gains* of over $600 million" and the trades that he "allocated specifically to the Core Strategies had net first day *losses* of over $600 million."  (*Id.* ¶ 5).  The Indictment further asserts that "[n]either [Mr. Leech] nor [Western] disclosed to investors that [Mr. Leech] used first-day performance to decide how to allocate trades, or that [Mr. Leech] was favoring Macro Opps in his allocations."  (*Id.* ¶ 4).

---

9(1) & 13(a)(5), 17 C.F.R. § 180.1, and 18 U.S.C. § 2.  Count Five charges Mr. Leech with making false statements in violation of 18 U.S.C. §§ 1001(a)(1)–(2).

## 2.    The Investing Strategies at Issue Differed Significantly

Western offers clients dozens of fixed-income investment strategies consistent with its long-term value investing approach.  These strategies differ in terms of their assets (*e.g.*, government bonds, corporate bonds, asset-backed securities), risk tolerances, return objectives, and other factors.  (Temkin Decl. ¶ 5).  The Indictment focuses on trades placed for and allocated to the Core Strategies and Macro Opps.[6]

Unlike in other criminal cherry-picking schemes, which typically allege identical or nearly identical accounts, the Core Strategies and Macro Opps were drastically different.  The Core Strategies (the strategies the government alleges were disfavored) are Western's flagship strategies, showcasing the firm's expertise in diversified U.S.-focused investing.  Western and Mr. Leech built their reputations on the strength of the Core Strategies' performance.[7]  Between 2021 and 2023, AUM in the Core Strategies ranged between $100 and $165 billion, (Indictment ¶ 8), generating *more than one-third* of the firm's revenue, (Temkin Decl. ¶ 8).  The Core Strategies and its many competitors at other firms are measured against the Bloomberg US

---

[6] Clients invested in the Core Strategies and Macro Opps through either separate accounts or co-mingled accounts.  While we discuss these as two different strategies, in fact, Western offered institutional clients the ability to tailor strategies to meet their specific investment goals, risk tolerances, and preferences.  Thus, the Core Strategies included approximately 180 different client accounts and Macro Opps included approximately 18 different client accounts.  As a result, accounts within a given strategy could (and frequently did) hold different assets, reflecting different risk profiles and requiring bespoke account management and heightening the complexity of managing the strategies.  (Temkin Decl. ¶ 7).

[7] *See, e.g.*, Charles Stein & John Gittelsohn, *This Bond Manager Isn't a Household Name, But He Beats 98% of His Peers*, Bloomberg (Dec. 22, 2017), https://www.bloomberg.com/news/articles/2017-12-22/this-bond-manager-isn-t-a-household-name-but-beats-98-of-peers ("The upshot: the $21.9 billion Western Asset Core Plus Bond Fund, Leech's biggest, beat 98 percent of intermediate bond funds in 2017, and 98 percent over the past three years and five years, according to Morningstar.").

6

Aggregate Bond Index. As a result, the Core Strategies' performance against competitors is an apples-to-apples comparison and is closely scrutinized in the industry. (*Id*.).

In contrast, Macro Opps (the allegedly favored strategy) was a niche strategy designed for Western's *most risk-tolerant clients*. Between 2021 and 2023, Macro Opps' AUM ranged from approximately $3 billion to $16 billion, (Indictment ¶ 9), and it constituted between five to twelve percent of the firm's revenue, (Temkin Decl. ¶ 9).

The Core Strategies and Macro Opps were fundamentally different in how they balanced risk and return. As alleged in the Indictment, the Core Strategies were relatively conservative, attempting "to generate a greater return than [the] benchmark index . . . while keeping benchmark-based constraints on the amount of risk that those strategies could take on." (Indictment ¶ 8). Macro Opps, in contrast, undertook far more risk, seeking "to maximize total return, with a relatively wide range of risk compared to the Core Strategies." (*Id*. ¶ 9).

The strategies thus differed on each of the factors Western uses to distinguish among its various investment offerings. (*Compare* Indictment ¶ 8, *with* ¶ 9). The Core Strategies (i) invested primarily in U.S.-based bonds;[8] (ii) were measured against a benchmark; (iii) drove returns "bottom-up" from the identification of under-valued securities; and (iv) expected to perform within three percent of the benchmark in ordinary years and six percent of the benchmark in extraordinary years. (Temkin Decl. ¶ 8). In contrast, Macro Opps (i) was a global-based strategy and held substantial investments in emerging markets and foreign currencies; (ii) was an "unconstrained" strategy, meaning that it was not measured against a

---

[8] Core accounts sought to limit their investments to U.S. dollar denominated securities, while Core Plus accounts generally could hold no more than 25 percent of their total assets in non-U.S. dollar denominated securities. Macro Opps accounts, in contrast, could hold as much as 75 percent of their net assets in non-U.S. dollar denominated securities. (Temkin Decl. ¶ 8).

benchmark and did not have direct or obvious competitor; (iii) drove returns "top-down" from the identification of macroeconomic trends; and (iv) was highly volatile, meaning it was expected to be up or down ten percent annually in ordinary years and up or down twenty percent annually in extraordinary years. (*Id.* ¶ 9).

Consistent with their widely divergent investment approaches, the Core Strategies and Macro Opps differed with respect to their duration and convexity positions—the two primary metrics of a portfolio's sensitivity to interest rate changes.[9] The Core Strategies generally maintained duration within 20 percent of the benchmark's duration in the case of Core, or 30 percent of the benchmark's duration in the case of Core Plus. Macro Opps, meanwhile, had a much broader duration band (more than three times greater than the Core Strategies). The strategies also differed in their convexities. Macro Opps was much more negatively convex than the Core Strategies, rendering it *far* more sensitive to interest rate moves than the Core Strategies. (*Id.* ¶ 10).

As a consequence of these differences, the Core Strategies and Macro Opps required different U.S. Treasury futures and options trades, especially during the extraordinary bear market conditions of the relevant period.[10]

---

[9] Duration is an estimate of a fixed-income instrument's (or collection of instruments') sensitivity to interest rate risk. Frank J. Fabozzi, *The Handbook of Fixed Income Securities* 111 (2021). Convexity refers to the sensitivity of an instrument's (or collection of instruments') duration to interest rate changes—that is, how rapidly duration would change in response to a change in interest rates. *Id.* Convexity can be positive or negative. Most relevant here, a negatively convex portfolio (such as Macro Opps) requires especially active trading to manage duration.

[10] *See, e.g.*, Samuel Indyk, *Bonds 'in Greatest Bear Market of All Time,' Bank of America Says*, Reuters (Oct. 6, 2023), https://www.reuters.com/markets/rates-bonds/bonds-greatest-bear-market-all-time-bofa-2023-10-06/.

### 3.    The Government's Discovery Productions

To date, the government has produced more than 600,000 documents totaling approximately 4,000,000 pages.  (Temkin Decl. ¶ 15).[11]  Included in the productions are Western trading records, contained in spreadsheets known as "trade blotters," which reflect trades purportedly made by Mr. Leech between 2019 and mid-2024.  The produced trade blotters contain approximately 62,011 unique trade identification numbers, each of which corresponds to a trade purportedly executed and allocated by Mr. Leech.  Over 33,000 of the trades identified in the blotters were purportedly placed by Mr. Leech (1) in U.S. Treasury futures and options, (2) during the 33 months covered by the Indictment, and (3) allocated to one or more accounts within the Core Strategies or Macro Opps.  The blotters detailing these 33,000 plus trades span 595,236 rows and 48 columns of the blotter for a total of 28,571,328 cells of information.  (*Id.* ¶ 16).

### 4.    The Government Rejects Mr. Leech's Request for Particulars

After receiving a significant portion of the government's discovery, including the trade blotters, counsel for Mr. Leech asked the government to provide particulars "identify[ing] each trade the government alleges Mr. Leech misallocated."  (Temkin Decl. Ex. 1 at 1).

The government did not dispute that there are tens of thousands of trades potentially implicated by the Indictment, yet it responded that it "does not need to identify in a bill of particulars specific trades the defendant may have misallocated."  (Temkin Decl. Ex. 2 at 1–2).

---

[11] The government has continued to provide significant volumes of discovery.  As recently as last week, the government produced 48,823 documents and 402,089 pages.  (Temkin Decl. ¶ 15). Mr. Leech reserves the right to make additional motions should unreviewed discovery materials necessitate doing so.

The government stated that the allegations in the Indictment as "further refined and contextualized by the discovery, which provides, among other things, the defendant's trading records for the relevant timeframe," are sufficient.  (*Id.* at 1).  The government also asserted that it need not identify the trades at issue because "the criminal fraud [alleged] is the defendant's failure to disclose th[e] practice" of "using first-day performance to decide how to allocate trades . . . . which constitutes a material misrepresentation or omission."  (*Id.* (internal quotation and alteration marks omitted)).

