UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------- x

                                              :

UNITED STATES OF AMERICA         :

                                              :

          - v. -                 :   24 Cr. 658 (GHW)

                                              :

S. KENNETH LEECH II,            :

                                              :

                  Defendant.     :

                                              :

                                              :

-------------------------------------------------- x

**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
IN OPPOSITION TO DEFENDANT'S PRETRIAL MOTIONS**

 

                                       SEAN BUCKLEY
                                        Attorney for the United States
                                        Southern District of New York

Thomas S. Burnett
Peter J. Davis
Assistant United States Attorneys

*- Of Counsel -*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND ............................................................................................................... 3

I.  The Defendant's Scheme to Favor His Preferred Clients ......................................... 3

    A.  Fixed Income Portfolio Management, U.S. Treasury Derivatives, and Trading......... 3

    B.  The Relevant Strategies and Accounts ....................................................................... 4

    C.  Leech Makes a Series of Poor Investment Decisions and Macro Opportunities Struggles .................................................................................................................. 6

    D.  WAMCO Trained Leech Not to Use His Trade Allocation Process to Favor Certain Clients ....................................................................................................................... 7

    E.  The Defendant's Trade Allocation Process Allowed Him to Observe How Trades Performed Before Allocating ..................................................................................... 9

    F.  Leech Used His Delayed Allocations to Favor Certain Clients Over Others ........... 10

    G.  Leech's False and Misleading Testimony to the SEC............................................... 13

II.  The Charges ............................................................................................................. 14

III.  Defense Motions ...................................................................................................... 14

ARGUMENT ................................................................................................................... 15

I.  The Court Should Deny Defendant's Demand for a Bill of Particulars ................................. 15

    A.  Applicable Law ......................................................................................................... 16

    B.  Discussion ................................................................................................................ 18

II. The Court Should Deny Defendant's Request to Strike Evidence of His Scheme from the Indictment ................................................................................................................. 43

    A.  Applicable Law ......................................................................................................... 43

    B.  Discussion ................................................................................................................ 45

III. The Court Should Deny Defendant's Request for Additional Discovery Regarding the Filter Team Because the Defendant Fails to Establish Privilege, Fails to Allege an Intentional Intrusion, and Fails to Allege Prejudice. .......................................................................... 46

    A.  Factual Background.................................................................................................... 47

    B.  Applicable Law ......................................................................................................... 52

C.   Discussion ............................................................................................................ 54

IV.   The False Statement Count Properly Alleges Venue ....................................................... 72

A.   Applicable Law .................................................................................................... 72

B.   Discussion ............................................................................................................ 73

CONCLUSION ............................................................................................................................ 75

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bice v. Robb*,
  511 F. App'x 108 (2d Cir. 2013)......................................................................... 57, 58

*Coplon v. United States*,
  191 F.2d 749 (D.C. Cir. 1951) ................................................................................. 61

*Grand Jury Subpoena of Ford v. U.S.*,
  756 F.2d 249 (2d Cir. 1985)..................................................................................... 66

*In re Grand Jury Subpoenas Dated March 19, 2022 and August 2,*
  *2002*, 318 F.3d 379 (2d Cir. 2003).......................................................................... 57

*In re Grand Jury Subpoenas*,
  454 F.3d 511 (6th Cir. 2006)................................................................................... 62

*In re Search Warrants Executed on Apr. 28, 2021*,
  No. 21 Misc.  (JPO), 2021 WL 2188150 (S.D.N.Y. May 28, 2021)........................ 52

*In re the Dratel Grp., Inc. & William M. Dratel*,
  SEC Release No. 77396, 2016 WL 1071560 (Mar. 17, 2016)................................. 19

*Kastigar v. United* States
  406 U.S. 441 (1972) ...................................................................... 66, 67, 69, 70

*Laird v. Integrated Res., Inc.*,
  897 F.2d 826 (5th Cir. 1990)................................................................................... 38

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
  601 U.S. 257 (2024) ................................................................................................ 39

*Montejo v. Louisiana*,
  556 U.S. 778 (2009) .......................................................................................... 52, 62

*Nat'l Educ. Training Grp., Inc. v. Skillsoft Corp.*,
  No. M8-85 (WHP), 1999 WL 378337 (S.D.N.Y. June 10, 1999) ........................... 56

*Rexford v. Olczak*,
  176 F.R.D. 90 (W.D.N.Y. 1997) .............................................................................. 58

*Robbins v. Chase Manhattan Bank, N.A.*,
  No. 97 Civ. 676 (DAB), 1998 WL 106152 (S.D.N.Y. Mar. 9, 1998)....................... 58

*S.E.C. v. Capital Gains Research Bureau Inc.*,
    375 U.S. 180 (1963) ........................................................................................... 38

*SEC v. Jacobson*,
    No. 23 Civ. 5650, 2025 WL 1026327 (E.D. La. Apr. 7, 2025)................................. 20

*SEC v. K.W. Brown Investments Inc.*,
    555 F. Supp. 2d 1275 (S.D. Fla. 2007)....................................................... 20, 38, 46

*SEC v. Kellen*,
    No. 20 Civ. 3861 (RSWL) (AGR), 2021 WL 4907238 (C.D. Cal. Sept. 14, 2021) .......... 20, 38

*SEC v. Paris*,
    No. 21 Cv. 3450, 2024 WL 4433614 (N.D. Ill. Oct. 7, 2024) ................................. 20

*SEC v. Rashid*,
    96 F. 4th 233 (2d Cir. 2024)................................................................................ 38

*SEC v. RRBB Asset Management, LLC*,
    No. 20-12523 (KM) (ESK), 2021 WL 3047081 (D.N.J. July 20, 2021) .......................... 19, 20

*SEC v. Slocum, Gordon & Co.*,
    334 F. Supp. 2d 144 (D.R.I. 2004) ........................................................................ 20

*SEC v. Susoeff*,
    No. 2:23 Civ. 173 (JCM) (EJY), 2024 WL 3938488 (D. Nev. Aug. 23, 2024)....................... 20

*SEC v. Werthe*,
    No. 23 Civ. 815 (DDL), 2025 WL 790970 (S.D. Cal. Mar. 12, 2025) ........................... 20

*SEC v. Westport Cap. Markets LLC*,
    408 F. Supp. 3d 93 (D. Conn. 2019) ..................................................................... 38

*SEC v. World Tree Fin., L.L.C.*,
    43 F.4th 448 (5th Cir. 2022)................................................................ 16, 19, 20, 33

*Swinton v. Livingston Cnty.*,
    No. 15 Civ. 00053A(F), 2016 WL 6248675 (W.D.N.Y. Oct. 26, 2016) ........................... 58

*United States v. Abu-Jihaad*,
    630 F.3d 102 (2d Cir. 2010)................................................................................ 46

*United States v. Ackert*,
    169 F.3d 136 (2d Cir. 1999)........................................................................... 55, 56

*United States v. Avenatti*,
    559 F. Supp. 3d 274 (S.D.N.Y. Sept. 9, 2021)...................................................... 52, 62

*United States v. Bankman-Fried*,
    680 F. Supp. 3d 289 (S.D.N.Y. 2023) ................................................................ 72, 73

*United States v. Bein*,
    728 F.2d 107 (2d Cir. 1984) .................................................................................. 71

*United States v. Bellomo*,
    263 F. Supp. 2d 561 (E.D.N.Y. Mar. 13, 2003) .................................................... 41

*United States v. Bickle*,
    No. 2:10–cr–00565–RLH–PAL, 2011 WL 3798225 (D. Nev. July 21, 2011) ........ 65

*United States v. Bin Laden*,
    91 F. Supp. 2d 600 (S.D.N.Y. 2000) ................................................................ 43, 74

*United States v. Blakstad*,
    No. 19 Cr. 486 (ER), 2020 WL 5992347 (S.D.N.Y. Oct. 9, 2020) ......................... 52

*United States v. Blau*,
    159 F.3d 68 (2d Cir. 1998) ............................................................................... 54, 71

*United States v. Bonventre*,
    No. 10 Cr. 228, 2013 WL 2303726 (S.D.N.Y. May 28, 2013) ............................... 28

*United States v. Bortnovsky*,
    820 F.2d 572 (2d. Cir. 1987) ................................................ 31, 32, 33, 34, 35, 37

*United States v. Butler*,
    351 F. Supp. 121 (S.D.N.Y. 2004) .................................................................. 44, 45

*United States v. Ceglia*,
    No. 12 Cr.876 (VSB), 2015 WL 1499194 (S.D.N.Y. Mar. 30, 2015) ..................... 52

*United States v. Chalmers*,
    410 F. Supp. 2d 278 (S.D.N.Y. 2006) ................................................................... 17

*United States v. Chierchio*,
    20 Cr. 306 (NGG), 2022 WL 523603 (E.D.N.Y. Feb. 22, 2022) ............................ 34

*United States v. Coffey*,
    361 F. Supp. 2d 102 (E.D.N.Y. 2005) ................................................................... 44

*United States v. Colasurdo*
    453 F.2d at 595 ...................................................................................................... 71

*United States v. Columbo*,
    No. 04 Cr. 273 (NRB), 2006 WL 2012511 (S.D.N.Y. July 18, 2006) ..................... 37

3

*United States v. Connolly*,
   No. 16 Cr. 0370 (CM), 2019 WL 2120523 (S.D.N.Y. May 2, 2019) ...................................... 69

*United States v. Combs*
   24 Cr. 542 (AS), Dkt. 148 (S.D.N.Y.) .................................................................................... 67, 68

*United States v. Coplan*,
   703 F.3d 46 (2d Cir. 2012) ....................................................................................................... 73, 74

*United States v. Cordones*,
   No. 11 Cr. 205 (AKH), 2022 WL 815229 (S.D.N.Y. Mar. 17, 2022) ............................... 17, 22

*United States v. Davidoff*,
   845 F.2d 1151 (2d Cir. 1988) ................................................................................................... 31

*United States v. De La Pava*,
   268 F.3d 157 (2d Cir. 2001) ..................................................................................................... 54

*United States v. DeFonte*,
   441 F.3d 92 (2d Cir. 2006) ....................................................................................................... 58

*United States v. Dupree*,
   781 F. Supp. 2d 115 (E.D.N.Y. 2011) ..................................................................................... 53

*United States v. Esformes*,
   No. 16-20549, 2018 WL 5919517 (S.D. Fla. Nov. 13, 2018) ................................................ 65

*United States v. Feng Ling* Liu,
   12 Cr. 934 (RA), 2014 WL 101672 (S.D.N.Y. Jan. 10, 2014) ................................................ 63

*United States v. Feola*,
   651 F. Supp. 1068 (S.D.N.Y. 1987) ........................................................................................ 42

*United States v. Finnerty*,
   No. 05 Cr. 393 (DC) (S.D.N.Y. Nov. 15, 2005) ...................................................................... 30

*United States v. Gartner*,
   518 F.2d 633 (2d Cir. 1975) ..................................................................................................... 54, 60

*United States v. Gonzalez*,
   144 F.4th 396 (2d Cir. 2025) .................................................................................................... 58, 62

*United States v. Harder*,
   No. CR 15-1, 2016 WL 7647635 (E.D. Pa. Apr. 18, 2016) .................................................... 66

*United States v. Helmsley*,
   726 F. Supp. 929 (S.D.N.Y. 1989) .......................................................................................... 53, 67, 70

*United States v. Henry*,
   861 F. Supp. 1190 (S.D.N.Y. 1994) ................................................................... 17, 18

*United States v. Heredia*,
   No. 02 Cr. 1246 (SWK), 2003 WL 21524008 (S.D.N.Y.  July 3, 2003) ................................. 28

*United States v. Hoey*,
   No. 15 Cr. 229 (PAE), 2016 WL 270871 (S.D.N.Y. Jan. 21, 2016) ................................. 53, 70

*United States v. Irons*,
   646 F. Supp. 2d 927 (E.D. Tenn. 2009) .................................................................... 66

*United States v. Johnson*, No.,
   17 Cr. 482 (S.D.N.Y. 2017) ............................................................................... 34

*United States v. Kahale*
   789 F. Supp. 2d 359 (E.D.N.Y. 2009) ..................................................................... 32

*United States v. Kostin*,
   No. 24 Cr. 91 (GHW), 2025 WL 1504409 (S.D.N.Y. May 27, 2025) ................... 17, 43, 59, 65

*United States v. Kovel*,
   296 F.2d 918 (2d Cir. 1961) ........................................................................... 55, 56

*United States v. Landji*,
   No. S118 Cr. 601 (PGG), 2021 WL 5402288 (S.D.N.Y. Nov. 18, 2021) ........................ 62, 64

*United States v. Lefkowitz*,
   618 F.2d 1313 (9th Cir. 1980) ............................................................................ 65

*United States v. Levy*,
   No. S5 11 Cr. 62 (PAC), 2013 WL 664712 (S.D.N.Y. Feb. 25, 2013), .................................. 41

*United States v. Lumiere*,
   No. 16 Cr. 483 (JSR), 2016 WL 7188149 (S.D.N.Y. Nov. 29, 2016) ............................. 53, 54

*United States v. Lusterino*,
   450 F.2d 572 (2d Cir. 1971) ............................................................................... 61

*United States v. Mahabub*,
   No. 13 Cr. 908 (AJN), 2014 WL 4243657 (S.D.N.Y. Aug. 26, 2014) ................................. 17

*United States v. Mandell*,
   710 F. Supp. 2d 368 (S.D.N.Y. 2010) ..................................................... 17, 22, 37, 41

*United States v. Marashi*,
   913 F.2d 724 (9th Cir. 1990) .............................................................................. 66

*United States v. Mariani,*
   851 F.2d 595 (2d Cir. 1988) .................................................................................. 71

*United States v. Martinez,*
   No. 22-cr-251 (LJL), 2023 WL 2403134 (S.D.N.Y. Mar. 8, 2023) .................................. 41, 43

*United States v. Maxwell,*
   534 F. Supp. 3d 299 (S.D.N.Y. 2021) ..................................................................... 44

*United States v. Mejia,*
   655 F.3d 126 (2d Cir. 2011) .................................................................................. 55

*United States v. Milton,*
   No. 21 Cr. 478 (ER), 2021 WL 5304328 (S.D.N.Y. Nov. 15, 2021) ............................... 67, 72

*United States v. Mitlof,*
   165 F. Supp. 2d 558 (S.D.N.Y. 2001) .................................................................. 17, 41

*United States v. Mora,*
   No. 19 Cr. 514 (JPO), 2020 WL 7496281 (S.D.N.Y. Dec. 21, 2020) ................................ 42

*United States v. Mostafa,*
   965 F. Supp. 2d 451 (S.D.N.Y. 2013) .............................................................. 44, 45, 46

*United States v. Motz,*
   652 F. Supp. 2d 284 (E.D.N.Y. 2009) ................................................................. 19, 29

*United States v. Mulder,*
   273 F.3d 91 (2d Cir. 2001) .................................................................................... 44

*United States v. Murphy,*
   No. 21 Cr. 280 (AKH), 2022 WL 1270958 (S.D.N.Y. Apr. 28, 2022) ................................ 17

*United States v. Nachamie,*
   91 F. Supp. 2d  (S.D.N.Y. 2000) ............................................................ 31, 32, 33, 34

*United States v. Naranjo,*
   14 F.3d 145 (2d Cir. 1994) .................................................................................... 72

*United States v. Neill,*
   952 F. Supp. 834 (D.D.C. 1997) ........................................................................ 62, 64

*United States v. Nicholas,*
   594 F. Supp. 2d 1116 (C.D. Cal. 2008) ................................................................... 66

*United States v. Ohle,*
   678 F. Supp. 2d 215 (S.D.N.Y. 2010) ..................................................................... 72

*United States v. Percoco*,
No. 16 Cr. 776 (VEC), 2017 WL 6314146 (S.D.N.Y. Dec. 11, 2017) ................................... 72

*United States v. Patel*
No. 16 Cr. 798, 2017 WL 3394607 (S.D.N.Y. Aug. 8, 2017) .................................... 54

*United States v. Peterson*,
357 F. Supp. 2d 748 (S.D.N.Y. 2005) ................................................... 72

*United States v. Rajaratnam*,
09 Cr. 1184 (RJH), 2010 WL 2788168 n.4 (S.D.N.Y. July 13, 2010) ............................ 30, 31

*United States v. Ramirez*,
420 F.3d 134 (2d Cir. 2005) ............................................................ 73

*United States v. Raniere*,
384 F. Supp. 3d 282 (E.D.N.Y. 2019) .................................................. 35, 37

*United States v. Ray*,
2021 WL 3168250 (S.D.N.Y. July 27, 2021) ............................................... 41

*United States v. Rispo*,
460 F.2d 965 (3d Cir. 1972) ............................................................ 61

*United States v. Reese*,
No. 24 Cr. 402 (VEC), 2025 WL 1770789 (S.D.N.Y. June 25, 2025) ................................... 74

*United States v. Rittweger*,
259 F. Supp. 2d 275 (S.D.N.Y. 2003) ................................................... 17, 28

*United States v. Robare*,
No. 8:07-CR-373 (FJS), 2008 WL 2967632 (N.D.N.Y. July 25, 2008) ................................. 66

*United States v. Rutigliano*,
614 F. App'x 542 (2d Cir. 2015) ........................................................ 46

*United States v. Salinas*,
373 F.3d 161 (1st Cir. 2004) ......................................................... 73, 74

*United States v. Samsonov*,
No. 07 Cr. 1198 (CM), 2009 WL 176721 (S.D.N.Y. Jan. 23, 2009) ........................................ 17

*United States v. Sanin*,
113 F.3d 1230 (2d Cir. 1997) .......................................................... 64

*United States v. Sattar*,
No. 02 Cr. 0395 (JGK), 2002 WL 1836755 (S.D.N.Y. Aug. 12, 2002) ............................ 53, 64

*United States v. Savin*,
No. 00 Cr. 45 (RWS), 2001 WL 243533 (S.D.N.Y. Mar. 7, 2001) ........................................ 37

*United States v. Scarpa*,
913 F.2d 993 (2d Cir. 1990) ........................................................................................................ 44

*United States v. Schulte*,
No. 17 Cr. 548 (PAC), 2019 WL 5287994 (S.D.N.Y. Oct. 18, 2019) .................................... 54

*United States v. Schwimmer*,
924 F.2d 443 (2d Cir. 1991) ........................................................................................... 52, 54, 64

*United States v. Sharma*,
No. 18 Cr. 340 (LGS), 2019 WL 3802223 (S.D.N.Y. Aug. 13, 2019) ................. 53, 54, 62, 69

*United States v. Siddiqi*,
06 Cr. 377 (SWK), 2007 WL 549420 (S.D.N.Y. Feb. 21, 2007)....................................... 35, 41

*United States v. Smith*,
985 F. Supp. 2d 547 (S.D.N.Y. 2014) ....................................................................................... 44

*United States v. Spivak*,
No. 21 Cr. 491, 2024 WL 3861334 (N.D. Ohio Aug. 17, 2024) ............................................ 64

*United States v. Squillacote*,
221 F.3d 542 (4th Cir. 2000)...................................................................................................... 66

*United States v. Stein*,
429 F. Supp. 2d 633 (S.D.N.Y. 2006) ....................................................................................... 72

*United States v. Stewart*,
294 F. Supp. 2d 490 (S.D.N.Y. 2003) ....................................................................................... 65

*United States v. Stringer*,
730 F.3d 120 (2d Cir. 2013) ................................................................................................ 16, 21

*United States v. Sullivan,*
No. 17 Cr. 00104(JMS), 2020 WL 1815220 ........................................................................... 65

*United States v. Tagliaferri*,
820 F.3d 568 (2d Cir. 2016) ...................................................................................................... 38

*United States v. Tajideen*,
319 F. Supp. 3d 445 (D.D.C. 2018) .......................................................................................... 42

*United States v. Tournant*,
No. 22 Cr. 276, 2023 WL 5276776, at *15 (S.D.N.Y. Aug. 15, 2023) ....................... 62, 70, 71

*United States v. Tuzman,*
    301 F. Supp. 3d 430 (S.D.N.Y. 2017) ................................................ 28, 29, 31, 33, 37

*United States v. Trie,*
    21 F. Supp. 2d 7 (D.D.C. 1998). .................................................................... 42

*United States v. Vaid,*
    No. 16 Cr. 763 (LGS), 2017 WL 3891695 (S.D.N.Y. Sept. 5, 2017) ..................... 34

*United States v. Weigand,*
    482 F. Supp. 3d 224 (S.D.N.Y. 2020) .............................................................. 69

*United States v. Wey,*
    No. 15 Cr. 611 (AJN), 2017 WL 237651 (S.D.N.Y. Jan. 18, 2017) ............... 28, 29, 37

*United States v. Yousef,*
    327 F.3d 56 (2d Cir. 2003) ................................................................... 53, 63

**Statutes**

7 U.S.C. § 6o ............................................................................................. 18

7 U.S.C. § 9(1) ........................................................................................... 18

15 U.S.C. § 78j(b) ....................................................................................... 18

15 U.S.C. § 80b-6 ....................................................................................... 18

**Rules**

Fed. R. Crim. P. 12(b)(3)(A)(i) ...................................................................... 72
Fed. R. Evid. 401 ....................................................................................... 46
Federal Rule of Civil Procedure 26 ................................................................ 57
Federal Rule of Criminal Procedure 7(c)(1) ...................................................... 16

**Regulations**

17 C.F.R. § 180.1 ................................................................................ 14, 18, 39
17 C.F.R. § 240.10b-5 ........................................................................... 14, 18, 39

**Other Authorities**

*United States v. Hwang*
    22 Cr. 240 (AKH) (S.D.N.Y) ............................................................ 28, 29, 37

*United States v. Kambolin,*
    No. 23 Cr. 20372 (PCH) (S.D. Fla. 2023) (Dkt. No. 1) ..................................... 19

## PRELIMINARY STATEMENT

For years, Kenneth Leech engaged in a fraudulent scheme to favor a select set of his clients over others. Leech assigned better-performing trades to his favored clients and worse-performing trades to others, a practice known as "cherry-picking." Because Leech owed an equal fiduciary duty to all of his clients, he committed fraud by failing to disclose that he was cherry-picking. At trial, the Government will prove that fraud through, among other ways, a statistical analysis of Leech's trading, which will demonstrate that he allocated trades to favor some clients over others.

