UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X
                                                              )
UNITED STATES OF AMERICA,                                     )
                                                              )
        -v-                                                   )        24 Cr. 658 (GHW)
                                                              )
S. KENNETH LEECH II,                                          )
                                                              )
                Defendant.                                    )
                                                              )
------------------------------------------------------------- X


**REPLY BRIEF IN SUPPORT OF DEFENDANT S. KENNETH LEECH II'S
OMNIBUS PRETRIAL MOTION**


Dated: October 7, 2025
        New York, New York


                                        MORVILLO ABRAMOWITZ
                                        GRAND IASON & ANELLO, P.C.
                                        Jonathan S. Sack
                                        Jeremy H. Temkin
                                        Anna Adams
                                        Joshua Bussen
                                        Samuel W. Magaram
                                        Nathaniel Sobel
                                        565 Fifth Avenue
                                        New York, NY 10017
                                        (212) 856-9600 (telephone)
                                        (212) 856-9494 (facsimile)

                                        *Attorneys for Defendant S. Kenneth Leech II*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

I.  The Court Should Order the Government to Provide a Bill of Particulars
    Identifying Allegedly Unlawful Trades and Alleged Misstatements .................................... 3

    A.  The Court Should Order the Government to Identify Allegedly
        Unlawful Trades ......................................................................................................... 3

    B.  The Court Should Order the Government to Identify Allegedly
        Fraudulent Statements ............................................................................................. 20

II.  The Court Should Strike the Indictment's Allegation of a $1.2 Billion
     Differential as Surplusage ................................................................................................ 20

III.  The Government's Opposition Confirms That Discovery and a Hearing
      into the Government's Deficient Taint Team Process Are Necessary ............................... 23

      A.  Mr. Leech Has Established That He Is Entitled to Discovery and a Hearing ............. 25

      B.  The Court Should Not Countenance the Government's Deficient Taint
          Team Procedure ....................................................................................................... 32

      C.  The Government's Challenges to Mr. Leech's Privilege Assertions Are
          Without Merit ........................................................................................................... 35

IV.  The Court Should Dismiss Count Five for Lack of Venue ................................................ 42

CONCLUSION ................................................................................................................... 45

# TABLE OF AUTHORITIES

**Cases**                                                          **Page(s)**

*Bice v. Robb*,
  511 F. App'x 108 (2d Cir. 2013)................................................................. 42

*Brady v. Maryland*,
  373 U.S. 83 (1963) ......................................................................................... 4

*Eglin Fed. Credit Union v. Cantor, Fitzgerald Sec. Corp.*,
  91 F.R.D. 414 (N.D. Ga. 1981).................................................................. 39

*Golden Trade v. Lee Apparel Co.*,
  143 F.R.D. 514 (S.D.N.Y. 1992)................................................................ 39

*In re Grand Jury Subpoenas Dated Mar. 19, 2002 & Aug. 2,
  2002*, 318 F.3d 379 (2d Cir. 2003)............................................................ 41

*In re Sealed Search Warrant & Application for a Warrant*,
  No. 20-MJ-03278 (JJO), 2020 WL 5658721 (S.D. Fla. Sept. 23, 2020)................................... 30

*In re Tri-State Outdoor Media Grp., Inc.*,
  283 B.R. 358 (Bankr. M.D. Ga. 2002) ...................................................... 39

*Kastigar v. United States*,
  406 U.S. 441 (1972) ............................................................................... 26, 27

*Leka v. Portuondo*,
  257 F.3d 89 (2d Cir. 2001)........................................................................... 4

*Macquarie Infrastructure Corp. v. Moab Partners, L. P.*,
  601 U.S. 257, 260 (2024) ........................................................................ 20, 21

*Matter of Search of Info. Associated with Rickmaike@yahoo.com*,
  No. 4:15MJ-00042 (HBB-JHM), 2020 WL 4369448 (W.D. Ky. July 30, 2020) ..................... 34

*SEC v. Slocum, Gordon & Co.*,
  334 F. Supp. 2d 144 (D.R.I. 2004)........................................................... 6, 10

*SEC v. World Tree Fin., L.L.C.*,
  43 F.4th 448 (5th Cir. 2022)......................................................................... 7

*Swinton v. Livingston Cnty.*,
  No. 15 Civ. 00053A(F), 2016 WL 6248675 (W.D.N.Y. Oct. 26, 2016) .................... 41

*United States v. Ackert*,
    169 F.3d 136 (2d Cir. 1999) ........................................................................ 39, 40

*United States v. Alvarez*,
    519 F.2d 1036 (3d Cir. 1975) ............................................................................... 39

*United States v. Avenatti*,
    559 F. Supp. 3d 274 (S.D.N.Y. 2021) ................................................................. 33

*United States v. Bankman-Fried*,
    680 F. Supp. 3d 289 (S.D.N.Y. 2023) ................................................................. 43

*United States v. Bickle*,
    No. 10 Cr. 00565 (RLH), 2011 WL 379822 (D. Nev. July 21, 2011) .................... 28

*United States v. Bin Laden*,
    146 F. Supp. 2d 373 (S.D.N.Y. 2001) ................................................................. 45

*United States v. Bortnovsky*,
    820 F.2d 572 (2d Cir. 1987) ......................................................... 4, 13, 14, 21

*United States v. Chalmers*,
    410 F. Supp. 2d 278 (S.D.N.Y. 2006) ................................................................... 6

*United States v. ChevronTexaco Corp.*,
    241 F. Supp. 2d 1065 (N.D. Cal. 2002) .............................................................. 41

*United States v. Colasurdo*,
    453 F.2d 585 (2d Cir. 1971) ............................................................................... 27

*United States v. Coplan*,
    703 F.3d 46 (2d Cir. 2012) ........................................................................... 44, 45

*United States v. Esformes*,
    No. 16 Cr. 20549 (RNS), 2018 WL 5919517 (S.D. Fla. Nov. 13, 2018) ................ 28

*United States v. Feng Ling Liu*,
    12 Cr. 934 (RA), 2014 WL 101672 (S.D.N.Y. Jan 10, 2014) .......................... 33, 34

*United States v. Feola*,
    651 F. Supp. 1068 (S.D.N.Y. 1987) ...................................................................... 3

*United States v. Finnerty*,
    474 F. Supp. 2d 530 (S.D.N.Y. 2007) ...................................................... 16, 17, 23

*United States v. Forrester*,
    No. 02-CR-302, 2002 WL 1610940 (S.D.N.Y. July 22, 2002)...................................................... 43

*United States v. Fortenberry*,
    89 F.4th 702 (9th Cir. 2023).......................................................................................................... 44

*United States v. Gonzalez*,
    144 F.4th 396 (2d Cir. 2025).......................................................................................................... 42

*United States v. Helmsley*,
    726 F. Supp. 929 (S.D.N.Y. 1989) ............................................................................................... 27

*United States v. Hoey*,
    No. 15 CR. 229 (PAE), 2016 WL 270871 (S.D.N.Y. Jan. 21, 2016)........................................ 27

*United States v. Kaplan*,
    No., 2 Cr. 883 (DAB), 2003 WL 22880914 (S.D.N.Y. Dec. 5, 2003) ................................ 32, 33

*United States v. Kostin*,
    No. 1:24-CR-91-GHW, 2025 WL 1504409 (S.D.N.Y. May 27, 2025) .................................... 36

*United States v. Kovel*,
    296 F.2d 918 (2d Cir. 1961) ................................................................................................. passim

*United States v. Levin*,
    No. 15 Cr. 1010 (KBF), 2015 WL 5838579 (S.D.N.Y. Oct. 5, 2015) .................................... 33

*United States v. Mandell*,
    710 F. Supp. 2d 368 (S.D.N.Y. 2010) ................................................................................ 6, 21, 22

*United States v. Motz*,
    652 F. Supp. 2d 284 (E.D.N.Y. 2009) ........................................................................................... 8

*United States v. Nachamie*,
    91 F. Supp. 2d 565 (S.D.N.Y. 2000) ................................................................................... passim

*United States v. Nobles*,
    422 U.S. 225 (1975) ...................................................................................................................... 41

*United States v. Novak*,
    443 F.3d 150 (2d Cir. 2006)........................................................................................................... 43

*United States v. Rainere*,
    No. 18 Cr. 204 (NGG) (VMS) (E.D.N.Y Apr. 6, 2019) ........................................................... 36

*United States v. Reese*,
    No. 24 Cr. 402 (VEC), 2025 WL 1770789 (S.D.N.Y. June 25, 2025)......................................45

*United States v. Schwimmer*,
    924 F.2d 443 (2d Cir. 1991)........................................................................26, 28, 29

*United States v. Sharma*,
    No. 18 CR. 340 (LGS), 2019 WL 3802223 (S.D.N.Y. Aug. 13, 2019) ....................................27

*United States v. Siddiqi*,
    No. 06 Cr 0377 (SWK), 2007 WL 549520 (S.D.N.Y. Feb. 21, 2007)........................ 16, 17, 21

*United States v. Torres*,
    901 F.2d 205 (2d Cir. 1990)............................................................................................3

*United States v. Wey*,
    No. 15-cr-0611 (AJN), 2017 WL 237651 (S.D.N.Y. Jan. 18, 2017) ............................... 12, 13

*United States v. Wilson*,
    505 F. Supp. 3d 3 (D. Mass. 2020) ............................................................................34

*United States v. Yousef*,
    327 F.3d 56 (2d Cir. 2003)............................................................................................33

**Statutes & Constitutional Provisions**

U.S. Const. amend. VI ............................................................................................3

**Rules**

Fed. R. Civ. P. 26........................................................................................... 7, 8, 9

Fed. R. Civ. P. 33......................................................................................................7

Fed. R. Crim P. 7 ......................................................................................................1

Fed. R. of Evid. 401 ...............................................................................................23

Local Civ. R. 26 ......................................................................................................35

## PRELIMINARY STATEMENT

To our knowledge, this is the first cherry-picking prosecution that alleges dishonest allocation of trades among fixed income portfolios with demonstrably different investment strategies, based solely on unrealized first day performance of trades, in which the defendant lacked a direct financial interest in the "favored" accounts.  Mr. Leech has sought particulars as to which of the approximately 33,000 trades identified in the discovery the government claims were fraudulently allocated.  The government opposes the motion, arguing that particulars are unwarranted because it intends to prove the charges chiefly through "a statistical analysis of Leech's trading, which will demonstrate that he allocated trades to favor some clients over others."  (Opp. Mem. at 1).[1]

In support of its refusal to provide particulars, the government relies almost entirely on civil enforcement actions brought by the SEC.  These cases are cited for the proposition that the SEC regularly proves cherry picking through a statistical pattern.  But this is a criminal case, and the issue is not one of trial evidence but the government's obligation under the United States Constitution and Federal Rule of Criminal Procedure 7(f) to inform a defendant what the alleged illegal acts were.  In a fraud case based on cherry-picking, the offense rests on trade allocations that allegedly improperly favored one investment account over another.  A statistical analysis of allocations is evidence; it is not the offense itself, and invocation of statistics does not, as the government suggests, negate a defendant's right to fair notice and particulars.

---

[1] "Opp. Mem."  refers to the Memorandum of Law of the United States in Opposition to Defendant's Pretrial Motions (Dkt No. 37); "Mem." refers to the Memorandum of Law in Support of Defendant S. Kenneth Leech II's Pretrial Motions (Dkt No. 35).  This submission otherwise uses the same terms defined in the Memorandum of Law (Dkt. No. 35).

The Court should also grant the defense's request for particulars identifying the specific statements it alleges were false or rendered false or misleading by a material omission. (*See* Mem. at 20–22). In response to this request, the government argues that its identification of thousands of communications and Western's SEC filings is sufficient. (*See* Opp. Mem. at 39–41). But nowhere does the government notify Mr. Leech which statements in those documents and client contacts are alleged to be false and misleading and will need to be defended at trial.

