UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- X

UNITED STATES OF AMERICA,     )

                                  )

      -v-                     )          24 Cr. 658 (GHW)

                                  )

S. KENNETH LEECH II,         )

                                  )

          *Defendant*.        )

---------------------------------------------------------------- X

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT S. KENNETH LEECH II'S MOTION TO PRECLUDE
THE GOVERNMENT'S OTHER ACTS EVIDENCE**

Dated:   December 15, 2025           MORVILLO ABRAMOWITZ
        New York, New York        GRAND IASON & ANELLO, P.C.

                                          Jonathan S. Sack
                                          Jeremy H. Temkin
                                          Nathaniel Sobel
                                          565 Fifth Avenue
                                          New York, New York 10017
                                          (212) 856-9600

                                          CLEARY GOTTLIEB
                                          STEEN & HAMILTON, LLP

                                          Joon H. Kim
                                          One Liberty Plaza
                                          New York, New York 10006
                                          (212) 225-2000

                                          *Attorneys for Defendant S. Kenneth Leech II*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT..................................................................................... 1

LEGAL STANDARD ................................................................................................... 1

ARGUMENT .................................................................................................................. 5

I.    The Court Should Preclude the Government from Presenting Evidence of a 2011
      TIPS Trade That Was Reallocated with Approval of Western's
      Compliance Department ........................................................................................ 5

      A.    Background ...................................................................................................... 6

            1.    Mr. Leech Mistakenly Allocated the TIPS Trade and Corrected
                  the Error Early the Next Morning with Compliance Approval............................. 6

            2.    The TIPS Trade Was Always Intended for Account-1 and Account-2
                  (and not Account-3) ........................................................................... 8

            3.    The Government Likely Relies on the Irrelevant "End-of-Day" Price
                  in the Trade Blotter ............................................................................ 9

      B.    Discussion ...................................................................................................... 10

II.   The Court Should Preclude the Government from Presenting Evidence
      Related to Account-1 in 2011 ....................................................................... 13

      A.    Background ...................................................................................................... 14

            1.    Mr. Leech's 2011 Investments in Account-1 ....................................... 14

            2.    Western's 2011 Internal Investigation.................................................. 15

            3.    The 2025 Outside Counsel Investigation.............................................. 16

      B.    Discussion ...................................................................................................... 17

III.  The Court Should Preclude Mr. Fulton's Unsubstantiated Allegations................................ 21

      A.    Background ...................................................................................................... 21

      B.    Discussion ...................................................................................................... 24

IV.  The Court Should Preclude the Trading Floor Parlor Game Testimony ............................... 26

    A.  Background ........................................................................................................ 26

    B.  Discussion ......................................................................................................... 27

V.  The Court Should Preclude the Government from Introducing More
Than 20-Year-Old Evidence of Compliance Violations ........................................................ 30

    A.  Background ........................................................................................................ 31

    B.  Discussion ......................................................................................................... 32

CONCLUSION ............................................................................................................................. 35

## <u>TABLE OF AUTHORITIES</u>

**Cases** <span style="float:right">**Page(s)**</span>

*Michelson v. United States*,
    335 U.S. 469 (1948) ............................................................................................ 2

*SEC v. Jensen*,
    835 F.3d 1100 (9th Cir. 2016) ........................................................................... 4

*United States v. Bayuo*,
    No. 15 Cr. 576 (JGK) (S.D.N.Y. Oct. 29, 2018) ............................................ 35

*United States v. Carboni*,
    204 F.3d 39 (2d Cir. 2000)......................................................................... passim

*United States v. Cole*,
    No. 19 Cr. 869 (ER) (S.D.N.Y Oct. 22, 2021)................................................. 4

*United States v. Curley*,
    639 F.3d 50 (2d Cir. 2011)............................................................................. 3, 4

*United States v. Garcia*,
    291 F.3d 127 (2d Cir. 2002) .............................................................................. 2

*United States v. Gordon*,
    987 F.2d 902 (2d Cir. 1993) ................................................................. 3, 12, 34

*United States v. Guang*,
    511 F.3d 110 (2d Cir. 2007) .............................................................................. 2

*United States v. Halper*,
    590 F.2d 422 (2d Cir. 1978) .............................................................................. 2

*United States v. Hatfield*,
    685 F. Supp. 2d 320 (E.D.N.Y. 2010)............................................................. 26

*United States v. Lentz*,
    282 F. Supp. 2d 399 (E.D. Va. 2002) ................................................................ 2

*United States v. Levin*,
    No. 15 Cr. 101 (KBF), 2016 WL 8711458 (S.D.N.Y. Jan. 8, 2016) ................... 24, 29

*United States v. Levy*,
    2013 WL 655251 (S.D.N.Y. Feb. 22, 2013) ............................................ 4, 13, 19

*United States v. Mamadjonov*,
No. 18 Cr. 34 (VAB), 2023 WL 2155852 (D. Conn. Feb. 21, 2023)........................................ 2

*United States v. Martoma*,
No. 12 Cr. 973(PGG), 2014 WL 31191 (S.D.N.Y. Jan. 6, 2014)................................... 4, 33, 34

*United States v. McCallum*,
584 F.3d 471 (2d Cir. 2009)............................................................................................ 2, 3

*United States v. Mergen*,
No. 06 Cr. 352 (NGG), 2010 WL 1423245 (E.D.N.Y. Apr. 9, 2010) ........................................ 3

*United States v. Nektalov*,
325 F. Supp. 2d 367 (S.D.N.Y. 2004) ................................................................................... 4

*United States v. Rajaratnam*,
No. 13 Cr. 211 (NRB), 2014 WL 2696568 (S.D.N.Y. June 10, 2014) ............................... 3, 12

*United States v. Salameh*,
152 F.3d 88 (2d Cir. 1998)................................................................................................... 4

*United States v. Sampson*,
385 F.3d 183 (2d Cir. 2004)................................................................................................. 2

*United States v. Ulbricht*,
79 F. Supp. 3d 466 (S.D.N.Y. 2015) .................................................................................... 4

*United States v. Williams*,
585 F.3d 703 (2d Cir. 2009)............................................................................................... 13

**Rules**

Fed. R. Evid. 403 ...................................................................................................... passim

Fed. R. Evid. 404 ...................................................................................................... passim

**Other Authorities**

John Y. Campbell et al, *Understanding Inflation-Indexed Bond Markets*,
Brookings Papers on Economic Activity (2009) ........................................................ 9

James Chen, *What is a Short Position? Definition, Types, Risks, and Example*,
Investopedia (Aug. 28, 2025) ....................................................................................... 8

Eyder Peralta, *Standard & Poors Downgrades U.S. Credit Rating*,
  NPR (Aug. 5, 2011) ................................................................................................ 9

Jack Pitcher, *Former Wamco Executive Said Star Investor's Suspicious Trade Go Back*
  *a Decade*, Wall St. J. (Jan. 14, 2025) ................................................................ 23

Garth Theunissen, *Italy Too Big as Crisis Enters New Phase,* Bloomberg (July 13, 2011) .......... 9

## PRELIMINARY STATEMENT

The government has charged Ken Leech with a cherry-picking scheme that allegedly occurred between 2021 and 2023 in his capacity as the Chief Investment Officer of the Western Asset Management Company ("Western"). The government alleges that Mr. Leech systematically favored one Western strategy over another totally different Western strategy. As the government has disclosed, its evidence will rely heavily on statistical analysis from paid expert witnesses. But lacking from the government's case are the sorts of co-conspirator testimony, documentary, or consciousness of guilt evidence typical of complex white-collar criminal prosecutions.

Seeking to plug these fatal holes in its case, the government has noticed its intent to introduce five categories of purported "other acts" evidence. None are admissible. Each is impermissible propensity evidence in sheep's clothing. All occurred more than a decade ago, and one as far back as 1999. Several of the government's cursory descriptions of these events contain inaccurate statements, omit critical context, and draw unsupported inferences—all of which expose that the government's proposed evidence is not in fact probative of the stated non-propensity purposes. And any probative value of these events would be clearly outweighed by the danger of unfair prejudice, confusing the issues, and wasting time with minitrials about irrelevant collateral issues that occurred long ago.

