UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------x

UNITED STATES OF AMERICA

- v. -

S. KENNETH LEECH II,

Defendant.

-----------------------------------------------------x

24 Cr. 658 (GHW)

**GOVERNMENT'S MOTION TO EXCLUDE EXPERT TESTIMONY PURSUANT TO FEDERAL RULES OF EVIDENCE 403 AND 702**

SEAN BUCKLEY
Attorney for the United States
Southern District of New York

Thomas S. Burnett
Peter J. Davis
Assistant United States Attorneys

Lindsey Keenan
Special Assistant United States Attorney
*Of Counsel*

## TABLE OF CONTENTS


PRELIMINARY STATEMENT ..... 1

BACKGROUND ..... 2

I. The Defendant's Scheme to Favor His Preferred Clients ..... 2

- A. The Relevant Accounts ..... 3
- B. The Defendant's Trading and Allocation Practices ..... 5
- C. The Defendant's Biased Allocations ..... 7

II. The Parties' Expert Notices ..... 8

- A. The Government's Initial Expert Disclosures ..... 8
- B. The Defense's Initial and Rebuttal Expert Disclosures ..... 13
- C. The Government's Rebuttal Expert Disclosures ..... 18

LEGAL STANDARD ..... 22

ARGUMENT ..... 24

I. The Court Should Exclude Testimony About The CRA Exercise. ..... 24

- A. The Court Should Exclude The CRA Exercise Because it is Unreliable. ..... 24
- B. The Court Should Exclude The CRA Exercise Because it Does Not Fit The Facts of The Case and is Likely to Confuse or Mislead the Jury. ..... 33

II. The Court Should Exclude The Defense's Regression Analyses. ..... 35

- A. The Dolgoff Regression is Unreliable and Misleading. ..... 35
- B. The Maloney Regressions are Unreliable and Misleading. ..... 42

CONCLUSION ..... 47

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002) ........ 22, 23

*Astra Aktiebolag v. Andrx Pharms., Inc.*,
222 F. Supp. 2d 423 (S.D.N.Y. 2002) ........ 24

*Bazemore v. Friday*,
478 U.S. 385 (1986) ........ 42

*Bickerstaff v. Vassar College*,
196 F.3d 435 (2d Cir. 1999) ........ 42

*Boucher v. U.S. Suzuki Motor Corp.*,
73 F.3d 18 (2d Cir. 1996) ........ 23, 27

*Capri Sun GmbH v. Am. Bev. Corp.*,
595 F. Supp. 3d 83 (S.D.N.Y. 2022) ........ 22, 23, 24, 26

*Compania Embotelladora Del Pacifico v. Pepsi Cola Co.*,
650 F. Supp. 2d 314 (S.D.N.Y. 2009) ........ 27

*Daubert v. Merrell Dow Pharms.*,
509 U.S. 579 (1993) ........ 22, 26

*Faulkner v. Arista Records LLC*,
46 F. Supp. 3d 365 (S.D.N.Y. 2014) ........ 35

*Franklin v. Con. Edison Co. of N.Y.*,
37 F. App'x 12 (2d Cir. 2002) ........ 27

*Freeland v. AT&T Corp.*,
238 F.R.D. 130 (S.D.N.Y. 2006) ........ 42

*In re Acetaminophen Prods. Liability Litig.*,
707 F. Supp. 3d 309 (S.D.N.Y. 2023) ........ 23

*In re Keurig Antitrust Litig.*,
2024 WL 354671 (S.D.N.Y. Jan 30, 2025) ........ 23

*In re LIBOR- Based Fin. Instruments Antitrust Litig.*,
2025 WL 2733020 (S.D.N.Y. Sept. 25, 2025) ........ 27, 35

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
299 F. Supp. 3d 430 (S.D.N.Y. 2018) ........ 44

*In re Mirena IUD Prods. Liability Litig.*,
169 F. Supp. 3d 396 (S.D.N.Y. 2016) ........ 25

*In re Mirena Ius Levonorgestrel-Related Prods. Liability Litig (No. II),*
982 F.3d 113 (2d Cir. 2020) ........ 23

*In re Mirena Ius Levonorgestrel-Related Prods. Liability Litig.*,
341 F. Supp. 3d 213, 241 (S.D.N.Y. 2018) ........ 27, 35

*In re Omeprazole Patent Litig.*,
84 F. App'x 76 (Fed. Cir. 2003) ........ 24

*Kumho Tire Co. Ltd v. Carmichael*,
526 U.S. 137 (1999) ........ 27, 35

*Nimely v. City of New York*,
414 F.3d 381 (2d Cir. 2005) ........ 24, 25

*Sobel v. Yeshiva Univ.*,
839 F.2d 18 (2d Cir. 1988) ........ 42

*United States v. Tin Yat Chin*,
371 F.3d 31 (2d Cir. 2004) ........ 22

*Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*,
571 F.3d 206 (2d Cir. 2009) ........ 23, 27

## PRELIMINARY STATEMENT

Stephen Kenneth Leech, the defendant, spent years defrauding investors by trying to bolster the performance of the Macro Opportunities strategy, which he created and controlled, at the expense of his firm's Core and Core Plus Strategies. He carried out that scheme by trading throughout the day, then waiting hours before deciding where to allocate trades. Delay gave him a chance to see how the market moved—which of his trades were up, and which were down—and he used that information to give Macro Opportunities a leg up, allocating better-performing trades to that strategy and worse-performing trades to the Core Strategies.

The Government's experts have analyzed vast quantities of data about market movements, the defendant's trading, and the relevant portfolios. Their analyses showed that the defendant routinely waited hours to make allocation decisions. That he used that the delay to allocate trades in a biased manner, sending trades that had net first-day gains of over $600 million to Macro Opportunities and net first-day losses of over $600 million to the Core Strategies. And that the defendant's allocation decisions were not driven by market conditions or differences between different strategies. Instead, these analyses show that the key factor in the defendant's allocation decisions was how a trade performed in the hours between making it and allocating it.

The defense's experts, by contrast, have largely avoided trying to understand why the defendant traded, and allocated, the way he did. Running away from the defendant's actual trading, the defense intends to present a trade allocation exercise, in which they had a different trader, allocate a small subset of the defendant's trades, using different restrictions and goals than the defendant did. Even that flawed exercise failed to replicated the defendant's results, matching the defendant's allocations only 56.8% of the time—slightly better than a coin flip. Yet defense plans to use this exercise to suggest that the defendant could have allocated net first-day gains to

Macro Opportunities and net first-day losses to the Core Strategies, without cherry picking. In another refusal to engage with inconvenient facts, the defense intends to present regression analyses to try to refute the idea that the defendant was allocating based on first-day performance. But the analyses are engineered to avoid key issues: Even though the defendant was supposed to know where he wanted to allocate trades at the time he placed them, the defense analyses are structured to avoid having to explain why the defendant traded as he did. Similarly, even though a key part of the defendant's fraud was allocating trades with first-day losses to the Core Strategies, the defense analyses focus only on Macro Opportunities, trying to sweep the losses under the rug.

These analyses should not be allowed to go to the jury. The trading exercise is unreliable and misleading because it gives the illusion of approximating the defendant's trading process, when in reality it was designed with arbitrary constraints that made the exercise nothing like the defendant's actual practices. The proposed regression analyses are also unreliable and misleading because they have the sheen of statistical rigor, concealing that they were designed to avoid critical factors that would have prevented the defense experts from reaching the defense's desired result.

## BACKGROUND

### I. The Defendant's Scheme to Favor His Preferred Clients

Between 2021 and 2023, the defendant served as the chief investment officers of a large investment-management firm called Western Asset Management ("WAMCo"). The defendant routinely traded fixed-income products and allocated the trades to accounts for various clients. He owed a fiduciary duty to all of those clients. But in violation of that duty, he engaged in a fraudulent scheme to favor certain clients at the expense of others through a practice known as "cherry picking." The defendant engaged in this cherry-picking scheme by trading throughout the day, then waiting hours after his trade was executed before deciding where to allocate the trade. The delay allowed him to see how his trades performed between the time of trade execution and

trade allocation and to steer trades that performed well to favored accounts and trades that performed poorly to others. Over the course of his scheme, the defendant allocated trades with net positive first-day returns ("FDRs") of over $600 million to his favored clients, and allocated trades with net negative FDRs of over $600 million to other clients.

**A. The Relevant Accounts**

The accounts that are relevant to the defendant's criminal scheme are those that followed WAMCo's Core and Core Plus strategies (the "Core Strategies"), those that followed WAMCo's Macro Opportunities strategy ("Macro Opps"), and two specific client accounts ("Account-1" and "Account-2"). *See* Ex. A (Cohen Rpt.), ¶¶ 7-8.

The Core Strategies were large fixed-income strategies that WAMCo primarily marketed to pension funds, large institutions, and retail investors. The Core Strategies were benchmarked to the Bloomberg Aggregate Index. This means that the risk level of the Core Strategies—measured by a metric called "duration," which is the sensitivity of a portfolio to a change in interest rates—had to be within a certain range of the duration of the Bloomberg Aggregate Index (+/- 20% for Core and +/- 30% for Core Plus). The defendant and other portfolio managers who allocated trades to the Core Strategies had flexibility in deciding where within the range to position the Core Strategies, as well as the mix of assets WAMCo would use to achieve that overall risk level. WAMCo advertised that its portfolio managers would use this flexibility to maximize total return over a market cycle, with the aim of outperforming the benchmark index. *See id.* ¶¶ 13, 63-64.

From 2021 through 2023, WAMCo had between approximately $100 and $165 billion in assets under management across accounts following the Core Strategies. The defendant shared management responsibilities for accounts in the Core Strategies with many other portfolio managers. During the relevant time period, the duration of the Core Strategies fluctuated around seven years, which tended to be higher than the duration of the Bloomberg Aggregate Index. The

convexity of the Core Strategies—which is a metric that measures the extent to which a portfolio's duration changes based on a move in interest rates—also tended to be modestly negative. This means that, as interest rates fell, the duration of the Core Strategies tended to fall, and as interest rates rose, the duration of the Core Strategies tended to rise. *See id.* ¶¶ 18, 63-64, 69-71.

