EXHIBIT C

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

565 FIFTH AVENUE
NEW YORK, NEW YORK 10017
(212) 856-9600
FAX: (212) 856-9494

www.maglaw.com

WRITER'S CONTACT INFORMATION

jsack@maglaw.com
(212) 880-9410

ELKAN ABRAMOWITZ
RICHARD F. ALBERT
ROBERT J. ANELLO*
KATHLEEN E. CASSIDY
BENJAMIN S. FISCHER
CATHERINE M. FOTI
CHRISTOPHER B. HARWOOD
LAWRENCE IASON
BRIAN A. JACOBS
TELEMACHUS P. KASULIS
KAREN R. KING
THOMAS A. McKAY
ROBERT M. RADICK*
JONATHAN S. SACK**
EDWARD M. SPIRO
JEREMY H. TEMKIN
RICHARD D. WEINBERG
LISA ZORNBERG

COUNSEL
JOSHUA BUSSEN
PIPPA HYDE***
KEFIRA WILDERMAN

RETIRED/PARTNER EMERITUS
PAUL R. GRAND

ROBERT G. MORVILLO
1938-2011
MICHAEL C. SILBERBERG
1940-2002
JOHN J. TIGUE, JR.
1939-2009

*ALSO ADMITTED IN WASHINGTON, D.C.
**ALSO ADMITTED IN CONNECTICUT
***ALSO ADMITTED IN ENGLAND AND WALES

October 23, 2025

**BY EMAIL**
Thomas Burnett, Esq.
Peter J. Davis, Esq.
Assistant United States Attorneys
Southern District of New York
United States Department of Justice
26 Federal Plaza
New York, NY 10278

**Re: *United States v. Leech*, No. 24 Cr. 658 (GHW) (S.D.N.Y.)**

Dear Messrs. Burnett and Davis:

Pursuant to Federal Rule of Criminal Procedure 16(b)(1)(C), the defense provides notice that Mr. Leech anticipates calling Aaron Dolgoff, Vice President at Charles River Associates ("CRA"), at trial as an expert witness. In addition to the subjects of testimony described below, Mr. Dolgoff may give testimony responding to and rebutting testimony given by the government's expert witnesses. Set forth below are Mr. Dolgoff's qualifications and a summary of his anticipated testimony.

## I. QUALIFICATIONS

Mr. Dolgoff is a Vice President in the Financial Markets practice at CRA. He holds the Chartered Financial Analyst® designation. Mr. Dolgoff has been consulting and testifying as an expert witness for over 22 years. In doing so, he applies economic and statistical methods in matters related to securities valuation, corporate finance, and financial markets. He has consulted on matters related to futures markets, fixed income securities, and derivative securities. As a consultant, Mr. Dolgoff has supported financial institutions with internal investigations and litigation related to allegations of trading misconduct.

Attached as Exhibit A is a copy of Mr. Dolgoff's CV, which includes his publications authored in the past 10 years and a list of all cases in which he has testified as an expert at trial or by deposition in the past 4 years.

## II. SUMMARY OF ANTICIPATED EXPERT TESTIMONY

Mr. Dolgoff will provide testimony about the design and results of the blind allocation exercise conducted by Professor Bruce Tuckman (the "Exercise").[1]

Expected general testimony regarding the Exercise:

- Mr. Dolgoff will testify that he and his colleagues at CRA worked with Professor Tuckman to formulate and implement the infrastructure of Professor Tuckman's Exercise.

- Mr. Dolgoff will testify that the Exercise was based on 50 trading days ("Exercise Days") selected by CRA from the period January 1, 2021 to October 20, 2023 (the "Relevant Period"). Mr. Dolgoff will testify that the Exercise Days were randomly selected from three subgroups of days from each year of the Relevant Period (2021, 2022, and 2023 through October 20) based on unrealized first day performance ($) ("UFP"): (i) top 15 UFP "gain" days for Macro Opportunities accounts, (ii) top 15 UFP "loss" days for Core Strategies accounts, and (iii) top 15 days of differential in UFP between Macro Opportunities accounts and Core Strategies accounts.[2] This resulted in a pool of 76 potential days after accounting for overlaps between the subgroups. The 50 Exercise Days were randomly selected from this set of 76.

- Mr. Dolgoff will testify that the UFP ($) and win/loss rate (%)[3] for the trades provided to Professor Tuckman to allocate between representative accounts for Macro Opportunities (account 3313 ("3313")) and the Core Strategies (account 984 ("984")) are not statistically different than the win/loss rate (%) and UFP ($) for the total population of Mr. Leech's Treasury futures and options trades (p-values of 0.38 and 0.69, respectively).

