UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
UNITED STATES OF AMERICA,       )
                                )
     -v-                   )         24 Cr. 658 (GHW)
                                )
S. KENNETH LEECH II,         )
                                )
          *Defendant.*       )
----------------------------------------------------------- X

**MEMORANDUM OF LAW IN FURTHER SUPPORT OF
DEFENDANT S. KENNETH LEECH II'S PRETRIAL MOTION REQUESTING
DISCOVERY AND A HEARING REGARDING
THE GOVERNMENT'S DEFICIENT TAINT TEAM PROCESS**

Dated:   January 7, 2026             MORVILLO ABRAMOWITZ
         New York, New York        GRAND IASON & ANELLO, P.C.

                                         Jonathan S. Sack
                                         Jeremy H. Temkin
                                         Nathaniel Sobel
                                         565 Fifth Avenue
                                         New York, NY 10017
                                         (212) 856-9600

                                         CLEARY GOTTLIEB
                                         STEEN & HAMILTON, LLP

                                         Joon H. Kim
                                         One Liberty Plaza
                                         New York, New York 10006
                                         (212) 225-2000

                                         *Attorneys for Defendant S. Kenneth Leech II*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT................................................................................................ 1

BACKGROUND ................................................................................................................. 2

ARGUMENT ...................................................................................................................... 6

I.   Mr. Leech's Confidential Communications with Third-Party Experts Retained
     by Counsel Are Privileged .................................................................................... 7

     A.   Applicable Law ............................................................................................ 7

     B.   Mr. Leech Has Met His Burden to Establish That His Communications
          with Stephen Leech and Dexter Senft Are Protected Under the *Kovel* Doctrine............ 9

II.  Mr. Leech's iPhone Notes and Google Searches Are Protected by the
     Work-Product Doctrine and the Attorney-Client Privilege.................................... 14

CONCLUSION................................................................................................................... 18

## **TABLE OF AUTHORITIES**

**Cases**                                                                          **Page(s)**

*A & R Body Specialty & Collision Works, Inc. v. Progressive Cas. Ins. Co.*,
    No. 07 Cv. 929 (WWE), 2014 WL 657688 (D. Conn. Feb. 20, 2014) ..................................... 16

*Adams v. United States*,
    No. 03 Cv. 049 (BLW), 2011 WL 39139 (D. Idaho Jan. 4, 2011) ........................................... 15

*Burroughs Wellcome Co. v. Barr Lab'ys, Inc.*,
    143 F.R.D. 611 (E.D.N.C. 1992) ................................................................................................ 17

*Diversified Grp., Inc. v. Daugerdas*,
    304 F. Supp. 2d 507 (S.D.N.Y. 2003) ........................................................................................ 16

*Eglin Fed. Credit Union v. Cantor, Fitzgerald Sec. Corp.*,
    91 F.R.D. 414 (N.D. Ga. 1981) .................................................................................................... 9

*Golden Trade v. Lee Apparel Co.*,
    143 F.R.D. 514 (S.D.N.Y. 1992) .................................................................................................. 9

*In re Grand Jury Subpoenas Dated Jan. 11, 2023 & June 28, 2023*,
    No. 23 Cr. 04 (JHR), 2025 WL 2673680 (S.D.N.Y. Sept. 18, 2025)......................................... 7

*In re Grand Jury Subpoenas Dated Mar. 19, 2002 & Aug. 2, 2002*,
    318 F.3d 379 (2d Cir. 2003) ....................................................................................................... 14

*In re Three Grand Jury Subpoena Duces Tecum Dated June 6 & 7, 1985*,
    No. M-11-188, 1985 WL 2340 (S.D.N.Y. Aug. 20, 1985)......................................................... 15

*In re Tri-State Outdoor Media Grp., Inc.*,
    283 B.R. 358 (Bankr. M.D. Ga. 2002)......................................................................................... 9

*Narayanan v. Sutherland Glob. Holdings Inc.*,
    285 F. Supp. 3d 604 (W.D.N.Y. 2018) ....................................................................................... 7

*Nat'l Educ. Training Grp., Inc. v. Skillsoft Corp.*,
    No. M8-85 (WHP), 1999 WL 378337 (S.D.N.Y. June 10, 1999) ........................................ 5, 12

*Parneros v. Barnes & Noble, Inc.*,
    332 F.R.D. 482 (S.D.N.Y. 2019)........................................................................................15, 17-18

*Stroh v. General Motors Corp.*,
    623 N.Y.S.2d 873 (1st Dep't 1995) ........................................................................................... 12

*Swinton v. Livingston Cnty.*,
   No. 15 Cv. 53A(F), 2016 WL 6248675 (W.D.N.Y. Oct. 26, 2016) .......................................... 16

*United States v. Ackert*,
   169 F.3d 136 (2d Cir. 1999) .............................................................................................. 12, 13

*United States v. Adlman*,
   134 F.3d 1194 (2d Cir. 1998) .................................................................................................. 18

*United States v. Allen*,
   No. 14 Cr. 272 (JSR), 2016 WL 315928 (S.D.N.Y. Jan 8, 2016) ........................................... 15

