UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                            :

UNITED STATES OF AMERICA        :

                            :

    - v. -                     :           24 Cr. 658 (GHW)

                            :

S. KENNETH LEECH, II,       :

                            :

              Defendant.    :

                            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S OPPOSITION TO
## DEFENDANT'S MOTIONS *IN LIMINE*

SEAN BUCKLEY
Deputy United States Attorney
Southern District of New York
26 Federal Plaza
New York, New York 10278

Thomas Burnett
Peter J. Davis
Assistant United States Attorneys

Lindsey Keenan
Special Assistant United States Attorney
- Of Counsel -

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

DISCUSSION ........................................................................................................................... 1

I.      The Court Should Permit Opinion Testimony from the Lay Witnesses Who Discovered the Defendant's Fraud ....................................................................................................... 1

    A.      Applicable Law ............................................................................................................ 2

    B.      Anticipated Testimony ................................................................................................ 3

    C.      Discussion .................................................................................................................... 6

II.     The Court Should Permit Evidence and Argument about the Impropriety of the Defendant's End of Day Allocations ................................................................................ 11

III.    The Court Should Permit the Government to Use Accurate Language to Describe the Defendant's Scheme ........................................................................................................ 15

IV.     The Defendant's "Other Acts" Are Admissible ............................................................. 21

    A.      Applicable Law .......................................................................................................... 22

        1.      Rules 401-403 .................................................................................................... 22

        2.      Direct Evidence and Rule 404(b) ...................................................................... 23

    B.      Discussion .................................................................................................................. 24

        1.      The Court Should Admit the Defendant's 2011 TIPS Trade .................... 24

        2.      The Court Should Admit Evidence of the Defendant's 2011 Trading in Portfolio 1058 ................................................................................................... 26

        3.      2011 Allegations of Preferential Allegations ............................................. 29

        4.      Trading Floor Parlor Game ............................................................................. 32

        5.      The Court Should Admit Evidence of the Defendant's Prior Compliance Violations ......................................................................................................... 35

V.      The Court Should Not Use a Written Juror Questionnaire ............................................... 37

CONCLUSION ........................................................................................................................ 43

## TABLE OF AUTHORITIES

<u>Cases</u>                                                                          <u>Page</u>

*Bank of China, N.Y. Branch v. NBM LLC,*
    359 F.3d 171 (2d Cir. 2004)...................................................................... 3

*Cardwell v. Davis Polk & Wardell LLP*, No. 19 Civ. 10256 (GHW) (S.D.N.Y.)........................ 40

*Rosales-Lopez v. United States,*
    451 U.S. 182 (1981)............................................................................ 37

*Sec. & Exch. Comm'n v. World Tree Fin., L.L.C.,*
    43 F.4th 448 (5th Cir. 2022) .................................................................. 17

*SEC v. K.W. Brown Investments Inc.,*
    555 F. Supp. 2d 1275 (S.D. Fla. 2007) ...................................................... 17

*SEC v. Werthe,*
    No. 23 Civ. 815, 2025 WL 790970 (S.D. Cal. Mar. 12, 2025)................................ 17

*United States v. Abu-Jihaad,*
    630 F.3d 102 (2d Cir. 2010).................................................................. 17

*United States v. Ahmed,*
    94 F. Supp. 3d 394 (E.D.N.Y. 2015) ......................................................... 21

*United States v. Cadet,*
    664 F.3d 27 (2d Cir. 2011)................................................................... 28

*United States v. Caputo,*
    808 F.2d 963 (2d Cir. 1987).................................................................. 28

*United States v. Cioffi,*
    08 Cr. 415 (FB) (E.D.N.Y.) .................................................................. 40

*United States v. Combs,*
    24 Cr. 542 (AS) (S.D.N.Y.) .................................................................. 38

*United States v. Curley,*
    639 F.3d 50 (2d Cir. 2011)............................................................... 23, 24

*United States v. Cuti,*
    720 F.3d 453 (2d Cir. 2013)............................................................ 2, 3, 7, 9

*United States v. Discala,*
  14 Cr. 399 (EN) (E.D.N.Y) ....................................................................... 40

*United States v. Doud,*
  19 Cr. 285 (GBD) (S.D.N.Y.) ................................................................... 39

*United States v. Downing,*
  297 F.3d 52 (2d Cir. 2002) ...................................................................... 31

*United States v. Dupigny,*
  18 Cr. 528 (JMF) (S.D.N.Y.) ................................................................... 21

*United States v. Ebbers,*
  458 F.3d 110 (2d Cir. 2006) ...................................................................... 8

*United States v. Felder,*
  993 F.3d 57 (2d Cir. 2021) ......................................................................... 8

*United States v. Finnerty,*
  474 F. Supp. 2d 530 (S.D.N.Y. 2007) ............................................... 18, 19

*United States v. Garcia,*
  413 F.3d 201 (2d Cir. 2005) .................................................................. 3, 8

*United States v. Gentile,*
  21 Cr. 54 (PK) (E.D.N.Y.) ....................................................................... 40

*United States v. Gonzalez,*
  110 F.3d 936 (2d Cir. 1997) ............................................................... 22, 23

*United States v. Hadden,*
  20 Cr. 468 (RMB) (S.D.N.Y.) .................................................................. 39

*United States v. Harding,*
  273 F. Supp. 2d 411 (S.D.N.Y. 2003) ..................................................... 37

*United States v. Inserra,*
  34 F.3d 83 (2d Cir. 1994) ........................................................................ 33

*United States v. James,*
  607 F. Supp. 3d 246 (E.D.N.Y. 2022) ................................................... 8, 9

*United States v. Kale,*
  445 F. App'x 482 (3d Cir. 2011) ............................................................... 9

*United States v. Ling,*
172 F. App'x 365 (2d Cir. 2006) ..................................................................... 25

*United States v. Martoma,*
12 Cr. 973 (PGG) (S.D.N.Y.) ......................................................................... 39

*United States v. Massino,*
546 F.3d 123 (2d Cir. 2008) .......................................................................... 28

*United States v. Mavashev,*
455 F. App'x 107 (2d Cir. 2012) ...................................................................... 7

*United States v. Maxwell,*
20 Cr. 330 (AJN) (S.D.N.Y.) ......................................................................... 38

*United States v. Menendez,*
23 Cr. 344 (SHS) (S.D.N.Y.) ......................................................................... 39

*United States v. Melzer,*
20 Cr. 314 (GHW) (S.D.N.Y.) ....................................................................... 38

*United States v. Mercado,*
573 F.3d 138 (2d Cir. 2009) .......................................................................... 28

*United States v. Miller,*
626 F.3d 682 (2d Cir. 2010) .......................................................................... 23

*United States v. Moseley,*
980 F.3d 9 (2d Cir. 2020) .............................................................................. 28

*United States v. Parnas,*
19 Cr. 725 (JPO) (S.D.N.Y.) .................................................................... 39, 41

*United States v. Percoco, No.,*
16 Cr. 776 (VEC) (S.D.N.Y.) ......................................................................... 40

*United States v. Petit,*
2022 WL 3581648 (2d Cir. Aug. 22, 2022) ...................................................... 8

*United States v. Quinones,*
417 Fed. Appx. 65 (2d Cir. 2011) ................................................................... 22

*United States v. Quinones,*
511 F.3d 289 (2d Cir. 2007) ..................................................................... 37, 38

*United States v. Ray*,
    20 Cr. 110 (LJL) (S.D.N.Y.) ...................................................................... 39

*United States v. Rea*,
    958 F.2d 1206 (2d Cir. 1992) ...................................................................... 2

*United States v. Rigas*,
    490 F.3d 280 (2d Cir. 2007) ................................................................... 8, 9

*United States v. Roldan-Zapata*,
    916 F.2d 795 (2d Cir. 1990) ...................................................................... 26

*United States v. Rutigliano*,
    614 F. App'x 542 (2d Cir. 2015) .............................................................. 17

*United States v. Salameh*,
    152 F.3d 88 (2d Cir. 1998) ........................................................................ 37

*United States v. Siddiqui*,
    699 F.3d 690 (2d Cir. 2012) ...................................................................... 23

*United States v. Silver*,
    15 Cr. 93 (VEC) (S.D.N.Y.) ...................................................................... 40

*United States v. Simon*,
    425 F.2d 796 (2d Cir. 1969) ........................................................................ 8

*United States v. Smith*,
    13 Cr. 297 (KMK) (S.D.N.Y.) ................................................................. 39

*United States v. Steinberg*,
    12 Cr. 121 (RJS) (S.D.N.Y.) ..................................................................... 41

*United States v. Thai*,
    29 F.3d 785 (2d Cir. 1994) ........................................................................ 38

*United States v. Tomero*,
    486 F. Supp. 2d 320 (S.D.N.Y. 2007) ...................................................... 37

*United States v. Treacy*,
    639 F.3d 32 (2d Cir. 2011) ........................................................................ 37

*United States v. Vaccarelli*,
    No. 18 Cr. 92 (JBA), 2020 WL 1329695 (D. Conn. 2020) ......................... 23, 27, 36

*United States v. White*,
  No. 08 Cr. 0682 (NGG), 2009 WL 4730234 (E.D.N.Y. Dec. 4, 2009) ................................... 21

*United States v. Yannotti*,
  541 F.3d 112 (2d Cir. 2008)........................................................................................ 2, 3, 9

*United States v. Zackson*,
  12 F.3d 1178 (2d Cir. 1993)............................................................................................ 28

Rules

Fed. R. Evid. 401 ............................................................................................... 17, 22, 36

Fed. R. Evid. 403 ............................................................................................... 17, 22, 23

Fed. R. Evid. 404(b).......................................................................................... 23, 25, 28, 31

Fed. R. Evid. 602 ..................................................................................................... 2

Fed. R. Evid. 701 ............................................................................................... 2, 3, 10

Fed. R. Evid. 702 ................................................................................................... 2, 23

Regulations

17 CFR § 1.35 ............................................................................................... 12, 13, 14, 25, 29

## PRELIMINARY STATEMENT

The Government respectfully submits this brief in opposition to the defendant's motions *in limine* dated December 15, 2025. (Dkt. 58, 59).

