UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------x

UNITED STATES OF AMERICA :

- v. - : 24 Cr. 658 (GHW)

S. KENNETH LEECH II, :

Defendant. :

---------------------------------------------------x

**GOVERNMENT'S OPPOSITION TO THE DEFENDANT'S MOTION TO EXCLUDE EXPERT TESTIMONY**

SEAN BUCKLEY
Attorney for the United States
Southern District of New York

Thomas S. Burnett
Peter J. Davis
Assistant United States Attorneys

Lindsey Keenan
Special Assistant United States Attorney
*Of Counsel*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........ 1

ARGUMENT ........ 3

I. The Experts Are Not Offering Impermissible State of Mind Testimony. ........ 3

A. Relevant Facts ........ 3

B. Applicable Law ........ 8

C. Discussion ........ 11

II. Testimony That Certain Analyses Were Consistent With The Defendant Considering First-Day Performance Is Admissible Under Rule 403. ........ 19

III. The Experts Used Reliable Assumptions When Analyzing the Defendant's Trading. ........ 22

A. Relevant Facts ........ 22

B. Applicable Law ........ 25

C. Discussion ........ 26

IV. Testimony About Trades Placed After October 19, 2023 is Permissible. ........ 30

A. Relevant Facts ........ 30

B. Discussion ........ 32

V. Both Experts Are Qualified to Testify About the Portfolio-Management Topics Described in Their Notices. ........ 38

A. Applicable Law ........ 39

B. Discussion ........ 40

VI. The Experts Are Not Offering Improper Bolstering Testimony. ........ 47

A. The Opinions in Professor Cohen's Rebuttal Notice Are Admissible ........ 47

B. The Opinions in Professor Kolm's Sur-Rebuttal Notice Are Admissible. ........ 49

VII. Professor Cohen Does Not Intend to Use the Term "Material." ........ 51

CONCLUSION ........ 52

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Boucher v. U.S. Suzuki Motor Corp.*,
73 F.3d 18 (2d Cir. 1996) ... 26

*Cary Oil Co. v. MG Refining & Mktg., Inc.*,
2003 WL 1878246 (S.D.N.Y. Apr. 11, 2003) ... 39, 40

*CFTC v. Wilson*,
2016 WL 7229056 (S.D.N.Y. Sept. 30, 2016) ... 10, 40

*Diaz v. United States*,
602 U.S. 526 (2024) ... 8, 9

*Faulkner v. Arista,*
*Recs.*, 46 F. Supp. 3d 365 (S.D.N.Y. 2014) ... 50

*Graham v. Perez*,
2011 WL 1486707 (S.D.N.Y. Apr.15, 2011) ... 21

*Harris v. Walsh*,
2007 WL 1576265 (S.D.N.Y. June 1, 2007) ... 21, 22, 23, 24

*In re LIBOR Antitrust Litigation*,
299 F. Supp. 3d 430 (S.D.N.Y. 2018) ... 29, 40

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
2025 WL 2733020 (S.D.N.Y. Sept. 25, 2025) ... 10

*In re Mirena Prods. Liability Litig.*,
341 F. Supp. 3d 213 (S.D.N.Y. 2018) ... 50

*In re Payment Card Antitrust Litig.*,
2022 WL 15044626 (E.D.N.Y. Oct. 26, 2022) ... 10

*In re Rezulin Prods. Liab. Litig.*,
309 F. Supp. 2d 531 (S.D.N.Y. 2004) ... 11

*In re Term Commodities Cotton Futures Litig.*,
2020 WL 5849142 (S.D.N.Y. Sept. 30, 2020) ... 10, 12

*In re Zyperxa Prods. Liab. Litig.*,
489 F. Supp. 2d 230 (E.D.N.Y. 2007) ... 39

*Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*,
2006 WL 2128785 (S.D.N.Y. July 28, 2006) ... 39, 40

*Lickteig v. Cerberus Cap. Mgmt.*,
589 F. Supp. 3d 302 (S.D.N.Y. 2022) ... 27, 28

*McCullock v. H.B. Fuller Co.*,
61 F.3d 1038 (2d Cir. 1995) ... 40

*On-Track Innovations Ltd. v. T-Mobile USA, Inc.*,
106 F. Supp. 3d 369 (S.D.N.Y. 2015) ... 50

*Pasternak v. Kim*,
961 F. Supp. 2d 593 (S.D.N.Y. 2013) ........ 29

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
691 F. Supp. 2d 448 (S.D.N.Y. 2010) ........ 40

*Ploss v. Kraft Food Grp.*,
637 F. Supp. 3d 561 (N.D. Ill. 2022) ........ 10

*Quinton v. Am. Express Co.*,
2025 WL 1384896 (E.D.N.Y. May 13, 2025) ........ 50

*Restivo v. Hesseman*,
846 F.3d 547 (2d Cir. 2017) ........ 26, 32, 35

*SEC v. Jacobson*,
2025 WL 1026327 (E.D. La. Apr. 7, 2025) ........ 17

*SEC v. Paris*,
2024 WL 4433614 (N. D. Ill. Oct. 7, 2024) ........ passim

*SEC v. Susoeff*,
2024 WL 3938488 (D. Nev. Aug. 23, 2024) ........ 26

*SEC v. U.S. Environmental, Inc.*,
2002 WL 31323832 (S.D.N.Y. Oct. 16, 2002) ........ 10

*SEC v. Werthe*,
2025 WL 790970 (S.D. Cal. Mar. 12, 2025) ........ 13, 17

*SEC v. World Tree Financial*,
43 F.4th 448 (5th Cir. 2022) ........ 17

*SLSJ, LLC v. Kleban*,
277 F. Supp. 3d 258 (D. Conn. 2017) ........ 12

*Sullivan v. Ford Motor Co.*,
2000 WL 343777 (S.D.N.Y. Mar. 31, 2000) ........ 39

*TC Sys. Inc. v. Town of Colonie*,
213 F. Supp. 2d 171 (N.D.N.Y. 2002) ........ 40

*United States v. DiDomenico*,
985 F.2d 1159 (2d Cir. 1993) ........ 9, 10, 12

*United States v. Eldridge*,
528 F. App'x 17 (2d Cir. 2013) ........ 9, 12

*United States v. Gillis*,
938 F.3d 1181 (2d Cir. 2019) ........ 9

*United States v. Glenn*,
312 F.3d 58 (2d Cir. 2002) ........ 17

*United States v. Hwang,* 22 Cr. 240 ........ 12, 41, 42, 43

*United States v. Joseph*,
542 F.3d 13 (2d Cir. 2008) .................... 40

United States v. Leech, 24 Cr. 658 (GHW) .................... 1

*United States v. Lopez*,
547 F.3d 364 (2d Cir. 2008) .................... 9

*United States v. Patel*,
2023 WL 2643815 (D. Conn. Mar. 27, 2023) .................... 10

*United States v. Phillips*,
2023 WL 6620146 (S.D.N.Y. Oct. 10, 2023) .................... 10, 12, 13, 16

*United States v. Platt*,
608 F. App'x 22 (2d Cir. 2015) .................... 9

*United States v. Skyers*,
787 F. App'x 771 (2d Cir. 2019) .................... 9

*United States v. Vesey*,
334 F.3d 600 (7th Cir. 2003) .................... 21

*United States v. Wade*,
512 F. App'x 11 (2d Cir. 2013) .................... 21

## PRELIMINARY STATEMENT

The Government intends to present testimony from two experts: Professors Lauren Cohen and Petter Kolm. Both have performed extensive analyses of trading and market data to help show how the defendant traded; how the first-day performance of trades the defendant allocated to Macro Opps and the Core Strategies compared to one another and to other comparators; and whether the difference in the first-day performance of trades the defendant allocated to Macro Opps and the Core Strategies could be caused by market conditions or differences between the strategies. Their work shows that the defendant typically waited hours after a trade was executed before entering his allocations. That in that window between trade and allocation, there was a vast difference between the performance of trades he allocated to Macro Opps and the Core Strategies. And that the difference was not present when the defendant lacked discretion to choose between Macro Opps and the Core Strategies, or once the window between trade and allocation—when he could see price movements before deciding how to allocate—closed. The defense's motion to exclude or limit that critical testimony is meritless.

*First*, the experts will not offer impermissible state-of-mind testimony. The experts performed rigorous analyses of how the defendant actually traded—not what he was thinking—and plan to compare that to common trading strategies. Their work is squarely in line with the type of expert analyses that courts routinely allow in both civil and criminal cases.

*Second*, the experts' statistical work is neither obscure, nor unhelpful. They have applied common data-analysis techniques that they regularly use in their own work, to evaluate an issue that academics and practitioners routinely assess in finance: How did a particular trader perform, and what did—and did not—cause that performance.

*Third*, in conducting their analyses of the defendants' trading, Professors Cohen and Kolm

made reasonable decisions about the data on which to rely. The defendant's employer, Western Asset Management Company ("WAMCo"), kept a record of when the defendant's trades were entered as allocated in WAMCo's system. In assessing the defendant's first-day performance, the experts used both the first-day returns on the defendant's trades, and the returns between the time of trade and the time the defendant's allocations were entered. Both showed that the defendant routinely allocated better-performing trades to Macro Ops, and worse-performing trades to the Core Strategies. It was reasonable to rely on this corporate data.

*Fourth*, the experts looked at comparators to help understand whether factors other than cherry picking could have caused the defendant's first-day performance. In doing so, they reasonably looked at the defendant's trading in Macro Opps after October 19, 2023—which is when the defendant lost the authority to allocate trades to the Core Strategies. This comparison is powerful evidence of fraud because it shows that, once the defendant no longer had the authority to direct poorly performing trades to the Core Strategies, his outstanding first-day performance in Macro Opps came to an abrupt end.

*Fifth*, the experts are qualified to assess the extent to which features of the Macro Opps strategy and Core Strategies caused the difference in the defendant's first-day performance. Both experts have deep experience studying and evaluating trading strategies and portfolio management, including in the context of fixed-income products. This work involves using data to understand what factors do, and do not, contribute to a trader's or fund's performance. The experts reliably applied that experience to the data in this case.

*Finally*, the experts do not intend to offer impermissible "bolstering" testimony. They have done independent work and plan to offer distinct sets of testimony, each of which will help the jury understand central issues in the case.

## ARGUMENT

### I. The Experts Are Not Offering Impermissible State of Mind Testimony.

The Government's experts will not opine on "whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense." Fed. R. Evid. 704(b). The defense's motion to exclude their testimony as running afoul of that rule ignores the substance of the Government's expert's disclosures, focusing instead on a few verbs taken out of context, and fails to cite longstanding precedent interpreting Rules 702 and 704(b).

#### A. Relevant Facts

Neither of the Government's proposed experts intend to offer an opinion about what was, or was not, in the defendant's head when he traded and allocated Treasury futures and options. Instead, their testimony, broadly speaking, falls into three categories: First, Professors Cohen and Kolm plan to present data and statistical analyses that show the defendant's trading and allocation practices, including that those trading and allocation practices resulted in a large discrepancy between the first-day performance of trades the defendant allocated to Macro Opps and those he allocated to the Core Strategies. Second, the experts plan to present additional data and statistical analyses showing that the discrepancy in first-day performance was not caused by market conditions, portfolio guidelines, or a consistent difference in trading patterns between Macro Opps and the Core Strategies. This will include regression analyses showing that the strongest predictor of where the defendant would allocate a trade was the performance between trade and allocation, as compared to other factors. Third, Professors Cohen and Kolm plan to explain that their analyses are consistent with the defendant using first-day performance of his treasury futures and options trades in making allocation decisions.

