UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

UNITED STATES OF AMERICA,       )

                              )

       -v-                    )       24 Cr. 658 (GHW)

                              )

S. KENNETH LEECH II,          )

                              )

           *Defendant*.        )

------------------------------------------------------------- X

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
DEFENDANT S. KENNETH LEECH II'S PRETRIAL MOTION
REQUESTING DISCOVERY AND A HEARING REGARDING
THE GOVERNMENT'S DEFICIENT TAINT TEAM PROCESS**

Dated:   February 6, 2026
         New York, New York

MORVILLO ABRAMOWITZ
GRAND IASON & ANELLO P.C.

Jonathan S. Sack
Jeremy H. Temkin
Nathaniel Sobel
565 Fifth Avenue
New York, New York 10017
(212) 856-9600

CLEARY GOTTLIEB
STEEN & HAMILTON LLP

Joon H. Kim
One Liberty Plaza
New York, New York 10006
(212) 225-2000

*Attorneys for Defendant S. Kenneth Leech II*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND ............................................................................................................... 1

     A.   Case Team's List and the Filter Team's Initial Review ..................................... 2

     B.   Google Returns .................................................................................................... 4

     C.   Apple Returns ...................................................................................................... 6

     D.   Defense's Privilege Review ................................................................................. 8

ARGUMENT ................................................................................................................... 10

I.   The Government's Filter Team Process Was Deficient, and the Court Should
    Impose an Appropriate Remedy ............................................................................ 10

II.  The Government Accessed Privileged Materials .................................................. 17

     A.   Mr. Leech's Communications with Experts Retained by Counsel Are Privileged ....... 17

     B.   Mr. Leech's Notes Are Privileged .................................................................... 23

     C.   Certain of Mr. Leech's Google Search History Is Privileged ......................... 26

     D.   Mr. Leech's Text Messages with Counsel, Counsel's Work Product,
         and a Document Reflecting Topics Discussed in Meetings with Counsel
         Are Privileged .................................................................................................... 27

CONCLUSION ................................................................................................................ 28

## **TABLE OF AUTHORITIES**

**Cases**                                                                    **Page(s)**

*A & R Body Specialty & Collision Works, Inc. v. Progressive Cas. Ins. Co.*,
No. 07 Cv. 929 (WWE), 2014 WL 657688 (D. Conn. Feb. 20, 2014) ..................................... 23

*Brady v. Maryland*,
373 U.S. 83 (1963) ................................................................................................. 2

*Burroughs Wellcome Co v. Barr Lab'ys, Inc.*,
143 F.R.D. 611 (E.D.N.C. 1992) ............................................................................ 26

*Cavallaro v. United States*,
284 F.3d 236 (1st Cir. 2002) ............................................................................ 20, 21

*Cicel (Beijing) Science & Tech. Co., Ltd. v. Misonix, Inc.*,
331 F.R.D. 218 (E.D.N.Y. 2019) ............................................................................ 24

*United States v. DeFonte*,
441 F.3d 92 (2d Cir. 2006)............................................................................... 24, 26

*Dunn as Tr. for Zohar Litig. Tr.-A v. Patriarch Partners, LLC*,
672 B.R. 587 (Bankr. D. Del. 2025) ................................................................... 18, 19

*In re Grand Jury Subpoena to Mrs. C.D.*,
22 F. Supp. 2d 507 (D. Md. 1998) ........................................................................ 14

*In Re Grand Jury Subpoena*,
127 F.4th 139 (9th Cir. 2025)................................................................................ 18

*In re Grand Jury Subpoenas Dated January 20, 1998*,
995 F. Supp. 332 (E.D.N.Y. 1998) ........................................................................ 21

*In re Kidder Peabody Sec. Litig.*,
168 F.R.D. 459 (S.D.N.Y. 1996) ........................................................................... 23

*Lively v. Wayfarer Studios LLC*,
No. 24 Cv. 10049 (LJL), 2025 WL 2606904 (S.D.N.Y. Sept. 9, 2025)..................................... 20

*Parneros v. Barnes & Noble, Inc.*,
332 F.R.D. 482 (S.D.N.Y. 2019)............................................................................ 26

*Regeneron Pharms., Inc., v. Merbus B.V.*,
No. 14 Cv. 1650 (KBF) 2014 WL 11344040 (S.D.N.Y. Dec. 5, 2014) ..................................... 23

*United States v. Avenatti*,
559 F. Supp. 3d 274 (S.D.N.Y. 2021) .................................................................. 12, 13

*United States v. Barnes*,
  411 F. App'x 365 (2d Cir. 2011) ............................................................... 16

*United States v. DeFonte*,
  441 F.3d 92 (2d Cir. 2006) ....................................................................... 25

*United States v. Gartner*,
  518 F.2d 633 (2d Cir. 1975) ............................................................... 11, 13

*United States v. Kovel*,
  296 F.2d 918 (2d Cir. 1961) ............................................................... 18, 22

*United States v. Landji*,
  No. 18 Cr. 601, 2021 WL 5402288 (S.D.N.Y. Nov. 18, 2021) ................... 11

*United States v. Ritchey*,
  605 F. Supp. 3d 891 (S.D. Miss. June 3, 2022) ....................................... 26

*United States v. Schwimmer*,
  924 F.2d 443 (2d Cir. 1991) ..................................................................... 11

*United States v. Sharma*,
  No. 18 Cr. 340 (LGS), 2019 WL 3802223 (S.D.N.Y. Aug. 13, 2019) ........ 12

*United States v. Tournant*,
  No. 22 Cr. 276 (LTS), 2023 WL 5276776 (S.D.N.Y. Aug. 15, 2023) ......... 11

*United States v. Valencia-Trujillo*,
  No. 02 Cr. 00329 T17EAJ, 2006 WL 1793547 (M.D. Fla. June 26, 2006) ... 17

*United States v. Zolin*,
  491 U.S. 554 (1989) .......................................................................... 12, 14

*WCA Holdings III, LLC v. Panasonic Avionics Corp.*,
  No. 20 Cv. 7472 (GHW), 2025 WL 1434375 (S.D.N.Y. May 17, 2025) ...... 18

**Other Authorities**

Jury Charge, *United States v. Schulte*,
  17 Cr. 548 (PAC) (S.D.N.Y. April 24, 2020) ............................................ 16

Mark S. Brodin, *Weinstein's Federal Evidence* (2025) ................................ 14

Paul R. Rice, *Attorney-Client Privilege in the U.S.* (2d ed. 2021) ................ 15

## PRELIMINARY STATEMENT

The defense has sought information regarding the government's filter team process since September 2024, when the government first asked for information about the individuals with whom Mr. Leech had a privileged relationship. The case was indicted a short time later, in November 2024. Based on the limited information the government disclosed prior to our pretrial motion, our initial motion sought discovery and a hearing to assess the full extent and nature of the government's violation of Mr. Leech's rights and asked the Court to grant appropriate relief. The Court determined that the defendant had made a threshold showing to be entitled to a hearing regarding the government's access to his privileged materials.

