UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -   x
                         :

  UNITED STATES OF AMERICA       :

                         :

        - v. -           :

                         :      24 Cr. 658 (GHW)

  S. KENNETH LEECH II,        :

                         :

          Defendant.      :

                         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - -   x


# THE GOVERNMENT'S PREHEARING MEMORANDUM


                                        JAY CLAYTON
                                          United States Attorney
                                          Southern District of New York


Stephen J. Ritchin
Dina McLeod
Adabelle U. Ekechukwu
Assistant United States Attorneys
*Of Counsel*

**TABLE OF CONTENTS**

SEALED FILING REQUESTED..................................................................................... 5

PRELIMINARY STATEMENT ..................................................................................... 5

BACKGROUND ............................................................................................................ 8

    A.  Procedural Background......................................................................................... 8

    B.  The Defendant's Disclosures to the SEC and the U.S. Attorney's Office.................. 11

    C.  The Purportedly Privileged Documents.................................................................. 15

        1.  The Documents With Respect to Which the Defendant Asserts Spousal
            Privilege ..................................................................................................... 15

        2.  The Documents With Respect to Which the Defendant Asserts Attorney-
            Client Privilege and Work Product Protection............................................... 16

DISCUSSION ............................................................................................................... 20

  I.  Relevant Law ............................................................................................................ 20

    A.  The Burden is on the Defense to Prove Manifest and Avowed Corruption Under the
        Fifth Amendment ................................................................................................ 20

    B.  A *Kastigar* Hearing for Alleged Breaches of Privilege is Not Required.................... 21

    C.  The General Practice in this Circuit is to Defer Any *Kastigar*-Like Hearing Until
        After Trial ......................................................................................................... 25

  II.  Any *Kastigar*-Like Hearing Should Be Deferred Until After Trial.................................... 27

CONCLUSION.............................................................................................................. 30

## TABLE OF AUTHORITIES

*Caldwell v. United States*,
205 F.2d 879 (D.C. Cir. 1953) ........................................................................................ 21

*Coplon v. United States*,
191 F.2d 749 (D.C. Cir. 1951) ........................................................................................ 21

*Grand Jury Subpoena of Ford v. United States*,
756 F.2d 249 (2d Cir. 1985) ........................................................................................... 15

*United States v. Krug*
198 F. Supp. 3d 235 (W.D.N.Y. 2016) ....................................................................... 26, 27

*Kastigar v. United States*,
406 U.S. 441 (1972) ................................................................................................... passim

*Nickel v. Hannigan*,
97 F.3d 403 (10th Cir. 1996) .......................................................................................... 24

*United States v. Ajemian,*
2012 WL 6762011 (S.D.N.Y. Dec. 27, 2012) ................................................................. 25

*United States v. Allen*,
160 F. Supp. 3d 684 (S.D.N.Y. 2016) ............................................................................. 25

*United States v. Allen*,
864 F.3d 63 (2d Cir. 2017) ......................................................................................... passim

*United States v. Avenatti*,
559 F. Supp. 3d 274 (S.D.N.Y. 2021) ............................................................................. 11

*United States v. Bein*,
728 F.2d 107 (2d Cir. 1984) ........................................................................................... 23

*United States v. Colasurdo*,
453 F.2d 585 (2d Cir. 1971) ........................................................................................... 23

*United States v. Combs,*
2025 WL 485377 (S.D.N.Y. Feb. 12, 2025) ................................................................. 6, 10

*United States v. Fuller*,
149 F. Supp. 2d 17 (S.D.N.Y. 2001) ............................................................................... 25

*United States v. Gartner*,
518 F.2d 633 (2d Cir. 1975) ........................................................................................... 21

*United States v. Gonzalez*,
144 F.4th 396 (2d Cir. 2025) ..................................................................................... 22, 28

*United States v. Gregory*,
611 F. Supp. 1033 (S.D.N.Y. 1985) ........................................................................... 25, 26

*United States v. Helmsley*,
    941 F.2d 71 (2d Cir. 1991) ............................................................................................. 26, 27

*United States v. Hoey,*
    2016 WL 270871 (S.D.N.Y. Jan. 21, 2016) ......................................................................... 27

*United States v. Kovel*,
    296 F.2d 918 (2d Cir. 1961) ................................................................................................. 7

*United States v. Kurzer*,
    534 F.2d 511 (2d Cir. 1976) ............................................................................................... 23

*United States v. Landji*,
    2021 WL 5402288 (S.D.N.Y. Nov. 18, 2021) ................................................................ 22, 28

*United States v. Lefkowitz*,
    618 F.2d 1313 (9th Cir. 1980) ............................................................................................ 25

*United States v. Levin,*
    2015 WL 5838579 (S.D.N.Y. Oct. 5, 2015) ....................................................................... 11

*United States v. Lusterino*,
    450 F.2d 572 (2d Cir. 1971) ............................................................................................... 21

*United States v. Marashi*,
    913 F.2d 724 (9th Cir. 1990) ......................................................................................... 24, 25

*United States v. Mariani*,
    851 F.2d 595 (2d Cir. 1988) ............................................................................................... 25

*United States v. Ozar*,
    50 F.3d 1440 (8th Cir. 1995) .............................................................................................. 24

*United States v. Rispo*,
    460 F.2d 965 (3d Cir. 1972) ............................................................................................... 21

*United States v. Rivieccio*,
    919 F.2d 812 (2d Cir. 1990) ............................................................................................... 25

*United States v. Schwimmer*,
    738 F. Supp. 654 (E.D.N.Y. 1990) ..................................................................................... 22

*United States v. Schwimmer*,
    892 F.2d 237 (2d Cir. 1989) ............................................................................................... 25

*United States v. Schwimmer*,
    924 F.2d 443 (2d Cir. 1991) ......................................................................................... passim

*United States v. Squillacote*,
    221 F.3d 542 (4th Cir. 2000) .............................................................................................. 24

*United States v. Tantalo*,
    680 F.2d 903 (2d Cir. 1982) ............................................................................................... 25

3

*United States v. Tournant,*
  2023 WL 5276776 (S.D.N.Y. Aug. 15, 2023) ............................................................... passim

