# EXHIBIT B

FOIA CONFIDENTIAL TREATMENT REQUESTED ON BEHALF OF S. KENNETH LEECH

BEFORE THE UNITED STATES
SECURITIES AND EXCHANGE COMMISSION

---

In the Matter of Certain Western Asset Management
Company Investment Allocations

SEC File No. LA-05450

---

## WELLS SUBMISSION ON BEHALF OF
## S. KENNETH LEECH II

MORVILLO ABRAMOWITZ GRAND
IASON & ANELLO P.C.
565 Fifth Avenue
New York, New York 10017
(212) 856-9600

September 9, 2024

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................. i

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ....................................................................................................................... 4

I. Mr. Leech's Distinguished Career In The Fixed Income Industry Was Built On The Success Of Western's Flagship Core And Core Plus Strategies ............................... 4

II. Macro Opps Was A Niche Product Designed For Risk-Seeking Investors With Greater Risk Tolerance ............................................................................................ 6

III. Core, Core Plus, ▮▮▮ Core Plus, And Macro Opps Are Different Strategies That Required Different Trades ......................................................................................... 6

    A. The Core Strategies And Macro Opps Are Long-Term Investment Strategies With Very Different Asset Compositions, Drivers Of Return, And Risk Profiles ..................................................................................... 7

    B. The Core Strategies And Macro Opps Had Different Daily Duration And Convexity Positions That Required Different Trades ................................... 10

      1. Duration And Convexity ................................................................... 10

      2. Duration-Management And Value-Investing Trades Exemplify The Differences Between The Core Strategies And Macro Opps ........................ 12

IV. Mr. Leech Allocated Trades In Compliance With Western's Policies ................... 14

V. First-Day Unrealized Returns Are Not Relevant To Portfolio Management ......... 15

ARGUMENT ........................................................................................................................... 16

I. Legal Standard ...................................................................................................... 17

II. Discussion ............................................................................................................ 19

    A. The Trades At Issue Were Not Equally Suitable For The Core Strategies And Macro Opps ............................................................................................. 19

      1. Interchangeable Trades Is a Prerequisite to a Cherry-Picking Scheme ........ 20

      2. Allocating Core Plus's Trades To Macro Opps Would Have Rendered Macro Opps Unmanageable ................................................................. 24

3.  A Regression Analysis Conducted by NERA Demonstrates That Mr. Leech's Management Of Duration In Macro Opps Would Be Expected To Produce Net Mark-To-Market First-Day Unrealized Gains ........................................ 25

4.  A Statistical Analysis That Fails To Account For Material Differences Between The Core Strategies And Macro Opps Cannot Serve As A Predicate For An Enforcement Action ........................................................................ 27

B.  Mr. Leech Did Not Have a Plausible Reason To Favor Macro Opps Or ███ Over Core And Core Plus ............................................................................ 29

1.  The Core Strategies Were Far More Important to Mr. Leech and Western, and Mr. Leech Had No Professional Motivation to Favor Macro Opps .............. 30

2.  Neither Mr. Leech's Deferred Compensation Investments Nor His Compensation Provide A Motive For Him To Favor Any Account ............. 32

3.  The Evidence Does Not Support The Notion That Mr. Leech Allocated First-Day Unrealized Gains To Macro Opps To Make Up For Poor Performance ........................................................................................... 33

4.  Mr. Leech Did Not Set Out To Realize First-Day Gains .............................. 35

C.  Unlike Cherry-Picking Cases, The Core Strategies And Macro Opps Involved Complex Trading Of Derivative Products To Manage Portfolios With Specific Risk Metrics……………………………………………………..………...36

D.  ███ Core Plus Was A Unique Core Plus Account That Required Different Trades And Mr. Leech Had No Motive To Favor It ...................................... 37

E.  The Staff's Other Purported Evidence Does Not Demonstrate That Mr. Leech Acted With Scienter ..................................................................................... 39

1.  Mr. Leech's Post-October 2023 Trades In Macro Opps Supports This View That His Trading Strategies in Macro Opps Were Likely To Produce First-Day Unrealized Returns…………………………………………………...39

2.  Ms. Marquez's "Come Back" Notes Are Not Evidence That Mr. Leech Delayed Allocating Trades To Enable Him To Allocate Trades With Unrealized First-Day Gains To Macro Opps ............................................... 40

3.  The Trades Mr. Leech Executed Through ███ Are Not A Reliable Control For All Of Mr. Leech's Macro Opps Trades ................................................ 42

CONCLUSION ........................................................................................................ 42

Appendix A: SEC Cherry-Picking Enforcement Actions

Appendix B: Trading Of Like Fixed Income Assets Under Different Portfolio Strategies

## PRELIMINARY STATEMENT

The Staff has informed us that it intends to recommend charges against S. Kenneth Leech II based on his alleged intentional misallocation of U.S. Treasury derivative trades at the Western Asset Management Company ("Western" or "WAMCO") during the period of January 2021 through October 2023 (the "Relevant Period").  As proposed by the Staff, the action will assert violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder; Sections 17(a)(1) and 17(a)(3) of the Securities Act of 1933 ("Securities Act"); Sections 206(1), 206(2), and 206(4) of the Investment Advisers Act of 1940 ("IAA") and Rule 206(4)-8 thereunder; and Sections 36(a) and 37 of the Investment Company Act of 1940 ("ICA").  According to the Staff, these charges would be based on an alleged "cherry-picking" scheme to allocate profitable trades to certain "favored" accounts within one strategy while allocating unprofitable trades to "disfavored" accounts within two other strategies.

The Staff's proposed charges rely chiefly on the existence of large differences in the unrealized first-day mark-to-market performance of trades allocated to two very different investment strategies offered by Western:  Core and Core Plus (despite their significant differences, for simplicity, referred to together as the "Core Strategies"), which are tied to a market benchmark, and Macro Opportunities ("Macro Opps"), which is a highly volatile, unconstrained global macro fixed income strategy.[1]  That differential is arguably a starting point to take a deeper look, but it is plainly an insufficient basis to conclude that Mr. Leech misallocated even a single trade.  In every cherry-picking case identified by counsel, most or all

---

[1] We refer to the Core Strategies and Macro Opps as two strategies for analytical purposes in this Wells submission, but, in the marketplace, the Core Strategies were further divided given the differing assets and risk profiles of Core and Core Plus.  The Staff has also asserted that Mr. Leech's allocations favored Western's most aggressive separately managed account within the Core Strategies designed for ████████████████████████ ("██████"), a relatively small institutional account.

of the following factors are present: (1) similar or identical funds (2) that engaged in straight-forward trading of equities or similar instruments (3) that resulted in realized gains (4) being allocated to a "favored" account that was controlled by the defendant who derived a direct and obvious financial benefit.[2] These factors are critical to a sound theory of wrongdoing: they enable investigators, who review performance long after the fact, to distinguish between (a) normal differences in the outcome of trades and (b) intentional misallocation of trades to a favored account. These factors are not present in this case.

The Core Strategies and Macro Opps had different asset compositions, different drivers of performance, different risk tolerances, and different client guidelines. Additionally, the Core Strategies have a benchmark while Macro Opps does not. These distinctions required Mr. Leech to execute different Treasury derivative trades for the respective strategies in the Relevant Period—a period of the most extraordinary volatility in the past 40 years in traditionally stable fixed-income markets. Put simply, the strategies were entirely dissimilar, and the trades were not interchangeable. In many instances, trades entered for the Core Strategies generally would not have been appropriate for Macro Opps and vice versa.

Unlike other cherry-picking cases that involve straight-forward trading of equities or similar instruments that could be day-traded for quick profits, the conduct at issue in this case relates to complex trading of derivatives as part of the management of multi-billion-dollar portfolios of fixed income instruments. Through his trades, Mr. Leech established positions that, on average, remained in the Core Strategies and Macro Opps portfolios for more than three weeks—and were often extended for even longer periods. Mr. Leech allocated trades

---

[2] In connection with our preparation of this submission, we identified and reviewed a total of 34 litigated or settled actions brought by the SEC, either in federal district court or administratively. A list identifying these cases reviewed is attached at Appendix A.

consistently with the portfolios' respective strategies, risk guidelines, and client guidelines. Unrealized first-day performance did not influence Mr. Leech's allocations. Allocating trades on that basis was not only irrelevant; such allocations would have exposed the portfolios to substantial and undue additional risks. Simply put, Mr. Leech did not consider unrealized first-day gains or losses in allocating trades.

Perhaps even more importantly, Mr. Leech had no plausible financial, professional, or other motive to favor Macro Opps over the Core Strategies—a critical flaw in the Staff's theory that he acted with scienter given the absence of indica of deceptive conduct. As set forth in more detail below, the Core Strategies were Western's flagship investment products and were essential to its business and to Mr. Leech's success and reputation as a portfolio manager. In contrast, Macro Opps was a small, niche strategy. Both the Core Strategies and Macro Opps were long-term, fixed-income strategies, and it is inconceivable that Mr. Leech would have managed those strategies with an eye towards unrealized mark-to-market first-day returns—much less that he would have misallocated trades to maximize first-day gains in Macro Opps by saddling the Core Strategies with excessive first-day losses.

Moreover, unlike every other cherry-picking case we found, Mr. Leech did not get a financial benefit from the alleged misconduct. Unlike other cherry-picking cases, the allegedly misallocated gains and losses at issue in this investigation were *unrealized*; the Staff has not asserted that Mr. Leech liquidated the positions to realize the gains or losses in the funds at issue, let alone that he did so to attain some personal gain. On the contrary, the length of time the accounts at issue held positions—more than three weeks and often much longer—means that there was a substantial risk that the first-day, mark-to-market gains could dissipate over time, or

turn into losses, which further undermines any suggestion that Mr. Leech was intentionally misallocating trades based on first-day unrealized returns or for financial or other benefit.

We submit that the proposed enforcement action rests on a mistaken understanding of the facts and would be a grievous error and an injustice.

## <u>BACKGROUND</u>

**I.      Mr. Leech's Distinguished Career In The Fixed Income Industry Was Built On The Success Of Western's Flagship Core And Core Plus Strategies**

Ken Leech is a distinguished investment professional with over 40 years' experience managing complex fixed-income portfolios.  In 1990, Mr. Leech joined Western as a portfolio manager.  From the late 1990s until last month, he served as Western's CIO, CIO emeritus, or co-CIO and played an integral role in Western's rise from a firm with approximately $5 billion in assets under management ("AUM") to a leading global institutional fixed income asset manager with over $380 billion in AUM as of June 2024.

Since joining Western, Mr. Leech has been a member of Western's teams managing its most important investment strategies—the Core Strategies.  The Core Strategies are diversified U.S.-based fixed-income products that are measured against the Bloomberg US Aggregate Bond Index or its predecessors (the "benchmark")[3] and showcase Western's expertise in U.S. fixed income securities. Western devotes significantly more resources to the Core Strategies than to any other Western investment product, as reflected in Western's staffing the Core Strategies with 10 highly experienced portfolio managers.  During the Relevant Period, AUM across all Core and Core Plus accounts ranged between approximately $108 billion and $165 billion in AUM and the Core Strategies generated more than one-third of Western's firmwide revenue.

---

[3] Core Plus is allowed greater variance from the benchmark as compared to Core, and thus attracts more risk-tolerant investors.

Western is characterized by a strong "team" approach to portfolio management, with regular dialogue among team members and lead portfolio managers about strategy and execution and full transparency of trading within portfolios. The Core Strategies were offered in mutual funds, commingled vehicles, and private separately managed accounts. As CIO, Mr. Leech was the lead portfolio manager of Western's Core and Core Plus mutual funds and certain of the separately managed Core and Core Plus accounts; additional portfolio managers took the lead on other separately managed Core and Core Plus accounts. Trades in all of these funds and accounts were discussed and coordinated among portfolio managers.

Mr. Leech's sterling reputation in fixed-income investing was built on the performance of the Core Strategies. In the early 2000s, based largely on his work on these strategies, Mr. Leech served as member of the Treasury Borrowing Advisory Committee and was inducted into the Fixed Income Hall of Fame.[4] Mr. Leech and Western teams have won numerous awards for their work on the Core Strategies, including top U.S. fixed income manager awards from Morningstar (2004 and 2014), Institutional Investor Magazine (2012, 2013, and 2014), and the Lipper Fund (2017 and 2018). Mr. Leech's public profile was closely tied to Core and Core Plus. For instance, when the Core Strategies have demonstrated strong performance, the industry press credited Mr. Leech,[5] but when they underperformed competitors, the press has called out Mr. Leech by name.[6]

---

[4] S. Kenneth Leech, *Fixed Income Analysts Society, Inc.*, https://fiasi.org/2007-hall-of-fame/92-s-kenneth-leech.

