USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/24/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
UNITED STATES OF AMERICA,                    :
                                             :
                 -against-                   :
                                             :
  S. KENNETH LEECH, II,                      :          1:24-cr-658-GHW
                                             :
                       Defendant.            :     MEMORANDUM OPINION &
-------------------------------------------------------------- X          ORDER

GREGORY H. WOODS, United States District Judge:

Defendant S. Kenneth Leech, II was a trader in fixed-income securities and Chief

Investment Officer at Western Asset Management Company ("WAMCO").  In that role, he traded

Treasury futures and options ("Treasury F&Os").  From January 1, 2021 until October 19, 2023 (the

"Relevant Period"), he was able to make trades for two strategies:  Core and Core Plus (collectively,

the "Core Strategies") and Macro Opportunities ("Macro Opps").  Each portfolio included a

number of accounts.  For each trade, Mr. Leech could allocate that trade to a single account, an

entire portfolio, or split the trade between accounts using the two strategies.

In November 2024, the Government brought a five-count indictment against Mr. Leech.

The Government alleges that Mr. Leech engaged in a fraudulent "cherry-picking" scheme.  The

Government alleges that Mr. Leech would execute a trade, wait to see how that trade performed,

and only then allocate well-performing trades to favored accounts and underperforming trades to

disfavored accounts.  The Government alleges that Mr. Leech misled his clients about this practice.

The Government also alleges that Mr. Leech lied to the Securities and Exchange Commission (the

"SEC") in connection with their investigation into trading at WAMCO.

In June 2025, the Court set pretrial deadlines in this case, including deadlines for noticing

expert disclosures and rebuttal expert disclosures pursuant to Federal Rule of Criminal Procedure

16.  The Court also set a deadline for motions to exclude expert testimony under the Federal Rules

of Evidence.  The Government and the defense noticed disclosures with proposed testimony from

several experts.  The experts used the copious data and documentary evidence in this case to

conduct sophisticated statistical analyses of Mr. Leech's allocation decisions.  Both the Government

and the defense proffered rebuttal analyses and proposed testimony from their experts.

Before the Court are the parties' cross-motions to exclude expert testimony.  Because none

of the proposed testimony merits exclusion at this stage under the relevant Federal Rules of

Evidence or the Federal Rules of Criminal Procedure, the parties' motions to preclude expert

testimony are DENIED.

## I.    BACKGROUND

### A.    Factual Background[1]

Mr. Leech was a fixed income trader and executive at WAMCO, a global fixed-income

investment advisor.  The Government alleges that during the Relevant Period, Mr. Leech served as

WAMCO's Chief Investment Officer or Co-Chief Investment Officer.

The Government alleges that Mr. Leech was also the portfolio manager for several

WAMCO strategies.  One set of strategies was the "Core Strategies."  The Core Strategies were

benchmarked against the Bloomberg U.S. Aggregate Index.  The Government alleges that the goal

of the Core Strategies was to generate superior returns relative to this benchmark while "keeping

benchmark-based constraints on the amount of risk that those strategies could take on."  Indictment

¶ 8.  Mr. Leech was one of many managers of the Core Strategies.  *Id.*

Mr. Leech also managed Macro Opps.  The Government alleges that Macro Opps was an

"unconstrained strategy," which meant that it did not have a benchmark.  Indictment ¶ 9.  The

---

[1] Unless otherwise noted, the facts in this section are drawn from allegations in the indictment.  *See* Dkt. No. 2
("Indictment")

Government alleges that the strategy's goal was to "maximize total return," with a "relatively wide range of risk" relative to the Core Strategies. *Id.* For the entire relevant period, Mr. Leech could allocate trades to Macro Opps as a whole, the Core Strategies as a whole, to specific accounts within both strategies, or split a trade across both strategies (a "50/50 trade"). *See generally id.*

The Government alleges that Mr. Leech engaged in a scheme to "improve the overall performance of Macro Opps" and other favored accounts. Indictment ¶ 13. The Government alleges that Mr. Leech—"without disclosure to any client"—"used first-day performance of trades to decide whether a trade would be allocated to Macro Opps . . . [or to] the Core Strategies." *Id.* The Government alleges that this resulted in a large differential in first-day performance between Macro Opps and the Core Strategies. *See, e.g., id.* ¶ 19(j). The Government alleges that this differential was not present when Mr. Leech did not have discretion to allocate a trade to either Macro Opps or the Core Strategies. *See, e.g., id.* ¶ 19(i)(ii).

The Government also alleges that Mr. Leech also gave false and misleading testimony to the SEC. *Id.* ¶¶ 21–25. In connection with an investigation into trading at WAMCO, Mr. Leech provided sworn testimony to the SEC. *Id.* ¶ 21. The Government alleges that Mr. Leech responded "yes" when asked if he "typically had an allocation in mind" when he made a trade. *Id.* ¶ 24. The Government alleges that this testimony was "false and misleading" because he "routinely did not decide where to allocate trade until hours after trading." *Id.* ¶ 25.

### B.    Procedural History

On November 25, 2024, a grand jury returned an indictment against Mr. Leech on five counts:  one count of Investment Adviser Fraud, one count of Securities Fraud, one count of Commodity Trading Advisor Fraud, one count of Commodities Fraud, and one count of providing False Statements. *See generally* Indictment.

On June 4, 2025, the Court set a schedule for pretrial submissions as well as exchange of

3

discovery materials pursuant to Federal Rule of Criminal Procedure 16.  *See* Dkt. No. 30 ("June Pretrial Order").  The Court set a deadline for the parties to provide notices of experts "who may potentially be called during their respective cases-in-chief."  *Id.* at 1.  The Court set a deadline for the parties to exchange notices of rebuttal experts "consistent with Rule 16."  *Id.*  The Court also set a briefing schedule for motions to preclude or limit expert testimony.  *Id.* at 1–2.

### C.      The Government's Expert Disclosures

On October 23, 2025, the Government produced notices for two experts:  Professor Lauren Cohen and Professor Petter Kolm.  *See* Dkt. No. 75-1 ("Cohen Disc."); *see also* Dkt. No. 75-4 ("Kolm Disc.").

### i.          Professor Cohen

Professor Cohen teaches at Harvard Business School and is a Research Associate at the National Bureau of Economic Research.  Cohen Disc. at 1.  He has "extensive experience researching, publishing, and teaching about finance, including in the areas of asset pricing, portfolio and mutual-fund management, and the performance of asset managers."  *Id.*

Professor Cohen anticipates providing opinion testimony based on analyses of Mr. Leech's trading and allocation of Treasury F&Os.  *Id.* ¶ 7.  Those analyses were based on his analysis of a record of trades, or a "trade blotter," received from WAMCO.  *Id.*  He proposes to testify that the trade blotter included information that allowed him to evaluate Mr. Leech's trading and allocation practices, including the type of trade, when it was executed, when the allocation was recorded, and to which account or set of accounts Mr. Leech allocated trades.  *See, e.g.*, *id.* ¶ 10.  Professor Cohen was able to identify when Mr. Leech allocated to a particular account, when Mr. Leech allocated to an entire strategy, and when Mr. Leech split trades between two strategies (a "50/50 Trade").  *Id.* ¶ 10.

Professor Cohen proposes to testify that, based on data from the trade blotter, he was able

to calculate the first-day return of trades that Mr. Leech allocated to Macro Opps and the Core Strategies. *Id.* ¶¶ 23–35. The first-day return was calculated by finding the difference between the price at the end of the day the trade was executed and the price at which Mr. Leech executed the trade. *Id.* ¶ 23.[2] He plans to testify that trades allocated to Macro Opps in the Relevant Period had an average first-day return of $243,000, while the trades allocated to the Core Strategies in the Relevant Period had an average first-day return of -$309,000. *Id.* ¶¶ 29–30. He also proposes to testify that the 50/50 Trades, trades allocated after the Relevant Period, and trades executed through a particular broker ("Marex") did not have "a pronounced positive or negative skew." *Id.* ¶¶ 31–32.[3]

Professor Cohen proposes to testify that the trade blotter allows him to identify when Mr. Leech placed a trade and also includes when Mr. Leech's trades "were recorded as allocated in [WAMCO's] trading system." *Id.* ¶¶ 40–41. He proposes to testify that that "there were typically ma[n]y hours between the time Mr. Leech's trades were filled and when those trades were reported as allocated." *Id.* ¶ 42.

Using data from the Chicago Mercantile Exchange, Professor Cohen was also able to calculate the price of the trade when it was recorded as allocated. *Id.* ¶ 45. He was therefore able to calculate a "pre-allocation return" using the price at the recorded allocation time and the price at which Mr. Leech executed the trade. *Id.* Using that information, he was able to repeat the first-day return analysis described above. *See id.* ¶ 46. He proposes to testify that this analysis showed "an even more pronounced difference between Mr. Leech's allocations to the Core Strategies and his allocations to Macro Opps, excluding Marex." *Id.*

Professor Cohen proposes to testify about the work that he did to understand what could

---

[2] In the parties' disclosures and in their briefing, the "first-day return" is sometimes referred to as "first-day performance" or "unrealized first-day performance."
[3] The Court understands that "Marex" is a broker for which Mr. Leech had a standing order that all trades executed through that broker would be automatically allocated to Macro Opps.

have caused the differences in first-day returns and pre-allocation returns.  He proposes to testify that the pattern he observed "was not the result of Mr. Leech being required to trade in particular ways to Macro Opps and the Core Strategies due to different portfolio requirements . . . ."  *Id.* ¶ 62. Professor Cohen proposes to testify that he reviewed WAMCO's public information describing the Core, Core Plus, and Macro Opps strategies.  *Id.* ¶ 63.  He proposes to testify that the three strategies have different constraints on their "duration."  *Id.* ¶ 64(a).[4]  He proposes to testify that he performed an analysis to understand whether these duration limits "meaningfully constrained Mr. Leech's allocations."  *Id.* ¶ 64(c).  Using individual accounts in Core, Core Plus, and Macro Opps, Professor Cohen took the trades specifically allocated to the Core Strategies and to Macro Opps and reassigned those trades in two ways:  first, as if they had been allocated 50/50, and second, as if their allocations had been reversed (the "Trade Reallocation Exercise").  *Id.*  He then re-calculated the daily durations for the accounts under both scenarios.  He proposes to testify that the re-calculated daily duration is correlated with the actual daily duration in both scenarios.  *Id.*

Professor Cohen also proposes to testify that, based on his review of WAMCO's investment guidelines, the patterns he observed in pre-allocation returns and first-day returns "do not appear to be driven by any of the requirements" of either Macro Opps' or the Core Strategies' investment guidelines.  *Id.* ¶¶ 66–67.  He proposes to testify that the difference in pre-allocation returns and first-day returns "do not appear to be driven by Mr. Leech using Treasury F&Os to pursue opposing strategies between those sets of portfolios."  *Id.* ¶ 68.

Finally, Professor Cohen proposes to testify that he conducted regression analyses to determine what variables could predict where Mr. Leech would allocate a trade.  *See id.* § XII.

---

[4] "Duration" is concept in fixed-income trading that refers to how sensitive a bond's price is to changes in interest rates. In general, as interest rates rise, the value of bonds falls, and vice-versa.  Duration measures how much the value of a bond would change for a given percent change in interest rates.  Consider a bond with a duration of 5 years.  If interest rates rise by 0.1%, the value of that bond will fall by approximately 0.5%.

Professor Cohen performed regressions using the following independent variables:  pre-allocation returns (both as a continuous or a binary variable), "trade size, trade convexity,[5] time-to-maturity of a trade, and interest rate movements prior to trade."  *Id.* ¶ 72.  Based on these analyses, Professor Cohen proposes to testify "that nearly all the explanatory ability behind Mr. Leech's allocation decisions is driven by Pre-Allocation profitability of a trade, whether as a binary or continuous variable."  *Id.* ¶ 73(k).  He also proposes to testify that the results of his analyses "is consistent with Mr. Leech using information about the first-day performance of his Treasury F&O trades in making allocation decisions between Macro Opps and the Core Strategies."  *Id.* ¶ 72.

### ii.    Professor Kolm

Professor Kolm is a "Clinical Professor of Mathematics and the Director of the Mathematics in Finance M.S. Program at New York University's Courant Institute of Mathematical Sciences."  Kolm Disc. at 1.  He has "extensive experience researching, publishing, and teaching about financial mathematics, including as it relates to investment management, portfolio optimization, trading strategies, portfolio and risk management, and evaluating trader performance."  *Id.*  He has "also worked designing trading strategies, including for fixed-income portfolios"  *Id.*

Professor Kolm proposes to testify about analyses he performed on Mr. Leech's trading and allocation activity as reflected in the WAMCO trade blotter.  *Id.* ¶ 6.  He proposes to testify that there are "a number of different methodologies that both academics and people who design trading strategies use to help assess the extent to which the performance of a trader or strategy is driven by elements unique to the trader or strategy, as opposed to the risk profile of the assets being traded."  *Id.* ¶ 15.  He proposes to testify that he conducted analyses to compare Mr. Leech's performance—

---

[5] "Convexity" is another concept in fixed-income trading.  The relationship between interest rates and price in fixed income trading is not linear.  As interest rates move, not only does the price of a bond change as a consequence of its duration, but duration itself changes.  Convexity is a measure of the change in duration as interest rates changes.  Convexity can be negative or positive.  When a portfolio is negatively convex, as interest rates rise, duration also rises.  When a portfolio is positively convex, duration falls as interest rates rise.

as measured by first-day returns—"to the performance of those assets and trades more broadly, as well as to other fixed-income funds." *Id.* ¶ 16.  He proposes to testify that the results of his analyses "showed that Mr. Leech's performance for [first-day returns] of Treasury F&O trades he allocated to Macro Opps was abnormally good, his performance for [first-day returns] of Treasury F&O trades he allocated to the Core Strategies was abnormally poor, and that the performance difference disappeared within the 24 hours after allocation." *Id.* ¶ 17.

Professor Kolm also proposes to testify that, based on his knowledge and experience, he believes that it would be "unusual for a trader to consistently generate positive or negative [first-day returns] trading Treasury F&Os." *Id.* ¶ 23.  He reviewed market data from the timeframe of the relevant period, which supports his understanding.  *Id.* ¶ 24.  He proposes to offer his opinion that, based the results of his analyses of market data, "interest rate movements were largely unpredictable" in the Relevant Period.  *Id.*  He also proposes to testify that he performed analyses of Mr. Leech's trades, which "show that Mr. Leech had a unique ability to generate positive [first-day returns] for Macro Opps and to generate negative [first-day returns] for the Core Strategies, but that ability was not present . . . when he lacked the ability to choose between Marco Opps and the Core Strategies." *Id.* ¶ 27.

Professor Kolm also proposes to testify that he employed "permutation testing" to determine whether the first-day performance of Mr. Leech's trades occurred through chance.  *Id.* ¶ 32.  Permutation testing is a way of evaluating a hypothesis by "randomly reshuffling the data" and measuring differences between two or more populations.  *Id.*  He proposes to testify that "the results of his permutation analysis are inconsistent with the hypothesis that the difference in [first-day returns] between Macro Opps and the Core Strategies was the result of random chance or luck and are instead consistent with Mr. Leech's using performance information from between the time of trade and the time of allocation when making allocation decisions." *Id.* ¶ 34.  As a check for this

8

analysis, Professor Kolm reviewed various records, including WAMCO's "public information describing the investment strategies of Core, Core Plus, and Macro Opps," and conducted analyses to determine whether Mr. Leech's decisions were constrained by the requirements of the trading strategies. *See, e.g., id.* ¶ 35(a). One of these included his own analysis of the Trade Reallocation Exercise. *Id.* ¶ 35(d).

Finally, "Professor Kolm proposes to testify that one way to analyze the distribution of returns is through a statistical metric called skewness," which "characterizes the asymmetry of a distribution" of data. *Id.* ¶ 37. Professor Kolm proposes to testify that comparing the skewness of two data sets can show the magnitude and direction by which one data set is more asymmetrical than another. *Id.* Professor Kolm proposes to testify that his expectations based on "his review of relevant academic literature" was that the first-day returns should follow a normal distribution. *Id.* ¶ 38. He proposes to testify that—"in contrast to his expectations"— "the skew of [first-day returns] for Treasury F&Os Mr. Leech allocated specifically to Macro Opps was significantly positive, and the skew of the [first-day returns] of Treasury F&Os that Mr. Leech allocated specifically to the Core Strategies was significantly negative." *Id.* ¶ 40.

### D.    The Defense's Expert Disclosures

On October 23, 2025, the defense provided notice of two experts that are relevant to the parties' motions to preclude expert testimony: Aaron Dolgoff and Professor Bruce Tuckman. *See* Dkt. No. 62-3 ("Dolgoff Disc."); Dkt. No. 62-4 ("Tuckman Disc.").

#### i.    Mr. Dolgoff

Mr. Dolgoff is "a Vice President in the Financial Markets Practice" at Charles River Associates ("CRA"). Dolgoff Disc. at 1. "He holds the Chartered Financial Analyst designation." *Id.* As a part of an extensive career serving as an expert witness, "he applies economic and statistical methods in matters related to securities valuation, corporate finance, and financial markets." *Id.* He

has also "consulted on matters related to futures markets, fixed income securities, and derivative securities." *Id.*

Mr. Dolgoff proposes to testify about the design and results of a blind allocation exercise (the "CRA Exercise" or the "Exercise") that he and Professor Tuckman designed and Professor Tuckman performed. *Id.* at 2. At a high level, this exercise tasked Professor Tuckman to allocate Mr. Leech's trades to either a representative Core Plus account or a representative Macro Opps account. *See id.* These trades had originally been allocated specifically to the Core Strategies or Macro Opps. *Id.* at 2. Professor Tuckman was provided with information about the Core and Macro Opps strategies generally and various data about the trades, the accounts, and the market. *See generally id.* However, he was not provided any information about first-day performance or Mr. Leech's allocation decisions. *Id.* at 4.

