# CLEARY GOTTLIEB STEEN & HAMILTON LLP

AMERICAS
NEW YORK
SAN FRANCISCO
SÃO PAULO
SILICON VALLEY
WASHINGTON, D.C.
ASIA
HONG KONG
SEOUL

One Liberty Plaza
New York, NY 10006-1470
T: +1 212 225 2000
F: +1 212 225 3999

clearygottlieb.com

D: +1 212 225 2000
jkim@cgsh.com

EUROPE & MIDDLE EAST
ABU DHABI
BRUSSELS
COLOGNE
LONDON
MILAN
PARIS
ROME

June 5, 2026

**VIA ECF**

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
500 Pearl Street, Room 2260
New York, New York 10007

> Re:   *United States v. Leech,* No. 24 Cr. 658 (GHW)

Dear Judge Woods:

The government moves to introduce at trial various statements contained in 55 exhibits. (Dkt. 159, the "Gov't Mot."). The Court ordered a hearing, which occurred on June 1, 2026, to consider this motion, and directed the government to submit a spreadsheet (the "Spreadsheet") containing the statements it seeks to admit at trial, along with the purported bases for admission. (Dkt. 163). The Court also directed the defense to submit its position in response in the Spreadsheet. We have included our specific responses in the Spreadsheet and have submitted it to the Court by email as directed. *Id.* We make this submission in support of the positions set forth in the Spreadsheet.

For the reasons set forth below and in the Spreadsheet, the statements the government offers should not be admitted. First, the government has failed to establish that either Julie Marquez or Rosemarie Snoke[1] were agents of Mr. Leech such that their statements might be admissible against Mr. Leech under Federal Rule of Evidence 801(d)(2)(D). Second, even if either was an agent, the government has failed to establish that the statements were made within the scope of such agency. Third, the statements are generally not admissible as a "present sense impression" under Rule 803(1) or a "then-existing mental, emotional or physical condition" under Rule 803(3). Finally, many of the statements should not be admitted on the basis of Rule 403, as any limited probative value of the statements is substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, and needlessly presenting cumulative evidence.

---

[1] For the avoidance of doubt, Ms. Marquez was referred to in prior filings as "Trading Assistant-1" and Ms. Snoke was referred to as "Operations Manager-1."

Cleary Gottlieb Steen & Hamilton LLP or an affiliated entity has an office in each of the locations listed above.

Hon. Gregory H. Woods, p.2

## I.    The Government Has Failed To Establish That Any Agency Relationship Existed.

Rule 801(d)(2) provides that a statement is not hearsay if "[t]he statement is offered against an opposing party" and "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed."  Fed. R. Evid. 801(d)(2)(D).  Thus, for a statement to be admissible under this Rule, the offering party must establish: (1) the existence of the agency or employment relationship; (2) that the statement was made during the course of the relationship; and (3) that the statement relates to a matter within the scope of the agency.  *United States v. Rioux,* 97 F.3d 648, 660 (2d Cir. 1996).  The threshold inquiry is whether an agency relationship exists.  If the declarant is not an agent, that ends the inquiry.  *See Zaken v. Boerer*, 964 F.2d 1319, 1324 (2d Cir. 1992) (excluding statement where there was an insufficient evidentiary foundation to establish existence of an agency relationship).[2]  If an agency relationship has not been established, then there is no—and can be no—analysis of whether a statement is "during the course of" or "within the scope" of a non-existent agency.  *See, e.g.*, *Boren v. Sable*, 887 F.2d 1032, 1039 (10th Cir. 1989) (affirming exclusion of statement after finding no agency relationship).

