

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*Jacob K. Javits Federal Building*
*26 Federal Plaza*
*New York, New York 10278*

June 8, 2026

**BY ECF**

Hon. Gregory H. Woods
Southern District of New York
500 Pearl Street
New York, NY 10007

> **Re:    United States v. S. Kenneth Leech II, 24 Cr. 658 (GHW)**

Dear Judge Woods:

The Government respectfully writes in response to the defendant's June 5, 2026 letter regarding the Rule 104 hearing. (ECF No. 174.) The defendant's arguments only underscore that the Government has established the admissibility of the proposed statements.

*First*, the defendant does not dispute that the Second Circuit applies a "functional test" to determine whether a declarant was an agent. *United States v. Goldstein*, 21 Cr. 550 (DC), 2023 WL 3662971, at * 6-7 (E.D.N.Y. May 25, 2023) (citing *Zaken v. Boerer*, 964 F.2d 1319, 1322-23 (2d Cir. 1992)). Nor does the defendant dispute "[m]ore recent cases confirm that *Zaken*'s 'directly responsible to' test may be satisfied by a direct reporting relationship *but may also be satisfied by facts demonstrating the declarant depended on the defendant for her position and job instructions*." *Id.* (emphasis added) (citing cases). Nor does the defendant dispute that courts have applied this functional test to admit agency statements in criminal cases. *See, e.g.*, *United States v. Rioux*, 97 F.3d 648 (2d Cir. 1996); *United States v. Lauersen*, 348 F.3d 329 (2d Cir. 2003).

*Second*, the defendant's letter does not engage with or address the overwhelming evidence at the hearing that Ms. Marquez (and Ms. Snoke when she stepped into her role) "depended on the defendant for her position and job instructions." *Goldstein*, 2023 WL 3662971, at *7. Ms. Snoke described Ms. Marquez's role as follows: "[Marquez] is the daily trade support for Ken Leech and all that his trading entails which wraps up most of her day and is her priority. She is diligent in doing whatever is necessary to ensure *his orders are carried out and reflected correctly in systems*." (GX 1111 at SDNY _LEECH_R01_00225429 (emphasis added).) Ms. Snoke wrote, "Support of Ken's trading means you have to think a bit like him whether you want to or not. . . . She is well acquainted with Ken's dealer coverage and never afraid to reach out to them for clarification or assistance." (*Id.* at SDNY_LEECH_R01_ 00225386.) Consistent with this, Ms. Marquez testified that she communicated with executing brokers about the defendant's trades. (6/1/26 Tr. 52:12-16).

Ms. Marquez's performance reviews describe her "prime responsibility" as "support[ing] of [Leech's] trade allocating and posting of the same." (GX 1111 at SDNY_LEECH_R01_00225431-2; 6/1/26 Tr. 20:18-21:9.) Ms. Marquez's role required extensive daily interaction with the defendant and the executing brokers for his trades. (6/1/26 Tr. 75:8-13.)

Marquez wrote in 2015, for example, "As I continue to primarily assist [Leech] with his trades, I've gotten to know him better and understand what he expects from me, and thereby making me better at my job." (GX 1111 at SDNY_RO1_00225430.; 6/1/26 Tr. 27:25-28:8.) In 2016, Marquez wrote, "I have a good rapport with [Leech] with whom I spend most of my day assisting with trade allocation and input. I've become efficient and capable at understanding him and what he needs from me." (GX 1111 at SDNY_LEECH_R01_00225386.) Ms. Marquez testified that her role in supporting Mr. Leech meant "supporting whatever [the defendant] needs." (6/1/26 Tr. 72:24-73:7).

That Ms. Marquez's job required her to do "whatever is necessary to ensure that [the defendant's] orders are carried out and reflected correctly in systems," perfectly encapsulates an agency relationship—this job depended on the defendant and the defendant's instructions. The defendant also instructed Ms. Marquez on how to allocate trades with the broker Marex and what to do if she could not obtain an allocation instruction directly from him. (6/1/26 Tr. 107:19-108:5.) The defendant testified before the SEC that if did not provide an allocation, and the senior investment professionals were not available to provide insight, the defendant authorized Ms. Marquez to allocate the unallocated trade 50/50 as a "default." (GX 802 at 173:17-174:3.) Ms. Marquez testified that she had authority to deviate from the defendant's standard allocation if she could not reach him and she "believed it was appropriate." (6/1/26 Tr. 46:23-47:5.)

