UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| -v- | ) | 24 Cr. 658 (GHW) |
| | ) | |
| S. KENNETH LEECH II, | ) | |
| | ) | |
| *Defendant*. | ) | |

**SENTENCING MEMORANDUM ON BEHALF OF S. KENNETH LEECH II**

Dated: September 17, 2026
New York, New York


MORVILLO ABRAMOWITZ
GRAND IASON & ANELLO, P.C.

Jonathan S. Sack
Jeremy H. Temkin
Samuel W. Magaram
Marissa Piccolo
Nathaniel Sobel
565 Fifth Avenue
New York, NY 10017
(212) 856-9600

CLEARY GOTTLIEB
STEEN & HAMILTON, LLP

Joon H. Kim
One Liberty Plaza
New York, NY 10006
(212) 225-2000

*Attorneys for Defendant S. Kenneth Leech II*

## TABLE OF CONTENTS


PRELIMINARY STATEMENT ........ 1

DISCUSSION ........ 2

I. KEN'S PERSONAL HISTORY ........ 2

A. Ken's Early Life ........ 2

B. Ken's Education ........ 3

C. Ken's Early Career ........ 4

D. Ken's Career at Western and Industry Recognition ........ 5

E. Ken's Devotion to His Family ........ 13

F. Ken's Devotion to His Friends ........ 19

G. Ken's Faith, Charitable Good Works, and Service ........ 20

H. Letters Submitted to the Court Demonstrate Ken's True Character ........ 24

II. THE OFFENSE CONDUCT ........ 37

III. AS RECOMMENDED BY THE PROBATION OFFICE, A TIME-SERVED SENTENCE IS WARRANTED AND APPROPRIATE UNDER 18 U.S.C. § 3553(a) ........ 38

A. The Need to Avoid Unwarranted Sentencing Disparities ........ 38

B. Advisory Guidelines Calculation and Related Provisions ........ 39

C. Ken's History and Characteristics ........ 41

D. Ken's Health ........ 45

E. The Nature and Circumstance of the Offense ........ 47

F. The Collateral Consequences of the Investigation, Prosecution, and Conviction ........ 48

G. The Need to Avoid Unwarranted Sentencing Disparities ........ 50

H. Specific Deterrence ........ 54

I. General Deterrence ........ 55

J. Sentencing Recommendation ........ 58

CONCLUSION ............................................................................................................................ 58

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Gall v. United States*,
552 U.S. 38 (2007) ........ 38, 39

*Pepper v. United States*,
562 U.S. 476 (2011) ........ 39

*United States v. Adelson*,
441 F. Supp. 2d 506 (S.D.N.Y. 2006) ........ 59

*United States v. Booker*,
543 U.S. 220 (2005) ........ 38

*United States v. Cavera*,
550 F.3d 180 (2d Cir. 2008) ........ 38

*United States v. Forbes*,
23 Cr. 387 (GKF) (N.D. Okla) ........ 52

*United States v. Gaind*,
829 F. Supp. 669 (S.D.N.Y. 1993) ........ 54

*United States v. Gardellini*,
545 F.3d 1089 (D.C. Cir. 2008) ........ 57

*United States v. Hess*,
22 Cr. 55 (JDP) (E.D. Wis.) ........ 52

*United States v. Jenkins*,
854 F.3d 181 (2d Cir. 2017) ........ 50

*United States v. Jones*,
531 F.3d 163 (2d Cir. 2008) ........ 39

*United States v. Mateo*,
299 F. Supp. 2d 201 (S.D.N.Y. 2004) ........ 55

*United States v. Olhovsky*,
562 F.3d 530 (3d Cir. 2009) ........ 58

*United States v. Ortega*,
13 Cr. 814 (JMF), 2023 WL 2752160 (S.D.N.Y. Mar. 31, 2023)............................................ 46

*United States v. Prosperi*,
686 F.3d 32 (1st Cir. 2012)........................................................................................... 50

*United States v. Singh*,
877 F.3d 107 (2d Cir. 2017) ........................................................................................... 50

*United States v. Tibbets*,
21 Cr. 218 (DCN) (D. Idaho) ......................................................................................... 52

*United States v. Velazquez*,
16 Cr. 233 (AKH), 2017 WL 2782037 (S.D.N.Y. May 26, 2017) .......................................... 58

**Statutes**

18 U.S.C. § 1505........................................................................................... 40, 52, 53

18 U.S.C. § 3553(a) ........................................................................................... passim

**Federal Sentencing Guidelines**

U.S.S.G.  § 2J1.2........................................................................................................ 52

U.S.S.G. § 5A1.1 ........................................................................................................ 41

U.S.S.G. § 5C1.1......................................................................................................... 40

**Other Authorities**

U.S. Sentencing Commission, Recidivism Among Federal Offenders: A Comprehensive
Overview (2016), https://www.ussc.gov/research/research-reports/recidivism-among-
federal-offenders-comprehensive-overview......................................................................... 54

*Twenty-First Century: A Review of the Evidence*, 42 Crime & Justice 199 (2013)...................... 57

U.S. Sent'g Comm'n, Individual Datafiles, Fiscal Years 2012–2025,
https://www.ussc.gov/sites/default/files/zip/opafy24nid_csv.zip............................................. 52

Vidhya Edwards Munnangi, *Former Western Asset Bond Manager Pleads Guilty to Obstructing SEC Probe*, Yahoo Finance (June 15, 2026) ........................................................ 56

U.S. Sentencing Commission Part B of the 2023 Criminal History Amendment Retroactivity Data Report, Apr. 2026........................................................................................................ 51

United States Sentencing Commission, The Effects of Aging on Recidivism Among Federal Offenders 3 (2017), https://www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders ........................................................................... 55

National Institute of Justice, Five Things About Deterrence (June 5, 2016), https://nij.ojp.gov/topics/articles/five-things-about-deterrence#one........................................ 57

U.S. Sent'g Comm'n, Interactive Data Analyzer (IDA), https://www.ussc.gov/research/interactive-data-analyzer .................................................. 51, 52

U.S. Dep't of Just., Off. of the Inspector Gen., The Impact of an Aging Inmate Population on the Federal Bureau of Prisons 18 (rev. Feb. 2016), https://oig.justice.gov/sites/default/files/reports/15-05.pdf...................................................... 47

Max Curtin & Eric Jacobson, *Storied Bond Trader Ken Leech Makes His Last Trade*, Morningstar (July 1, 2026)............................................................................................. 56

Legg Mason, Inc., *Morningstar's 2014 U.S. Fixed-Income Fund Manager of the Year Winner Seeks Enhanced Returns Beyond U.S. Treasuries*, PR Newswire ................................ 10

Harriet Clarfelt & Julia Rock, *Former Star Bond Investor Ken Leech Pleads Guilty to Obstructing Probe*, Fin. Times (June 12, 2026) ........................................................................ 56

Dick K. Nanto, Cong. Rsch. Serv., 97-1021 E, The 1997–98 Asian Financial Crisis (Feb. 6, 1998), https://sgp.fas.org/crs/row/crs-asia2.htm ........................................................... 7

David Weisburd *et al.*, *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995) ................................................................. 55

Danielle Walker, *Lessons for Investors From a Former Star Fund Manager's Guilty Plea*, Barron's (Aug. 11, 2026)................................................................................................ 56

Christine Kitchens, U.S. Sent'g Comm'n, Analyzing Federal Sentence Length & Type (2019) ............................................................................................................................ 51

Charles Stein & John Gittelsohn, *This Bond Manager Isn't a Household Name, But He Beats 98% of His Peers*, Bloomberg (Dec. 22, 2017)...............................................................11

Bob Van Voris, Chris Dolmetsch & Silla Brush, *Ken Leech to Plead Guilty in U.S. "Cherry Picking" Fraud Case*, Bloomberg (June 12, 2026) .................................................. 56

Amendment 821, Reason for Amendment, U.S. Sentencing Commission, https://www.ussc.gov/guidelines/amendment/821 (last visited Sept. 14, 2026) ...................... 41

Joseph De Avila, *Bond Investor Ken Leech Pleads Guilty to Obstructing SEC Probe*, Wall St. J. (June 12, 2026)............................................................................................ 56

## PRELIMINARY STATEMENT

This memorandum is respectfully submitted on behalf of S. Kenneth ("Ken") Leech II, who will stand before the Court for sentencing on October 30, 2026. Ken is 72 years old, a devoted husband, father, and grandfather, a steadfast friend, a generous mentor, and a deeply respected figure in his community, at his former firm, and in his former industry.

In his guilty plea, Ken admitted to making false and misleading statements in response to questions posed to him during sworn testimony before the Securities and Exchange Commission ("SEC"). He deeply regrets and apologizes for his conduct.

This offense conduct is entirely inconsistent with Ken's character as reflected in the 197 letters submitted to the Court on his behalf. As these letters illustrate, Ken is decent and kind. The letters describe a man whose life has been defined by showing up for others. He was a hardworking colleague known for his understated leadership, humility, integrity, and commitment to colleagues and clients. He is a stalwart friend whose devotion knows no end. And he is the anchor of his loving family.

In sentencing Ken, we ask the Court to consider his personal and professional history, his innumerable acts of service, mentorship, and quiet generosity, the heavy toll the investigation and prosecution have taken on Ken and his family, and the collateral consequences on Ken's life's work and reputation. As set forth below, we respectfully submit that, in light of these considerations and the remaining statutory factors, the sentence of time served recommended by the Probation Office is "sufficient, but not greater than necessary" to satisfy the factors set forth in 18 U.S.C. § 3553(a).

## DISCUSSION

### I. KEN'S PERSONAL HISTORY

#### A. Ken's Early Life

Ken grew up in a "modest but comfortable brick house" outside Syracuse, New York with his younger brother, Darryl. Ex. 1, Ken Leech letter at 1.[1] He was raised by a World War II Army veteran father and a mother who had grown up on a Kentucky farm during the Great Depression. When Ken's father, Stephen, returned to the United States from Europe, he became a health insurance salesman and later headed the physicians' professional association for Onondaga County. At a medical convention in Chicago, Stephen met Ken's mother, Alma, who had left Kentucky to pursue her own career, and at the time was the Executive Secretary of the American College of Surgeons. "It was unusual for a woman to hold that sort of position at that time, and she would sometimes use an initial rather than her first name." Ex. 1, Ken Leech letter at 1.

Stephen and Alma instilled in Ken a deep sense of responsibility. Ken shoveled snow and had a paper route. Ex. 1, Ken Leech letter at 1. As the eldest son, he looked out for his younger brother Darryl, who describes himself as "something of a loose cannon" as a teenager. Ex. 54, Darryl Leech letter at 1. Ken did the same for his cousins, Darin and Kevin, who grew up nearby. Ex. 35, Darin Fink letter at 1; Ex. 36, Kevin Fink letter at 1. As a straight-A student and altar server at the local church, Ken was a natural role model. Ex. 54, Darryl Leech letter at 1.

---

[1] Together with this memorandum, we are submitting a total of 197 letters from Ken and his family, friends, former colleagues, community members, and others. Letters cited in this memorandum are attached hereto in Volume I and organized alphabetically. Volume II contains letters not specifically referenced in this memorandum. It is organized into two sections: (1) letters from Ken's family, friends, and community members; and (2) letters from Ken's former co-workers, industry colleagues, and clients. Both subsections are organized alphabetically.

It was important to Ken's parents, as children of the Depression, that both he and Darryl work hard, go to college, and get good jobs. Ex. 1, Ken Leech letter at 1. The money Ken made as a paper boy—particularly hard-earned during Syracuse winters—sparked his early interest in investments. Ex. 1, Ken Leech letter at 1.

Ken formed a close-knit group of friends at his public high school. Despite their divergent paths—one became a doctor, another a classical guitarist, and a third attended law school before joining Ken in finance and ultimately moving to Australia—they have remained very close with Ken. One of these friends, Eliot Fisk, calls his lifelong relationship with Ken "sacred." Ex. 37, Eliot Fisk letter at 1. Mr. Fisk writes of "passionate" youthful debates with Ken that "taught me how to think!" Ex. 37, Eliot Fisk letter at 2. Dr. Steven Wilson, Ken's friend since kindergarten, praises Ken's "generosity," "modesty," and "integrity." Ex. 99, Dr. Steven Wilson letter. Then as now, Ken's friends view him as making them "better." Ex. 10, Bruce R. Arnold letter at 1.

**B. Ken's Education**

Ken accepted early admission as a Benjamin Franklin National Scholar at the University of Pennsylvania's Wharton School. Realizing that Penn charged tuition by the semester and not credit hour, Ken "took as many classes as I could, including many outside of business and finance." Ex. 1, Ken Leech letter at 2. In four years at Penn, Ken earned two bachelor's degrees (in history and economics) and an M.B.A. from the Wharton School—each with honors. Ex. 1, Ken Leech letter at 2; Ex. 10, Bruce R. Arnold letter at 1.

At Penn, Ken continued to form friendships that would endure for decades. College friend Mark Freedman calls Ken "among the most intelligent and driven people I have ever met, yet . . . unassuming." Ex. 40, Mark Freedman letter at 2. In college, Ken also continued to

demonstrate the generous spirit that has been a hallmark of his life. *See* Ex. 23, Rollin Bush letter at 1.

### C. Ken's Early Career

Penn instilled in Ken a lifelong interest in the relationship between monetary and fiscal policy. Fixed-income investing, and specifically domestic interest rates, was the natural fit. After graduating, Ken landed his first job in the Trust Department of the National Bank of Detroit, where he worked in fixed-income research. Ex. 1, Ken Leech letter at 2. In that role, Ken analyzed and wrote reports about a range of newly created fixed-income instruments, such as Treasury derivatives, zero-coupon bonds, and mortgage-backed securities. Ex. 1, Ken Leech letter at 2. He also traded fixed-income securities for clients as a junior portfolio manager. Ex. 1, Ken Leech letter at 2. Even decades later, Ken, having learned to trade by hand and phone long before electronic trading systems, was known for the "prehistoric" Monroe calculator on his trading-floor desk. Ex. 86, Rosemarie Snoke letter at 2.[2]

In the 1980s, Ken joined the First Boston Corporation in fixed-income research. Together with his colleague Dexter Senft—who, like so many others, would become a lifelong friend—Ken co-authored a scholarly paper on Treasury options' role in managing risk in fixed-income portfolios. Ex. 82, Dexter Senft letter at 2. They presented the paper to the bank's clients across the country. Ex. 82, Dexter Senft letter at 2; *see also* Ex. 74, Karlen Powell letter at 1 ("Around the firm, people often joked that [Ken] had 'written the book' on options trading

[2] The government called Ms. Snoke and Julie Marquez to testify at the June 1, 2026, evidentiary hearing, and both appeared on the government's trial witness list. Overall, nine current or former employees of Western Asset Management Company ("Western") who appeared on the government's trial witness list have submitted letters to the Court in support of Mr. Leech.

because he had authored a widely read industry paper on Treasury options when that market was still in its infancy.”).

