# Volume I

**_United States v. Leech_, No. 24 Cr. 658 (GHW) (S.D.N.Y.)**
**Volume I – Exhibits Cited in the Sentencing Memorandum on Behalf of S. Kenneth Leech II**

| Exhibit No. | Document |
|---|---|
| **Letters** | |
| 1. | Leech, Ken |
| 2. | Leech, Eileen Stueck |
| 3. | Dovetta, Catherine L. |
| 4. | Leech III, Stephen K. |
| 5. | Agregado, Liza |
| 6. | Aicher, Kathleen R. |
| 7. | Alexander, Dan |
| 8. | Anderson, Keith T. |
| 9. | Anderson, Louise Tucker |
| 10. | Arnold, Bruce R. |
| 11. | Ashworth, Rev. Tiffany |
| 12. | Bachmann, Peter |
| 13. | Balcazar, Andres Sanchez |
| 14. | Bazdarich, Michael J. |
| 15. | Bekbosunov, Timur |
| 16. | Bernardi, Marzo |
| 17. | Brandlin, Eilley |
| 18. | Britton Jr., Anthony “Tony” |
| 19. | Brooks, Brian P. |
| 20. | Brown, Gordon S. |
| 21. | Bruce, Robert Clark |
| 22. | Buchanan, Michael C. |
| 23. | Bush, Rollin |
| 24. | Cantz, Robert |

| Exhibit No. | Document |
|---|---|
| 25. | Catalan, Caroline C. |
| 26. | Choi, Jae |
| 27. | Chotiner, Dr. Jennifer |
| 28. | Cook, Thomas G. |
| 29. | Crowell, Rev. Cynthia W. |
| 30. | De Mello, Rajeev |
| 31. | Dovetta, Nicolas |
| 32. | Eafanti, Michelle |
| 33. | Ehrlich, Kevin |
| 34. | Fan, Derek |
| 35. | Fink, Darin T. |
| 36. | Fink, Kevin |
| 37. | Fisk, Eliot |
| 38. | Flick, Jim |
| 39. | Freebes, Linda |
| 40. | Freedman, Mark |
| 41. | Glaze, Samuel F. |
| 42. | Goettler, Peter N. |
| 43. | Grannis, Scott F. |
| 44. | Green, Dr. Alan |
| 45. | Greetham, Christopher |
| 46. | Hales, Jonathan |
| 47. | Harker, Ilene S. |
| 48. | Healy, James P. |
| 49. | Hirschmann, James W. |
| 50. | Hutson, Tracey A. |
| 51. | Katerjian, Rev. Megan |
| 52. | Kripalani, Ranjit (Ron) |

| Exhibit No. | Document |
|---|---|
| 53. | Larson, Michael |
| 54. | Leech, Darryl C. |
| 55. | Leech, Katy |
| 56. | Lindbloom, Mark |
| 57. | Lippman, David |
| 58. | Marchosky, Ernest |
| 59. | Marki, Frederick |
| 60. | Marquez, Julie |
| 61. | Martin, Haley |
| 62. | Matthews, Catherine |
| 63. | McCourt, John W. |
| 64. | McNamara, Dennis J. |
| 65. | Meidl, Karen |
| 66. | Miller, Bill |
| 67. | Mims, Pamela Ann |
| 68. | Mullet, Scott |
| 69. | Murphy, Jennifer W. |
| 70. | Murphy, Virginia W. |
| 71. | Nelson, Susan |
| 72. | Orswell, John E. |
| 73. | Patterson, Elizabeth L. |
| 74. | Powell, Karlen |
| 75. | Quinn, Norman P. |
| 76. | Roffina, Rev. Michael J. |
| 77. | Saltzman, Cantor Mark |
| 78. | Schlichter, Detlev |
| 79. | Scholnick, Julien |
| 80. | Schucking, Ivor |

| Exhibit No. | Document |
|---|---|
| 81. | Schulte, Holly |
| 82. | Senft, Dexter |
| 83. | Sibbrel, Robert |
| 84. | Sibley, Cel |
| 85. | Smith, Ian J. |
| 86. | Snoke, Rosemarie |
| 87. | Stringfield, Casey |
| 88. | Stueck, Clifford |
| 89. | Stueck, Florence |
| 90. | Stueck, Jill |
| 91. | Stueck, John J. |
| 92. | Stueck, Kathleen M. |
| 93. | Stueck, Lois |
| 94. | Stueck, Nannette A. |
| 95. | Sylvester, Dr. Lisa |
| 96. | Trepp, Suzanne |
| 97. | Walsh, Stephen A. |
| 98. | White, Paul M. |
| 99. | Wilson, Steven |
| 100. | Winston, Kenneth |
| 101. | Wright, Joy |
| 102. | Wynstock, Dr. Lori J. |
| 103. | Yamamoto, Dylan J. |
| **Other** | |
| A. | Morningstar Announces 2004 Fund Manager of the Year Awards |
| B. | Morningstar Announces 2014 U.S. Fund Manager of the Year Award Winners |
| C. | Email from K. Leech to S. Walsh, Subject: press |

# Exhibit 1

September 11, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods:

I am writing in anticipation of my sentencing on October 30. In my testimony during the SEC investigation, I gave false and misleading answers about my trade allocation process, and I failed to live up to the principles which have guided my personal and professional life. For that I am deeply sorry. I apologize to the staff of the SEC. They do important work in service of investors, and interfering with their investigation was wrong. For the rest of my life I will regret this decision, especially the impact my offense has had on people I care deeply about. My hope in writing this letter is to give you a sense of who I am beyond the offense to which I pled guilty.

I was born in a suburb of Syracuse, New York in 1954. My father Stephen was born in 1910, and my mother Alma in 1922. My father went to college for one year and then had to leave school because of the Depression. For most of World War II, my father was with the Army and stationed in London, where he was assigned to helping administer camps for German prisoners of war. After the war, he moved to the Syracuse area and became the head of the Onondaga County Medical Society -- the professional association for physicians in our county.

My mother grew up on a family farm in Kentucky during the Depression. After high school, she moved to Chicago and eventually became the Executive Secretary of the American College of Surgeons. It was unusual for a woman to hold that sort of position at that time, and she would sometimes use an initial rather than her first name. My parents met at a medical convention and later married. My mother stayed in the workforce and became the executive director of the Onondaga County Dental Society.

I grew up in a modest but comfortable brick house with my brother Darryl. In retrospect, I see that we had a relatively untroubled childhood. We had a variety of chores, such as shoveling snow during Syracuse winters. My parents were frugal and very focused on my brother and me going to college and getting good, steady jobs.

In junior high school, I had a paper route and was able to save some money. I became interested in investments. I read popular investment books and eventually picked a college that would allow me to study finance as an undergraduate. I applied early and was accepted to the University of Pennsylvania, which offered an undergraduate business program through the Wharton School.

In college, I realized that tuition was charged by the semester, not the number of classes, and so I took as many classes as I could, including many outside of business and finance. In the spring of 1976, I earned a B.A. in history and a B.A. in economics and then the next semester, in December, I earned my M.B.A. from the Wharton School on an accelerated track. I developed a passion and intellectual fascination with fixed income investing which lasted my whole career.

During the 1970s, when inflation was relatively high, bonds were a backwater investment class, and jobs on Wall Street were not easy to find. My first job in finance was at the National Bank of Detroit in the Trust Department. I first worked in research, analyzing a range of relatively new types of securities. Later, as a portfolio manager, I managed fixed income investments for Trust Department clients. The portfolio analytics were rudimentary at that time and so I learned to do math in my head so I could understand the impact market developments and my trades had on the portfolio.

For most of the 1980s, I worked at the First Boston Corporation in New York. I started in fixed-income research. A few years later, I transitioned into the proprietary trading department, which managed the bank's own investments. I specialized in making relative value trades -- that is, taking a long position in one asset and a short position in a different asset -- using U.S. Treasury bonds and their derivative instruments (Treasury futures, options, and zero-coupon bonds).

While working at First Boston, I met my wife Eileen through mutual friends at my close friend Rollin Bush's restaurant in New York. At that time, she was a paralegal at a large law firm in New York. I've had some very good fortune and made some good decisions in my life, but none better than meeting and marrying my wife Eileen. She has been the light of my life. She is effervescent, charming, and smart. Most of all, she has extraordinarily deep empathy for others. She is resolute and highly principled, yet you might not know that from her easy laughter around others. She is the foundation on which our family is built. Given my work and travel load, she bore the brunt of the deep responsibility for raising our children. It would have been hard not to have become a much better person with her as my wife.

In 1985, after Eileen graduated from the University of Connecticut Law School, we were married. During the first years of our marriage, Eileen worked as an associate at the firm where she was a paralegal and then at a small firm started by her mentor.

A few years later, while working at a specialized proprietary trading firm, I was offered a position at Western Asset Management, then a relatively small investment management firm, in Pasadena, California. The opportunity was unique and exciting. It would allow me to get back to my passion for broad-based fixed-income investing and away from being a specialist in only certain types of Treasury securities. It would also allow me to work with clients, which I missed from my days in Detroit. At that time, our daughter Catherine was an infant and our son Stephen would be born shortly thereafter. Starting a new life in California was a big move for our family, which was based on the East Coast. But Eileen and I felt that the opportunity was exciting and worth the risk, and Eileen was supportive of the decision to move our family to California.

Western Asset became a remarkable success story -- and one that I took great pride in being a part of. I started as a portfolio manager at Western with a specialty in interest rate strategies. Our

firm focused on the long-term returns of institutional accounts, largely pension funds. The firm grew from roughly $5 billion under management at the end of 1990 to over $600 billion before the Global Financial Crisis in 2008. I was employee number 30 when I joined, and we had over 800 employees at the firm's eight global offices at the peak. In 1998, the firm's Chief Investment Officer (CIO) abruptly resigned due to health concerns, and I was named to replace him. Having never had a single person report to me before, I now had the entire global investment team to manage along with directing firm-wide investment strategy, meeting with clients and managing client accounts.

In the late 1990s and early 2000s, the performance of Western's strategies, particularly Core and Core Plus, was very strong. For the Core strategy we won the prestigious Morningstar U.S. Fixed Income Manager of the Year award for 2004. Around that time, I was asked to serve on the U.S. Treasury Department's Borrowing Advisory Committee, which gave me the opportunity to periodically travel to Washington to meet with top economic policymakers to advise them about what our firm was seeing in the economy.

All investment firms have ups and downs, and Western Asset had several major down periods. The down periods were very disappointing but not entirely surprising given that we often took contrarian views that differentiated us from the index and market as a whole. As a firm, we addressed periods of weak performance by reaffirming our first principles: candid communications with clients, and continuous evaluation of our investment theses.

We had periods of acute underperformance in the Russian debt crisis of 1998, the Nasdaq collapse of 2000-2002, and especially the Global Financial Crisis in 2008 to 2009. Over the years, I got used to the market cycles. I understood that, as CIO, I was ultimately responsible for the periods of underperformance. As difficult as it was, I learned the crucial lesson that the firm, as a team, would thrive by candor and continued hard work.

In the spring of 2008, I was diagnosed with Barrett's Esophagus, a pre-cancerous throat condition. I took a medical leave, and testing for the prospects of cancer went on most of the summer. While the condition continues to need monitoring, the risk of cancer has meaningfully diminished. The uncertainty about my future galvanized me and Eileen to start our family foundation which has been a source of fulfillment as we have been able to help many worthy individuals and organizations both within our community in Pasadena and across the country.

I resumed work in late 2008. Steve Walsh had replaced me as CIO when I had left for my medical leave, and when I was ready to return, he and Jim Hirschman felt I could be of most help in managing our global business, which was also under intense strain due to the Global Financial Crisis. I started splitting my time between Pasadena and London, while also managing several bespoke portfolios that I had managed for clients before taking leave.

Steve Walsh retired in 2013, and I returned to my former position as CIO. In addition to my business and management responsibilities for the investment team, my role as investment strategist for the firm led me to take on a broad set of clients and responsibilities over the years. I was the lead manager on many products and strategies that grew over time. Even as I transitioned some responsibilities to other investment professionals, I continued to manage a

wide array of client accounts with different mandates and objectives -- Core and Core Plus and Macro Opportunities as well as long duration, structured and insurance, broad market portfolios, Treasury Inflation-Protected Securities, leveraged, unconstrained U.S. and global, global sovereign, and structured intermediate portfolios. This brought the full array of Western's investment groups under my purview. It was a heavy burden, but I took a lot of pride in managing a wide range of clients' assets and the trust that they put in me.

My work and my family took up almost all my time. I was lucky to have an occupation I was passionate about. I was not unaware it would lead to a comfortable lifestyle, though I could not have imagined how fortunate I would become. But it also put me and my family in a position to help others, and I'd like to think we took to heart the proverb "to whom much is given, much will be required." I have tried to give back to my community, including my church and causes that Eileen and I care passionately about.

I have taken inordinate joy in my family life. While getting to work before 5:00 a.m. was difficult, it gave me the opportunity to be home with my family later in the day and to see Catherine and Stephen grow into capable and loving adults. I was able to attend their plays, concerts, and ballgames, and more often than not we were able to have an early dinner together before my early bedtime.

I have been blessed by the life and family that Eileen and I have built together. That all came crashing down on October 20, 2023, when I was told that Western was investigating whether I had been misallocating trades. The SEC investigation began a short time later, followed in 2024 by the criminal investigation and charges. The past three years have been extraordinarily difficult; they were devastating and overwhelming at times. Not just dealing with the burden of the case itself but seeing Eileen and our children (and others) suffer as our name and reputation have been indelibly tarnished. The support of my family has been essential to my getting through these travails. They, in a sense, have been collateral damage as the publicity surrounding the case has upended our previous life. What my family, friends and former colleagues have had to endure weighs very heavily on me.

Irrespective of the outcome, the career I cherished is over. The firm I helped build for decades and cared about deeply is vastly diminished. The colleagues I worked with have been tarnished through no fault of their own and their career prospects have been meaningfully dimmed. My reputation has been ruined. My family has had to withstand the force of embarrassment and loss of community standing through no fault of their own.

I have believed my professional and family responsibilities were a type of calling. I worked hard to achieve the financial goals of the firm and my clients. And I took great pride in their gratitude. I always tried to respect my colleagues and treat them well and I hope that I have earned their respect as well. I am heartened and gratified beyond words by the fierce loyalty of my family, my friends, and my former colleagues. I am a man of faith, and I must believe I can get through all of this, though it never would have been possible without the support I received.

Eileen and I are blessed with two grandchildren who have given me much needed purpose and hope during my darkest days these past few years. My deepest wish is to be able to continue to be a positive presence in their lives.

I am asking for your leniency in sentencing. Throughout my life I have tried to treat everyone with respect and decency and serve others -- my family, my colleagues, my clients and my community. I hope that in sentencing me you will consider my whole life and will show me mercy.

Respectfully,

Ken Leech

# Exhibit 2

September 16, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1372

Dear Judge Woods,

My name is Eileen Stueck Leech. I am 69 years old, and I have been married to Ken Leech for 41 years. I am writing in the hope that you consider my perspective when you impose a sentence upon Ken later this year.

I grew up in faith in a loving family in Easton, Connecticut, the first of my parents' six children. My mom is still active, at 89 years old, and I am close to my two brothers and two sisters and their families. The first of my brothers died in infancy.

Ken and I were introduced by mutual friends in the summer of 1980 at a Greenwich Village restaurant where Rollin Bush, Ken's college roommate, was a co-owner and manager. Before meeting Ken, I had prayed fervently for months for the good Lord to send me someone who was loving and caring, with a character I could rely on and respect. In conversations that first evening and the days that followed, I was particularly struck by Ken's obvious kindness, loyalty to his family and friends, upbeat good humor, and devotion to his career. More than anything in life, I wanted to be Ken's wife and be granted the blessing of raising children with him. God bestowed this and additional blessings on us, because after raising two wonderful children, we now have two grandchildren who light up our lives.

At the time I met Ken, I had recently graduated from Mount Holyoke College and was working as a paralegal in New York City. Ken was helpful and supportive while I applied to law schools. After I became a student again at the University of Connecticut School of Law, on many weekends one of us would make the trip between Hartford, Connecticut and New York City. Ken was a hardworking professional, but he was thoughtful and always made me feel that being together was as much a priority for him as it was for me.

I graduated in 1984 and we were married the next year. Between 1984 and 1990, I worked as a litigation associate, first at Willkie Farr and Gallagher, and later at the newly formed law offices of my friend David Trachtenberg. One afternoon in early 1990, Ken greeted me at the door, telling me about an opportunity to interview at Western Asset, which was then a relatively small asset management firm in Pasadena, California. I can still remember him saying, "probably nothing will come of it, but do you mind if I look into it?" Of course, I said that he should investigate. Because the company was small, he would have an opportunity for a substantial amount of responsibility right away, and he could move from the field of proprietary trading

back into investing for institutional clients, which was his passion. After Ken was offered the position, we agreed that we'd try it for two years, and if either of us felt unhappy, we'd figure out a way to get back to New York.

Ken had always put in long hours, but from the very beginning of his tenure at Western, his schedule was exceptionally intense. Trading started at 5 a.m. Pacific time – 8 o'clock in New York. Ken was often the first person "on the desk" in the morning. In all the decades we spent in Pasadena, I can only count a handful of times that Ken ever left the office before the end of the trading day. He almost never used all his vacation time, and there were several instances where we drove (or even flew) home early because some event would happen that was roiling the markets.

As his wife, I knew better than anyone how constantly Ken worried over his client accounts, and how painful it was for him when the accounts weren't performing well. Ken always used to say that even the very best investors aren't right all of the time. Having studied economic history, he understood that no matter how hard anyone works, there are times when the markets will behave counter-intuitively and sometimes even irrationally. Like a successful football coach experiencing a rough patch, at such times Ken would face lots of questions from clients, board members and even from his colleagues. Was Western making the right calls? During these intermittent periods Ken would often be restless and even sleepless. At home he would spend hours poring over research reports and mentally crunching through alternative approaches. Despite the toll this took, in the difficult times, Ken accepted responsibility and never blamed anyone else. These challenging periods displayed Ken's admirable traits of loyalty to others and his capacity to be both tough-minded and persevering.