In reply, Mr. Leech asked the government to "identify any statement or statements that the government alleges constitutes a material misrepresentation or omission."  (Temkin Decl. Ex. 3 at 1–2 (internal quotation and alteration marks omitted)).  The government again refused to provide the requested information, asserting that Mr. Leech "committed fraud . . . regardless of whether he made a specific representation that was fraudulent, or a representation that was misleading because it omitted certain information."  (Temkin Decl. Ex. 4 at 1).

### B.    Applicable Law

The U.S. Constitution guarantees to every criminal defendant the right "to be informed of the nature and cause of the accusation" against him, U.S. Const. amend. VI, and fundamental principles of justice abhor trial by ambush, *see, e.g.*, *United States v. Kelly*, 420 F.2d 26, 29 (2d Cir. 1969) (condemning "a trial by ambush"); *United States v. Gallo*, 654 F. Supp. 463, 480 (E.D.N.Y. 1987) ("Precision, accuracy, and fairness suffer under a system of 'trial by ambush.'").  Thus, "real notice of the true nature of the charge against" the defendant is "the first and most universally recognized requirement of due process."  *Smith v. O'Grady*, 312 U.S. 329, 334 (1941).

For these reasons, Federal Rule of Criminal Procedure 7(f) entitles a defendant to a bill of particulars where "[a]n indictment . . . is . . . insufficient to permit the preparation of an adequate defense." *United States v. Rigas*, 490 F.3d 208, 237 (2d Cir. 2007) (internal quotation marks omitted).  Bills of particulars serve "to identify with sufficient particularity the nature of the charge pending against [the defendant], thereby enabling [him] to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (per curiam); *accord United States v. Davidoff*, 845 F.2d 1151, 1154–55 (2d Cir. 1988).

Whether to grant a bill of particulars involves a fact-specific inquiry that "rests within the sound discretion of the district court." *United States v. Bin Laden*, 92 F. Supp. 2d 225, 233 (S.D.N.Y. 2000), *aff'd sub nom. In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 93 (2d Cir. 2008).  "In deciding whether to exercise that discretion, a court must examine the totality of the information available to the defendant—through the indictment, affirmations, and general pretrial discovery—and determine whether, in light of the charges that the defendant is required to answer, the filing of a bill of particulars is warranted." *United States v. Murgio*, 209 F. Supp. 3d 698, 719 (S.D.N.Y. 2016) (Nathan, *J.*) (internal quotation marks omitted).

In fraud cases, courts frequently find that fairness demands that the government particularize the trades or transactions that constitute the charged fraud.  *See, e.g.*, *United States v. Nachamie*, 91 F. Supp. 2d 565, 571 (S.D.N.Y. 2000) (granting request for bill of particulars where government failed to specify which of thousands of Medicare claims "were false and in what way they were false"); Tr. at 10:10–16, *United States v. Johnson*, 17 Cr. 0482 (JSR) (S.D.N.Y. Oct. 11, 2017), ECF No. 40 (granting request for bill of particulars and directing the government to specify "the individual statements that the government will contend were false or

misleading" from among complex spreadsheets it produced previously); *United States v. Savin*, 00 Cr. 45 (RWS), 2001 WL 243533, at *3 (S.D.N.Y. Mar. 7, 2001) (ordering particulars where, "[a]bsent further information," defendant would "be forced to comb through [a] veritable mountain of [100,000 pages of] documents and to attempt to guess which of the numerous transactions documented therein, and conducted over a six-year period, are alleged by the government to have been improper"); *United States v. Chierchio*, No. 20 Cr. 306 (NGG), 2022 WL 523603, at *14 (E.D.N.Y. Feb. 22, 2022) (directing the government to "identify the transactions alleged to constitute money laundering in this case").

Such cases address the concern that exhaustive discovery productions can create a needle-in-a-haystack problem for defendants. *See, e.g.*, *United States v. Khalil*, No. 22 Cr. 20200 (MAG), 2024 WL 3160668, at *3–4 (E.D. Mich. June 25, 2024) (observing that "providing Defendants with a needle in a haystack is akin to not providing them with a needle at all" and directing the government to disclose "five categories of additional details"). The Second Circuit has cautioned that where the government produces voluminous discovery but does not specify which criminal acts it intends to prove, defendants may effectively be "forced to establish their innocence" such that "the burden of proof impermissibly [is] shifted to [defendants]." *Bortnovsky*, 820 F.2d at 574–75; *see also Bin Laden*, 92 F. Supp. 2d at 234 ("It is no solution to rely solely on the quantity of information disclosed by the government; sometimes, the large volume of material disclosed is precisely what necessitates a bill of particulars."). In such a circumstance, a bill of particulars should be granted to "condense[] the voluminous discovery produced by the prosecution into a form that apprise[s] [the defendant] of what the government would seek to prove at trial." *United States v. Ramirez*, 609 F.3d 495, 503 (2d Cir. 2010); *see Bortnovsky*, 820 F.2d at 574–75.

In other securities fraud cases, the government has obviated the need for bills of particulars by voluntarily identifying the trades at issue.  Gov.'s Mem. in Opp'n to Def.'s Disc. Mot. at 11, *United States v. Finnerty*, 05 Cr. 393 (DC) (S.D.N.Y. Nov. 15, 2005), ECF No. 18 ("[T]he Government has . . . identif[ied] *all* trades during the charged periods that . . . *are alleged to be violative*." (second emphasis added)); *United States v. Rajaratnam*, No. 09 Cr. 1184 (RJH), 2010 WL 2788168, at *9 n.4 (S.D.N.Y. July 13, 2010) (noting that, with respect to insider trading counts, "[t]he government has acknowledged its obligation to provide the defendants with the [illegal] trades that [it] allege[s] [the defendant] to have made").  Yet, in this case, the government has refused to provide these particulars to the defense.

## C.    The Court Should Order the Government to Identify the Allegedly Fraudulent Trades

The Court should require the government to identify the allegedly fraudulent trades to prevent surprise, enable Mr. Leech to prepare for trial, and avoid impermissible burden shifting.

### 1.    Neither the Indictment Nor the Discovery Identifies the Allegedly Fraudulent Trades

When presented with a motion for a bill of particulars, courts examine whether the information the defendant seeks is included in the indictment or discovery produced by the government.  *Bortnovsky*, 820 F.2d at 574 (ordering particulars is appropriate where "the information sought by defendant" is not "provided in the indictment or in some acceptable alternate form").  Here, neither the Indictment nor the discovery materials specify any trades Mr. Leech is alleged to have misallocated.

The Indictment alleges broadly that, over a 33-month period, Mr. Leech allocated an indeterminate number of unidentified trades in a fraudulent manner.  (Indictment ¶ 1).  It asserts

that U.S. Treasury futures and options trades that Mr. Leech allocated to Macro Opps "had net first day *gains* of over $600 million" and that U.S. Treasury futures and options trades that Mr. Leech "allocated specifically to the Core Strategies had net first day *losses* of over $600 million." (Indictment ¶ 5). But the Indictment does not claim that *all* of the trades that resulted in the unrealized first-day gains to Macro Opps or unrealized first-day losses to the Core Strategies were fraudulent. Nor does the Indictment provide sufficient information from which Mr. Leech could identify any of the trades that are alleged to have been allocated fraudulently.

The discovery produced by the government also fails to identify the allegedly fraudulent trades. Instead, the government produced the trade blotters that detail more than 33,000 U.S. Treasury futures and options trades purportedly allocated to the strategies referenced in the Indictment during the relevant period.

Without particulars, it will be impossible for Mr. Leech to determine which of these trades the government alleges were fraudulently allocated. Fairness demands that the government particularize what trades it alleges constitute the fraud charged in the Indictment.

### 2.    Without Particulars, Mr. Leech Will Be Unable to Answer the Charges

The Second Circuit has a "special sensitivity" to a defendant's need for particulars in complex cases. *See Chierchio*, 2022 WL 523603, at *14. Sensitivity is especially merited here. Defending any one of Mr. Leech's trades at trial will require detailed analysis of the relevant strategies' pre-existing positions both in U.S. Treasury assets (including cash bonds and derivatives[12]) and non-U.S. Treasury assets, their key metrics (duration and convexity) at the

---

[12] A cash bond refers to a debt security (*e.g.*, a U.S. Treasury bond or corporate bond) that is traded and settled in the cash (spot) market. A derivative is a financial contract that derives its

start of the day in question, how market developments affected those metrics, and what trades were necessary to manage the respective strategies in light of the market changes.[13]  In addition to these technical analyses, defending trades at trial will also require considering other materials produced by the government such as contemporaneous email correspondence evidencing strategy-specific trading objectives.  All this work must be performed manually and requires *extensive* input from experts in fixed income portfolio management.  As a result, it is not possible to perform this complex and time-consuming analysis for all—or even a meaningful portion—of the more than 33,000 trades recorded in the blotters before the April 6, 2026 trial date.  (Temkin Decl. ¶ 17).