Leech moves for pre-trial relief, but none of his requests are legally or factually sound. *First*, this Court should not require the Government to issue a bill of particulars. The defendant does not dispute that the Indictment provides him notice of the charges and allows him to plead double jeopardy; the Government has already given the defendant the key information he seeks—namely, the "trades on which the purported statistical pattern is calculated" (Def. Br. 19); and the Government will provide even further detail through its upcoming expert disclosures. No more is required. The defendant's claim that the Government must particularize "misallocated" trades is legally and factually wrong. Legally, the crime is a scheme to favor certain funds over others—not to "misallocate" trades—and the trading is simply evidence of the scheme. This is why courts deny similar requests for trade-level particulars in market manipulation securities fraud cases. Factually, the defense's request is misguided because Leech's trades did not have a "right" or "wrong" allocation. Instead, Leech determined his allocations only after having observed the trades perform in the market. The defense should not, through the guise of a bill of particulars, be able to recast the Government's case as one about "misallocation."

*Second*, this Court should deny the defendant's motion to strike the accurate statement in the Indictment that his trading resulted in over $600 million net first-day gains for his favored

clients and over $600 million of net first-day losses for others.  This motion is premature because courts wait until after the presentation of the evidence before ruling on a motion to strike (if a speaking indictment is provided to the jury at all).  It is also meritless because this stark differential is relevant to proving the defendant's fraudulent scheme—indeed, this type of proof is routinely admitted in cherry-picking cases—and is neither inflammatory, nor improperly prejudicial.

*Third*, this Court should not authorize additional discovery regarding the Government's use of a filter team to review search warrant returns for privilege.  Using a filter team is a common method to respect attorney-client privilege and is accepted in this Circuit.  The Government has provided extensive discovery regarding the filter process in this case, none of which is disputed, and all of which demonstrates that the Government took reasonable steps to protect the defendant's privilege and acted in good faith.  The defendant's motion is premised on unsupported, and unsupportable, privilege claims.  And the Government has already committed that it does not intend to view or use any material over which the defense has claimed privilege, absent a ruling from the Court that specific documents have been improperly designated as privileged.

*Finally*, the defendant seeks to dismiss Count Five for lack of venue.  The defendant acknowledges that the Indictment properly alleges venue, which is all that is required at this stage, and recognizes that his other arguments are barred by Second Circuit caselaw.

The defendant's motions should be denied.

# BACKGROUND

## I. The Defendant's Scheme to Favor His Preferred Clients

Between 2021 and 2023, the defendant served as the chief investment officer of the investment management company Western Asset Management ("WAMCO"). In that role, the defendant managed client accounts and made trades on their behalf. Importantly, the defendant owed an equal fiduciary duty to all of his clients. Despite that duty, and in violation of it, the defendant engaged in a fraudulent scheme to favor certain clients at the expense of others. The defendant implemented his scheme by "cherry picking." That is, the defendant assigned trades that performed well during their first day into client accounts that he favored and assigned trades that performed poorly to others. Over the course of his scheme, the defendant allocated trades with net-first day gains of over $600 million to his favored clients, and allocated trades with net first-day losses of over $600 million to clients to whom he owed an equal fiduciary duty.[1]

### A. Fixed Income Portfolio Management, U.S. Treasury Derivatives, and Trading

WAMCO is a global fixed-income investment advisor that manages hundreds of billions of dollars on behalf of its clients. WAMCO invests in a wide variety of fixed-income asset classes for its clients, including government bonds, corporate bonds, mortgage-backed and asset-backed securities, and inflation-linked-bonds. WAMCO also invests in derivative instruments, such as futures and options. Relevant here, U.S. Treasury futures are "standardized contracts for the purchase and sale of U.S. government notes or bonds for future liquidity."[2] U.S. Treasury options provide either the right to buy (call option) or the right to sell (put option) an underlying U.S.

---

[1] Indictment ("Ind."). at ¶¶ 1-6.

[2] *The Basics of U.S. Treasury Futures*, CME Grp., https://www.cmegroup.com/trading/interest-rates/basics-of-us-treasury-futures.html (last visited Sept. 22, 2025).

Treasury futures contract at a specific price during a certain period of time.[3]

WAMCO manages multiple client accounts at the same time. Accordingly, when a portfolio manager trades, he must identify the specific client account or accounts that he is making the trade for. This process, known as trade allocation, provides an opportunity for fraud—a portfolio manager could delay making a trade-allocation decision until long after a trade is executed, observe market movements and the trade's performance, and then use what he learned to assign better performing trades to preferred clients. As explained below, WAMCO's policies and trainings tried to eliminate even the appearance that portfolio managers would abuse their trade allocations to favor certain clients. The defendant, however, did just that.

### B.  The Relevant Strategies and Accounts

During the time period in the Indictment, Leech served as WAMCO's Chief Investment Officer and managed portfolios for an array of clients. Some of the portfolios he managed followed WAMCO's Core and Core Plus strategies (the "Core Strategies"). The Core Strategies were benchmarked to the Bloomberg U.S. Aggregate Index. WAMCO advertised the Core Strategies to pension funds, large institutions, and retail investors as a prudent, long-term investment strategy designed to outperform the benchmark over a market cycle. Investors could participate in either of the Core Strategies by having a separately managed account or investing in one of the WAMCO mutual funds that followed the Core Strategies. From 2021 to 2023, WAMCO had between approximately $100 and $165 billion in assets under management across the Core Strategies. Leech shared portfolio management responsibilities for Core and Core Plus with many other

---

[3]  *Get to Know Underlying (Options on Futures)*, CME Grp., https://www.cmegroup.com/education/courses/introduction-to-options/get-to-know-underlying-options-on-futures.html (last visited Sept. 22, 2025).

portfolio managers.[4]

The defendant also managed portfolios that followed WAMCO's Macro Opportunities ("Macro Opps") strategy. Macro Opps was an unconstrained strategy, which meant that, unlike the Core Strategies, it did not have a benchmark. Instead, the stated objective of Macro Opps was to maximize total return, with a relatively wide range of risk compared to the Core Strategies. WAMCO advertised that "the firm's overall value opportunities can be assessed through [Macro Opps]," and that the strategy typically expressed the best ideas drawn from other strategies across WAMCO—including the Core Strategies—but did so in a more concentrated, aggressive manner.[5] From 2021 to 2023, WAMCO had between approximately $3 and $16 billion in assets under management in mutual funds and separately managed accounts following Macro Opps. Leech shared portfolio management responsibilities for Macro Opps with one other portfolio manager.

The Macro Opps strategy had an outsized effect on WAMCO's net revenue, despite its relatively small size compared to the Core Strategies. Investors following the Macro Opps strategy paid fees that were approximately four times higher than fees paid by investors in the Core Strategies. That fee structure meant that each dollar in Macro Opps was more valuable to WAMCO than a dollar in the Core Strategies. Macro Opps also had a significant effect on the net revenue that WAMCO attributed to Leech's performance.

Finally, while Leech often allocated trades to all accounts within particular strategies— such as the Core Strategies or Macro Opps—he was also able to direct trades to specific accounts within those strategies, including two longstanding clients ("Account-1" and "Account-2"). Despite being a Core Plus account, Leech favored Account-1 in the same way that he did the Macro

---

[4] *Id.* ¶¶ 7-9.

[5] *Id.*

Opportunities Strategy, by specifically directing better performing trades to Account-1 (while omitting the other Core Strategy Accounts from that allocation). Similarly, although Account-2 was in Leech's Macro Opps allocation group and, by virtue of that position, often received better-performing trades, Leech further boosted Account-2's performance by allocating certain trades with positive first-day performance specifically to Account-2, omitting the other Macro Opps Accounts from that allocation.[6]

### C. Leech Makes a Series of Poor Investment Decisions and Macro Opportunities Struggles

Between 2021 and October 2023, the defendant made a series of poor investment decisions that disproportionately affected Macro Opps, causing significant losses in the fund that led Leech to seek to improve its performance, even at the expense of clients in the Core Strategies.[7] These decisions included obtaining and keeping a large position in Russian debt that was nearly wiped out soon after Russia invaded Ukraine in early 2022 and a significant investment in Credit Suisse debt that also lost all value when Credit Suisse collapsed in early 2023. Although those losses affected many of WAMCO's strategies, including the Core Strategies, they caused acute problems for Macro Opps, in large part because Macro Opps had more exposure to some of the losing investments. Over the period described above, the assets under management for Macro Opps fell by approximately 80%, dropping to a low of under $3 billion.

This severe drop in the value of Macro Opps caused Leech and the Macro Opps team to pay particularly close attention to improving the daily performance of that strategy. During this time of extreme drawdowns in Macro Opps, WAMCO and Leech engaged in a Macro Opps

---

[6] *Id.* at ¶¶ 6, 13, 20.

[7] *Id.* at ¶ 12.

"retention campaign" to convince clients to keep their investments in Macro Opps.  WAMCO attempted to convince its clients to stay invested in Macro Opps by claiming that Macro Opps typically recovered quickly after suffering losses.  Communications among members of the Macro Opps team, including Leech, reflected that focus on daily performance.  For example, on March 4, 2022, Leech remarked to another Macro Opps portfolio manager that "we just need a positive number desperately!"  And, on June 14, 2022, a member of the Macro Opps team emailed Leech that Macro Opps was, "in an extremely precarious position, [and] we can't afford to leave any basis points on the table."

### D.  WAMCO Trained Leech Not to Use His Trade Allocation Process to Favor Certain Clients

As a fiduciary to all of the clients for whom he managed money, Leech had an obligation not to favor certain clients over others, and clients expected that Leech would honor that obligation.  WAMCO advertised that fiduciary obligation to clients.  For example, WAMCO reported to investors that it was a fiduciary and had policies and procedures to uphold its duties, including policies and procedures designed to ensure that traders allocated trades consistent with their fiduciary obligations and in a manner that was fair and equitable.

WAMCO also trained Leech that he should not favor certain clients over others.[8]  To this end, WAMCO's policies stated that Leech must act as a fiduciary to all of the clients for which he managed money, and the policies explained that this fiduciary duty prohibited Leech from "inappropriately favor[ing] the interests of one client over another."  The policies specified that "[i]nvestment decisions must never be based upon an objective to allocate lucrative or profitable trades to particular accounts to make up for past account performance or to benefit the Firm

---

[8] Ind. at ¶ 16.

through a higher fee structure in such accounts."[9]

WAMCO's compliance training and materials also repeatedly emphasized to Leech and other traders that they should not wait hours to allocate their trades, but instead should allocate each trade promptly after the trade had been executed, and in no event later than the end of the trading day. WAMCO's compliance training for all investment staff, including Leech, stated that traders should complete the allocation process promptly after each trade they made was executed. The training presentation emphasized that it was not prompt to wait hours before allocating, giving a "[b]ad facts scenario" of a trader who executed a trade at 8 a.m., but waited until noon to complete the allocation for that trade, after the market had moved. WAMCO also trained Leech and others to document their "allocation rationale" because the electronic trade allocator creates an "audit trail that can be accessed later—memory can be unreliable."

WAMCO's compliance department reinforced this training through emails to all portfolio managers, including Leech. For example, in August 2021, a trade operations employee informed WAMCO compliance that WAMCO needed "our occasional refresh on timely allocations" after having to remind another employee that, "the optics of not allocating soon after execution may raise questions about deciding [how] to allocate once the market is closed...i.e. cherry-picking portfolios dependent on the movement in px [price], etc." WAMCO's compliance department then sent an email to all portfolio managers, including Leech, emphasizing that they "should be allocating reasonably promptly after [trade] execution." The email explained that WAMCO did "not want a market movement after execution to influence the allocation," and that "[t]he [Securities and Exchange Commission] is concerned that an adviser might use knowledge of

---

[9] *Id.*

market movement to allocate winning trades to certain accounts."

### E.  The Defendant's Trade Allocation Process Allowed Him to Observe How Trades Performed Before Allocating

During the relevant period, Leech primarily traded U.S. Treasury futures and options. Leech often allocated each trade in one of three ways: (1) the entire trade went to the Core Strategies only; (2) the entire trade went to Macro Opps only; or (3) the trade was evenly split between the Core Strategies and Macro Opportunities (a "50/50" trade).  Leech also had the ability to allocate a trade to a particular client's account (for example, Account-1 or Account-2.).

Although other portfolio managers also traded U.S. Treasury futures and options, Leech's trading was unique.  First, Leech conducted exceedingly more U.S. Treasury futures and options trades than any other portfolio manager at WAMCO.  Second, and notwithstanding the trainings and WAMCO's representations to investors, Leech did not identify which account a trade belonged to at the time he traded.  Instead, Leech routinely waited hours after trading—often until late in the day—before allocating his trades.  This practice provided Leech the opportunity to observe how his trades had performed at the time of his allocation decisions.[10]

In addition to providing Leech with the opportunity for abuse, Leech's unique allocation process imposed practical difficulties on the WAMCO employees responsible for implementing his allocation decisions.  Not only were Leech's allocations routinely delayed, but Leech at times did not provide an allocation instruction at all.  As a result, Leech implemented a standing order to his employees that applied if he was unavailable to allocate a trade at the end of the trading day. In those circumstances, Leech authorized his employees to allocate the unassigned trade "50/50;" that is, evenly between the Core Strategies and Macro Opportunities, without consulting Leech.

---

[10] *Id.* at ¶19.

### F.   Leech Used His Delayed Allocations to Favor Certain Clients Over Others

Leech took advantage of his ability to see trade performance before allocation to favor Macro Opps, Account-1, and Account-2 in his allocation of Treasury futures and options trades, at the expense of the Core Strategies.[11]   Overall, the first-day performance of Leech's Treasury futures and options trades did not generate significant first-day gains or losses.  Between 2021 and October 2023, approximately 55% of Leech's Treasury futures and options trades had first-day gains, and approximately 45% had first-day losses.  These gains and losses largely offset one another: On average, the first-day performance of the trades was a gain of approximately $6,500.[12]

A closer look at Leech's trading, however, revealed a starkly different pattern of performance based on how Leech allocated his trades.  As explained above, Leech allocated many of his trades specifically to either the accounts in the Macro Opps strategy, or to the Core Strategies. When he did so, Leech allocated trades in a biased manner, such that trades he allocated to Macro Opps were performing better on the first day than those he allocated to the Core Strategies.[13]  For example, approximately 80% of the Treasury futures and options trades that Leech allocated specifically to Macro Opps had first-day gains, with average first-day returns of over $225,000.[14] By contrast, approximately 25% of the Treasury futures and options trades that Leech allocated specifically to the Core Strategies had first-day gains, while approximately 75% had first day losses.  The average first-day return for trades Leech allocated specifically to the Core Strategies

---

[11] Ind. at ¶¶ 18-20.

[12] *Id.* ¶¶ 19(b).

[13] *Id.*

[14] Unless otherwise noted, data describing trades Leech allocated specifically to Macro Opps excludes trades Leech made through Broker-1, described below, because Leech did not exercise discretion over those allocations as a matter of course.

was a loss of over $300,000.

The bias in favor of Macro Opps persisted regardless of whether Leech was trading Treasury futures or Treasury options. And Leech's bias in favor of Macro Opps was more pronounced the larger the first-day gain or first-day loss. For example, there were over 500 Treasury futures or options trades that Leech chose to allocate specifically to either Macro Opps or the Core Strategies and that had first-day gains over $500,000. Leech allocated over 90% of those winning trades to Macro Opps and less than 10% to the Core Strategies. Conversely, over that same period, there were over 500 Treasury futures or options trades that Leech chose to allocate specifically to either Macro Opps or the Core Strategies and that had first-day losses over $500,000. Leech allocated less than 10% of those losing trades to Macro Opps, while allocating over 90% of them to the Core Strategies.[15]

Similarly, there were over 150 Treasury futures or options trades that Leech chose to allocate specifically to either Macro Opps or the Core Strategies and that had first-day gains over $1,000,000. Leech allocated over 90% of those winning trades to Macro Opps and less than 10% to the Core Strategies. Over that same period, there were over 200 Treasury futures or options trades that Leech chose to allocate specifically to either Macro Opps or the Core Strategies and that had first-day losses over $1,000,000. Leech allocated less than 5% of those losing trades to Macro Opps, while allocating over 95% to the Core Strategies.[16]

Leech's bias also persisted even when he allocated the same type of instrument, on the same day, to the two strategies. Between 2021 and October 2023, Leech routinely made multiple trades going in the same direction (buy or sell), for the same instrument (e.g., five-year Treasury

---

[15] Ind. at ¶¶ 18-20.

[16] *Id.*

11

futures), on the same day. Those trades often had different first-day performance because Leech executed the trades at different prices throughout the day. When Leech allocated those trades, he routinely allocated the better-performing trades to Macro Opps, and the worse-performing trades to the Core Strategies. Leech's pattern of biased allocation was steady over the period relevant to this Indictment. In each of the 34 months of the relevant period, the Treasury futures and options trades allocated specifically to Macro Opps had a net first-day gain. By contrast, over that same period, the Treasury futures and options trades that Leech allocated specifically to the Core Strategies had net first-day losses in all months except two.