Further, the Court should strike the Indictment's allegations regarding the $1.2 billion differential between the unrealized first-day gains allocated to the various accounts. (*See* Mem. at 22–23). Because the government does not dispute that this number is overinclusive, any allegations to that effect are misleading and prejudicial, and should be stricken as surplusage.

Next, Mr. Leech asked the Court to order discovery and grant a hearing to evaluate the government's deficient taint team procedure. That process allowed the prosecutors to access more than 200 privileged documents from Mr. Leech's Google account as well as documents from his Apple accounts that the government cannot even identify. (*See* Mem. at 23–38). In response, the government argues that Mr. Leech has not established that the documents it accessed were privileged and that he has not met the standard necessary to warrant a hearing. The government is wrong. As in many complex white-collar cases, counsel necessarily engaged experts, and Mr. Leech's communications with those experts are clearly privileged under the Second Circuit's seminal decision in *United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961). The government's aggressive and unreasonable invasion of Mr. Leech's privileged communications is not supported by law, and rather than simply accepting the government's contention that it acted appropriately and did not gain an unfair advantage by examining

privileged communications, the Court should grant defendant's request for discovery and a hearing.

Finally, the government does not dispute that the statements at issue in Count Five were made in the Central District of California, in connection with an investigation being conducted by the SEC's Los Angeles Regional Office, regarding conduct that allegedly took place in California. (*See* Mem. 38–42). With no connection between Mr. Leech's testimony and this District, the government contends that it can establish venue at trial by showing (i) an "industry expert" from the SEC listened to Mr. Leech's testimony by WebEx from the Southern District of New York, and (ii) that officials from the SEC and U.S. Attorney's Office relied on that testimony in the Southern District of New York. As articulated in Mr. Leech's opening brief, allowing the government to manufacture venue through such means would stretch the Venue and Vicinage Clauses of the Constitution past their breaking point. The government's argument should be rejected, and Count Five should be dismissed.

## I.    The Court Should Order the Government to Provide a Bill of Particulars Identifying Allegedly Unlawful Trades and Alleged Misstatements

### A.    The Court Should Order the Government to Identify Allegedly Unlawful Trades

Under the United States Constitution, a criminal defendant is entitled "to be informed of the nature and cause of the accusation" against him. U.S. Const. amend. VI. The Second Circuit has made clear that this means a criminal defendant is entitled to know "the specific acts of which he is accused." *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990) (quoting *United States v. Feola*, 651 F. Supp. 1068, 1132 (S.D.N.Y. 1987), *aff'd*, 875 F.2d 857 (2d Cir. 1989)). In a cherry-picking case, like this one, those criminal acts include the specific trades the government claims were fraudulently allocated to favor one account over another.

In moving for particulars, we argued that neither the Indictment nor the discovery specify which of the approximately 33,000 U.S. Treasury futures and options trades over the 33-month period covered by the Indictment the government claims were fraudulently allocated, and that without greater specificity, the defense will be forced to guess which trades the government will rely on at trial.  (Mem. at 14–18 (citing, *inter alia*, *United States v. Bortnovsky*, 820 F.2d 572 (2d Cir. 1987) (per curiam), and *United States v. Nachamie*, 91 F. Supp. 2d 565 (S.D.N.Y. 2000))).  We further argued that the inclusion of "scheme" liability charges in the Indictment does not relieve the government of its obligation to provide this basic information regarding the charges because a defendant has the right to notice of the specific illegal acts underlying the alleged scheme (Mem. at 18–19 (citing Tr. at 6:22–23, *United States v. Johnson*, No. 17 Cr. 0482 (JSR) (S.D.N.Y. October 11, 2017), Dkt. No. 40)); and that, to the extent the government intends to rely on a statistical pattern, it should be required to identify "the trades on which the purported statistical pattern is calculated" and the "trades included in the purported pattern that *were not* fraudulent" (Mem. at 19–20 (citing *Brady v. Maryland*, 373 U.S. 83 (1963), and *Leka v. Portuondo*, 257 F.3d 89, 103 (2d Cir. 2001))).

In response, the government makes essentially four arguments.  *First*, it doubles down on its strategy of relying on a statistical pattern, arguing that Mr. Leech is not entitled to notice of specific trades that were allegedly misallocated because it intends to prove the charged offenses through the overarching pattern.  (Opp. Mem. at 19–20).  *Second*, the government asserts that the notion that trades were "misallocated" is inapplicable because the government alleges that "Leech made trades throughout the day, typically without knowing where he would allocate" and that he "waited until he had an opportunity to see how the market moved and then made his allocation decision."  (Opp. Mem. at 27).  *Third*, the government argues that because courts have

4

rejected demands for trade-level particulars in market-manipulation cases, the same result should follow in this cherry-picking case. (Opp. Mem. at 27–31). *Fourth*, apparently conceding that providing an undifferentiated set of approximately 33,000 trades without identifying which ones it claims were dishonestly allocated is insufficient, the government argues that, by identifying subsets of those trades, it has adequately informed the defense of the specific allegedly unlawful acts. (Opp. Mem. at 36–37).

None of these arguments has merit, as we explain below.

### 1. The Government's Reliance on a Statistical Pattern Does Not Obviate the Need for Particulars

Throughout its opposition, the government argues that it need not identify specific trades that were fraudulently allocated because, at trial, it "intends to establish that the defendant engaged in a scheme, or a course of conduct, designed to defraud," that the scheme consisted of an "undisclosed plan to favor certain accounts over others" by using first-day performance to make allocation decisions, and that "[t]he patterns of the defendant's trade allocations are *evidence* that the defendant, in fact, had such a scheme." (Opp. Mem. at 26; *see also id*. at 1, 18). The government further makes clear that it intends to prove the alleged scheme through "a statistical analysis of Leech's trading, which will demonstrate that he allocated trades to favor some clients over others." (Opp. Mem. at 1; *see also id.* at 15, 19, 20, 24–27, 34, 36). From these premises, the government argues it is not obligated to provide particulars regarding the specific trades it claims were fraudulently allocated, because it has produced a blotter identifying approximately 33,000 trades that constitute the set of trades underlying the statistical pattern it plans to rely on at trial. (*Id.* at 25).

This argument entirely misses the point of a bill of particulars, which the government acknowledges is to "advise the defendant of the *specific acts of which he is accused*" and provide

information "necessary for the defense to prepare." (*See* Opp. Mem. at 16–17 (citing *United States v. Mandell*, 710 F. Supp. 2d 368, 384 (S.D.N.Y. 2010) (emphasis added), and *United States v. Chalmers*, 410 F. Supp. 2d 278, 286–87 (S.D.N.Y. 2006))). In a cherry-picking case, "the specific acts of which [the defendant] is accused" are fraudulent allocations, *i.e.*, allocations based on first-day performance. *See, e.g.*, *SEC v. Slocum, Gordon & Co.*, 334 F. Supp. 2d 144, 161 (D.R.I. 2004). Pointing to a pattern, by definition, fails to indicate what the specific alleged illegal acts were.

The Indictment is clear that the offense charged in this case is the cherry picking of trades based on their first-day performance. (Indictment ¶ 1 ("LEECH engaged in a criminal scheme commonly known as 'cherry picking.'")). Mr. Leech allegedly committed the crime of cherry picking "by assigning trades that performed well during their first day into [certain] client accounts . . . , and assigning trades that performed poorly over their first day into the accounts of other clients." (*Id.*). It follows from these allegations that any trade Mr. Leech allocated for reasons having nothing to do with first-day performance is not claimed to be part of the criminal conduct. As Mr. Leech's motion explained, and the government does not dispute, "the Core Strategies and Macro Opps required different U.S. Treasury futures and options trades, especially during the extraordinary bear market conditions of the relevant period." (Mot. at 8 & n.10). And yet, the government flatly refuses to tell the defense which trades were allocated based on first-day performance and which were not. This violates the defendant's right to fair notice of the alleged crimes.

In essence, the government conflates the distinct concepts of *what the crime is* with how the government proposes to *prove the crime*. The Court should reject the government's attempt

to sidestep its obligation to provide basic information regarding the specific illegal acts the defendant is charged with having committed.

The notion that the government may rely on a statistical pattern to meet its burden of proving a criminal case beyond a reasonable doubt is troubling.  Even more troubling is the government's further leap of insisting that it fulfills its obligations simply by alleging the pattern, rather than identifying the specific acts that it claims were criminal.  The government may want to rely on statistical theories and patterns to prove its case, but in preparing his defense, the defendant is entitled to know what alleged fraudulent acts he is being charged with having committed—here, what trades were allegedly allocated based on first-day performance.  That is his constitutional right, and the government's constitutional obligation.

### a.    The Government's Reliance on Civil Cases Is Misplaced

In support of its highly problematic approach to this criminal prosecution, the government principally relies on *civil* enforcement cases brought by the SEC for the proposition that "[c]ourts routinely admit statistical analysis of a defendant's trading to establish cherry picking."  (*See* Opp. Mem. at 20 & n.36; *see also id.* at 15–16 (citing *SEC v. World Tree Fin., L.L.C.*, 43 F.4th 448, 462 (5th Cir. 2022)).  But none of these cases addresses whether a defendant in a criminal cherry-picking case is entitled to a bill of particulars identifying specific trades that were allegedly fraudulently allocated.

Far from supporting the government's position, the reliance on civil enforcement cases reinforces the need for a bill of particulars.  Through the ordinary course of civil discovery, the defendants in these SEC cases would have had access to the very information Mr. Leech seeks here.  Among other things, those defendants were entitled to issue interrogatories, Fed. R. Civ. P. 33(1)–(2), receive extensive expert disclosures and reports pursuant to Fed. R. Civ. P. 26(a)(2)(B), and depose the government's witnesses (experts and otherwise), Fed. R. Civ. P.

26(b)(4)(A)—all months, if not years, before trial.  Here, by comparison, Mr. Leech will receive

nothing close to the level of disclosure he is entitled to get in the parallel civil case brought by

the SEC.   This is not just about different procedures for civil and criminal enforcement; it is

about the government depriving the defense of basic information about allegedly dishonest

allocations needed to defend the case.

Tellingly, neither of the criminal cherry-picking cases cited by the government—*United*

*States v. Motz*, 652 F. Supp. 2d 284 (E.D.N.Y. 2009), and *United States v. Kambolin*, No. 23 Cr.

20372 (PCH) (S.D. Fla. 2023)—supports the government's position that it need not disclose

specific trade-allocation data.  The government in *Motz* provided the defense "a list of all the

trades . . . executed as part of the 'cherry-picking' scheme."  Mem. in Opp. at 13, *United States v.*

*Motz*, No. 8 Cr. 598 (E.D.N.Y. Apr. 1, 2009), Dkt. No. 37.   Contrary to the government's

argument that the court in *Motz* "denied requests for 'trade-level detail,'" (*see* Opp. Mem. at 28–

29), in that case the government voluntarily agreed to "provide the defendants with a list of all

the trades [the defendant] executed" as part of the alleged scheme while the motion was pending,

which mooted that request before it was decided.  Mem. in Opp. at 13, *Motz*, No. 8 Cr. 598

(E.D.N.Y. April 1, 2009), Dkt. No. 37; *see also* Gov. Letter at 1, *United States v. Motz*, No. 08 Cr.

598, (E.D.N.Y. Apr. 17, 2009), Dkt No. 40.  And contrary to the government's suggestion that it

has "gone far above the disclosures in *Motz*" by producing "trade blotters" and "identifying in

the Indictment categories of trades that are evidence of the scheme," (Opp. Mem. at 29 n.55), the

government there provided the defendant with a list of trades that it described as all the "specific

trading activity that the government intends to introduce . . . at trial," which the government has

not done here.  *See* Gov. Letter at 1–2 n.1, *Motz*, No. 8 Cr. 598 (E.D.N.Y. Apr. 17, 2009), Dkt.

No. 40 (noting the government had also previously produced "trade blotters").  *Kambolin*, the

only other criminal cherry-picking case cited by the government, resulted in a guilty plea one month after indictment and therefore particulars regarding specific trades were not at issue.  Plea Agreement, No. 23 Cr. 20372 (S.D. Fla. Oct. 11, 2023), Dkt. No. 16.