## LEGAL STANDARD

Evidence of uncharged crimes, wrongs, or acts are "not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1).[1] So-called "propensity" evidence is inadmissible because of

---

[1] Unless otherwise noted, internal citations and quotations are omitted.

the serious risk that the jury will adopt a "forbidden inference" of guilt based on the defendant's commission of some prior uncharged act. *United States v. Sampson*, 385 F.3d 183, 192 n.7 (2d Cir. 2004); *see also Michelson v. United States*, 335 U.S. 469, 476 (1948). Rule 404(b) also prevents the defendant from "facing at trial the near impossible task of defending himself against 'prior acts from the span of one's entire lifetime' rather than the acts alleged in the indictment." *United States v. Lentz*, 282 F. Supp. 2d 399 (E.D. Va. 2002) (quoting *United States v. Queen*, 132 F.3d 991, 996 (4th Cir. 1997)). At bottom, Rule 404(b) plays an important role in guarding against the danger that this type of evidence will "undermine the presumption of innocence." *United States v. McCallum*, 584 F.3d 471, 475 (2d Cir. 2009).

Rather, evidence of uncharged crimes, wrongs or acts is admissible only for non-propensity purposes, such as to "prov[e] motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2).[2] The government bears the burden of establishing the admissibility of such evidence, *United States v. Mamadjonov*, No. 18 Cr. 34 (VAB), 2023 WL 2155852, at \*3 (D. Conn. Feb. 21, 2023), including that it is offered for a proper, non-propensity purpose and relevant to a material issue in dispute, *United States v. Guang*, 511 F.3d 110, 121 (2d Cir. 2007). While the Second Circuit has described its approach to such evidence as "inclusionary," *United States v. Garcia*, 291 F.3d 127, 136 (2d Cir. 2002), courts do not give the government "carte blanche" to offer "any prior act of the defendant," *McCallum*, 584 F.3d at 475; *see also United States v. Halper*, 590 F.2d 422, 432 (2d Cir. 1978) (establishing that 404(b) evidence is neither "presumed relevant [n]or

---

[2] As noted above, the government has noticed its intent to introduce five categories of uncharged conduct. The government's disclosure indicates its intent to offer the first three of these categories of evidence solely under Rule 404(b), while suggesting that it believes the fourth and fifth categories of evidence are admissible both as Rule 404(b) and as "direct" evidence.

automatically admissible"). District courts must scrutinize the purported probative value to ensure that the evidence is not "propensity evidence in sheep's clothing." *Id.* at 477.

To be probative of a non-propensity purpose, the other acts must be "sufficiently similar to the conduct at issue to permit the jury reasonably to draw" the government's desired inference. *United States v. Gordon*, 987 F.2d 902, 908 (2d Cir. 1993). For example, to carry its burden to offer uncharged trading activity, the government "must explain the uncharged transactions, identify similarities between the charged and uncharged transactions, and articulate how the similarities identified support an inference" unrelated to propensity, such as "knowledge or intent." *United States v. Rajaratnam*, No. 13 Cr. 211 (NRB), 2014 WL 2696568, at *4 (S.D.N.Y. June 10, 2014). The probative value of evidence decreases as it gets more remote in time from the conduct at issue, *see United States v. Mergen*, No. 06 Cr. 352 (NGG), 2010 WL 1423245, at *2 (E.D.N.Y. Apr. 9, 2010) (precluding government's Rule 404(b) evidence where it was "quite remote from the charged crimes, both in time and substance"), and the district court abuses its discretion if "the chain of inferences necessary to connect the evidence with the ultimate fact to be proved is unduly long," *United States v. Curley*, 639 F.3d 50, 57 (2d Cir. 2011) (reversing conviction because district court was too permissive in allowing Rule 404(b) evidence).

Even where the government has carried its burden to establish that the evidence is probative of a non-propensity purpose, district courts must still assess whether the "probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403; *see McCallum*, 584 F.3d at 475. This inquiry is heightened in the Rule 404(b) context: district courts must "make a conscientious assessment of whether unfair prejudice substantially outweighs probative value." *United States v. Salameh*, 152

3

F.3d 88, 110 (2d Cir. 1998). A district court abuses its discretion "when it admits 'other act' evidence with a high possibility of jury misuse but with only slightly more probative value than other evidence on the same issue." *Curley*, 639 F.3d at 57. In particular, it is proper to exclude relevant evidence under Rule 403 where, among other things, admitting it would require a "mini-trial" on collateral issues that would mislead the jury, confuse the issues, and waste time. *United States v. Ulbricht*, 79 F. Supp. 3d 466, 492-93 (S.D.N.Y. 2015) (precluding evidence of uncharged contraband sold on online marketplace); *see also United States v. Levy*, 2013 WL 655251 (S.D.N.Y. Feb. 22, 2013) (precluding evidence of prior FTC fraud judgment); Tr. at 13-14, *United States v. Cole*, No. 19 Cr. 869-ER (S.D.N.Y. Oct. 22, 2021), Dkt. 133 (precluding evidence of prior SEC investigation); *SEC v. Jensen*, 835 F.3d 1100, 1116 (9th Cir. 2016) (same).

Finally, uncharged conduct may be offered as "direct" or "intrinsic" evidence only if it "arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000). Courts "have interpreted these [categories] narrowly," *United States v. Martoma*, No. 12 Cr. 973 (PGG), 2014 WL 31191, at *3 (S.D.N.Y. Jan. 6, 2014), and the direct-evidence doctrine is strictly cabined: "where it is not manifestly clear that the evidence in question is intrinsic proof of the charged crime, the proper course is to proceed under Rule 404(b)," *United States v. Nektalov*, 325 F. Supp. 2d 367, 372 (S.D.N.Y. 2004).

**ARGUMENT**

I.    **The Court Should Preclude the Government from Presenting Evidence of a 2011 TIPS Trade That Was Reallocated with Approval of Western's Compliance Department**

The Court should preclude the government's evidence regarding a single Treasury Inflation-Protected Securities ("TIPS") trade—a type of Treasury bond not among the securities involved in the charged conduct—that Mr. Leech initially allocated on February 17, 2011 (a decade before the relevant period), and then reallocated the next day with compliance approval. The government claims it will use this one trade to demonstrate Mr. Leech's "opportunity to consider post-execution trade performance," "intent and plan to favor certain client portfolios over others, and the absence of mistake or lack of accident in the . . . first day trade gains . . . allocated to favored client portfolios, and . . . first day trade losses . . . allocated to disfavored client portfolios" between 2021 and 2023. (Gov't 404(b) Notice at 1).[3]

The government presents a misleading account of the facts and its reasoning is flawed. The fuller context shows that evidence of this one trade would serve no permissible purpose. A single trade executed in 2011 is not evidence of "intent" or a "plan" to misallocate trades a decade later, especially where, as here, the contemporaneous record shows the allocation was accidental. Further, "opportunity" evidence would only be admissible if that issue is contested at trial, and, in any event, there are a variety of ways the government could introduce "opportunity" evidence from the relevant period without resorting to a stale "other act" from a decade earlier.

---

[3] The citation "Gov't Notice" refers the government's disclosure letter dated November 12, 2025, which is attached as Exhibit A of the Declaration of Nathaniel Sobel accompanying this memorandum of law (hereinafter, "Sobel Decl."). The citation "Supp. Gov't Notice" refers to the government's response dated December 1, which is attached as Exhibit C of the Sobel Declaration.

In the alternative, the Court should preclude the government's evidence of this single trade because it would result in a minitrial within the trial that would likely confuse the jury and waste time—and would far outweigh any probative value of the government's proffered evidence.

**A.    Background**

To rebut and contextualize the government's proffered evidence, the defense would introduce evidence, including documents, lay witness, and expert testimony, that establishes at least the following.

**1.    Mr. Leech Mistakenly Allocated the TIPS Trade and Corrected the Error Early the Next Morning with Compliance Approval**

In 2011, Mr. Leech was the head of Western's global business, which required frequent travel between Western's California headquarters and its London office. He was a senior executive but worked under Western's then-CIO. At that time, Mr. Leech was a portfolio manager for roughly 20 different global-oriented accounts.[4] In addition, he managed other bespoke accounts, including:

- **Account-1**,[5] which was a largely unconstrained, international, and flexible portfolio that allowed for aggressive trading and the use of leverage. No client money was invested in the account; it was funded by Western and certain executives. In February 2011, Mr. Leech was not personally invested in Account-1.