The defendant also managed Macro Opps. Like the Core Strategies, Macro Opps invested in a wide array of largely fixed-income assets, with the goal of maximizing total return. Macro Opps drew investment ideas from other parts of WAMCo and had the same broad strategic positions as the Core Strategies—for instance, both were generally positioned to benefit if interest rates fell. Unlike the Core Strategies, however, Macro Opps did not have a benchmark. Instead, the accounts within Macro Opps were required to typically stay within a broad duration band of between 10 and -5 years, meaning the duration of Macro Opps accounts normally needed to be below 10 years and above -5 years, but could move freely in that range. *See id.* ¶¶ 15, 63-64.

From 2021 through 2023, WAMCo had between approximately $3 and $16 billion in assets under managements in Macro Opps accounts. The defendant was the lead portfolio manager and shared responsibility with only one other portfolio manager. During the relevant time period, the duration of Macro Opps was often between five and ten years, but fluctuated more widely from day to day than the duration of accounts in the Core Strategies. Like the Core Strategies, the convexity of accounts in Macro Opps was largely negative, albeit to a more significant degree than the Core Strategies. This meant that the duration of Macro Opps accounts could change more significantly in response to rate change than the duration of accounts in the Core Strategies. Macro Opps, however, was also permitted to have more significant changes in duration because it did not need to adhere to the same benchmark as the Core Strategies. *See id.* ¶¶ 15, 63-64, 70-71.

The two other accounts at issue—Accounts-1 and -2—were for specific, longstanding clients of the defendant. Account-1 was a Core Plus account and typically received allocations whenever the defendant allocated trades to the Core Strategies. Account-2 typically received allocations whenever the defendant allocated trades to Macro Opps. But the defendant occasionally allocated trades specifically to each account that did not go to either the Core Strategies or Macro Opps. *See id.* ¶¶ 14, 16.

**B. The Defendant's Trading and Allocation Practices**

The defendant carried out his criminal scheme through trades in U.S. Treasury derivatives—specifically futures and options. Treasury futures are contracts for the purchase and sale of U.S. Treasuries in the future. Treasury options are contracts that provide the right to buy (call options) or sell (put options) Treasury futures contracts at a specific price and time.

The defendant often traded Treasury futures and options throughout the day, with the highest volume of his trades concentrated between 5:00 and 7:00 a.m. Pacific Time. A trade has two basic steps: First, a trader places an order to trade with a broker. And second, the broker executes the trade, which refers to when the trade is actually filled in the market. The defendant used a wide array of major financial institutions as brokers for his Treasury futures and options trades, and many of his trades executed very quickly—within several minutes of the order. Some trades, however, took longer to execute—up to a day or more—because the defendant's order was at a price that was away from where the market was trading at the time the order was placed. Overall, the defendant was a heavy trader in Treasury futures and options and generally placed significantly more trades than other portfolio managers, including managers who also had authority over accounts in the Core Strategies and Macro Opps. *See id.* ¶¶ 20-22, 37-43.

Every trade the defendant placed was supposed to be for a particular account, strategy, or set of accounts and strategies. Information about what account a trade was for—that is, where it

was supposed to be "allocated"—was not conveyed to the broker when the defendant placed trades. Instead, the defendant needed to tell employees at WAMCo where the trades should go, and those employees were responsible for making sure that trades ended up in the right accounts.

Each of the defendant's Treasury futures and options trades typically consisted of between 500 and several thousand contracts. This gave the defendant flexibility to allocate an entire trade to a single strategy or account, or to split a trade among accounts or strategies. When the defendant wanted to allocate a trade to the Core Strategies, he typically told his employees to allocate to "SKL" or "SKL1." That allocation command would result in the entire trade being divided among the accounts within the Core Strategies, usually pro rata by the size of each account. When the defendant wanted to allocate a trade to Macro Opps, he typically told his employees to allocate to "Macro Opps" or "MO," which resulted in the trade being divided among the accounts in Macro Opps (again, usually pro rata). And when the defendant wanted to give a trade to *both* the Core Strategies and Macro Opps, he typically told employees to split the trade "50/50," which often resulted in half of the trade being divided up among accounts in the Core Strategies and the other half of the trade being divided up among accounts in Macro Opps. *See id.* ¶¶ 9-10.

In a deposition with the Securities Exchange Commission ("SEC"), the defendant claimed, in substance and in part, that he knew at the time he placed trades the strategy or account to which he intended to allocate the trade. But the defendant did not write down his allocation decision, or tell anyone about them, before or near the time of the trade. Instead, the defendant waited hours—often until the market close—before telling employees how he wanted his trades allocated. For example, excluding trades placed through Broker-1 (which were unique because the defendant had a standing rule that those trades should go to Macro Opps) the average time between the execution of the defendant's trades and those trades being allocated in WAMCo's systems was 8.5 hours.

This delay between trade execution and allocation gave the defendant an opportunity to see how the market moved before deciding where to allocate trades. *Id.* ¶¶ 24, 42-43.

**C. The Defendant's Biased Allocations**

The defendant took advantage of his delayed allocations to commit fraud. He used information about the price movements between the time of execution and allocation in deciding how to allocate trades between Macro Opps, the Core Strategies, and Accounts-1 and -2. This resulted in allocating better-performing trades to Macro Opps and Accounts-1 and -2, and allocating worse-performing trades to the Core Strategies.

Even the high-level data about the defendant's biased allocation is striking. Across all of the defendant's Treasury futures and options trades, the average return between the time the defendant executed a trade and the time he allocated it (the "Pre-Allocation Return")[1] was approximately -$13,000, and across the 50/50 trades, the defendant's average Pre-Allocation Return was approximately -$25,000. Similarly, when the defendant did not exercise discretion about allocation—such as his trades through Broker-1—the average Pre-Allocation Return of the defendant's Treasury futures and options trades was approximately -$13,000. *See id.* ¶ 46.

The defendant's allocations specifically to Macro Opps or the Core Strategies looked fundamentally different. The average Pre-Allocation Return of trades the defendant allocated only to Macro Opps was approximately $260,000, for a net Pre-Allocation Return of approximately $701 million. By contrast, the average Pre-Allocation return for trades the defendant allocated only to the Core Strategies was -$330,000, for a net Pre-Allocation Return of -$701 million. This

[1] Pre-Allocation Returns differ slightly from FDRs because the time between trade and allocation was not always the same as the time between trade and the end of the trading day. Sometimes the defendant allocated trades before the end of the day, and other times he allocated after.

difference was driven, in large part, by the defendant allocating trades with particularly large positive Pre-Allocation Returns to Macro Opps and particularly large negative Pre-Allocation Returns to the Core Strategies. For example, looking at all Treasury futures and options trades allocated to Macro Opps (excluding Broker-1) and the Core Strategies, approximately 56% went to the former and 44% to the latter. By contrast of the trades with a Pre-Allocation Return of $1 million or more, 96% went to Macro Opps and only 4% went to the Core Strategies. Whereas for trades with a Pre-Allocation Return of -$1 million or greater, only 5% went to Macro Opps, as 95% went to the Core Strategies. *See id.*

## II. The Parties' Expert Notices

### A. The Government's Initial Expert Disclosures

On November 4, 2025, the Government produced notices for two potential experts: Professor Lauren Cohen and Professor Petter Kolm. The Government's notices provide extensive detail about how the data from the defendant's actual trading show that he was using information about the performance of trades between execution and allocation in his allocation decisions, and the extreme bias in the performance of trades allocated to Macro Opps and the Core Strategies was not a result of other factors.

#### 1. Professor Lauren Cohen

Professor Cohen is the L.E. Simmons Professor in the Financial & Entrepreneurial Management Unit at Harvard Business School and a Research Associate at the National Bureau of Economic Research. Professor Cohen will present data on the defendant's trading and allocation patterns, including the defendant's practice of waiting hours between execution and allocation and the bias in Pre-Allocation Returns. *See* Ex. A, ¶¶ 37-50. Professor Cohen will also present statistical analyses of the Pre-Allocation Returns on the defendant's Treasury futures and options ttrades. *See id.* ¶¶ 53-55. These include, for example, statistical analyses showing that the

significant difference in performance between trades the defendant allocated to Macro Opps versus the Core Strategies was limited to the window between execution and allocation. In the 24 hours before execution, there was no meaningful difference in the performance of the assets the defendant purchased, nor was there a meaningful difference in performance in the 24 hours after allocation. Only the period between execution and allocation—when the defendant could see price changes and make allocation decisions—resulted in a difference between the strategies. *See id.* ¶¶ 48-50, 54-55.

Further, Professor Cohen will explain that the extreme differences in Pre-Allocation returns between Macro Opps and the Core Strategies cannot be explained by market conditions between 2021 and 2023, or by strategic requirements of Macro Opps or the Core Strategies. With respect to market conditions, Professor Cohen will testify that the Treasury market displayed a relatively high degree of volatility between 2021 and 2023, but that this would not explain a consistent pattern of trades with positive Pre-Allocation Returns going to Macro Opps and those with negative Pre-Allocation Returns going to the Core Strategies. *See id.* ¶¶ 56-61.

As for the fact that Macro Opps and the Core Strategies are marketed as different strategies, Professor Cohen will testify that the differences did not significantly constrain the defendant's discretion to allocate Treasury futures and options to either portfolio, or equally between the two. For example, the option to allocate trades 50/50 shows the wide discretion the defendant had in allocation decisions: Between 2021 and 2023, the defendant allocated 5,337 Treasury futures and options trades 50/50, which is more than he chose to allocate specifically to the Core Strategies or Macro Opps. Professor Cohen also performed a trade reassignment analysis, which showed that, if the defendant had taken all the Treasury future and options trades he assigned specifically to Macro Opps or the Core Strategies, and instead split them 50/50 (thereby removing any cherry

picking), the duration of his portfolios would have been extremely similar to how it was in reality. And Professor Cohen performed regression analyses, which showed that the best predictor of whether the defendant would allocate a trade to Macro Opps or Core Strategies was not the size of the trade, the type of the trade, or whether the trade was placed in reaction to pre-trade market movements, but instead was the trade's Pre-Allocation Return. *See id.* ¶¶ 62-74.

Finally, Professor Cohen will testify that he analyzed the convexity of Macro Opps and the Core Strategies and concluded that, while Macro Opps was often more negatively convex than the Core Strategies, that difference does not explain the bias in Pre-Allocation Returns.

Duration and convexity are two metrics relevant to managing fixed-income portfolios. Duration reflects the portfolio's sensitivity to changes in interest rates. For example, if interest rates fall by five basis points, and a portfolio's duration is two years, then the value of that portfolio will rise approximately ten basis points. If the duration of the portfolio were five years, it would be more sensitive to the same rate change, with its value rising by approximately 25 basis points.