---

[1] As explained further below, the allocation exercise is blind in that Professor Tuckman was not aware of either the first day performance associated with any of the trades he allocated or how Mr. Leech had allocated those trades.

[2] The pool of days in the Exercise was based on trades where 95% or more of the trade quantity was allocated to Macro Opportunities or Core Strategies accounts (excluding Marex-brokered and "Futures Roll Ticket" trades). Mr. Dolgoff refers to these trades as "At Issue" trades. The 95% figure excludes allocations to portfolios that are neither Macro Opportunities nor Core Strategies.

[3] A win is defined as a trade with UFP greater than $0. The win rate is defined as the percentage of trades that are wins.

These p-values are based on a two sample difference in proportions Z-test for the win/loss rate (%) and a two sample difference in means t-test for UFP ($).

- Mr. Dolgoff will testify that, in the Exercise, Professor Tuckman was asked to allocate the At Issue trades.[4]

- Mr. Dolgoff will testify that Professor Tuckman assigned trades to 3313 or 984 in one-hour windows based upon the first execution start time within the Trade Group ID (as used in the Western Trade Blotter). The one-hour windows were presented to Professor Tuckman sequentially for any given day (skipping time windows without any trades to be allocated). Professor Tuckman was only able to proceed to a new one-hour window after completing the allocations within the presented window. Professor Tuckman was not provided with the actual date of any days for which he allocated trades nor the actual transaction price of any of the trades.

- Mr. Dolgoff will testify that for each day, his colleagues at CRA prepared a dashboard for Professor Tuckman which reflected the following information:

  - Portfolio Duration and Convexity Information
    - Duration and Convexity of 3313 and 984 at the start of the trading day (end of prior trading day) and over various historical periods, including 30-day exponentially weighted moving averages.
    - Key Rate Durations of 3313 and 984 at the start of the trading day and over various historical periods.
    - Duration and Convexity contributions to 3313 and 984 of Treasury Futures and Options (by security type) at the start of the trading day.
    - Duration comparison of 3313 and 984 over the prior 180 trading days.
    - Comparison of 5-year Treasury rates and the duration of 3313 and 984 over the prior 10 trading days.

  - Market Information
    - Merrill Lynch Option Volatility Estimate ("MOVE") index over prior 90 days.
    - Treasury yield curve rates at the start of the day and over various historical periods.

[4] Because the Exercise was based only on accounts 3313 and 984, the Exercise also excluded trades that met the criteria set forth in footnote 2, but that had no allocation to 3313 or 984.

- Intra-day Window Information
    - Estimated Treasury yield change (from change in Treasury future prices) from the start of the trading day to the end of the window for various maturities.
    - Estimated end of window duration for 3313 and 984 based on start of day convexity and changes in Treasury yields (assuming no trades).
    - Estimated end of day duration and convexity contributions to 3313 and 984 of Mr. Leech's Treasury Futures and Options trades that Professor Tuckman was not allocating from the start of the trading day through the current window.
    - Trades to allocate in the window.
    - Estimated change in duration and convexity for both 3313 and 984 from potential allocation selection in window and cumulative impact on duration and convexity from selections in prior windows on that trading day.

- Allocation Reasons
    - For each window, Professor Tuckman could choose one or more pre-specified allocation reasons or input his own "custom reason."

- Mr. Dolgoff will testify that Professor Tuckman had no information regarding the UFP of the trades in the Exercise or Mr. Leech's allocation of those trades.

- Mr. Dolgoff will testify that Professor Tuckman does not know the results of the Exercise. Mr. Dolgoff will testify that Mr. Dolgoff analyzed the results of the Exercise.

Expected testimony regarding data relied upon for the Exercise:

- Mr. Dolgoff will testify that the following materials were relied upon to create the data for the Exercise:

    - Western Trade Blotter
    - Broker execution data
    - End of day portfolio metrics
    - Daily Treasury Par Yield Curve Rates from 1990-2024
    - MOVE Index values from 2020-2023
    - Daily portfolio holdings data
    - Daily portfolio asset values
    - Futures Tick Data from 2019-2024

Expected testimony regarding the UFP of Professor Tuckman's trade allocations as compared to Mr. Leech's trade allocations:

- Mr. Dolgoff will testify that Professor Tuckman's trade allocations to 3313 and 984 match Mr. Leech's allocations between the two strategies with a 56.8% match rate (comparing Mr. Leech's and Professor Tuckman's allocations for individual Trade Group IDs). Mr. Dolgoff will testify that this match rate is statistically significant at greater than a 99% confidence level (p-value < 0.0001), based on a one-sample proportion test. The test is run against the null hypothesis of 50% probability that any given trade within the trades allocated by Professor Tuckman would be allocated either to 3313 or 984.