*United States v. Alvarez*,
   519 F.2d 1036 (3d Cir. 1975) .................................................................................................... 9

*United States v. ChevronTexaco Corp.*,
   241 F. Supp. 2d 1065 (N.D. Cal. 2002) .................................................................................. 15

*United States v. DeFonte*,
   441 F.3d 92 (2d Cir. 2006) ..................................................................................................... 15

*United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*,
   119 F.3d 210 (2d Cir. 1997) ...................................................................................................... 7

*United States v. Kovel*,
   296 F.2d 918 (2d Cir. 1961) ............................................................................................Passim

*United States v. Nobles*,
   422 U.S. 225 (1975) ........................................................................................................ 14, 15

## PRELIMINARY STATEMENT

Defendant S. Kenneth Leech II ("Mr. Leech" or "Ken Leech") previously moved for discovery and a hearing to determine the extent to which his rights had been violated by the government's deficient taint team procedure, which allowed the Assistant United States Attorneys responsible for the prosecution to review his privileged communications. On November 7, 2025, the Court ruled that Mr. Leech was entitled to a hearing and established a framework to develop the record. *See* (Tr. at 99-101 (S.D.N.Y. Nov. 7, 2025) & Order at 1-2 (S.D.N.Y. Nov. 17, 2025), Dkt. 51).

On December 12, 2025, Mr. Leech provided the government with updated logs which gave additional details regarding his privilege assertions. In response, the government informed defense counsel that it continues to challenge Mr. Leech's privilege claims with respect to three categories of documents: (i) communications between Mr. Leech and experts retained by defense counsel; (ii) notes that Mr. Leech drafted on his iPhone in connection with discussions with counsel, including information that was subsequently incorporated into communications with counsel; and (iii) records of certain Google searches that Mr. Leech performed in connection with responding to his counsel's requests for analyses of factual matters relevant to the investigations.[1]

For the reasons set forth below, Mr. Leech has sustained his burden to establish each of his privilege assertions.

---

[1] In addition, the government accessed privileged communications and work product involving Mr. Leech's counsel, Ralph F. Hirschman, Esq. (Declaration of Ralph F. Hirschmann, Esq. dated January 7, 2026 ("Hirschmann Decl.") ¶¶ 15-16).

## **BACKGROUND**

The Indictment alleges that between 2021 and October 2023, while serving as the Chief Investment Officer of Western Asset Management Company ("Western"), Mr. Leech engaged in a cherry-picking scheme in which he purportedly allocated U.S. Treasury futures and options trades based on their unrealized first-day performance. According to the government, Mr. Leech improperly allocated trades with negative first-day performance to Western's flagship Core and Core Plus strategies and trades with positive first-day performance to Macro Opportunities, a niche product designed for Western's most risk-tolerant clients.

On or about October 20, 2023, Western informed Mr. Leech that it had retained outside counsel to investigate issues related to his trade allocations (the "Outside Counsel Investigation"). On October 22, 2023, Mr. Leech retained Ralph F. Hirschmann, Esq. to represent him in connection with the Outside Counsel Investigation and related matters. (Hirschmann Decl. ¶ 2-3). Mr. Hirschmann recognized the need for expert assistance given the volume of data, complexity of fixed income trading concepts at issue, and intense time pressure of the Outside Counsel Investigation. (*Id.* ¶ 4). On or about October 30, 2023, Mr. Hirschmann retained Mr. Leech's son, Stephen Kenneth Leech III ("Stephen Leech"), a financial industry professional to assist in his representation of Mr. Leech. (Hirschmann Decl. ¶ 6); Declaration of Stephen Kenneth Leech III dated January 7, 2026 ("Stephen Leech Decl.") ¶ 2). On or about November 24, 2023, Mr. Hirschmann also retained Dexter Senft, a retired fixed income executive. (Hirschmann Decl. ¶ 7; Declaration of Dexter Senft dated January 7, 2026 ("Senft Decl.") ¶ 4). Mr. Hirschmann retained Stephen Leech and Mr. Senft pursuant to *Kovel* agreements. (Hirschmann Decl. Exs. A & B).

In addition, from the outset of the Outside Counsel Investigation, Mr. Leech has worked directly with his counsel, including by preparing analyses at the request of and with assistance of counsel.  (Hirschmann Decl. ¶ 10; Declaration of S. Kenneth Leech II dated January 7, 2026 ("Leech Decl.") ¶ 6)).  Mr. Leech used his iPhone to do that work.  As described in his declaration, in connection with responding to requests from counsel, Mr. Leech occasionally used the mail application on his iPhone to draft notes relating to his trading on specific days, and the substance of the notes were subsequently conveyed to counsel.  (*Id.* ¶ 10).  Mr. Leech also used the mail application on his iPhone to draft notes that reflected matters that he discussed with counsel and matters that he intended to research based on requests that counsel had made during their conversations.  (*Id.* ¶ 11).  (The materials described in this paragraph are hereinafter referred to as the "iPhone Notes.")