The defendant, S. Kenneth Leech, II, moved for *in limine* rulings precluding (i) opinion testimony from fact witnesses who discovered the defendant's fraudulent scheme (Dkt. 58); (ii) argument concerning the propriety of the defendant's end of day allocation practice (*id.*); (iii) reference to the net gains and losses resulting from the defendant's scheme, or use of the terms "winners," "losers," "good trades," or "bad trades" to describe the defendant's trading and allocations (*id.*); and (iv) the admission of evidence of "other acts" of the defendant, as described in the Government's November 12, 2025, notice (the "Government's 404(b) Notice") (Dkt. 59). The defendant also requests that the Court use a written jury questionnaire in advance of *voir dire*. (Dkt. 58).

For the reasons below, the defendant's motions should be denied.

## DISCUSSION

### I.    The Court Should Permit Opinion Testimony from the Lay Witnesses Who Discovered the Defendant's Fraud

The Government expects to elicit testimony from a WAMCo analyst (the "Analyst") and a former WAMCo portfolio manager (the "Portfolio Manager") concerning their discovery of the defendant's cherry-picking scheme. Each of these witnesses will testify to facts within their personal knowledge, including knowledge gained by virtue of work they performed as WAMCo employees, such as their contemporaneous analysis of the defendant's trading activity. To the extent these witnesses offer any opinion testimony, it will be rationally based on their perception, squarely related to the issues in this case, with reasoning evident to the jury, and thus admissible pursuant to Rule 701.

### A.    Applicable Law

Lay witnesses may properly offer fact testimony and opinion testimony. Rule 602 of the Federal Rules of Evidence sets forth the well-established rule that a witness may testify to matters within his or her personal knowledge. *See* Fed. R. Evid. 602. However, "personal knowledge of a fact 'is not an absolute' to Rule 602's foundational requirement, which 'may consist of what the witness thinks he knows from personal perception." *United States v. Cuti*, 720 F.3d 453, 458-49 (2d Cir. 2013) (citation omitted).

Rule 701 provides that opinion testimony from a lay witness is admissible if it is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or determining a fact in issue; and (c) not based on scientific, technical, or other special knowledge within the scope of Rule 702." Fed. R. Evid. 701. A "rational perception" is one that involves "first-hand knowledge or perception." *United States v. Yannotti*, 541 F.3d 112, 126 & n.8 (2d Cir. 2008) (citing *United States v. Rea*, 958 F.2d 1206, 1215 (2d Cir. 1992)). As to Rule 701(c), opinion testimony regarding technical subject-matter or which involves jargon or industry terminology is not automatically rendered expert testimony under Rule 702.

Indeed, "some degree of specific-industry-related knowledge will not disqualify lay opinion testimony," as long as those opinions do "not depend on the sort of specialized training that scientific witnesses or statisticians rely upon when interpreting the results of their own experiments or investigations." *Yannotti*, 541 F.3d at 126. In other words, what matters is that the opinion "[results] from a process of reasoning familiar in everyday life," even if the testimony relates to complex matters. *Cuti*, 720 F.3d at 459 (upholding admission of lay testimony by sophisticated accountant and auditor with personal knowledge of events regarding accounting rules and treatment of allegedly fraudulent financial transactions as non-expert testimony); *see id.* at 460 (opinion testimony falls outside Rule 701 only when it is "based on specialized experience that the

agent accumulated from other cases and involved a special reasoning process not readily understandable to the average juror," but is proper under Rule 701 when witnesses "testified based only on their experiences with matters pertinent to this case, and their reasoning was evident to the jury").

For example, an "owner or officer of a business" properly provides opinion testimony under Rule 701 regarding "the value or profits of the business" without being qualified as an expert because the opinion is based on "the particularized knowledge that the witness has by virtue of his or her position in the business," not the witness's "experience, training, or specialized knowledge within the realm of an expert." *Yannotti*, 541 F.3d at 125. Similarly, "a witness's specialized knowledge, or the fact that he was chosen to carry out an investigation because of this knowledge, does not render his testimony 'expert' as long as the testimony was based on his 'investigation and reflected his investigatory findings and conclusions, and was not rooted exclusively in his expertise.'" *Cuti*, 720 F.3d at 460 (citing *Bank of China, N.Y. Branch v. NBM LLC*, 359 F.3d 171, 181 (2d Cir. 2004)). In other words, Rule 701 permits witnesses "to testify to their personal perceptions in the form of inferences or conclusory opinions." *United States v. Garcia*, 413 F.3d 201, 211 (2d Cir. 2005).

### B.    Anticipated Testimony

The Analyst and Portfolio Manager are fact witnesses who are expected to testify about their work at WAMCo, their discovery that the defendant favored certain funds over others, and their review of his trading.[1]

---

[1] These summaries are not a complete recitation of anticipated testimony but instead set forth the witnesses' personal knowledge of the subject matter, and the general contours of their anticipated testimony. The Government will not necessarily elicit all the testimony described herein, and the Government may elicit testimony about additional topics admissible pursuant to Rules 602 and 701.

In particular, the Analyst is expected to testify that he has worked at WAMCo for approximately ten years. Following a promotion, he was elevated to the role of "portfolio analyst," which was his role during the time period charged in the Indictment. As a portfolio analyst, the Analyst supported approximately 100 portfolios, including portfolios the defendant managed and to which the defendant allocated trades. Among other things, the Analyst's day-to-day work included executing trades, including Treasury derivatives trades, and assisting portfolio managers in sizing and pre-clearing their trades. In other words, the Analyst helped portfolio managers determine the size of trade required to achieve a particular result in a client account and then worked with WAMCo's compliance department to ensure a desired transaction satisfied client and regulatory requirements. The Analyst is expected to testify that while most WAMCo portfolio managers pre-cleared trades with compliance in advance of trade execution, the defendant generally did not pre-clear his Treasury futures and options trades.

In addition to his regular responsibilities, the Analyst occasionally sat in for the defendant's trading assistant ("Trading Assistant-1") when Trading Assistant-1, and Trading Assistant-1's back up were unavailable. On those occasions, the Analyst performed Trading Assistant-1's role entering and allocating the defendant's trades in WAMCo's trade management system, ATP. As a result of his varied responsibilities, the Analyst is personally familiar with the portfolios under the defendant's management, and he has first-hand knowledge of the defendant's trading and allocation practices. The Analyst is expected to testify that the defendant traded by voice all day and allocated the majority of his trades at the end of the day, in contravention of WAMCo's training.

The Portfolio Manager is expected to testify that he worked at WAMCo for more than ten years. During the relevant period, the Portfolio Manager was responsible for co-management of

portfolios in the Core Strategies, including portfolios on with the defendant was the lead portfolio manager. As a result, the Portfolio Manager is personally familiar with accounts the defendant managed and accounts to which the defendant allocated trades. The Portfolio Manager will testify about the composition of accounts in the Core Strategies, as well as their performance, risk metrics, and clients during the relevant period.

In addition, due to the Core Strategies' poor performance in 2022, the Portfolio Manager participated in a WAMCo task force to the assess volatility targets, objectives, and risk tolerances of portfolios in those strategies. One outcome of work performed by the task force was the implementation of strict risk management measures in Core Strategies accounts. The Portfolio Manager is expected to testify about his work on the task force, and his observation that on multiple occasions the defendant's trading breached the risk guardrails newly implemented by the task force. The Portfolio Manager also is expected to testify that as part of WAMCo's succession planning, he was advised that he would become the lead portfolio manager on certain Core Strategies portfolios, including portfolios on which the defendant was the lead portfolio manager during the time period charged in the Indictment. Despite this planned transition, the defendant told the Portfolio Manager that he intended to retain control of a favored account in the Core Strategies ("Account-1").

The Analyst and the Portfolio Manager are expected to testify that they discovered the defendant's cherry-picking scheme in approximately September 2023. Specifically, the Analyst is expected to testify that in or about September 2023, he observed the defendant's targeted allocations (e.g., trades allocated specifically to favored or disfavored funds, or to Account-1 or Account-2), generated intra-day gains and losses. This observation stemmed from the Analyst's review of the defendant's trade blotter, which was part of the ordinary course of the Analyst's

work, and the Analyst's receipt of daily emails concerning the performance of the defendant's favored funds. The Analyst elevated his concerns to multiple portfolio managers, who told him in substance and in part that they did not want to know about it. Thereafter, the Analyst extracted the defendant's trade data from WAMCo's database and created a spreadsheet to document his concerns. The Analyst shared this spreadsheet with the Portfolio Manager. To support his analysis, the Analyst prepared additional spreadsheets, including spreadsheets capturing the difference between trade price and end of day price for the defendant's trades over a two-year period, and capturing the trade data for another portfolio manager with a similar multi-strategy mandate, which did not show profits in one strategy and losses in another strategy.[2] The Portfolio Manager performed a separate analysis of the defendant's trading and allocations, before elevating his findings and the Analyst's concerns to WAMCo executives. Subsequently, the Portfolio Manager and the Analyst performed further analyses and jointly presented their findings to a broader group of WAMCo leadership.

Based on their review of the defendant's trade blotter, and analysis of the defendant's allocations, the Analyst and Portfolio Manager each came to the conclusion that the defendant allocated trades based on post-execution performance.

### C.    Discussion

The Analyst and Portfolio Manager's anticipated testimony fits squarely within the parameters of Rule 701.

First, it is based on firsthand experience the Analyst and Portfolio Manager developed working at WAMCo, and it is entirely grounded in their own conduct and perceptions.

---

[2] The Portfolio Manager performed additional statistical analyses that the Government does not intend to introduce at trial.

Second, because the Analyst and Portfolio Manager are financial industry professionals, their testimony will be particularly helpful to the jury. They are uniquely positioned to aid the jury in understanding WAMCo's investment strategies, the rationale behind certain WAMCo policies, and fixed income jargon more broadly. *See United States v. Mavashev*, 455 F. App'x 107, 113 (2d Cir. 2012) (affirming admissibility of lay opinion testimony regarding mortgage, even though agent occasionally defined technical terms to describe specific facts in the case).