### 1. Professor Cohen's Proposed Testimony

The Government produced an initial expert notice for Professor Cohen on October 23, 2025 and supplemental notices on November 20 and December 10, 2025 (respectively, Exhibits A, B, and C to this brief). Those notices disclose the various ways Professor Cohen plans to present data and statistical analyses that will help the jury assess how the defendant traded, the performance of those trades, and the extent to which certain factors do, and do not, explain the large difference in first-day performance between trades the defendant allocated to Macro Opps and those he allocated to the Core Strategies.

As the Government's notices disclose, one aspect of Professor Cohen's testimony will be presenting data and statistical analyses about how the defendant traded and the performance of his trades. With respect to how the defendant traded, Professor Cohen will present data analyses on topics such as the timing of the defendant's trades, the timing of his allocations, and the various ways the defendant allocated Treasury futures and options. This will include evidence that, aside from trades the defendant placed through Broker-1 (which the defendant had a standing rule went to Macro Opps), there were typically many hours between when the defendant traded and when his allocations were entered into WAMCo's systems. *See* Ex. A, ¶¶ 7-22, 37-43.

With regard to performance, Professor Cohen will present data analyses showing that there was a pronounced difference between the performance of Treasury futures and options trades the defendant allocated to Macro Opps and the Core Strategies, and that difference was unique to when the defendant had the discretion to allocate a trade between those strategies. Professor Cohen used data on both first-day returns ("FDRs"), which reflect the return on a trade between the time of trade and the end of the day, and pre-allocation returns ("Pre-Allocation Returns"), which reflect the return on a trade between the time of a trade and the time an allocation was entered. He will explain that the data show that the FDRs and Pre-Allocation Returns of trades the defendant

allocated to Macro Opps were net positive; the FDRs and Pre-Allocation Returns of the trades the defendant allocated to the Core Strategies were net negative; and the difference between the strategies became more pronounced as the size of the gain or loss on a particular trade grew. *See* Ex. A, ¶¶ 23-36, 44-51.

Professor Cohen will also use different comparators to show that this difference in performance was unique to situations when the defendant could choose between Macro Opps and the Core Strategies and had the opportunity to see price changes. For example, Macro Opps trades the defendant placed through Broker-1 were allocated to Macro Opps essentially automatically—depriving the defendant of the opportunity to send them to the Core Strategies—and did not have pronounced positive FDRs or Pre-Allocation Returns in the defendant's other Macro Opps allocations. Similarly, while there was a pronounced difference in the performance of assets the defendant allocated to Macro Opps and the Core Strategies in the period between trade and allocation, there was little difference in the performance of those assets in the 24 hours before the defendant purchased them or the 24 hours after he allocated them. *See* Ex. A, ¶¶ 23-36, 44-51.

Professor Cohen will also testify about statistical analyses he performed on the data described above. These analyses show the importance of the time between trade and allocation. For instance, Professor Cohen's analyses show that there was a highly statistically significant difference between the performance of trades the defendant allocated to Macro Opps and those he allocated to the Core Strategies, in the period between trade and allocation. By contrast, those same assets did not perform differently in the 24 hours before trade or the 24 hours after allocation. Professor Cohen's analyses also show that there was a highly statistically significant difference between the performance of trades the defendant allocated to Macro Opps and those he sent to Macro Opps by virtue of placing through Broker-1, in the period between trade and allocation.

But again, that difference was not present in the 24 hours before trade and the 24 hours after allocation. *See* Ex. A, ¶¶ 53-54; Ex. B, ¶¶ 2-18.

Next, Professor Cohen will testify that he considered factors that could have driven the difference between the first-day performance of trades the defendant allocated to Macro Opps and those he allocated to the Core Strategies. One set of factors he analyzed was market trends. Professor Cohen will explain that, between 2021 and 2023, Treasury yields were generally rising and volatility in the Treasury market was high compared to prior years. He will explain that these forces would not explain the difference in Pre-Allocation Returns and FDRs between Macro Opps and the Core Strategies. *See* Ex. A, ¶¶ 56-61.

Professor Cohen will also testify that he analyzed whether there were differences in portfolio requirements or strategies between Macro Opps and the Core Strategies that could have caused the defendant's pattern of allocating trades with positive first-day performance to Macro Opps and negative first-day performance to the Core Strategies. He concluded there were not. Professor Cohen assessed a number of possible differences, including:

- Professor Cohen noted that Macro Opps and the Core Strategies had different duration limits. But Professor Cohen found that these did not meaningfully constrain the defendant's discretion about how to allocate his Treasury futures and options trades. *See id.* ¶¶ 63-64.

- Professor Cohen explained that there was nothing about the investment guidelines for Macro Opps or the Core Strategies that would cause positive first-day performance in the former and negative first-day performance in the latter. For example, the defendant often allocated trades 50/50 between the strategies; the defendant's trades through Broker-1 did not consistently generate positive first-day performance for Macro Opps; and other traders who allocated Treasury futures and options to the Core Strategies did not consistently generate negative first-day performance for those strategies. *See id.* ¶¶ 66-67.

- Similarly, Professor Cohen will testify that—although the first-day performance of trades the defendant allocated to Macro Opps and the Core Strategies went in opposite directions—that was not a result of the defendant trading in opposite directions. If two portfolios pursued opposite strategies (e.g., one sells when the other buys), it might make sense to see opposite first-day performance. But Professor Cohen will explain that the

defendant's trading in Macro Opps and the Core Strategies did not reflect him pursuing opposite strategies between the portfolios. *See id.* ¶¶ 68, 74.

- Professor Cohen will testify that one difference between Macro Opps and the Core Strategies was that Macro Opps tended to be more negatively convex than the Core Strategies. Professor Cohen will testify that traders sometimes manage negative convexity by making trades to add or reduce duration in response to market movements.[1] Professor Cohen will testify that this would not explain consistent positive first-day performance in Macro Opps (much less negative first-day performance in the Core Strategies), and that multiple data analyses he performed show that the defendant was not, in fact, consistently trading in response to market movements or managing the duration of Macro Opps to a particular point. *See id.* ¶¶ 69-71, 74.

- Finally, Professor Cohen will testify that he performed regression analyses of the defendant's trades. These regression analyses were designed to test whether Pre-Allocation Returns were a strong or weak predictor of how the defendant would allocate trades, compared to other factors such as trade size, trade convexity, and pre-trade market movements. The analyses showed that a trade's Pre-Allocation Return was a strong predictor of whether the defendant would allocate it to Macro Opps or Core Strategies, and it was a significantly stronger predictor than the other factors Professor Cohen tested. *See id.* ¶¶ 72-73.

Finally, Professor Cohen intends to opine that the data and statistical analyses he performed are "consistent with Mr. Leech using information about the first-day performance of his Treasury F&O trades in making allocation decisions between Macro Opps and the Core Strategies." *See id.* ¶¶ 52, 55, 72, 78.

### 2. Professor Kolm's Proposed Testimony

The Government produced an initial expert notice for Professor Kolm on October 23, 2025 and supplemental notices on November 20 and December 10, 2025 (respectively, Exhibits D, E, and F to this brief). Professor Kolm will, among other things, present statistical analyses on the performance of the defendant's Treasury futures and options trades. Those analyses show that—compared to the expected performance of Treasury futures and options trades, and to other fixed-

[1] A more fulsome discussion of negative convexity is in the Government's motion to exclude certain testimony from the defense experts.

income funds—the defendant's first-day performance in Macro Opps was exceptionally good, his first-day performance in the Core Strategies was exceptionally poor, and that those differences in performance disappeared after the first day. *See* Ex. D, ¶¶ 14-21.

Professor Kolm will also present analyses showing that the positive first-day results in Macro Opps, and the negative first-day performance in the Core Strategies, was unusually consistent over time, *see id.* ¶¶ 23-31; that the distribution of trades was skewed, with many trades with large first-day gains going to Macro Opps and large first-day losses to the Core Strategies, *see id.* ¶¶ 37-41; and that the results the defendant achieved unlikely the result of chance or strategic requirements of either strategy, *see id.* ¶¶ 32-36. For many of these analyses, Professor Kolm also examined whether the differences between Macro Opps and the Core Strategies existed outside of the time between trade execution and allocation, and found that they did not.

As with Professor Cohen, Professor Kolm will testify that the results of his analyses are "consistent with Mr. Leech using performance information from between the time of trade and the time of allocation in making allocation decisions." *See id.* ¶¶ 17, 27, 34, 40.

**B. Applicable Law**

Rule 704(b) provides that, "[i]n a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state that or condition that constitutes an element of the crime charged or of a defense." Congress adopted this Rule after the trial of the man who attempted to assassinate President Ronald Reagan, at which experts had testified about the ultimate issue of whether the defendant was, or was not, insane. *See Diaz v. United States*, 602 U.S. 526, 533-34 (2024). Because of that context, and the general principle that an expert opinion "is not objectionable just because it embraces an ultimate issue," Fed. R. Evid. 704(a), the Supreme Court has held that Rule 704(b) "covers a narrow set of opinions": it "proscribes only expert opinions in a criminal case that are about a particular person ('the defendant') and a particular

ultimate issue (whether the defendant has 'a mental state or condition' that is 'an element of the crime charged or of a defense')." *Diaz*, 602 U.S. at 534.

Consistent with the limited scope of Rule 704(b), the Second Circuit has held that expert testimony is permissible if it stops short of "a conclusion as to the defendant's actual mental state" on an issue that is an element of the offense. *United States v. Skyers*, 787 F. App'x 771, 225 (2d Cir. 2019). For example, the Circuit has routinely held, in cases charging possession with intent to distribute narcotics, that it is permissible for an expert to testify that an amount of drugs, or certain paraphernalia, is "consistent with distribution" because "that testimony does not itself opine on the particular defendant's intent." *United States v. Eldridge*, 528 F. App'x 17, 19 (2d Cir. 2013); *accord United States v. Lopez*, 547 F.3d 364,373 (2d Cir. 2008) (allowing testimony that drugs and paraphernalia were "consistent with distribution"); *Skyers*, 787 F. App'x at 775 (allowing testimony that drug quantity "related to" distribution). Relatedly, the Circuit has held that, in a fraud case, expert testimony that a certain practice amounted to a "pyramid scheme" did not run afoul of Rule 704(b) because the expert did not go the next step of opining that the defendant knew the scheme was "illegal or fraudulent," which was the applicable mens rea. *United States v. Platt*, 608 F. App'x 22, 30 (2d Cir. 2015). In short, Rule 704(b) allows expert testimony "that supports an obvious inference with respect to the defendant's state of mind if that testimony does not actually state an opinion on [the] ultimate issue, and instead leaves this inference for the jury to draw." *United States v. Gillis*, 938 F.3d 1181, 1194 (2d Cir. 2019).[2]

---

[2] The decisions allowing experts to testify that conduct is consistent with a particular mental state are different from the Second Circuit's decision in *United States v. DiDomenico*, 985 F.2d 1159 (2d Cir. 1993). In *DiDomenico*, the Circuit found that the proposed expert's testimony "stat[ed] the bottom-line inference" that the defendant lacked the mental capacity to know something was stolen, which was "expressly stat[ing] the inference" that the jury should draw about the

Rule 702 also allows experts to opine that certain conduct is consistent with a particular state of mind, so long as the expert does not opine that a party actually had that state of mind. Courts in this Circuit have held that, "while experts are not permitted to testify to an actor's state of mind, an expert can testify to whether a given practice is consistent with a given state of mind." *In re Term Commodities Cotton Futures Litig.*, 2020 WL 5849142, at *14 (S.D.N.Y. Sept. 30, 2020); *accord CFTC v. Wilson*, 2016 WL 7229056, at *8 (S.D.N.Y. Sept. 30, 2016).