The government has now provided additional information about its process, which makes clear that, without justification, the prosecutors in charge of this case accessed more than 200 privileged communications. These are all documents that post-date Mr. Leech's retention of counsel and concern the same subjects as the government's investigation. The defense has met its burden in showing that these documents are privileged, that the government's filter team process was deficient in fundamental ways, and ultimately that the government's strained and unsupported arguments to the contrary only reinforce the conclusion that the government's review process was flawed in design and execution.

## BACKGROUND

The defense's omnibus pretrial motion ("the Motion") provided a factual summary, based on the information known to counsel at that time, of the government's deficient filter team process. (Dkt. 35 at 24-31). The government submitted a brief in opposition, (Dkt. 37 at 46-72), and the defense filed a reply brief. (Dkt. 38 at 23-42). The discussion below is based on the facts set forth in that prior briefing as supplemented by the declarations dated January 21, 2026

1

from Assistant U.S. Attorneys Molly Canick (the "Filter Team" or the "Filter Team Declaration") (Dkt. 78-1) and Peter J. Davis (the "Case Team" or the "Case Team Declaration") (Dkt. 78-2).[1]

### A.    Case Team's List and the Filter Team's Initial Review

In March 2024, the government received search warrant returns for Apple and Google accounts associated with Mr. Leech.  (Dkt. 78-2 ¶ 4).  At that time, the Case Team "was aware that the defendant was represented by counsel in connection with a related investigation by the Enforcement Division of the Securities and Exchange Commission and Western Asset Management Company."  (Dkt. 78-2 ¶ 4).  Mr. Leech also gave testimony to the staff of the U.S. Securities and Exchange Commission ("SEC") on March 6, 2023, in which Mr. Leech noted that, in the course of preparing for his testimony, he had discussions with "experts," and an attorney for the SEC (now a member of the Case Team) stated in response:  "I think experts retained by your counsel would be an agent of your counsel, and so that would fall within the realm of a privileged communication."  (Exhibit A).

On or about March 12, 2024, the Case Team provided the Filter Team "a list of law firms and lawyers who the [Case Team] understood represented the defendant, Western Asset Management Company, or were involved in the investigation conducted by Western Asset Management Company."  (Dkt. 78-2 ¶ 4).  In preparing that list, the Case Team made no effort at all to identify the experts retained by counsel that Mr. Leech referenced in his SEC testimony as individuals with whom he had privileged communications.  As demonstrated in a letter provided by the government pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), by early March 2024, the government's investigation was overt insofar as the Case Team had interviewed at least one of Mr. Leech's colleagues at Western on or about March 4, 2024.  Nonetheless, the Case Team

---

[1] For the purpose of this memorandum, the defense accepts as true the facts proffered in the Filter Team and Case Team Declarations.

chose not to consult Mr. Leech's counsel for assistance in identifying potentially privileged materials.

The Filter Team consisted of Assistant U.S. Attorney Canick, who serves in the role of Privilege Review Coordinator, and contract "law clerks" whom she supervises.  (Dkt. 78-1 ¶¶ 1-2).[2]  Based on the list provided by the Case Team and manual review of documents responding to certain search terms, the Filter Team was tasked with segregating "potentially privileged" data from the Case Team.  (*Id.* ¶ 5).

In a letter dated April 4, 2025, following the November 2024 indictment and the rolling production of case discovery, the defense requested that the government disclose "the search terms used by the Filter Team and, if those search terms changed over time, when each term was first used."  (Dkt. 36-9 at 7).  The government declined to respond to that request in any meaningful way, stating only that "the Filter Team used search terms and other review techniques."  (Dkt. 36-10 at 5 (referencing Dkt. 36-8 at 1)).

Now, in the Filter Team Declaration, having been forced to do so, the government has for the first time provided a broad overview of the Filter Team's process for segregating "records potentially subject to a valid assertion of attorney-client privilege or work product protection."  (Dkt. 78-1 ¶ 5).  While the Filter Team Declaration generally describes its protocols, significantly, the Filter Team did not maintain an audit log of this process.  (*Id.* ¶ 5).  Notably, in providing an explanation now as to why emails with the subject line "privilege" were not segregated as part of this process, the Filter Team acknowledges that the term "'privilege' was not used as a standalone term to segregate materials" but that the government has since amended

---

[2] The Filter Team Declaration does not describe how many law clerks worked on the case or their qualifications and training.

its protocol so that future reviews will "include a search for 'privilege' in the subject line of emails." (Dkt. 78-1 ¶ 7 n.1).

The government also did not take any steps to screen Mr. Leech's confidential communications with his wife that are protected by the spousal privilege. (*See* Dkt. 78-1 ¶ 20; *see also* Dkt. 36-8 at 1 n.1).

### B. Google Returns

In June 2025, the government informed defense counsel that, on four occasions, it had accessed privileged materials in the Google returns and then paused its review. (Dkt. 36-10 at 5). In April 2025, defense counsel had previously requested that the government provide the documents that "triggered the Prosecution Team to conclude it was necessary to pause its review and give the Filter Team additional guidance." (Dkt. 36-9 at 7). The government declined to provide this information, and still has not provided it. The Case Team Declaration now describes three of those instances. (Dkt. 78-2 ¶¶ 5, 7, 8). The Filter Team Declaration makes clear that the Filter Team did not maintain audit logs of any subsequent remedial steps it took after the Case Team paused its review. (Dkt. 78-1 ¶¶ 7-10, 12).

On or about April 18, 2024, the Case Team commenced its review of the Google returns. On that same day, the Case Team "encountered material that appeared to be potentially privileged and stopped [its] review." (Dkt. 78-2 ¶ 5). The Case Team then wrote a note to file stating that it "saw correspondence that suggested that Leech was consulting with an expert on the subject matter of this investigation." (*Id.*). The Case Team does not identify the specific document or documents that it reviewed, and it is unclear whether it is able to do so. And the Case Team did not at that time contact defense counsel to inquire about the identity of experts.

The next day, on or around April 19, the Filter Team "attempted to replicate the case-specific, topical searches that the Case Team had run before coming across the potentially privileged material" and ultimately segregated from the Case Team 95 files comprising of emails Mr. Leech sent to himself and his son (who was retained by counsel as an expert), including eight emails with the subject line "privilege." (Dkt. 78-1 ¶ 7). The Filter Team informed the Case Team in an email that these documents included:

> [E]mails from Ken Leech to himself (he has several email accounts). These are notes about trading. They could be notes that he is taking to record his recollections or actions in light of the SEC investigation. 8 of them have a subject 'privilege'. But there are 95 total that are very similar (and often duplicative). The others have either no subject or a dated subject like 'July note'.

(Dkt. 78-2 ¶ 6).