*United States v. Townsend,*
  987 F.2d 927 (2d Cir. 1993) ........................................................................................ 10

*United States v. Voigt,*
  89 F.3d 1050 (3d Cir. 1996) ........................................................................................ 21

*United States v. Volpe,*
  42 F. Supp. 2d 204 (E.D.N.Y. 1999) ...................................................................... 25, 26

*United States v. Warshak,*
  631 F.3d 266 (6th Cir. 2010) ....................................................................................... 24

*United States v. Weissman,*
  1996 WL 751386 (S.D.N.Y. Dec. 26, 1996) ............................................................... 29

*United States v. Wilson,*
  505 F. Supp. 3d 3 (D. Mass. 2020) ............................................................................. 16

**SEALED FILING REQUESTED**

The Government respectfully submits this memorandum in advance of the April 8, 2026 evidentiary hearing to address the scope of the Government's anticipated proof and the relevant legal standards to be applied to the facts developed at the hearing. The undersigned, who have not been and will not be part of the Case Team in this case, will represent the Government in connection with that hearing. We ask that this submission be filed under seal because it contains discussions of, and attaches as exhibits, documents defendant S. Kenneth Leech II has claimed are privileged.

**PRELIMINARY STATEMENT**

The Government will adduce evidence at the hearing to address the question Leech has put at issue: whether he can show that the conduct of the Government during its filter process has been manifestly and avowedly corrupt. Through witness testimony and exhibits, the Government will demonstrate that the Case Team and the Filter Team acted in good faith and to the extent any member of the Case Team temporarily accessed material protected by attorney-client privilege or the work product doctrine, he did so inadvertently. The defendant, therefore, will not be able to show the Government acted in bad faith, let alone carry his burden of showing that the Government acted with manifest and avowed corruption.

Without "'manifestly and avowedly corrupt'" misconduct, there cannot be a Fifth Amendment violation. *United States v. Tournant*, No. 22 Cr. 276 (LTS), 2023 WL 5276776, at *13 (S.D.N.Y. Aug. 15, 2023) (quoting *United States v. Schwimmer*, 924 F.2d 443, 447 (2d Cir. 1991)); (11/7/25 Tr. at 94). Accordingly, if and when the Court concludes that the defendant has failed to show that the Government acted corruptly or, in other words, in a manner "so offensive

5

that it 'shocks the conscience,'" *Tournant*, 2023 WL 5276776, at \*13 (quoting *United States v. Chin*, 934 F.2d 393, 298 (2d Cir. 1991)), the defendant's motion must be denied.[1]

The Government's presentation at the hearing will not focus on the issue of "taint" because that concept will not bear on the Fifth Amendment analysis here in the absence of a finding of manifestly and avowedly corrupt misconduct and because, even if it did, the general practice in this Circuit is to address it after trial, when the Court and the parties know what evidence has been relied upon and can determine whether that evidence was "tainted." A prosecution is not tainted "simply due to the prosecution's exposure to potentially privileged information (despite the filtering efforts that were undertaken), . . . rather there must be a concrete 'improper use' of privileged materials." *Tournant*, 2023 WL 5276776, at \*15 n.13 (quoting *Schwimmer*, 924 F.2d at 446).

The existing record—and the circumstances that will be proven at the hearing—demonstrate the extreme unlikelihood of any "improper use" here. For one thing, Leech made fulsome disclosures of his defenses to the charges in this case to the Case Team and the U.S. Securities and Exchange Commission ("SEC"), including before the Case Team had access to any of the search warrant returns at issue here, dispelling any possibility that communications about his defense led to any improper use. *Cf. United States v. Combs*, No. 24 Cr. 542 (AS), 2025 WL 485377, at \*5 (S.D.N.Y. Feb. 12, 2025) ("The generic nature of the notes makes it unlikely that any improper use of the information has or could be made. They give Combs's general thoughts on how to approach certain issues, none of which would come as a surprise. However, if a question arises closer to trial as to the use of suspect evidence and Combs can make a 'threshold showing

---

[1] Unless otherwise indicated, case quotations omit internal quotation marks, citations, previous alterations, and footnotes. "Dkt." refers to an entry on this Court's docket in this case.

that the . . . evidence is tainted,' then Combs can bring it to the Court's attention.") (quoting *Tournant*, 2023 WL 5276776, at *18). For another thing, Leech has acknowledged that the most numerous category of documents over which he has asserted attorney-client and work product privilege—notes he says he made at the direction of counsel or in connection with conversations with counsel—were "incorporated into documents that counsel ultimately submitted as part of the Outside Counsel Investigation," (Dkt. 65 at 16 n.9), documents that have been provided to the Case Team and publicly filed. (*See* Dkt. 78-3 at 17-18; Dkt. 77-3). And while Leech has claimed work-product privilege under *United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961), with respect to communications with his son and long-time friend Dexter Senft based on their status as experts, (*see* Dkt. 65 at 9-11), neither has been noticed as a defense expert and Senft's analysis of market activity on July 13, 2022, one of the days as to which Leech provided an analysis of his trading, has been publicly filed, (Dkt. 77-12 at Appendix A). Furthermore, the documents over which Leech has claimed privilege ███████████████████████████████████████ ████████████████ The assertedly privileged documents that are relevant to this case do not reveal unknown explanations for Leech's conduct. Nor do those documents reveal unknown facts of significance, especially given Leech's daylong testimony at the SEC about the conduct at issue in this case before the Case Team had access to any of the search warrant proceeds at issue here. As in *Combs*, nothing in the assertedly privileged documents would come as a surprise and it is therefore very unlikely that any improper use of the information has been or could be made.

Moreover, the evidentiary hearing is scheduled to take place more than two months before trial, more than a month before the Government's draft exhibit list is due, and more than two weeks before the Government's exhibit list is due. Thus, the evidence that will be before the jury will not be known and cannot, at this stage, be reliably known. While we expect none of that evidence will

be "tainted," *i.e.*, derived from a concrete improper use, neither we nor the Court can now measure any claim of "taint" against the evidence before the jury that will hear this case. Any effort to determine whether that evidence will be tainted is further hindered by our inability to show the Case Team the allegedly privileged documents (absent a waiver of privilege for these purposes by the defendant) and then ask whether the Case Team expects any evidence to be derived from those documents.[2] Once the evidence is in, however, both we and the Court can compare that evidence to the allegedly privileged documents as part of an effort to determine if any of the evidence was "tainted."