[5] Charles Stein & John Gittelsohn, *This Bond Manager Isn't a Household Name, But He Beats 98% of His Peers*, Bloomberg (Dec. 22, 2017), https://www.bloomberg.com/news/articles/2017-12-22/this-bond-manager-isn-t-a-household-name-but-beats-98-of-peers ("The upshot: the $21.9 billion Western Asset Core Plus Bond Fund, Leech's biggest, beat 98 percent of intermediate bond funds in 2017, and 98 percent over the past three years and five years, according to Morningstar.").

[6] Silla Brush & Michael Mackenzie, *Trailing 97% of Bond Funds, Western's Flagship Is Losing Cash*, Bloomberg Law (June 17, 2024), https://news.bloomberglaw.com/insurance/trailing-97-of-bond-funds-westerns-flagship-is-losing-cash ("Convinced that the economy and inflation are poised to slow, Ken Leech, the co-chief investment

**II.     Macro Opps Was A Niche Product Designed For Risk-Seeking Investors With Greater Risk Tolerance**

Over more than three decades at Western, Mr. Leech also managed accounts outside the Core Strategies.[7] After the global financial crisis, yields were generally low, and fixed-income investors sought specialty higher-yielding products like unconstrained bond strategies (*i.e.*, strategies not measured against a benchmark). During that period, Western launched Macro Opps to attract clients interested in investing in a higher-risk unconstrained global strategy. At that time, Mr. Leech was partially based in London as the head of Western's global investment strategy (not CIO), and he was part of the team that launched Macro Opps.

Macro Opps was designed as a niche product that was significantly more volatile than Western's other offerings and drew on global investment ideas. In light of the strategy's risk profile, it appealed to a highly self-selected group of investors who had a significantly higher risk tolerance than Western's typical clients. During the Relevant Period, Macro Opps' AUM ranged from approximately $3 to $13 billion—far less than the Core Strategies' AUM which exceeded $100 billion.

**III.    Core, Core Plus, █████ Core Plus, And Macro Opps Are Different Strategies That Required Different Trades**

The Core Strategies and Macro Opps are fundamentally disparate strategies. They differ sharply with respect to each of the three factors Western uses to distinguish its strategies and to inform investors about divergent expected risks and returns: (i) asset composition, (ii) drivers of

---

officer of Western Asset, and his team have stuck to their view that longer-term bonds will rally as the Federal Reserve gets closer to cutting rates.").

[7] These other fixed-income strategies included long duration, structured and insurance, broad market portfolios, Treasury Inflation-Protected Securities, leveraged, unconstrained U.S. and global, global sovereign, closed-end, and structured intermediate portfolios.

return, and (iii) risk profile. As explained below, these clearly delineated distinctions among strategies necessitated different trades to manage the portfolios.[8]

Western's business model encourages institutional clients to work with its investment staff to design bespoke accounts that reflect the client's specific needs and risk profiles.[9] Dating to 2004, ███████ took advantage of that opportunity and designed a distinct version of the Core Plus account ("██████ Core Plus"), which reflected ████████ desire to take on additional risk to seek higher returns. In accordance with its particular investment mandate, the ██████ Core Plus account has a different composition than other Core Plus accounts and therefore required different trading strategies than its "off-the-shelf" counterparts.[10] It also had unique client guidelines that reflected ████████ risk tolerances. To be clear, in its 20 years with Western, ████████ never wanted a traditional U.S. Core Plus strategy.

**A. The Core Strategies And Macro Opps Are Long-Term Investment Strategies With Very Different Asset Compositions, Drivers Of Return, And Risk Profiles**

The Core Strategies and Macro Opps were both long-term, value-oriented fixed income strategies, but beyond this shared high-level approach, the two strategies were disparate. Most importantly, the Core Strategies and Macro Opps are fundamentally different in regard to the three variables noted above—and thus were expected to generate different risks and returns.

*First*, the Core Strategies and Macro Opps had different asset compositions and strategies. Core and Core Plus were U.S.-based strategies (with variation between Core and Core Plus) that held large positions in domestic corporate bonds, mortgage-backed securities,

---

[8] Western, *About Us*, https://www.westernasset.com/us/en/about/index.cfm.

[9] WAMCO_SEC_0115867 (Sample Due Diligence Questionnaire: Western Asset US Core Plus (Mar. 31, 2024) (hereinafter "Core Plus DDQ") ("The [f]irm's goal is to provide investment solutions for clients; hence, collaboration with investors, who have a diverse set of return objectives and risk tolerance, is important to provide the appropriate solution and ensure the strategy can be managed to a client's specific active risk budget.")).

[10] *See infra* Argument II(D).

agency and non-agency residential-backed mortgages, asset-backed securities, and commercial real estate. These sectors comprised the substantial majority of the fund, and positions in U.S. Treasuries were relatively smaller.[11] In contrast, Macro Opps was a global strategy with an asset composition of predominantly non-U.S. securities and its overall exposure to foreign currencies was generally close to 50 percent (considering both long and short positions). In addition, sovereign bond positions and related futures comprised a meaningful portion of the overall assets. Macro Opps also held U.S. credit positions, often using a derivative overlay (CDX). Lastly, Macro Opps also held U.S. Treasury and Treasury derivative positions.[12]

*Second*, the Core Strategies and Macro Opps had different drivers of performance. Core and Core Plus drive returns primarily by relying on extensive research to identify and "[c]onsistently invest[] in undervalued securities."[13] This means that the yield advantage from investing in U.S. "spread sectors" (*i.e.*, non-Treasury bonds) must be tempered by the potential default risk in times of financial stress. In contrast, Macro Opps drove returns though its "actively managed global macro strategy that focuse[d] on relative-value opportunities in global interest rates and global credit . . . ."[14] Managing highly volatile global currency instruments was crucial to Macro Opps' performance, and U.S. Treasury positions had to be considered in connection with the fund's global positions.

---

[11] Core Plus Composition (Major holdings as of 6/30/2022): Corporate bonds - 36.7%; Mortgage backed-securities - 21.3%; US treasuries - 15.7%; Collateralized mortgage obligations - 8.8%; Non-US sovereign bonds - 7.4%.

[12] Macro Opps Composition (Major holdings as of 7/31/2022): Corporate bonds - 39.7%; Mortgage backed-securities - 0%; US treasuries - 2.7%; Collateralized mortgage obligations - 6.1%; Non-US sovereign bonds - 31.5%.

[13] WAMCO_SEC_0115867 (Core Plus DDQ).

[14] WAMCO_SEC_0115849 (Sample Due Diligence Questionnaire: Western Asset Macro Opps (June 30, 2024) (hereinafter "Macro Opps DDQ")).

*Third*, only the Core Strategies are measured against a benchmark. For example, Core Plus's objective is to outperform the benchmark by 1.5% annually, with a tracking error of 3%, meaning that most years it will perform within 3% of the benchmark and in exceptional years it will perform within 6% of the benchmark.[15] In contrast, Macro Opps was designed for Western's most risk-tolerant investors. It is an unconstrained strategy[16] not measured against a benchmark and with no obvious competitors. Macro Opps has an expected annual volatility of 10%, meaning that most years it will be up or down 10% annually and in exceptional years it will be up or down 20%. Western made Macro Opps' risk profile clear to investors, stating that "[t]he weakness or challenge of the strategy is its volatility. The strategy may suffer significant negative months, and day-over-day returns may be volatile."[17]

Unsurprisingly, given their very different compositions, drivers of performance, and risk profiles, the Core Strategies and Macro Opps generated highly disparate returns for investors.[18]

---

[15] WAMCO_SEC_0115867 (Core Plus DDQ).

[16] *See* James Chen, *Unconstrained Investing: What It Means, How It Works*, (Oct. 30, 2022), https://www.investopedia.com/terms/u/unconstrained-investing.asp ("Unconstrained investing focuses on performance over time, rather than on short-term gains. It also eschews constraints that arise by focusing on benchmark tracking.").

[17] WAMCO_SEC_0115850 (Macro Opps DDQ).

[18] According to their respective prospectuses, between 2016 and 2023, Core, Core Plus, and Macro Opps had the following returns:

| Year | Core | Core Plus | Macro Opps |
|---|---|---|---|
| 2016 | 4.12% | 4.79% | 6.49% |
| 2017 | 5.21% | 6.96% | 15.16% |
| 2018 | -0.63% | -1.49% | -5.54% |
| 2019 | 10.44% | 12.29% | 16.74% |
| 2020 | 9.12% | 9.39% | 6.81% |
| 2021 | -1.84% | -1.90% | -0.45% |
| 2022 | -16.93% | -18.78% | -21.06% |
| 2023 | 5.91% | 6.78% | 16.06% |

These substantially different outcomes—often reaching return differences of five to 10 percentage points in a single year—illustrate just how disparate the two strategies are in risk and composition, and how distinct the trading was that resulted in these returns.

### B. The Core Strategies And Macro Opps Had Different Daily Duration And Convexity Positions That Required Different Trades

Consistent with their different investment objectives, the Core Strategies and Macro Opps varied on a range of fixed income portfolio metrics, including, most importantly, their daily duration and convexity. Duration and convexity are central to the active management of fixed income portfolios, including the Core Strategies and Macro Opps.

On a daily basis, Macro Opps required "active yield curve and duration management" to a far greater degree than was necessary in the Core Strategies.[19]

### 1. Duration And Convexity

Duration is a measure of a fixed income instrument's (or portfolio's) sensitivity to interest rate changes.[20] Selling futures, selling call options, and buying put options all reduce duration ("short positions"), while buying futures, buying call options, and selling put options all increase duration ("long positions"). Fixed-income traders often simultaneously take offsetting "short" and "long" positions to take advantage of perceived market opportunities while hedging risk.[21] As a leading fixed income authority explains, "[h]edging strategies using options involve taking a position in an option and a position in the underlying bond in such a way that changes in the value of one position will offset any unfavorable price (and interest rate) movement in the other

---

[19] WAMCO_SEC_0115848 (Macro Opps DDQ).

[20] Frank J. Fabozzi, *The Handbook of Fixed Income Securities* at 111 (2021) (hereinafter "Fabozzi").

[21] For example, Mr. Leech frequently sold Treasury call options and bought Treasury futures in tandem. By executing such trades, Mr. Leech would add risk to the portfolios related to the valuation of the options, while hedging that risk by buying futures to keep the overall portfolio duration constant.

position."[22]  In bull markets, longer duration positions tend to outperform shorter duration positions (and vice versa in bear markets).

Measuring a bond's duration and, in turn, an overall portfolio's duration requires assumptions that may turn out to be inaccurate.  For example, the measure of duration assumes parallel shifts in the yield curve, but different sectors of the yield curve frequently move in different directions or different rates.  As another example, corporate bonds present several challenges that are distinct from Treasury bonds or their derivatives, which are not clearly captured by their duration measure—and require different trades to manage those risks.

Convexity refers to the sensitivity of an instrument's (or portfolio's) duration to interest rate changes.[23]  Portfolios can differ in (i) the direction of their convexity (positive or negative) and (ii) the magnitude of convexity (which can be measured in years squared).  For example, as explained below, a portfolio with low negative convexity (like the Core Strategies) will respond very differently to the same change in rates than a highly negatively convex portfolio (like Macro Opps).

The duration of a portfolio with positive convexity will increase in a bull market and decrease in a bear market.  In contrast, the duration of a negatively convex portfolio moves *adversely* both in bull markets (by decreasing in response to market rallies) and bear markets (by increasing in response to market declines).  Investors who hold negatively convex portfolios are compensated for taking that risk—for example, because negative convexity is produced by selling put and call options, a negatively convex portfolio receives a premium by selling the options and then profits if those options expire out of the money.

---

[22] Fabozzi at 1558.

[23] Fabozzi at 111 (explaining that "[t]o improve the estimate of [price change for a 100 basis point change in rates] provided by duration a measure called *convexity* can be used").