Mr. Dolgoff worked with Professor Tuckman to design and implement the Exercise. Dolgoff Disc. at 2. The Exercise was based on 50 trading days selected from the Relevant Period using a random selection methodology. *Id.* The first-day performance and the percent of trades that generated a positive first-day performance (the "win/loss rate") was "not statistically different than" that of "the total population of Mr. Leech's Treasury futures and options trades." *Id.*

Mr. Dolgoff proposes to testify that Professor Tuckman was tasked with allocating trades in one-hour windows, based on the time Mr. Leech executed the trade. *Id.* at 3. The one hour windows were presented sequentially for each of the fifty trading days. *Id.* Professor Tuckman had to allocate all of the trades in a window before moving on to the next window. *Id.* Professor Tuckman also had to provide a justification for his allocation decisions in each window. *Id.* at 4.

For each of the fifty trading days in the Exercise, CRA prepared a dashboard for Professor Tuckman. *Id.* at 3–4. The dashboard included: portfolio duration and convexity information, market information, and intra-day information relevant to each window. *Id.* at 3–4. Mr. Dolgoff

relied on various data sources, including the WAMCO trade blotter, to create this data.  *Id.* at 4.

Mr. Dolgoff proposes to testify about the results of the CRA Exercise.  *Id.* at 5.  Professor Tuckman did not know the results of the Exercise.  *Id.* at 4.  Mr. Dolgoff proposes to testify that "Professor Tuckman's trade allocations . . . match Mr. Leech's allocations between the two strategies with a 56.8% match rate."  *Id.* at 5.  He proposes to testify that this match rate is statistically significantly different than 50%.  *Id.*  Mr. Dolgoff also proposes to testify that the allocations to the Macro Opps account had a statistically significantly higher win/loss rate than the overall set of trades, and that the allocations to the Core Plus account had a statistically significantly lower win/loss rate.  *Id.*  He also proposes to testify that the allocations to the Macro Opps account had a statistically significantly higher first-day performance than the overall set of trades, and the allocations to the Core Plus account had a statistically significantly lower first-day performance.  *Id.*

### ii.        Professor Tuckman

Professor Tuckman is a "Clinical Professor of Finance at the Stern School of Business at New York University" in New York City.  Tuckman Disc. at 1.  He "teaches fixed income markets and securities" and "conducts research on those . . . topics."  *Id.*  He previously served as the Chief Economist of the Commodity Futures Trading Commission.  *Id.*  During that time, he "managed a group that produced research papers and policy analysis about futures and swaps markets."  *Id.*  He has also worked at investment banks, "with responsibilities that included modeling interest rate risk across a wide range of fixed income securities . . . ."  *Id.*

Professor Tuckman proposes to testify about the CRA Exercise.  He proposes to testify that he was "not aware of the methodology used to select the days in the Exercise, the actual dates that Mr. Leech executed or allocated the trades considered in the Exercise, or how Mr. Leech allocated the trades considered in the Exercise."  *Id.* at 3–4.  Professor Tuckman also did not know Mr. Leech's "views on the future evolution of interest rates" or "the risk profiles Mr. Leech had in mind

11

for each of the [representative accounts] on each day of the Exercise." *Id.* at 4.  However, he knew that Core Plus was benchmarked against the Bloomberg Barclays U.S. Aggregate Bond Index, while Macro Opps was not. *Id.*  He also knew that "Mr. Leech was an active portfolio manager." *Id.*

Professor Tuckman proposes to testify that, absent actual knowledge of how Mr. Leech viewed the market, he "created proxies" for Mr. Leech's views. *Id.*  These proxies were a "duration target" and a "convexity target" for each portfolio on each day. *Id.*  These targets were "weighted averages of the duration and convexity of each portfolio over the prior 30 days." *Id.*  In this way, he "implicitly assumed that Mr. Leech's risk preferences and market views, as applied to trading the portfolios, evolved gradually over time." *Id.*  Professor Tuckman proposes to testify that "[a]ny views Mr. Leech may have had and acted upon as to the market's undervaluation or overvaluation of individual securities were not incorporated in [his] allocation decisions." *Id.*

Professor Tuckman proposes to testify about how he conducted the Exercise.  Professor Tuckman proposes to testify that when he was presented a window, he "first observed the 'duration gap' and the 'convexity gap' of each portfolio," or "how far the duration and convexity of each portfolio were from its targets . . . ." *Id.* at 5.  He then "endeavored to allocate all of the trades in the window so as to narrow or close these gaps." *Id.* at 6.  He proposes to testify that "[l]arger gaps were typically prioritized over smaller gaps; trades that had a bigger impact on narrowing the gaps for one of the portfolios were typically allocated to that portfolio; and duration gaps were typically prioritized over convexity gaps." *Id.*  He also proposes to testify that in cases where "no allocations . . . narrowed the gaps of either portfolio," he "tried to allocate trades so as to minimize how much the gaps widened." *Id.*  He proposes to testify that "[t]hese allocations were described using the moniker of 'do least harm.'" *Id.*  He had to document the reasons for his decisions. *Id.* at 5.  He did so by "check[ing] applicable boxes with set reasons" and "typ[ing] into a comment box additional narrative explanations of his reasoning for the allocations." *Id.* at 5.

12

Professor Tuckman proposes to testify that it was "relatively straightforward" to allocate almost all of the trades. *Id.* at 6. He also proposes to testify that he observed that Macro Opps was very negatively convex throughout the course of the Exercise, and it had a higher duration gap than that of Core Plus. *Id.* He will therefore testify that "closing the duration gap of Macro Op[p]s . . . turned out to be the most important consideration of the Exercise, and it was the most commonly selected reason for [his] allocations."

### E.    Rebuttal Experts

#### i.    The Government's Rebuttal Disclosures

On November 20, 2025, the Government produced rebuttal notices for Professor Cohen and Professor Kolm. *See* Dkt No. 75-2 ("Cohen Rebuttal Disc."); Dkt. No. 75-5 ("Kolm Rebuttal Disc.").

In his rebuttal disclosure, Professor Cohen responded to the defense experts' disclosures regarding the CRA Exercise. *See* Cohen Rebuttal Disc. ¶ 3 (framing rebuttal disclosure as "[i]n light of the defense's expert disclosures . . . ."). In particular, Professor Cohen responded to the defense's experts' conclusion that the CRA Exercise "resulted in statistically significant differences between the performance of trades allocated to Macro Opps and certain null hypotheses." *Id.* ¶ 1.

In Professor Cohen's disclosure, he proposes to testify about "additional analyses he performed." *Id.* ¶ 3. He proposes to testify that those analyses "show that for different sets of Mr. Leech's trades, the [first-day returns] and [pre-allocation returns] were not only statistically different from one another, but were also *materially* different, meaning the magnitude of the difference was substantial." *Id.* (emphasis added). Professor Cohen proposes to testify that he performed "effects tests" which "are a commonly used statistical technique to measure the magnitude of the difference between two or more conditions under consideration." *Id.* ¶ 4. The disclosure described these analyses and Professor Cohen's proposed testimony about the results in detail. *See, e.g., id.* ¶ 17.

Professor Kolm also responded to the defense experts' testimony about the CRA Exercise. Kolm Rebuttal Disc. ¶ 8.  Professor Kolm proposes to testify about differences between the Exercise and "Mr. Leech's trading."  *Id.* ¶ 9.  His disclosure identifies six differences.  *See id.*  In particular, Professor Kolm proposes to testify that "Mr. Tuckman's inability to allocate trades 50/50 . . . likely had a significant impact on the CRA [E]xercise because it restricted Mr. Tuckman's ability to treat Macro Opps and the Core Strategies in a comparable manner."  *Id.* ¶ 11.  He proposes to testify that the requirement that Professor Tuckman allocate entirely to one strategy and the fact that there were times that a trade would bring neither account closer to its duration or convexity target meant that Professor "Tuckman allocated many trades . . . on the basis that the trade would 'do least harm' for one strategy compared to the other"  *Id.* ¶ 11(c).  He also proposes to testify that the differences between the Exercise and conditions under which Mr. Leech traded and allocated means that "Mr. Dolgoff's analyses are not useful for evaluating Mr. Leech's trading, and do not refute the statistical evidence that Mr. Leech was using performance between the time of trade and allocation . . ."  *Id.* ¶ 25.

Professor Kolm also proposes to testify that even if Mr. Dolgoff's match rate calculation is accurate, Mr. Dolgoff did not "analyze the extent of the *differences* between Professor Tuckman's allocations and Mr. Leech's allocations."  *Id.* ¶ 26 (emphasis in original).  Professor Kolm proposes to testify that he performed several analyses to quantify the differences between Mr. Leech's allocations and Professor Tuckman's, the results of which "are consistent with Mr. Leech using performance information between the time of trade and the time of allocation in making allocation decisions."  *Id.*; *see also id.* ¶¶ 27–29.

Professor Kolm proposes to testify that the allocation rationales provided by Professor Tuckman were not always consistent with the effect of the allocated trades.  *Id.* ¶ 12.  For instance, Professor Kolm proposes to testify that, based on his review of the CRA Exercise, "Mr. Tuckman

14

allocated 17 trade groups to Macro Opps on the basis that those trades had a greater convexity benefit to Macro Opps, even though those trades added convexity when [the representative Macro Opps account] was already above its Convexity Benchmark." *Id.* ¶ 12(e).

### ii.    The Defense's Rebuttal Disclosures

On November 20, 2025, the defense produced rebuttal notices for Mr. Dolgoff and Professor Kevin Maloney. *See* Dkt. No. 62-5 ("Dolgoff Rebuttal Disc."); Dkt. No. 62-6 ("Maloney Rebuttal Disc.")

In his rebuttal disclosure, Mr. Dolgoff responded to Professor Cohen's expert disclosure. Dolgoff Rebuttal Disc. at 4. In particular, Mr. Dolgoff concluded that "Professor Cohen's regression analysis" was incomplete because it "does not consider the duration impact of intraday changes in interest rates between the time of trade and trade allocation." *Id.* Mr. Dolgoff proposes to testify that he conducted "modif[ied]" regression analyses to measure that impact. *Id.* He proposes to testify that he estimated "Passive Duration Change," or "duration change resulting from market movement rather than a trading decision." *Id.* He calculated that change using "the change in the 10-year Treasury yield between trade execution time and blotter-recorded trade allocation time" and "the duration and convexity of [a particular Macro Opps account] at the end of the prior day." *Id.*

Mr. Dolgoff proposes to testify that he "created a variable indicating whether the duration of a trade is in the opposite direction of Passive Duration Change."[6] *Id.* He then performed the same regression analysis as Professor Cohen, replacing his pre-allocation profitability variable. *Id.* Mr. Dolgoff proposes to testify that, based on the results of this analysis, whether a trade "assists in managing the Passive Duration Change 'contains far more explanatory ability for Leech's allocation decisions than do trade size, trade convexity, trade time-to-maturity, or interest rate movements

---

[6] The Government refers to this variable as the "Convexity Effect Offset."

prior to the trade.'"  *Id.* at 4–5 (quoting Cohen Disc. ¶ 72(j)).

Mr. Dolgoff also responded to the conclusions that Professors Cohen and Kolm draw from their Trade Reallocation Exercise.  *Id.* at 5.  Mr. Dolgoff performed his own version of the Trade Reallocation Exercise (the "Dolgoff Reallocation Exercise;" collectively, the "Reallocation Exercises").  *Id.*  Mr. Dolgoff proposes to testify that the changes in duration he measured following trade reallocation did not match with the duration changes following trade reallocation as measured by the Government's experts in connection with their Trade Reallocation Exercise.  *Id.*  He proposes to testify that he identified several reasons for these discrepancies, including what he proposes to testify are errors in calculation and differences in assumptions.  *Id.* at 5–6.  One of those differences is that the Dolgoff Reallocation Exercise "is based on a different set of . . . trades."  *Id.* at 6.

Mr. Dolgoff proposes to testify that the Government's experts did not "consider whether trade reassignment would result in additional days where duration exceeds limits or larger impacts on end of day duration for different sub-periods."  *Id.*  He also proposes to testify that the Government experts' analysis of their Trade Reallocation Exercise is flawed because "even highly correlated data series can have meaningful differences."  *Id.*

Professor Maloney is the Chair of the Finance Department of Bryant University.  Dkt. No. 72-1, Ex. A, at 1 ("Maloney Disc.").  He teaches courses that "provide[] students with the conceptual knowledge to be a fixed income professional . . . [and] involve[] students in the management of [a real fixed income portfolio]."  *Id.* at 1.  Prior to his current teaching position, he held several roles in the private sector.  *Id.* at 1–2.

In Professor Maloney's disclosure, he also responded to the Government's experts' testimony about the Trade Reallocation Exercise.  *See* Maloney Rebuttal Disc.  He proposes to testify that he reviewed the Trade Reallocation Exercise and the Dolgoff Reallocation Exercise and

the associated materials. *Id.* at 3. He proposes to testify that "based on this review and his education, research, training, and professional experience," the Government's experts' conclusions are "unsupported" by their Trade Reallocation Exercise. *Id.* He proposes to testify that the results of the Reallocation Exercises "provide evidence that the allocations to Macro Opps were 'necessary to manage duration,' that the duration limits did 'meaningfully constrain' Mr. Leech's allocations during the [Relevant Period], and that it was 'likely that Mr. Leech's allocations to Macro Opps were driven by a need to manage negative convexity.'" *Id.* Professor Maloney proposes to testify that, in his opinion, a "reasonable portfolio manager" would consider the duration impact of reassigning trades—as measured in both Reallocation Exercises—both "significant" and "meaningful." *Id.* at 4. He proposes to testify that this is true because, "among other reasons," reallocating trades meant that there would be more days when Macro Opps would exceed its duration limits, and the magnitude of those excesses would be higher. *Id.*

In further support of his rebuttal to anticipated testimony about the Trade Reallocation Exercise, Professor Maloney proposes to testify that he conducted two sets of regression analyses using the data from Dolgoff Reallocation Exercise. *Id.* at 4–5. He proposes to testify that both analyses demonstrate that "the daily duration impact of the trades Mr. Leech allocated only to Macro Opps have the opposite sign" to daily duration changes of a representative Macro Opps account that were not caused by trading. *Id.* at 5–6. He measured "daily duration changes" that were not caused by trading in two ways: first by calculating the "daily duration changes [of the representative Macro Opps account] in the absence of the trades allocated to Macro Opps;" and second, by using "estimated passive duration drift from interest rate movements, which is driven by [Macro Opps'] negative convexity." *Id.* He proposes to testify that these results illustrate that "the trades Mr. Leech allocated only to Macro Opps mitigated the impact . . . resulting from" daily duration changes, and thus "had the effect of managing [the representative Macro Opps account] back toward its start

17

of day duration." *Id.* He also proposes to testify that switching the allocations of trades allocated to Macro Opps and the Core Strategies would "magnify the impact" result from daily duration changes. *Id.*

### iii.        The Government's Sur-rebuttal Disclosure

On December 10, 2025, the Government produced an additional notice for Professor Kolm. *See* Dkt. No. 62-8 ("Kolm Sur-rebuttal Disc.").

In his sur-rebuttal disclosure, Professor Kolm responded to Mr. Dolgoff's expert testimony as disclosed in the latter's rebuttal disclosure. *Id.* In particular, he responded to Mr. Dolgoff's testimony concerning "Passive Duration Change" and the regressions that Mr. Dolgoff performed using the variable that Mr. Dolgoff created to capture whether a trade offset "Passive Duration Change." *Id.* ¶ 3. Professor Kolm referred to that variable as "Convexity Effect Offset." *Id.* Professor Kolm offers three criticisms of that variable: first, that its explanatory power "arises because it mechanically tracks [p]re-[a]llocation returns;" second, Mr. Dolgoff's analysis does not examine pre-trade duration shifts; and third, that Mr. Dolgoff did not consider how the Convexity Effect Offset variable relates to the Core Strategies. *Id.*

Professor Kolm also responded to Professor Maloney's rebuttal disclosure. *Id.* ¶ 4. Professor Kolm proposes to testify that Professor Maloney's regressions "suffer from several methodological problems . . . ." *Id.* ¶ 5. Professor Kolm identifies three: first, "Mr. Maloney captures a phenomenon that mechanically mimics first-day returns . . . ;" second, "his regressions do not reflect whether Mr. Leech was correcting for duration changes because they rely on daily data," rather than trade-level data; and third, "the analyses do not address allocations to the Core Strategies." *Id.*

F.      The *Daubert* Motions

i.      The Defense's Motion

On December 15, 2025, the defense filed its motion to preclude the testimony of both Professor Cohen and Professor Kolm.  Dkt. No. 63 (Def. Mot.).  The defense argued that the Court should exclude six portions of the Government experts' proposed testimony, although only five are summarized here.[7]

First, the defense argued that the testimony of both witnesses should be precluded under Federal Rule of Evidence 704(b) because they, in the defense's view, purport to opine on Mr. Leech's state of mind.  *Id.* at 1.  In particular, the defense took issue with the Government experts' proposed testimony that their analyses are "consistent with" Mr. Leech "using" information in a particular way  *Id.* at 8.  The defense argued that the use of the word "using" implied that Mr. Leech allocated "intentionally" rather than "accidentally or "negligently."  *Id.*  They similarly argued that the experts' use of the words "driven" and "influenced" were impermissible testimony about Mr. Leech's state of mind.  *Id.* at 9.  The defense argued that even if Rule 704(b) did not preclude the experts' testimony, the testimony should be excluded under Rule 403 because, among other reasons, Government's experts' use of sophisticated statistical techniques risked misleading the jury about the strength of the conclusions that were supported by the analyses.  *Id.* at 13.

Second, the defense argued that the Government's experts should be precluded from testifying about their analyses because the methods used to calculate first-day and pre-allocation returns were unreliable.  *Id.* at 14–21.  The Government's experts ran analyses based on first-day returns.  The Government's experts also used the time that a trade was recorded as allocated in the trade blotter as a proxy for when Mr. Leech allocated that trade.  *Id.*  The Government used that

---

[7] The sixth basis—Professor Cohen's use of the word "material"—is moot, because the Government represents that Professor Cohen will no longer use that word.  *See* Dkt. No. 75 ("Gov't Opp'n") at 51.

time to calculate a "pre-allocation return." The defense argues that the decision to use both the end-of-day price and the price at the recorded allocation time were the product of flawed assumptions because they do "not account for the fact that there was a lag between when (i) Mr. Leech *communicated* his allocation decisions to his trading assistant and when (ii) they were *entered* in [WAMCO's] system." *Id.* at 16 (emphasis added). The defense argued that, as a result, any testimony based on analyses that depended on those assumptions were not the product of a reliable method as required by Rule 702. *Id.* at 19–21.