Statements under Rule 801(d)(2)(D) arise most commonly in the context of employee statements being offered against the employee's corporate employer.  *See, e.g.*, *Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534, 537 (2d Cir. 1992) (noting "[l]iberal admissibility of this sort of proof is grounded on" the employee-employer relationship).  Statements offered and admitted as agent statements under Rule 801(d)(2)(D) against a fellow employee are far less common and require a heightened showing.  In such circumstances, the offering party must establish that the declarant was not only an employee or agent of the company they both worked for, but specifically, was an agent of that fellow employee, personally and as an individual.  That is a heavy burden that cannot—and should not—be met easily, particularly in a criminal case where courts must assess the implication of admitting such statements on the defendant's right to a fair trial, including the right not to testify and the right to confront witnesses against him.  *See* Mueller & Kirkpatrick, *Federal Evidence* § 8:53 (4th ed. 2025) (cautioning that, in criminal cases, "the terms 'employee' and 'agent' should be construed more strictly than in civil cases").

Thus, the Second Circuit has held that to establish an agency relationship, the offering party must show that the declarant was "answerable and directly responsible to" the defendant. *Rioux*, 97 F.3d at 660.  In finding an agency relationship in *Rioux*, the Second Circuit pointed to the fact that a declarant was "hand-picked" by the defendant and "served at his pleasure."  *Id.* Courts have also found relevant facts that show "the declarant depended on the defendant for her position and job instructions."  *See United States v. Goldstein,* No. 21 Cr. 550, 2023 WL 3662971, at *7 (E.D.N.Y. May 25, 2023).  It is not enough for the declarant "merely to occupy a position lower down in a chain of command reporting to the defendant."  *Id.* (citing *Boren*, 887 F.2d at 1040).

---

[2] Because Rule 801(d)(2)(D) does not define "agent," courts look to federal common law.  *See Boren v. Sable*, 887 F.2d 1032, 1038 (10th Cir. 1989).  Under Restatement (Third) of Agency, "agency" exists where there is mutual assent between the principal and the agent to an agreement that the agent "shall act on the principal's behalf," "subject to [their] control."  § 1.01 cmt; *see also* (Dkt. 60, Government Motion *in Limine* at 14 (citing *Cabrera v. Jakabovitz*, 24 F.3d 372 (2d Cir. 1994))).

Hon. Gregory H. Woods, p.3

The government has failed to establish that either Ms. Marquez or Ms. Snoke was an agent of Mr. Leech.  To the contrary, the evidence at the hearing established the opposite.  While both were employed by, and therefore agents of, Western Asset Management Company ("Western"), neither served as Mr. Leech's agent, personally and individually.  The June 1 hearing established that:

- Neither Ms. Marquez nor Ms. Snoke ever reported directly to Mr. Leech (Tr.[3] 57:15–17, 151:4–5);

- Neither Ms. Marquez nor Ms. Snoke was ever supervised by Mr. Leech (Tr. 54, 151, 157);

- Neither Ms. Marquez nor Ms. Snoke ever received any reviews from Mr. Leech (Tr. 18, 156:10–24);

- Neither Ms. Marquez nor Ms. Snoke ever had their compensation determined by Mr. Leech (Tr. 79:8–13, 102:11–15, 156:10–24);

- Neither Ms. Marquez nor Ms. Snoke received any regular oversight from Mr. Leech in their day-to-day job responsibilities (Tr. 77, 109, 151:4–8, 158);

- Neither Ms. Marquez nor Ms. Snoke depended upon Mr. Leech for their positions at Western, as Ms. Marquez remained at Western and was promoted after Mr. Leech's departure (Tr. 79–80, 157:10–16 );

- Both Ms. Marquez and Ms. Snoke had duties and responsibilities unrelated to the assistance they provided to Mr. Leech (Tr. 58–72, 151–52);

- Both Ms. Marquez and Ms. Snoke had worked in Trading Operations for years before having any role in assisting Mr. Leech with his trade allocations (Tr. 61, 117–18, 150–53);

- Others besides Ms. Marquez and Ms. Snoke assisted Mr. Leech in his allocations (Tr. 154); and

- Ms. Snoke, as the Trade Operations Manager during the relevant period had oversight over numerous other specialists, and assisted Mr. Leech in his trade allocations approximately 30 days over a three year period.  (Tr. 151-152; 153-154).