Further, the decisions that Ms. Marquez made on the defendant's behalf were subject to the defendant's control—neither Ms. Marquez nor Ms. Snoke had trading authority and these were the defendant's trades. (6/1/26 Tr. 117:23-118:1; 119:10-12.)  For example, on November 29, 2022, after Marquez could not get in touch with the defendant regarding two trades, she emailed, "I allocated 50/50 on both of these below, fyi." (GX 1107-171.) The defendant responded, "Sorry-missed this-but as usual-your use of our standard allocation is correct!" (*Id.* 6/1/26 Tr. 46:4-22.) And, on December 8, 2021, Marquez wrote to other investment professionals at Western Asset, "Unfortunately, [Leech] left the office in a rush to board a flight today without calling in his allocations to me. I feel confident enough that I can figure out most of his trades but if you know of anything that he needed to do specifically today—then let me know." (GX 1106-117.) Ms. Marquez then wrote Ms. Snoke that the defendant "had been allocating some option trades recently to SKL1+F only but I did not do any like that because I could not see any pattern of which trades he allocates this way." Snoke responded, "Run with it." (Id.) Ms. Marquez later wrote that she got in touch with the defendant and "h[e] made a few adjustments to the allocations I had already in draft." (GX 1106-117.)[1]

---

[1] This agency relationship is reinforced by the Restatement's definition of agency cited by the defendant because Ms. Marquez acted on the defendant's behalf and the allocations were subject to the defendant's control. (ECF No. 174 at n.2). The Restatement explains that "a person may be an agent although the principal lacks the right to control the full range of the agent's activities, how the agent uses time, or the agent's exercise of professional judgment. A principal's failure to exercise the right of control does not eliminate it, nor is it eliminated by physical distance between the agent and principal." *Restatement of the Law (Agency)*, Section 1.01 *cmt. b.* Therefore, it is irrelevant to the agency relationship that the defendant did not control the "full scope" of Ms. Marquez's activities, how she used her time, or how she exercised her professional judgment. Instead, what matters is that—as to the defendant's trade allocations—Ms. Marquez received her

The defendant even recognizes that the declarants' "had authorization to allocate the trades under a default 50/50 rule" if they could not get in touch with Mr. Leech or others at Western with a specific allocation instruction. (ECF No. 174 at 4.) Accordingly, the hearing established that Ms. Marquez (and Ms. Snoke when she took over Ms. Marquez's role) depended on the defendant for her job and job instructions and had authority to act on the defendant's behalf for allocating and posting the defendant's trades.

*Third*, the defendant elides the Second Circuit's test for assessing whether a statement is within the scope of an agency relationship. In *United States v. Lauersen*, 348 F. 3d 329, 340 (2d Cir. 2003), the defendant argued that "file purging" was not within the scope of the nurse's employment—and thus the nurse's statements to a patient that a patient's file was "destroyed" along with "many others" and that Lauersen's office "'had a tip, therefore, they destroyed the files before the government agency came in to confiscate'" them were outside of the scope. 348 F. 3d at 340. The Second Circuit rejected that argument because "[t]he statements relate to patient files, and the nurse had 'authority to take action,' regarding patient files.'" *Id.* (citation omitted) quoting *Pappas v. Middle Earth Cond. Ass'n*, 963 F.2d 534, 538 (2d Cir. 1992)).

To this end, the defendant's claim that Ms. Marquez's and Ms. Snoke's statements cannot qualify under Rule 801(d)(2)(D) because the defendant "did not give them any instructions or direction as to how to communicate" is also barred by *Lauersen* where the nurse spoke about destroying patient files to avoid a government inquiry. More fundamentally, if accepted, defendant's argument would render Rule 801(d)(2)(C) superfluous. Rule 801(d)(2)(C) provides that a statement is not hearsay if it "was made by a person whom the party authorized to make a statement on the subject." Rule 801(d)(2)(D), by contrast, requires only that the statement is "on a matter within the scope of that relationship."

Here, the defendant concedes that Ms. Marquez and Ms. Snoke had authority to take action over the defendant's trade allocations and posting the same ("they had authorization to allocate the trades under a default 50/50 rule" if they "were not able to reach Mr. Leech or one of a select few individuals who worked closely with Mr. Leech"). (ECF No. 174 at 4.) The statements at issue "relate" to the defendant's trade allocations and therefore are within the scope because the declarants had "authority to take action" regarding the defendant's trade allocations. Defendant's arguments that certain statements were not "necessary" for the posting of the defendant's trades does not square with the Second Circuit's opinions in *Lauersen* or *Pappas*.