Ken later moved into First Boston’s fixed income proprietary trading unit, managing highly leveraged investments on behalf of the bank. Ex. 1, Ken Leech letter at 2. In that role, Ken specialized in trading Treasury bonds and derivatives.

### D. Ken’s Career at Western and Industry Recognition

In 1990, after a brief tenure at a proprietary trading firm in Connecticut, Ken was recruited to join Western by Edward (“Ed”) Moody, whom he had worked with at National Bank of Detroit. At that time, Western was a relatively small institutional fixed-income investment firm in Pasadena, California managing approximately $5 billion in client funds. Ex. 1, Ken Leech letter at 3. The thirtieth employee at Western, Ken was hired to lead the firm’s long duration and insurance strategies and to serve as the interest rate specialist for the firm’s flagship Core and Core Plus strategies (together, the “Core Strategies”).[3] Although Western was a small firm, Ken took the job because it offered him the chance to invest across a broad range of fixed-income assets and work directly with clients to develop strategies tailored to their unique needs. Ex. 1, Ken Leech letter at 2; Ex. 2, Eileen Stueck Leech letter at 2.

In 1998, when Western’s Chief Investment Officer (“CIO”) abruptly stepped down for health reasons, Ken’s “presence, investment acumen and personality” made him the clear choice for the role. Ex. 49, James W. Hirschmann letter at 1. Overnight, Ken became responsible for

[3] Core and Core Plus are fixed-income strategies that are measured against a broad-based index that is often called the “benchmark.” (In its present form, the benchmark is the Bloomberg U.S. Aggregate Bond Index.) Core and Core Plus are similar products, but Core was more tethered to the benchmark and invested only in U.S. securities, while Core Plus had greater variability and invested in some foreign fixed-income products. Virtually all major fixed-income investment managers offer comparable products. In consequence, such products serve as a basis for the market and clients to compare investment managers.

more than 30 investment professionals in Western's Pasadena and London offices. Despite not having been a manager before, Ken quickly developed his own "quiet leadership style," Ex. 26, Jae Choi letter at 1, that was "collaborative, team-oriented, open and honest," Ex. 97, Stephen A. Walsh letter at 2. *See* Ex. 56, Mark Lindbloom letter at 1 (describing Ken's "style of management" as "flat . . . to allow interaction and quick decision making").

Built predominantly on the performance of the Core Strategies, Western prospered. Ex. 49, James W. Hirschmann letter at 3 ("Ken and I spent 30+ years building Western around Core and Core Plus"). In 1999, James ("Jim") Hirschmann became the firm's new Chief Executive Officer ("CEO"). For the next two decades, Ken and Jim, along with many others, built Western into a global fixed-income powerhouse, which, at its peak, managed more than $600 billion and employed over 1,000 people across nine international offices. Ex. 97, Stephen A. Walsh letter at 1 ("Ken was the person most responsible for the investment results that drove Western's success."); Ex. 49, James W. Hirschmann letter at 3.

Ken "led by example." Ex. 78, Detlev Schlichter letter at 1. He was often the first to arrive at the office (as early as 4:30 a.m. or 5:00 a.m.), demonstrating a standard of "dedication and consistency . . . that [other employees] quietly tried to emulate." Ex. 7, Dan Alexander letter at 1. Western research analyst Suzanne Trepp recalls similarly that "Ken set the example for everyone around him through his extraordinary work ethic, arriving at the trading desk before most employees each morning, often by 5:15 a.m." Ex. 96, Suzanne Trepp letter at 1; *accord* Ex. 7, Dan Alexander letter at 1 ("I always took pride in arriving at the office early to prepare for the trading day, yet Ken almost invariably beat me there. Whether it was an ordinary weekday, a Friday before a holiday weekend, or a particularly demanding period in the markets, he was already at his desk, fully engaged.").

Ken's example extended beyond his work ethic. Jae Choi, an investment professional, describes working for Ken in the late 1990s as "the most fulfilling years of my work life." Ex. 26, Jae Choi letter at 1. Even though Ken "fired" Mr. Choi from Western, Mr. Choi's respect for Ken's character and integrity remain undiminished. Ex. 26, Jae Choi letter at 2. Mr. Choi describes Ken as "a man of impeccable ethics who makes hard decisions because they are the right ones." Ex. 26, Jae Choi letter at 2. In recognition of the lasting impact Ken had on him, Mr. Choi honored Ken by naming his daughter, [redacted],[4] after him. Ex. 26, Jae Choi letter at 2.

Shortly after Ken became CIO, the 1997–1998 Asian Debt Crisis[5] put significant strain on Western. In response, Ken "personally sat for days [making] calls to every client affected." Ex. 38, Jim Flick letter at 2. Ever the analyst, Ken was determined to learn from the "turmoil" and serve clients better. Ex. 68, Scott Mullet letter at 1. He enlisted Scott Mullet, a colleague in the risk department, to "build, from scratch, better models and analytical tools to provide the best investment management possible to clients during that market crisis." Ex. 68, Scott Mullet letter at 1. It was, Mr. Mullet writes, an example of how Ken "always had the client's best interest in mind." Ex. 68, Scott Mullet letter at 1; *accord*, Ex. 20, Gordon S. Brown letter at 2 (Ken "consistently placed the interests of clients at the centre of his decision-making"); Ex. 34, Derek Fan letter (Ken "cared deeply about [clients]"); Ex. 79, Julien Scholnick letter at 1 (Ken "put[] our clients first"). In part due to Ken's strong leadership, Western weathered the storm. Jim Flick, who "worked alongside Ken as a senior portfolio manager," writes that, through his

---

[4] As explained in the letter accompanying this submission, gray highlighting indicates text that we propose to redact from the public version of this memorandum filed on ECF.

[5] *See generally* Dick K. Nanto, Cong. Rsch. Serv., 97-1021 E, *The 1997–98 Asian Financial Crisis* 2 (Feb. 6, 1998), https://sgp.fas.org/crs/row/crs-asia2.htm.

actions during that crisis, "Ken showed all of us how important humility, honesty and transparency were to this business and to our clients." Ex. 38, Jim Flick letter at 2.

Based on the strength of its corporate bond research and its interest rate positioning, Western continued to grow. Western's Core strategy, for which Ken was the lead manager, won the prestigious Morningstar Manager of the Year Award for 2004. Ex. A, Morningstar, *Morningstar Announces 2004 Fund Manager of the Year Awards* (Jan. 3, 2005). Rather than seek the limelight, Ken insisted on sharing credit with his colleagues. Ex. 97, Stephen A. Walsh letter at 2. "When Ken was named Manager of the Year" again in 2014, "the media needed[] a photo of Ken to run with their stories. Ken immediately refused and said it was a Team effort, therefore, the photos should be of the Team." Ex. 49, James W. Hirschmann letter at 2; *accord* Ex. 59, Fred Marki letter (Ken "insisted that the award be attributed to the investment management team"). "The cover photo wasn't of Ken in his office but of the whole team standing in the plaza." Ex. 59, Fred Marki letter; *accord* Ex. 58, Ernest Marchosky letter at 1.

Likewise, in 2007, when Ken was named to the Fixed Income Analyst Society Hall of Fame, attendees at the ceremony recall that Ken demonstrated his characteristic humility by turning the attention to and giving credit to others on his team. *See* Ex. 97, Stephen A. Walsh letter at 2; Ex. 69, Jennifer W. Murphy letter at 2; Ex. 82, Dexter Senft letter at 3.

In the spring of 2007, Ken was diagnosed with a medical condition called Barrett's esophagus, which significantly increases his risk of esophageal cancer. Ex. 102, Dr. Lori J. Wynstock letter at 1. Because the diagnosis was serious and required regular endoscopic procedures and frequent biopsies, Ken stepped down as CIO and did not expect to return to Western. *See* Ex. 2, Eileen Stueck Leech letter at 2 ("It was a frightening time for us. Ken had to

endure extensive testing and inconclusive results, as well as the threat of a complicated and painful surgery."). Ken's friend and deputy CIO, Steve Walsh, was appointed to replace him.

By the fall of 2008, the condition was determined to be non-cancerous, and Ken was able to return to work. Respecting that Mr. Walsh had been named CIO on a permanent basis, Ken returned as a portfolio manager under Mr. Walsh. While the arrangement could have been awkward or even antagonistic, Ken's colleagues remember the deference and respect Ken showed for Mr. Walsh's leadership. *See* Ex. 14, Dr. Michael Bazdarich letter at 3; Ex. 97, Stephen A. Walsh letter.

Shortly before Ken returned, the Global Financial Crisis plunged the market into turmoil. Ex. 1, Ken Leech letter at 3. CEO Jim Hirschmann recalls that Western "hit a bad patch – a really bad patch . . . . the firm was in a tight spot." Ex. 49, James W. Hirschmann letter at 1. Mr. Hirschmann "approached Ken to see if he'd be . . . willing to help out." Ex. 49, James W. Hirschmann letter at 1. As he always does, Ken agreed and, recognizing "that the team and the firm were best served if he was in London," he undertook to manage Western's global business, which was centered in London and required extensive travel there. Ex. 49, James W. Hirschmann letter at 1. Ken did this, Mr. Hirschmann writes, "at the expense of his health, because of the respect and care of the firm and its people." Ex. 49, James W. Hirschmann letter at 1. Helping Western weather the ensuing European Sovereign Debt Crisis, Ken "remained calm, analytical and collaborative." Ex. 20, Gordon S. Brown letter at 2. He encouraged "open debate across the team" and supported the team's investment judgment, which was ultimately vindicated. Ex. 20, Gordon S. Brown letter at 2.

In London, Ken also worked closely with Andres Sanchez Balcazar. Mr. Sanchez Balcazar describes Ken as a person of "integrity, honesty, humility and commitment to others."

Ex. 13, Andres Sanchez Balcazar letter at 1. As a manager, Ken "was always the first one to take blame when his portfolios did not perform well" and "never hid behind numbers, charts or stories." Ex. 13, Andres Sanchez Balcazar letter at 2. Instead, he believed that "performance and transparency were always first," and he held himself accountable for poor performance, even when that poor performance happened when he was on medical leave. Ex. 13, Andres Sanchez Balcazar letter at 2. Years later, Ken would seek to recruit Mr. Balcazar, who had left Western, to take his place as the portfolio manager responsible for the Macro Opportunities ("Macro Opps") strategy.[6] Ex. 49, James W. Hirschmann letter at 3; Ex. 13, Andres Sanchez Balcazar letter at 3.

In 2014, Mr. Walsh retired and Ken reassumed his prior position as CIO. Western performed well in the following years. In January 2015, Morningstar again named Ken and his colleagues Fixed-Income Fund Manager of the Year for 2014, this time for both Core *and* Core Plus.[7] Ex. B, Morningstar, *Morningstar Announces 2014 Fund Manager of the Year Award Winners* (Jan. 21, 2015). In the years that followed, as Western enjoyed another extended period of success, the financial press emphasized the positive performance of the Core Strategies.[8] *See,*

---

[6] Around 2012, when Ken was the head of Western's global business, Western launched Macro Opps. Macro Opps was a global unconstrained strategy, meaning that it was not measured against a benchmark and was designed for clients who wanted exposure to a concentrated, high-risk global bond portfolio. Unexpectedly, the strategy grew into a successful, niche product in Western's wide set of investment offerings. *See* Ex. 49, James W. Hirschmann letter at 3.

[7] Ken and Western received numerous other awards and honors, particularly for the Core Strategies. To take just one example, Institutional Investor named Ken and Western U.S. Fixed-Income Core and Core Plus Managers of the Year for 2014. Legg Mason, Inc., *Morningstar's 2014 U.S. Fixed-Income Fund Manager of the Year Winner Seeks Enhanced Returns Beyond U.S. Treasuries*, PR Newswire (Jan. 28, 2015), https://www.prnewswire.com/news-releases/morningstars-2014-us-fixed-income-fund-manager-of-the-year-winner-seeks-enhanced-returns-beyond-us-treasuries-300026490.html.

[8] Western was best known for the Core Strategies, which were central to its business. Macro Opps, in contrast, was small, lower profile, and less significant to Western's financial performance and reputation. From 2021 to 2023, the Core Strategies held at least ten times more assets under management ("AUM") than Macro Opps and accounted for over one-third of

*e.g.*, Charles Stein & John Gittelsohn, *This Bond Manager Isn't a Household Name, But He Beats 98% of His Peers*, Bloomberg (Dec. 22, 2017), https://www.bloomberg.com/news/articles/2017-12-22/this-bond-manager-isn-t-a-household-name-but-beats-98-of-peers. But during the historic bear market in the 2021 to 2023 period, Western lagged its competitors by a considerable margin, largely because of its mistaken view that inflation was transitory and interest rates would decline. *See* Silla Brush & Michael MacKenzie, *Trailing 97% of Bond Funds, Western's Flagship Is Losing Cash*, Bloomberg (June 17, 2024), https://www.bloomberg.com/news/articles/2024-06-17/trailing-97-of-bond-funds-western-s-flagship-is-losing-cash (emphasizing poor performance in Core and Core Plus).

As CIO, Ken bore enormous responsibilities and demands on his time. He oversaw investment positions across diverse asset classes and strategies. He frequently met with and presented to clients and had many other business management-related obligations. He managed more than 100 investment professionals across nine global offices, dealing with a wide range of personnel and administrative matters. And he was the lead portfolio manager of seven unique investment strategies, including not only Core, Core Plus, and Macro Opps, but also others such as Long Duration and Treasury Inflation-Protected Securities. Despite the breadth of his responsibilities, Ken approached his work with a consistent set of principles. As discussed more extensively below, *see infra* I.H., he was known for putting clients' interests first, fostering an ethos of accountability, hard work and transparency, mentorship, and treating everyone with whom he worked with respect.

---

Western's firmwide revenue, compared to 7 percent to 13 percent from Macro Opps. Western's largest fifteen clients held roughly 33 percent of their AUM in the Core Strategies, compared to less than 1 percent in Macro Opps.

Ken's colleagues who worked beside him for decades describe his skill in managing disparate portfolios during chaotic markets, patience when markets turned sour, and insistence on being accountable to clients. *See* Ex. 14, Dr. Michael Bazdarich letter at 1–2. Karlen Powell, who leads Western's client services and sales support functions, observed Ken lead through the Global Financial Crisis. In client meetings during that difficult period, with clients "scrutiniz[ing]" Western's investment decisions, "Ken never distanced himself from difficult outcomes. As the firm's investment leader, he accepted responsibility, patiently explained the team's thinking, and relied on the perspective that only decades of experience navigating multiple market cycles can provide." Ex. 74, Karlen Powell letter at 2.