In 2008, Ken developed a condition called Barrett's Esophagus that led him to relinquish his duties as Western's CIO and take a health-related leave. It was a frightening time for us. Ken had to endure extensive testing and inconclusive results, as well as the threat of a complicated and painful surgery. It was in this timeframe, not knowing our future and considering the very real possibility of an early retirement, that Ken had the idea of starting a small family charitable trust. We called it the Lazy L Foundation. It was very small when we started it, but it grew over the years. I now run it with the help of our daughter, and we have dedicated our efforts toward advancing human thriving by supporting organizations in the spheres of education, the arts, healthy communities, and with missions advancing and protecting individual liberty.

After Ken returned from his leave, he served Western as the point-person for its global accounts. This required spending lengthy periods in London with regular travel to far-flung locations. He didn't enjoy the frequent air travel, but he was learning a great deal as he navigated the leadership of international investment strategies.

In January of 2013, our friend Steve Walsh, who had taken over as CIO when Ken went on leave, retired and the firm asked Ken to return to the role of CIO. This meant less time in London, but we knew very well that he would be returning to greater duties and a grueling schedule in

Pasadena. Ken accepted the position. He took his role as a leader of the firm seriously. At the office, Ken encouraged others and worked diligently to find openings for employees who were having difficulties in managing their responsibilities, but who might have success if their job description could be changed to better fit their strengths. He regularly turned down invitations for media appearances and sent the talented next generation to speak for the firm, enabling others to make a name for themselves.

On numerous occasions over many years, Ken would tell me that the firm had asked him to take on the obligation to be the lead portfolio manager for additional accounts after clients requested his personal attention. Although I thought he was already overworked, Ken would always say yes to additional responsibilities. It was part of his DNA to do what the firm asked of him.

Despite the demands of his job, Ken always made time for our family. Our daughter, Catherine, was born in 1989. We welcomed our son, Stephen, in 1991 after our move to California. It was very important to us that our children be brought up in a strong religious tradition, and we attended church as a family every Sunday at Trinity Presbyterian Church in Pasadena. Ken taught Sunday School and served as an elder, while I volunteered for mission activities and sang in the church choir. Ken and I both volunteered at the kids' schools. Ken was in charge of bedtime stories, made a weekly visit to Wendy's for burgers, and was the maven of math homework. Despite Ken's need to get to sleep early in anticipation of his 4 a.m. wake-up call, I often found him in our bedroom after he had retired for the night with one of the kids sitting on the bed and school papers scattered all around them.

Over the years, I focused on managing the children and meeting the needs of a busy household. In addition to volunteering at our church, I served on boards and committees in support of our children's schools and volunteered as a rehearsal assistant at the Los Angeles Children's Chorus, where I also served on the board. In 2022, I joined the board of the Cato Institute, where I worked to support programs such as the Sphere Education Initiatives for teachers seeking to promote civil discourse in their classrooms. Ken did not treat me as a secondary partner due to my lack of salaried employment. Instead, he fully supported my decision to be an "at-home-parent," and he made it clear that he valued and appreciated my efforts.

Beyond our immediate family, Ken has taken the lead in arranging care and comfort for all our relatives. For many years, our family spent considerable time visiting Ken's elderly Aunt Miriam in Florida. In 2008 we helped her move to Georgia, and in 2010 we assisted her with another move back to Florida. She lived there briefly before we brought her to Pasadena in 2012, where she resided in a memory care facility near us. With help from Ken's brother and his wife, we oversaw Miriam's medical care and finances, taking care of many of her expenses ourselves. Later, we did the same for my father. Ken was also dedicated to the well-being of his own parents. We are grateful that my mom is still with us, and that she remains mentally sharp, but we likewise spend a lot of time and effort making sure that she has everything she needs. We do

these things because it's simply who Ken is – someone whose instinct is always to care for others before himself.

Only a few short weeks after the tragedy of 9/11, the father of one of Ken's closest childhood friends passed away. Everyone was frightened of what other terrible things might happen in those early days, but Ken booked a flight and navigated from Los Angeles to Syracuse, New York as fast as he could. One of his high school friends saw him walk into the funeral parlor for the evening service and burst into tears. "Kenny's come all this way," she said. It's part of Ken's loyal disposition that he always shows up for his family and friends. Ken has always been humble, never looked for or expected any special treatment, and gives attention and respect to all. Every person of his acquaintance knows that they matter to him.

Our world was turned upside down on October 20th of 2023 when Ken was told that Western was investigating his trade allocation practices. As the internal investigation turned into an SEC investigation and then a DOJ SDNY investigation, living any kind of a "normal" life became impossible. Both of our children moved back in with us for a time. Our daughter, Catherine, and her husband, Nicolas, worked hard to encourage us. Our son-in-law, a new American citizen, was born and raised in France, and has been as stalwart and caring as our own children. Spending time with our grandchildren, GD and OD, has been one of the few things that reliably shines a light in the darkness that has surrounded us. Our son Stephen immediately put his own life on hold and became an indispensable point-person, explaining the arcane world of bonds to our lawyers, navigating oceans of math and statistics and helping me to bolster Ken's spirits to a level where he might be able to emerge from deep shock and depression. I resigned from all my board and volunteer activities, simply because I no longer had time to do anything other than respond to the relentless and massively time-consuming demands of the investigation and legal proceedings.

When we received the information that the SDNY was going to indict Ken for federal crimes, we were sickened and terrified. We spent the night before Ken's first court appearance trembling and holding hands as we lay awake waiting for dawn. Watching him stand in the courtroom, so resolute and pale, is a vision permanently embedded in my memory. It felt surreal and difficult to believe anything so dreadful could be happening to Ken before my eyes. That was by far the worst 24 hours of our lives; in some ways more devastating and harsh than the times we suffered the loss of relatives or friends, harder to endure than the night we tearfully prayed while our daughter went through a high-risk labor and delivery, worse even for me than the days and nights that my mother and sister and I sat with my father while he lay dying. These previous devastating events, as awful as they were, unfolded as part of what we humans have no option but to endure. But the accusations against Ken are contrary to everything that I have ever known about my husband.

Since the indictment, Ken and I have both lived a life in which "all joy is darkened." (Isaiah 24:11). Food and drink are necessary but no longer part of happy occasions. The methods and

demands of official investigations and prosecutions have separated us from friends and colleagues. With Ken's passport taken away, we have lost the ability to attend various events and family gatherings, and we have suffered separation from ailing friends who are unable to travel. Ken, who for years has strictly limited his alcohol consumption, has begun to medicate himself with alcohol. There are many nights when his allergies and other health issues cause him to cough continually, and I fear for further damage to the unhealthy area of his throat.

In my heart, I know my husband to be incapable of conceiving of or participating in a "scheme." Over the 46 years I have known him, I have never once witnessed Ken do or say anything that would give him an unfair advantage over anyone else or in any way harm another person. Ken's integrity shines, and virtually every person who has ever dealt with him will attest to it. Yet every aspect of our lives has been placed under examination. The accusation alone brought massive destruction. Career, gone. Company, shrunken beyond recognition. Old friends losing their jobs. For almost three years now, Ken has rarely been able to sleep through the night. Restful slumber doesn't come easily to me, either – that's putting it mildly. We often spend hours awake in desperate apprehension of what is to come. Ken and I struggle as we conduct our constrained lives in a shadow world, living behind a curtain of agonizing pressure. Without our belief in God's goodness, we could not have endured the unremitting pain that is present in our consciousness every minute of every day. We steadily offer prayers that the Lord will lead us to serve in the ways most pleasing in His sight and that He "will uphold [us] with [His] righteous right hand." (Isaiah 41:10).

Ken has cared for his family and his friends in every way possible and served his clients and colleagues with self-effacing commitment over the course of a lengthy and steadfast career. Though the intensity and time commitment required by his work life was extraordinarily demanding, Ken always put his family first, and I have been blessed that the good Lord sent me an extraordinary man who placed his family's happiness and well-being at the center of his life.

I humbly request that, as you make your decision, you take into account the nearly three years that we have spent in a wilderness of exhaustion and emotional devastation, Ken's abject and permanent suffering, and the lasting physical toll this has taken on his health. I would also implore you to consider my husband's lifetime of dedication, hard work and loving care for those around him, and his heartfelt desire to serve God's purpose here on earth.

Thank you for taking the time to read this letter.

Respectfully,

Eileen Stueck Leech

Eileen Stueck Leech
[redacted]

# Exhibit 3

September 15th, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse 500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods,

My name is Catherine Emily Leech Dovetta, and I am Ken Leech's daughter. I am 37 years old and live in Pasadena, California with my husband, Nicolas, and my two young children, [redacted], age 3, and [redacted], age 1. My father is a good, kind, and generous man who is a gift to our family. I am aware that he has recently pled guilty to obstructing a federal investigation, and am writing to illustrate elements of his good character in hopes that you will take these positive qualities into account when determining his sentence.

My father is incredibly kind and generous with his time, energy, and resources. Despite waking up at four in the morning and spending every spare waking minute in service to his company and his clients, he always made time for our family and for me. When I was five years old, I failed a school test that involved catching a beanbag and walking on a balance beam. The next week, I came home from school to find a balance beam in our backyard. My father then practiced the balance beam and the bean bag toss with me every day when he got back from work. For months, it became our daily ritual. He patiently coached and encouraged me across the beam, and then we played catch until the sun set and it was time for dinner. He believed in me, and that helped me believe in myself. I ended up passing the test with flying colors.

As the years went on, I learned unequivocally that I could always count on my father's help and support. In everyday moments, he was just as willing to lend me his time and attention as he was during our balance beam and bean bag toss sprint. One notable example is that I could always count on him to help me with my math homework. There are people who intuitively understand math, and then there are those who can understand it only after lengthy study. My father is in the first category. I am in the second. However, no matter how tired he was or how silly my mistakes, he would patiently and good-humoredly look over my problem sets. I would make corrections while sitting next to him as he read one of his many reports and he would check my work again and again until I understood the material.

He was similarly there for me when things did not turn out the way I hoped. When I was eleven, I auditioned for a premier ensemble in the Los Angeles Children's Chorus. I had spent the last three years working toward this goal, so I was very invested in the outcome. Unfortunately, I didn't get in, and I was devastated. Dad held me as I cried, and even picked me up and rocked me, in a way he hadn't since I was little. He didn't try to fix it for me, but held me and felt my pain. I was embarrassed to face my friends in the chorus who would be moving up to the next level, but knowing that I was loved and

accepted by my family, particularly my father, allowed me to keep singing in the choir and broadening my musical skills; something I adored then and continue to enjoy now.

Dad was also willing to support me when my plans ran counter to his own wishes, at least in the short term. As an adult, I found myself struggling with a conflict between my desire to stay close to my family and my hope to build a life with my significant other, now my husband, who was working abroad. I had the opportunity to live with the love of my life in Paris, but I was worried about the impact that might have on my family, especially my father, who had always wanted me to stay close. Finally, after a long conversation on some other topic, I admitted to Dad that I was considering moving to France. He took a long pause, then looked at me and said, "Honestly, Scooter, I don't know why you haven't already." Even when my decision might have caused him pain, he was still willing to give me the support I needed to spread my wings and fly away.

My husband and I have now been married for seven years, and moved back to California in 2021. Since our son was born in 2023, I have had the privilege of seeing the same generosity and care in my father as a grandparent. This past Christmas, he tirelessly walked my daughter, OD, up and down my parents' hallway while she screamed like a banshee, attempting to soothe her to sleep. No task is too menial for him, whether it be helping me to change a diaper or entertaining my son for a few minutes so that I can go to the bathroom. In Spring 2024, when my son GD was 14 months old, my father traveled with us to Augusta, Georgia for my cousin Caroline's wedding. Over the course of two flights and a two-hour layover, Dad participated in countless diaper changes, some of which were handled over both of our laps, and many other child care tasks over the course of our long journey. This case has taken an enormous emotional toll on my father, however even in this difficult period, he has gone above and beyond to help me with my children. Every time I ask, he offers with kindness and good humor.

Not despite but because of his dedication to work, it was important to Dad to intentionally prioritize our family. He rose at 4:00 a.m. for the markets and often stayed up late with printed reports, yet he always made it home for our 5:00 p.m. family dinners. Every year, he planned family trips so we could spend time together, notably bringing us to almost every national park. Dad is a lifelong lover of history and loved telling us stories from his broad base of knowledge. He also took a full week off work to tour East Coast colleges with me, turning what could have been a purely educational trip into one of my most cherished memories, complete with many humorous campus info sessions and a father-daughter evening seeing Wicked on Broadway. For my 18th birthday he planned an entire Dodgers outing for my friends and me; tickets, transportation, food, refreshments, and even hats, then sat in a different section for the whole evening, checking in on us every few innings to make sure we had what we needed.

My father's kindness and generosity with his time and energy extended to others in our family as well. He loved his parents and called them every Sunday without fail until they passed. His mother, my Nana, loved to tell the story of how when he was a young boy, he spent his first paycheck as a paper boy on a fish-shaped vase for her for Mother's Day. He had seen it in a shop window on the way home from school and decided she had to

have it. The vase still has a place of honor in my parents' house. He also invited his parents and his in-laws to stay with us every third month both to encourage their relationships with our family and to shelter them from the cold, east coast winters. When he was in college, he would regularly travel from Pennsylvania to Delaware to see his Aunt Emily, his father's cousin and adopted sister, to spend time with her and to enjoy their shared passion for bridge. Later, he moved his Aunt Miriam, his father's sister, from Florida to California when she developed dementia and could no longer care for herself. He helped her manage her finances, and visited regularly. My father likewise spent long hours on the phone with his mother's sister, Aunt Polly, advising her how to invest her retirement and explaining her options. He also personally picked up Aunt Miriam and Aunt Polly from their respective homes and drove them to our house for special events and holidays. On one notable occasion, Dad carried Aunt Polly up the stairs after she fell three quarters of the way up.

At the same time, my father was deeply committed to his work. He took his responsibility to Western Asset and his clients very seriously, going home early from multiple hard-won vacations to help his team when the markets turned south. When the company's investments did not do well, he was often the one sent to fly to his clients' place of business to explain what had happened and field their disgruntled questions. Despite these confrontations taking an enormous toll on Dad, he made the trip every time because he believed in his clients' right to be angry about the performance. Dad achieved enormous success in his field, but he didn't take this to mean he was in any way superior to those around him. In fact, he would be the first to tell you how lucky he has been, and how much chance is involved in the outcome of any market decision, regardless of how much planning and expertise goes into it.

In addition to being generous with his time and energy, Dad is also generous with his resources. He feels a strong responsibility to give back to his community with what he has been given. In 2008, when major health challenges led Dad to contemplate an early retirement, he created a family foundation to support causes that are important to our family and our community. Over the years, the foundation has given grants to local charities, under-funded schools, and organizations seeking to increase human thriving on the national and global scale. To give one example, the foundation made a significant contribution to fire relief after wildfires ravaged the Los Angeles area this past year. My father in particular felt strongly that the foundation should give generously to our community in the aftermath of the disaster. In 2020, the foundation became large enough that my parents needed help managing grants and so they asked me to become involved. As an appendix to this letter, I have provided a brief description of the foundation's projects.

My parents give generously and often, through the foundation and personally. Another admirable element of my parents' generosity is that they do not seek any recognition for these efforts. In fact, they prefer to operate almost entirely under the radar. Most of our friends and family, unless they are involved with the organizations the foundation supports, are unaware even of its existence.

Your Honor, my father is a remarkable and good man. He is kind, generous, caring, humble, self-sacrificing, and morally upstanding. I am aware that he has pleaded guilty to obstructing a federal investigation before the Securities and Exchange Commission, but I cannot express to you strongly enough how completely this conduct is at odds with my lifetime of experience.

I beg you, Your Honor, to consider my father's extraordinary kindness, humility, and generosity when determining the appropriate sentence. He is truly the best man that I know, and he is precious to our family. I beg you to see the merits of his good character and to keep him safe. His loving and kind presence cannot be replaced, for me, for my family, or for my young children.

Sincerely,

Catherine L. Dovetta

**Catherine L. Dovetta**
[redacted]
Pasadena, CA [redacted]
[redacted]

## Appendix: Lazy L Foundation Summary

The Lazy L Foundation (the "Foundation") is a small, family-run foundation based in Pasadena, California. Its mission is to invest in human thriving through community support, education, the arts, and free enterprise. The recipients of its donations include local charities, under-funded schools, and organizations seeking to solve problems in our country and in the world. The original trustees, Eileen & Ken Leech, initially set aside a modest sum for charitable purposes in 2008. Since it was founded, the Foundation has supported over 70 organizations, including 27 local groups in the Pasadena area after the Eaton Fire ravaged the community this year.

Some of the Foundation's most significant donations and projects are described below.

### Pasadena Area Organizations

Door of Hope is a Christian non-profit organization serving Los Angeles County that assists families facing or at risk of homelessness by providing transitional housing, comprehensive support services, and targeted homelessness prevention programs. In 2020 alone, Door of Hope prevented homelessness for 227 families. Every year, the Foundation receives handwritten letters from families who have been saved from homelessness thanks to these donations. They speak of the relief and the dignity of having a roof over their heads, of getting back on their feet, and of planning for the future. One single mother of five wrote, "My children and I want you to know what a blessing your donation to Door of Hope has been to our family. With your support, we've been able to keep our home." This year, the Foundation made an additional donation to Door of Hope's Eaton Fire Housing Assistance Program, an emergency effort designed to help those who lost their homes in the fire.

Other organizations the Foundation supports in Pasadena and the surrounding areas include Young & Healthy, an organization providing free dental, medical, and mental healthcare to children and families from low-income households, Shabby Dog, a local animal shelter, and Huntington Hospital, a high-ranking hospital. In the wake of the Eaton Fire, the foundation also issued emergency donations to Young & Healthy and the Shabby Dog Rescue to help with the even greater population of children and creatures who need care.

This year, the Foundation responded to the Eaton Fire by administering grants for fire relief to organizations in the community, including schools and churches that were lost or damaged in the disaster. It donated to three charter schools, two public schools, three private schools, one Catholic school, two preschools, five churches, and one synagogue. It also donated to a senior center distributing resources to older adults who were affected. Finally, it issued grants to organizations helping with cleanup and ongoing recovery efforts, such as Altadena Search and Rescue, Sierra Madre Search and Rescue, and Samaritan's Purse.