In sum, absent a bill of particulars, Mr. Leech's defense will be forced to play a version of "whack-a-mole" in which it guesses which specific trade allocations it will have to prepare to defend at trial only to have the government argue that different trades, for which the defense has not prepared, were fraudulent.  Such a trial by surprise is manifestly unfair in a criminal case, and avoiding it is a primary purpose of a bill of particulars.

This concern for fundamental fairness often prompts courts to order bills of particulars in fraud cases.  *Bortnovsky* is the paradigmatic case decided by the Second Circuit.  There, the government charged the defendants with mail fraud and conspiring to defraud insurers by

---

value from the performance of an underlying asset, but ownership of a derivative does not involve ownership of the underlying asset.  *See* James Chen, *Treasury Bond: Overview of U.S.-Backed Debt Securities*, Investopedia (updated Aug. 3, 2025), https://www.investopedia.com/terms/t/treasurybond.asp; Jason Fernando, *Understanding Derivatives: A Comprehensive Guide to Their Uses and Benefits* (updated Aug. 14, 2025), Investopedia, https://www.investopedia.com/terms/d/derivative.asp.

[13] Because the Core Strategies' and Macro Opps' holdings were dramatically different, market changes often affected them differently, thereby necessitating different U.S. Treasury futures and options trades.

submitting fraudulent claims for "fake burglaries."  820 F.2d at 573–75.  Although the
government "set[] forth the essential elements of the mail fraud charges, provide[d] a list of the
suspect pieces of mail along with their approximate dates of mailing and addressees," and
produced over 4,000 documents, which undoubtedly contained the allegedly fraudulent claims, it
did not "specify the dates of the staged burglaries or enumerate which of numerous documents
were falsified." *Id*. at 574.  Defendants moved for a bill of particulars directing the government
to identify (1) the allegedly fraudulent documents and (2) which of the burglaries for which they
had filed claims were allegedly "fake." *Id*.  The district court denied the request.

Finding that this was error, the Court of Appeals vacated the convictions.  The court held
that, although the government had produced to the defendants all the insurance claims they
filed—that is, the universe in which the fraudulent claims could be found—the government's
refusal to identify which documents it alleged were fraudulent and which burglaries were fake
prevented the defendants from preparing effectively for trial.  The court explained how a lack of
particulars impermissibly shifted the burden to the defendants:

> [A]ppellants were hindered in preparing their defense by the district court's failure
> to compel the Government to reveal crucial information: the dates of the fake
> burglaries and the identity of the . . . fraudulent documents.  Appellants were forced
> to explain the events surrounding eight actual burglaries and to confront numerous
> documents unrelated to the charges pending.  In effect, *the burden of proof
> impermissibly was shifted to appellants* . . . .  The relevance of key events was
> shrouded in mystery at the commencement of and throughout the trial.  The
> Government *did not fulfill its obligation merely by providing mountains of
> documents to defense counsel* who were left unguided as to which documents would
> be proven falsified or which of some fifteen burglaries would be demonstrated to
> be staged.

*Id.* at 574–75 (emphasis added).

Complex fraud cases frequently cite *Bortnovsky* in granting motions for particulars.  For
example, in *Nachamie*, the indictment alleged that the defendants defrauded Medicare by

submitting falsified claims. Although the government had "produced over 200,000 pieces of paper in hundreds of boxes and files, relating to 2,000 Medicare claims," it had not "informed the defendants which of these claims were false and in what way they were false." *Nachamie*, 91 F. Supp. 2d at 571. Applying *Bortnovsky*, the district court held that the government's productions failed to comply "with its obligation to provide adequate notice to the defense," and it directed the government to provide a bill of particulars. *Id.* at 571, 574; *see also United States v. Vaid*, No. 16 Cr. 763 (LGS), 2017 WL 3891695, at *11 (S.D.N.Y. Sept. 5, 2017) (directing the government to identify "each individual [insurance] claim that the Government intends to prove was fraudulent"); *United States v. Hawit*, No. 15 Cr. 252 (PKC), 2017 WL 663542, at *11 (E.D.N.Y. Feb. 17, 2017) (directing the government to provide "a bill of particulars specifying the transactions . . . that the government will seek to prove were tainted by an unlawful conspiracy" because otherwise defendant would be "in the same position as the criminal defendants . . . in *Bortnovsky* and *Nachamie*: accused of having committed unlawful acts in connection with a category of transactions, but without being given notice of which specific transactions falling within that category are alleged to have been tainted by unlawful conduct" (citations omitted)).[14]

---

[14] Although not a fraud case, *United States v. Siddiqi*, No. 06 Cr. 377 (SWK), 2007 WL 549420 (S.D.N.Y. Feb. 21, 2007), is also instructive. In *Siddiqi*, the government alleged that the defendant accepted bribes in return for official acts. The district court granted the defendant's motion for a bill of particulars detailing the dates and amounts of the alleged bribes because "[i]n the absence of more specific information . . . [the defendant] w[ould] be unreasonably hampered in his ability to prepare a defense." *Id.* at *3. Specifically, the court explained, the defendant would "be [un]able to set forth a lawful purpose for the receipt of any alleged payment if he is unaware of when such payment was allegedly made and in what amount." *Id.*; *see, e.g.*, Min. of Mot. Hr'g at 3–4, *United States v. Carson*, No. 8:09 Cr. 77 (C.D. Cal. May 18, 2009), ECF No. 75 (ordering a bill of particulars identifying "[w]ith respect to each of the 236 alleged bribes not described in the Indictment," the "date" and "amount" of each payment, as well as "the name of the recipient and business affiliation of the recipient").

This case is on all fours with *Bortnovsky* and *Nachamie*.  Indeed, the amount of data here pales in comparison to the volume that mandated particulars in *Bortnovsky* and *Nachamie*. Without particulars, Mr. Leech will have to guess which trades the government claims were fraudulent and will be "forced to explain the events surrounding" more than 33,000 trades listed in the trade blotters, not just those that the government alleges were fraudulently allocated. *Bortnovsky*, 820 F.2d at 574–75.

### 3.    The Government Cannot Escape Its Obligation to Provide Sufficient Notice to Mr. Leech by Relying on "Scheme Liability"

In a letter to defense counsel, the government asserted that it need not provide particulars because it believes it needs "to prove that the defendant engaged in this fraudulent scheme, not that he misallocated a particular trade."  (Temkin Decl. Ex. 2 at 1).  This argument ignores the fundamental unfairness of accusing Mr. Leech with having engaged in a fraudulent "cherry-picking" scheme without identifying the trades that were purportedly "cherry-picked."[15]

Judge Rakoff rejected a similar argument in *United States v. Johnson*, 17 Cr. 0482 (JSR) (S.D.N.Y.).  In that case, the indictment alleged that the defendants perpetrated a multi-year fraud scheme in which they submitted complex spreadsheets containing allegedly false or misleading statements to banks.  The indictment, however, failed to specify which statements in

---

[15] The Indictment and the government's press release announcing charges against Mr. Leech characterized the crime charged as a "cherry picking" scheme.  (Indictment ¶ 1); Press Release, U.S. Attorney's Office for the Southern District of New York, *Former Chief Investment Officer of Global Bond Investment Firm Charged With Over $600 Million Investment Adviser Fraud* (Nov. 25, 2024), https://www.justice.gov/usao-sdny/pr/former-chief-investment-officer-global-bond-investment-firm-charged-over-600-million/ (quoting then-U.S. Attorney Damian Williams's allegation that Mr. Leech "used his position to cherry pick trades and prop up his favored but failing accounts at the expense of others"); *accord* Complaint at ¶ 1, *Securities and Exchange Commission v. Stephen Kenneth Leech*, 24 Cv. 9017 (KPF) (S.D.N.Y. Nov. 25, 2024), ECF No. 1.

the spreadsheets were allegedly false or misleading.  The defendants moved for a bill of particulars identifying this and other information.  The government opposed the motion, relying on its characterization of "the crimes alleged in the indictment [as] *schemes* to defraud."  Tr. at 6:22–23, *Johnson*, 17 Cr. 0482 (JSR) (S.D.N.Y. October 11, 2017), ECF No. 40 (emphasis added).  Judge Rakoff rejected this argument, observing that "one doesn't know what the scheme consists of until one knows what are the false or fraudulent representations, promises, etc., in this case, statements."  *Id*. at 7:6–8.  The court explained that "[i]n order to prove a scheme to defraud, [the government is] going to have to prove that certain statements were intentionally false . . . . Therefore, how can [the defendants] possibly prepare if they don't know what statements you're saying are false?"  *Id*. at 7:11–15; *see id.* at 9:6–9 (reiterating that the defendants needed to know the spreadsheet entries that the government alleged were false to "prepare to meet [the] charge").  Similarly, Mr. Leech cannot prepare to meet the charges without notice of the specific conduct underlying the scheme: the allegedly misallocated trades.