The bias in favor of Macro Opps was not caused by Leech pursuing a particular trading strategy for Macro Opps. Notably, when Leech did not exercise discretion to allocate trades between Macro Opps and the Core Strategies, the trades that went to Macro Opps were not characterized by disproportionate first-day gains. Leech generally did not exercise discretion to allocate trades through a particular broker ("Broker-1") at the end of the day because his trading assistant automatically allocated them to Macro Opps. When Treasury futures and options trades were allocated to Macro Opps without Leech first observing performance in the market, the bias in favor of Macro Opps disappeared. Over the relevant period, approximately 55% of the trades Leech placed through Broker-1 trades had first-day gains, while approximately 45% had first-day losses. These trades produced modest first-day losses, generating an average first-day return of a loss of over $5,000. This is dramatically different from the first-day performance of trades Leech allocated to Macro Opps when he had the opportunity to first observe market movements, which had an average first-day return of a gain of over $225,000.

Similarly, after October 2023, WAMCO removed Leech from the Core Strategies, so he no longer had the authority to allocate trades to those strategies. As with the Broker-1 trades, when

Leech no longer had discretion to allocate trades to the Core Strategies, the trades Leech allocated to Macro Opps stopped having a consistent, pronounced bias toward first-day gain. Between in or about November 2023 and July 2024, approximately 60% of the Treasury futures and options trades Leech allocated to Macro Opps had first-day gains, while approximately 40% had first-day losses. Unlike when Leech could choose to allocate between Macro Opps and the Core Strategies, the average first-day return on the trades allocated to Macro Opps after October 2023 was a first day loss of approximately $1,500.

What is more, Leech also allocated in a biased manner to certain longstanding clients. Account-1 and Account-2 were separately managed accounts, with which Leech had longstanding relationships. Although Account-1 was with the Core Plus strategy, Leech made specific allocations to Account-1 that he did not make to the rest of the Core Strategies. Those allocations were biased toward assigning Account-1 trades that had positive first-day performance. Similarly, Leech allocated trades specifically to Account-2 that had positive first-day performance.[17]

### G. Leech's False and Misleading Testimony to the SEC

On March 6, 2024, Leech provided sworn testimony to the SEC, in connection with an SEC investigation into Leech's allocations between 2021 and 2023. In his sworn testimony before the SEC, Leech lied about his process for allocating trades, falsely claiming, in substance, that he already decided to which strategy trades would be allocated at the time he placed the trade orders. These responses were false and misleading. Leech routinely did not decide where to allocate trades until hours after trading—typically late in the day—after he had a chance to observe how his trades had performed during the day, at which point he conveyed his allocation decisions to his trading assistant over the phone. Indeed, as set forth above, far from having a particular client in mind at

---

[17] *Id*. at ¶ 20.

the time that Leech placed a trade order, there were occasions where Leech did not provide any allocation at all at the end of the trading day. In those circumstances, Leech instructed employees to allocate any unassigned trades 50/50, regardless of the trade at issue.

## II.    The Charges

A Grand Jury sitting in this District returned a five count indictment (the "Indictment") charging the defendant with Investment Adviser Fraud, in violation of Title 15, United States Code, Sections 80b-6 and 80b-17 and Title 18, United States Code, Section 2 (Count One); Securities Fraud, in violation of Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations 240.10b-5 and Title 18, United States Code, Section 2 (Count Two); Commodity Trading Adviser Fraud in violation of Title 7, United States Code, Sections 6o and 13(a)(5) and Title 18, United States Code, Section 2 (Count Three); Commodities Fraud, in violation of Title 7, United States Code, Sections 9(1) and 13(a)(5); Title 17, Code of Federal Regulations Section 180.1; Title 18, United States Code, Section 2 (Count Four); and False Statements in violation of Title 18, United States Code, Sections 1001(a)(1)-(2) (Count Five).

## III.    Defense Motions

On August 22, 2025, the defendant filed motions seeking (1) a bill of particulars; (2) striking surplusage from the Indictment; (3) requesting further discovery regarding the government's Filter Team; and (4) dismissing Count Five for lack of venue. (ECF No. 34.)

## ARGUMENT

### I.    The Court Should Deny Defendant's Demand for a Bill of Particulars

Leech does not dispute that the Indictment informs him of the nature of the charges and allows him to plead double jeopardy.  Leech also acknowledges that, as outlined in the Indictment, the trial proof will include a "statistical pattern" demonstrating that he favored certain clients by allocating trades using their first-day performance.[18]  Although Leech asserts that meeting this proof "can only be done if the government identifies the trades on which the purported statistical pattern is calculated," *id.*, he ignores that the Government has provided "the trades on which the purported statistical pattern is calculated" in searchable, sortable excel format.  The Government will provide further detail about its trade-level proof of defendant's scheme in expert disclosures (issued over five months before trial), exhibit lists, and Section 3500 material.  These disclosures allow Leech to defend against the Government's evidence.  Leech's motion for a bill of particulars, therefore, fails on its own terms.

Nonetheless, the defendant seeks further particulars identifying each individual trade that he "misallocated."[19]  That misunderstands the charges and the extensive caselaw related to proof of cherry-picking schemes.  As charged in the Indictment, the jury will decide whether the defendant engaged in a scheme to defraud by favoring certain clients over others, without disclosing that favoritism.  To answer that question in a cherry-picking case, courts have consistently recognized that a fact-finder does not need to identify specific trades that have been misallocated, but instead may "draw[] inferences from a pattern of behavior, irregularities, and

---

[18] Def. Br. 19.

[19] Def. Br. 3.

trading data."[20]  Leech may argue to the jury that this analysis is insufficient, including by using examples of specific trades to try to discredit the inference the jury can draw from the patterns. But there is no legal basis to require the Government to identify "misallocated" trades where, as here, the Government has (and will continue to) identify the set of trades it plans to use to show the defendant's pattern of biased allocations.

In addition to ignoring the law on cherry-picking cases, Leech also ignores that his request for trade-by-trade detail has consistently been rejected in the analogous context of market-manipulation cases, where trading data and analysis of market movement are often introduced at trial.  The defendants in those cases often request, like Leech, that the Government particularize the trades that allegedly manipulated the market.  Courts uniformly deny those requests because they improperly seek evidentiary detail.  Courts similarly reject defendants' requests for particularization of every misrepresentation and omission in a fraud scheme.  This Court should deny these requests for the same reasons:  Leech seeks a full accounting of the Government's trial evidence ahead of the Court-ordered schedule.

### A.  Applicable Law

Pursuant to Federal Rule of Criminal Procedure 7(c)(1), an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged."  "An indictment is sufficient if it first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecution of the same offense."[21]  "A bill of particulars should be required only where the charges of the indictment are so general that they do not advise

---

[20] *SEC v. World Tree Fin., L.L.C.*, 43 F.4th 448, 462 (5th Cir. 2022) (quotation marks omitted).

[21] *United States v. Stringer*, 730 F.3d 120, 123-24 (2d Cir. 2013) (citation and quotations omitted).

the defendant of the specific acts of which he is accused."[22]  "A bill of particulars is not a discovery device,"[23] and the advanced disclosure of evidentiary detail is not its function.  "It is not enough that the [requested] information would be useful to the defendant."[24]  Instead, the question presented by a request for a bill of particulars is whether the requested information is "necessary for the defense to prepare."[25]  Accordingly, "[t]he Government may not be compelled to provide a bill of particulars disclosing the manner in which it will attempt to prove the charges, the precise manner in which the defendants committed the crimes charged, or a preview of the Government's evidence or legal theories."[26]

There are good reasons why bills of particulars are warranted only where the allegations in the Indictment, as supplemented by discovery and otherwise, are so general as to render it impossible to prepare a defense.  Because "a bill of particulars confines the Government's proof to particulars furnished," it can "restrict unduly the Government's ability to present its case."[27]

---

[22] *United States v. Murphy*, No. 21 Cr. 280 (AKH), 2022 WL 1270958, at *3 (S.D.N.Y. Apr. 28, 2022) (citation and quotation marks omitted); *see also United States v. Kostin*, No. 24 Cr. 91 (GHW), 2025 WL 1504409, at *31-32 (S.D.N.Y. May 27, 2025) (a bill of particulars "is not a general investigative tool, a discovery device or a means to compel the government to disclose evidence or witnesses to be offered prior to trial" (citations and quotation marks omitted)).

[23] *United States v. Mandell*, 710 F. Supp. 2d 368, 384 (S.D.N.Y. 2010).

[24] *United States v. Cordones*, No. 11 Cr. 205 (AKH), 2022 WL 815229, at *8 (S.D.N.Y. Mar. 17, 2022) (citation and quotation marks omitted).

[25] *United States v. Chalmers*, 410 F. Supp. 2d 278, 286-87 (S.D.N.Y. 2006) (emphasis added) (citation omitted).

[26] *United States v. Rittweger*, 259 F. Supp. 2d 275, 291 (S.D.N.Y. 2003) (citing *United States v. Mitlof*, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001) (collecting cases)).

[27] *United States v. Henry*, 861 F. Supp. 1190, 1197 (S.D.N.Y. 1994); *see also United States v. Mahabub*, No. 13 Cr. 908 (AJN), 2014 WL 4243657, at *2 (S.D.N.Y. Aug. 26, 2014) (recognizing that "care must be taken" in deciding whether to order a bill of particulars because "[t]he government's presentation of evidence at trial is limited to the particulars contained in the bill"); *United States v. Samsonov*, No. 07 Cr. 1198 (CM), 2009 WL 176721, at *3 (S.D.N.Y. Jan. 23,

Moreover, because the Government's provision of particulars is tantamount to an itemized preview of its proof, a bill of particulars creates the very real danger that a defendant will "tailor [his] testimony to explain away the Government's case."[28] These concerns animate the rule that "if the defendant has been given adequate notice of the charges against [him] and can prepare fully for trial with reasonably diligent efforts, the Government cannot be required to disclose additional details about its case."[29]

### B. Discussion

#### 1. The Charges and the Scheme

The Indictment charges the defendant with four counts relevant to this motion:  Investment Adviser Fraud (Count 1); Securities Fraud (Count 2); Commodity Trading Adviser Fraud (Count 3); and Commodities Fraud (Count Four).  For each of these charges, the Government can establish the defendant's guilt by proving that he engaged in a scheme to defraud or a course of conduct that would operate as a fraud or deceit upon others.[30]  Here, the Indictment charges that the defendant engaged in a fraudulent scheme or course of conduct because he favored certain clients over others by using first-day performance of his U.S. treasury futures and options trades to make allocation decisions, without disclosing that he was using first-day performance to allocate trades.

This type of fraudulent scheme is commonly known as "cherry-picking."  A cherry-picking

---

2009) ("The vehicle of a bill of particulars serves to inform a defendant of the nature of the charge, when he is otherwise insufficiently informed, and must not be misused to compel disclosure of how much the Government can prove, nor to foreclose the Government from using proof it may develop as the trial approaches.").

[28] *Henry*, 861 F. Supp. at 1197.

[29] *Id.*

[30] 15 U.S.C. § 80b-6; 7 U.S.C. § 6o; 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; 7 U.S.C. § 9(1); 17 C.F.R. § 180.1.

"scheme requires specific preparation and the deliberate allocation of a disproportionate number of profitable trades," and the "knowing conduct of picking certain accounts over others."[31] "By directing the more profitable trades toward preferred accounts, a securities professional is effectively stealing from one customer to enrich himself or other preferred customers."[32] And because certain securities professionals—such as the defendant—often owe equal fiduciary duties to all their clients, an undisclosed scheme to favor some over others is fraud.

While the Government may always offer circumstantial evidence to prove intent, courts have recognized that "[d]etermining whether cherry picking has occurred often requires drawing inferences from a pattern of behavior, irregularities, and trading data."[33] To this end, a statistical analysis of a defendant's trading data is a "means to establish or defend against liability" in a cherry-picking case.[34] For example, in *SEC v. World Tree Financial*, the Fifth Circuit held that, to prove a cherry-picking case, the SEC did not "need[] to introduce direct evidence of cherry-picking

---

[31] *World Tree Fin., L.L.C.*, 43 F.4th at 464 (quoting *SEC v. RRBB Asset Management, LLC*, No. 20-12523 (KM) (ESK), 2021 WL 3047081, at * 3 (D.N.J. July 20, 2021); *United States v. Motz*, 652 F. Supp. 2d 284, 289 (E.D.N.Y. 2009) ("The superseding indictment alleges that Motz engaged in 'cherry-picking,' a practice whereby a trader executes trades without immediately assigning them to a particular account . . . the superseding indictment alleges that Motz purchased securities in the early part of the trading day and waited until later in the day—when he saw whether the securities purchased had appreciated in value—to allocate the securities to MFA's proprietary account."); *United States v. Kambolin*, No. 23 Cr. 20372 (PCH) (S.D. Fla. 2023) (Dkt. No. 1) (alleging that "in numerous instances," the defendant directed others "to allocate the most profitable trades to the Proprietary Accounts and to allocate the unprofitable or less profitable trades to the Customer Accounts. In doing so, [the defendant] defrauded investors . . . by depriving them of a proportional share of trading profits [the defendant] generated and causing investors to incur a disproportionate share of [defendant's] trading losses").

[32] *In re the Dratel Grp., Inc. & William M. Dratel for Rev. of Action Taken by Finra*, SEC Release No. 77396, 2016 WL 1071560, at *1-2 (Mar. 17, 2016).

[33] *Id.*; *World Tree Fin.*, 43 F.4th at 461-62.

[34] *World Tree Fin.*, 43 F.4th at 461-62 (citations and quotations omitted).

to prove its claim," but instead could "rely[] on statistical evidence."[35]  Courts routinely admit statistical analysis of a defendant's trading to establish cherry picking.[36]

This case will be no different: part of the government's proof at trial will consist of a statistical analysis of the defendant's trading during the relevant period, which proves that the defendant engaged in fraud by having an undisclosed scheme to favor certain accounts (specifically, Macro Opps, Account-1, and Account-2) over others, by using first-day performance of his Treasury futures and options trades in making allocation decisions.

_____

[35] *Id.* at 461-62.

[36] *See, e.g.*, *RRBB Asset Management, LLC*, 2021 WL 3047081, at * 3 ("Schwartz engaged in omnibus trading, yet the first-day return rates for the favored accounts were substantially higher than those for the disfavored accounts and all other RRBB accounts. This raises an inference that the trades, despite starting in an omnibus or block fashion, were allocated differently. It is plausible, then, that such differing returns were not the product of chance but choice. These irregularities tend to show cherry-picking and thus a knowing scheme.") (citation omitted); *World Tree Fin.*, 43 F.4th at 462 (district court credited expert opinion that "that there was less than a one in one million chance that the patterns could have occurred if the allocations were made without regard to first-day return"); *SEC v. Werthe*, No. 23 Civ. 815 (DDL), 2025 WL 790970, at *4-6 (S.D. Cal. Mar. 12, 2025) (granting summary judgment in a cherry-picking case because SEC established "scheme to defraud" by, among other ways, "[u]sing two types of statistical analysis, [the SEC expert] determined that the difference in performance between the [defendant's] Account and Client Accounts was not attributable to random chance"); *SEC v. Jacobson*, No. 23 Civ. 5650, 2025 WL 1026327, at *6-7 (E.D. La. Apr. 7, 2025) (admitting expert testimony in cherry picking case that provided opinion that there was less than a one in a million chance that the patterns in Defendant's trading could have occurred if the allocations were made without cherry-picking); *SEC v. Susoeff*, No. 2:23 Civ. 173 (JCM) (EJY), 2024 WL 3938488, at *7-8 (D. Nev. Aug. 23, 2024) (admitting expert testimony in cherry-picking case that "Meritage's trading between January 1, 2021, and July 31, 2021, showed clear signs of cherry-picking"); *SEC v. K.W. Brown Investments Inc.*, 555 F. Supp. 2d 1275, 1299 (S.D. Fla. 2007) (finding that "90% of the trades that went to the 180 Account where winners while conversely 91% of the trades that went to ten or more of the Adviser's clients were losers. Market forces cannot explain this discrepancy, but cherry picking does explain it."); *SEC v. Paris*, No. 21 Cv. 3450, 2024 WL 4433614, at *7-12 (N.D. Ill. Oct. 7, 2024) (statistical analysis of defendant's trading admissible to prove cherry-picking); *SEC v. Slocum, Gordon & Co.*, 334 F. Supp. 2d 144 (D.R.I. 2004) (analyzing statistical analysis and other evidence and finding SEC did not meet burden to prove cherry picking); *SEC v. Kellen*, No. 20 Civ. 3861 (RSWL) (AGR), 2021 WL 4907238, at *2, 6-8 (C.D. Cal. Sept. 14, 2021) (denying summary judgment where SEC expert opined that "that the probability that random chance could result in the performance differences ... [is] less than one in one billion").

### 1. A Bill of Particulars is Not Required

The Court should deny defense's motion for a bill of particulars because the Government has already gone far beyond what is legally required and because the Court's pretrial disclosure schedule ensures the defendant will continue to receive increasingly granular information about the Government's case-in-chief in the run-up to trial. Fundamentally, "[a]n indictment is sufficient," and a bill of particulars is unnecessary, if the indictment does two things: "first, [if it] contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, [if it] enables him to plead an acquittal or conviction in bar of future prosecution of the same offense."[37]

The 22-page speaking indictment in this case meets both requirements. It fairly informs the defendant of the charges against him by: (1) stating that he is charged with committing fraud through a cherry-picking, in which he favored certain clients over others; (2) identifying the accounts and strategies that the defendant favored (Macro Opps, Acccount-1, and Account-2), as well as those he disfavored (the Core Strategies); (3) explaining that the method the defendant used to carry out his scheme was to wait between the time of his trades and the allocation time, so he could see the performance of trades before allocating; and (4) specifying that the set of trades through which the defendant executed his scheme was Treasury futures and options trades that he specifically allocated to Macro Opps, Account-1, Account-2, or the Core Strategies.[38] The Indictment also allows the defendant to invoke double-jeopardy protections in any future

---

[37] *Stringer*, 730 F.3d at 123-24 (quotation marks omitted).

[38] As explained in the Indictment, this set of trades excludes certain "paired" trades and trades that Leech placed through Broker-1. *See* Ind. at nn. 1-2. These trades are identifiable in the blotter that the Government has produced to the defense, and the Government will provide additional detail about them with its expert disclosures.

prosecution because it gives a clear picture of the crimes with which he has been charged and the conduct that led to those charges.

A bill of particulars is not a proper mechanism to obtain more information about the Government's case. "A bill of particulars is not a discovery device,"[39] and one is not required simply because "the information would be useful to the defendant."[40] That is particularly true where, as here, the Government has given the defendant extensive information—both within the Indictment and outside its four corners—to help the defense meet the Government's proof at trial.

### a.  The Indictment Previews Evidence of the Defendant's Scheme

Start with the Indictment itself.  The Indictment goes far beyond offering a general description of the scheme and charges, offering detail about the method the defendant used to carry out his scheme.  For instance, the Indictment alleges that Leech was able to carry out his undisclosed scheme to favor certain accounts over others by delaying between the time of trade and the time of allocation, which gave him an opportunity observe market movements throughout the day and allocate trades based on their first-day performance.[41]

The Indictment also does more than simply allege that Leech executed his scheme through his allocation of Treasury futures and options.  Instead, it provides details about the first-day performance of Leech's trading as a whole; the trades that he split evenly between Macro Opps and the Core Strategies (the "50/50 Trades"); the trades Leech allocated specifically to Macro Opps only (excluding Broker-1); and the trades that Leech allocated specifically to the Core Strategies only.  That is not all.  The Indictment also shows how the bias in Leech's allocations increased as

---

[39] *Mandell*, 710 F. Supp. 2d at 384.