### b.    Fairness and Trial Management Call for Disclosure of Particulars

The government implies that its proof at trial will extend beyond the pattern that purportedly supports its allegation that Mr. Leech engaged in cherry-picking.  (*See* Opp. Mem. at 1 (government will prove fraud through "among other ways"); *id.* at 20 ("[P]art of the government's proof at trial will consist of a statistical analysis"); *id.* at 34 ("The Government plans to prove its case, in part, through evidence of statistical patterns")).  To the extent this other evidence includes specific trades the government will claim were fraudulently allocated, the government should be required to disclose those trades now or, at the latest, in connection with its expert disclosure (in two weeks).[2]

If the government is permitted to first identify specific trades through Jencks Act materials (disclosure of which will start seven weeks before trial) or its exhibit list (disclosed five weeks before trial), the defense will have to analyze the complex data necessary to place trades in context while digesting all of the government's disclosures and under the pressure of other deadlines fixed by the Court, including the deadline to produce Rule 16 materials and the defense's witness list, which are due two weeks after the government produces its exhibit list. Given the complexity of the data and analysis at issue (*See* Mem. at 14–15), allowing the government to spring specific trades on the defense in the weeks leading up to the trial, will

---

[2] Under Rule 16(A)(1)(G)(iii) of the Federal Rules of Criminal Procedure, these disclosures will likely be less detailed than those that would be required under Rule 26 of the Federal Rules of Civil Procedure.  And unlike civil discovery, the defense will not have an opportunity to depose the government's expert witnesses.

render moot the Court's carefully planned case management schedule since adjournments will be needed to allow the defense adequate time to address the late-identified trades. This problem will be exacerbated if the government ambushes defense counsel with specific trades during the trial. The government should not be permitted to engage in gamesmanship and hide the ball in this fashion.

### 2.    The Government's Argument That There Were No Correct Allocations Is Misguided

The government disputes that cherry picking consists of trades that were "misallocated," or fraudulently allocated, and argues that, because Mr. Leech allocated trades late in the day, after having "had an opportunity to see how the market moved . . . there was no 'right' allocation at the time Leech made a trade." (Opp. Mem. 27; *see also id.* at 22.)[3]  Not only does this argument ignore the complexity of managing multi-billion dollar fixed income portfolios, but also it conflates the *opportunity* to allocate trades based on first-day performance with *actually allocating* trades on the basis of first-day performance. Although allocating trades after they are placed may be necessary to a cherry-picking scheme, it is not sufficient to establish cherry picking, and we are unaware of any court that has suggested otherwise. *See, e.g.*, *Slocum*, 334 F. Supp. 2d at 171 (holding SEC failed to prove cherry-picking scheme in part because the "mere opportunity for possible fraud does not translate into actual wrongdoing").

---

[3] Mr. Leech allocated his trades before the end of the workday, which conformed with Western's trade allocation policy, and the timing of his allocations was driven largely by his responsibilities as both Western's Chief Investment Officer and the portfolio manager responsible for dozens of accounts across numerous strategies. The government knows that the purported "standing instruction" that unallocated trades be allocated 50/50 if he was unable to provide an allocation by the end of a trading day (Opp. Mem. at 27), was only occasionally employed. The infrequent use of the standing instruction does not, as the government suggests, imply that *all* of Mr. Leech's trades were interchangeable among the various strategies he managed.

In short, the criminal acts alleged in a cherry-picking case are the actual dishonest allocations based on first day performance, not the delay in allocating the trades. The government should not be allowed to shirk its obligation to specify the criminal acts Mr. Leech is charged with having committed by claiming that the alleged offense lies in the timing of allocations.

### 3.    The Government's Reliance on Market-Manipulation Cases is Misplaced and Contradicts Its Position in Prior Cases

In the absence of criminal cherry-picking cases that support its position, the government resorts to an inapposite line of market manipulation prosecutions in which courts denied requests for trade-level disclosures. But this argument ignores key distinctions between cherry picking and market manipulation. In each of the cases cited by the government, the defendant had ample notice that entire categories of trades were unlawful because each and every trade furthered the alleged manipulation scheme.

 For instance, in *United States v. Tuzman*, the government alleged that the former CEOs and managers of two companies conspired with a hedge fund to have the fund "purchase and hold . . . stock" in one of the companies "to artificially inflate its price and trading volume," including through "wash" trading and the government "stated that it is operating under the presumption that all of [the entity's] trading in [the at-issue] stock during the relevant time was manipulative." 301 F. Supp. 3d 430, 436, 452 (S.D.N.Y. 2017). Because the government in *Tuzman* identified the specific acts that were alleged to be criminal (*i.e.*, all trades in the securities at-issue), the defense knew which acts the government was claiming were criminal.

Similarly, in *United States v. Hwang*, the indictment alleged that the defendant operated a RICO enterprise designed to "amass enormous, price-altering market power . . . while hiding those positions from the market so that the market would not know that the price was being

11

driven by a single actor."  Gov. Opp. to Defs.' Omnibus Pretrial Mem. at 30, No. 22 Cr. 240 (AKH) (S.D.N.Y. Jan. 12, 2023), Dkt No. 53; *Hwang*, Indictment ¶¶ 1–74 (RICO allegations), No. 22 Cr. 240 (AKH) (S.D.N.Y. Apr. 25, 2022), Dkt No. 1.  In response to the defendant's request for particulars, the defense requested "[e]very trade alleged to be manipulative or otherwise unlawful," which the government characterized as "essentially ask[ing]" for "every single one of the trades made by [the defendant's fund]" in the relevant securities.  Gov. Opp. to Defs.' Omnibus Pretrial Mem. at 64–65, *Hwang*, 22 Cr. 240 (AKH) (S.D.N.Y. Jan. 12, 2023), Dkt No. 53.  Again, because the government identified the unlawful trades (*i.e.*, all of them), the defendant was notified of the specific criminal acts he was charged with committing.

Finally, in *United States v. Wey*, the government alleged that the defendant had orchestrated a scheme involving the "undisclosed amassing of beneficial ownership of more than five percent of the stock of certain publicly traded companies" and "manipulation of the market price and demand for the stock of those companies in which [the defendant] had covertly amassed substantial beneficial ownership interests."  *See* Indictment ¶ 7, No. 15 Cr. 611 (AJN) (S.D.N.Y. Sept. 8, 2015), Dkt No. 2.  In response to a motion for particulars, the government argued that the defendant had "secretly amassed stock ownership in companies that he then brought public, used various means . . . to artificially inflate and support the value of the shares in those companies, and then liquidated his positions for substantial profits that he subsequently laundered."  Gov. Mem. of Law in Opp. to Def.'s Omnibus Mot. at 2, *Wey*, No. 15 Cr. 611 (May 31, 2016), Dkt. No. 47.  As in *Tuzman* and *Hwang*, the government informed the defense that every trade the defendant (or his associates) made—or caused certain others to make—in specific securities was fraudulent, and the court concluded that "requir[ing] the disclosure of further . . . trade-level detail . . . would be to require the Government to advise Wey of the

specific manner in which it will attempt to prove the charges." *United States v. Wey*, No. 15-cr-0611 (AJN), 2017 WL 237651, at *19 (S.D.N.Y. Jan. 18, 2017) (citations omitted).

In *Wey*, the government distinguished *United States v. Bortnovsky* and *United States v. Nachamie* as necessitating particulars when the government "*allege[s] that some but not all of a universe of transactions were fraudulent*." *See* Gov's Mem. of Law in Opp. to Def's Omnibus Mem. at 19, *Wey*, 15 Cr. 611 (May 31, 2016), Dkt. No. 47 (emphasis added). But that is precisely what the government alleges here. The government has stated that the trades at issue involved all trades in U.S. Treasury futures and options but the government is not alleging that all allocations were fraudulent, only that the unlawful trade allocations are *among* that group. (*See* Opp. Mem. at 31 (stating the government "provided the defendant all of the trades 'at issue'—the defendant's U.S. Treasury futures and options trades during the charged time period"); *see also* Opp. Mem. at 25, 30)).

More specifically, the government does not allege that all "winning" trades allocated to Macro Opps, Account-1, or Account-2, and all "losing" trades allocated to the Core Strategies were assigned based on the improper consideration of their first-day performance, just that the unlawful trade allocations were among that group. So, unlike the manipulation cases, the government does not say that all trade allocations were improper, or that all trade allocations furthered the cherry-picking scheme. Rather, the government argues that the pattern of "winners" and "losers" proves that many trades were allocated based on first-day performance, without saying which those were. By refusing to provide particulars, the government is depriving the defendant of the right to know the criminal specific acts he is being charged with having committed.

13

The government's unsuccessful attempt to distinguish cases cited in Mr. Leech's moving papers only reinforces the need for particulars in this case. (Opp. Mot. at 30–31).

The government argues that *United States v. Bortnovsky*, 820 F.2d 572 (2d Cir. 1987) is distinguishable because it was a RICO prosecution in which the government impermissibly shifted the burden of proof to the defense at trial because it "effectively required the defense to prove . . . which burglaries were real" by introducing evidence of insurance claims that it did not assert were fraudulent alongside those that it claimed were fraudulent. (*See* Opp. Mem. at 31–34 (citing *Bortnovsky*, 820 F.2d at 573–74)). But *Bortnovsky* placed no reliance on the fact that it was a RICO prosecution. By seeking to introduce evidence of overinclusive statistical patterns that are not limited to trade allocations based on unrealized first-day performance, the government will be shifting the burden in the same manner condemned in *Bortnovsky*; here, the government's refusal to give particulars will require the defense to prove the appropriateness of trade allocations. Moreover, the government's contention that, unlike *Bortnovsky*, its proof of legitmate trade allocations are relevant to proving the fraudulent ones because it will adduce evidence of a statistical pattern is meritless. (*See* Opp. Mem. at 33). As in *Bortnovsky*, where the government presented proof of a "pattern," *Bortnovsky*, 820 F.2d at 573, the government must prove Mr. Leech allocated trades for fraudulent reasons. The existence of licit trade allocations is not relevant to making that showing.

The government's attempt to distinguish *United States v. Nachamie*, 91 F. Supp. 2d 565 (S.D.N.Y. 2000) is similarly unpersuasive. (Opp. Mem. at 32–34). Forced to concede that in *Nachamie* the court required the government to provide particulars regarding which of the 2,000 Medicare claims it would claim at trial were false, the government attempts to style this order as the equivalent of an order to produce an "exhibit list," something it says that it has already

14

committed to providing in this case.  (Opp. Mem. at 32).  This characterization is specious.  Far from simply ordering the equivalent of an "exhibit list," in *Nachamie* the court ordered the government to provide a significant amount of detail regarding the claims that would be at issue during trial, including "each and every one of the 'false and misleading' claims which were allegedly submitted and/or filed," "who allegedly prepared each such form, "who allegedly submitted each such form," and "each item or entry on each such form which is alleged to be 'false and misleading."  *Nachamie*, 91 F. Supp. 2d at 574.  Contrary to the government's unsubstantiated argument, the *Nachamie* court required significantly more than the particulars requested herein and cannot be fairly characterized as an "exhibit list."  Further, in *Nachamie*, as here, the government asserted that particulars should not be ordered because it would provide the defendants with "summary charts" and "expert reports" ahead of trial and argued that this would give the defendants sufficient notice regarding the scheme alleged.  *Id.* at 571.  The court rejected that argument because the government's proposed disclosures were "not specific enough and do not go far enough to enable defendants to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy."  *Id.* (quotation marks and alterations omitted).