- **Account-2**, which was a largely unconstrained, U.S.-only, and flexible portfolio that allowed for aggressive trading and the use of leverage. Western's then-CIO (not Mr. Leech) was the lead portfolio manager. Account-2 was only a small portion of the client's

---

[4] These accounts were part of Western's Global Core strategies and are distinct from the strategies Mr. Leech managed between 2021 and 2023.

[5] Account-1 was called the Macro Speculation Fund.

overall investment with Western.[6]

- **Account-3**, which had a unique investment mandate to manage an investment that was used to fund scholarships. Specifically, the account's sole objective was to generate returns to match an explicit liability schedule (*i.e.*, tuition payments). The account was among Western's "highest touch" accounts. It performed poorly during the global financial crisis. In 2009, Mr. Leech was added as a portfolio manager in an effort to resuscitate the account—which he ultimately did.

The government's Rule 404(b)'s notice is based entirely on a single email exchange

between Mr. Leech and his then-trading assistant, Karen Meidl. (*See* Sobel Decl. Exhibit D).

However, the government's notice elides the precise sequence of events. The correspondence

actually shows that:

- On February 17, 2011, Mr. Leech was in London. At 2:16 p.m. in London (GMT),[7] Mr. Leech used an electronic platform called TradeWeb to place an order to purchase 20 million TIPS.[8] According to a screenshot of the trade order platform included in the email correspondence, at the time Mr. Leech placed the order, an "internal" note indicating an allocation to Account-3 was entered. (*Id.*).

- On February 18, early in the morning in London, Mr. Leech emailed Ms. Meidl about a TIPS trade he had executed "yesterday." (*Id.*). Mr. Leech appeared to be aware that the trade was not allocated to Account-1 or Account-2 as he had intended since Mr. Leech asked: "Did you deiviene [sic] what I meant? Or did you put them somewhere else? *Or are they lost*?" (*Id.* (emphasis added)).

- Ms. Meidl responded roughly eight hours later, which was early in the morning in California (and typical of when she arrived in the office), and told Mr. Leech that she would "revise" the allocation. (*Id.*).

- About an hour later, Ms. Meidl entered a note in Western's electronic trade management platform, which was recorded in the trade blotter. The government's notice wholly omitted that, at 6:46 a.m. (PST), Ms. Meidl entered:

---

[6] Account-2 is one of the "two other accounts" Mr. Leech was charged with allegedly favoring between 2021 and 2023. (Indictment ¶ 6).

[7] The trade execution time reflected in the email correspondence is 9:16 a.m. (EST) which was, as stated above, 2:16 p.m. (GMT).

[8] TIPS are U.S. Treasury bonds indexed to the Consumer Price Index that are designed to protect investors against inflation risk. Unlike Treasury futures and options, they are (i) cash bonds, (ii) trade in over-the-counter markets, and (iii) require full payment for settlement.

> PM provided incorrect allocation. It was always intended for [Account-2] for 90% and [Account-1] for 10%, per [Mr. Leech]. To cover short. Precleared manually ok per AS.

(Sobel Decl. Exhibit E). This blotter note almost certainly reflects a telephone conversation Ms. Meidl had with Mr. Leech. The statement "Precleared manually ok per AS" indicates that Andy Song, a Western compliance official, approved the reallocation in accordance with Western's next-day trade reallocation policy. (Sobel Decl. ¶ 8).

### 2.    The TIPS Trade Was Always Intended for Account-1 and Account-2 (and not Account-3)

The government's notice also ignores other contemporaneous evidence demonstrating that the TIPS trade was initially allocated in error. Contemporaneous holdings data corroborate Mr. Leech's communication to Ms. Meidl that the trade was executed to "cover short" positions in Account-1 and Account-2.[9] On the morning of February 17, Account-1 had a short position of approximately $1.5 million in TIPS and Account-2 had a short position of approximately $18.2 million dollars in TIPS. By allocating 10 percent of the trade to Account-1 and 90 percent of the trade to Account-2, Mr. Leech fully covered the short position in both accounts, and added a small long position in Account-1.

Crucially, **no such short position existed in Account-3**. Indeed, contemporaneous holdings data reflects that, between January 1, 2011 and December 21, 2012, **Account-3 never held TIPS** (other than at the end of the day on February 17, 2011, due to the inadvertent allocation). Moreover, expert testimony would establish that it would not make economic sense

---

[9] A short position "involves *selling* a security with the expectation of buying it back at a lower price, aiming for profit if the price drops." James Chen, *What Is a Short Position? Definition, Types, Risks, and Example*, Investopedia (Aug. 28, 2025), https://www.investopedia.com/terms/s/ short.asp#toc-real-world-example-shorting-a-stock-for-profit. When a portfolio has a short position in a particular security, *purchasing* that same security is known as "covering" the short position.

to allocate TIPS to Account-3 given its unique liability-matching mandate: TIPS are used to manage inflation risk, but inflation risk was not relevant to Account-3's mandate. Account-3 was expected to match the cashflows that would be needed to satisfy predetermined *nominal* liabilities (*i.e.*, tuition payments) and had no need to use TIPS to match so-called *real* (*i.e.*, inflation-adjusted) liabilities.[10]

### 3. The Government Likely Relies on the Irrelevant "End-of-Day" Price in the Trade Blotter

The government's letter asserted that, when Mr. Leech allocated the TIPS trade early in the morning in London on February 18, "the value of defendant's TIPS trade [had] increased." (Gov't Notice at 1). But the government has not produced evidence establishing that fact and, more likely, based that assertion on an irrelevant "end-of-day" price in Western's trade blotter.

The three discrete points in time relevant to the TIPS trade are illustrated in the chart below and defined as "Time 1," "Time 2," and "Time 3."



---

[10] *See, e.g.*, John Y. Campbell et al, *Understanding Inflation-Indexed Bond Markets*, Brookings Papers on Economic Activity 114 (2009), https://campbell.scholars.harvard.edu/publications/understanding-inflation-indexed-bond-markets ("Inflation-indexed bonds [like TIPS] . . . play an important role for institutional investors who need to hedge long-term *real* liabilities. Pension funds and insurance companies with multiyear commitments should use inflation-indexed bonds to neutralize the swings in the present value of their long dated liabilities due to changes in long-term *real* interest rates." (emphasis added)).

Western's trade blotter memorializes the trade execution price at Time 1 and the "end-of-day" price at Time 2. (*See* Sobel Decl. Exhibit E). The defense assumes that the government's assertion that "the value of defendant's TIPS trade [had] increased" was based on the observation that, between Time 1 (execution price) and Time 2 (end-of-day price in the trade blotter), the price of TIPS increased by less than one percent. (Gov't Notice at 1). But the price at Time 2 is irrelevant. The only price that would be relevant to Mr. Leech's purportedly fraudulent intent would be the price at Time 3, when Mr. Leech emailed to reallocate the trade. Years after the fact, based on publicly available information, it is not possible to obtain the price of TIPS at Time 3. However, historical price records would establish that, between Time 2 (end-of-day price in the trade blotter) and Time 3 (when Mr. Leech emailed Ms. Meidl), bond market prices declined (and accordingly, the value of the TIPS trade decreased between Time 2 and Time 3).

### B.    Discussion

The government asserts that this isolated, 15-year-old trade—just one of hundreds of thousands trades Mr. Leech made over the course of his career at Western—is probative of Mr. Leech's "intent and plan to favor certain client portfolios over others" between 2021 and 2023. (Gov't 404(b) Notice at 2). It is not.

The email exchange between Mr. Leech and Ms. Meidl alone would establish that the reallocation was, in fact, caused by an accident, and not an instance of cherry picking. While the exact circumstances of how the "internal" allocation to Account-3 was entered and how the online portal worked are not known (and likely now, unknowable), even the email correspondence that the government's notice relies upon does not provide any basis to infer any sort of dishonest conduct. To the contrary, it reflects an error that was resolved with compliance approval.