Convexity reflects how a portfolio's duration moves in response to changes in interest rates. The value of certain fixed-income assets, such as Treasury options, does not move in a linear manner with interest rate changes. Instead, the extent to which an interest rate move will change the value of a Treasury option depends on a number of factors, including how close the option is to its strike price. This means that the duration of a Treasury option, or of a portfolio that contains many Treasury options, will change as interest rates changes.

The convexity metric helps predict that change. When a portfolio is negatively convex—as both Macro Opps and the Core Strategies were for most of the relevant period—the portfolio's duration will fall as interest rates fall, and the portfolio's duration will rise as interest rates rise. Portfolio managers can react in a host of ways to convexity-driven duration changes, depending

on their objectives. They could try to offset the duration change, in full or in part, by trading to add duration as interest rates fall and trading to shed duration as interest rates rise. They could use the duration change to help accelerate a shift in the portfolio's risk profile, trading to add duration as interest rates rise or shed duration as interest rates fall. Or they could do nothing, using convexity as a natural way to alter the portfolio's duration profile. *See id.* ¶ 71.

Professor Cohen will testify that Macro Opps tended to be more negatively convex than the Core Strategies. That did not arise out of a difference in trading strategies: The defendant allocated many negatively convex trades—largely sales of Treasury options—to *both* strategies. Those allocations, however, had a larger impact on the convexity of Macro Opps than the Core Strategies because it was a significantly smaller portfolio, such that each trade allocated to Macro Opps moved its convexity more than the same trade going to the Core Strategies. *See id.* ¶ 70.

Professor Cohen will explain that, while the greater negative convexity in Macro Opps meant that the duration of Macro Opps moved more than the Core Strategies in response to interest rate changes, that difference does not explain the bias in Pre-Allocation Returns (or FDRs). Among other things, Professor Cohen will explain that: (a) there is no reason why managing the negative convexity of Macro Opps would consistently generate positive Pre-Allocation Returns for Macro Opps and negative Pre-Allocation Returns for the Core Strategies; (b) the duration of Macro Opps fluctuated significantly, which shows that the defendant was not closely managing duration changes in the portfolio; (c) the exercise of reassigning trades 50/50 shows that the defendant did not need to allocate trades specifically to Macro Opps to manage its duration and convexity; and (d) statistical analyses (including regression analyses) show that the defendant was not placing trades in a manner that was consistent with managing the negative convexity of Macro Opps, such as placing trades to add duration when interest rates were falling or shed duration as

interest rates were rising. In short, Pre-Allocation Returns and FDRs explain the defendant's allocation decisions, not managing convexity. *See id.* ¶¶ 71-74.

**2. Professor Petter Kolm**

Professor Kolm is a Clinical Professor of Mathematics and the Director of Mathematics in Finance M.S. Program at New York University's Courant Institute of Mathematical Sciences. He has extensive experience designing trading strategies for fixed-income portfolios and assessing the performance of such strategies. Professor Kolm will present statistical analyses on the performance of the defendant's Treasury futures and options trades. Those analyses show that—compared to the expected performance of Treasury futures and options trades, and to other fixed-income funds—the defendant's first-day performance in Macro Opps was exceptionally good, his first-day performance in the Core Strategies was exceptionally poor, and that those differences in performance disappeared after the first day. *See* Ex. B (Kolm Rpt.), ¶¶ 14-21. Professor Kolm will also present statistical analyses showing that the positive first-day results in Macro Opps, and the negative first-day performance in the Core Strategies, was unusually consistent over time, *see id.* ¶¶ 23-31; that the distribution of trades was skewed, with many trades with large first-day gains going to Macro Opps and large first-day losses to the Core Strategies, *see id.* ¶¶ 37-41; and that the results the defendant achieved were unlikely the result of chance or strategic requirements of either strategy, *see id.* ¶¶ 32-36.

Finally, Professor Kolm will present evidence on the significance of the defendant's cherry-picking scheme for Macro Opps and the Core Strategies, using specific accounts within each strategy—account 3313 for Macro Opps, account 984 for Core Plus, and account 671 for Core—as examples. Professor Kolm will explain that, *excluding* first-day performance, the defendant's Treasury future and options trades generated losses: approximately $180 million of losses for 3313 in Macro Opps and approximately $570 million of losses for 671/984 in the Core

Strategies. However, the defendant directed $130 million of net first-day gains 3313 in Macro Opps, largely offsetting the losses from other days. By contrast, he directed approximately $440 million of first-day losses to 671/984 in the Core Strategies, nearly doubling the losses from other days. The $130 million in first-day gains was significant to the overall performance of 3313 in Macro Opps. During the period relevant to the indictment, that account saw approximately $440 million of losses overall. Without the first-day gains, those losses would have been almost 30% higher. By contrast, the defendant was able to hide first-day loses in the Core Strategies: During the same period, 671/984 in the Core Strategies saw overall losses of approximately $13.5 billion. The first-day losses from the defendant's Treasury futures and options only contributed 3% of those overall losses. *See id.* ¶ 22.

**B. The Defense's Initial and Rebuttal Expert Disclosures**

On November 4, 2025, the defense produced notices for five potential experts: Mr. Andrew Newman, Dr. Richard Goldberg, Professor Bruce Tuckman, Mr. Aaron Dolgoff, and Professor Kevin Maloney. The defense subsequently produced multiple supplements to those reports in response to requests for clarification. On November 20, 2025, the defense produced rebuttal reports from Mr. Dolgoff and Mr. Maloney.

As is relevant here, the defense's initial expert notices disclosed two trade-allocation exercises conducted by pairs of experts—Mr. Newman and Dr. Goldberg performed one exercise, and Professor Tuckman and Mr. Dolgoff performed the other. The exercises involved having an expert allocate the defendant's trades on certain days, supposedly without knowing how the defendant had allocated the trades, then comparing the experts' allocations to the defendant's allocations. The defense's rebuttal notices disclosed that, among other things, Messrs. Dolgoff and Maloney intend to present regression analyses designed to show that the defendant made allocation decisions to manage duration changes in Macro Opps, rather than to cherry pick.

On December 10, 2025, the defense informed the Government it will not be calling either Mr. Newman or Dr. Goldberg at trial and will not be presenting evidence regarding the allocation exercise they conducted. Prior to the defense withdrawing the notices, the Government informed the defense that it had learned that the supposedly blind exercise that Mr. Newman and Dr. Goldberg had conducted may not, in fact, have been blind because Mr. Newman (who allocated the trades) may have been exposed to information about how the defendant allocated trades.

**1. The CRA Exercise - Professor Tuckman and Mr. Dolgoff**

The defense intends to present evidence of a hypothetical trading exercise performed by Professor Tuckman and Mr. Dolgoff, with the assistance of a consulting firm called Charles River Associates (the "CRA Exercise"). *See* Ex. C (Dolgoff Rpt.), p. 2; Ex. D (Tuckman Rpt.), p. 2. The two experts call the CRA Exercise a "blind allocation exercise" that, at a high level, consisted of taking the trades the defendant made on a sample of days and having Professor Tuckman decide how to allocate those trades, without knowing the defendant's allocations or the performance of those trades. Professor Tuckman plans to testify about the design of the exercise and how he made allocation decisions, while Mr. Dolgoff plans to testify about the design of the exercise and will present its results. *See* Ex. C, pp. 2-5; Ex. D, pp. 3-6.

The CRA Exercise began with selecting 50 trading days to use in the analysis. Members of CRA randomly selected those days from three subgroups of days, made up of days with the largest positive FDRs in Macro Opps, the largest negative FDRs in Core Strategies, and the largest difference in FDRs between those two strategies. *See* Ex. C, p. 2. From there, Professor Tuckman was given the trades that the defendant had allocated specifically to Macro Opps or to the Core Strategies, excluding 50/50 trades, Broker-1 trades, and certain other types of trades. According to the expert notices, Professor Tuckman was not given information about how the defendant had allocated those trades. Instead, he was given historical information about the duration and

convexity profiles of an account in Macro Opps (account 3313) and an account in the Core Strategies (account 984); historical information about the market; and information about market conditions and the duration and convexity of 3313 and 984 in the hour window surrounding the execution time of each trade Professor Tuckman had to allocate. *See id.* at 3-4; Ex. D, pp. 2-4.

Under the CRA Exercise, Professor Tuckman only received information about each trade in one-hour windows, and needed to allocate all trades within a window before he would receive information about the next set of trades. Professor Tuckman was required to allocate trades to either Macro Opps or the Core Strategies and was not given the option to allocate trades 50/50 or to specific accounts. *See* Ex. C, pp. 3-4; Ex. D, pp. 2-4.

Professor Tuckman created a process for deciding how to allocate trades. Professor Tuckman had data on the historical duration and convexity profiles of 3313 and 984 "but did not know the risk profiles [the defendant] had in mind" for those accounts or the defendant's "views on the future evolution of interest rates on any given day of the Exercise." Given that absence of information, Professor Tuckman created a "duration target" and a "convexity target" for each portfolio. He created these targets using an exponentially weighted average of the previous 30 days' duration and convexity metrics. With these targets and data provided by CRA, Professor Tuckman was able to see, at the time of each trade, the duration and convexity targets for 3313 and 984, the actual duration and convexity of those portfolios, and the direction in which the trade at issue would move the duration and convexity of those portfolios. *See* Ex. D, pp. 4-6.

Using that information, Professor Tuckman attempted to "allocate all of the trades in the [one-hour] window so as to narrow or close" any "gaps" between the duration or convexity targets and the actual duration or convexity of the portfolios. Professor Tuckman typically prioritized "[l]arger gaps . . . over smaller gaps" and "duration gaps . . . over convexity gaps." When "there

was no allocation that narrowed the gaps of either portfolio," he "tried to allocate so as to minimize how much the gaps widened," labeling the rationale in his papers as "do least harm." *See id.* at 6.

According to the notices, Professor Tuckman does not know the results of the CRA Exercise, so Mr. Dolgoff plans to present them. Mr. Dolgoff plans to testify that, during the 50 days at issue, Professor Tuckman's allocations matched the defendant's allocation approximately 56.8% of time, and the net FDRs of trades he allocated to 3313 (Macro Opps) was positive, while the net FDRs of trades he allocated to 984 (the Core Strategies) was negative. He also plans to present statistical analyses of Professor Tuckman's performance compared to the performance of the overall set of trades that Professor Tuckman allocated. He does not, however, compare Professor Tuckman's first-day performance to the defendant's first-day performance. Ex. C, p. 5.