Expected testimony regarding the statistical significance of the UFP of Professor Tuckman's trade allocations:

- Mr. Dolgoff will testify that:
  - The win/loss rate for Professor Tuckman's allocations to 3313 is statistically significantly larger than win/loss rate for the overall set of trades that were allocated by Professor Tuckman (p-value < 0.0001).
  - The win/loss rate for Professor Tuckman's allocations to 984 is statistically significantly smaller than the win/loss rate for the overall set of trades that were allocated by Professor Tuckman (p-value < 0.0001).
  - The above statistical significance findings are based on a two-sample test for differences in proportions, using a test statistic following a Z-score (i.e., standard normal) distribution.
- Mr. Dolgoff will testify that:
  - The difference between the UFP ($) per trade for Professor Tuckman's allocations to 3313 is statistically significantly greater than the UFP ($) per trade for the overall set of trades allocated by Professor Tuckman (p-value of 0.0004).
  - The UFP ($) per trade for Professor Tuckman's allocations to 984 is statistically significantly less than the UFP ($) per trade for the overall set of trades that were allocated by Professor Tuckman (p-value of 0.0004).
  - The above statistical significance findings are based on a two-sample test for a difference in means, using a test statistic following a t-distribution.

## III. SUMMARY OF ANTICIPATED SUMMARY WITNESS TESTIMONY

In addition to the above expert opinions, Mr. Dolgoff may testify about data related to the At Issue trades. Specifically, as described below, Mr. Dolgoff may summarize (i) the hypothetical impact of re-assigning the At Issue trades from Core Strategies accounts to Macro Opportunities accounts, and vice versa, and (ii) the holding period of At Issue Treasury futures and options trades allocated to Core Strategies accounts and Macro Opportunities accounts. We view this as summary and not expert testimony; nevertheless, in an excess of caution we are disclosing such testimony now.

Expected testimony regarding the hypothetical impact of re-assigning Mr. Leech's Core Strategies trades to Macro Opportunities—and vice versa:

- Mr. Dolgoff may testify regarding the impact on portfolio duration of hypothetical re-assignment of At Issue trades, including reassigning Mr. Leech's allocations from Core Strategies accounts to Macro Opportunities accounts, and from Macro Opportunities accounts to Core Strategies accounts. This exercise focuses on portfolios 671, 984 and 3313. For each day during the Relevant Period, Mr. Dolgoff may show each portfolio's actual duration and the estimated hypothetical duration assuming the reassignment of At Issue trades.

- This analysis was based on the following data:

    - Western Trade Blotter
    - End of day portfolio metrics
    - Daily portfolio holdings data

Expected testimony regarding the holding period of Mr. Leech's trades:

- Mr. Dolgoff may testify to schedules showing the average holding periods (number of days) of Mr. Leech's futures and options trades in portfolios 3313 and 984. These holding periods are based on the purchase and sale transactions within each portfolio, applying first-in-first-out and last-in-first-out accounting methods. The average holding periods are calculated for various categories of At Issue trades.

- This analysis was based on the following data:

    - Western Trade Blotter
    - Broker execution data

## IV. RESERVATION OF RIGHTS TO SUPPLEMENT DISCLOSURES

Mr. Dolgoff reserves his right to supplement and/or amend these disclosures, including in response to the government's disclosures and the evidence presented in its case-in-chief.

* * *

Please let us know if you have any questions. We are available to meet and confer to further discuss these disclosures.