In addition, during the course of the Outside Counsel Investigation, counsel asked Mr. Leech to assist them in describing his trading on certain days.  Given the passage of time between the days in question and the investigations, at counsel's suggestion, Mr. Leech analyzed the market conditions and various economic events that would have impacted trading decisions several years earlier, using Google's search engine to conduct that research.  (*Id.* ¶ 12).  (The materials referenced in this paragraph are hereinafter referred to as the "Google Searches."[2])

In early 2024, the government obtained search warrants for the contents of Mr. Leech's Apple and Google accounts.  (Def.'s Pretrial Mots. at 25-26 (S.D.N.Y. Aug. 22, 2025), Dkt. 35).  Through these warrants, the government obtained thousands of Mr. Leech's personal emails, text messages, and other electronic records.  (*Id.*).  At the time, the government knew that Mr. Leech was represented by counsel in connection with the Outside Counsel Investigation and a related

---

[2] Mr. Leech is only asserting privilege as to a subset of the search records.

investigation being conducted by the U.S. Securities and Exchange Commission ("SEC").[3]  (*Id.*).
Nevertheless, for approximately six months, the government reviewed the search warrant returns
without notifying Mr. Leech's counsel or seeking their input to ensure that the prosecutors
responsible for the investigation were not exposed to privileged materials.  (*Id.* at 26).

      On November 4, 2024, the government belatedly informed counsel of the search warrants
and produced materials it had obtained from Google and Apple.  (*Id.* at 29).  In November and
December 2024, defense counsel submitted privilege logs for those materials.  (*Id.*).  In a letter
dated February 2, 2025, the government requested that counsel provide further information
regarding, among other things, the assertion of privilege over Mr. Leech's communications with
experts retained by his counsel, the iPhone Notes, and the Google Searches.  Between April 7,
2025 and July 18, 2025, the government and defense counsel exchanged a series of letters
regarding Mr. Leech's privilege assertions (as well as the government's taint team procedure).
(*See* Dkt. 36-9 (April 7, 2025 letter from J. Sack to P. Davis & T. Burnett); Dkt. 36-10 (June 11,
2025 letter from P. Davis & T. Burnett to J. Sack & J. Temkin); Dkt. 36-11 (July 2, 2025 letter
from J. Sack to P. Davis & T. Burnett); Dkt. 36-12 (July 18, 2025 letter from P. Davis & T.
Burnett to J. Sack & J. Temkin)).

      Mr. Leech's omnibus pretrial motion sought a hearing to determine the extent to which
the government's taint team process violated his rights.  (Def.'s Pretrial Mots. at 24 (S.D.N.Y.
Aug. 22, 2025), Dkt. 35).  In opposition, the government argued that, although it had accessed
hundreds of documents over which Mr. Leech had asserted privilege, Mr. Leech had not
established that "any of the materials the case team reviewed" were privileged and that Mr.

---

[3] On or about November 8, 2023, the SEC issued a subpoena to Mr. Leech in connection with its
own investigation of certain trade allocations.

Leech had not met the standard for a hearing.  (Gov. Opp. at 55 (S.D.N.Y. Sept. 23, 2025), Dkt. 37).

The government argued that Mr. Leech's communications with his *Kovel* experts were not privileged because the communications "clearly cannot be characterized as necessary." (*Id.* at 57 (quoting *Nat'l Educ. Training Grp., Inc. v. Skillsoft Corp.*, No. M8-85 (WHP), 1999 WL 378337, at *5 (S.D.N.Y. June 10, 1999)).  The government further contended that even though Mr. Leech's son (Stephen Leech) and his long-time friend (Dexter Senft) both "have experience in fixed-income trading," it was "difficult to fathom that they [were] serving in the role of translator or interpreter between Leech and his attorneys, as opposed to close confidants talking with Leech about his conduct." (*Id.*).  Relevant here, the government argued that the iPhone Notes were not privileged because "[c]ounsel has not undertaken the task of identifying which parts of which notes reflect communications between lawyer and client, much less provided evidence to support such a conclusion."  (*Id.* at 59).  Finally, the government did not contest Mr. Leech's assertions of spousal privilege for other documents they had accessed but instead argued that "[s]pousal communications are not protected by the Sixth Amendment."  (*Id.* at 60).

In reply, Mr. Leech established that Stephen Leech and Mr. Senft were both highly qualified experts in fixed income topics relevant to the trade allocation investigations and explained that the government's position rested on "a mischaracterization of *United States v. Kovel* and its progeny."  (Def. Rep. Br. at 38 (S.D.N.Y. Oct. 7, 2025), Dkt. 38).  In addition, Mr. Leech submitted an attorney declaration establishing that the iPhone Notes were made in connection with the trade allocation investigation and conveyed to assist counsel.  (*Id.* at 41). Mr. Leech also argued that the Court should consider the government's deliberate invasion of his spousal privilege in weighing the appropriate remedy.  (*Id.* at 34).