Third, although the anticipated testimony relates to complex matters, the analysis the Analyst and the Portfolio Manager performed has "a process of reasoning familiar in everyday life." *Cuti*, 720 F.3d at 459. While the average juror may not know the difference between a put option and a call option, or a long position and a short position, anyone who has ever engaged in commerce will understand that if an object decreases in value after purchase it loses money, and if it increases in value after purchase it earns money. The simple math the Analyst and Portfolio Manager performed to determine whether the end of day price for an instrument was higher or lower than its trade price is neither technical nor specialized, and the fact that the instruments at issue are Treasury derivatives does not make it so.

The defendant asserts that opinions offered by the Analyst and the Portfolio Manager are inadmissible expert testimony because they are based on "after the fact work," rather than their own perceptions. (Def. Mot. at 7). That is wrong. The Analyst and Portfolio Manager are expected to testify that they personally extracted data from WAMCo's systems and then, as part of their employment, personally analyzed it. That their labor followed Leech's trades in time is of no significance; what matters is that their testimony springs from their own perceptions. Taken to its logical conclusion the defendant's position would preclude the testimony of any witness who discovered a crime in progress and undertook to investigate or analyze then-existing evidence.

That is not the law. Instead, is well-settled in the Second Circuit that a witness with personal knowledge may provide lay testimony establishing the impact of a defendant's fraudulent conduct in just this manner. *See, e.g., United States v. Petit*, 2022 WL 3581648, at *3 (2d Cir. Aug. 22, 2022) (summary order) (citing *Rigas*, 490 F.3d 209); *see also United States v. Ebbers*, 458 F.3d 110 (2d Cir. 2006); *United States v. Simon*, 425 F.2d 796 (2d Cir. 1969).

The holding in *United States v. Garcia*, 413 F.3d 201 (2d Cir. 2005), on which the defendant relies, does not dictate otherwise. In *Garcia*, the Second Circuit considered the admissibility of a case agent's trial testimony as to the defendant's culpability. *Garcia*, 413 F.3d at 210. When offering his opinion that the defendant was a member of a narcotics trafficking conspiracy, the testifying agent drew on his background investigating narcotics trafficking writ large, and on investigatory work performed by other agents on the case. *Id*. Here, the Analyst and Portfolio Manager's anticipated testimony is not based on work performed by others, or on experience analyzing different financial records for fraud (which they do not have). Instead, it is based on their personal analysis of the defendant's trading records—which they undertook in the scope of their employment—and their personal familiarity with the portfolios to which the defendant allocated trades.

The defendant's reliance on *United States v. Felder,* 993 F.3d 57 (2d Cir. 2021) and *United States v. James*, 607 F. Supp. 3d 246 (E.D.N.Y. 2022), is similarly misplaced. In *Felder*, the Second Circuit found no error in the admission of expert testimony from a law enforcement witness, finding "the government offered the detective's opinion precisely because he had specialized knowledge of, and long experience with, firearms and their component parts, which went well beyond that of an average person and which afforded him expert insights helpful to a jury in identifying objects in grainy surveillance images." *Felder*, 993 F.3d at 73. In *James*, the

Court precluded testimony from the defendant's former employees, finding in part that it required the former employees to draw on "collective experiences" developed elsewhere. *James*, 607 F. Supp. 3d at 259.[3]

Here by contrast, testimony from the Analyst and Portfolio Manager is not based on long experience investigating other similar crimes, or collective experience developed working for other investment managers. They will testify about transactions they personally observed on the defendant's blotter, while working at the same firm as the defendant, and the steps they personally performed to sort and assess those transactions. Familiarity with fixed income investing, WAMCo's investment strategies and policies, and the very portfolios at issue in this case, does not render the anticipated testimony inadmissible expert testimony. It renders the anticipated testimony uniquely helpful to the jury. *See*, *e.g.*, *Cuti*, 720 F.3d at 458-60 (accountants who were "personally familiar with the accounting of the transactions at issue" could testify about the effect of the fraud on the accounting treatment of those transactions without rendering expert testimony); *United States v. Yannotti*, 541 F.3d 112, 126 (2d Cir. 2008) ("While we do not profess that loansharking is an activity about which the average person has knowledge, we find that the opinion DiDonato reached from his own loansharking experience derived from a reasoning process familiar to average persons."); *Rigas,* 490 F.3d at 225 ("a witness's specialized knowledge . . .

---

[3] The out-of-circuit precedent the defendant cites, *United States v. Kale*, 445 F. App'x 482, 483 (3d Cir. 2011), likewise is inapposite. In that case, the Court found no error in the admission of lay testimony from a Sprint records custodian about the operation of cell sites, and the use of cell sites to determine a cellphone user's location. *See Kale*, 445 F. App'x at 482 ("a person of average intelligence would almost certainly understand that the strength of one's cell phone reception depends largely on one's proximity to a cell phone tower. Even if this were not common knowledge, [the custodian] certainly had sufficient training and experience to testify about the operation of Sprint's cell phone towers. [The custodian] had worked for Sprint for over a year, was trained for four weeks on how to read cell phone records, and interacted regularly with radio frequency engineers. Thus, he had sufficient 'personal knowledge' of how cell phone towers operate to testify reliably on this subject.").

does not render his testimony 'expert' as long as it was based on his investigation and reflected his investigatory findings and conclusions, and was not rooted exclusively in his expertise").

Further, because neither the Analyst nor the Portfolio Manager will be offered as an expert, there is no merit to the defendant's argument that it would cause undue prejudice to permit them to offer opinion testimony "without the Rule 16 disclosures required of true expert witnesses." (Def. Mot. at 8). It is of no import that a witness may have the professional background to qualify as an expert witness; what matters is the type of testimony offered. *See* Fed. R. Evid. 701, advisory committee notes (2000) (the Federal Rules of Evidence do "not distinguish between expert and lay *witnesses*, but rather expert and lay *testimony*" (emphasis added)). Numerous anticipated witnesses in this case have substantial experience in investment management, and their testimony will necessarily include reference to industry-specific subject matter. But because the anticipated testimony is based on their firsthand knowledge, it falls outside of Rule 16's expert notice requirements.

There also is no merit to the defendant's argument that the Government's proposed experts, Professor Lauren Cohen and Professor Petter N. Kolm, will "unfairly benefit from what would amount to an endorsement from lay witnesses affiliated with Western." (Dkt. 58 at 9). As a general matter, the prejudice from having fact witnesses and expert witnesses that both independently demonstrate the defendant's guilt is not "unfair." More specifically, the Analyst and the Portfolio manager will not endorse the analyses performed by the Government's proposed experts. The Analyst and Portfolio manager did not perform the "dozen highly technical analyses" complained of in the defendant's motion to preclude expert testimony (Dkt. 63 at 1), and therefore could not possibly bolster their work.

For the same reasons, the proposed testimony will be neither confusing nor cumulative. The Analyst and the Portfolio Manager will testify about their familiarity with the defendant's portfolio management, their observations of and concerns with the defendant's trading and allocations, the steps taken to extract, sort, and analyze data, and the conclusions resulting from their analysis. Without testimony from the Analyst and the Portfolio Manager about their firsthand observations and investigation, the jury might be left with the misleading impression that the Government "manufactured this prosecution around a statistical analysis" without evidence from "any witness, document, or other evidence for that matter," as defense counsel appears poised to assert. (Dkt. 58 at 1). That would be false.

## II.    The Court Should Permit Evidence and Argument about the Impropriety of the Defendant's End of Day Allocations

The Government will show at trial that the defendant allocated the majority of his trades hours after he executed them, and after he had the opportunity to observe how those trades performed. Excluding trades executed by a particular broker for which the defendant had a default allocation ("Broker-1"), the Government expects the evidence will show that the mean time between when the defendant's trades were filled and when he allocated them approached 8.5 hours. The Government will argue to the jury that this 8.5 hour window provided the defendant with the opportunity to distribute trades between his favored and disfavored funds based on their first-day performance and the defendants' allocation practices violated company policies designed to prevent just such behavior.

Anticipating this proof, the defendant moves to preclude the Government from arguing that end-of-day allocations are "inherently improper or suspect." (Dkt. 58 at 11.) The Government does not seek to instruct the jury that end-of-day allocations are *per se* fraudulent, and the Government will not argue that the jury could or should convict the defendant of fraud merely because he

allocated at the end of day. Accordingly, much of the defendant's motion can be denied as moot. To the extent that the defendant more broadly seeks to prevent the Government from urging the jury to draw inferences from the defendant's end-of-day allocation practices, the motion should be denied. The circumstances of the defendant's trading—that he allocated late in the day, in violation of company policy, and after having the opportunity to consider first-day performance—adequately support an argument that his conduct was "improper" and "suspect" and, indeed, part of a criminal fraud.

The defendant bases his motion on the claim that Commodity Futures Trading Commission Rule 1.35 ("Rule 1.35") "expressly permits" end of day allocation, but he misdescribes that rule. Rule 1.35 only permits "post execution allocation of bunched orders" if numerous requirements are satisfied, none of which the defendant met. Significantly, pursuant to Rule 1.35, allocations are to be made "as soon as practicable after the entire transaction is executed," allocations "must be fair and equitable," and "no account or group of accounts may receive consistently favorable or unfavorable treatment." Rule 1.35(b)(iv)(A), (B). Further, "allocation methodology must be sufficiently objective and specific to permit independent verification of the fairness of the allocations using that methodology." Rule 1.35(b)(iv)(C). In addition, eligible account managers must maintain records concerning their allocation methodology sufficient to permit the reconstruction of the handling of the order from the time of placement by the account manager to the allocation to individual accounts. Rule 1.35(b)(v)(A), (B). Leech neither tried to, nor did, comply with these requirements.

Far from executing trades "as soon as practicable" and doing so in an unbiased way, the defendant's allocations typically were delayed by many hours, resulted in consistently favorable *and* unfavorable treatment, had no documented methodology permitting independent verification

of fairness, and cannot be reconstructed by anyone, including the defendant himself. The existence of a rule with which the defendant did not comply should not circumscribe the Government's argument at trial. For example, the fact that certain tax deductions are lawful would not preclude argument that deductions exceeding income were suspicious, or that thousands of identical deductions across multiple returns demonstrated a tax preparer's fraudulent intent. The Government, no less than the defense, may fairly argue inferences to be drawn from the facts, including that Leech's unusually long delay in allocations tends to show he purposefully acted to take account of first-day performance.