For example, in a recent criminal case involving allegations of fraudulent market manipulation, Judge Liman allowed experts to testify that the allegedly manipulative trading was, or was not, consistent with certain lawful trading strategies. Judge Liman explained that the expert would not speak to the defendant's "state of mind," but would instead "testify as to strategies, investment theses, and incentives that . . . market participants typically have, and whether particular . . . trades are consistent with . . . those strategies, theses, and incentives." *United States v. Phillips*, 2023 WL 6620146, at *14 (S.D.N.Y. Oct. 10, 2023); *see also Ploss v. Kraft Food Grp.*, 637 F. Supp. 3d 561, 571, 575 (N.D. Ill. 2022) (allowing expert to testify that trading was "consistent with" market manipulation); *SEC v. U.S. Environmental, Inc.*, 2002 WL 31323832, at *2-3 (S.D.N.Y. Oct. 16, 2002) (allowing expert testimony that certain trading practices were "inconsistent with those of a lawful market maker"). Similarly, in antitrust cases, courts routinely allow experts to testify about whether a particular practice is "consistent with" an agreement between alleged conspirators. *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2025 WL 2733020, at *22 (S.D.N.Y. Sept. 25, 2025); *accord United States v. Patel*, 2023 WL 2643815, at *39 (D. Conn. Mar. 27, 2023); *In re Payment Card Antitrust Litig.*, 2022 WL 15044626, at *16

---

defendant's intent. *Id.* at 1165. When testimony stops short of drawing that final conclusion about a mental state that is an element of the offense, it does not violate Rule 704(b).

(E.D.N.Y. Oct. 26, 2022). As with Rule 704(b), so long as the expert does not opine on the defendant's actual mental state, the testimony is admissible.

**C. Discussion**

None of the proposed testimony from Professor Cohen or Professor Kolm is impermissible state-of-mind testimony. At the outset, the defense does not, and cannot, argue that either expert plans to offer an opinion that the defendant had a "mental state" that "constitutes an element of the crime charged or a defense." Fed. R. Evid. 704(b). The mental state that constitutes an element of the crime charged is intent to defraud, and the applicable defense is good faith. The Government experts will not testify that the defendant acted with intent to defraud or that he lacked good faith.

Instead, the defense's primary challenge to both experts is that Professors Cohen and Kolm plan to testify that the defendant "*used* the first-day performance of his trades to make allocation decisions." Mot. at 4. That is not a "mental state" that "constitutes an element of the crime charged or a defense," Fed. R. Evid. 704(b), and it is not an accurate description of the testimony the experts plan to offer. Instead, as explained above, both experts intend to testify that certain analyses are "*consistent with* Mr. Leech using information about the first-day performance of his Treasury F&O trades in making allocation decisions between Macro Opps and the Core Strategies." *See, e.g.*, Ex. A, ¶¶ 52, 55, 72, 78 (emphasis added).

The distinction is important both in practice and under the case law. Practically speaking, the difference is important because Professor Cohen and Kolm will be clear on both direct and cross examination that they do not know what the defendant was thinking, so there is no risk that the jury will misunderstand the scope of the testimony. Legally, there is a crucial difference between testify about a defendant's mental state and testifying that certain conduct is consistent with a certain mental state. All of the decisions the defense cites excluded experts who claimed to "know for sure" the motivations of a party, *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531,

546-57 (S.D.N.Y. 2004), who claimed to be able to explain a party's "motives and what he knew," *SLSJ, LLC v. Kleban*, 277 F. Supp. 3d 258, 284 (D. Conn. 2017), or who "stated the bottom-line inference" that a defendant lacked a culpable mental state, *DiDomenico*, 985 F.2d at 1165.

By contrast, as explained above, courts routinely hold that Rules 702 allows witnesses to opine that "a given practice is consistent with a given state of mind." *In Cotton Futures*, 2020 WL 5849142, at *14, and that Rule 704(b) does not prohibit such testimony in criminal cases, *see Eldridge*, 528 F. App'x at 19 (allowing testimony that drugs and paraphernalia were "consistent with" distribution); *Phillips*, 2023 WL 6620146, at *14 (allowing expert testimony that trading was "consistent with" a particular strategy). The proposed testimony from Professors Cohen and Kolm falls squarely on that permissible side of the line because they plan to say that certain analyses of the defendant's trading are consistent with using information about first-day performance in making allocation decisions, not that the defendant actually did use that information (much less that he had the intent to defraud).

Indeed, one of the cases the defense discusses at length shows that this proposed testimony is permissible. The defense notes that, in *United States v. Hwang*, Judge Hellerstein suggested in a pretrial conference that he would "probably" sustain an objection to testimony that data was "consistent with" certain strategies. 22 Cr. 240, Dkt. No. 181. But the defense ignores what Judge Hellerstein actually did when trial came around: He repeatedly allowed the expert to offer opinions that certain trading patterns were, or were not, "consistent with" various trading strategies at issue in the case, over defense objections. *See* Tr. 2788-89, 2874-85, 2900, 2926-27, 2929-30. Allowing that testimony was consistent with Judge Liman's rulings in *Phillips*. Professors Cohen and Kolm should not be held to a different standard.

Next, the defense raises challenges to Professor Cohen's proposed testimony whether the large difference between the first-day performance of Macro Opps and the Core Strategies was caused by Macro Opps and the Core Strategies being subject to different guidelines or pursuing different strategies. *See* Mot. at 5-6; Ex. A, ¶¶ 66-71. Notably, the defense does not claim that the analyses themselves are impermissible. Instead, the defense tries to restrict the language Professor Cohen can use in explaining that the analyses show that the bias in first-day performance between Macro Opps and the Core Strategies was not due to differences between those strategies.

That is an inappropriate invocation of Rule 704(b). A core defense in many cherry-picking cases is that the defendant was pursuing different strategies in the favored and disfavored portfolios, and experts routinely assess whether the biased results could have come from those allegedly different strategies. *See, e.g. SEC v. Werthe*, 2025 WL 790970, at *5-6 (S.D. Cal. Mar. 12, 2025); *SEC v. Paris*, 2024 WL 4433614, at *10 (N. D. Ill. Oct. 7, 2024). This is not testifying about the defendant's mental state. For example, suppose a cherry-picking case involved one portfolio advertised as a short-term strategy and another advertised as a long-term strategy. It would not be testifying about a defendant's mental state for an expert to assess whether the defendant's trades were, in fact, "consistent with" the portfolios following different strategies, or whether those different strategies would lead to divergent performance. *Phillips*, 2023 WL 6620146, at *14. Such analyses examine what the trader was doing, not what the trader was thinking. Similarly, Professor Cohen examined whether there were relevant differences between Macro Opps and the Core Strategies and whether those differences could have caused the biased first-day performance that appears in the defendant's allocations.

The full context of Professor Cohen's notice shows the error in the defense's challenge. The defense first challenges Paragraphs 66 and 67, which state that Professor Cohen will testify

that the positive Pre-Allocation Returns and FDRs in Macro Opps, and the negative returns in the Core Strategies, "do not appear to be driven by any requirements of the . . . investment guidelines" for those strategies or the strategies themselves. *See* Ex. A, ¶¶ 66-67. The notice goes on to explain the trading data Professor Cohen plans to present on these topics. For example, with respect to Macro Opps, Professor Cohen will explain that trades the defendant placed through Broker-1 were, as a rule, sent to Macro Opps (depriving the defendant the chance to allocate them to the Core Strategies), and those trades did not have consistently positive first-day performance. As for the Core Strategies, there were other traders who allocated Treasury futures and options to those strategies, and their trades did not have consistently negative first-day performance.

These analyses (and the others described in the notice) show that there was nothing inherent in the Macro Opps strategy that would cause positive first-day performance, and nothing inherent in the Core Strategies that would result in negative first-day performance. This is not testimony about the defendant's mental state. It is data-driven analysis designed to answer a key question: Is there something inherently different about Macro Opps and the Core Strategies causing the bias in the first-day performance of the defendant's allocations?

Similarly, the defense is wrong to take issue with Professor Cohen's opinion that the difference in first-day performance and Macro Opps was not "driven by Mr. Leech using Treasury F&Os to pursue opposing strategies" between Macro Opps and the Core Strategies. *See* Mot. at 5-6. As a continuation of the analyses described above, Professor Cohen evaluated whether the large difference in first-day performance could have been caused by the defendant following opposite strategies in Macro Opps and the Core Strategies—for instance, selling futures for one strategy whenever he was buying futures for the other. The data and portfolio literature showed that the defendant was not trading in such a manner. *See* Ex. A, ¶ 68. Stating that conclusion is

not testimony about the defendant's state of mind merely because Professor Cohen's disclosure uses the word "driven." Rather, in context, the word "driven" refers to the conclusion that the difference in first-day performance between Macro Opps and the Core Strategies did not arise because the defendant was consistently making opposite trades in those strategies. That is testimony about what the defendant did, not what he was thinking.

The defense's remaining challenges to Professor Cohen's testimony about possible causes of the bias in first-day performance fail for similar reasons. All of the remaining challenges related to Paragraph 71 of Professor Cohen's notice. In that paragraph, and the preceding paragraphs, Professor Cohen explained that Macro Opps was more negatively convex than the Core Strategies, and that traders can respond to negative convexity in a number of ways. One way is to counteract the effects of negative convexity on a portfolio's duration by trading to add duration when interest rates fall and trading to reduce duration when interest rates rise. *See* Ex. A, ¶¶ 69-71.

Professor Cohen performed data and statistical analyses to test whether the trades the defendant allocated to Macro Opps were consistent with that pattern of adding duration when interest rates fell and reducing duration when interest rates rose. His analyses included examining whether pre-trade interest rate movements were strong predictors of the trades the defendant would make for Macro Opps, *id.* ¶¶ 71(a), (d), (e); examining whether Macro Opps had stable duration over time, which would be consistent with the defendant trading to keep duration stable, *id.* ¶ 71(b); and examining whether the duration of Macro Opps would have been meaningfully different if the defendant had allocated trades differently, *id.* ¶ 71(c). The results of the analyses were all inconsistent with defendant routinely using Treasury futures and options to counteract the effects of negative convexity, so in addition to presenting the data, Professor Cohen plans to

describe those results by saying the trading data showed the defendant did not appear to be trading in Macro Opps to manage negative convexity.

It is not impermissible state-of-mind testimony for Professor Cohen to identify a potential trading strategy and assess whether the actual trading was "consistent with . . . th[at] strateg[y]." *Phillips*, 2023 WL 6620146, at *14. Professor Cohen is not testifying about what the defendant was thinking. Instead, he is identifying a common trading strategy and analyzing whether the defendant's trading was consistent with following that strategy. This type of testimony is essential in this case. The defense's expert notices show that a core part of the defense case is likely to revolve around the claim that Macro Opps was more negatively convex than the Core Strategies, so the defendant needed to trade differently in Macro Opps to manage that negative convexity. Professor Cohen should be allowed to meet that defense theory by looking at the actual trading data to assess whether the defendant was trading in a way consistent with managing negative convexity and whether such a strategy would have led to the positive first-day performance in Macro Opps that the defendant achieved.

Turning away from Professor Cohen, the defense takes issue with one sentence in Professor Kolm's proposed testimony about a trade-reassignment analysis. *See* Mot. at 5. As explained in the notice, Professor Kolm will testify about an analysis that involved re-allocating trades between Macro Opps and the Core Strategies, to see how it would affect the duration of those strategies. The analysis showed that re-allocating trades would not have significantly increased the number of days portfolios were outside of duration limits, so duration limits did not significantly constrain the defendant's flexibility in allocating Treasury futures and options. *See* Ex. C, ¶ 35(d). The defense does not object to the substance of the analysis; in fact, their experts performed an essentially identical analysis. Instead, the defense argue that Professor Kolm should not be able

to state that the analysis is helpful for "assess[ing] the degree to which duration limits influenced Mr. Leech's Treasury F&O allocation decisions." Mot. at 6. But that is not a statement about the defendant's state of mind at all. It is simply a way to help frame for the jurors why Professor Kolm is talking about the analysis, so they can place it in its proper context.