The Case Team then resumed its review. (*Id.* ¶ 7). On or about April 23, the Case Team Declaration states that the Case Team and the Filter team had a "discussion" and "to assist the Filter Team in locating and segregating documents that could be potentially privileged . . . , [it] marked messages as potentially privileged, alerted [the Filter Team], and halted [its] review." (*Id.*). The Case Team noted in an email that it "marked an email potentially privileged as well as an email to 'Dexter Senft.'" (*Id.*). The Filter Team reviewed and segregated certain of these messages, including 24 emails with the subject line "privilege." (Dkt. 78-1 ¶ 8). The Filter Team informed the Case Team that it had added Mr. Senft and another expert working with him, Autum Soukup, to "the Filter Team's privilege list." (Dkt. 78-2 ¶ 8).

In an email to the Case Team, on or about April 25, the Filter Team proposed that "we could confirm that these were in fact expert witnesses retained by counsel by asking for documentary support from defense counsel." (Dkt. 78-2 ¶ 8). The Case Team disregarded this suggestion.

On or about May 14, the Case Team "encountered an additional potentially privileged record." (*Id.* ¶ 9). The document appears to have been "an email between the defendant and his wife with an attached note from the defendant's wife to Dexter Senft." (*Id.*). The Filter Team Declaration states that the document was likely not segregated from the Case Team because Mr. Senft was not a participant in the underlying email correspondence. (*Id.*).

In a June 11, 2025 letter to counsel, the government stated that the Case Team "paused its review on or about July 24, 2024 and asked the Filter Team to review materials that might be privileged." (Dkt. 36-10 at 5). The Case Team Declaration, however, does not discuss this incident or identify the documents that trigged the pause in July 2024. The Filter Team Declaration states that "the Case Team expressed concern that there may have been a technical issue in loading the Google Data to Relativity resulting in loss of data because they were unable to locate certain information including search history and calendar entries." (Dkt. 78-1 ¶ 10). The Filter Team Declaration acknowledged that these files "had been segregated as potentially privileged." (*Id.*). Nonetheless, the Filter Team then released the files to the Case Team the next day after "review[ing] the contents to confirm that these were records of search history and calendar entries, but [the Filter Team] did not conduct a page-by-page review of each file." (*Id.*).[3]

### C.    Apple Returns

On or about April 29, 2024, the Case Team requested the ability to access the search warrant returns from Mr. Leech's Apple accounts. (Dkt. 78-2 ¶ 10). The Case Team initially viewed the Apple returns on a platform called Cellebrite. (*Id.* ¶ 11). Using Cellebrite, the Filter Team processed data from Mr. Leech's Apple accounts "into eleven individual Cellebrite

---

[3] Paragraph 10 of the Filter Team Declaration references both "July 24, 2025" and "July 24, 2024," but the defense assumes it only intended the July 24, 2024 date.

reports." (Dkt. 78-1 ¶ 11).  The Filter Team's process for segregating privileged materials in the Apple returns was different than the process used for the Google returns.  The Filter Team conducted a series of searches "one at a time" for privileged materials and then reviewed the "hits . . . before progressing to the next term." (*Id.* ¶ 12).  Again, the Filter Team did not maintain an audit log for this process.  (*Id.*).  When the Filter Team identified a file as potentially privileged, it was marked with a "tag." (*Id.*).  After that, an FBI forensic examiner removed the potentially privileged files from the Cellebrite reports which were then "double-checked" by the Filter Team.  (*Id.* ¶ 13).

In early August, the 11 Cellebrite reports (without documents that had been removed based on the Filter Team's review) were delivered to the Case Team.  (*Id.* ¶ 14).  Even though, on April 25, the Filter Team had added Mr. Senft to its "privilege list," on August 9, the Case Team informed the Filter Team that the Cellebrite reports that it received and had accessed included "chats" between Mr. Leech and Mr. Senft.  (Dkt. 78-2 ¶ 11).[4]  The Filter Team then sent updated "tags" to the FBI to generate new reports.  (Dkt. 78-1 ¶ 15).

On or around August 15, the Filter Team provided new reports to the Case Team.  (*Id.* ¶ 16).  That same day, the Case Team informed the Filter Team that it "saw a file path that said privileged from [defense counsel]." (Dkt. 78-2 ¶ 13).  He stated that the Case Team "did not review the document, but it appears there is still privileged materials in these reports." (*Id.*).  The Filter Team Declaration states that "this file was missed during the initial screen because the terms were not in the body of the document but were located in a file path." (Dkt. 78-1 ¶ 17).

---

[4] Unlike the Google returns, the government has not produced a list of documents that it accessed in the Apple returns.

On August 23, after finishing a "supplemental review" of the Apple returns, the Filter Team released new Cellebrite reports to the Case Team. (Dkt. 78-1 ¶ 19). These reports contained a text message between Mr. Leech and defense counsel. (*Id.*). The Filter Team Declaration describes this message as "coordinating an introduction with a contact card attached." (*Id.*).

On August 28, the Case Team informed the Filter Team about "a potentially privileged document." (Dkt. 78-2 ¶ 15). That document was an email between Mr. Leech and his spouse and "was marked 'Confidential.'" (Dkt. 78-1 ¶ 20). Ultimately, on or about August 30, the Case Team decided to abandon the Cellebrite platform and transfer "Email, Exchange files and Documents" from the Apple returns onto the Relativity platform that was used to review the Google returns. (*Id.* ¶ 22).

### D.    Defense's Privilege Review

On September 9, 2024, the Case Team contacted the defense for the first time regarding privilege issues and asked to get counsel's input as to potentially privileged communications. By letter dated September 24, 2024, defense counsel responded to the government's request, provided the requested information, and asked the government for details regarding "the process the Office intends to use to ensure that potentially privileged material is not reviewed or otherwise considered in connection with the government's investigation." (Dkt. 36-6 at 1). The government ignored that request. On November 4, 2024, the government produced over 35,000 documents to defense counsel. (*See* Dkt. 36 ¶ 28). In late 2024, defense counsel reviewed these documents and asserted privilege over approximately 3,123 documents, which included, among other things, communications Mr. Leech had with his attorneys, experts retained by attorneys, and his wife.

Between February 2025 and July 2025, counsel and the government exchanged letters regarding the filter team process. In the course of that correspondence, the defense relinquished privilege over a small number of documents. In a June 11, 2025 letter, the government disclosed that the Case Team had accessed 231 documents from the Google returns over which Mr. Leech had previously asserted privilege. (Dkt. 36-10 at 5-6). The government also informed counsel that "[u]nlike the Google Returns, the Government is unable to similarly audit the items that the Prosecution Team viewed in the Apple Returns because the Apple Returns were primarily reviewed in the Cellebrite tool." (*Id.* at 7). Thus, the government was unable to identify which of the approximately 835 privileged documents in the Apple returns it has accessed. (*Id.*).