Accordingly, the scope of the hearing currently scheduled for April 8 should be limited to the issue raised by Leech: whether the conduct of the government during its filter process has been "manifestly and avowedly corrupt." Any inquiry into taint should follow trial, when the Government's evidence is known.

## BACKGROUND

### A. Procedural Background

On August 22, 2025, the defendant filed a pretrial motion seeking discovery regarding the Government's filter process and an "evidentiary hearing to determine the nature of the government's filter team process." (Dkt. 35). The Government opposed because, among other things, the defendant had not established privilege, failed to allege an intentional intrusion of the attorney client privilege, and failed to allege any prejudice. (Dkt. 37).

On November 7, 2025, the Court said:

---

[2] This situation therefore is unlike cases concerning compelled statements, where the statement can be discussed with the Case Team without risking further violation of the right at issue since "the Fifth Amendment [self-incrimination protection] is a personal trial right—one violated only at the time of 'use' rather than at the time of 'compulsion.'" *United States v. Allen*, 864 F.3d 63, 86 (2d Cir. 2017).

> There are three aspects of the record that I believe must be developed. First, I need to know what communications over which the defendant asserts privilege have been reviewed by the prosecution team, and whether they are, indeed, privileged. Second, I need to understand the process that was used by the Government to filter potentially privileged documents from review by the prosecution team, and the reasons why any privileged materials may have moved through that net. And third, if the Government's conduct was a violation of the defendant's rights, I will need to understand the extent to which the documents 'tainted' the Government's prosecution to evaluate what if any remedy is appropriate.

(11/7/25 Tr. at 99-100). The Court then proposed a three-step framework to develop the record:

> First, I will take briefing from the parties regarding whether the documents over which the defendant asserts privilege are privileged. The Government asserts that some are not, but the issue has been litigated in a categorical manner without reference to any privilege log or the documents themselves. As a result, my inclination is for the defendant to demonstrate the privilege for the documents using a privilege log; to the extent the Government challenges any assertion of privilege, they can do so by reference to the privilege log.

> Second, I will take evidence from the Government regarding the efforts used by the Government to avoid disclosure of privileged materials to the prosecution team, including the methodology deployed by the filter team to screen documents.

> Third, after I have heard that evidence, more factual development may be necessary to evaluate the effect of any violation of the defendant's rights on the prosecution.

> I do not expect to order the production of discovery by the Government to the defendant. Instead this evidence will be provided at a hearing. I am directing the parties to consider this framework and to meet and confer regarding how they wish to implement it, or to modify it.

(11/7/25 Tr. at 100-01).

On November 14, 2025, the parties jointly proposed a schedule to implement the Court's three-part framework. (Dkt. 50). That joint proposal included the submission of privilege logs by the defense; a schedule for the defendant to submit sworn declarations supporting the privilege assertions and written briefing; a schedule for the Government to submit sworn declarations regarding the filter process and written briefing on the defendant's privilege claims and the Government's filter process. (*Id*.). On November 17, 2025, the Court set the schedule along the lines proposed by the parties. The Court noted,

9

> Unless the Government is able to conclusively establish that none of the materials accessed during the review of the search warrant returns were protected by the attorney-client privilege or the work-product doctrine, the Court expects to hold a hearing on whether access of those materials tainted the prosecution. The Court will make this determination following the completion of briefing on the issues of privilege *i.e.*, after Defendant's January 30, 2026 deadline to file a reply has passed—and may order the Government to file a reply in further support of its filter team process.

(Dkt. 51).

The parties submitted their sworn declarations and briefing pursuant to the November 17, 2025 Order. In its opposition, the Government contended, among other things, that the defendant had failed to meet the relevant standard under the Fifth Amendment and that, "[t]he defendant has not articulated any theory of prejudice, identified which documents give rise to that prejudice, or stated what relief he seeks." (Dkt. 78).

The defendant filed a reply brief on February 6, 2026. The defendant's reply did not dispute that the Fifth Amendment standard applies to his claims. Nor did the defendant articulate any prejudice or identify which documents gave rise to that prejudice. Instead, remarkably, the defendant claimed that because, "[t]he government's procedure contemplated that the Case Team might view privileged materials, and then pause its review to permit further work by the Filter Team," the Government's conduct "amount[ed] to an intentional intrusion." (Dkt. 94 at 11).[3] This, the defendant claims, was "manifestly corrupt" under *Schwimmer*. (Dkt. 94 at 16-17).

---

[3] This claim is wrong. Knowledge that something "might" happen does not amount to intentional conduct. "Intentional" in common usage means "done by intention or design; intended." https://www.merriam-webster.com/dictionary/intentional. Similarly, before a jury can find that a defendant acted intentionally, the jury must be satisfied "that the defendant acted deliberately and purposefully; that is, defendant's act must have been the product of defendant's conscious objective rather than the product of a mistake or an accident." *United States v. Townsend*, 987 F.2d 927, 930 (2d Cir. 1993). And in the specific context of Filter Team review of potentially privileged materials, knowledge that a Filter Team may err does not constitute an intentional intrusion on privilege. *See, e.g.*, *Combs*, 2025 WL 485377, at *2 ("Investigator-1 sent the photographs he took to the filter team (not the case team) to review for any privileged information. It may be that the filter team's privilege determinations were inaccurate, but nothing indicates any intent to intrude

On February 19, 2026, the Court ordered that "it must conduct an evidentiary hearing to resolve Defendant's motion pursuant to *Kastigar v. United States*, 406 U.S. 441 (1972)." (Dkt. 97). On February 25, 2026, the Court explained, "In other words, some subset [of] the emails may be privileged because my understanding is once there's a toggle that the government has seized some privileged email, then under these circumstances I have to hold this hearing." (2/25/26 Tr. at 18).