A portfolio's degree of convexity indicates how rapidly its duration would change in response to a change in interest rates. One way of understanding convexity is that the duration of a portfolio with high negative convexity changes at an *accelerated rate* in response to a change in rates (as compared to a portfolio with less or no negative convexity). Two portfolios that have similar duration but different levels of convexity will see their respective duration levels change at very different rates in response to the same change in yields—and, as explained below, the trades needed to manage the respective portfolios' duration will necessarily be different. Because of the large negative convexity typically present in Macro Opps, volatile market environments made portfolio hedging especially challenging.[24]

### 2. Duration-Management And Value-Investing Trades Exemplify The Differences Between The Core Strategies And Macro Opps

Two of the most important distinctions between the Core Strategies and Macro Opps relate to duration. *First*, the strategies had to be managed to comply with two sets of dramatically different duration limits. Core and Core Plus had to keep duration between 20% and 30% of the benchmark, which amounted to bands of roughly 3.2 and 4.4 years, respectively. In contrast, consistent with Macro Opps' mandate of "active management of . . . volatility," it had a much wider latitude of 15 years, allowing for more room to take different interest rate bets depending on the particular market environment. *Second*, Macro Opps' greater duration band was necessary in light of its high level of negative convexity—which caused Macro Opps'

---

[24] Fabozzi at 111 (explaining that "using duration combined with convexity to estimate the percentage price change of a bond to changes in interest rates is called the *duration/convexity approach*").

duration to change far more drastically in response to changes in yields than the Core Strategies'
duration. These differences are reflected in the following chart.[25]

| Portfolio | Representative Account | Median Duration | Duration Limit (Corresponding Actual Min-Max Duration) | Median Convexity |
|---|---|---|---|---|
| Core | 671 | 1.010 yrs (Active) | Benchmark ± 20% (4.666-7.813 yrs) | -0.736 (Active) |
| Core Plus | 984 | 1.352 yrs (Active) | Benchmark ± 30% (4.083-8.464 yrs) | -0.717 (Active) |
| Macro Opps | 3313 | 7.609 yrs (Actual) | - 5 ↔ +10 yrs | -12.709 (Actual) |

The Relevant Period coincided with what has been described as the "greatest bond bear
market of all time."[26] Fixed income markets experienced unprecedented volatility in terms of
both intraday change of yields[27] and the shape of the yield curve. [28] In the midst of these
unprecedented market conditions, distinct trading strategies were necessary and appropriate for
the Core Strategies and Macro Opps.

A good illustration is duration-management trades that were needed on volatile days to
manage Macro Opps' duration but generally were not necessary for the Core Strategies. As
disclosed to investors, Macro Opps had a "long [duration] bias on . . . the Treasury side,"
reflecting Western's well publicized view that inflation was transitory.[29] To maintain that long

---

[25] This chart uses metrics based on the three main Core, Core Plus, and Macro Opps accounts Mr. Leech managed. The term "active" refers to an account's metric as compared to the benchmark; in the case of an unconstrained fund, its active and actual risk metrics are the same.

[26] Samuel Indyk, *Bonds 'in greatest bear market of all time', Bank of America says*, Reuters (Oct. 6, 2023), https://www.reuters.com/markets/rates-bonds/bonds-greatest-bear-market-all-time-bofa-2023-10-06/#:~:text=BoFA's%20report%20showed%20that%20the,right%20now%20is%20buying%20bonds.

[27] Tom Lauricella, *Markets Brief: Why Have Bonds Been So Volatile? And Will That Continue?*, Morningstar (Jan. 12, 2024), https://www.morningstar.com/markets/markets-brief-why-have-bonds-been-so-volatile-will-that-continue ("Wide price swings are not what most investors associate with bonds, especially government bonds. Bonds are regarded as safer than stocks, and most investors think of them as ballasts, providing stability in their portfolios against swings in riskier investments like stocks. In 2022 and 2023, that was far from the case.").

[28] Joe Rennison, *A Recession Alarm Is Ringing on Wall Street*, N.Y. Times (July 21, 2022), https://www.nytimes.com/2022/07/21/business/yield-curve-inversion.html.

[29] WAMCO_SEC_0115851 (Macro Opps DDQ).

duration position together with Macro Opps' negative convexity, Mr. Leech frequently had to acquire additional duration in Macro Opps in response to market rallies to offset its decreasing duration (*i.e.*, "chase up"), and decrease duration in response to market declines to counteract its increasing duration (*i.e.*, "chase down").

The Core Strategies frequently traded in the opposite direction. While the Core Strategies shared Macro Opps' long duration bias, they were managed to avoid being in a position where it was necessary to shorten duration in a falling market. Consistent with their value-investing strategy, Core and Core Plus frequently responded to declining markets as opportunities to add duration as prices decreased and responded to rising markets to reduce duration as prices increased. These two different trading strategies, among others, would be expected to, and did, account for a considerable portion of the first-day differential between the Core Strategies and Macro Opps.

## IV.    Mr. Leech Allocated Trades In Compliance With Western's Policies

Western's Compliance Manual required investment professionals to allocate trades "in a fair and equitable manner" and "*no later than the end of the day* on which the transaction [was] completed."[30] Mr. Leech's trades and allocations were done in compliance with that policy. We recognize that Western's policy (consistent with industry practice and the federal securities laws) permitted Mr. Leech to allocate trades within a specific window.[31] The extreme intraday price movements in the Relevant Period exposed potential vulnerabilities in this long-standing

---

[30] WAMCO_SEC_0000500 (Western Compliance Manual 2022 (emphasis in original)).

[31] *See* Complaint at 15, *SEC v. Dushek*, No. 13-cv-3669 (N.D. Ill. May 16, 2013) ("*Same-day* or pre-trade allocations are considered best practices because they protect against unfair allocation schemes such as cherry picking." (emphasis added)).

process,[32] but, as we explain further below, these circumstances were not a vehicle of fraud or wrongdoing. *See SEC v. Slocum, Gordon & Co.*, 334 F. Supp. 2d 144, 171 (D.R.I. 2004) (noting that late allocations do not "translate into actual wrongdoing" and rejecting cherry-picking allegations where the pattern of first-day returns was explained by different strategies).

## V. First-Day Unrealized Returns Are Not Relevant To Portfolio Management

Mr. Leech sat on the trading floor in close proximity to Western's investment professionals, and the teams regularly discussed and coordinated trades that would be executed on a given day to address the needs of the portfolios. Mr. Leech and other investment professionals at Western managed portfolios based on common industry metrics, notably duration and convexity.[33] They did not consider first-day performance of individual trades because it was not relevant to the day-to-day management of their investment strategies. It would have been a potentially harmful distraction, and would have complicated the already challenging job of managing large fixed-income portfolios in a period of unprecedented volatility. Accordingly, first-day returns of individual trades were not computed or monitored at Western, or used in making investment or allocation decisions, and we are not aware of any Western investment professional who could credibly say otherwise.

---

[32] Western's policy was adopted many years before 2021, in the context of fixed-income markets that were largely characterized by lower intraday volatility. That changed during the Relevant Period. For example, the daily change in yield of the 10-year Treasury note during the period 2022–23 was approximately double what it had been during 2017–22.

[33] During a meeting on August 13, 2024, the Staff questioned whether Mr. Leech's trades could be used to manage duration when other traders were trading for both portfolios. This question wrongly assumes that traders working on the same portfolio are acting independently of one another. Western's teams were in close communication, and major trade decisions were rarely made without discussions with Mr. Leech or Western's Pasadena-based team, and Mr. Leech's Treasury derivatives trades were the primary vehicle used to manage duration. It was simply not the case that traders were undermining the agreed upon trading objectives strategies set for the day or counteracting Mr. Leech's trades.

Because Macro Opps was a volatile and global strategy, Mr. Leech required additional data to manage its daily risk metrics which were relatively less important for the Core Strategies. In particular, nearly every morning, he and his Macro Opps team received a hardcopy scenario analysis for the lead Macro Opps account that he managed. That analysis illustrated how the portfolio's duration would change in response to different changes in rates. Having traded fixed-income portfolios for decades before the advent of systems used by younger managers, Mr. Leech developed the ability to do what, for him, was relatively simple math in his head. Mr. Leech began his career well before the digital era and continued to use methods that he had used for decades. In fact, Western developed the capacity to calculate intraday duration and convexity only in 2019. The suggestion that Mr. Leech was not trading based on fixed-income metrics like duration and convexity is not correct.

## ARGUMENT

The Commission's enforcement actions alleging trade misallocations have been characterized by most, if not all, of the following facts: (1) similar or identical funds (2) that engaged in straight-forward trading of equities or similar instruments (3) that resulted in realized gains (4) being allocated to a "favored" account that was controlled by the defendant who derived a direct and obvious financial benefit. These characteristics are critical because they enable an after-the-fact observer to differentiate between (i) allocations based on legitimate, often highly complicated trading strategies that, in hindsight, resulted in asymmetrical patterns of first-day results and (ii) unjustifiable allocations attributable to fraudulent conduct that violated the federal securities laws.

Underlying all trade misallocation cases is the premise that the "favored" and "dis-favored" portfolios are identical or so similar that they *should* share equally or almost equally in

first-day returns.  That premise does not apply to this case.  The evidence clearly and irrefutably demonstrates that Core and Core Plus were fundamentally different from Macro Opps and ███████ Core Plus, and that Mr. Leech necessarily placed and allocated different trades to manage the portfolios in extraordinarily volatile markets.  Given this lack of similarity, and the lack of any plausible reason for Mr. Leech to have fraudulently favored either Macro Opps or ███████ Core Plus over Core and Core Plus, Mr. Leech did not violate the securities laws, and the Commission should not bring an action.

## I.      Legal Standard

The statutory and regulatory provisions cited by the Staff make it unlawful to employ any device, scheme, or artifice to defraud, or to engage in any act, transaction, practice, or course of business which operates or would operate as a fraud or deceit.

Courts have described cherry-picking as

> a practice by which an investment adviser purchases a security, waits to evaluate its performance, and then allocates it to himself or his firm rather than clients if it "pops," or goes up quickly within a short period of time.  To explain this another way, an investment adviser engaging in cherry picking buys securities in blocks without determining an intended recipient.  Then, [before allocating the trade], he watches the security's performance.  If the value increases significantly, he allocates the security to the firm, thus picking the "cherry" for himself.  However, if the value decreases prior to settlement, or if it stays the same, the investment adviser allocates the security to his clients, thus leaving them the "pit."

*Slocum,* 334 F. Supp. 2d at 161–62.  A cherry-picking scheme requires "specific preparation and the deliberate allocation of a disproportionate number of profitable trades."  *SEC v. World Tree Fin. LLC,* 43 F.4th 448, 463 (5th Cir. 2022) (quoting *SEC v. RRBB Asset Mgmt., LLC*, No. CV2012523KMESK, 2021 WL 3047081, at *3 (D.N.J. July 20, 2021)); *see also RRBB Asset Mgmt., LLC*, 2021 WL 3047081, at *3 ("[c]herry-picking by its nature involves knowing conduct").

To prove that Mr. Leech engaged in an unlawful cherry-picking scheme, the SEC must demonstrate, among other things, that he acted with scienter. *See World Tree Fin. LLC,* 43 F.4th at 464; *Slocum*, 334 F. Supp. 2d at 170. Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Slocum*, 334 F. Supp. 2d at 170 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)).[34]

While scienter can be established with a showing of recklessness, both the Second and Ninth Circuits require "deliberate" or "conscious recklessness," which involves "'a subjective inquiry' turning on 'the defendant's actual state of mind.'" *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1093 (9th Cir. 2010); *Gomez v. Credit Suisse AG*, No. 23-862-CV, 2024 WL 506240, at \*1 (2d Cir. Feb. 9, 2024) ("[T]o adequately plead conscious misbehavior or recklessness, a plaintiff must allege '*conscious* recklessness—*i.e.*, a state of mind *approximating actual intent*, and *not merely a heightened form of negligence.*'" (quoting *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009))); *Slocum,* 334 F. Supp. 2d at 170 ("In this context, however, 'recklessness' must be more than a greater degree of ordinary negligence; it must be extreme, rising to 'a lesser form of intent.'" (quoting *Greebel v. FTP Software, Inc.,* 194 F.3d 185, 198–99 (1st Cir. 1999))).

---

[34] To establish scienter, the Commission may "either (1) identify circumstances indicating conscious or reckless behavior by defendants or (2) allege facts showing both a motive and a clear opportunity for committing the fraud." *RRBB Asset Mgmt., LLC*, 2021 WL 3047081, at \*2; *see also SEC v. Sason,* 433 F. Supp. 3d 496, 509 (S.D.N.Y. 2020) ("The SEC may establish scienter either by alleging 'that defendants had both motive and opportunity to commit fraud' or 'strong circumstantial evidence of conscious misbehavior or recklessness.'") (quoting *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000))); *but see In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1174 (C.D. Cal. 2007) ("In order to show a strong inference of deliberate recklessness, plaintiffs must state facts that come closer to demonstrating intent, as opposed to mere motive and opportunity." (quoting *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999), *as amended* (Aug. 4, 1999))). In circumstances where motive is not established, courts have required "'the strength of the circumstantial allegations [to] be correspondingly greater' to support a finding of scienter." *See Sason*, 433 F. Supp. 3d at 509 (quoting *ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198–99 (2d Cir. 2009)).