Third, the defense argued that the Government's experts were not qualified to offer opinion testimony on "what trades were or were not appropriate for managing the disparate strategies at issues in this case." *Id.* at 21. The defense argued that both experts only had academic experience and did not have practical experience in fixed-income portfolio management. The defense argued that, as a result, neither Professor Cohen nor Professor Kolm was qualified under Rule 702 to testify on "practical aspects of fixed-income portfolio management." *Id.* at 25. This included, for example, their opinions based on their review of WAMCO's public statements and portfolio guidelines. *Id.* at 26.

Fourth, the defense argued that Professors Cohen and Kolm should be precluded from offering testimony based on analyses regarding trades placed on and after October 20, 2023 (the "Post Period"). *Id.* at 27–31. During the Post Period, Mr. Leech was only responsible for trading in Macro Opps and did not trade for the Core Strategies. The Government's experts, therefore, used that period as a point of comparison when analyzing first-day returns during the Relevant Period. *See, e.g.,* Cohen Disc. ¶ 32. The defense argues that this too was based on a flawed assumption, because the bond market and the characteristics of the Macro Opps portfolio were dramatically different in the Post Period as compared to the Relevant Period. *Id.* at 28–30. Therefore, the defense argued, analyses based on trading data from the Post Period was unreliable. *Id.* The defense

also argued that this testimony should be precluded under Rule 403, because a jury might infer that the limitation in Mr. Leech's responsibilities in the Post Period was the result of wrongdoing and because presenting evidence about the Post Period would result in "delay and wasted time." *Id.* at 30–31.

Fifth, the defense argued that both Professor Cohen's rebuttal disclosure and portions of Professor Kolm's sur-rebuttal disclosure should be excluded. *Id.* at 31–36. As to the former, the defense argued that Professor Cohen's disclosure was not proper rebuttal testimony because it was neither responsive to the defense's experts' disclosures nor dependent on information that Professor Cohen did not have when he made his initial disclosure. *Id.* at 32–33. The defense argued that his disclosure was therefore, in effect, a belated initial disclosure, and the factors considered in the civil context weighed in favor of exclusion. *Id.* at 33–34. As it relates to Professor Kolm's sur-rebuttal disclosure, the defense argued that it was improper for Professor Kolm to respond to Mr. Dolgoff's rebuttal of Professor Cohen. *Id.* at 34–36.

On January 15, 2026, the Government filed its opposition and responded to all five arguments proffered by the defense. *See* Dkt. No. 75 ("Gov't Opp'n"). First, the Government argued that Rule 704(b) only precluded expert testimony that concerned the "mental state" that "constituted an element of the crime charged or a defense." *Id.* at 11. The Government argued that none of the proposed testimony met that definition because the experts would only opine on Mr. Leech's conduct. The Government also argued that "courts routinely" allow experts to testify that "a given practice is consistent with a given state of mind." *Id.* at 12. The Government also argued that the defense took many of the words used by its experts out of context, and that the word "driven" was not a reference to Mr. Leech's personal motivations at all but was a way to describe the relationship between a cause and effect. *Id.* at 14–15. Finally, as it relates to Professor Kolm's use of the word "influenced," the Government argued that, in context, the word is being used to frame

the import of his analysis, rather than to opine on Mr. Leech's state of mind. *Id.* at 16–17. Next, the Government argued that its experts' use of statistics will not overwhelm the jury, and that the testimony and the analyses it is based on will "help the jury understand" the evidence in this case. *Id.* at 17–19. The Government also argued that Rule 403 does not merit exclusion of its experts' proposed testimony because the testimony is highly probative and the experts' use of statistics does not risk misleading the jury. *Id.* at 19–22.

Second, the Government argued that its experts' calculation of first-day and pre-allocation returns were the product of reliable assumptions. *Id.* at 22–29. The Government argued that the use of first-day returns to demonstrate Mr. Leech's allegedly biased allocation practices was reliable because there was "evidence from other sources that [Mr. Leech] routinely waited until late in the day to allocate." *Id.* at 26. The Government argued that their experts should not be precluded from using pre-allocation returns because they were even more probative, and confirmed the analyses performed using first-day returns. *Id.* at 27. The Government also argued that the defense's criticisms could be ventilated during cross-examination and did not merit exclusion of testimony. *Id.* Finally, the Government proffered analyses from Professor Kolm showing that calculating returns two hours before the recorded allocation time still showed biased pre-allocation performance. *Id.* at 29–30.

Third, the Government argued that the use of trading data in the Post Period was also reliable. *Id.* at 32–38. The Government argued that the defense treated the Post Period and the Relevant Period as monoliths, while there were periods of volatility in both. *Id.* at 33–34. Responding to the defense's arguments that the portfolio management needs of Macro Opps changed because Macro Opps was more often positively convex in the Post Period, the Government responded that it was positively convex for portions of in the Relevant Period as well. *Id.* at 35–36. The Government also argued that its experts analyzed the types of market conditions

that characterized the differences between the Relevant Period and the Post Period, and that their analyses found that those conditions did not impact first-day performance. *See, e.g., id.* at 36 (citing Cohen Disc. ¶ 75). The Government argued that "[a]t bottom," the parties disagree about whether market conditions and Macro Opps' negative convexity during the Relevant Period can explain first-day performance differentials, and their experts have "an informed basis" for their position that they cannot. *Id.* at 36. The Government also argued that Rule 403 does not merit exclusion of Post Period analysis because that analysis is probative despite the existence of other comparators and that the Court can limit any prejudice by limiting evidence of "why [Mr. Leech] stopped allocating trades to the Core Strategies" or by giving a limited instruction. *Id.* at 37–38. The Government also argued that "it would not be difficult" to present evidence regarding differences between the Post Period and the Relevant Period "through a handful of charts and cross-examination of the Government's experts." *Id.* at 38.

Fourth, the Government argued that both experts were qualified to testify about the portfolio management topics described in their notices. *Id.* at 38–46. The Government argued that both of its experts had strong academic credentials, including teaching and researching in the area relevant to their testimony. *Id.* at 40, 43. The Government also pointed out that Professor Kolm has "also kept a foot in the private sector." *Id.* at 43. The Government argued that among the experts' extensive experience included "performing data-driven analyses of the performance of trading strategies and portfolio managers," which the Government argued was the "same task" performed here. *Id.*; *see also id.* at 45.

Fifth, the Government argued that its experts were not offering improper bolstering testimony. *Id.* at 47–51. First, they argued that Professor Cohen's rebuttal notice included analyses that he conducted only after the "defense experts created a risk that the jury might think" that Professor Cohen's analysis that there were statistically significant differences in first-day

23

performance and the analogous statistically significant results from Mr. Dolgoff's analysis of the CRA Exercise were "a wash." *Id.* at 47. The Government then argued that the late disclosure standard did not apply, and that even if it did, the rebuttal notice should not be excluded under that standard. *Id.* at 48. As it related to Professor Kolm, the Government argued that his sur-rebuttal was designed to respond to Mr. Dolgoff, not to "bolster" Professor Cohen's testimony. *Id.* at 49–51. The Government also argued that Professor Kolm's sur-rebuttal disclosure was not improperly cumulative of Professor Cohen's testimony and therefore should not be excluded under Rule 403. *Id.*

The defense's motion was fully briefed when they filed their reply on January 29, 2026. Dkt. No. 82 ("Def. Reply"). The defense reprised each of its five principal arguments to exclude the Government's proposed expert testimony. First, the defense argued that the Government's framing of its experts as only testifying about "conduct" was a post-hoc rationalization. *Id.* at 3–4. The defense then argued that the Government misconstrued the applicable legal standard for when an expert may testify that certain evidence is "consistent with" conduct, and that the Government did not cite any authority for the proposition that an expert may state that conduct is consistent with intent without "a body of comparison" against which to compare the defendant's conduct. *Id.* at 4–7. Next, the defense argued that the Government's experts did not simply use words like "driven" in the context of describing data analyses but rather went "one step further" and stated the inference of mental state that only the jury can properly draw. *Id.* at 7–8. Finally, they reprised their argument that Rule 403 merited exclusion because "the government makes clear that it intends to overstate the importance of the experts' limited conclusions." *Id.* at 9–14.

Second, the defense argued that the Government had failed to meet the preponderance of the evidence standard for admissibility of expert testimony because it had not demonstrated that its use of price at time of recording or price at end of day was reliable. *Id.* at 14–18. The defense

24

argues that the Government did not adequately respond to its evidence that there was a delay between when Mr. Leech communicated his allocation decision and when it was recorded in WAMCO's system. *Id.* at 17. As it relates to the analysis by Professor Kolm, the defense argued that this was an impermissible, after-the-fact analysis that still did not meet the Government's burden because the delay between when Mr. Leech communicated his allocation decisions and when they were recorded varied and, at times, exceeded two hours. *Id.* at 18–20.

Third, the defense argued that the Government had misread the applicable case law on when an expert with only academic experience can offer opinion testimony on practical matters. The defense argued that in the cases offered by the Government, experts had either had practical experience or were only allowed to offer "limited conclusions," unlike the Government's experts' proposed testimony. *Id.* at 20–22.

Fourth, the defense argued that none of the Government's arguments supported admissibility of their experts' testimony about trades that took place in the Post Period. The defense argued that even if market conditions fluctuated across both periods, it was the Government's experts who had compared data across the periods as "monoliths." *Id.* at 24. The defense also argued that any of the Government's experts' analyses about the factors that were different across the two periods were only based on trades in the Relevant Period. *Id.* Finally, the defense reprised its argument that Post Period comparisons have limited probative value and argued that a curative instruction may be inadequate and may increase the prejudice to Mr. Leech by "highlight[ing] the issue." *Id.* at 25. The defense also restated its argument that the need to present evidence about the incomparability of the two time periods would lead to an "unnecessary mini-trial." *Id.*

Finally, the defense argued that Professor Cohen's rebuttal did not "rebut any opinion proffered by a defense expert" and that Professor Kolm's sur-rebuttal was an impermissible "interjection" into a disagreement between Professor Cohen and Mr. Dolgoff. *Id.* at 25–26. The

25

defense argued that the Government's explanation of how Professor Cohen rebuts Mr. Dolgoff is "post-hoc," because Professor Cohen introduced a new issue about the significance of the differentials in the first-day performance of Mr. Leech's trades. *Id.* Finally, the defense argued that allowing Professor Kolm to rebut Mr. Dolgoff's rebuttal of Professor Cohen will "convert the case into a tag-team battle of the experts." *Id.* at 28.

### ii. The Government's Motion

On December 15, 2025, the Government also filed its motion to preclude expert testimony. Dkt. No. 62 ("Gov't Mot."). The Government argued that the Court should exclude two portions of the defense experts' proposed testimony.

First, the Government argued that the Court should exclude testimony about the CRA Exercise because it was unreliable, because it does not fit the facts of the case, and because it was likely to confuse or mislead the jury. *Id.* at 24–35. The Government argued that the CRA Exercise did not satisfy the four factors of reliability articulated in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 709 (1993) and that it was not "subject to any testing." *Id.* at 25–27. The Government also argued that the CRA Exercise's design was unrealistic because it was "artificially constrain[ed]," resulting in "fundamental differences" to the circumstances in which Mr. Leech traded and allocated his trades. *Id.* at 27–31. In particular, the Government argued that Professor Tuckman could not choose to abstain from trading, could not allocate trades 50/50, and created unrealistic duration and convexity targets. *Id.* at 28–29. Finally, the Government argued that, based on Professor Kolm's analysis of the proffered allocation rationales, Professor Tuckman did not consistently follow his methodology. *Id.* at 31–33. The Government also argued that the CRA Exercise was unreliable because it did not "fit the facts of the case" and that any probative value was outweighed by the possibility that the jury would infer that Professor Tuckman was attempting to mimic the way Mr. Leech made allocation decisions. *Id.* at 33–35.

26

Second, the Government argued that the Court should exclude portions of Mr. Dolgoff and Professor Maloney's testimony concerning the regression analyses that those experts conducted. *Id.* at 35–46. The Government argued that Mr. Dolgoff's testimony about the regressions he conducted to rebut Professor Cohen's regression testimony was unreliable because the Convexity Effect Offset variable "appear[ed] to have [been] reverse engineered to serve as an alternative to Pre-Allocation Returns, without any regard to how that variable fits the facts of the case." *Id.* at 35. The Government argued that the Convexity Effect Offset variable was at odds with Mr. Leech's testimony to the SEC, which the Government argued established that Mr. Leech knew where a trade would be allocated when he executed it. *Id.* at 39–40. Next, the Government argued that the Convexity Effect Offset variable did not account for pre-trade, convexity-driven changes to duration and that it did not accurately predict Mr. Leech's allocation decisions on days when Macro Opps was positively convex. *Id.* at 40–41. The Government next argued that Mr. Dolgoff neglected to address Mr. Leech's allocations to the Core Strategies. *Id.* at 41. The Government argued that, as a result of these flaws, the Mr. Dolgoff's work "presents a clear risk of confusing or misleading the jury by giving the false impression of scientific rigor." *Id.* at 42.

The Government argued that Professor Maloney's testimony was unreliable and also had the potential to mislead the jury. *Id.* at 42–46. The Government argued that Professor Maloney's regressions were unreliable because they did not account for all relevant variables—including intra-day duration shifts—because they analyzed data at the day level rather than trade-by-trade, and because the regressions ignored trades allocated to the Core Strategies. *Id.* at 42–46. The Government argued that those same infirmities rendered Professor Maloney's regressions misleading. *Id.* at 46.

On January 15, 2026, the defense filed its opposition. Dkt. No. 72 ("Def. Opp'n"). First, the defense argued that the CRA Exercise was reliable to evaluate what it referred to as the "null

hypothesis," *i.e.*, the assumption the defense argued was the "premise underlying" the Government's case: "that specified populations of trades should have no significant difference in unrealized first-day performance." *Id.* at 4, 20–24. Responding to the Government's arguments, the defense argued that courts allow case-specific frameworks even if they do not meet the *Daubert* factors. *Id.* at 22. The defense then argued that the Government's remaining arguments "mischaracterize[] the Exercise's purpose and misstates the proper scope of expert testimony." *Id.* In particular, the defense argued that "Professor Tuckman's disclosure clearly stated that he was *not* trying to replicate Mr. Leech's decision-making process." *Id.* at 23 (emphasis in original). The defense argued that the differences between the CRA Exercise and the circumstances surrounding Mr. Leech's trading and allocation activity did not merit exclusion because the Exercise appropriately fit the facts of the case and because Professor Tuckman's methodology was the product of his "expert judgment" and was "consistent with industry practice." *Id.* at 24–28. Finally, the defense argued that Professor Kolm's evaluation that Professor Tuckman did not consistently apply his own methodology was erroneous. *Id.* at 28–31. They proffered a declaration from Mr. Dolgoff in support of this argument. *See id.*; *see also* Dkt. No. 72-1 ("Dolgoff Decl."). Finally, the defense argued that the Government had not established that the CRA Exercise was likely to confuse the jury because "nothing about Professor Tuckman's testimony will create a 'risk of giving the misimpression that the defendant . . . was thinking along the same lines as Professor Tuckman." *Id.* at 32.

Second, the defense argued that there was no basis to exclude testimony about Mr. Dolgoff and Professor Maloney's regression analyses. *Id.* at 32–43. The defense argued that, in general, rebuttal experts have a "less demanding task because they have no burden to produce models or methods of their own . . . they need only attack those of" the opponent's experts. *Id.* at 33 (citation omitted). To that end, the defense argued that Mr. Dolgoff's rebuttal analysis was reliable because it "illustrates the incompleteness of Professor Cohen's analysis." *Id.* at 34. The defense argued that

28

Mr. Dolgoff's regressions also sufficiently fit the facts of the case. Mr. Leech's testimony did not foreclose Mr. Dolgoff's regressions because Professor Cohen's analysis was premised on the assumption that Mr. Leech used information gained after a trade was executed. *Id.* at 35–36. And Mr. Dolgoff's decision not to consider pre-trade, convexity-driven duration changes was reliable because Mr. Dolgoff was considering variables in the "*the same time interval*" as the variable Professor Cohen analyzed. *Id.* at 37 (emphasis in original). The defense argued that the Government's arguments about positive convexity did not merit exclusion and that Mr. Dolgoff's analysis implicitly considered the Core Strategies because "trades in the regression could only be allocated to either the Core Strategies or Macro Opps." *Id.* at 37–41. The defense also argued that because Macro Opps was more negatively convex than the Core Strategies, the Convexity Offset Effect variable "applied most significantly to Macro Opps." *Id.* at 39.

Finally, the defense argued that Professor Maloney's analysis was reliable as a rebuttal analysis. *Id.* at 41–44. The defense argued that the variables that Professor Maloney did not consider were the same ones not considered in the analyses Professor Maloney purports to rebut—namely, the Trade Reallocation Exercise. *Id.* at 41–43. The defense also argued that the purpose of Professor Maloney's analysis is not to "compare the variables he ran to other variables," and therefore cases that considered the admissibility of regressions seeking to establish cause and effect relationships were inapposite. *Id.* at 42. The defense argued that, for similar reasons, the Government's charge that Professor Maloney did not look at individual trades did not merit exclusion. *Id.* at 43. The defense argued that Professor Maloney did not need to analyze the Core Strategies because the conclusions he sought to rebut only focused on Macro Opps. *Id.* at 44.