Far from establishing the type of personal agency relationship with Mr. Leech that the government needed in order to meet the threshold question under Rule 801(d)(2)(D), the hearing established that both Ms. Marquez and Ms. Snoke were professionals employed by Western in its Trading Operations group for decades, who as part of their jobs, assisted Mr. Leech with his trade allocations.  As members of that group (and, for Ms. Snoke, the head of it for years),

---

[3] Cites to "Tr." are to the transcript of the Court's June 1, 2026 hearing.

Hon. Gregory H. Woods, p.4

among their other duties, they had the responsibility of supporting trading operations activities of *all* the traders at Western.  (Tr. 58–59, 151–52).

Because of Mr. Leech's relatively larger trading volume and his use of voice brokers, he needed greater support from the Trading Operations group.  The group, and in particular Ms. Snoke as its head, decided to organize itself in a way that had one Trading Operations specialist take on much of the work of assisting Mr. Leech with his trade allocations.  That was Karen Meidl until about 2012, and then when Ms. Meidl left the team, Ms. Marquez, eleven years into her job as a Trading Operations specialist, "had to step in and do much of the work [of Ms. Meidl] in addition to [Ms. Marquez's] own [work]."  (Tr. 60–61).  Although assisting Mr. Leech with his trade allocations took up more of Ms. Marquez's time, she always remained a member of the Trading Operations team, supporting Western's trading function as a whole and taking on other functions and roles as well.  (Tr. 63 (she is "willing to support the rest of the desk in the same responsible manner"); *id.* 65 (she seeks to "be more efficient in my own work and helpful to PMs and PAs who may be struggling with [systems] changes"); *id.* 67 (she "worked hand in hand" with global support operations group of five to eight individuals); *id.* 66 (she had responsibility for U.S. Treasury auctions which supported the entire trading desk); *id.* 70–72 (she is also "completely involved in the rest of trading operations responsibilities")).  The fact that supporting Mr. Leech's trading took more time (because of the manner and volume of his trades) did not make Mr. Marquez or Ms. Snoke his personal agent, just as providing specific trading operations support for the other traders did not make them mini-agents of all those traders for the limited purposes of supporting their trading activity.  *See* Tr. 58–59 (testifying that Ms. Marquez supported at least 20 other traders personally); 151–52 (testifying that Ms. Snoke and the Trading Operations group supported dozens of traders).  Ms. Marquez and Ms. Snoke were agents of Western, not of Mr. Leech or each of the individual traders or other colleagues they supported.

In short, the government has failed to establish that either Ms. Marquez or Ms. Snoke was an agent of Mr. Leech.  Neither was "answerable and directly responsible to" Mr. Leech, nor did they otherwise have a relationship with Mr. Leech that meets the common law definition of agency.  *See Rioux*, 97 F.3d at 660; *Boren*, 887 F.2d at 1038.  Since the government has not established, as a threshold matter, any agency relationship personally with Mr. Leech (as opposed to with Western, the company), the inquiry ends.  No analysis needs to or can be made as to whether a statement was made within the scope of an agency relationship that has not been established.

## II.    Even If Any Agency Relationship Had Been Established, The Proposed Statements Are Not Within the Scope Of That Agency.

Even if an agency relationship existed—which it does not, for either Ms. Marquez or Ms. Snoke—the statements the government seeks to introduce are not within the scope of any agency.  The June 1 hearing established that the specific tasks that Ms. Marquez and Ms. Snoke assisted Mr. Leech with were to (1) obtain Mr. Leech's allocations, and (2) input them into the ATP system.  (Tr. 72, 82, 155, 168:5–10).  And if they were not able to reach Mr. Leech or one of a select few individuals who worked closely with Mr. Leech, they had authorization to allocate the trades under a default 50/50 rule.  (Tr. 46–47, 72, 165).  Both Ms. Marquez and Ms. Snoke testified that Mr. Leech did not give them any instructions or directions as to how to

Hon. Gregory H. Woods, p.5

communicate with the back office (which both Ms. Marquez and Ms. Snoke testified was a necessary part of the Trading Operations group's responsibilities, not a task specific to Mr. Leech (Tr. 83–84)), with brokers (Tr. 108), or with each other or among the specialists within the group (Tr. 83, 97). Based on that testimony, the scope of the relationship at issue (even if part of an agency relationship) was clearly limited and confined to obtaining Mr. Leech's allocations and inputting them into the ATP system. Statements not required for those specific tasks were not within the scope of what Ms. Marquez and Ms. Snoke had received direction about from Mr. Leech.