Pages five and six of the defendant's letter make a number of categorical challenges to statements as outside of the scope of the agency relationship. Those all fail under *Lauersen*, but, tellingly, the defendant does not address GX 1107-119, which is one of the clearest examples of Ms. Marquez acting as the defendant's agent as to one of the defendant's unallocated trades and making statements within the scope of that agency relationship: On July 21, 2022, Ms. Marquez wrote to Ms. Snoke, "tried ken but no answer . . . no allocation from ken." (*Id.* at SDNY_LEECH_R01_01154390.) They then have the following exchange about how to allocate the defendant's trade:

---

instructions from the defendant, acted on the defendant's behalf, and that the ultimate trade allocation was subject to the defendant's control.

| Ms. Marquez: | "although its [sic] a great price." |
| Ms. Snoke: | "We know how he thinks. He would be happy to have a winning trade. What is the trade." |
| MS. Marquez: | "so i feel like its [sic] such a great price he would want to dictate specifically where to allocate. sell 1000 tyu2 119-00. . . . he was doing 50/50 on other ty's today. . . I could just do that." |
| Ms. Snoke: | I'd [sic] that . . . yes. Least invasive." |

The employees decide to "leave it until tomorrow," but then, after Ms. Marquez receives a confirm from the broker she writes, "i will do 50/50." (*Id.* at 1165391-92.) This is a core example of Ms. Marquez making statements on a matter over which she had authority to take action from the defendant. (6/1/26 Tr. 46:23-47:5; 145:10-16.)

*Fourth*, the defendant's Rule 803 arguments are also meritless. The defendant does not explain why a declarants' written statements are less trustworthy than oral ones, or how that mattes under Rule 803(1). Nor does the defendant explain why the declarants' contemporaneous observations about the defendant's allocation process, for example, "Ken is out of control today. Markets are crazy. Not one allocation yet for the 70+ trades he has executed," GX 1106-99, are not "statement[s] describing or explaining an event or condition." And the defendant ignores the important probative value of Ms. Marquez's and Ms. Snoke's state of mind when attempting to allocate the defendant's outstanding trades. For example, far from each of these trades being *required* to go to particular clients as the defendant has argued throughout this case ("the Core Strategies and Macro Opps required different U.S. Treasury futures and options trades," (ECF No. 35 at 17), the statements at issue show the opposite—Mr. Leech authorized these employees to make allocation decisions for his trades using their judgment, and, if they failed to get into touch with him or other members of the investment teams for guidance, they were instructed to evenly split the trades between the Core Strategies and Macro Opps as a default rule that the defendant established. The declarants' intent and plan with respect to the defendant's unallocated trades is therefore highly probative.

*Finally*, the defendant's Rule 403 arguments also fall flat. The defendant does not identify "unfair" prejudice that can stem from these statements. *See, e.g.*, *Costantino v. Herzog*, 203 F.3d 164, 174-75 (2d Cir. 2000) ("Because virtually all evidence is prejudicial to one party or another, to justify exclusion under Rule 403 the prejudice must be *unfair*." (emphasis in original)). The defendant's view that the declarants' "were just work colleagues commiserating about the workload and having to work late," ECF No. 174 at 7-9, is a classic jury argument that goes to "weight, not admissibility." *United States v. Azocar*, No. 21 Cr. 379 (VSB), 2025 WL 1463088, at *12 (S.D.N.Y. May 22, 20225). Further, the defendant does not get to choose the "best evidence" in the Government's case-in-chief and preclude everything it thinks is not the Government's "best evidence." (ECF No. 174 at 7.) Indeed, the Supreme Court and the Second Circuit have rejected this argument: "'the mere fact that two pieces of evidence might go to the same point [does] not, of course, necessarily mean that only one of them might come in.'" *United States v. Thompson*,

24-1513-cr, 2025 WL 843296, at * 2 (2d Cir. March 18, 2025) (quoting *Old Chief v. United States*, 519 U.S. 172, 183 (1997)).

Instead, the Supreme Court "emphasized 'the importance of allowing the prosecution to maintain the natural sequence of narrative evidence in presenting its case, to ameliorate the concern that people who hear a story interrupted by gaps of abstraction may be puzzled at the missing chapters.'" *Id.* (quoting *United Staes v. Al-Moayad*, 545 F.3d 139, 161 (2d Cir. 2008)). Here, the only potential prejudice the defendant can identify is that these statements are further evidence of the defendant's guilt and undercut defense counsel's false jury narrative that "the government will not present evidence from any co-conspirator—or any witness, document, or other evidence for that matter—establishing any of the actual details or specifics of the alleged criminal scheme, its purpose, its means, or its methods." (ECF No. 58 at 6.) That is not cognizable Rule 403 prejudice. The defendant should not be able to keep from the jury critical evidence of his crimes.

Respectfully submitted,

SEAN BUCKLEY
Attorney for the Government

by: *Peter G. Davis*

Thomas Burnett/Peter Davis
Assistant United States Attorneys

Lindsey Keenan
Special Assistant United States Attorney
(212) 637-2468/1064/6523

cc: Counsel (by ECF)