That characterization is echoed by retired Director of Portfolio Operations Dennis McNamara, who recalls Ken confronting losses directly, answering client questions, assessing both downside and upside without false certainty, and managing through inevitable periods of underperformance "with utmost integrity, despite the pressures of the market." Ex. 64, Dennis J. McNamara letter at 1. What "distinguished Ken," current Western CIO Michael Buchanan writes, was his "unwavering sense of accountability." Ex. 22, Michael C. Buchanan letter at 1. When Western's investment decisions proved unsuccessful or even disastrous, Ken's "response was remarkably consistent." Ex. 22, Michael C. Buchanan letter at 1. He "accepted responsibility for the outcome regardless of the extent of his personal involvement in the underlying research or investment recommendation. While Western's investment process relies on extensive collaboration among research analysts and portfolio managers, Ken never sought to shift responsibility to others. His view was simple: as Chief Investment Officer, the responsibility ultimately rested with him." Ex. 22, Michael C. Buchanan letter at 1–2; *see also*

Ex. 82, Dexter Senft letter at 3 (Ken took responsibility for poorly performing investments for which he was not directly responsible).

These were not isolated episodes but the steady and consistent way in which Ken led Western's investment team over decades: colleagues repeatedly describe Ken as calm, analytical, candid, and accountable. Ex. 69, Jennifer W. Murphy letter at 2 ("Ken personally provided regular updates to our clients. I saw him always present our results objectively, making it clear when we underperformed and what we got wrong. Ken took responsibility himself for our shortcomings, while giving members of his team credit for what we got right."). These characteristics were particularly in evidence during volatile markets, including his personal outreach to every affected client during the Asian Debt Crisis and his refusal to shift blame following the Global Financial Crisis. *See, e.g.*, Ex. 38, Jim Flick letter at 1; Ex. 13, Andres Sanchez Balcazar letter at 2; Ex. 22, Michael C. Buchanan letter at 1–2; Ex. 82, Dexter Senft letter.

Ken served as Western's CIO until August 2023 (in total for close to 25 years), when he became co-CIO alongside his longtime deputy, Michael Buchanan. In August 2024, upon receiving a Wells notice from the SEC, Ken took a leave of absence from Western, and he retired in 2025 at the age of 71.

### E. Ken's Devotion to His Family

Ken writes that he has been "blessed by the life and family that Eileen and I have built together." Ex. 1, Ken Leech letter at 4. Ken and Eileen have been married for 41 years. They were introduced in 1980 at a Greenwich Village restaurant on Seventh Avenue and began dating. Ex. 2, Eileen Stueck Leech letter at 1; Ex. 1, Ken Leech letter at 2. Ken was working at First Boston and Eileen was a paralegal at a law firm. Eileen appreciated Ken's "kindness, loyalty to his family and friends, upbeat good humor, and devotion to his career" and that he supported her

ambition to attend law school. Ex. 2, Eileen Stueck Leech letter at 1. They married five years later. Ex. 2, Eileen Stueck Leech letter at 1; Ex. 1, Ken Leech letter at 2. Ken writes that marrying Eileen was the best decision of his life, describing her as "effervescent, charming, . . . smart . . . . resolute and highly principled" with "extraordinarily deep empathy." Ex. 1, Ken Leech letter at 2.[9]

In 1990, Ken and Eileen decided that Ken should accept an offer at Western. Ex. 2, Eileen Stueck Leech letter at 1; Ex. 1, Ken Leech letter at 2. With their young daughter Catherine in tow, they moved cross-country to Southern California, where son Stephen was born the next year. *See* Ex. 1, Ken Leech letter at 2; Ex. 2, Eileen Stueck Leech letter at 3. More than three decades later, Ken and Eileen remain in the same Pasadena home where they raised their children. *See* Ex. 13, Andres Sanchez Balcazar letter at 2–3 ("He lived in the same house . . . making improvements as the family grew.").

Notwithstanding the demands of his career, Ken was an engaged, loving parent. Stephen recalls that his dad "was extremely attentive as a family man and a doting father." Ex. 4, Stephen Leech letter at 1. Catherine describes her father as "good, kind, and generous" and "a gift to our family." Ex. 3, Catherine L. Dovetta letter at 1. "Even when he was tired after a full day of work," young Catherine "could always count on him to help me with my math homework . . . . [N]o matter how tired he was or how silly my mistakes, he would patiently and good-humoredly look over my problem sets." Ex. 3, Catherine L. Dovetta letter at 1. Stephen agrees,

---

[9] More than 30 years later, Ken still recounts "in detail" how he met Eileen and how the two "walked the streets of New York until dawn." Ex. 46, Jonathan Hales letter at 1. Catherine's friend Jonathan Hales writes, "[t]he openhearted way he told the story communicated in no uncertain terms both his love and respect for Eileen." Ex. 46, Jonathan Hales letter at 1. Many attest to Ken's adoration for Eileen. *See, e.g.*, Ex. 65, Karen Meidl letter at 2 (noting that Ken has a "deep admiration and love for his wife"); Ex. 42, Peter N. Goettler letter at 1 ("Ken and Eileen have a marriage that has thrived for decades because of their devotion to one another.").

"[d]espite every weekday beginning at 4 a.m. and lasting twelve or more hours, and requiring additional hours of evening reading, there was never a time when I felt that my father was not deeply present in every facet of my life." Ex. 4, Stephen Leech letter at 1.

Stephen marvels that his dad found time to attend so many of his children's "water polo matches, school functions, and performances." Ex. 4, Stephen Leech letter at 2. While others may have viewed his extremely early workday as a burden, Ken viewed it as an opportunity. He explains that his early schedule "gave me the opportunity to be home with my family later in the day and to see Catherine and Stephen grow into capable and loving adults. I was able to attend their plays, concerts, and ballgames, and . . . have an early dinner together before my early bedtime." Ex. 1, Ken Leech letter at 4.

Ken's relationship with his children has evolved from providing daily care in childhood to serving as a source of support and wisdom as they built lives of their own. Catherine recalls Ken's advice when she was considering moving to Paris "to live with the love of my life" and future husband, Nicolas ("Nico") Dovetta:

> I found myself struggling with a conflict between my desire to stay close to my family and my hope to build a life with my significant other, now my husband, who was working abroad . . . . but I was worried about the impact that might have on my family, especially my father, who had always wanted me to stay close. Finally, . . . I admitted to Dad that I was considering moving to France. He took a long pause, then looked at me and said, "Honestly, Scooter, I don't know why you haven't already." Even when my decision might have caused him pain, he was still willing to give me the support I needed to spread my wings and fly away.

Ex. 3, Catherine L. Dovetta letter at 2.

Ken and Stephen are extremely close, speaking by phone multiple times per week. Stephen, who also went into finance, notes how their conversations extend from sports to their views of the financial markets to family matters. Ex. 4, Stephen Leech letter at 2. During their

conversations, Ken looks for ways to help, asking about "anything [he can] assist me or anyone else in the family with," such as "flights to a family friend's wedding or funeral, hotel rooms or meals for visitors coming into town, or advice to friends of mine going through challenging work issues." Ex. 4, Stephen Leech letter at 3. Stephen's girlfriend, Haley Martin, writes of Ken's kindness and generosity toward her, particularly over the past year as her own father unexpectedly became ill and passed away. She notes how meaningful this was given that "every act of kindness I have witnessed occurred while he was carrying the weight of this case." Ex. 61, Haley Martin letter at 2.

Ken is an adoring grandfather to Catherine and Nico's two young children, [redacted]. When three-year-old [redacted] spots his granddad, he shouts "with pure joy" and "launches himself straight into Ken's lap and demands a book. And Ken reads it—four times in a row the other day—with the same steady love and attention, as if it were the first time and the most important thing in the world." Ex. 31, Nicolas Dovetta letter at 1. Ken's brother-in-law, John Stueck writes, "I've watched Ken step into one of the most meaningful roles of his life: becoming a grandfather." Ex. 91, John J. Stueck letter at 2. He continues:

> What strikes me most is how much he wants to share the best parts of himself with them, his gentleness, his humor, his belief in the potential of every person. These are gifts that only a grandfather can give, and they are gifts that will shape who these children become. These early years are when a grandparent's influence can have the greatest impact, and every day he is able to be present in their lives is invaluable.

Ex. 91, John J. Stueck letter at 2.

Ken's devotion extends well beyond his immediate family, particularly to elderly relatives who need sustained, hands-on care. In 2008, when his widowed Aunt Miriam, who had no children, began to experience cognitive decline, Ken helped arrange her care. Ex. 54, Darryl Leech letter at 2–3; Ex. 2, Eileen Stueck Leech letter at 3. Ken and his family flew to Georgia to

assist in her move from Florida to be near his brother Darryl, unpacking boxes on a sweltering afternoon and devoting hundreds of hours to phone calls, emails, research, and difficult decisions. Ex. 54, Darryl Leech letter at 2–3. In 2012, when Aunt Miriam's health declined further, Ken arranged to move her to a dedicated memory-care facility near his home in Pasadena. Ex. 54, Darryl Leech letter at 2; Ex. 2, Eileen Stueck Leech letter at 3. In the years that followed, until her death at 102, "Ken and his family visited Aunt Miriam frequently, which could often be very hard because she either wouldn't recognize them or occasionally confused Ken for [Ken and Darryl's] father. Nonetheless, Ken was always deeply committed to doing right by Aunt Miriam." Ex. 54, Darryl Leech letter at 3.

Ken showed the same patient attention to his Aunt Polly as her health declined. Polly lived nearby in Los Angeles, and Ken spent countless hours helping her manage her finances and ensuring that she received proper care. He also attended to relatives who traveled to visit her. Ex. 54, Darryl Leech letter at 3; Ex. 35, Darin Fink letter at 1. Because Aunt Polly lived close by, Ken and Eileen made her part of the rhythm of their family life, regularly bringing Catherine and Stephen to see her. Ex. 54, Darryl Leech letter at 3. Eileen's sister Florence Stueck writes that Ken would "driv[e] over an hour to collect and return Aunt Polly, pushing her wheelchair over the difficult sloping terrain of the yard and bypassing multiple stairs to get her to [family] gatherings. This would be repeated in reverse on their way out going downhill. Ken would smile and joke with her and I surmise she actually loved the adventure of those 'off-roading' moments." Ex. 89, Florence Stueck letter at 1.

Eileen's sister Kathleen Stueck writes movingly of the "hundreds of ways Ken has enhanced my life and the lives of my family through his quiet acts of kindness and support." Ex. 92, Kathleen M. Stueck letter at 2.

> Ken was there when I was devastated after my divorce, when my father died, and when my mother needed many resources after my father's death. One thing I will never forget is how he stood by me after my long-time partner's death [redacted] How he encouraged me to write and give the eulogy, something I had not believed I could do. And it meant so much to me when he told me afterwards how proud he was of me for delivering a speech that delivered the full story of who my partner was – the delightful and fun parts as well as the challenges . . . . There are often people you can depend on to enjoy the good times, and just a small handful you can count on to slog through with you during the tough times. I don't think anyone in history has had a better brother-in-law. I couldn't have wished for someone more kind, more generous, more humble, more dedicated to family, or more valuable to me in this life.

Ex. 92, Kathleen M. Stueck letter at 2; *see also* Ex. 90, Jill Stueck letter at 1–2; Ex. 93, Lois Stueck letter at 2; Ex. 89, Florence Stueck letter at 1–2.

Ken does not treat caring for family members as a burden or an obligation; he does so with affection, dignity, and the quiet constancy that has defined his care for family throughout his life. Ex. 35, Darin Fink letter at 1–2.[10]

As the letters reflect, Ken is the anchor of his family. He is an abiding source of love, guidance, and support for his wife, children, grandchildren, and extended family.

---

[10] Ken is generous with extended family as well. When brother Darryl's step-grandson was diagnosed with [redacted] "Ken and his family helped us make sure that he got the best treatment available." Ex. 54, Darryl C. Leech letter at 2. Quietly, without being asked, Ken helped to shoulder the medical bills. *See* Ex. 87, Casey Stringfield letter at 1; Ex. 28, Thomas G. Cook letter at 1; Ex. 54, Darryl C. Leech letter at 2; Ex. 55, Katy Leech letter at 1.

Similarly, when Ken's sister-in-law's stepson [redacted] Ken helped alleviate the financial burden of care "[w]ithout being asked." Ex. 27, Dr. Jennifer Chotiner letter at 1.

Ken also encouraged and supported the academic aspirations of his nephew Clifford Stueck, who is now completing a Ph.D. in aerospace engineering at the Georgia Institute of Technology. Mr. (and soon-to-be Dr.) Stueck writes, "I am excited about the future and the opportunities before me to make a meaningful impact in advancing space exploration for the betterment of society[.] These opportunities were made possible in large part, because this kind and loving individual paid attention to a little boy's wildest dreams and believed they should be nurtured." Ex. 88, Clifford Stueck letter at 2.

### F. Ken's Devotion to His Friends

Ken's friends are legion, long-standing, and from every stage of his life. His stalwart devotion to them is remarkable. Ken is "first in line to be helpful to his friends when they are in need." Ex. 24, Robert Cantz letter at 2. Friend after friend writes that Ken is there for them in good times and in bad. *See* Ex. 24, Robert Cantz letter at 2 ("He has been intimately involved in every major life event of mine over the past 42 years . . . . Marriage, the birth of my kids, the death of my parents, job losses, divorce, parenting challenges—his empathy and wisdom have featured prominently in all."); Ex. 75, Norman P. Quinn letter at 1 ("When I went through a divorce, and again when I lost a loved one, Ken listened to me with real compassion and spoke to me in ways that eased my pain and helped me believe that better days were ahead."); Ex. 71, Susan Nelson letter at 1 ("He has been a loyal friend—someone people can depend on during both joyful times and life's greatest challenges."); Ex. 10, Bruce R. Arnold letter at 2 ("Ken's generosity is more than just financial — it extends to what might be called emotional generosity . . . . [H]e has always been willing to share his time and attention with his friends.").

Ken's relationship with Ed Moody—the man who recruited him to Western and with whom Ken shared a profound, decades-long friendship—is a study in devotion. [redacted], and those years were, by all accounts, painful and difficult. Ken never wavered. Ken "never judged Ed, never gave up on him, never made him feel less than worthy of kindness and friendship." Ex. 32, Michelle Eafanti letter at 1; *see* Ex. 26, Jae Choi letter at 1. Ed's partner, Michelle Eafanti, writes, "Ken became the brother Ed never had. He stood beside him through some of the darkest moments with compassion, loyalty, and quiet strength." Ex. 32, Michelle Eafanti letter at 1. "Throughout the last chapter of Ed Moody's life, Ken provided constant emotional as well as financial support . . . without fanfare or recognition . . . . [I]t was

selfless and remarkable." Ex. 57, David Lippman letter at 1. Ken's support "came from his heart." Ex. 32, Michelle Eafanti letter at 1.

When Ed tragically succumbed to his illness in 2015, Ken was asked to speak at the funeral. Ex. 6, Kathleen R. Aicher letter at 1. Ms. Eafanti, Ed's partner, writes, "[it] was one of the most beautiful and sincere tributes I have ever heard . . . . In the midst of overwhelming grief, his words brought comfort." Ex. 32, Michelle Eafanti letter at 1; *see also* Ex. 81, Holly Schulte letter at 1–2. Another friend of Ed's, Kathleen Aicher, recalls:

> I will never forget that day sitting in the church as hundreds of people filed in – there was Ken holding us all up in his strength of character, profound words, getting us to laugh a bit and paying tribute and respect to a man he loved very much. Through the pain, through the tears – Kenny's words, inflection and sentiment gave each of us comfort and allowed everyone to start healing from this tragic loss. That is Kenny…always there for others…a man of strong character and a deep sense of compassion.