## Organizations Beyond the Pasadena Area

The Foundation likewise supports organizations making a difference in their own communities. In 2010, Ken and Eileen read an article about a parochial school in Queens, New York, Ss. Joachim and Anne, that had taken in children of the families of their constituents affected by the earthquake in Haiti. Coincidentally, this was the same parish where Eileen's parents, Lois and Clifford, had been married 54 years earlier and where her paternal grandmother Florence taught the second grade. Many of the children at the school had relatives that had been killed in the disaster, and the school welcomed 22 displaced children to learn and shelter in their halls. Eileen and Ken were inspired by the school's generosity and have been sending them funds ever since.

The Foundation also contributes to a variety of organizations making the world richer through art and music. These include Sanctuary for Humanity, the Eliot Fisk Guitar Academy, the Huntington Library and Botanical Gardens, Art of Opera, and the Los Angeles Master Chorale.

In addition, the Foundation contributes to organizations that aim to solve problems on the national level, including the Institute for Justice (IJ), the Cato Institute, and the Atlas Network. All three organizations support individual liberty through a range of initiatives. The Institute for Justice (IJ), a non-profit public interest law firm, defends regular Americans pro bono when their civil rights have been violated. As part of its Zoning Justice Project, IJ is currently defending Lighthouse Christian Ministries against the City of Wenatchee's permit revocation in an ongoing effort to reopen a soup kitchen that once provided daily hot meals and support to hundreds of low-income and homeless residents.

The Cato Institute, a public policy research organization, recently created the Sphere Summit, a full-scholarship professional development program for grades 5–12 teachers, to improve civil discourse. Studies show American children begin polarizing politically around age 11. The program gives educators a chance to learn from experts across the political spectrum and gain strategies for teaching students to explore multiple sides of important issues.

The Atlas Network, a global organization that increases human flourishing by sharing knowledge and resources with entrepreneurs worldwide, lifts low-income communities out of poverty by putting the tools into the hands of the people who know their communities best. Across 29 countries in recent years, Atlas Network has helped over 405,000 people escape poverty. The Atlas Network now has nearly 500 partners in 103 countries, all working to lift up their communities through entrepreneurial success, economic freedom, and resistance to tyranny.

***

By growing the Lazy L Foundation through further giving and careful investment, Eileen & Ken's goal is to support these worthy organizations for many years to come.

# Exhibit 4

September 4th, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, NY

Dear Judge Woods,

My name is Stephen Leech. I am 35 years old and live in Pasadena, California. I am the son of Ken Leech, and I am writing today to tell you why having Ken Leech as my father is the greatest privilege of my life. He is a devoted father, kind to every person he comes into contact with, humble, and deeply generous. I hope you will take this letter into consideration as you determine my father's sentence.

As a child, despite the extreme demands of building a highly successful bond business, my dad was extremely attentive as a family man and a doting father to my older sister Catherine and me. Despite every weekday beginning at 4 a.m. and lasting twelve or more hours, and requiring additional hours of evening reading, there was never a time when I felt that my father was not deeply present in every facet of my life. From sharing his love of baseball with me, to helping with homework whenever my sister or I needed it, I cannot recall ever feeling like Dad wasn't completely and totally in my corner. When my older sister was just five years old, she declared that Dad's business trips should only ever last three days. However challenging that may have been for him, my father took the request to heart. From that point forward, my dad always made it home to tell us a bedtime story by the third night, rain or shine. No matter what, regardless of where he had traveled from, we could always count on him to come into our shared childhood bedroom and tell us a nighttime story. These included made up stories, a night on every President of the United States, and some incredible stories that only later in life did we discover were actually the plots of famous movies.

His constant presence extended past our childhood and continues to this day. Dad was never one to force anyone to take his advice but always there to offer sage wisdom whenever anyone asked. Each night, Dad would ask us what we learned that day, listen and help us with any challenges we encountered. I could always count on Dad to help with issues from upcoming tests and essays to what happened at my water polo practice. We also received occasional lessons in macroeconomics and current financial events. Watching dad discuss markets, it always was clear just how deeply he cared about his job

and wore the strain of doing his best for his clients and colleagues. The only thing that surpassed that dedication to his work is his love and devotion to his family, and his desire to use his unique understanding of the markets to serve others.

Dad's generosity extends far beyond our immediate family. My parents have helped aunts, uncles, cousins, grandparents, and friends with all kinds of challenges, large and small. These good deeds take up immense amounts of time and energy, as well as financial resources. My parents are so humble about what they do for others that I am quite sure I still do not even know the half of it. What sticks out to me though are the many moments in time where that kindness has shown through. In one extremely rare instance when my dad wasn't available to help with homework, it turned out he was counseling a dear friend who was in the throes of a difficult battle with [redacted]. I also witnessed him help many family members and friends with difficult financial issues, particularly elderly relatives who struggled with the complexities of modern finances. I recall him spending hours on the phone with my late Great Aunt Polly whenever she had financial questions. Ever patient, he helped her safely navigate life into her late 90s, while also helping her daughters understand the decisions he helped Aunt Polly make and why those decisions were in their mother's best interest.

Over time, our similar intellectual interests led me to become interested in financial markets. While Dad always lights up explaining bonds and complicated economic and financial topics to anyone who asks, not once did I feel any pressure to follow in his footsteps. However, his pursuit of wisdom and excellence, while treating everyone the right way, instinctively was a path that I wanted to follow. Therefore, upon graduating from Emory's Goizueta Business School and briefly working on Wall Street at the Royal Bank of Scotland, I moved back to Los Angeles to work at a direct competitor of Western Asset.

At that firm, I learned so much about my dad's life that I never could have understood otherwise from solely understanding him as an incredible father. My hours in that position, which required being in the office when markets opened in New York and lasted well past the market close, were grueling. This made it clear to me how impossible and unbelievable it was that he had managed to make nearly every water polo match, school function, and performance of my sister our entire childhood.

Working at that other firm, I also saw that my dad's role at Western was equivalent to two or three senior-level jobs at my own firm. While my firm had a very busy CIO as well, the best way I can describe the difference is that the firm's CIO is the head coach who is in charge of directing firm strategy, managing the people, and dealing with clients. However, Dad was both the head coach and quarterback at the same time. This meant that in addition to directing strategy, managing people and answering client questions, he also led the actual

implementation of interest rate strategy across the firm while also dealing with the associated account management that most others at his level would have long since left behind. Not to mention a whole host of management, client and business responsibilities across many products that came with individual account management. Despite this absolute mountain of responsibility never once did I hear him complain about the workload or weight that was on his shoulders.

A few years ago, I started my own investment firm that I still run today. Thus far, in the thirteen years I have spent in the highly demanding world of Wall Street and investment management, I have never once encountered a person with a negative thing to say about my father. In fact, it is always quite the opposite. The kind words arrive from many corners. Most notably, many former Western employees who had left the firm for a variety of reasons always went out of their way to seek me out to say glowing things about how Dad had treated them when they had worked for him. I also recall being on my firm's trading floor when Western won Morningstar's Bond Manager of the Year for their Core Plus Product. The third ranking member of the entire investment department sought me out to tell me, "If the award was not going to go to us, I am glad it is going to him." Despite the consistent kind words that others from the industry heap upon my dad whenever they come across me, Dad remains too humble to accept even a small part of the glowing praise I get on his behalf.

Throughout my career but particularly since starting my own firm, whenever I would get on the phone with Dad, he always wanted to know what I was thinking about in markets, and what business issues I was encountering. The next topic would almost certainly be the family and if there was anything Dad could assist me or anyone else in the family with. These gracious offers included things like flights to a family friend's wedding or funeral, hotel rooms or meals for visitors coming into town, or advice to friends of mine going through challenging work issues they had not encountered before. Only after all of these topics and the Yankees (his team) and Dodgers (my team) recent scores were discussed could I try and move on and be a sounding board for him for market or business challenges he was facing. By pure virtue of his role and the size of Western Asset, these challenges were invariably far larger than my own. Always humble and a man of few words, dad always cared most about what actions he can take to help his family, his clients, his colleagues, and his friends and acquaintances. Not once in my life, have I ever seen my father act in a self-centered way at the expense of another person.

I was present in your courtroom when my father pleaded guilty to obstructing a proceeding of the Securities and Exchange Commission. This letter is not the place to discuss my staunch beliefs about the government's case. There is a reason I have spent nearly every

day for the last three years supporting my father and helping my mother throughout this investigation and proceedings. In many ways, I placed my life on hold for nearly three years to help my father defend against the allegations put forward by the government and come to his defense. At two different points, I even moved into my childhood bedroom for months at a time so I could be on call and supportive 24/7. This was not an insignificant commitment, and yet, I would do so again in a heartbeat. The reason is that my dad is the greatest man I have ever known. Nothing about the allegations levied against him or his guilty plea has dissuaded me from that unwavering conviction. I hope and pray that you take this testimony into account when you consider the appropriate sentence, and grant as much leniency as the Court deems just.

Respectfully,

Stephen K. Leech III

# Exhibit 5

The Honorable Gregory H. Woods

United States District Judge

Southern District Of New York

Daniel Patrick Moynihan U.S. Courthouse

500 Pearl Street

New York, New York 10007-1312

Dear Judge Woods,

I am writing on behalf of Ken Leech regarding his recent guilty plea, with the hope that this letter provides helpful context for his sentencing.

My name is Liza Agregado, a resident of Pasadena, CA. I was employed as a travel coordinator for the various offices of Western Asset Management Co. for 25 years, starting in August 1998 until my retirement at age 62 in 2023. In this role, I handled both corporate and personal travel plans for the company.

My relationship with Ken is strictly professional. Over the many years, on the few occasions I made mistakes with his travel arrangements, he was always incredibly understanding and forgiving. His kindness and patience in those moments truly meant a lot to me.

Ken has always struck me as a person of quiet character; thoughtful, humble, and leads by action rather than words. Every interaction I had with him was pleasant and congenial, and he was always approachable and respectful.

Another quality I have long admired is his dedication. He was often one of the first people to arrive at the office, demonstrating a strong work ethic and commitment to his responsibilities. He possesses a servant's heart—always willing to contribute and support others without seeking recognition.

Throughout my tenure, I saw Ken as a key member of the leadership team who carried himself with professionalism and integrity. He was a main part of the team that took the company to great heights, and I truly value his contributions to our success. He earned my respect not through grand gestures, but through his consistency, humility, and the example he set every day.

Thank you for your time and consideration.

Sincerely,

Liza Agregado

[redacted]

Pasadena CA [redacted]

# Exhibit 6

Kathleen R. (Kathy) Aicher, VP Alliant Retirement Consulting
[redacted], Altadena CA [redacted]
[redacted]

July 22, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

Re: Sentencing of S. Kenneth Leech II

Dear Judge Woods,

I am writing this letter on behalf of S. Kenneth (Ken/Kenny) Leech II to offer my perspective on his character as you prepare for his upcoming sentencing. I have known Ken since 1992, when I joined Western Asset and have maintained a friendship with Ken and Eileen all these years since leaving Western Asset. While I am aware of the events that led to his guilty plea regarding obstruction, the Ken Leech I know extends far beyond this legal proceeding.

Over the time I have known Ken, I have consistently seen a man defined by his humility, respect for others, kindness, generosity both professionally and personally and overall genuine concern for people's wellbeing – in addition to being a very present father and husband. As a junior person on the compliance team at Western Asset – Ken was always available for a question or clarification; while we worked together – Ken was generous with his time and never made anyone feel less than or that their question was insignificant.

One unique experience Ken and I share and a relationship that deeply impacted us both, was with our dear friend Ed Moody (retired Western Asset employee). Ken and Ed's relationship pre-dates mine – but through the decades and up until Ed's passing in 2015 – Ed Moody remained both Ken and my dearest friend. And to that end – Ken and I were the only 2 non-family members asked to speak at the church services for Ed. A day that was incredibly difficult for me to manage the grief and reconcile the enormous loss. And in his uniquely kind, gentle and unassuming style – the person who gently coached me through the sadness and reminded me of how truly lucky we were to share this incredible friend – was Kenny Leech. I will never forget that day sitting in the church as hundreds of people filed in – there was Ken holding us all up in his strength of character, profound words, getting us to laugh a bit and paying tribute and respect to a

man he loved very much.  Through the pain, through the tears – Kenny's words, inflection and sentiment gave each of us comfort and allowed everyone to start healing from this tragic loss. That is Kenny…always there for others…a man of strong character and a deep sense of compassion.

In my experience with him, Ken has always demonstrated a profound commitment to his family, friends and colleagues**.** I was deeply saddened to learn of his recent guilty plea, as it stands in stark contrast to the man of principle and respect that I have known all these years.

This entire ordeal has been incredibly humbling for Ken, and I know he deeply regrets the disappointment it has caused his family, friends, his peers, and the broader financial community. I am confident that this experience, while difficult, does not define the totality of his life or his character.

I respectfully ask that the Court consider his long history of good deeds, his character, and his genuine remorse when determining an appropriate sentence.
Thank you for your time, attention, and the careful consideration you give to this matter.
Sincerely,

DocuSigned by:
F87420D09E1A446...

**Kathleen R Aicher**
Former colleague and friend

# Exhibit 7

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods:

My name is Dan Alexander, and I am a Portfolio Manager at Western Asset Management. I joined the firm in 2004, fresh out of college, and have known and worked alongside Ken Leech for more than twenty years. During that time, I have worked in both the Risk Management and Investment Management departments, serving as a Risk Analyst, Portfolio Analyst, Trader, and now Portfolio Manager. I am writing this letter to share my firsthand observations of Ken's character and the impact he had on me and many others at Western Asset. I recognize that Ken has pleaded guilty, and I hope my perspective will be helpful as the Court considers his sentence.

Over two decades, I had the opportunity to observe Ken interact with employees at every level of the firm. Despite being one of the firm's most senior and respected investment professionals, he was consistently humble, approachable, and respectful. One example that stands out was the firm's annual celebration for employees who earned the Chartered Financial Analyst® designation. Ken always made a point of attending, congratulating each recipient, and speaking to the group. Rather than focusing on his own accomplishments, he would candidly discuss the challenges facing the markets and the investment team, emphasizing preparation, humility, and continuous learning. Even during years of exceptional investment performance, I never saw him boast or seek personal recognition.

Ken's work ethic was equally remarkable. I always took pride in arriving at the office early to prepare for the trading day, yet Ken almost invariably beat me there. Whether it was an ordinary weekday, a Friday before a holiday weekend, or a particularly demanding period in the markets, he was already at his desk, fully engaged. His dedication and consistency set a standard that many of us quietly tried to emulate.

As a trader, I had the opportunity to interact with Ken regularly. He would often stop by my desk to ask about developments in the investment grade credit market. We would discuss current market conditions, debate investment ideas, and talk through opportunities that could meet the specific objectives of his client portfolios across a variety of strategies. I was always impressed by Ken's ability to synthesize new information, understand market conditions, and thoughtfully evaluate investment opportunities. Yet what I remember most about those conversations was not his intellect, but his personality. They often ended with Ken teasing me that his Yankees had just beaten, or were about to beat, my beloved Oakland Athletics. Those moments reflected someone who, despite his senior position, genuinely enjoyed connecting with colleagues in an authentic and unpretentious way.

One quality that consistently stood out to me was Ken's humility. During discussions about prior investment periods, he never looked to assign blame when an investment had not worked out as expected. Conversely, when discussing successful investments, he was quick to recognize the contributions of analysts, traders, and other members of the investment team rather than taking credit himself. I found that especially meaningful given his position within the firm. That approach fostered an environment where people felt

comfortable sharing ideas, learning from mistakes, and celebrating one another's successes. In my view, Ken played an important role in creating the collaborative, open, and respectful culture that defined Western Asset.

Ken also had a way of making people feel valued. Throughout more than twenty years, I never witnessed him belittle, yell at, or demean another employee. Regardless of title or seniority, he treated people with professionalism and respect. Employees celebrating significant milestones with the firm, whether five, ten, fifteen, or twenty years of service, would find a commemorative gift and a personally signed card from Ken waiting on their desks. It was a simple gesture, but one that reflected his appreciation for the people around him.

During my career, I had opportunities to pursue positions elsewhere. One of the reasons I chose to remain at Western Asset was the opportunity to continue learning from leaders like Ken. Beyond his deep investment expertise, I valued the culture he helped create, built on hard work, humility, intellectual curiosity, and mutual respect. Those qualities had a meaningful influence on my own professional development over the past two decades.

Over more than twenty years working alongside Ken, I came to know him as someone whose defining qualities were integrity, humility, respect for others, and accountability. Based on my firsthand experience, the conduct to which he has pleaded guilty is fundamentally inconsistent with the person I have known throughout my career. While I recognize the seriousness of these proceedings, I respectfully ask that you consider the character and decades of conduct that I personally observed as you determine an appropriate sentence.

Thank you for your time and consideration.

Respectfully,
Dan C Alexander
Dan Alexander

# Exhibit 8

Keith T. Anderson
[redacted]
Washington, CT [redacted]

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods:

I am writing on behalf of my longtime friend, Kenneth Leech. I understand that Ken has pleaded guilty to obstructing a proceeding before the Securities and Exchange Commission, and I respectfully ask that you consider my perspective regarding his character as you determine an appropriate sentence.

My name is Keith Anderson. I have spent my career in the investment management industry, including serving as Chief Investment Officer at BlackRock, where I was also one of the firm's founders. I have known Ken for forty years.

Ken and I first met in 1986 as young employees at First Boston. Over the years, our relationship grew into a close friendship. Professionally, we eventually became competitors, with Ken serving as Chief Investment Officer of Western Asset Management while I held the same position at BlackRock. We competed intensely for clients, talent, and performance, yet throughout those years my admiration for Ken as a person never changed.

One of the reasons I believe my perspective may be helpful is that I have known Ken in many different settings. I have watched him as a colleague, a competitor, a husband, a father, and a friend. I have celebrated birthdays with him over many years and had the privilege of attending the wedding of his daughter, Catherine. Those occasions revealed the person behind the successful executive—a devoted family man who took enormous pride in his children, treasured his friendships, and was fully present for the people he loved.

Although Ken achieved extraordinary professional success, that has never been what most impressed me about him. What has always stood out instead is his character. During the four decades I have known him, I have consistently found him to be thoughtful, generous, dependable, and deeply loyal. He treated people with respect regardless of their position or status, and he developed lasting friendships because people trusted him.

I also witnessed the respect Ken earned throughout our industry. I was proud to attend his induction into the Fixed Income Hall of Fame, an honor reflecting the esteem in which he was

held by his peers. While I understand that professional accomplishments do not excuse criminal conduct, I believe they are part of the broader picture of a life that, until this chapter, was marked by decades of dedication, leadership, and meaningful contributions.