### 4.    The Government's Disclosure Obligations Reinforce the Need for Particulars

The government's *Brady* obligations reinforce the need for particulars in this case.  As far as the defense is aware, the government does not have a cooperating witness who will testify that he or she engaged in misconduct with Mr. Leech and there are no contemporaneous documents describing dishonest allocations by Mr. Leech.  Rather, based on the Indictment, it appears that the government will rely on an alleged statistical pattern and invite the jury to infer that Mr. Leech allocated trades fraudulently.  Defending against such allegations and explaining the rationale underlying specific trade allocations can only be done if the government identifies the trades on which the purported statistical pattern is calculated.  In addition, the government must

disclose evidence of trades included in the purported pattern that *were not* fraudulent, because such trades would tend to undermine the inference of guilt the government asks the jury to draw from the purported pattern.  *See Brady v. Maryland*, 373 U.S. 83 (1963); *Leka v. Portuondo*, 257 F.3d 89, 103 (2d Cir. 2001).  The government's voluminous productions to date do not satisfy its *Brady* obligations.  *See United States v. Thomas*, 981 F. Supp. 2d 229, 239 (S.D.N.Y. 2013) (the government "cannot hide *Brady* material as an exculpatory needle in a haystack of discovery materials").  This deficiency reinforces the need for particulars.

### D.    The Government Should Be Ordered to Identify All Alleged Misstatements or Omissions

Independent of its decision with respect to the request for particulars specifying the allegedly fraudulent trades, the Court should direct the government to identify any statements it alleges were false or rendered false or misleading by a material omission.  This information is essential to inform Mr. Leech of the nature of the charges against him, and it is not included in the Indictment or clear from the discovery produced to date.

The Indictment alleges that Mr. Leech "ma[de] an untrue statement of material fact and omitt[ed] to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  (Indictment ¶ 28).  In a letter dated April 11, 2025, the government asserted that the "criminal fraud" alleged is "a material misrepresentation or omission."  (Temkin Decl. Ex. 2 at 1 (internal quotation and alteration marks omitted)).

But the government has refused to identify the misleading statements that constitute the criminal fraud alleged.  Instead, the government has identified general categories of statements—such as "[c]ommunications to clients about performance and compliance," "client diligence

reviews," and SEC filings—and claims that it need not identify the statements at issue because it already produced "numerous communications the defendant, directly or indirectly, made to clients that were misleading." (Temkin Decl. Ex. 4 at 2–3). And the government went further, asserting that it need not prove at trial "a specific representation that was fraudulent, or a representation that was misleading because it omitted certain information." (*Id.* at 1).

"A defendant faced with false statements charges should not have to waste precious pre-trial preparation time guessing which statements he has to defend against . . . when the government knows precisely the statements on which it intends to rely and can easily provide the information." *United States v. Trie*, 21 F. Supp. 2d 7, 21 (D.D.C. 1998); *see Siddiqi*, 2007 WL 549420, at *3 ("[W]here defendants have prepared multiple statements or documents, the Government should specify which of these are being called into question, lest defendants be forced to review all of the statements or documents in order to prepare a defense of the veracity of each." (citing *Bortnovsky*, 820 F.2d at 575; *Nachamie*, 91 F. Supp. 2d at 571, 574–75; *Trie*, 21 F. Supp. 2d at 21–22)).

In this case, the voluminous discovery contains tens of thousands of pages of documents that the government might attempt to characterize as false or misleading client communications. The challenge faced by the defense in identifying which statements the government may have in mind is exacerbated by the government's strained and strange assertion that it need not prove "a specific representation that was fraudulent, or a representation that was misleading because it omitted certain information." (Temkin Decl. Ex. 4 at 1). Mr. Leech is entitled to know which statements the government will argue underlie the fraud charged so that he need not "waste precious pre-trial preparation time guessing which statements he has to defend against." *Trie*, 21 F. Supp. 2d at 21.

\* \* \*

Without particulars regarding both the trades and statements at issue, Mr. Leech faces the impossible task of preparing to defend both the bona fides of over 33,000 trades in the complicated realm of fixed-income portfolio management and the truth and completeness of every statement he made to Western's clients over a 33-month period. This Court should not permit the government to shift the burden of proof to Mr. Leech in this fashion. *See Bortnovsky*, 820 F.2d at 574–75.

## II.    The Allegation of a $1.2 Billion Differential Should Be Stricken as Surplusage

Paragraph 5 of the Indictment alleges that the trades Mr. Leech "allocated specifically to Macro Opps had net first day *gains* of over $600 million" and the trades that he "allocated specifically to the Core Strategies had net first day *losses* of over $600 million." (Indictment ¶ 5). This aggregate $1.2 billion differential assumes that Mr. Leech misallocated each and every trade that resulted in either unrealized first-day gains to Macro Opps or unrealized first-day losses to the Core Strategies. The government, however, has not alleged that Mr. Leech did so. Nor can it. Accordingly, any suggestion that the alleged fraudulent scheme accounted for a $1.2 billion differential would both be misleading and unfairly prejudicial. *See United States v. Finnerty*, 474 F. Supp. 2d 530, 546 (S.D.N.Y. 2007) (Chin, *J.*) (holding that the government's "repeated reference to the 26,300 instances of" alleged market manipulation, which "formed the cornerstone of the Government's argument that [the defendant] engaged in securities fraud[,] . . . . was severely prejudicial" in light of evidence that the defendant was not responsible for several of the trades included in the 26,300 figure), *aff'd*, 533 F.3d 143 (2d Cir. 2008). The allegation is also misleading because the $1.2 billion differential is the sum of the trades' *unrealized* first-day performance. Because the trades generally were held for significantly longer

periods, any purported gains or losses represented by the first-day performance were uncertain and speculative.

Pursuant to Rule 7(d) of the Federal Rules of Criminal Procedure, allegations in an indictment should be stricken as surplusage if they "are not relevant to the crime charged and are inflammatory and prejudicial." *United States v. Scarpa*, 913 F.2d 993, 1013 (2d Cir. 1990) (internal quotation marks omitted). Here, the allegations regarding the unrealized first-day performance of trades allocated to the Core Strategies and Macro Opps are irrelevant and highly prejudicial and should therefore be stricken as surplusage.[16]

## III. The Court Should Order the Government to Provide Discovery and Should Conduct a Hearing to Determine Whether the Government's Deficient Taint Team Process Warrants Relief

The government frequently uses search warrants to obtain the contents of personal email accounts of targets of white-collar criminal investigations. (Temkin Decl. ¶ 22). In early 2024, the government obtained the contents of Mr. Leech's Apple and Google accounts, including thousands of his personal emails, text messages, and other electronic records. Despite knowing that Mr. Leech was represented by counsel in connection with the subject matter of its investigation, the government employed a flawed taint team review process that resulted in the prosecutors assigned to the case accessing privileged materials on at least seven separate occasions.

---

[16] While the defense believes this allegation can and should be stricken on the present record, it recognizes that the Court may prefer to reserve judgment until the defense's anticipated motion *in limine* addressing the issue. *See* Wright & Miller, *Federal Practice & Procedure: Criminal* § 128 n.39 (5th ed.) ("Because allegations should not be stricken as surplusage unless it is clear that they are not relevant and are inflammatory and prejudicial, it is proper to reserve ruling on a motion to strike until the trial court has heard evidence that will establish the relevance of the allegedly surplus language."); *see also Scarpa*, 913 F.2d at 1012–13.

While the use of taint teams in criminal investigations has become commonplace, courts in the Second Circuit and across the country have repeatedly cautioned the government against using precisely the type of procedure employed here.  As discussed in greater detail below, although the government has informed counsel that it does not intend to introduce the warrant returns at trial,[17] this Court should not countenance the government's intrusion on Mr. Leech's privileges.  Rather, we ask the Court to order the government to produce discovery regarding the taint team procedures and the nature and extent of the government's breach of Mr. Leech's privileges, and to order a hearing at which counsel can develop the record and enable the Court to decide what remedies are warranted, including potentially dismissal or disqualification of the prosecutors or agents who have been tainted by exposure to privileged materials.