[40] *Cordones*, 2022 WL 815229, at *8 (citation and quotation marks omitted).

[41] Ind. at ¶19.

the size of the first-day gain or first-day loss increased (for example, trades with first-day gains or losses of over $1,000,000); identifies the consistency in Leech's biased allocations from month to month and across similar trades; and explains how trades through Broker-1 and after October 2023 demonstrate that the bias in Leech's allocations was not driven by any particular strategy in Macro Opportunities.[42]  That additional detail—which was not legally required—provides the defense further information to understand not only what the defendant is charged with, but also how the Government is likely to prove its case.

### b. Additional Information Provided to the Defendant Prior to the Indictment

The Indictment was also not the defendant's first exposure to the nature of the case against him.  On June 12, 2024, the Government contacted defense counsel about its investigation of Leech's trading.  Over the next five months, defense counsel made extensive oral and written submissions about the merits of the case to the U.S. Attorney's Office.[43]  The upshot is clear: Not only does the defendant have a sufficient understanding of the Government's case to prepare for trial now, but he had a good understanding of the nature of the Government's investigation long before the Indictment, such that his attorneys were able to have extensive discussions with the Government about that conduct.

### c. Rule 16 and Expert Discovery

The Government also has provided, and will continue to provide, extensive information about its case to the defense beyond what is in the Indictment.  The Government has produced to the defendant Rule 16 discovery, virtually all of which has been produced in an electronically-loadable, text-searchable format that allows the defendant to search by a number of different

---

[42] Ind. ¶¶ 18-20.

[43] *See* Temkin Decl. ¶ 25.

parameters, including keyword, date, and type of document. The discovery also includes trade blotters of the defendant's trading in excel format so that the defendant can sort, filter, and analyze each of his trades. A search warrant affidavit also provides additional analysis of Leech's trading.

### d.  Additional Detail

In addition to the above sources, the defense will receive extensive evidentiary detail as we approach trial. On October 20, 2025, which is over five months before trial, the Government will produce its expert notices.[44] The Government anticipates that those notices will give the defendant useful information about the types of statistical analyses it intends to offer at trial and the sets of trades on which the Government has run those statistical analyses. Further still, the defendant will receive Section 3500 material on February 13, 2026 (seven weeks before trial) and a draft exhibit list on March 2, 2026 (five weeks before trial), which will provide even more insight into how the Government intends to prove its case.

### 2.  As With Every Court to Address Similar Requests for Additional Trade Particulars, the Court Should Deny Defendant's Requests

The defendant's arguments do not raise any colorable basis for requiring a bill of particulars. The Government has already given the defense the set of trades that underlie the allegations in the Indictment, and the defendant's additional request for the Government to identify "misallocated" trades mischaracterizes the charges, ignores settled cherry-picking case law, and ignores analogous case law from the context of market manipulation cases.

### a.  The Government Has Provided the Relevant Set of Trades

Acknowledging that the Government has disclosed its intent to use statistical evidence in its case, the defense contends that it can prepare only if "the Government identifies the trades on

---

[44] The Government will provide a copy of its expert notices to the Court so it can consider them in deciding this motion.

which the purported statistical pattern is calculated."[45] But the Government has done that and will continue to provide more information as the case heads toward trial.

In the Indictment, the Government explained that the defendant carried out his scheme by using first-day performance in allocating Treasury futures and options trades specifically to Macro Opps, the Core Strategies, Account-1, and Account-2.[46] That informed the defendant that the Government's allegation is that the crime occurred with respect to Treasury futures and options trades that he specifically allocated to those accounts. The Government then provided information from which the defendant could identify those trades by producing multiple copies of trade blotters from WAMCO that list all the defendant's trades in sortable Excel files.

The Government also identified, in the Indictment, that it intends to analyze sets of trades to help prove that the defendant was committing fraud when allocating Treasury futures and options specifically to Macro Opps, the Core Strategies, or Accounts-1 and -2. For example, as explained in the Indictment, the Government intends to offer analysis of the Treasury futures and options trades that the defendant allocated equally between Macro Opps and the Core Strategies— so-called "50/50 trades"—to show, among other things, that the defendant could (and often did) split trades equally and, when he did so, there was no notable bias in first-day performance. Similarly, the Indictment notes that the defendant's trades through Broker-1, and his trades after October 2023, can serve as control groups for other analyses. The Government will provide additional information about these analyses in connection with its expert disclosures, which it is scheduled to make over five months before trial.

---

[45] Def. Br. 19.

[46] The Indictment also identifies some sets of trades that are carved out of this data set, *see supra*, and the Government will provide further detail with its expert disclosures.

In short, the Government has identified the set of trades that are at issue in the cherry-picking scheme, has identified other sets of trades that will shed light on that scheme, and will continue to provide information of the analyses it intends to present at trial. There is no need for a bill of particulars.

### b. The Request to Identify "Misallocated" Trades Is Meritless

Shifting away from its request for the set of trades the Government intends to use for its statistical analyses, the defense additionally requests that the Government particularly identify the trades the defendant "misallocated." This request mischaracterizes the crime and the Government's theory, ignores the caselaw on cherry-picking, and fails to cite decisions denying similar requests in the analogous context of market manipulation.

*First*, the request for "misallocated" trades misunderstands the crimes with which the defendant has been charged. As explained above, to prove the defendant is guilty of each of the relevant counts, the Government intends to establish that the defendant engaged in a scheme, or a course of conduct, designed to defraud. The scheme to defraud is the undisclosed plan to favor certain accounts over others. The patterns of the defendant's trade allocations are *evidence* that the defendant, in fact, had such a scheme. But the question for the jury is whether the defendant engaged in a fraudulent, undisclosed scheme to favor certain accounts over others, not which specific trades were "misallocated."

That is how other cherry-picking cases have been charged and tried. As explained above, the Government routinely proves cherry-picking cases by offering statistical evidence about a defendant's trading pattern. Courts correctly allow that proof because a judge or jury can draw reasonable inferences from patterns and statistical evidence about whether a defendant did, or did not, intend to favor one set of clients over another. *See supra*. That method of proof is also fair to the defense because the defense can offer evidence, and make arguments, showing that the

statistical evidence does not prove what the Government claims.  This can include, but is not limited to, citing examples of trades within the set and making arguments about why those examples show the jury that the statistical pattern the Government has presented is unreliable.  But that does not mean that the Government is required to specifically identify and prove individual trades were "misallocated"—that is not in the relevant statutes, and the defense has not identified a case that establishes that rule.

*Second*, the defense's "misallocated" framing is factually inapposite.  The idea of a trade being "misallocated" presumes that Leech had a fixed allocation in mind at the time he placed a trade order, but allocated the trade elsewhere.  That is not how Leech traded.  As alleged in the Indictment, Leech made trades throughout the day, typically without knowing where he would allocate.  Leech waited until he had an opportunity to see how the market moved and then made his allocation decision.  Given this process, there was no "right" allocation at the time Leech made a trade.  Indeed, the defense's theory that there were "right" allocations and "wrong" allocations makes no sense given that Leech had a standing instruction for his staff to automatically allocate any unassigned trades 50/50 if he could not provide an allocation by the end of the trading day.

*Third*, courts uniformly reject analogous requests for trade-level particularization in market-manipulation cases.  In those cases, the Government typically argues that the defendant engaged in a fraudulent scheme to artificially control prices, and uses a pattern of trading as evidence of that fraudulent scheme.  Defendants often move to require the Government to particularize the manipulative trades in the data set, and courts have uniformly rejected these requests for particularized trade information as "nothing more than ill-disguised attempts at

general pretrial discovery."[47]  In *United States v. Tuzman*, for example, the court denied defendant's request for "particularized trade information" because the Indictment alleged "the types of trades the government considers improper" and because the defendant cited "no market manipulation case in which a court has required that particularized trade information be disclosed."[48]

Similarly, in *United States v. Wey*, the court rejected requests for "disclosures detailing on an individualized basis those trades and other acts that the Government claims manipulated the price of the Issuers' stock."[49]  The court viewed defendant's requests as an effort "to compel the production of the very type of evidentiary minutiae that is not appropriate for a bill of particulars" and found that the Indictment's allegations and search warrant affidavit sufficiently "spelled out the types of actions" alleged to have been manipulative.[50]  Ultimately, the Court held that "[t]o require the disclosure of further detail, *including trade-level detail*, would be to require the Government to advise Wey of the specific 'manner in which it will attempt to prove the charges.'"[51]

Consistent with *Wey* and *Tuzman*, courts have denied requests for "trade-level detail" because they improperly seek the "manner in which [the Government] will attempt to prove the

---

[47] *United States v. Wey*, No. 15 Cr. 611 (AJN), 2017 WL 237651, at *19 (S.D.N.Y. Jan. 18, 2017) (alterations and quotation marks omitted).

[48] 301 F. Supp. 3d 430, 453 (S.D.N.Y. 2017) (alterations and quotation marks omitted).

[49] 2017 WL 237651, at *19.

[50] *Id.*

[51] *Id.* (emphasis added) (quoting *Rittweger*, 259 F. Supp. 2d at 291 and citing *United States v. Bonventre*, No. 10 Cr. 228, 2013 WL 2303726, at *5-7 (S.D.N.Y. May 28, 2013), *aff'd*, 646 Fed. Appx. 73 (2d Cir. 2016)).

charges."[52]  In *United States v. Hwang*, for instance, the Indictment charged a market manipulation

scheme:  "at various times between in or about June 2020 and March 2021, Archegos's trading

caused and established certain stock prices that were not set by ordinary market forces of supply

and demand . . . [the] cumulative effect of the of the Archegos Conspirators' schemes over the

course of 2020, and particularly in or about fall 2020 and through March 2021, contributed to

significant artificial increases in the prices of the securities underlying Archegos's long swaps."[53]

Defendants moved for a bill of particulars because the indictment's "sweeping allegations are

bereft of any detail about which specific trades . . .  were manipulative and/or created an artificial

price" and "[a]bsent these particulars, Mr. Hwang confronts the herculean task of preparing a

defense to every one of the thousands of trades that Archegos executed."[54]  In short, Hwang, like

Leech, contended that the Government must particularize the trades that manipulated the market

in a market manipulation case.  As in *Wey* and *Tuzman*, the court rejected that argument.[55]

---

[52] *Id.; see also United States v. Heredia*, No. 02 Cr. 1246 (SWK), 2003 WL 21524008, at *9 (S.D.N.Y.  July 3, 2003) (bill of particulars request denied in stock manipulation case because "[t]he information sought by defendants is exactly the type 'routinely denied in the Second Circuit'" (quotation marks omitted)).

[53] 22 Cr. 240 (AKH) (Dkt. No. 48, at 112-13) (quoting the indictment).

[54] *Id.* at 113-114.

[55] 22 Cr. 240 (AKH) (Dkt. No. 66).  In *United States v. Motz*, No. 08 Cr. 598 (ADS) (E.D.N.Y 2008), moreover, the indictment charged a cherry-picking scheme:  "the trades that MOTZ allocated to the [hedge funds] generally were more profitable by the end of the day on which they were purchased than the trades MOTZ allocated to his discretionary account clients." *Id.*, Dkt. 13 at ¶¶ 12, 22.  The defendants sought a bill of particulars.  *Id.* Dkt. 34.  Instead of a bill of particulars, the Government provided a list "encompassing the specific trading activity that the government intends to introduce against the defendants."  *Id.* at Dkt. 40.  The Court did not order any further bill of particulars as to the trading data.  *Id.* Dkts. 42, 43. (The Court did order particulars as to venue.)  Here, as in *Motz*, the Government has provided the defendant with the trade blotters that specify the defendant's trading and allocations throughout the entire period. Indeed, the Government has gone far above the disclosures in *Motz* by identifying in the Indictment categories of trades that are evidence of the scheme.

Leech is in the same position as the defendants in *Wey, Tuzman,* and *Hwang*. In each of those cases, defendants engaged in a trading-based securities fraud scheme involving a large volume of trades. But in none of those cases, did the Court order the Government to detail trade-by-trade evidence in a bill of particulars. Defendants do not address these analogous trading cases. Instead, they cite to the *United States v. Finnerty*,[56] and *United States v. Rajaratnam*,[57] for the proposition that the Government in those cases identified "the trades at issue," thus obviating the need for a bill of particulars.[58] To start, the Indictment spells out the "trades at issue"—Leech's Treasury futures and options trades during the relevant period. Moreover, in *Finnerty*, the defendant did not seek a bill of particulars as to his trades, but instead "simply request[ed] that the government state what the alleged fraud is."[59] The defendant withdrew his motion for a bill of particulars, not because the Government identified trade-specific details, but because the Government provided a description of the fraud. Leech does not claim—as in *Finnerty*—that he does not understand the fraud charges against him.[60]

In the same way, in *Rajaratnam*, the court held that "the defendants are not entitled to an itemization of the trades at issue in the conspiracy counts," because the defendants "cite no case in which a court has ordered such particularization; the Court is aware of no such case; and the

---

[56] No. 05 Cr. 393 (DC) (S.D.N.Y. Nov. 15, 2005).

[57] No. 09 Cr. 1184 (RJH), 2010 WL 2788168, at *9 n.4 (S.D.N.Y. July 13, 2010).

[58] Def. Br. 13.

[59] Dkt. 17-2 at 10-11.

[60] Indeed, the defense selectively quotes from the brief he cites in *Finnerty,* the full quotation is "For example, the Government has provided the defendants with exception reports that identify *all* trades during the charged periods that were executed in each of the defendants' respective stocks that are alleged to be violative." Dkt. 18 at 11. Far from a bill of particulars, the Government was referring to Rule 16 discovery productions of NYSE generated "exception reports."

Court is not persuaded that more detail is necessary to prepare a defense here."[61]  Instead, the Government informed the defendants that the trades "at issue" in the relevant counts were "all trades in ATI executed between March 7, 2006 to July 24, 2006, and all trades in Intel executed between April 9, 2007 and April 17, 2007."[62]  Similarly here, as the defendant concedes, the Government has provided the defendant all of the trades "at issue"—the defendant's U.S. Treasury futures and options trades during the charged time period.[63]  Defendant's cases therefore support denying a bill of particulars here.

### c.  *Bortnovsky* and *Nachamie* Do Not Support the Defendant's Request

Lacking support in the securities fraud cases that involve trading evidence, the defendant relies primarily on two cases: *United States v. Bortnovsky*, 820 F.2d 572 (2d. Cir. 1987) and *United States v. Nachamie*, 91 F. Supp. 2d 571 (S.D.N.Y. 2000), neither of which support the defendant's request for a bill of particulars here.

*Bortnovsky* involved a prosecution under the Racketeer Influenced and Corrupt Organizations Act ("RICO") with facts that bear no resemblance to this case.  To begin, the Second Circuit has noted that RICO prosecutions often have unique needs for bills of particulars given the

---

[61] 2010 WL 2788168, at *9.

[62] *Id.* at *9 n.4 ("The Court is not persuaded that greater particularization is necessary or even possible.").  The defendant alters the quotation of this footnote in his brief (Def. Br. at 13) by adding the word "illegal" to the following sentence: "The government has acknowledged its obligation to provide the defendants with the trades that Counts 18 and 19 allege Rajaratnam to have made."

[63] *See also Tuzman*, 301 F. Supp. 3d at 453 (distinguishing *Rajaratnam*, because "disclosure of *some* allegedly illegal trading activity was found sufficient").

nature of the charges.[64]  The need was particularly heightened in *Bortnovsky* because of the unique nature of the offense.  The defendants were charged, in part, with engaging in a scheme to defraud federal and state agencies, including by submitting false claims for burglary losses and false claims for fire damage.[65]  At trial, the prosecution introduced evidence of twelve burglaries, but argued that only four were fabricated.  It also introduced evidence of numerous documents regarding those burglaries, but argued that only three of the documents introduced were false.[66]  The Second Circuit held that, on these facts, it was error not to require a bill of particulars because the failure to identify which burglaries and documents were fraudulent before trial effectively required the defense to prove which of the twelve burglaries were real, rather than being able to focus on rebutting the Government's proof that four were fake.[67]  That problem was magnified because one defendant's counsel "had only four days within which to prepare a defense."[68]

Similarly, in *Nachamie*, the Government produced over 2,000 Medicare claims, but did not inform the defense "which of these claims were false and in what way they were false."[69]  The Court, relying on *Bortnovsky*, granted a bill of particulars request to identify the false and misleading claims "only with regard to those claims that the Government intends to prove at trial."[70]  In other words, the Government provided an exhibit list, as the Government will do here.

---

[64] *United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988).  As a result, the typical practice in this District for RICO prosecutions is for the Government to provide the defendant with a so-called "enterprise letter" in advance of trial which sets forth the nature of the proof as to the enterprise and the predicate acts.

[65] *Bortnovsky*, 820 F.2d at 573-74.

[66] *Id.* at 574.

[67] *Id.*

[68] *Id.*

[69] 91 F. Supp. 2d at 571.

[70] 91 F. Supp. 2d at 774.

Due to the unique facts of *Bortnovsky* and *Nachamie*, courts in this Circuit have distinguished them and denied bills of particulars requests. In *United States v. Kahale*, Judge Matsumoto noted that "unlike the circumstances here, both *Bortnovsky* and *Nachamie* presented the quintessential 'needle in a haystack' problem to defendants who were faced with sifting through thousands of legitimate transactions in an attempt to discover which transactions the government sought to prove were fraudulent."[71] Judge Matsumoto concluded that "the Indictment and discovery materials here provide adequate notice to defendants of the crimes charged and specify precisely that the allegedly fraudulent transactions at issue involved investments made in B.I.M. in exchange for which fraudulent 'gold delivery certificates' were issued."[72] Accordingly, the Court denied defendants' request for "[p]articulars of the [t]ransactions [t]hemselves."[73] The Court in *Tuzman* also distinguished *Bortnovsky* and *Nachamie* for the same reasons, finding that "non-securities fraud cases [that] rely on *Bortnovsky* and *Nachamie* [were not] persuasive."[74]

Given the nature of the defendant's cherry-picking scheme, and the means by with the Government will prove it, the concerns animating the decisions in *Bortnovsky* and *Nachamie* are not present. That is because the Government will, in part, prove the defendant's scheme through an analysis of Leech's pattern of trades. Unlike in *Bortnovsky*, where the real burglaries had no relevance to proving the fake burglaries, or in *Nachamie*, where the non-fraudulent claims were not going to be admitted in the Government's case-in-chief at all, in cherry-picking cases, "[d]etermining whether cherry picking has occurred often requires drawing inferences from a

---

[71] 789 F. Supp. 2d 359, 376 (E.D.N.Y. 2009), *aff'd sub nom. United States v. Graham*, 477 F. App'x 818 (2d Cir. 2012).

[72] *Id.*

[73] *Id.*

[74] *Tuzman*, 301 F. Supp. 3d at 453.

pattern of behavior, irregularities, and trading data."[75]  The defendant recognizes this when he argues that, "[b]ecause trades are interrelated in their effects and *cannot be viewed in isolation*, addressing any single trade also requires analyzing that trade in the context of the of the trades placed for the relevant portfolio on the day in question."[76]  To this end, the case here does not present the same risk—present in *Bortnovsky* and *Nachamie*—that the defense will waste effort preparing to address some trades that do not prove relevant at trial.  The Government's statistical analyses will address the full set of trades described in the Indictment (and detailed in its expert notices), so all those trades are relevant.