Also unpersuasive is the government's attempt to distinguish *United States v. Rajaratnam*, No. 9 Cr. 1184 (RJH), 2010 WL 2788168 (S.D.N.Y. July 13, 2010) where the government conceded that it had an "obligation" to provide the defendants with the trades with respect to the insider trading counts.  *Id.* at *9 n.4.  The government's claim that *Rajaratnam* nonetheless supports its position because the court in that case declined to order the government to itemize the overt acts (that is, the trades at issue) for the conspiracy counts, (Opp. Mem. at 30–31), ignores that the court's decision was based on the nature of a conspiracy charge and the fact that "the Government is not required to charge any overt acts in the indictment."  *Id.* at *3

15

(quotation marks omitted).  Far from undermining Mr. Leech's argument, the fact that the

government in *Rajaratnam* acknowledged that it was "obligate[d]" to disclose the trades relating

to the substantive insider trading counts (similar to the substantive counts charged here) supports

Mr. Leech's request for particulars.

Finally, contrary to the government's characterization of *United States v. Finnerty*, No. 5

Cr. 397 (DC), (S.D.N.Y.), as a case in which the defendant did not request a "bill of particulars,

but instead 'simply requested that the government state what the alleged fraud is,'" (Opp. Mem.

at 30), the government in *Finnerty* voluntarily "identif[ed] *all* trades during the charged periods

that were executed in . . . the defendant['s] . . . stocks that are alleged to be violative" and

represented that it had "produced detailed specifications explaining the criteria used to identify

the illegal trades, as well as the NYSE's proprietary computer code written to implement these

specifications."  Gov. Mem. in Opp. to Defs' Discovery Mots. at 11, *United States v. Finnerty*,

No. 5 Cr. 397, (S.D.N.Y. Nov. 15, 2005), Dkt. No. 19.  Unlike here, the defense in *Finnerty* had

no need to seek to compel the government to identify the specific "trades during the charged

periods . . . that are alleged to be violative" of the law.[4]  Moreover, the *Finnerty* court noted that

---

[4] The government's attempt to distinguish *United States v Chierchio*, No. 20-cr-306 (NGG), 2022
WL 523603 (E.D.N.Y. Feb. 22, 2022), *United States v. Johnson*, No. 17-cr-0482 (JSR) (S.D.N.Y.
Oct. 11, 2017), and *United States v. Vaid*, No. 16-cr-763 (LGS), 2017 WL 3891695 (S.D.N.Y.
Sept. 5, 2017), all rest on the premise, refuted in *supra* Section I.A.2, that no trades in the alleged
cherry-picking scheme were "misallocated."  (*See* Opp. Mem. at 34 at n. 76 (distinguishing these
cases because "[i]in a cherry-picking case, an allocation is not 'true' or 'false,' instead, the whole
of defendants' trading is 'evidence of [cherry picking]')).

The government also attempts to distinguish *United States v. Siddiqi*, No. 06-cr-0377 (SWK),
2007 WL 549520 (S.D.N.Y. Feb. 21, 2007), which charged a bribery scheme, as granting a bill of
particulars only with respect to "the group of approved requests for payment and change orders
that it alleges were part of the bribery scheme," without requiring "one-to-one mapping of
tainted requests for payment or change orders to particular bribes."  (*See* Opp. Mem. at 34-35).
But as in *Siddiqi*, all the defense requests here is the identity of the trades the government claims

the defense was "free to move for a judgment of acquittal at trial" if the government failed "to prove personal participation" in each of the trades it alleged. *Finnerty*, 2006 WL 2802042, at *8 (S.D.N.Y. Oct. 2, 2006) (Chin, *J.*).[5]

> **4.    The Government Has Not Produced Enough Information to Enable the Defense to Identify the Unlawful Trades Being Charged**

In response to our assertion that "it will be impossible for Mr. Leech to determine which . . . trades the government alleges were fraudulently allocated," (*see* Mem. at 14), the government claims that voluminous data produced in discovery is sufficient to inform the defense of the specific unlawful trades at issue—in other words, that the "haystack" it produced is not so big as to prevent the defense from finding the "needles." The government has produced data relating to every trade allocation made over the course of the 33-month period of the Indictment. What the government has not done is identify the trades it claims were allocated based on improper consideration of first-day performance, or even how it distinguishes between allegedly fraudulent and non-fraudulent allocations.

The government does not claim that all trades with positive unrealized first-day performance should have been allocated to the Core Strategies, or that all trades with negative unrealized first-day performance should have been allocated to Macro Opps. (*See, e.g.*, Opp. Mem. at 18 ("[T]he Indictment charges that the defendant engaged in a fraudulent scheme or

---

constituted the underlying criminal conduct. Consistent with *Siddiqi*, the defense does not seek additional specifics, let alone evidentiary detail.

[5] Ultimately, in *Finnerty*, Judge Chin granted a motion for a new trial based on his determination that "the Government's repeated reference to the 26,300 instances of interpositioning was unduly prejudicial" since the evidence showed that the figure was "clearly and significantly overstated." 474 F. Supp. 2d 530, 545–46 (S.D.N.Y. 2007), *aff'd*, 533 F.3d 143 (2d Cir. 2008). Judge Chin's careful decision illustrates why this Court should not allow the government to be allowed to lump together allegedly fraudulent and non-fraudulent conduct as an undifferentiated mass of evidence underlying a statistical pattern.

course of conduct because he favored certain clients over others by using first-day performance . . . to make allocation decisions")).  Nor does it claim that Mr. Leech's "win-rate" for trades allocated to Macro Opps, the Core Strategies, Account-1, and Account-2 should have been identical (and mirrored his overall "win-rate").  But the government refuses to say which trades were allocated based on their first-day performance.  The government does not fulfill its obligations by turning over a haystack of trades and saying it is the defense's job to not only to find the needles but determine what is a needle and what is not.

The government argues, first, that the discovery includes sufficient data from which the defense can ascertain these subsets on its own.  (*See* Opp. at 24–25).  But the trade blotters the government produced contain approximately 33,000 trades.  That number of trades is too large to enable counsel to identify and prepare to defend the trades the government claims were fraudulently allocated.  *See United States v. Khalil*, No. 22 Cr. 20200, 2024 WL 3160668, at *4 (E.D. Mich. June 25, 2024) ("[P]roviding Defendants with a needle in a haystack is akin to not providing them with a needle at all").

The government next argues that it has identified the "at-issue" trade allocations.  (*See* Opp. Mem. at 25).  According to the government, this set consists of approximately 5,175 trades that "underlie[s] the biased pattern in Leech's trading."  (*See* Opp. Mem. at 37 (referencing trades allocated specifically to the at-issue accounts)).  The government does not contend that all 5,175 of these trades were allocated based on their unrealized first-day performance, nor does the government provide a baseline figure of how trades *should have* been allocated but for the alleged cherry picking.  The set of 5,175 trades is therefore insufficient to apprise Mr. Leech of the "specific acts" he is charged with committing.

18

The government also argues that the Indictment identifies the *sorts* of trades at issue. (*See* Opp. Mem. at 22–23 (citing Indictment ¶¶ 18–20)). But even if a "[p]review [of] [e]vidence" in an indictment could sometimes suffice to provide notice of the criminal acts a defendant is charged with committing, it does not do so here. Other than trades allocated specifically to the Core Strategies, Macro Opps, Account-1, and Account-2, the Indictment identifies trades "allocated . . . in the same instrument on the same day" but to different portfolios, as evidencing misallocations. Indictment ¶ 19(g). But this category of trades is ambiguous, voluminous, and, because the government does not claim that all trades in this category were allocated based on their first-day performance, it is replete with false positives.[6]

Finally, the prosecution argues that it has identified subsets of trades based on the size of their allocations. (*See* Opp. at 23 ("The Indictment also shows how the bias in Leech's allocations increased as the size of the first-day gain or first-day loss increased (for example, trades with first-day gains or losses of over $1,000,000)."). This category, though identifiable, is likewise both overinclusive and underinclusive: the government does not argue that all the allocations of trades with unrealized first-day gains or losses of over $1,000,000 were improper, or that this subset contains all the trade allocations it claims were fraudulent.

The defense should not be required to parse the data for the trade allocations the government claims were fraudulent. Far from allowing for the preparation of the defense, the

---

[6] The government also references another category of trades—i.e., so-called "control groups." (*See* Opp. Mem. at 25 (arguing that the government has identified "trades through Broker-1," "trades after October 2023," and trades the defendant "allocated equally between Macro Opps and the Core Strategies" as "control groups for other analyses")). While the government apparently intends to use these groups to demonstrate that other trades were fraudulently allocated, as discussed above, *see supra* Section I.A.4., the identification of groups of trades the government believes were not fraudulently allocated (and therefore serve as control groups) does not specify which of the remaining trades *were* allocated based on improper consideration of their unrealized first-day performance.

government's refusal to give particulars will enable it to engage in trial by ambush in violation of Mr. Leech's constitutional right to know the criminal acts the government claims he committed.

### B.    The Court Should Order the Government to Identify Allegedly Fraudulent Statements

Mr. Leech also demonstrated in his opening brief that the Court should direct the government to identify any statements it alleges were false or rendered false or misleading by a material omission.  Without those particulars, the defense explained, "Mr. Leech faces the impossible task of preparing to defend both the bona fides of over 33,000 trades in the complicated realm of fixed-income portfolio management and the truth and completeness of every statement he made to Western's clients over a 33-month period."  (Mem. at 22).

Rather than address this argument head on, the government first asserts that it need not rely on any misrepresentation to prove its charges under Counts One through Four.  (Opp. Mem. at 38–39).  Although this is wrong as a matter of law,[7] the government's argument does not

---

[7] As the Supreme Court recently held in *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 260 (2024), "[p]ure omissions are not actionable under Rule 10b-5(b)."  *Id.* at 260; *Maso Cap. Invs. Ltd. v. E-House (China) Hldgs Ltd.*, No. 22-355, 2024 WL 2890968, at *4 (2d Cir. June 10, 2024) (stating that "'pure omissions' are no longer 'actionable under Rule 10b-5,' and there can be no 'liability for failure to speak on a subject at all'" (citing *Macquarie*, 601 U.S. at 265)).  In *Macquarie*, a shareholder alleged that a company violated Section 10b-5(b) by failing to disclose the impact a U.N. regulation would have on demand for its services.  *Id.* at 260.  Relying on the dictionary definition of "statement," the Court confirmed that Section 10b-5(b) "bars only half-truths"—*i.e.*, situations in which an "omission renders affirmative statements misleading."  *Id.* at 257–58, 262 (quoting 17 C.F.R. § 240.10b-5(b)); *see also id.* at 258 (holding that "[a] duty to disclose . . . does not automatically render silence misleading under Rule 10b-5(b)" absent "affirmative statements made misleading").  *Macquarie*'s reach beyond Section 10b-5(b) and Rule 10b-5 remains undecided, including whether it applies to identical or substantially identical language in the Investment Advisers Act ("IAA") and implementing regulations (Count One) and the Commodities Exchange Act (Count Four).  *See, e.g.*, *Loginosvkaya v. Baratchenko*, 764 F.3d 266, 272 (2d Cir. 2014) (stating that "courts have looked to the securities laws when called upon to interpret similar provisions of the [Commodities Exchange Act]" (quotation and citation omitted)); 15 U.S.C. § 80b-6(4) (subsection of IAA prohibiting conduct defined by SEC regulations); 17 C.F.R. § 275.206(4)-8 (SEC regulation incorporating language of Section 10b-5(b) into the IAA); *see also United States v. Spivak*, No. 21 Cr 0491, 2025 WL 474299, at *6 (N.D. Ohio Feb. 12, 2025) (noting that

answer the need for particulars since it concedes that Counts Two and Four of the Indictment

charge Mr. Leech with having made misrepresentations.  (Opp. Mem. at 39).