Moreover, contemporaneous documents the government ignored establish that the trade was intended to cover a short position—which existed *only* in Account-1 and Account-2, and not in Account-3. In fact, *Account-3 never otherwise traded TIPS* in the entire two-year period from 2011 to 2012. Fact witness and expert testimony would further establish that TIPS were objectively unsuitable for Account-3, which corroborates the fact that the trade was initially allocated to Account-3 in error. Additionally, testimony would establish that Account-3 was a closely watched account with a specific investment strategy, making it exceptionally unlikely that Mr. Leech would have deliberately allocated the TIPS trade to it for an improper reason. And, in any event, Mr. Leech had no personal interest in Account-1 or Account-2.

Testimony would also establish that the government is wrong to rely on the price change between Time 1 (execution price) and Time 2 (end-of-day mark) since the bond market declined between Time 2 (end-of-day mark) and Time 3 (when Mr. Leech emailed Ms. Meidl). In any event, the exact price of TIPS at Time 3 is now virtually impossible to ascertain based on publicly available information—and so the trade's unrealized first-day performance when Mr. Leech emailed Ms. Meidl is unknown.

Given these critical facts, the evidence simply does not support the government's desired inference and thus has no probative value to establish an intent, plan, or absence of mistake in favoring certain portfolios. *See, e.g.*, *Rajaratnam*, 2014 WL 2696568, at *4 (evidence of uncharged insider trading not admissible where government failed to establish that defendant had requisite knowledge or intent). Far from demonstrating a non-propensity purpose, the fact that after scouring decades worth of emails and hundreds of thousands of trades, the government has come up with a mistaken allocation from a decade before the alleged scheme only establishes the opposite: the government's purported rationales are unfounded.

The government, alternatively, contends that the evidence is admissible to show Mr. Leech's "opportunity to consider post-execution trade performance when making allocation decisions." (Gov't Notice at 2). This theory is equally contrived.

On this point, the government's proffered evidence is fundamentally dissimilar from its theory of the charged crime. For the 2011 TIPS trade, Mr. Leech apparently allocated the trade *at the time he placed the order* and then reallocated it a day later—with the approval of Western's compliance department. In contrast, the indictment alleges that, between 2021 and 2023, Mr. Leech carried out a "scheme by placing trades, waiting to see how those trades performed throughout the day, and then using the first-day performance of his trades to determine in which portfolio to allocate those trades." (Indictment ¶ 3; *see also id.* ¶ 17 (same); Govt's Opp. to Def.'s Pretrial Mots. at 27, Dkt. 37 ("As alleged in the Indictment, Leech made trades throughout the day, typically without knowing where he would allocate.")). That lack of similarity is fatal to the government's opportunity theory, particularly given that the next-day reallocation was approved by Western's compliance department, which is inconsistent with the alleged criminal scheme. *See, e.g.*, *Gordon*, 987 F.2d at 908 (requiring "close parallel between the crime charged and the acts shown").

In any event, "opportunity" evidence is inadmissible unless the defense argues that Mr. Leech lacked the opportunity to allocate trades before the end of the day. In other words, if the issue of "opportunity to consider post-execution trade performance" is not disputed, (Gov't Notice at 2), uncharged acts may not be admitted for that purpose, *see, e.g.*, *United States v. Williams*, 585 F.3d 703, 708 (2d Cir. 2009) (rejecting government's argument that evidence was admissible to prove "opportunity and motive" where "opportunity or motive . . . was not put in issue during the trial").

12

Finally, even assuming *arguendo* some marginal probative value to this evidence, it would be far outweighed by the danger of unfair prejudice, confusing the issues, and wasting time. *See Levy*, 2013 WL 655251, at *1 (precluding evidence on basis that it would "lead to a confusing 'mini-trial'"). The government's (unfounded) assertion that the 2011 TIPS trade was an instance of cherry picking is based only on a misreading of one email exchange; the government has indicated it has no witnesses who would testify about this event. This presents a real danger that the jury will draw the forbidden propensity inference based on an incomplete picture. To rebut and correct the government's tortured account of this trade, the defense would need to put on substantial documentary, lay witness, and expert testimony, including but not limited to the evidence described above. This already complex trial would devolve into a minitrial about an individual, 15-year-old trade, requiring explication of at least: the different strategies and accounts at issue; the trade's suitability for the respective strategies; the concept of covering short positions; and a detailed examination of the price of the trade at different relevant points in time. Indeed, on this last point, the age of the conduct not only undermines its probative value but also creates substantial unfair prejudice to the defense since, given the passage of time, it is virtually impossible to ascertain the price of TIPS when Mr. Leech corrected his prior day's error, and the government has not even attempted to provide that information.

Accordingly, the Court should preclude the government from introducing evidence relating to the 2011 TIPS trade.

## II.    The Court Should Preclude the Government from Presenting Evidence Related to Account-1 in 2011

The Court should preclude the government's evidence related to two personal investments Mr. Leech made in the spring of 2011 in the highly aggressive and leveraged Account-1. The government argues that the evidence shows, among other things, Mr. Leech's

"intent and plan to benefit certain portfolios over others" and his "opportunity to exercise discretion when allocating trades" between 2021 and 2023. (Gov't Notice at 3). However, Mr. Leech's 2011 investments have been the subject of multiple investigations that have found no wrongdoing and no evidence of inappropriate allocations.

In an attempt to side-step these findings and misuse this decade-old incident to shore up the deficient evidence of its charged scheme, the government's notice conflates Mr. Leech's trading in Account-1 with the fundamentally different issue of Western's determination that Mr. Leech's personal investments "could narrowly be construed to have not had all appropriate approvals documented." (Sobel Decl. Exhibit F at 1). That conclusion has nothing to do with the charged conduct and is plainly not admissible to prove, as the government proffers, "that [Mr. Leech] was aware of his fiduciary duties and willfully violated them when he employed the charged scheme." (Gov't Notice at 3). This is quintessentially improper propensity evidence.

## A.    Background

To rebut and contextualize the government's proffered evidence, the defense would need to introduce evidence, including documents, lay witness, and expert testimony, that establishes at least the following.

### 1.    Mr. Leech's 2011 Investments in Account-1

On Friday, April 29, 2011, a prime broker informed Western of a margin call in Account-1, stating that it was "imperative" that Western add funds to the account by Monday, May 2. (Sobel Decl. ¶ 10). At the time, Western was the only investor in Account-1. Mr. Leech was not included in the initial external or internal communications regarding the margin call, which risked liquidation of the securities in the account. After Western's then-CIO did not take action to meet the margin call, on Tuesday, May 3, Mr. Leech stepped in and invested $4 million of his own personal funds to bail out the struggling account. When Mr. Leech made the investment, he

informed Western's head of Enterprise Risk that he was doing so. (Gov't Notice at 2-3). Approximately one month later, on June 13, Mr. Leech made an additional $4 million investment in Account-1. As the government acknowledges, "Western Asset executives had contemporaneous notice of [Mr. Leech's] personal investments in Portfolio [Account-1]." (Gov't Notice at 3).

### 2.    Western's 2011 Internal Investigation

On August 5, a Western executive inquired about liquidating certain non-client accounts, and Account-1 was proposed as a candidate. In the course of the liquidation process, Western executives observed that, due to the different time at which the respective investments were made, Western's investment had a small loss while Mr. Leech's investment had a $5.1 million gain.[11] In response to an observation made by Western's then-CEO that the discrepancy "seemed odd," Western executives sought to understand the drivers of these returns. (Gov't Notice at 3).

Subsequently, Western retained outside counsel to investigate whether Mr. Leech had complied with requirements for preclearing trades that would have been necessary had the account been Mr. Leech's own personal account. The issue was not whether Mr. Leech had disclosed the investments but, rather, whether the formal approval process had been strictly followed. As Western's present counsel recently informed the government in a formal submission: "The investigation found that while Leech had taken steps to obtain preclearance, it was unclear whether preclearance was required under the circumstances but, if so, [it was] also unclear whether Leech had obtained sufficient preclearance." (Sobel Decl. ¶ 11).

Also around this time, Western's Chief Compliance Officer ("CCO") reviewed Mr. Leech's trades in Account-1. Western recently informed the government that: "We expect that

---

[11] Western had previously redeemed a $10 million gain on an investment in Account-1.