**2. Regression Analyses – Messrs. Maloney and Dolgoff**

Separately, the defense submitted rebuttal notices for Messrs. Dolgoff and Maloney, which disclose that each expert intends to offer testimony about regression analyses. The details of their analyses differ, but both analyses broadly attempt to show that the defendant's allocations to Macro Opps were designed to offset duration changes in the portfolio driven by its negative convexity. *See* Ex. E (Dolgoff Rebuttal Rpt.), pp. 4-5; Ex. F (Maloney Rebuttal Rpt.), pp. 4-5.

As noted above, Professor Cohen conducted a number of regression analyses, including analyses that examined the extent to which a number of variables—including Pre-Allocation Returns, trade size, trade direction, and pre-trade market movements—predicted whether the defendant would allocate a trade to Macro Opps or the Core Strategies. Those analyses showed that Pre-Allocation Returns were the strongest predictor of how the defendant would allocate the trade. Indeed, Pre-Allocation Returns were a notably stronger predictor of whether a trade would go to Macro Opps or the Core Strategies than pre-trade market movements, which is strong

evidence that the defendant was cherry picking and not managing convexity by trading in response to changes in interest rates. *See* Ex. A, ¶¶ 72-74.

Mr. Dolgoff's regression analyses are a modification of Dr. Cohen's regression analyses. Specifically, Mr. Dolgoff took Dr. Cohen's regression model specifications and created a variable focused only on Macro Opps (specifically, account 3313): Mr. Dolgoff replaced the Pre-Allocation Return variable with a variable that measured whether a trade counteracted (to some extent) the estimated convexity-driven duration change of account 3313 between the time of trade execution and allocation, which Mr. Dolgoff calls the "Convexity Effect Offset." Mr. Dolgoff plans to testify that this Convexity Effect Offset variable was a better predictor of the defendant's allocations than the other variables in Dr. Cohen's regressions (aside from the Pre-Allocation Return variables, which Mr. Dolgoff excluded from his analyses). *See* Ex. E, pp. 4-5.

Mr. Maloney performed two sets of regression analyses. Like Mr. Dolgoff's regressions, Mr. Maloney's were focused on account 3313 in Macro Opps. Mr. Maloney's first set of regression analyses primarily focused on two variables: the convexity-driven change in duration of 3313 each day (which he calls "passive duration drift") and whether the trades that the defendant allocated to Macro Opps had a duration impact that counteracted (to some extent) the passive duration drift. Mr. Maloney intends to testify that his analyses showed that the trades the defendant allocated toward Macro Opps tended to move the duration of 3313 in the opposite direction of the passive drift. He will argue that this shows the trades the defendant allocated to Macro Opps "had the effect of managing 3313 back toward its start of day duration." Mr. Maloney performed a similar set of regression analyses assessing Mr. Leech's daily duration change counteraction in lieu of passive duration drift. *See* Ex. F, pp. 4-5.

**C. The Government's Rebuttal Expert Disclosures**

On November 20, 2025, the Government produced rebuttal notices for Dr. Cohen and Professor Kolm. The Government supplemented those disclosures on December 10, 2025, in response to the defense's rebuttal notices. As is relevant here, Professor Kolm's notices addressed the CRA Exercise and the defense's regression analyses. *See* Ex. G (Kolm Rebuttal Rpt.), pp. 5-8, 15-21; Ex. H (Kolm Supp. Rebuttal Rpt.), pp. 1-5.

In his rebuttal report, Professor Kolm identified problems with the design and execution of the CRA Exercise. With respect to design, Professor Kolm explained that the options available to Professor Tuckman and his objectives, differed significantly from the defendant's options and objectives. For example, the defendant had the option to allocate trades 50/50 or not to trade at all, whereas Professor Tuckman could only allocate trades to either Macro Opps or the Core Strategies and had to allocate all of the defendant's trades. Professor Tuckman also used duration and convexity targets that have no basis in the defendant's actual trading strategy.

Professor Kolm will explain that these differences had a significant impact on the CRA Exercise. Professor Tuckman was often arbitrarily forced to choose between allocating to Macro Opps or the Core Strategies when a trade could have benefited both and could have been allocated 50/50. Professor Tuckman also was often forced to allocate trades on the theory that they did "least harm" to one portfolio than the other—rather than whether they benefited a portfolio—because he was required to allocate all of the defendant's trades. And Professor Kolm will testify that he identified numerous instances where the allocation rationales that Professor Tuckman recorded in the CRA Exercise do not appear to reflect the actual effect of his trades (e.g., a trade is labeled a benefiting the duration of Macro Opps, even though it does not move the duration of Macro Opps closer to Professor Tuckman's duration target). *See* Ex. G, pp. 5-8.

As for results, Professor Kolm plans to present data and statistical analyses showing that the defendant's allocations were significantly more biased in favor of Macro Opps and against the Core Strategies than Professor Tuckman's allocations. Overall, Professor Tuckman's allocations resulted in net positive FDRs in Macro Opps of approximately $43 million and net negative FDRs in the Core Strategies of approximately $61 million. By contrast, the defendant's allocations of those same trades resulted in net positive FDRs in Macro Opps of approximately $223 million and net negative FDRs in the Core Strategies of approximately $241 million. That overall difference was driven by the defendant consistently allocating better performing trades to Macro Opps, and worse performing trades to the Core Strategies, at a much higher rate than Professor Tuckman. To show the difference, Professor Kolm ran Dr. Cohen's regression model against both Professor Tuckman's allocations and the defendant's allocations of the same trades. The regression analysis showed that FDRs were a very weak predictor of Professor Tuckman's allocations, but a very strong predictor of the defendant's allocations. *See id.* at pp. 15-21.

In a supplemental rebuttal report, Professor Kolm identified significant problems with the regression analyses performed by Messrs. Dolgoff and Maloney. Mr. Dolgoff's regression analysis, Professor Kolm will explain, has significant flaws. Even though the defendant claimed, in his deposition, that he knew where he would allocate trades at the time he placed those trades, Mr. Dolgoff's analysis does not look at pre-trade duration movements. Instead, the Convexity Effect Offset metric he created looks exclusively at duration movements between the time of trade execution and allocation. It appears the reason Mr. Dolgoff looked at this period is because, in that window, the Convexity Effect Offset behaves similarly to Pre-Allocation Return whenever Macro Opps was negatively convex, which was most of the time. In other words, the Convexity

Effect Offset appears to be a post-hoc way to find a variable that mirrors Pre-Allocation Returns in Macro Opps. *See* Ex. H, ¶¶ 1-3.

Professor Kolm identified three important facts to show the problem with Mr. Dolgoff's analysis. First, by focusing only on the period between trade execution and allocation, the Convexity Effect Offset variable ignores convexity-driven duration changes *before* a trade. That is a significant error because the defendant testified he knew where he was going to allocate a trade at the time he placed it—not that he waited until allocation to decide—and because Dr. Cohen's regression analysis shows that the pre-trade market movements were a weak predictor of where the defendant would allocate. Second, as noted above, the Convexity Effect Offset variable effectively mirrors Pre-Allocation Returns when Macro Opps was negatively convex. When Macro Opps was not negatively convex, the relationship between Pre-Allocation Returns and the Convexity Effect Offset variable reversed. Professor Kolm will show, on days when Macro Opps was positively convex—and so the Convexity Effect Offset variable behaved differently than Pre-Allocation Returns—the defendant allocated trades in a manner that were inconsistent with managing convexity but lined up with cherry picking. Third, Mr. Dolgoff only ran his regression model on Macro Opps and ignored the Core Strategies. So whereas Pre-Allocation Returns was a strong predictor of the defendant's allocations to both Macro Opps and the Core Strategies, there is no evidence that the Convexity Effect Offset variable can explain the significant losses going to the Core Strategies. *See id.*

Mr. Maloney's regression analyses have their own set of problems. Mr. Maloney's regression analyses use a "passive duration drift" variable that looks at how the convexity of Macro Opps, when coupled with market movements, caused the duration of Macro Opps to change on a daily basis. Professor Kolm will explain that this daily approach does not separate how convexity

caused duration to change *during* the day, such as on an hour-by-hour or minute-by-minute basis. That is a significant flaw because the defendant placed his trades throughout the day—not just at the end of the day—so could only have been reacting to duration changes that occurred before he placed the trade, not events that may have happened later. Professor Kolm will explain that, as with Mr. Dolgoff, it appears that Mr. Maloney may have taken this daily approach—rather than looking at information available to the defendant at the time of each trade—because positive FDRs in Macro Opps are correlated with offsetting passive duration drift, so Mr. Maloney is effectively trying to find a post-hoc substitute for FDRs. *See id.* ¶¶ 4-5.

To illustrate the issue, Professor Kolm will explain that Mr. Maloney's regression analyses do not examine any of the variables Professor Cohen looked at—such as Pre-Allocation Returns, trade size, trade type, and pre-trade market movements—Mr. Maloney's analyses do not compare the explanatory power of his passive duration drift or daily duration change theory to other variables. And Mr. Maloney, like Mr. Dolgoff, ignores the Core Strategies, leaving no explanation of why the defendant was consistently directing significant losses to those strategies. *See id.*

## LEGAL STANDARD

Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

The District Court "has a 'gatekeeping' function under Rule 702—it is charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265-66 (2d Cir. 2002).[2]

The threshold question under Rule 702 is whether the witness is qualified to speak to the topics at issue. This requires "compar[ing] the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004).

Rule 702 next requires that, if a witness has appropriate expertise, that expert's testimony is reliable; that is, the testimony relies on "reliable principles and methods" and "reflects a reliable application of the principles and methods to the facts of the case." In *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993), the Supreme Court identified "a list of non-exclusive factors courts should consider in determining whether an expert's methodology is reliable," which includes assessing whether the methodology "can be or has been tested," has been "subjected to peer review," has a "high error rate," and "is generally accepted in the field." *Capri Sun GmbH v. Am. Bev. Corp.*, 595 F. Supp. 3d 83, 120 (S.D.N.Y. 2022). "A proffered opinion may fail all" of these

[2] Unless otherwise noted, internal citations and quotation marks are omitted from case citations.

"reliability factors and still be admitted," but "a court in such a situation must carefully scrutinize, pause, and take a hard look at the expert's methodology." *Id.*; *accord In re Acetaminophen Prods. Liability Litig.*, 707 F. Supp. 3d 309, 335 (S.D.N.Y. 2023).