Very truly yours,

Jonathan S. Sack
Jeremy H. Temkin

Reviewed and Approved By:

Aaron Dolgoff

# Exhibit A

CRA Charles River Associates

# AARON DOLGOFF

Vice President

M.A., The Johns Hopkins University, School of Advanced International Studies

B.S.E., University of Pennsylvania, Wharton School of Business

B.A., University of Pennsylvania, College of Arts & Sciences

Mr. Dolgoff is a Vice President in CRA's Finance practice based out of the Charlotte metro area and CRA's Boston office. Mr. Dolgoff provides consulting and expert witness support in litigation matters requiring specialized securities valuation and corporate finance expertise. His experience includes matters related to securities litigation, M&A and other transaction disputes, valuation / appraisal disputes, commercial damages, trading and market manipulation matters, and compensation disputes. In his prior work at Monitor Group, Mr. Dolgoff specialized in corporate finance and its application to corporate and business unit strategy, investment decision-making, and compensation design. Aaron's experience spans a wide range of industries and sectors such as pharmaceuticals, metals mining and other natural resource industries, banking, asset management, private equity, technology, venture capital / startups, real estate investment, and consumer goods.

Mr. Dolgoff has been a Chartered Financial Analyst (CFA) charterholder since 2007.

## EXPERTISE

### Securities and Valuation

- Section 11, Rule 10(b)-5, and related matters, with expertise related to class certification, loss causation, damages quantification, settlement analysis, and analyses related to compensation incentives / scienter allegations.
- Matters involving corporate valuations in a wide variety of types of disputes, including appraisal disputes, commercial litigation, international arbitrations (e.g., disputes under investment treaties), breach of employment contract disputes, wrongful death, and other matters.
- Experience with M&A disputes, including assessment of damages and related economic issues in failed merger disputes.
- Insurance coverage disputes, including assessment of underlying damages and settlement benchmarking analysis.

### Trading and Market Manipulation

- Insider trading matters, including economic assessments of materiality, analysis of trading activity, and assessment of gains and avoided losses.
- Experience in matters related to allegations of market manipulation in financial markets including precious metals and foreign exchange spot and futures markets, analyses of claims of collusive trading activity, spoofing, and other manipulative trading activity.

### Commercial Litigation

- Assessment of lost profits and other forms of damages in matters such as breach of contract, breach of merger reps & warranties, defamation claims, and other matters.
- Assessment of lost business value as a result of breach of contract claims, defamation claims or other causes of action.

### Compensation Disputes and Related Matters

- Measurement of lost compensation in wrongful termination and breach of employment contract matters, particularly in matters involving claims related to employee stock options, stock appreciation rights, restricted stock, carried interest and other forms of risky compensation.
- Assessment of compensation as related to governance-related claims in the context of merger disputes, breaches of fiduciary duty, and related matters.
- Assessment of lost business value in wrongful death suits,

### Business Consulting Experience

Prior to his work in litigation and regulatory disputes, Mr. Dolgoff was a consultant on a variety of projects related to strategic and corporate finance issues, with selected experience in M&A (acquisition, JV and divestiture analysis), project analysis using real options and other valuation methods, compensation design, marketing strategy design, and corporate strategic options analysis.

## EXPERIENCE

2015–Present *Vice President*, Charles River Associates

2003–2015 *Associate Principal, Principal*, Charles River Associates

Manage projects and analytical research in support of litigation expert witness reports and testimony related to securities fraud, damages estimation, compensation disputes, financial markets issues, and commercial disputes. Provide valuation analysis related to corporate entities and financial securities. Specific experience valuing employee stock options and corporate-issued securities including stock, preferred stock, convertible securities, bonds and other debt securities, and derivative claims.

1997–2003 *Consultant*, *Monitor* Group, Cambridge, MA

Founding member and co-leader of Monitor Corporate Finance with lead responsibility for resource allocation, recruitment, training and performance evaluations. Performed original research and developed finance products, methodologies and tools in the areas of shareholder value management, investment valuation, real options applications, compensation design, and financial analysis. Project team leader for consulting projects related to corporate and business unit strategy, M&A and investment choices, corporate finance and organizational effectiveness. Designed and led Monitor's global corporate finance training program.

1993–1996 *Senior Project Manager*, Strategic Management Group, Philadelphia, PA

Project manager and lead developer of business simulations used as case study in corporate training and development seminars. Developed system dynamics modeling techniques to improve realism of business simulations. Designed and co-authored overhaul of strategy and finance curricula; lectured on finance and strategy topics.

## CERTIFICATIONS

Chartered Financial Analyst – 2007 to present

## EXPERT TESTIMONY LAST FOUR YEARS

NADEGE DUBOIS-SEEX, Individually, et al., v. The Boeing Company, U.S.D.C for the Northern District of Illinois, No. 1:19-cv-03392, deposition February 12, 2025.

Private, confidential arbitration on behalf of respondent, hearing testimony January 30, 2025.

Private, confidential arbitration on behalf of claimant, deposition September 18, 2024; hearing testimony September 28, 2024.