The Court rejected the government's argument that Mr. Leech was not entitled to a hearing, holding that "[t]he defendant has made the required 'threshold showing' to be entitled to a hearing regarding the prosecution team's access to his privileged materials." (Tr. at 96 (S.D.N.Y. Nov. 7, 2025)). At the Court's direction, the parties met and conferred on November 12, 2025 to discuss the Court's proposed framework for considering issues relating to Mr. Leech's assertions of privilege and the government's taint team process. The parties agreed on interim deadlines and dates, some of which this Court adopted in an Order. (Order at 1 (S.D.N.Y. Nov. 17, 2025), Dkt. 51). The government subsequently produced materials from the Apple search warrant returns that had been released to the prosecution team in August 2024.[4]

On December 12, defense counsel submitted updated privilege logs to the government. The updated logs provided additional factual detail regarding each privilege assertion and made other minor changes. During a meet and confer on December 22, the government informed defense counsel that it continued to contest, on a categorical basis, Mr. Leech's privilege assertions with respect to Mr. Leech's communications with both Stephen Leech and Mr. Senft, the iPhone Notes, and the Google Searches. With this memorandum, Mr. Leech is submitting further updated privilege logs. (Declaration of Nathaniel Sobel dated January 7, 2026 ("Sobel Jan. 7 Decl.") ¶ 2 & Ex. A).

## ARGUMENT

"The party invoking a privilege bears the burden of establishing its applicability to the case at hand." *In re Grand Jury Subpoenas Dated Jan. 11, 2023 & June 28, 2023*, No. 23 Cr. 04

---

[4] In the meet and confer, the prosecutors made an informal proffer regarding the Apple search warrant returns that the prosecutors accessed in or around August 2024. Defense counsel and the prosecutors had a misunderstanding about one aspect of the informal proffer, and the government subsequently agreed to make an additional production to defense counsel, which may require defense counsel to supplement the privilege log with respect to the Apple returns.

(JHR), 2025 WL 2673680, at *4 (S.D.N.Y. Sept. 18, 2025) (internal citations omitted).  The

"burden is a heavy one, because privileges are neither lightly created nor expansively construed."

*Id.* (internal citations omitted).  As a general matter, "[s]uch showings must be based on

competent evidence," and cannot be met by "mere conclusory or ipse dixit assertions."

*Narayanan v. Sutherland Glob. Holdings Inc.*, 285 F. Supp. 3d 604, 611 (W.D.N.Y. 2018)

(citations omitted).

      Mr. Leech's privilege logs and supporting declarations are more than sufficient to sustain

his burden to establish that the documents at issue are privileged, as set forth below.

## I.     Mr. Leech's Confidential Communications with Third-Party Experts Retained by Counsel Are Privileged

      Mr. Leech's communications with experts retained by counsel are privileged under a

straightforward application of the Second Circuit's decision in *United States v. Kovel*, 296 F.2d

918 (2d Cir. 1961).[5]

### A.     Applicable Law

      The attorney-client privilege "serves the function of promoting full and frank

communications between attorneys and their clients.  It thereby encourages observance of the

law and aids in the administration of justice."  *United States v. Int'l Bhd. of Teamsters,

Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 119 F.3d 210, 214 (2d Cir. 1997).  In

*Kovel*, the Court confronted the question of "under what circumstances, if any, the attorney-client

privilege may include a communication to a nonlawyer by the lawyer's client."  296 F.2d at 920-

21.  The Court concluded that the attorney-client privilege can be expanded to third-party experts

as long as the "communication [was] made in confidence for the purpose of obtaining legal

---

[5] The documents that Mr. Leech has asserted are privileged under the *Kovel* doctrine are
identified with the designations "1," "2," and "3" in the column labeled "Category" on the
privilege logs attached as Exhibit A to the Sobel Declaration dated January 7, 2026.

advice from the lawyer." *Id.* at 922.  The Court further explained that where the presence of a

third-party expert is "necessary, or at least highly useful, for the effective consultation between

the client and the lawyer," the client's communications with the expert are privileged even when

the attorney is not physically present.  *Id.* (explaining that, for example, attorneys need not

participate in "preliminary conversations" between the client and the expert).

While the Court acknowledged a "general teaching" weighing against the expansion of

evidentiary privileges, it also recognized that "by reason of the complexity and difficulty of our

law," common litigation practices required the ability "to place unrestricted and unbounded

confidence in the professional agent."  *Id.* at 921.  The Court further reasoned that

> the complexities of modern existence prevent attorneys from effectively handling
> clients' affairs without the help of others; few lawyers could now practice without
> the assistance of secretaries, file clerks, telephone operators, messengers, clerks
> not yet admitted to the bar, and aides of other sorts. The assistance of these agents
> being indispensable to his work and the communications of the client being often
> necessarily committed to them by the attorney or by the client himself, the
> privilege must include *all the persons who act as the attorney's agents*.

*Id.* (internal citation omitted (emphasis added)).