The Government's trial arguments regarding Leech's delayed allocations will be bolstered by the further fact that Leech's conduct violated WAMCo policy. WAMCo's policy concerning "bunched orders," which are the subject of Rule 1.35, required "a pre-determined and impartial procedure" for allocation, and an "intended allocation algorithm" provided "to the broker before or promptly after a trade [was] executed." Far from permitting traders and portfolio managers to take in the day's market activity before making allocation decisions, WAMCo required traders to determine an allocation procedure for "bunched orders" pre-trade.

Consistent with that policy, WAMCo's compliance staff and internal training regularly described end of day allocations as risky and inappropriate.[4] In particular, annual trainings and email instructions prepared by WAMCo's chief compliance officer repeatedly counseled WAMCo

---

[4] The defendant asserts that WAMCo's compliance manual "only required that *traders*" allocate their trades by the end of the day on which they were executed. (Dkt. 58 at 13 n.3). In fact, WAMCo's compliance manual required that *Western Asset* allocate trades by the end of the day on which trades were executed. After a trader conveyed an allocation decision to an assistant, and after the assistant entered the allocation in ATP, multiple time-consuming operational steps occurred to settle trades with clearing brokers such that they were actually allocated to client accounts. Thus, the distinction is significant.

investment staff to allocate trades promptly. For example, in a video-recorded 2018 investment management refresher training, WAMCo's chief compliance officer advised investment staff:

> [A]t the bottom right that you'll see, "Finalize allocations and the trade ticket promptly after the trade execution." This is another thing that we know that the regulators are doing, they're looking at time stamps. So, if they get a sense that you executed first thing in the morning but we didn't allocate until the end of the day, they may come to us, especially on a volatile day, and wonder "Geez you only allocated after you saw what the market did." So, the sooner you get that trade executed and allocated and that ticket drafted so we can get it posted, the shorter that amount of time of delay is, and the less risk that you have of being second guessed.

Rather than sanctioning end of day allocations, this WAMCo training described allocating "end of day" as a "risk," and identified the defendant's precise conduct (executing "first thing in the morning" and waiting to allocate) as likely to attract regulatory scrutiny.

Similarly, in a video-recorded 2019 compliance training, WAMCo's chief compliance officer advised investment staff:

> [F]inalizing trades promptly is important for a lot of reasons. Some of them are operational, some of them are also regulatory risks, so look at this fact pattern. We have a bad fact pattern if you execute the trade in the morning, the market makes big moves, and you allocate later in the day. The regulator looks at that and says "geez, how do I know when you allocated at one o'clock, that you allocated the same way you would have at eight now that you know that the market moved?" I'm sure we never do this, but [regulators have] seen other people in the industry do this and this is one of the things they look at when they come and check out our blotter.

Far from approving end of day allocation (despite the existence of Rule 1.35), this training described allocating "later in the day" after "the market makes big moves" as a "bad fact pattern." Indeed, WAMCo's chief compliance officer found this practice so unacceptable, he stated "I'm sure we never do this."

In addition to focusing on the importance of timely allocations in formal training, WAMCo's compliance department conveyed similar messages in written directives. For example, in an August 2, 2021, email addressed to all portfolio management and trade operations staff, WAMCo's chief compliance officer exhorted staff to "**Finalize allocations promptly after execution so that ATP tickets can be drafted and posted**." (emphasis in original). The email detailed, "Minimizing the time gap between execution and posting mitigates the risk of market movement before the allocation is finalized. We do not want a market movement after execution to influence the allocation. . . . We do NOT want a fact pattern that implies that we might trade and then wait to see how the market changes during the day before finalizing our allocation." The email detailed, "The longer the gap between execution and allocation, the higher the risk of market movement. Even if your actions are benign, we might have to defend and explain if we have a pattern of market movements and allocations made late in the day." Once again, the defendant's exact practice of allocating only after the market moved was described by WAMCo as an undesirable fact pattern.

Because Rule 1.35 does not "expressly permit" the defendant's conduct, and because the timing of the defendant's allocations in light of the circumstances supports a variety of inferences about the defendant's intent and purpose, there is no basis to preclude the Government from arguing that the jury may infer the defendant's conduct was "improper" or "suspect" or, as alleged, fraudulent.

## III.    The Court Should Permit the Government to Use Accurate Language to Describe the Defendant's Scheme

The defendant argues the Government should be precluded from (i) referencing the net first-day gains and losses attributable to his scheme, and (ii) using the terms "good," "bad," "winners," and "losers" to describe his trades. The Court should deny the motion. The phrases and

terms identified by the defendant are factually accurate, commonly used, and easily understood. The defendant identifies no legal basis to preclude their use but rather contends that Leech did not act with the intent to defraud and did not cause losses to his investors. However, those are the factual issues the jury will decide, and the Rules of Evidence do not permit the defendant to impose burdensome and unnecessary limitations on the Government's language in advocating at trial.

With respect to the net first-day gains and losses attributable to the defendant's scheme, the defendant argues the Government should be precluded from referencing the more than $600 million of gains enjoyed by favored funds and more than $600 million of losses suffered by disfavored funds. The defendant first asserts that because the Government is not arguing "*every* trade allocated during the relevant period was misallocated," the $1.2 billion differential between favored and disfavored funds is overstated. (Dkt. 58 at 14). This argument appears to misapprehend the pool of trades identified by the Government's bill of particulars, which is substantially less than "every trade" the defendant executed during the period charged in the Indictment. In fact, the defendant allocated approximately half of his Treasury futures and options  trades "50/50," splitting them among his favored and disfavored funds. The gains and losses attributable to the defendant's "50/50" allocations are not accounted for in the $1.2 billion differential, nor are gains and losses attributable to trades executed through Broker-1, trades executed on certain types of trade tickets, or trades in foreign currency instruments. Instead, the $1.2 billion differential is attributable to Treasury futures and options trades the defendant executed and specifically allocated to favored or disfavored funds. As such, the figure is not overstated.

More fundamentally, the defendant does not contest that he did in fact allocate more than $600 million in net first-day gains to favored funds and $600 million in net first-day losses to disfavored funds. Nor does the defendant attempt to contest that this incredible disparity is relevant

16

under Rule 403.[5] It is obviously relevant and is the type of evidence used to demonstrate knowledge and fraudulent intent in other cherry-picking cases.[6]

The defendant's focus on whether trades identified by the Government's bill of particulars were "misallocated" is itself misplaced. After trial, the jury will not be asked to determine which of the defendant's trades were "misallocated." Rather, the jury will be asked to determine whether the defendant executed a scheme to defraud investors. The defendant's pattern of allocating trades that performed well between execution and allocation to favored funds and trades that performed poorly between execution and allocation to disfavored funds is evidence of his undisclosed scheme to favor certain funds at the expense of others. The magnitude of the differential is merely the sum of specific allocation decisions the defendant made during the period charged in the Indictment. In other words, the $1.2 billion differential is a product of the defendant's scheme, not a figment of the Government's imagination. The defendant will be free to argue that the jury should disregard the pattern in its entirety, because certain trades were "appropriate" for a particular strategy on a particular date. By the same token, the Government should not be constrained from arguing that

---

[5] *United States v. Rutigliano*, 614 F. App'x 542, 545 (2d Cir. 2015); *United States v. Abu-Jihaad*, 630 F.3d 102, 131-132 (2d Cir. 2010) ("To be relevant, evidence need not be sufficient by itself to prove a fact in issue, much less to prove it beyond a reasonable doubt. . . . . Rather, evidence is 'relevant' if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" (quoting Fed. R. Evid. 401)).

[6] *See*, *e.g.*, *SEC v. Werthe*, No. 23 Civ. 815, 2025 WL 790970, at *5 (S.D. Cal. Mar. 12, 2025) ("Defendant allocated trades totaling $33,341,414 (based on the purchase price) to the Werthe Account and earned a profit of $471,885. He allocated trades totaling $43,846,546 (based on the purchase price) to the Client Accounts, which collectively incurred a loss of $555,485."); *SEC v. World Tree Fin. LLC*, 18 Civ. 1229, Dkt. 91 (W.D. La. Jan 15, 2021) (findings of fact including that expert *SEC v. World Tree Fin., L.L.C.*, 43 F.4th 448 (5th Cir. 2022); *SEC v. K.W. Brown Investments Inc.*, 555 F. Supp. 2d 1275, 1299 (S.D. Fla. 2007) (expert analysis found "the results of these trades were polar opposites, because 89% of the trades placed in the 180 Account were winners that generated profits of more than $1.79M while 91% of the trades placed into ten or more customers accounts were losers for losses of more than $3.4M").

the defendant's consistent pattern of allocation decisions, which sent hundreds of millions of dollars of trades at first day gains in one direction and hundreds of millions of dollars of trades at first day losses in the other direction, is powerful proof of the defendant's fraudulent scheme.

The defendant next argues the $1.2 billion differential is overstated because the gains and losses attributed to the defendant's Treasury futures and options trades were "unrealized." (Dkt. 58 at 15). This argument is flawed. All gains and losses are "unrealized" until a position is closed – that is not a feature unique to the defendant's trading. To the contrary, because WAMCo was not a day trading operation but a fixed income investment manager committed to long-term stewardship of client funds, the Government expects the evidence at trial will demonstrate that WAMCo's portfolio managers generally opened positions with the expectation of maintaining them to generate value over time. Despite remaining open for certain periods of time after execution, all trades contribute to fund performance in additive and negative ways on the date of trade execution. Importantly, WAMCo calculated the net asset value of its funds on a daily basis, certain WAMCo clients requested daily reporting of net asset value, and for retail investors in WAMCo mutual funds, "unrealized" gains and losses contributed to the value of the position they could subscribe to or redeem on any given date. The defendant could not control whether a trade was at a gain or a loss after he allocated it, because the market is not predictable. It is of no moment that the defendant's trades were "mostly held for longer periods of time," (Dkt. 58 at 15), because he exercised control in the only window of opportunity available to him, which existed post-trade and pre-allocation.