Finally, the defense claims that restricting how Professors Cohen and Kolm describe their analyses is necessary because they performed technical, statistical analyses that are not "capable of proving" the defendant traded using first-day performance and will "overwhelm" the jury. Mot. at 10-11. These assertions are incorrect and are not a basis for limiting the proposed testimony under Rules 702 or 704(b).

While the Government's experts do not plan to opine that the defendant intentionally cherry picked, their analyses are certainly "capable of proving" to the jury that he had that intent. Courts have repeatedly held that testimony about trading data and statistical analyses can prove the existence of a cherry-picking scheme, even "without direct evidence of cherry-picked allocations." *SEC v. World Tree Financial*, 43 F.4th 448, 461-64 (5th Cir. 2022); *see, e.g.*, *Werthe*, 2025 WL 790970, at *4-6 (granting summary judgment to SEC in cherry-picking cases based on statistical proof of cherry picking); *Paris*, 2024 WL 4433614, at *7-8 (denying defense motion for summary judgment in cherry-picking case because of SEC's statistical evidence of cherry picking); *SEC v. Jacobson*, 2025 WL 1026327, at *4-8 (E.D. La. Apr. 7, 2025) (same). Although those decisions are from the civil enforcement actions, data and statistical proof is no less powerful in the criminal context. It is black-letter law that "the prosecution may prove its case entirely by circumstantial evidence so long as guilt is established beyond a reasonable doubt." *United States v. Glenn*, 312 F.3d 58, 64 (2d Cir. 2002).

In resisting this settled law, the defense overplays the complexity of the analyses Professors Cohen and Kolm performed and improperly minimizes what their work can show. *See* Mot. at 10-11. True, both experts performed some statistical analyses that have academic-sounding names. But fundamentally, these analyses were just one part of the extensive data analysis that the experts performed and are designed to help the jury to understand the magnitude of the bias in the defendant's allocations, and the information they provide is far more robust than simply showing a that the defendant's allocations were "correlated with first-day performance." Mot. at 11.

For example, the defense notes that Professor Kolm analyzed Sharpe ratios, empirical asset pricing models, and volatility-adjusted returns, *see* Ex. B, ¶ 15, trying to cast that work as "highly technical analyses" that will befuddle the jury. But these tools are common in financial analysis, and their purpose is to clarify the data, not confuse it. Here, the analyses show that the trades the defendant allocated to Macro Opps dramatically outperformed comparators, but *only* on the first day. On the other hand, the trades the defendant allocated to the Core Strategies dramatically underperformed comparators, but also only on the first day. This will help the jury understand that the defendant's first-day performance was highly unusual and did not last past the first day—which was also the only day on which he could see performance before deciding how to allocate.

Similarly, the defense plucks out some statistical analyses Professor Cohen performed that have particularly long names, *see* Mot. at 10, but does not actually engage with the data and statistical analysis he performed. For instance, Professor Cohen's analyses do not simply show that the first-day performance of trades the defendant allocated to Macro Opps were better than the performance of trades he allocated to the Core Strategies to a degree that is not the product of chance. Professor Cohen's analyses also show that the first-day performance of those trades was also better than the performance of other trades that went to Macro Opps via 50/50 allocations and

through Broker-1, to an extreme degree. That the extreme difference in performance did not continue after the first day. And that first-day performance was a powerful predictor of whether the defendant would allocate a trade to Macro Opps, while other factors—such as pre-trade market movements—were not.

This, of course, does not cover the full scope of the testimony that Professors Cohen and Kolm plan to offer. Rather, the point is that, just because the expert notices disclose statistical tests with technical names, does not mean that the experts plan to present inscrutable analyses that do little more than show some correlation between the defendant's trades and first-day performance. The defense's assertion—without any substantive engagement—that testimony from Professors Cohen and Kolm will be complex and of little value is not a basis for exclusion.

The Government's experts plan to offer testimony that is well within the bounds of Rules 702 and 704(b). Their testimony should not be curtailed on the grounds that it is impermissible state-of-mind testimony. And at most, the defense's motion would warrant minor modification to how the experts discuss the results of certain analyses, rather than exclusion of entire opinions.

## II. Testimony That Certain Analyses Were Consistent With The Defendant Considering First-Day Performance Is Admissible Under Rule 403.

Rule 403 does not prohibit Professors Cohen and Kolm from testifying that many of their analyses are "consistent with" the defendant "using information about first-day performance" in making allocation decisions. That testimony is accurate, has significant "probative value," and that value is not "substantially outweighed" by a risk of "unfair prejudice" or "misleading the jury." Fed. R. Evid. 403.

The opinion that Professor Cohen and Kolm's analyses are consistent with the defendant using information about first-day performance to allocate trades is accurate. As explained above, and in greater detail in the expert notices, Professor Cohen and Kolm's work show, among other

things, that (i) there was often a long lag between the time the defendant's trades were executed and the time the allocations for those trades were entered into WAMCo's systems; (ii) the defendant tended to allocate trades that performed well during that period of delay to Macro Opps, and trades that performed poorly to the Core Strategies; (iii) the difference in the first-day performance of trades allocated to Macro Opps and to the Core Strategies cannot be explained by chance; (iv) the difference between the first-day performance of trades allocated to Macro Opps and other comparators, and between the Core Strategies and other comparators, cannot be explained by chance; (v) first-day performance was a strong predictor of whether the defendant would allocate a trade to Macro Opps or the Core Strategies, and other factors were not strong predictors of where he would allocate; and (vi) the significant difference in performance between trades the defendant allocated to Macro Opps and those he allocated to the Core Strategies (and other comparators) did not persist after the defendant allocated. These analyses are consistent with the defendant using information he obtained between trade and allocation to decide whether to assign a trade to Macro Opps or the Core Strategies.

Testimony explaining that these analyses are consistent with the defendant using first-day performance to make allocation decisions is also highly probative. The experts analyzed trading data from many different perspectives, to try to isolate the extent to which first-day performance could explain the defendant's allocations, as compared to other factors. Allowing the experts to explain that the results of their analyses were consistent with the defendant using first-day performance in allocation decisions is important for helping the jury understand how the experts' work fits into the bigger picture of the case. Without that testimony, there is a risk that the jury may be confused about whether or not a particular set of analyses are, or are not, consistent with the defendant using first-day performance to allocate trades.

That probative value is not "substantially outweighed" by any of the dangers listed in Rule 403, including the risk of "unfair prejudice" or "misleading the jury." There is no meaningful risk that the jury will think the experts know what the defendant's actual intentions were because they will not claim to have that knowledge, and the defense can reinforce that point through vigorous cross examination. There is also not a concern about misleading the jury because the proposed testimony is true: The results of the experts' analyses are, in fact, consistent with the defendant using first-day performance to make allocation decisions.

The fact that the experts use statistical analyses to support their opinion does not, as the defense suggests, make proposed testimony unfair or misleading. "All evidence is probabilistic—statistical evidence merely explicitly so"; it is just "probabilistic evidence coded in numbers rather than words." *United States v. Vesey*, 334 F.3d 600, 606 (7th Cir. 2003). For example, in a murder case, the Government may present statistical evidence about DNA or fingerprint matches, or it could present testimony from an eyewitness who claims to be "positive" the defendant is the shooter. *See id.* Both types of evidence give the jury information about the probability the defendant is guilty—the statistical evidence just uses numbers to express it—and both types, standing alone, are sufficient for a conviction. *See, e.g.*, *Harris v. Walsh*, 2007 WL 1576265, at *20 (S.D.N.Y. June 1, 2007) (explaining that uncorroborated DNA evidence is sufficient to prove guilt beyond a reasonable doubt); *Graham v. Perez*, 2011 WL 1486707, at *21 (S.D.N.Y. Apr.15, 2011) (explaining that fingerprint evidence alone is sufficient to support a conviction).

The cases the defense cite about the "prosecutor's fallacy" do not stand for the proposition that statistical evidence is dangerous or untrustworthy. The prosecutor's fallacy is a common *misuse* of statistical evidence in DNA cases. Experts in DNA cases often testify that the probability a member of the general population would match a particular DNA sample is "1 in 10,000." *United*

*States v. Wade*, 512 F. App'x 11, 15 (2d Cir. 2013). This means that, if a city had 100,000 people, there may be 10 people in the city who are a DNA match. But sometimes, lawyers incorrectly describe the 1 in 10,000 number to mean that there is a 1 in 10,000 chance someone other than the defendant is the source of the DNA, equating to a ".01% chance the defendant is innocent." *Id.* Courts, unsurprisingly, hold that this misinterpretation of the statistical evidence is impermissible. But so long as witnesses and lawyers avoid misstating the statistics, the evidence is admissible, *see id.*, and standing alone can sustain a conviction, *Harris*, 2007 WL 1576265, at *20.

The takeaway from the prosecutor's-fallacy decisions is not that statistics should be kept out. Rather, it is that witnesses and lawyers should not claim that statistical analyses show things that they do not. Professors Cohen and Kolm are not misstating the statistics when they say their analyses are consistent with the defendant using first-day performance to allocate trades, so that probative testimony should not be kept from the jury.

## III. The Experts Used Reliable Assumptions When Analyzing the Defendant's Trading.

Professors Cohen and Kolm relied on data from WAMCo in conducting their analyses of Pre-Allocation Returns and FDRs. This data included information about the price of each asset at the end of each trading day and the time the defendant's allocations were entered into WAMCo's systems. It was reasonable for Professors Cohen and Kolm to rely on company's trading data, and the defense's motion to exclude analyses based on that data is not appropriate under Rule 702.

### A. Relevant Facts

Professors Cohen and Kolm were tasked with analyzing the first-day performance of the defendant's trades. To determine first-day performance, both experts started with the trade blotters produced by WAMCo. Those blotters list data about each of the defendant's Treasury futures and options trades, including the price at which the defendant executed each trade and the price of that

same instrument at 3:00 p.m. Central Time, or 1:00 p.m. Pacific Time.[3] The experts used those two prices—the trade price and the end-of-day price—to calculate FDRs for the defendant's trades. *See, e.g.* Ex. A, ¶ 23.

The experts went on to conduct additional analyses to test the reliability of their use of end-of-day prices. When Western Asset produced trade blotters, it explained that a field in the data labeled "Execution_Time" reflects the time each trade allocation was entered into WAMCo's trading system. Professors Cohen and Kolm used that data to see how often the defendant's trades were entered as allocated in WAMCo's systems around the end of the day. They found that the defendant's allocations were typically entered between 12:00 p.m. and 3:00 p.m. Pacific Time, which ranges from slightly before, to after, the 1:00 p.m. end-of-day time. *See* Ex. A, ¶ 41. They also found that the highest volume of the defendant's allocations occurred between 1:00 and 2:00 p.m. Pacific Time, which is right around the end-of-day time. *See id.*

Professors Cohen and Kolm then took their analyses a step further. Their first-level analyses already supported the conclusion that the defendant typically allocated around the end of the day, so the end-of-day price was a reasonable price to use when evaluating his performance. But because the experts had data on the allocation-entry time, they took the additional step of assessing the performance of the defendant's trade at the time his trades were allocated in WAMCo's system. This process required taking the allocation time from WAMCo's trading blotters and using that time, in conjunction with data from the Chicago Mercantile Exchange ("CME"), to estimate the price of each asset at the time of allocation. *See* Ex. A, ¶¶ 44-45. From

---

[3] Data produced by Western Asset says that "futures and options" prices in its trade blotters "us[e] the 3pm CT [Chicago Mercantile Exchange ("CME")] price for [end-of-day marks]." This is at the end of the period from 2:00 to 3:00 p.m. Central Time when CME is closed for Treasury futures and options trading.

there, the experts could compare the trade price to the estimated price at the time of allocation entry, to calculate the Pre-Allocation Return. *See id.*

The calculation of Pre-Allocation Returns provided another way to analyze the trading data that provided a more granular look at how the defendant's trades performed between the time of execution and allocation. The Pre-Allocation Return data also confirmed that it was reasonable to use FDRs because the Pre-Allocation Returns of the defendant's trades were very similar to his FDRs. For example, the net FDRs of trades the defendant allocated to specifically Macro Opps was approximately $664 million, and the net FDRs of trades the defendant allocated specifically to the Core Strategies was approximately -$659 million. *See id.* ¶¶ 28-29. Similarly, the net Pre-Allocation Returns of trades the defendant allocated specifically to Macro Opps was approximately $701 million, and the net Pre-Allocation Rturns of trades the defendant allocated specifically to the Core Strategies was approximately -$701 million. *See id.* ¶ 46(c)-(d).