Based on the limited information provided in the government's letters, on August 22, 2025, the defense filed the Motion which requested a hearing and appropriate relief in light of the government's intrusion of Mr. Leech privilege. The Court subsequently determined that: "[t]he defendant has made the required 'threshold showing' to be entitled to a hearing regarding the prosecution team's access to his privileged materials" and articulated a three-part framework to determine the appropriate relief. (Tr. 96).

In the first step of the process set out by the Court, the government made a production of the Cellebrite reports of the Apple returns to which the Case Team was provided on August 23, 2024. The defense then provided an updated log identifying the privileged materials in the Google returns that the government previously disclosed it had reviewed and all of the privileged documents in the August 23, 2024 Cellebrite report.[5] The government raised various objections,

_____

[5] Because the government's recent production consisted of the Cellebrite reports it received on August 23, 2024, the defense's privilege log did not include documents that the government accessed prior to August 23, and were subsequently removed by the Filter Team. For example, the chat between Mr. Leech and Mr. Senft that the Case Team accessed on August 9, (*see* Dkt.

and in response, counsel relinquished privilege over 11 documents and certain Google search history queries (out of a total of hundreds of pages of such records).  The defense then submitted to the Court a memorandum of law in support of Mr. Leech's privilege assertions, an updated privilege log, and supporting declarations on January 7, 2026 ("January Brief").  (Dkts. 65 & 66).  The government filed its memorandum of law in opposition on January 21, 2026 ("Opposition").  (Dkt. 78).

## ARGUMENT

I.    **The Government's Filter Team Process Was Deficient, and the Court Should Impose an Appropriate Remedy**

The Filter Team and Case Team Declarations confirm that the government's process was deficient.  On at least six separate occasions, the Case Team accessed over 200 privileged documents.  The filter team process was so deficient that the Case Team had to pause its review on at least six occasions to allow the Filter Team to conduct further reviews.  In the government's view, it "employed reasonable screening procedures, adjusted those procedures to improve their effectiveness based on materials encountered during the review, and repeatedly took affirmative steps to avoid encountering privileged material."  (Dkt. 78 at 33-34).  But given the circumstances of an ongoing SEC investigation into the same subject as the government's criminal investigation, the fact that its investigation was no longer covert (by virtue of it having interviewed Mr. Leech's co-workers), and the absence of any risk to potential victims, the government's decision not to consult with counsel until September 9, 2024 (over three months after the Case Team first contacted counsel regarding other matters) was unreasonable.  Indeed, the Case Team went so far as to reject the Filter Team's suggestion that, on April 25, 2024, it

_____

78-2 ¶ 11), was not included in the government's production of the August 23 reports (or the defense's updated privilege log).

contact defense counsel to identify the experts working with defense counsel.  (*See* Dkt. 78-2 ¶ 8).  And a protocol that does not segregate emails with the word "privilege" in the subject line is not reasonable.  Having chosen to assume the authority to set its own rules, the government should be held accountable for its invasion of Mr. Leech's privilege.

The government's procedure contemplated that the Case Team might view privileged materials, and then pause its review to permit further work by the Filter Team.  This amounts to an intentional intrusion of Mr. Leech's privilege and contravenes Supreme Court and Second Circuit precedent.

The Second Circuit has long established that "[w]hen conduct of a Government agent touches upon the relationship between a criminal defendant and his attorney, such conduct exposes the Government to the risk of a fatal intrusion and must be accordingly carefully scrutinized."  *United States v. Gartner*, 518 F.2d 633, 637 (2d Cir. 1975).  While, as the Court observed in finding that Mr. Leech had established his initial burden, "there is 'a dearth of law in the Second Circuit' on the issue of 'a *Kastigar* claim premised on access to privileged materials,'" (Tr. at 92 (quoting *United States v. Landji*, No. 18 Cr. 601 (PGG), 2021 WL 5402288, at *20 (S.D.N.Y. Nov. 18, 2021)), the leading authority is the Second Circuit's decision in *United States v. Schwimmer*, 924 F.2d 443 (2d Cir. 1991).[6]  There, the Second Circuit confirmed that an "intentional intrusion into the attorney-client domain . . . warrants careful scrutiny."  *Id.* at 446-47.  In *Schwimmer*, the Court held that, to obtain the reversal of a conviction, a defendant must show that "the conduct of the Government has been manifestly and avowedly corrupt," or "prejudice to his case resulting from the intentional invasion of the

---

[6] Courts apply the *Schwimmer* standard "[i]n the case of violations of the attorney-client privilege that occur pre-indictment."  *United States v. Tournant*, No. 22 Cr. 276 (LTS), 2023 WL 5276776, at *13 (S.D.N.Y. Aug. 15, 2023).

attorney-client privilege." *Id.* at 447 (alteration adopted and citation omitted).  To meet the manifestly and avowedly corrupt standard, it is not necessary that the defense show that the government acted with malicious intent; rather in "cases [that] have found manifest corruption, the record showed a clear, intentional, and flagrant intrusion by the government into the realm of attorney-client privilege." *United States v. Tournant*, No. 22 Cr. 276 (LTS), 2023 WL 5276776, at *14 (S.D.N.Y. Aug. 15, 2023).

The government's filter team process was corrupt under the *Schwimmer* standard because it violated the procedural protections for the attorney-client privilege established both by the Supreme Court's decision in *United States v. Zolin*, 491 U.S. 554 (1989), and by courts within this district that have approved the government's use of filter teams to review warrant returns. But even if the Court concludes the government's conduct did not rise to the level that *Schwimmer* established for the reversal of a conviction, Mr. Leech is nonetheless entitled to relief as discussed below.

The Supreme Court's decision in *Zolin* stands for the proposition that a court need not conduct an *in camera* review of disputed documents until the government "present[s] evidence sufficient to support a reasonable belief that *in camera* review may yield evidence that establishes" that assertedly privileged documents may not be privileged.  *Id.* at 574.  In other words, just to obtain *in camera* judicial review, *Zolin* held that the government has to make a "factual" showing "adequate to support a good faith belief by a reasonable person" that an exception to the privilege applies.  *Id.* at 572.  In contrast, the government (both the Filter Team and the Case Team) here reviewed assertedly privileged documents before a court ruled on any privilege assertions—and without making any threshold showing that the documents were not privileged.

As we previously noted:

> To the extent courts in this Circuit have approved the use of filter reviews, they
> have done so under circumstances vastly different from the approach taken by the
> government here. In the vast majority of Southern District cases rejecting
> challenges to filter reviews, judges have relied on the facts that the government
> either conferred with the privilege holder or obtained judicial approval of the
> review protocol, or both, before the filter review started.

(Dkt. 35 at 32).  For instance, in *United States v. Sharma*, No. 18 Cr. 340 (LGS), 2019

WL 3802223, at *5 (S.D.N.Y. Aug. 13, 2019), the Court emphasized that defendants had

agreed to the filter protocol before the government reviewed documents, and in *United*

*States v. Avenatti*, 559 F. Supp. 3d 274, 281-82 (S.D.N.Y. 2021), the government

disclosed its intent to use a filer team in the warrant application.  (*See* Dkt. 35 at 32-33).