### B.  The Defendant's Disclosures to the SEC and the U.S. Attorney's Office

On March 6, 2024, the defendant provided sworn testimony under oath to the SEC where he described, *inter alia*, both how he allocated trades and his trading strategies in the relevant funds. (Exh. A).[4] In addition, the Government contacted defense counsel prior to indictment to indicate that it was considering charges and to provide counsel with an opportunity to be heard before any final charging decision was made. In response, the defense made the following voluntary disclosures prior to the indictment in this case, each of which contained detailed advocacy to the Government about Mr. Leech's trading, allocation of trades, and trading strategies:[5]

---

on Combs's privilege."); *United States v. Avenatti*, 559 F. Supp. 3d 274, 282 (S.D.N.Y. 2021) ("where, as here, material is 'already in the government's possession ... the use of the taint team to sift the wheat from the chaff constitutes an action respectful of, rather than injurious to, the protection of privilege.'") (quoting *In re Grand Jury Subpoenas*, 454 F.3d 511, 522-23 (6th Cir. 2006)); *United States v. Levin*, No. 15 Cr. 101 (KBF), 2015 WL 5838579, at *2 (S.D.N.Y. Oct. 5, 2015) ("As the wall is for the protection of the defendant's rights, it is decidedly not to give the Government a substantive look into that which it has no right to see.").

[4] This factual discussion is based on the expected testimony at the evidentiary hearing, where we also expect the exhibits cited herein to be authenticated by a witness or witnesses.

[5] In addition to defense counsel's presentations to the U.S. Attorney's Office, defense counsel for defendant's employer, Western Asset Management, as well as additional counsel that Western Asset Management hired to conduct an internal investigation, each presented to the U.S. Attorney's Office on multiple occasions. Those presentations, as with defense counsel's presentations,

On August 13, 2024, defense counsel presented arguments to the U.S. Attorney's Office for why the Government should not bring charges. ███████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

On September 9, 2024, the defendant submitted a 43-page Wells submission to the SEC, which was subsequently provided to the Government by the SEC. (Exh. B, the "September 9 Wells Submission"). This 43-page submission argued that "the existence of large differences in the unrealized first-day mark-to-market performance of trades" is "arguably a starting point to take a deeper look, but it is plainly an insufficient basis to conclude that Mr. Leech misallocated even a single trade." (*Id.* at 1). The September 9 Wells Submission included detailed descriptions of the defense's expert analyses, including a description of a regression analysis performed by the defense experts. (*Id.* at 25-26). The September 9 Wells Submission also argued the defendant's trades placed with a particular broker ("Broker-1") were not a reliable control group because Mr. Leech "executed a disproportionate percentage" of futures buys in the morning through Broker-1. (*Id.* at 42).

On September 12, 2024, defense counsel presented arguments to the U.S. Attorney's Office outlining additional reasons the Government should not bring charges.

On September 17, 2024, defense counsel presented arguments to the U.S. Attorney's Office, including the Deputy U.S. Attorney, outlining additional reasons that the Government should not bring charges.

---

involved detailed discussions of the disparity between trades that Mr. Leech allocated to Macro Opps and those he allocated to the Core Strategies, the funds at issue in this case.

On September 23, 2024, the defendant made a supplemental Wells submission to the SEC (Exh. C), withdrawing his prior representations that Broker-1 could not serve as a control group because the defendant executed a disproportionate percentage of futures buys in the morning through Broker-1 and replacing it with a new argument regarding Broker-1.

On October 8, 2024, the defendant submitted to the SEC an 18-page document addressing two types of trades on two specific days identified by the SEC. (Exh. D). This submission, which the defendant also submitted to the U.S. Attorney's Office, addressed "same instrument/direction" and "first-day realizations" trades on particular days during the relevant period. (*Id.* at 1). The submission provides the defendant's trade-by-trade defense of his trading on those days. The defendant described the work as follows:

> We note that Mr. Leech traded Treasury futures and options hundreds of days a year for over 40 years. While he does not have a specific recollection of individual trades that were executed between January 2021 and October 2023, he has attempted to reconstruct, based on available information, the reasons for placing and allocating trades on two of the six days the Staff has identified in that period: November 4, 2021 ("November 4") and August 2, 2022 ("August 2"). We discuss "same instrument/ direction" trades on November 4, and "first-day realization" trades on August 2. In some instances, we supplement Mr. Leech's best reconstruction of trading with data researched and provided by experts.

(*Id.*).

On October 17, 2024, defense counsel again presented arguments to the U.S. Attorney's Office, including the Deputy U.S. Attorney, outlining additional reasons the Government should not bring charges. ███████████████████████████████

███████████████████████████████████

On October 23, 2024, the defense wrote to the SEC to describe three expert models that the defense had had prepared in support of its advocacy to the U.S. Attorney's Office and the SEC: "In a recent meeting with representatives of the Office of the United States Attorney for the Southern District of New York, we summarized this additional work performed by NERA

13

[National Economic Research Associates]— specifically, three models that explain why FDRs [First Day Results] in the Core Strategies and Macro Opps would be different in the specific market conditions of 2021 to October 2023." (Exh. E at 1). The defense also provided this submission to the Deputy U.S. Attorney of the U.S. Attorney's Office.

On October 25, 2024, the defendant wrote to the Government responding to issues raised by the Government in response to the defense's in-person presentations and written advocacy. █

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████

On October 28, 2024, the defendant wrote to the Deputy U.S. Attorney, the Chief of the Criminal Division, and others at the U.S. Attorney's Office, and attached the defendant's prior submissions to the Government and the SEC. (Exh. G).[6]

As noted above, defense counsel also incorporated the defendant's notes to self into reports and disclosed those reports to outside counsel for WAMCo (the "Trade Memos"). On November 3, 2025, counsel for WAMCo produced four such Trade Memos to the Government and noted that "Mr. Leech's counsel has confirmed that they do not object to WAM's production of these documents to the Government." (Dkt. 78-3 at 17-18). The defendant filed those Trade Memos publicly on January 15, 2026. (Dkt. 77-3, 77-6, 77-9, 77-12).

---

[6] In an abundance of caution, the Government has redacted parts of this exhibit and Exhibit H in light of a stipulation entered into by the Government, the SEC, and the defendant on November 12, 2024.