Although liability under certain of the anti-fraud provisions referenced by the Staff can be based on negligence, "cherry-picking cannot be the result of mere negligence or ordinary recklessness; rather, it necessarily involves knowing and intentional conduct." *SEC v. World Tree Fin. LLC*, Civ. No. 18-1229, 2021 U.S. Dist. LEXIS 22740, at *21 (W.D. La. Jan. 15, 2021), *aff'd*, 43 F.4th 448 (5th Cir. 2022)); *see also World Tree Fin. LLC,* 43 F.4th at 463; *RRBB Asset Mgmt., LLC*, 2021 WL 3047081, at *3; *In re James C. Dawson*, Release No. 3057, 2010 WL 2886183, at *5 (SEC July 23, 2010). Thus, unlawful cherry-picking requires "deliberate" misallocation of trades. *World Tree Fin. LLC*, 43 F.4th at 463.

## II.  Discussion

This case does not have any of the factors necessary for a sound cherry-picking case. As explained below, the portfolios at issue in this case pursued different strategies, and trades generally could not be allocated interchangeably between them. Mr. Leech did not consider first-day unrealized performance in his trading and allocation decisions. We are not aware of documentary evidence that shows that he did that, and we are doubtful that members of the teams who worked with Mr. Leech could or would testify that he actually allocated trades based on first-day unrealized performance. In our understanding, the investment team members who have expertise in trading Treasury futures and options, and who understood the strategic needs of the different products, would concur.

### A.  The Trades At Issue Were Not Equally Suitable For The Core Strategies And Macro Opps

To bring a cherry-picking action, the Commission must be able to prove that the allegedly fraudulent trades were equally appropriate for a "favored" or "disfavored" account. That is not true here.

*First*, while cherry-picking presupposes that the accounts at issue pursued identical (or virtually identical) trading strategies, the different investment strategies at issue here were specifically designed to pursue disparate strategies which called for different Treasury derivative trades based on distinct daily duration and convexity characteristics, among other factors. *Second*, an analysis performed by experts at National Economic Research Associates ("NERA") demonstrates that Mr. Leech's trades for the Core Strategies and Macro Opps were not interchangeable: allocating the trades Mr. Leech did for Core Plus to Macro Opps would have caused Macro Opps to be essentially always out of compliance with its duration limits. *Third*, a separate regression analysis performed by NERA demonstrates that during the Relevant Period, trades executed in Macro Opps to manage its specific duration and convexity characteristics would be expected to generate substantial first-day gains, which confirms that trades in the two strategies are not interchangeable. *Fourth*, the type of statistical analysis that the Commission typically employs in cherry-picking has no application here because there is no baseline to establish what the correct allocations should have been to two disparate strategies, which would lead to an unacceptably high number of false positives.

### 1. Interchangeable Trades Is a Prerequisite to a Cherry-Picking Scheme

Essential to a cherry-picking case is proof that the defendant used hindsight to allocate trades he or she knew were profitable to "favored" accounts and unprofitable trades to "disfavored" accounts. This ability to allocate trades based on hindsight presupposes interchangeability, or fungibility, of trades: that the trades belong equally in one portfolio or the other.

In *Slocum*, the Commission's cherry-picking allegation relied heavily on a statistical comparison of the performance of stocks purchased for the firm's trading account with stocks

purchased for clients. 334 F. Supp. 2d at 172–73 (analysis concluded that firm realized a profit on securities in its firm account, within three days of initiating trade, 98% of the time, and client trades decreased in value as of close of trading two days after the trade date 49% of the time). The Commission argued that the success rate of trades allocated to the firm's account was impossible to achieve under normal market conditions and must have been the product of fraud. *Id.* at 173. In response, the defendants argued that the allocations were justified by the different investment strategies for the respective accounts. *Id.* at 151–52.

After a bench trial, the district court rejected the SEC's claim because it failed to take the different strategies into consideration and concluded that the statistical pattern demonstrated the different trading strategies in operation. *Id.* at 173. The court was most persuaded by the defendants' ability to explain specific trades in accordance with their stated strategies. *Id.* at 172; *see also SEC v. Kellen*, No. CV 20-3861-RSWL-AGR, 2021 WL 4907238, at *6 (C.D. Cal. Sept. 14, 2021) (denying SEC's motion for summary judgment on its cherry-picking claims, in part because defendant advanced sufficient evidence that the "pervasive asymmetry in first day profits" between his accounts and his clients' accounts "may well be justified by legitimate trading strategies").

In cases in which the Commission prevails, it is able to refute the defendant's claim that the strategies in question were different. For example, in *World Tree Financial*, the Fifth Circuit affirmed a verdict in favor of the Commission stressing that one defendant's "explanations for the allocation patterns" were "implausible or largely beside the point," such that the district court "did not believe him when he claimed that he did not engage in cherry-picking." 43 F.4th at 463. In rejecting the defendants' comparison of their trading to the different strategies in *Slocum*, the Fifth Circuit observed that the *Slocum* court "*credited* the defendants' testimony that trades

represented legitimate client strategies" and credited the testimony of a nonparty employee who processed paperwork on all trades and would have known if cherry picking occurred. *Id.* at 463 n.10 (citing *Slocum*, 344 F.Supp.2d at 172–73, 175–76) (emphasis in original). In contrast, the court noted that the trial court in *World Tree Financial* expressly found the defendant "*not credible and his allocation explanations 'implausible.'*" *Id.*

Similarly, when the SEC has succeeded (at least at avoiding dismissal at the pleading stage), the asserted differences between the strategies were after-the-fact, contrived assertions that the "disfavored" accounts were long-term investors while the "favored" accounts were investing to generate short-term profits. Even in those cases, however, courts have uniformly acknowledged that non-interchangeability is an essential element of a cherry-picking claim.[35]

Here, the differences between disparate strategies pursued by the Core Strategies and Macro Opps are objective, substantial and well-documented in prospectuses and client communications; they do not depend on a post hoc rationalizations formulated in response to an enforcement action.[36] Both the Core Strategies and Macro Opps were marketed as long-term investment vehicles, but they sought to generate gains through different means: Core and Core Plus by investing largely in U.S. fixed income instruments and seeking to beat an index through "bottom-up" value investing, and Macro Opps by investing in both U.S. and international securities and seeking to generate profits by identifying global macroeconomic trends. Both the

---

[35] *See, e.g.*, *SEC v. Strong Investment Mgmt.*, No. 8:18-cv-00293-JLS-DFM, 2018 WL 8731559, at *6 (C.D. Cal. Aug. 9, 2018); *SEC v. Paris*, No. 21-CV-3450, 2022 WL 3026913, at *8 (N.D. Ill. Aug. 1, 2022) (though firm's Forms ADV described six possible trading strategies a trader may use, the language did not "commit to any one trading strategy"); *RRBB Asset Mgmt.*, 2021 WL 3047081, at *3.

[36] In the case of two portfolios with divergent assets and risks, as we have here, the manager's trading of Treasury derivatives at different times and in different directions (short or long) for each portfolio is not a sign of misallocation but, rather, is consistent with appropriate management of two different portfolios. This conclusion is confirmed by the analysis in Appendix B, which explains and illustrates how the same Treasury derivatives would be traded very differently for different strategies, and would result in different returns, without any reason to think that misallocation had occurred.

Core Strategies and Macro Opps managed their duration within very different and specified windows, and Macro Opps' investors were aware that the strategy was exposed to high levels of volatility as a result of its negatively convex portfolio.

During the Relevant Period, Mr. Leech and Western believed that inflation in the United States was transitory and that interest rates would soon decline.[37] As a result, Mr. Leech typically sought to keep both the Core Strategies and Macro Opps at the long end of their respective duration limits. To implement this investment thesis in the context of the prevailing volatile market conditions, Mr. Leech frequently either (i) *had* to execute certain trades to bring one of the portfolios within its guidelines, or (ii) executed a trade that was plainly more appropriate for one strategy than the other.

For example, because of Macro Opps' negative convexity and consistent with its mandate, Mr. Leech frequently "chased the market" (*i.e.*, bought in response to a rising market or sold in response a declining market) to manage duration.[38] Because Macro Opps' negative convexity caused its duration to fall at an accelerated rate during market rallies, it was necessary to add duration to maintain the portfolio's duration exposure. Likewise, because Macro Opps' negative convexity caused its duration to increase at an accelerated rate during market declines, it was necessary to reduce duration to maintain the portfolio's duration exposure. These trades would have been inappropriate for the Core Strategies, which typically had far less negative convexity and therefore—in most instances—did not need to take such drastic steps to manage

---

[37] *See, e.g.*, Ken Leech, *Market Commentary* (Aug. 27, 2021), https://www.westernasset.com/us/en/research/whitepapers/market-commentary-2021-08.cfm (predicting that pre-pandemic inflation landscape would soon return and that interest rates would not rise precipitously); Ken Leech, *Market Commentary* (May 31, 2022), https://www.franklintempleton.com/articles/western-asset/market-commentary-0522 (same).

[38] During the Relevant Period, Macro Opps exceeded its permissible duration limits on 12 occasions. On each occasion, Mr. Leech and his team acted promptly to cure the exceedances, executing trades to remedy 11 of the 12 duration exceedances the following day. On eight of these 11 days, Mr. Leech's trades that reduced duration in Macro Opps resulted in first-day gains.

duration. And because the Core Strategies typically lacked negative convexity, Mr. Leech had room to add undervalued securities that would have been inappropriate for Macro Opps.[39] Trades related to different duration characteristics in the two strategies would have affected first-day mark-to-market returns.

There are other examples of types of trades that were appropriate for either the Core Strategies or Macro Opps in light of each portfolio's unique asset compositions. During the Relevant Period, Macro Opps had large positions in Japanese Yen, which were highly correlated with U.S. Treasuries. Accordingly, especially when adding or reducing the portfolio's exposure to Japanese instruments, it was necessary to adjust Macro Opps' exposure to Treasury instruments to retain a desired level of exposure to U.S. interest rates. Similarly, the Core Strategies were relatively overweight in "spread" products, which unlike Treasuries have a risk of default in a recession that, as noted above, is otherwise not reflected in a portfolio's overall duration. As a result, in response to concerns about a possible economic downturn, it would be appropriate to add duration via Treasury derivatives in the Core Strategies (and particularly in shorter tenors that tend to outperform longer tenors during such market downturns).

2. **Allocating Core Plus's Trades To Macro Opps Would Have Rendered Macro Opps Unmanageable**

To demonstrate the fallacy of the Staff's apparent presumption that Mr. Leech's trades were interchangeable, NERA analyzed what would have happened to the duration of the Macro Opps portfolio if either all of Mr. Leech's trades or only the trades with the highest P&L for the day (+/-$50,000, $100,000 or $200,000) (a) had been allocated 50/50 between Core Plus and

---

[39] For example, Mr. Leech sought to keep the Core Strategies close to their duration limits, and he frequently added duration to the Core Strategies accounts. However, because of Macro Opps' high negative convexity, Mr. Leech had to be more cautious in adding duration to Macro Opps accounts since an adverse market move could result in those accounts breaching their duration limits.

Macro Opps, (b) had been allocated proportionally across Core Plus and Macro Opps accounts based on their respective AUM, or (c) had their allocations switched between the two accounts.[40] Regardless of the particular methodology employed, NERA's analysis demonstrates that changing the allocations would have resulted in Macro Opps breaching its duration limit between 500 and 600 of the 712 trading days during the Relevant Period.

Moreover, even assuming that the duration was reset after a breach, Macro Opps, on average, would have exceeded its duration limit every two weeks (when switching the allocations) or four weeks (when allocating all trades 50/50). In any of these scenarios, breaching duration limits this frequently would have rendered Macro Opps out of compliance, or on the verge of a compliance breach, on an almost daily basis and thus unmanageable.

In other words, the trades Mr. Leech allocated were not interchangeable and his trades aligned with the different strategies and the needs of the respective accounts.[41]

3. **A Regression Analysis Conducted by NERA Demonstrates That Mr. Leech's Management Of Duration In Macro Opps Would Be Expected To Produce Net Mark-To-Market First-Day Unrealized Gains**

Another analysis performed by NERA looks at the relationship between (i) trades designed to manage changes in duration and (ii) first-day unrealized returns observed in Macro Opps. NERA performed a regression analysis that modeled how much trading Mr. Leech did to manage Macro Opps' duration in response to overnight changes in yields (*i.e.*, trades that

---

[40] This analysis uses accounts 984 and 3313 as proxies for Core Plus and Macro Opps, respectively.