The Government's motion was fully briefed when the Government filed its reply on January 29, 2026. Dkt. No. 87 ("Gov't Reply"). Addressing the defense's argument that the CRA Exercise rebutted an assumption underlying the Government's case, the Government argued that its case was

29

not based on the "premise" as described by the defense. *Id.* at 3. The Government argued that the defense's concession that the Exercise was not designed to mimic Mr. Leech's behavior merited its exclusion because it vitiated its relevance and demonstrated that the defense created a "novel experiment" for the purposes of this case without testing it as required by *Daubert*. *Id.* at 3–5. Reprising its arguments that the differences between the Exercise and Mr. Leech's trading merited its exclusion, the Government argued that the facial similarity between the two would mislead the jury to "wrongly conclude that Professor Tuckman was trying to mimic" Mr. Leech's responsibilities. *Id.* at 6–10. Responding to the defense's argument that Professor Kolm miscalculated or misinterpreted the defense experts' work, the Government conceded that Professor Kolm had made calculation and interpretation errors. *Id.* at 11. The Government argued, however, that Professor Kolm's work nonetheless highlighted "a significant flaw in the CRA Exercise"—that the Exercise's design "ma[de] it impossible . . . to understand the actual reason the defendant chose to allocate each trade." *Id.* at 11–12. The Government argued that this was both a "significant problem under Rule 702, as well as a practical trial problem." *Id.* at 12. In further support of its argument that testimony about the CRA Exercise should be precluded under Rule 403, the Government argued that Professor Tuckman's testimony that he "found it relatively straightforward to allocate all of the trades" alongside Mr. Dolgoff's testimony about the match between Professor Tuckman's allocations and Mr. Leech's allocations will confuse and mislead the jury. *Id.* at 12–14.

Responding to the defense's arguments that rebuttal experts do not have as high a burden as party-proponent experts, the Government argued that rebuttal experts must nonetheless "meet the standards of Rule 702, and both Mr. Dolgoff and Professor Maloney fall far short of that bar." *Id.* at 14–15. The Government reiterated that Mr. Dolgoff's decision to analyze the Convexity Effect Offset variable "ma[de] no sense" in context of the other facts in the case, including Mr. Leech's testimony to the SEC, the existence of pre-trade duration changes driven by convexity, and the fact

30

that Mr. Dolgoff did not consider trades allocated to the Core Strategies. *Id.* at 15–19. The

Government reiterated that Mr. Dolgoff's analyses fail to accurately predict Mr. Leech's allocations

when Macro Opps was not negatively convex. *Id.* at 19–20.

Finally, the Government once again argued that testimony about Professor Maloney's

regression analyses should be excluded or limited. The Government reiterated the flaws it had

identified in its opening brief, including Professor Maloney's failure to include intra-day duration

changes, his decision to analyze daily data rather than trade-by-trade data, and Professor Maloney's

failure to account for the Core Strategies. *Id.* at 20. The Government framed these purported

omissions as meriting exclusion because the Maloney regressions "lacked many key features" of a

"traditional regression," which is designed to "isolate the effect of one variable (the independent

variable) on another variable (the dependent variable) . . . ." *Id.* (citations and internal quotations

omitted). The Government argued that allowing Professor Maloney to present his regression

analyses runs the risk that the jury will draw the conclusion that the "passive duration drift in Macro

Opps influenced [Mr. Leech's] trading decisions for that strategy." *Id.* at 21. Accordingly, the

Government argued that the Court should preclude or limit Professor Maloney's testimony. *Id.*

## II.    LEGAL STANDARDS

### A.    FRE 702

Federal Rule of Evidence 702, which governs the admissibility of expert testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or
> education may testify in the form of an opinion or otherwise if the proponent
> demonstrates to the court that it is more likely than not that: (a) the expert's
> scientific, technical, or other specialized knowledge will help the trier of fact to
> understand the evidence or to determine a fact in issue; (b) the testimony is based on
> sufficient facts or data; (c) the testimony is the product of reliable principles and
> methods; and (d) the expert's opinion reflects a reliable application of the principles
> and methods to the facts of the case.

Fed. R. Evid. 702

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court

explained that Rule 702 requires district courts to act as gatekeepers by ensuring that expert testimony "both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597. As such, the Court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93. In short, the Court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).

### i.    Qualification as Expert

"Rule 702 requires a trial court to make an initial determination as to whether the proposed witness qualifies as an expert." *Baker v. Urban Outfitters, Inc.*, 254 F. Supp. 2d 346, 352–53 (S.D.N.Y. 2003). "Courts within the Second Circuit 'have liberally construed expert qualification requirements' when determining if a witness can be considered an expert." *Cary Oil Co., Inc. v. MG Refining & Marketing, Inc.*, 2003 WL 1878246, at *1 (S.D.N.Y. Apr. 11, 2003) (quoting *TC Sys. Inc. v. Town of Colonie, N.Y.*, 213 F. Supp. 2d 171, 174 (N.D.N.Y. 2002)); *accord Plew v. Ltd. Brands, Inc.*, 2012 WL 379933, at *4 (S.D.N.Y. Feb. 6, 2012). "To determine whether a witness qualifies as an expert, the court must first ascertain whether the proffered expert has the educational background or training in a relevant field." *Crown Cork & Seal Co., Inc. Master Retirement Trust v. Credit Suisse First Boston Corp.*, 2013 WL 978980, at *2 (S.D.N.Y. Mar. 12, 2013) (citation and internal quotation marks omitted). "Any one of the qualities listed in Rule 702—knowledge, skill, experience, training, or education— may be sufficient to qualify a witness as an expert." *Id.* (citing *Tiffany (N.J.) Inc. v. eBay, Inc.*, 576 F. Supp. 2d 457, 458 (S.D.N.Y. 2007)).

Even if a proposed expert lacks formal training in a given area, he may still have "practical experience" or "specialized knowledge" qualifying him to give opinion testimony under Rule 702.

*See McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995) (quoting Fed. R. Evid. 702) (internal quotation marks omitted).  But "[i]f the witness is relying solely or primarily on experience, then [he] must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F. Supp. 2d 448, 473 n.148 (S.D.N.Y. 2010) (quoting Fed. R. Evid. 702 Advisory Committee Note).  Where a witness's "expertise is too general or too deficient," the Court "may properly conclude that [he is] insufficiently qualified."  *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 81 (2d Cir. 1997).

A court must then "compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony."  *United States v. Tin Yat Chin,* 371 F.3d 31, 40 (2d Cir. 2004) (citing *United States v. Diallo*, 40 F.3d 32, 34 (2d Cir. 1994)).  "The expert's testimony must be related to those issues or subjects within his or her area of expertise."  *Crown Cork*, 2013 WL 978980, at *2 (citing *Malletier v. Dooney & Bourke, Inc.,* 525 F. Supp. 2d 558, 642 (S.D.N.Y. 2007)).  "If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent."  *In re Zyprexa Prods. Liab. Litig.,* 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007) (citing *Stagl,* 117 F.3d at 80).  "Thus, an expert 'should not be required to satisfy an overly narrow test of his own qualifications,' and the court's focus should be on 'whether the expert's knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth.'"  *Crown Cork,* 2013 WL 978980, at *2 (quoting *Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.,* 2006 WL 2128785, at *5 (S.D.N.Y. July 28, 2006)).  "Assertions that the witness lacks particular educational or other experiential background, 'go to the weight, not the admissibility, of [the] testimony.'"  *In re Zyprexa Prods. Liab. Litig.,* 489 F. Supp. 2d at 282 (quoting *McCullock,* 61 F.3d at 1043).

33

###### ii.    Expert Testimony Must Assist the Trier of Fact

A district court must conclude that the proposed testimony will assist the trier of fact. *In re Rezulin Products Liab. Litig.*, 309 F. Supp. 2d 531, 540 (S.D.N.Y. 2004). "Testimony is properly characterized as 'expert' only if it concerns matters that the average juror is not capable of understanding on his or her own." *United States v. Mejia*, 545 F.3d 179, 194 (2d Cir. 2008); *see also United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994) ("A district court may commit manifest error by admitting expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average juror.")

"Weighing whether the expert testimony assists the trier of fact goes primarily to relevance." *Faulkner v. Arista Records LLC*, 46 F. Supp. 3d 365, 375 (S.D.N.Y. 2014) (citing *Daubert*, 509 U.S. at 591). Relevance can be expressed as a question of "fit"—"whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591 (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)). The testimony is not helpful if it "usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) (quoting *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)). Expert testimony that is "directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help" should not be admitted. *United States v. Mulder*, 273 F.3d 91, 101 (2d Cir. 2001) (quoting *United States v. Castillo*, 924 F.2d 1227, 1232 (2d Cir. 1991)).

###### iii.    Expert Testimony Must Be Reliable

In assessing reliability, courts should consider "the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the

product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case." *Amorgianos v. Nat'l R.R. Passenger Corp.,* 303 F.3d 256, 265 (2d Cir. 2002) (citing Fed. R. Evid. 702). "Under *Daubert,* factors relevant to determining reliability include 'the theory's testability, the extent to which it 'has been subjected to peer review and publication,' the extent to which a technique is subject to 'standards controlling the technique's operation,' the 'known or potential rate of error,' and the 'degree of acceptance' within the 'relevant scientific community.'" *Restivo v. Hessemann,* 846 F.3d 547, 575–76 (2d Cir. 2017) (quoting *United States v. Romano,* 794 F.3d 317, 330 (2d Cir. 2015)); *see also Daubert,* 509 U.S. at 593–95.

"A proffered opinion may fail all four *Daubert* reliability factors and still be admitted." *In re Mirena Ius Levonorgestrel-Related Prods. Liab. Litig. (No. II),* 341 F. Supp. 3d 213, 240 (S.D.N.Y. 2018), *aff'd sub nom. In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II),* 982 F.3d 113 (2d Cir. 2020). In such a situation, the Court "must 'carefully scrutinize,' pause, and take a 'hard look' at the expert's methodology." *Id.* (citations omitted). "The district court has broad discretion" in "*how* to determine reliability." *In re Pfizer Inc. Sec. Litig.,* 819 F.3d 642, 658 (2d Cir. 2016) (quoting *Kumho Tire,* 526 U.S. at 142) (emphasis in *Kumho Tire*). "[T]he types of factors that are appropriate to consider will 'depend[ ] upon the particular circumstances of the particular case at issue.'" *Id.* (quoting *Kumho Tire,* 526 U.S. at 150). Ultimately, the Court's task "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire,* 526 U.S. at 152.

When evaluating the reliability of an expert's testimony, the court must "undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos,* 303 F.3d at 267. If the expert's testimony does not rest on traditional scientific methods,

35

the court may permit testimony "where a proposed expert witness bases her testimony on practical experience rather than scientific analysis." *Davis v. Carroll*, 937 F. Supp. 2d 390, 412 (S.D.N.Y. 2013). "[T]he reliability inquiry may . . . focus upon personal knowledge and experience of the expert." *Id.*

"In undertaking this flexible inquiry, the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Amorgianos*, 303 F.3d at 266. But as the Supreme Court has explained, "conclusions and methodology are not entirely distinct from one another," and a district court is not required to "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (citation omitted). "Thus, when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266. On the other hand, "[w]here an expert's methodology overcomes the hurdle of being based on a reliable process, remaining controversies as to the expert's methods and conclusions generally bear on the weight and credibility—but not admissibility—of the testimony." *Royal & Sun Alliance Ins. PLC v. UPS Supply Chain Solutions, Inc.,* 2011 WL 3874878, at *2 (S.D.N.Y. Aug. 31, 2011) (citation omitted).

In light of the liberal admissibility standards of the Federal Rules of Evidence, exclusion of expert testimony is warranted only when the district court finds "serious flaws in reasoning or methodology." *In re Fosamax Prods. Liab Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009) (citing *Amorgianos*, 303 F.3d at 267). Otherwise, if an expert's testimony falls within "the range where experts might reasonably differ," the duty of determining the weight and sufficiency of the evidence on which the expert relied lies with the jury, rather than the trial court. *Kumho Tire*, 526 U.S. at 153. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the

36

burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citation omitted).  "[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (citing *Daubert*, 509 U.S. at 593 n. 10).

If, at the end of the Court's evaluation of these factors, "'some, but not all, of an expert's opinions . . . meet the criteria' of Rule 702 of the Federal Rules of Evidence, then 'a court may exclude portions of an expert report while admitting other portions.'" *Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n*, 324 F. Supp. 3d 387, 394 (S.D.N.Y. 2018) (quoting *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 76 (S.D.N.Y. 2015)).

### B.    FRE 403

Testimony that is admissible under Rule 702 may be excluded under Federal Rule of Evidence 403 if the court finds that "its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.  Expert testimony is particularly susceptible to these dangers, "given the unique weight such evidence may have in a jury's deliberations." *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005).  "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it.  Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595 (quotations omitted).

A court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following:  unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.  "Rule 403 recognizes that relevance alone does not ensure admissibility.  A cost/benefit analysis must often be employed.

Relevant evidence may be excluded if its probative value is not worth the problems that its admission may cause." Weinstein's Federal Evidence § 403.02[1][a]. A district court is "accorded a wide discretion in determining the admissibility of evidence" under Rule 403. *Sprint/United Management Co. v. Mendelsohn*, 552 U.S. 379, 384 (2008) (quotation omitted).

### C.     FRE 704

Under Federal Rule of Evidence 704, "[i]n a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense." Fed. R. Evid. 704(b). This rule "disables . . . an expert from 'expressly stating the final conclusion or inference as to a defendant's actual mental state' at the time of a crime." *United States v. DiDomenico*, 985 F.2d 1159, 1164 (2d Cir 1993) (quoting *United States v. Richard*, 969 F.2d 849, 854 (10th Cir. 1992), *cert. denied*, 506 U.S. 887 (1992)). "The rule recognizes that expert testimony concerning a defendant's mental state poses a uniquely heightened danger of intruding on the jury's function." *Id.* The Second Circuit has cautioned, however, that "Rule 704(b) does not prohibit all expert testimony that gives rise to an inference concerning a defendant's mental state." *Id.* at 1165. "The plain language of the rule, however, means that the expert cannot expressly state the inference, but must leave the inference, however obvious, for the jury to draw." *Id.* (internal quotations omitted). "It is only as to the last step in the inferential process—a conclusion as to the defendant's actual mental state—that Rule 704(b) commands the expert to be silent." *Id.* at 1164 (quoting *United States v. Dunn*, 846 F.2d 761, 762 (D.C. Cir. 1988)).

## III.     DISCUSSION

For the reasons that follow, both parties' motions to preclude expert testimony are denied. There are, however, three instances where descriptions of the proposed testimony increase the risk that the words used by the experts at trial will confuse the jury. The Government's experts'

38

disclosures describe their proposed testimony as stating that the results of statistical analyses are "consistent with" Mr. Leech "using" information to make "allocation decisions."  Although the content of this testimony is admissible, care should be taken regarding the language used by the experts in their testimony so as not to suggest an inference into Mr. Leech's state of mind.  The same is true with respect to Professor Tuckman's proposed testimony about his use of "proxies" to capture Mr. Leech's "views" about the bond market.

To minimize the risk of objections that disrupt the presentation of evidence at trial, the Court orders the parties to meet and confer on mutually agreeable language that the parties may elicit from the experts at trial.  The Court orders the parties to file a letter on the status of those discussions no later than two weeks from the date of this order.

Although the defense's description of the testimony about the CRA Exercise as rebutting a "null hypothesis" of the Government's case does not appear in the disclosures, it is an inapposite use of a statistical term of art in a case with a great deal of statistical evidence.  Absent additional scientific justification for the use of that term in this context, the Court expects to sustain any properly raised objection should the defense elicit testimony that frames the Government's case in this way.  However, there is no basis to exclude any defense expert's testimony because that framing does not appear in the defense's disclosures.

### A.     The Defense's Daubert Motion

#### i.      "State of Mind" Testimony

##### 1.     Rule 704

Neither Professor Cohen nor Professor Kolm intend to offer impermissible testimony on whether Mr. Leech "did or did not have a mental state or condition that constitutes an element of the crime charged . . . ."  Fed. R. Evid. 704(b).

In substance, Professors Cohen and Kolm intend to offer testimony that can help the jury

understand Mr. Leech's conduct.  Describing what Mr. Leech was doing during the Relevant Period

is not a simple task.  In carrying out his responsibilities as an asset manager, Mr. Leech had to take a

series of steps, each of which involved highly technical analysis of securities markets and portfolio

strategies and required a balance of competing considerations.  During the relevant period, Mr.

Leech executed "thousands of trades" that are at issue in this case.  Def. Mot. at 4.[8]  Those trades

involved two types of securities:  "U.S. Treasury futures and options."  *Id.*  Whenever Mr. Leech

made or allocated a trade, Mr. Leech was tasked with considering the needs of different trading

strategies.  These trading strategies were different, potentially in important ways.  The defense

summarizes these differences in its motion:

> The Core Strategies (i) invested primarily in U.S.-based bonds; (ii) were measured
> against a benchmark; (iii) drove returns "bottom-up" from the identification of
> under-valued securities; and (iv) were expected to perform within three percent of
> the benchmark in ordinary years and six percent of the benchmark in extraordinary
> years.  In contrast, Macro Opps (i) was a global-based strategy and held substantial
> investments in emerging markets and foreign currencies; (ii) was an "unconstrained"
> strategy, meaning that it was not measured against a benchmark and did not have any
> direct or obvious competitor; (iii) drove returns "top-down" from the identification
> of macroeconomic trends; and (iv) was highly volatile, meaning it was expected to be
> up or down ten percent annually in ordinary years and up or down twenty percent
> annually in extraordinary years.

Def. Mot. at 22.  And as experts from both the Government and the defense agree, understanding

what Mr. Leech was doing requires some understanding of concepts in fixed-income trading,

including duration and convexity.