Second Circuit law requires that—even if an agency relationship has been established—to be admissible under Rule 801(d)(2)(D), a statement must reflect some decision-making authority that is exercised by the principal, who assented to the declarant acting as "an advisor or other significant participant in the decision-making process." *Rioux*, 97 F.3d at 661 (supervisors' statements that sheriffs must pay association dues in order to keep their jobs reflected the supervisors' delegated authority to make hiring and firing decisions regarding sheriffs); *Zaken*, 964 F.2d at 1323 (statement by declarant, "company's then vice president of sales . . . that Robin Weinberg was fired because she was pregnant" reflected that declarant "had ostensible authority over and took part in personnel decisions regarding hiring and firing of sales staff"); *United States. v. Laurensen,* 348 F.3d 329, 340 (2d Cir. 2003) (finding statement within scope where declarant had "authority to take action;" nurse's statement that files had been intentionally destroyed reflected the nurse's delegated authority to maintain files). Other Circuits have articulated this same point by holding that the statement must reflect the exercise of delegated authority. *See Precision Piping & Instruments, Inc. v. E.I. du Pont de Nemours & Co.*, 951 F.2d 613, 618–19 (4th Cir. 1991) (declarants must have "actual authority" over the subject of statements sought to be admitted; "the relevant question is whether [declarants] had the authority to hire and fire").

Thus, even if an agency relationship existed (which it did not), the statements offered by the government are not admissible under Rule 801(d)(2)(D), because they do not reflect the narrow authority or decision-making process that constitutes the "matter within the scope of that relationship." Rule 801(d)(2)(D). The statements the government offers involve:

- Office banter among colleagues that was not necessary to allocate or post trades for Mr. Leech, (*see, e.g.*, Tr. 85–86; GX 1106-15; GX 1106-47; GX 1106-49; GX 1106-51; GX 1106-69; GX 1106-99; GX 1106-100; GX 1106-102; GX 1106-112; GX 1106-117; GX 1107-97; GX 1107-98; GX 1107-120; GX 1108-56);

- After-the-fact discussions between colleagues within the Trading Operations group with complaints about the volume and timing of work on prior days leading to personal inconveniences (*see, e.g.*, Tr. 95–96; GX 1105-08; GX 1106-13; GX 1106-15; GX 1106-45; GX 1106-51; GX 1106-117; GX 1107-118; GX 1107-125; GX 1107-182; GX 1108-26; GX 1108-56);

- Complaints and discussion about delays in the process that were not even always specific to Mr. Leech (*see, e.g.*, GX 1106-15 (Operations Manager-1: "brokers failed to send confirms or send dupes."); GX 1107-125);

Hon. Gregory H. Woods, p.6

- Communications with the back office in order to assist the back office in conducting its work, after the allocations are in and about which Mr. Leech had never provided instructions or directions (*see, e.g.*, Tr. 83–84, 132, 152; GX 1106-38; GX 1106-82; GX 1106-99; GX 1106-100; GX 1107-21; GX 1107-23; GX 1107-97; GX 1107-123; GX 1107-160; GX 1107-161; GX 1107-163; GX 1107-164; GX 1107-181; GX 1107-182; GX 1108-32);