Ex. 6, Kathleen R. Aicher letter at 1–2.

### G. Ken's Faith, Charitable Good Works, and Service

Ken's life has been defined as much by acts of kindness and charity to his community, as by professional achievements.

Ken is committed to his church and his faith. Nearly every Sunday, Ken and Eileen attend services at Trinity Presbyterian Church in Pasadena. Ex. 11, Rev. Tiffany Ashworth letter at 1 (describing Ken as a "steady presence" at the church). Reverend Cynthia Crowell writes how she has witnessed Ken's faithfulness over 27 years. Ex. 29, Rev. Cynthia Crowell letter at 1; *see also* Ex. 11, Rev. Tiffany Ashworth letter at 1 (Ken is "faithful to his church and family"); Ex. 72, John Orswell letter at 1. As a church elder, Ken "provide[s] wisdom and expertise" and has "look[ed] for ways to serve others and the community." Ex. 76, Rev. Michael Roffina letter at 1.

Ken's faith has informed his giving, which is nondenominational. Cantor Mark Saltzman writes how Ken has supported his congregation, Kol Ami, providing "consistent financial sustenance to th[e] small temple by supporting its sacred mission, innovative music and social awareness programs that have served the LGBTQ community at large for over thirty years." Ex. 77, Mark Saltzman letter at 2. Similarly, although he is not a member of St. Mark's Episcopal Church, Ken "quietly and generously" donated to the church's rebuilding efforts after a devastating wildfire "without being asked and without any public display or recognition." Ex. 77, Mark Saltzman letter at 2; *see also* Ex. 95, Dr. Lisa Sylvester letter at 1. Ken and Eileen have also quietly donated money to a Catholic school associated with the church at which Eileen's parents were married in Queens Village, New York. His generosity allowed the school to welcome approximately 60 refugee children who left Haiti after the devastating earthquake there. Ex. 39, Linda Freebes letter at 1.

After being diagnosed with Barrett's esophagus in 2007, Ken "had the idea of starting a small family charitable trust," the Lazy L Foundation, to formalize his family's philanthropic efforts. Ex. 2, Eileen Stueck Leech letter at 2. The family foundation, which has "gr[own] over the years," has contributed to many worthy causes in the Pasadena area and beyond. Ex. 2, Eileen Stueck Leech letter at 2. Recipients include: Door of Hope, a Christian non-profit organization that assists families in the Los Angeles area facing homelessness; Young & Healthy, which provides free dental, medical, and mental healthcare to children and families in low-income households in Pasadena; arts and cultural centers including the Huntington Library and Botanical Gardens; Art of Opera; Los Angeles Master Chorale; and civic organizations such as the Institute for Justice, the Cato Institute, and the Atlas Network. *See* Ex. 3, Catherine L. Dovetta letter at 3 and appendix at 5–6.

Catherine describes how her "father in particular felt strongly that the Foundation should give generously . . . in the aftermath of the" 2025 Eaton Fire, which devastated the Los Angeles area. Ex. 3, Catherine L. Dovetta letter at 3. In addition to donating to Door of Hope's Eaton Fire Housing Assistance Program, the Lazy L Foundation administered specialized fire relief grants to other organizations in the community, including eleven schools, five churches, and one synagogue. It also donated to a senior center distributing resources to older adults and organizations helping with cleanup and ongoing recovery efforts, such as Altadena Search and Rescue, Sierra Madre Search and Rescue, and Samaritan's Purse. *See* Ex. 3, Catherine L. Dovetta letter at 5; *see also* Ex. 51, Rev. Megan Katerjian letter at 1.

Beyond this significant formal philanthropy, Ken is the first to support friends, family, coworkers, acquaintances, and even strangers in times of need. For example, Pamela Mims, who helps Ken and Eileen manage paperwork in their home and counts them as friends, writes:

> Ken quite literally changed the course of my life. In 2013, [redacted] I was self-employed, uninsured, and unable to afford the specialized medical care I desperately needed. Without my asking, Ken and his wife quietly financially supported me so I could see a specialist at USC Keck Medical Center. Because of their generosity, I was able to see a specialist and receive the treatment that ultimately saved my life, and I have remained in remission since 2014. I will never forget that act of compassion.

Ex. 67, Pamela Ann Mims letter at 1. And when the Eaton Fire destroyed the home of a friend of Ms. Mims—a woman whom Ken had never met—he "completely furnished" an apartment for her so that "she could begin rebuilding her life with dignity." Ex. 67, Pamela Ann Mims letter at 2. Ken "never asked for recognition or expected anything in return." Ex. 67, Pamela Ann Mims letter at 2.

Ken contributes his time as well as his money. Ken served on the Board of Trustees of Flintridge Preparatory School, which Stephen attended, for a six-year term. He served as

treasurer and chair of the audit, finance, and endowment portfolio committees. Former school headmaster Peter Bachmann writes that Ken discharged these responsibilities "with impeccable expertise, insight, and propriety." Ex. 12, Peter Bachmann letter at 1. "Ken personally saved the school's endowment in January, 2009 when equity markets were alarmingly low, and many trustees wished to cash out stocks and retreat to bonds. Despite being a bond specialist, Ken argued passionately to stay the course." Ex. 12, Peter Bachmann letter at 1. Significantly, Ken's service to the Flintridge School continued long after Stephen's graduation: "Not only was Ken one of the most valuable trustees of my thirty year headship," Mr. Bachmann continues, but he "was the one who kept the most devoted presence after his term was completed, and more than a decade following Stephen's graduation." Ex. 12, Peter Bachmann letter at 1.[11]

Whether volunteering his time or contributing financially, Ken's "demeanor is always one of modesty, and his preference and modality of service is to remain anonymous and unheralded . . . . he never desires (and in fact tries to avoid) any form of public credit or acknowledgement. He only wishes to be of service in whatever way he can." Ex. 77, Cantor Mark Saltzman letter at 1. Ken and Eileen's generosity is generally unknown to the public and even their friends and family. Ex. 3, Catherine L. Dovetta letter at 3; *see also, e.g.*, Ex. 96, Suzanne Trepp letter at 2 ("His generosity was something he practiced quietly, without seeking recognition."); Ex. 103, Dylan Yamamoto letter at 2 ("[I]t is the manifest theme with Ken: he and his family continuously—but quietly—help family, friends, and strangers when they could easily turn away."). Elizabeth Patterson, who knows the Leech family from church, writes that, though she served on the board of Door of Hope, she only learned about Ken's support for the organization

[11] Years before, Ken served on the finance committee of his children's elementary school. *See* Ex. 41, Samuel F. Glaze letter at 1.

when the executive director, assuming she already knew, let it slip. *See* Ex. 73, Elizabeth L. Patterson letter at 2.

### H. Letters Submitted to the Court Demonstrate Ken's True Character

The 197 letters submitted on behalf of Ken to this Court, people from every part of Ken's long life, describe a man who respects others; is kind, thoughtful, and offers grace; is humble; is unconcerned with material things; and shows integrity and devotion to clients. These virtues demonstrate Ken's true character. Really, they define his life.

#### 1. Ken's Respect for Others

"Everyone matters to [Ken]." Ex. 86, Rosemarie Snoke letter at 1. Ken values people for who they are and what they contribute to the world. No matter whether a person is a colleague, friend, client, or stranger, Ken believes that he or she deserves respect and dignity.

A portfolio manager who worked with Ken for 20 years writes that "[r]egardless of title or seniority, he treated people with professionalism and respect." Ex. 7, Dan Alexander letter at 2. Another colleague adds that, "[n]o matter what your position at [Western], Ken always had time to listen to you, to thoughtfully answer your questions, and to provide his perspectives . . . over the years we worked together I approached Ken with many questions, which while I am sure were obvious to him, he was always patient in his explanations." Ex. 79, Julien Scholnick letter at 1. As Julie Marquez, who worked with Ken daily on his trade allocations, puts it, "[d]espite all [Ken's] success, he never carried himself as someone who was above anyone else." Ex. 60, Julie Marquez letter at 2. Across every department and all levels at Western, Ken was—and still is—held in the highest regard. *E.g.*, Ex. 25, Caroline Catalan letter (marketing department) at 2; Ex. 16, Marzo Bernardi letter (client services) at 1; Ex. 47, Ilene S. Harker letter (compliance) at 1; Ex. 33, Kevin Ehrlich letter (compliance) at 2.

The letters of those who worked for Ken—from direct reports to junior investment professionals to executive assistants—reveal Ken's true character. A brief, and by no means comprehensive, sampling of such letters describes Ken's genuine concern for others:

- Tracey A. Hutson, who serves as executive assistant to Chairman and former-CEO Jim Hirschmann, writes that when "Ken noticed a new person in our on site Café or on the cleaning crew, he'd inquire as to where the other long time employee went, who the new person was and ask what was their story. Ken believed everyone had value." She continues, "[w]henever he spoke to you, it was with kindness. In watching him deal with others, he did it with kindness." And when she would assist Ken with something, she would "get at least 3 Thank You's from Ken over the next week for the last minute assist. That's a lot of Thank You's over 31 years." Ex. 50, Tracey A. Hutson letter at 2.

- Ms. Marquez, Ken's trading assistant, recalls that on first being assigned to work with Ken, "I was a bit nervous . . . . But Ken immediately made me feel at ease with his gentle demeanor and patience for my learning curve. He was never rude or short tempered, and he always treated me with a great amount of respect and understanding. And this continued throughout his entire tenure at Western Asset, and I observed this kindness being extended to everyone he worked with quite broadly across the firm." Ex. 60, Julie Marquez letter at 1.

- Ms. Snoke writes that Ken was "most 'generous' with his interest in other people . . . [N]o matter who you were and in what way you interacted with Ken, you mattered." "There was never an instance in our long-term relationship where I felt degraded, disregarded or disrespected." Ex. 86, Rosemarie Snoke letter at 1–2.

- Karen Meidl, who joined Western as a receptionist before rising in the ranks to trading assistant, writes that from "[w]hen I first met Mr. Leech, one of the most defining aspects of his personality was the respect he showed to myself and to others." Ex. 65, Karen Meidl letter at 1.

- Liza Agregado, who coordinated Ken's work travel, recalls that "on the few occasions I made mistakes with [Ken's] travel arrangements, he was always incredibly understanding and forgiving. His kindness and patience in those moments truly meant a lot to me. Ken has always struck me as a person of quiet character; thoughtful, humble, and leads by action rather than words." Ex. 5, Liza Agregado letter at 1.

- Mr. Choi writes that "Kenny always treated the trading assistants with respect and kindness, often taking responsibility for any miscommunication and blaming his poor handwriting (which was illegible). I never heard him raise his voice to those who weren't in a position to defend themselves. It was an

admirable trait, especially on a trading floor where tough markets can bring out the worst in our behavior." Ex. 26, Jae Choi letter at 2.

- John W. McCourt, who worked with Ken at Western and later as a counterparty, writes, "Kenny knew everyone's name and was always thoughtful and considerate . . . . His respect and care for the trading desk, the cleaning professionals, the operations professionals, security professionals, the graphic professionals, support professionals, client service professionals etc. was always the same way with respect and a smile 'how are you, how is your family' he cared about people first." Ex. 63, John W. McCourt letter at 1.

- Mr. Flick writes that Ken "treated everyone at the firm with respect from the CEO, to the intern, to the receptionist. That example created an amazing culture of teamwork and trust." Ex. 38, Jim Flick letter at 2.

In his quiet way, Ken has mentored and championed the careers of women and underrepresented minorities, and he created a culture at Western that was welcoming and inclusive, a notable achievement in an industry that all too often is not. Araceli "Cel" Sibley writes movingly:

> Even though I was a woman and an immigrant, he never treated me as a minority in the Investment Team. In a hyper-competitive environment of the Trading Desk, I have never felt 'less' because from the very beginning until my retirement in mid-2021, he treated me as a colleague . . . . Never seeking the limelight and always in the background, he was kind, humble, protective, and always one who would give people a chance. How else would I have thrived in an industry known to be cutthroat and inhospitable to women and minorities, especially back in the 90s when there were no role models to guide a young immigrant girl like myself through the intricacies of Wall Street? Because there was someone named Ken Leech on the Trading Desk at Western Asset who gave me that chance.

Ex. 84, Araceli "Cel" Sibley letter at 1–2.

Another of Ken's mentees, senior portfolio manager Catherine Matthews, recalls that Ken took "pride in my professional development. He was especially thoughtful and understanding of the demands I faced working in a full-time investment role while raising my children." Ex. 62, Catherine Matthews letter.

Ken encouraged Western employees to prioritize their families in the same way he prioritized his own. Mr. Flick writes, "[t]here was never hesitation for anyone at Western to take

time away to attend to a family matter. Ken and the other leaders at Western made sure that family came first." Ex. 38, Jim Flick letter at 2; *accord* Ex. 56, Mark Lindbloom letter at 2 (Ken supported travel to visit wife, children, and grandchildren who did not relocate to California).

**2. Ken's Kindness, Thoughtfulness, and Grace**

Ken's fundamental decency is manifested in innumerable acts of kindness, thoughtfulness, and grace. Ken has "a way of making people feel valued." Ex. 7, Dan Alexander letter at 2. At Western, "employees celebrating significant milestones with the firm, whether five, ten, fifteen, or twenty years of service, would find a commemorative gift and a personally signed card from Ken waiting on their desks. It was a simple gesture, but one that reflected his appreciation for the people around him." Ex. 7, Dan Alexander letter at 2. Ken put much effort into such gifts too. Ms. Hutson writes that she has "seen Ken rack his brain for days, trying to come up with the right idea to acknowledge someone's birthday, anniversary, milestone or loss. He felt that the more personal the outreach, the more meaningful it would be." Ex. 50, Tracey A. Hutson letter at 2.[12]

One former colleague, Ian Smith, captures Ken's thoughtfulness in describing an occasion when Mr. Smith brought his wheelchair-bound grandfather to a Rose Bowl game:

> Ken found out [that Mr. Smith's grandfather could not manage stairs] and he got my grandfather into the box, where he did not have to leave his chair. Moreover, Ken sat down next to him and stayed there the entire game bringing him food and drinks while thoroughly enjoying the repartee. He did not work the room, he did not take calls, he spent the afternoon with an old Marine he had no reason to

[12] *See also* Ex. 24, Robert Cantz letter at 1 ("On my first day on the job at Jefferies LLC in 2013, I found myself in personally challenged circumstances, coping with a recent period of unemployment, divorce, and depression. Midway through a research presentation Jefferies management was making to Western . . . . Ken . . . present[ed] me, a virtual Jefferies unknown and new kid on the block, with a memento signed by the entire Western portfolio management staff welcoming me back to the bond business. Ken was keenly aware that Jefferies luminaries were watching, and timed his effort to highlight my value to the Jefferies/Western business relationship.").