Based on everything I have observed over forty years, the conduct to which Ken pleaded guilty is wholly inconsistent with the man I have known. It is not the person I have worked alongside, competed against, or called a friend. While I fully recognize the seriousness of his offense and the importance of accountability, I also believe that a person's life should be judged in its entirety, not solely by its worst mistake.

I have every confidence that Ken will continue to be a devoted husband, father, grandfather, and friend, and that he will continue to make meaningful contributions to those around him. I respectfully ask that you take into account his lifetime of good character, his acceptance of responsibility, and the countless positive ways he has touched the lives of others when determining his sentence.

Thank you for considering my thoughts.

Respectfully,

Keith T. Anderson
[redacted]

# Exhibit 9

September 1, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods:

In the wake of Ken Leech's guilty plea in June, I am writing to request that his sentencing be treated with the greatest leniency.

I am an attorney and retired from the Verizon legal department in Washington D.C. after serving as a contract manager for the company's Fios TV franchise agreements with municipalities in four states.

I have known Ken since 1981. His wife, Eileen Stueck Leech, is a fellow alumna from Mount Holyoke College and a close friend. I was a participant in their 1985 wedding.

In those forty-five years, Ken has been one of the finest people I have ever known: brilliant, hard-working, and a dedicated husband, father, and grandfather.

A deeply devoted family man, Ken and Eileen raised their daughter Catherine and son Stephen to be grounded and respectful. Ken and Eileen were generous with education, experiences, and values, but their children were not showered with expensive gifts. They were raised to be hardworking, not entitled. They had to share an old Nissan (a "beater") in high school.

Unlike some of his media-hungry peers in finance, Ken avoided the spotlight. In their private life as well, Ken and Eileen have been known for their generosity and quiet philanthropy.

For this reason, I was shocked by the charges and, later to the acts for which he has pleaded guilty. They are incongruous with the man I know well. Ken's life is based not on greed, but on generosity and devotion to family. His professional success at Western Asset is well documented, and his reputation in the finance world of character and integrity well-earned. It is inconceivable that he would do anything to endanger his reputation or his family.

The financial services industry is based on trust. The image posed by this case robs Ken of this fundamental element. His life and decades of work belie that false image.

Ken Leech has been robbed of both his livelihood, and his reputation:

> Who steals my purse steals trash…he that filches from me my good name
> Robs me of that which not enriches him
> And makes me poor indeed. (3.3)
>
> Othello, Act 3

For this reason, I add my voice to those asking for your consideration of his exemplary life in sentencing. You cannot restore his reputation, but your leniency can grant him grace, and the freedom to resurrect it.

Thank you for your consideration, Judge Woods.

Respectfully,

Louise Tucker Anderson

Louise Tucker Anderson
Attorney at Law
[redacted]
Arlington, Virginia [redacted]

# Exhibit 10

Bruce R Arnold
[redacted] / New South Wales AUSTRALIA / [redacted]

20 August 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods,

I am writing you in regard to the prospective sentencing of S Kenneth Leech II for his commission of the crime of impeding a proceeding of the U.S. Securities and Exchange Commission by having untruthfully described, during a deposition, how he allocated trades to different client accounts. Allow me to provide some information about Ken (as his family and friends call him) which I hope you find useful when considering the appropriate punishment for Ken's actions.

I have known Ken since the autumn of 1966, when we started seventh grade at Jamesville-DeWitt High School, in a suburb of Syracuse, New York. We have been fast friends ever since. Long before I met him, Ken had decided that he was going to be a portfolio manager, from an age when I was still deciding between astronaut, cowboy, and fireman. His plan was to attend the University of Pennsylvania's Wharton School. Not only did his plan never waiver, but it was big enough to include me as well. We both applied to Penn, and both of us were named Ben Franklin National Scholars — not bad for a couple of kids from a nondescript public school in the middle of snow country. This was Ken, bringing me along, making me better.

Ken did things at Penn that they had never seen before. In four-and-a-half years, he earned a bachelor's degree in American History, his undergraduate degree in finance, and an MBA, with the highest possible honours in all three programs. In his spare time(!), Ken brought a relative novice bridge player to the Philadelphia Men's Pairs, and they won — Ken bringing his partner along, making him better. I did not attend Penn/Wharton, but wish I had. For spending those years with Ken, matching wits on a daily basis, would have been an education unlike any other.

And from Penn/Wharton, Ken went into bonds — not the trendiest corner of finance in the late 1970s. His elementary school dreams were to run a stock portfolio, but I am comfortable saying that Ken ended up knowing more about bonds than just about anyone. And I am comfortable saying that, over forty-plus years, Ken was better at it than just about anyone. Two things, in particular, define his career. First, he did it for the love of the intellectual challenge — he'd be just as happy playing for matchsticks. Second, he was generous with his knowledge. Many people owe their livelihoods to what they learned at his side. Ken brought many along, making them better.

As I mentioned, I did not attend Penn/Wharton, but attended the hometown Syracuse University, followed by law school at the University of Virginia. Ken moved to New York to work for a bulge-bracket investment bank, while I was working in a big law firm. I left that for a software start-up, which failed. The door back to Big Law had closed, and I was at loose ends. Ken had recently married his bride Eileen and moved into a new apartment. Ken let me live in his old apartment, paying only what I could. And then Ken changed my life. There was a newly created position at his firm, which combined finance, law, and computer stuff, and Ken put me up for it. On the strength of his recommendation, I got the job. I turned out to be a decent investment banker, in no small part because my second-hand knowledge of bonds, just from being around Ken, was greater than most of my peers' first-hand knowledge from having been in the business. The firm eventually seconded me to the Sydney office, I have lived in Australia ever since. (As a postscript: after my career in investment banking, I returned for another degree, followed by a stint as the head of research at Australia's regulator of banks, insurance companies, and superannuation funds.)

Keeping a roof over my head, staking his reputation in order to give me a chance — these are uncommon acts of generosity. But even more uncommon is the fact that Ken never asked me to pay back rent, nor did he even seek gratification by telling anyone — or even reminding me — of what he had done. I know for a fact that Ken has made many, many similar acts of generosity (buying someone a house, saving a music festival), but I never heard of whisper of these from Ken. Those are other people's stories to tell, and I'm hoping some of these people share them with you.

Ken's generosity is more than just financial — it extends to what might be called emotional generosity. Just like he was willing to share his knowledge with his colleagues, he has always been willing to share his time and attention with his friends and acquaintances. In social settings, he is exceptionally adept at recognising those who feel left out. He is also exceptionally adept at showing genuine interest, building them up, making them feel "in".

There is a difference, of course, between generosity and charity. Ken and Eileen have given substantial sums to philanthropic, educational, and religious organisations, without a skerrick of pride or boastfulness. Again, I'm hoping that some of the people whose stories these are share them with you.

While I call myself Ken's friend, on multiple occasions (at least twice by my count, maybe more by his) I have made terrible errors which caused him considerable harm — errors of which I am still ashamed. Ken's reaction was to be more disappointed than mad. He understands human nature and human limitations, and accepts people for what they are, flaws and all. This is perhaps the most attribute of all: He has shown me, and many others, grace.

Perhaps the most remarkable thing of all is that in the 59 years that I've known Ken, I honestly can't remember a single time when anyone within my earshot has ever said anything derogatory about him. Over the same period, I've heard *"He's a prince!"* more times than I can count. I'm sure

that you have read many sentencing letters that are, well, gushing. I can assure you, though, that the letters you receive about Ken accurately reflect what people think — what everybody thinks — about him.

Ken has committed the crime of obstructing an SEC investigation — a wrong which Ken acknowledges. I can attest, though, that it is completely out of character, and at odds with the honesty Ken has displayed over the entire time I've known him. When considering Ken's sentence, I respectfully ask that you consider the many forms of generosity which Ken has shown to me and many others, and the grace which he has shown me in particular. Please show Ken grace as well.

Very truly yours,

Bruce Robt Arnold

Bruce R Arnold

# Exhibit 11

# TRINITY PRESBYTERIAN CHURCH

3740 E. Sierra Madre Blvd. Pasadena, CA 91107


August 7, 2026

The Honorable Gregory H. Woods
United States District Judge Southern
District of New York
Daniel Patrick Moynihan U.S. Courthouse 500
Pearl Street
New York, New York 10007-1312 Dear

Judge Woods:

My name is Reverend Tiffany Ashworth, and I am the interim senior pastor at Trinity Presbyterian Church where Ken Leech and his family have attended for years. I live with my husband and two children in Pasadena, CA and have been an ordained minister for almost four years. Prior to becoming a minister, I was a public high school English teacher. I have been serving as the interim pastor at Trinity since mid-October 2025 and met the Leech family for the first time when I began working here. I am helping to lead the church through a discernment process of calling a new permanent pastor in the wake of their former pastor's retirement after 27 years of service.

Very soon after I arrived at Trinity, I learned about Ken's case and have recently heard the news that he has pleaded guilty to the crime of obstructing a proceeding before the Securities and Exchange Commission. I'm writing because I hope you will take this letter into consideration as you determine his sentence.

Ken faithfully attends church and gives very generously, though he has kept a very low profile at church since this case began. Even under tremendously difficult personal circumstances, Ken has remained a steady presence in our community and been faithful to his church and family.

When I first arrived at Trinity, there were several prayer gatherings happening for Ken and his family. I have gotten to know Ken's family and others in the church who have known him for over thirty years. Every person I speak with about this matter is devastated on Ken's behalf and has utmost confidence in his good character. Two pastors whom I trust told me on multiple occasions that Ken's character is above reproach. Both of these pastors have known Ken for over thirty years: the one pastor is Rev. Cyndie Crowell, and the other pastor is Rev. Michael Roffina. He served as Ken's pastor at Trinity, but also was a teacher at a school where Ken was on the board. Rev. Roffina told me how respected and trusted Ken is in all of the circles in which he's known him and said that the principal of the private school where Ken was a board member trusted him implicitly.


Phone: 626-510-6670 E-mail: trinityprespasadena@gmail.com

My own observations are that Ken is a dedicated grandfather, father, and husband, incredibly kind and humble, and very sincere in his faith. His reputation precedes him as a person of trustworthy character. Speaking as someone who is usually skeptical of those with immense privilege, I can honestly say that Ken strikes me as a man of integrity. When I picture Ken, I see him listening intently to my sermons or I envision his obvious joy as he bounces his grandson on his knee in the pew where he worships with his wife and family.

Thank you for taking the time to read this letter and consider its contents as you determine Ken's sentence.

Respectfully,

Rev. Tiffany Ashworth

Rev. Tiffany Ashworth
Interim Senior Pastor Trinity Presbyterian Church
3740 E Sierra Madre Blvd.
Pasadena, CA 91107
626-510-6670
[redacted]

# Exhibit 12

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, NY 10007-1312

Dear Judge Woods,

I write in support of Ken Leech.

My name is Peter Bachmann, former C.E.O. and Headmaster of Flintridge Preparatory School, a 7-12 independent school where I interacted closely with Ken Leech for 15 years, 2005 – 2020. During those years, I got to know Ken, his wife Eileen, and son Stephen extremely well. Stephen attended Prep from 2005 – 2009. Ken and Eileen were standout parents: full throated supporters of Stephen's water polo team, deeply engaged attendees and volunteers at school functions, and quiet, generous donors. Ken's modest demeanor, sly humor, and quiet kindness never failed to delight and impress.

Most importantly, I grew close to Ken during his formal and informal service to Prep's Board of Trustees from 2007 – 2020. He was a trustee from 2007 – 2013 (six year bylaw limit). For five of those years (2008-13), he served as Treasurer of the corporation and chair of our audit, finance and endowment portfolio committees. The Board bestowed upon Ken maximum fiduciary trust, a responsibility he discharged with impeccable expertise, insight, and propriety. At his best during a crisis, Ken personally saved the school's endowment in January, 2009 when equity markets were alarmingly low, and many trustees wished to cash out stocks and retreat to bonds. Despite being a bond specialist, Ken argued passionately to stay the course ("that's why we have a strategic plan"), a decision that has made possible equity growth in the ensuing decades.

Not only was Ken one of the most valuable trustees of my thirty year headship, but he was the one who kept the most devoted presence after his term was completed, and more than a decade following Stephen's graduation. From 2013 – 2020, despite serious personal illness and international commitments, he remained a non-trustee member of the portfolio committee, purely as a volunteer. His steady voice continued to calm the waters in uncertain times, such as March 2020 during the COVID outbreak.

A decade ago, the Leeches and I shared another passion: in 2014, Green Beret Scott Studenmund gave his life for his country in Afghanistan. I wrote of him in a book attended his service at Arlington, while Ken and Eileen spearheaded a fundraising effort on behalf of surviving soldiers.

Since my retirement in 2020, the Leech family and I have remained in touch, Stephen as a student in my 2023 adult education class, Ken and Eileen through common philanthropic interests. I consider Ken one of the finest, kindest men I have ever known, loyal to his family, his church, our school, and to me personally.

I respectfully request that you consider this context when making a sentencing decision. For forty years, I have asked students in my humanities class, including Stephen Leech, the question: What is the Good Life? Ken's example answers that question. I believe that Ken exemplifies a life well-lived.

Sincerely,

Peter Bachmann

Peter Bachmann
Head Emeritus
Flintridge Preparatory School
[redacted]

# Exhibit 13

Andres Sanchez Balcazar
[redacted]
[redacted] Geneva
Switzerland

July 20th 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods,

I am writing you regarding the sentencing of Ken Leech who has recently pleaded guilty to the crime of obstructing a proceeding before the Securities and Exchange Commission. I hope to provide a fuller picture of the person I know beyond this offense.

I have known Ken for the last 21 years; I reported to Ken when I joined Western Asset Management in London (UK) in 2004 and have counted him as a dear friend and mentor since 2011 when I left the company. After I left Western, Ken and I continued our professional and personal relationship, talking frequently about the markets and also our families and what was going on in our lives.

Over the last 25 years of working at the highest level in finance in the asset management industry, I have met many smart and impressive people. Few if any of those would match Ken in integrity, honesty, humility and commitment to others. Over his 40 year + stellar career Ken built a world class business, was at the forefront of financial thinking and made a lot of money for his clients. More importantly he built a beautiful family in Los Angeles with his wife Eileen even though they both are born and bred New Yorkers. In the 1990s, he went to Los Angeles to be an entrepreneur, joining a small company called Western Asset Management (now part of Fraklin Templeton) and leaving a well-established job as a trader in Connecticut. He was instrumental in transforming Western into one of the biggest and the best fixed income managers in the world. He has since consistently contributed to his community in Pasadena and his country, never forgetting his New York roots. Ken was part of that brilliant generation of bond managers that came out of First Boston and like many of them succeeded in building successful bond management businesses.

I worked with Ken when I was working in Western's London office and he was the CIO based in Pasadena. Around 2008, after taking a leave of absence to manage concerns about potential throat cancer, Western's CEO Jim Hirschmann asked Ken to move to London to help Western's global business since a new CIO had been appointed to take Ken's prior position. Ken never complained about not coming back as CIO and during that time when he was working in London, we became very close.

Our friendship was born out of shared intellectual interest in bonds and markets. Our

dialogue was constant. Ken was always interested in figuring out how to position our portfolios for long-term success, and I was very lucky to share my thoughts and learn from him. And our relationship turned into a real friendship. Ken got to know my family and I got to know his. When he would visit me, he would bring candies for my children and he would always ask my wife about how our family was doing, which showed to me that he cared about me as a person. When I was in California for work, he always invited me to visit him at his home, and that is how I got to know Eileen and his children Catherine and Stephen.

When Ken was in London, he cared a great deal about making the office more collegial, which was the culture that he had created in Pasadena when he was CIO in the early 2000s. Ken would bring coffee and breakfast for everyone in the office. He would also make himself available to everyone in that office, which was a difficult job because it involved hearing a lot of complaints. Even though I could tell that what Ken really cared about was managing the investments, he always made himself available to all of the staff because he was so dedicated to serving Western and doing the best for its clients.

As a manager, Ken was always the first one to take blame when his portfolios did not perform well, he was never shy to admit his shortcomings when that was the case, and he was always humble in front of the markets. Ken knew he was the firm's Chief Investment Officer and the buck stopped with him, and he never hid behind numbers, charts or stories. Performance and transparency were always first. During the 2007-2009 financial crisis he took the blame for the firm's portfolios poor performance even though we were all responsible for it, even for the performance that occurred when he was on medical leave in part of 2007 and 2008. He started all the meetings he chaired with a transparent assessment of our performance, "how are we doing?" He wanted clear, straightforward answers. In front of his clients (often the biggest pension funds, trade unions, insurance companies, sovereign wealth funds and endowments in the world) he would start his meetings with performance, always the starting point of the discussion.

Ken’s style is to lead by example, as his humble nature tends to make him feel uneasy about telling people what to do. He prefers to nudge people, and let them come to their own conclusions, rather than impose himself. He tends to trust people to a fault and give them leeway to shine. Although he is a great listener he also tends to be stubborn, he often said "often wrong, never in doubt." He applied this motto often when talking about his deep value investment style, he knew that getting the markets always right was impossible but also knew that he had to stand out from the crowd in order to have exceptional returns. This belief in staying the course made him one of the few active investors that survived and thrived both in the inflationary 1970s and the deflationary period from 1980 to 2020.

Most importantly, as a person, Ken is a family man, a fantastic friend and a contributing member of his community. He devoted his whole life to Eileen his wife, and his two children Catherine and Steven. As much as he loved the markets, he enjoyed even more the chance to connect with the people he cared about over a good meal.

He tried to remain low key, and he was never drawn to show off his wealth. He never pretended to know more or be better than anyone else. He drove the same 1990s Lexus for 3 decades, only yielding to buy a newer car when there were no spare parts to repair the old one. He still lives in the same house that he bought when he arrived in Los Angeles, making

some improvements as the family grew. He never suffered from vanity, making fun of himself when a press article would try to hype his personality or his professional achievements.

I was particularly moved when he sent me a box of very nice wine after he learned that [redacted]. He told me that, as my friend, the right thing to do would have been to visit me but that given the travel restrictions of the pandemic, he was sending me some wine to drink as the next best option.