### A.    Relevant Facts

#### 1.    Western's Outside Counsel Investigation

In October 2023, Western retained outside counsel to conduct an investigation into trades that Mr. Leech executed for the Core Strategies and Macro Opps (the "Outside Counsel Investigation").  (Temkin Decl. ¶ 11).  Mr. Leech immediately retained counsel who, in turn, retained several experts to assist him in his representation of Mr. Leech with respect to matters relating to Mr. Leech's trade allocations.  (*Id.*).  In or around late October 2023, Mr. Leech stopped trading for the Core Strategies.  (*Id.* ¶ 12).  As a practical matter, this terminated even the possibility of any sort of preferential allocations between the Core Strategies and Macro Opps.

---

[17] The government has, however, reserved the right to contest defense counsel's privilege assertions and, if successful on such challenges, to use at trial additional documents to which it obtains access.  (Temkin Decl. Ex. 13 at 2, Ex. 14 at 1).

### 2.    The SEC's Investigation

On or about November 6, 2023, the Los Angeles Regional Office of the SEC opened a

formal investigation into certain trades and allocations done at Western and issued subpoenas for

documents and informal document requests for personal records connected to Mr. Leech, his

family members, and entities connected to him.  (Temkin Decl. ¶ 13).  Through counsel, Mr.

Leech started discussions with the SEC's staff on or about November 14, 2023, and he made

nine separate document productions between December 6, 2023 and April 1, 2024.  (*Id.*).  These

productions amounted to more than 1,000 pages of documents.  (*Id.*).  On March 6, 2024, Mr.

Leech appeared and gave testimony at the SEC's Los Angeles Regional Office in Los Angeles,

California at which his counsel was present and stated their appearances on the record.  (*Id.*

¶ 14).

### 3.    The Search Warrants

Unknown to Mr. Leech and his counsel, on or about February 28, 2024, the government

obtained search warrants requiring Apple and Google to produce emails, text messages, and

other materials for three accounts associated with Mr. Leech for the period January 1, 2021 to

February 28, 2024.  (Temkin Decl. ¶ 22).  The affidavit submitted in support of the search

warrant application disclosed the existence of the Outside Counsel Investigation but made no

reference to Mr. Leech's cooperation with it or his representation by counsel and did not propose

any protocol for preserving the attorney-client privilege, the work-product doctrine, or any other

relevant privilege.  (*Id.* ¶ 23).

On March 7, 2024, the day after Mr. Leech's SEC testimony, Google produced 16,036

emails and 14,289 other records, including Google search history, to the government.  (*Id.* ¶ 24).

Separately, Apple produced another 999 emails, 1,311 text messages, and 2,464 other records.

(*Id.*).  Thus, altogether, the government obtained 17,035 emails, 1,311 messages, and 16,753 other records from Mr. Leech's Apple and Google accounts.  (*Id.*).

### 4.    The Government's Flawed Taint Team Process

By email dated September 9, 2024, the government informed Mr. Leech's counsel that it had "obtained materials on which [it was] conducting a privilege review" and requested "a list with the names and contact information of any people with whom you believe Mr. Leech has had privileged communications."  (Temkin Decl. Ex. 5 at 1).  In response, by letter dated September 24, 2024, Mr. Leech's counsel provided the requested information and asked the government for details as to "the process the Office intends to use to ensure that potentially privileged material is not reviewed or otherwise considered in connection with the government's investigation." (Temkin Decl. Ex. 6 at 1).  On February 6, 2025, more than four months after that request and over two months after the Indictment was returned, the government responded by disclosing sparse details regarding its privilege review protocols "as a courtesy and to assist [counsel's] preparation and analysis."  (Temkin Decl. Ex. 8 at 1).

As described by the government, the review process involved a filter team (the "Filter Team") which used "search terms and a manual review process to identify materials that may potentially be protected by the attorney-client privilege or the work-product doctrine."  (Temkin Decl. Ex. 7 at 1).  The Filter Team deliberately did not screen for "materials protected by marital privilege," (Temkin Decl. Ex. 8 at 1 n.1), thereby ensuring that the AUSAs assigned to the case (the "Prosecution Team") would (and did) review Mr. Leech's communications with his wife of 40 years.  After conducting its review, the Filter Team passed materials to the Prosecution Team. (*Id.* at 1–2).  The government added that: "As is the Government's usual practice, the Filter Team and the prosecution team agreed that, if members of the prosecution team identified any

26

material during the responsiveness review that appeared to be potentially privileged, the prosecution team would immediately pause its review and notify the Filter Team, so the Filter Team could conduct a supplemental privilege review, if necessary."  (*Id.* at 2).

Through subsequent correspondence, the government disclosed that its process was deeply flawed.  In a letter dated June 11, 2025, the government informed counsel that, on seven separate occasions, the Taint Team released privileged materials to the Prosecution Team.  This happened on four occasions with respect to materials produced by Google (the "Google Returns") and three occasions with respect to materials produced by Apple (the "Apple Returns").  (Temkin Decl. Ex. 10 at 5–7).

With respect to the Google Returns:

- The Taint Team first released data from the Google Returns to the Prosecution Team in April 2024.

- The Prosecution Team paused its review on or about April 19, 2024 and asked the Filter Team to review materials that might be privileged.  The Filter Team identified and segregated additional items as potentially privileged and then released the remaining materials to the Prosecution Team on or about April 22, 2024.

- The next day, on or about April 23, 2024, the Prosecution Team again paused its review of the Google Returns and asked the Filter Team to review materials that might be privileged.  The Filter Team identified and segregated additional items as potentially privileged and then released the remaining materials to the Prosecution Team on or about April 26, 2024.

- Approximately three weeks later, on or about May 14, 2024, the Prosecution Team paused its review of the Google Returns yet again and asked the Filter Team to review materials that might be privileged.  The Filter Team identified and segregated additional items as potentially privileged and then released the remaining materials to the Prosecution Team the next day, on or about May 15, 2024.

- Finally, the Prosecution Team paused its review of the Google Returns on or about July 24, 2024 and asked the Filter Team to review materials that might be privileged.  The Filter Team identified and segregated additional items as

potentially privileged, then released the remaining materials to the Prosecution
Team on or about July 29, 2024.

(*Id.* at 5–6).

The review of the Apple Returns was similarly tainted:

- The Taint Team first released data from the Apple Returns to the Prosecution
  Team in August 2024.

- The Prosecution Team paused its review of the Apple Returns on or about August
  9, 2024 and asked the Filter Team to review materials that might be privileged.
  The Filter Team identified and segregated additional items as potentially
  privileged and then released the remaining materials to the Prosecution Team on
  or about August 15, 2024.

- That same day, the Prosecution Team again paused its review of the Apple
  Returns and asked the Filter Team to review materials that might be privileged.
  The Filter Team identified and segregated additional items as potentially
  privileged and then released the remaining materials to the Prosecution Team on
  or about August 23, 2024.

- Less than a week later, on August 29, 2024, the Prosecution Team paused its
  review of the Apple Returns yet again and asked the Filter Team to review
  materials that might be privileged.  The Filter Team identified and segregated
  additional items as potentially privileged and then released the remaining
  materials to the Prosecution Team on or about September 6, 2024.

(*Id.* at 5–7).

Significantly, the Prosecution Team not only knew that Mr. Leech was represented by

counsel in connection with the Outside Counsel Investigation and the SEC investigation when it

started reviewing the Google Returns but also, on June 12, 2024, the government contacted Mr.

Leech's counsel in connection with its investigation.  (Temkin Decl. ¶ 25).  Although Mr.

Leech's counsel and the Prosecution Team were in frequent communication through the summer

and fall of 2024, (*id.*), the Prosecution Team continued to employ the flawed privilege review

process without seeking the input of defense counsel.  Indeed, four of the seven occasions on

28

which the Taint Team improperly released information to the Prosecution Team occurred after the Prosecution Team was in regular contact with defense counsel.

Perhaps belatedly recognizing the fatal flaws in the process it had been utilizing for six months, in or around September 2024, the government paused its review of the Apple and Google Returns and, for the first time, asked Mr. Leech's counsel for the names of individuals with whom Mr. Leech had privileged discussions.  (Temkin Decl. Ex. 8 at 2).  The government subsequently provided counsel access to the Apple and Google Returns.  Mr. Leech asserted privilege over certain materials on November 26, 2024 and December 20, 2024.  (Temkin Decl. ¶ 29).  The government later informed counsel that it segregated all materials that (i) were withheld by the Filter Team and (ii) over which Mr. Leech has asserted privilege.  (Temkin Decl. Exs. 8, 12).