Similarly, the case here does not present a burden-shifting problem.  The Government plans to prove its case, in part, through evidence of statistical patterns.  The defense can argue that the statistical evidence does not prove beyond a reasonable doubt that he was engaged in a cherry-picking scheme.  In support of that defense, the defendant can give examples of particular trades within the data set used for the statistical analysis and show why those examples refute, or weaken, the inference that the jury should draw from the statistical evidence.  This is essentially the same as what happens in any criminal case: the Government presents evidence (including circumstantial

---

[75] *World Tree Fin.*, 43 F.4th at 462.

[76] Def. Br. 4 (emphasis added).  This feature of the charged scheme distinguishes cases like *United States v. Chierchio*, where the defendant could not be sure "which transfers the government believes are evidence of money laundering." No. 20 Cr. 306 (NGG), 2022 WL 523603, at *14 (E.D.N.Y. Feb. 22, 2022).  In a cherry-picking case, an allocation is not "true" or "false," instead, the whole of defendants' trading is "evidence of [cherry picking]."  This also distinguishes Judge Rakoff's oral ruling in *United States v. Johnson*, No. 17 Cr. 482 (S.D.N.Y. 2017), which addressed false statements that could be assessed in isolation, and *United States v. Vaid*, No. 16 Cr. 763 (LGS), 2017 WL 3891695, at *11 (S.D.N.Y. Sept. 5, 2017) (following *Nachamie* in a false claims case because each claim would be proven fraudulent on an individual basis: "Accordingly, as to each individual claim that the Government intends to prove was fraudulent because goods or services were either medically unnecessary or not provided, it must identify, by 60 days prior to trial, the claim and whether the goods or service was not provided or was medically unnecessary").

evidence), and the defense argues that the evidence does not establish the defendant's guilt beyond a reasonable doubt.[77]

Another decision the defendant cites, *United States v. Siddiqi*,[78] illustrates why a bill of particulars is not necessary here. *Siddiqi* was a bribery case in which the Court ordered a bill of particulars as to "which of the requests for payment and change orders were allegedly approved by Siddiqi in return for bribes." Importantly, however, the Court made clear that "the Government need not allege that particular requests for payment or change orders were approved in return for particular bribery payments. Requiring this sort of one-to-one mapping of tainted requests for payment or change orders to particular bribes would improperly restrict the Government's proof at trial."[79] Instead, the Court ordered that the Government "should identify the *group of approved requests* for payment and change orders that it alleges were *part of the bribery scheme* with which Siddiqi is charged."[80] *Siddiqi* therefore rejected the particularized trade-by-trade itemization defendant seeks in favor of what the Government has already provided—the group of trade allocations that are "part of" the cherry-picking scheme—and will continue to detail in its

---

[77] Leech's claim that he is in the same position as the defendants in *Bortnovsky*—one of whom had four days to prepare a defense—is unconvincing. The defendant will have over a year and four months to prepare for trial, has had his own trading data presumably since late 2023, has been provided text-searchable evidence (something not available in 1986, when *Bortnovsky* was tried), and a detailed indictment which provides extremely specific examples of the fraudulent conduct that occurred during the scheme. *See United States v. Raniere*, 384 F. Supp. 3d 282, 323 (E.D.N.Y. 2019) (distinguishing *Bortnovsky* when denying a motion for a bill of particulars and noting that "[s]uch unique facts are vastly different from the situation here, given the information Raniere has received already and the lengthy amount of time Raniere has had to prepare for trial since he was indicted over a year ago") (internal citation omitted).

[78] No. 06 Cr. 377 (SWK), 2007 WL 549420, at *3-4 (S.D.N.Y. Feb. 21, 2007), cited at Def. Br. 17 n.14.

[79] *Id.*

[80] *Id.* (emphasis added).

forthcoming disclosures.

The defendant nevertheless contends that preparing a defense of Leech's trading cannot be accomplished by the April 2026 trial date because a trade-by-trade analysis "must be performed manually and requires *extensive* input from experts in fixed income portfolio management." (Def. Br. 15.)  But even assuming, *arguendo*, that it would be admissible for experts to manufacture after-the-fact explanations for each of the defendant's trades, that workload does not require a bill of particulars.  The defense knows the set of trades on which the Government basis its statistical analyses.  The defense has known about the basic nature of this case for months before the charges. And the defense will receive even more information about the Government's case at the expert deadline in October, which is many months before trial.

What is more, the difficulty the defense claims to have in identifying the reason for the defendant's allocations is, in many respects, a feature of the defendant's scheme.  Contrary to WAMCO's training, the defendant generally did not keep any written documentation of his rationale for allocating trades between his clients.[81]  So defense's alleged difficulty in explaining why the defendant allocated trades as he did is not a function of the Government's case, or the need for a bill of particulars, but a creation of the defendant's making.

*Finally*, the defendant's claims of overwhelm and unfair surprise are unfounded.  Far from the 30,000 trades that Leech cites in his brief, during the relevant period, Leech allocated approximately 2,600 futures and options trades to Macro Opportunities only (excluding Broker-1), approximately 2,100 futures and options trades to the Core Strategies only, and approximately

---

[81] The compliance training included a slide that stated: "[b]est practice to document allocation rational"; "[u]se the ATP allocator—use objective criteria"; "ATP allocator creates an audit trail that can be accessed later—memory can be unreliable."

250 futures and options trades specifically to Account-1, and approximately 225 trades specifically to Account-2. As set forth in the Indictment, those sets of allocations underlie the biased pattern in Leech's trading. As further proof that Leech engaged in this scheme, the Indictment also analyzes Leech's other trading. But, there too, the trading data is limited: Leech allocated approximately 2,800 futures and options trades executed with Broker-1 (during which Leech generally did not have the opportunity to observe first-day performance), approximately 5,300 futures and options trades 50/50 (that is, evenly split between Macro Opps and the Core Strategies); and approximately 700 futures and options trades after the relevant period from on or about October 19, 2023 through in or about August 2024. The defense does not contend that it is unable to find these trades. Indeed, they are produced in the searchable, sortable excels.[82]

In sum, the defense has all the tools to meet the Government's proof, and it will only obtain further details as the Government discloses expert reports, Section 3500 material, and exhibit lists. These disclosures will further detail the proof the Government will offer during trial. The defendant is free to dispute that a pattern exists, argue that the pattern does not prove his guilt, or attempt (through admissible evidence) to establish that particular trades that underlie the pattern or specific examples focused on at trial were not allocated based on their first day performance. This places the defendant in the same shoes as the defendants in *Tuzman*, *Wey*, and *Hwang*, all of

---

[82] That the Government has provided the defendant's trades in sortable excel format distinguishes *United States v. Savin*, No. 00 Cr. 45 (RWS), 2001 WL 243533, at *1 (S.D.N.Y. Mar. 7, 2001), where, twenty-five years' ago, the Government produced "85 boxes of documents, which Savin's counsel estimates contain more than 100,000 pages of material." The production of the trades also ensures that the Government has met its disclosure obligations under Rule 16 and *Brady*. To the extent the defense wants to use the defendant's trading to rebut the Government's argument that Leech committed a crime, it has all the tools it needs to do so.

whom had their requests for trade-by-trade particulars rejected.[83]  The motion should be denied.

### 3. The Court Should Deny Defendant's Request to Identify All Misstatements and Omissions

As set forth above, the Indictment charges that the defendant engaged in a fraudulent scheme or course of conduct, whereby he used first-day performance in his allocation decisions to favor certain clients over others in his allocation decisions, without disclosing that fact to clients. The defendant was a fiduciary, as a result, he had to disclose that he was favoring certain portfolios over others by using first-day performance in deciding how to allocate, or refrain from trading.[84] Undisclosed cherry-picking violates a fiduciary's affirmative duty of utmost good faith to avoid misleading clients.[85] And so, "[c]herry-picking axiomatically constitutes" a scheme that "operates

---

[83] Nor can the defendant simply point to the volume of discovery and claim that a bill of particulars is warranted.  Judge Garaufis rejected exactly this argument in *Raniere*, noting that "Raniere fails to elaborate on the supposed problems with the discovery provided by the Government to date. His assertion, lifted from *Bortnovsky* but stripped of detail, that the Government provided 'mountains of documents with little guidance as to which ones are relevant' is insufficient." *Id.* (internal citations and quotation marks omitted); *see also Mandell*, 710 F. Supp. 2d at 371 (noting that "the mere existence of 'mountains of documents' does not entitle Mandell to a bill of particulars"); *United States v. Columbo*, No. 04 Cr. 273 (NRB), 2006 WL 2012511, at *6 (S.D.N.Y. July 18, 2006) (denying request for bill of particulars and noting that "[w]hile defendants claim that the quantity of audio tapes and documents produced in this case is voluminous and overwhelming, we note that they will have had more than a year to review discovery prior to trial").

[84] *See, e.g.*, *SEC v. Rashid*, 96 F. 4th 233, 240-41 (2d Cir. 2024) (noting that the Investment Advisers Act "imposed on advisers 'an affirmative duty of utmost good faith, and full and fair disclosure of all material facts, as well as an affirmative obligation to employ reasonable care to avoid misleading [their] clients.'"); *SEC v. Westport Cap. Markets LLC*, 408 F. Supp. 3d 93, 103-04 (D. Conn. 2019) ("[A]n investment adviser may violate [§80b-6(1)] by failing to disclose material information about the adviser's conflict of interest even if the adviser had no intent to injure his clients and even if his clients were not injured at all." (citing *S.E.C. v. Capital Gains Research Bureau Inc.*, 375 U.S. 180, 186 (1963); *United States v. Tagliaferri*, 820 F.3d 568, 572 (2d Cir. 2016)).

[85] *Id.* at 461 (citing *Laird v. Integrated Res., Inc.*, 897 F.2d 826, 835 (5th Cir. 1990)).

as a fraud" or is "fraudulent."[86]  Accordingly, the defendant is guilty of Counts One through Four by employing this scheme without informing clients, regardless of whether he (directly or indirectly) made a specific representation that was fraudulent, or a representation that was misleading because it omitted certain information.

The Indictment also includes additional bases for the defendant's guilt in the Securities Fraud (Count Two) and Commodities Fraud (Count Four) counts.  These counts alternatively allege that the defendant made, directly or indirectly, any "untrue statement[s] of material fact and omit[ted] to state [] material fact[s] necessary in order to make the statements made . . . not misleading."[87]  As the Government explained to defense counsel in a letter, the defendant made misstatements to investors through numerous communications with clients that were misleading because they disclosed information about his investment strategies; the reasons for the performance of the accounts the defendant managed; and the defendant's fiduciary duties, processes for managing conflicts of interest, and allocation practices, yet they omitted that the defendant had a practice of favoring certain portfolios over others by using first-day performance in his allocation decisions for Treasury futures and options.

As to these alternative bases for guilt in Counts Two and Four, the Government has produced in discovery extensive examples of Mr. Leech's communications with clients and WAMCO's SEC filings, in which Leech directly and indirectly made untrue statements of material fact and omitted to state material facts necessary in order to make the statements not misleading.

---

[86] *Kellen*, 2021 WL 4907238, at *6 (C.D. Cal. Sept. 14, 2021) (citing *K.W. Brown* and *Dratel*).

[87] *See, e.g.*, 17 C.F.R. § 240.10b-5(b); *see also* 17 C.F.R. § 180.1(b). This prong "covers half-truths, not pure omissions."  *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 264 (2024).  *Macquarie* did not extend this holding to the other two prongs of Rule 10b-5.  *See id.* at 265 n.2.

For example, the Government has produced Leech's presentations and commentary in response to clients' desires to "dig deep" on the sources of recent underperformance and due diligence meetings. The Government has also produced a searchable and sortable excel catalogue of Leech's communications with Core Strategies, Macro Opportunities strategies, and Account-1 clients during the relevant period. These excel sheets provide details the client, interaction type, WAMCO attendees, external attendees, date, and summary of the meetings.

In addition to an excel catalogue of Leech's client communications during the relevant period, the Government has also produced WAMCO's Macro Opportunities Retention Campaign Materials, referenced in the Indictment, including a client memorandum approved by Mr. Leech. The paper contained a chart with "every single trading day of [Macro Opportunities] since inception" to show that "[d]rawdown periods appear symmetrical; although they happen quickly, recoveries also occurred quite fast."

WAMCO also filed documents with the SEC which represent that "Mr. Leech is the Chief Investment Officer for the Company and has input on the applicant's investment policies and procedures." WAMCO's Form ADV Part 2A, included representations that (1) investment allocations are done in a manner that Western Asset believes is fair and equitable, with the presumption that similarly situated clients should generally participate in similar investment opportunities and trades and (2) all investment advisory firms owe a fiduciary duty to their clients, and, in its role as a fiduciary, Western Asset endeavors to eliminate and/or mitigate conflicts and potential conflicts of interest.

Despite these categories and specific examples of Leech's materially false statements and omissions in client communications, marketing memorandum, and WAMCO's public filings, the defendant seeks the identification of each misrepresentation made during the scheme. The

defendant is not entitled to this level of detail about the Government's proof. Nor does the defendant offer any explanation as to why—after receiving a detailed Indictment and searchable discovery—the defendant does not understand the charges against him. Indeed, the thrust of the defendants' arguments in this Motion—in court and in motion practice—is that the defendant did not engage in the charged scheme, not that he disclosed it to clients

Courts routinely deny requests for a bill of particulars to identify all misrepresentations and omissions in fraud cases.[88] These courts recognize defendants' requests to be an effort to force the Government to preview its case for the defense and issue an exhibit list months ahead of the Court-ordered schedule.[89] "As a general matter, in our adversarial system, it is incumbent on the defense to review the discovery for itself to determine its significance; it is not the role of the government to tell the defense everything that is important and why."[90]

---

[88] *See United States v. Martinez*, 22-cr-251 (LJL), 2023 WL 2403134, at *2 (S.D.N.Y. Mar. 8, 2023) (denying motion for bill of particulars where "[t]he Complaint generally informs the defense of the nature of the misrepresentations"); *Mandell*, 710 F. Supp. 2d at 372 (concluding that the defendant's attempt "to compel the Government to particularize the allegations in the Indictment regarding misrepresentations allegedly made to investors and to identify the allegedly defrauded investors" was "nothing more than an ill-disguised attempt at general pretrial discovery") (quotation marks and alterations omitted).

[89] *See United States v. Mitlof*, 165 F. Supp. 2d 558, 569 (S.D.N.Y. Sept. 20, 2021) ("The Government may not be compelled to provide a bill of particulars disclosing the manner in which it will attempt to prove the charges, the precise manner in which the defendant committed the crime charged, or a preview of the Government's evidence or legal theories"); *United States v. Bellomo*, 263 F. Supp. 2d 561, 580 (E.D.N.Y. Mar. 13, 2003) ("A bill of particulars is not designed to: obtain the government's evidence; restrict the government's evidence prior to trial; assist the defendant's investigation; obtain the precise way in which the government intends to prove its case; interpret its evidence for the defendant, or disclose its legal theory."); *United States v. Levy*, No. S5 11 Cr. 62 (PAC), 2013 WL 664712, at *13 (S.D.N.Y. Feb. 25, 2013), *aff'd*, 803 F.3d 120 (2d Cir. 2015) (denying a bill of particulars where indictment described "the types of material misrepresentations and omissions that [the defendant] allegedly made;" "the extent of [the defendant's] financial commitment to the target companies;" and "[d]efendants' participation in the manipulation of the target companies' stock").

[90] *Martinez*, 2023 WL 2403134, at *2 (quoting *United States v. Ray*, 2021 WL 3168250, at *9 (S.D.N.Y. July 27, 2021)).

Defendant cites two cases in support of his motion, but neither are fraud cases nor support his argument for a bill of particulars.[91]  Defendant cites *Siddiqi*, the bribery case discussed above, which ordered the Government identify a "group" of requests that were part of the bribery scheme, and not the "one-to-one mapping of tainted requests" that defendant sought.[92]  As discussed above, to the extent this case is relevant at all, it counsels against ordering a bill of particulars.  Defendant next cites *United States v. Trie*.[93]  As defendant quotes, *Trie* ordered a bill of particulars as to "false statements" charges under Title 18, United States Code, Sections 1001.[94]  Prosecutions under Section 1001—which is used to charge individuals who, for example, lie to the FBI—involve discrete false statements to the federal government, often on a specific occasion.  They are not fraud charges.  In a Section 1001 prosecution, the statement itself *is* the crime.  This stands in contrast with a fraud charge, in which a fraudulent statement is simply a *means* to commit the crime.[95]  Cases under Section 1001 are therefore afield from defendant's challenge to the misstatement prongs of Counts Two and Four,[96] and cannot support the defendants' request for the

---

[91] Def. Br. 20-22.

[92] 2007 WL 549420, at *3.

[93] 21 F. Supp. 2d 7 (D.D.C. 1998).

[94] Def. Br. 21; *Trie*, 21 F. Supp. 2d at 13 (noting that Counts 9-11 charge with aiding and abetting the making of false statements to a government agency in violation of 18 U.S.C. § 1001 and 18 U.S.C. § 2.)

[95] *See United States v. Mora*, No. 19 Cr. 514 (JPO), 2020 WL 7496281, at *1 (S.D.N.Y. Dec. 21, 2020) ("The Government is not required to disclose the manner in which it will attempt to prove the charges, nor the means by which the crimes charged were committed.") (alteration and quotation marks omitted); *United States v. Feola*, 651 F. Supp. 1068, 1132 (S.D.N.Y. 1987) ("It is well settled that defendants need not know the means by which it is claimed they performed acts in furtherance of the conspiracy nor the evidence which the Government intends to adduce to prove their criminal acts.").

[96] Count Five does bring a Section 1001 charge, and, tellingly, the defendant does not challenge Count Five for failing to particularize the statements at issue.

minute details of trial proof.[97]

In sum, given the detailed nature of the Indictment, the extensive discovery that has been produced, the Government's disclosures to date, and the additional disclosures that the Government has agreed to provide the defendant in advance of trial, "the only function of a bill of particulars in this case would be to place the Government in a strait jacket and to force it to reveal, far in advance of trial, its trial strategy and the minutiae of how it will prove the charges."[98]

## II. The Court Should Deny Defendant's Request to Strike Evidence of His Scheme from the Indictment

The defendant asks the Court to strike from the Indictment the allegation that, "[f]rom January 2021 through October 2023, the U.S. Treasury ("Treasury") futures and options trades that LEECH allocated specifically to Macro Opps had net first day *gains* of over $600 million.  By contrast, during this period, the Treasury futures and options trades that LEECH allocated specifically to the Core Strategies had net first day *losses* of over $600 million."[99]  The defendant's motion is premature and meritless, and the Court should deny it.

### A. Applicable Law

"Although the Federal Rules of Criminal Procedure grant the Court authority to strike surplusage from an indictment, it has long been the policy of courts within the Southern District

---

[97] *See United States v. Tajideen*, 319 F. Supp. 3d 445, 466 (D.D.C. 2018) (denying a request for a bill of particulars, in a case where the defendant was charged with defrauding the federal government by interfering with OFAC's lawful functions, in part by submitting misrepresentations or fraudulent statements, because "in this case false statements are not at the core of the defendant's charges against him" (brackets and internal citations omitted)).