The government argues that it should not be required to provide particulars because it has

produced in discovery "numerous communications" with clients, "extensive examples" of

Western's SEC filings, and an Excel spreadsheet that catalogues more than 2,500 calls, video

conferences, and in-person meetings the defendant had with Western's clients.  (Opp. Mem. at

39–41).  But this is exactly why particulars are needed to defend the charges.  While the

*government* knows which of the "numerous" client communications and "extensive" SEC filings

it will rely upon at trial, without particulars the defense will have no way of understanding which

of these statements are alleged to have been false or misleading.   *Siddiqi*, 2007 WL 549420, at

*3 ("[W]here defendants have prepared multiple statements or documents, the Government

should specify which of these are being called into question, lest defendants be forced to review

all of the statements or documents in order to prepare a defense of the veracity of each." (citing

*Bortnovsky*, 820 F.2d at 575; *Nachamie*, 91 F. Supp. 2d at 571, 574–75; *United States v. Trie*, 21

F. Supp. 2d 8, 21–22 (D.D.C. 1998))).[8]

The fraud cases cited by the government, (*see* Opp. Mem. at 41 & nn.88–89), are

unpersuasive.  In *United States v. Mandell*, 710 F. Supp. 2d 368, 385 (S.D.N.Y. 2010), the court

rejected a request for bill of particulars where the indictment "catalog[e]d a number of

---

jury instructions in criminal case "account[ed] for the Supreme Court's decision in *Macquarie*
*Infrastructure* regarding an omission theory").

[8] Contrary to the government's argument, (*see* Opp. Mem. at 42 & n.92), *United States v. Siddiqi*,
No. 06 Cr 0377 (SWK), 2007 WL 549520 (S.D.N.Y. Feb. 21, 2007), weighs in favor of granting
a bill of particulars regarding the alleged misrepresentations.  While the court in *Siddiqi* did not
require a "one-to-one mapping of tainted requests for payment or change orders to particular
bribes," it did require the government to identify the "group of approved requests . . . that it
alleges were part of the bribery scheme . . . defined by date, by the substance of the relevant
requests for payment and change orders, and by the identity of the contractor submitting them."

falsehoods and omissions with great specificity."[9]  *See also United States v. Martinez*, No. 22 Cr 0251 (LJL), 2023 WL 2403134, at *2 (S.D.N.Y. Mar. 8, 2023) (rejecting request for bill of particulars where complaint "outline[d] scheme with a discrete number of alleged misrepresentations made over a limited period of time and to a defined group of alleged victims," including specific "submission[s] the defendant made).[10]  Here, in contrast, the government asserts there were misrepresentations in thousands of SEC filings and client communications over a 33-month period, (*see* Opp. Mem. at 39–40), and the Indictment provides scant and general information regarding the statements at issue.  (*See* Indictment ¶ 15 (providing three general examples of statements in due diligence questionnaires and SEC filings)).

## II.    The Court Should Strike the Indictment's Allegation of a $1.2 Billion Differential as Surplusage

In our moving papers, we argued that the allegation that Mr. Leech allocated trades with $600 million in "net first day *gains*" to Macro Opps while allocating trades with $600 million

---

[9] Indictment at ¶¶ 20, 23, 24, 29, 30, 33, 36, *United States v. Mandell*, No. 09 Cr 0662 (PAC) (S.D.N.Y. June 30, 2009), ECF No. 2 (identifying misrepresentations in "booklet," "trade tickets," and "brokerage statements," quoting specific language the defendants used, and specifying contents of "written and oral representations" made in connection with two discrete transactions).

[10] Complaint at ¶ 19, *United States v. Martinez*, No. 22 Cr 0251 (LJL) (S.D.N.Y. Feb. 28, 2022), ECF No. 1 (identifying specific misstatements in specific loan-application documents on specific dates).  The third fraud case cited by the government, *United States v. Levy*, No. 11 Cr 0062 (PAC), 2013 WL 664712 (S.D.N.Y. Feb. 25, 2013), was a "pump and dump" scheme, and the court concluded that the indictment sufficiently identified the specific content of misrepresentations the defendant made to a defined group of recipients with respect to specific target companies.  Two other cases cited by the government do not address whether a defendant charged with securities fraud is entitled to particulars identifying his alleged misrepresentations.  *See United States v. Bellomo*, 263 F. Supp. 2d 561, 580 (E.D.N.Y. Mar. 13, 2003) (denying bill of particulars regarding venue and racketeering acts without referencing statements or misrepresentations); *United States v. Mitlof*, 165 F. Supp. 2d 558, 569 (S.D.N.Y. Sept. 20, 2021) (denying bill of particulars in a manslaughter prosecution where defendant requested the identity of "each act of 'fraud, neglect, connivance, misconduct, and violation of law' on the part of each defendant").

losses in "net first day *losses*" to the Core Strategies should be stricken as surplusage. *See* Indictment ¶ 5, *see also id.* at ¶ 1. In its response, the government argues that the motion is premature and suggests that it will be moot if the Court does not give the Indictment to the jury. (*See* Opp. Mem. at 45 ("In this District, it is often the practice of the courts not to give "speaking" indictments to the jury, so this issue may be entirely moot")). What the government does not argue is that all of the trades that make up the $1.2 billion differential were allocated based on improper consideration of their unrealized first day performance, as discussed above. Thus, even if, as the government asserts, the "extreme disparity surpasses the 'low bar for relevance' under Federal Rule of Evidence 401," (Opp. Mem. at 46), it is undoubtedly misleading and prejudicial. *See United States v. Finnerty*, 474 F. Supp. 2d 530, 546 (S.D.N.Y. 2007) (Chin, *J.*) (government's "repeated reference to the 26,300 instances of" alleged market manipulation "was severely prejudicial" given its over-inclusiveness because the 26,300 figure gave the jury the "indelible impression that [the defendant] had to be guilty if the number was that high"). Under the circumstances, the allegation should be stricken.

## III. The Government's Opposition Confirms That Discovery and a Hearing into the Government's Deficient Taint Team Process Are Necessary

In his motion, Mr. Leech urged the Court to order discovery and hold an evidentiary hearing to determine the nature and scope of the government's violation of his rights when it accessed more than 200 privileged documents from his Google account and an undisclosed number of privileged documents from his Apple account. (Mem. 29–30 (citing Temkin Decl. ¶ 32 & Ex. 10)).

In response, the government argues that the defense has not established that it reviewed privileged material, and that even if it did, the Court should deny the request for discovery and a hearing because (a) it did not violate Mr. Leech's rights under the Sixth Amendment, (b) its

conduct did not prejudice Mr. Leech, and (c) Mr. Leech has not met the standard for discovery or a hearing.  (Opp. Mem. at 46–47).

The government's arguments are without merit for three main reasons.  First, the information already disclosed by the government regarding the government's deficient taint team process provides more than sufficient basis to warrant further discovery as to which privileged documents it accessed and whether it intentionally accessed privileged materials.  Second, the government ignores the fact that numerous courts—including judges in the Southern District of New York—have put it on notice that it should implement protocols to ensure that prosecutors do not access privileged documents—protocols plainly and deliberately not followed here.  Third, the government's attacks on Mr. Leech's privilege assertions are unsupported by law.

The omissions from the government's submission are glaring.  Nowhere does the government provide any justification—law enforcement or otherwise—for its decision to review materials post-dating October 2023, when the government knew both that Mr. Leech was no longer trading for the Core Strategies, thereby ensuring that the conduct at issue had ceased, and that Mr. Leech was represented by counsel in connection with Western's Outside Counsel Investigation.[11]  Rather, the government chose to review these materials without asking Mr. Leech's counsel to provide a list of individuals with whom Mr. Leech was having privileged communications and without instituting other reasonable and necessary precautions to protect Mr. Leech's privilege.  Nor does the government explain why it waited over three months after its initial contact with Mr. Leech's counsel to request information necessary to conduct an

_____

[11] While the government notes that the warrant was "covert," it provides no justification as to why it declined to engage with counsel to facilitate an informed taint team review, especially after Mr. Leech's SEC testimony in March 2023 and after the government initiated dialogue with counsel in June 2024.  (Opp. Mem. at 63 n.165).

appropriate privilege review.  Courts have leveled criticism of filter protocols that allow prosecutors to view privileged documents without seeking judicial approval or providing defense counsel the opportunity to object to specific documents being released.  But the government here chose to proceed without judicial approval and without giving defense counsel that opportunity. This Court should not countenance this conduct.

### A.    Mr. Leech Has Established That He Is Entitled to Discovery and a Hearing

As described in our moving papers, the government's privilege review process was fundamentally flawed. (Mem. at 26–31).[12]  Putting aside the government's meritless challenges to Mr. Leech's privilege assertions, the following facts are not in dispute:

- The complexity of the data and issues under investigation required both defense counsel and the government to work with experts to help understand the specific fixed income, statistical, portfolio management and other issues presented by the facts (*Cf.* Opp. Mem. at 15 (noting government's forthcoming expert disclosures));

- The government obtained Mr. Leech's communications post-October 20, 2023 when he was represented by counsel and cooperating with both Western's Outside Counsel Investigation and an investigation being conducted by the SEC (Mem. at 24–25 (citing Temkin Decl. ¶¶ 11–14));

- The government did not communicate with counsel before commencing its review of the warrant returns (Mem. at 28);

- The government's taint team procedure resulted in the Prosecution Team accessing privileged materials on at least seven occasions (Mem. at 27 (citing (Temkin Decl. Ex. 10 at 5–7));

- Four of these seven occasions on which privileged material was accessed occurred in the three months *after* the Prosecution Team initiated contact with defense counsel and *before* it asked counsel to identify individuals with whom Mr. Leech had privileged communications (Mem. at 28–29);

---

[12] In its opposition brief, the government does not disclose any new information that was not previously disclosed in its letters to counsel regarding its Filter Team process.  (Mem. 24—31 & Temkin Decl. ¶¶ 11–14, 22–35).  Nor, does the government dispute that, given its practice of obtaining search warrants for digital data in virtually every white-collar case, the flaws in its taint team process likely affect a wide range of cases.  (Temkin Decl. ¶ 22).

- The government accessed 231 documents privileged documents from Mr. Leech's Google account, including 14 emails with the subject line "privileged" and one email with the subject line "RFH Work Product (Mem. at 29–30 (citing Temkin Decl. ¶ 32 & Ex. 10));

- The government accessed privileged documents from Mr. Leech's Apple accounts but used a platform that is unable to audit the documents the Prosecution Team accessed (Mem. at 30 (citing Temkin Decl. ¶ 32)); and

- The government only contacted Mr. Leech's counsel to obtain a list of individuals with whom he had privileged communications after the seventh occasion on which the Prosecution Team accessed privileged materials (Mem. at 29 (citing (Temkin Decl. Ex. 8 at 2)).

The government does not dispute that the Second Circuit's decision in *United States v. Schwimmer*, 924 F.2d 443 (2d Cir. 1991) ("*Schwimmer II*"), controls here, but nonetheless argues that Mr. Leech is not entitled to discovery or a hearing because, in its view, Mr. Leech has not established that the government intentionally violated the privilege or acted in a way that was "manifestly and avowedly corrupt" or that he has suffered prejudice. (*Compare* Mem. at 36 *with* Opp. Mem. at 54 n.136). This argument is circular: the government claims that Mr. Leech is not entitled to discovery that might show the extent of its violation and resulting prejudice because Mr. Leech is not able now to show the extent of the government's violation and resulting prejudice. The government, in essence, equates the test for getting discovery with the test on the merits, but that makes no sense. Mr. Leech should not be deprived of the opportunity to show the full extent of the government's intrusion on his privilege and the resulting prejudice.

In *Schwimmer II*, the Second Circuit wrote that "an intentional intrusion [into the attorney-client relationship] warrants careful scrutiny." 924 F.2d at 447. To evaluate whether that standard has been met, district courts in the Second Circuit require the government to "demonstrate that the evidence it uses to prosecute an individual was derived from legitimate, independent sources." *Id.* at 446 (citing *Kastigar v. United States*, 406 U.S. 441, 461–62

26

(1972)). "To warrant a taint hearing, Defendants have the burden of showing a 'factual relationship' between the privileged information and the prosecution." *United States v. Sharma*, No. 18 CR. 340 (LGS), 2019 WL 3802223, at *5 (S.D.N.Y. Aug. 13, 2019) (applying *Kastigar* in privilege context); (*see also* Mem. at 32–33 (discussing *Sharma*)).