[the CCO] would say that while he does not recall the [Account-1] investigation, his apparent review at the time for allocation issues, front-running, and cross-trading likely was ancillary and proactive, not prompted by any complaint about Leech's allocations or the other concerns reviewed, of which he recalls none." (Sobel Decl. Exhibit G at 5). A spreadsheet reflecting the CCO's review in September 2011 posed the question: "Any evidence of front running or preferred allocations with [Account-1]?" and concluded: "No." (Sobel Decl. ¶ 13).

Ultimately, in an abundance of caution, Western and Mr. Leech agreed to donate the profits from Mr. Leech's investment to charity. The government's disclosure twice mischaracterized a memorandum that, for accounting purposes, memorialized the end of the investigation:

- The government's letter asserted that the memorandum concluded that Mr. Leech "*lacked* appropriate approvals." (Gov't Notice at 3 (emphasis added)). The memorandum, however, clearly stated: "Upon review, WAM management deemed that the re-investment could *narrowly be construed to have not had all appropriate approvals documented*." (Sobel Decl. Exhibit F at 1 (emphasis added)); and

- The government's letter asserted that "[Western] . . . *required*" Mr. Leech to donate the profits to charity. (Gov't Notice at 3 (emphasis added)). The memorandum actually stated that: "Following an internal review, WAM and the subject senior executive [Mr. Leech] *agreed* the ~$6 million of gains attributed to his re-investment should be disgorged and a charitable contribution made in the amount of the gains." (Sobel Decl. Exhibit F at 1 (emphasis added)).

### 3. The 2025 Outside Counsel Investigation

More recently, at the government's request, an elite law firm with the assistance of an economics consulting firm conducted its own review of Mr. Leech's trades and allocations in 2011 ("2025 Outside Counsel Investigation"). (Sobel Decl. ¶ 14). The 2025 Outside Counsel Investigation "did not identify any [improper allocations]." (*Id.*). Among the factors the 2025 Outside Counsel Investigation considered were differences in the underlying asset composition of the portfolios Mr. Leech managed in 2011, the fact that allocating the trades Mr. Leech

allocated to Account-1 to other accounts instead could have violated those other accounts'
guidelines, and contemporaneous communications from Mr. Leech elucidating his trading. (*Id.*).

> **B.    Discussion**

The government contends that the 2011 allocations to Account-1 demonstrate Mr.
Leech's "intent and plan to benefit certain portfolios over others" in 2021 to 2023. (Gov't Notice
at 3). But this specific allegation has been twice investigated and rejected. Western's internal
investigation in 2011 found no evidence of such misconduct. And when the 2025 Outside
Counsel Investigation examined the issue earlier this year, it did *not* find evidence of cherry
picking.

Unsatisfied with these conclusions, the government seeks to relitigate this 15-year-old
collateral issue at a criminal trial in 2026. But even putting aside the contrary conclusions of the
law firms that investigated the issue, the government's stated basis for its insinuation that Mr.
Leech engaged in cherry picking in 2011 is remarkably thin. Notably, lacking from the
government's notice is any analysis that even purports to establish that dishonest allocations
occurred. The government's proffer rests on two assertions: (1) performance in Account-1
improved after Mr. Leech invested his own money in it; and (2) "[s]everal of the profit
generating trades the defendant allocated to Portfolio [Account-1] were Treasury futures trades
broadly appropriate for other portfolios over which the defendant had management and trade
allocation authority." (Gov't Notice at 2). That sort of conjecture utterly fails to carry the
government's burden of proving that the proffered evidence is probative of its desired inferences
regarding intent, plan or absence of mistake. And introducing this old and objectively ambiguous
data for the purpose of demonstrating Mr. Leech's "opportunity to exercise discretion when

allocating trades" is improper, particularly, given that, as noted, Mr. Leech does not expect to contest that he had the ability to allocate trades before the end of the day. (*Supra* at pp. 12-13).

The government contends that evidence that Mr. Leech "disgorged $6,000,000 in gains is also admissible to prove the defendant was aware of his fiduciary duties and willfully violated them when he employed the charged scheme." (Gov't Notice at 3). This argument wrongly conflates distinct issues. Western's formal investigation made no finding of wrongdoing by Mr. Leech regarding his allocations, which is the only sort of conclusion that might be probative of the issues in this trial. Western instead concluded only that, on the discrete issue of whether Mr. Leech's trades were appropriately precleared, his personal investments "could narrowly be construed to have not had all appropriate approvals documented." (Sobel Decl. Exhibit F at 1). Even if that were a finding of misconduct (and it is not), it is of a fundamentally different nature.

The government also concedes that some Western executives had contemporaneous notice of Mr. Leech's investment; the issue that caused Mr. Leech to forgo his profits was whether all necessary approvals were documented. That administrative-type error has no connection to the charged conduct of thousands of allegedly preferential trade allocations between 2021 and 2023.

Moreover, whether the 2011 events reveal anything about Mr. Leech's knowledge of his fiduciary duties regarding Western's preclearance policy for personal investments in firm accounts, they are *not* probative of Mr. Leech's fiduciary duties relevant to allocating trades among clients a decade later. The account at issue in 2011 held no outside investor funds. Further, there can be little doubt that any trader would be unaware that he was not allowed to cherry pick trades, and the government has appropriate ways to prove that point. *See, e.g.,*

(Indictment ¶ 16(a)-(d) (describing Western policies, compliance training, and communications to investment staff); Govt's Opp. to Def.'s Pretrial Mots. at 7-8, Dkt. 37 (same)).

In the alternative, the government's deliberate conflation of these distinct issues highlights the very real Rule 403 dangers of unfair prejudice in admitting this evidence. The government's hope is plainly to confuse the issues and have the jury impute wrongdoing to Mr. Leech based on his agreement with Western to donate the profits to charity. But courts regularly preclude evidence of fines or settlements even where there is a finding or admission of wrongdoing under Rule 403. *See, e.g.*, *Levy*, 2013 WL 655251, at *1 (precluding evidence of unrelated fraud judgment). Preclusion of such evidence is all the more appropriate where, as here, the only possible wrongdoing is an error of a totally different nature than the charged cherry-picking scheme. Further, the government's insinuation of cherry picking rests almost entirely on the fact that Account-1 made significant profits in a short period of time—the sort of evidence that could inflame the jury, even though there was no finding that Mr. Leech's trade allocations were inappropriate.

This evidence should also be precluded because explaining the 2011 allocations would require not just a minitrial but an entire second trial within the trial. The period at issue spans four months and covers more than one thousand trades. To respond to the government's innuendo of cherry picking, the defense would need to offer, at least, expert and fact testimony regarding the different investment mandates and guidelines of the strategies Mr. Leech managed, the difference in asset composition among the strategies, the impact of Mr. Leech's Treasury bond and derivatives trades on the risk profiles of various accounts, the market conditions in 2011

(including the European debt crisis and the downgrade of U.S. debt),[12] analysis illustrating that the trades for Mr. Leech's various accounts were not interchangeable, and Western's internal investigation and its conclusions, including the factual basis for the agreement that Mr. Leech would donate the profits from his investment to charity (which would implicate complex privilege issues).

Finally, the defense will be substantially prejudiced because of the conduct's age. As Western has already explained to the government, many of the key witnesses from Western's 2011 investigation do not recall certain key facts. In a recent letter, Western advised the government that both the then-CCO and general counsel have limited recollections of the investigation. (*See* Sobel Decl. Exhibit G at 8-9; *see also id.* at 2-3). Many other likely witnesses have long since left Western or retired. And sorting through 15-year-old privilege issues involving any findings that may have been made by Western's outside counsel would make it exceedingly difficult to provide a fair and complete picture of Western's investigation. By offering a thinly supported insinuation of prior misconduct 15 years after the fact (despite knowing that the internal investigation found no wrongdoing), the government would unfairly prejudice Mr. Leech by forcing him to defend ancient allegations with one hand tied behind his back.

---

[12] *See* Garth Theunissen, *Italy Too Big as Crisis Enters New Phase*, Bloomberg (July 13, 2011), https://www.bloomberg.com/news/articles/2011-07-13/italy-too-big-to-bail-out-as-crisis-enters-new-phase-chart-of-the-day?embedded-checkout=true; Eyder Peralta, *Standard & Poors Downgrades U.S. Credit Rating*, NPR (Aug. 5, 2011), https://www.npr.org/sections/thetwo-way/2011/08/06/139038762/s-p-lowers-united-states-long-term-rating.