That hard look at the expert's methodology involves "a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *In re Mirena Ius Levonorgestrel-Related Prods. Liability Litig (No. II)*, 982 F.3d 113, 123 (2d Cir. 2020). Proposed testimony must be excluded if it "is speculative or conjectural or . . . in essence an apples and oranges comparison." *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 213-214 (2d Cir. 2009); *accord Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996). Similarly, exclusion is required "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached." *Amorgianos*, 303 F.3d at 266. The expert's analysis must be "reliable at every step," and although "[a] minor flaw in an expert's reasoning . . . will not render an expert's opinion per se inadmissible," exclusion is warranted whenever "the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions." *Id.* at 267. While, in many cases, deficits in an expert's methodology "will only go to the weight of the evidence[,] . . . there are only so many questions of weight that can be tolerated." *In re Keurig Antitrust Litig.*, 2024 WL 354671, *4 (S.D.N.Y. Jan 30, 2025).

In addition to requiring reliability, Rule 702 also requires that the proposed testimony will assist the trier of fact, which turns, in part, on whether "the expert's testimony 'fits' the facts of the case." *Capri Sun*, 595 F. Supp. 3d at 120. "Even when the expert's method is reliable, [the] testimony may fail [this] fit requirement where (1) [the] data is materially different from the data relevant to the facts of the case, (2) the expert has failed to consider the necessary factors or based

the analysis upon a faulty assumption, or (3) the expert's methodology was transposed form one area to a completely different context, and there is no independent research supporting the transposition." *Id.*; *accord Astra Aktiebolag v. Andrx Pharms., Inc.*, 222 F. Supp. 2d 423, 488 (S.D.N.Y. 2002), *aff'd sub nom. In re Omeprazole Patent Litig.*, 84 F. App'x 76 (Fed. Cir. 2003).

Finally, "expert testimony is [also] subject to [Federal Rule of Evidence] 403 and may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005). Expert testimony requires particularly close scrutiny under Rule 403 "given the unique weight that such evidence may have in a jury's deliberations." *Id.*

## ARGUMENT

### I. The Court Should Exclude Testimony About The CRA Exercise.

This Court should exclude Professor Tuckman and Mr. Dolgoff from testifying about the CRA Exercise. Such testimony is inadmissible under Rules 702 and 403 because the CRA Exercise is unreliable in its design and execution, lacks an appropriate fit with the facts of the case, and is significantly more likely to confuse or mislead the jury than to advance any relevant point.

#### A. The Court Should Exclude The CRA Exercise Because it is Unreliable.

This Court should exclude the CRA Exercise because it is unreliable. The exercise does not satisfy any of the *Daubert* factors and was not tested for repeatability or sensitivity to key variables. The exercise placed arbitrary limits on Professor Tuckman's allocations by requiring him to allocate all trades, preventing him from allocating trades 50/50, and using duration and convexity targets that the defendant did not use. And Professor Tuckman did not undertake the exercise in a reliable manner because he did not apply his methodology in a consistent manner.

### 1. The CRA Exercise is Unreliable Because it Does Not Satisfy the *Daubert* Factors and Was Not Subjected to Any Testing.

This case involves a rich record of data about when and how the defendant traded, including data about market conditions, the state of Macro Opps and the Core Strategies, the timing of the defendant's trades, and the types of trades he placed. The Government's experts have conducted extensive analyses of that record that are designed to help the jury understand how the defendant was actually managing his portfolios and what factors truly influenced his allocation decisions. Those analyses support the conclusion that Pre-Allocation Returns were an important driver of the defendant's allocation decisions, as compared to other factors.

The CRA Exercise, by contrast, is not aimed at illuminating what the defendant was doing or thinking when he allocated trades. Indeed, Professor Tuckman admitted in his notice that he does not know "the risk profiles [the defendant] had in mind" for the relevant portfolios in Macro Opps and the Core Strategies, nor did he know the defendant's "views on the future evolution of interest rates on any given day of the Exercise." Ex. D, pp. 4-6. Instead of trying to assess what the defendant was doing, the CRA Exercise uses the trades the defendant placed as the starting point for Professor Tuckman to make his own, hypothetical allocations of those trades, claiming to be "blind" to the defendant's allocations and the performance of those trades. The defense intends to use this hypothetical exercise to argue that a trader doing something that, on the surface, looks similar to what the defendant did could have allocated trades in a manner that resulted in net positive FDRs going to Macro Opps and net negative FDRs going to the Core Strategies, even in the absence of cherry picking. *See id.*; Ex. C, p. 5.

This proposed hypothetical exercise "does not satisfy any of the four factors listed in *Daubert* to assist district courts in considering whether a proffered opinion has sufficient indicia of reliability." *In re Mirena IUD Prods. Liability Litig.*, 169 F. Supp. 3d 396, 448 (S.D.N.Y. 2016).

The CRA Exercise appears to have been designed solely for this case. It has not been "subjected to peer review" and is not a type of exercise that is "generally accepted in the field." *Daubert*, 509 U.S. at 593-94. There is also no indication from the defense's disclosures that CRA, Mr. Dolgoff, or Professor Tuckman took any steps to test the accuracy or repeatability of the CRA Exercise. For example, there is no evidence that the experts (a) had other traders perform the CRA Exercise to see how their results compared to Professor Tuckman's results; (b) ran the CRA Exercise with different assumptions about duration and convexity targets to assess how changing targets may change the results; (c) ran the CRA Exercise using a portfolio from the Core Strategy (as opposed to 984, which was from the Core Plus Strategy), to see if the exercise was sensitive to using only Core Plus; or (d) ran the CRA Exercise using different days, to test whether the outcome may change based on a different set of trades.

Although "a proffered opinion may fail all four *Daubert* reliability factors and still be admitted," the failure means that the court should take pause to "carefully scrutinize" the CRA Exercise and its methodology. *Capri Sun*, 595 F. Supp. 3d at 120. That need for scrutiny is acute here because the defense's disclosures leave many unanswered questions about how the CRA Exercise came together. As Professor Kolm explained in his rebuttal report, the CRA Exercise, by necessity, was put together after there was already a full record of the defendant's trading available and a mountain of information about market conditions between 2021 and 2023. This creates a significant risk that experts could run simulations to see how changes to different variables—such as the days, portfolios, or duration targets used—might affect the outcome of a trade-allocation exercise, before actually running that exercise, putting a thumb on the scale for a particular result. *See* Ex. G, pp. 15-21. The defense disclosures, however, do not reveal any information about other versions of the CRA Exercise that CRA may have run before the final

exercise disclosed in the notices. The defense disclosures also do not reveal if there was any testing to ensure that the result of the CRA Exercise was repeatable. In short, there is nothing in the disclosures to ensure the experts "employ[ed] . . . the same level of intellectual rigor" that would be expected in their field. *Kumho Tire Co. Ltd v. Carmichael*, 526 U.S. 137, 152 (1999).

**2. The CRA Exercise is Unreliable Because it Uses Arbitrary Limits and Targets.**

The value of the CRA Exercise to the defense is based, at least in part, on the appearance that Professor Tuckman was performing a portfolio-management task that was similar to the task the defendant performed each day. That appearance is an illusion. There were significant differences between the CRA Exercise and the defendant's trading that make it impossible to reliably compare between the exercise and reality.

A cardinal principle of the reliability analysis under Rule 702 is that courts "should exclude expert testimony" if that testimony is "in essence an apples and oranges comparison." *Zerega Ave.*, 571 F.3d at 214; *accord Boucher*, 73 F.3d at 21. For example, courts do not hesitate to exclude scientific analyses "when a critical step in a prospective expert's reasoning is based on a highly dubious analogy." *In re Mirena Ius Levonorgestrel-Related Prods. Liability Litig.*, 341 F. Supp. 3d 213, 241 (S.D.N.Y. 2018); *see Franklin v. Con. Edison Co. of N.Y.*, 37 F. App'x 12, 14 (2d Cir. 2002) (affirming exclusion of expert testimony based on unsupported link between analysis and facts of the case). Similarly, courts exclude economic analyses when the analyses are "based on unrealistic assumptions" that do not accurately reflect the relevant factual situation. *See, e.g.*, *Boucher*, 73 F.3d at 21-22 (rejecting testimony about lost earnings when based on unrealistic assumptions); *Compania Embotelladora Del Pacifico v. Pepsi Cola Co.*, 650 F. Supp. 2d 314, 319 (S.D.N.Y. 2009) (excluding damages analysis based on "assumptions that have no basis in fact or reality"); *In re LIBOR- Based Fin. Instruments Antitrust Litig.*, 2025 WL 2733020,

at *82-85 (S.D.N.Y. Sept. 25, 2025) (excluding economic analysis because expert failed to show that it was based on an appropriately comparable benchmark).

Here, the CRA Exercise cannot reliably be used to show that a trader in the defendant's shoes would have generated positive FDRs for Macro Opps and negative FDRs for the Core Strategies. The CRA Exercised differed from how the defendant traded in a host of ways, but three differences in particular stand out.

First, the defendant could choose whether to trade at all, whereas Professor Tuckman was forced to allocate every trade CRA gave him.[3] Each day, the defendant could observe the market and relevant risk metrics and decide whether there was a suitable trade to make for Macro Opps, the Core Strategies, or both sets of accounts (among other options). If he did not think there were any good trades to be made, he could simply not trade. Professor Tuckman was not given that key option. The design of the CRA Exercise not only prevented him from making decisions about what trades to make, but it also forced him to allocate each of the trades that CRA gave him. While the former constraint may have been unavoidable, the latter was not: CRA could have given Professor Tuckman an option to *not* allocate a trade if there was no suitable place for it to go, which would have mimicked not trading. Because he lacked that option, the CRA Exercise was missing a key decision point that the defendant had—namely, the power to not trade at all.

Second, Professor Tuckman faced another significant, artificial constraint because he was not allowed to allocate trades 50/50 between Macro Opps and the Core Strategies. As explained above, the defendant could decide to place trades for Macro Opps, the Core Strategies, both

[3] As noted above, CRA gave Professor Tuckman all of the trades the defendant specifically allocated to Macro Opps or the Core Strategies, but included a number of trade categories, including trades that the defendant allocated 50/50.

strategies (via 50/50 trades), or for specific portfolios. He actively used all of those options. In fact, the defendant allocated more trades 50/50 than he allocated specifically to Macro Opps (excluding Broker-1) or to the Core Strategies. Without any explanation, the CRA Exercise denied Professor Tuckman the same menu of options available to the defendant. Not only was Professor Tuckman required to allocate every trade, he was also forced to allocate the trade to either Macro Opps or the Core Strategies, without the choice of a 50/50 allocation or an allocation to a specific portfolio.[4] That was a significant, unrealistic constraint because it meant that, if a trade could benefit both Macro Opps and the Core Strategies, he was arbitrarily forced to choose one over the other. Similarly, if a trade was not suitable for either strategy, Professor Tuckman was forced to pick which would receive the ill-fitting trade, rather than permit the trade to be split up.