Jeffrey Qiuhong Yang v. Global Win Capital Corporation, et al, Superior Court for the State of California, County of Los Angeles, Case No. 20STCV45192, deposition, April 19, 2024.

Square Robot, Inc. v. Eric Levitt, Superior Court of the Commonwealth of Massachusetts, Suffolk, C.A. No. 2284-CV-02620, hearing testimony, December 6, 2023.

FS Medical Supplies, LLC v. Tanner Pharma UK Limited, et al., U.SD.C for the Western District of North Carolina, Charlotte Division, 3:23-cv-00598-GCM-SCR, deposition December 5, 2024.

WBC Extrusion Products, Inc. v. Wolf Jachimowicz and Christian Ganser, Superior Court of the Commonwealth of Massachusetts, Suffolk, C. A. No. 2077-CV-00909, deposition April 13, 2023.

## PUBLICATIONS (LAST 10 YEARS)

Dolgoff, Aaron and Tiago Duarte-Silva, "Event Studies Using Contemporaneous Forward-Looking Information," Securities Litigation, American Bar Association Section of Litigation, vol. 25, no. 4 (2015).

Dolgoff, Aaron and Tiago Duarte-Silva, "Prejudgment Interest: An Economic Review of Alternative Approaches," *Journal of International Arbitration*, vol. 33, no. 1 (2016).

Dolgoff, Aaron and Tiago Duarte-Silva, "Fund Performance Indicators the Securities and Exchange Commission May Be Watching," *ABA Business and Commercial Litigation Journal* (Summer 2016).

Dolgoff, Aaron and Tiago Duarte-Silva, "Prejudgment Interest and the Fallacy of the Invalid Round Trip," *World Arbitration and Mediation Review*, vol. 10, no. 3 (2016).

Dolgoff, Aaron and Tiago Duarte-Silva, "Prejudgment Interest: What is a 'Normal Commercial Rate'?" *Kluwer Arbitration Blog* (February 2017).

Walker, Melanie E., Nicholas K. Tygesson, and Aaron Dolgoff, "Section 11 Damages and Stock-for-Stock Acquisitions: Legal and Economic Considerations," Bloomberg Law (October 2019).

Duarte-Silva, Tiago, Aaron Dolgoff, and Julian DiPersio, "Pre-Award Interest: The Appropriate Spread on Interest Rate Benchmarks," *Journal of Damages in International Arbitration*, vol. 7, no. 2 (2022)

Dolgoff, Aaron, Tiago Duarte-Silva, and Julian DiPersio, "The End of Libor: Which Benchmark Rate for Pre-Award Interest?" Institute for Transnational Arbitration, *ITA In Review*, vol. 4, no. 3 (2023)

Dolgoff, Aaron and Tiago Duarte-Silva, "Did Changes to Delaware Corporate Law in SB21 Harm Shareholders?" *The CLS Blue Sky Blog* (April 2025).

Calder, Kyle, Rahul Chhabra and Aaron Dolgoff, "Bias in Securities Litigation Event Studies When Volatility and Beta Shift," *Journal of Forensic Economics* (forthcoming).

*CRA Insights*

- Implementation issues in setting prejudgment interest (March 2016)
- Factors affecting variations in securities class action claims rates (October 2020)
- Section 11 damages computation for direct listings (May 2022)
- Pre-award interest: Is LIBOR+2% a reasonable commercial rate? (June 2022)
- The end of LIBOR: Which benchmark rate for pre-award interest? (June 2022)
- Slack v. Pirani: Will the Section11 tracing requirement lead to more direct listings? (June 2023)
- Tesla Board compensation derivative suit settlement (January 2024)
- Leakage theory of loss causation and damages in securities litigation (September 2024)
- Tesla Board compensation derivative suit: Implications of the Final Judgment (April 2025)

## Speeches and Presentations

"Fundamentals of Event Studies," Guest Speaker, United States Securities and Exchange Commission (SEC), Division of Enforcement, Chicago, Illinois, June 25, 2012.

"Defeating Class Certification by Attacking Plaintiffs' Classwide Damages Models," panelist for Strafford CLE webinar, December 22, 2015.

"Opposing Class Certification by Attacking Plaintiffs' Classwide Damages Methods," panelist for Strafford CLE webinar, December 20, 2016.

"The Role of Risk in Equity Compensation Disputes," New York State Management Attorneys Conference, Spring Meeting, May 5, 2019.