To illustrate the types of scenarios in which a client's communications with a third-party

agent (or expert) are protected by the attorney-client privilege, the Court employed four

hypotheticals.  As the Court explained,

> [W]e can see no significant difference between a [*first*] case where the attorney
> sends a client speaking a foreign language to an interpreter to make a literal
> translation of the client's story; a *second* where the attorney, himself having some
> little knowledge of the foreign tongue, has a more knowledgeable non-lawyer
> employee in the room to help out; a *third* where someone to perform that same
> function has been brought along by the client; and a *fourth* where the attorney,
> ignorant of the foreign language, sends the client to a non-lawyer proficient in it,
> with instructions to interview the client on the attorney's behalf and then render
> his own summary of the situation, perhaps drawing on his own knowledge in the
> process, so that the attorney can give the client proper legal advice.

*Id.* at 921 (emphasis added).  Notably, both the first and fourth scenarios establish that a client's communications with a third-party expert—absent the presence of an attorney—are protected by the attorney client privilege.  The Court found the analogy of a foreign language translator useful since "[a]ccounting concepts are a foreign language to . . . lawyers."  *Id.* at 922.[6]

**B.    Mr. Leech Has Met His Burden to Establish That His Communications with Stephen Leech and Dexter Senft are Protected Under the *Kovel* Doctrine**

This is an extraordinarily complex white-collar criminal case as reflected in the parties' expert disclosures and *Daubert*-related motion practice.  It concerns thousands of U.S. Treasury futures and options trades over nearly three years that were allocated to fundamentally different multi-billion-dollar fixed income strategies.  As the government is well aware, merely accessing, manipulating, and summarizing the contents of the trade blotter—which includes more than 33,000 trades and 595,000 rows of data—requires specialized expertise.  (Def.'s Pretrial Mots. At 9 (S.D.N.Y. Aug. 22, 2025), Dkt. 35).  Indeed, discovery produced by the government makes clear that it relied on individuals with specialized economic and coding expertise during its investigation.

Since late October 2023, Mr. Leech's counsel have likewise relied on individuals with expertise in fixed income securities, including the use of U.S. Treasury futures and options instruments to manage risk metrics such as duration and convexity.  Throughout their respective engagements, Stephen Leech and Mr. Senft have been essential parts of the defense team, assisting counsel in understanding key concepts and addressing various issues in the Outside

---

[6] Courts have since applied *Kovel* to communications involving accountants, *Eglin Fed. Credit Union v. Cantor, Fitzgerald Sec. Corp.*, 91 F.R.D. 414, 418 (N.D. Ga. 1981), patent agents, *Golden Trade v. Lee Apparel Co.*, 143 F.R.D. 514, 518 (S.D.N.Y. 1992), bankruptcy advisors, *In re Tri-State Outdoor Media Grp., Inc.*, 283 B.R. 358, 362–64 (Bankr. M.D. Ga. 2002), and psychiatrists, *United States v. Alvarez*, 519 F.2d 1036, 1039, 1046 (3d Cir. 1975).

Counsel Investigation, the SEC investigation, and ultimately the investigation conducted by the Office of the United States Attorney for the Southern District of New York. (Hirschmann Decl. ¶¶ 5-8; Sobel Jan. 7 Decl. ¶¶ 3-6). Both Stephen Leech and Mr. Senft engaged in privileged and confidential communications with defense counsel (with and without Mr. Leech). (Stephen Leech Decl. ¶ 6; Senft Decl. ¶ 5; Hirschmann Decl. ¶¶ 5, 7; Sobel Jan. 7 Decl. ¶¶ 3, 5). Additionally, Mr. Leech communicated directly with Stephen Leech and Mr. Senft, and all parties to those communications understood that they were privileged and confidential. (Leech Decl. ¶¶ 7-8; Stephen Leech Decl. ¶ 6; Senft Decl. ¶ 5).

Independent of his being Mr. Leech's son, Stephen Leech was (and is) highly qualified to serve as an expert in this case. He holds the Chartered Financial Analyst® designation. (Stephen Leech Decl. ¶ 4). Between 2013 and the present, he worked in fixed income investing as an Analyst at the Royal Bank of Scotland, Vice President of Fixed Income at the TCW Group, and manager of his own investment fund. In these positions, he has traded fixed-income securities, including Treasury securities. (*Id.*). At counsel's request, he has performed a range of analyses relating to the investigation. (*Id.* ¶ 6).

Specifically, Stephen Leech has been an essential resource for counsel in at least two ways. First, Stephen Leech's fixed-income experience makes him a critical resource for counsel in understanding various fixed income concepts, including but not limited to explaining concepts he had discussed with Mr. Leech, and analyzing the complex trading at issue in the investigation. (Hirschmann Decl. ¶ 5; Sobel Jan. 7 Decl. ¶ 3). Second, Stephen Leech has played an essential role in enabling Mr. Leech to access and analyze certain data files related to the Outside Counsel Investigation in light of Mr. Leech's lack of facility with Microsoft Excel and other similar programs. (Leech Decl. ¶ 5; Stephen Leech Decl. ¶ 6; Hirschmann Decl. ¶ 5). Each of the email

communications between Mr. Leech and Stephen Leech over which Mr. Leech has asserted privilege are related to these functions.  (Leech Decl. ¶ 7; Stephen Leech Decl. ¶ 6; Sobel Jan. 7 Decl. ¶ 4).