Citing to *United States v. Finnerty*, 474 F. Supp. 2d 530 (S.D.N.Y. 2007), a Rule 29 decision, the defendant next argues that reference to the $1.2 billion differential among the defendant's favored and disfavored funds would be unfairly prejudicial. In *Finnerty*, the

prosecution made repeated references to thousands of "instances of interpositioning" but the district court later concluded the figure was "clearly and significantly overstated" in light of the proof developed at trial, in part because "the Government failed to account for numerous circumstances when Finnerty was not executing the trades himself-he was not on the floor or he was not at his post or he was negotiating with the crowd or otherwise engaged in non-trading activity." *Finnerty*, 474 F. Supp. 2d at 546. That specific evidentiary concern is absent here, because there is no dispute that the trades accounted for in the $1.2 billion differential were executed and allocated by the defendant himself.

With respect to describing trades as "good" or "bad" or "winners" or "losers," the defendant argues such terminology should be precluded because it is inaccurate and would mislead the jury. According to the defendant, he and WAMCo did not measure or focus in any way on the "hypothetical gains and losses of particular trades" on the date of execution. (Dkt. 15 at 16). To the contrary, the Government expects the evidence at trial will show the defendant and WAMCo were intensely focused on the favored funds' daily performance, which is of course affected by how trades perform on the date of execution. Further still, the evidence will show that WAMCO did "measure" trades' first-day performance. Not only that, the evidence also will show that multiple WAMCo employees flagged the defendant's first-day performance metrics as anomalous, with one employee noting, for example, that the defendant's first-day trading gains in Account-2 were "amazingly positive."

In addition to the daily calculation of portfolio performance described above, the defendant and others routinely used common adjectives connoting value to describe trading and trade dates. For example, in an email exchanged among the defendant and his team on February 22, 2021, a trader asked an analyst to recalculate the day's performance and "only send back a *positive*

number." A fellow portfolio member responded, "knew it was shaping up to be a *tough day across every trade*, but did not expect that number." In response to a performance estimate the same analyst provided on October 29, 2021, the defendant asked how convexity got him "longer both yesterday (*down day*) and today (*up day*)." (emphasis added). In an email dated December 29, 2021, the defendant described his expectations for a "*big negative* day." In an email dated March 25, 2022, the defendant wrote a co-portfolio manager that selling calls "near the *low*" kept a favored fund from being "just one *bad* day from out of bounds."

Such descriptive terminology for trading and trade dates was not limited to the defendant's team at WAMCo, but was used by WAMCo employees in other departments, clients, and trading counterparties as well. For example, a WAMCo client pitch deck described success as driven by "picking winners but ALSO avoiding losers." Similarly, WAMCo's responses to written due diligence questions from a different client stated "[w]e particularly believe that correctly picking winners and losers" in a particular investment space "will allow for strong alpha generation." Likewise, in a summary of a Core Strategies client meeting dated January 25, 2022, a WAMCo client services representative described a "*good* trade." In an email to all investment staff, WAMCo's chief compliance officer advised, "The SEC is concerned that an adviser might use knowledge of market movement to allocate *winning* trades to certain accounts."

The Government expects that commonly used words, such as "good," "bad," "up," "down," "positive," "negative," "winners," and "losers," and variations thereof, will be used to describe the defendant's trading and allocations at trial. These words are easily understood by jurors, facilitate a description of the offense conduct, and are not unfairly prejudicial. As courts have recognized, the Government cannot be expected to prove the crime without being able to describe the crime and communicate its theory of the case. Use of descriptive terminology like "good trade" and "bad

trade" in a jury address is not an expression of counsel's opinion; it is the Government's litigating position, just like referencing someone as the "shooter" in a shooting case or the "dealer" in a narcotics case. Words that describe the offense conduct are a necessary part of explaining and narrating the offense conduct to the jury. *See*, *e.g.*, *United States v. Dupigny*, No. 18 Cr. 528 (JMF) (Oct. 17, 2019), Dkt. 198 at 49-50 ("It strikes me that precluding the[] use [of "victim" or "pimp"] altogether is both unnecessary and impractical. I think the discussion that we just had is an example that it's just hard to engage in a discussion of the charges here without using those terms"); *United States v. Ahmed*, 94 F. Supp. 3d 394, 435–36 (E.D.N.Y. 2015) ("Defendants assert that these words [including terrorist, terrorist activity, or terrorism] are prejudicial and inflammatory and amount to legal conclusions that must be left for the jury to determine. Defendants' request is unnecessary and impractical."); *United States v. White*, No. 08 Cr. 0682 (NGG), 2009 WL 4730234, at *2 (E.D.N.Y. Dec. 4, 2009) (permitting the use of the phrase "convicted felon" as a convenient shorthand," and noting "[c]ourts have routinely used it in that manner, and defense counsel has provided no reason why it would be inflammatory to use it before a jury"). Here, none of the objected-to terms are in fact inflammatory or prejudicial; they are accurate, descriptive, and relevant to the offense conduct.

The defendant's motion to preclude reference to the amount of first-day gains and losses attributable to his scheme and the use of common descriptive words and phrases is nothing more than an attempt to sanitize the evidence and testimony by preventing the Government and its witnesses from describing the defendant's conduct. Such cumbersome and unworkable restrictions are routinely rejected by courts and should not be imposed here.

## IV.    The Defendant's "Other Acts" Are Admissible

On November 12, 2025, consistent with the Court's scheduling order, the Government provided the defendant with notice of the following "other act" evidence it may seek to introduce

21

at trial: (i) a 2011 trade the defendant executed electronically and later reallocated to an entirely different account; (ii) the defendant's personal investment in a WAMCo fund, which was investigated by WAMCo and deemed to lack appropriate approvals; (iii) certain trades executed by the defendant and investigated by a fellow-portfolio manager; (iv) an earlier in time allocation practice which involved the end of day delivery of paper tickets to Trading Assistant-1; and (v) the defendant's repeated failures to report or preclear trades. (Dkt. 61: Sobel Decl. Ex. A). The defendant moves to preclude all five categories of other act evidence, asserting each constitutes "impermissible propensity evidence." (Dkt. 59).

For the reasons described below, each category of evidence is admissible for non-propensity purposes, including to rebut certain arguments the defendants have foreshadowed in advance of trial. Thus, the defendant's motion should be denied.

### A.    Applicable Law

#### 1.    Rules 401-403

Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence; and . . . the fact is of consequence in determining the action." Fed. R. Evid. 401. "To be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997). So long as evidence has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable that it would be without the evidence," it is relevant. *United States v. Quinones*, 417 Fed. Appx. 65, 68 (2d Cir. 2011). Under Rule 403, a court may exclude relevant evidence only "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, wasting

time, or needlessly presenting cumulative evidence," Fed. R. Evid. 403; *see also United States v. Miller*, 626 F.3d 682, 689 (2d Cir. 2010).

### 2.    Direct Evidence and Rule 404(b)

Evidence of an uncharged act is admissible as direct evidence, without regard to Rule 404(b), if the uncharged act "arose out of the same transaction or series of transactions as the charged offense"; (2) "is inextricably intertwined with the evidence regarding the charged offense"; or (3) "is necessary to complete the story of the crime on trial." *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997). State of mind evidence also is admissible as direct evidence of the charged crimes. *See, e.g.*, *United States v. Vaccarelli*, No. 18 Cr. 92 (JBA), 2020 WL 1329695, at *7 (D. Conn. 2020) (defendant's knowledge and evasion of his employer's rules was "highly relevant to his mental state in committing the charged fraud"), *aff'd,* No. 20-3768-CR, 2021 WL 4805218 (2d Cir. 2021) (affirming district court's ruling that such evidence was direct evidence of the charged crimes).

Rule 404(b), while prohibiting the introduction of other act evidence to prove that the defendant has a propensity to commit the offenses charged, nonetheless explicitly allows admission of such evidence "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b). The Second Circuit has adopted an "'inclusionary' approach" to Rule 404(b), under which "all 'other act' evidence is generally admissible unless it serves the sole purpose of showing a defendant's bad character." *United States v. Siddiqui*, 699 F.3d 690, 702 (2d Cir. 2012); *see also United States v. Curley*, 639 F.3d 50, 57 (2d Cir. 2011) ("'Other act' evidence serves a proper purpose so long as it is not offered to show the defendant's propensity to commit the offense."). To determine admissibility under Rule 404(b) (in conjunction with Rule 403), the Court should consider whether (1) the evidence is offered for a proper purpose; (2) the evidence is relevant to a

disputed issue; and (3) the probative value of the evidence is substantially outweighed by its prejudicial effect. *Curley*, 639 F.3d at 50. In addition, the Court should give an appropriate limiting instruction to accompany any such evidence, if the defense so requests. *Id.*

### B.    Discussion

#### 1.    The Court Should Admit the Defendant's 2011 TIPS Trade

The defendant executed the majority of his trades by voice, using the telephone. However, on February 17, 2011, the defendant executed a substantial trade in Treasury Inflation-Protected Securities ("TIPS"), using an electronic trading platform called Tradeweb. Because the trade was executed electronically, it was documented electronically. The defendant's Tradeweb history reflects the defendant's order time was 9:16 a.m. (EST). The defendant's Tradeweb history also reflects the defendant's order was accepted and then confirmed by a dealer one minute after it was placed, on February 17, 2011, at 9:17 a.m. The Tradeweb history further reflects that between when the defendant placed the order and when the dealer confirmed acceptance, the defendant documented an intended allocation for the trade, portfolio 1446. In an email approximately twelve hours later, and after the value of the defendant's TIPS trade increased, he emailed his then-trading assistant, stating, in substance and in part, "I purchased 20 million tips yesterday—I meant to put them in [Account-2]/1058…. Did you divi[]ne what I meant?" His assistant responded, in substance and in part, "You noted allocation as #1446… so no I did not read what you meant…. I will revise now."

This incident succinctly demonstrates the defendant's intent and plan to favor certain accounts (including Account-2) at the expense of others, and his opportunity to observe market movement prior to allocation decisions. Therefore, it is plainly admissible under Rule 404(b).