Professors Cohen and Kolm were not able to find a better proxy for the time the defendant allocated trades than the allocation-entry time because the defendant did not keep any records showing when he decided how to allocate his trades. But the work they performed gave them comfort that Pre-Allocation Returns and FDRs provided a reasonable window into trade performance at the time the defendant allocated. Professors Cohen and Kolm are familiar with volatility in the Treasury market and know that volatility tends to be highest in morning, when there are significant news releases.[4] This made it unlikely that a modest delay between the defendant communicating his allocation decision and that allocation being entered in WAMCo's

---

[4] The defense's own expert has noted that "empirical economic literature shows that Treasury market risk (as measured by volatility) is highest I the morning trading hours (Eastern time zone), coinciding with the timing of most economic information releases." Dolgoff Rebuttal at 3.

system would lead to a significant difference in price. Consistent with that idea, Professors Cohen and Kolm found that Pre-Allocation Returns and FDRs were similar, even though the time of allocation entry and end-of-day time often differed by an hour or two in either direction.

To test that idea further, in response to the argument in the defense's motion, Professor Kolm performed an additional test: He assess Pre-Allocation Returns using *earlier* times than the time the defendant's trades were entered into WAMCo's systems. That analysis shows that, if the defendant allocated trades an hour earlier than the allocation time in the blotter, he still would have had Pre-Allocation Returns of approximately $670 million in Macro Opps and -$672 million in the Core Strategies. Indeed, even if the defendant allocated trades two hours earlier than the allocation times in the blotter, he would have had Pre-Allocation Returns of $590 million in Macro Opps and -$610 million in the Core Strategies. *See* Ex. G, ¶¶ 1-4.

Finally, the Government expects that the evidence at trial will confirm that the defendant's allocations were entered in close proximity to when he gave them. The Government expects that, consistent with the data, witness testimony and documents will show that the defendant typically allocated trades late in the day. Witnesses and documentary evidence will also show that the team responsible for entering the defendant's allocations in WAMCo's system routinely entered the allocations promptly after receiving them from the defendant, and that it took only a few minutes to enter each trade in the system.

**B. Applicable Law**

Rule 702 requires that expert testimony must be based on "reliable principles and methods" and "reflect[] a reliable application of th[ose] principles and methods to the facts of the case." Assessing reliability requires examining assumptions underlying expert testimony. The Second Circuit has consistently "held that a trial judge should exclude expert testimony" based on allegedly flawed assumptions only in the limited circumstances when the assumptions "are so

unrealistic and contradictory as to suggest bad faith or [are] in essence an apples and oranges comparison." *Restivo v. Hesseman*, 846 F.3d 547, 577 (2d Cir. 2017). "By contrast, other contentions that assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Id.*; *accord Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 22 (2d Cir. 1996).

**C. Discussion**

Professors Cohen and Kolm made reasonable decisions to analyze FDRs and Pre-Allocation Returns, relying on data from WAMCo. The defense's arguments for exclusion do not show that the experts' analyses are unreliable—much less "so unrealistic and contradictory as to suggest bad faith," *Restivo*, 846 F.3d at 577—and, if accepted, would lead to the illogical conclusion that the performance of the defendant's trades cannot be reliably analyzed because he refrained from keeping records of when he allocated.

Even if Professors Cohen and Kolm had used FDRs, without any other supporting analyses, their testimony would have been admissible. It is highly probative evidence that the defendant routinely allocated trades with positive FDRs to Macro Opps and negative FDRs to the Core Strategies, that the difference in performance did not last after the first day, and that the difference in performance did not exist when the defendant lacked discretion to choose between Macro Opps and the Core Strategies (such as when he placed trades through Broker-1). Such testimony, in tandem with evidence from other sources that the defendant routinely waited until late in the day to allocate, supports a strong inference that the FDRs were biased because the defendant was using information he gained during the delay to make allocation decisions. Indeed, this is typically the expert testimony in cherry-picking cases. *See, e.g.*, *Paris*, 2024 WL 4433614, at *4 (citing expert analysis of first-day returns and evidence that defendant generally allocated late in the day); *SEC v. Susoeff*, 2024 WL 3938488, at *4 (D. Nev. Aug. 23, 2024) (same).

The defense can challenge this evidence by cross examining witnesses, and arguing to the jury, that the first-day returns could be driven by market movements *after* allocation, so data on first-day returns is not a useful metric. But that is a factual argument for the jury to weigh, not a fundamental defect in the expert analysis. *See Lickteig v. Cerberus Cap. Mgmt.*, 589 F. Supp. 3d 302, 333 (S.D.N.Y. 2022) ("[F]actual disagreements are to be resolved by the trier of fact as a matter of weight, not by the Court as a matter of admissibility.").

Of course, in this case, Professor Cohen and Kolm did not simply take the data on FDRs at face value. They went further and used data about the time allocations were entered into WAMCo's system both to see whether that the defendant's allocations were routinely entered late in the day and to calculate Pre-Allocation Returns. Those analyses supported that FDRs were a reasonable metric to use. The allocation data showed that the defendant's allocations were routinely logged at the end of the day. And the Pre-Allocation Return data produced results that were similar to FDRs, which confirmed that the bias observed in FDRs was not a result of changes in prices between the time the defendant's allocations were entered and the end of the day.

What is more, this additional work generated a new data set—Pre-Allocation Returns—that the experts used to perform additional analyses. These analyses, like the analyses of FDRs, showed that there was an large discrepancy between the Pre-Allocation Returns of the trades the defendant specifically allocated to Macro Opps and those he specifically allocated to the Core Strategies, that the discrepancy did not exist when the defendant lacked the discretion to allocate poorly performing trades to the Core Strategies, and that the discrepancy did not persist after allocation. That, too, is highly probative evidence that the defendant was using information he learned between trade and allocation to make his allocation decisions.

The defense is wrong to argue that these analyses are unreliable because there could have been a delay between the time the defendant told his trading assistants how to allocate his trades and the time those assistants entered the trades into WAMCo's systems. First, the defense's argument sets an impossible standard. There is no more precise record of when the defendant conveyed (or made) his allocation decisions than WAMCo's trade blotter because the defendant did not keep such records. It is reasonable to rely on the records that WAMCo itself used to track allocation times. *See, e.g.*, *Lickteig*, 589 F. Supp. 3d at 332-33 (allowing expert to offer valuation testimony based on company's projections). The Government's experts should not be held to the impossible standard of reconstructing exactly when the defendant conveyed each allocation.

Second, the defense's assertion that there were "significant gap[s]" between when the defendant conveyed his allocations and when those allocations were entered has little support, and is not a factual assumption the experts were required to adopt. *See Paris*, 2024 WL 4433614, at *9 ("[A]n expert is not required to resolve disputed facts in the defendant['s] favor."). The Government expects that the evidence at trial—including witness testimony and documentary evidence—will show that, consistent with the allocation data in WAMCo's blotters, the defendant routinely told his assistants how to allocate trades late in the day, and those assistants promptly entered the allocations in WAMCo's systems. The defense's evidence to the contrary comes from a submission prepared by WAMCo. The submission is not a representative sample: it was prepared as part of the company's advocacy to the SEC, and it addressed only eight trading days out of the more than 600 at issue in this case. That submission also showed that, even on the eight days the company selected, the defendant routinely conveyed his allocations after 12:00 p.m. Pacific Time. And far from showing that his trading assistants delayed, it shows that they worked efficiently to enter his late allocations, even when he called with large numbers of allocations at unpredictable

times. Indeed, the average time between trade and allocation that the defense cites from the submission was driven largely by a single day, when the defendant's trading assistants were overwhelmed because he gave allocation information for nearly 100 trades at 12:45 p.m.

Finally, the defense has not identified any evidence that delay between the time the defendant conveyed his allocations and the time that those allocations were entered would have made a difference for Professor Cohen and Kolm's analyses. In the cases the defense cites that excluded expert testimony due to flawed assumptions, the defense explained why the supposedly flawed assumption mattered. For example, in *In re LIBOR Antitrust Litigation*, Judge Buchwald found that it was unreliable for experts to assume that LIBOR manipulation had a stable effect on prices throughout the day because that assumption was inconsistent with other evidence "intraday trading" and other market information could significantly alter "the impact of LIBOR artificiality." 299 F. Supp. 3d 430, 487-88 (S.D.N.Y. 2018). Similarly, in *Pasternak v. Kim*, Judge Chin precluded expert testimony about bonuses a plaintiff expected to receive in the future because record evidence showed that the plaintiff was not likely to have receive bonuses in the way that the expert had calculated them. 961 F. Supp. 2d 593, 595-96 (S.D.N.Y. 2013).

Here, by contrast, the defense has not shown that, even if there was occasionally a lag between the time the defendant conveyed his allocations and the time his assistants entered those allocations, it would have mattered. Professor Kolm found that it would not. He took the allocation-entry times from WAMCo's blotter and worked backward, assessing how Pre-Allocation Returns would have changed if there had been up to a two-hour delay between the time the defendant conveyed his allocations and the time those allocations were entered. The facts remain the same: The defendant was consistently allocating trades with positive Pre-Allocation Returns to Macro Opps and negative Pre-Allocation Returns to the Core Strategies. Even a two-

hour shift would have resulted in $590 million of gains going to Macro Opps and $610 million of losses going to the Core Strategies. *See* Ex. G, ¶¶ 1-4.

At bottom, the defense has not shown that the experts' analyses are remotely unreliable, let alone so unreliable as to suggest bad faith or an essentially useless analysis. They should be allowed to testify about their analyses of FDRs and Pre-Allocation Returns, and the defense can cross examine them about the supposed flaws in that work.

## IV. Testimony About Trades Placed After October 19, 2023 is Permissible.

After October 20, 2023, WAMCo removed the defendant from the Core Strategies, but allowed him to continue allocating trades to Macro Opps. Professors Cohen and Kolm analyzed the defendant's performance after that period to help understand whether the positive first-day performance in Macro Opps before that date was caused by features of the Macro Opps strategy, as opposed to the defendant's cherry-picking of winning trades for Macro Opps and losing trades for the Core Strategies. They found that, once the defendant was no longer able to allocate trades to the Core Strategies, the consistent positive first-day performance of trades allocated to Macro Opps—which had been a feature of the period from January 2021 through October 2023—disappeared. This evidence is critical to refute a core defense theory that the positive first-day performance of Macro Opps was related to the strategy itself, rather than cherry picking. The experts' analyses are reliable and should not be precluded under Rules 702 or 403.