The government declined to employ either protection here.

The government's filter team process ignored that authority.  Rather than providing the

defense the ability to assert its privilege claims (or even making a simple inquiry of the identity

of defense experts at a time when the investigation was overt) before the Filter and Case Teams

reviewed the warrant returns or presenting its proposed protocol to a magistrate judge, the

government arrogated to itself the role of determining the applicability of privilege in the first

instance.  The Filter Team reviewed all of the documents obtained from the search warrants and

it appears they conveyed substantive information about the documents to the Case Team.  Thus,

while the Filter Team and Case Team Declarations do not recount oral conversations, they do

reveal that, in April 2024, the Filter Team described for the Case Team that the warrant returns

included Mr. Leech's "notes about trading" that he may have "tak[en] to record his recollections

or actions in light of the SEC investigation" and had "a dated subject like 'July note'."  (Dkt. 78-

2 ¶ 6).[7]  Under *Zolin*, the government never should have had access to these documents and certainly the Filter Team should not have disclosed them to the Case Team.

The Second Circuit has noted that courts have imposed sanctions where "the Government's intrusion upon the attorney-client relationship of a defendant where that conduct has been an offensive interference with the defendant's rights without any justification." *Gartner*, 518 F.2d at 637 (explaining that the sanction "represents a moral as well as a legal condemnation of such egregious and unequivocal conduct for which sanctions are imposed against the Government as punishment regardless of the defendant's guilt").  Simply put, the government should not have reviewed Mr. Leech's post-October 2023 communications (*i.e.*, his communications after he had retained counsel related to investigations of the same subject matter as the government's investigation) without adequately protecting his privileges.  And the invocation of an inadequate filter team process does not absolve the government of its obligation to respect Mr. Leech's privileges.

Proceeding without obtaining judicial imprimatur (via the search warrant) and then ignoring the Filter Team's suggestion that the Case Team seek the input of defense counsel as to the identity of individuals with whom Mr. Leech had privileged communications about the complex subject matter under investigation amounted to an intentional intrusion of Mr. Leech's privilege and the defense camp.  The government claims the Filter Team was supposed to serve the role of "protect[ing] potentially privileged material on behalf of the defendant," (Dkt. 78-1 ¶ 26), yet the Case Team unreasonably disregarded the Filter Team's recommendation.

---

[7] In our July 2, 2025 letter, we asked the government to produce communications between the Case Team and the Filter Team.  (Dkt. 36-11 at 8).  Other than a few references in the Filter Team and Case Team Declarations, the government has declined to provide this information.

Further, the government's intrusion was unjustifiable given that, by the time the government received the Google returns, the investigation was not covert. (*See* Dkt. 35 at 24). The government knew Mr. Leech was represented by counsel and was consulting with experts, and that any purported improper allocations had necessarily stopped by October 2023.

Moreover, the government's total disregard for the spousal privilege was highly problematic. Putting aside the government's callous disregard of ensuring the sanctity of confidential communications between spouses, *see, e.g.*, *In re Grand Jury Subpoena to Mrs. C.D.*, 22 F. Supp. 2d 507, 508 (D. Md. 1998) (noting that "[t]he preservation of familial harmony and the institution of marriage through the spousal privilege is of paramount importance (citation omitted), by accessing Mr. Leech's communications with his wife, the Case Team appears to have accessed expert materials covered by the *Kovel* privilege. (Dkt. 78-1 ¶ 9 (describing email between Mr. Leech and his wife involving Mr. Senft); *see also* 3 Weinstein's Federal Evidence § 511.07 (2025) ("There is no waiver when the disclosure is made in another communication that is itself privileged.")).

The government's arguments to the contrary are unavailing. (Dkt. 78 at 35-37). The government argues that "the use of the Filter Team itself demonstrates that the Case Team did not intentionally review any privileged material" and that "the Case Team diligently, and repeatedly, flagged potentially privileged materials." (*Id.* at 35). But employing a Filter Team does not afford the government carte blanche to review privileged documents. This particular filter process was flawed both in its design and execution, as it resulted in hundreds of privileged documents reaching the Case Team. The government's assertion that Case Team undertook "good faith efforts to avoid encountering privileged material" after the Filter Team started releasing documents for the Case Team's review would have the Court ignore the government's

decision to employ a flawed process from the outset.  (*Id.*).  The government's argument that "the

nature of the defendant's privilege claims . . . underscore that there was no intentional invasion

of the defendant's privilege" only undermines its position.  (*Id.* at 36).  As one commentator

noted in criticizing the government's use of filter teams:

> The privileged status of many communications is not apparent on their face.  This,
> of course, is why privilege proponents generally have to supply supporting
> materials to opposing parties and the reviewing judicial officers when their claims
> are made.  None of this often essential information can even be made available to
> the members of the [filter] team because they cannot reveal the contents of any of
> the seized communications to those who could supply it.  As a consequence, this
> [filter] team process will necessarily result in a large number of false negatives—
> privileged documents that are not recognized as such.

Paul R. Rice, *Attorney-Client Privilege in the U.S.* § 11:19 (2d ed. 2021).  As discussed below

(*see infra* pp. 22-23), it is blackletter law that an attorney need not be a party to a communication

for privilege to be validly asserted.  Given the government's knowledge that Mr. Leech was in

communication with experts retained by counsel (*see supra* p. 2), its failure to screen

communications reflects a deficiency in its process.

* * *

Having already decided not to use any of the non-privileged materials in the search

warrant returns, (Dkts. 36-13 & 13-14), the government argues that suppression is the sole

remedy available to the defense.  (Dkt. 78 at 38).  But in light of the fact that the government

cannot establish that the documents it reviewed did not impact its investigation, the numerous

courts that have cautioned the government regarding its filter team procedures, and the

government's continued use of those flawed procedures to review search warrant returns, the

Court can and should impose a meaningful sanction.  Even absent bad faith, courts have imposed

remedies ranging from the disqualification of prosecutors and agents, *United States v. Valencia-

Trujillo*, No. 02 Cr. 00329 T17EAJ, 2006 WL 1793547, at *14 (M.D. Fla. June 26, 2006), *report*

16

*and recommendation adopted*, 2006 WL 8434326 (M.D. Fla. June 28, 2006), to giving adverse

jury instructions, (Jury Charge at 156, *United States v. Schulte*, 17 Cr. 548 (PAC) (S.D.N.Y. April

24, 2020), Dkt. 385 (providing adverse inference instruction where the government provided

untimely disclosure about one of its witnesses)); *United States v. Barnes*, 411 F. App'x 365, 369

(2d Cir. 2011) (noting that district court gave adverse-inference instruction where the

government lost evidence).[8]

## II.    The Government Accessed Privileged Materials

As established in our moving papers and again in the January Brief, the defense has met

its burden to sustain privilege assertions over four categories of documents:  (i) Mr. Leech's

communications with *Kovel* experts, (ii) notes that Mr. Leech drafted in connection with

discussions with counsel, (iii) records of certain Google searches that Mr. Leech performed in

connection with responding to his counsel's requests, and (iv) documents involving defense

counsel that are obviously privileged.  The government's continued challenges to these assertions

of privilege all fail.