On or about the evening of November 19, 2024, defense counsel called AUSA Davis directly to further discuss the Government's suggestion that the defendant's Broker-1 trades served as a control group to test whether legitimate trading strategies could account for the allocation disparity.

On November 20, 2024, defense counsel wrote the U.S. Attorney's Office to "summarize the principal reasons why criminal charges against our client, S. Kenneth Leech II, are not warranted." (Exh. H at 1).

That November 20, 2024, submission also specifically addressed



### C. The Purportedly Privileged Documents

#### 1. The Documents With Respect to Which the Defendant Asserts Spousal Privilege

The vast majority of documents Leech has asserted are privileged are spousal communications and do not implicate the Constitution or attorney-client privilege at all. *See Grand Jury Subpoena of Ford v. United States*, 756 F.2d 249, 255 (2d Cir. 1985) ("[T]he marital privilege, unlike that against self-incrimination, is derived from the common law and has no equivalent Constitutional stature.").

15

More than 450 of the approximately 600 documents with respect to which Leech has claimed privilege fall into this category. Of these, well over 200 of the documents contain messages related to ███████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████

It is not apparent what subset of the spousal communication documents could warrant any relief. There is no binding law supporting the propositions that "the government ought to have used a 'taint team' to review [] spousal communications" or that "its failure to do so warrants the disqualification of the prosecutors and witnesses who viewed those emails." *United States v. Wilson*, 505 F. Supp. 3d 3, 12-13 (D. Mass. 2020). Nor do spousal communications implicate *Kastigar*. *See id*. at 13. ("In any event, the *Kastigar* analysis is not triggered by the existence of mere evidence protected by a privilege but, instead, by governmental conduct compelling a witness to testify over his or her claim of privilege. Thus, here, because no testimony has been compelled with respect to Wilson or his wife, there is no reason to hold a hearing pursuant to *Kastigar* as to whether to disqualify prosecutors and witnesses."). Given the nature of these (hundreds of) documents, any "taint" hearing should be narrowed to exclude them, or the defendant should be required to identify specific documents that he claims warrant relief.

### 2. The Documents as to Which the Defendant Asserts Attorney-Client Privilege and Work Product Protection

The largest group of documents with respect to which Leech has asserted attorney-client privilege and work product protection are what he has said were notes about, among other things, his trading on specific days. (Dkt. 68 ¶ 10). There are 92 such documents. (*See* Dkt. 66, Exh. A

16

(category 4 documents)). They are not in the form of notes, but of emails from Leech to himself. None of these emails contains on its face any indication that it was prepared at the direction of counsel, that it was prepared for counsel, or that it was subject to a privilege. These emails have

██████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████

Leech's acknowledgment that the notes he made in this manner "were incorporated into documents that counsel ultimately submitted as part of the Outside Counsel Investigation," (Dkt. 65 at 16 n.9), is borne out by ███████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

17

The same pattern is repeated in other groups of documents over which Leech has asserted privilege. For example,

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████ Leech's statement in his

testimony to the SEC that "with negative convexity, you have to trade . . . in order to keep your

duration constant by trading in the direction of the market." (Exh. A at 180).

████████████████████████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████

████████     This    information    can    readily    be    gleaned    from    the    Internet.    (*See*

https://www.sec.gov/files/ib_high-yield.pdf (describing the economic risk to holders of high-yield

bonds if the economy falters); https://www.congress.gov/crs-product/IF10054 ("The Fed reduces

rates    to    stimulate    economic    activity    and    raises    rates    to    slow    activity.");

https://www.spglobal.com/spdji/en/indices/fixed-income/sp-us-high-yield-corporate-bond-

index/#overview    (S&P    U.S.    High    Yield    Corporate    Bond    Index);

https://fred.stlouisfed.org/series/DGS10 (Market Yield on U.S. Treasury Securities at 10-Year

Constant Maturity)).

And some of the emails Leech has claimed are privileged have little apparent relationship

to the case against him and appear not to be privileged. For example, ███████████████

████████████████████████████████████████████

████████████████████████████

19



Leech has claimed that this is a privileged attorney-client communication under the *Kovel* doctrine and has described it as "a communication relating to expert statistical analysis." (Dkt. 66, Exh. A, Log Number 26.01.07-PL-27; *see* Dkt. 66 ¶ 6 (describing this as among the communications that "relate to various technical analyses of Treasury futures and options trades that were prepared to assist [Leech's lawyers]")).  Those descriptions appear to be inaccurate.

**DISCUSSION**

I.      **Relevant Law**

A. **The Burden is on the Defense to Prove Manifest and Avowed Corruption Under the Fifth Amendment**

As the Court has recognized, the filter process all took place prior to indictment. Accordingly, the Fifth Amendment applies, but the Sixth Amendment does not. (11/7/25 Tr. 92-95). Under that standard, "[t]he existence of a due process violation must turn on whether the governmental conduct, standing alone, is so offensive that it 'shocks the conscience.'" *Tournant*, 2023 WL 5276776, at *13. In the case of "violations of the attorney-client privilege that occur pre-indictment, a defendant must show that 'the conduct of the government has been manifestly and avowedly corrupt.'" *Id.* (quoting *Schwimmer*, 924 F.2d at 447).

The Second Circuit has invoked the notion of "manifestly and avowedly corrupt" conduct to describe actions that might invoke a "per se rule [that] represents a moral as well as a legal

20

condemnation of such egregious and unequivocal conduct for which sanctions are imposed against the Government as punishment regardless of the defendant's guilt." *United States v. Gartner*, 518 F.2d 633, 637 (2d Cir. 1975). Such a rule applies where the government's "conduct has been an offensive interference with the defendant's rights without any justification." *Id.* The Second Circuit has pointed, as examples of government conduct that might meet this standard, to cases where the government planted an informer in the defense camp, *Caldwell v. United States*, 205 F.2d 879 (D.C. Cir. 1953), where the government tried multiple defendants including one who, unbeknownst to his co-defendants or even his attorney, was a government informant, *United States v. Rispo*, 460 F.2d 965 (3d Cir. 1972), where the government tried an informant along with a co-defendant and the informant professed his own and his co-defendant's guilt in front of the jury, *United States v. Lusterino*, 450 F.2d 572 (2d Cir. 1971), and where the government wiretapped a defendant and her counsel before and during trial, *Coplon v. United States*, 191 F.2d 749 (D.C. Cir. 1951). *Gartner*, 518 F.2d at 637.