[41] Nothing about the 50/50 allocation Mr. Leech frequently used to direct the back office to allocate trades between the Core Strategies and Macro Opps suggests that the trades were in fact interchangeable. Occasionally, when he placed trades but was truly unavailable due to travel or meetings that could not be interrupted, that instruction was given, but that was rare and at most had only a de minimis effect on Mr. Leech's allocations. On only 2 percent of days in 2021 to 2023 were more than 90 percent of trades allocated 50/50; on only 7 percent of days in that period were more than 75 percent of the trades allocated 50/50. The data make clear that Mr. Leech regularly allocated trades to Macro Opps only, the Core Strategies only, and on a 50/50 basis, and an infrequently applied "standing" 50/50 allocation does nothing to demonstrate that trades were, in fact, interchangeable.

reduced duration in response to an overnight increase in rates or increased duration in response to an overnight decline in rates). The model only used information available as of 5:20 a.m. (PT) on a given day to predict the amount of trading Mr. Leech would do in Macro Opps that day. NERA's analysis focuses this change in duration—a key factor in managing a fixed-income portfolio recognized by others on the Macro Opps team and experts in fixed income investing. NERA's work demonstrates that, during the Relevant Period, trades appropriate for Macro Opps would be expected to generate substantial positive first-day returns in Macro Opps that would not go to the Core Strategies.

Because managing duration was only one factor in Mr. Leech's trading, NERA's analysis does not attempt to account for all of Mr. Leech's trades for Macro Opps. For example, the analysis does not account for (i) trades needed to avoid or correct exceedance of duration limits; (ii) trades that took a directional view on future rate moves (which Mr. Leech was able to enter in Macro Opps but had a more limited ability to enter in the Core Strategies); and (iii) management of risks done through trades placed after the close of the prior day and before the morning open. This is a partial list and modeling all of the trades done by Mr. Leech is challenging since they often turn on Mr. Leech's judgment based on over 40 years managing fixed income portfolios. But we are confident that the Staff has heard (or will hear) from others on the Macro Opps team that many considerations went into Mr. Leech's trading.

In short, this analysis shows that by looking at only one type of trade that Mr. Leech did, the first-day unrealized returns in Macro Opps would logically be different from those in the Core Strategies, and thus that trades are not interchangeable between the Core Strategies and Macro Opps. This analysis should give the Staff pause before proceeding based on assumptions that would treat trades, and first-day gains and losses, as interchangeable between the strategies.

26

### 4. A Statistical Analysis That Fails To Account For Material Differences Between The Core Strategies And Macro Opps Cannot Serve As A Predicate For An Enforcement Action

Based on discussions with the Staff, we understand the proposed action relies heavily on statistical disparity in first-day, unrealized, mark-to-market returns between the Core Strategies and Macro Opps during the Relevant Period. But, as discussed above, a viable cherry-picking case presupposes that the two strategies at issue are identical or so similar that the trades in question could have been allocated interchangeably between them. Not only is interchangeability the *sine qua non* of a cherry-picking case, it is also the basic assumption upon which the statistical analysis in virtually every cherry-picking case is based.

In other cases, the Commission has relied on a statistical analysis to show that the differential in first-day gains is so unlikely to have been the result of random chance that it must have been the result of fraud. *See, e.g., World Tree Fin.*, 43 F.4th at 462. However, "a statistical analysis is only as reliable as the assumptions beneath it," *id.*, and in determining whether a model is reliable and should be admitted, a court will consider the model's known or potential rate of error. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 594 (1993). Establishing the model's known error rate requires demonstrating the extent to which the data upon which the model is based includes "false positives." *United States v. Chavez*, No. 15-CR-00285-LHK-1, 2021 WL 5882466, at *3 (N.D. Cal. Dec. 13, 2021) ("the focal point of the inquiry should be on the rate of false positives"); *see also United States v. Finnerty*, 474 F. Supp. 2d 530, 546 (S.D.N.Y. 2007) (government's repeated reference to 26,300 trades it characterized as fraudulent was severely prejudicial because the number was "clearly and significantly overstated" and included trades that could not be attributed to the defendant and other "exceptions" that did not qualify as fraudulent, *i.e.*, false positives), *aff'd*, 533 F.3d 143 (2d Cir. 2008).

Because the trades in Treasury derivatives allocated to the Core Strategies and Macro Opps during the Relevant Period were not interchangeable, *see supra* at Argument II(A)(1)-(3), there is no basis to believe the different strategies should have had similar, let alone identical, first-day return profiles. As noted above, *see supra* Background I(B) and footnote 18, the Core Strategies and Macro Opps historically and consistently generated materially different annual returns for investors, and their first-day returns could not be expected to move in lock-step. Unless the Staff can quantify the appropriate baseline differential for expected returns, any analysis that treats all trades as having been misallocated is fatally flawed. The absence of an evaluation of what differential between the Core Strategies and Macro Opps would have been appropriate in the context of the extreme market volatility during the Relevant Period is especially problematic given the Staff's failure to identify specific trades that were misallocated.[42]

Here, at least two types of "false positives" undermine the reliability of any model the Staff relies upon. *First*, as discussed above, *supra* Argument II(A)(1)-(3), trades were executed and allocated consistent with the needs of the different strategies at the time of execution. To the extent such trades with first-day unrealized gains were allocated to Macro Opps, or trades with first-day unrealized losses were allocated to the Core Strategies, inclusion in a model that assumes all trades were misallocated is inappropriate.

---

[42] Even in cases where the Commission is able to present a valid statistical model supporting a cherry-picking allegation, it still identifies specific instances of misallocated trades. *See, e.g.*, *Paris*, 2022 WL 3026913, at *3 (discussing the SEC's "example" of "classic cherry-picking": defendant purchased specific shares during a four-day period and allocated profitable day trades to himself on the first and third days and an unprofitable trade to a client on the second day); *Slocum*, 334 F.Supp.2d at 163 (former firm employee identified two specific sets of trades that purportedly entailed cherry picking). Indeed, courts have required the Commission to provide specific examples to demonstrate that cherry-picking occurred. *See Slocum,* 334 F. Supp. 2d at 171. Notably, in *Slocum*, the defendants were able to rebut the Commission's allegations regarding specific trades. *See id.* at 172.

*Second*, the cherry-picking scheme alleged here includes thousands of trades that were executed as hedges against one another and were allocated the same portfolio consistent with Mr. Leech's intention at the time he placed his order.[43] Necessarily, one "leg" of the hedged trade posted a first-day unrealized gain while the other "leg" posted a first-day loss. It is inconceivable that these trades were allocated based on first-day performance, and they too would have to be excluded from any statistical analysis.

### B. Mr. Leech Did Not Have a Plausible Reason To Favor Macro Opps Or ▇▇ Over Core And Core Plus

To establish scienter in the absence of deceptive or reckless conduct, the Commission must demonstrate that the defendant had motive and a clear opportunity to commit fraud. *See RRBB Asset Mgmt.*, 2021 WL 3047081, at *2.[44] Here, the SEC cannot prove Mr. Leech acted with scienter without establishing that he had both the motive and opportunity to misallocate trades.

In every cherry-picking case that we have identified, the defendants' motive to misallocate trades is established through evidence that they held a substantial interest in the "favored" accounts, either directly or through their families or firms. No such facts are present here. Not only did Mr. Leech not have a financial motive to misallocate trades, but any theory that he was motivated to favor Macro Opps over the Core Strategies ignores the reality that the latter were more far important to Western's success (and Mr. Leech's reputation) than the former. It is inconceivable that Mr. Leech would have deliberately harmed Western's flagship funds to

---

[43] Mr. Leech frequently executed trades in connection with one another including yield curve trades, futures vs options (including, for example, covered calls), and option straddles and strangles.

[44] While the SEC may also establish scienter by "identify[ing] circumstances indicating conscious or reckless behavior by defendants," *RRBB Asset Mgmt.*, 2021 WL 3047081, at *2, *see supra* footnote 34, for the reasons explained in this submission, the SEC cannot do so here.

benefit a relatively small, niche product. Such a claim would turn a usual Commission argument on its head: in many instances, the Commission brings actions where misconduct has occurred in order to *boost* performance in its flagship fund.[45]

### 1. The Core Strategies Were Far More Important to Mr. Leech and Western, and Mr. Leech Had No Professional Motivation to Favor Macro Opps

Core and Core Plus were Western's "flagship" strategies: they boasted the largest assets under management, were most readily associated with Western and Mr. Leech in the press,[46] and were most often used by analysts to compare its performance to other asset managers.[47] For decades, Core and Core Plus have been the backbone of Western's and Mr. Leech's success, and have served as the gateway for attracting clients to other fixed income strategies offered by the firm. In contrast, Macro Opps was a niche product launched after the global financial crisis to provide an additional investment vehicle for investors with greater risk tolerance in an increasingly differentiated market.

Significantly, every one of Western's major competitors (*e.g.*, PIMCO, Blackrock, and Vanguard) offers investors a bond fund that is measured against the same benchmark as the Core Strategies, thereby providing easy apples-to-apples comparisons for potential investors. Even minor deviations (up or down) are highly consequential for both attracting and retaining clients.

---

[45] *See, e.g.*, Press Release, *SEC Settles Fraud Charges with IIG Executive Director*, SEC (July 22, 2010), https://www.sec.gov/enforcement-litigation/administrative-proceedings/33-10806-s; Press Release, *SEC Charges Platinum Funds and Founder with Defrauding Investors*, SEC (Dec. 20, 2016), https://www.sec.gov/enforcement-litigation/litigation-releases/lr-23704; Sarah N. Lynch and Trevor Hunnicutt, *Pimco to Pay $20 Million Over Misleading Investors About ETF Performance*, Reuters (Dec. 1, 2016), https://www.reuters.com/article/business/pimco-to-pay-20-million-over-misleading-investors-about-etf-performance-idUSKBN13Q5WY/.

[46] For example, a financial news database (Factavia) search reveals that between January 2019 and January 2024, there were over 15 times more references to the Core Strategies than to Macro Opps (out of 187 articles, 177 discussed Core and 10 discussed Macro Opps).

[47] *See Western Asset Core Portfolios*, Franklin Templeton, https://www.franklintempleton.com/investments/-options/separately-managed-accounts/products/COLMCORE/NA/western-asset-core-portfolios (last visited Aug. 28, 2024).

Macro Opps, on the other hand, was unconstrained with no established benchmark against which to measure its success.

Given their relative sizes, the Core Strategies generated substantially more revenue for Western than Macro Opps. Both Macro Opps and the Core Strategies suffered declines in AUM in 2022 and 2023 as a result of both negative investment performance and redemptions, but redemptions from the Core Strategies had a far greater impact on Western's bottom-line. Mr. Leech's compensation was based on the success of the firm overall, with his discretionary bonus being predicated on the profitability of the entire firm; to the extent Mr. Leech was motivated by financial gain, it only would have led him to favor the Core Strategies over Macro Opps.

During Mr. Leech's testimony, the Staff referred to Macro Opps as "sort of [Mr. Leech's] baby,"[48] implying that he had some special interest in its success. Nothing could be further from the truth. Mr. Leech's extraordinary reputation in the fixed-income business was built on the Core Strategies' performance. As noted above, he was named manager of the year for his and his team's performance in Core and Core Plus in 2004 and 2014, he received numerous awards for his management of Core and Core Plus, and press coverage tied him to the performance of Core and Core Plus. In contrast, the press did not link him with Macro Opps when it performed poorly during the Relevant Period.

Other evidence further refutes the notion that Mr. Leech had a special affinity for Macro Opps. For instance, between 2021 and 2023, Mr. Leech actively recruited a candidate that Western perceived as uniquely well positioned to take over as Macro Opps' lead portfolio manager.[49] He was ready to relinquish responsibility for Macro Opps in order to devote more

---

[48] Testimony of S. Kenneth Leech II at 39:21, *In the Matter of Certain Western Asset Management Company Asset Investment Allocations*, LA-05450 (Mar. 6, 2024).

[49] *See, e.g.*, WAMCO_SEC_0001942 (Leech email to Sanchez-Balcazar dated Mar. 31, 2023).

time to the Core Strategies and other responsibilities at the firm. Additionally, on April 14, 2022, after Russia's invasion of Ukraine caused an historically unprecedented decline in the value of Russia's sovereign debt, Mr. Leech suggested that Western close Macro Opps.[50]

In sum, Mr. Leech had no conceivable reputational or other reason to harm Core and Core Plus in order to favor Macro Opps, and we see no facts or logic to support any such motivation.

### 2. Neither Mr. Leech's Deferred Compensation Investments Nor His Compensation Provide A Motive For Him To Favor Any Account

While at Western, Mr. Leech accumulated substantial personal wealth. He could have made substantial investments in the Core Strategies and/or Macro Opps in his personal accounts but chose not to do so. During the Relevant Period, Mr. Leech's only investments in these funds were made through his deferred compensation accounts.