The Government's experts use statistical tools, data from WAMCO trade blotters, other

documentary evidence, and their own experience to form opinions about Mr. Leech's conduct.  *See,*

*e.g.*, Cohen Disc. ¶¶ 1–4 (describing data used for Professor Cohen's statistical analyses).  They use

---

[8] The volume of records that capture (in part) Mr. Leech's conduct demonstrate the difficulty in describing Mr. Leech's conduct in simple terms.  The defense, in its omnibus pretrial memorandum, represented that the Government had produced a trade blotter identifying over 33,000 trades placed "purportedly placed by Mr. Leech (1) in U.S. Treasury futures and options, (2) during the 33 months covered by the Indictment, and (3) allocated to one or more accounts within the Core Strategies or Macro Opps."  See Dkt. No. 35 ("Def. Omnibus Mem.") at 9.  The blotters themselves "span 595,236 rows and 48 columns . . . for a total of 28,571,328 cells of information."  *Id.*

statistical tests to identify patterns in the vast quantity of data and relationships—or the absence of any meaningful relationship—between a number of variables that they believed to be relevant based on their academic and practical experiences.  For example, Professor Cohen proposes to explain that a "Mann-Whitney $U$ test assesses, based on ranks of population members, whether randomly selected values from two populations come from the same distribution."  *Id.* ¶ 53(a).  He proposes to testify that he performed the Mann-Whitney $U$ test on "on the Pre-Allocation Returns for . . . allocations to Macro Opps (excluding Marex) and the Pre-Allocation Returns for Mr. Leech's . . . allocations to the Core Strategies."  *Id.* ¶ 54(a).  He proposes to testify that the Mann-Whitney $U$ test—along with other analyses—"showed that the difference in the distributions of Pre-Allocation Returns between Macro Opps and the Core Strategies was highly statistically significant."  *Id.*

The Government's experts seek to use the results of those analyses to explain how they illuminate Mr. Leech's conduct.  The Second Circuit has allowed an expert to testify that, based on her experience and her evaluation of the relevant evidence, the evidence is "consistent with" criminal conduct.  *United States v. Lopez,* 547 F.3d 364, 373 (2d Cir. 2008).  The Government's experts propose to offer that type of testimony in this case.  As it relates to the Mann-Whitney $U$ test, Professor Cohen proposes to offer his opinion that the statistical significance of the differences in distributions can illuminate Mr. Leech's conduct.  His disclosure describes his proposed testimony that the results of that test and other analyses "are *consistent with* Mr. Leech using information about the first-day performance of his Treasury F&O trades in making allocation decisions between Macro Opps and the Core Strategies."  *Id.* ¶ 55.  In this way, the Government's experts' testimony is analogous to that of a former police detective experienced in narcotics investigations testifying that, based on his experience and review of the physical evidence, that "drugs and paraphernalia found in [the defendant's] car were more consistent with distribution than personal use."  *Lopez,* 547 F.3d at 373.  The detective in *Lopez* relied on a visual inspection of physical evidence to reach his

conclusions about the defendant's conduct; the Government's experts in this case rely on statistical analysis of documentary evidence—primarily, trade blotter data—to reach their conclusions about Mr. Leech's conduct. *Id.*

The Government experts' testimony is not impermissible because the jury may infer Mr. Leech's intent from their testimony about his conduct. "Rule 704(b) does not prohibit all expert testimony that gives rise to an inference concerning a defendant's mental state . . . . The plain language of the rule, however, means that the expert cannot expressly 'state the inference,' but must leave the inference, however obvious, for the jury to draw." *DiDomenico*, 985 F.2d at 1165; *cf. United States v. Smith*, 2025 WL 3293093, *24 (S.D.N.Y. Nov. 26, 2025) (opining, where defendant was charged with intent to possess child sex abuse material, that withdrawn expert opinion that "a broken Link File is more indicative of a file that a user *intended to dispossess*" such files would violate Rule 704(b) (emphasis added)). A jury may infer, based on the testimony of the Government's experts, that Mr. Leech engaged in a pattern of conduct as evidence that he did so with the requisite criminal intent. *See Lopez*, 547 F.3d at 373; *see also* Dkt. No. 95 at 12 (identifying parties' agreement that the jury should be instructed that the mental state element of the charged crimes requires that the conduct was undertaken "knowingly, willingly, and with an intent to defraud."). Neither Professor Cohen nor Professor Kolm propose to offer any testimony that expressly states the inference—*i.e.*, that Mr. Leech was engaging in the conduct "knowingly, willingly, and with an intent to defraud." Accordingly, their proposed testimony does not run afoul of Rule 704(b).

The case that the defense cites in support of its motion to exclude under Rule 704(b) is distinguishable because it concerns testimony that does expressly state the inference. In *United States v. Hwang*, 22-cr-240, the defendant was charged with seven counts of market manipulation. *See* 1:22-cr-240, Dkt. No. 134 ¶¶ 77–78. The *mens rea* element of that crime required the Government to prove beyond a reasonable doubt that the defendant "engaged in the sale of any security . . . with the

sole intent to (1) create a false impression of market activity regarding [certain securities], and (2) artificially distort the price of [those securities]." 22-cr-240, Dkt. No. 125 at 54 & n.114 (citing *United States v. Mulheren*, 938 F.2d 364, 368 (2d Cir. 1991)). Considering the defense's motion *in limine*, Judge Hellerstein did not exclude any testimony before trial, but opined that expert testimony that certain data were "consistent with the strategy to influence market prices" was "problematic." 22-cr-240, Dkt. No. 181 at 11:6–11. During trial, he sustained an objection to testimony that stated whether the use of certain trading strategies was "consistent with the *intent* to *minimize price impact*." 22-cr-240, Tr. at 2826 (emphasis added). Here, in contrast, the Government's experts do not intend to testify that Defendant had any particular "intent." Judge Hellerstein's decision to sustain objections to testimony that explicitly discussed a defendant's "intent" to commit the criminal act— *i.e.*, to artificially distort the price of securities—does not justify exclusion of the testimony that the Government's experts propose to offer in this case.

The defense's objections to the language the Government experts use to summarize their testimony does not justify excluding that testimony under Rule 704(b). The defense points to portions of both experts' proposed testimony that the results of certain analyses are "consistent with Mr. Leech *using* information about the first-day performance of his Treasury F&O trades in making allocation decisions." Cohen Disc. ¶ 78 (emphasis added); *see also* Def. Mot. at 8. They also point to portions of the proposed testimony that certain characteristics of trades allocated to Macro Opps and the Core Strategies "do not appear to be driven" by certain other explanations. *See, e.g.* Cohen Disc. ¶ 66. Finally, the defense argues that Professor Kolm's use of the word "influenced" is impermissible. *See, e.g.*, Kolm Disc. ¶ 35(d).

Neither the use of "driven," "using," or "influenced" transforms the Government's experts' proposed testimony into an opinion on the mental state that the Government must prove beyond a reasonable doubt. The defense misconstrues Professor Cohen's use of the word "driven."

Professor Cohen does not propose to use that word in connection with anything Mr. Leech did. None of his testimony is about what Mr. Leech was "driven"—*i.e.,* "motivated"—to do. Instead, he uses the word "driven" to describe a cause-and-effect relationship, often basing that conclusion on the results of statistical analysis. *See, e.g.* Cohen Disc. ¶ 66 ("Professor Cohen proposes to testify that the *positive Pre-Allocation Returns and [first-day returns]* for Mr. Leech's allocations to Macro Opps (excluding Marex) *do not appear to be driven by* any requirements of the Macro Opps investment guidelines or the Macro Opps strategy . . . ." (emphasis added)). The object of "driven" is a potential explanation of the first-day performance differential, not Mr. Leech. *See id.*; *see also id.* ¶ 71(c) ("Professor Cohen will testify that this shows it was unlikely that *Mr. Leech's allocations* to Macro Opps were *driven by a need to manage negative convexity*" (emphasis added)).

The words "using" and "influenced" appear in the experts' disclosures to summarize testimony that proposes to opine on Mr. Leech's conduct, not the mental state of the charged crime. The defense argues that the word "use" must mean "intentionally use." Def. Mot. at 8 n.1. But unlike the expert in *Hwang*, Professors Cohen and Kolm do not propose to use "intent" or any of its derivatives. They propose to testify that the data appears consistent with Mr. Leech using first-day performance to make allocation decisions. The jury need not accept that this testimony means he was consciously aware of differences in first-day performance and deliberately acted on that awareness when making allocation decisions. Therefore, their use of the word "using" does not transform their testimony into the kind that runs afoul of Rule 704(b).

While "influenced" does present a closer case, Professor Kolm uses that word in his disclosures to summarize proposed testimony that is, in substance, his opinion about Mr. Leech's conduct. The defense points out that Professor Kolm proposes to opine that certain analyses provide "a useful way to assess the degree to which [certain portfolio requirements] influenced Mr. Leech's Treasury F&O allocation decisions," and will conclude "that the results of those analyses . . .

44

[are] further evidence that [those requirements] did not significantly constrain Mr. Leech's flexibility in allocating Treasury F&Os." Kolm Disc. ¶ 35(d). Here, too, the testimony concerns conduct. This proposed testimony is his opinion on what statistical analyses show about the extent to which WAMCO's requirements imposed constraints on allocations to Macro Opps and the Core Strategies. Understanding the effect of WAMCO's requirements is important to contextualize Mr. Leech's conduct. Professor Kolm does not propose to opine on the degree to which Mr. Leech was consciously considering those constraints when he made allocation decisions.

### 2.    Rule 403[9]

The probative value of proposed testimony from the Government's experts is not substantially outweighed by the risk that the testimony will confuse or mislead the jury. Both Professor Cohen's and Professor Kolm's proposed testimony has significant probative value. Evidence is probative if "it has any tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401(a). Mr. Leech is accused of engaging in a cherry-picking scheme in which he defrauded his clients by allocating trades that performed well in the hours after they were executed to favored accounts and allocated trades that performed poorly in the hours after they were executed to disfavored accounts. To prove its case, the Government must prove that Mr. Leech made decisions on where to allocate trades accounting for how well they performed in the hours after they executed them.

As detailed above and in the Government's expert disclosures, the Government's experts propose to testify about data analyses they performed on Mr. Leech's trading data. Those analyses examined the time between when Mr. Leech executed a trade and when it was recorded in

---

[9] As discussed, Federal Rule of Evidence 403 may justify exclusion of evidence even if it meets the requirements of Rule 702 and 704. Here, the defense has moved to exclude different portions of the experts' testimony based on different requirements of Rules 702 and 704. They argue that, for some portions they move to exclude, that Rule 403 justifies exclusion in the alternative. Therefore, the Court elects to analyze whether Rule 403 justifies exclusion in this same way.

WAMCO's systems and calculated the first-day performance of trades allocated to various strategies and accounts.  Those analyses also sought to determine whether the differences in first-day performance could be explained by random chance.  The analyses also examined whether there are other explanations for the pattern in Mr. Leech's trading history.  Based on the results of those analyses, the experts propose to opine on Mr. Leech's conduct.  The analyses and the experts' opinions based on the results of those analyses are highly probative of Mr. Leech's trading and allocation activity.  The evidence makes it more likely that Mr. Leech waited to allocate a trade until he knew how well it performed in the hours following its execution.

That probative value is not substantially outweighed by the risk that the jury will be confused or misled.  The defense argues that the Government's experts present "numerous, complex, and overlapping statistical analyses."  Def. Mot. at 12.  The defense argues that there is a risk that the jury will give undue weight to the experts' statistical analysis because the jury will not "appreciate the limits of the data" and because they argue that the Government plans to "overstate the importance of the experts' limited conclusions."[10]  Def. Reply at 11.  Neither concern justifies excluding the Government's experts' testimony.  As discussed, the facts of this case involve technical and complicated topics that are likely to be outside the ambit of most jurors' personal knowledge.  But, without more, the possible confusion that may result from exposure to unfamiliar topics and statistical analysis is not a sufficient basis to exclude otherwise relevant evidence.  *Cf. United States v. Jakobetz*, 955 F.2d 786, 797 (2d Cir. 1992) ("Although scientific and statistical evidence may seem complicated, we do not think that a jury will be so dazzled or swayed as to ignore evidence

---

[10] The Court notes that none of the examples the defense identifies in advancing this argument refer to statements in the Government's expert witness disclosures.  Instead, the defense taken quotes from the Government's briefing.  The quotes are often taken out of context.  *Compare* Def. Reply at 12 ("For example, the government's brief states that Professors Cohen's and Kolm's analyses *show* 'whether the large difference in the first-day performance of trades the defendant allocated to Macro Opps and the Core Strategies could be caused by market conditions or differences between the strategies.'"), *with* Gov't Opp'n. at 1 ("Both have performed extensive analyses of trading and market data *to help show* . . . whether the difference in the first-day performance of trades the defendant allocated to Macro Opps and the Core Strategies could be caused by market conditions or differences between the strategies." (emphasis added)).

suggesting that an experiment was improperly conducted or that testing procedures have not been established.").[11]  And as it relates to the risk that the Government will overstate the importance of its experts conclusions, the defense "may challenge [the Government's expert testimony] through, among other things, cross-examination and presentation of contrary evidence." *United States v. Nektalov*, No. S203CR.828 (PKL), 2004 WL 1469487, at *2 (S.D.N.Y. June 30, 2004).  As the defense references in its motion, it plans to offer testimony from experts about the very limitations that it argues will mislead the jury.  *See* Def's Reply at 12 n.9.  Defense counsel can also test the experts' conclusions through vigorous cross-examination.  "Ultimately the jury will consider what weight, if any, to give to the [Professors'] expert testimony." *Nektalov*, 2004 WL 146987, at *2.

Although the Court declines to preclude Professors Kolm and Cohen from proffering any of their proposed testimony, the Court cautions that their testimony should be framed with care so that it does not cross the lines drawn by Rules 704 and 403.  The Second Circuit has been clear that as it relates to mental state of the crime charged that "the expert cannot expressly state the inference, but must leave the inference, however obvious, for the jury to draw." *DiDomenico*, 985 F.2d at 1165.  In other words, the expert cannot "leav[e] it to the jury merely to murmur, 'Amen.'" *Id.*  As proposed, the Government's experts' testimony does not run afoul of Rule 704 because the experts do not propose to state the inference that can be drawn from these their proposed testimony.  And, as discussed, any risk of confusion does not substantially outweigh the probative value of this evidence.

While the Court will not exclude this testimony under Rule 704 or Rule 403 on the basis of the expert disclosures, the Court recognizes that the live testimony at trial could be objectionable if

---

[11] The defense's invocation of the prosecutor's fallacy is inapposite.  The prosecutor's fallacy concerns a situation where statistics are not interpreted correctly.  To take the defense's example, if a random DNA match probability is 1/100,000, that is not the same as saying that there is a 99.99% chance that the defendant is guilty if the DNA test returns a "match."  This incorrect interpretation is what makes it a "fallacy."  The defense does not identify any portion of the Government experts' disclosures where they propose to testify based on incorrect interpretations of the relevant statistical tests.

not carefully framed.  To minimize the possibility that objections will result in delay during the trial,

the Court orders the parties to meet and confer to determine whether they can agree on alternative

language to clarify that the expert's opinions do not speak to the defendant's state of mind.  The

deadline for the parties to file a letter on the status of those discussions two weeks from the date of

this opinion.

### ii.        Reliability

Professor Cohen and Professor Kolm's proposed testimony is the product of sufficiently

reliable methods.  To be admissible, expert testimony must be "grounded on sufficient . . . data" and

"the product of reliable principles and methods."  *Amorgianos*, 303 F.3d at 265.  "A minor flaw in an

expert's reasoning or a slight modification of an otherwise reliable method will not render an

expert's opinion *per se* inadmissible."  *Id.* at 267.  The Court "should only exclude the [testimony] if

the flaw is large enough that the expert lacks good grounds for his or her conclusions."  *Id.* (citation

and internal quotations omitted).  Such a standard accords with "the liberal admissibility standards

of the federal rules and recognizes that our adversary system provides the necessary tools for

challenging reliable, albeit debatable, expert testimony."  *Id.*

The defense moves to exclude the Government's experts' testimony by virtue of the experts'

decisions to base their analyses on two sets of data:  (1) first-day and pre-allocation performance;

and (2) Post Period first-day performance of trades allocated to Macro Opps.  The Government

experts' use of both sets of data is sufficiently reliable to avoid exclusion under Rule 702.  The Court

analyzes each of the defense's requests to exclude in turn.

The experts' testimony regarding Mr. Leech's use of first-day and pre-allocation performance

to allocate trade across different strategies is the product of a sufficiently reliable method.  Both

experts plan to testify that their analyses showed that there were differences in the first-day and pre-

allocation performance of trades allocated to Macro Opps and first-day and pre-allocation

performance of trades allocated to the Core Strategies. Gov't Opp'n at 22–24; *see, e.g.*, Cohen Disc ¶ 78. In their initial reports, both experts relied on two points in time to assess the performance of Mr. Leech's trades after he executed the trade but before he decided to allocate them: the end-of-day price as published by the Chicago Mercantile Exchange and the price at the time the WAMCO trade blotter indicated that Mr. Leech recorded his allocation decision. In response to the defense's assertion that there was a gap between when Mr. Leech communicated his allocation decision and when his trading assistants recorded that decision, Professor Kolm repeated some of his analyses by looking at the aggregate return using the Chicago Mercantile Exchange price at a point two hours before the recorded allocation time in the trade blotter. *See* Gov't Opp'n at 25.

That methodology was sufficiently reliable. The assumption that either the end-of-day price or the price at the time the allocation decision was recorded is a reliable proxy for the price at the time of allocation is not "so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." *Restivo*, 846 F.3d at 577. The defense does not argue that the assumption is unrealistic and does not identify any portion of the experts' testimony that contradicts that assumption. *See In re LIBOR-Based Financial Instruments Antitrust Litig.*, 299 F. Supp. 2d 430, 487 (S.D.N.Y. 2018) (granting motion to preclude expert testimony because expert both conceded that intra-day price differences were important but failed to consider them). The experts did not have data about when Mr. Leech actually allocated all of the trades in their analysis; relying on proxies does not suggest bad faith. Nor does it constitute an "apples to oranges comparison." *Restivo*, 846 F.3d at 577. And this is not a case where expert testimony should be excluded because the assumption on which it relies has "no support." *Pasternak v. Dow Kim*, 961 F. Supp. 2d 593, 595 (S.D.N.Y. 2013) (Chin, J.). The Government represents that it plans to introduce evidence that "the defendant routinely told his assistants how to allocate trades late in the day, and those assistants promptly entered the allocations in WAMCO's systems." Gov't Opp'n at 28.

49

Instead, this is a case where the defense's "contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Restivo*, 846 F.3d at 577. "As the Supreme Court has explained, '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Amorgianos*, 303 F.3d at 267 (quoting *Daubert,* 509 U.S. at 596). Indeed, "[c]hallenges to the factual basis for an expert's application of an otherwise reliable methodology are quintessential jury issues." *U.S. Bank Nat. Ass'n v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122, 134 (S.D.N.Y. 2015).