- Statements that relate generally to trading allocations but are not part of or related to assisting Mr. Leech in inputting his trade allocations into the ATP system (the government's basis for asserting agency) (*see e.g.*, Tr. 85–87 (Q: "Is this communication [GX 1106-102] necessary for you to input allocations for trades on Tuesday?" A: "No."); GX 1106-15; GX 1106-45; GX 1106-47; GX 1106-49; GX 1106-50; GX 1106-51; GX 1106-99; GX 1106-100; GX 1106-112; GX 1107-118; GX 1107-123; GX 1107-125; GX 1108-26; GX 1108-56); and

- Tangential statements that are difficult to understand on their face and/or have little or nothing to do with declarants actually getting allocation information from Mr. Leech and inputting them into the ATP (*see e.g.*, GX 1106-21 (concerning broker error); GX 1107-126 (concerning third party broker actions); GX 1108-20; GX 1108-31).

For these reasons, and as set forth with greater specificity in the defense responses in the Spreadsheet, even if agency relationships had been established (which they have not), the statements the government offers should not be admitted as they do not fall within the scope of what Mr. Leech understood declarants were assisting him with.

### III. The Statements Offered as Present Sense Impressions Under Rule 803(1) or Then-Existing Mental, Emotional or Physical Condition Under Rule 803(3) Do Not Meet The Legal Requirements of Those Rules Either.

The government presents alternative bases to admit certain of the statements. Specifically, the government argues that certain statements are admissible as present sense impressions under Rule 803(1) or then-existing mental, emotional or physical condition under Rule 803(3). As set forth in the response to the government's arguments in the Spreadsheet, the statements do not satisfy those Rules either.[4]

Rule 803(1) is intended to capture a (1) contemporaneous or nearly contemporaneous statement, (2) describing or explaining an event (3) personally perceived. This exception was originally created to capture oral statements (like eye witness accounts or 911 calls) that, as a

---

[4] Since filing its original request (Dkt. 159), the government's assertions relating to the Rule 803 hearsay exceptions have shifted significantly. In its original Exhibit A, which listed 55 exhibits it sought to introduce at trial, the government asserted Rule 803 as an alternative basis for admissions for 41 exhibits. In the Spreadsheet it has now submitted, the government has completely removed its Rule 803 assertion from 8 of them, has modified its Rule 803 assertions in another 9 exhibits, and has added new Rule 803 assertion to two exhibits not indicated as containing any statement admissible under Rule 803 in the government's original request. The government's shifting positions confirm the unreliability of its theories of admissions under Rule 803.

Hon. Gregory H. Woods, p.7

result of the contemporaneous nature, have "inherent trustworthiness." *See United States v. Jones,* 299 F.3d 103, 112 (2d Cir. 2002); *United States v. Ibanez*, 328 F. App'x 673, 676 (2d Cir. 2009) (finding that statement qualified as a present sense impression because it was made "within maybe 5 minutes" from the event observed). Present sense impressions must be of contemporaneous or nearly contemporaneous events personally perceived, not statements of conjecture or surmise. *See Brown v. Keane,* 355 F.3d 82, 89 (2d Cir. 2004) ("The present sense impression exception applies only to reports of what the declarant has actually observed through the senses, not to what the declarant merely conjectures."). As set forth in greater detail in the Spreadsheet, the statements presented by the government generally were not made "contemporaneous or nearly contemporaneously" to any event and often times described simply the lack of any event to perceive, as opposed to a reporting of a contemporaneous perception of an event, as required under the rule.

Rule 803(3) is intended to capture a statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health). Under Rule 803(3), there must be "contemporaneity between the event that gives rise to the state of mind or intent and the declarant's expression of that state of mind or intention." *Amerisource Corp. v. RxUSA Int'l Inc.*, No. 02 Civ. 2514, 2009 WL 235648, at *2 (E.D.N.Y. Jan. 30, 2009). In addition, Rule 803(3) expressly excludes from the exception "a statement of memory or belief to prove the fact remembered or believed … [and] does not permit the witness to relate any of the declarant's statements as to why [the declarant] held the particular state of mind." *Id*. (internal citation omitted). And last, "the hearsay declarant's mind must be relevant to the case." *Id.* As reflected in the Spreadsheet, the statements the government seeks to introduce are inadmissible under Rule 803(3) because Ms. Marquez's and Ms. Snoke's state of mind is not relevant to the case; the statements are being offered for the improper purpose of proving memory or fact; the statements do not really reflect anyone's state of mind; and the statements lack contemporaneity.