> spend it with, and he made sure the man had the day he had waited eighty years for.
>
> My grandfather talked about it until he died.
>
> I include that story because Ken had nothing to gain from it. I was nobody at the firm. My grandfather was not a client. There was no one to impress and nothing to win. That is the man I worked for.

Ex. 85, Ian Smith letter at 1–2.

Executive assistant Joy Wright recalls a conversation with Ken shortly after [redacted], he invited her to sit and:

> spent the next thirty minutes speaking to me not as an executive, but as a human being [redacted] His words were calm, thoughtful, and sincere. In that moment, he gave me something I desperately needed — reassurance, guidance, and hope. That conversation changed my life. It helped me move from fear to action. It reminded me that I was not alone. And it showed me the depth of his decency, empathy, and respect for the people around him, regardless of their position.

Ex. 101, Joy Wright letter at 1.

For Ken, Western was his extended family. Ms. Sibley remembers that Ken supported her by attending her wedding and "help[ing] fill up my side of the church, since most of my family and friends were back home in the Philippines unable to attend." Ex. 84, Araceli "Cel" Sibley letter at 1. And when Ms. Sibley's husband became a chef at a local restaurant, the Leech family "made sure to dine at his new venture and even decided to host Ken's 50th birthday at the restaurant." Ex. 84, Araceli "Cel" Sibley letter at 1–2.

Once a colleague joined Ken's extended family, they remained part of it. Mr. Walsh writes of the way Ken's "kindness and care" revealed his true character:

> When my father passed away in 2018, Ken, who had lost both his parents, wrote me a beautiful, heartfelt note that expressed very personally what I was experiencing and needed to hear. Then, in this past year, I lost my wife, and Ken and his family were at the funeral. At what had to be the most difficult time in his own life, he again wrote me a handwritten note, and with great empathy and compassion expressed words of comfort.

Ex. 97, Stephen A. Walsh letter at 2.[13]

Ken is the first to see the good in people, recognize that no one is perfect, and give second chances. As Ms. Hutson writes, "[w]hen there were personnel issues, Ken didn't have anything bad to say about the individual(s). Ken would be the 1st to point out their positive attributes and what they did right. He was also the person to champion for someone to be given a 2nd chance, or a 3rd or a 4th." Ex. 50, Tracey A. Hutson letter at 4. Jennifer W. Murphy, Western's Chief Operating Officer, recalls an incident in which "a mid-level manager with long tenure at the firm spoke inappropriately in anger to another employee." Ex. 69, Jennifer W. Murphy letter at 2. She discussed with Ken how to handle the situation.

> [H]e pointed out to me that this incident was very unusual for this employee and could be a sign of distress. We investigated further and found this was indeed the case, which helped us develop a fair and effective way to handle the issue. Ken's great care toward employees taught me a lot about how to make this part of Western's culture.

Ex. 69, Jennifer W. Murphy letter at 2.

Ken gives grace to his friends as well. His friend of 60 years, Bruce R. Arnold, writes that "on multiple occasions . . . I have made terrible errors which caused [Ken] considerable harm — errors of which I am still ashamed. Ken's reaction was to be more disappointed than

---

[13] In another instance, in 2019, Ken attended a former colleague's sister's memorial service with other Western employees. "[O]ffered to sit up front in the pews," he responded, "I'm staying here with my people [from Western]." Ex. 84, Araceli "Cel" Sibley letter at 2.

mad. He understands human nature and human limitations, and accepts people for what they are, flaws and all. He has shown me, and many others, grace." Ex. 10, Bruce R. Arnold letter at 2.

### 3. Ken's Humility

"In an industry known for its egos, vying for the spotlight and advancement, Ken was the opposite. Ken is . . . gentle, truly humble, and self-effacing." Ex. 97, Stephen A. Walsh letter at 1. Letters testifying to these characteristics are far too numerous to cite. *E.g.*, Ex. 86, Rosemarie Snoke letter at 1 ("He has no ego. In an industry where that characteristic is so prevalent, and can be hurtful or demeaning, Ken is most definitely an outlier."); Ex. 34, Derek Fan letter ("He was genuinely humble in a business that does not often reward humility."); Ex. 49, James W. Hirschmann letter at 2 (recalling Ken's refusal to be pictured alone after winning Morningstar's "Manager of the Year"). Western's former head of marketing Caroline Catalan writes, "[e]gotism and self promotion were not natural to Ken." Ex. 25, Caroline Catalan letter at 2. The awards, accolades, and media attention "did not seem to affect Ken's personal character or our working relation." Ex. 25, Caroline Catalan letter at 2. "Ken sought minimal publicity, seemed to have very visceral discomfort at being in the limelight and in general, only agreed to modest media exposure, particularly compared to the competition." Ex. 25, Caroline Catalan letter at 2; *see also id.* at 2 ("It was like pulling teeth to get his headshot updated! And his quarterly audio webcasts remained just that, in audio, I think in part because of that lack of desire to be in the spotlight and his humility.").

Ken's reticence reflects his belief that no one succeeds on his or her own. Ms. Hutson writes:

> The thing I've seen Ken do consistently over 32 years is NOT claim ownership when something went well or right. While he might be the first to accept responsibility for something that didn't go well, Ken was the last person to claim or accept ownership when something went well/right. No matter how much others would talk to him about everything he did leading up to that point that

> made the situation work, Ken said the victory belonged to The Team. And then he'd proceed to name all the individuals that played a part - no matter how small it was. No amount of cajoling would ever get Ken to retreat from his stance that all wins are Team wins. The conversation was over. Period.

Ex. 50, Tracey A. Hutson letter at 3.

When Western made the correct investment decisions, "Ken was quick to give credit to his colleagues and to thank our clients for having faith in us." Ex. 14, Dr. Michael Bazdarich letter at 1. But "[w]hen the markets went against us, he never castigated others, but stayed patient and tried to minimize our losses until better performance came our way." Ex. 14, Dr. Michael Bazdarich letter at 1. Former colleague Derek Fan echoes these observations: "When our investment performance was strong, he gave the credit to his team; when it was poor, he took the blame himself. I watched him do this consistently, year after year, in good markets and bad. It was not a posture—it was simply how he operated." Ex. 34, Derek Fan letter.

Ken never wanted accolades. When Fortune Magazine dubbed him "The New King of Bonds," "Ken was especially unhappy . . . because he felt it was grossly unfair to the dozens of people on his Western Asset team that made him successful." Ex. 82, Dexter Senft letter at 3. Indeed, Ken *complained* about his positive press. In a 2011 email to Mr. Walsh, Ken bemoaned an AsianInvestor article that included the moniker: "I don't know where the king of bonds stuff came from . . . . getting a sensational king of bonds headline doesn't help the firm with its desire to showcase depth in Asia." Ex. C, Email from Ken Leech to Stephen A. Walsh, May 12, 2011.

It is no surprise then that many closest to Ken knew little of his immense success. For example, Dr. Wilson, with whom Ken has had an "uninterrupted friendship" since kindergarten writes, "[o]nly recently, did I learn how outstanding his reputation had been in the world of bond investing." Ex. 99, Dr. Steven Wilson letter. Dr. Michael Bazdarich, Ken's close friend and colleague, recalls that "[a]fter I had consulted with Western for a few years, Ken contacted me

and told me he couldn't play late-night bridge anymore, because of the 'new job' he had . . . . Only much later did I find out that his 'new job' was as Chief Investment Officer." Ex. 14, Dr. Michael Bazdarich letter at 2; *accord* Ex. 103, Dylan Yamamoto letter at 1 (learning of Ken's accomplishments from a Bloomberg article). Even Ken's mother-in-law was often in the dark. She writes, despite "Ken's success in the business world . . . he never talked about himself . . . . The only way we learned of awards he received would be if someone heard or read about them and told us." Ex. 93, Lois Stueck letter at 1.

### 4. Ken's Lack of Concern for Material Trappings

Likewise, in a notoriously materialistic, status-driven industry, Ken stood out. Mr. Sanchez Balcazar writes, "he was never drawn to show off his wealth. He never pretended to . . . be better than anyone else. He drove the same 1990s Lexus for 3 decades, only yielding to buy a newer car when there were no spare parts to repair the old one." Ex. 13, Andres Sanchez Balcazar letter at 2; *accord, e.g.*, Ex. 99, Dr. Steven Wilson letter ("He lives well but is not materialistic. I never heard him brag or show off the trappings of wealth."). Ms. Marquez describes how "[d]espite all his success, he never carried himself as someone who was above anyone else. In fact, I noticed he drove the same older model car for years, not because he had to, but because material possessions didn't seem to define him." Ex. 60, Julie Marquez letter at 2. "Those small, everyday choices," Ms. Marquez observes, "reflected the kind of person I came to know- someone who valued people far more than appearances." Ex. 60, Julie Marquez letter at 2; *see* Ex. 9, Louise Tucker Anderson letter at 1 ("Ken's life is based not on greed, but on generosity and devotion to family.").

Paul White, Western's head of human resources from 2004 until his retirement in 2015, writes, "I never heard any statement or observed any action from Ken, in an effort to increase his personal compensation." Ex. 98, Paul M. White letter at 1; *see also* Ex. 98, Paul M. White letter

at 2 ("Compensation for Ken was structured such that he was paid based on team results as a whole, and not on individual strategies, trades, or clients."). Mr. White's successor Robert Sibbrel writes that, even though Ken's compensation was determined after "all employees were paid . . . Ken . . . advocat[ed] for a fair outcome for each member of the Investment Management team." Ex. 83, Robert Sibbrel letter at 1. Mr. Hirschmann agrees, explaining that Ken advocated for [the Investment Team's] compensation" even though such compensation "came from Ken and my share of the [firm's] profits." Ex. 49, James W. Hirschmann letter at 2. He continues:

> every dollar that Ken pushed for the Investment Team members to get . . . was a dollar less that would be left at the end for him. But Ken always pushed for the compensation of his team, and I agreed. We believed in fairly recognizing and compensating the Team before ourselves.

Ex. 49, James W. Hirschmann letter at 2–3.

This down-to-earth style and genuine lack of interest in conspicuous consumption is, perhaps, why Ken can forge such meaningful connections with a diverse array of friends, acquaintances, and colleagues. Ms. Sibley observes that she has "never seen the trappings of success around him. None of the fancy cars, fancy clothes or fancy mansions typically associated with his peers from this industry. Because of the non-existence of 'flashy' things, I was able to relate despite his intelligence and stature that were beyond my own." Ex. 84, Araceli "Cel" Sibley letter at 1.

**5. Ken's Integrity and Devotion to Clients**

Over the decades, Ken's actions, large and small, reveal a man of deep personal integrity and commitment to his colleagues and the clients who place their trust in him. Simply stated, Ken does "the right thing." Ex. 24, Robert Cantz letter at 2.

Ken built a nearly five-decade career on the foundational principle that one's word must be his bond. David Lippman, who first worked with Ken in the late 1980s, explains that "[i]n

institutional bond trading" a person's word is "sacred" because "we are constantly committing tens if not hundreds of millions of dollars on a verbal agreement." Ex. 57, David Lippman letter at 1. "In all of the years that I worked with Ken I found this to be true, even when circumstances were difficult." Ex. 57, David Lippman letter at 1. That same moral constancy governed Ken's expectations of those around him. As Mr. Lippman writes, "Ken led by example, he expected and demanded honesty and level play among all of his team." Ex. 57, David Lippman letter at 1. Even when Ken and Mr. Lippman became competitors, "Ken's behavior and decency remained unblemished, even when it would have been to his economic advantage to do otherwise." Ex. 57, David Lippman letter at 1. Mr. Senft echoes these observations, writing that "Ken is highly ethical in all his endeavors. His word is his bond. He owns up to mistakes and takes responsibility for himself and his team." Ex. 82, Dexter Senft letter at 3; *see also* Ex. 38, Jim Flick letter at 2.

Those who worked most closely with Ken echo this assessment. Ms. Snoke writes that "Ken has the utmost integrity. He is one of a kind. Honest to the core." Ex. 86, Rosemarie Snoke letter at 2. Mr. Choi, a former colleague, writes that Ken "showed me what genuine integrity looked like in a professional setting." Ex. 26, Jae Choi letter at 1.

Ken's integrity was manifest in how he handled mistakes, both his own and others', and how he credited others for successes. *See, e.g.*, Ex. 26, Jae Choi letter at 1 ("Kenny was quick to take accountability for his mistakes and generous in sharing the credit with colleagues."). Mr. Senft recounts a telling anecdote: a junior trader at Western had mistakenly purchased Enron notes for a prominent client's charitable foundation. When the client met Ken for the first time, his greeting was, "So you're the guy who bought Enron . . . . Ken could have offered any number of excuses or placed the blame elsewhere, but his response was simply to say, 'Yes.'" Ex. 82,

Dexter Senft letter at 3. Not only did Ken "take the blame himself" for the ill-advised investment, he "refused to fire the analyst" "who made the call to hold" the bonds. Ex. 49, James W. Hirschmann letter at 2. "His attitude was 'none of us makes the right call all the time.'" Ex. 49, James W. Hirschmann letter at 2.

And Ken was committed, before all else, to serving his clients. Mr. Brown, who worked with Ken during his time in London, "found Ken to be a person of integrity who consistently placed the interests of clients at the cent[er] of his decision-making" and "demonstrated remarkable loyalty when investment decisions did not work out as planned." Ex. 20, Gordon S. Brown letter at 2–3. Looking back on 15 years of close collaboration, Mr. Fan echoes these sentiments:

> What stayed with me most was his willingness to face difficult moments directly. When performance turned against us and clients had hard questions, Ken did not hide behind others or delegate the uncomfortable conversations. He showed up himself, met with those clients, and answered them honestly and clearly. He believed he owed them that, and he cared deeply about those relationships. Over the years he built a reputation with clients as smart, humble, and authentic, and in my experience that reputation was earned honestly, one relationship at a time, over decades.

Ex. 34, Derek Fan letter. When Western's investments performed poorly, Ken's "only regret was his negative performance for the clients, that he had let them down, at least for the moment." Ex. 14, Dr. Michael Bazdarich letter at 1; *accord* Ex. 79, Julien Scholnick letter at 2 ("Ken always emphasized the importance of putting our clients first, above all else."). Former client Christopher Greetham writes that he knew Ken "would be straight with me as his client and able to deliver news in clear and precise terms . . . . Even during periods of subpar performance, I could trust that . . . Ken would address forthrightly the reasons why the portfolio was not performing as hoped." Ex. 45, Christopher Greetham letter at 1–2.

Brian Brooks, who worked with Ken after Ken was selected as one of two independent directors to oversee OneWest Bank's "rescue" of IndyMac Bank in 2010, writes that Ken took on this "thankless" task out of a "sense of duty," emphasizing a "'no shortcuts' approach" to compliance. Ex. 19, Brian Brooks letter at 1–2. Years later, when Mr. Brooks became a senior government official, Ken "gave generous amounts of time to educate me on issues I might face in that position." Ex. 19, Brian Brooks letter at 2.