Another example of Ken's character is the letter he wrote me when I left Western in 2011. Ken really wanted me to stay at Western. But when another opportunity opened up for me, he wrote a very graceful letter of recommendation to my eventual new employer. He didn't forget about me, and in 2022 he kept me in mind when he was looking for a portfolio manager to run the successful Macro Opportunities strategy. He convinced the then CEO of Western Jim Hirschmann to come over to Geneva and have lunch with me to try to talk to me about joining Western again. Even though I did not end up joining them, I was very flattered that he would consider handing over to me such a successful book of business.

I understand that Ken has pleaded guilty to obstructing an SEC investigation. Over the last three years Ken and his family have spent the best part of their lives defending him which I know has caused great pain and anguish for Ken, his family, and the colleagues at Western who he cares about so much. A severe sentence would have a very negative impact on his already deteriorated health, his family and his community. The career that Ken had before this case is effectively over. I would respectfully submit that he would serve society better by starting a new chapter in his life and using his unique skills to find a way to mentor and grow whole new generation of investors and analysts, contributing to his community and his country as he has always done. I respectfully ask that you consider my letter and be lenient when imposing a sentence on Ken.

Sincerely,

Andres Sanchez Balcazar

# Exhibit 14

Michael J. Bazdarich, Ph.D.
[redacted]
La Canada, CA [redacted]

August 6, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312 2

Dear Judge Woods:

I understand that Ken Leech has pleaded guilty to the offense of obstructing an SEC investigation. I am writing to provide background on Ken whom I have known for 37 years. I am economist, and I worked very closely with Ken first for 16 years when I was an economic consultant for Western Asset, then for 19 years when I worked full-time at Western, and for the last two years since my retirement in July 2024. I hope my input will be useful to you.

***Ken's Character and Modesty***. I have always been impressed with Ken's honesty, integrity, kindness, and modesty, alongside his considerable skills as a portfolio manager. As I am sure you are aware, portfolio management is a tough and extremely competitive business. Ken was as competitive as anyone, but he was also respectful of his competitors, of his colleagues, and especially of our clients.

Throughout my experience working with Ken, his focus was on attempting to outperform our competitors by having better research on both the economy and the individual corporations we scrutinized, not on inside information or other shortcuts. His intent was to build long-term investor relationships with clients by providing successful results over the long-term.

We worked hard to determine the near-term course of the economy and the fixed-income markets, but we were well aware that we would often be wrong in these determinations. If we were right more than often than wrong, that was probably as good as it gets, and we would prosper ***in the long run***. When we were right, Ken was quick to give credit to his colleagues and to thank our clients for having faith in us. When the markets went against us, he never castigated others, but stayed patient and tried to minimize our losses until better performance came our way. In such times, his only regret was his negative performance for the clients, that he had let them down, at least for the moment. Never mind the fact that he and we had long runs of successful performance prior to that and after.

When it comes to gimmicks that might provide short-term artificial benefit, in the bond market, the main thing that comes to mind is extolling one's position in the financial press, partly to advertise one's expertise and possibly to influence the markets (known as "selling your position"). Ken never did that.

His dictum to us was to avoid talking to the press. The only press contact I remember him having in 35 years with Western was when a financial magazine wrote a profile piece about him that he reluctantly consented to. His principle was to use our insights to the benefit of our clients, not for publicity and not for any ephemeral boost to our position from market reaction.

***My Working and Personal Experience With Ken***. I had started my own company, MB Economics, as an economic consultant in 1986, after having worked at the Federal Reserve, a commercial bank, and another economic consulting firm, Claremont Economics. I started consulting with Western in 1988 shortly after they were acquired by Legg Mason and moved to Pasadena from downtown Los Angeles. A colleague of mine at Claremont had joined Western and convinced them to hire my fledgling service.

Sometime later, I believe in 1989, I learned that Western had hired a new portfolio manager, who was a bridge player. I was asked if I was interested in playing bridge with the new manager, who was moving from the East Coast and didn't know anyone in California. That manager, of course, was Ken, and that was the beginning of our relationship.

We played bridge, but we also had great rapport in tracking the economy and what that meant for Federal Reserve policy and for interest rates. We worked closely on both for the next 16 years. As my office was just a 10 minute drive from Western's office in Pasadena, I would visit their offices regularly, always sitting down with Ken and going over what I thought was going on with the economy, how I thought the Fed would react, and how much interest rates might respond to those developments. It was initially from these sit-downs that I got to know Ken's work and how he dealt with colleagues and clients.

***Ken's Management Style as CIO at Western***. After I had consulted with Western for a few years, Ken contacted me and told me he couldn't play late-night bridge anymore, because of the "new job" he had. (Our duplicate bridge games on Tuesday or Thursday night would typically keep us up until 11:00 pm.) Only much later did I find out that his "new job" was as Chief Investment Officer. As part of his administration of that office, he had decided that portfolio managers should be in the office at their desks by 5:00 am Pacific time, in order to be up and running when the bond markets opened at 5:30 am (8:30 am New York time).

I mention this only because it illustrates Ken's humility. He never mentioned the fact that he was now running the investment side of the company. He acted with me and his associates just as he did before, and I found out from someone else that he was now their boss.

Gradually, my scope of work consulting with Western expanded. Eventually, I was working with them so extensively that they offered me a full-time position, in 2005.

Ken was stricken with a severe disease toward the middle of 2008. It was a malady of the throat. It is typical and descriptive of Ken that he never wanted to talk much of his ailment, so that at this point, 18 years later, my recollection of it is a little hazy. This illness caused Ken to take an extended leave of absence as CIO. While he was away, Steve Walsh, who had been Deputy CIO, took over as CIO.

After months of recuperation, Ken was healthy enough to resume work. Rather than demand a return to his old position, he was content to return strictly as a portfolio manager. In that role, he never meddled into Steve's operations as CIO and never criticized Steve's investment strategies, even though Steve and Ken had very different investment styles.

Steve himself took an early retirement a few years later, for family reasons. It was only then that Ken resumed the position of CIO. My point is that here too, Ken put ego and status aside to focus on the work, to serve Western and our clients. He was loyal and true to his colleagues, even when that meant returning to a lower-responsibility position than he held prior to his illness.

Ken told me once that just after the turn of the century, when Western's star was rising, there was a weekend corporate retreat attended by our Chief Executive Officer (CEO), Jim Hirschman, Ken as CIO, and Steve Walsh, the Deputy CIO. The topic of discussion at the retreat was whether Western should aim to become a large, global presence fixed-income manager or remain the largely boutique operation that it had established itself as in its 10-plus years of operation as a Legg Mason subsidiary. (Prior to the 1988 acquisition by Legg, Western was owned by First Interstate Bank.)

Ken's stated preference was that Western remain in the boutique niche where it had done so well. He did not need to be the head of a global investment firm. He was content to be the best portfolio manager for his clients that he could be. Jim and Steve had more global ambitions, and their wishes carried the day. Once that decision was made, Ken gave everything he had to that effort. I think this is a testament both to his humility and to his loyalty to the company. Corporate growth into global stature was not necessarily an ambition of Ken's, but he did his utmost to bring that about when it had become company strategy.

***Ken's and My Regular Discussions.*** I was in frequent contact with Ken both when I consulted for Western from 1989 to 2005 and as a product specialist in pension management and macro forecasting from 2005 through 2007. As principal economist for the firm from 2008 through 2024, I met with him at least once a week in person to discuss our views on the economy and the implications for interest rates and our investment strategy. Never once in any of those years did I ever hear him take credit for or congratulate himself when things were going well, not even in private between the two of us. However, he always took blame and castigated himself when things were going poorly. He never took success for granted and when it came, he was more likely to attribute to the contributions of others or to good fortune rather than to his own input.

He would express chagrin when other portfolio managers at Western complained that their own views or specialties were given less prominence in firmwide strategies than those managers wished. However, he never expressed any criticism of these managers nor did he ever make derogatory remarks about them.

Often during our conversations, a portfolio assistant would come in with questions about some of the positions or a request for various decisions. He always treated these assistants with respect and courtesy. He never complained about them interrupting him.

Our discussions regularly brought up issues of investment tactics in response to market gyrations. In my prior work forecasting interest rates with my own company, my sole effort was to get the direction right, up or down. Working with Ken at WA, I learned the importance of all the variations on that theme. It was not just whether rates were rising or falling, but also which portions of the yield curve were moving more or less than others and which segments of the non-Treasury fixed-income market were benefitting more or less: investment-grade corporate bonds, high-yield (junk) bonds, foreign bonds, and mortgages.

Running a range of very different portfolios with different benchmarks/objectives during turbulent market conditions, trading can get very wild, even confusing. If trade allocations were not documented in the moment, and if the trade allocations were not fully explained to the portfolio assistant when trading was over for the day, I would imagine that it would be difficult to exactly remember or piece together those allocations years later. I wonder if that was a factor in the conduct that has given rise to the offense to which he has pleaded.

I know that in popular fiction and in some investigative reporting, portfolio managers are typically portrayed as nefarious, egotistical shady-dealers. In my 47 years of experience working with investment managers around the world, I can say without hesitation that that was not my experience. A few managers I met had big heads, but the vast majority of them were conscientious and ethical. Of all of them, Ken is the finest person I have ever met in the investment industry. I would trust him with my fortune or my life without hesitation. I would ask you to take these character traits into consideration when you are making your sentencing decision.

Thank you for taking the time to read these recollections.

Sincerely,

Michael J. Bazdarich

Michael J. Bazdarich

# Exhibit 15

July 10, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods:

My name is Timur Bekbosunov, and I am writing to you regarding Ken Leech, who is scheduled to appear before you for sentencing. I am a Grammy-nominated opera singer and producer based in Los Angeles, California. I trained at the New England Conservatory and the University of Southern California, and have performed as a soloist with companies around the world, including the Los Angeles Philharmonic, Los Angeles Opera, Opera Philadelphia, and the Brooklyn Academy of Music. I serve as curator and producer of the International Opera Initiative at UCLA's Center for the Art of Performance, and I am a member of the Recording Academy, the Producers Guild of America, the Dramatists Guild and SAG-AFTRA.

I understand that Ken has pleaded guilty to obstructing an SEC proceeding, and I do not write to minimize that fact or the seriousness of these proceedings. I write only to share with the Court my first-hand experience of Ken as a person, in the hope that it may be of some help to you as you consider his sentence.

I have known Ken for the past sixteen years through Trinity Presbyterian Church. Over the years, I have seen his kindness expressed in countless quiet ways. One example has always stayed with me. Ten years ago, I was approached to take charge of creative affairs for ACE Pictures Entertainment, a Malaysian company with investment interests in film, music, and theater. I had a great many questions, and Ken was the person I turned to for guidance. He did not need to help me, and there was nothing in it for him, but he took hours out of an already demanding schedule to discuss over the matter carefully and walk me through it, simply because he cared about a friend and did not want me making a decision I might come to regret. I was, and remain, deeply grateful to him. That is the Ken I know: someone who always wants to help, who gives his time and attention freely to the people around him, expecting nothing in return.

I respectfully ask that you take this letter into consideration, and that you extend whatever leniency you believe is appropriate, when you determine Ken's sentence.

Thank you for your time and for considering my perspective.

Respectfully,

Timur Bekbosunov
[redacted]
Los Angeles, CA [redacted]
[redacted]

# Exhibit 16

July 16, 2026

The Honorable Gregory H. Woods

United States District Judge

Southern District of New York

Daniel Patrick Moynihan U.S. Courthouse

500 Pearl Street

New York, New York 10007-1312

Dear Judge Woods:

My name is Marzo Bernardi. I am 56 years old and live in Manhattan Beach, California. I am writing to you as a former colleague of Ken Leech, whom I came to know well over nearly two decades working together at Western Asset Management. I understand that Ken has pleaded guilty to obstructing a proceeding before the Securities and Exchange Commission, and I am writing to share with you what I know of Ken's character, in the hope that it may be useful to you as you consider his sentencing.

I joined Western Asset Management in 2007, and it was around that time that I first met Ken. For my first eight years at the firm, I was responsible for our Brazilian operations, and I would see Ken a couple of times a year, whether when he traveled to Brazil or when I visited the firm's headquarters in Pasadena. In 2015, I relocated to Pasadena myself to work at headquarters, and for the following eleven years I had a much closer professional relationship with Ken. I saw him regularly, often twice a week, in internal meetings and in meetings with clients. During this period, I served as Director of Global Client Services and Marketing, and I also participated regularly in Ken's weekly investment committee meetings, so I had a great deal of direct exposure to how he worked and how he treated the people around him.

Ken held one of the most senior positions in the firm, serving as Chief Investment Officer. Despite that seniority, what struck me most about him, over so many years and so many interactions, was how consistently he treated everyone with respect and humility. I witnessed this myself many times, and I also saw how our firm's clients valued the time they spent with him. He had a way of explaining his market views clearly and directly, without condescension, whether he was speaking to a senior client or a junior colleague.

In all my years working with Ken, my interactions with him were uniformly positive. He consistently showed integrity and genuine care for our clients, for our employees, and for the business. I also saw firsthand the admiration that Western's employees had for him, particularly

those who had worked with him the longest and knew him best. That kind of long-standing respect, in my experience, is not something people extend to someone they do not trust.

It was for these reasons that I was genuinely surprised to learn of Ken's guilty plea. Based on my own experience working closely with him, it did not match the man I knew, someone who always spoke candidly and held himself accountable in a humble way.

It is Your Honor's role to determine the appropriate sentence in this case. I would ask only that you consider what I have shared here about Ken's character in reaching that decision, and I respectfully ask for your leniency.

Thank you for your time and consideration.

Respectfully,

Marzo Bernardi

# Exhibit 17

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods,

I am writing this letter on behalf of Kenneth Leech. I have known him for over 20 years as a church member of Trinity Presbyterian Church in Pasadena, California, and as a friend.

During the time I have known Ken, I have found him to be a person of integrity, kindness, and responsibility. He consistently demonstrates respect for others and has always been willing to help family, friends, and members of the community when needed. In my position as secretary of his church I have personally witnessed Ken's dedication to his faith and church. He has been a generous with his time and talents to the benefit of Trinity Presbyterian Church both in worship and in leadership.

While I understand the seriousness of the matter currently before the Court, I respectfully ask that you consider Ken's overall character, positive contributions, and potential for continued growth. The acts to which he has pleaded are inconsistent with the behavior of the man I know. Based on my firsthand knowledge, I believe will continue to be a productive and responsible member of the community.

Thank you for taking the time to consider my perspective. I appreciate your attention to this letter and your service to our community.

Respectfully,
Eilley Brandlin
[redacted]
Temple City, CA [redacted]
[redacted]

# Exhibit 18

The Honorable Gregory H. Woods
United States District Judge
United States District Court for the Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods:

My name is Anthony "Tony" Britton Jr. I am a retired financial services executive who spent more than forty years in the institutional fixed-income markets. During my career, I worked closely with many of the largest institutional asset managers, banks, and dealers in the country and had the opportunity to know and observe many of the industry's most accomplished investment professionals. I respectfully submit this letter on behalf of Ken Leech. I understand that Mr. Leech has pleaded guilty to an offense, and I fully respect these proceedings. My purpose is simply to share my firsthand experiences with Ken over more than three decades so that the Court has a fuller understanding of the person I have known.

I first came to know Ken around 1990 while he was at Western Asset Management, a firm that had been a client of mine since the mid-1980s. Although Ken and I were not day-to-day business counterparts, our professional paths crossed regularly. My expertise was in the credit markets, while Ken specialized in rates and macro investing. Because those markets are closely interconnected, we periodically exchanged perspectives on developments affecting both sectors. While we did not transact directly with one another, Ken always welcomed thoughtful discussion and valued differing viewpoints.

Over the years, I interacted with hundreds of portfolio managers, traders, and investment professionals. Ken distinguished himself not only because of his intelligence and market insight, but because of the manner in which he conducted himself. He possessed exceptional intellectual curiosity and genuinely sought to understand perspectives that differed from his own. He was willing to challenge conventional wisdom, but always with careful analysis, humility, and a deep appreciation for risk. Conversations with Ken were never about winning an argument; they were about learning, understanding, and arriving at better conclusions.

Just as important to me was the way Ken approached relationships. The institutional investment business is built on trust. Reputations are earned over decades and can be lost in a single transaction. In my experience, Ken understood that enduring success depended upon treating counterparties fairly and maintaining relationships built on credibility, integrity, and mutual respect. He never approached business with a short-term, win-at-all-costs mentality. Instead, he recognized that successful long-term relationships require fairness and that all participants must have confidence in one another to best serve their clients. Those principles were consistently evident throughout the many years that I knew him professionally.

My admiration for Ken extended beyond his professional accomplishments when my oldest son, Tony, was a junior at Cornell University and obtained a summer internship at Western Asset Management. Ken had absolutely no obligation to devote his time to a college intern, yet he chose to do exactly that. He became a mentor, making himself available to answer questions, explain the markets, and encourage my son to think critically. My son often remarked that Ken's door was always open. For someone with the responsibilities

and demands that Ken carried, his willingness to invest his time in the development of a young person spoke volumes about his character. My son has never forgotten that generosity, and neither have I.

Based on my more than thirty-five years of knowing Ken, the conduct to which he has pleaded guilty is wholly inconsistent with the man I have known. The Ken I observed throughout my career was thoughtful, intellectually honest, generous with his time, respectful of others, and committed to building relationships founded on trust and integrity.

I respectfully ask the Court to consider these firsthand observations, accumulated over more than three decades, as it determines an appropriate sentence for Mr. Leech. I hope the Court will take into account the many positive qualities of character that I have personally witnessed throughout the years I have known him.

Thank you for your time and consideration.

Respectfully,

Anthony "Tony" Britton Jr.
[redacted]
Vero Beach, FL [redacted]

[redacted]

# Exhibit 19

**BRIAN P. BROOKS**
[redacted]
**PASADENA, CALIFORNIA** [redacted]

September 9, 2026

The Honorable Gregory H. Woods
United States District Court for the
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, NY 10007-1312

Re: Mr. S. Kenneth Leech

Dear Judge Woods:

I write as a longtime colleague and friend of Ken Leech, whom I have known for more than 15 years. I know that Ken has pleaded guilty to an offense, and I hope that my observations and experience of his character and integrity over many years can provide helpful context as the Court considers the next phase of proceedings.