Through counsel, Mr. Leech sought information regarding the nature of the Taint Team review and the improper disclosure of privileged materials to the Prosecution Team.  (Temkin Decl. Ex. 11 at 8).  The government generally refused to provide the requested information.  (Temkin Decl. Ex. 12 at 2).

The government did, however, disclose that the Prosecution Team accessed 231 documents from the Google Returns over which Mr. Leech, when given an opportunity, asserted privilege.  These documents include:

- 14 emails with the subject line "privilege";

- One email with the subject line "RFH Work Product";[18]

---

[18] RFH refers to Mr. Leech's counsel Ralph F. Hirschmann, Esq. in connection with the Outside Counsel Investigation and the pre-charging phases of both the SEC and the DOJ investigations. (Temkin Decl. ¶ 32).

- 83 documents exchanged between Mr. Leech and his wife, Eileen;

- 41 emails between Mr. Leech and experts retained by counsel; and

- 104 documents or draft documents that Mr. Leech prepared at the direction of counsel and sent to himself in the form of emails.[19]

(Temkin Decl. ¶ 32 & Ex. 10).

Mr. Leech has asserted privilege over 835 documents in the Apple Returns, including numerous substantive communications with counsel and experts retained by counsel. (Temkin Decl. ¶ 32). The government has, however, informed defense counsel that it is unable to recreate which of those documents were improperly released to the Prosecution Team. (Temkin Decl. Ex. 10 at 7 (noting that, "[u]nlike the Google Returns, the Government is unable to similarly audit the items that the Prosecution Team viewed in the Apple Returns because the Apple Returns were primarily reviewed in the Cellebrite tool")). Notwithstanding its inability to identify the specific documents reviewed by the Prosecution Team, the government asserts that its "records indicate that the types of materials the Prosecution Team came across in the Apple Returns would fall into the same categories of materials that the Prosecution Team viewed in the Google Returns." (*Id.*).

During a conversation on July 22, 2025, the government confirmed that it "will not use any of the materials to which [the Prosecution Team] currently has access at trial for any purpose, including in the government case in chief, as impeachment material, or in any rebuttal case by the government, and that this position is not contingent on the defense refraining from making a motion regarding the Search Warrant Materials." (Temkin Decl. Ex. 13 at 2, Ex. 14 at

---

[19] The documents referenced in this list exceed the 231 documents accessed by the government because certain documents fall into more than one category.

1). As noted above, *see supra* note 17, the government added that, if Mr. Leech "makes a motion regarding the Search Warrant Materials, the government reserves the right to (1) contest the defense's privilege designations regarding the Currently Segregated Materials, (2) affirmatively seek rulings from the Court on the defendant's privilege claims over the [currently segregated materials], and (3) use the Currently Segregated Materials at trial for any purpose." (*Id.*).

### B.    Applicable Law

Where, as here, potentially privileged documents are seized during an investigation, it is incumbent on the government to implement a review procedure to prevent the prosecutors and agents responsible for the investigation from accessing potentially privileged information. The Justice Department has recognized that courts "have expressed discomfort with filter teams" and "have generally indicated that evidence screened by a filter team will be admissible only if the government shows that its procedures adequately protected the defendants' rights and no prejudice occurred." U.S. Dep't of Just., *Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations* 110–11 (2009), http://www.cybercrime. gov/ssmanual/02ssma.html.

Indeed, some courts have determined that where, as here, the government opts to employ a filter team, as opposed to the more traditional alternatives of *in camera* or special master review, it bears the burden of rebutting the presumption that the prosecution team was exposed to privileged materials. *See United States v. Neill*, 952 F. Supp. 834, 840–41 (D.D.C. 1997). As Judge Hens Green explained in *Neill*:

> While the parties dispute whether courts have sanctioned the Department of Justice's 'taint team' procedures, it is clear that the government's affirmative decision to invoke these procedures constitutes a per se intentional intrusion . . . .

> Where the government chooses to take matters into its own hands rather than using the more traditional alternatives of submitting disputed documents under seal for *in camera* review by a neutral and detached magistrate or by court-appointed special masters . . . it bears the burden to rebut the presumption that tainted material was provided to the prosecution team.

*Id.*[20]

To the extent courts in this Circuit have approved the use of filter reviews, they have done so under circumstances vastly different from the approach taken by the government here. In the vast majority of Southern District cases rejecting challenges to filter reviews, judges have relied on the facts that the government either conferred with the privilege holder or obtained judicial approval of the review protocol, or both, *before* the filter review started.

For example, in *United States v. Sharma*, defendants moved to dismiss the indictment or, in the alternative, disqualify the AUSAs and appoint an independent examiner to review documents seized from a messaging service, when 21 privileged documents were improperly released by the filter team. No. 18 Cr. 340 (LGS), 2019 WL 3802223, at *5 (S.D.N.Y. Aug. 13, 2019). In denying the defendants' motion, the court emphasized that the defendants had agreed to the filter review protocol before the government reviewed any documents. *Id.* Challenges have similarly been rejected when defendants were aware of and had the opportunity to object to

---

[20] Numerous courts have highlighted the risks the government takes when it relies on a filter team to determine that a document is not privileged and can be disclosed to the prosecution. *See, e.g.*, *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 178 (4th Cir. 2019), *as amended* (Oct. 31, 2019) (criticizing filter protocol for leaving "the government's fox in charge of guarding the [privilege-holder's] henhouse"); *United States v. Ritchey*, 605 F. Supp. 3d 891, 903 (S.D. Miss. June 3, 2022) (enjoining the government from employing a filter team protocol that gave it "unilateral" authority to decide what was privileged before turning material over to the prosecution team); *see United States v. Kaplan*, No. 02 Cr. 883 (DAB), 2003 WL 22880914, at *12 (S.D.N.Y. Dec. 5, 2003) (expressly disapproving of the use of a filter team when "potentially privileged materials are turned over to the trial team and case agents before any challenge to those determinations can be raised by a Defendant and determined by a court").

the use of a filter team before the government began its review.  *See, e.g.*, *United States v. Feng Ling Liu*, No. 12 Cr. 934 (RA), 2014 WL 101672, at *12 (S.D.N.Y. Jan. 10, 2014) (rejecting challenge to use of filter team when government offered to provide defense counsel with details of its proposed review procedure and defendants failed to object to procedure before government began its review).

Courts have also rejected challenges to filter reviews where the government obtained judicial approval of the use of a filter team, in either an *ex parte* or an adversarial setting, before the commencement of the filter review.  *See, e.g.*, *United States v. Avenatti*, 559 F. Supp. 3d 274, 281–82 (S.D.N.Y. 2021) (use of filter team disclosed in search warrant application); *Feng Ling Liu*, 2014 WL 101672, at *12 (search warrant affidavits "spell[ed] out in detail the wall procedure"); *United States v. Grant*, No. 04 Cr. 207 (BSJ), 2004 WL 1171258, at *1 (S.D.N.Y. May 25, 2004) (court rejected defendants' challenge to terms of filter protocol *before* government started reviewing contents of documents).

In *Avenatti*, for example, Judge Furman held that the government was generally "entitled to rely on [the court's] approval" of the use of a filter team because the government disclosed its intent to use a filter team in the search warrant application.  559 F. Supp. 3d at 281–82.[21]  Judge

---

[21] Courts outside the Second Circuit have criticized the government for implementing filter reviews without first seeking the privilege-holder's approval "by an informal, good-faith resolution" with counsel, including the proposed protocol in a search warrant application, or otherwise obtaining court approval in an adversarial context, before turning over documents to the prosecution team.  *See, e.g.*, *In re Ethics Investigation of Allegations Raised by UDF*, No. 4:22-MC-01-O, 2023 WL 3327251, at *20 (N.D. Tex. Feb. 6, 2023) (criticizing government for implementing filter team without informing privilege-holder or court of filter team protocol), *report and recommendation adopted*, No. 4:22-MC-01-O, 2023 WL 3322586 (N.D. Tex. May 9, 2023); *Ritchey*, 605 F. Supp. 3d at 901, 903 (finding filter review protocol inadequate for creating the appearance of non-neutrality, citing that the search warrant "did not mention a potential filter team protocol," that "[a]fter executing the [warrant] . . . , the Government did not

Furman further noted that the court-approved review protocols employed by the government

ensured that the privilege holders would receive "notice and the opportunity to raise objections

with the court before potentially privileged materials are disclosed to members of the prosecution

team." *Avenatti*, 559 F. Supp. 3d at 284; *see also United States v. Combs*, No. 24 Cr. 542 (AS),

2025 WL 485377, at *5 (S.D.N.Y. Feb. 12, 2025) (denying relief under the Sixth Amendment

but nonetheless recommending that filter team clear potentially privileged documents with

defense counsel before turning them over to prosecution team).[22]

Here, the government did not employ any of the safeguards suggested by the other cases:

it did not consult with Mr. Leech's counsel before initiating its review, seek judicial imprimatur

of a review protocol in its search warrant application, or offer Mr. Leech's counsel the

opportunity to review documents before they were released to the Prosecution Team.  The

---

seek court preapproval or an informal agreement with the defendant," and that the defendant was
not "fully aware of the filter team protocol" until over a year after the warrant was executed); *see
also* Elizabeth Williams, *Attorney-Client Privilege: Use of Taint or Filter Teams in Federal
Investigations and Prosecutions*, 74 A.L.R. Fed. 3d Art. 5 (2022) ("[T]he government typically
seeks court preapproval of its filter team protocol in an adversarial context or an informal, good
faith resolution with the defendant . . . .").