[98] *Martinez*, 2023 WL 2403134, at * 2 (alterations and quotation marks omitted); *see also United States v. Kostin*, 24 Cr. 91 (GHW), Dkt. 197 at 61-62 (May 27, 2025) ("The indictment and the Government's disclosures contain sufficient information for [the defendants] to prepare their defense and avoid prejudicial surprise at the trial. [The defendants] are requesting a preview of the Government's proof at trial, which is not the proper purpose for a bill of particulars.").

[99] Ind. ¶ 5.

to refrain from tampering with indictments."[100] "Motions to strike surplusage from an indictment will be granted only where the challenged allegations are not relevant to the crime charged and are inflammatory or prejudicial."[101]

"Given this exacting standard, such motions [to strike] are rarely granted."[102]  In setting forth allegations in a charging instrument, the Government is not limited to an enumeration of the bare elements of a crime; instead, a charging instrument may be used to provide background to the charged criminal conduct, to describe the circumstances, means, and methods, of an offense, and to describe evidence that is otherwise admissible at trial.[103]  Where there is any doubt about the connection between the allegations and the evidence that will be admitted at trial, "[c]ourts in this district routinely await presentation of the Government's evidence at trial before ruling on a motion to strike."[104]  As multiple courts have concluded, "'[t]here is little or no purpose in attempting to predict in advance of trial what evidence will prove admissible or how specific allegations relate to the overall charges.'"[105]

---

[100] *United States v. Bin Laden*, 91 F. Supp. 2d 600, 621 (S.D.N.Y. 2000) (quotation marks, alterations, and citations omitted).

[101] *United States v. Scarpa*, 913 F.2d 993, 1013 (2d Cir. 1990) quotation marks omitted). "[I]f evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken." *Id.* (quotation marks omitted); *see also United States v. Mulder*, 273 F.3d 91, 99 (2d Cir. 2001) (quoting *Scarpa*, 913 F.3d at 1013).

[102] *United States v. Coffey*, 361 F. Supp. 2d 102, 123 (E.D.N.Y. 2005).

[103] *See United States v. Mostafa*, 965 F. Supp. 2d 451, 466 (S.D.N.Y. 2013) (citing *Mulder*, 273 F.3d at 99).

[104] *Id.* at 467; *see also United States v. Maxwell*, 534 F. Supp. 3d 299, 322 (S.D.N.Y. 2021) ("The Court will follow the well-worn path of others in this District and reserve the issue [of striking surplusage] for trial.").

[105] *United States v. Smith*, 985 F. Supp. 2d 547, 612 (S.D.N.Y. 2014) (brackets in original) (quoting *United States v. Butler*, 351 F. Supp. 121, 124 (S.D.N.Y. 2004)).

### B. Discussion

Defendant moves to strike the statement in the Indictment that describes his Macro Opportunities-specific allocations as producing over $600 million in net gains and his Core Strategy-specific allocations as producing over $600 million in net losses. Defendant does not claim that these numbers are factually inaccurate. Instead, defendant argues they are "misleading" and "unfairly prejudicial," because, in his view, those aggregate statistics are overinclusive and account for only unrealized first-day performance.

As a threshold matter, the defendant's motion to strike is premature and may be rendered moot. Any surplusage issues "need not be fully addressed" at the motion to dismiss stage because "[c]ourts in this district routinely await presentation of the Government' evidence at trial before ruling on a motion to strike."[106]  In this District, it is often the practice of the courts not to give "speaking" indictments to the jury, so this issue may be entirely moot; in the event this Court decides to provide the jury with the Indictment following the conclusion of the trial and in connection with deliberations, the defendant will have an opportunity to make a motion then with the benefit of the trial evidence, the Court's expected jury instructions, and information about what materials would otherwise be provided to the jury.

Substantively, the factual references to the net first-day gains and losses of Mr. Leech's Macro Opps or Core Strategy specific allocations should not be stricken from the Indictment because this information is relevant and neither inflammatory nor improperly prejudicial. That Leech's Macro Opps-specific allocations resulted in net first day *gains* of over $600 million and

---

[106] *Mostafa*, 965 F. Supp. 2d at 467 (citing cases); *see also Butler*, 351 F. Supp. 2d at 124 ("[I]f it should be appropriate to give a copy of the indictment to the jury in connection with their deliberations, that copy can be redacted according to the charges, allegations, and evidence that remain relevant in light of the entire trial").

his Core Strategy-specific allocations resulted in net first day *losses* of over $600 million, is proof that the defendant engaged in a scheme to favor Macro Opps by observing his trades' first-day performance and allocating better performing trades to Macro Opps and worse performing trades to the Core Strategies. This extreme disparity surpasses the "low bar for relevance" under Federal Rule of Evidence 401, [107] and is the type of evidence routinely admitted to prove a cherry-picking scheme.[108] Defendant is free to make jury arguments about this disparity, but those arguments go to weight, not admissibility. At bottom, the Court need not resolve this evidentiary dispute now; the defense has stated that the evidence related to this allegation will be the subject of a motion in limine prior to trial and even if not, the Court should "await presentation of the Government's evidence at trial before" granting a motion to strike.[109] The Court should deny the motion.

### III. The Court Should Deny Defendant's Request for Additional Discovery Regarding the Filter Team Because the Defendant Fails to Establish Privilege, Fails to Allege an Intentional Intrusion, and Fails to Allege Prejudice.

Leech's third motion seeks additional discovery related to the Government's filter team protocols. Leech proposes to inquire into the Government's handling of potentially privileged documents obtained by search warrant. Leech makes this request not because he has identified an intentional or prejudicial error, but because he has not. The Government has already provided the

---

[107] *United States v. Rutigliano*, 614 F. App'x 542, 545 (2d Cir. 2015); *United States v. Abu-Jihaad*, 630 F.3d 102, 131-132 (2d Cir. 2010) ("To be relevant, evidence need not be sufficient by itself to prove a fact in issue, much less to prove it beyond a reasonable doubt. . . . . Rather, evidence is 'relevant' if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" (quoting Fed. R. Evid. 401)).

[108] *See, e.g.*, *SEC v. K.W. Brown & Co.*, 555 F. Supp. 2d 1275, 1299 (S.D. Fla. 2007) (finding that "90% of the trades that went to the 180 Account where winners while conversely 91% of the trades that went to ten or more of the Adviser's clients were losers. Market forces cannot explain this discrepancy, but cherry picking does explain it."). *See also supra*.

[109] *Mostafa*, 965 F. Supp. 2d at 467.

defense extensive information regarding its filter process, none of which is disputed, and all of which demonstrates that the Government took reasonable steps to protect the defendant's privilege and acted in good faith. The defendant's failure to describe any bases to conclude the Government has intentionally violated his privileges suffices to deny his motion. In any event, the defendant's privilege assertions are unestablished and baseless and, notably, do not relate to communications with lawyers. Finally, prior to receiving the defendant's motion, the Government had already concluded that the warrant returns did not contain relevant evidence, and therefore the Government will not offer documents from the warrant returns at trial, including those over which the defendant has asserted privilege (unless this Court rules that they are not privileged), so the defendant faces no prospect that this issue will prejudice him before the jury. Given the extensive undisputed factual record provided to the defense, the defendant's failure to establish privilege, and the defendant's failure to articulate any conceivable prejudice or intentional violation of the attorney client privilege, the Court should deny defendant's request for additional discovery.

## A. Factual Background

### 1. The Filter Process

On or about February 28, 2024, the Honorable Stewart D. Aaron signed covert, sealed search warrants related to the defendant's accounts at Google and Apple (the "Providers"). Judge Aaron also issued an order that the Providers not notify others of the warrant and that the affidavit and warrant be filed under seal. When the Government received data from the Providers (the "Apple Returns" and the "Google Returns"), the case team sent that data to a filter team under the supervision of the Office's Privilege Review Coordinator (the "Filter Team") to screen potentially privileged material prior to the case team's responsiveness review.[110] The case team did not

---

[110] Def. Ex. 8 (Government's February 6, 2025 Letter to Defense counsel).

conduct any review prior to the Filter Team's initial screen.

As the defense notes, the combined returns included thousands of records. The Filter Team applied search terms to identify potentially privileged materials, using both common legal terms and terms specifically derived from attorneys and law firms representing Leech, WAMCO, and Franklin Templeton (WAMCO's parent company). The Filter Team also implemented other review techniques, including manual review, to identify potentially privileged materials that might not be captured by the search terms. The Filter Team released to the case team the items that the Filter Team did not identify as potentially privileged. As the Filter Team identified potentially privileged materials, it segregated them so the case team could not access them.

The Filter Team released data from the Google Returns in April 2024 and released data from the Apple returns in August 2024. The case team commenced its responsiveness review after each release. As is the Government's usual practice, the Filter Team and the prosecution team agreed that, if members of the case team identified any material during the responsiveness review that appeared to be potentially privileged, the case team would pause its review and notify the Filter Team, so the Filter Team could conduct a supplemental privilege review, if necessary. The case team and Filter Team followed this protocol each time the case team encountered materials that appeared to be potentially privileged. The case team and Filter Team implemented this protocol several times for the Google Returns.

The Government also diligently respected the defendant's privilege through the filter review process for the Apple Returns. The Filter Team did not release data from the Apple Returns to the Prosecution Team until August 2024. This allowed the Filter Team to use much of what it had learned from the review of the Google Returns in screening potentially privileged materials from the Apple Returns. As with the Google Returns, the Filter Team and case team agreed that,

if members of the case team identified any material during the responsiveness review that appeared to be potentially privileged, the case team would pause its review and notify the Filter Team, so the Filter Team could conduct a supplemental privilege review, if necessary. The case team and Filter Team implemented this protocol several times for the Apple Returns.[111]

### 2.  The Defense's Privilege Assertions

Prior to Indictment, in or around the beginning of September 2024, the case team paused its review of materials from the Apple and Google Returns to have further dialogue with defense counsel about materials defense counsel believed may be potentially privileged before the prosecution team completed its responsiveness review.[112]   On September 9, 2024, to aid supplemental screening of the materials by the Filter Team, the case team asked the defense to provide a list of names and contact information with whom Leech may have had privileged communications.[113] The defendant responded on September 24, 2024.  On November 4, 2024, the Filter Team produced portions of the Apple and Google Returns to the defense, and the prosecution team sent a letter asking the defense to identify materials over which Leech was asserting privilege and to provide a privilege log.[114]  Specifically, the Filter Team produced to the defense four sets of documents, which included the Filter Team's preliminary identification of material as potentially privileged and work product material and material that had not identified as potentially

---

[111] That the case team paused its review so that the Filter Team could review materials that might be privileged, does not mean that the case team necessarily reviewed the contents of that potentially privilege document.  Indeed, the purpose of pausing the review was to *avoid* the case team substantively reviewing anything that might be privileged.

[112] Def. Ex. 7 (Government's November 4, 2024 letter to defense counsel).

[113] Def. Ex. 5 (Government's September 9, 2024 email to defense counsel).

[114] Def. Ex. 7.

privileged or work product material.[115]  The defendant complied with that request through letters
and productions sent to the Government on November 26, 2024 and December 20, 2024.  The
Filter Team segregated all materials over which the defendant asserted privilege that had not
previously been restricted and released to the case team any materials over which Leech had not
asserted privilege.[116]  The Filter Team's segregation of the materials over which the defense has
claimed privilege does not mean that the Filter Team, or the case team, agrees with those privilege
assertions.  The case team then resumed the responsiveness review of the materials over which the
defense had not asserted privilege.

### 3.    The Government's Responses to Information Requests

On June 11, 2025, the Government provided the defense additional information regarding
the filter process.  As the Government explained, because all of the Google Returns were reviewed
on the Relativity platform, the Government has been able to use Relativity's software to identify
all items from the Google Return that a member of the case team has viewed, and over which the
defense has asserted privilege.  The Government produced to the defense a spreadsheet listing
those documents.[117]  Notably, none of the identified documents appear to be communications
between Mr. Leech and an attorney—and the defendant does not claim otherwise.  Instead, all but
six of the listed documents fall into one of three categories: (1) documents that the defendant is
claiming as a confidential spousal communication; (2) communications between the defendant and
non-attorneys claimed to be agents; (3) and communications between the defendant and himself.[118]

---

[115] *Id.*

[116] Def. Ex. 10 (Government's June 11, 2025 letter to defense counsel).

[117] *Id.*

[118] As set forth below, the Government communicated to defense counsel its objections to
defendant's privilege assertions.

The Government further explained that, unlike with the Google Returns, the Government was unable to similarly audit the items that the case team viewed in the Apple Returns at that level of detail because the Apple Returns were primarily reviewed in the Cellebrite tool, which does not keep a record of each time a document has been reviewed.[119]  That said, the Government explained that records produced to the defense indicate that the types of materials the case team viewed in the Apple Returns would fall into the same categories of materials that the case team viewed in the Google Returns, including communications with non-attorneys claimed to be agents.  The Filter Team did not first release data from the Apple Returns to the case team until August 2024, which allowed the Filter Team to use what it had learned from the review of the Google Returns to screen potentially privileged materials from the Apple Returns.  Consistent with that, the Government's records showed that the types of materials the case team came across in the Apple Returns that prompted pauses of reviewed fell into the same categories of materials that appeared on the audit of the Google Returns, such as spousal communications and communications with non-attorneys whom the defense claims to be agents.[120]

On July 2, 2025, the defense asked the Government to, among other things, identify any materials from the search-warrant returns that the Government intends to offer at trial, either in the Government's case-in-chief or its examination of defense witnesses.[121]  On July 18, 2025, the Government informed the defense that, based on the Government's understanding of the issues that will be in dispute at trial, and evaluation of those materials, the Government would not

---

[119] Def. Ex. 10.

[120] *Id.*

[121] Def. Ex. 11.  The Government produced the full search warrant returns to the defendant on or about December 23, 2024.

introduce any of the Search Warrant materials at trial.[122]  The Government made clear, however, that there were documents that were segregated from the case team because the defense had identified them as potentially privileged.[123]  Therefore, the Government advised counsel that if the defense filed a motion regarding the warrant returns, including any motion based on the premise that the case team was improperly exposed to privileged materials, the Government would contest the defense's privilege claims, seek rulings from the Court on the defendant's privilege claims, and, depending on the Court's decision, review any documents that are not presently in the case team's possession that the Court decides are not privileged, both for responsiveness to the Government's search warrant and for potential use at trial (if any documents are responsive).[124]

### B.  Applicable Law

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense."[125]  The Sixth Amendment is violated when the Government intentionally interferes with the attorney-client relationship.[126]  "The use of a filter team is a common procedure in this District and has been deemed adequate in numerous cases to protect attorney-client communications."[127]  Indeed, the applicability of the out-of-circuit

---

[122] Def. Ex. 12 (Government's July 18, 2025 letter to defense counsel).

[123] *Id.*

[124] *Id.*

[125] U.S. Const. amend. VI.

[126] *See United States v. Schwimmer*, 924 F.2d 443, 447 (2d Cir. 1991).

[127] *In re Search Warrants Executed on Apr. 28, 2021*, No. 21 Misc. 425 (JPO), 2021 WL 2188150, at *2 (S.D.N.Y. May 28, 2021) (citing *United States v. Blakstad*, No. 19 Cr. 486 (ER), 2020 WL 5992347, *8 (S.D.N.Y. Oct. 9, 2020); *United States v. Ceglia*, No. 12 Cr.876 (VSB), 2015 WL 1499194, *1 (S.D.N.Y. Mar. 30, 2015)); *see also United States v. Yousef*, 327 F.3d 56, 168 (2d Cir. 2003) ("[T]he Government established an effective firewall to prevent disclosures to the Government's trial attorneys of trial strategies or confidential communications between [the

precedents criticizing filter teams, which the defendant cited, has been rejected in this District.[128]

Inadvertent disclosure of potentially privileged information to the prosecution team is not alone a Sixth Amendment violation.[129]    Indeed, "[w]here the intrusion upon an attorney-client communication is unintentional or justified there can be no violation of the Sixth Amendment without a showing that the intercepted communication was somehow used against the defendant to the defendant's prejudice."[130]    To be entitled to a hearing "to determine whether the prosecution was tainted by exposure to privileged information . . . [d]efendants have the burden of showing a 'factual relationship' between the privileged information and the prosecution."[131]    This requires showing that privileged materials have an "apparent bearing on what are likely going to be issues in the case" and would "give the Government [an] unfair 'tactical advantage' and insight into Defendants' means of defeating the charges."[132]    It is the defendant's burden to "show 'a distinct,

---

defendants] and their attorneys."), overruled on other grounds by *Montejo v. Louisiana*, 556 U.S. 778 (2009).

[128] *See United States v. Avenatti*, 559 F. Supp. 3d 274, 281-84 (S.D.N.Y. Sept. 9, 2021) (approving of the use of filter teams and distinguishing non-binding precedents from outside the circuit).

[129] *United States v. Dupree*, 781 F. Supp. 2d 115, 163 (E.D.N.Y. 2011); *see also United States v. Lumiere*, No. 16 Cr. 483 (JSR), 2016 WL 7188149, at *6 (S.D.N.Y. Nov. 29, 2016) (after the-fact notice of potentially privileged documents did not render an earlier search invalid).

[130] *United States v. Sattar*, No. 02 Cr. 0395 (JGK), 2002 WL 1836755, at *6 (S.D.N.Y. Aug. 12, 2002).

[131] *United States v. Sharma*, No. 18 Cr. 340 (LGS), 2019 WL 3802223, at *5 (S.D.N.Y. Aug. 13, 2019) (denying a hearing where potentially privileged search warrant returns were inadvertently provided to the trial team). In other words, a defendant is required to show that privileged materials have an "apparent bearing on what are likely to be the issues in the case" and would "give the Government [an] unfair 'tactical advantage' and insight into Defendants' 'means of defeating the charges.'" *Id.* (citation omitted).

[132] *Sharma*, 2019 WL 3802223, at *5.

as opposed to speculative, possibility of taint.'"[133]   "Failure to show the requisite factual relationship is sufficient to end the inquiry."[134]

Where privileged material passes to the prosecution team, "[t]he general remedy for violation of the attorney-client privilege is to suppress introduction of the privileged information at trial,' not to order wholesale suppression" of warrant returns or another serious remedy, such as dismissal or disqualification.[135]   Indeed, even in the context of *intentional* breaches of attorney-client privilege the "[Second] Circuit never has gone so far as to adopt a per se rule" requiring the those more serious remedies.[136]   Rather, even when there is intentional intrusion, "unless 'the conduct of the Government has . . . been . . . manifestly and avowedly corrupt,' . . . a defendant must show prejudice to his case resulting from the intentional invasion of the attorney-client privilege."[137]  "'The dismissal of an indictment is an extraordinary remedy reserved only for extremely limited circumstances implicating fundamental rights.'"[138]

### C.  Discussion

The defendant's argument for discovery on the Filter Team process fails.  The defense has

---

[133] *United States v. Hoey*, No. 15 Cr. 229 (PAE), 2016 WL 270871, at *4 (S.D.N.Y. Jan. 21, 2016), aff'd, 725 F. App'x 58, 61 (2d Cir. 2018) (quoting *United States v. Helmsley*, 726 F. Supp. 929, 933 (S.D.N.Y. 1989)).

[134] *Sharma*, 2019 WL 3802223, at *5 (quoting *United States v. Blau*, 159 F.3d 68, 72 (2d Cir. 1998)) (brackets omitted).

[135] *Lumiere*, 2016 WL 7188149, at *6 (quotation marks omitted); *see also United States v. Schulte*, No. 17 Cr. 548 (PAC), 2019 WL 5287994, at *2 (S.D.N.Y. Oct. 18, 2019) (same); *United States v. Patel*, No. 16 Cr. 798 (KBF), 2017 WL 3394607, at *6 (S.D.N.Y. Aug. 8, 2017) (same).