The government contends that Mr. Leech is not entitled to a hearing because he "has not raised a 'distinct, non-speculative possibility of taint.'" (Opp. Mem. at 67 (quoting *United States v. Helmsley*, 726 F. Supp. 929, 933–34 (S.D.N.Y. 1989))). We submit that Mr. Leech has done so already, but in any event, that is not the standard. Another case cited by the government articulates *two* independent grounds to order a hearing: "[T]o trigger a taint hearing, [the defendant] must make a 'threshold showing' that the current prosecution . . . is factually related to the privileged information that Government agents gleaned from [the defendant] during the . . . investigation, *or* otherwise show 'a distinct, as opposed to a speculative, possibility of taint.'" *United States v. Hoey*, No. 15 CR. 229 (PAE), 2016 WL 270871, at *4 (S.D.N.Y. Jan. 21, 2016) (emphasis added) (quoting *Helmsley*, 726 F. Supp. at 933)). There can be no question that the current prosecution relates to the privilege materials the Taint Team released to the Prosecution Team. Relatedly, to the extent that the government argues that the Court should deny Mr. Leech's request for a hearing on the basis that he does not "articulate any theory of prejudice" (Opp. Mem. at 71), the government cites no applicable authority to support the contention that a defendant must show prejudice in order to be entitled to a hearing.[13]

---

[13] The government's reliance on *United States v. Colasurdo*, 453 F.2d 585 (2d Cir. 1971) is misplaced. (Opp. Mem at 71). In that case, the Second Circuit did not address the standard for holding a hearing because it found that even if the appellants' argument was correct, it would not be grounds for the relief sought (dismissing the indictment). *See id.* at 595-96.

Measured by the proper standard, Mr. Leech has made the necessary showing for discovery and a hearing: the prosecution is clearly related to the privileged materials reviewed by the prosecutors. Additionally, as Mr. Leech's motion noted, courts outside the Second Circuit have ordered hearings where defendants have made showings of deficient taint team procedures. (Mem. at 37 (citing *United States v. Sullivan*, No. 17 Cr. 00104 (JMS), 2020 WL 1815220, at *2 (D. Haw. Apr. 9, 2020); *United States v. Esformes*, No. 16 Cr. 20549 (RNS), 2018 WL 5919517, at *1, 34 (S.D. Fla. Nov. 13, 2018); *United States v. Bickle*, No. 10 Cr. 00565 (RLH), 2011 WL 3798225, at *8 (D. Nev. July 21, 2011)). Here, all the privileged communications took place during Western's Outside Counsel Investigation and after the allegedly unlawful allocations at issue in the case. The privileged materials the Prosecution Team accessed in Mr. Leech's Google account relate chiefly to analyses being conducted to assist in his defense. (*See infra* Section III.C.1.). And the notes saved in Mr. Leech's emails relate to various technical topics he communicated to his attorneys. (*See infra* Section III.C.2.). As to Mr. Leech's Apple accounts, the government acknowledges that the Prosecution Team accessed communications over which Mr. Leech has asserted privilege but cannot say which of the 835 documents that were subject to privilege assertions.

To evaluate whether the government's invasion of Mr. Leech's privilege meets the standard for relief established in *Schwimmer II*, we requested five discrete categories of information narrowly tailored to seek information regarding the circumstances and extent of the government's breach of privilege.[14] (Mem. at 38). The government's responses that it has

---

[14] The five categories are: "(i) the search terms and procedures the Taint Team employed before releasing materials from the warrant returns to the Prosecution Team in April 2024; (ii) the communications between the Taint Team and the Prosecution Team on each of the seven occasions between April 19 and September 6, 2024, when the Prosecution Team viewed privileged documents that caused it to pause its review; (iii) communications among members of

"provided sufficient information" and that these requests "bear no relevance on any possible motion" (Opp. Mem. at 68) ask the Court, in essence, to take its assertions on faith.  But, given its callous and inadequate approach to the privilege review, the government has not earned that trust, and the information that Mr. Leech has requested is essential to a fair and thorough evaluation of the issues at stake.[15]

### 1.    Initial Search Tems and Procedures

Mr. Leech requested the initial search terms and procedures the government employed to segregate privileged from non-privileged material after it received the search warrant returns and before the Prosecution Team commenced its review.  In response, the government stated:

> The Filter Team applied search terms to identify potentially privileged materials including using both common legal terms and terms specifically derived from attorneys and law firms representing Leech, Western Asset Management Company, and Franklin Templeton.  The Filter Team also implemented other review techniques, including manual review, to identify potentially privileged materials that might not be captured by the search terms. The Filter Team released to the prosecution team the items that the Filter Team did not identify as potentially privileged.  As the Filter Team identified potentially privileged materials, it segregated them so the prosecution team could not access them.

(Opp. Mem. at 68).

---

the Prosecution Team relating to privileged documents to which it was given access; (iv) the nature of the remedial measures (if any) implemented; and (v) the basis for the government's assertion that 'records indicate that the types of materials the Prosecution Team came across in the Apple Returns would fall into the same categories of materials that the Prosecution Team viewed in the Google Returns' despite the government's inability to identify the Apple materials it viewed."  (Mem. at 38).  Request (i) is discussed below in Section III.A.1; requests (ii)-(iv) are discussed in Section III.A.2; and request (v) is discussed in Section III.A.3.

[15] The nature of the government's intrusion affects the standard that courts apply:  when the government's conduct is "manifestly and avowedly corrupt," it is not necessary for the defendant to show prejudice.  *Schwimmer II*, 924 F.2d at 447.  Accordingly, Mr. Leech's claim may prevail regardless of whether prejudice is shown, and the government's assertion that Mr. Leech's motion "fails" because at this stage he does not allege prejudice is wrong and unsupported by case law.  (Opp. Mem. at 63).

The government's response does not shield it from discovery for two principal reasons. *First*, the government does not address whether it made any effort to identify and segregate privileged communications not involving attorneys. As experienced prosecutors undoubtedly know, counsel in complex white-collar investigations regularly engage experts whose communications with the client are protected by the attorney-client privilege under the *Kovel* doctrine. (*See infra* at Section III.C.1.). And courts have found filter team protocols to be deficient when they simply require "the filter team to segregate only those communications which are 'to/from attorneys,'" and then provide the remaining materials to the prosecution team. *In re Sealed Search Warrant & Application for a Warrant*, No. 20-MJ-03278 (JJO), 2020 WL 5658721, at *5 (S.D. Fla. Sept. 23, 2020), *aff'd*, 11 F.4th 1235 (11th Cir. 2021). The Court should order discovery because, if the government made no attempt to segregate communications between Mr. Leech and experts working with counsel, that would support a finding that the government intentionally intruded on Mr. Leech's privilege.

*Second*, the government disclosed that it reviewed 14 emails with the subject line "privileged" and one email with the subject line "work product." (Mem. at 29 & n.18 (citing Temkin Decl. ¶ 32 & Ex. 10)). It is hard to envision how documents labeled "privileged" and "work product" could pass through any filter team process truly designed to preserve a putative defendant's rights. Mr. Leech seeks the specific search terms the government employed to ascertain not just how the government accessed those particular communications but, more generally, what steps were taken to identify privileged documents.

### 2. Communications Between the Prosecution Team and the Filter Team

Mr. Leech requested communications between the Prosecution Team and the Filter Team with respect to the seven occasions on which the Prosecution Team accessed privileged

materials, communications regarding the privileged documents it accessed, and the nature of the remedial measures (if any) put in place. These communications obviously bear on the government's conduct and whether the Prosecution Team (1) sought to gain a tactical advantage by viewing privileged materials; (2) understood the nature of the privilege materials it was reviewing; or (3) took steps to avoid further breaches. In particular, these communications would allow Mr. Leech and the Court to evaluate whether the procedures the government put in place after reviewing privilege materials were adequate to prevent the government from accessing other similar types of communications. Although the government posits that these communications demonstrate the Prosecution Team "was respecting the defendant's privilege," it offers no means of assessing, much less verifying, that contention. (Opp. Mem. at 69). Rather, it asks Mr. Leech and the Court to accept its factual assertions.

### 3. Basis for the Government's Statements Regarding the Apple Returns

The government has stated that, although it cannot identify which documents in the Apple returns the government reviewed, the government's "records indicate that the types of materials the Prosecution Team came across in the Apple Returns would fall into the same categories of materials that the Prosecution Team viewed in the Google Returns." (Mem. 30 (quoting Temkin Decl. Ex. 10 at 7)). The government does not specify which records provided the basis for that conclusion, let alone explain why those records preclude it from identifying with greater specificity the documents they saw. Further, the government vaguely asserts that because it reviewed the Google warrant returns prior to the Apple warrant returns it "was able to incorporate learning from its prior review," but does not disclose the procedures, if any, the government put in place to "incorporate [that] learning," let alone explain why these procedures were so inadequate that it had to stop review of the Apple returns on three occasions. (Opp.

Mem. at 69).  At bottom, the government should not get a free pass for using an un-auditable review platform, and discovery as to the government's review of the Apple warrant returns is essential to understand the bona fides of the government's filter team process.

* * *

In sum, Mr. Leech is entitled to discovery to determine whether the government intentionally invaded his privilege and any resulting prejudice.

### B.    The Court Should Not Countenance the Government's Deficient Taint Team Procedure

In his moving papers, Mr. Leech noted that "[t]o the extent courts in this Circuit have approved the use of filter reviews, they have done so under circumstances vastly different from the approach taken by the government here."  (Mem. at 32; *see also id.* at 31 (citing internal Justice Department guidance noting that courts "have expressed discomfort with filter teams")).  Specifically, courts within the Second Circuit "have relied on the facts that the government either conferred with the privilege holder or obtained judicial approval of the review protocol, or both, *before* the filter review started."  (Mem. at 32).  The government ignores these authorities and instead baldly asserts that "the use of a filter team has been deemed adequate protection of potentially privileged material obtained by the Government—pursuant to a search warrant or otherwise—time and again in cases in this District."  (Opp. Mem. at 62).

But the law in this District does not insulate the government's use of a taint team from scrutiny and challenge.  The government fails to engage meaningfully with the numerous decisions cited in Mr. Leech's motion in which courts within and outside the Second Circuit have analyzed and criticized deficient taint team procedures.  (Mem. at 32–33 nn.20–21).  In the Southern District, courts have made their criticisms of deficient taint teams unmistakably clear. In *United States v. Kaplan*, the Court noted:

32

> Certainly this Opinion should be counted among those *disapproving* the government's use of an ethical wall team to 'protect' the attorney-client and work-product privileges or to determine whether the crime-fraud exception applies, where potentially privileged materials are turned over to the trial team and case agents before any challenge to those determinations can be raised by a Defendant and determined by a court.

No. 2 Cr. 883 (DAB), 2003 WL 22880914, at *12 (S.D.N.Y. Dec. 5, 2003) (emphasis in original); *see also United States v. Levin*, No. 15 Cr. 1010 (KBF), 2015 WL 5838579, at *2 (S.D.N.Y. Oct. 5, 2015) (noting that an ethical screen "is for the protection of the *defendant's* rights" and should be designed to avoid "giv[ing] the Government a substantive look into that which it has no right to see" (emphasis in original)).

The authorities the government relies on for its assertion that "the use of a filter team has been deemed adequate protection of potentially privileged material obtained by the [g]overnment" (Opp. Mem. at 62) actually demonstrate the deficiency of the process used by the government.  (Opp. Mem. at 62 n.164 (collecting cases)).  Thus, while the court in *United States v. Avenatti* rejected a challenge to a government taint team, as we noted in our motion, the procedure employed in that case: (i) was disclosed in a search warrant application and (ii) gave the defendant the opportunity to object to the taint team's privilege calls *before* materials were disclosed to the prosecution.  (Mem. at 33–34 (citing 559 F. Supp. 3d 274, 284 (S.D.N.Y. 2021)).  Neither of the essential aspects of the process employed in *Avenatti* is present here.  (Mem. at 34–35).