### III. The Court Should Preclude Mr. Fulton's Unsubstantiated Allegations

The Court should preclude evidence of the allegations made by Witness-1—who is identified in discovery as Stephen Fulton—regarding certain of Mr. Leech's trades in 2011. Based on a limited and vaguely described personal investigation, Mr. Fulton seeks to opine that Mr. Leech engaged in cherry picking in 2011. The government intends to introduce that suspicion to show that "just as [Mr. Fulton] observed" in 2011, Mr. Leech also engaged in cherry picking in 2021 through 2023. (Gov't Notice at 4). That is a naked propensity argument: "[J]ust as" Mr. Leech allegedly did one bad thing long ago, he also allegedly did the same bad thing during the charged period. Mr. Fulton's aspersions are also unfounded (as the SEC has apparently concluded) and too vaguely described to satisfy the government's burden. Alternatively, Mr. Fulton's testimony should be precluded under Rule 403 as it will lead to a minitrial on unspecified trades.

### A. Background

Mr. Fulton was a portfolio manager on Western's mortgage-backed securities desk. He did not work directly with Mr. Leech or on the strategies Mr. Leech managed. Mr. Fulton's tenure at Western was marked by a range of formal (and unusual) workplace disciplinary infractions for, among other things, sending inappropriate emails, weeks-long unexcused absences, and breaking a television at a company apartment in New York City in 2012. In a 2010 performance review, Mr. Fulton's supervisor wrote that Mr. Fulton's "greatest challenge historically is a lack of consistency in work performance. He seems to go through periods where his work ethic and motivation are very low and outside interests dominate his work performance." (Sobel Decl. ¶ 15). In 2013, Mr. Fulton left Western. It is clear that Mr. Fulton did not like Mr. Leech.

The government asserts that "[i]n approximately October 2011, [Mr. Fulton] learned of a particular trade in which the defendant bought a substantial number of zero-coupon bonds and upon investigation learned the defendant also executed an offsetting futures trade." (Gov't Notice at 3). The government's letter referenced an email Mr. Fulton sent on October 5, 2011 to his longtime friend Witness-2—who was not an investment professional and did not supervise Mr. Fulton. The email included screenshots reflecting Mr. Leech's purchase of U.S. government bonds known as "STRIPS" approximately 12 weeks earlier, on July 14, 2011. Mr. Leech allocated the trade pro rata among the various global accounts he managed at the time. Along with the screenshots, Mr. Fulton wrote: "This trade was done at 5:26 AM and allocated at 1:36 PM to non US acounts [sic] (no hedge fund) with the price dwn 2%." (Sobel Decl. ¶ 16).[13] The email has no subject line and there was no further correspondence. The government contends that "upon investigation[, Mr. Fulton] learned the defendant also executed an offsetting futures trade" but does not identify the so-called "offsetting" trade. (Gov't Notice at 3). Nothing in Mr. Fulton's contemporaneous emails identified the offsetting trade.

Later in the day on October 5, Mr. Fulton sent Witness-2 an email message that contained only the words "5 days trading" and attached a Microsoft Excel file showing trades Mr. Leech executed between July 11 and 15, 2011. The spreadsheet did not indicate the accounts to which the trades were allocated, the time of day the trades were allocated, or end-of-day prices. The government contends that this spreadsheet reflects Mr. Fulton's "identific[ation of] additional offsetting trades." (*Id.* at 4). But the spreadsheet in no way recorded which of the trades could

---

[13] The time the trade was allocated is unclear. First, it is not known at what time Mr. Leech gave his allocation instruction. Second, it appears that Western's internal system for the trade was "updated" at 1:36 p.m., but notably the allocation time of 1:36 p.m. is not reflected in Western's blotter.

even be considered "offsetting trades"—whatever that vague term means. When the defense

asked for information about Mr. Fulton's prior statements to understand if his testimony would

shed light on these vague accusations, the government declined to provide that information, at

least until the deadline for Section 3500 disclosures.

Contrary to the government's assertion that "after identifying this pattern and sharing it

with Witness-2, [Mr. Fulton] notified Western Asset's then-general counsel," (*id.*), no records

exist indicating that Mr. Fulton contacted the general counsel in 2011 or any other time, (Sobel

Decl. Exhibit G at 2-4).[14] Western informed the government that: "there is no record of Fulton

ever approaching [Western's then-general counsel] or anyone else in Legal or Compliance

regarding Leech's allocations" and that the company "expect[s] that [the then-general counsel]

would say he does not recall any such interaction with Mr. Fulton at any point in time." (*Id.* at 2-

3).

Finally, absent from the government's initial notice was the acknowledgement that even

the SEC had declined to pursue a purported complaint Mr. Fulton made in 2013. However, only

after a specific request from defense counsel did the government concede that: "based on

documents collected and analyzed at the time, the SEC concluded that there was an *insufficient*

*record to proceed with an action in connection with any complaints made by* [Mr. *Fulton*] in or

about 2013." (Supp. Gov't Notice at 1-2 (emphasis added)).[15]

---

[14] Earlier this year, the *Wall Street Journal* reported, according to "people familiar with the matter," that Mr. Fulton made his allegation in 2012—and not 2011 as the government now asserts. Jack Pitcher, *Former Wamco Executive Said Star Investor's Suspicious Trades Go Back a Decade*, Wall St. J. (Jan. 14, 2025), https://www.wsj.com/finance/regulation/former-wamco-executive-said-star-investors-suspicious-trades-go-back-a-decade-6bfbf185.

[15] Based on counsel's review of the discovery, there is nothing in the government's voluminous productions concerning the purported complaint Mr. Fulton made to the SEC.

B.       Discussion

The Court should exclude the government's evidence regarding Mr. Fulton's over a decade-old, unsubstantiated, and inconsistent allegations—which the SEC declined even to investigate many years ago. The impropriety of this evidence is laid bare by the government's notice. In describing the purported relevance of the testimony, the government began by simply repeating the boilerplate line that "[t]he Government intends to introduce this evidence to demonstrate the defendant's opportunity, intent, plan, absence of mistake, or lack of accident." (Gov't Notice at 4). Then, in elaborating, the government said the quiet part out loud: Mr. Leech "executed a fraudulent scheme to favor certain client portfolios . . . *just as* [Mr. *Fulton*] *observed* . . . *in 2011.*" (*Id.* (emphasis added)). Put differently, the government will argue that he (allegedly) did it before, so he must have done it again. That is plainly impermissible propensity evidence. *See, e.g.*, *United States v. Levin*, No. 15 Cr. 101 (KBF), 2016 WL 8711458, at *9 (S.D.N.Y. Jan. 8, 2016) (precluding government from introducing evidence to "pursue a 'once a fraudster, always a fraudster' theory").

In any event, the proffered evidence fails to support even that improper purpose. To prove that Mr. Leech "used post-execution trade performance as a metric when determining whether to allocate trades" in 2011, the government pointed to an email that shows *one* single trade that had an unrealized first-day loss. Nothing other than pure conjecture establishes that the trade was allocated to certain accounts *because* of its unrealized first-day performance. To the extent Mr. Fulton actually identified other "offsetting trades," those trades were neither reflected in the contemporaneous record nor the government's notice.[16] And when the defense asked for further

---

[16] Notably, contemporaneous records reflect that no single trade Mr. Leech executed on July 14 offset the duration impact of the purchase of STRIPS—which is what one would expect that the term "offsetting" would mean. (Gov't Notice at 3-4).

detail that might elucidate the testimony, such as Mr. Fulton's prior statements on the subject matter, the government declined to provide it. The only useful additional information that the government provided was to confirm, as the defense suspected, that the SEC "concluded that there was an insufficient record to proceed with an action in connection with any complaints made by [Mr. Fulton] in or about 2013." (Supp. Gov't Notice at 1-2). What was not credible enough for the SEC at the time, according to the government, is now sufficiently probative and reliable to use against Mr. Leech in his criminal trial 15 years later. That is not a proper use of Rule 404(b) evidence.