Third, Professor Tuckman decided to create duration and convexity targets for the two portfolios he was using—3313 for Macro Opps and 984 for the Core Strategies. This was unrealistic. The defendant was not required to manage his portfolios to specific duration or convexity targets, but instead had to keep those portfolios within proscribed limits. Professor Tuckman admits he had no evidence that the defendant even tried to manage the duration and convexity of his portfolios. And the record shows that the defendant did not attempt to do so, but instead allowed the duration of Macro Opps to fluctuate in multi-year bands. Professor Tuckman's duration and convexity targets are also incomplete in an important respect: the defendant's allocations to the Core Strategies went to *both* Core and Core Plus, but Professor Tuckman's duration and convexity targets look only at account 984, which is a Core Plus account. This means that Professor Tuckman was not even accounting for how his allocations to the Core Strategies

---

[4] Professor Tuckman was also not given the choice to allocate trades the defendant allocated 50/50, even though those trades also mattered for managing the duration and convexity.

may alter the duration and convexity of accounts in Core, which is a significant oversight because Core had more restrictive duration limitations than Core Plus.

These differences between the CRA Exercise and reality had a significant effect on the implementation of that exercise. Professor Tuckman's inability to refrain from allocating a trade forced him into allocating many trades that he did not think were suitable for either Macro Opps or the Core Strategies. In his disclosure, Professor Tuckman states that, when a trade could not narrow the duration or convexity gap in either portfolio, he "tried to allocate [the trade] so as to minimize how much the gaps widened" and labeled the trade "using the moniker of 'do least harm.'" Ex. D, p. 6. Because Professor Tuckman could not refrain from allocating, he allocated a large number of trades on this "do least harm" rationale. Specifically, Professor Tuckman allocated a total of 935 trades over the course of the CRA Exercise. He used the "do least harm" label for 405 of those allocations—which amounts to over 40%. See Ex. G, pp. 5-8. If Professor Tuckman had the option to refrain from allocating, he may not have allocated many of those trades.

Professor Tuckman's inability to allocate trades 50/50, in combination with his use of duration and convexity targets, was similarly problematic. The basic structure of his methodology was that he tried to reduce "gaps" between his duration and convexity targets and the actual duration and convexity of the portfolios. For example, if account 3313 (for Macro Opps) had a duration target of 5 years and an actual duration of 4.5 years, Professor Tuckman would look to place duration adding trades in Macro Opps to reduce that gap. Similarly, if 3313 had a convexity target of -5 and an actual convexity of -4.5, Professor Tuckman would look to place trades that would further reduce convexity in Macro Opps. This approach leaves the possibility that the duration or convexity of *both* 3313 (for Macro Opps) and 984 (for the Core Strategies) may be above or below their respective targets at the same time. In that situation, the same trade could

benefit both strategies. For instance, if both 3313 and 984 were below their duration targets, a duration adding trade could, under Professor Tuckman's thinking, benefit both. Splitting the trade 50/50 could have been a natural choice in such a situation, but Professor Tuckman was arbitrarily denied that option and forced to choose one portfolio over the other. *See* Ex. D, p. 6.

This situation arose time and time again in the CRA Exercise. According to Professor Kolm the duration of 3313 and 984 was either above or below the respective duration targets for *both* portfolios at the time he allocated 579 trades. That amounts to approximately 62% of the 935 trades he allocated. Similarly, the convexity of 3313 and 984 was either above or below the respective convexity targets for both portfolios at the time he allocated 646 trades. That amounts to approximately 69% of the 935 trades he allocated. If Professor Tuckman—like the defendant—had an option to split trades 50/50, he may have allocated some, or all, of these hundreds of trades 50/50, but the CRA Exercise unrealistically forced him to choose a strategy. *See* Ex. G, pp. 5-8.

These fundamental differences between the CRA Exercise and the defendant's trading are fatal to the proposed testimony of Professor Tuckman and Mr. Dolgoff. The conclusion that Professor Tuckman's allocations resulted in net positive FDRs to Macro Opps and net negative FDRs to the Core Strategies is meaningful only if his exercise resembled the defendant's trading process. But it did not: Professor Tuckman had fundamentally different options and objectives than the defendant. Those differences make it impossible to draw a reliable conclusion from the CRA Exercise about the defendant's trading.

**3. The CRA Exercise is Unreliable Because Professor Tuckman Did Not Consistently Follow His Purported Methodology.**

Finally, the CRA Exercise is unreliable because Professor Tuckman did not consistently apply his own methodology when allocating trades. Professor Tuckman's stated method for allocating trades was to identify whether there was a "gap" between the actual duration or

convexity of each portfolio and its duration or convexity target. He then allocated trades, when possible, to reduce the gap, prioritizing duration gaps over convexity gaps and larger gaps over smaller ones. When a trade did not close any gaps, he allocated trades to do the "least harm" to either portfolio. Professor Tuckman recorded the rationale for each allocation. *See* Ex. D, p. 6.

Professor Kolm compared Professor Tuckman's stated reasons for each allocation, with the actual duration and convexity gaps that Professor Tuckman was presented with for each trade. He found that Professor Tuckman often gave reasons that do not appear to be consistent with his methodology. For example, Professor Tuckman allocated 17 trades to Macro Opps on the basis that those trades had a duration benefit to Macro Opps, even though those trades added duration when 3313 was already above its duration target. Professor Tuckman allocated 17 trades to account 3313 in Macro Opps on the basis that those trades had a convexity benefit to Macro Opps, even though those trades added convexity when 3313 was already above its convexity target. And Professor Tuckman allocated 20 trades to Macro Opps on the basis that those trades had a convexity benefit to account 3313 in Macro Opps, even though those traded reduced convexity when 3313 was already below its convexity target. There were similar problems with Professor Tuckman's allocations to account 984 in the Core Strategies as well as his use of the "least harm" label, which are identified in Paragraph 12 of Professor Kolm's rebuttal notice. *See* Ex. G, p. 5-8.

These inconsistencies in Professor Tuckman's allocation rationales show that he has not "applied [his] principles and methods reliably to the facts of the case." Fed. R. Evid. 702. In all, the inconsistencies Professor Kolm identified affected over 200 of Professor Tuckman's 935 allocations. There does not appear to be any way, from the information the defense has provided, to understand Professor Tuckman's actual rationale for allocating these trades. If they were mistakes, the volume suggests a significantly flawed process that is not sufficiently rigorous to

deserve to go to the jury. If they were not mistakes, and there were other reasons for Professor Tuckman's allocations, he is required to revise his methodology or record his reasons, to make it possible to tell whether he has a sound basis for his decisions. But as the analysis currently stands, these unexplained inconsistencies are sufficiently pervasive to merit exclusion of the CRA Exercise, even setting aside the other reliability problems with the experiment.

### B. The Court Should Exclude The CRA Exercise Because it Does Not Fit The Facts of The Case and is Likely to Confuse or Mislead the Jury.

Testimony about the CRA Exercise should also be excluded under Rules 702 and 403 because it does not fit the facts of the case and is far more likely to confuse or mislead the jury than it is to support a relevant conclusion.

At best, the CRA Exercise shows that a different trader, acting under different limitations than the defendant, with different information from the defendant, and using different targets than the defendant, could allocate trades in a manner that results in positive net FDRs for Macro Opps and negative net FDRs for the Core Strategies. Professor Tuckman's results also bears little resemblance to the defendant's trading. The defendant's allocations only matched Professor Tuckman's allocations 56.8% of the time—a little better than a coin flip. Among the same set of trades, the defendant's allocations generated $180 million more first-day gains in Macro Opps, and $180 million more first-day losses in the Core Strategies, than Professor Tuckman's allocations. *See* Ex. G, pp. 15-21. Given the yawning gap between the defendant's process and results and Professor Tuckman's process and results, any relevance of the CRA Exercise is marginal. It cannot shed light on what the defendant was thinking or doing; it just refocuses attention on a different trader and a different set of allocations.

That does not, however, mean that the CRA Exercise is innocuous. To the contrary, it presents a significant risk of confusing and misleading the jury. The CRA Exercise risks confusing

the jury because it draws the focus of trial away from how the defendant traded, the options that were available to him, the ways he managed his portfolios, and the results of his trade allocations. Instead, it introduces into the trial a parallel narrative about a different trader doing something that, on the surface, looks similar to the defendant's process, but in reality is differs in many, critical ways. This presents a real risk of confusing the jury by blurring together facts relevant to the defendant and facts relevant to Professor Tuckman.

The CRA Exercise also risks misleading the jury because it creates the potential for the jury to mistakenly believe that Professor Tuckman's methodology was informed by what the defendant was doing and thinking. It is clear from the notices that Professor Tuckman does not know how the defendant managed his portfolios or why he made particular trades. But having Professor Tuckman explain how he, Professor Tuckman, thought about allocating the defendant's trades creates a risk of giving the misimpression that the defendant—as another sophisticated trader—was thinking along the same lines as Professor Tuckman.

Some of the proposed testimony that Professor Tuckman plans to offer highlights the problem. For example, Professor Tuckman plans to testify that he "found it relatively straightforward to allocate almost all of the trades" and that "closing the duration gap of Macro [Opps] turned out to the be the most important consideration of the Exercise." *See* Ex. D, pp. 5-6. These statements are irrelevant: It does not matter whether Professor Tuckman found it easy to apply his own methodology, or that his methodology resulted in closing duration gaps in Macro Opps particularly important. Professor Tuckman is not on trial, and the defendant was not following the same methodology as he was. Instead, statements like this show how the CRA Exercise is likely to lead the jury astray. The natural inference for a jury to draw from Professor Tuckman saying it was easy to allocate the trades is that it was easy because the defendant must

have been doing something similar. By the same token, Professor Tuckman saying closing the duration gap in Macro Opps was the most important thing in his analysis is likely to make a jury think that managing the duration of Macro Opps was the most important thing for the defendant. The CRA Exercise does not support either of those conclusions, but the superficial similarities between the exercise and the defendant's trading misleadingly suggest that Professor Tuckman and the defendant were doing the same thing.