Mr. Senft had a 43-year career on Wall Street as a fixed income quantitative analyst and managing director overseeing fixed income departments at Morgan Stanley, Barclays Capital, Lehman Brothers, and The First Boston Corporation.  (Senft Decl. ¶ 2).  Mr. Senft was inducted into the Fixed Income Analysts Society Hall of Fame in 2004.  (*Id.*).

Given Mr. Senft's considerable fixed income and quantitative expertise, he has performed a range of expert analyses in connection with and at the direction of counsel.  Each of the email communications between Mr. Leech and Dexter Senft over which Mr. Leech has asserted privilege are related to these functions.  (Leech Decl. ¶ 9; Senft Decl. ¶ 6; Sobel Jan. 7 Decl. ¶ 6).

Mr. Leech's post-October 2023 communications with Stephen Leech and Mr. Senft related to the trade allocation investigation fall within the heartland of *Kovel*.  After Mr. Leech retained Mr. Hirschmann, Mr. Hirschmann engaged Stepehen Leech and Mr. Senft to assist him in representing Mr. Leech in connection with Western's Outside Counsel Investigation and later the SEC investigation.  In addition to performing various quantitative analyses, Stephen Leech and Mr. Senft have both served as "translators" for counsel in that they have discussed complex concepts with Mr. Leech and explained those and other concepts relating to fixed income portfolios to counsel.  (*See* Hirschmann Decl. ¶ 12; Sobel Jan. 7 Decl. ¶¶ 3-6).

The government contends that "it is difficult to fathom that they are serving in the role of translator or interpreter between Leech and his attorneys, as opposed to close confidants talking with Leech about his conduct."  (Gov. Opp. at 57 (S.D.N.Y. Sept. 23, 2025), Dkt. 37).  But

setting the government's aspersions aside,[7] these communications were part and parcel of counsel's efforts to understand and synthesize massive amounts of data under the considerable pressure of timely responding to the multiple investigations.  In the context of counsel's defense of Mr. Leech, they were undoubtedly "necessary" and "highly useful," *Kovel*, 296 F.2d 918 at 922—and the Court should give no weight to the government's second-guessing of the defense's choices as to the composition of the defense team.  There is no authority that requires *Kovel* experts to be strangers or that precludes family members or close acquaintances from serving as experts to assist the defense.  Far from it, when time and experience are of the essence—as it was here—retaining experts with preexisting and trusted relationships with the client makes perfect sense.

The government relies heavily on the Second Circuit's decision in *United States v. Ackert*, 169 F.3d 136 (2d Cir. 1999)—even going so far as to invent the "*Kovel* and *Ackert* standard" (Dkt. 36-10 at pp. 2)—but *Ackert* was simply a straightforward application of *Kovel* and supports Mr. Leech's position.  In *Ackert*, Ackert (an investment banker) pitched an investment proposal to Paramount (the client).  *Id.* at 138.  Subsequently, Meyers (Paramount's attorney) contacted Ackert as part of Meyers's factual investigation into the proposed transaction.  *Id.*  Paramount later executed the transaction through another investment bank.  In connection with its examination of the transaction, the IRS summoned Ackert, and Paramount argued that his conversation with Meyers, which pre-dated the transaction under examination, was covered by *Kovel*, even though no "*Kovel* agreement" had been entered into.  Unsurprisingly, the Court

---

[7] *Cf. Nat'l Educ. Training Grp.*, 1999 WL 378337, at *4 (citing *Stroh v. General Motors Corp.*, 623 N.Y.S.2d 873, 874-75 (1st Dep't 1995) for the proposition that the "presence of the [client's] daughter during discussions of [a car] accident with the [client's] attorneys did not vitiate the privilege").

summarily rejected Paramount's argument that Ackert's communications with Meyers were protected under *Kovel*:

> Meyers was not relying on Ackert to translate or interpret information given to Meyers by his client. Rather, Meyers sought out Ackert for information Paramount did not have about the proposed transaction and its tax consequences. Because Ackert's role was not as a translator or interpreter of client communications, the principle of *Kovel* does not shield his discussions with Meyers.

169 F.3d at 139-40.

Despite the government's reliance on cherrypicked language from *Ackert*, (Gov. Opp. at 56-57 (S.D.N.Y. Sept. 23, 2025), Dkt. 37), articulating the unremarkable principle that "a communication between an attorney and a third party does not become shielded by the attorney-client privilege solely because the communication proves important to the attorney's ability to represent the client," *id.* at 139, *Ackert* establishes that *Kovel* protects Mr. Leech's communications with Stephen Leech and Mr. Senft.