The defendant asserts the 2011 TIPs trade is too remote in time to be relevant, and does not demonstrate intent, plan, or absence of mistake because the defendant's reallocation was

approved by WAMCo's compliance department as a purported "mistake." As an initial matter, pursuant to Rule 404(b), the Second Circuit has identified permissible purposes for the admission of other acts, such as the defendant's TIPs trade, occurring within ten years of a charged crime. *See*, *e.g.*, *United States v. Ling*, 172 F. App'x 365, 366 (2d Cir. 2006) (finding that testimony concerning ten-year old narcotics transactions would have been admissible pursuant to Rule 404(b) to prove knowledge and opportunity). Further, while the defendant is free to argue that his initial, electronic allocation was an error, the jury is also free to reject that argument; they may find it implausible that although the defendant first allocated the whole trade to a single portfolio, his intent was to split the trade in unequal percentages among two entirely different portfolios. That the defendant was able to generate a post-hoc reason for reallocation that WAMCo accepted is not particularly persuasive, in view of the fact that the record does not appear to reflect a single instance in which WAMCo's compliance department denied the defendant's request to reallocate a trade.

The defendant next argues this incident does not demonstrate the opportunity to observe market movement and then allocate because the initial, electronic allocation was contemporaneous with trade execution. However, the electronic record demonstrates the defendant executed the TIPs trade, and then twelve hours later, after it increased in value, made another allocation decision. (Sobel Decl. Ex. D). That it was a reallocation decision does not alter the basic principal that the defendant had the opportunity to allocate a trade many hours after it was executed, following

significant market movement.[7] Thus, to the extent the defendant contests he had the opportunity to consider post-execution trade performance before allocating trades, this evidence is admissible to demonstrate opportunity.

Finally, the probative value of the TIPs trade is not outweighed by the risk of unfair prejudice. The central allegations in this case concern a preferential allocation scheme occurring over nearly three years. A single, discrete instance of reallocation to accomplish the goal of benefiting Account-2 is "[no] more sensational or disturbing." *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990). The defendant's assertion that evidence concerning a single trade would devolve into a mini-trial is unfounded. The Government would establish the transaction through testimony from a lay witness and documentary evidence including contemporaneous emails, the defendant's trade blotter, and historical pricing data.

### 2. The Court Should Admit Evidence of the Defendant's 2011 Trading in Portfolio 1058

In 2011, WAMCo investigated the defendant's personal investment in a WAMCo proprietary fund called the Macro Speculation Fund, portfolio 1058 ("Portfolio 1058").[8] Portfolio 1058 was funded at various times by Western Asset, a Legg Mason executive, and the defendant himself. In April 2011, performance in Portfolio 1058 was flagging. At that time, and again two months later, in June 2011, the defendant personally invested $4,000,000 in Portfolio 1058. After

---

[7] The defendant asserts historical records would establish the bond market declined between February 17, 2011, at 12:00 p.m. PT, when WAMCo's blotters documented an improved end of day price for the TIPS trade, and February 17, 2011, at 9:00 p.m. PT, when the defendant emailed his assistant seeking to reallocate the TIPS trade. The defendant's trade blotter reflects he purchased the TIPS at 98.37539, and the end of day price was 99.25, and historical pricing data from Bloomberg reflects the price of TIPS rose between when the defendant executed the TIPS trade and when he reallocated it. Thus, prices in the broader bond market do not seem relevant.

[8] Portfolio 1058 is referred to in the defendant's motion as "Account-1." To avoid confusing Portfolio 1058 with the "Account-1" identified in the Indictment, the Government will refer to it as Portfolio 1058.

the defendant's investment, Portfolio 1058 had a remarkable recovery, and in a period of months the defendant made several million dollars on his investment.

Subsequently, with the assistance of outside counsel, WAMCo conducted an investigation of the defendant's investment in Portfolio 1058. The investigation considered whether the defendant violated the letter of WAMCo's personal trading rules, by failing to obtain approval for his investments, or the spirit of WAMCo's personal trading rules, by preferencing his own interests above client interests. In connection with the investigation, WAMCo's chief compliance officer conducted an analysis of the defendant's trading in Portfolio 1058 and Account-2. Among other things, WAMCo's chief compliance officer analyzed whether there was any evidence of "front running or preferred allocations with 1058," whether "1058 would have been subjected to the Code of Ethics as a personal account," and whether there was "[e]vidence of [the defendant] using 1058 as a proxy personal account." Following the internal investigation, Western Asset determined the defendant's investment in Portfolio 1058 lacked "all appropriate approvals." After retaining counsel, the defendant agreed with WAMCo to disgorge approximately $6,000,000 in gains attributable to his investment in Portfolio 1058.

The Government must establish that the defendant participated in a scheme to defraud investors and that he acted knowingly and with intent to defraud. The fact that the defendant previously was investigated for preferential allocations put him on notice that such conduct is improper and thus is direct proof of his knowledge and intent. *See*, *e.g.*, *Vaccarelli*, 2020 WL 1329695, at *7 (D. Conn. 2020) (defendant's knowledge and evasion of his employer's rules was "highly relevant to his mental state in committing the charged fraud"), *aff'd,* No. 20-3768-CR, 2021 WL 4805218 (2d Cir. 2021) (affirming district court's ruling that such evidence was direct evidence of the charged crimes).

Prior act evidence also is admissible to demonstrate intent "[w]here a defendant claims that his conduct has an innocent explanation." *United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993). "Where intent to commit the crime charged is clearly at issue"—that is, where it is an element of the crime—"evidence of prior similar acts may be introduced to prove that intent." *United States v. Caputo*, 808 F.2d 963, 968 (2d Cir. 1987). "Evidence of other acts need not be identical to the charged conduct to show knowledge or intent pursuant to Rule 404(b), so long as the evidence is relevant in that it provides a reasonable basis for inferring knowledge or intent." *United States v. Cadet*, 664 F.3d 27, 32-33 (2d Cir. 2011). Because intent to defraud is an element, evidence tending to show the defendant's understanding that it was improper to allocate trades based on post execution performance is particularly relevant. *See also United States v. Moseley*, 980 F.3d 9, 27 (2d Cir. 2020) ("Here, borrower complaints about illegal practices by Moseley's business served to put Moseley on notice of their potential illegality. That he continued to operate his business despite this notice makes the complaints probative of his intent to violate the law.").

Contrary to the defendant's assertion, this evidence does not present any meaningful concern of unfair prejudice. Evidence is unfairly prejudicial when "it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Massino*, 546 F.3d 123, 132 (2d Cir. 2008). Prejudice is "not likely to be great" where the prior bad acts "are not especially worse or shocking than the transactions charged." *United States v. Mercado*, 573 F.3d 138, 142 (2d Cir. 2009). Here, a prior investigation resulting in a finding that the defendant failed to obtain all appropriate approvals for personal trades in a WAMCo fund is not more inflammatory than a multi-year scheme to defraud investors.

Finally, the fact that the defendant previously was investigated for preferential allocations is relevant to rebut any suggestion the defendant he believed he was acting properly or in good

faith. For example, if the defendant were to testify he believed Rule 1.35 permitted him to observe market movements and then wait all day before allocating trades at a gain to certain portfolios and trades at a loss to other portfolios, the prior investigation is evidence that he was on notice that it did not. In addition, the prior investigation is relevant to rebut any suggestion or claim by the defendant that he has an unblemished record or has never engaged in trading impropriety. To the extent the defendant makes such arguments, the Government will seek to introduce evidence related to his investment in Portfolio 1058, and WAMCo's investigation of the same.

### 3.    2011 Allegations of Preferential Allocations

In addition to the internal investigation described above, a fellow portfolio manager ("Witness-1") separately accused the defendant of engaging in preferential allocations in 2011. Specifically, Witness-1 reviewed the defendant's trade blotter and identified offsetting trades in Treasury bonds and other United States debt instruments. The trades were "offsetting" in that as one increased in value the other decreased in value and both could not be profitable at the same time. For example, transactions buying and selling the same instrument which necessarily move in opposite directions depending on the market. According to Witness-1, the defendant allocated his offsetting trades late in the day with winning trades allocated to a hedge fund-type vehicle, and losing trades allocated to Western Asset's broad market portfolios.

Witness-1 is expected to testify that in approximately October 2011, Witness-1 learned of a particular trade in which the defendant bought a substantial number of zero-coupon bonds and upon investigation learned the defendant also executed an offsetting futures trade. According to Witness-1, both trades were allocated late in the day with the losing trade going to the defendant's non-United States accounts, and the winning trade going to the defendant's hedge fund-type account. Contrary to defense counsel's assertion (Dkt. 59 at 24), the record does reflect that the defendant sold offsetting futures on the same date as the zero-coupon trade, and allocated them to

Portfolio 1058 and Account-2 at substantial first day gains. Witness-1 prepared excerpts of the defendant's trade blotter and summarized order allocation history with respect to the zero-coupon trade and shared the information by email with another Western Asset executive ("Witness-2"). Witness-1's email noted the defendant's losing zero-coupon trade was executed at 5:26 a.m., and allocated at a loss approximately eight hours later, at 1:36 p.m. On the same date, Witness-1 conducted a review of the defendant's trade blotter for an earlier period in time, and identified additional offsetting trades. Witness-1 also shared this blotter, which reflected both the zero-coupon trade and the offsetting futures trade, with Witness-2.

Witness-1 believed the defendant was either personally invested in the hedge-fund type account to which he allocated winning trades, or received performance fees from the account to which he allocated winning trades. According to Witness-1, after identifying this pattern and sharing it with Witness-2, he notified Western Asset's then-general counsel. Witness-1 is expected to testify that after initially identifying the defendant's pattern of preferential allocations, he persistently discussed them, and eventually was advised that he should resign.

Witness-1's account of events occurring in 2011 is substantially corroborated by the record. For example, the record includes the emails described above and reflects Witness-1 had a meeting with WAMCo's then-general counsel on a Saturday in 2013, which meeting Witness-1 is expected to testify was to discuss his concerns about the defendant's trade allocations. The record also reflects Witness-1 made a contemporaneous complaint to the Securities Exchange Commission ("SEC"). Contrary to defense counsel's assertion (Dkt. 59 at 25), numerous of Witness-1's contemporaneous emails have been produced in discovery, and the Government advised defense counsel that to the extent Witness-1 testifies, any additional Witness-1 statements will be produced on the Court-ordered deadline for the production of Section 3500 material.