### A. Relevant Facts

Between January 1, 2023 and October 20, 2023, the defendant had the ability to allocate Treasury future and options to the Core Strategies, Macro Opps, or certain individual portfolios. He used that discretion to allocate worse-performing trades to the Core Strategies and better-performing trades to Macro Opps. This resulted in Macro Opps having net-positive FDRs and Pre-Allocation Returns. Those returns were not only positive in the aggregate, resulting in net

FDRs of approximately $664 million, but also consistently: for example, there were 518 days where the Treasury futures and options the defendant allocated specifically to Macro Opps had net-positive FDRs and only 40 days when there were net-negative FDRs.

Professors Cohen and Kolm conducted many data and statistical analyses designed to assess whether the positive first-day performance in Macro Opps and negative first-day performance in the Core Strategies could have been the result of differences between those strategies, as opposed to cherry picking. As part of that project, Professors Cohen and Kolm identified situations where the defendant did not exercise discretion about whether to allocate trades to Macro Opps or the Core Strategies. These situations provided a way to test whether features of the strategies themselves caused the large positive or negative first-day performance.

One example Professors Cohen and Kolm identified revolved around Broker-1. The defendant had a standing rule that, whenever he placed a trade through Broker-1, his trading assistants would allocate that trade to Macro Opps. This meant that, as a practical matter, the defendant lacked discretion to allocate Broker-1 trades to the Core Strategies. Professors Cohen and Kolm analyzed the defendant's Broker-1 trades, to see if they had the same positive first-day performance as other trades the defendant allocated specifically to Macro Opps. They did not. In fact, between January 1, 2021 and October 20, 2023, the trades the defendant placed through Broker-1 had net *negative* FDRs of approximately $19 million. *See* Ex. A, ¶ 31.

Another example Professors Cohen and Kolm identified revolved around the period after October 19, 2023. Beginning October 20, 2023, WAMCo removed the defendant's ability to allocate trades to the Core Strategies. This meant that the defendant could continue allocating trades to the Macro Opps, but no longer had the ability to protect that strategy by sending worse-performing trades to the Core Strategies and saving better-performing trades for Macro Opps.

Professors Cohen and Kolm will explain that the strong positive performance of Macro Opps disappeared once the defendant could no longer also send trades to the Core Strategies. For example, before October 20, 2023, the average trade the defendant allocated specifically to Macro Opps had positive FDRs of approximately $243,000 (resulting in net FDRs of $664 million), but between October 20, 2023 and August 12, 2024, the average trade he allocated to Macro Opps had positive FDRs of approximately $7,000 (resulting in net FDRs of $3 million). *See* Ex. A, ¶¶ 29, 32; Ex. C, ¶¶ 39, 41(h). The first-day performance of trades the defendant allocated to Macro Opps also fluctuated between positive and negative after October 20, 2023, whereas they were routinely positive before that date. *See* Ex. A, ¶ 34; Ex. C, ¶ 30(d).

**B. Discussion**

Professors Cohen and Kolm should be allowed to testify about their analyses of the period after October 19, 2023. Their analyses are reliable and important for refuting the defense's incorrect argument that the first-day performance of Macro Opps was caused by factors related to the Macro Opps strategy, as opposed to cherry picking.

The experts' analyses were reliable under Rule 702 because it was reasonable to compare the period before and after the defendant was removed from the Core Strategies. Rule 702 requires that expert testimony is reliable, which requires that experts make reasonable assumptions and comparisons in their work. Expert testimony should be excluded for flaws in assumptions or comparisons only when the assumption or comparison is "so unrealistic and contradictory as to suggest bad faith or [to be] in essence an apples and oranges comparison." *Restivo*, 846 F.3d at 577. Other challenges "go to the weight, not the admissibility, of the testimony." *Id.*

Here, the experts reasonably used the period beginning October 20, 2023 as part of analyzing whether the Macro Opps strategy, instead of cherry picking, caused the large positive first-day performance in that strategy. The experts identified that Macro Opps and the Core

Strategies were advertised as different strategies and had some different features. A key question, then, was whether those differences could have caused the differences in first-day performance. As explained above, one way Professors Cohen and Kolm went about answering that question was by analyzing the trades the defendant allocated specifically to Macro Opps and the Core Strategies, as well as the market conditions under which he made those allocations. For instance, Professor Cohen performed multiple analyses of whether the first-day performance in Macro Opps could have been cause by managing negative convexity (e.g., trading to add duration when rates fall, and trading to shed duration when rates rise). He concluded that first-day performance in Macro Opps was not a result of managing negative convexity because the defendant did not routinely trade to add duration when rates fell or shed duration when rates rose, and because such a trading pattern would not have consistently generated positive first-day returns.

Another way to assess whether it was the Macro Opps strategy, and not cherry picking, that led to positive first-day performance was to find times when the defendant did not have discretion to allocate trades to the Core Strategies. One comparator was trades placed through Broker-1, and the other was trades placed beginning on October 20, 2023. Analyzing both comparators led to the same result: When the defendant did not have discretion to allocate to the Core Strategies (and so could not send worse-performing trades that direction) the large, positive first-day performance in Macro Opps vanished.

The defense claims that the period after October 20, 2023 is a poor comparator, citing different market conditions and different portfolio characteristics. Mot. at 28-29. These arguments are red herrings and do not warrant exclusion of the experts' testimony.

The defense begins by arguing that macro-economic conditions were before and after October 20, 2023, arguing that volatility was lower and the bear market between 2021 and fall

2023 ended. Mot. at 28-29. This argument fails for two reasons. First, the defense incorrectly treats the before and after periods as monoliths, with 2021 to fall 2023 market by rising rates (a bear market) and high volatility, and October 20, 2023 onward market by falling interest rates and lower volatility. That is both an incorrect way to think about the defendant's trading and a misleading portrayal of the facts. The key question for Professors Cohen and Kolm was what explained the *first-day* performance of the defendant's trades. The fact that, on the whole, interest rates rose between 2021 and 2023 has little bearing on that issue because that rise was not uniform. There were periods of rates rising. There were periods of rates falling. And there were periods of stability. Volatility also fluctuated over the course of 2021 through fall 2023, rising and falling from day to day and week to week. The defendant, however, *consistently* generated positive first-day performance across the entire period, notwithstanding these changes.

It makes little sense, then, to compare a birds-eye view of 2021 through fall 2023 with a birds-eye view of the period after October 20, 2023. For example, the defense points out the bonds rallied (rates fell), in the last two months of 2023. Mot. at 29. But bonds had also rallied multiple times before, such as between mid-June and early-August 2022, November 2022, and March 2023. What is more, although the defense ignores it, bond prices fell (rates rose) between January and April 2024, much like they had at points in 2021, 2022, and 2023. Similarly, although the defense asserts that the period after October 20, 2023 was less volatile than the period before, the reality is that there were many days between October 20, 2023 and the summer of 2024 when volatility was equal to or higher than it had been in 2021, 2022, and portions of 2023.[5] But unlike before October 20, 2023—when the defendant consistently had positive first-day performance in Macro Opps

---

[5] Notably, the defense did not put in an affidavit on interest rates or volatility, instead citing two articles, neither of which compare interest rates or volatility before and after late October 2023.

regardless of market conditions—the defendant's first-day performance in Macro Opps after October 20, 2023 fluctuated between positive and negative.

Second, the premise of the defense's argument—that if macro-economic conditions were different before and after October 20, 2023, that would matter for first-day performance—was considered by the experts and rejected. A section of Professor Cohen's expert notice is devoted to whether market trends between 2021 and 2023, including high volatility and the bear market, could explain Macro Opps having consistently positive first-day performance. *See* Ex. A, s. X. He concluded that those factors could not explain the defendant's results. Professor Cohen explained that volatility measures the *variability* in prices, so could not explain the defendant having a consistent pattern of positive first-day performance in Macro Opps. And Professor Cohen will testify that he performed multiple analyses of interest-rate changes between 2021 and 2023, which showed that on a daily and intra-day basis, interest rates were highly variable and unpredictable, so the general trend between 2021 and 2023 could not explain the consistent daily performance the defendant achieved. *See id.* The defense cannot argue that the experts unreliably used the period after October 20, 2023 based on differences—volatility and rate movements—that they already analyzed and concluded were irrelevant for the issue of first-day performance.

The defense's argument that the "portfolio-management characteristics and needs of Macro Opps" were different beginning on October 20, 2023, Mot. at 29-30, is wrong for similar reasons. First, the defense again paints with too broad a brush. It is true that Macro Opps was generally more negatively convex before October 20, 2023 than after. But that does not mean the periods are incomparable. Both before and after, there were periods of positive convexity. Both before

and after, there were periods of differing degrees of negative convexity.[6] But before October 20, 2023, the defendant consistently had positive first-day performance in Macro Opps regardless of whether convexity was positive, negative, or severely negative. After October 20, 2023, by contrast, the defendant's first-day performance fluctuated between positive and negative.

Second, the premise of the defense's argument is that negative convexity would have some bearing on first-day performance of trades allocated to Macro Opps. But again, the experts have already considered that issue. As explained above, Professor Cohen analyzed whether the defendant was trading in response to market movements in a way that would be consistent with managing negative convexity in Macro Opps and found that he was not. Professor Cohen also performed data analyses showing that trading in response to market movements to manage negative convexity would not consistently generate positive first-day performance. *See* Ex. A, ¶ 74. These analyses show that, to the extent there was a difference in negative convexity before or after October 20, 2023, that difference is not relevant to figuring out why the defendant had such extreme positive first-day performance beforehand.

At bottom, the defense's theory of the case is that market conditions and negative convexity can (at least partially) explain the positive first-day performance in Macro Opps. Professors Cohen and Kolm disagree, and they each have an informed basis for that disagreement. Rule 702 is not an avenue to prevent analyses from going to the jury because the experts have not accepted the defense's view that market conditions and negative convexity are an important difference between the periods before and after October 20, 2023, particularly when there are serious flaws in the

---

[6] It is telling that the defense tries to magnify the difference between before and after October 20, 2023 by focusing on "the first 29 months of the [period between January 1, 2021 and October 19, 2023]," instead of the full period. Mot. at 29 n.8. That is because the remaining months of the period had negative convexity closer to zero, including stretches with positive convexity.

defense's view of the facts. *See Paris*, 2024 WL 4433614, at *9 ("[A]n expert is not required to resolve disputed facts in the defendant['s] favor.").

The analyses comparing the defendant's performance in Macro Opps before and after October 20, 2023 is also admissible under Rule 403. The analyses help establish (1) that, when the defendant did not have discretion to send poor-performing trades to the Core Strategies, the first-day performance of Macro Opps was worse because it could not avoid those trades, and (2) that there is not something inherent in the Macro Opps strategy that caused the defendant's allocations to consistently have positive first-day performance. Both points are critically important for proving that the defendant was cherry picking.

It is wrong for the defense to suggest that these analyses of are "minimal" value because the Government has "other comparators," citing the Government's use of Broker-1 and 50/50 trades as comparators. Mot. at 30. No natural experiment is perfect, and the defense will undoubtedly have arguments as to why both of those comparators are lacking. They may claim, for instance, that the defendant only used Broker-1 for a certain type of trade, or that the defendant had discretion about allocating 50/50 trades. Proving the defendant's guilt beyond a reasonable doubt is a high bar. The Government should not be limited in its case because the defense thinks other proof is good enough—particularly when the issue is central to the defense theory and it will undoubtedly argue to the jury that the Government's total quantum of proof is lacking.

The probative value of this evidence is also not "substantially outweighed" by the risk of unfair prejudice, confusion, or waste of time. The defense claims that introducing the evidence would be unfair because it "would likely be interpreted by the jury as reflecting Western's determination that Mr. Leech had misallocated trades." Mot. at 30. But the Court is well-equipped to manage that risk by limiting evidence of why the defendant stopped allocating trades to the Core

Strategies and by giving a limiting instruction,[7] directing the jurors that they should not consider why the defendant stopped allocating trades to the Core Strategies.