### A.    Mr. Leech's Communications with Experts Retained by Counsel Are Privileged

In the January Brief and supporting declarations, the defense established that, to the

extent at issue in this motion, Mr. Leech's communications with his son, Stephen Leech, and his

long-time friend, Dexter Senft are privileged.  (Dkt. 65 at 9-14).  Since the fall of 2023, Stephen

Leech and Mr. Senft have been essential members of the defense team, and have performed

---

[8] For example, the Court could instruct the jury that, "[i]n connection with the investigation, the government accessed Mr. Leech's personal email and text message communications and improperly reviewed certain privileged communications with Mr. Leech's wife and experts retained by his counsel.  The government ultimately determined that none of the materials it obtained from the searches reflected any misconduct and has not offered any of those materials in evidence at trial.  In deciding this case, you may decide what weight, if any, to give to the government's conduct on this issue."

various analyses directly at counsel's request.  (*Id.* at 9-10).  They were both retained by counsel

as provided for in *United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961).  (Dkts. 69-70 (Stephen

Leech retention agreement) & (Mr. Senft retention agreement)).  The government offers

scattershot and ultimately unsuccessful challenges to Mr. Leech's assertions of privilege.

 At the outset, the government contends that Mr. Leech's privilege log is not sufficiently

detailed to sustain his privilege.  The government is wrong.  The defense's privilege log, together

with the supporting declarations, provide more information than has been required in civil cases

where privilege claims were litigated.  The defense's privilege log "contain[s] a brief description

or summary of the contents of the document, the date the document was prepared, the person or

persons who prepared the document, the person to whom the document was directed, or for

whom the document was prepared, the purpose in preparing the document, the privilege or

privileges asserted with respect to the document, and how each element of the privilege is met as

to that document."  *WCA Holdings III, LLC v. Panasonic Avionics Corp.*, No. 20 Cv. 7472

(GHW), 2025 WL 1434375, at *3 (S.D.N.Y. May 17, 2025).

 In *WCA Holdings*, the Court held that privilege log entries such as "email from corporate

counsel 'requesting or rendering legal advice or analysis regarding [the contract at issue]" were

adequate to sustain an assertion of privilege, along with other details on the privilege log that

corroborated that information.  *Id.* at *6 (quoting the privilege log)).[9]  The defense's privilege

log, which includes descriptions of emails, all of which post-date counsel's retention of the

---

[9] For other privilege log entries, the Court held that the privilege proponent did not adequately state that the communication was made for a privileged purpose. *See id.* at *7 (discussing emails sent to corporate counsel "providing documents and/or information at counsels' request").  That concern is not at issue here where all of the communications were made *after* Mr. Leech's counsel retained the experts for the purpose of assisting in counsel's response to the ongoing investigations.  (*See, e.g.*, Dkt. 68 (Leech Decl.) ¶¶ 7-9).

experts exceed this bar.  It is plainly not necessary for the defense to describe to the government

the precise nature of the various analyses that the experts performed in order to sustain the

privilege assertions.  The government's insistence on such a level of detail that would practically

defeat the claim of privilege.  *Cf. In Re Grand Jury Subpoena*, 127 F.4th 139, 144 (9th Cir. 2025)

(denying government's motion to compel the produce of a privilege log where production of the

log would undermine the act of production privilege by "reveal[ing] the existence, authenticity,

and Client's custody of those documents").

The government's reliance on *Dunn as Tr. for Zohar Litig. Tr.-A v. Patriarch Partners*,

LLC, 672 B.R. 587, 592 (Bankr. D. Del. 2025), for the proposition that "a categorial assertion

based on 'retention' and 'general' descriptions of the purported agents' assistance is insufficient,"

is misplaced.  (Dkt. 78 at 10).  In that case, it appears that the Court initially determined that

without "specific document descriptions and explanations of why the *Kovel* Documents fell

within the doctrine" (*i.e.*, without a privilege log), the Court was unable to conclude whether

certain documents were protected by privilege.  *Zohar*, 672 B.R. at 587.  In contrast, the

defense's privilege log describes every email as to which privilege has been asserted and the

supporting declarations provide the context in which the communications took place.  (*See* Dkt.

66).

Further, the court in *Zohar*, after giving counsel the opportunity to provide a

supplemental submission, determined that the documents were protected by the *Kovel* doctrine.

672 B.R. at 594.[10]  In conducting its analysis, the Court recognized that "sharing a detailed

---

[10] In reaching that conclusion, the Court did not find that each document amounted to a specific translation as the government suggests is necessary.  (*See* Dkt. 78 at 14).  Instead, the Court determined that the communications reflected that without the experts' accounting "expertise, neither [the client] nor the [attorneys] "would have been able to effectively determine the proper course of action."  *Id.*

[*Kovel*] analysis would reveal protected communications," and gave counsel the opportunity to supplement its submission.  *Id.*  These considerations obviously constrained the level of detail counsel chose to provide to the government.[11]

The government's argument that Mr. Leech's "pre-existing personal relationship" with Stephen Leech and Mr. Senft suggests that the "defendant was confiding in his son and friend about his case and seeking their input on the evidence" is specious.  (Dkt. 78 at 11).  The actual factual record establishes the opposite.  As noted in the January Brief and supporting declarations, "[t]hroughout their respective engagements, Stephen Leech and Mr. Senft have been essential parts of the defense team, assisting counsel in understanding key concepts and addressing various issues in the Outside Counsel Investigation, the SEC investigation, and ultimately the investigation conducted by the Office of the United States Attorney for the Southern District of New York."  (Dkt. 65 (citing Dkt. 67 (Hirschmann Decl.) ¶¶ 5-8; Dkt. 66 (Sobel Jan. 7 Decl.) ¶¶ 3-6)).  The Court should reject the government's baseless conjecture that the communications are actually of a "personal nature" or that Stephen Leech's role consisted of "a son occasionally helping his father with a computerized task."  (Dkt. 78 at 14-15).[12]

The defense does not contest that Mr. Leech had a preexisting relationship with his son and longtime friend—and the prior email correspondence included in the government's submission (none of which implicates the privilege claims at issue) is irrelevant to the question before the Court.  Just as there is no rule prohibiting a client from retaining a lawyer with whom

---

[11] In the event the Court determines that Mr. Leech has not sustained his burden, the defense should be afforded the opportunity to submit more detailed declarations for *in camera* review, as in *Zohar*.