"In contrast, in cases which have concluded that the government's actions were not manifestly corrupt, the government either did not commit any intentional intrusion into the attorney-client relationship, or its actions (even if intentional) did not rise to a level of egregious misconduct that prejudiced the defendant." *Tournant*, 2023 WL 5276776, at *14.

As this Court recognized, "a defendant claiming outrageous government misconduct 'bear[s] both the burden of production and persuasion.'" (11/7/25 Tr. 94 (quoting *United States v. Voigt*, 89 F.3d 1050, 1070 (3d Cir. 1996))).

### B. A *Kastigar* Hearing for Alleged Breaches of Privilege is Not Required

In *Kastigar*, a number of witnesses were subpoenaed for grand jury testimony. 406 U.S. at 442. The witnesses appeared but asserted their Fifth Amendment privilege against compulsory self-incrimination and refused to testify. *Id*. The Court considered whether testimony may be

21

compelled by granting immunity from the use of compelled testimony and evidence derived therefrom ("use and derivative use immunity"), or whether it is necessary to grant immunity from prosecution for offenses related to the compelled testimony ("transactional immunity"). *Id*. at 443. The Court held that use and derivative use immunity "leaves the witness and the prosecutorial authorities in substantially the same position as if the witness had claimed the Fifth Amendment privilege." *Id*. at 462.

As this Court has noted, there is a dearth of law in this Circuit on the issue of a *Kastigar* claim premised on access to privileged materials, as opposed to the use of compelled testimony. (11/7/25 Tr. at 92). And as Judge Swain has explained, "there is no binding Second Circuit authority on the question of whether a *Kastigar* hearing is required in all" cases where a defendant has claimed intrusion upon the attorney-client privilege by the Government. *Tournant*, 2023 WL 5276776, at *17.[7] To the extent that dicta suggests that *Kastigar* prescribes the standards for a hearing on whether the attorney-client privilege has been breached and a prosecution tainted, that

---

[7] The repetition in *United States v. Gonzalez*, 144 F.4th 396, 404 (2d Cir. 2025), of *Schwimmer*'s dictum that "[t]he government must demonstrate that the evidence it uses to prosecute an individual was derived from legitimate, independent sources" does not provide any reason to doubt this conclusion. In *Gonzalez*, Judge Gardephe held a *Kastigar* hearing because of "the uncertainty about what standard the Second Circuit would deem appropriate in the context of an alleged Government intrusion into material protected by the attorney-client privilege." *United States v. Landji*, 18 Cr. 601 (PGG), 2021 WL 5402288, at *28 (S.D.N.Y. Nov. 18, 2021), *aff'd sub nom*. *United States v. Gonzalez*, 144 F.4th 396 (2d Cir. 2025). As a result, the Second Circuit was not called upon to determine whether such a hearing was necessary. Similarly, the district court in *Schwimmer* wrote: "Because I conclude that the government has satisfied the 'heavy burden' described in *Kastigar*, I may assume, without deciding, that the defendant's contention [that the *Kastigar* standards apply] is correct." *United States v. Schwimmer*, 738 F. Supp. 654, 658 (E.D.N.Y. 1990), *aff'd*, 924 F.2d 443 (2d Cir. 1991). Accordingly, the Second Circuit in *Schwimmer* also was not called upon to decide whether application of the *Kastigar* standards was required.

*dicta* is inconsistent with decisions outside this Circuit that have addressed these questions and with other decisions of the Second Circuit.

The Second Circuit has made it plain that it does not contemplate that a hearing under the standards triggered by compelled testimony is required every time the Government is exposed to privileged material in the course of an investigation. In *United States v. Colasurdo*, 453 F.2d 585 (2d Cir. 1971), for example, attorneys for the defendants were interviewed by the United States Attorney's Office and testified before the grand jury. The district court held a hearing outside the presence of the jury at which it sustained the claim of privilege as to two of the attorneys. But the defendants argued on appeal of their convictions that the district court should have held a preliminary hearing on whether the grand jury had before it evidence obtained in violation of the privilege. In ruling against the defendants, Judge Friendly explained that if a defendant could claim a right to dismiss charges on this basis, "before trial on the merits there would always be a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury, with resultant delay." *Id*. at 595; *see United States v. Bein*, 728 F.2d 107, 113 (2d Cir. 1984) (citing *Colasurdo*). In addition, under the Second Circuit's Fifth Amendment jurisprudence, it is not even "clear whether all involuntary statements or all compelled statements should be subjected to the strong medicine prescribed in *Kastigar*, or whether some other doctrine should govern in certain circumstances." *United States v. Allen*, 864 F.3d 63, 91 n.121 (2d Cir. 2017). And the Second Circuit has distinguished the self-incrimination clause of the Fifth Amendment, which affords a right not to testify against oneself at trial that "is 'absolute,'" *id.* at 81 (quoting *Salinas v. Texas*, 570 U.S. 178, 184 (2013)), and "is by its terms an exclusionary rule," *United States v. Kurzer*, 534 F.2d 511, 516 (2d Cir. 1976), from other judicially-created exclusionary rules, whose reach may

extend only so far as the rule serves its purpose of deterring unlawful conduct, *id.* at 516; *Allen*, 864 F.3d at 82.

The Sixth Circuit has addressed directly a defendant's claim that a district court erred by failing to hold the Government to the *Kastigar* burden of proving that its evidence was derived from a legitimate source wholly independent of privileged material where "case agents came into possession of myriad documents that were ostensibly subject to the attorney-client privilege." *United States v. Warshak*, 631 F.3d 266, 292-93 (6th Cir. 2010). The Court concluded, "because the documents were not the product of compelled testimony, a full *Kastigar* hearing was not required." *Id.* at 294. Similarly, the Fourth Circuit, in addressing a claim that a *Kastigar* hearing should have followed breach of the psychotherapist's privilege, held that "because the government's right to compel testimony in the face of a claim of privilege is the issue at the heart of *Kastigar,* its protections do not apply in cases where there is privileged evidence, but no compelled testimony." *United States v. Squillacote*, 221 F.3d 542, 560 (4th Cir. 2000). The Tenth Circuit has declined to apply even the "fruit of the poisonous tree" doctrine to the attorney-client privilege. *See Nickel v. Hannigan*, 97 F.3d 403, 409 (10th Cir. 1996) (declining to apply the fruit of the poisonous tree doctrine to a possible breach of attorney-client privilege).