At Western, executives receive 20% of their annual bonuses in the form of deferred compensation, which vest over a four-year period. Western strongly encourages portfolio managers to invest their deferred compensation accounts in the funds they manage because clients want to know that portfolio managers have "skin in the game." Over the years, Mr. Leech made substantial investments in several Western funds through his deferred compensation accounts, and the allocation of those accounts during the Relevant Period belies any claim that he sought to favor Macro Opps for personal financial gain.[51]

---

[50] WAMCO_SEC_0111863 (Leech email to Hirschmann dated Apr. 14, 2022).

[51] On average, between January 2021 and November 2023, Mr. Leech held approximately $39.5 million in his deferred compensation accounts, and he regularly moved his investments between funds based on his view of the market. At the end of August 2022, Mr. Leech reduced his Macro Opps holdings (from $15.5 million to $11.9 million) and increased his investment in the Core Strategies (from $14.4 million to $19.4 million). In September 2022, he further reduced his Macro Opps holdings (from $11.3 million to $136,000) and again increased his investments in the Core Strategies (from $18.37 million to $18.40 million). This shift in his deferred compensation account investments undermines any suggestion that Mr. Leech was intentionally favoring Macro Opps over the

### 3. The Evidence Does Not Support The Notion That Mr. Leech Allocated First-Day Unrealized Gains To Macro Opps To Make Up For Poor Performance

While the Staff posits that Mr. Leech misallocated trades over a 34-month period, it has no coherent theory for when or why he started to put his thumb on the scales to favor that fund over the Core Strategies. To the extent the Staff theorizes that Mr. Leech improperly allocated trades with first-day gains to Macro Opps to reduce or offset poor performance in Macro Opps, NERA has analyzed whether a correlation could be found between days or months when the Macro Opps' NAV declined and days or months when trades with first-day unrealized gains were allocated to that fund. NERA found no such correlation. The absence of a correlation is true regardless of whether we look at the same day or month as the allocations in question or the day or month before the allocations in question. In other words, the data does not support the notion that Mr. Leech was motivated to misallocate trades to Macro Opps to offset losses in that strategy.

NERA also determined that over the 712 trading days in the Relevant Period, there were only three days (less than 0.5%) when the allocation of trades with first-day unrealized gains resulted in Macro Opps' NAV increasing when it otherwise would have declined. This too demonstrates that allocations were not made to enhance short-term superficial results.

---

Core Strategies for personal financial gain. Indeed, including those adjustments, Mr. Leech's deferred compensation accounts lost approximately $2.86 million between September 27, 2022 and February 28, 2023, as opposed to the approximately $2.41 million they would have lost if he had not made those adjustments. In other words, his investments lost an additional $450,000 by virtue of his moving money from Macro Opps to the Core Strategies. At the end of February 2023, Mr. Leech reduced his investments in the Core Strategies (from $18.7 million to $5.5 million) and other funds and redeployed $18.3 million to Macro Opps and $11.8 million to Western's Long Duration fund, which he also managed. At the end of July 2023, Mr. Leech further reduced his investments in the Core Strategies (from $3.9 million to $145,000), effectively maintained his investments in Macro Opps, and added an additional $4.7 million in value to the Long Duration fund. Through late September 2023, these changes in allocation had virtually no impact on the performance of the accounts in comparison to Mr. Leech's pre-March 2023 investments.

We can find no pattern of returns that would even begin to explain when or why Mr. Leech would start to put his thumb on the scale of his allocations.  Looking at the public funds, Macro Opps had positive returns from January 1, 2020 through October 31, 2021, which means that during this period Mr. Leech would have had no incentive to shift returns from the Core Strategies (which was measured against a benchmark) to Macro Opps (which was not).  Starting in November 2021 and through the end of 2022, Macro Opps' performance suffered as the market entered a historic decline.

In 2022 Macro Opps was down approximately 21% on the year.  Some clients pulled out of the strategy.  Others who could accept that level of risk stayed in the strategy.  New clients were not coming into the fund or separately managed accounts.  The modest incremental performance in Macro Opps resulting from the allegedly misallocated trades was plainly not going to change any of those dynamics.  In contrast, investors in the Core Strategies could evaluate the losses suffered by Core and Core Plus against the benchmark.  The notion that Mr. Leech would expose the Core Strategies to even marginal incremental losses to make Macro Opps' performance look "slightly less bad" similarly makes no sense.

And finally, in 2023, Core and Maco Opps both had positive returns, with the more volatile Macro Opps fund recouping more of its 2022 losses than the Core Strategies.  Again, given the highly competitive market for core bond strategies, it defies logic that Mr. Leech would have forfeited the opportunity to have the Core Strategies excel against their competitors by shifting gains to Macro Opps.  These are powerful facts.  While the Staff may see an anomalous pattern and seek to identify a motive to support its negative inference with hindsight, in real time, Mr. Leech had no reason to misallocate trades to benefit Macro Opps.

### 4. Mr. Leech Did Not Set Out To Realize First-Day Gains

With rare exceptions, defendants in cherry-picking cases brought by the Commission close out winning trades to realize the first-day gains, often even before they have allocated the initial trade. Accordingly, the act of realizing gains provides strong evidence of scienter.[52]

Here, in contrast, Mr. Leech did not execute trades to realize the first-day, mark-to-market gains at the heart of the Staff's allegations. To the contrary, on average, Mr. Leech held positions for a minimum of 26.6 days in Core Plus and 25.7 days in Macro Opps.[53] This holding period undermines the Staff's suggestion that Mr. Leech was engaged in cherry-picking for two reasons.

*First*, holding a position for an extended period creates a substantial risk that the first-day unrealized gains will dissipate and never be realized. The notion that someone would misallocate a trade that was profitable on a first-day basis and, rather than realizing that gain, would continue to hold the position over a minimum of several weeks, thereby risking a close to twentyfold increase or decline in the position makes no sense.[54] If Mr. Leech had been driven to allocate based on first-day gains, he surely would have sought to preserve those gains by realizing them before they dissipated or turned to losses. Not even the Staff, however, has

---

[52] *See* Gov't Sentencing Mem. at 5 n.3, *United States v. Kambolin*, 1:23-cr-20372-PCH (S.D. Fl. Jan. 1, 2024), ECF No. 36 (emphasizing that culpable conduct included *only* the trades in which the defendant realized gains as distinguished from the trades that remained open at the end of the day).

[53] This analysis uses account 984 as a proxy for Core Plus and account 3313 as a proxy for Macro Opps and relies on reasonable assumptions based on standard accounting methodology. In many instances, the actual holding period were considerably longer as it was common for positions to be extended. This analysis did not take into account trades that were done in connection with each other; if it did so, the holding periods would be much longer.

[54] The daily average first-day return of trades allocated to Macro Opps during the Relevant Period was approximately $205,000. This means that, over the average holding period of 25.7 days about 67 percent of the time the ultimate return would be in the range of a gain of $4,354,000 and a loss of $3,945,000, and about 33 percent of the time, the ultimate return would be a gain of more than $4,354,000 or a loss of more than $3,945,000.

suggested that Mr. Leech engaged in or even had interest in any such efforts to preserve the gains he purportedly sought to capture.

*Second*, holding a position allocated to take advantage of first-day unrealized gains as opposed to a portfolio's needs would create additional hurdles to the already complicated process of managing the portfolios in the unprecedented market volatility. Both of these risks were greatly exacerbated by the unprecedented market volatility in the Relevant Period. The fact that Mr. Leech held positions for weeks if not longer is totally inconsistent with the notion that he was trying to secure unrealized first-day gains dishonestly for Macro Opps; and it strongly supports our position that trades were allocated correctly based on portfolio needs.

In sum, on the Staff's theory, Mr. Leech risked the reputation he had built over his 40-year career by allocating trades based on first-day unrealized gains, only to leave the misallocated positions in place, thereby exposing the portfolios to additional risks, while potentially seeing the allegedly misallocated first-day gains dissipate or disappear altogether. This theory makes no sense.

   **C. Unlike Cherry-Picking Cases, The Core Strategies And Macro Opps Involved Complex Trading Of Derivative Products To Manage Portfolios With Specific Risk Metrics**

Other cherry-picking cases brought by the Commission involve the straightforward trading of individual equities, rather than complex portfolio management. Unlike an investment professional trading individual securities who is positioned to take advantage of short-term movements in the market, Mr. Leech managed multi-billion-dollar portfolios of fixed income instruments through complex trading strategies. *See supra* at Background III. Not only did Mr. Leech not engage in the type of day trading entailed in virtually all the Commission's cherry-picking cases, but the notion that he allocated positions based on unrealized, first-day gains

makes no sense. Rather, on any given day, the Core Strategies and Macro Opps would be affected far more by the existing positions held in the portfolios than the trades added on the day, and Mr. Leech had to make sure the positions allocated to the Core Strategies and Macro Opps were consistent with their respective strategies and risk guidelines. He would not (and did not) consider the unrealized first-day gains attributable to those positions.

**D. ▮▮▮▮ Core Plus Was A Unique Core Plus Account That Required Different Trades And Mr. Leech Had No Motive To Favor It**

The Staff's contention that Mr. Leech unfairly favored the ▮▮▮▮ Core Plus account is unfounded. During the Relevant Period, as it had for the 20 years for which ▮▮▮▮ was a Western client, the ▮▮▮▮ Core Plus account had a uniquely aggressive mandate within the Core Plus strategy. It had unique client guidelines and was designed with higher volatility bands, which meant that, on occasion, it made sense for it to do trades similar to Macro Opps and other high-volatility accounts. The difference between the returns of the ▮▮▮▮ Core Plus account and the other Core Plus accounts is explainable by the fact that certain trades were necessary to maintain the account's risk profile.

During the period at issue, Core Plus held approximately 2.5 times more investment grade and high yield corporate bond risk than ▮▮▮▮ Core Plus.[55] This differential is so substantial that it not only influenced the composition of other sectors in the account but it also influenced Mr. Leech's U.S. Treasury futures and options trading. The lower amount of corporate bond risk in the ▮▮▮▮ Core Plus account presented Mr. Leech with the flexibility to pursue a more tactical trading strategy generally and in U.S. Treasury futures and options specifically.

---

[55] In addition, about 5% of the Core Plus portfolio was composed of corporate loans, while ▮▮▮▮ Core Plus held no individual loans but did hold about 5% of their portfolio in collateralized loan obligations.

Core Plus and ▮▮▮▮ Core Plus used U.S. Treasury futures and options in the portfolios in a very different manner. For Core Plus, the U.S. Treasury futures and options contributed approximately 1.6 years to the fund's overall duration. For ▮▮▮▮ Core Plus, the U.S. Treasury futures and options only contributed about six months of duration. A larger difference though is that ▮▮▮▮ Core Plus's U.S. Treasury futures and options played a more pronounced role in the fund's key rate durations ("KRDs"), which are a measure of how much duration risk there is at specific tenors on the yield curve. For non-futures and options positions, Core Plus and ▮▮▮▮ Core Plus had roughly similar KRDs, but ▮▮▮▮ Core Plus used U.S. Treasury futures and options to have negative KRDs at the 5-year and 10-year point and then higher KRDs at the 20-year and 30-year points. This resulted in ▮▮▮▮ Core Plus having a much more pronounced yield curve position than Core Plus and this position is achieved with U.S. Treasury futures and options.

The lower amount of corporate bond risk in the ▮▮▮▮ Core Plus portfolio gave Mr. Leech more flexibility to pursue yield-curve and tactical trading through Treasury derivatives. These differences in the usage of Treasury futures and options meant that ▮▮▮▮ Core Plus had to trade them differently than Core Plus, despite superficially similar overall durations. As a result, variation in portfolio level duration in ▮▮▮▮ Core Plus (as measured by the standard deviation of duration) was about twice as high as the variation in Core Plus. These differences in the use of U.S. Treasury futures and options predate the Relevant Period and extend at least as far back as 2019.

Finally, Mr. Leech had no motive to favor ▮▮▮▮▮▮ Core Plus was approximately 107 times smaller than Western's flagship Core Plus account and Mr. Leech had no reason to favor that account over any other account. He had no financial interest in the account's

performance whatsoever, nor did he have a special relationship with the ▮▮▮▮ representatives with whom he interacted. And even during difficult periods of performance, ▮▮▮▮unlike other clients—showed no sign of leaving Western. To the contrary, an email reporting on a meeting between Mr. Leech and ▮▮▮▮ management recounted that Mr. Leech, "talked about the 3-fold themes/challenges: 1) started year with belief that the global economy would be more balanced/recovering (risk on, overweight EM); 2) underestimated elevated/persistent inflation; 3) misjudged Fed reaction function." The client's reaction was "appreciative of [Mr. Leech's] thoughts and depth of discussion as usual."[56]

Likewise, in another email following a three-month decline in February 2022, ▮▮▮▮ management "jokingly" told Western that "[y]ou guys have been on a roll since the 80s, so you deserve some challenges here and there."[57] These interactions make clear that ▮▮▮▮ was not a disgruntled client that somehow needed to be placated with unrealized gains generated through improper allocations.