Here, the defense is challenging the factual basis for the Government expert's decision to use the recorded time of allocation as a proxy for when Mr. Leech made an allocation decision. The defense represents that it plans to introduce an "analysis of nine trading days reflect[ing] that the lag time between when Mr. Leech communicated allocation decision to his trading assistant and when she entered that decision into [WAMCO's] system averaged roughly two hours, with a maximum of over seven hours." Def's Mot. at 16. Whether the times in the WAMCO trade blotter accurately reflect the times that Mr. Leech decided where to allocate a trade is quintessentially a factual dispute that may be resolved by the fact finder. *U.S. Bank Nat. Ass'n*, 112 F. Supp. 3d at 134.

The defense's reliance on *In re LIBOR-Based Financial Instruments Antitrust Litigation* is misplaced. 299 F. Supp. 3d at 487. In that case, the court excluded plaintiff's expert testimony because it "relie[d] upon [an] unfounded assumption" that "any artificiality in LIBOR ha[d] an impact of constant magnitude over the 23 hours per day during which [Eurodollar futures contracts] are traded." *Id.* Judge Buchwald identified several errors associated with this assumption. *Id.* First, she observed that it was "inconsistent with [the expert's] assertion that [Eurodollar futures contracts ("EDFs")] 'trade in efficient markets and react to all relevant information in a timely and complete manner.'" *Id.* Second, she noted that it was also inconsistent with the plaintiff's assertion that

"EDF prices continually incorporate all fundamental information." Finally, she observed that "intraday variations in EDF pricing are of particular relevance to [the plaintiff's] action," because traders that opened and closed EDF positions within a single day "ma[d]e up a large proportion of the putative class." *Id.*

The assumption made by Professors Cohen and Kolm does not suffer from any of the same infirmities. None of the experts' other assertions nor the Government's assertions contradicts the assumption that time-of-recording price and end-of-day price are reliable proxies for time-of-allocation price. And the record before the Court does not establish any particular relevance of the price changes between when the trades were allocated and either the time at which Mr. Leech's trading assistants recorded the allocations or the end of the day price. Therefore, the Government experts' use of time-of-recording prices and end-of-day prices to analyze the pre-allocation performance of Mr. Leech's trades is sufficiently reliable.

Similarly, the experts' testimony regarding comparisons of first-day performance of trades allocated to Macro Opps from different time periods is sufficiently reliable. The experts compared the first-day performance of the trades for which Mr. Leech had discretion in his allocation decisions to the first-day performance of the trades for which he did not have such discretion. One such comparison involved Mr. Leech's allocations to Macro Opps in two time periods. Beginning on October 20, 2023, Mr. Leech was only able to allocate trades to Macro Opps. Prior to that, he could allocate to both Macro Opps and Core Strategies. The Government's experts compared the first-day performance of trades allocated to Macro Opps in the period before October 20, 2023 and the period on and after that date. *See, e.g.*, Cohen Disc. ¶ 32.

The experts' assumption that first-day performance can be fairly compared across the two trading windows is also not "so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." *Restivo*, 846 F.3d at 577. The defense argues that

51

Government experts' comparison is flawed because Mr. Leech's trading activity was different across the two time periods for two reasons: first, the "macro-economic conditions in the bond markets"—namely, volatility and interest rates—varied "dramatically" different in the two periods; and second, the Macro Opps portfolio's convexity changed from "significantly—and consistently—negative" to "close to zero (and sometimes positive)." Def. Mot. at 28–29.

The fact that Mr. Leech may have traded differently across the periods does not render the expert's testimony based on comparative analyses of first-day performance unreliable. At bottom, the defense's argument is that because Mr. Leech may have needed to trade differently in the two periods due to market conditions or portfolio characteristics, any differences in first-day performance cannot be conclusively tied to whether Mr. Leech had discretion to trade for and allocate to different strategies. However, the Government's experts do not plan to offer such categorical testimony. The experts plan to testify as to other comparative analyses, including those that compare different sets of trades allocated to Macro Opps within the Relevant Period. *See, e.g.*, Kolm Disc. ¶ 41(g) (describing proposed testimony comparing [first-day returns] of trades made through brokers other than Marex in the Relevant Period allocated to Macro Opps to [first-day returns] of trades made through Marex in the Relevant Period). Even if the experts did not plan to offer testimony about other comparators, the defense's critique goes to the weight of the evidence rather than its admissibility.

The experts' testimony comparing trade performance across time periods is also not excludable under Federal Rule of Evidence 403. The defense argues that there is a risk that the introduction of Post Period evidence will result in an "unnecessary mini-trial." Def. Reply at 25. The defense also argues that any probative value is substantially outweighed by the prejudicial effect of allowing the jury to "hear that . . . Western decided it prudent for Mr. Leech not to allocate trades

52

to the Core Strategies." Def. Mot. at 30.[12] Neither argument justifies excluding the evidence under Rule 403.

As to the first argument for exclusion under Rule 403, the defense has not established that there will be a need for substantial additional evidence as it relates to the Post Period to justify exclusion. As the parties agree, the effect of market conditions on Mr. Leech's trading and allocation activity is a key issue in this case. *See, e.g.*, Def. Opp'n at 4 (describing a flaw in the Government's experts' analyses as "treat[ing] each trade as fungible and ignor[ing] the strategies' day-to-day trading needs during a highly volatile market period"). The parties intend to introduce the jury to ways in which market conditions might impact Mr. Leech's trades and their first-day performance in connection with the Relevant Period. *Id.*; *see also* Tuckman Disc. at 6 (opining on need to manage Macro Opps' negative convexity as being the "most important consideration" in his allocation decisions during the CRA Exercise). Thus, the jury will already have been introduced to the concepts needed to understand market conditions that might bear on Mr. Leech's trading and allocation decisions, including duration, convexity, and volatility of interest rates. The experts' testimony concerning the Post Period may require that the jury hear about a different set of market conditions. That the testimony about the first-day performance of trades in Post Period will "introduce the jury to a new set of facts . . . does not warrant excluding it under Rule 403." *United States v. Phillips*, No. 22-CR-138, 2023 WL 6620146, at *9 (S.D.N.Y. Oct. 10, 2023).

As to the second argument, none of the proposed testimony states that Mr. Leech did not allocate trades to the Core Strategies because of any decision by WAMCO. However, the Court

---

[12] The defense also argues that there is minimal probative value to the time period comparison because "the government experts propose to analyze several other comparators." Def. Mot. at 30. Although the defense is correct there are other comparators, the time period comparison does not replicate those other comparators. *See United States v. Jamil*, 707 F.2d 638 643 (2d Cir. 1983) ("Evidence is cumulative when it replicates other admitted evidence, and the exclusion of relevant, but cumulative, evidence is within the discretion of the trial court."). The other comparators look at the pre-allocation performance of trades allocated to a particular broker or trades split across Macro Opps and the Core Strategies. The comparators capture trades in the period in which Mr. Leech could trade for the Core Strategies. Only the time period comparison looks to a period where Mr. Leech did not have that discretion.

recognizes the defense's concern that a jury may infer from the experts' testimony about the strategies to which Mr. Leech could allocate in the two periods that WAMCO decided to limit Mr. Leech's allocation discretion.  The jury could draw the additional inference that WAMCO did so because it suspected wrongdoing by Mr. Leech.  The Court invites the defense to propose a limiting instruction to cure any risk of prejudice.  *See United States v. Walker,* 142 F.3d 103, 110 (2d Cir. 1998) ("As the Supreme Court has recognized, limiting instructions are often sufficient to cure any risk of prejudice.") (citing *Zafiro v. United States*, 506 U.S. 534, 538–39 (1993)).  The deadline for the defense to propose a limiting instruction is the date that is two weeks following the date of this opinion.

### iii.        The Experts' Qualifications

The experts' proposed opinions on practical aspects of fixed-income portfolio management are within the scope of their expertise.  "To determine whether a witness qualifies as an expert, [the Court must] compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony" *Tin Yat Chin,* 371 F.3d at 40.  Professor Cohen has researched and taught about "portfolio . . . management[] and the performance of asset managers."  Cohen Disc. at 1.  He has also published "peer-reviewed research papers . . . on trading behavior."  Professor Kolm has researched and taught about "investment management, portfolio optimization, trading strategies, portfolio and risk management, and evaluating trader performance."  Kolm Disc. at 1.  He has also "worked [on] designing trading strategies, including for fixed-income portfolios." *Id.*

The subject matter of the experts' proposed testimony falls within the area in which they have "superior knowledge, education, [or] experience." *Tin Yat Chin*, 371 F.3d at 40.  As is relevant to the defense's motion, Professor Cohen proposes to offer opinion testimony about the portfolio management requirements of the Core Strategies and Macro Opps based on his review of WAMCO's marketing materials. *See, e.g.*, Cohen Disc. ¶ 68(b).  He also proposes to offer testimony

concerning whether Mr. Leech's trading and allocation can be explained by efforts to adhere to those requirements. *Id.*; *see also id.* ¶ 62. Professor Cohen has research experience in evaluating the performance of asset managers and in portfolio management. Professor Cohen is therefore qualified to offer opinion testimony that evaluates the performance—measured with reference to strategy requirements—of Mr. Leech—an asset manager. *See Phillips*, No. 2023 WL 6620146, at *12 (denying motion to exclude testimony opining on "whether . . . Bloomberg chats are consistent with a particular trading strategy" because despite "lack[] of practical experience working as an FX trader," expert "ha[d] extensive experience researching and publishing on FX markets").

The same analysis applies to Professor Kolm. Professor Kolm proposes to offer similar opinion testimony on the requirements of the Core Strategies and Macro Opps and the effect of those requirements on Mr. Leech's trading. *See* Kolm Disc. ¶ 35. This testimony is squarely within the scope of Professor Kolm's expertise—he has designed trading strategies for fixed income portfolios and researched portfolio management. He is therefore qualified to opine on the trading strategies involved in managing the fixed-income portfolios at issue.

In resisting this conclusion, the defense misapplies the legal standard applicable to determine if an expert is qualified. The defense argues that the Government's experts cannot opine on "practical aspects of fixed-income portfolio management" because they lack "practical experience." Def. Mot. at 25. This criticism is inapplicable to Professor Kolm. As set out in the Government's disclosure of Professor Kolm's proposed testimony, in addition to his academic credentials, he has "worked designing trading strategies, including for fixed-income portfolios." Kolm Disc. at 1. And although Professor Cohen does not have hands-on industry experience in portfolio management, this does not disqualify him from testifying as an expert. *See Phillips*, 2023 WL 6620146 at *12; *see also In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d at 466 ("A formal education in a particular field is sufficient to qualify a witness as an expert as a general matter, such that a lack of

extensive practical experience directly on point does not necessarily preclude [the] expert from testifying." (internal quotation omitted)).[13]  Ultimately, the defenses' objections are the type to be "properly explored on cross-examination and [go] to [the experts'] testimony's weight and credibility—not its admissibility." *McCullock*, 61 F.3d at 1043.

### iv.    Professor Cohen's Rebuttal Disclosure

The Court will not preclude Professor Cohen from offering the testimony disclosed in his rebuttal disclosure during the Government's rebuttal case.  The Federal Rules of Criminal Procedure obligates the Government to disclose opinion testimony that the Government intends to use "during its rebuttal to counter testimony that the defendant has timely disclosed . . . ."  Fed. R. Crim. P. 16(a)(1)(G)(i).  The Rule describes the required content of the disclosures.  *See id.* 16(a)(1)(G)(iii). Rule 16 is "intended to minimize the surprise that often results from unexpected testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of [an] expert's testimony through focused cross-examination."  *United States v. Cruz*, 363 F.3d 187, 196 n.2 (2d Cir. 2004) (citation and brackets omitted).  In setting pretrial deadlines in this case, the Court asked the parties to provide expert notices "consistent with Rule 16."  *See* June Pretrial Order.

Here, the Government properly disclosed the expert testimony that it intended to elicit during its rebuttal case.  The disclosure was timely and included the content required by Rule 16(a)(1)(G)(iii).  *See* Cohen Rebuttal Disc.  In particular, it included a "complete statement of all opinions that the government will elicit from the witness in its . . . rebuttal *to counter testimony that the defendant has timely disclosed under [Rule 16](b)(1)(C)*."  Fed. R. Crim. P. 16(a)(1)(G)(iii) (emphasis

---

[13] The defense misconstrues the reasoning of the court in admitting applicable testimony in *Phillips*.  The defense argues that in *Phillips*, the court "qualified [the expert] to offer only limited conclusions."  Defs. Reply at 21.  That is not accurate.  In *United States v. Phillips*, Mr. Phillips "move[d] to prevent Professor Richard Lyons from providing expert testimony on whether communications in [a] Bloomberg chat were consistent with an effort to sell USD at a high price and minimize the impact of that selling."  2023 WL 6620146, at *12.  Judge Liman denied that motion and allowed the expert to testify as to his opinion on whether the "chats [were] consistent with a particular trading strategy."  *Id.*  The Court did not "limit" the conclusions that the experts could offer.  The scope of the Judge Liman's discussion was limited to the Bloomberg chats because Mr. Phillips' motion was so limited.

added).  Professor Cohen's rebuttal disclosure explicitly frames his testimony as rebutting testimony to be offered by Messrs. Dolgoff and Tuckman.  *See* Cohen Rebuttal Disc. ¶ 3 (framing testimony as "[i]n light of the defense's expert disclosures . . . .").[14]

Assuming that the standard set out in *Softel, Inc. v. Dragon Medical and Scientific Communications, Inc.* applied to criminal cases, it has no applicability here.  118 F.3d 955, 961 (2d Cir. 1997).  Contrary to the defense's restatement of the first factor as "(1) the reasons for the delay in providing the evidence," Def's Mot. at 33, the first factor is "(1) the party's explanation for the failure to comply with the discovery order," *Softel, Inc.*, 118 F.3d at 961.  As discussed above, the Government complied with its discovery obligations under the relevant rule and the Court's order setting a schedule for the disclosure of rebuttal experts.  At the time of Professor Cohen's rebuttal disclosure, trial was over four months away.  Since then, the Court has adjourned the trial by over two months.  There is no question that the defense has been given "a fair opportunity to test the merit of [Professor Cohen's rebuttal] testimony through focused cross-examination."  *Cruz*, 363 F.3d at 196 n.2.

#### v.        Professor Kolm's Sur-Rebuttal Disclosure

The Court will not exclude testimony within the scope of Professor Kolm's sur-rebuttal disclosure.  Professor Kolm's sur-rebuttal disclosure is relevant and does not "needlessly present[] cumulative evidence."  Fed. R. Evid. 403.  "Evidence is cumulative when it replicates other admitted evidence, and the exclusion of relevant, but cumulative, evidence is within the discretion of the trial court."  *United States v. Jamil*, 707 F.2d 638, 643 (2d Cir. 1983).  "[M]ultiple expert witnesses expressing the same opinions on a subject is a waste of time and needlessly cumulative.  It also raises

---

[14] The Government's opposition represents that—consistent with its decision to provide this disclosure at the deadline for rebuttal disclosures—it will only offer the testimony in Professor Cohen's "rebuttal notice" as "rebuttal testimony." Gov't Opp'n at 48.  To the extent that Government instead elicits testimony in its rebuttal notice during its case in chief, the Court expects to resolve any objection that is properly raised during the trial.

the unfair possibility that jurors will resolve competing expert testimony by 'counting heads' rather than evaluating the quality and credibility of the testimony." *On Track Innovations Ltd. v. T-Mobile USA, Inc.*, 106 F. Supp. 3d 369, 414 (S.D.N.Y. 2015).

Here, Professor Kolm's testimony is both relevant and not "needlessly cumulative" when considered together with Professor Cohen's testimony. *Id.* Professor Cohen proposes to offer testimony about regressions that he performed to identify the factors that were predictive of where Mr. Leech would allocate a specific trade. He proposes to testify that the performance of a trade between the time the trade was executed and when Mr. Leech allocated the trade was "a strong predictor of Mr. Leech's allocation decisions between Macro Opps (excluding Marex) and the Core Strategies." Cohen Disc. ¶ 72. To rebut Professor Cohen's testimony, Mr. Dolgoff also performed regression analyses. He identified another variable that could predict where Mr. Leech allocated his trades—the "Convexity Effect Offset." That variable measured the extent to which Mr. Leech's allocation counteracted shifts in duration that resulted from changes in interest rates between the time of trade execution and trade allocation. Mr. Dolgoff proposes to testify that the regressions he performed showed that this variable was a strong predictor of Mr. Leech's allocations.

Professor Kolm's rebuttal testimony does not express an opinion on what variables are or are not a strong predictor of Mr. Leech's allocation activity. *See* Kolm Sur-rebuttal Disc. Nor does Professor Kolm seek to testify about additional regressions that he performed to identify such variables. *Id.* Instead, his proposed testimony related to regressions reflects additional analysis he did to evaluate Mr. Dolgoff's choice to conduct regressions using the Convexity Effect Offset variable. *See, e.g., id.* ¶ 3. Professor Kolm also proposes to testify about Mr. Dolgoff's decision to only perform regression analyses on Macro Opps trades. *Id.* ¶ 3(h). At bottom, though Professor Kolm's proposed rebuttal testimony does concern the general topic of regression analyses performed on Mr. Leech's allocations, the opinions he seeks to express and the analyses he

58

performed to reach those conclusions are not improperly cumulative to the testimony Professor Cohen proposes to offer.

For the same reasons, the defense's argument concerning the Government's decision to offer Professor Kolm's testimony to rebut Mr. Dolgoff's is without merit. The defense asks the Court to look askance at the Government's decision to have Professor Kolm defend Professor Cohen. As discussed, this mischaracterizes Professor Kolm's proposed testimony. Professor Kolm does not propose to offer any opinion on Professor Cohen's decision to use pre-allocation returns as a regression variable. And the defense offers no legal support for its request that the Court should reject what it refers to as "prejudicial gamesmanship." Def. Reply at 28. Indeed, in the only case they cite, the court allowed the challenged expert to testify. *See Henderson v. Lockheed Martin Corp.,* No. 6:21-CV-1363-RBD-DCI, 2024 WL 5320042, at *1 (M.D. Fla. Dec. 19, 2024) (concluding that the expert "may testify for now.").