## IV.    The Statements Should Not Be Admitted Following a Rule 403 Analysis at Trial

The Court has ruled that none of the proposed statements will be admitted before the Court has had an opportunity, based on the evidence at trial, to weigh any limited probative value against the dangers of unfair prejudice, confusing the issues, misleading the jury, wasting time and presenting cumulative evidence. (Tr. 180–81).

As set forth in the Spreadsheet, the statements presented by the government in this motion are largely communications between colleagues within Western commenting on or complaining about the volume and timing of allocations and how that has led to personal inconveniences. Despite the way the government appears to be trying to use them, out of context and potentially without explanatory testimony, the hearing established that the sometimes colorful language used in these exchanges were not intended nefariously at all. (Tr. 93:15–18, 96:10–19). They were just work colleagues commiserating about the workload and having to work late. They are far from the best evidence of the facts the government claims they need these statements for, including delays in the process of allocating Mr. Leech's trades. The trade blotters reflect the times of allocations for trades. And the testimony of Ms. Marquez and Ms. Snoke, of course, is a much better source of evidence regarding the timing of the allocations. Indeed, the hearing revealed that Ms. Marquez and Ms. Snoke provide critically important

Hon. Gregory H. Woods, p.8

context around their statements without which the statements in the emails and chats cannot be understood fairly or properly.

The only reason to try to offer this type of cumulative evidence of the delay through these emails and chats would be for the purpose of presenting the inflammatory and unfairly prejudicial commentary out of context and potentially without explanatory testimony.  Indeed, many of the proposed statements, on a limited number of days over an almost three-year period, appear to have been selected precisely because of the prejudicial impact the language could have. *See, e.g.*, GX 1106-102 (Operations Manager-1:  "Friday was HELL!  Called me at 12:45pm"); GX 1106-69 (Operations Manager-1:  "SKL back to his old tricks yesterday;" Trading Assistant-1:  "He was really busy the couple days before I went out on vacation, sorry it continued for you"); GX 1106-117 (Operations Manager-1:  "Ok.  You gotta give him some grief for this.").  Rule 403 was designed to address exactly this type of risk.  When the limited probative value of these statements are weighed against the danger of unfair prejudice, confusing the issues, undue delay, wasting time, and cumulative evidence by the Court at trial, these statements should be precluded.

*     *     *

For the foregoing reasons and those set forth in the enclosed Spreadsheet, we respectfully submit that the Court deny the motion to admit the proposed statements of Ms. Marquez and Ms. Snoke.  The government has failed to establish an agency relationship with Mr. Leech under Rule 801(d)(2)(D).  Even if an agency relationship had been established, the statements do not fall within the scope of any such agency.  Moreover, Rules 803(1) and 803(3) do not provide alternative bases for admission.  The Court should, in any event, preclude admission of these statements on the basis that any probative value is substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, wasting time, and needlessly presenting cumulative evidence.

Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

*/s/ Joon H. Kim*
Joon H. Kim
Mitchell Kohles
One Liberty Plaza
New York, New York 10006
(212) 225-2000

Hon. Gregory H. Woods, p.9

MORVILLO ABRAMOWITZ
GRAND IASON & ANELLO, P.C.

*/s/ Jonathan S. Sack*

Jonathan S. Sack
Jeremy H. Temkin
Joshua Bussen
565 Fifth Avenue
New York, New York 10017
(212) 856-9600

*Attorneys for Defendant S. Kenneth Leech II*

Cc:    AUSA Peter J. Davis (via ECF)
       AUSA Thomas S. Burnett (via ECF)
       SAUSA Lindsey Keenan (via ECF)