Likewise, personal friends and community members note that Ken's reputation for honesty and integrity extends well beyond Western. *See, e.g.*, Ex. 11, Rev. Tiffany Ashworth letter at 2 ("His reputation precedes him as a person of trustworthy character."); Ex. 17, Eilley Brandlin letter (describing Ken as a "person of integrity, kindness, and responsibility."). Virginia W. Murphy, who has known Ken since 1979, writes, "Ken has always been as honest as the day is long. His moral and ethical character is what has made him so respected by friends and colleagues around the world. I state this unconditionally and without reservation." Ex. 70, Virginia W. Murphy letter at 3. Ken's character even made an impression on his children's friends. For example, an old friend of Catherine's writes, "[t]he Ken I've seen up close, through years of friendship with his daughter, is someone built on honesty and modesty, a man whose family always came first." Ex. 46, Jonathan Hales letter at 1.

***

Every part of Ken's life—professional, family, church, and social—has been defined by his generosity, humility, integrity, deep devotion, respect, and kindness. The letters submitted to this Court show the true Ken Leech.

## II. THE OFFENSE CONDUCT

As reflected in Ken's guilty plea, the statement of his offense submitted to the Probation Office, and his letter to the Court, Ken accepts full responsibility for his conduct. PSR[14] ¶¶ 20–21; Ex. 1, Ken Leech letter at 1. He recognizes that obstructing the SEC investigation was not only illegal, but also inconsistent with his own deeply held ethical principles and his life-long history of trying to do the right thing.

In late October 2023, Western informed Ken that it had retained outside counsel to investigate certain of his trade allocation decisions.[15]

When the SEC's Los Angeles Regional Office opened a formal investigation in November 2023 and issued document subpoenas, Ken promptly engaged with the SEC through counsel, produced thousands of pages of his family's financial records as well as data from his cell phones, and agreed to answer questions. On March 6, 2024, Ken appeared and gave sworn testimony at the SEC's Los Angeles office.

As Ken acknowledged at his plea hearing, during his sworn testimony before the SEC on March 6, 2024, he gave false and misleading answers regarding his trade allocation process. Specifically, he stated in his SEC testimony that he typically knew at the time he placed his

---

[14] "PSR" or "Presentence Report" refers to the final Presentence Investigation Report dated September 9, 2026, that was prepared in connection with Ken's sentencing by the United States Probation Office ("Probation Office").

[15] The investigation pertained chiefly to allocations Ken made to the Core Strategies and Macro Opps. As noted above, *see supra* note 8, the Core Strategies, Western's flagship products with over $100 billion in AUM, were relatively conservative, U.S.-based investment products that were measured against a benchmark. Macro Opps, in contrast, was a far smaller, more aggressive, unconstrained, global strategy that sought to take advantage of macroeconomic trends, with substantially higher concentrations of riskier asset classes (such as foreign instruments and currencies and lower-grade credits). The Core Strategies and Macro Opps had dramatic differences in their levels of negative convexity, among other differing attributes, which affected management of the very different strategies.

trades the client accounts to which he intended to allocate them. In fact, certain of his actual allocations differed from what he had originally intended. Ken knew that his answers were incomplete and misleading, and that they would impede the SEC investigation. Plea Tr. at 27.

As Ken wrote in his letter to Your Honor, he deeply regrets his deliberately misleading answers. He should have been candid with the SEC, and he is ashamed that he was not. Ken accepts full responsibility for his serious error of judgment. Ex. 1, Ken Leech letter at 1.

## III. AS RECOMMENDED BY THE PROBATION OFFICE, A TIME-SERVED SENTENCE IS WARRANTED AND APPROPRIATE UNDER 18 U.S.C. § 3553(a)

The Sentencing Guidelines, the Section 3553(a) factors, and the PSR counsel strongly for a sentence of time served. All components of the federal sentencing framework point, with remarkable consistency, to this result. As discussed below, a time-served sentence is indicated by the Guidelines calculation read together with applicable Guidelines commentary and the Section 3553(a) factors, including Ken's history of extraordinary generosity, decency, professional commitment, accomplishment, and deep family and community ties; his age and health conditions; the sentences imposed in comparable cases; the collateral consequences of the investigation and conviction; and the fact that imprisonment is not needed for purposes of general or specific deterrence.

### A. The Need to Avoid Unwarranted Sentencing Disparities

Under *United States v. Booker*, 543 U.S. 220 (2005), the Sentencing Guidelines are advisory. Thus, while "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," *Gall v. United States*, 552 U.S. 38, 49 (2007), the Guidelines are "truly advisory," *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008). "In short, while a sentencing court is statutorily obligated to give fair consideration to the Guidelines before imposing sentence, in the end, it must make an 'individualized assessment' of the

sentence warranted by § 3553(a) 'based on the facts presented.'" *United States v. Jones*, 531 F.3d 163, 170 (2d Cir. 2008) (internal citation omitted) (quoting *Gall*, 552 U.S. at 50).

Under 18 U.S.C. § 3553(a), the Court must impose a sentence that (A) "[reflects] the seriousness of the offense, [promotes] respect for the law, and [provides] just punishment for the offense;" (B) "[affords] adequate deterrence to criminal conduct;" (C) "[protects] the public from further crimes of the defendant;" and (D) "[provides] the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." In addition, Section 3553(a) directs the Court to consider "the nature and circumstances of the offense and the history and characteristics of the defendant;" "the kinds of sentences available;" the Guidelines and any "pertinent" policy statements issued by the Sentencing Commission; "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;" and "the need to provide restitution to any victims of the offense."

In determining the appropriate sentence, a court's lodestar is the so-called parsimony clause, which requires "a sentence sufficient, but not greater than necessary, to comply with" the Section 3553(a) factors. 18 U.S.C. § 3553(a); *see Pepper v. United States*, 562 U.S. 476, 491 (2011).

**B. Advisory Guidelines Calculation and Related Provisions**

The Probation Office has correctly calculated an advisory Guidelines range of 6 to 12 months. PSR ¶ 76. This range is based on its determination that the base offense level is 14, the total offense level is 10, and the Criminal History Category is I. The Probation Office's calculation of the total offense level includes a two-level reduction under Section 3E1.1(a) because Ken clearly accepts responsibility for his offense and a two-level reduction because Ken had zero criminal history points and met the criteria of Section 4C1.1, the "zero-point offender

adjustment." PSR ¶¶ 29–30. These determinations are consistent with the parties' stipulations in the Plea Agreement, and they are correct and appropriate.[16]

When, as in this case, the applicable Guidelines range is in Zone B of the Sentencing Table and the defendant receives an adjustment under Section 4C1.1, the Guidelines commentary states that "a sentence other than a sentence of imprisonment . . . *is generally appropriate*." U.S.S.G. § 5C1.1, cmt. n.9 (emphasis added); *see* PSR ¶ 77 (citing U.S.S.G. § 5C1.1, cmt. n.9). In lieu of imprisonment, the Guidelines commentary thus favors "a sentence of probation that includes a condition or combination of conditions that substitute intermittent confinement, community confinement, or home detention." U.S.S.G. § 5C1.1(c)(3).

This preference for a non-incarceratory sentence was set forth in Amendment 821 to the Sentencing Guidelines, effective in late 2023.[17] The Sentencing Commission adopted this commentary—which is stronger than the prior "should consider" language—based on extensive empirical study and in response to congressional directive "to ensure that the guidelines reflect

---

[16] Pursuant to the Plea Agreement, Ken pleaded guilty to a Superseding Information charging one count of obstructing the SEC in violation of 18 U.S.C. § 1505, and the government has agreed to dismiss the underlying Indictment, including the four fraud and one false statement charges set forth therein. As a result, the offense of conviction is obstruction, not fraud, and allegations of fraud do not affect the computation of the Guidelines for the obstruction offense of conviction under Section 2J1.2 and are not "Relevant Conduct" under Section 1B1.3.

The PSR states that "[t]he SEC's investigation focused on whether, between 2021 and 2023, [Ken] engaged in a scheme" to favor some Western clients over others, PSR ¶ 11, and that "telling the truth about his allocation practices . . . would [have made] it easier for the SEC to identify and prosecute *a* cherry-picking scheme," PSR ¶ 16 (emphasis added). Accordingly, the PSR refers to the subject of the investigation at the time Ken gave testimony to the SEC and does not make findings with respect to the conduct alleged in the to-be-dismissed fraud charges.

To the extent the PSR suggests that Ken had reason to harm the Core Strategies clients in order to favor Macro Opps clients, *see* PSR ¶¶ 9–10, we disagree largely for the reasons set forth in footnotes 1 and 2 on page four of the PSR.

[17] Amendment 821 also added the Section 4C1.1 zero-point offender adjustment.

the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense." Amendment 821, *Reason for Amendment*, U.S. Sentencing Commission, https://www.ussc.gov/guidelines/amendment/821 (last visited Sept. 14, 2026).[18]

**C. Ken's History and Characteristics**

Ken is 72 years old. He has no criminal history. He built a successful career over nearly five decades, earning the trust and respect of colleagues, clients, and industry peers. He did this without guile or self-promotion. As the scores of letters submitted to this Court make clear, Ken is a deeply principled man who has consistently displayed humility, generosity, devotion to faith and family, diligence and hard work, personal integrity, and accountability. His "career was defined by dedication to clients, loyalty to colleagues, devotion to his family, intellectual honesty and personal decency." Ex. 20, Gordon S. Brown letter at 4.

Those who have known Ken across decades and in every part of his life remark on Ken's surpassing humility. "In a business full of outsized egos, he stood apart, modest to a fault." Ex. 53, Michael Larson letter at 1; *accord* Ex. 97, Stephen A. Walsh letter at 1–2. He embraced responsibility when investments went wrong, and he credited others when they went right. When Morningstar named him Manager of the Year, Ken refused to be photographed alone; the resulting photograph showed the entire team standing together. Ex. 49, James W. Hirschmann

[18] Since 2023, the Sentencing Commission has continued to emphasize the appropriateness of non-incarceratory sentences. As recently as this past April, the Commission adopted an amendment to the Guidelines (to become effective on November 1, 2026) that adds a new table outlining sentencing options. Tellingly, for defendants who fall within Zone B, it lists probation first and imprisonment last. U.S.S.G. § 5A1.1 (Sentencing Table), Amendments to the Sentencing Guidelines, Apr. 30, 2026 (effective Nov. 1, 2026); *see also* Tr. at 179–81, 188, Public Hearing on Proposed Amendments to the Federal Sentencing Guidelines, Mar. 9, 2026.

letter at 2; Ex. 59, Fred Marki letter. Even those closest to him often knew little of his professional stature and many awards.[19]

That instinct—to direct attention away from himself and to others—is inseparable from Ken's extraordinary decency and generosity. He is decent toward everyone in his life, regardless of station or status, and enormously generous with his time, energy, compassion, wisdom, grace, and philanthropy.

His generosity begins with words: encouragement freely offered, gratitude repeatedly expressed, and praise for the good in others. When someone in his life celebrated a significant achievement or milestone, Ken would come up with the perfect gift and pen a warm note of congratulations because he knew doing so would be more meaningful.[20]

When a colleague or a friend or a family member, or one of his children's friends, went through a rough spot, Ken was there with consolation, counsel, and hands-on help. [redacted] Ken "stood beside him through some of the darkest moments with compassion, loyalty, and quiet strength." Ex. 32, Michelle Eafanti letter at 1. [redacted] Ken offered help and "gave me something I desperately needed — reassurance, guidance, and hope." Ex. 101, Joy Wright letter at 1. When a friend lost a spouse or a colleague lost a sibling, Ken was there.[21]

Ken's generosity extends to time and attention. Mr. Smith recalls that when he brought his grandfather to a game at the Rose Bowl, Ken "spent the afternoon with an old Marine he had

---

[19] *See* Ex. 99, Dr. Steven Wilson letter; Ex. 93, Lois Stueck letter at 1.

[20] *See* Ex. 50, Tracey A. Hutson letter at 2; Ex. 7, Dan Alexander letter at 2; Ex. 24, Robert Cantz letter at 2.

[21] *See* Ex. 97, Stephen A. Walsh letter at 2; Ex. 84, Araceli "Cel" Sibley letter at 2; Ex. 6 Kathleen R. Aicher letter at 1; Ex. 32, Michelle Eafanti letter at 1.

no reason to spend it with, and he made sure the man had the day he had waited eighty years for." Ex. 85, Ian Smith letter at 2. When Timur Bekbosunov, whom Ken knows from church, needed career advice, he "turned to [Ken] for guidance." Ex. 15, Timur Bekbosunov letter at 1. Mr. Bekbosunov writes, "[h]e did not need to help me, and there was nothing in it for him, but he took hours out of an already demanding schedule to discuss over the matter carefully and walk me through it, simply because he cared." Ex. 15, Timur Bekbosunov letter at 1. Throughout his career, Ken went out of his way to mentor Western employees, former employees, industry colleagues, and others he barely knew.[22]

When an aging relative needed help relocating, assistance managing her finances, or just a ride to a family gathering, Ken would go out of his way to help, always with warmth and love, and often with a joke.[23]

He was generous also in seeing the best in people, offering grace, and giving second chances. When confronting personnel problems, Ken would be the first to point out an employee's positive attributes and to champion a second chance. *See* Ex. 50, Tracey A. Hutson letter at 2–4. Ivor Schucking, a Western employee who had analyzed Credit Suisse securities favorably, recalls that when the bank collapsed in March 2023, causing substantial losses in multiple Western portfolios, Ken "put his arm around me" and told Mr. Schucking to "hold my head up high." Ex. 80, Ivor Schucking letter at 1.

---

[22] *See, e.g.*, Ex. 30, Rajeev De Mello letter at 1–2; Ex. 38, Jim Flick letter at 2; Ex. 48, James P. Healy letter at 2; Ex. 25, Caroline Catalan letter at 1; Ex. 84, Araceli "Cel" Sibley letter at 1–2; Ex. 85, Ian Smith letter at 2; Ex. 21, Robert Clark Bruce letter at 1; Ex. 18, Anthony "Tony" Britton Jr. letter at 1.

[23] *See* Ex. 89, Florence Stueck letter at 1; Ex. 54, Darryl C. Leech letter at 2.

Ken's financial generosity is substantial, but its defining feature is its humility. His giving through the Lazy L Foundation has supported organizations serving families facing homelessness, child refugees, schools, churches, a synagogue, the arts, and those rebuilding after catastrophic fires.[24] Beyond that formal philanthropy, Ken has stepped forward, often without being asked, to shoulder medical expenses for relatives, obtain life-saving care for an uninsured friend, furnish an apartment for a woman he had never met, and countless other acts of charity.[25] Ken's "demeanor is always one of modesty," his preferred manner of service is "to remain anonymous and unheralded," and he "never desires (and in fact tries to avoid) any form of public credit or acknowledgement." Ex. 77, Cantor Mark Saltzman letter at 1.

Ken's generosity—with his words, mentorship, time, attention, and resources—is thus of a piece with his humility. He gives not to be seen giving, but because, in matters large and small, his life has been defined by showing up for others.