I have spent my career in finance and financial regulation. Among other roles, I served from 2020-21 as Acting Comptroller of the Currency, leading the federal agency that is the primary regulator of the national banking system. In that capacity I also served as a board member of the Federal Deposit Insurance Corporation (FDIC) and a voting member of the Financial Stability Oversight Council. Before that I had served as general counsel of Fannie Mae, the largest source of housing finance liquidity in the United States, and later was appointed a member of Fannie Mae's board of directors. For the first 17 years of my career I was an attorney at O'Melveny & Myers, where I was managing partner of the firm's Washington, DC office and global chair of the financial services practice group. I am currently chairman and CEO of Meridian Capital Group, a large national commercial mortgage brokerage, and I sit on the boards of three public companies.

I first met Ken in 2010 when he was an independent member of the board of directors of OneWest Bank in Pasadena, California (OneWest). I had been engaged as outside counsel to the bank by Steven Mnuchin, the bank's chairman who had organized a group of investors to form OneWest to buy the assets of the failed IndyMac Bank from the FDIC. The FDIC and the Office of the Comptroller of the Currency (Comptroller) required OneWest to appoint two directors who would be independent of the bank's new ownership group. At the time I was engaged, Ken was one of only two independent directors; the other board members were either owner representatives or members of management.

On the basis of my later government service, I know that Ken had to undergo a

rigorous review and approval process in order to become an independent director of OneWest. This was also not a normal situation. By purchasing IndyMac's failed assets, OneWest would be working though the largest bank failure up to that time. Ken was a natural choice for independent director given his reputation and stature in the financial community of Southern California. In a time of immense crisis, the government signed off on Ken to help oversee a historic bank rescue.

In 2010 and 2011, OneWest and other large financial institutions were under review by the Comptroller and the Federal Reserve Board for foreclosure practices that predated the formation of OneWest (the so-called "robosigning" controversy and other default management practices). This review culminated in a regulatory consent order being imposed on 14 banks, including OneWest, which required the signature of all bank directors.

OneWest's two independent directors responded differently to the consent order. One of these directors resigned from the board and avoided having to sign the consent order and serve through the remediation process. Ken was very different. Ken saw it as his obligation as a director to sign the consent order and commit time and effort to the multi-year remediation process. This was vital to rebuilding the bank's core business to meet regulatory expectations.

When I joined OneWest as vice chairman, among other things my job was to lead our consent order remediation process. In that capacity I worked closely with Ken to develop and vet new procedures, new compliance frameworks, and a process for restarting our mortgage servicing operations in a way that would meet the new regulatory expectations for the industry. As chair of the bank's audit committee for a period of time, Ken had responsibility for overseeing the bank's internal controls.

I cannot emphasize enough what a thankless job this was; unlike the other board members, Ken did not stand to make significant income from a successful outcome for the bank, and the corrective actions he was responsible for overseeing primarily occurred before the ownership group took over the bank from the FDIC. Nonetheless, when the other independent director left, Ken remained in his post out of a sense of duty, and his personal work with me in that extremely difficult work taught me many valuable life and leadership lessons.

Along the way, the bank was presented with choices about how to accomplish the remediation required by the government. Ken consistently advocated for erring on the side of doing more rather than less; it was a "no shortcuts" approach. For example, one of the requirements of the consent order was that the bank had to complete a loan-by-loan review of all foreclosures initiated over the prior five years. Other banks chose to pay a civil penalty rather than do the loan-by-loan review. But Ken maintained the view that if we as new owners wanted to be known for our integrity after IndyMac's checkered past, we needed to complete the full review and deal with whatever the facts were. We were the only lender to undertake the full review and live with the consequences. The New York Times later published an article about the bank's decision and process.

Because of our time in the trenches there, Ken and I remained in close contact over the years. At one point, my then-college age son needed advice about launching a career in finance, and Ken was kind enough to spend time with him. Those formative experiences working in that

summer position led my son to launch a career in banking in New York, and as a father I will always be grateful that Ken extended such an opportunity to a young man when he had no obligation to do so and when doing so offered him no personal advantage.

Later, when I was publicly announced as the President's likely pick for Deputy Treasury Secretary (the number 2 position leading the Department of the Treasury), I sought counsel on the important financial policy issues facing the nation at that time, and Ken gave generous amounts of time to educate me on issues I might face in that position. He gave advice completely divorced from his own interests and the interests of his company, and instead focused broadly on challenges of the federal budget, global trade flows, bond-market signals for the future interest rate environment, and other items. He essentially gave me free access to a master class in macroeconomics for no reason other than to help me succeed in pursuing the national interest in high office.

I hope these experiences will underscore that, in our more than 15 year relationship, I have known Ken to be selfless and generous with his time, advice, and work. I have never personally observed him to seek self-enrichment or self-aggrandizement - his success instead flowed from his selflessness and sense of duty. I have always respected that and continue to do so.

I respectfully ask that you exercise leniency in sentencing.

Respectfully submitted,

Brian P. Brooks

# Exhibit 20

July 1, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

RE: Ken Leech

Dear Judge Woods:

My name is Gordon S. Brown. I worked at Western Asset Management from 2011 until my retirement in late 2025. I initially joined the firm as a Senior Portfolio Manager within the Global Portfolios Team, subsequently became Co-Head of the team alongside Ken Leech, and ultimately succeeded him as sole Head of Global Portfolios. I am writing in support of my former colleague, manager and close professional confidant, Ken Leech, whom I had the privilege of working closely with for approximately fifteen years.

I understand that Mr. Leech has pleaded guilty to the offence before the Court. I do not seek to comment on the circumstances surrounding that offence. Rather, I hope to provide the Court with my personal experience of Ken's character and the professional relationship we shared over many years.

During my time at Western Asset, Ken and I worked together more closely than almost anyone else in the firm. We jointly managed global fixed income portfolios, co-led the Global Portfolios Team for several years, and were the principal risk-takers across many of the firm's flagship global bond mandates. We spoke virtually every working day, often several times a day, discussing investment ideas, portfolio positioning and trade implementation. We also co-chaired the firm's Global Investment Strategy Committee, the principal forum through which regional and sector investment leaders debated and established the firm's macroeconomic and investment outlook. I worked alongside Ken in London while he was based there and thereafter met with him regularly in both London and Pasadena throughout my career.

As our careers progressed, our relationship evolved from manager and colleague into one of genuine professional partnership. Given the amount of time we spent working together, the responsibilities we shared, and the trust placed in us, I believe I came to know Ken as well as anyone at Western Asset from a professional perspective. Our relationship was built on mutual trust, constant communication and shared responsibility for managing tens of billions of dollars on behalf of clients around the world. I also spent many hours with him outside the office, including playing golf and in social settings, which allowed me to know him on a more personal level.

Throughout all of those years, I found Ken to be a person of integrity who consistently placed the interests of clients at the centre of his decision-making. In an industry where trust is fundamental, I always had complete confidence in his judgement and his commitment to doing what he believed was right for clients and for the firm. He earned my respect not simply because of his exceptional investment ability, but because of the way he treated colleagues and the confidence he placed in those around him.

One quality that particularly distinguished Ken as a leader was the trust he placed in his team. Although we often challenged one another's views—as experienced investors should—Ken was always willing to support a strongly held investment conviction when it was underpinned by careful research and clear reasoning, even where it differed from his own initial view. He encouraged independent thinking rather than conformity, creating an environment where robust debate was welcomed because it ultimately led to better investment decisions.

I vividly remember joining Western Asset in 2011 during the height of the European sovereign debt crisis. Ken, I and the rest of the Global Portfolios Team had barely had time to establish working relationships before we found ourselves managing through one of the most challenging periods in modern fixed income markets. Several of our positions, including significant exposures to Italian government debt, were under considerable pressure. Despite the uncertainty and the intense scrutiny that naturally accompanies managing large institutional portfolios in such conditions, Ken remained calm, analytical and collaborative. He encouraged open debate across the team, listened carefully to differing views, and ultimately supported our collective conviction that European authorities would take the necessary steps to stabilise markets. That judgement was eventually vindicated. What has always stayed with me was not simply the investment outcome, but the way Ken led under immense pressure—with composure, trust in his colleagues and an unwavering focus on making the best decisions for clients.

As my own responsibilities increased, Ken gave me the freedom to establish my own leadership style and authority within the Global Portfolios Team. He actively supported a number of process enhancements that I proposed, demonstrating humility and openness to new ideas regardless of where they originated. Those opportunities were instrumental in my own development as both an investor and a leader.

Ken also demonstrated remarkable loyalty when investment decisions did not work out as planned. Every investment professional experiences setbacks, and I certainly had my share, including significant positions in the Mexican peso and UK government bonds that ultimately proved unsuccessful. Rather than seeking to assign blame, Ken supported me, encouraged an objective assessment of what had gone wrong, and focused on ensuring lessons were learned. His response fostered accountability while maintaining confidence and trust. It is a leadership quality that I have sought to emulate throughout my own career.

He was equally supportive of his colleagues away from the investment process. I saw first-hand how hard he advocated for both me and my team during discussions with the firm's executive leadership regarding compensation and recognition. He consistently sought to ensure that contributions were fairly recognised and that talented people were rewarded appropriately. I always believed he genuinely cared about the people who worked alongside him.

Professionally, Ken commanded enormous respect throughout the investment industry. He was widely regarded by clients, competitors and peers alike as one of the finest fixed income investors of his generation. Despite that reputation, I never found him arrogant or dismissive. He remained intellectually curious, approachable and willing to listen to others, irrespective of seniority.

I also came to know Ken away from work. During visits to Pasadena, I met his wife and family, of whom he always spoke with enormous pride and affection. It was evident to me throughout the years we worked together that his family was the most important part of his life. I also know Ken to have been generous with both his time and his resources, quietly supporting a number of charitable causes without seeking recognition. Those acts reflected the same generosity of spirit that I observed throughout our years working together.

Based on my many years of working alongside him, the conduct to which Ken has pleaded guilty is wholly inconsistent with the person I came to know over the course of our professional relationship. While I fully appreciate that he has accepted responsibility for his actions, my own experience was of someone whose

career was defined by dedication to clients, loyalty to colleagues, devotion to his family, intellectual honesty and personal decency.

I respectfully ask that the Court take my observations into account when considering Mr. Leech's sentence. Thank you for taking the time to consider my perspective.

Respectfully yours,

Gordon S Brown

Gordon S. Brown

# Exhibit 21

August 11, 2026

Hon. Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Dear Judge Woods:

My name is Robert Bruce and I have had the good fortune to know Ken Leech and his family, both personally and professionally, for 30+ years. I consider Ken both a colleague and friend. Both my wife and family have had the pleasure of meeting Ken's whole family on different occasions throughout the years. I understand that Ken has recently pleaded guilty to obstructing a SEC investigation and I write to tell you that this is completely out of character for the person whom I have known and admired for so long. I respectfully ask you to take this letter into consideration in your decision regarding his sentencing. The intent of this letter is to portray my feelings for someone that has positively shaped both my business life and personal life.

I worked as a broker executing futures and options trades for my clients on the floor of the Chicago Board of Trade in Chicago for 33 years and off the floor for 9 years. In the pits and on the trading floor, I believe an individual's character is the most important trait needed in this line of work. Without it you do not last. I believe I am a good judge of character. Working closely with Ken over thirty years gave me time to understand his character, who he was and his intent behind his actions. Our conversations ranged from executing trades, investing, family and sports. I see Ken as a man with incredible integrity and someone I have trusted and continue to trust.

I first met Ken in the early 1990s when I was working for Merrill Lynch and Ken had recently started at Western. I quickly grew to appreciate Ken's remarkable understanding of the markets. The routine we developed early on lasted many years. In the morning when Ken got into the office, we would talk about what was happening in the markets. Ken had a unique understanding of options and typically wanted to know about volatility in the market (which is very important for trading options). He seemed to appreciate my views and I always appreciated his which formed the basis of a great working relationship together over many years.

Ken was a great mentor to me and many others. There were many times when I would call to speak to him and his assistant would tell me that: "It may be awhile, there are four people waiting to talk to him." That never surprised me because of how respected and generous he was with his time and knowledge. In our conversations, I learned a great deal from Ken about the markets and our industry. He might tell me about how Treasury futures and options were correlated with German Bunds or something of that sort that I hadn't thought about before. I

often learned something new from Ken and that made me better at my job and better able to serve Ken and his clients.

Inevitably, on the trading floor, when things are moving fast and the markets are volatile, mistakes happen. Thankfully, they were quite rare, but they did happen. Ken was always fair in those circumstances. He wanted to understand what had happened and learn from it and move on. That was Ken's personality. He was fair and direct.

At various points in my career, I encountered some health struggles. When Ken learned about them, he wrote me handwritten notes and would send me a bottle of wine. That's the type of old-school, thoughtful person he is. Ken is also loyal. Around 2016, when the major firms were closing down their physical operations on the trading floor, I decided to move to a different brokerage firm, R.J. O'Brien. Ken appreciated the relationship we had built over many years and told me that he would support me whenever I ended up. I will never forget those acts of kindness.

Finally, another example that demonstrates and encompasses what Ken meant to people was the evening he was inducted into the Fixed Income Analysts Hall of Fame. That was really an honor as it's only a short list of people who get that award. The room was full of Ken's colleagues, friends, and family and his humble nature was very apparent. What I remember most from that evening is that people talked not just about how he was a great investor but how he was a great person. There were a lot of sharp people in the room who really admired him. I learned even more about Ken that evening by listening to his colleagues, friends and family talk about him. The respect in the room was clear as many told "Ken" stories. It was a very moving evening. He was and is a man who has impacted many peoples' lives including my own. And even though I could tell he was a little uncomfortable with the spotlight on him, I could also see how proud he was to share his work life with his family and how proud his family was of him.

Ken has a wonderful family. I had the good fortune of meeting them many times, including some baseball games with my son and Ken's son Stephen. When we had the time to talk about things other than the markets, the conversation turned to our families and I could tell how much Ken loved and cared for his family.

I respectfully ask that you show Ken leniency in determining his sentence. Thank you for your time and consideration.

Sincerely,

Robert Clark Bruce
Email: [redacted]
Cell: [redacted]

# Exhibit 22

July 14, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods,

My name is Michael Buchanan, and I have served as Western Asset's Chief Investment Officer since August 2024. Prior to that, I served as Co-Chief Investment Officer alongside Ken Leech, as Deputy CIO, Head of Global Credit, and Head of High Yield. I have known Ken since joining Western Asset in March 2005 and have worked closely with him throughout that time. From 2005 through 2015, we also lived near one another, which allowed me to know him not only as a colleague but also as a neighbor and friend.

I am writing on Ken's behalf in the hope of providing perspective on his character and integrity. I recognize that he has pleaded guilty, and I do not seek to diminish the seriousness of that fact. Rather, I hope to provide the Court with insight into the person I have known for more than two decades. Throughout that time, I have consistently witnessed Ken conduct himself with integrity, humility, and a genuine concern for others, even in the most difficult circumstances.

I would like to share an experience that I believe best illustrates Ken's character. In my view, one learns a great deal about a person's values by observing how they respond during challenging investment environments. I have worked in the fixed-income markets since graduating from college in 1990, and Ken has even more experience than I do. Regardless of the rigor of an investment process, not every investment succeeds. Over the years, I have seen investment leaders respond to these situations in many different ways. Too often, the immediate reaction is to assign blame to the individual or team most closely associated with the investment before turning attention to managing the position.

What always distinguished Ken was his unwavering sense of accountability. Whether the issue involved an incorrect interest-rate outlook, a significant investment in a U.S. automotive company whose fundamentals later deteriorated and ultimately brought it to the brink of default, or and investment in Russia that was adversely affected by geopolitical events, his response was remarkably consistent. Ken accepted responsibility for the outcome regardless of the extent of his personal involvement in the underlying research or investment recommendation. While Western Asset's investment process relies on extensive collaboration among research analysts and portfolio managers, Ken never sought to shift responsibility to others. His view was simple: as Chief Investment Officer, the responsibility ultimately rested with him.

I saw the weight of that responsibility reflected in his interactions with clients during difficult periods. Yet when investments performed well, Ken took the opposite approach. Rather than seeking recognition for himself, he consistently highlighted the analysts and portfolio managers

whose work contributed to the success. He made a deliberate effort to ensure that others received credit from both clients and colleagues, even when his own contributions had been significant.

I could share many more examples, but they would all reflect the same underlying truth: Ken is an honorable man who consistently puts others before himself and cares deeply about his clients, colleagues, friends, and family. I respectfully ask that the Court consider the totality of his character, his longstanding pattern of leadership and accountability, and the positive impact he has had on those around him when determining an appropriate sentence.

Respectfully,

Michael C. Buchanan
[redacted]

# Exhibit 23

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods,

Commencing in 1972, Ken and I were roommates for 4 years at the University of Pennsylvania. Our friendship has continued unabated since then. I am a born and bred NYC boy and a retired Manhattan bar/restaurant owner. Ken has invested profitably as a minority shareholder in a couple of my establishments. I am also the trustee of his children's trusts. This last is more a sinecure than a job as Ken is the investment manager of the trusts, but I do receive a fee which gives my freedom a greater wing, and gave my life partner, Linda Bahoritsch the opportunity to retire earlier than she might have as a NYC public high school teacher. Lastly, I am one of his bridge partners, to my bridge ranking's benefit and his bridge ranking's cost.

Though we are close and speak frequently our friendship is grounded more in shared values than shared experiences. A world class financier who helped create, historically, one of the largest fixed income firms is not seeking insights from a bar/restaurant guy. Nevertheless, as my establishments have been point central for many of his social events, small and large, especially when Ken's career was in Manhattan or he visited his firm's NYC office, I have met a great many of Ken's friends and colleagues. I am sure you are hearing from many of them and I would gladly be canyon to amplify their praises. But how could I praise the man more than to say that I love him because I know him. His generosity, his humility, his loyalty and integrity are the reasons for the acts you will read about. I have known those reasons for a half century.

Over the last 2 ¾ years I have spoken with or seen Ken a great deal. In allowing me to write to you to advocate for leniency in Ken's sentence I cannot divorce the immense pain and suffering I have witnessed Ken experience over this period from the penalty you must impose. I can only speak my heart and what I believe to be true and know that you will use it as you feel just.

There is a very great penalty Ken has already paid related to the charges which have been dropped. The billions of dollars which have lit the stage in these proceedings blind one to the personal and intimate pain Ken and his wife have suffered. Ken once told me that he was sitting amidst his team of lawyers and did not hear them because he was so dumbfounded that he was even there.