[22] Courts outside the Second Circuit have likewise recognized that the opportunity to review and
object prior to the release of potentially privileged documents mitigates the risk that a filter team
will inadvertently provide privileged materials to the team conducting the investigation. *See, e.g.*,
*In re Sealed Search Warrant & Application for a Warrant by Tel. or Other Reliable Elec. Means*,
11 F.4th 1235, 1249 (11th Cir. 2021) (deeming filter protocol sufficient when it required the
privilege-holders' "permission or court order for any purportedly privileged documents to be
released to the investigation team"); *In re Search Warrants*, No. 21 Cv. 04968 (SDG), 2021 WL
5917983, at *6 (N.D. Ga. Dec. 15, 2021), *on reconsideration in part*, No. 21 Cv. 4968 (SDG),
2022 WL 19075290 (N.D. Ga. Mar. 2, 2022) (imposing modified protocol that permitted
privilege-holders to review all documents before their production to prosecution team, and
required submission of disputed items submitted to court or special master for privilege
determination).

government must bear the consequences of its use of a flawed process that resulted in the Prosecution Team being exposed to privileged materials.

### C.    The Government's Deficient Taint Team Process Resulted in the Prosecution Team Accessing Privileged Communications

The government taint team process was deficient and resulted in the Prosecution Team accessing privileged materials.  By the government's own admission, the review protocol wholly disregarded Mr. Leech's spousal privilege and the Prosecution Team was given full access to Mr. and Mrs. Leech's communications.  Moreover, on at least seven distinct occasions between April and September 2024, the Prosecution Team determined it was necessary to pause its review of documents released by the Taint Team because it had released privileged materials.  Indeed, the Prosecution Team accessed at least 231 privileged documents from the Google Returns and countless others from the Apple Returns, which cannot be identified due to the government's use of a review platform that does not permit an audit trail.

The presumption of taint due to the Prosecution Team's review of privileged documents, *see Neill*, 952 F. Supp. at 840–41, is reinforced by the government's inability to identify documents to which it was improperly given access.  The government plainly should not get the benefit of the doubt when its systems were inadequate to memorialize the extent of its intrusion into Mr. Leech's privileges.

Moreover, through the search warrants, the government sought Mr. Leech's personal communications, not only for the period of the alleged misconduct, but through the end of February 2024, four months after Mr. Leech had ceased allocating trades to both the Core Strategies and Macro Opps (and therefore after any alleged misconduct had concluded).  The government further knew that, during the additional four months, Mr. Leech was cooperating

with both Western's Outside Counsel Investigation and the SEC's investigation of alleged misallocations and that Mr. Leech was represented by counsel in connection with those investigations.  Finally, it knew or should have known that, given the nature of the investigations, competent counsel would have retained experts to assist them in analyzing the tens of thousands of trades at issue.

These factors warranted a heightened scrupulousness in identifying and protecting privileged communications.  But far from exercising caution, the government waited more than six months (until September 2024) before notifying Mr. Leech's counsel of the search warrants and, during this period, the Prosecution Team was repeatedly given access to privileged communications due to a fundamentally flawed taint team process.

### D.    This Court Should Order the Government to Produce Discovery and Should Hold an Evidentiary Hearing to Determine the Nature and Scope of the Government's Violation of Mr. Leech's Rights

In *United States v. Schwimmer*, 924 F.2d 443 (2d Cir. 1991) ("*Schwimmer II*"), the Second Circuit established the standard to be applied when the government intrudes into a criminal defendant's attorney-client relationship.  *See United States v. Tournant*, No. 22 Cr. 276 (LTS), 2023 WL 5276776, at *13 (S.D.N.Y. Aug. 15, 2023) (applying *Schwimmer II* in the context of "violations of the attorney-client privilege that occur pre-indictment").  In *Schwimmer II*, the court noted that where the government's intrusion on the attorney-client privilege is "manifestly and avowedly corrupt," dismissal is required even without a showing of prejudice. 924 F.2d at 446–47.

The "manifestly corrupt" standard does not implicate "corruption" as that term is commonly understood.  Rather, "[i]n cases which have found manifest corruption, the record showed a clear, intentional, and flagrant intrusion by the government into the realm of attorney-

client privilege." *Tournant*, 2023 WL 5276776, at *14 (S.D.N.Y. Aug. 15, 2023) (citing

authorities). In cases in which prosecutors have been exposed to a defendant's privileged

communications, the government must meet the standards established in *Kastigar v. United*

*States*, 406 U.S. 441 (1972), and "demonstrate that the evidence it uses to prosecute an

individual was derived from legitimate, independent sources." *Schwimmer II*, 924 F.2d at 446;

*see, e.g.*, *United States v. Landji*, No. 18 Cr. 601 (PGG), 2021 WL 5402288, at *28 (S.D.N.Y.

Nov. 18, 2021) ("The same protection [applicable under *Kastigar*] applies where the

Government has obtained information protected by the attorney-client privilege.").

     While the circumstances described above strongly suggest that the government, at a

minimum, acted with reckless disregard of Mr. Leech's attorney-client privilege, given the

government's refusal to produce documents relating to the review protocol, including

communications between the Taint Team and the Prosecution Team, at this stage, the first step is

for this Court to order the government to produce discovery and hold an evidentiary hearing to

determine the appropriate remedy—which may consist of dismissal or disqualification of the

prosecutors or agents who have been tainted by exposure to privileged documents. Other courts

have conducted hearings to review the scope of privilege intrusions. *See United States v.*

*Sullivan*, No. 17 Cr. 00104 (JMS), 2020 WL 1815220, at *2 (D. Haw. Apr. 9, 2020) (requiring

multiple evidentiary hearings to determine taint team violations); *United States v. Esformes*, No.

16 Cr. 20549 (RNS), 2018 WL 5919517, at *1, 34 (S.D. Fla. Nov. 13, 2018) (finding taint team

violations and suppressing evidence after nine-day evidentiary hearing); *United States v. Bickle*,

No. 10 Cr. 00565 (RLH), 2011 WL 3798225, at *8 (D. Nev. July 21, 2011) (requiring

evidentiary hearing to "allow counsel to cross-examine on the taint procedures, and to make sure

that the government has not accessed privileged communications").

In each of these cases, the court held an evidentiary hearing to determine the nature of the government's filter team process.[23]  Mr. Leech is entitled to the same.  Counsel should have the opportunity to learn, at a minimum: (i) the search terms and procedures the Taint Team employed before releasing materials from the warrant returns to the Prosecution Team in April 2024; (ii) the communications between the Taint Team and the Prosecution Team on each of the seven occasions between April 19 and September 6, 2024, when the Prosecution Team viewed privileged documents that caused it to pause its review; (iii) communications among members of the Prosecution Team relating to privileged documents to which it was given access; (iv) the nature of the remedial measures (if any) implemented; and (v) the basis for the government's assertion that "records indicate that the types of materials the Prosecution Team came across in the Apple Returns would fall into the same categories of materials that the Prosecution Team viewed in the Google Returns" despite the government's inability to identify the Apple materials it viewed.  Each of these issues is directly relevant to determining the nature and full extent of the government's intrusion into Mr. Leech's privileges.

## IV.    The Court Should Dismiss Count Five for Lack of Venue

The United States Constitution "twice safeguards the defendant's venue right."  *United States v. Cabrales*, 524 U.S. 1, 6 (1998).  Article III guarantees a criminal defendant a trial "in the State where the said Crimes shall have been committed."  U.S. Const. art. III, § 2, cl. 3.  The Sixth Amendment similarly requires that "[i]n all criminal prosecutions, the accused shall enjoy

---

[23] In *United States v. Weigand*, 482 F. Supp. 3d 224, 246 (S.D.N.Y. 2020), Judge Rakoff determined that a taint team protocol is not discoverable under Rule 16(a)(1)(E) given the particular "circumstances" in that case.  That decision has no bearing on this case because, unlike here, there was no basis for the defendant in *Weigard* to allege that privileged information had been improperly disclosed.

the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law." U.S. Const. amend. VI.  Rule 18 of the Federal Rules of Criminal Procedure reinforces these constitutional guarantees, providing that "[u]nless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed."  Fed. R. Crim. P. 18; *see* Fed. R. Crim. P. 12(b)(3)(A)(i) (authorizing pretrial motion to dismiss for "improper venue").