[136] *United States v. Schwimmer*, 924 F.2d 443, 447 (2d Cir. 1991) ("Schwimmer IV") (quoting *United States v. Gartner*, 518 F.2d 633, 637 (2d Cir. 1975)).

[137] *Id.*

[138] *Sharma*, 2019 WL 3802223, at *3 (quoting *United States v. De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001)).

failed to establish that any of the materials the case team reviewed are, in fact, protected by the attorney-client privilege. The Government has provided the defense with extensive discovery about its filter process, and, even with that undisputed factual record, the defense has not articulated any intentional violation of the attorney client privilege or any possible prejudice.

### 1. The Defendant Has Not Established that the Government Reviewed Attorney Client Privileged Material

The Sixth Amendment protects the attorney-client privilege as part of protecting the defendant's right to counsel in a criminal case. The defense cannot show a Sixth Amendment violation because it has not met its threshold burden to show that any of the supposedly privileged materials the Government reviewed are, in fact, protected by the attorney-client privilege. Those materials principally consist of three categories of non-lawyer communications: (1) communications between Leech and purported non-attorney agents; (2) communications Leech sent to himself; and (3) communications over which Leech claims spousal communications privilege. Leech has not established that the first two categories are privileged, and, though the spousal communications privilege is merely an evidentiary one, the Government has segregated and will not use at trial any of the documents over which Leech claims spousal privilege.

*First*, the defendant has not established that communications between Leech and non-attorney agents (which did not include any attorneys) were privileged. The attorney-client privilege can extend to communications between a client and a non-lawyer when the purpose of the communication is "to clarify communications between attorney and client."[139] The Second Circuit has applied the privilege to a communication between a client and an accountant, for example, reasoning that "[a]ccounting concepts are a foreign language to some lawyers in almost

---

[139] *United States v. Ackert*, 169 F.3d 136, 139 (2d Cir. 1999).

all cases, and to almost all lawyers in some cases" and therefore concluded that "the presence of the accountant is necessary, or at least highly useful, for the effective consultation between the client and the lawyer which the privilege is designed to permit."[140]

"Nevertheless, the extension has always been a cabined one, and to that end, the privilege protects communications between a client and an attorney, not communications that prove important to an attorney's legal advice to a client."[141]  Accordingly, the principle of *Kovel* "has no application" where the attorney "was not relying on [the third-party] to translate or interpret information given to [the attorney] by his client," even where the information provided to the third party was "important to the attorney's ability to represent the client" or helped provide information that the attorney and client "did not have."[142]  In other words, where the third-party's "role was not as a translator or interpreter of client communications, the principle of *Kovel* does not shield his discussions with" the attorney.[143]

The Government requested that the defendant produce evidence to sustain his privilege assertions over his communications with "non-attorney agents" that did not include attorneys.  The defendant responded on April 7, 2025.  The defendant's position is that "[t]hese communications were made in connection with matters relating to counsel's provision of legal advice to Mr. Leech."  However, that does not meet the "necessity" requirement; instead, counsel has described exactly

---

[140] *United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961).

[141] *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011) (quotation marks and alterations omitted).

[142] *Ackert*, 169 F.3d at 139-40.

[143] *Id.* at 140; *see also Nat'l Educ. Training Grp., Inc. v. Skillsoft Corp.*, No. M8-85 (WHP), 1999 WL 378337, at *2 (S.D.N.Y. June 10, 1999) (noting that the "'necessity' element means more than just useful and convenient, but rather requires that the involvement of the third party be nearly indispensable or serve some specialized purpose in facilitating the attorney-client communications").

the type of non-privileged communication that may be "may have been useful, but it clearly cannot be characterized as necessary."[144]

What is more, the context of the communications suggests it is highly unlikely the communications at issue are protected by the attorney-client privilege under *Kovel*. Many of the communications at issue are between Leech and his son and a long-time friend. While both have experience in fixed-income trading, it is difficult to fathom that they are serving in the role of translator or interpreter between Leech and his attorneys, as opposed to close confidants talking with Leech about his conduct. The defense cannot turn those communications—which in any other case are plainly not privileged—into attorney-client communications, simply by having the defendant's son and friend sign a retention agreement and claiming that the conversations are helpful to the defense.[145] Accordingly, the defendant has failed to establish the privilege over the first category of documents.

*Second*, the defendant has not sustained his assertions that his notes to himself are attorney work product. The work product doctrine, which is distinct from the attorney-client privilege, "provides qualified protection for materials prepared by or at the behest of counsel in anticipation of litigation or for trial."[146] In *Bice v. Robb*, the Second Circuit held that documents created by

---

[144] *Id.* at *2.

[145] The defense produced retention agreements between his counsel and five of his listed non-attorney agents. The earliest of these agreements is dated November 9, 2023, Mr. Senft's agreement is dated November 24, 2023, and Mr. Leech's son's agreement is dated November 14, 2023. Although the defendant claimed that these non-attorney agents have been "remunerated for their work," the defense has not produced any payment records showing the timing or amounts of any payments.

[146] *In re Grand Jury Subpoenas Dated March 19, 2022 and August 2, 2002*, 318 F.3d 379, 383 (2d Cir. 2003). "[T]he party invoking [the work product doctrine] bears the burden of establishing its applicability," and the "burden is a heavy one," in light of the "fundamental maxim . . . that the public has a right to every man's evidence." *Id.* at 384.

non-lawyers are "not protected by the attorney work-product doctrine" simply because "they may have been created because of the prospect of litigation."[147]  Under this rule, the defendant's notes to himself fall outside the scope of work-product protections.  And while some lower courts have, in the civil context, interpreted *Bice* narrowly in light of Federal Rule of Civil Procedure 26, cases have not shielded a party's "personal diaries or logs" because they are "generally relevant and do not constitute work-product."[148]

The Second Circuit affirmed that "[a] rule that recognizes a privilege for *any* writing made with an eye toward legal representation would be too broad."[149]  Courts look instead to whether the allegedly privileged information has actually been communicated to counsel.[150]  This is because "there can be no violation of the [S]ixth [A]mendment without some communication of valuable information."[151]  Accordingly, while "delivery of the [notes to one's attorney] is not necessary" for the privilege to attach, a defendant must demonstrate that the content of the notes was communicated by the client to the attorney."[152]  To this end, courts have allowed disclosure of a party's notes.[153]

---

[147] *Bice v. Robb*, 511 F. App'x 108, 110 (2d Cir. 2013).

[148] *Swinton v. Livingston Cnty.*, No. 15 Civ. 00053A(F), 2016 WL 6248675, at *3 (W.D.N.Y. Oct. 26, 2016).

[149] *United States v. DeFonte*, 441 F.3d 92, 96 (2d Cir. 2006).

[150] *United States v. Gonzalez*, 144 F.4th 396, 403 (2d Cir. 2025).

[151] *Id.* (internal citation and quotation omitted).

[152] *Id.*

[153] *See, e.g., Robbins v. Chase Manhattan Bank, N.A.*, No. 97 Civ. 676 (DAB), 1998 WL 106152, at *1-2 (S.D.N.Y. Mar. 9, 1998) (finding no work product protection over plaintiff's notes because "neither of the purposes underlying the work product doctrine are implicated," and "[e]ven if Ms. Robbins had begun recording her experiences at the suggestion of her attorney rather than either at the behest of the SDHR representative or on her own initiative, her notes would not have been protected"); *Rexford v. Olczak*, 176 F.R.D. 90, 93 (W.D.N.Y. 1997) (allowing discovery of

Here, the defense has not established that the defendant's notes to himself are protected by attorney-client privilege or the work-product doctrine because counsel has not specifically identified which parts of each notes were, in fact, communicated from client to attorney or vice versa.  Instead, the defense has only broadly claimed that the defendant's notes are protected because the defendant "prepared them to memorialize thoughts relating to the Trade Allocation Matters (in anticipation of litigation relating to the Trade Allocation Matters) and forwarded them to himself or (intentionally or unintentionally) saved them as drafts for future reference."[154]  That is plainly insufficient: The defendant simply having notes to himself about the "Trade Allocation Matter" does not make those notes privileged or work product.  For instance, a defendant who wrote a note to himself to "figure out a defense to the fraud I just committed," would not be able to claim that note was protected because it contemplated preparing a defense to a crime.  The defense is no better served by the broad assertion that the notes "were drafted at the direction of counsel—and convey counsel's views as to potential responses to the ongoing investigations. Additionally, in the context of the complex regulatory investigations, they were part of essential fact gathering so that Mr. Leech's counsel could provide him legal advice."  Counsel has not undertaken the task of identifying which parts of which notes reflect communications between lawyer and client, much less provided evidence to support such a conclusion.  Without that "document-by-document" analysis establishing that each document is privileged, the defendant's

---

plaintiff's diary because the "contemporaneous account of meetings, conversations and other events central to the issues in this case provide relevant evidence that may be useful for impeachment or other trial preparation purposes" and they "contain[] no 'mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation'").

[154] Def. Ex. 9 at 10 (Def. April 7, 2025 Letter); Def. Ex. 11 at 7 (Def. July 2, 2025 Letter).

privilege claims fail.[155]  *Third*, the defense's claim of privilege over spousal materials is not a basis for discovery or a hearing in this case.  Spousal communications are not protected by the Sixth Amendment, and the Government has informed the defense that it has segregated spousal communications from the case team and does not intend to introduce such communications at trial.

Because the defendant has not met his burden of establishing that the Government has reviewed materials protected by the attorney-client privilege, this Court should reject his request for discovery.  The Government also respectfully requests that the Court issue a decision on whether the first two categories of documents are properly withheld as privileged, so the Government can decide whether to review those materials pursuant to the search warrants.

### 2.  Even if the Prosecution Team Saw Privileged Materials, the Court Should Deny Defendant's Request for Discovery

#### a.  The Government Did Not Intentionally Violate the Privilege or Act in a Way That Was "Manifestly and Avowedly Corrupt"

Even if the case team saw privileged material, the defendant's motion must fail because he cannot plausibly make out a Sixth Amendment violation on the undisputed factual record before the Court.  The Government's access to any privileged material cannot credibly be described as an "intentional"—much less a "manifestly and avowedly corrupt"—intrusion on the defendant's Sixth Amendment rights, and the Government has previously informed the defendant that it will not use at trial any materials from the search-warrant returns, unless this Court affirmatively decides certain materials are not privileged.

The Second Circuit has invoked the notion of "manifestly and avowedly corrupt" conduct to describe actions that might invoke a "per se rule [that] represents a moral as well as a legal condemnation of such egregious and unequivocal conduct for which sanctions are imposed against

---

[155] *See United States v. Kostin*, No. 24 Cr. 91 (GHW) (S.D.N.Y. 2024) (Dkt. No. 197 at 60-61).

the Government as punishment regardless of the defendant's guilt."[156]  Such a rule applies where the government's "conduct has been an offensive interference with the defendant's rights without any justification."[157]  The Second Circuit has pointed, as examples of government conduct that might meet this standard (though still eschewing a *per se* rule), to cases where the government tried multiple defendants, including one who, unbeknownst to his co-defendants or even his attorney, was a government informant,[158] where the government tried an informant along with a codefendant and the informant professed his own and his codefendant's guilt in front of the jury,[159] and where the government wiretapped conversations between a defendant and her counsel before and during trial.[160]

The Government's conduct with respect to the search warrant returns is the opposite of manifest corruption or an intentional intrusion on the privilege.  Instead, the Government took steps to protect the defendant's privilege, including:  (1) instituting a Filter Team to review and screen out potentially privileged materials; (2) repeatedly stopping and reengaging the Filter Team to review what the case team believed could be potentially privilege material; (3) engaging with defense counsel before the Indictment was filed to request a document-by-document privilege log; (4) segregating all materials over which the defendant has claimed privileged, notwithstanding the legally unsound nature of those privilege claims; and (5) informing counsel before the motions deadline and months before trial that it would not use the warrant returns at trial (unless this Court finds that material is not privileged).

---

[156] *Gartner*, 518 F.2d at 637.

[157] *Id.*

[158] *United States v. Rispo*, 460 F.2d 965 (3d Cir. 1972).

[159] *United States v. Lusterino*, 450 F.2d 572 (2d Cir. 1971).

[160] *Coplon v. United States*, 191 F.2d 749 (D.C. Cir. 1951).

The Government's use of the Filter Team, and repeated pausing of its responsiveness to review to make sure it was not reviewing potentially protected material demonstrates its good faith efforts to *avoid* coming into contact with privileged material. And even if the Filter Team inadvertently released privileged material, the Government's use of the Filter Team in the first place negates a finding of intentional intrusion on the attorney-client privilege.[161] Moreover, in cases in which the case team did *not* employ a filter team to review potentially privileged material, courts in this District have declined to find constitutional violations.[162]

To find otherwise, would be to turn this Circuit's caselaw approving the Government's use of filter teams upside-down. Far from an intentional invasion of the privilege, courts in this District consistently recognize, "[w]here the Government has obtained potentially privileged material, use of a filter team constitutes an action respectful of, rather than injurious to, the protection of privilege."[163] Indeed, the use of a filter team has been deemed adequate protection of potentially privileged material obtained by the Government—pursuant to a search warrant or otherwise—time and again in cases in this District.[164]

---

[161] *See United States v. Tournant*, No. 22 Cr. 276, 2023 WL 5276776, at *15 (S.D.N.Y. Aug. 15, 2023) ("[I]n determining whether the government has intruded upon privilege, courts often consider whether the prosecution took reasonable precautions to avoid exposure to privileged materials."); *Sharma*, 2019 WL 3802223, at *3 (finding no intentional intrusion on the attorney-client privilege when Government used filter protocol for materials that it knew may contain privileged communications).

[162] *See United States v. Landji*, No. S1 18 Cr. 601 (PGG), 2021 WL 5402288, at *23-24 (S.D.N.Y. Nov. 18, 2021), *aff'd sub nom. United States v. Gonzalez*, 144 F.4th 396 (2d Cir. 2025) (finding no "reckless disregard" for the defendants' Sixth Amendment rights after case agents' "cursory review" of privileged material).

[163] *Avenatti*, 559 F. Supp. 3d at 282 (quoting *In re Grand Jury Subpoenas*, 454 F.3d 511, 522-23 (6th Cir. 2006)).

[164] *See Avenatti*, 559 F. Supp. 3d at 282 (noting that the use of a filter team "is a common procedure in this District and has been deemed adequate in numerous cases to protect attorney client

Tellingly, the defense does not even attempt to claim that the Government's use of a Filter Team here constitutes "manifest corruption." Instead, the defense seeks more detail about the Filter Process.[165] As set forth below, this ignores the extensive disclosures that the Government has made to the defense in this case, which include (1) a detailed description of the Filter Process, including a chronology of relevant events; (2) a production—prior to the Indictment—of sets of materials that the Filter Team had identified as potentially privileged and non-privileged from both the Google and Apple returns; and (3) a document "view" audit of the Google returns. In short, the Government has already armed the defendant with information sufficient to identify intentional intrusions into his privileged communications and he has been unable to do so. The law does not empower him to keep demanding information until he finds some facts to support his claims.

### b. The Defendant Has Not Articulated Any Prejudice

The defendant's motion also fails because, even assuming the case team viewed privilege material, the defendant has not attempted to articulate how he could have been prejudiced. First, the Government has segregated all of the documents over which the defense has raised privilege

---

communications" and citing multiple cases); *see also United States v. Yousef*, 327 F.3d 56, 168 (2d Cir. 2003) (finding that "the Government established an effective firewall to prevent disclosures to the Government's trial attorneys of trial strategies or confidential communications between [the defendants] and their attorneys" in case in which government received notes and information from a jailhouse informant about defendants), *overruled on other grounds by Montejo v. Louisiana*, 556 U.S. 778 (2009). This District's cases stand in contrast to the out-of-district district court case that defendant relies on, *United States v. Neill*, 952 F. Supp. 834, 841-42 (D.D.C. 1997), which criticized the use of filter teams, but nonetheless denied defendant's request for relief. The Court in *United States v. Feng Ling* Liu, 12 Cr. 934 (RA), 2014 WL 101672, at *11-12 (S.D.N.Y. Jan. 10, 2014), for example, acknowledged cases that criticized use of filter teams, but noted that none of the cases "suggest[] that this practice necessitates the suppression of evidence."

[165] To the extent that the defense contends that the Government should have consulted with the defendant earlier regarding privilege issues, he cites no authority in support. This was a covert warrant, and the Government did, prior to the case being charged, engage with the defense on privilege issues.

claims.  Second, the Government did not rely on any of the segregated materials in any search

warrant (there were no subsequent warrants in the investigation) or any litigation before this Court.

Third, unless and until the Court determines that any of the segregated materials are not privileged,

the case team will not access them and will not introduce them at trial.  Accordingly, the potentially

privileged materials will not be "used against the defendant to the defendant's prejudice," and

therefore there can be no Sixth Amendment violation.[166]

Nor does the defendant contend that viewing any of the potentially privileged materials

provided the Government with any insight into the defendant's trial strategy.[167]  The defense has

not specifically identified any documents that it believes the Government may have reviewed, the

reviewing of which would have given the Government useful insight into the defendant's trial

strategy.  Nor is that plausible for at least two reasons: First, all of the materials from the search

warrants were from before March 2024, and this trial will not take place until April 2026—a full

two years after the last document the Government could have reviewed.  And second, throughout

the fall of 2024, defense counsel made pre-Indictment presentations and submissions to the U.S.

Attorney's Office so that the Government could consider counsel's advocacy before deciding

whether to proceed in the case.  In light of counsel's voluntary disclosures to the Government in

late 2024, any suggestion—and defendant does not make any suggestion—that the Government's

---

[166] *Sattar*, 2002 WL 1836755, at *6; *see also United States v. Sanin*, 113 F.3d 1230, at *4 (2d Cir. 1997) (finding no prejudice when government did not use privileged information at trial); *United States v. Spivak*, No. 21 Cr. 491, 2024 WL 3861334, at *1-2 (N.D. Ohio Aug. 17, 2024) (even where government's "use of a filter team could have been structured or handled better," finding no prejudice when potentially privileged material was discovered by prosecutors after indictment).

[167] *Cf. Landji*, 2021 WL 5402288, at *27 (refusing to presume prejudice even when Government had access to "highly sensitive, attorney work product material" laying out proposed trial strategy for defendant); *see also Neill*, 952 F. Supp. at 841-42 (no prejudice when case team reviewed potentially privileged materials identifying entities and persons but not trial strategy).

handling of non-lawyer communications eight months before the Indictment in this case could have revealed trial strategy would be "wholly conjectural and insubstantial," and cannot support a finding of prejudice.[168]

Indeed, the defendant cites no cases challenging the Government's filter process that resulted in anything other than suppression of the privileged material or a subset of the warrant returns.[169]  Courts have routinely found that "the proper remedy for any breach of the privilege . . . would be their exclusion at trial.[170]  Thus, even if the case team viewed privileged materials, because the defendant cannot demonstrate prejudice, his Sixth Amendment violation claim fails.[171]

Although not implicating the attorney client privilege or the Sixth Amendment, the defendant has also asserted an evidentiary privilege over confidential spousal communications, including those that involved other participants (or initially included other participants).  The spousal communications privilege is an evidentiary one that does not implicate constitutional

---

[168] *See Schwimmer*, 924 F.2d at 445-46 (holding that although the Government had "intentionally obtained . . . information protected by the attorney-client privilege," "any influence on the government's case . . . was 'wholly conjectural and insubstantial'").