The government also relies on *United States v. Yousef*, 327 F.3d 56, 168 (2d Cir. 2003), a case concerning the protocols for handling information provided by a "jailhouse informant" that has no bearing on the search warrants the government obtained in this matter.  And, as the government acknowledges, the court in *United States v. Feng Ling Liu*, noted that "certain decisions in this district have expressed disapproval of the government's use of 'ethical walls' or

'taint teams' to screen for privileged material." 12 Cr. 934 (RA), 2014 WL 101672, at *12 (S.D.N.Y. Jan. 10, 2014).[16]

Finally, the government's deliberate decision to review Mr. Leech's communications with his wife is emblematic of the government's disregard of Mr. Leech's rights.  Courts have rejected taint team procedures that did not adequately protect "privileged communications with [the account holder's] wife."  *Matter of Search of Info. Associated with Rickmaike@yahoo.com*, No. 4:15MJ-00042 (HBB-JHM), 2020 WL 4369448, at *1 (W.D. Ky. July 30, 2020).  Even if, as the government argues, the Constitution does not bar the government's review of Mr. Leech's communications with his wife, common decency does,[17] and the government's decision not to segregate those materials in the first instance evidences a mindset that it need not respect privileges but may review materials without recourse so long as it does not offer them at trial.

At the very least, the government was on notice that courts have required the government to put in place protocols that prevent the prosecution team from accessing privileged materials.  Based on the government's disclosures to date, that did not happen here, and the Court should order the government to provide discovery that will permit scrutiny of the protocols employed.

---

[16] The government contends that *Feng Ling Liu* stands for the proposition that judges critical of taint team processes have denied defendants' request for suppression.  (Opp. Mem. at 62–63 n.164).  That contention reveals the casual attitude toward judicial review shown in this case.

[17] In *United States v. Wilson*, 505 F. Supp. 3d 3 (D. Mass. 2020), the court declined to impose a constitutional remedy for the government's review of search warrant returns covered by the marital communications privilege, but specifically noted that "the government took reasonable steps to minimize the intrusion into the spousal emails" by "using search terms to filter out unresponsive materials."  *Id.* at 12.  Not only did the government not take similar steps in this case, but also it apparently viewed the absence of a constitutional remedy as providing carte blanche to review marital communications.

### C.    The Government's Challenges to Mr. Leech's Privilege Assertions Are Without Merit

Mr. Leech has asserted privilege over (i) certain of his communications with fixed income experts and (ii) notes he prepared on his cell phone in connection with responding to questions posed by counsel.  The government argues that Mr. Leech has not established the privileged nature of the materials that it reviewed.  Its arguments are wrong on both the facts and the law.

As set forth in our moving papers, in November and December 2024, at the government's request and consistent with standard practice in this district,[18] counsel provided a privilege log that identified the date, sender, recipient(s), basis of the privilege determination, and description of the privilege determination for each communication over which Mr. Leech asserted privilege.  (Mem. at 29 (citing Temkin Decl. ¶ 29)).  On February 2, 2025, the government requested additional information regarding Mr. Leech's privilege assertions.  (Opp. Mem. at 56).  Defense counsel responded to that request on April 7, 2025.  (Temkin Decl. Ex. 9).  On June 11, 2025, based on an unsupported reading of Second Circuit authority, the government broadly challenged Mr. Leech's privilege assertions and requested further information from counsel.  (Temkin Decl. Ex. 10).  Counsel responded to the government's June 11 letter on July 2, 2025, and invited the Filter Team to contact counsel with any further questions.  (Temkin Decl. Ex. 11).  On July 18, the government informed counsel that it "does not intend to offer at trial any of the search warrant materials."  (Temkin Decl. Ex. 12 at 2).

---

[18] Mr. Leech's privilege logs are consistent with the information required under this Court's local civil rules governing privilege logs.  *See* Local Civil Rule 26.2(a)(2)(A) ("For documents (including electronically stored information): (i) the type of document, e.g., letter, email, or memorandum; (ii) the general subject matter of the document; (iii) the date of the document; and (iv) the author of the document, the addressees of the document, and any other recipients, and, where not apparent, the relationship of the author, addressees, and recipients to each other").

While neither the Filter Team nor the Prosecution Team followed up on defense counsel's July 2 offer to address the Prosecution Team's requests with the Filter Team, the government now argues that Mr. Leech has not sufficiently "identifi[ed] the potentially privileged document (or documents) that [counsel] believe[s] are the subject of the hearing" (Opp. Mem. at 67) and "skip[s] the steps of establishing privilege" (Opp. Mem. at 68). This argument ignores the privilege logs produced in November and December 2024, which provided a basis for each of the documents over which Mr. Leech has asserted privilege. In the course of correspondence, the government has not identified specific documents listed on the privilege log that it disputes. Rather, in response to Mr. Leech's document-by-document assertion of privilege, the government raised categorial objections, to which Mr. Leech responded, also on a categorical basis. Mr. Leech's privilege assertions were appropriate, consistent with practice in this District, and sufficient to enable this Court to determine that the government reviewed privileged documents.[19]

### 1.    Mr. Leech's Communications with Experts

This is an extraordinarily complex case. It concerns the trading of U.S. Treasury futures and options over nearly three years in multi-billion-dollar portfolios in order to manage fundamentally different fixed-income strategies. As the government is well aware, merely accessing and summarizing the contents of the trade blotter—which includes more than 33,000 trades and 595,000 rows of data—require specialized expertise. (Mem. at 9). Various materials

---

[19] To the extent that the Court requires more information to evaluate the government's categorical objection to Mr. Leech's privilege assertions, (Opp. Mem. at 60 n.155 (citing *United States v. Kostin*, No. 1:24-CR-91-GHW, 2025 WL 1504409, at *31 (S.D.N.Y. May 27, 2025)), we are prepared to submit documents for *in camera* review, *cf.* Order at 8–9, *United States v. Rainere*, No. 18 Cr. 204 (NGG) (VMS) (E.D.N.Y Apr. 6, 2019), ECF No. 543 (denying government's motion to declare categories of documents as non-privileged as moot following the court's *in camera* review).

the government has produced make clear that it too has relied on individuals with specialized economic expertise throughout its investigation.

Shortly after Mr. Leech retained counsel in connection with Western's Outside Counsel Investigation, his counsel recognized that they needed assistance from experts. Although Mr. Leech is an experienced fixed income professional, the volume of data and complexity of concepts necessitated that counsel retain experts. Given the volume of materials the subject matter, in the early stages of the investigation, in addition to a consulting firm, counsel engaged several individuals who were especially well suited to assist with this work. These individuals included Mr. Leech's son, Stephen Leech, and a long-time personal friend, Dexter Senft.

The government's bald contention that Mr. Leech's counsel sought to "turn those communications—which in any other case are plainly not privileged—into attorney-client communications, simply by having the defendant's son and friend sign a retention agreement and claiming that the conversations are helpful to the defense" (Opp. Mem. at 57) is totally unfounded. Both Stephen Leech and Mr. Senft were engaged by defense counsel pursuant to written engagement letters. Both are highly qualified financial professionals who were fully equipped to help counsel analyze the data, respond to Western's Outside Counsel Investigation, and prepare for potential litigation with the SEC, which had issued a subpoena to Mr. Leech. Specifically, as counsel disclosed to the government:

- Stephen Leech, CFA, is a Charter Financial Analyst charterholder[20] and has over ten years of experience in the fixed income investment markets, first as an analyst at the Royal Bank of Scotland, then as an analyst and later a Vice President of Fixed Income at The TCW Group, an institutional fixed income asset manager,

---

[20] To attain the CFA designation, candidates "must pass three levels of exams covering accounting, economics, ethics, money management, and security analysis." Adam Hayes, *Chartered Financial Analyst (CFA): Definition and Exams*, Investopedia (July 15, 2025), https://www.investopedia.com/terms/c/cfa.asp.

and finally as the Founder and Chief Investment Officer of his own firm, Powder River Capital Management.

- Mr. Senft had a 43-year career on Wall Street as a fixed income quantitative analyst and managing director overseeing departments including fixed income trading. He has held top positions at Morgan Stanley, Barclays Capital, Lehman Brothers, EJV Partners, and The First Boston Corporation. He was inducted into the Fixed Income Analysts Society Hall of Fame in 2004.

(*See* Temkin Decl. Ex. 9 at 8 nn.4 & 6).

Moreover, the government's unfounded contention that "it is highly unlikely the communications at issue are protected by the attorney-client privilege" relies on a mischaracterization of *United States v. Kovel* and its progeny. (Opp. Mem. at 57). In *Kovel*, the Second Circuit addressed the issue of whether the attorney-client privilege protected the communications between a client and an accountant who was employed by a law firm. The Court held that, in light of "the complexities of modern existence [that] prevent attorneys from effectively handling clients' affairs without the help of others," the attorney-client privilege "'must include all the persons who act as the attorney's agents.'" *Kovel*, 296 F.2d at 921 (quoting 8 Wigmore, Evidence, § 2301)). Judge Friendly described four unique scenarios in which "every element" of fundamental privilege principles are met:

> [W]e can see no significant difference between a [*first*] case where the attorney sends a client speaking a foreign language to an interpreter to make a literal translation of the client's story; a *second* where the attorney, himself having some little knowledge of the foreign tongue, has a more knowledgeable non-lawyer employee in the room to help out; a *third* where someone to perform that same function has been brought along by the client; and a *fourth* where the attorney, ignorant of the foreign language, sends the client to a non-lawyer proficient in it, with instructions to interview the client on the attorney's behalf and then render his own summary of the situation, perhaps drawing on his own knowledge in the process, so that the attorney can give the client proper legal advice.

*Id.* (emphasis added).  Specifically, both the first and fourth scenarios establish that communications involving only the client and an expert can fall under the attorney-client privilege, as shown in the diagram below:

| Client  ↔  Expert |
| --- |
| ↕ |
| Attorney |

To be clear, *Kovel's* invocation of a "foreign language" stands for the idea that certain financial concepts—like accounting—are "foreign" to attorneys.  Courts have since applied *Kovel* to communications involving accountants, *Eglin Fed. Credit Union v. Cantor, Fitzgerald Sec. Corp.*, 91 F.R.D. 414, 418 (N.D. Ga. 1981), patent agents, *Golden Trade v. Lee Apparel Co.*, 143 F.R.D. 514, 518 (S.D.N.Y. 1992), bankruptcy advisors, *In re Tri-State Outdoor Media Grp., Inc.*, 283 B.R. 358, 362–64 (Bankr. M.D. Ga. 2002), and psychiatrists, *United States v. Alvarez*, 519 F.2d 1036, 1039, 1046 (3d Cir. 1975).

Nothing in *United States v. Ackert*, 169 F.3d 136 (2d Cir. 1999), relied upon by the government (Opp. Mem. 55–56), changed the scope of the *Kovel* doctrine.  There, Ackert (an investment banker) pitched an investment proposal to Paramount (the client).  *Id.* at 138.  Subsequently, Meyers (Paramount's attorney) contacted Ackert as part of Meyers's own independent research into the proposed transaction.  *Id.*  Paramount later executed the transaction through another investment bank.  In connection with its examination of the transaction, the IRS summoned Ackert, and Paramount argued that his conversation with Meyers, which pre-dated the transaction under examination, was covered by *Kovel*.  Unsurprisingly, the Court summarily rejected Paramount's argument that Ackert's communications with Meyers were protected by privilege:

Meyers was not relying on Ackert to translate or interpret information given to Meyers by his client. Rather, Meyers sought out Ackert for information Paramount did not have about the proposed transaction and its tax consequences. Because Ackert's role was not as a translator or interpreter of client communications, the principle of *Kovel* does not shield his discussions with Meyers.

*Id.* at 139–40.