Even if there were some minimal non-propensity value to this testimony, it should be precluded under Rule 403. Mr. Fulton's allegation (adopted by the government) is conjecture without substance. But even the bare allegations would take significant time, effort, and testimony for the defense to unwind, creating a sideshow that would confuse the issues, waste time, and risk the jury inferring guilt based on conduct that occurred years ago. As described above, Mr. Fulton's testimony would require the defense to put on an in-depth analysis of Mr. Leech's trading in 2011 to show that no improper allocations occurred. (*Supra* Section II). In addition, at the very least, the defense would elicit evidence on the following topics in response to Mr. Fulton's testimony:

- Mr. Fulton's personal animus towards Mr. Leech;

- The purpose of Mr. Fulton's rogue investigation, whether he was competent to analyze Mr. Leech's trades, and how to evaluate the results of his analysis—to the extent they exist today or ever existed at all;

- Inconsistencies regarding Mr. Fulton's allegations, including but not limited to (i) the government's implication that Fulton alleged made a complaint around October 2011 (Gov't Notice at 4), while (ii) the Wall Street Journal reported that Mr. Fulton had a discussion with Western's general counsel in 2012, (*supra* at pp. 23 n.14), and (iii) likely testimony from Western's general counsel that "he does not recall any . . . interaction

with Fulton at any point in time," (Sobel Decl. Exhibit G at 3); and

- Mr. Fulton's tenure at Western, including the range of conduct for which he was formally sanctioned.

Finally, given the passage of time, Mr. Leech would be unfairly prejudiced by the inability to examine witnesses who have any sort of clear recollection of Mr. Fulton's allegations. *See United States v. Hatfield*, 685 F. Supp. 2d 320, 324 (E.D.N.Y. 2010) (precluding evidence that would result in a minitrial "while adducing no evidence concerning whether the Defendants committed the charged crimes").

## IV.    The Court Should Preclude the Trading Floor Parlor Game Testimony

The Court should preclude the government's vague and innuendo-laden evidence of a so-called "parlor game" played on the Western trading floor in "approximately 2014." (Gov't Notice at 4). From what can be discerned from the government's proffer, this anecdote is neither direct evidence of the charged crimes, which allegedly occurred nearly a decade later, nor is it an "other act" that may be admitted under Rule 404(b). In any event, it should be precluded under Rule 403.

### A.    Background

According to the government's one-paragraph notice, it will offer testimony from an unidentified witness ("Witness-3") who will say that, about 12 years ago, with some undisclosed regularity, Mr. Leech "spent approximately one hour each morning on the trading floor, then went to his office until the close of the market." (Gov't Notice at 4). Witness-3 will apparently testify that, later in the day, Mr. Leech "returned to the trading floor and gave his trading assistant a stack of paper trading tickets." (*Id.*). According to the witness, "it was a 'parlor game' on the trading floor to attempt to reconstruct the defendant's trading rationale by reviewing his trade log." (*Id.*). Notably absent from the government's proffer are any details about who the

26

witness is, whether he or she worked on strategies Mr. Leech managed (and would have had any informed insight into Mr. Leech's trading), or with whom he or she purportedly had these discussions. Also absent is any allegation that Mr. Leech's allocations, which were the subject of this "parlor game," inappropriately favored certain clients over others. The government further proffers that the witness will offer a (likely improper) lay opinion that Mr. Leech's practices were inconsistent with Western's compliance trainings and fiduciary duties. (*Id.*).

In response to this notice, the defense sought further information about the witness and the context for the purported statements. The government declined to provide that information, presumably because it intends to do so much closer to trial, in connection with the production of Section 3500 and *Giglio* materials, *after* the parties will have briefed the instant motion.

### B.    Discussion

The government principally claims that the 2014 "parlor game" anecdote is "direct evidence of the defendant's fraudulent scheme." (Gov't Notice at 4). It is not. Uncharged conduct may be considered direct evidence in the limited circumstances in which it (1) "arose out of the same transaction" as the charged offenses; (2) is "inextricably intertwined" with the evidence regarding the charged offenses; or (3) is "necessary to complete the story" of the crime on trial. *Carboni*, 204 F.3d at 44. As an example of the close connection necessary to admit prior acts evidence as so-called direct evidence, in *Carboni*, the defendant was charged with making false statements to secure advances on a line of credit, so evidence that the defendant used fictional inventory to conceal discrepancies from the bank during its evaluation of how much money the defendant could borrow was properly admitted as part of the defendant's "continued effort" to commit the charged crime. *Id.*

Witness-3's proffered testimony appears to be nothing more than office gossip—which dates at least seven years before the charged conduct—and clearly does not fit within those categories of uncharged conduct that can be introduced as direct evidence of an alleged criminal scheme. It necessarily arises out of different transactions (*i.e.*, unspecified trades in 2014). It is not in any way intertwined with the conduct that occurred seven-to-nine years later. And the government can very well tell the story of the charged conduct without referring back to this unsubstantiated gossip from years earlier. Presumably the government will have testimony from witnesses about Mr. Leech's trading practices and rationale from the relevant period. This 2014 "parlor game" testimony adds nothing except a pejorative and prejudicial phrase.

It is no answer for the government to say that this evidence "corroborates that the defendant had a pattern of delaying allocations until late in the day." (Gov't Notice at 4). Mr. Leech's practices in 2014 are minimally probative of his practices more than seven years later. And, more importantly, the government's "corroboration rationale" is just a disguised propensity rationale: Because he did this (allegedly) bad thing in 2014, that shows that he *must have* done the same (allegedly) bad thing a decade later. That is the definition of propensity, not direct evidence. *See, e.g.*, *Levin*, 2016 WL 8711458, at *9.

The government also argues that this evidence is admissible to show that Mr. Leech "did not trade in accordance with a preconceived strategy or plan that was known to others on the trading floor and is admissible to rebut any potential defense argument to the contrary." (Gov't Notice at 4). That argument fares no better. Again, whether unidentified investment staff gossip about Mr. Leech's trading rationale at some unspecified time in 2014 is not probative of his actual trading rationale between 2021 and 2023. Even if Mr. Leech offers evidence that he had "a pre-conceived strategy" that was known to *all* members of the trading floor, the government's

proposed rebuttal would only be appropriate if Witness-3 were among the people with whom Mr. Leech shared such a strategy. Given the anonymity of the witness and the government's refusal to provide more information, there is no way to evaluate whether he or she was among that group of people, making the probative value of this witness—even as a rebuttal witness—speculative at best.[17]

In the alternative, the government argues that this evidence is admissible under Rule 404(b), because Mr. Leech's "widely accepted practice of providing allocation instructions at the end of the day created the opportunity for his scheme to defraud." (Gov't Notice at 4). As noted above, unless Mr. Leech disputes that he had the opportunity to allocate trades before the end of the day, this testimony from 2014 is not probative of any contested issue. (*Supra* at pp. 12-13). And even if some of Witness-3's testimony was admissible to show opportunity, the notion that traders played a "parlor game" to reconstruct Mr. Leech's rationale would be entirely unnecessary to that narrower point.

Even if the 2014 evidence had some probative value (which it does not), the Court should preclude the evidence under Rule 403 because the phrase "parlor game" is being presented as a pejorative way to describe Mr. Leech's conduct. Witness-3 apparently has no first-hand knowledge and will make no specific assertion that there was anything improper about Mr. Leech's allocation decisions. Instead, the government intends to have Witness-3 unfairly waft unsupported suspicions that there was something improper about Mr. Leech's allocations. In any event, the government will presumably introduce evidence at trial about Mr. Leech's trading

---

[17] Similarly, without information about the witness's identity, it is not clear that he or she is even qualified to offer the opinion testimony that Mr. Leech's practices were "inconsistent with Western Asset's compliance training, the practices of other traders and portfolio managers at Western Asset, and Western Asset's fiduciary duties to its clients." (Gov't Notice at 4).

practices during the relevant period, so any testimony about his prior practices would be both duplicative and irrelevant.