The CRA Exercise is unreliable, has little relevance to the case, and is highly likely to confuse or mislead the jury. It should be excluded from the case.

## II. The Court Should Exclude The Defense's Regression Analyses.

This Court should also exclude the regression analyses run by Messrs. Dolgoff and Maloney (respectively, the "Dolgoff Regression" and the "Maloney Regressions") under Rules 702 and 403 because the regressions are unreliable and misleading.

### A. The Dolgoff Regression is Unreliable and Misleading.

The Dolgoff Regression is unreliable and misleading because uses a variable—Convexity Effect Offset—that Mr. Dolgoff appears to have reverse engineered to serve as an alternative to Pre-Allocation Returns, without any regard for how that variable fits the facts of the case.

Expert testimony, to be admissible, must reflect the "level of intellectual rigor" that one would expect from an expert outside the courtroom. *Kumho Tire*, 526 U.S. at 152. "Opinions that a assume a conclusion and reverse-engineer a theory to fit that conclusion" do not fit that bill and are "inadmissible." *In re Mirena*, 341 F. Supp. 3d at 242 (collecting cases); *accord In re LIBOR*, 2025 WL 2733020, at *29. Accordingly, courts take a careful look to ensure that an expert has arrived at a conclusion only after considering how that opinion fits with the relevant "facts and data" and did not artificially limit his or her focus with the "aim[] [of] achieving one result." *Faulkner v. Arista Records LLC*, 46 F. Supp. 3d 365, 382 (S.D.N.Y. 2014).

The Dolgoff Regression runs afoul of this rule because of the way Mr. Dolgoff designed the Convexity Effect Offset variable. Understanding the problem requires some background. As explained above, one risk metric relevant to both Macro Opps and the Core Strategies was duration, which measures the sensitivity of the portfolio's value to changes in interest rates. As interest rates fluctuated throughout the day, the value of accounts in Macro Opps and the Core Strategies fluctuated, in part based on the duration of those portfolios.

Another relevant risk metric for the portfolios was convexity. Convexity measures the sensitivity of the portfolio's duration—rather than its value—to interest rate changes. So as interest rates moved over the course of the day, the duration of accounts in Macro Opps and the Core Strategies was also moving. When a portfolio is *negatively* convex, the duration falls when interest rates fall (or, stated differently, as prices rise, because prices move inversely with rates). Similarly, duration rises when interest rates rise (or, stated differently, as prices fall). The opposite phenomenon occurs when a portfolio is positively convex. For most of the period between 2021 and 2023, both Macro Opps and the Core Strategies were negatively convex. Macro Opps was usually significantly more negatively convex—meaning its duration was more sensitive to interest rate changes—but Macro Opps also had greater flexibility for its duration to move because it had less strict duration benchmarks than the Core Strategies.

The defendant traded actively throughout the day, often trading Treasury futures and options. He could add duration in his portfolios by taking "long" positions, such as buying futures or buying call options. He could lower duration in his portfolios by taking "short" positions, such as selling futures or selling call options. He could increase convexity by buying options or lower convexity by selling them. Or he could make trades that were duration or convexity neutral, meaning that the trades were not designed to alter duration or convexity at all. But crucially, the

defendant could only place trades based on information that was already available in the market—that is, things that had already happened. For example, if the duration of Macro Opps fell because it was negatively convex and interest rates fell, and if the defendant wanted to offset that duration movement, he could *react* by taking "long" positions to add duration. But because the defendant could not see the future, he could not place trades based on market movements *after* the trade.

Of course, the defendant routinely waited for many hours after each trade before allocating it, which allowed him to see additional, post-trade market movements. That is what enabled him to cherry pick. Nonetheless, the defendant claimed, in a deposition, that he knew where he intended a trade to go at the time he placed the trade. To test the veracity of that idea, Professor Cohen performed a wide array of statistical analyses, including regression analyses (the "Cohen Regressions"). The Cohen Regressions essentially analyzed the extent to which a set of variables could explain whether the defendant would allocate a trade to Macro Opps or the Core Strategies. Because the defendant claimed he made decisions at the time of trade, the set of variables includes pre-trade interest rate changes. Pre-trade interest rate changes act as a useful proxy for convexity-driven duration change because, as explained above, both Macro Opps and the Core Strategies were typically negatively convex, so if the defendant was consistently trading in the opposite direction of pre-trade interest rate movements (e.g., adding duration when interest rates were falling) it might suggest that he was trading to offset convexity-driven duration changes. Because Professor Cohen saw a large bias in Pre-Allocation Returns between Macro Opps and the Core Strategies, he also included Pre-Allocation Returns as a variable.

The Cohen Regressions showed that Pre-Allocation Returns were a strong predictor of whether the defendant would allocate a trade to Macro Opps or to the Core Strategies. A trade having a positive Pre-Allocation Return was a strong predictor of it going to Macro Opps, and a

trade having a negative Pre-Allocation Return was a strong predictor of it going to the Core Strategies. That predictive power grew when also accounting for the size of the Pre-Allocation Return. By contrast, other variables—including pre-trade interest rate changes—were much weaker predictors of where the defendant would allocate trades. This was consistent with the defendant using Pre-Allocation Returns to make allocation decisions, as opposed to information that was available to him at the time of trade.

Mr. Dolgoff took the Cohen Regressions and tried to find another variable that he could use to replace the Pre-Allocation Return variables. He arrived at the Convexity Effect Offset variable. This variable focuses only on Macro Opps. It attempts to measure the extent to which convexity caused the duration of Macro Opps to change not *before* the trade, but between the time of trade execution and allocation. The variable then shows the extent to which the defendant's trades had the effect of moving duration in the opposite direction of that movement. That is, the Convexity Effect Offset variable assesses whether the defendant allocated trades to Macro Opps that added duration when portfolio duration fell between trade and allocation, or reduced duration when portfolio duration rose between trade and allocation. According to Mr. Dolgoff, when he replaced the Pre-Allocation Return variables in the Cohen Regressions with the Convexity Effect Offset variable, the resulting regression showed that Convexity Effect Offset was the best predictor of how the defendant would allocate trades, as compared to the remaining variables (aside from the Pre-Allocation Return variables). *See* Ex. E, pp. 4-5.

That result should not be surprising: Mr. Dolgoff reverse-engineered the Convexity Effect Offset variable to mimic Pre-Allocation Returns. The defendant largely allocated trades with positive Pre-Allocation Returns to Macro Opps. A positive Pre-Allocation Return occurred whenever (1) the defendant made a duration-adding ("long") trade and interest rates fell between

the time of trade and allocation (causing prices to rise) or (2) the defendant made a duration-reducing ("short") trade and interest rates r0se between the time of trade and allocation (causing prices to fall). As Professor Kolm explains in a rebuttal report, Mr. Dolgoff was able to use the Convexity Effect Offset variable to replicate that phenomenon in Macro Opps because Macro Opps tended to be negatively convex. Whenever Macro Opps is negatively convex, Mr. Dolgoff's Convexity Effect Offset variable predicts that the defendant would allocate trades to Macro Opps if (1) the defendant made a duration-adding ("long") trade and interest rates fell between the time of trade and allocation, because the duration-adding trade would offset the decline in duration from the rate move, or (2) the defendant made a duration-reducing ("short") trade and interest rates rose between the time of trade and allocation, for the same reason. In other words, the Convexity Effect Offset variable mirrors Pre-Allocation Returns whenever Macro Opps is negatively convex: Trades that have a positive Pre-Allocation Returns also offset convexity-driven duration changes between trade and allocation. *See* Ex. H, pp. 1-3.

The fact Mr. Dolgoff found a variable to mirror Pre-Allocation Returns would not, by itself, warrant excluding the Dolgoff Regression. What makes his testimony inadmissible is that the Convexity Effect Offset variable makes no sense with other facts that are important to the regression, yet Mr. Dolgoff ignored those obvious problems.

First, the Dolgoff Regression is at odds with the defendant's testimony. The defendant claimed that he knew where he intended to allocate trades at the time he placed them, and that the delay between trade and allocation was largely a result of being busy and having trouble getting in touch with his trading assistant. The Convexity Effect Offset variable, however, does not look at the period leading up to the defendant's trade; it only looked at the period between the trade and allocation. It is unclear, then, how the variable fits with any plausible theory of the case.

Second, the Dolgoff Regression ignores pre-trade convexity-driven duration changes. The premise of the Convexity Effect Offset variable seems to be as follows: The defendant directed trades to Macro Opps in an effort to offset duration changes driven by the negative convexity of that strategy. But the variable itself looks *only* at duration changes between the time of trade and allocation, and not at any duration changes that occurred *before* the trade. It is hard to comprehend why the defendant would trade to manage duration changes in Macro Opps, but care only about the duration change between the time of trade and allocation. Indeed, Mr. Dolgoff even designed the CRA Exercise to make sure Professor Tuckman would only look at pre-trade duration and interest rate movements. So why would Mr. Dolgoff gerrymander the Convexity Effect Offset variable to exclude pre-trade duration changes? The answer is because, as the Cohen Regressions showed, the defendant was not consistently trading to manage pre-trade duration changes, so Convexity Effect Offset variable would be significantly less powerful if it looked at whether the defendant was trading to offset convexity-driven duration changes, instead of arbitrarily focusing only on the time between trade and allocation. *See* Ex. H, pp. 1-3.

Third, the proposed testimony about the Dolgoff Regression ignores what happens on the days when the Convexity Effect Offset variable did not mirror Pre-Allocation Returns. As explained above, the Convexity Effect Offset variable mirrored Pre-Allocation Returns whenever Macro Opps was negatively convex—that is, trades that had *positive* Pre-Allocation Returns also offset convexity-driven duration changes. That was most of the time; but not all of the time. As Professor Kolm explains in his rebuttal report, there were 14 days when Macro Opps was positively convex. On those days, the Convexity Effect Offset and Pre-Allocation Return no longer tracked one another. Instead, trades that offset convexity-driven duration changes would have *negative* Pre-Allocation Returns. Professor Kolm explains that, on those days, the defendant (as usual)

largely allocated trades with positive Pre-Allocation Returns to Macro Opps, and negative Pre-Allocation Returns to the Core Strategies, even though the Dolgoff Regression results for the Convexity Effect Offset variable would predict he should have done the opposite. Mr. Dolgoff ignores this inconvenient fact, just like he ignores pre-trade duration changes. *See* Ex. H, pp. 1-3.