Unlike both *Kovel* and the present case, *Ackert* did not involve an attorney retaining outside experts to help him represent a client in connection with an investigation. Rather, the corporate attorney (Meyers) spoke with a banker (Ackert) to gather facts regarding an investment that Ackert was trying to sell to Meyers' client (Paramount). Moreover, the Court in *Kovel* noted that the sequence of the communications is critically important, even if arguably drawing an "arbitrary line." 296 F.2d at 922. Where the "client communicates first to his own accountant," *Kovel* **does not protect** the communications. *Id.* In contrast, where "the client in the first instance consults a lawyer who retains an accountant," *Kovel* **protects** the communications. *Id.* The Court's decision in *Ackert* merely applied that brightline rule. In *Ackert*, the Court found that the sequence of communications was such that *Kovel* had "no application." 169 F.3d at 139-40. The facts here are just the opposite: Mr. Leech's communications with counsel-retained

13

experts were made *after* counsel retained the experts and "in confidence for the purpose of obtaining legal advice from the lawyer." *Kovel*, 296 F.2d 918 at 922.

In sum, Mr. Leech's privilege logs and supporting declarations establish that his communications with Stephen Leech and Mr. Senft are privileged under *Kovel*.

## II.    Mr. Leech's iPhone Notes and Google Searches Are Protected by the Work-Product Doctrine and the Attorney-Client Privilege

As set forth in the accompanying declarations, during the course of the Outside Counsel Investigation and the SEC investigation, Mr. Leech drafted the iPhone Notes in response to requests from his counsel relating to his trading on specific days and to record matters he had either discussed with counsel or needed to research based on requests by counsel.  As for the Google Searches, he conducted them, at counsel's suggestion, that he review the market conditions and various economic events that would have impacted trading decisions several years earlier.  While the government categorically challenges Mr. Leech's assertion of privilege with respect to the iPhone Notes and the Google Searches, these materials are protected under the work-product doctrine and attorney-client privilege because they (i) were prepared at the behest of counsel in anticipation of litigation and (ii) reflect counsel's judgments regarding key issues as to which Mr. Leech's input was needed.  The government's arguments to the contrary are without merit.[8]

The work-product doctrine "provides qualified protection for materials prepared by or at the behest of counsel in anticipation of litigation or for trial."  *In re Grand Jury Subpoenas Dated Mar. 19, 2002 & Aug. 2, 2002*, 318 F.3d 379, 383 (2d Cir. 2003).  The doctrine is "[b]oth distinct from and broader than the attorney-client privilege."  *Id.* (quoting *United States v. Nobles,* 422

---

[8] The draft emails at issue in this section are identified with the designations "4," "5," and "6" in the column labeled "Category" on the privilege logs attached as Exhibit A to the Sobel Declaration dated January 7, 2026.

U.S. 225, 238 n.11 (1975)).  Specifically, the doctrine "protects not only work product by the attorney *but also that by the client*."  *United States v. ChevronTexaco Corp.*, 241 F. Supp. 2d 1065, 1087 n.4 (N.D. Cal. 2002) (emphasis added); *see also Parneros v. Barnes & Noble, Inc.*, 332 F.R.D. 482, 492 (S.D.N.Y. 2019) ("The text of Fed. R. Civ. P. 26(b)(3)(A) accords the protection to material prepared 'by or for [a] party or its representative'—not merely material prepared by or for an attorney.'").  Although the doctrine is most frequently asserted as a bar to discovery in civil litigation, the Supreme Court has characterized its "role in assuring the proper functioning of the criminal justice system" as "even more vital." *Nobles*, 422 U.S. at 238.  In addition, "the attorney-client privilege protects *papers prepared by the client* for the purpose of a confidential communication to the attorney."  *In re Three Grand Jury Subpoena Duces Tecum Dated June 6 & 7, 1985*, No. M-11-188, 1985 WL 2340, at *1 (S.D.N.Y. Aug. 20, 1985) (emphasis added).

The iPhone Notes are plainly protected under the Second Circuit's decision in *United States v. DeFonte*, 441 F.3d 92 (2d Cir. 2006).  There, the Second Circuit held that notes constituting "an outline for an attorney-client conversation . . . which is subsequently discussed with one's counsel" were "squarely" privileged.  *Id.* at 96; *see also United States v. Allen*, No. 14 Cr. 272 (JSR), 2016 WL 315928, at *2 (S.D.N.Y. Jan. 8, 2016) ("[T]he Court does not read *DeFonte* to suggest that when a client takes notes pursuant to a direction from his attorney for the purpose of engaging in a discussion with his attorney, those notes are not covered by the attorney-client privilege simply because the notes are not conveyed to that same attorney as a consequence of intervening events such as delay in an investigation."); *Adams v. United States*, No. 03 Cv. 049 (BLW), 2011 WL 39139, at *3 (D. Idaho Jan. 4, 2011) (holding documents

created by the client at counsel's request so that counsel could "judge the validity of [the] claims" were privileged).