Far from being a "naked propensity argument" (Dkt. 59 at 23), Witness-1's testimony is admissible for multiple purposes pursuant to Rule 404(b), including to demonstrate the defendant's opportunity, intent, plan, absence of mistake or lack of accident. To the extent the defendant contests he had the opportunity to observe market movements before allocating his trades, Witness-1 personally observed instances in the defendant's trade blotter and ATP records wherein he executed trades in the early morning and allocated them in the late afternoon. Witness-1 will be able to describe the steps he took using ATP to identify this timing information for the defendant's trades.

For much the same reasons described above with respect to WAMCo's 2011 investigation of the defendant's investment in Portfolio 1058, Witness-1's account also is relevant to the defendant's knowledge and intent, which the Government anticipates will be at issue at trial.

In addition, the Government expects one of the defenses at trial will be the improbable distribution of gains and losses to the defendant's favored and disfavored accounts was in fact accidental. Thus, Witness-1's observation that the defendant previously allocated trades at a gain to high fee-paying hedge fund-type accounts, and trades at a loss to accounts paying lesser fees is relevant to his plan, and the absence of mistake or lack of accident. *See United States v. Downing*, 297 F.3d 52, 59 (2d Cir. 2002) (affirming admission of evidence concerning prior, similar scheme "for the purpose of showing [defendant's] knowledge, intent or absence of mistake").

Finally, the defendant's argument that admission of Witness-1's 2011 allegations would cause a confusing, time-wasting sideshow (Dkt. 59 at 25), is overblown. Proving up other acts pursuant to Rule 404(b) necessarily involves the admission of additional evidence, the time required to do so here would be no greater than with other acts in other cases. The jury in this case will be asked to consider financial records spanning years, and to develop some familiarity with

fixed income investment terms. The Government anticipates that by the time of Witness-1's direct testimony, the jury already will be familiar with certain subject matter and Witness-1's description of events occurring in 2011 and shortly thereafter will take a matter of hours at most. The limited records Witness-1 examined, which are WAMCo's business records, cover a short period of days. The Government does not intend to offer any expert testimony related to Witness-1's observations.

### 4.    Trading Floor Parlor Game

Beginning in approximately 2014, a particular portfolio manager ("Witness-3") worked near Trading Assistant-1 on WAMCo's trading floor. Witness-3 sat near Trading Assistant-1 for years, until approximately March 2020, when the majority of WAMCo's staff began working at home because of the Covid-19 pandemic. During that time, Witness-3 observed interactions between the defendant and Trading Assistant-1 on a near daily basis.

According to Witness-3, the defendant generally spent approximately one hour each morning on the trading floor, then went to his office until near the close of the market. At some time near or after the close of the market, the defendant returned to the trading floor and gave Trading Assistant-1 a stack of paper trading tickets. At that time of day, the trading floor was calm, and Witness-3 regularly was able to hear the defendant providing brief instructions to Trading Assistant-1. After speaking to the defendant, Trading Assistant-1 would enter the defendant's trades and allocation instructions into Western Asset's electronic trade allocation system. Witness-3 understood Trading Assistant-1 was entering trade allocations because if Witness-3 walked past Trading Assisant-1's desk, she was typing into a trade allocation screen.

According to Witness-3, it was a "parlor game" on the trading floor to attempt to reconstruct the defendant's trading rationale by reviewing his trade log after Trading Assistant-1 went through the late afternoon routine of entering the defendant's allocations. Witness-3 typically reviewed the defendant's Core Strategies trades, because those had the most exposure to the

products Witness-3 traded. For the duration of Witness-3's tenure at WAMCo, Witness-3 and other traders and portfolio managers discussed the defendant's Treasury futures and options trades to try and understand the directionality and yield curve positioning of his trades.

As a portfolio manager, Witness-3 attended WAMCo's annual compliance training and received informal reminders from compliance staff concerning the importance of allocating trades close in time to execution. According to Witness-3, the defendant's practice of late-afternoon allocations was inconsistent with Western Asset's compliance training, the practice of other traders and portfolio managers at Western Asset, and Western Asset's fiduciary duty to its clients.

The Government intends to offer Witness-3's account of the defendant's trading and allocation practices as direct evidence of the charged crime. Out of an abundance of caution and because the substance of Witness-3's anticipated testimony pre-dates the time period charged in the Indictment, the Government provided notice of Witness-3's anticipated testimony in its 404(b) Notice. Contrary to defense counsel's repeated assertions, the fact that Witness-3's testimony concerns 2014 to 2020 does not render it irrelevant. Instead, "evidence that does not directly establish an element of the offense charged [is admissible] in order to provide background for the events involved in the case." *United States v. Inserra,* 34 F.3d 83, 89 (2d Cir. 1994).

Here, Witness-3's view that the defendant's end-of-day allocations occurred with regularity, diverged from the practices of other traders, and violated WAMCo's policies and trainings provides context for the charged offense and is directly relevant to the defendant's knowledge and intent. In particular, the Government anticipates the defendant will argue to the jury that his end of day allocations were permissible pursuant to WAMCo's policy that Western Asset must complete allocations by the end of the day on which transactions were executed. (Dkt. 58 at 13 n.3). Witness-3 will testify about WAMCo's compliance policies and training, developed

33

through his own participation in training and annual affirmation that he would abide by WAMCo's policies, his understanding of the reasons why prompt trade allocation was important, and his observation of the urgency with which he and other portfolio managers treated allocations. The jury may infer that if Witness-3 understood the written end of day policy to be an outside limit for exigencies, and that if Witness-3 understood prompt allocation to be an important matter of fiduciary duty, the defendant might have understood the same.

The Government also anticipates the defendant will argue his trades were not "misallocated" because they were consistent with WAMCo's broader investment themes and theses. Thus, it is relevant that at earlier periods of time other WAMCo employees were unable to guess at the rationale behind the defendant's trading and allocation decisions.

Further, the Government anticipates the defendant will argue the Government's witness are intent on maligning the defendant for financial gain (Dkt. 58 at 4) and due to personal animus. (Dkt. 59 at 25). Witness-3 will corroborate other witnesses' observations of the defendant's trading and allocation practices, undercutting the notion that multiple witnesses have undertaken to accuse the defendant of a cherry-picking for personal purposes.

Finally, the defendant's past allocation practice directly bears on his opportunity to commit the charged crime. The jury may infer from Witness-3's testimony that the defendant was confident in his ability to evade detection because he already had spent years allocating trades in a manner that violated WAMCo's policies and had suffered no consequences for doing so. The probative force of this evidence is further enhanced by the defendant's arguments that it would be irrational for him to cherry-pick because it would cost him his career. His past experiences show otherwise.

5. **The Court Should Admit Evidence of the Defendant's Prior Compliance Violations**

The Government has produced documentation of the defendant's extensive record of compliance violations in discovery.

Several of the defendant's compliance violations resulted in written memoranda describing his obligations and the potential ramifications of similar violations (the "Memoranda"). One such memorandum, dated July 25, 2000, was addressed to the defendant and described his failure to report a trade in Treasury notes for a particular portfolio. The memorandum described that failure to report a trade on its trade date was a violation of WAMCo's trade reporting policy, then stated in a separate bold paragraph: "Maintaining accurate records of our trading activity and portfolio positions is a requirement of the Investment Advisers Act of 1940. Failure to report trades in a timely manner is a violation of this requirement and could subject Western Asset to sanctions" by the SEC.[9] A subsequent memorandum, dated August 3, 2000, was addressed to the defendant and described his failure to pre-clear personal securities transactions. It stated, "failure to preclear personal securities transactions is a violation of Western Asset's Code of Ethics and could subject the firm to sanctions by the Securities Exchange Commission. This is your third violation of the Firm's Code of Ethics and is subject to a suspension of the ability to open a new position in any of your personal accounts for one month."[10] The defendant committed further personal trading violations in 2003, 2004, 2006, 2008, 2009, 2010, 2011, 2013, and 2018. These violations were documented by WAMCo in a spreadsheet identifying the violation date, type, and sanction imposed, among other things. The Government has not identified written notices resulting from these later in time-violations.

---

[9] Exhibit A: R01_376438.

[10] Exhibit B: R01_376468.

The defendant argues the Memoranda are not relevant because the violations they describe are dissimilar from the charged offense, the Government likely will have other evidence of the defendant's knowledge of WAMCo's policies, and the Government does not need to prove the defendant's knowledge of particular statutes or regulations violated by his conduct. (Dkt. 59 at 32-33).

Evidence of the defendant's knowledge of the securities laws and WAMCo's policies is clearly relevant to his intent to commit the charged crimes. *See*, *e.g.*, *United States v. Vaccarelli*, No. 20-3768, 2021 WL 4805218, at *2 (2d Cir. Oct. 15, 2021) (evidence that defendant violated employer and FINRA regulations was relevant to "'scheme to . . . conceal the defrauding' of his clients and probative of the manner and means by which [defendant] committed the charged offense."). The July 25, 2000, memorandum described above does not say "failure to report trades by the *end of the trading date* is a violation of the Investment Advisers Act of 1940." Instead, it states that "failure to report trades in a *timely manner* is a violation of the Investment Advisors Act of 1940." The August 3, 2000, memorandum described above states that violations of WAMCo's personal trading rules could subject the firm to sanctions by the SEC – such sanctions result from breaking the law, not from mere "administrative infractions." (Dkt. 59 at 31). Far from being ambiguous, these documents advised the defendant in plain English that multiple regulations and WAMCo policies governed the reporting of client and personal trades. This evidence satisfies the low bar for relevance set by Rule 401, and any potential prejudice stemming from the fact of the defendant's compliance violations can be cured with a limiting instruction. *See Vaccarelli,* No. 20-3768, 2021 WL 4805218, at *2 ("even if there was some potential for prejudice, the district court gave careful instructions to the jury not to convict for violation of a TIC rule, TIC contract, or

FINRA rule, because none of these acts, standing alone, would constitute a crime under federal law").

For all of these reasons, the Court should admit evidence of the "other acts" described in the Government's 404(b) Notice.