The probative value is also not substantially outweighed by the time it will take for the defense to present why conditions were different before and after October 20, 2023. Mot. at 31. The factual points the defense has made in this brief would not be difficult to present to a jury through a handful of charts and cross-examination of the Government's experts. The experts would also be able to respond to those cross-examination questions, which would further the truth-seeking function of the trial. By contrast, excluding the evidence would prevent the jury from even hearing important evidence that bears on the core issues in the case.

### V. Both Experts Are Qualified to Testify About the Portfolio-Management Topics Described in Their Notices.

As explained above, Professors Cohen and Kolm analyzed whether the difference in first-day performance between trades allocated to Macro Opps and those allocated to the Core Strategies was a result of differences between the strategies. One way Professors Cohen and Kolm analyzed that issue was by identifying specific features of Macro Opps and the Core Strategies and using data analyses to explore whether those features necessitated different trading between Macro Opps and the Core Strategies. These types of analyses were squarely within their areas of expertise: Both experts have extensive academic experience studying and teaching about portfolio management (including in the fixed-income context) and using data-analysis techniques to evaluate fund managers and trading strategies. Professor Kolm also has practical experience

---

[7] It is wrong to claim that the jurors will necessarily think the defendant stopped allocating to the Core Strategies for disciplinary reasons. For example, by mid-2023 there were already plans in place to start having the defendant hand off Core and Core Plus portfolio responsibilities to other portfolio managers as part of WAMCo's succession planning.

designing trading strategies. The defense's motion to exclude this testimony significantly understates the experts' qualifications and misconstrues the testimony they intend to offer.

**A. Applicable Law**

To testify pursuant to Rule 702, a witness must be "qualified as an expert by knowledge, skill, experience, training, or education," such that "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." "In assessing whether a witness can testify as an expert, courts have liberally construed the expert qualification requirement." *Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, 2006 WL 2128785, at *5 (S.D.N.Y. July 28, 2006). Analyses of expert qualifications typically proceed in two parts. Courts "first ascertain whether the proffered expert has the educational background or training in a relevant field" to qualify as an expert. *Cary Oil Co. v. MG Refining & Mktg., Inc.*, 2003 WL 1878246, at *2 (S.D.N.Y. Apr. 11, 2003). Courts then "compare the expert's area of expertise with the particular opinion the expert seeks to offer." *Id.*

In keeping with the "liberal" construction of the expert-qualification requirement, courts in the Second Circuit have emphasized that an "expert should not be required to satisfy an overly narrow test of his own qualifications." *Johnson & Johnson*, 2006 WL 2128785, at *5. "If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." *In re Zyperxa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007); *Sullivan v. Ford Motor Co.*, 2000 WL 343777, at *4 (S.D.N.Y. Mar. 31, 2000) ("One knowledgeable about a particular subject need not be precisely informed about all details of the issues raised in order to offer an opinion."). That is because, in considering qualifications, the "only matter the court should be concerned with is

whether the expert's knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth." *Johnson & Johnson*, 2006 WL 2128785, at *5.

Courts applying this standard have held that "[a] formal education in a particular field is sufficient to qualify a witness as an expert as a general matter, such that a lack of extensive practical experience directly on point does not necessarily preclude the expert from testifying." *Phillips*, 6620146, at *12 (quoting *LIBOR*, 299 F. Supp. 3d at 466); *accord Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F. Supp. 2d 448, 459-60 n.54 (S.D.N.Y. 2010); *Cary Oil Co. v. MG Refinining & Mkt'g*, 2003 WL 1878246, at *2 (S.D.N.Y. Apr. 11, 2003); *Johnson & Johnson*, 2006 LW 2128785, at *6; *TC Sys. Inc. v. Town of Colonie*, 213 F. Supp. 2d 171, 174-75 (N.D.N.Y. 2002). For example, in cases involving trading, courts have allowed experts to testify about whether trades were consistent with certain strategies, even when the witnesses did not have firsthand trading experience. *See, e.g.*, *Phillips*, 6620146, at *12 (allowing testimony about foreign-exchange trading strategy despite no trading experience); *Wilson*, 2016 WL 7229056, at *9 (allowing testimony about rate-trading strategy despite no experience trading). "[Q]uibble[s] with [an expert's] academic training . . . and . . . other alleged shortcomings" are "properly explored on cross-examination." *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995); *accord United States v. Joseph*, 542 F.3d 13, 21-22 (2d Cir. 2008).

**B. Discussion**

Professors Cohen and Kolm are qualified to testify about their analyses of the defendant's trading, including their assessment of certain features of the relevant strategies. The defense's motion significantly understates the qualifications of both witnesses: Both have extensive experience analyzing trading strategies and portfolios, including in the fixed-income context.

Professor Cohen is a tenured professor at Harvard Business School and a research associate at the National Bureau of Economic Research. Professor Cohen received a PhD and MBA in

Finance from the Graduate School of Business at the University of Chicago. That program included courses on asset pricing, portfolio management, and investment management and strategies. These courses covered fixed-income products and portfolios that used such products. *See* Cohen CV p.2.

Since receiving his PhD, Professor Cohen has served as a Professor at Yale School of Management and the Harvard Business School. He has taught MBA, PhD, and executive-level courses on finance, investment management, and investment strategies. In those courses, he has taught students about, among other things: (i) common-through-advanced strategies for trading different asset classes; (ii) strategies for constructing portfolios, including portfolios that include fixed-income products; (iii) techniques for managing the risk of portfolios; and (iv) methods for evaluating the performance of trading strategies, portfolios, or asset managers. These topics include lessons on fixed-income products, including the use of duration and convexity metrics to construct and manage portfolios that include fixed-income products. This teaching work requires researching academic work and events related to portfolio management; presenting real-world case studies to illustrate different trading and portfolio-management practices; and interacting with leaders in the field of portfolio management. *See id.* p.8-12, 18.

In addition to teaching, Professor Cohen is also an active researcher and lecturer. Professor Cohen's research work broadly involves applying data-analysis techniques to portfolio choice and asset management. This includes award-winning, data-driven papers that involve analyzing, and assessing the factors that drive, the performance of traders and portfolio managers, both in the

context of equities and fixed-income products.[8] Professor Cohen's research work also has also involved serving as an editor of multiple reputable journals, which involves reviewing and assessing cutting-edge academic work on empirical asset pricing, investment management, and portfolio management. *See id.* p.1. Finally, Professor Cohen is routinely hired to consult for financial institutions on many topics, including on creating investment strategies and evaluating the performance of multi-strategy funds that included fixed-income products.

Professor Kolm is, contrary to the defense's portrayal, similarly well credentialed. Professor Kolm is the Director of the Mathematics in Finance Program at New York University's Courant Institute of Mathematical Sciences. Professor Kolm obtained a PhD in Mathematics from Yale University. He then spent approximately four years at Goldman Sachs Asset Management (the investment-management arm of Goldman Sachs), as part of the firm's quantitative strategies group and Global Alpha hedge fund. This job involved designing and evaluating trading strategies for a global macro fund within Goldman Sachs. This included designing and evaluating trading strategies using fixed-income instruments and derivatives based on fixed-income instruments. *See* Kolm CV p.2.

Professor Kolm eventually left Goldman Sachs, attended a PhD program in finance at Yale University, and then became a professor in the Mathematics in Finance Program at NYU.

[8] *See, e.g.*, Don't Take Their Word For It: The Misclassification of Bond Mutual Funds" (with Huaizhi Chen and Umit Gurun), 2021, *Journal of Finance* 76, 1699-1730; "Cloaked Trading" (with Dong Lou and Christopher Malloy), 2016. *Journal of Investment Consulting* 17, 207–248; "Decoding Inside Information" (with Christopher Malloy and Lukasz Pomorski), 2012. *Journal of Finance* 67, 1009-1044; "The Small World of Investing: Board Connections and Mutual Fund Returns" (with Andrea Frazzini and Christopher Malloy), 2008, *Journal of Political Economy*, 116, 951-979; "Hidden Alpha" (with Manuel Amman, Alexander Cochardt, and Stephan Heller), 2022; "IQ from IP: Simplifying Search in Portfolio Choice" (with Huaizhi Chen, Umit Gurun, Dong Lou, and Christopher Malloy), 2020, Journal of Financial Economics 138, 118-137; "Moving Targets" (with Quoc Nguyen), 2022.

Professor Kolm's academic work involves both teaching and research. On the teaching side, Professor Kolm has taught graduate courses on risk and portfolio management, data science in quantitative finance, and algorithmic trading and quantitative strategies. Those courses include teaching students about trading strategies and techniques for portfolio and risk management, including in the context of fixed-income products and portfolios using those products (and derivatives based on those products). *See id.* pp.1-2. As for research, Professor Kolm has written extensively on designing and evaluating trading strategies and conducting data-driven evaluations of portfolio and fund performance. *See id.* pp.4-7. He is also on the editorial board of a number of reputable journals, including the Journal of Portfolio Management, the Journal of Investment Strategies, and the International Journal of Portfolio Analysis and Management. That role involves reviewing journal submissions and staying up to date on the state of academic literature related to portfolio management, portfolio analysis, and investment strategies. *See id.* p.1.

While performing this academic work, Professor Kolm has also kept a foot in the private sector. He is often invited by financial institutions to run training courses, programs, and workshops on topics that include asset pricing, derivative pricing, trading, and risk and portfolio management. Professor Kolm also consults for financial institutions on designing sophisticated trading strategies and implementing techniques for evaluating those strategies. This work spans many asset classes, including fixed-income products. *See id.* p.3.

The project that Professors Cohen and Kolm performed in this case fall squarely into their areas of expertise. Both witnesses have extensive experience performing data-driven analyses of the performance of trading strategies and portfolio managers. This work involves teasing out the factors that do, and do not, drive that performance. Professors Cohen and Kolm performed the same task here: They analyzed the performance of the defendant's Treasury futures and options

trades and assessed the extent to which that performance was caused by certain features of the Macro Opps strategy and the Core Strategies.

In trying to argue to the contrary, the defense largely ignores the actual analyses described in the notices. First, the defense takes issue with Professor Cohen's proposed testimony that the different duration restrictions between Macro Opps and the Core Strategies "did not, in practice, meaningfully constrain how Mr. Leech allocated Treasury F&Os between the strategies." *See* Ex. A, ¶ 64. But the defense ignores the work Professor Cohen did, and how that fits with his background. As the notices explain, Professor Cohen analyzed the extent to which the defendant's actual Treasury future and options trades moved the duration of portfolios in Macro Opps and the Core Strategies, and observed that they made a minimal difference. *See id.* ¶ 64(b). He also performed an exercise that involved re-assigning trades between strategies, including changing to 50/50 allocations all of the trades the defendant allocated to Macro Opps and the Core Strategies. That analysis showed that 50/50 allocations would have barely changed the duration of Macro Opps and the Core Strategies, and rarely would have implicated the portfolio limits on duration. *See id.* ¶ 64(c). This shows that Professor Cohen was applying his experience using data analyses and portfolios to the facts of the case.

Next, the defense objects to Professors Cohen and Kolm explaining that the public descriptions of Macro Opps and the Core Strategies gave the defendant flexibility in allocating Treasury futures and options, and did not describe "opposing strategies." *See* Ex. A, ¶¶ 63, 65(a), 68. Those are accurate statements about WAMCo's descriptions of the two strategies and evaluating them was consistent with the experts' normal work. The opinions are also modest, stating that the defendant had flexibility about how to allocate trades—a point the defense does not substantively contest. What is more, the defense again ignores that the experts' statements are

supported by rigorous data analysis. For instance, Professor Cohen's notice describes his extensive analysis of the composition of the portfolios in Macro Opps and the Core Strategies; how frequently the defendant allocated trades 50/50 to both; how re-allocating trades would not significantly change duration; and how the data showed the defendant was not regularly assigning opposite trades to the two strategies. *See id.* ¶¶ 13-19, 63, 65-68.