[12] To the extent the Court has any concerns regarding the nature of the communications in question, the defense is prepared to submit the documents for *in camera* review as well as expert remuneration records.

he had a preexisting relationship, there is no rule mandating that an attorney retain experts with no preexisting relationship to the client. And the government does not (and cannot) argue that either Stephen Leech or Mr. Senft is unqualified to serve as an expert.

The authority the government relies on to attack Mr. Leech's preexisting relationship with Stephen Leech and Mr. Senft only proves this point. (*See* Dkt. 78 at 12 nn. 24 & 25). Unsurprisingly, in *Lively v. Wayfarer Studios LLC*, No. 24 Cv. 10049 (LJL), 2025 WL 2606904 (S.D.N.Y. Sept. 9, 2025), the Court rejected a party's attempt to assert privilege with respect to communications with her father (an attorney) whom she did not retain as her counsel and whom her counsel did not retain as a *Kovel* expert. *Id.* at *4. That is plainly not the situation here, where counsel have submitted their retention agreements with the experts along with declarations attesting to the work they performed.[13]

And the government's reliance on *Cavallaro v. United States*, 284 F.3d 236 (1st Cir. 2002) is even more off target. (*See* Dkt. 78 at 12 n.25). In *Cavallaro*, the defendants used accountants with whom they had a pre-existing relationship in connection with a scheme to conceal a fraudulent business transaction and "the record [did] not show that any party hired [the accountant] to assist [counsel] in providing legal advice." *Id.* at 247. The Court rejected the purposed *Kovel* relationship, citing to a legal treatise for the unremarkable proposition that "when the client has previously employed the agent independent of the attorney-client relationship, to perform the same services that he will perform for the attorney[,] . . . [t]his creates a risk that the agent's retention by the attorney is simply a subterfuge." *Id.* at 249

---

[13] The government's protest that Stephen Leech was retained on October 30, 2023, while his letter was not executed until November 14, 2023, is irrelevant because the first email between Mr. Leech and Stephen Leech on the privilege log is dated December 3, 2023. (*See* (Dkt. 66 (USAO_GOOGLE_02_00000149-0150, 0155, 0161, 0826, 3890, 3893, 3897, 5056, 5060))).

(quoting P.R. Rice, *Attorney–Client Privilege in the United States* § 3:5, at 30 (2d ed. 1999)). While the government quotes the court's parenthetical description of the treatise, it does not explain how the case has any bearing here where neither counsel nor Mr. Leech previously employed the experts, let alone to perform the same work that the experts were performing in connection with the *Kovel* engagement. Instead, counsel retained the experts for the explicit purpose of altering their pre-existing relationship with Mr. Leech and working under the supervision of counsel.[14] (*See, e.g.*, Dkt. 67 (Hirschmann Decl.) ¶ 5 (describing attorney relationship with Stephen Leech)).

Finally, it is telling that the government does not meaningfully engage with either *Kovel* or *Ackert*. As explained in the Motion and the January Brief, those cases establish clearly that, "if the lawyer has directed the client, either in the specific case or generally, to tell his story in the first instance to an [expert] engaged by the lawyer, who is then to interpret it so that the lawyer may better give legal advice, communications by the client reasonably related to that purpose ought fall within the privilege." *Kovel*, 296 F.2d at 922. That describes the communications here. The government does not get to make an after-the-fact judgment as to

---

[14] The government's reliance on *dicta* in the district court decision in *In re Grand Jury Subpoenas Dated January 20, 1998*, 995 F. Supp. 332 (E.D.N.Y. 1998) for the proposition that the defense must show that "the sole purpose of the conversations with the [non-attorney agent] was to assist the attorney in his representation of the client" is misplaced. (Dkt. 78 at 10 (quoting *In re Grand Jury Subpoenas Dated January 20, 1998*, 995 F. Supp. at 337; *see also id.* at 14)). In that case, the Court noted at least three major distinctions from *Kovel*, including that "the police officers who . . . assert[ed] an attorney-client privilege [with a union representative] took place *before* those officers ever entered into any confidential relationship with a licensed attorney." *In re Grand Jury Subpoenas*, 995 F. Supp. at 338 (emphasis added). In any event, the supporting declarations establish precisely that the experts were retained to assist counsel. (*See, e.g.*, Dkt. 67 (Hirschman Decl.) ¶ 4 ("Upon being retained, I recognized the need for expert assistance . . . I retained several individuals and firms with the expertise to assist me in my representation of Ken"); *id.* ¶ 5 (discussing Stephen Leech); *id.* ¶ 7 (discussing Mr. Senft)).

whether, in its view, discussion of certain analyses performed by defense experts was "necessary" to the defense.

Seeking to reverse eighty years of practice under the *Kovel* doctrine, the government suggests that direct communications between a client and a *Kovel* expert are not privileged unless an attorney is copied or otherwise part of a communication. (Dkt. 78 at 14). Neither *Kovel* nor its progeny require the inclusion of counsel on such communications. Indeed, the government's suggestion that "[c]opying an attorney on an email is a costless protective choice," (*id.*), would only be the case if counsel immediately deleted the email or otherwise did not engage with the communication. But since *Kovel*, the law has protected direct client-expert communications and does not require either the involvement of counsel or a facade of participation. *See Kovel*, 296 F.2d at 922. And given the complexity of the issues involved in this case—and the fact that Mr. Leech was both continuing to serve as Western's Co-Chief Investment Officer and responding to the various investigations in late 2023 and early 2024—Stephen Leech's role as a "translator," conveying fixed-income trading concepts to the attorneys, was essential.

### B.    Mr. Leech's Notes Are Privileged

Mr. Leech used his iPhone to record notes based on his conversations with counsel. The government argues that Mr. Leech's notes are not privileged because he waived that privilege when his attorneys "incorporated [his] notes into reports and disclosed" the reports about his trading to Western's outside counsel. (Dkt. 78 at 18). But characterizing this subsequent submission as a "waiver" would eliminate some of the most basic protections of attorney-client privilege.

Courts have recognized that "[a] client may intend to direct or permit the release of the final version of a document while still intending that his communications with his attorney prior

to the finalization of the document remain confidential." *In re Kidder Peabody Sec. Litig.*, 168 F.R.D. 459, 474 (S.D.N.Y. 1996). For this reason, the "public release of [a document] does not waive the privilege for the drafts if they were otherwise protected by privilege." *Id.*

Mr. Leech provided notes to his counsel to assist in counsel's preparation of external reports. His attorneys later disclosed the reports, and not the underlying notes, to outside counsel and later authorized the disclosure of the reports to the government. Put in context, these notes are nothing like the attorney-prepared "talking points for use by [a company] spokesman" that "contemplate[d] disclosure of [their] contents to a third party" that the government suggests are analogous here. (Dkt. 78 at 19 (citing *A & R Body Specialty & Collision Works, Inc. v. Progressive Cas. Ins. Co.*, No. 07 Cv. 929 (WWE), 2014 WL 657688, at *2 (D. Conn. Feb. 20, 2014)).