Similarly, the Eighth Circuit reversed the suppression of all evidence obtained through electronic surveillance even where attorney-client privileged communications were intercepted. "Because there was no bad faith attempt to obtain privileged conversations, if privileged conversations were intercepted (and the government seems to concede that some inadvertently were), those conversations should be suppressed on an individual basis at or before trial." *United States v. Ozar*, 50 F.3d 1440, 1448 (8th Cir. 1995)*; see also United States v. Marashi*, 913 F.2d 724, 731 n.11 (9th Cir. 1990) ("no court has ever applied [the 'fruits of the poisonous tree'] theory

to any evidentiary privilege and . . . we have indicated we would not be the first to do so"); *United States v. Lefkowitz*, 618 F.2d 1313, 1318 n.8 (9th Cir. 1980) ("Because we reject . . . Lefkowitz's argument that the marital privileges are somehow constitutionally grounded in, among other locations, the Fourth Amendment, we doubt that a secondary source of information obtained through information protected by the confidential marital communications privilege would in any way be tainted").

### C.  The General Practice in this Circuit is to Defer Any *Kastigar*-Like Hearing Until After Trial

A district court has discretion to conduct a *Kastigar* hearing before trial, during trial, after trial, or to use some combination of these alternatives. *United States v. Tantalo*, 680 F.2d 903, 909 (2d Cir. 1982). But "it is the general practice in this Circuit to defer *Kastigar* hearings until after the trial if grounds for it then exist." *United States v. Ajemian*, No. 11 Cr. 1091 (VM), 2012 WL 6762011, at *5 (S.D.N.Y. Dec. 27, 2012)*; accord United States v. Allen*, 160 F. Supp. 3d 684, 687 (S.D.N.Y. 2016), *rev'd on other grounds*, 864 F.3d 63 (2d Cir. 2017); *United States v. Fuller*, 149 F. Supp. 2d 17, 26 (S.D.N.Y. 2001); *United States v. Volpe*, 42 F. Supp. 2d 204, 219 (E.D.N.Y. 1999); *United States v. Gregory*, 611 F. Supp. 1033, 1042 (S.D.N.Y. 1985); *see United States v. Rivieccio*, 919 F.2d 812, 814 (2d Cir. 1990) ("The district court deferred the hearing on the motion until after trial."); *United States v. Mariani*, 851 F.2d 595, 597 (2d Cir. 1988) ("the district court ruled that such a hearing would be conducted after the trial."). In *United States v. Schwimmer*, 892 F.2d 237 (2d Cir. 1989), "the district court deferred until the close of the testimony Schwimmer's motion to dismiss the indictment for violation of the attorney-client privilege or for a hearing to determine whether there had been such a violation and, if so, the extent thereof," *id.* at 242. While the Second Circuit found that the district court should have conducted such a hearing "to determine whether the government's case was in any respect derived from a violation of the attorney-client

25

privilege in regard to confidential communications passing from Schwimmer to [an accountant],"
*id.* at 245, it did not fault the district court for deferring its determination until the close of the
testimony, when the district court knew the actual content of "the government's case." Indeed, the
Second Circuit has recently reaffirmed that a district court's decision to conduct a *Kastigar* hearing
after trial is "an exercise of its discretion," and declined to opine on the merits or prevalence of the
practice of doing so. *Allen*, 864 F.3d at 78 n.58.

There are multiple reasons to hold a *Kastigar*-like hearing after trial. The Second Circuit
noted one such reason in *United States v. Helmsley*, 941 F.2d 71 (2d Cir. 1991), when it explained
that "Judge Walker postponed the question until the completion of trial, at which time he could
determine with the benefit of trial evidence whether there was a sufficient nexus between the
immunized testimony and the federal prosecution to warrant a hearing." *Id.* at 80. The Court in
*Gregory* identified another reason: "Whether or not a hearing is required in the instant case, it
would best be deferred until after the trial, as the Government requests, at which time a proper
evaluation could be made as to whether in fact the evidence offered was obtained from wholly
independent sources." 611 F. Supp. at 1042. Similarly, the Court in *Volpe* explained that "[t]he
court can [after trial] evaluate whether the government's evidence was from independent sources,
and avoid disclosure of the government's proof before trial." 42 F. Supp. 2d at 219. And in *United
States v. Krug*, 198 F. Supp. 3d 235 (W.D.N.Y. 2016), the Court catalogued the multiple reasons
for its choice to hold a hearing only after and/or during trial:

> First, the hearing will likely be more efficient, as it will need to address only the
> evidence that the Government actually introduces at trial—not all the evidence in
> the Government's possession that it might conceivably use at trial. Second, the
> Court will be able to better evaluate whether a hearing remains necessary, as the
> Court will then be able to tell "with the benefit of trial evidence whether there [is]
> a sufficient nexus between the immunized testimony and the federal prosecution to
> warrant a hearing." *United States v. Helmsley*, 941 F.2d 71, 80 (2d Cir. 1991). And
> third, conducting a *Kastigar* hearing either during and/or after trial may allow the

26

Court, in evaluating the source of the Government's evidence, to rely at least in part on testimony elicited during trial, thus also shortening the *Kastigar* hearing. Closer to trial, the Court will decide whether the parties may, during trial and outside the presence of the jury, question relevant witnesses on *Kastigar*-related issues in order to further streamline any remaining post-trial *Kastigar* proceedings.