### E. The Staff's Other Purported Evidence Does Not Demonstrate That Mr. Leech Acted With Scienter[58]

#### 1. Mr. Leech's Post-October 2023 Trades In Macro Opps Supports This View That His Trading Strategies in Macro Opps Were Likely To Produce First-Day Unrealized Returns

The Staff has posited that the change in the pattern of first day returns in Mr. Leech's trades after October 2023 (when Mr. Leech stopped entering trades for the Core Strategies) suggests that the first-day gains in Macro Opps prior to October 2023 were the product of

---

[56] WAMCO_SEC_0114158 (Coombes email dated Dec. 19, 2022).

[57] WAMCO_SEC_0111672 (Coombes email dated Feb. 4, 2022).

[58] Mr. Leech was asked during his testimony about an investment he made in Western's Macro Spec Fund in 2011. In counsel's understanding, this matter was thoroughly investigated, and is unrelated to this allocation matter.

misallocations. In fact, even after he ceased trading for the Core Strategies, Mr. Leech's trades for Macro Opps continued to show positive first-day results, which undermines the notion that Mr. Leech had generated first-day gains in Macro Opps during the Relevant Period by misallocating successful trades that had initially been intended for the Core Strategies.

After October 2023, Mr. Leech's trades for Macro Opps had positive unrealized first-day returns on 67% of the days, compared to 72.5% of the days prior to November 2023. The unrealized positive first day returns after October 2023 were relatively small, however, and in this period there were no days with unrealized first-day returns exceeding $1 million (and substantial decline in days with significant first-day unrealized losses). The absence of such days is attributable to several factors including the fact that the later period was substantially less volatile than the period March 2022 to October 2023, which generally resulted in fewer days with large gains or losses. The reduced volatility after October 2023 is seen in the results posted by other traders covering Macro Opps who also saw substantially fewer days with large gains or losses after October 2023. Ultimately, large unrealized first-day returns (whether positive or negative) are dependent on, among other things, the extent of intraday movements in the market.

In sum, Mr. Leech's trading after October 2023 shows that an experienced trader can readily make trades with positive unrealized first-day returns at a rate substantially higher than 50%—without any possibility of misallocation.

### 2. Ms. Marquez's "Come Back" Notes Are Not Evidence That Mr. Leech Delayed Allocating Trades To Enable Him To Allocate Trades With Unrealized First-Day Gains To Macro Opps

During our August 13 meeting, representatives of the government suggested that Mr. Leech sometimes told Ms. Marquez, who was primarily responsible for inputting Mr. Leech's trades into Western's system, to "come back" to certain trades as they discussed allocations. This

was reflected on notepads that Ms. Marquez kept while working from home during the COVID-19 pandemic. We have conducted a preliminary review of the notes that were produced.

While we have limited insight into what Ms. Marquez has said about Mr. Leech's allocations and specifically how she explained her shorthand notations, we understand that the "come back" notes mean either (i) that Mr. Leech told Ms. Marquez to come back to the trade at the end of their conversation or (ii) that Mr. Leech needed to check something about the trade and would allocate the trade in a subsequent conversation. Out of the 8,941 trades in Ms. Marquez's handwritten notes and spreadsheets, we could identify only 20 with a notation "come back." That is less than a quarter of one percent of the trades in Ms. Marquez's notes, let alone trades executed during the entire period.

The fact that there were instances when Mr. Leech needed to follow up with Ms. Marquez regarding an individual trade is evidence that he took care in allocating his trades and does not evidence a fraudulent scheme. On average, Mr. Leech placed approximately 65 trades per day. In addition to his trading responsibilities, he was often moving between client or internal management meetings. It is understandable (and in fact prudent) that when in doubt he would want to take a minute to review the specific trades he placed (including how various legs of a multi-leg trade fit together) and confirm that the broker had executed that trade, especially given the heightened issues with broker errors during the COVID/work-from-home period. Of these 20 trades, some were allocated to the Core Strategies, some to Macro Opps. Some had first-day unrealized gains, some had first-day unrealized losses. We cannot find anything in this tiny number of trades that sheds light on the issues presented by the Staff's recommended charges.

### 3. The Trades Mr. Leech Executed Through ▮▮▮▮ Are Not A Reliable Control For All Of Mr. Leech's Macro Opps Trades

The suggestion that Mr. Leech's trades executed through ▮▮▮▮ serve as a control group is misplaced. A simple comparison between ▮▮▮▮ and non-▮▮▮▮ trades for Macro Opps is not an apples-to-apples comparison. Macro Opps frequently needed to purchase futures contracts in the early morning, and Mr. Leech executed a disproportionate percentage of such purchases through ▮▮▮▮ as compared to other brokers. During the Relevant Period, early morning futures buys tended to have poor first-day returns, and so the futures contracts purchased through ▮▮▮▮ negatively affected the overall performance of all trades executed for Macro Opps through ▮▮▮▮ To fairly compare ▮▮▮▮ performance to the other brokers, futures buys from ▮▮▮▮ and the other brokers were removed. With all of the brokers on equal footing, Mr. Leech's trades with ▮▮▮▮ had positive first-day returns at rates that were similar to the first-day returns of trades executed for Macro Opps through other brokers.

### CONCLUSION

For the reasons stated above, the proposed enforcement action rests on substantial and fundamental misconceptions. The Core Strategies and Macro Opps are so disparate that any assumption that trades allocated to the different strategies should have consistent first-day returns is fundamentally flawed. Moreover, Mr. Leech had no plausible professional or financial reason to favor Macro Opps, a relatively small, niche strategy, over Western's flagship Core Strategies, which are the foundation of Mr. Leech's success and reputation as a fixed income manager. Finally, the concept of unrealized first-day returns is irrelevant to long-term portfolios like the Core Strategies and Macro Opps. It defies logic that Mr. Leech would jeopardize his more than 40-year career and reputation (and liberty) by misallocating trades based on first-day performance—only to leave the allegedly misallocated positions in place for weeks, thereby

risking that the unrealized gains would turn into substantial losses and exposing the portfolios to

additional risk.  In sum, pursuing charges against Mr. Leech would be a grievous error and

injustice.

Respectfully submitted,

MORVILLO ABRAMOWITZ GRAND
IASON & ANELLO P.C.


By: ___*/s/ Jonathan S. Sack*___
    Jonathan S. Sack
    Jeremy H. Temkin
    Anna G. Adams
    Nathaniel J. Sobel

# Appendix A

# SEC Cherry-Picking Enforcement Actions

## Decisions Issued By Federal Courts

1. *SEC v. Paris*, No. 21-CV-3450, 2022 WL 3026913 (N.D. Ill. Aug. 1, 2022)
2. *SEC v. Kellen*, No. CV 20-3861-RSWL-AGR, 2021 WL 4907238 (C.D. Cal. Sept. 14, 2021)
3. *SEC v. RRBB Asset Mgmt., LLC*, No. CV2012523KMESK, 2021 WL 3047081 (D.N.J. July 20, 2021)
4. *SEC v. World Tree Fin. LLC*, Civ. No. 18-1229, 2021 U.S. Dist. LEXIS 22740 (W.D. La. Jan. 15, 2021), *aff'd*, 43 F.4th 448 (5th Cir. 2022)
5. *SEC v. Strong Investment Mgmt.*, No. 8:18-cv-00293-JLS-DFM, 2018 WL 8187912 (C.D. Cal. Aug. 9, 2018)
6. *SEC v. Aletheia Rsch. & Mgmt. Inc. et al.*, No. CV1210692JFWRZX, 2015 WL 13404306 (C.D. Cal. May 11, 2015), *aff'd sub nom. SEC v. Aletheia Rsch. Mgmt.*, 689 F. App'x 512 (9th Cir. 2017)
7. *SEC v. K.W. Brown & Co.*, 555 F. Supp. 2d 1275 (S.D. Fla. 2007), *supplemented* (Jan. 4, 2008)
8. *SEC v. Slocum, Gordon & Co.*, 334 F. Supp. 2d 144 (D.R.I. 2004)

## Other Cases Filed in Federal District Courts

1. *SEC v. MacWright*, 2:23-cv-20609-KM-JRA (D.N.J. Sept. 25, 2023)
2. *SEC v. Werthe*, 3:23-cv-00815-L-DDL (S.D. Cal. May 4, 2023)
3. *SEC v. Susoeff*, 2:23-cv-00173-JCM-EJY (D.N.V. Feb. 1, 2023)
4. *SEC v. Brander*, 2:22-cv-05506-EP-ESK (D.N.J. Sept. 12, 2022)
5. *SEC v. Toroian*, 2:22-cv-00715-MSG (E.D. Pa. Feb. 25, 2022)
6. *SEC v. Sugranes*, 1:21-cv-22152-MGC (S.D. Fl. June 10, 2021)
7. *SEC v. TH Wealth Management, LLC*, 3:20-cv-03676-C (N.D. Tex. Dec. 18, 2020)
8. *SEC v. Lambert*, 4:20-cv-03116 (D. Neb. Sept. 28, 2020)
9. *SEC v. Berger*, 2:12-cv-04728-SJF-ARL (E.D.N.Y. Sept. 21, 2012)
10. *SEC v. Dawson*, 1:08-cv-07841-PGG (S.D.N.Y Sept. 9, 2008)

## Administrative Proceedings

1. *In the Matter of Marguerite Cassandra Toroian, Respondent.*, Release No. 6486 (Nov. 20, 2023)
2. *In the Matter of Brian Keat Hobbs, Respondent.*, Release No. 6470 (Oct. 24, 2023)
3. *In the Matter of Douglas MacWright, Respondent.*, Release No. 98669 (Sept. 29, 2023)

4. *In the Matter of Lina Maria Garcia, Respondent.*, Release No. 96146 (Oct. 24, 2022)
5. *In the Matter of Ramiro Jose Sugranes, Respondent.*, Release No. 96145 (Oct. 24, 2022)
6. *In the Matter of Donald J. Kellen, Respondent.*, Release No. 6152 (Sept. 27, 2022)
7. *In the Matter of Corbin L. Lambert, Respondent.*, Release No. 95836 (Sept. 20, 2022)
8. *In the Matter of Scott Adam Brander, Respondent.*, Release No. 95818 (Sept. 19, 2022)
9. *In the Matter of Buckman Advisory Group, LLC and Harry J. Buckman, Jr., Respondents.*, Release No. 95747 (Sept. 13, 2022)
10. *In the Matter of IFP Advisors, LLC, Respondent.*, Release No. 6086 (Aug. 10, 2022)
11. *In the Matter of Richard Keith Robertson, Respondent.*, Release No. 95462 (Aug. 10, 2022)
12. *In the Matter of Joseph B. Bronson, Respondent.*, Release No. 5368 (Sept. 25, 2019)
13. *In the Matter of Laurel Wealth Advisors, Inc., Respondent.*, Release No. 5330 (Aug. 26, 2019)
14. *In the Matter of Joseph C. Buchanan, Respondent.*, Release No. 86761 (Aug. 26, 2019)
15. *In the Matter of Financial Sherpa, Inc., and James L. Beyersdorf, Respondents.*, Release No. 86710 (Aug. 20, 2019)
16. *In the Matter of John B. Engebretson, Respondent.*, Release No. 4967 (July 12, 2018)
17. *In the Matter of Gary W. Freeman, Respondent.*, Release No. 83382 (June 5, 2018)
18. *In the Matter of Valor Capital Asset Management, LLC, and Robert Mark Magee, Respondents.*, Release No. 82816 (Mar. 6, 2018)
19. *In the Matter of Jeremy A. Licht d/b/a JL Capital Management, Respondent.*, Release No. 81584 (Sept. 12, 2017)
20. *In the Matter of Laurence I. Balter d/b/a Oracle Investment Research, Respondent.*, Release No. 10228 (Oct. 4, 2016)
21. *In the Matter of TPG Advisors LLC d/b/a The Phillips Group Advisors, and Larry M. Phillips, Respondents.*, Release No. 77649 (Apr. 19, 2016)
22. *In the Matter of The Dratel Grp., Inc. & William M. Dratel, Respondents*, Release No. 77396 (Mar. 17, 2016)
23. *In the Matter of Welhouse & Associates, Inc., and Mark P. Welhouse, Respondents.*, Release No. 75319 (June 29, 2015)
24. *In the Matter of J.S. Oliver Capital Management, L.P., Ian O. Mausner, and Douglas F. Drennan, Respondents.*, Release No. 9446 (Aug. 30, 2013)
25. *In the Matter of Howard B. Berger, Respondent.*, Release No. 3548 (Feb. 6, 2013)
26. *In the Matter of Aletheia Research and Management Inc., Peter J. Eichler, Jr. and Roger B. Peikin, Respondents.*, Release No. 64442 (May 9, 2011)
27. *In the Matter of James C. Dawson, Respondent.*, Release No. 2914 (Aug. 12, 2009)
28. *In the Matter of K.W. Brown & Company, et al., Respondents*, Release No. 57814 (Jan. 4, 2008)

# Appendix B

**Trading of Like Fixed Income Assets Under Different Portfolio Strategies**

## Introduction

It is a common misconception, especially in fixed income asset management, that the factors that make a particular fixed income sector, maturity, or instrument attractive to one portfolio would make that asset attractive to all portfolios. The thinking is that if an asset is "cheap," all portfolio managers would want to buy it, whereas "rich" assets should be universally attractive to sell; in this view, buying a rich instrument or selling a cheap one would just be inviting losses and thereby, would lead to underperformance.