### vi.        "Material"

The Court does not reach the defense's request to preclude Professor Cohen from using the word "material" in connection with his analyses. The Government, in its opposition, represents that Professor Cohen no longer intends to use this word. In its reply, the defense requests that the Court nonetheless prospectively issue an order preventing the Government's experts from opining on "materiality." The Court will not do so. Should the Government elicit such testimony at trial, the Court expects that it will resolve any objection raised by the defense at that time.

### B.     The Government's Daubert Motion.

### i.        The Charles River Associates Exercise

The Government's request to exclude testimony about the CRA Exercise is denied. The exercise's design and execution meet the threshold of reliability under Rule 702, and its relevance is not substantially outweighed by the risk of confusing the jury under Rule 403.

### 1.     Reliability

Professor Tuckman and Professor Dolgoff's proposed testimony concerning the CRA Exercise is sufficiently reliable. "An expert is . . . expected to 'employ[ ] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *In re Mirena*, 341 F. Supp. 3d at 241 (quoting *Kumho Tire*, 526 U.S. at 152). "'Expert testimony should be excluded if it is speculative or conjectural." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996). Testimony should also be excluded when the proffered opinion is "based on data, a methodology, or studies that are simply inadequate to support the conclusions reached," *Amorgianos*, 303 F.3d at 266.

The design of the CRA Exercise is sufficiently reliable to support the conclusions reached by Mr. Dolgoff. Mr. Dolgoff and Professor Tuckman designed the Exercise to evaluate whether a trader's allocation decisions between Macro Opps and the Core Strategies based on the financial characteristics of those portfolios, rather than first-day performance, would result in different first-day performance. In designing an exercise to answer that question, the experts employed the same level of "'intellectual rigor that characterizes the practice of an expert in'" their respective fields. *In re Mirena*, 341 F. Supp. 3d at 241 (quoting *Kumho Tire*, 526 U.S. at 152). The defense's expert disclosures identify the steps taken by the defense's experts to design, conduct, and analyze the results of the Exercise.

Mr. Dolgoff supervised the creation of the Exercise. Dolgoff Disc. at 1. He has experience "consult[ing] on matter related to . . . fixed income securities" and "appl[ying] economic and statistical methods in matters related to . . . financial markets." *Id.* at 1. He selected the trades to be included in the Exercise using a random methodology and checked that those trades accurately reflected the first-day performance and win/loss rates of the overall pool of trades from which they were drawn. *Id.* at 2. For each day of the Exercise, he and his colleagues at CRA prepared a

60

dashboard with three sets of information:  portfolio and convexity information, market information, and intra-day window information.  *Id.* at 3–4.  Professor Tuckman, who "teaches fixed income markets and securities," Tuckman Disc. at 1, worked with Mr. Dolgoff to "formulate and implement the infrastructure" of the Exercise, Dolgoff Disc. at 2.  Although the dashboard provided Professor Tuckman information he could use to allocate trades, in other, important respects, the Exercise was blind:  Professor Tuckman did not know where Mr. Leech had allocated trades, what the first-day performance of those trades was, or Mr. Leech's views on the fixed income markets.  Tuckman Disc. at 5.

Professor Tuckman conducted the Exercise.  Professor Tuckman has experience in "modeling interest rate risk across a wide range of fixed-income securities" for investment banks. Tuckman Disc. at 1.  Professor Tuckman knew that Mr. Leech was an "active portfolio manager," and based on his experience he was generally aware of how an "active" manager might manage a fixed-income portfolio.  *Id.* at 2–3.  Though he did not know Mr. Leech's views or his allocation decisions, he developed his methodology to allocate the trades based on his experience in and knowledge of fixed-income markets and his independent review of WAMCO's marketing documents.  Def. Opp'n at 6.  Professor Tuckman plans to testify about how he implemented his allocation methodology to allocate the 935 trades in the Exercise, including how he evaluated competing considerations when deciding where to allocate trades.  *See* Tuckman Disc. at 5–6.  In particular, he plans to testify that "closing the duration gap of Macro Op[p]s . . . turned out to be the most important consideration of the Exercise."  Tuckman Disc. at 6.

Mr. Dolgoff analyzed the results of the CRA Exercise.  He analyzed the first-day performance of Professor Tuckman's allocations.  Def. Opp'n at 11.  He proposes to testify that "the trades Professor Tuckman allocated to Core Plus had a lower percentage of positive unrealized first-day returns and net unrealized first-day performance than the overall sample, and the trades

Professor Tuckman allocated to Macro Opps had a higher percentage of unrealized first-day returns and net unrealized first-day performance than the overall sample." *Id.* He also proposes to testify that "that Professor Tuckman's allocations matched Mr. Leech's allocations 56.8 percent of the time," a result that is "statistically significant." *Id.* He plans to testify that this result "provides confirmatory evidence of the overlap in [Professor Tuckman and Mr. Leech's] allocation decisions." *Id.*

The design, execution, and analysis of the CRA Exercise reflect that both experts were employing the level of intellectual rigor that might be expected in their respective fields. Mr. Dolgoff, a consultant experienced in statistical analysis and financial markets, took care to select a representative sample of trades. Along with Professor Tuckman, who has private sector experience modeling interest rate risk, Mr. Dolgoff identified a set of metrics that he identified would useful to a fixed-income portfolio manager. Professor Tuckman knew general information about Mr. Leech and the two strategies, but the experts took care to shield him from information that might bias his allocation decisions. He then relied on his independent expertise to develop and implement an allocation methodology. Mr. Dolgoff then analyzed the results. These steps were sufficiently rigorous to meet the standard of reliability under Rule 702.

The Government's arguments concerning the design and execution of the CRA Exercise do not require exclusion of testimony concerning the Exercise. The Government argues that Messrs. Tuckman and Dolgoff should be precluded from testifying about the Exercise for three reasons: (1) the design of the Exercise does not satisfy the four factors articulated in *Daubert* and was not subject to any testing; (2) Professor Tuckman's allocation strategy is a poor comparator for Mr. Leech's allocation strategy; and (3) Professor Tuckman's stated justifications do not consistently match his allocation decisions.

The first criticism is premised on a factual error and on a misapplication of the legal

62

standard.  Contrary to the Government's argument, the defense does not represent that it intends to offer this testimony to "illuminat[e] what the defendant was doing or thinking when he allocated trades."  Gov't Mot. at 25.  The testimony is instead meant to criticize an assumption that the defense argues underlies the allegations in the indictment and the proof the Government plans to present at trial:  that, in the absence of a conscious purpose to use first-day performance to allocate trades, first-day performance should be similar across strategies.  *See generally* Indictment.  The reliability of the methodology should be evaluated against this purpose.[15]

Evaluated against this purpose, the CRA Exercise is sufficiently reliable.  The Government argues that the defense's experts' testimony must be excluded the defense's disclosures did not identify "any steps to test the accuracy or repeatability of the CRA Exercise" as would be required by the reliability factors articulated in *Daubert*.  But the Government does not justify why the *Daubert* factors fit the "particular circumstances of [this] particular case."  *In re Pfizer Inc. Sec. Litig.*, 819 F.3d at 658.  In *Kumho Tire,* the Supreme Court clarified that "[t]he objective of [*Daubert*'s gatekeeping] requirement is to ensure the reliability and relevancy of expert testimony."  526 U.S. at 152.  Therefore, "a trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony."  *Id.*  *Daubert* concerned a scientific expert offering scientific testimony; at issue here is the testimony of two individuals with professional knowledge and expertise offering testimony based on their exercise of that knowledge and expertise.  As discussed above, the disclosures of Messrs. Dolgoff and Tuckman identify in detail the steps they took to design, conduct, and analyze the Exercise using techniques based on the experts' professional knowledge and experience.  The disclosures therefore bear sufficient indicia of reliability such that the experts' testimony on the CRA Exercise is admissible.

---

[15] To the extent the jury might view the Exercise as demonstrating more than this limited purpose, the Court addresses those arguments below.

The Government argues that the Court must "carefully scrutinize" the methodology of the Exercise. *See* Gov't Mot. at 26 (citing *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 120 (S.D.N.Y. 2022)). The Government argues that such scrutiny is necessary because the there is a risk that the defense's experts could have manipulated the Exercise's design to manufacture the result. Gov't Mot. at 26. The Government offers no evidence for its assertion. Ultimately, the Government's critiques about the CRA Exercise's design go to its weight, not its admissibility. *See Capri Sun GmbH*, 595 F. Supp. 3d at 133 (holding that the critique "that other, more sophisticated methods could have been used, although a fair ground for cross-examination and critique at trial, is not the decisive test on a motion to preclude under *Daubert* or Rule 702.").

The Government's second criticism similarly does not merit exclusion of CRA Exercise testimony. The Government argues that the assumptions underlying the CRA Exercise are unrealistic for three reasons: first, Professor Tuckman did not have the option to "chose whether to trade at all;" second, Professor Tuckman did not have the option to allocate a trade to both strategies; and third, Professor Tuckman elected to use duration and convexity targets to make allocation decisions. Gov't Mot. at 28–29. None of these methodological concerns justify exclusion of the testimony.

The first concern is inapposite. The experts' testimony concerns an experiment that designed to measure on the effect of *allocating*, rather than *executing* trades. The experts plan to opine on whether a trader following a lawful allocation rationale could allocate trades to Macro Opps and Core Strategies and in such a way that the aggregate impact of such trades result in different first-day performance between the strategies. It does not, as the Government attempts to frame it, concern the "defendant's trading," even though the pool of trades being allocated are the ones that Mr. Leech executed. Gov't Mot. at 27. It is not unrealistic that an exercise designed to answer a question about the effect of allocation would focus on the period during which a trade was allocated

and would begin from the premise that a trade had already been executed.

Although the second and third concerns about the CRA Exercise's design bear more directly on the testimony the defense's experts plan to offer, they do not merit exclusion of that testimony. At bottom, the Government's argument is that the design of the Exercise does not fit the facts of this case. "To be admissible, expert testimony must be of the type that will 'help the trier of fact to understand the evidence or to determine a fact in issue.'" *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 641 (S.D.N.Y. 2016), *aff'd sub nom. LVL XIII Brands, Inc. v. Louis Vuitton Malletier SA*, 720 F. App'x 24 (2d Cir. 2017). "This means that the testimony must be both reliable and relevant in that it 'fits' the facts of the case." *Id.* (citing *Daubert*, 509 U.S. at 591–92). "The 'fit' and 'reliability' requirements overlap: Testimony is neither helpful nor reliable where 'there is simply too great an analytical gap between the data [on which the expert relies] and the opinion proffered.'" *Id.* (quoting *Joiner*, 522 U.S. at 146).

The assumptions underlying the Exercise sufficiently fit the facts of the case. It is true that Mr. Leech had the option to allocate a trade 50/50 to both the Core Strategies and Macro Opps. However, the Exercise excluded those trades altogether. The trades in the Exercise were a sample of the trades that Mr. Leech allocated to Macro Opps and the Core Strategies that the Government has asserted to be consistent with the alleged cherry picking scheme. It was therefore not unrealistic to design the CRA Exercise such that Professor Tuckman could only allocate trades to either a Macro Opps account or a Core Plus account. It is also true that Professor Tuckman set duration and convexity targets based on his review of the requirements of Core Plus, which could deviate more from the Bloomberg Aggregate duration benchmark than Core. *See* Tuckman Disc. at 4. The Core accounts could deviate from the benchmark by 20%, while a Core Plus account was allowed to deviate by 30%. Gov't Reply at 10. However, as the Government acknowledges, Mr. Leech exceeded Core's limit many times during the relevant period. *See* Cohen Disc. ¶ 64(a). Thus, the

decision not to include a Core account in the CRA Exercise does not represent a "complete break" from the constraints under which Mr. Leech operated. *Boucher*, 73 F.3d at 21; *see also Zerega Ave.*, 571 F.3d at 214 (affirming district court's decision to admit expert testimony even though "shortcomings [in that expert's testimony] may diminish the probative value of [that] testimony."). Although the Government offers a sound basis for critique of the assumptions underlying the Exercise, that critique does not justify exclusion of testimony about the Exercise entirely.

Finally, the Government's third criticism does not justify exclusion of any of the defense experts' testimony. The Government argues that Professor Tuckman's testimony about his trade allocation decisions should be excluded because he did not reliably apply his methodology. The Government argues that Professor Tuckman provided allocation rationales that were, at times, inconsistent with the allocations for each individual trade. Gov't Mot. at 31–33. The defense points out that Professor Tuckman will not testify that he identified allocation rationales for each of the 935 trades he was tasked with allocating; rather, Professor Tuckman provided rationales at the allocation window level. A window could include several trades. Therefore, it is possible that an allocation rationale did not comport with an individual trade in the window, but that it did explain the trades as a whole. *See* Def. Opp'n at 30. Acknowledging this response, the Government's argument shifts in its reply: it argues that only allowing Professor Tuckman to provide window-level allocation rationales "shows a significant flaw in the CRA Exercise." Gov't Reply at 11. In essence, the Government argues that even if Professor Tuckman reliably applied his methodology, the methodology itself is unreliable.

Professor Tuckman reliably applied his methodology. Mr. Dolgoff affirms that Professor Tuckman's allocation rationales were consistent with the allocation decisions. Dolgoff Decl. ¶ 20. As the Government acknowledges, Mr. Dolgoff affirms that he explicitly reviewed whether trades within a window collectively moved duration or convexity. *Id.* ¶¶ 12–19. The Government does not

proffer any evidence to suggest that Mr. Dolgoff's affirmation is incorrect.  The preponderance of the evidence therefore establishes that Professor Tuckman reliably applied his methodology.

The decision to design the Exercise such that Professor Tuckman could only provide a window-level allocation rationale was also sufficiently reliable and not so untethered to the facts of this case to be an inadequate fit.  The purpose of the CRA Exercise was to determine whether a trader that did not know about Mr. Leech's allocations and had no visibility into first-day performance could nonetheless allocate trades in such a way that Macro Opps and Core Plus accounts would exhibit statistically different first-day performance.  The Government does not explain why such a test requires that the expert provides a rationale for every single trade.  The Government argues that window-level rationales "make[] it impossible for anyone who did not participate in the CRA Exercise to understand the actual reason *the defendant* chose to allocate each trade."  Reply at 12 (emphasis added).  However, the Exercise does not seek to establish why *the defendant*—Mr. Leech—made certain allocation decisions.  Providing rationales at the window level allows the Government to interrogate whether the testimony about the Exercise is appropriately connected to the way the Exercise was conducted and to cross-examine the defense's experts— including Professor Tuckman.  This methodological concern therefore does not establish that testimony about the Exercise is unreliable or an improper fit with the facts of this case.

### 2.      Rule 403

Testimony concerning the CRA Exercise does not run afoul of Rule 403.  The testimony is relevant.  Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  *Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 184 (2d Cir. 2001) (citing Fed. R. Evid. 401).  Professor Tuckman and Mr. Dolgoff's testimony is relevant to a critical factual issue:  whether the first-day performance of the two strategies would vary even

where first-day results were not known at the time of an allocation decision.  Professor Tuckman plans to testify that he was able to allocate the trades using his methodology, and that applying his methodology was "relatively straightforward."  Tuckman Disc. at 6.  He also plans to testify that the most important consideration ended up being the need to manage duration for the Macro Opps account.  *Id.*  Mr. Dolgoff plans to testify that Professor Tuckman's allocations matched Mr. Leech's more frequently than they would have had the former allocated randomly.

For avoidance of doubt, that testimony is not relevant because it is direct evidence of what Mr. Leech was doing.  The Government's proof includes the existence of differences in first-day performance.  The results of the CRA Exercise and the testimony about it is evidence that it is possible to allocate the trades that Mr. Leech allocated—without knowing first-day performance—in such a way that nonetheless generates first-day performance differences.  This reduces the force of the Government's proof.  Although the Exercise does not fully replicate the circumstances under which Mr. Leech was allocating trades, that shortcoming may reduce the CRA Exercise's probative value, but it does not vitiate it.  *See Zerega Ave.*, 571 F.3d at 214.

The probative value of the experts' testimony is not substantially outweighed by the risk of confusing the jury.  The Government argues that the presentation of the defense experts' testimony runs the risk that the jury will think that Professor Tuckman was attempting to divine Mr. Leech's strategy or that Mr. Leech must have also been using convexity and duration targets.  Professor Tuckman's testimony directly refutes the first inference.  He plans testify that he developed an allocation strategy without any detailed knowledge of Mr. Leech's "views on the future evolution of interest rates on any given day of the Exercise."  Tuckman Disc. at 4.  That same testimony also belies the second inference:  Professor Tuckman plans to testify that he set numerical targets because he did not know what Mr. Leech was thinking.

To the extent that Professor Tuckman's and Mr. Dolgoff's testimony in tandem run the risk

of confusing the jury, such confusion does not substantially outweigh the probative value of the testimony.  And "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509 U.S. at 596 (citation omitted).  The Government will have the opportunity to clarify expert testimony that it believes might mislead the jury on cross-examination and is not precluded from presenting evidence in its rebuttal case to attack the defense's presentation of expert testimony.  *See, e.g.*, Kolm Supplemental Disc.

While the Court will not exclude Mr. Dolgoff's testimony or Professor Tuckman's testimony under Rule 403, the Court notes that some of the phrasing used to describe Professor Tuckman's proposed testimony is problematic, as is the characterization of other portions of testimony about the CRA Exercise in the defense's opposition.  In its disclosure of Professor Tuckman's testimony, counsel for the defense writes the following:

> Professor Tuckman knew that Mr. Leech was an active portfolio manager, but did not know the risk profiles Mr. Leech had in mind for each of the Core Plus (984) and Macro Opps (3313) accounts on each day of the Exercise.  Professor Tuckman did not know *Mr. Leech's views* on the future evolution of interest rates on any given day of the Exercise.  Therefore, *in place of this detailed knowledge, Professor Tuckman created proxies for these risk preferences and views* in the forms of a "duration target" and a "convexity target" for each portfolio on each day of the Exercise.

Tuckman Disc. at 4 (emphasis added).