Ken's failure to be fully truthful in his SEC testimony is inconsistent with his true character. Those who know him describe him as a man of integrity.[26] This reputation for

---

[24] *See, e.g.*, Ex. 2, Eileen Stueck Leech letter at 2; Ex. 3, Catherine L. Dovetta letter at 3 and appendix 5–6; Ex. 51, Rev. Megan Katerjian letter at 1.

[25] *See, e.g.*, Ex. 54, Darryl C. Leech letter at 2; Ex. 87, Casey Stringfield letter at 1; Ex. 28, Thomas G. Cook letter at 2; Ex. 67, Pamela Ann Mims letter at 1–2.

[26] *See, e.g.*, Ex. 86, Rosemarie Snoke letter at 2; Ex. 26, Jae Choi letter at 1 ("He showed me what genuine integrity looked like in a professional setting. Kenny was quick to take accountability for his mistakes and generous in sharing the credit with colleagues."); Ex. 38, Jim Flick letter at 2 ("Ken showed all of us how important humility, honesty and transparency were."); Ex. 98, Paul M. White letter at 1 ("I know of no executive or investment leader in the industry more ethically correct than Ken, in company obligations to clients or to regulators, and holding his or her team to the same standards."); Ex. 20, Gordon S. Brown letter at 2 (describing Ken as "a person of integrity who consistently placed the interests of clients at the centre of his decision-making. In an industry where trust is fundamental, I always had complete confidence in his judgement and his commitment to doing what he believed was right for clients and for the firm.").

honesty and integrity extends beyond Western, as industry colleagues, personal friends, and community members attest.[27] It is not surprising, therefore, that those who know Ken best and longest, professionally, socially, and from his church, uniformly describe his conduct in this case as wholly inconsistent with the person they have known for decades.[28] Keith T. Anderson, co-founder and former CIO of investment manager BlackRock, writes: "Based on everything I have observed over forty years, the conduct to which Ken pleaded guilty is wholly inconsistent with the man I have known. It is not the person I have worked alongside, competed against, or called a friend." Ex. 8, Keith T. Anderson letter at 2.

### D. Ken's Health

Ken's health is also relevant to sentencing. *See* 18 U.S.C. § 3553(a)(2)(D). Ken suffers from several medical conditions requiring ongoing, specialized care, and a custodial sentence would pose a significant risk to his health.

---

[27] *See, e.g.*, Ex. 11, Rev. Tiffany Ashworth letter at 2 ("His reputation precedes him as a person of trustworthy character."); Ex. 17, Eilley Brandlin letter at 1 (describing Ken as a "person of integrity, kindness, and responsibility"); Ex. 24, Robert Cantz letter at 2 ("Ken not only has a long history of doing the right thing for his friends, colleagues, and community, he is considered by myself and many others to be a standard bearer for it."); Ex. 57, David Lippman letter at 1–2 ("There is an old saying in our business that a persons word should be sacred. In all of the years that I worked with Ken I found this to be true, even when circumstances were difficult . . . . I am proud to call Ken Leech a friend and trust his integrity fully.").

[28] *See, e.g.*, Ex. 47, Ilene S. Harker letter at 1 ("The acts which Ken has pled guilty to are not consistent with the behavior I witnessed on a daily basis over the 20 years we worked together."); Ex. 9, Louise Tucker Anderson letter at 1 (the acts to which Ken pleaded guilty "are incongruous with the man I know well"); Ex. 98, Paul M. White letter at 3 ("[A]ny wrongdoing in a regulatory or a legal matter is totally inconsistent with Ken's character and his ethical and interpersonal expectations of those on his team."); Ex. 73, Elizabeth L. Patterson letter at 1–2 ("[T]his behavior is not the Ken I . . . know and respect . . . . In my experience of him over the years, I have come to trust his values, his ethics, and his integrity. I will continue to do so."); Ex. 16, Marzo Bernardi letter at 2 ("I was genuinely surprised to learn of Ken's guilty plea. Based on my own experience working closely with him, it did not match the man I knew, someone who always spoke candidly and held himself accountable in a humble way.").

Most acutely, Ken has Barrett's esophagus, "a serious condition in which the normal tissue lining the esophagus is replaced by tissue similar to the intestinal lining." Ex. 102, Dr. Lori J. Wynstock letter at 1; *see* PSR ¶ 48. Because "[t]his condition is . . . a recognized precursor to esophageal adenocarcinoma, a form of cancer . . . . [it] demands vigilant, ongoing surveillance." Ex. 102, Dr. Lori J. Wynstock letter at 1. Since his initial diagnosis in 2007, Ken's doctors have monitored him closely, including through regular upper endoscopic procedures and biopsies, and luckily his condition has not worsened or turned malignant. Ex. 102, Dr. Lori J. Wynstock letter at 1. But the potential for malignant progression is real, and any lapse in monitoring could have life-threatening consequences. His doctor, Lori J. Wynstock, explains that "[a]ny interruption or inconsistency in [Ken's] medication regimen or dietary plan could exacerbate inflammation, accelerate tissue changes, and increase the risk of progression to a more dangerous stage of disease. Timely access to his gastroenterologist . . . is essential should any new symptoms develop." Ex. 102, Dr. Lori J. Wynstock letter at 1.[29]

The Bureau of Prisons ("BOP") is ill-equipped to provide the level of individualized, specialized care that Ken's condition demands.[30] Regular surveillance endoscopy and biopsies, prompt access to a gastroenterologist, uninterrupted medication access, and a specialized diet are not the types of services the BOP reliably provides. Particularly relevant here, the Department of Justice's Inspector General found that "[t]he limited availability of Correctional Officers restricts

---

[29] *See also* Ex. 44, Dr. Alan Green letter at 1 (explaining that "[redacted]" his esophageal condition and describing several other health conditions).

[30] Indeed, "the Department of Justice's own Inspector General has acknowledged that providing adequate healthcare for inmates remains a challenge for the BOP." *United States v. Ortega*, 13 Cr. 814 (JMF), 2023 WL 2752160, at *2 n.3 (S.D.N.Y. Mar. 31, 2023); *see* Sent. Tr. at 60, *United States v. Pickett*, 22 Cr. 00586 (NRM) (E.D.N.Y. May 7, 2025), ECF No. 64 ("There continue to be severe nationwide staffing shortages at BOP facilities which adversely impact both the timeliness and level of care that persons incarcerated in those facilities receive.").

aging inmates' access to medical care outside the institutions . . . as a result, there are waitlists to send inmates to outside medical specialists." U.S. Dep't of Just., Off. of the Inspector Gen., *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* 18 (rev. Feb. 2016), https://oig.justice.gov/sites/default/files/reports/15-05.pdf.[31] A non-custodial sentence would preserve Ken's access to the medical care on which his health, and potentially his life, depend.[32]

**E. The Nature and Circumstance of the Offense**

Ken accepts full responsibility for his offense. He acknowledges that during his sworn testimony before the SEC, he gave false and misleading answers regarding his trade allocation process. Without in any way minimizing Ken's conduct, we ask the Court to consider that Ken's obstruction of the SEC investigation was limited to false and misleading statements made in response to several questions during a single day of testimony.

At no other time—neither before nor after the testimony, neither through statements nor document productions—did he otherwise impede the SEC investigation. His offense conduct was confined to his failure to provide complete and accurate answers to a limited series of questions on a single occasion. Ken did not destroy documents, fabricate evidence, influence witnesses, suborn perjury, or otherwise engage in a calculated campaign to obstruct the SEC investigation.[33]

---

[31] *See also* Sent. Tr. at 58, *United States v. Pickett*, 22 Cr. 00586 (NRM) (E.D.N.Y. May 7, 2025) (noting that defendant experienced "deprivation of medical treatment" resulting in delayed cancer diagnosis, "extraordinary trauma," and "pain at an excruciating level").

[32] As this Court has observed, the need for treatment "outside of the jail system" for "serious health conditions" can "weigh[] very heavily in favor of a nonincarceratory sentence." Sent. Tr. at 32, *United States v. Walker*, 21 Cr. 797 (GHW) (S.D.N.Y. May 25, 2023), ECF No. 99.

[33] Consistent with the terms of the Plea Agreement, the Probation Office determined that Section 2J1.2's three-point enhancement for an "offense result[ing] in substantial interference with the administration of justice" does not apply. *See* PSR ¶ 24.

Moreover, in consequence of the limited nature of the offense conduct, nothing Ken said during his testimony appears to have materially affected the course or outcome of the SEC investigation. His incomplete statements did not cause the SEC to abandon a line of inquiry, overlook evidence, or alter the focus of its investigation.

### F. The Collateral Consequences of the Investigation, Prosecution, and Conviction

The severe professional and personal collateral consequences Ken has already suffered further support a downward variance. As a result of his criminal conviction, Ken's career and reputation have been "ruined," the company he helped build over a lifetime "vastly diminished," and his family deeply harmed. Ex. 1, Ken Leech letter at 4. Ken has been personally crushed by his prosecution and conviction and utterly devastated by the harm it has caused his family. Ex. 1, Ken Leech letter at 4.

Mr. Senft writes that "[a]s Ken's friend of 50 years, I have observed the devastating toll this case has had on Ken and his family. It has been heartbreaking to watch as he lost the career he loved and the reputation he valued." Ex. 82, Dexter Senft letter at 4; *accord* Ex. 66, Bill Miller letter at 1 ("Ken's reputation as one of the best and most trustworthy stewards of clients' assets in the industry was destroyed and cannot be recovered."); Ex. 40, Mark Freedman letter at 3 ("The past two years have already taken an enormous personal, emotional, and professional toll on [Ken]."); Ex. 53, Michael Larson letter at 2 ("The events of the past several years have plainly taken a severe toll on him, both personally and professionally.").

Ranjit ("Ron") Kripalani, who has known Ken for decades in a number of contexts, writes, "[t]he professional and reputational consequences [Ken] has already suffered have been profound and permanent. The firm he helped build and lead has been fundamentally altered, and

a lifetime spent earning the trust of clients, colleagues, and the investment community has been irretrievably changed." Ex. 52, Ranjit (Ron) Kripalani letter at 1–2.[34]

Eileen provides an intimate account of Ken's life over the past three years:

> Since the indictment, Ken and I have both lived a life in which "all joy is darkened." (Isaiah 24:11). Food and drink are necessary but no longer part of happy occasions. The methods and demands of official investigations and prosecutions have separated us from friends and colleagues. With Ken's passport taken away, we have lost the ability to attend various events and family gatherings, and we have suffered separation from ailing friends who are unable to travel. Ken, who for years has strictly limited his alcohol consumption, has begun to medicate himself with alcohol. There are many nights when his allergies and other health issues cause him to cough continually, and I fear for further damage to the unhealthy area of his throat.

Ex. 2, Eileen Stueck Leech letter at 4–5.

The "ceaseless, sleep depriving, fear, stress and pain" has been borne by Ken's family as well. Ex. 23, Rollin Bush letter at 2. Ken's cousin-in-law Nannette Stueck observes that "[t]his case has put a great toll on the emotional well-being of Ken, his wife and children as well as their immediate family members who have always counted on Ken for his magnanimous support." Ex. 94, Nannette A. Stueck letter at 2. Ken deeply regrets that he caused his family to suffer.

As Judge Stearns of the District of Massachusetts observed in sentencing defendants in *United States v. Blais*, a non-incarceratory sentence can be appropriate, even when a defendant's Guidelines range is significantly higher than Ken's, particularly for individuals with no prior experience in the criminal justice system. Judge Stearns explained:

> I think it is very difficult at times, for those of us who are judges or prosecutors or lawyers, to put ourselves in the shoes of a person with no prior experience with the criminal justice system who finds himself or herself accused of a crime. I do not think, sometimes, we fully recognize the anguish and the penalty and the

[34] *See also* Ex. 43, Scott F. Grannis letter at 2 ("[A]s a consequence of his indictment his career is effectively over and the firm he worked for has downsized painfully; a harsh sentence on top of this would be cruel punishment for a man who has done so much for so many over the years.").

> burden that persons face when called to account, as these men are, for the wrongs that they committed.

Sent. Tr. at 19–20, *Blais*, 06 Cr. 10116 (RGS) (D. Mass. May 27, 2010), ECF No. 309, *quoted approvingly in United States v. Prosperi*, 686 F.3d 32, 48 (1st Cir. 2012).

### G. The Need to Avoid Unwarranted Sentencing Disparities

Under Section 3553(a)(6), the Court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." A time-served sentence in this case would be consistent with the sentences imposed on similarly situated defendants.

#### 1. Sentencing Commission Data

According to the Sentencing Commission, over the period FY 2021–2025, there were 45 defendants nationwide who, like Ken, had a primary Guideline of § 2J1.2, a total offense level of 10, and a Criminal History Category of I, and who did not receive a § 5K1.1 substantial assistance departure. U.S. Sent'g Comm'n, *Judiciary Sentencing Information* (JSIN), https://jsin.ussc.gov/ (last visited Sept. 16, 2026). Of these similarly situated defendants, 62 percent did *not* receive a sentence of imprisonment. *Id.*[35]

The incarceration rate of similarly situated defendants over the age of 50 is even lower. Over the period FY 2021–2025, of those defendants nationwide over 50 years old who are U.S. citizens with a primary Guideline of § 2J1.2, a Criminal History Category of I, and a Guidelines range falling within Zone A or Zone B of the Sentencing Table, 71 percent did not receive a

[35] Statistics regarding sentences imposed on similarly situated defendants are relevant to the Court's assessment of unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6). *See United States v. Jenkins*, 854 F.3d 181, 193 (2d Cir. 2017) (explaining that Sentencing Commission statistics "validate[d]" concern that sentence created "unwarranted . . . disparity" and provided a "meaningful comparison" to similarly situated offenders); *United States v. Singh*, 877 F.3d 107, 116 (2d Cir. 2017) (considering Sentencing Commission data).

sentence of imprisonment. U.S. Sent'g Comm'n, Interactive Data Analyzer (IDA), https://www.ussc.gov/research/interactive-data-analyzer (last visited Sept. 16, 2026).

Even these figures likely overstate the percentage of similarly situated defendants sentenced to any actual term of imprisonment for two reasons. *First*, the Commission categorizes defendants who received a sentence of one day "time served"—typically, for processing only—as being sentenced to a term of imprisonment. *See* Christine Kitchens, U.S. Sent'g Comm'n, *Analyzing Federal Sentence Length & Type* 10 n.22 (2019) ("minimal" sentence of "one day of time served" is recorded by Sentencing Commission "as having at least one day of prison").[36] Thus, some subset of the defendants treated as having been sentenced to incarceration in fact served no actual time in prison.

*Second*, the period covered by this data includes three years, FY 2021–2023, that predate Amendment 821's zero-point offender adjustment and presumption against a sentence of imprisonment for defendants like Ken. *See supra* III.B. Because Amendment 821 is retroactive, defendants sentenced before the adoption of Amendment 821 were eligible for (and may have received) subsequent sentence reductions, which would not be captured in JSIN data. *See U.S. Sentencing Commission Part B of the 2023 Criminal History Amendment Retroactivity Data Report*, Apr. 2026, Table 6. It is therefore likely that some of the defendants who were sentenced to imprisonment and later received relief under Amendment 821 would have received non-incarceratory sentences if sentenced today.