The word "relentless" is a good one but in a second it is gone, where the reality is an indefatigable force; who could endure hearing every beat of their heart? Since October 2023

Ken and his wife have been relentlessly pursued by the SEC and Southern District prosecutors. Ken's reputation, a long-held one of decades and tantamount to the finest in his industry, has been permanently maimed. He has watched as the firm he helped build has been decimated. His and Eileen's community standings have been sullied. Their lives have been consumed with orders to excavate every corner of it. As you know, many hundreds of thousands of documents needed to be examined and defended; these numbers alone speak to the amounts of labor involved. At the end of the day, all the lawyers, on both sides, got to go home; the Leeches have been home all this time but there was never peace, only work, work to stave off ruination and the ceaseless, sleep depriving, fear, stress and pain of contemplating failing to do so. Undoubtedly, the foregone enjoyments devoured by these labors are a substantial additional penalty.

Both Ken and Eileen are salts of the earth. That Ken would choose to be a criminal, and then in doing so crush Eileen's soul, is impossible for me to fathom.

Your Honor, thank you for reading this. I respectfully ask that you exercise leniency in sentencing my dear friend, Ken.

Respectfully,

Rollin Bush
[redacted]
New York, NY [redacted]
[redacted]

# Exhibit 24

July 10, 2026

The Honorable Gregory H. Woods
United States District Court Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods:

My name is Robert Cantz. I am 67 years old, live in Los Angeles, and have spent my entire professional career as a fixed income salesperson for a number of Wall Street firms. I have known Ken Leech for 42 years, beginning in 1984 when we were colleagues at The First Boston Corporation in New York for about five years, and continuing into 1990 after we both moved to Los Angeles and he became my customer as a portfolio manager at Western Asset Management. My job was to help Ken make good decisions and to facilitate his trades in the bond market. There is an intimacy to the fixed income sales relationship which required me to be in daily contact with Ken, frequently under demanding circumstances, every day for 35 years. They say the strongest bonds are forged on the battlefield, and that is true for Ken and me. He is one of my ve,y closest friends.

I know that Ken has pleaded guilty to obstructing a SEC investigation. I want you to know that this .offense is in no way consistent with the man that I know. I am writing this letter to share my insight into Ken's character in the hope that it will inspire you to show him mercy in the sentencing process.

To understand our professional relationship, it is necessary to appreciate that Ken was a vely large and important fixed income customer, and I was one of many brokers competing for his business. This kind of lopsided dynamic is not uncommon in the brokerage industry, and it has been known to inspire arrogant and abusive customer behavior, but that was never Ken's way. He has always treated me as a colleague. Ken was a demanding customer, but he was always fair, and he was always collegial, even in my weakest moments. Further, he went out of his way to make me look good in front of my bosses, always shining a favorable light on me. A noteworthy example: On my first day on the job at Jefferies LLC in 2013, I found myself in personally challenged circumstances, coping with a recent period of unemployment, divorce, and depression.

Midway through a research presentation Jefferies management was making to Western Asset on that day, Ken abruptly interrupted the proceedings (involving over 40 people) to present me, a virtual Jefferies unknown and new kid on the block, with a memento signed by the entire Western portfolio management staff welcoming me back to the bond business. Ken was keenly aware that Jefferies luminaries were watching, and timed his effort to highlight my value to the Jefferies/Western business relationship. Thirteen years later, this event remains legendary at my firm, and I continue to bask in the halo of that moment. Ken had nothing to gain from making the gesture; it was purely to help a friend in need look good in front of his new bosses. Ken is a person of exceptional talent and stature, and he has been a giant in the world of fixed income, but I believe his humility and grace are what truly define him as a man.

Personally, Ken has been profoundly present for me as a friend. He has been intimately involved in every major life event of mine over the past 42 years, and always with his best foot forward. Marriage, the birth of my kids, the death of my parents, job losses, divorce, parenting challenges-his empathy and wisdom have featured prominently in all. It has been quite a while, but I remember his poignant reminder to me that my late father was "behind my right shoulder, just out of sight, smiling at all the appropriate moments" as I was grieving his loss. Ken is a private person, but he has always been first in line to be helpful to his friends when they are in need. He was instrumental in helping my daughter Dylan land a summer internship at Western Asset in 2022 and I know of a number of instances where Ken has provided meaningful financial support to friends who had fallen on hard times. Philanthropically, Ken and his wife are pillars of their community, generously supporting a broad collection of civic, cultural, medical, and educational causes. In 2016, I was asked to make some introductory remarks at a gala in downtown Los Angeles to honor the Leech's for their support of the Los Angeles Children's Chorus. In those remarks, I described Ken as "understated, but fiercely principled." In short, that is Ken Leech. Ken not only has a long history of doing the right thing for his friends, colleagues, and community, he is considered by myself and many others to be a standard bearer for it.

Thank you for considering my thoughts in determining Ken's sentence.

Respectfully,

Robert Cantz

Robert Cantz
[redacted]
Studio City, CA [redacted]
[redacted]

# Exhibit 25

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods,

My name is Caroline Catalan, a former colleague of Ken Leech at Western Asset. I have known Ken for over 30 years, ever since I joined Western Asset in 1993. I am 60 years old, retired (I was part of the Western Asset (WA)/Franklin Templeton layoffs in May 2025) and currently reside in South Pasadena, California.

It is my understanding that Ken has pleaded guilty to obstructing a proceeding and is due for sentencing in October 2026. I write this letter in the hopes that my warm and gratifying experience working with Ken can provide you with a better appreciation of his personal character. It is my deep desire that these sentiments would help persuade you to exercise leniency in imposing a sentence.

I first joined Western Asset as Graphic Designer in 1993. I believe Ken was already CIO at that time. As a junior member of the Client Service and Marketing Department, I was tasked with producing slides for presentation books. Having had no previous industry experience, I remember feeling intimidated working with senior leadership. Yet despite Ken's stature and, honestly, his genius, he was approachable, kind, humorous, and showed integrity in his demeanor. He treated me with patience, was generous with responding to questions about investments and most importantly, he provided me with opportunities to grow by entrusting me with projects and assignments that expanded my knowledge and eventually, my responsibilities. I firmly believe that over time, his confidence in my abilities was instrumental in increasing *my* self confidence and helped the progression of my career at WA.

As my responsibilities grew to include the management of various teams (Graphics, Request for Proposal, Publications, Digital Media Services), I oversaw dozens of associates who had constant exposure to working with senior executives. I received consistent feedback from my teams regarding those executives and knew who the difficult ones were, the hardworking ones, those who skated by in their work, etc. For members of my teams who were fortunate enough to have worked with Ken, whether

they were editors working with him on white papers, RFP writers collaborating on investment responses, or Graphics Associates producing books, the general consensus was that Ken was open to ideas, harbored a real interest in ensuring their respective understanding of investment concepts he was trying to communicate, and his lack of ego. He was demanding in his pursuit of excellence, for sure, but never difficult, never self-serving.

I eventually became a Marketing Manager and my responsibilities included helping to promote firm and executive staff accomplishments through our website, webcasts and other promotional materials. So I was keenly aware of the various awards that WA, and specifically Ken, had received over the decades as well as the stellar portfolio/ composite performance achieved at that time. Yet, Ken sought minimal publicity, seemed to have very visceral discomfort at being in the limelight and in general, only agreed to modest media exposure, particularly compared to the competition. It was like pulling teeth to get his headshot updated! And his quarterly audio webcasts remained just that, in audio, I think in part because of that lack of desire to be in the spotlight and his humility. Yet, he would generously speak at internal events to say kind words (genuine, warm and often funny) to and about colleagues, or write thoughtful notes of appreciation to and about co-workers.

All these accolades, however, did not seem to affect Ken's personal character or our working relationship. Egotism and self promotion were not natural to him. It just didn't seem to be what motivated him. It is my impression that it was the work, the constant exercise of the mind, and the people he worked with that kept him going.

I write all this because I find Ken's upstanding character to be so inconsistent with the offense which he has pleaded guilty to. They are so uncharacteristic of this generous, quiet, gentle intellectual whom I have gotten to know these past 33 years. Judge Woods, I ask that you please take my above account into consideration when you impose your sentence and may you be lenient and merciful as you do so.

I am grateful for your time.

Respectfully,

Caroline C. Catalan
[redacted]

# Exhibit 26

August 7, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods,

My name is Jae Choi and I am writing to you on behalf of Ken Leech. I understand that he has pled guilty and is waiting for sentencing. The purpose of my letter is to kindly ask for leniency, based on Kenny's character and integrity, as they are contrary to the offense of obstructing a SEC investigation to which he has pled guilty.

In many ways, I am an unlikely candidate for such a petition because I was fired by Ken Leech over 20 years ago and have not been in contact with him in many years. Yet when asked, I was happy to do so and felt honored that I would be considered. Please let me explain why.

I joined Western Asset in early 1997, before Ken Leech was elevated to CIO. There was a leadership change when Kent Engel (CIO) unexpectedly passed away, and Ken was asked to be co-CIO. My earliest memory of Kenny was his quiet leadership style. He seemed to approach his new role with humility, with a self-deprecating approach to the markets. He was often the first one in the office around 5:15am, and the last one to leave because of marketing/ client meetings. Kenny focused on investment meritocracy and avoided office politics.

I worked for Kenny for six years, and they were the most fulfilling years of my work life. He showed me what genuine integrity looked like in a professional setting. Kenny was quick to take accountability for his mistakes and generous in sharing the credit with colleagues. Many on the investment team considered Ken the smartest person in the room, but he preferred to elevate other portfolio managers and credit analysts on the team. This trait was evident in his relationship/friendship with Edward Moody, a friend who originally brought Ken over to Western Asset. Ed was a member of the investment team, who was particularly good at marketing with state retirement funds. When Ed encountered some personal issues, Ken stood by his friend. Ken encouraged Ed to take care of himself and also Ken did all he could to support Ed in the workplace, showing Ed support and compassion. Relationships mattered to Kenny, and his eulogy at Ed's memorial service brought many to tears.

I also witnessed what humility looked like on a trading floor. Kenny always treated the trading assistants with respect and kindness, often taking responsibility for any miscommunication and blaming his poor handwriting (which was illegible). I never heard him raise his voice to those who weren't in a position to defend themselves. It was an admirable trait, especially on a trading floor where tough markets can bring out the worst in our behavior.

After Western, I was in touch with Ken from time to time. I met him for dinner in New York and also shared a meal with his son Stephen when Stephen was first starting out in the fixed-income industry. My last meaningful contact with Ken was over 8 years ago, when he reached out about a potential job opportunity at Western Asset. I was going through a challenging time, sick with [redacted], going through a divorce, and being unemployed. This job would have meant a great deal to me. When I did not get it, Ken and Jim Hirschmann (CEO) called me to personally relay the disappointing news. The fact that Ken even wanted to re-hire me, gave me confidence to move forward.

When my second child was born in 2009, I wanted to honor Ken by naming that child after him. The first challenge was the child was a baby girl, and the second challenge was finding a girl's name when your choices are between "Kenneth" and "Leech". Her name is KC, and KC for short. My then wife asked me why I would honor someone who fired me? It was because although we had differences in regards to my dismissal, that did not change his character or integrity - nor does it now. This is not grace or forgiveness on my part, but it is my belief that Ken is a man of impeccable ethics who makes hard decisions because they are the right ones.

Honorable Judge Woods, I humbly ask you to consider showing mercy to Ken Leech. Thank you for your time.

Sincerely yours,

Jae Choi

# Exhibit 27

July 15, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods:

I am respectfully writing on behalf of my brother-in-law, Mr. Ken Leech, in the hope that you will consider leniency and mercy in determining his sentence. For more than two decades, I have been committed to creating educational and career opportunities for underserved populations as a Biology Professor at a Hispanic-Serving Institution. More recently, I have joined the Kaiser Permanente Medical School to continue to advance equity through medical education of future physicians. My son and I became part of Ken and his wife Eileen's family fifteen years ago when I partnered and later married Eileen's sister, Flo. Throughout that time Ken's unwavering kindness, generosity, financial support, and guidance have been a constant source of strength in our lives.

When my son was nearing the end of elementary school, it became clear that he was both academically gifted and in need of a strong support system for [redacted] Although we were still relatively new members of the family, Ken immediately offered both his mentorship and financial assistance so that a private school education would be an option for my son if we chose that path. While we ultimately decided to enroll him in public school, Ken's willingness to help spoke volumes about the kind of person he is. He continued to provide encouragement, guidance, and support to our family in ways that were invaluable.

During the COVID-19 pandemic, our family faced [redacted] At the time, our financial resources were extremely limited. Without being asked, Ken relieved us of our rent obligations [redacted] His generosity allowed us to focus [redacted] I honestly do not know how we would have navigated that period without his compassion and support.

When I recently accepted a faculty position at the Kaiser Permanente School of Medicine, no one was happier for me than Ken. His pride was never about prestige or status. Rather, he celebrated the opportunity because he understood how deeply committed I have been throughout my career to helping students from historically marginalized backgrounds become physicians. He recognized that this position represented the fulfillment of years of work toward a mission that mattered greatly to me. His encouragement during that transition was another example of the way he consistently invests in the success and well-being of those around him.

Over the past fifteen years, I have come to know Ken as someone whose instinct is to help others, often quietly and without expectation of recognition. Through his generosity, loyalty, and steadfast support during difficult times, he has made a profound difference in my family's life and the lives of many others. While he has accepted responsibility by pleading guilty, I believe this offense is not

representative of the compassionate, selfless, and dependable person I have known for so many years. I recognize the seriousness of these proceedings and the importance of accountability, and I humbly ask that, in determining an appropriate sentence, the Court also consider the many years during which Ken has demonstrated exceptional generosity, compassion, and commitment to his family and community. His positive influence has had a lasting impact on my life and the life of my son, and I will always be grateful for the support he has given us during some of our most difficult moments.

Thank you for taking the time to read this letter and for considering my perspective.

Respectfully,

Dr. Jennifer Chotiner
Associate Professor of Biomedical Sciences
[redacted]
Sierra Madre, CA [redacted]

# Exhibit 28

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynithan U.S Court House
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods:

My name is Thomas G. Cook. I am Ken's nephew. I am a retired Air Force Sergeant, the father of two boys and the owner of corporation in Virginia.

I have known my Uncle Ken since I was 4 years old when Uncle Ken's brother Darryl married my mother. Uncle Ken always embraced me as if I was his true nephew by blood. I always looked up to Ken and knew he was kind and had a gentle soul. At a young age I remember Ken coming to visit after a long flight and playing ping pong with me even when he was tired from his travels. Growing up, I spent many hours with Ken's kids Catherine and Stephen who also both treated me as their own cousins.

I also had the chance to visit Uncle Ken and his family in California. He would always make sure to take time away from his busy schedule to spend time with me and his family. I could always tell Ken was a good father because he made sure to attend Stephen's sporting and Catherine's singing events.

My youngest son DG was diagnosed with [redacted] when he was six years old. He also had a [redacted] The doctors told me he would not survive. Luckly, God had more plans for DG, and we spent 7 months in the ICU and DG walked out of there. Without my ever asking for help, Uncle Ken helped me with DG's hospital bills. Uncle Ken also urged his friends to donate to a Go Fund Me website that I set up for DG

Uncle Ken is a man of kindness. I know he has created multiple foundations and hosted charitable events for people that are in need of help. He has always believed in Faith, Family, and Compassion for others.

I know Ken has pleaded guilty to obstructing a SEC investigation. With that being said, I'm asking you Honorable Judge Woods, to have compassion and leniency on a great man.

Respectfully,

Thomas G. Cook

[redacted]

# Exhibit 29

**The Rev. Cynthia Warner Crowell**
[redacted]
**Sierra Madre, CA** [redacted]

August 6, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods,

I am writing to you on behalf of KEN LEECH whom I am aware has pleaded guilty to an offense. I would like to provide you with some information that I hope you will keep in mind as you make a decision regarding the severity of his sentence.

I have had the privilege of knowing Ken for over 27 years. He is an active member and respected elder/leader at Trinity Presbyterian Church of Pasadena California, where I served as the Pastor/Head-of-Staff for 26 years. I retired from active ministry in May, 2025 but have remained a resident of the Pasadena area. Over the years, I have had the privilege of witnessing his faithfulness in a variety of ways including as a dedicated spouse, father, grandfather, church elder, community leader, and friend. Our children attended Sunday School and sang in the church youth choir together. I have confirmed both of his children into church membership, officiated at his daughter's wedding, and baptized his first grandchild. I have spent time in the Leech home, and have appreciated the warmth of his hospitality. Many times he has shared his coveted season tickets to the LA Dodgers with me.

Ken's participation at Trinity is significant. He is highly respected among his fellow church members and colleagues. Trinity Presbyterian Church has become stronger and better able to make a difference in the larger community due to Ken's contributions of time, talent, and financial support. For example, the congregation has been actively responding to the exponential losses in our Pasadena/Altadena community resulting from the devastating January, 2025 Eaton Fire.

I have always experienced Ken Leech to be a man of integrity, honesty, and compassion. As an experienced pastor of over 40 years in the Presbyterian Church (U.S.A.), I think I have become a very good judge of a person's character. I sincerely believe the acts to which Ken has pleaded

guilty are totally inconsistent with the good character of the man that I have come to know over the years.

It is my hope that you will take this information to heart as you consider Ken's impending sentence and exercise as much leniency as is possible.
Respectfully Yours,

*Cynthia W. Crowell*

The Rev. Cynthia W. Crowell
Honorably Retired, Presbyterian Church (U.S.A.)

[redacted]

# Exhibit 30

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods:

My name is Rajeev De Mello. I am 60 years old and am a Partner and Chief Investment Officer of GAMA Asset Management, an investment management firm based in Geneva, Switzerland. I am Swiss and have lived in Singapore for the past twenty years.

I came to know Ken Leech professionally when I worked at Western Asset Management. As the regional head of investments for Asia, I reported directly to Ken. I left Western Asset in mid-2011, but Ken and I remained friends thereafter. I would generally visit him at least once a year, and we also met when his travels brought him to Singapore.

I understand that Ken has pleaded guilty to obstructing a proceeding before the Securities and Exchange Commission. I am writing to provide the Court with some perspective on the person I have known for nearly twenty years, which I respectfully hope the Court will take into consideration in determining his sentence.