When a federal statute does not specify how to determine where the crime was "committed," "[t]he *locus delicti* must be determined from the nature of the crime alleged and the location of the act or acts constituting it."  *Cabrales*, 524 U.S. at 7–8 (citation omitted).  In such a situation, "[v]enue is proper only where the acts constituting the offense—the crime's 'essential conduct elements'—took place."  *United States v. Tzolov*, 642 F.3d 314, 318 (2d Cir. 2011) (quoting *United States v. Rodriguez–Moreno,* 526 U.S. 275, 280 (1999)).

With respect to Section 1001, venue is proper in the district where the statement was made.  *See United States v. Coplan*, 703 F.3d 46, 78 (2d Cir. 2012).  Additionally, the Second Circuit has held that materiality is an "essential conduct element" of Section 1001 and, thus, venue may also be proper in a district where the statement is received if "[p]roving the materiality of [the] false statements" "necessarily requires evidence that those statements were conveyed to or had an effect on [members of the government] working in" that district.  *Id.*; *United States v. Ramirez*, 420 F.3d 134 (2d Cir. 2005).

Count Five charges Mr. Leech with making false statements during testimony before the SEC, in violation of 18 U.S.C. § 1001(a)(1)–(2).  (Indictment ¶¶ 33–34).  Although the Indictment alleges that the purportedly false statements were made "in the Southern District of

New York and elsewhere," (*see* Indictment ¶ 34), the testimony was given in the Central District of California in connection with an investigation being conducted by the SEC's Los Angeles Regional Office relating to alleged conduct by Mr. Leech in California, (Temkin Decl. ¶¶ 13–14).  The Indictment does not discuss any connection to New York in relation to these statements other than generally alleging that the statements were made in "in the Southern District of New York and elsewhere."  (Indictment ¶ 34).[24]

In *United States v. Bin Laden*, 146 F. Supp. 2d 373 (S.D.N.Y. 2001), the defendant was charged in the Southern District of New York with making false statements under Section 1001 in two "face-to-face" interviews with the FBI in the Northern District of Texas.  *Id.* at 375–76.  In dismissing the false statements counts, Judge Sand distinguished *United States v. Candella*, 487 F.2d 1223 (2d Cir. 1973), which held that venue can be proper in both the district where a statement is made and the district where it was "recei[ved] by the appropriate federal authority."  *Id.* at 376.  In *Candella*, the false statements charges were predicated on documents executed in Brooklyn and delivered to New York City officials in Brooklyn, before being forwarded to Manhattan for review and processing.  *Id.*  Thus, the *Candella* court held that venue was proper in the Southern District because the offenses "had begun in the Eastern District" and "were complete upon their receipt in the Southern District."  *Id.*  In distinguishing *Candella*, Judge Sand held that the "allegedly false statements [in *Bin Laden*] . . . were uttered and received wholly inside" another district—that is, the offense "began, continued, and was completed" in

---

[24] The Court should dismiss Count 5 now because "the basis for the motion is . . . reasonably available and the motion can be determined without a trial on the merits." Fed. R. Crim. P. 12(b)(3).

Texas, rendering venue improper in the Southern District of New York. *Id.* at 376. Judge Sand's reasoning in *Bin Laden* warrants dismissal here.

Following *Bin Laden*, the Second Circuit addressed the proper venue for a false statements charge in *United States v. Coplan*, 703 F.3d 46 (2d Cir. 2012). Like *Candella*, *Coplan* is distinguishable from this case. In *Coplan*, the IRS conducted a promoter penalty audit of five tax shelters designed and implemented by employees at Ernst & Young in New York. *Id.* at 80. As part of the audit, the IRS interviewed various Ernst & Young employees, including one partner who was interviewed in Nashville, Tennessee, where he lived and worked. *Id.* at 76. Thereafter, the IRS transmitted the defendant's deposition transcript to New York where it was "reviewed and discussed by IRS officials in connection with the ongoing [Ernst & Young] audit." *Id.* at 80.

The Second Circuit held that, even though the defendant made the allegedly false statements in Nashville, venue was proper in the Southern District of New York because "[p]roving the materiality of [the] false statements . . . *necessarily require[d]* evidence that those statements were conveyed to or had an effect on [members of the government] working" on the Ernst & Young investigation in the Southern District of New York. *Id.* at 79 (emphasis added).[25]

---

[25] The Second Circuit has also held that use of the "substantial contacts" test is appropriate when the defendant argues that prosecution in this District will "result [ ] in a hardship to him, prejudice[ ] him, or undermine[ ] the fairness of his trial." *Coplan*, 703 F.3d at 80 (citation omitted); *United States v. Miller*, 808 F.3d 607, 622 (2d Cir. 2015) (noting that the substantial contacts test "examine[s] the offense's contacts with the forum district [which] 'offers guidance on how to determine whether the location of venue is constitutional, especially in those cases where the defendant's acts did not take place within the district selected as the venue for trial'" (quoting *United States v. Saavedra*, 223 F.3d 85, 93 (2d Cir. 2000))). The test considers (i) "the site of the defendant's acts," (ii) "the elements and nature of the crime," (iii) "the locus of the effect of the criminal conduct," and (iv) "the suitability of each district for accurate factfinding." *Coplan*, 703 F.3d at 80. These factors further support a finding that venue is improper in this District.

Here, unlike in *Coplan*, the government is not "necessarily require[d]" to show that the false statements had an effect on government investigators in the Southern District of New York in order to prove materiality. Rather, the statement at issue was made during SEC testimony given in Los Angeles in connection with an investigation being conducted by the SEC's Los Angeles Regional office. Any material effect the statements had on investigators was felt immediately in the room in Los Angeles at the time Mr. Leech testified. That the SEC may have sent the transcript of the testimony to federal prosecutors in this District is inapposite to the issue of materiality. Thus, as in *Bin Laden*, the alleged offense here "began, continued, and was completed in just one federal judicial district": the Central District of California.

Accordingly, the Court should dismiss Count Five of the Indictment for lack of venue pursuant to Fed. R. Crim. P. 12(b)(3)(A)(i).[26]

## CONCLUSION

For the foregoing reasons, the Court should issue an order:

(1) directing the government to serve on the defendant a bill of particulars;

(2) striking surplusage from the Indictment;

---

[26] To the extent this Court believes *Coplan* mandates a finding that venue is proper in this District, we respectfully submit that case was wrongly decided. Other Circuits addressing similar facts have held that venue is proper only in the district where the allegedly false statements were made. *See United States v. Fortenberry*, 89 F.4th 702, 706 (9th Cir. 2023); *United States v. Smith*, 641 F.3d 1200, 1207 (10th Cir. 2011) ("[T]he *locus delecti* [of a Section 1001 offense] is where the defendant makes the false statement."); *United States v. John*, 477 F. App'x 570, 572 (11th Cir. 2012) ("[V]enue is proper only in the district or districts where the defendant made the false statement."). As the Ninth Circuit noted in *Fortenberry*, characterizing materiality as an essential conduct element of Section 1001 in order to make venue proper in other districts raises serious constitutional concerns. 89 F.4th at 709 (noting that a "complex [Section 1001] case may involve investigators spread across several jurisdictions" and it would strain a defendant's rights under the Venue and Vicinage Clauses to find that "venue is proper in any one of those locations, irrespective of where the false statement was actually made").

(3) directing the government to produce specific discovery to be followed by a hearing into the government's taint team review procedure;

(4) dismissing Count Five of the Indictment for lack of venue; and

(5) granting such other relief as may be warranted.

Dated: August 22, 2025,                          MORVILLO, ABRAMOWITZ
       New York, New York                        GRAND, IASON & ANELLO, P.C.

                                                 */s/ Jeremy H. Temkin*
                                                 Jonathan S. Sack
                                                 Jeremy H. Temkin
                                                 Joshua Bussen
                                                 Nathaniel Sobel
                                                 Samuel W. Magaram
                                                 565 Fifth Avenue
                                                 New York, NY 10017
                                                 (212) 856-9600 (telephone)
                                                 (212) 856-9494 (facsimile)

                                                 *Attorneys for Defendant S. Kenneth Leech II*