[169] *See, e.g.*, *United States v. Sullivan*, No. 17 Cr. 00104(JMS), 2020 WL 1815220, at *10 (D. Haw. April 9, 2020) (denying motion for dismissal and blanket motion to suppress, but granting suppression of subset of warrant returns); *United States v. Esformes*, No. 16-20549, 2018 WL 5919517, at *33 (S.D. Fla. Nov. 13, 2018) (denying request for dismissal and disqualification, and noting that any prejudice arguments as to privileged materials were "moot" because the Government agreed it would not rely on them at trial); *United States v. Bickle*, No. 2:10–cr–00565–RLH–PAL, 2011 WL 3798225, at *26 (D. Nev. July 21, 2011) (granting suppression motion in part as to particular documents).

[170] *See, e.g.*, *United States v. Stewart*, 294 F. Supp. 2d 490, 494 (S.D.N.Y. 2003) ("Stewart has cited no decision disqualifying an attorney for inadvertently viewing either kind of work product. The proper remedy in disputes over work product is the remedy already granted here: prohibiting the opposing side from using the document at trial.").

[171] *See United States v. Kostin*, No. 24 Cr. 91 (GHW) (S.D.N.Y. 2024) (Dkt. 197 at 60-61) ("[E]ven if some documents are privileged, the remedy for any potential violation of the attorney-client privilege in this case is preclusion from use at trial.").

concerns.[172] A communication subject to it may not be admitted at trial, but when a privilege is not constitutionally grounded, courts have refused to conduct "taint" analysis, or to suppress evidence derived from review of privileged materials. [173] Accordingly, even assuming that these communications were reviewed by the case team, they do not provide a basis for relief.[174] Further

---

[172] *See, e.g., United States v. Lefkowitz*, 618 F.2d 1313, 1318 n.8 (9th Cir. 1980) (rejecting argument that marital communications privilege is grounded in Constitution and therefore subject to "taint" analysis).

[173] *See id.* ("Because we reject [defendant's] argument that the marital privileges are somehow constitutionally grounded in, among other locations, the Fourth Amendment, we doubt that a secondary source of information obtained through information protected by the confidential marital communications privilege would in any way be 'tainted.'"); *United States v. Marashi,* 913 F.2d 724, 731 n.11 (9th Cir. 1990) (discussing the marital communications privilege and noting that "no court has ever applied the [fruit of the poisonous tree] theory to *any* evidentiary privilege and ... we have indicated we would not be the first to do so.") (emphasis in original); *cf. United States v. Squillacote*, 221 F.3d 542, 561 (4th Cir. 2000) ("because the privilege at issue here [psychotherapist's privilege] is not a constitutional one, the district court properly refused to suppress any evidence arguably derived from the government's interception of the two conversations with [defendant's] therapists"); *United States v. Nicholas*, 594 F. Supp. 2d 1116, 1118-19 (C.D. Cal. 2008) (holding that even a privileged confidential marital communication, relevant to the case, must be disclosed to a co-defendant because it could be admissible as impeachment material, among other things); *United States v. Robare*, No. 8:07-CR-373 (FJS), 2008 WL 2967632, at *4 (N.D.N.Y. July 25, 2008) (discussing marital privilege and holding that "the fruit-of-the-poisonous-tree doctrine does not apply in cases such as this, where the defendant asserts an evidentiary privilege that is not constitutionally-derived");*United States v. Irons*, 646 F. Supp. 2d 927, 957-58 (E.D. Tenn. 2009) (denying defendant's motion to "exclude any other evidence gained by the government, including that evidence gained as a direct result of government agents listening to the marital communications in question" because the "fruit of the poisonous tree" doctrine has no application where the privilege does not "enjoy any constitutional basis"); *United States v. Harder,* No. CR 15-1, 2016 WL 7647635, at *6 (E.D. Pa. Apr. 18, 2016) (declining to "suppress any fruits of the Government's review of the privileged emails," even in the attorney-client privilege context).

[174] Courts recognize a distinction between the Government's attempt to compel *testimony* over an assertion of a non-constitutional privilege, and purely evidentiary privileges like the one at issue here. *See Squillacote*, 221 F.3d at 559-60 (rejecting a request for *Kastigar* hearing because while "the government's right to compel testimony in the face of a claim of privilege is the issue at the heart of *Kastigar*, its protections do not apply in cases where there is privileged evidence, but no compelled testimony"); *Grand Jury Subpoena of Ford v. U.S.*, 756 F.2d 249, 252 (2d Cir. 1985) (approving screening procedures to permit the Government to compel a spouse's testimony over a

still, the Government did not rely on these materials in any search warrant; has segregated these materials, does not have access to them going forward; and will not seek to introduce these communications at trial or to challenge Leech's assertions over these communications. And, just as with the other materials that the defendant has claimed privilege, the defendant has not articulated any way in which he is prejudiced by any review of this set of communications. Accordingly, they provide no basis for relief.

### c. The Defendant Has Not Met the Standard for Discovery or a Hearing

The defendant is not entitled to a hearing. *First*, prior to any hearing, the defense would need to identify the potentially privileged document (or documents) that they believe are the subject of the hearing and establish they are, in fact, privileged. *Second*, even if the Court were to find that those documents were privileged, there would be no need for discovery or a hearing because the case team does not currently have access to the materials or intend to use the documents at trial,[175] and because the defendant has not raised a "distinct, non-speculative possibility of taint."[176]

Courts routinely deny discovery and hearing requests in similar circumstances. In *United States v. Milton*, for example, the Court denied a similar request for an evidentiary hearing on the government's filter team protocols: "Mr. Milton's motion for an evidentiary hearing on the government's filter team protocols is denied as it is based primarily on surmise. Inadvertent disclosure of potentially privileged information to the prosecution team is not alone a basis for

---

privilege assertion because "the government's promise not to use any of the witness-spouse's testimony before the grand jury, either directly or indirectly, against the non-witness spouse, is sufficient to meet the claim of privilege by the testifying spouse").

[175] *Id.*

[176] *Helmsley*, 726 F. Supp. at 933-34.

relief."[177]  Similarly, in *United States v. Combs*, the Court denied a request for a *Kastigar* hearing because the defendant did not make a showing of prejudice: "Combs doesn't come close to making such a showing, particularly now that the Government has disavowed use of the notes or evidence derived from them."[178]  So too here, where the Government has segregated the materials, did not use them in any subsequent search warrant, and will not use them at trial (unless and until this Court rules they are not privileged).

Nor is additional discovery into the filter process warranted, as the Government already provided the defendant extensive information that he does not dispute.  Defendant requests five categories of discovery each of which the Government has provided sufficient information, bear no relevance on any possible motion, or skip the steps of establishing privilege and articulating prejudice.  *First*, defendant requests the "search terms and procedures the Taint Team employed before releasing materials from the warrant returns to the Prosecution Team in April 2024."  The Government has already provided a description of the Filter Team's process to the defense on February 6, 2025:

> The Filter Team applied search terms to identify potentially privileged materials including using both common legal terms and terms specifically derived from attorneys and law firms representing Leech, Western Asset Management Company, and Franklin Templeton. The Filter Team also implemented other review techniques, including manual review, to identify potentially privileged materials that might not be captured by the search terms. The Filter Team released to the prosecution team the items that the Filter Team did not identify as potentially privileged.  As the Filter Team identified potentially privileged materials, it segregated them so the prosecution team could not access them.[179]

---

[177] *United States v. Milton*, 21 Cr. 478 (ER) (S.D.N.Y.), September 8, 2022 Conf. Tr. at 8.

[178] 24 Cr. 542 (AS), Dkt. 148 at 6.

[179] Def. Ex. 8 (February 6, 2025 Government Letter to Defense Counsel).

Not further disclosures are necessary.[180]

*Second*, the defendant seeks internal communications between the case team and the Filter Team on occasions where the case team paused its review to have the Filter Team review potentially privileged documents. As discussed, those occasions on which the case team paused its review to assure itself that it was respecting the defendant's privilege and to *avoid* reviewing privileged material are a basis for denying defendant relief.

*Third*, the defendant requests the case team's internal correspondence about any "privileged documents to which it was given access." This request does not identify any particular privileged document, establish that it is privileged, or articulate a non-speculative basis for prejudice.

*Fourth*, the defendant requests the "nature of any remedial measures." The defendant has this information: the Government has segregated all of the material over which the defendant has claimed privilege and will not use any of those materials unless the Court rules that they are not privileged. These measures address any potential prejudice that the defendant could assert and the defense does not claim otherwise.

*Fifth*, the defendant asks for information about the case team's review of the Apple Returns. The Apple Returns were released by the Filter Team after the Google Returns, so the Filter Team was able to incorporate learning from its prior review. Additionally, the Filter Team produced to the defense—prior to the Indictment—sets of materials that it identified as potentially privileged and non-privileged. Accordingly, even though the Filter Team identified for the defense documents it identified as non-privileged from the Apple Returns, and the defendant provided a

---

[180] *See United States v. Weigand*, 482 F. Supp. 3d 224, 246 (S.D.N.Y. 2020), as corrected (Sept. 2, 2020) ("Under these circumstances, a 'taint protocol' is not 'material to preparing the defense' and so does not fall within the scope of Rule 16(a)(1)(E).").

document-by-document privilege log of those documents, the defendant offers no concrete examples of prejudice, nor do they present a "factual relationship" between any potentially privileged information and the present prosecution.[181]

Finally, the defense's reliance on *Kastigar v. United* States, is misplaced and does not support the need for a hearing. Numerous cases make clear that the Second Circuit does not contemplate that a hearing under the standards triggered by compelled testimony is required every time the Government is exposed to privileged material. *Kastigar* held that when a witness is compelled to give incriminating testimony under a grant of immunity and is thereafter prosecuted for a matter related to the compelled testimony, the Government bears "the heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources."[182] Courts have interpreted *Kastigar* to establish a proceeding in which the district court can determine whether the Government's evidence was derived from legitimate sources. While some courts in this Circuit have applied the *Kastigar* standard to defendants' claims of governmental intrusion upon the attorney-client privilege, there is no binding Second Circuit authority on the question of whether a *Kastigar* hearing is required in all such cases.[183] Moreover, even in cases in which courts have applied the *Kastigar* standard to such a claim, a *Kastigar*

---

[181] *See Sharma*, 2019 WL 3802223, at *5 ("To warrant a [*Kastigar*] taint hearing," a defendant has "the burden of showing a factual relationship between the privileged information and the prosecution." (citation omitted)); *United States v. Connolly*, No. 16 Cr. 0370 (CM), 2019 WL 2120523, at *19 (S.D.N.Y. May 2, 2019) ("'An insubstantial and speculative possibility of taint' does not trigger *Kastigar*." (citation omitted)); *Hoey*, 725 F. App'x at 61 (defendant must show a "factual connection between" the content of "the allegedly privileged information and the charges in [the] case" to warrant hearing).

[182] 406 U.S. 441, 461-62 (1972).

[183] *See, e.g.*, *Tournant*, 2023 WL 5276776, at *13.

hearing "is not required merely because a defendant has *asserted* that a prosecution is tainted."[184] Rather, the defendant must raise a "distinct, non-speculative possibility of taint,"[185] and must demonstrate a "factual relationship" between the protected information and the present prosecution.[186]

In *United States v. Colasurdo*, for example, attorneys for the defendants were interviewed by the United States Attorney's office and testified before the grand jury. Claiming breach of the privilege in these communications, the defendants argued on appeal of their convictions that the district court should have dismissed the charges based on disclosure of privileged information to the grand jury. In rejecting this claim, Judge Friendly stressed that, if defendants could claim a right to dismiss charges on this basis, "before trial on the merits there would always be a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury, with resultant delay."[187] The Second Circuit reaffirmed this ruling in *United States v. Bein*, 728 F.2d 107, 113 (2d Cir. 1984). Under these authorities, the pretrial disclosure of privileged communications, without more, does not trigger the right to a hearing.

To be entitled to a hearing or further discovery, the defendant needs to demonstrate that the allegedly privileged materials are privileged, that he is somehow prejudiced by their inadvertent disclosure. Defendant fails to satisfy these requirements or to articulate any theory of prejudice. Nor could he. As set forth above, courts acknowledge that the remedy for a violation (assuming

---

[184] *United States v. Hoey*, 15 Cr. 229 (PAE), 2016 WL 270871, at *4 (S.D.N.Y. Jan. 21, 2016) (emphasis in original), *aff'd*, 725 F. App'x 58, 61 (2d Cir. 2018).

[185] *United States v. Helmsley*, 726 F. Supp. 929, 933-34 (S.D.N.Y. 1989).

[186] *United States v. Blau*, 159 F.3d 68, 72 (2d Cir. 1998) (citing *United States v. Mariani*, 851 F.2d 595, 599-600 (2d Cir. 1988)); *see also Tournant*, 2023 WL 5276776, at *17-18.

[187] 453 F.2d at 595.

there was one) is suppression, and the Government has already segregated the materials and is not using them at trial. The motion should be denied.

## IV.    The False Statement Count Properly Alleges Venue

Defendant's fourth motion seeks a pre-trial dismissal of Count Five for lack of venue. Count Five charges the defendant with violating Title 18, United States Code, Sections 1001(a)(1)-(2). Specifically, the Indictment charges that, "on or about March 6, 2024, in the Southern District of New York and elsewhere, S. KENNETH LEECH II, the defendant, in a matter within the jurisdiction of the executive branch of the Government of the United States, knowingly and willfully falsified, concealed, and covered up by a trick, scheme, and device a material fact, and made a materially false, fictitious, and fraudulent statement and representation, to wit, during testimony before the SEC, LEECH made false representations that he knew his trade allocation at the time he placed his trade orders with the brokers."

### A.    Applicable Law

The Government must prove that venue is proper by a preponderance of evidence.[188] Where venue is challenged on a pretrial motion to dismiss, the government's burden is limited to showing that the indictment alleges facts sufficient to support venue.[189] "At this stage in the proceedings, the Government need only allege with specificity that the charged acts support venue in this district, and the Court assumes as true the allegations in the Indictment."[190] Courts in this District have recognized that "as long as the indictment alleges venue, a pretrial motion to dismiss

---

[188] *See United States v. Naranjo*, 14 F.3d 145, 146 (2d Cir. 1994).

[189] Fed. R. Crim. P. 12(b)(3)(A)(i); *see United States v. Bankman-Fried*, 680 F. Supp. 3d 289, 314-15 (S.D.N.Y. 2023); *United States v. Peterson*, 357 F. Supp. 2d 748, 751 (S.D.N.Y. 2005); *United States v. Ohle*, 678 F. Supp. 2d 215, 231-32 (S.D.N.Y. 2010).

[190] *United States v. Percoco*, No. 16 Cr. 776 (VEC), 2017 WL 6314146, at *16 (S.D.N.Y. Dec. 11, 2017).

based on contrary allegations by the defendant must be denied."[191] "The question of whether there is sufficient evidence to support venue is appropriately left for trial."[192]

### B. Discussion

The Court can deny this motion because the Indictment is facially valid and properly alleges venue.[193]    Whether the Government can carry its burden to prove venue at the preponderance of the evidence standard must be left for trial.[194]    Nonetheless, the defendant's merits arguments are wrong.   When a crime takes place across multiple locations, "venue is properly laid in any of the districts where the essential conduct element of the crime took place."[195] "[T]he essential conduct prohibited by § 1001(a)(2) is the making of a materially false, fictitious, or fraudulent statement."[196]    Where a false statement is made in one District but transmitted to another in a Section 1001 case, "the materiality requirement proves dispositive with respect to venue."[197]    Because "[p]roving the materiality" of a defendant's false statements "requires evidence that those statements were conveyed to or had an effect on [government] investigators working in the Southern District of New York," venue is proper in this District.[198]

Here, the SEC deposition was physically held in Los Angeles by members of the SEC's

---

[191] *United States v. Stein*, 429 F. Supp. 2d 633, 643 (S.D.N.Y. 2006); *see also United States v. Milton*, No. 21 Cr. 478 (ER), 2021 WL 5304328, at *3 (S.D.N.Y. Nov. 15, 2021).

[192] *Ohle*, 678 F. Supp. 2d at 231.

[193] *See Bankman-Fried*, 680 F. Supp. 3d at 314-15.

[194] *Id.*

[195] *United States v. Ramirez*, 420 F.3d 134, 139 (2d Cir. 2005).

[196] *United States v. Coplan*, 703 F.3d 46, 79 (2d Cir. 2012).

[197] *Id.*

[198] *Coplan*, 703 F.3d at 79; *see also United States v. Salinas*, 373 F.3d 161, 167 (1st Cir. 2004) ("When materiality is a critical component of the statutory definition, it makes perfect sense to consider the crime as continuing into the district in which the effects of the false statement are felt.").

Asset Management Unit, who were based both in Los Angeles and the Southern District of New York. Indeed, a member of the SEC's enforcement division joined the deposition by WebEx and was logged into the Webex from the Southern District of New York.[199] Accordingly, the false statements were transmitted in real time to the Southern District of New York.

But, even if they were not, "[p]roving the materiality" of a defendant's false statements "requires evidence that those statements were conveyed to or had an effect on [government] investigators working in the Southern District of New York," so venue is proper in this District.[200] This is because part of the SEC's enforcement team was based in the Southern District of New York (of course, the SEC filed their parallel civil action against Mr. Leech in the Southern District of New York), and the U.S. Attorney's Office in charge of this case and investigation is in the Southern District of New York.[201] The defendant may believe that *Coplan* is "wrongly decided," Def. Br. 42 n.26, but it is binding circuit precedent in this District. And the defendant's reliance on pre-*Coplan* district court cases are of no moment. Not only are they not binding, they fail on their own terms because, unlike in *United States v. Bin Laden*,[202] the defendant's false statements were not "uttered and received wholly inside" another district. As Judge Caproni recently found, "a slew of § 1001 cases in this Circuit have found venue to be proper not only in the district where

---

[199] Dep Tr. at 5-6 (noting also that members of the defense team were participating remotely from New York).

[200] *Coplan*, 703 F.3d at 79; *see also United States v. Salinas*, 373 F.3d 161, 167 (1st Cir. 2004) ("When materiality is a critical component of the statutory definition, it makes perfect sense to consider the crime as continuing into the district in which the effects of the false statement are felt.").

[201] Although the defendant notes that he could challenge venue under a "substantial contacts test," Br. 41 n.25, he does not articulate how, if at all, prosecution in this District will result in hardship to him or undermine the fairness of his trial. This is especially so, since the defendant has not challenged venue on the other four counts.

[202] 146 F. Supp. 2d 373 (S.D.N.Y. 2001).

the false statements were made, but also in the district to which they were transmitted."[203]  The

Motion should be denied.

## CONCLUSION

For the foregoing reasons, the defendant's motions should be denied in their entirety.

Dated:  New York, New York
        September 23, 2025


                                        Respectfully submitted,

                                        SEAN BUCKLEY
                                        Attorney for the United States

                        By:     _/s_____
                                Thomas S. Burnett
                                Peter J. Davis
                                Assistant United States Attorneys
                                Telephone: (212) 637-1064 / 2468

---

[203] *United States v. Reese*, No. 24 Cr. 402 (VEC), 2025 WL 1770789, at *3-4 (S.D.N.Y. June 25, 2025) ("[A]lthough Mr. Reese made false statements to his Eastern District probation officers and those officers had discretion whether to transmit the statements to their Southern District counterparts, the fact remains that the false statements were transmitted to this District, and once transmitted, they were capable of influencing the Southern District probation officers' decision to issue a violation report.").