The government's claims that *Ackert* stands for the proposition that "the principle of *Kovel* 'has no application' where the attorney 'was not relying on [the third-party] to translate or interpret information given to [the attorney] by his client,' even where the information provided to the third party was 'important to the attorney's ability to represent the client' or helped provide information that the attorney and client 'did not have'" (Opp. Mem. at 56), is untethered to the facts of that case. The communication at issue in *Ackert* occurred before the transaction and nothing in *Kovel* protects a fact-finding conversation with an investment banker who was not even ultimately used in the transaction, let alone retained to assist defense counsel during an investigation.

In contrast to the circumstances in *Ackert*, Mr. Leech's post-October 2023 communications with experts, including Stephen Leech and Mr. Senft, fall within the heartland of *Kovel*. Counsel engaged Stephen Leech and Mr. Senft *after* Mr. Leech engaged counsel to represent him with respect to Western's Outside Counsel Investigation and the SEC's investigation for the purpose of preparing his defense. The government contends that "it is difficult to fathom that they are serving in the role of translator or interpreter between Leech and his attorneys, as opposed to close confidants talking with Leech about his conduct." (Opp. Mem. at 57). But setting the government's aspersions aside, these communications were part and parcel of counsel's efforts to synthesize massive amounts of data under the considerable pressure of responding to the two investigations. Attorneys were often a party to email communications

involving Mr. Leech and retained experts (*see* Declaration of Nathaniel Sobel dated October 7, 2025 ("Sobel Decl.") ¶ 4), and Mr. Leech's communications with those experts that did not include attorneys remain privileged under *Kovel*.

### 2.    Mr. Leech's Notes Prepared at the Direction of Counsel

In the course of representing Mr. Leech in Western's Outside Counsel Investigation, defense counsel occasionally asked Mr. Leech to draft documents explaining various components of Mr. Leech's fixed income trading.  In response to several of these requests, Mr. Leech drafted emails that, as counsel informed the government, memorialized his "thoughts relating to the Trade Allocation Matters (in anticipation of litigation relating to the Trade Allocation Matters) and forwarded them to himself or (intentionally or unintentionally) saved them as drafts for future reference." (Temkin Decl. Ex. 9 at 10).   Mr. Leech has asserted privilege over 104 documents (many of which are substantive duplicates) on this basis.  Virtually all of these documents were ultimately incorporated into a communication that Mr. Leech sent to his counsel.  (*See* Sobel Decl. ¶¶ 5–6).

The work product doctrine "provides qualified protection for materials prepared by or at the behest of counsel in anticipation of litigation or for trial."  *In re Grand Jury Subpoenas Dated Mar. 19, 2002 & Aug. 2, 2002*, 318 F.3d 379, 383 (2d Cir. 2003).  Specifically, the doctrine "protects not only work product by the attorney but also that by the client."  *United States v. ChevronTexaco Corp.*, 241 F. Supp. 2d 1065, 1087 n.4 (N.D. Cal. 2002).  Although the doctrine is most frequently asserted as a bar to discovery in civil litigation, the Supreme Court has characterized its "role in assuring the proper functioning of the criminal justice system" as "even more vital."  *United States v. Nobles*, 422 U.S. 225, 238 (1975).

The cases cited by the government for the proposition that "personal diaries or logs . . . do not constitute work-product" (Opp. Mem. at 58 (quoting *Swinton v. Livingston Cnty.*, No. 15

Civ. 00053A(F), 2016 WL 6248675, at *3 (W.D.N.Y. Oct. 26, 2016)) are inapposite. The documents at issue are nothing like personal diaries; they were drafts of documents responding to requests by counsel for information in connection with both Western's Outside Counsel Investigation and the SEC's investigation. Likewise, the Second Circuit's summary order in *Bice v. Robb*, 511 F. App'x 108 (2d Cir. 2013), has no relevance here. In that case, the Second Circuit ruled that "emails between . . . [four] siblings considering their potential claims against [their older brother]" were not covered by the work product privilege. *Id.* at 110. The Court reasoned that although the emails "may have been created because of the prospect of litigation[,] they are not the work product of an individual acting as the siblings' attorney." *Id.* Nothing in *Bice* indicates that the siblings' correspondence were connected to any communication with an attorney—which is the crucial distinction: here, Mr. Leech's attorneys asked him to prepare certain notes to assist his defense in the course of then-ongoing investigations.[21]

## IV.    The Court Should Dismiss Count Five for Lack of Venue

In his motion, Mr. Leech established that Count Five should be dismissed for lack of venue because the allegedly false statements were made in testimony given in the Central District of California in connection with an investigation being conducted by the SEC's Los Angeles Regional Office relating to alleged conduct by Mr. Leech in California. (Mem. at 38–42). The government makes three arguments in opposition, none of which is persuasive. (Opp. Mem. at 72–75).

---

[21] The government's reliance the recent decision in *United States v. Gonzalez*, 144 F.4th 396 (2d Cir. 2025) is also misplaced. The issue there concerned whether certain client notes were ever communicated to an attorney. *Id.* at 403. Here, the notes at issue were made at the request of defense counsel and later communicated to counsel.

*First*, the government argues that "the Indictment is facially valid and properly alleges venue" and, thus, the Court must accept the allegation as true and leave this issue for trial. (Opp. Mem. at 73). However, the Indictment here, coupled with the government's statements in its opposition papers, clearly reveals a venue defect that is ripe for this Court's consideration. *United States v. Forrester*, No. 02-CR-302, 2002 WL 1610940, at *1 (S.D.N.Y. July 22, 2002) ("[W]here, as here, the government has provided the Court with a 'full proffer' of the facts it intends to introduce at trial to establish venue, the Court may decide whether venue is proper before trial." (quotation marks omitted)); *cf. United States v. Novak*, 443 F.3d 150, 161 (2d Cir. 2006) (noting that "the indictment *or statements by the prosecutor*" can reveal a venue defect (alterations and quotation marks omitted) (emphasis added)).

Here, other than a barebones allegation that the false statements occurred "in the Southern District of New York and elsewhere," the Indictment does not tie the conduct charged in Count Five to this District. The government concedes that the statements at issue were made in the Central District of California in connection with an investigation being conducted by the SEC's Los Angeles Regional Office. (Opp. Mem. at 73–74). Thus, the issue can be decided as a matter of law before trial. *Forrester*, 2002 WL 1610940, at *1.[22]

*Second*, the government asserts that venue in the Southern District of New York is proper because an SEC employee listened to Mr. Leech's testimony by WebEx from the Southern District of New York. (Opp. Mem. 74). But that individual, Brian Fitzpatrick, joined as an

---

[22] The government cites *United States v. Bankman-Fried*, 680 F. Supp. 3d 289 (S.D.N.Y. 2023), to support its argument. (Opp. Mem. at 73). *Bankman-Fried* is distinguishable because the defendant argued that venue was improper based on various unestablished facts. *Bankman-Fried*, 680 F. Supp. 3d at 314. Here, on the other hand, the government does not contest that the statements at issue were made during Mr. Leech's testimony in the Central District of California. (Opp. Mem. at 73). Thus, unlike in *Bankman-Fried*, there is no need to wait for additional fact development at trial to determine whether venue has been established.

"industry expert," did not ask any questions or otherwise participate in the interview, and did not identify where he was located at the time he joined the WebEx.  (Sobel Decl. ¶ 7).[23]  The suggestion that Mr. Fitzpatrick's passive presence via WebEx suffices to establish venue in the Southern District of New York raises serious constitutional concerns since holding that venue is proper would permit the government to manufacture venue anywhere in the country, regardless of that district's relevance to the matter under investigation.  (See Mem. at 42 n.26 (citing *United States v. Fortenberry*, 89 F.4th 702, 709 (9th Cir. 2023) (holding that predicating venue on the fact that agents worked in in a district would be an "outlandish outcome" that "cannot be squared with the Constitution" and that "[t]he Venue and Vicinage Clauses may not be disregarded simply because it suits the convenience of federal prosecutors"))).

*Third*, the government asserts that it has established that venue is proper in this District because Mr. Leech's testimony was relied on by "part of the SEC's enforcement team" and the U.S. Attorney's Office.  (Opp. Mem. at 74).  It argues that, under *United States v. Coplan*, 703 F.3d 46 (2d Cir. 2012), venue is proper because the government, in proving the materiality element, will be "require[d]" to present "evidence that [the] statements were conveyed to or had an effect on [government] investigators working in the Southern District of New York."  (Opp. Mem. at 86 (quoting *Coplan*, 703 F.3d at 79)).  But the materiality of the allegedly false statements does not *require* evidence that the statements had any effect on investigators in the Southern District of New York.  To the contrary, even the government concedes that "[i]n a Section 1001 prosecution, the statement itself *is* the crime" (Opp. Mem. at 42 (emphasis in

---

[23] To the extent the court views Mr. Fitzpatrick's participation in the meeting as dispositive, it should require that he submit a declaration confirming the unsworn assertion in the government's memorandum that he was, in fact, located in the Southern District of New York when he joined the WebEx.

original)) and "[a]ny material effect the statements had on investigators was felt immediately in the room in Los Angeles at the time Mr. Leech testified," (Mem. at 42).[24] Thus, whether the SEC sent the transcript of the testimony to federal prosecutors in this District does not bear on the issue of materiality because the alleged offense "began, continued, and was completed in just one federal judicial district": the Central District of California. *United States v. Bin Laden*, 146 F. Supp. 2d 373, 377 (S.D.N.Y. 2001).[25]

Count Five should be dismissed for lack of venue.

## CONCLUSION

For the foregoing reasons, the Court should issue an order:

(1) directing the government to serve on the defendant a bill of particulars;

(2) striking surplusage from the Indictment;

(3) directing the government to produce specific discovery to be followed by a hearing into the government's taint team review procedure;

---

[24] The government suggests that Mr. Leech's reliance on *United States v. Bin Laden*, 146 F. Supp. 2d 373 (S.D.N.Y. 2001) is misplaced, because in that case, the defendant's statements were "'uttered and received wholly inside' another district," whereas here, the statements were conveyed to or had an effect on the Southern District of New York. (Opp. Mem. 74). But as discussed, the allegedly false statements here *were* "uttered and received wholly inside" the Central District of California—not the Southern District of New York.

[25] The government does not argue that *Bin Laden* was overruled by *Coplan*. Instead, it argues that *Bin Laden* is "not binding" and attempts to distinguish it. (Opp. Mem. at 74). At the same time, the government relies on other district court decisions that are similarly also not binding. (*See* Opp. Mem. at 75 n.203 (citing *United States v. Reese*, No. 24 Cr. 402 (VEC), 2025 WL 1770789, at *3–4 (S.D.N.Y. June 25, 2025)). In *Reese*, the Court acknowledged that the government's theory of venue rested on the proposition that "'the entire purpose and effect' of [the defendant's] false statements [in the Eastern District of New York] was to ensure that 'he would not have to pay money' on restitution ordered by Judge Marrero in [the Southern District of New York]." *Id.* at *3. This comports with *Coplan*'s reasoning—in *Reese* the government was required to show that the allegedly false statement was transferred to the Southern District of New York in order to establish its materiality. *See Coplan*, 703 F.3d at 78. Those circumstances are not present here. The government does not have to rely on the allegedly false statements in this case having been transferred to the Southern District of New York to establish materiality. Rather, as in *Bin Laden*, the material effect of the statements occurred when they were uttered in the Central District of California. (*See* Mem. at 41–42).

(4) dismissing Count Five of the Indictment for lack of venue; and

(5) granting such other relief as may be warranted.


Dated:  October 7, 2025                    MORVILLO ABRAMOWITZ
        New York, New York                 GRAND IASON & ANELLO, P.C.

                                           */s/ Jeremy H. Temkin*
                                           Jonathan S. Sack
                                           Jeremy H. Temkin
                                           Joshua Bussen
                                           Nathaniel Sobel
                                           Samuel W. Magaram
                                           565 Fifth Avenue
                                           New York, NY 10017
                                           (212) 856-9600 (telephone)
                                           (212) 856-9494 (facsimile)

                                           *Attorneys for Defendant S. Kenneth
                                           Leech II*