Finally, the Court should preclude the government's evidence regarding Witness-3 on the basis that the government has failed to "provide reasonable notice" of the witness's testimony. Fed. R. Evid. 404(b)(3)(A); *see also* Fed. R. Evid. 404 (advisory committee's note to 2020 amendment) ("Advance notice of Rule 404(b) evidence is important so that the parties and the court have adequate opportunity to assess the evidence, the purpose for which it is offered, and whether the requirements of Rule 403 have been satisfied—even in cases in which a final determination as to the admissibility of the evidence must await trial."). Following the government's Rule 404(b) notice, the defense requested additional information about the witness and context for the statement. But the government refused to provide it ahead of the Court's deadline for the instant motion. At the very least, Mr. Leech should be afforded the opportunity to renew his motion to preclude the instant motion after the government produces its Section 3500 and *Giglio* material.

## V.    The Court Should Preclude the Government from Introducing More Than 20-Year-Old Evidence of Compliance Violations

Mr. Leech worked at Western, in the highly regulated fixed-income securities industry, for more than 30 years. In a last-ditch effort to resurface irrelevant past conduct, the government says that it intends to bring the jury back to the turn of the century and introduce proof of administrative compliance violations from 1999 and 2000, purportedly as "direct proof" of Mr. Leech's "fraudulent intent" (in 2021 through 2023). (Gov't Notice at 5). The government asserts that "these violations put him on notice of his responsibility to 'report trades in a timely manner' and the concomitant risk of SEC 'sanctions' if he failed to abide by Western Asset policy." (Gov't Notice at 5).

The Court should preclude this evidence. The memoranda referenced in the government's notice are ambiguous and vague. They contain essentially no details about the purported infractions or the surrounding circumstances—and 25 years after the fact any details whatsoever are likely no longer possible to ascertain. Furthermore, the government's "notice" argument is plainly pretextual: The government will have ample opportunity at trial to introduce evidence from the charged period showing that Mr. Leech was on notice of his duties, so the clear purpose of bringing in these ancient memoranda is to show the *violation*, not the notice. Like the rest of the Rule 404(b) evidence the government proposes, this is just impermissible propensity evidence.

### A.    Background

The government's notice cited two distinct types of turn-of-the-century administrative infractions. First, the government referenced a memorandum stating that Mr. Leech purchased US Treasury Notes for a certain client and failed to report this trade.[18] The circumstances surrounding this memorandum are opaque. It appears, from a trade ticket attached to the memorandum, that Mr. Leech executed the trade on Friday, July 21, 2000 and did not allocate it until either Monday, July 24 or Tuesday, July 25—the date of the allocation is not clear from the record and the government's notice does not specify it. Second, the government referenced a memorandum citing Mr. Leech for failing to "pre-clear personal securities transactions" in 1999. (Gov't Notice at 5). The securities mentioned are stock options—not the sort of fixed-income

---

[18] Counsel has no reason to believe that Mr. Leech was a portfolio manager for an account held by the client referenced in the memorandum, and has not identified any documents in discovery to suggest otherwise. It would have been unusual for Mr. Leech to place a trade for an account he did not manage, which raises a host of questions as to the circumstances regarding this trade and its allocation. Given the age of the conduct, any details about this particular trade are likely no longer ascertainable.

products that Western managed and which are at issue in this case. The government's initial notice did not describe the form this evidence would take. (Gov't Notice at 5). When asked for further information, the government indicated that it would offer both records and witness testimony, but provided no detail whatsoever about who the witness might be or what he or she might say. (Supp. Gov't Notice at 2).

**B.    Discussion**

The government's contention that Mr. Leech's personal trading violations are "direct evidence" of the charged offense is baseless. Although the memoranda are unclear and the government has provided no information about the intended witness testimony, the disclosure suggests that these are discrete incidents that are unrelated to trades Mr. Leech made more than 25 years later. This evidence is obviously not part of the same transaction as the charged offense, is not inextricably intertwined with the evidence regarding the charged offense, and is not necessary to complete the story at trial. *See Carboni*, 204 F.3d at 44. The government nevertheless suggests that it is direct evidence because "these *violations* put [Mr. Leech] on notice of his responsibility to 'report trades in a timely manner' and the concomitant risk of SEC 'sanctions' if he failed to abide by Western Asset policies." (Gov't Notice at 5) (emphasis added). This argument fails on a number of levels.

First, the policies in question are not relevant to the charged conduct. The violation for a failure to preclear personal trades is clearly not relevant, as that is not the government's allegation here. And while the violation for failing to timely report might bear some superficial similarity to the charged conduct, it appears to be a sanction for a trade that was allocated *outside* of Western's end-of-day trade allocation policy. In contrast, virtually all of Mr. Leech's trades during the relevant period were allocated in compliance with Western's end-of-day policy and

the indictment does not allege anything to the contrary. More importantly, Western's policy in 1999 about timely reporting of trades is of minimal relevance when the charged conduct occurred between 2021 and 2023, and evidence will surely be admitted about the applicable policies during *that* period.

Second, even if it were relevant to prove that Mr. Leech was on "notice" of a policy applicable to the allegation in the indictment, the government does not need to show that he previously *violated* that policy. The government surely will introduce evidence that Mr. Leech had notice of the policies relevant to the charged conduct during the relevant period, such as evidence showing that he received compliance trainings. (*See, e.g.*, Indictment ¶ 16). Evidence that Mr. Leech long ago *violated* a vaguely similar policy does not add any marginal probative value for the intended "notice" purpose. Rather, it is being presented to try to paint Mr. Leech as a rule-breaker—the very sort of propensity purpose that Rule 404(a) forbids. *See, e.g.*, *Martoma*, 2014 WL 31191, at *5 (evidence that "goes to criminal propensity alone, [is] precisely what Rule 404(b) prohibits").

Third, there is no relevance to evidence that puts Mr. Leech on "notice" of the "risk of SEC 'sanctions' if he failed to abide by Western Asset policy." (Gov't Notice at 5). This is a criminal case, not one seeking to impose SEC sanctions. And the government will surely argue that it needs only to prove that Mr. Leech acted with fraudulent intent, not that he understood the particular statutes or regulations he might be violating by his conduct. So, again, the only reason to introduce evidence of SEC "sanctions" would be to improperly suggest propensity to violate rules.

Finally, even if the violations were admissible as direct evidence of the charged scheme, they would be inadmissible under Rule 403. This evidence has minimal (if any) probative value

since there is no "close parallel" between these years-old administrative mistakes and the charged conduct. *Gordon*, 987 F.2d at 908. The age of the conduct not only detracts from its probative value but also unfairly prejudices Mr. Leech as it impairs the defense's ability to investigate the conduct at issue and offer evidence that clarifies the events described in the brief and ambiguous memos. And this would be yet another digression from the actual issues on trial that would waste time and confuse the jury. *See Martoma*, 2014 WL 31191, at *5.

## CONCLUSION

For the foregoing reasons, the Court should preclude the government's evidence under Rule 404(b) or, alternatively, Rule 403.[19]

In any event, to the extent the Court determines that the record is not adequately developed to preclude the government's evidence, the Court should defer Rule 404(b) rulings until trial when it will become "clear for what specific purpose the Rule 404(b) evidence is relevant and so that the Court can make an informed balancing analysis under Rule 403, taking into account the actual evidence in the case." Tr. at 37-38, *United States v. Bayuo*, No. 15 Cr. 576 (JGK) (S.D.N.Y. Oct. 29, 2018), Dkt. 161 (citing *United States v. Colon*, 880, F.2d, 650, 660 (2d Cir. 1989).

Dated:  December 15, 2025           MORVILLO ABRAMOWITZ
         New York, New York          GRAND IASON & ANELLO, P.C.

                                       */s/* Jonathan S. Sack
                                       Jonathan S. Sack
                                       Jeremy H. Temkin
                                       Nathaniel Sobel
                                       565 Fifth Avenue
                                       New York, New York 10017
                                       (212) 856-9600

                                       CLEARY GOTTLIEB
                                       STEEN & HAMILTON, LLP

                                       */s/* Joon H. Kim
                                       Joon H. Kim
                                       One Liberty Plaza
                                       New York, New York 10006
                                       (212) 225-2000

                                       *Attorneys for Defendant S. Kenneth Leech II*

---

[19] Mr. Leech reserves his right to supplement or renew the instant motion upon the production or identification of materials not presently available to counsel, such as the witness statements the government has declined to produce.