Fourth, and most glaringly, the Convexity Effect Offset variable does not attempt to address the defendant's allocations to the Core Strategies. The Convexity Effect Offset variable looks at convexity-driven duration changes in Macro Opps only, and it assesses whether offsetting those changes predicts trades being allocated to Macro Opps. But this case is not just about Macro Opps. The Core Strategies were often negatively convex, too, and there needed to be a good reason for the defendant to allocate a trade to them. But Mr. Dolgoff, in the Convexity Effect Offset variable, does not even attempt to consider convexity-driven duration changes in Core Strategies or identify any other variable that could explain the defendant's allocations to the Core Strategies. Instead, he assumes that the Core Strategies appropriately received whatever castoff trades did not help manage duration changes in Macro Opps between trade and allocation. Mr. Dolgoff offers no reason why such a massive proportion of those castoff trades going to the Core Strategies had negative Pre-Allocation Returns—he just ignores the issue. *See* Ex. H, pp. 1-3.

These holes in the logic of the Convexity Effect Offset variable expose Mr. Dolgoff's real project. There is no lawful explanation for the power of Pre-Allocation Returns to explain the defendant's allocation decisions, so Mr. Dolgoff reverse-engineered a variable that could mimic Pre-Allocation Returns in a regression. The problem, however, is that the variable works in a statistical formula, but does not have any reliable basis in the facts of what the regression is supposed to be helping analyze or fit with other important factors, like pre-trade duration changes, and the duration changes of Core Strategies. This type of conclusion-driven expert work should

not go to the jury. It does not satisfy the reliability requirements of Rule 702 and presents a clear risk of confusing or misleading the jury by giving the false impression of scientific rigor.

**B. The Maloney Regressions are Unreliable and Misleading.**

The Maloney Regressions are also inadmissible under Rules 702 and 403. Professor Maloney's analyses are unreliable and misleading because they ignore nearly all of the major variables in the case—including intra-day rate changes and specific trades—and fail to account for the defendant's allocations to the Core Strategies.

While regression analyses are a common basis for expert testimony, such analyses are still subject to the same test of reliability that Rule 702 demands of all expert testimony. For regressions, a key piece of the reliability inquiry is the extent to which a regression analysis appropriately considers all significant variables. "Ordinarily, the failure to include a variable in a regression analysis will affect the probative value of the analysis and not its admissibility." *Bazemore v. Friday*, 478 U.S. 385, 400 (1986). But when a regression analysis omits "significant variables that are quantifiable . . . the study may become so incomplete that it is inadmissible as irrelevant." *Freeland v. AT&T Corp.*, 238 F.R.D. 130, 146 (S.D.N.Y. 2006); *see Bickerstaff v. Vassar College*, 196 F.3d 435, 449 (2d Cir. 1999) (affirming giving no weight to regression analysis that "omitted the major variables"). The party challenging the validity of a regression analysis typically must "make a showing of relevance for each particular variable it contends [the regression] ought to include." *Sobel v. Yeshiva Univ.*, 839 F.2d 18, 34 (2d Cir. 1988). Ultimately, however, the "burden of proving helpfulness and relevance rests on the proponent of a regression analysis, [so] it is the proponent who must establish that the major factors have been accounted for in a regression analysis." *Freeland*, 238 F.R.D. at 145.

Here, the Maloney Regressions are unreliable because they omit many of the most important variables in the case. The Maloney Regressions are different from the Cohen

Regressions and the Dolgoff Regression (which is a modification of the Cohen Regressions). Those regressions look at different variables, from different points throughout each day, and assess the extent to which those variables could predict how the defendant would allocate each trade.

The Maloney Regressions, by contrast, look at only two things: Whether the duration of Macro Opps (as represented by 3313) would rise or fall each day in the absence of Mr. Leech's Treasury F&O trading.[5] And whether the trades the defendant allocated to Macro Opps that day—as a group—moved the duration of the portfolio in the opposite direction of that duration change. For example, imagine that, going into Tuesday, June 7, 2022, Macro Opps was negatively convex and, by the end of the day on June 7 interest rates were lower than at the beginning of the day. The Maloney Regressions would identify that day as having a convexity-driven decrease in the duration of Macro Opps (because, in a negatively convex portfolio, duration falls as rates fall), and would ask whether—as a group—the trades the defendant allocated to Macro Opps added duration. Professor Maloney plans to testify that his regressions show that "the daily duration impact of the trades [the defendant] allocated only to Macro Opps" tended to "have the opposite sign" to convexity-driven duration changes. In other words, when duration in Macro Opps fell due to negative convexity, the defendant's trades tended to add duration, and when the duration rose due to negative convexity, the defendant's trades tended to reduce duration. *See* Ex. F, pp. 4-5.

Professor Maloney's regressions omit a number of major variables, and each omissions render his analyses unreliable. First, the Maloney Regressions omit any consideration of how duration changed over the course of each day. Due to negative convexity, the duration of a

[5] Professor Maloney used two different ways to estimate this duration movement. In one, he used daily portfolio convexity data and interest-rate changes. In the other, he used daily duration data for 3313 and subtracted the duration changes that were attributable to Treasury future and option trades the defendant had added that day.

portfolio fluctuates as interest rates change throughout the day. The Maloney Regressions, however, gloss over intra-day duration changes by considering only whether, at the end of each day, the duration of Macro Opps would have gone up or down compared to the beginning of the day if not for Mr. Leech's Treasury F&O trading. *See* Ex. H, ¶¶ 4-5. That omission makes it impossible to discern whether the defendant was, in fact, trading to offset duration changes in Macro Opps. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 487 (S.D.N.Y. 2018) (excluding regression analysis that failed to account for intra-day price changes).

Suppose, for example, that in the first half of a day, the duration of Macro Opps fell, and the defendant placed a number of trades in Macro that further reduced its duration. Then suppose that later in the day, the duration of Macro Opps rose, such that duration was higher than when the day began. Under the Maloney Regressions, that day would be classified as the defendant trading to offset duration in Macro Opps because the portfolio duration rose by the end of the day, and his trades reduced duration. But that is clearly not what happened: The defendant was reducing duration as duration was falling, and duration rose only after his trading was over. In other words, by ignoring intra-day duration movements—which are not solely the results of the defendant's trading, but also occur because of market movements—the Maloney Regressions obscure how the defendant's trading actually lines up with duration changes in Macro Opps.

Second, the Maloney Regressions ignore individual trades and only look at trades in the aggregate. Unlike the Cohen Regressions, the Maloney Regressions do not attempt to assess the extent to which different variables predict how the defendant would allocate particular trades. Instead, the Maloney Regressions look at whether all of the trades the defendant allocated specifically to Macro Opps—in the aggregate—had the effect of counteracting (some of) the convexity-driven duration change that day. *See* Ex. H, ¶¶ 4-5.

This, again, obscures the actual relationship between the defendant's trading and convexity-driven duration changes. For example, suppose the defendant made duration reducing trades as duration in Macro Opps was falling, then made duration adding trades as duration in Macro Opps was rising in another part of the day. In that scenario, the defendant clearly is not trading to offset duration changes. But if, by the end of the day, the overall effect of convexity-driven duration changes had been to reduce duration in Macro Opps, and his trades grouped together added a small amount of duration to Macro Opps, the Maloney Regressions would identify that as a day when the defendant was trading to offset duration in the portfolio.

Third, the Maloney Regressions do not account for any variables other than the estimated daily duration change in Macro Opps and the net duration impact of trades the defendant allocated to Macro Opps. Professor Maloney, for example, did not run his regression to analyze the power of other variables on how the defendant allocated trades, including trade size, trade convexity, pre-trade interest rate movements, trade type, FDRs, or Pre-Allocation Returns. *See* Ex. H, ¶¶ 4-5. This makes it impossible to assess the significance of the variables that the Maloney Regressions do examine. For example, if offsetting convexity-driven duration changes in Macro Opps was a weak predictor of how the defendant allocated a trade, and Pre-Allocation Returns were a much stronger predictor, that would be an important fact for an expert—and for the jury—to understand. Indeed, Professor Maloney's work papers show that, while there was some relationship between the daily convexity-driven duration movement of Macro Opps and whether the defendant was adding or reducing duration in the portfolio, they do not show whether this relationship would persist with the presence of other variables in the Regressions. By refusing to look at other variables, Professor Maloney's results are unreliable because they are devoid of important context.

Fourth, the Maloney Regressions, like the Dolgoff Regression, ignore the Core Strategies. The defendant's cherry picking was not limited to directing gains to Macro Opps; he also directing losses to the Core Strategies. And the Core Strategies, like Macro Opps, was often negatively convex—albeit to a lesser degree. Nonetheless, Professor Maloney refused to consider the duration changes of Core Strategies in his regressions, or to consider any variable that could account for the consistent losses the defendant was sending that direction. *See* Ex. H, ¶¶ 4-5.

These clear, significant omissions from the Maloney Regressions are important not only because they make the analysis unreliable; they also mask a similar dynamic that was present in Mr. Dolgoff's faulty analysis. As explained above, due to the negative convexity of Macro Opps, allocating trades with Positive Pre-Allocation Returns to Macro Opps will also generally have the effect of (partially) offsetting duration changes that occur in the window between trade and allocation. Mr. Dolgoff mimicked that precisely with his Convexity Effect Offset variable. As Professor Kolm explained in his rebuttal report, Professor Maloney capitalized on the same phenomenon in the Maloney Regressions: An incidental byproduct of allocating Pre-Allocation Returns to Macro Opps was offsetting some of the convexity-driven duration change between trade and allocation. This highlights the danger of the many omissions in the Maloney Regressions. By refusing to look at intra-day prices changes, or specific trades, or other variables, or duration changes in the Core Strategies, Professor Maloney is avoiding looking at all the factors that would reveal the defendant was not actually trading in response to duration changes in his portfolios.

The Maloney Regressions do not pass muster under Rules 702 or 403. Professor Maloney ignored key variables and did so in a way that renders the analyses unreliable and misleading. This Court should exclude them from trial.

## CONCLUSION

For the foregoing reasons, the Court should exclude the CRA Exercise and the defense's proposed regression analyses.

Dated: New York, New York
December 15, 2025

Respectfully submitted,

SEAN BUCKLEY
Attorney for the United States

By: _/s_____________________
Thomas S. Burnett
Peter J. Davis
Assistant United States Attorneys

Lindsey Keenan
Special Assistant United States Attorney
*Of Counsel*