These notes were created at counsel's request or in connection with conversations with counsel and ultimately, in sum or substance, communicated to counsel.  (Leech Decl. ¶¶ 10-11; Hirschmann Decl. ¶ 14; Sobel Jan. 7 Decl. ¶ 7).  Moreover, they clearly fall within the policy articulated in *DeFonte* of not "discourag[ing] clients from taking the reasonable step of preparing an outline to assist in a conversation with their attorney."  *Id.*  To hold otherwise would produce an absurd result such that a client's draft communications responding to questions posed by counsel would only be shielded by privilege *after* the client presses "send" on his iPhone, but not before.[9]

The authorities previously cited by the government confirm the same.  The government has contended that "personal diaries or logs . . . do not constitute work-product" (Gov. Opp. at 58 (quoting *Swinton v. Livingston Cnty.*, No. 15 Civ. 00053A(F), 2016 WL 6248675, at *3 (W.D.N.Y. Oct. 26, 2016), Dkt. 37).  But the notes at issue here are not "personal diaries or logs." Rather, they are drafts of documents requested by counsel in order to respond to both the Outside Counsel Investigation and the SEC investigation.  Similarly untethered to the relevant facts is the government's contention that "a defendant who wrote a note to himself to 'figure out a defense to the fraud I just committed,' would not be able to claim that note was protected because it

---

[9] The fact that Mr. Leech's notes were incorporated into documents that counsel ultimately submitted as part of the Outside Counsel Investigation is of no matter.  *See Diversified Grp., Inc. v. Daugerdas*, 304 F. Supp. 2d 507, 514 (S.D.N.Y. 2003) ("The disclosure to an attorney of drafts of documents ultimately intended to be released to the public is protected by the attorney-client privilege where the drafts reflect client confidences and the legal advice and opinions of attorneys, all of which is protected by the attorney-client privilege." (citation omitted and alternation adopted); *accord A & R Body Specialty & Collision Works, Inc. v. Progressive Cas. Ins. Co.*, No. 07 Cv. 929 (WWE), 2014 WL 657688, at *2 (D. Conn. Feb. 20, 2014)).

16

contemplated preparing a defense to a crime." (Gov. Opp. at 59). While colorful, that hypothetical has no bearing on the actual issue before the Court: Mr. Leech was not writing a note to himself in a vacuum. Instead, by preparing notes in connection with queries posed by his counsel, Mr. Leech was operating under the work-product doctrine's "zone of privacy" which allows attorneys and their clients to "develop legal theories and strategy with an eye toward litigation, free from unnecessary intrusion by his adversaries." *Parneros*, 332 F.R.D. at 492 (citations omitted). Assumedly, the government would concede that a note stating: "I am drafting this note in response to my attorney's questions to support my defenses to the false allegations of misconduct" would be protected under both the attorney-client privilege and the work-product doctrine, especially if it was subsequently conveyed to counsel. That is what happened here, albeit without the explicit preamble.

Similarly, in the course of the Outside Counsel Investigation, Mr. Leech's counsel was asked to explain trading on certain days in 2021 and 2022, *i.e.*, approximately two to three years earlier. Working with his counsel and at his counsel's request for assistance, Mr. Leech conducted Google searches to look up certain market information about the days in question. (Leech Decl. ¶ 12; Hirschmann Decl. ¶ 14; Sobel Jan. 7 Decl. ¶ 7). These search queries are protected both under the attorney-client privilege (because they reflect the requests made by counsel and were done to assist counsel) and the work-product doctrine (because they were done in anticipation of litigation).

While counsel is unaware of a case addressing this precise question, the decision in *Burroughs Wellcome Co. v. Barr Lab'ys, Inc.*, 143 F.R.D. 611 (E.D.N.C. 1992), is instructive. There, the Court held that the "printed results of database searches conducted at the request of counsel" were protected by the work-product doctrine because they "reflect[ed] the

17

attorney's legal theory and thought processes concerning anticipated litigation." *Id.* at 624. To the extent *Burroughs* addressed searches of legal databases, the same logic applies here. The Google Searches also fall within the work-product doctrine's purpose of "preserv[ing] a zone of privacy in which a lawyer can prepare and develop legal theories and strategy," *Parneros*, 332 F.R.D. at 492, as well as reflecting counsel's discussions with their client. Google searches are a form of database searches, and given the centrality of Google (and other similar online research services) to modern life, the government's position that a client's search queries could *never* be privileged would unfairly allow the government to pry into the inner workings of the defense camp—including work done in response to requests and in order to obtain legal advice from counsel—as they respond to ongoing investigations.

## **CONCLUSION**

For the foregoing reasons, the Court should hold that Mr. Leech has established that the documents accessed by the government are privileged.

Dated:    January 7, 2026                              MORVILLO ABRAMOWITZ
       New York, New York                       GRAND IASON & ANELLO, P.C.

                                              /s/ Jeremy H. Temkin
                                              Jonathan S. Sack
                                              Jeremy H. Temkin
                                              Nathaniel Sobel
                                              565 Fifth Avenue
                                              New York, New York 10017
                                              (212) 856-9600

                                              CLEARY GOTTLIEB
                                              STEEN & HAMILTON, LLP

                                              Joon H. Kim
                                              One Liberty Plaza
                                              New York, New York 10006
                                              (212) 225-2000

                                              *Attorneys for Defendant S. Kenneth Leech II*

18