## V.    The Court Should Not Use a Written Juror Questionnaire

The defendant requests that the Court use a written juror questionnaire to "assist the court and the parties in selecting a fair and impartial jury." According to the defendant, extensive pretrial publicity, the anticipated duration of trial, complex subject matter, and anti-finance bias render oral *voir dire* insufficiently helpful. Because a written jury questionnaire is not warranted and would prolong the jury selection process, wasting time and resources, the defendant's motion should be denied.

"[T]he obligation to impanel an impartial jury lies in the first instance with the trial judge." *Rosales-Lopez v. United States*, 451 U.S. 182, 189 (1981). It is well-established that because federal judges "must rely largely on [their] immediate perceptions" to impanel an impartial jury, district courts "have been accorded ample discretion in determining how best to conduct the *voir dire*." *Id.* (citing cases); *United States v. Harding*, 273 F. Supp. 2d 411, 429 (S.D.N.Y. 2003) (same); *see also United States v. Quinones*, 511 F.3d 289, 299 (2d Cir. 2007). Accordingly, "[w]hether to use a jury questionnaire is within the discretion of the Court." *United States v. Tomero*, 486 F. Supp. 2d 320, 324-25 (S.D.N.Y. 2007) (citing cases); *see also, e.g.*, *United States v. Treacy*, 639 F.3d 32, 47 (2d Cir. 2011) (court did not abuse discretion in denying request for juror questionnaire); *United States v. Salameh*, 152 F.3d 88, 120-21 (2d Cir. 1998) (same). The Second Circuit thus "will not interfere with the manner in which the district court has chosen to conduct *voir dire* unless an abuse of discretion is 'clear.'" *Treacy*, 639 F.3d at 46; *see also id.* ("Although we have approved the use of questionnaires as one of many tools available for *voir*

*dire*, we have expressly declined to hold that district judges are ever obligated to make use of this procedure in selecting juries." (internal quotations and citation omitted)).

The circumstances of this case do not necessitate a juror questionnaire. The customary practice in this district is oral *voir dire* and that process is a time-tested method for selecting a fair and impartial jury. Written questionnaires have been administered in rare cases, sometimes with the consent of both parties (*see*, *e.g.*, *United States v. Maxwell*, No. 20 Cr. 330 (AJN)), where the defendant is nearly universally known to the public (*see*, *e.g.*, *United States v. Combs*, No. 24 Cr. 542 (AS)), and in other circumstances that are not present here. For example, courts in this district have used written questionnaires as a result of the decision to empanel an anonymous jury, *see, e.g.*, *United States v. Thai*, 29 F.3d 785, 800-01 (2d Cir. 1994) (discussing the use of a written jury questionnaire in selecting an anonymous jury as a result of, among other things, two defendants having threatened and killed a civilian witness), in capital cases, *see, e.g.*, *United States v. Quinones*, 511 F.3d 289, 299-300 (2d Cir. 2007) (discussing the use of a written jury questionnaire in a case in which jurors were asked to deliberate, following a penalty phase, as to whether or not to impose the death penalty), and in cases of particularly odious conduct, *see, e.g.*, *United States v. Melzer*, No. 20 Cr. 314 (GHW) (charges involving infiltrating the United States Army in service of satanist, neo-nazi, pro-rape organization, conspiring to murder United States service members, and material support of terrorism, with anticipated exhibits depicting torture, murder, lynchings, and sexual violence).

The defendant's argument that pretrial publicity favors a written jury questionnaire is without merit. While it is true that this case has been the subject of limited attention in the financial press, the majority of the coverage referenced in the defendant's motion was published on the date the Indictment was unsealed, or on the following day. There is no basis to conclude that a

customary *voir dire* process will fail to properly screen for pretrial bias, as it has in cases that received substantially greater press attention. *See, e.g.*, *United States v. Menendez*, No. 23 Cr. 344 (SHS) (S.D.N.Y. Apr. 22, 2024), Dkt. 344 at 64, 68 (denying defense request for a questionnaire and explaining, "I don't really find that they are terribly helpful"); *United States v. Hadden*, No. 20 Cr. 468 (RMB) (S.D.N.Y. Jan. 20, 2022), Dkt. 151 at 1 (denying defense request for juror questionnaire as "not necessary to select a fair and impartial juror in this case" and noting the Court's practice of conducting trials, "including those trials involving pretrial publicity," without using a juror questionnaire); *United States v. Doud*, No. 19 Cr. 285 (GBD) (S.D.N.Y. Jan. 10, 2022), Dkt. 134 at 86 (a juror questionnaire was inefficient and not "necessary" because the court could "adequately address the issues" and questions for the potential jurors, and concluding that the case was not "so unique[] that it would warrant a jury questionnaire" and that the "nature of the questions in the jury questionnaire are pretty much the questions that I can ask as a group of the jurors and have them indicate whether they have some response and follow-up questions with those jurors."); *United States v. Ray*, No. 20 Cr. 110 (LJL) (S.D.N.Y. Jan. 6, 2022), Dkt. 290 at 4 (a juror questionnaire would not be "appropriate" and "the way to ensure a fair and impartial jury for every party is to conduct oral *voir dire* and not to use a jury questionnaire."); *United States v. Parnas*, No. 19 Cr. 725 (JPO) (S.D.N.Y. Oct. 5, 2021), Dkt. 275 at 13 (denying defense request for written questionnaire, finding that "questioning the potential jurors in person is more reliable and efficient"); *United States v. Smith*, No. 13 Cr. 297 (KMK) (S.D.N.Y. Dec. 18, 2014) (minute entry denying motion for questionnaire in criminal trial of former State Senate Leader Malcolm Smith).

The circumstances in *United States v. Martoma*, No. 12 Cr. 973 (PGG) (S.D.N.Y.), on which the defendant relies, were markedly different than those here. Among other things, Martoma

went to trial following a press conference concerning a plea agreement between his employer, SAC Capital, and the United States Attorney's Office, in which SAC Capital was fined $1.8 billion. The public corruption and out-of-district cases cited by the defendant do not warrant a different result. The trials in *United States v. Percoco*, No. 16 Cr. 776 (VEC) (S.D.N.Y.) and *United States v. Silver*, No. 15 Cr. 93 (VEC) (S.D.N.Y.) generated substantial attention in the mainstream media and concerned New York State public officials. The FIFA corruption trial, *United States v. Full Play*, No. Cr. 252 (PKC) (E.D.N.Y.) was a matter of international interest. The trial in *United States v. Discala*, No. 14 Cr. 399 (EN) (E.D.N.Y.), implicated an issue of defendant's privacy sufficient to merit sealing later public filings related to the same. *See, e.g.*, *United States v. Gentile*, No. 21 Cr. 54 (PK) (E.D.N.Y.), Dkt. 251, 252 at 5 n.1 (redacting reference to privacy concern meriting jury questionnaire in *Discala*). The defendants in *United States v. Cioffi*, No. 08 Cr. 415 (FB) (E.D.N.Y.), were Bear Stearns hedge fund managers charged with various mortgage and securities fraud crimes who went to trial at the height of the financial crisis in 2009.

The defendant's further arguments, concerning the length of trial, complex subject matter, and financial industry-bias are no more persuasive. First, written questionnaires have been used in trials predicted to last for multiple months, rather than weeks. The cases cited by the defendant, *Cardwell v. Davis Polk & Wardell LLP*, No. 19 Civ. 10256 (GHW) (S.D.N.Y.) and *United States v. Melzer*, No. 20 Cr. 314 (GHW) (S.D.N.Y.), posed concerns beyond anticipated duration that contributed to the proposal of a written questionnaire. Second, the Government has identified no case in which a questionnaire was used to screen jurors who may "have difficulty with the complexity of the proof." Indeed, that concern seems like it would be better addressed by judicial impressions at oral *voir dire*. Similarly, concerns about anti-financial industry bias can be readily

addressed by oral *voir dire*, as in *United States v. Steinberg*, No. 12 Cr. 121 (RJS) (S.D.N.Y. Nov. 7, 2013), Dkt. 311. Put simply, nothing about the press attention or facts of this case warrant departing from the ordinary practice in this District.

Finally, there is no reason to believe the unsupported assertion that issues in this case would be "addressed more efficiently [in] written responses." (Dkt. 58 at 21). This is not the type of case in which prospective jurors' relevant personal experiences and impressions are likely to be deeply private or traumatizing, such that discussing them in open court might be painful or embarrassing. Instead of maximizing efficiency, a written questionnaire would prolong jury selection and waste judicial resources, which is not in the interest of the public or the prospective jurors. *See, e.g.*, *United States v. Parnas*, No. 19 Cr. 725 (JPO) (S.D.N.Y. Nov. 4, 2021), Dkt. 275 at 13 (denying defense request for written questionnaire, stating: "I'm not planning to do a written questionnaire in this case. I find that questioning the potential jurors in person is more reliable and efficient. And I will ensure that a fair jury is selected.").

If a juror questionnaire was administered in this case, the Government understands that the process would entail: (1) the parties and the Court drafting a juror questionnaire; (2) summoning prospective jurors to the courthouse to read through and complete the juror questionnaire; (3) a review of the completed juror questionnaires by the Court, the defendant, his numerous counsel, and the Government, while prospective jurors wait, to determine which jurors, if any, should be removed from the venire for cause; and (4) oral *voir dire* (which would likely involve follow-up questions to clarify the questions asked and answers provided on the written jury questionnaires). This multi-step process would likely take considerable pre-trial preparation and several days of juror time, if not longer. An oral *voir dire* would eliminate the first three steps while appropriately disposing of for-cause challenges. Jury selection would begin with the oral questioning of

prospective jurors and the parties could propose juror strikes the same day. In-person questioning would also allow the Court and the parties to directly assess the jurors and their responses—and ask follow-up questions on the spot. Such a process would lead to the same outcome: the selection of a fair and impartial jury.

## CONCLUSION

For the reasons set forth above, the Court should deny the defendant's motions *in limine*.

Dated: New York, New York
       January 15, 2026

                          Respectfully submitted,

                          SEAN BUCKLEY
                          Deputy United States Attorney
                          for the Southern District of New York

            By:     _s/_____
                          Thomas Burnett
                          Peter J. Davis
                          Assistant United States Attorneys

                          Lindsey Keenan
                          Special Assistant United States Attorney
                          (212) 637-2468; 1064; 6523

43