The defense is similarly wrong to challenge Professor Cohen's statement that there were "no requirements" in Macro Opps or the Core Strategies about "how long Mr. Leech had to hold a position" or "the level of convexity." *See id.* ¶¶ 65, 69. Those are true statements about the strategies, and the defense does not say otherwise. Moreover, the defense again ignores that the statements are jumping-off points for rigorous data analysis of the length of time for which the defendant held positions and the negative convexity of Macro Opps compared to the Core Strategies. *See id.* ¶¶ 65, 69-71.

Finally, there is no merit to the claim that the experts are unqualified to opine that the defendant's pattern of allocating trades with good first-day performance to Macro Opps and poor first-day performance to the Core Strategies does not appear to be driven by portfolio guidelines or other features of those strategies. *See* Ex. A, ¶¶ 62, 66, 67. A core piece of the work Professors Cohen and Kolm do outside of this case is analyzing how trading strategies and portfolio managers performed and what the reasons were for that performance. That is precisely what these proposed opinions express: The experts studied the relevant strategies, identified key similarities and differences between the two, conducted extensive analyses of the defendant's trading and his performance, and concluded from that work that the extreme difference in first-day performance was not a natural result of portfolio requirements or other features of the strategies.

Professors Cohen and Kolm should not be precluded from offering these opinions simply because do not have "practical experience managing fixed-income portfolios." Mot. at 24. As explained above, courts routinely hold that "[a] formal education in a particular field is sufficient to qualify a witness as an expert as a general matter, such that a lack of extensive practical experience directly on point does not necessarily preclude the expert from testifying." *Phillips*, 6620146, at *12. This includes allowing experts who have only academic experience analyzing trading to testify about trading strategies. *See supra* at 40. And here, there is even less of a gap between the proposed testimony and the experts' qualifications. Professors Cohen and Kolm are not testifying about obscure, complex trading strategies, without any data grounding their testimony. Instead, they are identifying core portfolio-management concepts like duration and convexity management, which they teach about and have experience analyzing both in academic work and (for Professor Kolm) in designing trading strategies. Then they are using data and statistical techniques—the type of techniques they routinely use when evaluating performance—and applying those tools to understand what could be causing the defendant's performance.

The defense's claim that the experts should not be able to "offer unqualified value judgments," Mot. at 26, is also off base. As explained in the notices, the experts plan to testify that certain features did, or did not, "meaningfully" constrain the defendant's discretion. *See* Ex. A, ¶ 64. But the notices *also* explain that such testimony is based on extensive data analyses, and the experts plan to explain that their opinions are informed by those analyses. The experts should not be prohibited from giving a plain-language description of their views when those views are informed by thoughtful analyses. The defense can cross-examine the experts on whether the data supports, or does not support, the conclusion that the defendant was meaningfully constrained by portfolio requirements. But that is not a basis to exclude the testimony.

## VI. The Experts Are Not Offering Improper Bolstering Testimony.

Professors Cohen and Kolm are not offering improper bolstering testimony. The defense's arguments to the contrary ignore important context and do not warrant exclusion.

### A. The Opinions in Professor Cohen's Rebuttal Notice Are Admissible

The defense claims that Professor Cohen's rebuttal disclosure does not rebut the defense's expert disclosure, but was solely designed to bolster the analyses in his original notice. That is wrong. As the rebuttal notice explains, Professor Cohen's rebuttal consisted of new analyses designed to rebut an important aspect of the defense experts' proposed testimony.

The order of events shows the propriety of Professor Cohen's rebuttal notice. In his original notice, Professor Cohen performed analyses that showed there was a statistically significant difference between the defendant's first-day performance in Macro Opps and the Core Strategies. He also performed analyses that showed there was a statistically significant difference between the defendant's first-day performance in those strategies and other comparators. As described in the Government's *Daubert* motion, the defense, for their part, noticed two pairs of experts in their initial disclosures who had performed hypothetical trade-allocation exercises. In the exercises, one expert was given a set of the defendant's trades and was asked to decide whether to allocate those trades to Macro Opps or the Core Strategies. Another expert then reviewed the results, using statistical analyses. The notices disclosed that defense experts planned to testify that both experts' analyses resulted in statistically significant differences between the performance of trades allocated to Macro Opps and certain comparators, and a statistically significant difference between the performance of trades allocated to the Core Strategies and certain comparators.

The defense experts created a risk that the jury might think: Professor Cohen's analyses of the defendant's trade showed statistically significant differences, but the hypothetical trade-allocation exercises also resulted in statistically significant differences, so it's a wash. That would

not be a correct conclusion to draw for a number of reasons, one of which relates to magnitude. The difference between the defendant's first-day performance in Macro Opps, the Core Strategies, and Comparators was much *more* statistically significant than the results the defense experts achieved, and the magnitude of the differences were much greater. *See* Ex. B, ¶¶ 1-2. To make sure that point was not lost on the jury, Professor Cohen, in his rebuttal report, performed a number of different "effects tests" to measure the "magnitude of the difference" between the defendant's first-day performance in Macro Opps, the Core Strategies, and other comparators. The rebuttal notice describes the results of those analyses. *See id.* ¶¶ 3-18.

This proposed testimony was appropriate for a rebuttal notice. The defense notices raised an issue of how to tell the difference between two statistically significant results, which prompted Professor Cohen to perform magnitude analyses. The fact that Professor Cohen does not directly critique the defense experts' analyses does not mean it is not substantively rebutting the point of the analyses they intend to present.

Because Professor Cohen's rebuttal notice is properly rebuttal testimony, the defense's analysis of the standard for late supplements is irrelevant. Mot. at 33. But even if that standard applied, Professor Cohen's analyses should not be excluded. The proposed testimony is important for addressing an argument the defense is likely to advance through their experts, and it was reasonable that Professor Cohen did not conduct the analyses in connection with his initial notice because he could not predict what the defense experts might do. There is also no prejudice because the Government gave Professor Cohen's notice to the defense more than four months in advance of trial, leaving ample time to prepare for the testimony or respond to it through a supplemental expert notice of their own.

### B. The Opinions in Professor Kolm's Sur-Rebuttal Notice Are Admissible

The defense's effort to exclude portions of Professor Kolm's sur-rebuttal report is also meritless. Professor Kolm's testimony is an appropriate response to new analyses the defense identified in a rebuttal notice. It does not impermissibly "bolster" Professor Cohen's work.

Once again, the defense's motion leaves out important context. In his initial report, Professor Cohen performed regression analyses, the results of which showed that Pre-Allocation Returns were a much stronger predictor of how the defendant would allocate trades than other factors. As explained in the Government's *Daubert* motion, at the rebuttal stage, two defense experts—Aaron Dolgoff and Michael Maloney—noticed regression analyses. Mr. Maloney's regression analyses looked at the extent to which trades the defendant allocated to Macro Opps had the effect of counteracting duration changes that occurred in that portfolio over the course of a day. Mr. Dolgoff's regression analyses took Professor Cohen's work and swapped out the Pre-Allocation Return variable for another variable (called "Convexity Effect Offset") that measured whether a trade counteracted (to some extent) the estimated convexity-driven duration change of account 3313 between the time of trade execution and allocation.

Although both sets of regression analyses are described as responding to certain aspects Professor Cohen and Kolm's testimony, they suggest a fundamentally new theory of the case that was not present in the defense's initial expert notices. Specifically, they suggest that the defendant was making allocation decisions based on changes to the duration of Macro Opps that occurred *after* the defendant placed a trade, but before he allocated it.

Professor Kolm submitted a sur-rebuttal notice to respond to these new regression analyses. Both of the defense regressions had many similar flaws, so Professor Kolm responded to both of them. His critiques of both defense experts include explaining that: (i) Messrs. Dolgoff and Maloney both use variables in their regressions that appear designed to mimic first-day

performance; (ii) that both analyses fail to distinguish between information that the defendant could have known before he placed trades and information that he only could have learned after; and (iii) that Messrs. Dolgoff and Maloney focus only on Macro Opps, without providing any explanation of the defense's allocations to the Core Strategies. *See* Ex. E, ¶¶ 1-29.

This is appropriate rebuttal testimony, not improper bolstering of Professor Cohen. There is also no rule of evidence one expert "bolstering" another. Instead, courts analyze arguments that experts are impermissibly supporting or repeating one another under Rule 403, prohibiting "multiple expert witnesses [from] express[ing] the same opinion on a subject" because it would be a "waste of time" and would "raise[] the unfair possibilities that jurors will resolving competing expert testimony by 'counting heads.'" *Quinton v. Am. Express Co.*, 2025 WL 1384896, at *3 (E.D.N.Y. May 13, 2025); *accord On-Track Innovations Ltd. v. T-Mobile USA, Inc.*, 106 F. Supp. 3d 369, 414 (S.D.N.Y. 2015). This rule bars different experts from expressing the same opinion on the same topic; it does not prohibit all overlap between expert testimony or for one witness to offer evidence that inferentially reinforces the points made by another. The law even permits one witness to construct opinions grounded in the work of another, as "an expert may rely on assistants or the opinions of other experts in formulating their own expert opinions." *Faulkner v. Arista Recs.*, 46 F. Supp. 3d 365, 385 (S.D.N.Y. 2014); *see also In re Mirena Prods. Liability Litig.*, 341 F. Supp. 3d 213, 295-96 (S.D.N.Y. 2018) ("In some circumstances, experts can permissibly rely on the opinions of other experts.").

Here, Professor Kolm's sur-rebuttal testimony is not improperly cumulative of, or bolstering, Professor Cohen's regression analyses. Professor Kolm's role is not to reiterate the results of Professor Cohen's regression analyses. Instead, Mr. Dolgoff modified Professor Cohen's regression model by creating his own Convexity Effect Offset variable. Professor Kolm's

testimony critiques Mr. Dolgoff's the way Mr. Dolgoff chose and designed that variable. This testimony is neither cumulative, nor a waste of time. It is a unique response to Mr. Dolgoff's work, and is essential for the jury to understand the flaws in Mr. Dolgoff's analyses.

What is more, it is entirely reasonable for Professor Kolm to respond to Mr. Dolgoff's regression analyses because Professor Kolm is also responding to Mr. Maloney's regression analyses. As explained above, Mr. Maloney's regression analyses are not built on Professor Cohen's model, but have many of the same flaws and Mr. Dolgoff's work. It is sensible, then, to have a single Government expert ready rebut both analyses.

## VII. Professor Cohen Does Not Intend to Use the Term "Material."

Finally, the defense notes that Professor Cohen's rebuttal report occasionally uses the word "material" when describing the results of certain analyses. For example, Paragraph 3 of the notice states: "Professor Cohen will testify about additional analyses he performed that show that[,] for different sets of trades[,] the FDRs and Pre-Allocation Returns were not only statistically different from one another[,] but were also materially different, meaning the magnitude of the difference was substantial." *See* Ex. B, ¶ 3.

As is clear from that sentence, Professor Cohen was using the word "material" in the colloquial sense of being of significant magnitude. The Government appreciates, however, that using the word could create confusion with the legal concept of materiality. To avoid any possibility of confusion, the Government will instruct Professor Cohen not to use the word "material" when describing the results of his analyses.

**CONCLUSION**

For the foregoing reasons, the Court should deny the defendant's motion to exclude testimony from Professors Cohen and Kolm.

Dated: New York, New York
January 15, 2026

Respectfully submitted,

SEAN BUCKLEY
Attorney for the United States

By: _/s_____________________
Thomas S. Burnett
Peter J. Davis
Assistant United States Attorneys

Lindsey Keenan
Special Assistant United States Attorney
*Of Counsel*