The government also accuses Mr. Leech of using privilege "as both a 'sword and shield' by partially disclosing only the privileged documents [he] so chooses while shielding other unfavorable privileged documents on the same subject matter." (Dkt. 78 at 17 & n.39 (citing *Regeneron Pharms., Inc., v. Merbus B.V.*, No. 14 Cv. 1650 (KBF) 2014 WL 11344040, at *4 (S.D.N.Y. Dec. 5, 2014)). However, that is not correct. For the reasons stated above, the privileged notes were never disclosed. There can be no waiver of attorney-client privilege absent any "detail with respect to [a] specific communication that [the government] claims to have been used as a sword." *Cicel (Beijing) Science & Tech. Co., Ltd. v. Misonix, Inc.*, 331 F.R.D. 218, 237 (E.D.N.Y. 2019) (declining to find that the defendant had placed investigatory materials

underlying an internal investigation "at issue" by relying on that investigation in forming its defense).[15]

To the contrary, Mr. Leech and counsel were operating well within the zone of privilege afforded clients and their attorneys when working together on the reports for Western's outside counsel. The Second Circuit clarified in *United States v. DeFonte*, 441 F.3d 92 (2d Cir. 2006) that where, as here, a client's notes are concerned, the relevant question is whether "the notes w[ere] in fact communicated by the client to the attorney." *Id.* at 96. There is no serious dispute that they were. Mr. Leech asserted privilege over two types of notes. The first category is related to reports about trading on specific days and would then be conveyed to counsel. (Dkt. 68 (Leech Decl.) ¶ 10 (Category 4)). The second category consists of "notes that reflected matters [Mr. Leech] discussed with counsel and/or matters [he] intended to research based on requests that [his] counsel had made during our conversations." (*Id.* ¶ 11 (Category 5)). The government seizes on the fact that the latter category were not directly conveyed to counsel. But those notes memorialized and reflected prior communications that Mr. Leech had with his attorneys. It would make little sense for Mr. Leech to give his attorneys his notes of his privileged conversations with them.

Finally, the government suggests that, in order to prevail, Mr. Leech must compare his privileged notes with the final reports submitted to Western's outside counsel in order to show that all confidential information was eliminated. (*See* Dkt. 78 at 21). However any information contained in the reports submitted to outside counsel is already known to the government. Everything in the notes not reflected in the reports is privileged. Put simply, an attorney's

---

[15] Moreover, the government's sword and shield argument turns on the fact that the memoranda were provided to the government in connection with a disclosure of a putative expert who defense counsel subsequently informed the government it will not call at trial.

representations to a third party on a particular subject matter do not render all preceding communications between the attorney and his or her client on that subject matter "at issue" or discoverable.

### C.    Certain of Mr. Leech's Google Search History Is Privileged

The Government argues that documents containing records of Mr. Leech's Google search history are not privileged because the supporting declarations are insufficient to establish that the searches were made at the direction of his counsel.  (Dkt. 78 at 22).  But, the declarations speak directly to this point.  *See, e.g.*, Dkt. 68 (Leech Decl.) ¶ 6 ("I have also actively assisted my attorneys, including by preparing analyses at my attorneys' request and with their assistance."); *id.* ¶ 12 ("[M]y counsel suggested that I review the market conditions and various economic conditions. . . [The documents at issue] are records of Google search history that reflect research that I did to assist my counsel and which informed my discussion with counsel."); Dkt. 67 (Hirschman Decl.) ¶ 13 ("[M]y MAGIA co-counsel and I asked Ken to review the market conditions and various other economic events that would have impacted trading decisions."); *id.* ¶ 14 ("[T]he search queries over which Mr. Leech asserted privilege . . . reflect or relate to topics that I discussed with Mr. Leech.").

Without citing any in-circuit case addressing this novel issue, the government argues that Mr. Leech cannot sustain his burden by relying on an out-of-circuit authority.  (Dkt. 78 at 22).  The Google searches are protected under basic principles that a client and his attorneys must be afforded a "zone of privacy" in order to "develop legal theories and strategy . . . free from unnecessary intrusion by his adversaries," *Parneros v. Barnes & Noble, Inc.*, 332 F.R.D. 482, 492 (S.D.N.Y. 2019) (internal quotation marks omitted), and that a client should be encouraged to "tak[e] [ ] reasonable step[s] . . . to assist in a conversation with their attorney," *DeFonte*, 441 F.3d at 96.  The decision in *Burroughs Wellcome Co v. Barr Lab'ys, Inc.*, 143 F.R.D. 611, 623

26

(E.D.N.C. 1992), that search results may be shielded from discovery if they "reflect[] the legal strategy of counsel" and were "conducted in anticipation of litigation," is instructive, and the government cites to no contrary authority for the proposition that similar searches are not protected. That counsel did not specifically instruct Mr. Leech to perform Google searches is of no matter; the point is that the searches reflect discussions with counsel and work performed in connection with analyses prepared for counsel.

### D.   Mr. Leech's Text Messages with Counsel, Counsel's Work Product, and a Document Reflecting Topics Discussed in Meetings with Counsel Are Privileged

The government's contention that three additional documents are not privileged is baseless. First, Mr. Leech's text messages with Mr. Hirschmann on October 22, 2023, which the Filter Team described to the Case Team as "logistics of coordinating an introduction" in fact reflected Mr. Hirschmann's legal strategy immediately upon being retained after Mr. Leech learned of Western's outside counsel investigation. (Dkt. 78-1 ¶ 19).[16] Second, a workbook created by Mr. Hirschmann includes Mr. Hirschmann's notes reflecting his analysis of certain trades is obviously privileged. (Dkt. 67 ¶ 16). Lastly, a document that, as produced, contains more than 300 pages of computer code together with text reflecting meeting topics discussed between Mr. Leech, experts, and counsel is obviously privileged. (Dkt. 66 (first row)).

---

[16] The fact that the Filter Team provided details of the privileged documents to the Case Team is further evidence of the flaws with the entire filter team review which has been likened to the "fox . . guarding the . . . henhouse." *United States v. Ritchey*, 605 F. Supp. 3d 891, 903 (S.D. Miss. June 3, 2022).

## CONCLUSION

For the foregoing reasons, the Court should grant Mr. Leech's pretrial motion and order

appropriate relief.

Dated:  February 6, 2026                          MORVILLO ABRAMOWITZ
        New York, New York                        GRAND IASON & ANELLO P.C.


                                                  /s/ Jonathan S. Sack
                                                  Jonathan S. Sack
                                                  Jeremy H. Temkin
                                                  Nathaniel Sobel
                                                  New York, New York 10017
                                                  (212) 856-9600

                                                  CLEARY GOTTLIEB
                                                  STEEN & HAMILTON LLP


                                                  Joon H. Kim
                                                  One Liberty Plaza
                                                  New York, New York 10006
                                                  (212) 225-2000

                                                  *Attorneys for Defendant S. Kenneth Leech II*