198 F. Supp. 3d at 247-48.

## II. Any *Kastigar*-Like Hearing Should Be Deferred Until After Trial

As this Court has noted, in order for there to be a hearing, a defendant must show a "'connection between the *content* of the evidence' to be used in the present prosecution and the protected information; otherwise, the 'policies underlying the Fifth Amendment' are not implicated." (11/7/25 Tr. at 95 (quoting *United States v. Hoey*, No. 15 Cr. 229 (PAE), 2016 WL 270871, at *4 (S.D.N.Y. Jan. 21, 2016), which quoted *Helmsley*, 941 F.2d at 82). And the Court has said that "if the Government's conduct was a violation of the defendant's rights, I will need to understand the extent to which the documents 'tainted' the Government's prosecution to evaluate what if any remedy is appropriate." (11/7/26 Tr. 100). If there is a hearing held under the standards set in *Kastigar*, this Court must also determine whether the government has met its burden of showing that its evidence "is derived from a legitimate source wholly independent of" privileged materials (assuming *Kastigar* is extended from compelled testimony to privileged materials). *Kastigar*, 406 U.S. at 441.

That inquiry should be held after trial. The evidentiary hearing is currently scheduled to be held more than two months before trial is to begin, (Dkt. 102, 106), more than a month before the Government's draft exhibit list is due, and more than two weeks before the Government's witness list is due, (Dkt. 108). Moreover, the draft exhibit list and the witness list are both "subject to good-faith revision as the Government continues to prepare for its case." (*Id.*). Neither the "content of the evidence" nor the full extent of "the Government's prosecution" will be knowable at the time of the hearing if it goes forward on the current schedule. Nor will the Court be able to determine

27

conclusively whether there has been any "concrete improper use" of privileged materials or prejudice to the defendant's case until the evidence has been presented. *Schwimmer* itself makes clear that a post-trial hearing is preferable. Among other things, the Second Circuit—in affirming the district court's finding that no derivative use had occurred—noted that "The cross-examination of defense witnesses in the case was conducted entirely by AUSA Alan Friedman [an AUSA who had neither seen nor discussed the workpapers]." *Schwimmer*, 924 F.2d at 446. Here, too, the Government's Case Team includes an AUSA who was added to the team only *after* any access to allegedly privileged materials had occurred. Thus, which AUSA performs which role at trial could also inform the taint inquiry.

The difficulty of an inquiry into taint at this point is increased by the fact that the defendant has failed to allege specific improper uses of protected information. *Cf. United States v. Landji*, No. (S1) 18 Cr. 601 (PGG), 2021 WL 5402288, at *25 (S.D.N.Y. Nov. 18, 2021) ("[I]n an effort to show prejudice, Defendants contend that the Government's theory of the case changed in two respects after its improper review of Defendants' Documents. According to Defendants, the Government dropped its assertions that (1) Landji helped co-pilot the flight into Zagreb; and (2) that the flight into Zagreb was a "black flight."), *aff'd sub nom. United States v. Gonzalez*, 144 F.4th 396 (2d Cir. 2025). Nor is this a case in which the number of privileged documents has been narrowed to a small number, permitting a focused inquiry into taint. *Cf. id.* at *17 ("In sum, of the materials Defendants have submitted to the Court, only a single page . . . is clearly privileged.").

The difficulty in holding a *Kastigar*-like hearing in the privilege context is manifest, particularly where the defense has not identified which allegedly privileged documents purportedly gave rise to any taint. *Kastigar* itself dealt with taint arising from compelled testimony, which is typically discrete in nature and which, unlike documents over which privilege has been asserted,

can be viewed by the case team. Among other things, the witnesses cannot refresh any recollection (if they have one) of the documents by looking at them or know the content of the documents such that they can testify whether that content was used derivatively, and until the evidence is presented the Court cannot make that judgment either.[8]

Moreover, the nature of the allegedly privileged material coupled with the fulsome disclosures the defense has made to the Government about why it believes Leech engaged in the conduct with which he is charged means that there is very unlikely to be, or to have been, an improper use of privileged information. As has been discussed above, the largest of the categories of documents that Leech claims were accessed in violation of the attorney-client privilege and work product doctrine consists of what he says are notes he made using the mail application on his iPhone about, inter alia, his trading on specific days. (Dkt. 65 at 3; Dkt. 68 ¶10). But those notes "were incorporated into documents that counsel ultimately submitted as part of the Outside Counsel Investigation," (Dkt. 65 at 16 n.9), and which were produced to the Case Team and filed publicly by the defense. (*See* Dkt. 78-3 at 17-18); Dkt. 77-3). Furthermore, none of the other assertedly privileged documents provides any insight of significance into why Leech engaged in the charged conduct beyond what Leech has disclosed to the SEC and the Case Team. Nor do the assertedly privileged documents provide new facts of significance.

---

[8] In *United States v. Weissman*, No. (S2) 94 Cr. 760 (CSH), 1996 WL 751386, at *13 (S.D.N.Y. Dec. 26, 1996), the Court approved a re-examination of a privileged document by an AUSA "for the purpose of addressing the possibility of taint," noting that that was the "only way" to determine whether independent sources of information existed for the facts in the document. But that was a document the AUSA had already studied and made marginal notes on. *Id*. at *4. We expect the evidence will show no similar scrutiny by the Case Team of assertedly privileged documents here.

**CONCLUSION**

For the foregoing reasons, the Government's presentation of evidence at the April 8 hearing will address the question Leech has put in issue: whether he has satisfied his burden of showing manifestly and avowedly corrupt misconduct during the Government's filter process. The evidence will show that the Case Team and the Filter Team acted in good faith and to the extent any member of the Case Team temporarily accessed material protected by attorney-client privilege or the work product doctrine, such access was inadvertent. The defendant, therefore, will be unable to show even that the Government acted in bad faith, let alone meet his burden of showing manifestly and avowedly corrupt conduct.

Consistent with the practice in this Circuit and the circumstances of this case—including the months that remain before trial and the defendant's failure to specify any documents he claims gave rise to taint, any improper use he claims was made of privileged information, or any prejudice to his case, as well as the extraordinarily fulsome disclosure the defendant has made to the Government of his defenses in this case, which renders improper use of privileged information extremely unlikely—any inquiry into taint should follow trial.

Dated: New York, New York
April 6, 2026

Respectfully submitted,

JAY CLAYTON
United States Attorney


By: _____/s/_____
Stephen J. Ritchin
Dina McLeod
Adabelle U. Ekechukwu
Assistant United States Attorneys
Telephone: (212) 637-2503/1040/1944

30