This paper demonstrates that this notion is wrong. Strategy is everything, and rational strategies can have one portfolio buying the very same thing another portfolio is selling. In fact, such strategies are not just rational; they can all be successful in outperforming a common benchmark. Furthermore, trading in opposite directions on the same asset is not a rare occurrence. Such divergence is quite common.

## Discussion

To illustrate these points, we have constructed a simple investment universe consisting of futures and options on four fixed income instruments: 2-year bonds, 5-year bonds, 10-year bonds and 30-year bonds with yields corresponding to the constant maturity Treasury bonds over the time period from January 2, 2019 to December 23, 2023. We derive hypothetical futures prices by computing the price of a bond of that maturity bearing a coupon rate equal to the bond's yield on January 2, 2019. In this fashion, all of the futures contracts start at a price of par (100), thus making it easy to see whether the market is up or down at any subsequent time. See Appendix A for a list of assumptions made.

This chart shows the prices of the four futures contracts over the period studied.



As the chart shows, all 4 contracts ended at lower prices than where they began, with the longest contracts doing the worst. This is a direct result of interest rates rising on balance over the 5-year period.

As a Benchmark, we have used a market-weighted average of the 4 contracts with equal weight given to each maturity.[1] Rebalancing is done at the end of every day using that day's closing price. Its initial duration is 8.75 years but over the 5-year period it ranges from 8.36 years (when yields are at their highest) to 8.82 years (when yields are lowest). In the relevant period, the Benchmark has a negative total return and has a value of -1.83% annualized. This is the number to beat.

Five investment strategies have been tested with the hope of beating the benchmark. Their details are laid out in Appendix B, but in brief they are as follows:

Strategy 1: Monthly rebalancing. Same as Benchmark but less rebalancing to save on commissions.

Strategy 2: Barbell, Duration=4. Hold only 2-year and 30-year contracts so as to maximize convexity, with a target modified duration of 4 years.

Strategy 3: Momentum play (MA 10v30). Capitalize on market momentum trends using 10-day vs. 30-day moving averages as buy/sell indicators.

Strategy 4: Yield Curve Trades (2s10s and 5s30s). Trade based on the shape of the yield curve to capitalize on steepening or flattening.

Strategy 5: Sell options (both puts and calls), collect the premium and manage duration risk with futures.

Here are the results of the various strategies.

| Jan 1, 2019 to Dec 21, 2023 Strategy | Starting Value | Ending Value | Annualized Pct Return | Net After Commissions | Net vs. Benchmark |
|---|---|---|---|---|---|
| Benchmark | 1,000,000 | 912,213 | -1.83% | -1.84% | |
| 1: Monthly Rebalancing | 1,000,000 | 913,531 | -1.80% | -1.80% | +3 bp |
| 2: Barbell, Duration=4 | 1,000,000 | 999,168 | -0.02% | -0.02% | +182 bp |
| 3: Momentum play (MA 10v30) | 1,000,000 | 1,061,913 | 1.22% | 1.18% | +301 bp |
| 4: Yield Curve Trades (2s10s, 5s30s) | 1,000,000 | 1,002,555 | 0.05% | 0.02% | +185 bp |
| 5: Sell options and hedge duration | 1,000,000 | 991,856 | -0.16% | -0.25% | +159 bp |

As the table shows, all five strategies beat the benchmark. This will not be true in general, but the period from 2019 to 2023 was conducive to each strategy's success. However, finding successful

---

[1] A benchmark is not necessary for this analysis. It serves mainly to show that different active portfolio management strategies, which trade the same assets in opposite directions, can produce good relative returns.

strategies was not the goal of this paper. We now turn to the question of how correlated the buying and selling patterns of the various strategies were.

Our analysis looks at every strategy versus every other strategy as well as versus the Benchmark. For every day when there was trading in either the 2-year or the 30-year contract in each strategy, we count how many times the trading was in the same direction versus the opposite direction. (We focus only on 2-year and 30-year contracts because the Barbell Strategy does not hold or trade 5s and 10s.)

Here are the results:

**Pct of Trading Days When Strategies Transact Opposite Directions**

| 2-Year Contracts | | | | | |
|---|---|---|---|---|---|
| | **B** | **1** | **2** | **3** | **4** | **5** |
| **B** | - | | | | | |
| **1** | 40.7% | - | | | | |
| **2** | 88.6% | 60.3% | - | | | |
| **3** | 48.7% | 34.5% | 49.5% | - | | |
| **4** | 16.4% | 50.0% | 71.7% | 50.7% | - | |
| **5** | 31.6% | 49.2% | 77.1% | 43.6% | 53.3% | - |

| 30-Year Contracts | | | | | |
|---|---|---|---|---|---|
| | **B** | **1** | **2** | **3** | **4** | **5** |
| **B** | - | | | | | |
| **1** | 47.5% | - | | | | |
| **2** | 7.7% | 46.6% | - | | | |
| **3** | 49.0% | 87.9% | 49.8% | - | | |
| **4** | 29.1% | 48.3% | 33.6% | 49.3% | - | |
| **5** | 87.4% | 54.2% | 89.3% | 44.9% | 65.2% | - |

As the table shows, it is extremely common for different portfolio strategies to trade the same asset in opposite directions. In fact, the average of all of the percentages for each maturity is over 50%, meaning that for these strategies in this time period, it was more likely than not for the strategies to trade opposite one another.

**Conclusion**

This illustrates the reality that two different portfolios, as in our situation, would quite reasonably trade the same instruments for different reasons, or trade different instruments, and that the first-day outcomes (gains or losses) of trades should not be viewed isolation but rather in light of the strategies being pursued. The attractiveness of a particular fixed income asset or trade is not

universal.  Richness or cheapness is relative, not absolute.  Context matters, and strategy provides that context.

*January 2024*

**Appendix A**
Assumptions

The following assumptions were made to simplify the analysis and/or to reduce the complexities associated with how futures and options work in the real world. None of these affect the conclusions reached.

1.      Hypothetical futures contracts were created based on a coupon rate equal to the yield on their respective bonds on January 2, 2019. This means all contracts were priced at par on that date, making it easy to see relative price changes at all points in time. (In reality, futures contracts all have an assumed coupon rate of 6%.)

2.      The futures contract is assumed to be perpetual and have a price reflective of the yield on a constant maturity bond. (In reality, futures contracts mature quarterly, allow for multiple bonds or notes to be delivered and must be rolled every 3 months into a new instrument.)

3.      No margin is required. (In reality, futures require daily cash margin which is either paid to the clearing house when there is a daily loss or received from it when there is a gain.)

4.      Cash balances accrue no interest. (In reality they would, but the short-term interest rate during this period averaged only 0.5%, and the results would be little changed.)

5.      Fractional contracts may be bought or sold. (In reality, futures and options trade only in integer amounts, but our assumed portfolio size of $1 million makes $100,000 contracts inconvenient. The alternative would be to assume a smaller contract size. The result would be the same.)

6.      The Black-Scholes model is used to derive option values and deltas, using annualized price volatilities of 2%, 5%, 9% and 18% for the 2-, 5-, 10- and 30-year underlying contracts, respectively. (These are typical of such contracts, but in reality, the volatilities would fluctuate with market conditions.)

7.      We assume there is a cost to trading futures and options of $5 per contract "round trip" ($2.50 per contract each way). This cost is subtracted from the gross return to determine a net return after commissions.

**Strategy 1: Monthly Rebalancing.** This is a portfolio with the same initial holding as the Benchmark but with rebalancing only at the end of each month. This allows for benefits to accrue from intra-month runs up or down in price. It also permits greater moves in the duration of the portfolio.

**Strategy 2: Barbell, Duration=4.** A barbell strategy is one that holds only the shortest and longest maturities, which in this case are the 2-year and 30-year futures. Rebalancing is done every day to keep the modified duration equal to 4 years. This maximizes the convexity of the portfolio (apart from buying options), thus allowing for relative gains from large parallel shifts (up or down) in the yield curve.

**Strategy 3: Momentum Play (MA 10v30):** This strategy trades based on signals from 10-day and 30-day moving average (MA) in each futures contract. The portfolio is managed as 4 sub-portfolios – one for each contract, and each with 25% of the available funds. When the 10-day MA is above the 30-day MA, the sub-portfolio gets a "Buy" signal and when the 10-day MA is lower than the 30-day MA, it gets a "Sell" signal. The sub-portfolios begin 50% invested, which is to say they hold half of the initial number of contracts in the Benchmark and keeps the rest in cash. There are no signals for the first 29 days, as the moving averages develop. After that, the MAs are evaluated every day. Upon a Buy signal, half of the available cash for that asset is used to purchase more. Upon a Sell signal, half of the existing holdings are sold for cash. The strategy trades frequently and often in large sizes. It benefits from any medium- or long-term upward or downward momentum in any of the assets.

**Strategy 4: Yield Curve Trades (2s10s, 5s30s):** This strategy also uses signals but instead of using moving averages, it looks at 2 yield spreads: the spread from 2-years to 10-years (2s10s), and the spread from 5-years to 30-years (5s30s). The strategy begins with the same initial holdings as the Benchmark. Then the following table is used:

| Signal | Actual Spread | 2s10s Target Duration | 5s30s Target Duration |
|---|---|---|---|
| None | -1 < sd < 1 | 5.25 | 12.25 |
| Sell | -2 < sd <= -1 | 6.25 | 13.25 |
| Strong Sell | sd <= -2 | 7.25 | 14.25 |
| Buy | 2 > sd >= 1 | 4.25 | 11.25 |
| Strong Buy | sd >= 2 | 3.25 | 10.25 |

Because equal market values of 2-year and 10-year contracts have an initial duration of (appx.) 5.25 years, that is the duration target for our 2s10s holdings in the absence of a signal. If the actual 2s10s spread is more than 1 standard deviation (sd) above its average (but

---

[2] Details of each strategy's trading are available from the author.

less than 2 sd), we "buy the curve" by increasing the target duration by one year, to 6.25. If the spread exceeds 2 sd above the average, it is a Strong Buy and the target duration is raised another year. Sell signals work in the same manner but they lower the target duration by 1 or 2 years. Whenever a new signal is received, the quantities of 2s and 10s are adjusted to create the new target duration. No trading takes place until a different signal occurs.

The 5s30s trades work exactly the same way, except that the initial target duration is 12.25 years, and the buy/sell signals add or subtract one or two years from that.

The thinking behind the strategy is that when these yield spreads are high, the curve is more likely to flatten than to steepen more, so the longer maturities are favored. The strategy does nothing for the first 19 days. During that time, it develops averages and standard deviations for 2s10s and 5s30s, and these statistics are continually updated. In this manner, the strategy had no advance knowledge of yield curve dynamics that lie ahead.

**Strategy 5: Sell Options and Hedge Duration:** This strategy is a negative convexity play and seeks to add return from selling straddles (a combination of equal amounts of puts and calls), collecting a premium, and managing the duration risk by rebalancing with futures. As in Strategy 3, the portfolio is managed as 4 sub-portfolios and begins half invested and half cash. On the first trading day of each month, the portfolio rebalances to a holding of 50% invested and it sells one put and one call option for each futures contract held. If the futures go up in price, the call becomes worth more, the put becomes worth less and the delta of the options positions decreases (because we are short the options). This causes the strategy to purchase more futures ("chasing up"). If the futures go down in price, the reverse occurs and the strategy "chases down". In general, this strategy involves a lot of trading so the commission cost will be high.

As long as market volatility is low, this strategy succeeds because the losses from futures trading are outweighed by the benefit of the options premium received. As per the previously stated assumptions, a single (realistic) implied volatility is used because we lack the data to determine actual implied volatilities for one-month options.