If Professor Tuckman describes his process in this way, that description may run the risk of confusing the jury.  The defense repeatedly represents that it does not intend to present Professor Tuckman's allocation decisions as a stand-in for what it will argue Mr. Leech was thinking or doing.  However, the use of the word "proxy" somewhat belies this representation.  A "proxy" is a "function . . . of a deputy who acts as a substitute for another."[16]  Using that word in connection

---

[16] *See Proxy*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/proxy (last accessed April 7, 2026).

with Professor Tuckman's decisions to create duration and convexity targets may imply that he was attempting to stand in Mr. Leech's shoes when he conducted the allocations in the Exercise. That veers close to testimony about Mr. Leech's mental state—namely, whether he was acting in good faith when he made allocation decisions. In this way, the words used in the defense's disclosures are similar to the Government's use of the word "using" in connection with "allocation decision" in its summary of its experts' testimony.

Just as the Court will not exclude any portion of the Government's experts' testimony, the Court will not exclude any portion of the defense experts' testimony. The content of Professor Tuckman's testimony, as discussed above, is not meant to illuminate what Mr. Leech was thinking or doing. However, it is possible that the testimony elicited at trial will be objectionable because it crosses the line drawn by Rule 704 or risks confusing the jury if it is not carefully framed. To minimize any disruptions to the presentation of this evidence at trial, the Court orders that the meet and confer described above include a discussion about mutually agreeable language to describe the CRA Exercise. The status letter as previously ordered must also include a summary of the status of this discussion.

The Court also notes that the defense's framing of the CRA Exercise in its opposition is potentially problematic. In their opposition, the defense represents that the objective of the Exercise "test the premise underlying the government's case, also called the '*null hypothesis,*' which is that specified populations of trades should have no significant difference in unrealized first-day performance." Def. Opp'n at 4 (emphasis added). The defense also states that the results of the Exercise "refute the *null hypothesis* at the heart of the government's case and their experts' analyses." *Id.* at 10 (emphasis added). "Null hypothesis" is a term that describes a baseline assumption of a statistical test.[17]

---

[17] The Supreme Court recently described the utility of the null hypothesis as follows.

If the defense elicits testimony that uses the phrase "null hypothesis" to frame the Government's case in this way, that testimony risks confusing the jury. For one, multiple experts for the parties propose to offer testimony based on the results of tests of statistical significance. Each of these tests has a "null hypothesis." For instance, Mr. Dolgoff proposes to testify that the match between Professor Tuckman's allocations and Mr. Leech's is statistically significantly different than the null hypothesis that there should only be a 50% match rate—*i.e.*, that there should be no correlation between the two traders' allocations. Dolgoff Disc. at 5. The defense does not offer any scientific justification for why the term "null hypothesis" is an accurate way to describe what the defense believes to be an assumption underlying the Government's case.

The use of "null hypothesis" in connection with the CRA Exercise is also problematic because the Exercise does not account for the full set of conditions under which first-day performance differed between two strategies in this case. The Government alleges that Mr. Leech had the opportunity to allocate his trades to Macro Opps in particular, the Core Strategies in particular, *or to both*. The Government alleges that he used first-day performance to make that decision. The Government plans to offer statistical evidence showing that, in an environment where Mr. Leech had three ways to allocate a trade to an entire portfolio, Mr. Leech's allocations to Macro Opps and Core Strategies had significantly different first-day performance. *See* Indictment.[18] The

---

"A study that is statistically significant has results that are unlikely to be the result of random error . . . ." Federal Judicial Center, Reference Manual on Scientific Evidence 354 (2d ed.2000). To test for significance, a researcher develops a "null hypothesis"—e.g., the assertion that there is no relationship between Zicam use and anosmia. *See id.*, at 122. The researcher then calculates the probability of obtaining the observed data (or more extreme data) if the null hypothesis is true (called the p-value). *Ibid.* Small p-values are evidence that the null hypothesis is incorrect. *See ibid.* Finally, the researcher compares the p-value to a preselected value called the significance level. *Id.*, at 123. If the p-value is below the preselected value, the difference is deemed "significant." *Id.*, at 124.

*Matrixx Initiatives, Inc. v. Siracusano,* 563 U.S. 27, 40 n.6 (2011)

[18] While the defense is correct that the trades allocated specifically to the Core Strategies and to Macro Opps are the trades "at issue," the Government does not allege that Mr. Leech broke the law because of the way he traded. The Government is alleging he broke the law because of the way he allocated those trades.

71

CRA Exercise only concerned trades allocated to Macro Opps and the Core Strategies.

However, because Mr. Dolgoff and Professor Tuckman's disclosures do not characterize their proposed testimony in that same way, the Court will not exclude any of their testimony at this stage or require the parties to meet and confer. Absent scientific justification why the use of the statistical term "null hypothesis" is an appropriate descriptor of an assumption underlying the Government's case, the Court expects that it will sustain any objection to such testimony.

### ii.        Mr. Dolgoff's Regression Analyses

The Court will not exclude testimony about Mr. Dolgoff's regression analyses. As discussed above, for expert testimony to be reliable, it must fit the facts of the case. *LVL XIII Brands, Inc.*, 209 F. Supp. 3d at 641. In his initial disclosure, Professor Cohen conducted regression analyses to evaluate which of several variables were predictors of where Mr. Leech allocated his trades. *See* Cohen Initial Disc. ¶ 72. Among the variables he tested were pre-allocation returns, both as a binary variable and as a continuous variable. *Id.* ¶ 73(a). He plans to testify that those variables were "strong predictors" of where Mr. Leech would allocate a trade. *Id.* Mr. Dolgoff, as described in his rebuttal disclosure, plans to testify that another variable—calculated using "Passive Duration Change"—"contains far more explanatory ability for Leech's allocation decisions than do trade size, trade convexity, trade time-to-maturity, or interest rate movements prior to the trade." Dolgoff Rebuttal Disc. at 4. "Passive Duration Change"—like pre-allocation returns—captures information that would have only been available to Mr. Leech after he executed his trades. For the same reason as Professor Cohen's use of such a variable was reliable, so too was Mr. Dolgoff's.

The Government's arguments do not compel a contrary conclusion. The Government raises four arguments in support of its motion to exclude Mr. Dolgoff's testimony. First, that the use of a variable reflecting information that Mr. Leech could only have acquired after he made a trade is at odds with his testimony to the SEC; second, that Mr. Dolgoff's regressions ignore pre-

72

trade duration shifts; third, that the regressions do not accurately predict Mr. Leech's trading activity when Macro Opps was positively convex, and fourth, that Mr. Dolgoff's regressions do not consider allocations to the Core Strategies.

The first two of the Government's arguments incorrectly assume what has been established as "facts of the case." The Government argues that Mr. Leech testified that he knew where a trade was going to be allocated at the time he placed the trade.[19] Mr. Leech's testimony does not preclude the defense from presenting testimony concerning the Convexity Effect Offset variable for two reasons. First, even assuming that Mr. Leech's testimony is inconsistent with him using information about post-trade duration shifts to allocate trades, "[the Sixth Amendment] demands that defendants be allowed to present wholly inconsistent defenses." *United States v. Aquart*, 912 F.3d 1, 42 (2d Cir. 2018) (quotation omitted). Thus, Mr. Leech is entitled to argue that his testimony to the SEC did not fully capture what information he used when he allocated a trade, but that his use of post-trade information was not designed to benefit Macro Opps at the expense of the Core Strategies. Second, "[c]hallenges to the factual basis for an expert's application of an otherwise reliable methodology are quintessential jury issues." *U.S. Bank Nat. Ass'n*, 112 F. Supp. 3d at 134. To the extent that the Government contests the factual basis for using post-trade duration changes and not accounting for pre-trade duration changes, that is an issue for the trier of fact.

---

[19] Mr. Leech's testimony, in relevant part, was as follows:

> Q At the time you place the trade order, do you typically have an allocation in mind?
> A Yes.
> Q Do you document that allocation anywhere?
> A No. I know – I know where I want to put the trade. I do it orally.
> Q You do it orally?
> A I give my – my instructions orally. I don't document the trade. I don't document the trade, no.
> Q So you place the trade orally, and you give the allocation instruction orally?
> A I don't usually give the allocation instruction to the broker, no.
> Q Okay. You have an allocation instruction in mind at the time you place the trade order with the broker?
> A Yes.

Def. Opp'n at 35 n.15.

The third and fourth arguments do not establish such serious gaps in reasoning that would justify exclusion of Mr. Dolgoff's testimony. The Second Circuit has cautioned that while a district court can "conclude[] that there is simply too great an analytical gap between the data and the opinion proffered," "[f]requently . . . 'gaps or inconsistencies in the reasoning leading to [the expert's] opinion . . . go to the weight of the evidence, not to its admissibility.'" *Restivo*, 846 F.3d at 577 (quoting *Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 186 (2d Cir. 2001)). "In the context of regression analysis testimony, some (slightly) more specific standards have emerged in the case law." *Reed Const. Data Inc. v. McGraw-Hill Companies, Inc.*, 49 F. Supp. 3d 385, 399 (S.D.N.Y. 2014), *aff'd*, 638 F. App'x 43 (2d Cir. 2016). "[T]o be admissible, a regression analysis must examine an appropriate selection of data." *Id.* at 400. The analysis must also "control for the 'major factors' that might influence the dependent variable." *Id.* at 400–01 (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 (1986). "But, '[n]ormally, failure to include variables will affect the analysis' probativeness, not its admissibility.'" *Id.* (quoting *Bazemore*, 478 U.S. at 400).

The Government's criticisms of Mr. Dolgoff's regression methodology go to its probative value, not its admissibility. Mr. Dolgoff only seeks to testify about the variables that could predict whether Mr. Leech would allocate a trade to Macro Opps. It was therefore "appropriate" for his "selection of data" to be limited to the trades only allocated to Macro Opps. *Reed Const. Data Inc.*, 49 F. Supp. 3d at 400. And Mr. Dolgoff's decision not to account for the convexity of Macro Opps is not a fatal flaw that mandates exclusion. *See Sobel v. Yeshiva Univ.*, 839 F.2d 18, 36 (2d Cir. 1988) ("The failure, by either side, to include a relevant variable (or the inclusion of an irrelevant or multicollinear variable) will go to the probative value of the [expert's] analysis, not its admissibility."); *see also Reed Const. Data Inc.*, 49 F. Supp. 3d at 401 ("Whether [the expert's] omissions impermissibly biased the results" of his regression is "a matter for the jury to decide.").

For similar reasons, Rule 403 does not merit exclusion of Mr. Dolgoff's testimony. His

74

testimony is probative:  it reduces the force of Professor Cohen's testimony that pre-allocation

return is a strong predictor of where Mr. Leech would allocate a trade.  That probative value is not

substantially outweighed by the risk that the jury will be misled.  The Government has the

opportunity to present evidence in its rebuttal case to offer its critiques of Mr. Dolgoff's decision to

conduct regressions using the Convexity Offset Effect variable.  *See* Kolm Sur-rebuttal Disc.

### iii.         Professor Maloney's Regression Analyses

The Court denies the Government's motion to preclude Professor Maloney's proposed

testimony.  Professor Maloney proposes to offer testimony rebutting the testimony of Professors

Cohen and Kolm.  Both of the Government's experts seek to testify on "the degree to which

duration limits influenced Mr. Leech's Treasury F&O allocation decisions."  Kolm Disc. ¶ 35(d).  As

described, they base this opinion on the results of the Trade Reallocation Exercise.  As a part of that

exercise, they calculated what the daily duration of the portfolios would have been had Mr. Leech

allocated trades in two different ways:  first, had the trades specifically assigned to Macro Opps been

reassigned to the Core Strategies, and vice versa; and second, had all trades specifically allocated to

both strategies been allocated 50/50.  *Id.*  They intend to testify that the results of their analysis "is

further evidence that duration limits did not significantly constrain Mr. Leech's flexibility in

allocating Treasury F&Os."  *Id.*  In particular, Professor Kolm proposes to testify that "the duration

of Macro Opps would not have changed significantly if Mr. Leech had allocated trades 50/50 or

flipped his allocations, suggesting that [Mr. Leech's] allocations to Macro Opps were not necessary

to manage duration."  *Id.* ¶ 35(f).

Professor Maloney plans to rebut that testimony by providing opinion testimony about the

daily effect of trades allocated to Macro Opps.  He proposes to testify that "the trades Mr. Leech

allocated only to Macro Opps mitigated the impact . . . resulting from" duration shifts that happened

throughout a trading day and therefore "had the effect of managing [an account in Macro Opps]

back toward its start of day duration." Maloney Rebuttal Disc. at 4.  He proposes to base that opinion on the results of two regression analyses he conducted. *Id.*  Those regression analyses were aimed at identifying whether the trades allocated to Macro Opps had the effect of counteracting daily duration shifts absent those trades. *See id.*[20]  He proposes to testify that the analyses demonstrate that the trades allocated to Macro Opps had the effect of counteracting those shifts because "the daily duration impact of the trades Mr. Leech allocated only to Macro Opps have the opposite sign to the daily duration changes to [a Macro Opps account]." *Id.* at 4–5.[21]

The Government's argument in support of its motion to exclude this testimony relies on a misconception of the purpose of Professor Maloney's regressions.  The Government argues that the regressions are unreliable because they do not account for intra-day rate changes and analyze daily data rather than trade-by-trade data.  Gov't Mot. at 43–45.  However, Professor Maloney does not plan to testify that his regressions measure whether each trade was allocated to counter daily duration shifts.  Rather, he conducted regression analyses to understand the aggregate effect of his allocations on a daily basis.  The use of variables that consider the daily aggregate effect of trades on duration is reliable if his conclusions are also about daily changes in duration.  Additionally, he is rebutting the conclusions of Professor Cohen and Professor Kolm, who also calculated daily duration changes as part of their Trade Reallocation Exercise. *See, e.g.*, Cohen Disc. ¶ 63(c) ("Professor Cohen will testify that he performed an analysis to see how the duration of [representative accounts in Core, Core Plus, and Macro Opps] *on each day during the relevant period* would have differed had Mr. Leech allocated trades differently." (emphasis added)). Professor

---

[20] Professor Maloney performed two sets of regression analyses, representing two different ways of calculating daily duration shifts absent the trades. *See* Maloney Rebuttal Disc. at 4-5.  In one, he calculated "the daily duration changes to [Macro Opps] in the absence of [trades to Macro Opps]." *Id.*  In the other, he used convexity and interest rate movement data to determine what the "passive duration drift" would be for Macro Opps. *Id.*

[21] "Opposite sign" here refers to whether a numerical value is positive or negative.  For instance, Professor Maloney may testify that when the aggregate daily duration impact of the trades allocated to a Macro Opps was positive—*i.e.*, the trades had the effect of adding duration—the daily duration changes to a Macro Opps account is negative—*i.e.*, duration would have been lower at the end of the day than it was at the start.

Maloney's decision not to include variables that are more granular than those used by the experts whose conclusions he seeks to rebut does not justify precluding his testimony. *See Sobel*, 839 F.2d at 35.

In advancing its motion to exclude, the Government compares the Maloney regressions to the regressions performed by Mr. Dolgoff and Professor Cohen. Gov't Mot. at 42–43. This comparison is inapt. Those regressions seek to predict the variables that best explain Mr. Leech's allocation decisions. In other words, the analyses seek to use regressions to isolate a cause-and-effect relationship between various variables and Mr. Leech's individual allocation decisions. Unsurprisingly, those regressions analyze data trade-by-trade and account for variables relevant individual allocations—including the interest rate movements that occurred before the trade was executed and between the trade's execution and its allocation. In contrast, Professor Maloney seeks to rebut the Government experts' testimony about the effect of Mr. Leech's allocations in the aggregate. In particular, Professor Maloney will testify that the trades allocated to Macro Opps on a particular day changed the duration of that portfolio in the opposite direction of duration changes that were not related to those trades. He does not propose to testify that whether a single trade would counteract duration shifts in Macro Opps can predict whether Mr. Leech would allocate that trade to Macro Opps. Therefore, his failure to include the variables the Government identifies in his regression analysis does not justify excluding his testimony.

For similar reasons, Professor Maloney's decision not to analyze the effect of trades allocated to the Core Strategies does not justify precluding his testimony. Professor Maloney does not intend to offer any opinion about the effect of Mr. Leech's allocations on the duration of the Core Strategies. *See* Maloney Rebuttal Disc. Therefore, his testimony about the daily effect of Mr. Leech's allocations on the duration of Macro Opps is admissible. *See Reed Const. Data Inc.*, 49 F. Supp. 3d at 400.

The probative value of Professor Maloney's testimony is not substantially outweighed by the risk of misleading the jury. Professor Maloney's testimony is helpful to the jury to evaluate the Government experts' testimony that Mr. Leech did not need to allocate trades to Macro Opps in order to manage duration. The Government argues that there is a risk that the jury will conclude that Professor Maloney's regression analyses demonstrate that Mr. Leech was driven to allocate because of duration shifts. Gov't Reply at 21. The Government argues that this risk is acute because one of its witnesses—Professor Cohen—proposes to testify about how "traditional regression analyses are supposed to be used." *Id.* The Government does not point to any specific portion of Professor Maloney's testimony that states or implies that there is a causal or predictive relationship between the daily duration shifts in Macro Opps and the duration shifts attributable to Mr. Leech's allocations. Nor does the Government offer any evidence to suggest that a regression cannot be helpful even if it does not seek to establish a causal relationship. To the extent that the jury is confused by this point, the Government "should have no problem correcting jury confusion through cross-examination and summation." *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 643 F. Supp. 2d 482, 497 (S.D.N.Y. 2009); *see also* Kolm Supplemental Disc.

## IV.    CONCLUSION

For the foregoing reasons, both the defense's motion to exclude expert testimony and the Government's motion to exclude expert testimony are DENIED in full. As specified above, the parties are ordered to meet and confer to discuss mutually agreeable language that their respective experts may use when discussing their analyses. The parties must file a letter updating the Court on the status of those discussions no later than the date that is two weeks from the date of this opinion. By that same date, the defense must propose any limiting instruction it desires as it relates to evidence about Mr. Leech's trading and allocation in the Post Period.

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 62.

SO ORDERED.

Dated:  April 24, 2026
New York, New York

_____
GREGORY H. WOODS
United States District Judge