The case for a time-served sentence is even stronger when the analysis is confined to the Second Circuit. Prison sentences for similarly situated defendants are not merely less frequent in

[36] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-notes/20190926_Research-Notes-Issue2.pdf?utm.

the Second Circuit, they are nonexistent. Sentencing Commission data show that, over the period FY 2021–2025, not one of the five defendants sentenced with the same primary Guideline and a Guidelines range falling within Zone A or Zone B of the Sentencing Table received a sentence of imprisonment. U.S. Sent'g Comm'n, *Interactive Data Analyzer* (IDA), https://www.ussc.gov/research/interactive-data-analyzer (last visited Sept. 16, 2026).

Last, sentences of imprisonment for violation of 18 U.S.C. § 1505 specifically are vanishingly rare for defendants with a primary Guideline of § 2J1.2 and a Guidelines range falling within Zone A or Zone B. An analysis of Sentencing Commission datasets for FY 2012–2025 identified only three defendants sentenced for violation of Section 1505 with a primary Guideline of § 2J1.2 and a Guidelines range falling within Zone A or Zone B.[37] None received a sentence of imprisonment.[38]

Non-incarceratory sentences for defendants whose Guidelines range falls within Zone A or Zone B are commonplace both because the Guidelines do not require imprisonment and because downward variances are ubiquitous. Sentencing Commission data show that most defendants situated similarly to Ken receive a downward variance or departure. Over the period FY 2021–2025, of those defendants nationwide sentenced with a primary Guideline of § 2J1.2, a total offense level of 10, and a Criminal History Category of I, 65 percent received a downward departure or variance, 33 percent received sentences within the Guidelines range, and only 2

[37] U.S. Sent'g Comm'n, Individual Datafiles, Fiscal Years 2012–2025, https://www.ussc.gov/sites/default/files/zip/opafy24nid_csv.zip.

[38] *See United States v. Forbes*, 23 Cr. 387 (GKF) (N.D. Okla.); *United States v. Hess*, 22 Cr. 55 (JDP) (E.D. Wis.) (defendant received substantial assistance credit); *United States v. Tibbets*, 21 Cr. 218 (DCN) (D. Idaho).

percent received an upward departure or variance.[39] U.S. Sent'g Comm'n, *Judiciary Sentencing Information* (JSIN), https://jsin.ussc.gov/ (last visited Sept. 16, 2026).

It is important to note, moreover, that many defendants who received sentences within the Guidelines range were probably sentenced to home or community confinement rather than prison.

### 2. Sentences Imposed for Violation of § 1505

A review of other cases charging violation of Section 1505 makes clear that a time-served sentence would be appropriate here and that a sentence including incarceration would create "unwarranted sentence disparities" that Section 3553(a)(6) specifically states should be avoided.

Since 2000, there has been only one case in the Southern District of New York in which 18 U.S.C. § 1505 was the sole count of conviction and four such cases in the Eastern District of New York. In four of these cases, the court imposed a non-incarceratory sentence; in the fifth case, the court imposed minimal incarceration:

- In the Southern District case, *United States v. Smith*, the defendant pleaded guilty to producing fake research memoranda to interfere with an SEC insider trading investigation. Information, 08 Cr. 1185 (GBD) (S.D.N.Y. Dec. 2, 2008), ECF No. 2. The court sentenced the defendant to two years' probation with a special condition of five months' home confinement. Judgment, 08 Cr. 1185 (GBD) (S.D.N.Y. Mar. 19, 2009), ECF No. 8.

- In *United States v. Richardson*, the defendant pleaded guilty to obstructing an SEC investigation by falsely testifying about another person's trading activity. Plea Tr. at 22–23, 06 Cr. 416 (NGG) (E.D.N.Y. Aug. 8, 2006), ECF No. 8. The court determined that the defendant's Guidelines range was 6 to 12 months' imprisonment and sentenced the defendant to one year of probation. Sent. Tr. at 4, 8, 06 Cr. 416 (NGG) (E.D.N.Y. Feb. 15, 2008).

[39] These statistics exclude defendants who received a § 5K1.1 substantial assistance departure.

- In *United States v. Litman*, the defendant pleaded guilty to one count of obstruction of justice and was sentenced to three years' probation. Judgment, 01 Cr. 1324 (ADS) (E.D.N.Y. Dec. 28, 2004), ECF No. 13.[40]

- In *United States v. Schaeffer*, the defendant pleaded guilty to one count of obstruction of justice and was sentenced to three years' probation. Judgment, 03 Cr. 304 (CBA) (E.D.N.Y. Feb. 10, 2005), ECF No. 568.[41]

- In *United States v. Chalkias*, the defendant pleaded guilty to obstructing a U.S. Coast Guard inspection by concealing a ship's waste discharges and failing to make required records in the ship's log. Information, 05 Cr. 346 (ARR) (E.D.N.Y. May 19, 2005), ECF No. 18. The court sentenced the defendant to one month imprisonment. Judgment, 05 Cr. 346 (ARR) (Oct. 13, 2005), ECF No. 23.

### H. Specific Deterrence

There is no need for additional specific deterrence or to protect the public from further misconduct by Ken. Ken is 72 years old, a first-time offender, a college graduate who has been employed throughout his adult life, and a committed husband, father, and grandfather. Ken's career in the securities industry is over, rendering the risk of recidivism effectively zero. *See United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993), *aff'd*, 31 F.3d 73 (2d Cir. 1994) ("Elimination of the defendant's ability to engage in similar or related activities—or indeed any major business activity—for some time, and the substantial loss of assets and income resulting from this have decreased for the foreseeable future his ability to commit further crime of the type he was tempted to undertake, and constitutes a source of both individual and general deterrence.").[42]

---

[40] Further details about this case are sealed or otherwise not available on the docket.

[41] Further details about this case are sealed or otherwise not available on the docket.

[42] The lack of need for specific deterrence in this case is confirmed by extensive research and analysis published by the Sentencing Commission. *See* U.S. Sentencing Commission, Recidivism Among Federal Offenders: A Comprehensive Overview 27 (2016), https://www.ussc.gov/research/research-reports/recidivism-among-federal-offenders-comprehensive-overview (last visited Aug. 13, 2026) ("[T]wo factors – offenders' criminal histories and their ages at the time of release into the community – were most closely associated

Finally, any need for specific deterrence is satisfied by Ken's highly publicized felony conviction, which will follow him for the rest of his life. It does not necessitate imprisonment. *Cf. United States v. Mateo*, 299 F. Supp. 2d 201, 210 (S.D.N.Y. 2004) ("[B]eyond the offender's actual deprivation of liberty when incarcerated, a host of other penalties and burdens always attend criminal conviction."); David Weisburd *et al.*, *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995) (no difference in specific deterrence for white collar offenders between probation and imprisonment).

**I. General Deterrence**

A sentence of time served would be meaningful and satisfy the need for general deterrence. Ken's guilty plea to interfering with an SEC investigation, and the devastating collateral consequences of his indictment and conviction, have sent precisely the deterrent message that Section 3553(a)(2)(B) contemplates. Ken's career and reputation have been destroyed, the company he helped build over a lifetime "vastly diminished," and his family profoundly harmed. Ex. 1, Ken Leech letter at 4. The public and financial services industry already are aware, warned, and more than adequately deterred. The purposes of general deterrence have already been satisfied. We submit that, in the circumstances of this case, a time-served sentence would constitute a meaningful sentence that satisfies the goal of general deterrence.

---

with differences in recidivism rates."); United States Sentencing Commission, The Effects of Aging on Recidivism Among Federal Offenders 3 (2017), https://www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders (last visited Aug. 13, 2026) ("Older offenders were substantially less likely than younger offenders to recidivate following release."); *see also* Sent. Tr. at 31, *United States v. Walker*, 21 Cr. 797 (GHW) (S.D.N.Y. May 25, 2023), ECF No. 99 (noting the advanced age (62 years old) and low criminal history of defendant "associated with a low level of recidivism").

The general deterrent effect of Ken's conviction is amplified by the extraordinary degree of attention this case has generated. The prosecution and conviction have been extensively covered in both the mainstream and financial press.[43] And those who work in the industry have tracked the case closely. *See, e.g.*, Ex. 66, Bill Miller letter at 2; Ex. 100, Kenneth Winston letter at 1; Ex. 38, Jim Flick letter at 1. The message is unmistakable: a prominent and well-regarded industry leader, in the twilight of his illustrious career, was charged in this District, pleaded guilty before Your Honor and will soon face sentencing, and has incurred ruinous collateral consequences.[44]

As this Court has recognized numerous times, a meaningful but non-custodial sentence, in conjunction with significant collateral consequences, can provide general deterrence. *See, e.g.*, Sent. Tr. at 24–25, *United States v. Ramphal*, 24 Cr. 653 (GHW) (S.D.N.Y. May 29, 2026), ECF No. 68 ("I'm also required to consider the goal of general deterrence[. G]iven the substantial collateral consequences of this conviction for the defendant[,] I believe that this

[43] *E.g.*, Danielle Walker, *Lessons for Investors From a Former Star Fund Manager's Guilty Plea*, Barron's (Aug. 11, 2026), https://www.barrons.com/advisor/articles/western-sec-ken-leech-guilty-plea-cc1bb673; Max Curtin & Eric Jacobson, *Storied Bond Trader Ken Leech Makes His Last Trade, Morningstar* (July 1, 2026), https://www.morningstar.com/funds/storied-bond-trader-ken-leech-makes-his-last-trade; Vidhya Edwards Munnangi, *Former Western Asset Bond Manager Pleads Guilty to Obstructing SEC Probe*, Yahoo Finance (June 15, 2026), https://finance.yahoo.com/markets/stocks/articles/former-western-asset-bond-manager-114431153.html; Joseph De Avila, *Bond Investor Ken Leech Pleads Guilty to Obstructing SEC Probe*, Wall St. J. (June 12, 2026), https://www.wsj.com/finance/regulation/bond-investor-ken-leech-pleads-guilty-to-obstructing-sec-probe-60f28082; Bob Van Voris, Chris Dolmetsch & Silla Brush, *Ken Leech to Plead Guilty in U.S. "Cherry Picking" Fraud Case*, Bloomberg (June 12, 2026), https://www.bloomberg.com/news/articles/2026-06-12/ken-leech-to-plead-guilty-in-us-cherry-picking-fraud-case; Harriet Clarfelt & Julia Rock, *Former Star Bond Investor Ken Leech Pleads Guilty to Obstructing Probe*, Fin. Times (June 12, 2026), https://www.ft.com/content/ea2f30d4-4ae4-47cc-b2a8-095328452f0b.

[44] This deterrent message is crystal clear whether the case is viewed from the perspective of the count of conviction, or more broadly in terms of the allegations generally.

sentence [of two years' probation] will achieve that goal."); Sent. Tr. at 31, *United States v. DuPont*, 23 Cr. 320 (GHW) (S.D.N.Y. Jan. 5, 2024) (considering "collateral consequences of a felony conviction" in finding that a sentence of probation with a period of home confinement satisfied general deterrence purpose).

No rational actor would view a time-served sentence in this case as a green light to engage in criminal conduct. In *United States v. Gardellini*, 545 F.3d 1089, 1095 (D.C. Cir. 2008), then-Judge Kavanaugh rejected the government's contention that a sentence of probation failed to provide sufficient deterrent effect. His reasoning is directly applicable here: deterrence cannot be "elevate[d]" over the other Section 3553(a) factors, and individuals contemplating whether to commit similar offenses would be irrational to rely on a non-custodial sentence imposed on another defendant without understanding all the circumstances that informed it. "[O]nly a fool would think that he or she necessarily would receive the same sentence as [the defendant] for a similar . . . offense." *Id*. Here, the collateral consequences Ken already has experienced and will continue to experience for the rest of his life—being convicted of a felony, having seen his reputation irreparably destroyed, having endured years of investigation, and seeing his beloved family suffer—are more than enough to dissuade others from engaging in similar offense conduct.

Last, research shows that imprisonment is unnecessary because general deterrence is primarily a function of the certainty of punishment, not its severity. *See* National Institute of Justice, *Five Things About Deterrence* (June 5, 2016), https://nij.ojp.gov/topics/articles/five-things-about-deterrence#one (last visited Aug. 13, 2026) ("The certainty of being caught is a vastly more powerful deterrent than the punishment."); Daniel S. Nagin, *Deterrence in the Twenty-First Century: A Review of the Evidence*, 42 Crime & Justice 199 (2013). As one court

in this District observed, "every major survey of the evidence" has found that, while "certainty of punishment has a deterrent effect, 'increases in severity of punishment do not yield significant (if any) marginal deterrent effects.'" *United States v. Velazquez*, 16 Cr. 233 (AKH), 2017 WL 2782037, at *4 (S.D.N.Y. May 26, 2017) (quoting Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28–29 (2006)).

**J. Sentencing Recommendation**

Throughout his life, Ken Leech has demonstrated extraordinary generosity, humility, and respect for and commitment to others. The experience of being investigated, charged, and called to account before this Court has carried with it profound personal and professional consequences that themselves constitute significant punishment and promote respect for the law. *See* Sent. Tr. at 16, *United States v. Ramos*, 16 Cr. 153 (GHW) (S.D.N.Y. Sept. 15, 2016), ECF No. 53 ("I do not believe that a period of incarceration is necessary to promote respect for the rule of law."). Numerous letters to Your Honor have detailed the severe impact this case has had on Ken.

Under the circumstances, we respectfully urge the Court to adopt the Probation Office's recommendation, grant a downward variance, and impose a sentence of time served. Such a sentence would appropriately recognize Ken's many positive qualities, while reflecting the seriousness of the offense, promoting respect for the law, and providing just punishment. It would be "sufficient, but not greater than necessary" to serve the goals of Section 3553(a). *See, e.g.*, *United States v. Olhovsky*, 562 F.3d 530, 551 (3d Cir. 2009) ("[I]t is not *severe* punishment that promotes respect for the law, it is *appropriate* punishment.").

## CONCLUSION

"[I]f ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." *United States v. Adelson*, 441 F. Supp.

2d 506, 513–14 (S.D.N.Y. 2006) (Rakoff, J.), *aff'd*, 301 F. App'x 93 (2d Cir. 2008). We respectfully submit that Ken's life of good works, in actions large and small, counsel for leniency. We respectfully ask the Court to impose a sentence of time served.

Dated: September 17, 2026
New York, New York

MORVILLO ABRAMOWITZ
GRAND IASON & ANELLO, P.C.

/s/ Jonathan S. Sack
Jonathan S. Sack
Jeremy H. Temkin
Samuel W. Magaram
Marissa Piccolo
Nathaniel Sobel
New York, NY 10017
(212) 856-9600

CLEARY GOTTLIEB
STEEN & HAMILTON, LLP

/s/ Joon H. Kim
Joon H. Kim
One Liberty Plaza
New York, NY 10006
(212) 225-2000

*Attorneys for Defendant S. Kenneth Leech II*