I first met Ken in 2007, when he interviewed me for a position as Country Head of Western Asset Management in Singapore. I still remember that meeting vividly. Ken was one of the principal reasons I decided to join Western Asset and subsequently remained with the firm. What impressed me then, and throughout the years that I worked with him, were his strong moral compass, extraordinary work ethic, humility, and the respect with which he treated the people around him.

I began my career in investment management in 1987, and over the course of almost four decades I have worked with many senior investment professionals. Ken remains the best boss I have had. That assessment is based not simply on his abilities as an investor, but on the way he treated the people who worked for him.

One quality that particularly distinguished Ken was his willingness to listen. Investment management can be an intensely competitive and stressful profession. Ken had an unusual ability to listen to his portfolio managers, understand the pressures they faced, and offer guidance without diminishing them. As one of his direct reports, I experienced this personally.

That relationship did not end when I left Western Asset. Ken had no professional obligation to continue helping me, yet he repeatedly made time to see me, discuss my career and investment decisions, and offer advice and encouragement. On several occasions, despite an extraordinarily demanding schedule, he would make the effort to come and meet me rather than simply expecting me to accommodate him. Those gestures may sound small, but to me they revealed a

great deal about his character. His interest in helping people was genuine and continued even when there was nothing for him to gain professionally.

Ken extended the same generosity to my family. When my son developed an interest in economics and investing, Ken took the time to meet him and speak with him. He treated him seriously and generously, despite having no reason or obligation to do so. I also observed over many years how important Ken's own family was to him and how warmly he spoke about and cared for those close to him.

I was also struck by the sense of responsibility Ken felt toward Western Asset's clients. During the extraordinarily difficult markets of 2007 and 2008, Ken took investment losses very personally. I remember that during this period he made a point of wearing a suit and tie to work every day until the investment performance had recovered its earlier losses. It was a symbolic gesture, but one that reflected something deeper: he felt personally accountable to the people whose money had been entrusted to the firm.

I also remember Western Asset managing money for charitable foundations whose endowments were important to their ability to carry out their missions. My recollection is that the economics of managing some of these portfolios were modest for the firm, yet Ken and the investment team treated those clients with the same seriousness and care as much larger commercial relationships. That made an impression on me.

Another episode that has stayed with me occurred after Ken experienced a serious health challenge around 2008. He took time away from work to recover. At that stage of his career, he could easily have chosen to retire comfortably. Instead, he returned to lead the firm during one of the most difficult periods in financial markets and in Western Asset's history. To me, that decision reflected his resilience and a profound sense of responsibility toward his colleagues, the firm, and its clients.

Ken's faith was also an important part of the person I knew. I remember his regular attendance at church and the seriousness with which he approached his beliefs. Whether in his professional life or in his relationships with colleagues and friends, I saw a man who tried to live according to principles larger than his own personal interests.

I recognize the seriousness of the fact that Ken has pleaded guilty to a criminal offense. I do not seek to excuse or minimize that. I can only tell the Court, truthfully, that the conduct to which he has pleaded guilty is deeply inconsistent with the character of the man I came to know over almost two decades.

My experience of Ken is of a humble, caring, and remarkably generous person; a mentor who continued to help me long after I ceased working for him; a leader who felt a deep responsibility toward his colleagues and clients; and a person who has had a positive influence on my life and on the lives of many others.

I respectfully ask the Court to consider these aspects of Ken's character, and the totality of the person he has been over the course of his life, when determining his sentence. I hope that my

experience of knowing him for nearly twenty years will be of some assistance to the Court, and I respectfully ask that you extend to Ken such leniency as you believe appropriate.

Respectfully,

Rajeev De Mello

August 25, 2026

[redacted]

[redacted] Singapore

[redacted]

# Exhibit 31

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods:

My name is Nicolas Dovetta. I am 38 years old, originally from Prelles, a small village in the middle of the French Alps, and now live in Pasadena, California with my wife—Ken Leech's daughter—and our two young children (one and three years old). I serve as Chief of Staff at a growing ~400-person startup in Los Angeles. I have known Ken since 2012, when I first started dating his daughter. In 2021 we moved from France to a home just fifteen minutes away from him. From the very first day, Ken welcomed me into his home and his family with open arms and genuine warmth, making someone who had crossed an ocean feel like he truly belonged.

Leaving my family, friends, and entire life in France was one of the hardest things I have ever done. At 38, with young children and the pressures of building a career, creating a new support network has not been easy. Yet Ken and his family became exactly that for me: a true family and real friends who filled a loneliness I carried quietly. He spent countless hours sharing stories about my wife's childhood—funny, vivid tales told with love and laughter, like the time she escaped class and hid high in a tree until the school had to call her parents to find her. Those stories wove me into their family history. That same generosity of spirit is something Ken clearly passed on. My wife has already grown her hair long and donated ten inches of it five times in her life to help strangers she will never meet. When someone is that selfless about something so personal, it comes from the values and example set at home.

One example that stays close to my heart is how Ken welcomed my family for our wedding in Los Angeles. My parents were flying for the first time in their lives, embarking on a twenty-hour journey to a country where they did not speak the language. I knew I was going to be busy and I was worried. Ken was so dedicated to making sure the "French contingent," as he liked to say, had a wonderful time (like spending time with my parents, making sure they had what they needed, making sure someone from the wedding who could translate was checking in with them). It meant a lot to me, and it meant a lot to them.

It is in watching Ken with our son that I have seen his truest character most clearly. He reads the same books to him over and over again—stories like Yertle the Turtle by Dr. Seuss—with genuine excitement and a patience that never wanes. Our three-year-old will suddenly spot his granddad across the living room, shout "Grandad!" with pure joy, and come running in that special, clumsy, full-speed way only a small child can. He launches himself straight into Ken's lap and demands a book. And Ken reads it—four times in a row the other day—with the same steady love and attention, as if it were the first time and the most important thing in the world.

Another moment stays with me. Our son was holding a piece of chalk and asked, "Granddad, can I trash your car?" Ken replied, "sorry what? ..of course no." Seeing the disappointment on that little face, he picked our son up, looked him in the eye, and said, "How about we go play with all the buttons in the car instead?" They spent the next hour inside the car together, exploring every dial and button with delight and laughter.

These are not isolated moments. They are the consistent expression of the man I have known for fourteen years: steady, patient, kind, and deeply devoted to his family. Ken has been a father-in-law in the fullest sense—present, supportive, and quietly generous with his time, his stories, and his love. Even now, in his seventies, he is always the first to rush over and take any luggage or heavy item from my hands, making it feel like the most ordinary thing in the world—never once making me, the Frenchman who had taken his daughter away to France for several years, feel awkward or like a burden. He helped me feel less alone in a new country and gave my son a grandfather who shows up with his whole heart.

Although I am aware that Ken has pleaded guilty to obstructing a proceeding before the Securities and Exchange Commission, those actions are completely inconsistent with the character of the man I have known and loved as family. The Ken Leech I know is a person of integrity who has spent years building trust, connection, and love within our family.

I respectfully ask that Your Honor take this letter into consideration when determining the appropriate sentence. I implore you to show leniency and mercy—not only for Ken, but for the family that loves him and depends on him. My wife, our children, and I have built our life here with Ken as a central part of it. I ask for our children OD and GD and most of all I ask for my son, who at three years old is learning what love, patience, and family look like through his grandfather's eyes. The bond they share is pure and important to his little world.

Thank you for your time and for considering the full measure of the man before you.

Respectfully,

Nicolas Dovetta
Son-in-law of Ken Leech
Pasadena, California
[redacted]

# Exhibit 32

August 16, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods,

My name is Michelle Eafanti, and I am writing on behalf of my dear friend Ken Leech. I have known Ken for over 30 years both professionally and personally. I want to share my experience of the man I have come to know.

I understand that Ken has pleaded guilty and accepted responsibility for his actions. I am not writing to excuse what has happened or to address the legal issues before the Court. Instead, I hope to provide insight into the person I have known for so long.

I first met Ken when I interviewed at Western, where my future partner Ed Moody also worked. I was hired and worked at Western as a trading assistant until I retired in 1997. Western became my family. At that point, it was not very big. We were all very close knit. On the desk and outside work, everyone looked up to Ken. He was a steady presence that everyone could rely on.

My partner Ed was one of Ken's closest friends. Sadly, Ed [redacted] and those years were difficult. Ken never turned away. He never judged Ed, never gave up on him, never made him feel less than worthy of kindness and friendship.

Ken became the brother Ed never had. He stood beside him through some of the darkest moments with compassion, loyalty, and quiet strength. Ken would be Ed's and my first call.

His support was never for recognition - it simply came from his heart.

When Ed passed away, Ken gave the eulogy at his funeral. It was one of the most beautiful and sincere tributes I have ever heard. Every word came from a place of genuine love, respect, and gratitude for their friendship. In the midst of overwhelming grief, his words brought comfort not only to me but to everyone who was there. It is a moment I will never forget. On the anniversary of Ed's passing this year, in the midst of his legal problems, Ken was one of the few people who remembered and personally reached out to me. He is one of the kindest men I have ever known.

I know the Court has difficult decisions to make and I respect that responsibility. I only ask that, as you consider Ken's future, you also consider the countless quiet acts of kindness, loyalty, and generosity that have defined his life and the profound difference he has made in the lives of those who know and love him.

I respectfully ask the Court to consider both the offense and the many positive qualities that reflect Ken's character.

Thank you for your time and consideration.

Respectfully

Michelle Eafanti

Michelle Eafanti

[redacted]

Denver, Colorado

# Exhibit 33

July 12, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods,

As a former professional colleague, I write to provide additional background for consideration in the resolution of the case involving Mr. Kenneth Leech. I understand that Mr. Leech has acknowledged responsibility and the determination of sanction remains.

I served at Western Asset Management Company in various Legal & Compliance capacities from early 2004 through mid-2022. I voluntarily left the Firm on good terms over a year before the investigation that gave rise to this case. My primary role was operating as the Firm's Manager of Regulatory Affairs. That position afforded an opportunity to interact directly with the Firm's personnel at all ranges of role, tenure and seniority. I interacted and worked alongside Mr. Leech for many years in that capacity and therefore have personal knowledge of him and his character.

Western Asset had (and presumably still has) a proud history of taking care of clients since its inception in 1971. The Firm took on clients with some of the most complex needs and objectives, managed assets across the fixed income spectrum that involved some of the most complex instruments and strategies, and navigated through major market stresses. Neither the Firm nor any employee were perfect but there was never any question of a desire or intent to take care of clients, deliver the service they expected, and do it the right way – whether a client or regulator was watching or not. I was privileged to work with many good Western Asset personnel who devoted their blood, sweat and tears to taking ownership of issues and challenges with the good of the client in mind.

Clients of Western Asset should take comfort that their trust was not misplaced. As a senior leader for the Firm and investment function, Mr. Leech played a significant role in building that culture and setting that tone.

My relationship with Mr. Leech was not a one-sided monologue in either direction. He was always available to me and I was always available to him. He was unafraid to raise potential issues, seek guidance and wrestle with difficult questions. Likewise, I had an open door to raise questions and concerns that arose in the course of ongoing oversight. The culture was built on mutual respect and a willingness to have a conversation. I never had concerns about transparency, honesty, or

unspoken agendas. He honored the role of Legal & Compliance and other internal control functions. When a decision on compliance matters was made, he respected the independent reporting lines, process and result.

This way of doing business was standard operating procedure. As a senior leader for the Firm and investment function, Mr. Leech played a significant role in setting that tone.

The Firm's culture encouraged rigor, candor and questions. That culture embedded humility and recognized that a credible answer might involve re-validating assumptions, judgments, sources of authority and facts. That culture guarded against the temptation of "ends justifies the means." I never saw any evidence of Mr. Leech acting with ill intent or malice or a lack of integrity. Quite the opposite.

Western Asset alumni will recall the tradition of in-person compliance training held in the ground-floor auditorium. It would have been logistically easier to buy a generic vendor compliance training module and do training on-line, but the Firm believed in tailoring content and delivering in a way that would be memorable and useful. It was a major commitment of time and priority but "checking the box" was a cultural anathema. Mr. Leech's time was rarely his own, but he made time to attend in person as well. He did not come in late, sit in the back, and spend the time looking at papers or his phone. He sat in the first few rows and paid attention.

I gave the training and remember the eye contact. As a senior leader of the firm and the investment function, Mr. Leech played a significant role in supporting the importance of the exercise by his actions.

This letter's existence is testament to the inherently flawed nature of humans. An honorable person can have a lapse in judgment and still be an honorable person. Mr. Leech is an honorable person with a positive track record that warrants acknowledgement.

I appreciate the consideration and trust that my personal experience can be useful in determining an appropriate sentence in this case.

Respectfully,

Kevin Ehrlich

# Exhibit 34

July 21, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods:

My name is Derek Fan. I am 47 years old, I live in Los Angeles, and I have spent my career in institutional asset management, in roles focused on client and consultant relationships, including in leadership positions. I worked alongside Ken Leech at Western Asset Management for nearly fifteen years. I am aware that Ken has pleaded guilty to an offense.I hope you will consider this letter as you make your sentencing decision.

In fifteen years of working with Ken, the quality that defined him was how he treated the people around him and the clients who entrusted us with their money. He was genuinely humble in a business that does not often reward humility. When our investment performance was strong, he gave the credit to his team; when it was poor, he took the blame himself. I watched him do this consistently, year after year, in good markets and bad. It was not a posture — it was simply how he operated.

What stayed with me most was his willingness to face difficult moments directly. When performance turned against us and clients had hard questions, Ken did not hide behind others or delegate the uncomfortable conversations. He showed up himself, met with those clients, and answered them honestly and clearly. He believed he owed them that, and he cared deeply about those relationships. Over the years he built a reputation with clients as smart, humble, and authentic, and in my experience that reputation was earned honestly, one relationship at a time, over decades.

Another quality I respected in Ken was his genuine discomfort with being the center of attention. Though he was highly sought after, he had no interest in promoting himself and routinely declined invitations to appear on financial news or speak at high profile business conferences. That reticence was part of what made it meaningful when he did choose to speak to the broader team at the firm over the years. In good times and bad, when Ken addressed the team, his words carried weight — they were thoughtful, measured, and impactful. I especially remember the remarks he would offer to send retiring colleagues off: appreciative, poignant, often hilarious, and genuinely touching. The team held him in high regard, and moments like those were a large part of why.

The conduct to which he has pleaded guilty is inconsistent with the man I know and worked beside for so many years. I do not say that to minimize anything — only to tell you truthfully that the Ken Leech I know is a good and decent person who cared about his colleagues, his clients, and his family.

I respectfully ask that you take this letter into consideration and that you show Ken leniency in imposing sentence.

Warm regards,

Derek Fan

Phone: [redacted]

E-mail: [redacted]

# Exhibit 35

Darin T. Fink
[redacted]
New York, NY [redacted]

September 11, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods:

I am writing this letter in support of my cousin, Ken Leech, whom I have known throughout my entire life. Ken was an early role model to both my brother and me during our formative years in Manlius, New York. Because our mothers were sisters and we grew up in neighboring towns, our families shared a close bond that allowed me to spend countless hours with Ken from his teenage years, through college, and well into adulthood. Over the decades, I have had the opportunity to know Ken not only as family, but as a trusted friend and mentor. We have maintained a continuous exchange of ideas and experiences throughout our lives, and I have observed his conduct firsthand in a wide range of personal and family situations. These experiences have given me a unique perspective on his character and values.

One of the most meaningful ways Ken influenced my life occurred during my youth, when athletics had become my primary focus and much of my identity was centered on sports. Ken took a sincere interest in my academic development and repeatedly emphasized the importance of education, learning, and applying myself in the classroom. I vividly remember wearing Ken's college sweatshirts with pride and looking up to him not only as an athlete and older cousin, but as someone who valued education and personal growth. He regularly asked about my grades, my academic accomplishments, and my future plans. Those conversations had a lasting impact on me. Ken helped broaden my perspective beyond sports and encouraged me to pursue excellence as a student, instilling lessons about discipline, preparation, and lifelong learning that have remained with me throughout my life.

What has consistently stood out to me is Ken's compassion, humility, generosity, and genuine concern for the well-being of others. He has always been someone who listens carefully, offers thoughtful guidance, and seeks to help those around him without expectation of recognition or reward. I have witnessed his kindness toward both friends and family members on countless occasions, and his actions have consistently reflected a deep sense of empathy and responsibility.

One example that remains particularly meaningful to me was the care and attention he provided to our Aunt Polly during the decline of her health. Living in the Los Angeles area, Ken took an active role in ensuring that she received proper care and that her needs were met. He was attentive not only to her well-being, but also to the comfort of family members who traveled to visit her. His commitment to helping her through that difficult period demonstrated extraordinary compassion, patience, and devotion to family.

Ken's thoughtful and caring nature has also been evident in his relationship with my parents. As adults, Ken interacted frequently with both my mother and father in a manner that was consistently respectful, considerate, and kind. He always valued their opinions and was mindful of the physical limitations that naturally accompanied aging. He never treated them as an obligation, but rather with genuine affection and respect. Time and again, he demonstrated the qualities of an exceptional family member by offering his assistance whenever it was needed and by making himself available to support those he cared about.

I experienced this personally following the loss of my father. During one of the most difficult times in my life, Ken was the first member of my extended family to reach out, offer comfort, and provide whatever assistance he could. His

support was immediate, heartfelt, and sincere. It reflected the same qualities that I have seen throughout his life: an instinct to care for others, to ease their burdens, and to be present when they need help the most.

The Ken I have known for a lifetime is a man of integrity, strong moral character, and unwavering commitment to the people he cares about. He is, and has always been, a humble and respectful person who opens his heart to others. The values he demonstrated as an older cousin and role model during my formative years are the same values I have continued to see throughout his adult life. He consistently treats people with dignity, compassion, and respect, regardless of circumstance.

Based on my lifelong relationship with Ken and my firsthand observations of his character over many decades, I can say without reservation that he is a compassionate, caring, and honorable individual. I respectfully ask that you consider the entirety of the man I have known throughout my life, a man whose character has been defined by kindness, humility, generosity, and devotion to others, and that you grant leniency in your consideration of his circumstances.

Thank you for your time, consideration, and any leniency you may find appropriate to extend.

Respectfully submitted,

Darin T. Fink
[redacted]
New York, NY [redacted]
[redacted]