# Volume I

***United States v. Leech*, No. 24 Cr. 658 (GHW) (S.D.N.Y.)**
**Volume I – Exhibits Cited in the Sentencing Memorandum on Behalf of S. Kenneth Leech II**

| Exhibit No. | Document |
|---|---|
| **Letters** | |
| 1. | Leech, Ken |
| 2. | Leech, Eileen Stueck |
| 3. | Dovetta, Catherine L. |
| 4. | Leech III, Stephen K. |
| 5. | Agregado, Liza |
| 6. | Aicher, Kathleen R. |
| 7. | Alexander, Dan |
| 8. | Anderson, Keith T. |
| 9. | Anderson, Louise Tucker |
| 10. | Arnold, Bruce R. |
| 11. | Ashworth, Rev. Tiffany |
| 12. | Bachmann, Peter |
| 13. | Balcazar, Andres Sanchez |
| 14. | Bazdarich, Michael J. |
| 15. | Bekbosunov, Timur |
| 16. | Bernardi, Marzo |
| 17. | Brandlin, Eilley |
| 18. | Britton Jr., Anthony “Tony” |
| 19. | Brooks, Brian P. |
| 20. | Brown, Gordon S. |
| 21. | Bruce, Robert Clark |
| 22. | Buchanan, Michael C. |
| 23. | Bush, Rollin |
| 24. | Cantz, Robert |

| Exhibit No. | Document |
|---|---|
| 25. | Catalan, Caroline C. |
| 26. | Choi, Jae |
| 27. | Chotiner, Dr. Jennifer |
| 28. | Cook, Thomas G. |
| 29. | Crowell, Rev. Cynthia W. |
| 30. | De Mello, Rajeev |
| 31. | Dovetta, Nicolas |
| 32. | Eafanti, Michelle |
| 33. | Ehrlich, Kevin |
| 34. | Fan, Derek |
| 35. | Fink, Darin T. |
| 36. | Fink, Kevin |
| 37. | Fisk, Eliot |
| 38. | Flick, Jim |
| 39. | Freebes, Linda |
| 40. | Freedman, Mark |
| 41. | Glaze, Samuel F. |
| 42. | Goettler, Peter N. |
| 43. | Grannis, Scott F. |
| 44. | Green, Dr. Alan |
| 45. | Greetham, Christopher |
| 46. | Hales, Jonathan |
| 47. | Harker, Ilene S. |
| 48. | Healy, James P. |
| 49. | Hirschmann, James W. |
| 50. | Hutson, Tracey A. |
| 51. | Katerjian, Rev. Megan |
| 52. | Kripalani, Ranjit (Ron) |

| Exhibit No. | Document |
|---|---|
| 53. | Larson, Michael |
| 54. | Leech, Darryl C. |
| 55. | Leech, Katy |
| 56. | Lindbloom, Mark |
| 57. | Lippman, David |
| 58. | Marchosky, Ernest |
| 59. | Marki, Frederick |
| 60. | Marquez, Julie |
| 61. | Martin, Haley |
| 62. | Matthews, Catherine |
| 63. | McCourt, John W. |
| 64. | McNamara, Dennis J. |
| 65. | Meidl, Karen |
| 66. | Miller, Bill |
| 67. | Mims, Pamela Ann |
| 68. | Mullet, Scott |
| 69. | Murphy, Jennifer W. |
| 70. | Murphy, Virginia W. |
| 71. | Nelson, Susan |
| 72. | Orswell, John E. |
| 73. | Patterson, Elizabeth L. |
| 74. | Powell, Karlen |
| 75. | Quinn, Norman P. |
| 76. | Roffina, Rev. Michael J. |
| 77. | Saltzman, Cantor Mark |
| 78. | Schlichter, Detlev |
| 79. | Scholnick, Julien |
| 80. | Schucking, Ivor |

| Exhibit No. | Document |
| --- | --- |
| 81. | Schulte, Holly |
| 82. | Senft, Dexter |
| 83. | Sibbrel, Robert |
| 84. | Sibley, Cel |
| 85. | Smith, Ian J. |
| 86. | Snoke, Rosemarie |
| 87. | Stringfield, Casey |
| 88. | Stueck, Clifford |
| 89. | Stueck, Florence |
| 90. | Stueck, Jill |
| 91. | Stueck, John J. |
| 92. | Stueck, Kathleen M. |
| 93. | Stueck, Lois |
| 94. | Stueck, Nannette A. |
| 95. | Sylvester, Dr. Lisa |
| 96. | Trepp, Suzanne |
| 97. | Walsh, Stephen A. |
| 98. | White, Paul M. |
| 99. | Wilson, Steven |
| 100. | Winston, Kenneth |
| 101. | Wright, Joy |
| 102. | Wynstock, Dr. Lori J. |
| 103. | Yamamoto, Dylan J. |
| **Other** | |
| A. | Morningstar Announces 2004 Fund Manager of the Year Awards |
| B. | Morningstar Announces 2014 U.S. Fund Manager of the Year Award Winners |
| C. | Email from K. Leech to S. Walsh, Subject: press |

# Exhibit 36

August 10, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods,

I am writing this letter in support of my older cousin, Ken Leech. My name is Kevin Fink and I am currently retired after a career that included working in staffing and recruiting, as a mortgage loan officer, and as a contractor. I live in upstate New York not far from where Ken and I grew up.

I have known Ken all of my life of sixty years. I am aware he has pleaded guilty to obstructing an SEC investigation and believe it is important to share my perspective on his character and conduct.

Ken is absolutely loved and cherished by everyone in our extended family my entire life. I recently had dinner with Ken and his wife Eileen when they came up to visit my elderly mother (Ken's Aunt), and we talked about some of the best times of my life growing up. Ken was like a big brother to me as we lived very close to each other as I was growing up. Ken's mother, my aunt, would sometimes baby sit my brother and me. That was a big treat for us because as now, we looked up to Ken. Even though Ken was about a decade older, he would always play tag, wiffle ball, frisbee, and football with me and my brother. When he was back home from college, he would play chess with me even though I was only around eight years old. He was instrumental in helping me learn how to play when none of my friends from our hometown could. Even after Ken moved to Pasadena, he always stayed in touch and supported his family in upstate New York. Around 2009, Ken wanted to get everyone together and actually flew everyone in our entire family out to Pasadena and put them up in a hotel for a one-week reunion. If someone was in trouble, he would help. He helped out with my mother's older sister who was living out in the LA area and would visit her in assisted living. When his parents got older, he made sure they were in an accessible condo near me and my mom. He would check in and we would stay in touch about how they were doing.

Ken has been a truly loving father, husband, and respected member of his community. Ken was- always a person of high moral character displaying honesty and truthfulness with all of my interactions with him. He consistently showed me respect and kindness and dignity. He is extremely funny, compassionate, and humble. I've worked around a lot of people who love to tell you how great they are. Not Ken. You would never know his job from talking to him.-

Based on my knowledge of Ken, I firmly believe that the actions Ken pled guilty to are extremely uncharacteristic of his true nature. I genuinely believe that Ken Leech is a person of high integrity and is remorseful of the -consequences it has caused. I have seen the toll the case has taken on him over the last several months when he has visited me and my mother (who is the oldest person left in our family) in upstate New York. I kindly request the court's consideration of Ken Leech's overall character and any leniency you may find appropriate to extend.

Respectfully,

Kevi

[redacted]

Manlius NY [redacted]

[redacted]

# Exhibit 37

August 14, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U. S. Courthouse
500 Pearl St.
New York, New York 10007-1312

Dear Judge Woods,

My name is **Eliot Fisk**, and it is both an honor and a very great pleasure to write in support of my beloved friend of more than half a century, **Ken Leech**.

I am a professional classical guitarist performing around the world since the age of 13. My career has proceeded along parallel tracks: I have played hundreds of concerts on 5 continents but have also been privileged to teach in 5 different languages as a tenured faculty member at various universities, after having started the guitar department at Yale. At age 72 I am still active worldwide as concert artist and teacher (www.eliotfisk.com).

I understand that my beloved friend Ken has pleaded guilty to obstructing an SEC investigation. I write this letter to beg you to consider what I write here about Ken Leech with regards to his sentencing.

There follows a brief summary of my own formation as a person.

I was blessed with extraordinary parents of high moral character and by my only brother who had Down's Syndrome. Reacting to his condition, seeing first hand how cruel our society can at times be to people with disabilities gave me a precocious sense of justice and injustice. I carry this legacy with me always.

My performing career has taken me into every possible circumstances from major concert halls and private performances for royalty and presidents to elementary schools, logging camps and prisons. I have met every possible kind of person. Yet I have never known anyone finer than Ken Leech, whom I have only known to be scrupulously honest, endlessly generous, intellectually brilliant, and morally beyond impeccable.

I first met Ken in high school in Dewitt, New York, where during the years 1968 - 1972 we were classmates at Jamesville-Dewitt High School. During that time we began a sacred friendship which has been a light in my life ever since. I have had the good fortune to experience Ken's unimpeachable character stretching back over almost 6 decades of friendship.

In high school Ken's political views were strongly influenced by William F. Buckley - style conservatism; on the other hand, due to my Quaker upbringing, I have always been a liberal.

Ken and I were often involved in ferocious political debates. However, we avoided any and all *ad hominem* attacks, although as passionate young people on opposite sides of many issues our discussions could grow heated at times.

Nevertheless, in all the many times we disagreed about issues, Ken always played fair. He marshaled statistics quoted from memory and presented sequential, reasoned arguments to defend his point of view that were convincing, challenging and hard to refute. In the process and in a very wonderful way Ken taught me how to think! Rebutting him was no easy task. No matter how passionate the debate, Ken never hit below the belt.

Our group of friends also played bridge regularly. Ken patiently taught me the basics and never lorded it over anyone that he was in fact by far the best bridge player of our group. Although Ken always seemed to know intuitively where the cards were, he would never have thought of cheating. That would have been so far beneath him! And in fact that would have taken from him the whole pleasure of playing the game! I never once saw Ken on the losing side, but he never made anyone else less talented than himself feel his obvious superiority!

Ken applied to only one college. He wanted to attend the Wharton School at the University of Pa. He chose wisely and was of course accepted. Even though we were now geographically apart, he remained a loyal friend. He drove all the way up from Philadelphia to support me perform a solo in Carnegie Hall during those years. After college a group of us ended up back together in New York City. We were young and finding our way together in the city of dreams. We met regularly on weekends.

During this time, Ken married his magnificent wife, Eileen, whom I had met soon after we all ended up in NYC together. They, in turn, took the time to travel all the way to rural Mexico (where my wife is from) when I got married. Ken and Eileen never let you feel for a moment that their time or generosity brought with it any expectation of return on investment. Both of them give from the heart, just for the joy of giving. Never calling attention to themselves. Their two extraordinary, now grown up and independent children are exactly the same way, further proof of the essential righteousness of the Leech family.

Ken's work eventually took him to Pasadena where he founded his wonderfully successful company. I occasionally came through LA to perform and often stayed at Ken and Eileen's house, and Ken brought his entire family to visit me when I was living out in Spain. No matter how often I showed up, theirs remained a standing invitation. They managed to put up with my incessant practicing and always treated me like visiting dignitary!

For nearly a decade Ken has been an indispensable sponsor of my annual Boston GuitarFest, an international gathering that presents concerts, master classes and individualized instruction to guitarists of all levels from around the world. One day I mentioned the festival to Ken and then, entirely on his own accord and without a show of anything, he quietly gave a very generous donation and has been a supporter ever since. Ken's support has been vital in the ability of our Festival to survive and evolve. Even though Ken has never been able to actually visit the Festival, his generous support has never wavered. Just this past year, as Ken was facing this legal case, and we had some major challenges due to the World Cup in Boston, he still gave his usual donation. Even when facing absolute devastation, Ken finds the time to think about and care for others.

After more than half a century of our very deep friendship, there has been no time whatsoever that Ken has not demonstrated his fundamental honesty, ethics, generosity and decency.

I write this letter with my heart full of love for this extraordinary individual and with admiration for his extraordinary life journey.  I implore you to exercise leniency in sentencing Ken, who is **quite simply a national treasure!**

Yours most respectfully,

Eliot Fisk

# Exhibit 38

# James J. Flick

[redacted]
Palos Verdes Estates, CA [redacted]

July 20, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods,

My name is Jim Flick and I am writing you on behalf of my friend and former colleague S. Kenneth Leech. I was devastated a couple years back to hear the news that Ken was being charged by the DOJ and SEC for a fraudulent investment scheme. I know now that Ken has pleaded guilty to obstructing justice during the investigation into this matter. This was a terrible lapse in judgement on Ken's part and totally out of character for the the friend and colleague I have known for over 30 years. Ken's mistake has cost him so much personally but I know he is even more concerned about how this hurt the lives and careers of his colleagues and coworkers at Western Asset and the firm itself. Knowing Ken as well as I do, I know he carries this every minute of every day.

I began my Fixed Income career at Goldman Sachs in 1987 and met Ken through mutual friends in the industry in the early to mid '90s. My respect for Ken and the other leaders at Western Asset is the reason I joined Western Asset in 1998. Ken and I developed a great working relationship and friendship over the course of my 18 years at Western. During the first half of my career I worked for and alongside Ken as a senior portfolio manager. Ken was my boss and our Chief Investment Officer. During the second half of my career starting in 2009 I joined Ken and others on the firm's leadership team as Head of Global Client Servicing and Marketing.

During my years working alongside Ken on the portfolio management team I saw day in and day out how Ken set the example of how colleagues treated one another and how important trust and mutual respect were both internally, with our trading partners (the Street) and most importantly with our clients. Ken set the bar for this and we all strived to match his level. This became clear to me during my first few weeks at the firm. It was during the 1998 Asian Debt crisis and Western's strategies were being negatively impacted creating under performance for client portfolios to an alarming degree. Ken's leadership instincts took over and he created a situation room where he personally sat for days and made calls to every client affected with Western's client service executive assigned to that account. I learned a lot about Ken that first month. Ken showed all of us how important humility, honesty and transparency were to this business and to our clients.

Ken was an incredible mentor to me and most of us on the investment team. As busy as he was, he always made himself available as a sounding board willing to listen and discuss potential strategies or trade ideas. His brilliance and experience helped everyone on the team. Most importantly he treated everyone at the firm with respect from the CEO, to the intern, to the receptionist. That example created an amazing culture of teamwork and trust.

During my years as Head of Global Client Service and Marketing my working relationship changed as our interactions were more strategic for the firm. Working together to develop new products and penetrate new client markets was a different focus but Ken's wisdom, values and work ethic were always a great help to our Client teams. As he was when I worked with him on the trading desk, Ken was always the first one in and last one to leave. What an example he set.

The most important thing in Ken's life is his family. That was another of Ken's values, family first. There was never hesitation for anyone at Western to take time away to attend to a family matter. Ken and the other leaders at Western made sure that family came first. While many of us in the industry spent free time split between friends and family. Ken passed on many golf trips or ski trips with the "boys" because being with family was way more important to him. I can't imagine how difficult this has been for them but I know how much support they are to him.

Judge Woods, Ken has made a terrible mistake but I hope you will consider what a positive influence Ken has been on his friends and colleagues over these past four decades and what a great husband and father he is. Thank you.

Sincerely yours,

Jim Flick

# Exhibit 39

HAND IN HAND
THROUGH CHRIST

Ss. Joachim & Anne School
218-19 105 Avenue
Queens Village, New York 11429

School Office (718)465-2230
Financial Office (718)776-9188

Ah! Qu'il Est Bon
Le Bon Dieu!

July 20, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods,

Thank you for allowing me to address the Court regarding the matter of Mr. Ken Leech which is before your honor. My name is Linda Freebes. I have been the principal of Ss. Joachim and Anne School, Queens Village, New York for the past 36 years. Our school is home to a student body that is comprised of a mostly immigrant population, primarily of Haitian descent. We have been a devoted Catholic school that fosters intellectual and spiritual development in an environment of love, justice, and peace since 1924. We rely heavily on the generosity of our donors and alumni along with their countless prayers.

On June 12, 2010, Haiti was devastated by a tragic earthquake that severely impacted our community. During that time, our school had a tremendous number of families with children who were still living in Haiti. This disastrous event immediately unfolded before our eyes as children were being flown to the United States with only the clothes they were wearing. Sixty of those children landed on our doorstep the very next day.

At the same time, a New York Times reporter took up residence in our school and began writing about the students, the distant families who took them in, and the overall effect of the tragedy in our school and local community. By divine intervention, the articles reached California and the eyes of Ken Leech. Thus began a 16 year relationship with a person who has been a friend of Ss. Joachim and Anne ever since.

As fate would have it, Mr. Leech's wife had a connection to our school – her parents were married at Ss. Joachim and Anne Church and a family member was a teacher here in the 1960's. Due to this familial connection, Mr. Leech began a journey of extraordinary generosity and compassion for the children we were now tasked with educating and providing a safe environment for. He quietly donated money to our school to provide our refugee children with

immediate assistance as they navigated a new country, home, and language. The help provided by Mr. Leech was immeasurable during those very dark and trying days following the earthquake. This was only the beginning of Mr. Leech's empathy and generosity to our school and the children we serve. He has consistently remembered us every year and continues to help children he has never met, but whose needs are never ending. His acts of kindness were never motivated by personal gain. Our humble corridors could only provide thank you notes, masses, and daily prayers read by the children. Mr. Leech's generosity enabled students to remain in school and experience opportunities that would not have been possible otherwise. Half of the students we assisted from the Haitian earthquake went on to college.

I can speak with confidence that Mr. Leech demonstrates compassion, humility, and a sincere commitment to help others. As the principal of Ss. Joachim and Anne, I have witnessed Ken Leech's extraordinary benevolence. He is a person who deeply values community and believes in the future of children who have been challenged in many ways. It is our hope he will be able to visit our school some day and see the difference he has made in the lives of so many of our students. Our Gospel choir would rejoice in song!

I respectfully ask the Court for leniency and to consider these aspects of Mr. Ken Leech's character and the positive impact he has had on our school community.

Respectfully,

Linda Freebes

Linda Freebes
Principal
Ss. Joachim and Anne School

# Exhibit 40

August 7, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods:

I am writing to you regarding my good friend of almost 55 years, Ken Leech. Although Ken has pleaded guilty to the offense of obstructing an SEC investigation, I would like to provide some information about his character that I hope you will consider in determining an appropriate sentence.

Ken is intelligent, driven, hardworking, trusting, loyal, unassuming, generous, honest, ethical, and deeply devoted to his family. Based on my knowledge of Ken's character, the conduct to which he pleaded guilty is wholly inconsistent with the person I have known throughout our friendship and with the values he has consistently demonstrated over the years.

Ken grew up in what he described as a middle-class family in Syracuse, New York. I met Ken in September of 1972 at University of Pennsylvania. We lived across the hall from one another in the freshman dorm.

At that time, most students at Penn enrolled in the College of Arts and Sciences to obtain a liberal arts degree. Most liberal arts students had no clear sense of their major and, accordingly, no clear plan for life after graduation. Ken, on the other hand, had career aspirations that he knew would never change. He merely wanted to invest money better than everyone else and therefore enrolled in Penn's Wharton School. My hallmates and I nicknamed him "Wharton" in our first week at school and that nickname stuck with him throughout his college career.

During our time at Penn, I spoke with Ken daily for at least an hour on various topics, including our backgrounds, current events, scholastic topics, and sports. We enjoyed going to the Palestra for all of Penn's basketball games.

Ken worked very hard, but he made sure he had time for his favorite pastime. His dad taught him how to play bridge when Ken was about 4 or 5 years old, and his dad took him to tournaments by the time Ken was about 10. Ken taught almost everyone on our freshmen dorm floor how to play. The two of us became bridge partners and played every Wednesday night at Penn's Duplicate Bridge game and in some local tournaments.

Meanwhile, Ken became increasingly interested in what Penn had to offer, and he decided to obtain a major in history in addition to his Wharton degree. In 5 years, he graduated with top honors, earning undergraduate degrees from both Wharton and the College of Arts and Sciences, along with a Wharton MBA in finance.

Ken's many personality traits became evident during our college years. He was among the most intelligent and driven people I have ever met, yet he remained unassuming—even after later achieving significant professional success. Though somewhat introverted, his kindness and trustworthiness made him universally well-liked by our classmates. Ken was deeply loyal to his friends and often hosted visitors from his hometown days. He was also generous. Although he did not have much money during our student years, he freely gave his time, knowledge and advice to others whenever he could. During those years, Ken taught me a great deal about business and economics, and he personally mentored me as I entered the actuarial profession.

Once college ended, our lives became more complicated, and although we did not speak as much to one another as in college, we always stayed in touch.

I remember Ken telling me how excited he was when he got his first job at a bank in Detroit for $17,000 per year. When I started working as an actuary, he gave me lessons in investments, and I always listened to him. He gave me career advice about switching from working at an insurance company to a consulting firm. I ultimately became a Principal (non-CPA equity partner) at Ernst & Young and was elected President of the Society of Actuaries. I am currently retired and a board member of Munich American Reassurance Company.

Ken's business career took off after that Detroit job. He went on to pursue a series of investment type opportunities along the east coast and, as an entrepreneur, took a risk with a friend of his to start Western Asset Management, a venture that proved highly successful. He was later inducted into the Fixed Income Hall of Fame and achieved life master status in the American Contract Bridge League.

Ken loved Penn and donated generously to the school. From time to time, Ken came back to Philadelphia to speak with Wharton students. In some of those visits, I had dinner with him or played in local bridge games with him. Ken also gave financial assistance to friends and relatives in need over the years and never wanted to be repaid.

Ken and I were at each other's weddings and recently at our daughters' weddings. Over the past 10 years or so, we played bridge tournaments with one another in different locations and played online bridge, too.

Ken loves his family. He was extremely proud when his daughter got admitted to Yale and when his son got admitted to Emory. He was ecstatic when his daughter made him a grandfather, and even more so when his daughter and her family

decided to move back from France to Los Angeles. He was also proud to tell me when his son started dabbling in the investment world.

Ken is also loyal to his friends. At his daughter's wedding, he had several high school friends in attendance, even though Ken moved away from them over 50 years ago.

Ken achieved the American Dream through hard work, integrity, and dedication to his family and profession. The past two years have already taken an enormous personal, emotional, and professional toll on him. I hope the Court will take that into account by fashioning a fair and compassionate sentence.

Our country would benefit from having more people like Ken Leech – individuals who work hard, care deeply about their families, and willingly give more time and talents to help others. I respectfully ask that you allow him the opportunity to continue living the productive, honorable life he has led for so many years, so that he may continue contributing to the well-being of his family, his friends, and his community.

Please allow him to continue the good life that he has continually lived so that he can continue to contribute to his family's, friends', and community's success. I respectfully ask that you show him leniency in imposing Ken's sentence.

Respectfully,

Mark Freedman
Jenkintown, PA
[redacted]

# Exhibit 41

Samuel F. Glaze
[redacted]
Sierra Madre, CA [redacted]

July 20, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods:

Thank you for reading this letter. I am writing to give you a picture of Ken Leech whom I have known since 1995. I was then, and still am, an active teacher at the Pasadena Waldorf School in Altadena, California. Ken and his wife Eileen met me when they applied to the school for his elder child, Catherine, to be admitted to my first-grade class. We had a somewhat lengthy meeting because Catherine would be in my class for the next eight years. Both Ken and Eileen had lots of questions for me, and I had a number for them. Catherine was in the school until eighth grade with me as her lead teacher. As I told Ken and Eileen way back then, I would become somewhat like a third parent. Our working relationship grew and I got to know Ken quite well.

During Ken's decade or more of being a parent at Pasadena Waldorf, he was generous with sharing his knowledge of finance and economics and served many years as a member of our Finance Committee. I had the opportunity to serve with him for a few of those years as our terms overlapped. He was not only an expert, he was a patient expert, and always willing to help educate us as to why a particular expenditure was wise or not. I consider his service to the school as exemplary.

I know that Ken has pleaded guilty to a crime and that you are the judge who will determine his sentence. My picture of Ken is one of a caring and involved father to two children, a devoted husband, and someone who cared about his extended family and friends. He was very supportive of his in-laws Lois and Clifford Stueck, and he made sure Eileen's parents

were cared for. The Ken Leech I know has been an upstanding member of my school community, a dad who showed up for his kids, and interacted with me and other members of the school community with integrity and good humor. His daughter, my student for eight years, started out quietly and then aced her way through high school and Yale. I am privileged that I can still count Ken and his extended family as friends even though my academic responsibilities to Catherine ended in 2002.

I wanted to share my picture of Ken Leech and vouch for his stature, kindness, and commitment to all of us during the many years I have known him.

Respectfully,

SF Glaze

SAMUEL F. GLAZE

# Exhibit 42

CATO INSTITUTE

1000 Massachusetts Avenue NW
Washington, DC 20001
202-842-0200
www.cato.org

Peter N. Goettler
*President and CEO*

July 21, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods:

My name is Peter Goettler, and I serve as President & CEO of the Cato Institute. It has been a pleasure of my life to know, and become friends with, Ken Leech.

I first became acquainted with Ken more than a decade ago, when we were both financial supporters of the Cato Institute and would meet casually at donor retreats convened by the organization. I also knew Ken by reputation, since my previous career had been in the fixed-income markets in New York City. Since I became President of Cato eleven years ago, my relationship with Ken and his wife, Eileen, has developed into a deep friendship.

I am writing in hopes that you will consider the whole person—and the whole life—when deliberating the sentence that will be imposed upon Ken. For I believe the offense to which Ken has pleaded guilty is but one mark on a life that has otherwise been lived with exemplary character and great integrity.

It is quite easy to write such a letter in support of Ken, because one need not simply ask that the word of the writer be trusted. For Ken's value as a human being is so abundantly supported by evidence, and my own experience over the years.

What are the critical elements of character? Values, of course, like family; dedication to causes; financial and personal generosity; commitment to principle; care for the generations that come next; work ethic; and respectful treatment of others. As I share below, I have seen all of these attributes in Ken.

Ken and Eileen have a marriage that has thrived for decades because of their devotion to one another. They have built and nurtured a close, loving family. I have seen this up close over the years, and particularly when I have been a guest in Ken and Eileen's home and they in mine. And

at our Cato events, which have often been family affairs for the Leeches—with Ken, Eileen, and their children Catherine and Stephen participating. We even welcomed their infant grandson to his first Cato weekend in the fall of 2024. Ken has built and sustained this commitment to family while maintaining an exceptionally demanding career, which speaks to his steadiness, priorities, and integrity.

For more than thirty years, Ken, Eileen, and their family have been generous with their time, service, and financial resources in support of Cato and our mission. They share our belief that Cato is a unique organization in its adherence to principle, independence, and nonpartisanship—joining with allies on both right and left to advance common goals. I have never observed the Leeches to have much interest in politics; but rather, a commitment to principle regardless of with which political party these principles may align them in the context of any particular policy area. The Leeches have been particularly enthusiastic about our Sphere education project, in which we join with tens of thousands of educators from across our entire country and the full breadth of the ideological spectrum, in an effort to restore our civic culture and promote civil discourse in schools.

I believe Ken and Eileen have been steadfast supporters of Cato because they recognize the important contribution an independent and nonpartisan organization can make to the kind of country our children and grandchildren will inherit. And I believe that someone like Ken, who rose from a modest background and upbringing to enjoy extraordinary success, has a special appreciation for the American dream. He understands that there is no higher moral responsibility we owe to future generations than to preserve for those who come next the ability for each to live his or her own version of the American dream, with the same level of opportunity that we have enjoyed.

And in the crucial project of sustaining our responsibility to future generations, perhaps Ken's most personal success is reflected in his own next generation. Because Ken's daughter and son, Catherine and Stephen, share Ken and Eileen's adherence to principle and sense of duty and generosity to those who come next.

When I met Ken over a decade ago, I was initially most impressed with what he had accomplished in his business career. I worked in fixed income on Wall Street for over twenty years, so I was familiar with the markets, the people, and the major firms. Knowing Ken by reputation, I recognized his significant place in the pantheon of legendary fixed income asset managers. And I appreciated—and greatly admired—what Ken and his colleagues achieved in growing Western Asset Management Company into one of the industry's largest, most successful, and most respected firms.

Yes, work ethic and dedication can be indicative of strong character; but despite this, Ken's business success may seem less important than the other factors discussed above. But it is relevant here, I believe, because Ken is a self-effacing man of great humility and kindness. For example, I have seen how Ken treats Cato's most junior-level staff members with friendliness,

warmth, and respect. These are, of course, exemplary qualities; but I believe they are even more remarkable in someone who has achieved so much success in life.

I greatly appreciate the opportunity to share my thoughts and personal experiences with you, Judge Woods, and I appreciate you taking the time to read this letter and to consider them. I am hopeful that you will grant leniency in determining an appropriate sentence for Ken. Personally, of course, as I hope Ken and his family can sooner return to the quiet and dignified life they have otherwise lived. But also because Ken can continue to make in the years ahead important contributions to the future of our country.

With respect,


Peter N. Goettler
President and CEO
Cato Institute
[redacted]

# Exhibit 43

August 11, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods:

I write to you seeking leniency for my long-time colleague and friend S. Kenneth (Ken) Leech. I understand that Ken has pleaded guilty to obstructing a proceeding before the Securities and Exchange Commission, and that you will be presiding over his sentencing. In this regard, I would urge you to consider his age, his career, his excellent character, and the positive impacts he has had on the lives of so many people including myself.

I have known Ken for 35 years, and I worked closely with him at Western Asset Management for 16 of those years as an economist and a member of the firm's investment strategy team, until I retired in late 2007. I was one of the people who interviewed and later decided to hire Ken. Thanks in large part to Ken's investment skills, wisdom and charm (his trademark Irish humor is immediately endearing), Western Asset Management grew from a small firm with only 40 people to one of the leading fixed-income management firms in the country, with over 500 employees. That would not have been possible without Ken.

Ken was the most revered and respected member of the firm, and for good reason: he is passionate about investments, and he is a good, decent and honest person. To my knowledge, those qualities were never challenged by anyone inside or outside the firm. Indeed, those qualities are essential to one's success in the bond market, where trading is done almost exclusively over the counter. The mere hint of doubt about Ken's integrity would have been enough to end his career years ago.

I owe Ken a healthy portion of my investment knowledge and financial success. Ken is one of  the most skilled and intelligent investors I have ever known—and I've known many in the course of working with corporate finance executives responsible for many hundreds of billions of dollars. Those same corporate chieftains universally considered Ken to be an unimpeachable source of investment savvy.

My respect, trust, and admiration for Ken is of the highest order. In the late 1990s I had a disagreement with the president of the firm that would have led to my dismissal if not for Ken's intervention. I consider myself lucky to enjoy his friendship, and we share investment ideas and economic views to this day. Thanks in large part to Ken's tutelage over the years, in my retirement I now manage portfolios for several dozen family members with no small measure of success. As one put it, I have changed her life, much as Ken changed mine. For years I have instructed my wife that in the event of my death, she should seek Ken's advice on any and all investment issues.

When I first learned he had been indicted for fraudulently allocating thousands of derivatives trades I was dumbfounded. That's definitely not the Ken I know. Regardless, as a consequence of his indictment his career is effectively over and the firm he worked for has downsized painfully; a harsh sentence on top of this would be cruel punishment for a man who has done so much for so many over the years. I would respectfully ask that you show leniency to Ken.

Sincerely,

Scott F. Grannis

[redacted] Claremont CA [redacted]
[redacted]

# Exhibit 44

September 15, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods,

I am a doctor, specializing in the treatment of allergic, asthmatic and immunologically-mediated problems. I have been practicing clinical medicine in Glendale, California for 45 years; during that time I have had the pleasure of caring for all members of the Leech family: Ken and his wife (Eileen), as well as their children (Stephen and Catherine) and their first grandchild (GD). Ken has been a patient in my practice for 30 years, during which time he has been treated for [redacted]. He also has a [redacted]

[redacted] This requires careful, ongoing clinical scrutiny and periodic [redacted] follow-up evaluation.

Over the three decades I have treated Ken, I have gotten to know him well. When I learned that Ken was having legal problems, I immediately told his family that I would gladly volunteer to be a witness in describing the warmth and personable congeniality of his character, which I have observed over many years of interaction with him. Indeed, Ken seems to treat everyone with that same degree of good-natured cordiality, truthfulness and respect that have been my experience over the intervening decades. Please consider Ken's very positive, deep-seated, genuine traits of human kindness as you decide on punishment for his legal transgressions. As the great English poet, Alexander Pope, so spiritually declared, "To err is human; to forgive, divine."

Sincerely Yours,

Dr. Alan Green
1809 Verdugo Blvd., Suite 300
Glendale, CA 91208
(818) 790-5233

# Exhibit 45

21 August, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U. S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods:

My name is Christopher Greetham. I am 81 years old and a resident of London.
My career has been in the investment business. I started out as an analyst for a stockbroker in the City of London, I then worked for Bankers Trust in the investment department in both London and New York. I was then hired as a CIO/CFO by OIL Insurance (now named Everen) in Bermuda, OIL was founded in 1972 by 16 international oil companies to underwrite major property exposures.

OIL assets were not managed internally but by outsider managers (bonds and equities). The managers were selected by me and approved by the Investment Committee (made up of CFOs from several major oil companies). I worked with Ken Leech and WAMCO for over 25 years.

I know that Ken has pleaded guilty to an offense. However, because of the length and strength of our relationship, I feel compelled to write on Ken's behalf, to provide information about the nature of the relationship and the respect that I hold for him.

I have had many different money managers over the years, and, through working with and hiring and firing managers, I believe I have become a good judge of character. For me, one of the most critical considerations in hiring a manager was my first experience meeting with them: how they communicated, how they conducted the conversation, how they related to me and others. From the very start, Ken struck me as extremely knowledgeable, bright and capable, but also humble – an unusual combination of characteristics for such a successful asset manager. Unlike other managers, he did not hold himself out as the smartest guy in the room (or the planet, as some managers I met would have). He was self-deprecating, with a great dry sense of humor, but also direct. I knew he would be straight with me as his client and able to deliver news in clear and precise terms.

After meeting Ken, I hired WAMCO initially to manage a bond portfolio for OIL Insurance. WAMCO became a key manager for the Company's balance sheet, as the assets grew from $350mm in 1982 to $1.5bn in 1996. In 1996 I was hired by EXEL Limited (later re-named XL Capital) as Chief Investment Officer. At that time the company's overall assets were $4bn, predominantly invested in fixed income assets. I restructured the portfolio and hired WAMCO to manage an important part of that Balance Sheet.

During my 10-year tenure at XL Capital, I managed a tenfold growth in invested assets to more than $40bn. WAMCO remained a core Fixed Income manager throughout this period of growth. The extremely able, principled and humble man I first met remained the same over the many years of our professional relationship, even as Ken's success and reputation grew.

My continued professional and personal relationship with Ken reflected the respect and confidence that I had in Ken and his portfolio team. This confidence endured throughout my career at XL Capital until I retired in 2006. Even during periods of subpar performance, I could trust that Ken would remain committed to the strategies he and Western explained to me from the start, and that Ken would address forthrightly the reasons why the portfolio was not performing as hoped. In simple terms, Western and Ken were always true to what they told me from the start of our relationship.

Over the years, our professional relationship evolved into a friendship. I decided to invite Ken and his two partners - Steve Walsh and Jim Hirschman-and their wives to Bermuda to attend a fund-raising dinner for The Bermuda National Trust. The major event of the evening was an auction to blend your own barrel of wine at Deerfield Winery in California. We decided to bid as a group - and won!

We all met at the winery, including our wives, to personally blend the wine. My wife and I had the pleasure of meeting Ken's wife, Eileen. Ken's, and my personal friendship expanded to include our wives. Since that time, we have had dinner in London and attended the Masters Golf Tournament, again with our wives.

The relationship with Ken and the WAMCO family has been an important, and memorable part of my career. It is, absolutely, not common for a money manager and client to develop a decades-long friendship like ours. This friendship reflects the deep respect I have for Ken, both as a fiduciary, and a person.

Ken and his team always operated at the highest level of professionalism, met the portfolio

performance goals that I set, and never disappointed. I respectfully ask that you exercise leniency in sentencing Ken.

Respectfully,

Christopher Greetham

[redacted]

# Exhibit 46

July 20, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods,

My name is Jonathan Hales, and I'm the co-founder of Glass Bio, a biotech startup focused on building tools to advance scientific progress.

For over a decade, Catherine has been a valued friend, and through our longstanding relationship, I have had ample opportunity to observe her father Ken's character firsthand. He is, in my experience, a man defined by his compassion, his willingness to give of himself, his deep commitment to his children, and an unassuming honesty that guides his conduct. I bring these observations to your attention respectfully, trusting that the breadth of a person's character is relevant to the judgment you are tasked with making.

I first met Ken in 2017 at Catherine's masters recital in New York. What first impressed me about Ken was how far he was willing to go to support his daughter's artistic dreams. Though Ken is no stranger to long flights in pursuit of business or client support, flying from Los Angeles to New York for one weekend is a long way to come to see an academic concert, especially one that Catherine produced and performed herself. It was evident from the beginning that he loves his daughter very much and was committed to supporting her in any way he could. He was delighted to meet me, my wife Naomi, and Gene Epstein, my stepfather, who also attended the concert, and it was very clear that any friend of his daughter's was also a friend of his.

Ken and I shared a particularly meaningful conversation at Catherine's 35th birthday. Over the course of our nearly three-hour-long conversation, I learned a number of things about him. First, I learned how much he clearly still loves his wife, Eileen. He recounted to me and my wife in detail the story of how they met and how they walked the streets of New York until dawn. The openhearted way he told the story communicated in no uncertain terms both his love and respect for Eileen and his love for New York City, the place that brought them together and where I also grew up.

I also learned how generous he was with his time. Not only was he incredibly knowledgeable on topics ranging from history and economics to political philosophy, but he was also delighted to spend time with us and to share facts and stories with two people visiting from out of state who didn't know many other people at the party. We talked about our favorite books, and our vision for the future.

The Ken I've seen up close, through years of friendship with his daughter, is someone built on honesty and modesty, a man whose family always came first. While nothing I've shared can undo what has occurred, I'm aware that Ken has admitted to obstructing an SEC investigation. I hope that you will take into consideration the character of the man I have observed over the years I've known him. The Ken I know is one who has earned my respect over time, and his actions in this matter do not reflect who he truly is at his core.

Thank you for your consideration,

**Jonathan Hales**

[redacted]
Lee NH [redacted]

# Exhibit 47

July 17, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Re: Ken Leech Sentencing – October 20, 2026

Dear Judge Woods:

I am writing as a friend and former colleague of Ken Leech. I have known Ken since he joined Western Asset Management in 1990 and we worked together at Western Asset until my retirement in 2014.

Although I realize Ken plead guilty, I am writing on his behalf to provide some information that I hope you will consider in making your decision with regard to sentencing.

In the many years I worked with Ken, I had numerous opportunities to witness his outstanding character, the importance he placed on the trust given to him as a fiduciary for our clients, and the level of respect he earned by all those who worked with him. Ken and I would often have discussions about various aspects of our business. He was always very mindful of his obligations to our clients and our firm. We didn't just discuss what needed to be done, but also the why, so we could be sure we were really solving whatever issue we were facing. In all my encounters with Ken, he was thoughtful, respectful and very intent on always doing what was best for our clients. The acts which Ken has pled guilty to are not consistent with the behavior I witnessed on a daily basis over the 20 years we worked together.

Since my retirement from Western Asset in 2014, my husband and I have stayed in touch with Ken and his family. I have seen his children Catherine and Stephen grow into adulthood and the Leeches are a beautiful family. He has been a wonderful husband to Eileen and father to both of his children.

I hope you will take into consideration Ken's outstanding qualities and character in making this important sentencing decision.

Respectfully,

Ilene S. Harker

Ilene S. Harker
[redacted]
Newport Beach, CA [redacted]
[redacted]

# Exhibit 48

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

September 5, 2026

Dear Judge Woods,

I am writing to provide you with information and a perspective on Ken Leech that you may wish to consider in connection with his upcoming sentencing.

By way of background, I am 75 years old and have spent most of my career in the finance industry. I worked at Credit Suisse and its predecessor, First Boston, in the Fixed Income Division from 1982 to 2007. During my 25-year career there, I served in a number of senior positions, including Co-Head of Credit Suisse Financial Products, which was responsible for the firm's trading of financial derivatives; Head of the Global Emerging Markets Business; founder of the Relative Value and Arbitrage Fund, a proprietary trading business focused on derivatives; and Head of the Global Fixed Income Division.

In 2010, I founded Capra Ibex Advisors, a financial advisory firm that provides investment and risk management advice to financial institutions and ultra-high-net-worth individuals. I am currently transitioning toward full retirement and serve as Founder and Advisor to the firm. I also served for several years on the Board of Directors of E*Trade prior to its sale to Morgan Stanley.

I feel fortunate to have had the career I have had, and that is one of the reasons I wanted to write to you about Ken. When I joined First Boston in 1982, I had previously worked as an economist at the International Monetary Fund. The world of Wall Street trading was completely new to me, and I had a great deal to learn. Looking back over the more than four decades since then, there were two people who played a pivotal role in helping me get started on what would become a successful career. One of them was Ken Leech.

Fixed-income options, futures, caps, floors, and swaps had only recently begun trading in 1982, and there were relatively few derivatives experts on Wall Street. There were no courses to take or standard textbooks to consult; much of what we learned came from financial journals and, importantly, from one another. My first job at First Boston was to determine how these new instruments could be used to develop hedging strategies for the firm's clients.

At the time, Ken was Head of Option Trading on the Treasury desk at First Boston, and he was one of only two people in the firm whom I felt had a deep quantitative and practical

understanding of how the fixed-income options market worked. I regularly spent time at his desk, asking questions and trying to understand how he priced and traded options. He was busy trading and managing positions, but he invariably found time to answer my questions patiently and, usually, with good humor.

Other traders were less willing to take the time and, frankly, sometimes treated me like the pest I probably was. But not Ken. He understood that I was trying to learn, and he always found time to help me. He was smart, patient, straightforward, and blessed with a great sense of humor. We became good friends at work, and over the next several years we worked together on many transactions for clients.

Ken's early help served me well. I went on to develop a deep expertise in derivatives and, a decade later, became Co-Head of Credit Suisse Financial Products, responsible for the trading, sales, and structuring of derivative products across all asset classes at the firm. I have never forgotten the role Ken played in helping me develop that expertise at the beginning of my career.

Our careers went separate ways in the 1990s. Ken rose through the ranks at Western Asset Management (WAMCO), while I rose through the ranks at Credit Suisse. We stayed in occasional contact through a close mutual friend, but we no longer interacted professionally.

That changed in 2002, when I became Global Head of the Fixed Income Division, responsible for all the firm's fixed-income trading and sales businesses. By then, Ken was Chief Investment Officer at WAMCO, one of our most important clients. Although I did not interact with him directly on individual transactions, Ken was in regular contact with our Treasury sales desk. He had an excellent reputation on the desk as someone who knew the markets extremely well, conducted himself professionally, and treated our salespeople fairly. He was highly respected for being straightforward and honest in his dealings with our firm.

I write this knowing full well that Ken has pleaded guilty to an offense, and I do not mean to minimize the seriousness of that fact. I can only tell you that the conduct to which he pleaded guilty was surprising to me and inconsistent with the person I had known over many years—both from my personal experience with him early in my career and from the reputation he later earned among the professionals at Credit Suisse who dealt with him regularly.

I hope this letter helps provide a fuller picture of Ken than might otherwise be apparent from the court filings alone. I have known him as a consummate professional who conducted himself with honesty and integrity, but also with kindness, patience, and good humor.

I especially appreciated those qualities more than four decades ago, when I was first finding my feet on Wall Street, and I continue to appreciate them to this day.

Respectfully,

Jim Healy

James P. Healy
[redacted]
Riverside, CT [redacted]
[redacted]

# Exhibit 49

July 30, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods:

My name is Jim Hirschmann and I am the current Chairman and former CEO of Western Asset Management. I began my career at Western Asset in 1989 - a year before Ken Leech joined. Because my role was in Marketing, I had frequent contact with Ken and other members of the Investment Team. While Ken would not become CIO for some time, his presence, investment acumen and personality made it evident that he was a future leader of the firm. Ken and I were able to spend a considerable amount of time together because of the numerous work trips we needed to do as well as the times our families were together for personal or work events.

Ken was appointed CIO in 1998 (I became CEO in 1999). Having worked more closely with him the previous 8 years, it was an appointment I wholeheartedly supported. I had come to know that not only was he passionate about what he did, but he was just as passionate about those he worked with. No matter what was going on in the markets, Ken didn't have a problem stepping away to have a one on one chat with a Team member that "seemed" off lately or having a personal sit down with an employee whose spouse had health issues. As much as Ken's focus was on the markets, he knew and appreciated the fact that our people were the most important assets we had. And because they were important, they deserved time and attention.

A testament to Ken's dedication and commitment to our clients and the firm came after Ken had taken a step back from the firm for health reasons. The firm hit a bad patch - a really bad patch. It was a very tough time for everyone and the firm was in a tight spot. I approached Ken to see if he'd be interested and willing to help out, in any way he felt comfortable doing. After some thought and speaking with his wife Eileen, he said yes. He began providing support and guidance to the London Investment Team from home. After a bit of time, Ken realized that the Team and the firm were best served by him physically being in the London office. At the expense of his health, and because of the respect and care of the firm and its people, Ken opted to make frequent trips back and forth to London. The Firm owes him a huge debt of gratitude for that personal sacrifice, among many others.

Ken has always believed in a Team philosophy. We succeed together - we fail together. I concur with that philosophy and that is how we've tried to lead the firm. However, Ken is more humble than most. Even when he wasn't responsible for the decisions of all of his Team, he believed that as a leader, it was ultimately HIS responsibility to be accountable for their decisions as well as it being his responsibility to stand by his Team. It was a personal commitment that he would not compromise on, despite my occasional thoughts to the contrary.

In that vein, I'd like to provide you with a few examples to illustrate this point.

- In 1998, we suffered a crisis in the Emerging Market sector. Ken's immediate thought was that he should phone every client that was affected to explain our rationale for the positions we held in their portfolio and his thoughts on the process going forward to make a course correction so the clients would know we were on top of the situation.

- In the Enron collapse of 2001, Ken's response was to take the blame himself with our clients rather than put the blame on the analyst who made the call to hold. He went a step further and refused to fire the analyst for their wrong call. His attitude was "none of us makes the right call all the time."

- When Ken was named Manager of the Year in 2014, the media needed/wanted a photo of Ken to run with their stories. Ken immediately refused and said it was a Team effort, therefore, the photos should be of the Team. And that is what we did.

- I don't remember the year, but when we had made some bad investment decisions on behalf of one specific client, it was particularly brutal. One of the worst "apology tours" we had to do. Not a fan of flying, Ken nonetheless insisted we get on a plane to speak with them in person. We didn't know it, but we'd have to make that trip several times before we were able to warrant another chance. The client eventually hired us back and have come to rely on us as a committed and trusted investment partner. I know for a fact, that it was because of his insistence to do these meetings personally and to accept responsibility for investment decisions that did not perform well that the client decided to keep a small amount of cash with WA so that they would be able to easily re-fund once a decision had been made on an investment strategy.

- Lastly, in 2023, when an analyst made the wrong call on Credit Suisse and the bank collapsed, Ken again took the blame with clients and refused to let the analyst be held publicly responsible. True to form, Ken felt that as the CIO, all bad decisions were ultimately his responsibility since he was the head of the Team. Yet, when things went well, Ken was the first to give credit to others on the Team.

In building the firm together, we shared a common philosophy and vision. As leaders of the firm, our focus was on the long term - for the firm, our clients and our staff. Profits were never the guiding force. If we concentrated on the long term benefits, the profits would eventually come. Even our compensation structure was based on the long term. Many (if not most) investment firms reward handsomely for a job well in a given year. Ken and I believed that yes, you did reward staff for having a good year, but you also stressed that one year doesn't "make us" and the expectation was the solid work needed to continue. Our belief was to reward staff at the time, but also over time. When the firm did well - staff did well. It was a Team concept. I believe our staff retention level attests to that.

As for the Investment Team, Ken was the individual that advocated for their compensation numbers since he was the one that managed them. I think it is important to note that compensation numbers for the Investment Team came from Ken and my share of the profits. Therefore, every dollar that Ken pushed for the Investment Team members to get, that was a dollar less that would be left at the end for him. This was also true when times were tough - more

for his Team, resulted in less in his final comp. But Ken always pushed for the compensation of his team, and I agreed. We believed in fairly recognizing and compensating the Team before ourselves. It was the right thing to do and it was the best decision for the long term. Even today, I know we both stand on that decision.

Everyone always knew that investments were Ken's passion. If you ever asked him a question about the markets, a particular company or the economy in general, you might as well sit down because that was Ken's wheelhouse and he could go on forever! We didn't always agree when it came to investment strategy, but Ken was always gracious enough to hear me out. And then he would be methodical in explaining how I might be incorrect. At the end of the day, whether I had changed my mind or not, I would defer to Ken. I trusted his judgment, and more importantly, I had absolute confidence in his integrity. I had worked with him long enough to know what drove him was his intention to put the well-being of our clients first. It was his job to steer us in the appropriate investment direction and I was always confident that he would do so.

Ken and I spent 30+ years building Western around Core and Core Plus. While I know that this case relates to Core, Core Plus and Macro Opps, I think I am uniquely qualified to address Ken's commitment and attitude regarding this subject. He and I personally spent a considerable amount of time on those products - Ken on the investment side and myself on the marketing and business side. We both saw Core and Core Plus as sound investment vehicles that would provide solid options for our clients and would be products that would fit into our long term plans for Western. Macro Opps was a lucrative product for Western but it never came close to Core/Core Plus in terms of revenue or importance to the firm and its reputation. However, Macro Opps ended up being a huge burden on Ken in regards to the amount of time it took to manage that product. It was a difficult product to manage. This was in addition to the 10 other different strategies and accounts that Ken oversaw for Western's biggest and most important clients as well as the oversight of the entire Investment Team. There were times when Macro Opps was such a drain on his time that Ken floated the idea of closing the strategy. We agreed that was not the best decision for the firm, so Ken sought to have someone else take over the fund. There weren't any solid obvious choices in-house who had the necessary expertise and experience to do this, but he identified a former portfolio manager, Andres Sanchez Balcazar, as a potential candidate. While we made a few trips to Geneva to have one on one discussions with him, the recruitment was ultimately unsuccessful. While disappointed, Ken didn't complain and continued on.

These are some of the experiences I had with Ken in building Western with him together over 30+ years we have worked together. There are many more stories just like these that I am sure you are also hearing from others at Western Asset. Ken is a good man, a person of integrity, humility and empathy. He cared deeply about Western Asset, its people and its clients. I understand the significance of Ken's plea as well as the severity of this entire case. I've written this letter so that you can see, from someone who has known and worked with Ken for many decades, the type of person Ken has been for many years. I respectfully ask that you take that into consideration and show leniency in regards to Ken's sentencing. I appreciate the time you have taken to review my letter and the many others that I'm sure have come your way.

Sincerely,

James W. Hirschmann

# Exhibit 50

July 27, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, NY 10007-1312

Dear Judge Woods:

My name is Tracey Hutson. I am 59yrs old and I am the Executive Assistant to Jim Hirschmann, Chairman of Western Asset Management Company (WA). I have known and worked with Ken Leech since I began my career at WA in 1994.

I am writing to you today on behalf of Ken Leech and to share what I know of his character. I know that Ken has pleaded guilty in this matter, so I am very clear how serious this is. I thank you for taking the time to read this letter and I hope you will take these thoughts into consideration when making your decision regarding his sentencing.

When I asked if I could participate in this process, I assumed it would be an easy task. I was 'sure' that I could look back over our 32 year relationship and provide a million instances that would show the Ken Leech I know – it would only be a question of *which* examples I would provide. I was wrong. I've struggled with this letter for 2 weeks now. Not because I was unable to think of anything. It has been the opposite. How do you know someone, better than most people do, and how do you adequately describe how this person is personally and professionally, to someone that has only seen them during the worst point in their life? This felt like such a daunting task.

Therefore, while my format may not be like the others, it's the best way for me to share a myriad of examples of the Ken Leech I know. I've chosen to categorize the list by characteristic and then provide bullet points to illustrate my thoughts.

**Thoughtful:**

- While most C Suite Execs have a Christmas card list a mile long (as did Ken), the # of cards that would have personal hand written notes in them was usually small or non-existent. Ken was the opposite. Ken took the time to write something personal to most of the folks on his list. I asked him why one day and he said that's the way it should be – you should always take the time to acknowledge someone and to show them they are important.

- If/When Ken noticed a new person in our on site Café or on the cleaning crew, he'd inquire as to where the other long time employee went, who the new person was and ask what was their story. Ken believed everyone had value. He also knew that people 'further down the food chain' were often unseen, and he wasn't going to be one of those Execs that didn't acknowledge every member of the Team. I've seen someone that is used to being one of the unseen, smile from ear to ear when Ken acknowledged them by name. It was a lesson I took to heart and try to do the same.
- I've seen Ken rack his brain for days, trying to come up with the right idea to acknowledge someone's birthday, anniversary, milestone or loss. He felt that the more personal the outreach, the more meaningful it would be to the receiver. But then, he'd be surprised by the Thank You note he'd receive in return. He was stunned, because he really was doing something to be thoughtful, not for anything in return. He once gave me a thank you note for the thank you note that I had written him! That was a first for me.

**Compassionate:**

- At one time, we had over 1,000 people in our offices worldwide. No matter how many people you dealt with, you were never in touch with everyone. In the Exec. Area (5 of us), we depended on each other to let the others know if we heard of a team member that was having personal struggles. No matter the issue, Ken's first response was what can we do? Anything I should do? Whatever we decided to do or not do, either personally as a group or collectively as a company, Ken was one of the few that would always circle back later, wanting to know how things were – how the individual was doing specifically. In an age when many folks are quick to donate money to a cause, you rarely hear from them afterwards. That was never the way with Ken.

**Work Ethic:**

- Most days, Ken was the first one in (5/5:30am) and the last one (or one of them) out at the end of the day – after 4pm. While I was not on the Trading Fl. with him and his Team (he'd end his day in his office upstairs from the Trading Fl, where I was), I was well aware of when the work load got heavier as he'd have more on his plate. No matter how tired he looked or how worn down you saw he was, he'd never complain. It was just part of the job. Even if I chided him that everyone else had gone home and questioned why he hadn't, he'd usually laugh and just say he drew the short straw! Then he'd put his head down and start flipping thru all the paperwork that needed to be tended to.
- Despite how much Ken had on his plate, he hated to inconvenience someone else to assist him. Whether it was a last minute travel change, a draft of something he needed another set of eyes on, or changes to a presentation that needed to get into Graphics, he never assumed that anyone had the time or bandwidth to assist him. I remember several times when it's late in the day and Ken should have been long gone. He'd start to come over to my desk, papers in hand, look at his watch, walk

back to his office. I was the late person, so his assistant was already gone. I'd cringe sometimes cuz I just wanted to go home. After a couple of the back and forth, he'd make it to my desk and ask, "can I trouble you for something..."? Of course you put your stuff down and help because that's what we do with and for each other. Unlike others, you'd get at least 3 Thank You's from Ken over the next week for the last minute assist. That's a lot of Thank You's over 31 years – more than I received from anyone else (other than my Boss).

**Accountability:**

- This is one of the main reasons that I stayed at Western so long. It is one of the main reasons that you show up every day with an attitude of "I'm here to do what ever is needed from me". I've heard Ken say countless times
    - "We've got to tell the client what went wrong here and we have to do it now"
    - "We owe the client an explanation so lets pull in whomever is needed so we can get the facts so we can answer all their questions"
    - "I wasn't the PM on this account, but at the end of the day, I'm responsible, so I'll make the phone call if we think that is best".
    - Ken, who hates to fly, volunteers to fly to a foreign country, just so he can speak to a client in person because "we screwed up – it's the least we can do".

So in answer to the question as to why I've been here so long, it's because I work with Ken Leech and for people that admit when they are wrong or are willing to take the blame even when they aren't responsible, simply because it's the **right** thing to do.

**Humility:**

- I realized early on that humility/being humble is something many claim to be, but few are. The definition of humility is: 'someone doesn't think less of themselves – they think of themselves, less'. I would wholeheartedly assign this as a character trait of Ken. Yes, he's done all the obvious: donate anonymously, help behind the scenes to assist someone, ask not to be included as one who participated in something for the good, etc. The thing I've seen Ken do consistently over 32 years is NOT claim ownership when something went well or right. While he might be the first to accept responsibility for something that didn't go well, Ken was the last person to claim or accept ownership when something went well/right. No matter how much others would talk to him about everything he did leading up to that point that made the situation work, Ken said the victory belonged to The Team. And then he'd proceed to name all the individuals that played a part – no matter how small it was. No amount of cajoling would ever get Ken to retreat from his stance that all wins are Team wins. The conversation was over. Period.

**Kindness:**

- I work in a business that is not kind to the faint of heart. Many of the players in this business are truly, un-kind people. Even many of the folks that I thought *might* be

one of the good guys, ended up being the opposite. Anyone that knows me, knows that I'm pretty jaded when it comes to people in general. I assume everyone isn't so good unless/until they prove to me otherwise. I assumed the same about Ken. He proved otherwise. He has always just been a nice and kind person. When there were personnel issues, Ken didn't have anything bad to say about the individual(s). Ken would be the 1st to point out their positive attributes and what they did right. He was also the person to champion for someone to be given a 2nd chance, or a 3rd or a 4th.

- It's hard to think of instances of Ken being kind, because he was just like that all of time. He's one of the people you'd describe as not having a mean bone in his body. Whenever he spoke to you, it was with kindness. In watching him deal with others, he did it with kindness. Even when he reprimanded someone, you almost had to replay Kens sentences in your mind to realize that it was a reprimand – not a compliment. For a lot of people, it's human nature that when someone is unkind or harmful to them, it wouldn't be out of the question for them to wonder what 'payback' would be like. With Ken, it just wouldn't dawn on him. His mind doesn't work that way. I'd actually challenge anyone that knows him to provide an example of when he ***wasn't*** kind in word, deed or action. Not sure you'd get any examples.

I'm sorry to have taken up so much of your time with this long letter. I know it's been a lot. Ken is a friend of mine. He is one of the best people I've ever had the pleasure of working with and for. And Ken has taught me a few things over the years that have made me a better person and made me rethink how I respond to people. If I wasn't so tired and he was looking to stay in this business, I'd work with him and for him for many years to come. I would only say that of a few people.

I appreciate your time and thank you for taking my views of Ken under consideration. Hopefully, at the end of the review period, you will get to know the Ken Leech we know and decide that his situation warrants leniency.

Respectfully,
Tracey A. Hutson
Tracey A. Hutson

# Exhibit 51

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

DOOR of HOPE

September 10, 2026

Dear Judge Woods:

My name is Megan Katerjian, and for the past nine years I have served as Chief Executive Officer of Door of Hope, a Southern California nonprofit serving families experiencing homelessness, families at risk of eviction, and low-income families who lost their homes in the Eaton Fire. Our work focuses on improving families' financial and emotional well-being and helping them move into permanent, stable housing. I also serve as a pastor.

I am writing regarding Ken Leech, who has supported Door of Hope for decades. I understand that Mr. Leech has pleaded guilty to an offense, and I do not write to address the legal issues before the Court. Rather, I hope to offer perspective on his longstanding commitment to vulnerable families and the character he has demonstrated through that commitment.

Ken's support of our work has consistently reflected thoughtful concern for people with the fewest resources. Following the Eaton Fire, for example, Ken and his family carefully researched how they could have the greatest impact for low-income fire survivors. After considering a number of organizations responding to the disaster, they chose to make a significant investment in Door of Hope to help vulnerable families recover and return to stable housing.

Based on my experience with Ken through Door of Hope, I have seen him demonstrate generosity, thoughtfulness, and genuine concern for people in need. I respectfully ask that, as the Court determines an appropriate sentence, you consider his longstanding contributions to our community and the positive impact he has had on vulnerable families over many years.

We would also welcome the opportunity for Ken to serve directly with the families whose lives he has supported through his philanthropy. If the Court sees fit to sentence Ken to probation, Ken would be able to work with us in one or more ways:

- Provide and share a meal with families living in one of our three Pasadena shelters one to four times each month.
- Lead workshops for families in our Homelessness Prevention Program and serve as a financial mentor or coach for clients working on household budgeting, financial planning, and long-term stability.
- Lead financial-planning workshops for Eaton Fire survivors who may eventually receive significant damages settlements through Southern California Edison litigation, and meet by video with interested clients for more individualized guidance around budgeting, planning, and responsible management of those funds.

These opportunities would allow Ken to use his financial-planning skills in ways that could have lasting value for low-income families while also building personal relationships with people navigating homelessness, financial hardship, and disaster recovery. Door of Hope would welcome his assistance and would be prepared to structure and oversee this service.

Thank you for considering my perspective.

Respectfully,

Rev. Megan Katerjian
Chief Executive Officer

# Exhibit 52

The Honorable Gregory H. Woods

United States District Judge

Southern District of New York

500 Pearl Street

New York, NY 10007

**Re: United States v. S. Kenneth Leech II — Sentencing Submission**

Dear Judge Woods:

I write to you respectfully as someone who has known Kenneth Leech in several distinct capacities over nearly three decades, including as Chief Executive Officer of two institutional capital markets firms, and I do so with the sincere hope that this letter may offer a perspective on Mr. Leech's character and lifetime of conduct that formal court proceedings, by their nature, rarely have the opportunity to fully convey.

I first met Ken Leech in 1998 when I was recruited by Western Asset Management as a prospective hire. The interview process included dinners with spouses, and it was there that I first encountered Ken as a thoughtful professional and gracious host. Although I ultimately chose a different career path, the impression he made on me during that process proved lasting and accurate.

My relationship with Ken then evolved professionally. In the role I went on to hold, Western Asset Management became a significant institutional client, and Ken, as Chief Investment Officer, was a counterpart with whom I worked regularly over many years until my retirement in 2014. In that capacity I observed him at close range—in client meetings, market presentations, and in the conduct of a firm that reflected his values and leadership. During more than fifteen years of that relationship, I never witnessed anything that caused me to question his integrity, professionalism, or commitment to the clients whose capital he was entrusted to manage.

When my family later relocated to the West Coast, the introduction made during my interview grew into a genuine friendship. We share membership at the same golf club in the desert, and our families have spent time together over many years. I have come to know Ken not only as a distinguished investment professional, but also as a husband, father, and friend. The character I have observed in those personal settings has always been entirely consistent with the person I knew professionally: principled, measured, and deeply serious about his obligations to others.

Finally, from 2014 until 2023 I served on the Board of Directors of Western Asset Mortgage Capital Corporation, a publicly traded REIT externally managed by Western Asset. Ken regularly provided market briefings and investment perspectives to the Board. His presentations were invariably thoughtful, candid, and, most importantly for a board member's purposes, honest. He never spoke to flatter or mislead. He told us what he genuinely believed, even when the outlook was difficult or uncertain.

Having spent more than three decades leading major institutional fixed-income and capital markets businesses, including serving as CEO of two firms and as a Director of multiple publicly traded companies, I have worked alongside hundreds of portfolio managers, traders, and investment executives. My opinion of Mr. Leech is formed against that broad professional experience and is one I do not offer lightly.

I want to be clear about what I am not asking. I am not writing to dispute the guilty plea Mr. Leech has entered, nor to minimize the seriousness with which this Court must approach its responsibilities. I fully accept that this proceeding must run its course.

What I respectfully ask is that the Court consider the full weight of a life and career when determining an appropriate sentence. Mr. Leech is 71 years old. He devoted decades to helping build one of the world's most respected fixed-income investment organizations, serving pension beneficiaries, endowments, and countless ordinary investors. The professional and reputational

consequences he has already suffered have been profound and permanent. The firm he helped build and lead has been fundamentally altered, and a lifetime spent earning the trust of clients, colleagues, and the investment community has been irretrievably changed. While those consequences do not replace the sentence this Court must impose, they are part of the overall context of a lifetime of work and service that I respectfully ask the Court to consider.

The Kenneth Leech I have known across nearly thirty years—as a prospective employer, an institutional counterpart, a personal friend, and a colleague in the boardroom—is a far more complete person than can be captured solely by the conduct underlying this proceeding. I respectfully ask the Court to weigh that lifetime of character, leadership, and service alongside all of the other factors it must consider in determining a just and appropriate sentence.

Thank you for your consideration of this letter.

Respectfully submitted,

**Ranjit (Ron) Kripalani**

Date: JULY 6, 2026

[redacted]

Current Director, Rithm Capital Corp. (NYSE: RITM)
Former Chief Executive Officer, CRT Capital Group LLC
Former Chief Executive Officer, Countrywide Capital Markets
Former Director, Western Asset Mortgage Capital Corporation (NYSE: WMC)
Former Director, Griffin Realty Trust, Inc. (NYSE: GRT)

# Exhibit 53

Friday, July 31st, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Re: Ken Leech

Dear Judge Woods:

My name is Michael Larson. I am the Chief Investment Officer at Cascade Asset Management Company.

For more than forty years, I have known Ken Leech through a relationship that began in the investment business and grew into a deep and lasting friendship. That long history has given me the opportunity to see Ken in different settings, both professional and personal.

I understand that Ken has pleaded guilty to obstructing a proceeding before the Securities and Exchange Commission. I do not minimize the seriousness of that matter. I simply ask that the Court in its determination of an appropriate sentence also take into consideration his profound contrition and strength of character as well as the demonstrable positive influence he has on his family, colleagues and the wider community.

Ken and I first came to know one another through the investment-management profession. Over the years, I observed his work closely during my service on the boards of funds managed by Western Asset. Ken played a vital role in helping Western Asset become one of the most significant investment-management firms in the world. I always trusted Ken in our dealings, and he gave me no reason to doubt him. But what stands out for me even more in considering his success is the loyalty, respect and devotion he inspired among the people with whom he worked most closely. In my experience, that kind of affinity is not produced by titles or monetary success. It is earned through years of fair treatment, honesty, collaboration,and personal decency.

Ken was also a frequent and welcome guest at my firm's annual investment meeting. He always brought intellectual integrity to those discussions, defending his views on the markets and the global economy thoughtfully, respectfully, and always on the merits. Mild-mannered, soft-spoken, and approachable, Ken was nonetheless direct—though always patient. In a business full of outsized egos, he stood apart, modest to a fault, caring more about understanding an issue than winning an argument. I will forever be grateful for the insights he so generously shared.

Away from work, over dinners, sporting events and other social engagements over the years, I also got to know Ken and his wife and children, all of whom continue to depend on his loving support and guiding presence. On a personal level, few memories about Ken live stronger with me than the generosity of spirit he extended on the evening after the September 11, 2001 terrorist attack in New York. I was traveling alone and stranded far from home and Ken went out of his way to have dinner with me. We were among only a few people at the restaurant. Like everyone else across the country that day, we were trying to comprehend what had just happened to the victims and their families, our many financial industry colleagues. Ken's willingness to join me that night was characteristic. He was thoughtful, steady, and kind at a moment when the world felt profoundly uncertain. He did not need to be there with me, but he understood that I was alone and made the effort to do so.

I am also grateful to Ken for showing genuine interest in members of my own family, especially my son, and in young people entering the investment profession. Patiently teaching and listening, he generously sets aside his time to explain difficult concepts and share what he had learned over the course of his successful career. Ken possesses a natural willingness to help others develop their own judgments rather than simply telling them what to think.

Your Honor, the conduct to which he has pleaded guilty is inconsistent with the fundamentally decent person I have observed throughout our long relationship. The events of the past several years have plainly taken a severe toll on him, both personally and professionally. I truly hope the Court will exercise leniency after considering the positive influence Ken has had and I believe will continue to have on family, friends, business associates and the wider community.

Respectfully,

Michael Larson

[redacted]
Seattle, WA [redacted]

[redacted]

[redacted]

# Exhibit 54

August 8, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods,

My name is Darryl C. Leech, and I am Ken Leech's brother. I am 70 years old. I retired from the hotel business in 2023, after 50 years of service in 14 different hotels. My last position was Vice President & General Manager of the Augusta, Georgia Marriott facility where I worked for 32 years. I understand that Kenny has pleaded guilty to the offense of obstructing an SEC investigation and am writing to you to give you some information about my brother's character and devotion to his family which I hope you will take into account.

We grew up in DeWitt, New York, a suburb of Syracuse. Our parents had lived through the Great Depression and were very hard-working. They always wanted the best for us. Ken was a straight A student, including taking honors courses. We both served as acolytes at Saint Paul's Episcopal Church. I was something of a loose cannon growing up and Ken always looked out for me and kept me out of trouble. The two of us made a close-knit group of friends from our town and we both cherish many of those friendships to this day.

Kenny went to the University of Pennsylvania where he did very well. I took a different path and ended up at Paul Smith's College in the Adirondack Mountains where I got a degree in hotel management. Hotels ended up being a great fit for me. I started at the very bottom of the industry and worked my way up over the years. After I graduated, I accepted a job with what was then the Hyatt hotel chain, which involved doing 14 rotations at various locations across the country. I remember Kenny visiting me in Chicago, Houston, and Knoxville. Then for about six months we overlapped when I was in Dearborn, Michigan and he was in Detroit. No matter how far I was he always made it a priority to visit me and show his support for me as I worked my way up through the hotel business.

In the early 1980s, I took a job at the Grand Hyatt hotel and moved to New York City. At that time, I was fortunate to live in the same city as my brother where I got to meet some of the people he worked with who all thought highly of him. He always made an effort to make me feel included in his circle of friends and show generosity towards me.

I was extremely proud of my brother for becoming a leading person in the investing industry. I was especially proud to attend his induction into the Fixed Income Hall of Fame. Many people in his industry showed up at the event to congratulate him. But the whole time, he was always very humble about his many accomplishments. Ken has always been a truly humble,

hardworking person who never really cared about taking credit the way most people in his business do.

Even as Ken had major job responsibilities, he always put our family first. Right around the time he took a lower paying job and his family was moving to California, he helped our parents move out of their home and move into a one-story condominium in Syracuse that better served their needs as they aged. As our parents got older, he hosted them for weeks at a time at his home in Pasadena so that they could escape the long Syracuse winters. His home was always buzzing with visitors to whom he showed the utmost hospitality. It was very important to Kenny that our parents had a close relationship with his children and our parents loved their grandchildren very much.

Some years ago, our mother fell very ill when she was visiting me. She went to the doctor, who diagnosed her with pancreatic cancer. The doctor told us that the cancer was advanced and she might only live for a few months at most. Without hesitation, Ken got on a plane and was at the hospital to visit our mother. His wife Eileen and his kids followed the next day. Ken was actually making plans with his job to move to Georgia to be with our mother during this time when our mother's health took a sudden turn for the worse and she passed away. It meant a great deal to me that Ken was willing to put his life on hold to come support our family.

Ken was also generous with his time and efforts with our extended family. My grandson [redacted] was diagnosed with [redacted] when [redacted] was 6 years old. Ken and his family helped us make sure that he got the best treatment available. The medical bills would have been a major financial burden for my son's family and Ken and his family helped us get through a major financial and emotional burden by giving his support. Thanks to some amazing doctors and Ken's enormous generosity, [redacted] [redacted]

Ken and his wife Eileen also showed great devotion to our father's sister, Aunt Miriam. Aunt Miriam was eight years younger than our father and they were close, living in New York City together after our father returned from World War II. Aunt Miriam lived in Florida and unfortunately became a widow at a young age, and she did not have any children. She was a very independent person and she lived on her own for many years. But as she got older, her cognitive abilities started to decline. Initially, Ken, Eileen, my wife Katy, and myself all helped move her to a community in Florida near where she lived that would make it easier for her to get various types of help with daily chores. Unfortunately, that situation didn't work out and so we all decided that she should move to an elder care home near my house in Georgia. Ken and his family came to Georgia to help Aunt Miriam move in and I remember us all unpacking boxes on one very hot afternoon. Sadly, as Aunt Miriam's health continued to get worse, the situation in Georgia didn't work out. She really wanted to move back to Florida so we helped her find a living situation there but that soon became untenable, and we all decided that she should move to a home with dedicated memory-care capabilities near Ken's home in Pasadena so that's what we did. And in fact, Ken and Eileen ultimately helped move Aunt Miriam to a second facility that specialized only in memory care that was also in Pasadena. We all spent hundreds and hundreds of hours trying to figure out the best living option for Aunt Miriam who lived to

be 102. Ken was extremely generous with his time and resources in trying to make it all work out. There were a lot of phone calls, emails, and research. We were all trying as best we could to get everything right. Throughout these years, Ken and his family visited Aunt Miriam frequently, which could often be very hard because she either wouldn't recognize them or occasionally confused Ken for our father. Nonetheless, Ken was always deeply committed to doing right by Aunt Miriam. We all were. Ken's character is that he always stands by his family and that really showed during the many years we all worked together to care for Aunt Miriam.

And Ken and Eileen did the same thing for our Aunt Polly, who was our mother's sister. Ken spent countless hours helping Aunt Polly manage her finances as she got older. Aunt Polly lived in LA and Ken and Eileen made her a part of their family, bringing their kids to visit her often.

I could not have had a better brother throughout my life. He has always been there for me, during good times and hard times. I remember one time when I was an adult when I was having a hard time with some personal issues and Ken, without hesitation, got on a plane to come see me and counsel me. That's the type of person he is. I am so very grateful for him.

I am asking you, sir, for you to consider being lenient on Kenny in imposing any sentence. He is 72 years of age, retired from industry and he just wants to spend what time he has left with his children, grandchildren and extended family and friends.

Respectfully,

Darryl C. Leech
Augusta, GA

# Exhibit 55

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse

August 25, 2026

Dear Judge Woods,

My name is Katy Leech and I am writing on behalf of Ken Leech. Ken is my brother-in-law and I have known him for more than 40 years. I am married to his only sibling, Darryl Leech. We live together in Augusta, GA. I've been retired for about 20 years after working as an HR director at a Mattel toy factory.

I understand that Ken has pleaded guilty to obstructing an SEC investigation but in all the years I have known him, he has always been a person of great integrity.

I first met Ken when Darryl and I moved to Miami in 1984. Ken and Eileen actually surprised me by showing up at our new house before we arrived. They welcomed me warmheartedly and we hit it off. I had heard about Ken from Darryl beforehand. Darryl always got into a little trouble growing up, but Ken would try to reel him in. Ken is softspoken and patient which is different from his brother. Ken was easy to talk to and easy to get along with when I met him, even though I was a Southern girl with a definite Southern accent.

Ken has been kind and generous to me and my family including my children from a previous marriage. It never mattered to Ken that they were only related to him through Darryl's and my marriage. He always treated them like blood. My grandson DC became ill with [redacted] when he was 7 years old. He was in the hospital for months and my son stayed in the hospital with him for one month while I watched his other son who was in school. Out of the blue, without being asked, Ken sent a very generous check to cover the expenses. And he didn't even tell us. He just sent me the check in an envelope with a note to please give it to my son. It was really a blessing. DC was able to get the best treatment available and beat cancer. DC is now 18 years old and is getting ready to start a school in Virginia to get an associates degree. His life would have been very different without Ken's generosity.

Ken was also very generous with his Aunt Miriam. A number of years ago we convinced Ken and Darryl's Aunt Miriam to move to Augusta, Georgia where she would be closer to family. She was 93 at the time. A few years later, she started having memory issues. Ken suggested moving her to Pasadena where there were better memory care facilities. He took care of all of her finances and financial needs until she passed away in 2020 at 102 years old. I believe she lived so long because Ken and Eileen took such great care of her out there. Ken visited at least once a week and Ken and Eileen would take her out to dinner to get her out of the home. He paid for all her funeral expenses including getting her to Delaware where she wanted to be buried.

Ken is also generous with his time. Over the years, Ken would not just take off work to spend time with us but also put in effort to make things special. After meeting in Miami, we went to visit Ken and Eileen in New York City several times. I had never been to New York City and when I first came to visit, Ken wanted to make it a really great experience, including going to a Yankees game. Over the years Darryl and I have visited his family in Pasadena and he has managed to take time off from his busy work schedule and take us to see the Dodgers, the Lakers, and more recently football games. One time when we were visiting Pasadena, he took off work so that he could join us on a tour of celebrity houses. Although Ken is not someone who gets "starstruck" or cares much about celebrity houses, he still took the time off to join us for something he knew I was excited about. Ken also flew across the country to come to my surprise 70th birthday party a few years ago. I was really touched by everyone who attended, but I started crying when I saw Ken and Eileen and the effort they made to share my special day with me.

I ask that you please take into consideration Ken's good deeds and thoughtfulness when deciding his sentencing. He has always been someone of character and this case is inconsistent with the person I have known for many years.

Thank you,

Katy Leech

Katy Leech

# Exhibit 56

The Honorable Gregory H. Woods

United States District Judge

Southern District of New York

Daniel Patrick Moynihan U.S. Courthouse

500 Pearl Street

New York, New York 10007-1312

Dear Judge Woods:

My name is Mark Lindbloom. I work at Western Asset Management and have done so since 2005. I joined Western Asset Management (WAM) from Citigroup to work directly with and for Ken and several other people. I'm 70 years old and have been managing fixed income (bond) portfolios since 1978. I currently live in Pasadena California. While my relationship with Ken over 20+ years has mostly been professional, I consider him a friend as well.

I am writing on Ken's behalf and to convey my own relationship and who Ken is as a colleague and friend. I do fully understand Ken has pleaded guilty but hope you will take these thoughts into consideration regarding his sentencing.

As mentioned, I've known Ken since 2005 when I joined a small group of portfolio managers at WAM. I most recently worked directly for him and before that indirectly to him. Western Asset Management has always been known as a premier fixed income manager in the industry, much of that due to Ken and our team. Our small group sat on a trading floor which is typical for portfolio managers and allowed us to interact with each other on a consistent basis. Ken's style of management is very flat reporting structure to allow interaction and quick decision making. He also insisted on integrity and honesty with each other and with our clients. In our business you hope to get most investment decisions right but know we get some wrong. Either way communication with clients is essential. Ken and I are of similar "vintage", that is old. We've been in the bond business since the late 1970's and we know the key attribute and strength is our integrity. That is the Ken I know. From a professional perspective I saw this always with his interaction with clients on explaining strategies and performance, good or bad. Ken has been known as a

superior bond investor over the decades and clients looked up to him for his opinions and knowledge. From a personal standpoint Ken has always supported me. I moved to California without my wife, kids, and later grandkids and he was always supportive of me taking the time to travel. I witnessed other interactions with colleagues who needed advice or having problems. The working culture and ethics at WAM over the decades were instilled by Ken and the management team. The charges that he has pleaded guilty to are not consistent with the Ken I know.

I hope, Judge Woods, that you will take these facts and opinions into consideration when imposing the sentence.

Respectfully,

Mark Lindbloom

[redacted]

Mark

8/13/2026

# Exhibit 57

August 13, 2026

The Honorable Gregory H. Woods

United States District Judge

Southern District of New York

Daniel Patrick Moynihan U.S. Courthouse

500 Pearl Street

New York, New York 10007-1

Your Honor,

My name is David Lippman. Though I am not familiar with the facts and circumstances regarding Ken's guilty plea before your court, I would like to speak briefly about Ken Leech's moral integrity. Ken and I began working with each other sometime in 1986 or 1987. I was Ken's sales coverage when he joined Western Asset Management. Like Ken, I had migrated to Los Angeles from New York (Ken from Buffalo). Ken worked shoulder to shoulder with Edward Moody who was a close friend of mine at the time. Perhaps a good example of Ken's character can be demonstrated in the care and compassion Ken showed to Ed in the final months of Ed's life. Ed passed away long before he should have due to a long term illness. Throughout the last chapter of Ed Moody's life, Ken provided constant emotional as well as financial support and he did so without fanfare or recognition, it was selfless and remarkable.

Throughout our friendship Ken always did the right thing. In institutional bond trading we are constantly committing tens if not hundreds of millions of dollars on a verbal agreement. There is an old saying in our business that a person's word should be sacred. In all of the years that I worked with Ken I found this to be true, even when circumstances were difficult. The same moral consistency applied to Ken's expectations of all of the people that he worked with. Ken led by example, he expected and demanded honesty and level play among all of his team. Eventually I transitioned from working at a brokerage firm to working for an investment management company. I became the CEO of a small asset management firm and later a large asset management firm, in effect, Ken and I became competitors. Regardless of circumstance, Ken's behavior and decency remained unblemished, even when it would have been to his economic advantage to do otherwise.

Over the years I have become familiar with Ken's family as well. He is committed to his family and has always exhibited great character and a strong moral compass. He is

deeply involved in his daughter and son's welfare and raised children (now adults) with high moral standards. I had the opportunity to work closely with Ken's son Steven and can vouch directly to his character.

I am proud to call Ken Leech a friend and trust his integrity fully.

Your Honor, reiterating the fact that I am not aware of the facts and circumstances to which Ken Leech has pleaded guilty. I am quite familiar and comfortable attesting to Ken's moral integrity as well as his outstanding commitment to his family, friends and community. I hope you will consider my humble request that Ken be treated leniently in light of all of his positive contributions over the past forty years I have known him.

Respectfully,

David Lippman

# Exhibit 58

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

RE: Ken Leech

Dear Judge Wood,

I first met Ken Leech in the late 1980s, just before he joined Western Management (WAMCO) as a senior portfolio manager. I was a fixed income sales representative at Westpac Pollock. In simple terms, he was a customer of mine. Our business interactions led to a friendship that has now spanned more than 35 years.

In 1990 I was hired as a fixed income sales representative at Dean Witter and my business relationship with Ken and WAMCO remained strong. It wasn't until 1997 when Dean Witter merged with Morgan Stanley that things changed. WAMCO and Morgan Stanley had a falling out in the early 1990's and WAMCO would not do business with Morgan Stanley. These two major companies dug their heels in despite the detriment to both.

Ken was then CIO at WAMCO and he worked consistently to mend the fences with Morgan Stanley. During the early years of the merger my relationship stayed strong with Wamco; however, it was a long process to restore the relationship between firms. Ultimately, through the efforts of Ken and other likeminded executives, business between these major players in the industry was renewed.

Despite those challenging early years, my friendship with Ken grew. Our shared interest in baseball was anchored by our Dodger/Yankee rivalry and included countless ballgames together. Ken is gracious, fun and knowledgeable. I love going to games with him and talking baseball, sports and life. We also golfed together countless times. One gets to know another well after dozens of rounds. Golf can be a true test of one's honesty, integrity and grace. Ken passes that test with ease.

After business with WAMCO restarted, Morgan Stanley decided to restructure the sales team and assign WAMCO to the home office in New York thereby excluding me and impacting my production associated with WAMCO. When this was announced, Ken, on behalf of WAMCO, objected and insisted on me being part of the team. Ultimately, Morgan Stanley kept me involved.

Ken had shown his support for me and his friendship meant more to me than ever before. In 2004 Ken was recognized as the Bond Manager of the Year in New York. This is a major achievement in our industry. I had a scheduling conflict for the night this

honor was being bestowed upon Ken in New York as I was the chair of the UCLA Hall of Fame Committee and its induction ceremony was set for the same evening in Los Angeles. Faced with the decision of which ceremony to attend, I chose to attend the ceremony honoring my friend Ken Leech because of my respect for him, the support he had shown to me at critical times during our lives and the significance his award represents within the national fixed income industry. Our mutual respect is layered throughout the past 35+ years. He also received this award in 2014 which speaks volumes of the respect he garnered from his peers during his career.

In 2023 I was diagnosed [redacted] Overwhelmed by the diagnosis and feeling pretty low, my treatment decisions weighed heavily on my mind. The big, wide world I knew was suddenly tiny, with my view being myopic. The change was evident to Ken and he organized a golf trip that really lifted my spirits. Being diagnosed with [redacted] shook me like nothing I had ever experienced, and Ken's friendship, action and support gave me even more courage to [redacted] with everything I've got, 3+ years and counting!

Ken's legal situation caught me off guard. His conduct was contrary to the decades of business and personal interactions I shared and enjoyed with him. Others within the industry have shared their disbelief. Nevertheless, I understand he has pled guilty and now faces sentencing. It is my sincere hope that his lifetime of achievement, sound judgment and dear friendship is not overshadowed by the recent decisions he made placing him in this predicament. To the extent my input carries any weight, I ask the court to be as lenient as possible to Ken who has otherwise led a life of respect, kindness and high character.

Thank you for your time and consideration,

*Ernest Marchosky*

Ernest Marchosky

# Exhibit 59

July 15, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods,

My name is Fred Marki and am a former colleague of Ken Leech at Western Asset Management. I have worked in finance since 1983 and as a portfolio manager since 1991. I have had the pleasure of working with Ken since joining the Western Asset Pasadena office in 2006.

I know that Ken has pleaded guilty and would like to provide my perspective of Ken and his character. I hope this will be helpful to you.

Ken has been a tremendous colleague and investment professional for the two decades that I have worked with him. Ken was the senior investment professional and encouraged us all to do our best for our clients. Ken sat with us, elbow to elbow, on the trading floor every day. Working conditions could at times be stressful. It is human nature to not want to own securities that are falling in price, for example, yet Ken would insist we follow our process. He was supportive of our individual contributions even when things turned at least temporarily sour. When things worked out well, as they often did, he remained humble with both colleagues and clients. My line is that Ken must have a big ego, he just doesn't let it show.

His dedication to his clients was noted not only by us in the office and his clients, but also by industry trade magazines. When he was awarded "Fixed Income Manager of the Year", Ken insisted that the award be attributed to the investment management team. The cover photo wasn't of Ken in his office but of the whole team standing in the plaza.

I hope that this provides a small indication of the good and generous character of Ken Leech. What he has pleaded guilty to is incongruous with Ken's professional and personal life as I have known it. Please take this into consideration and be lenient.

Sincerely yours,

Frederick Marki

Frederick Marki

# Exhibit 60

July 16, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods,

I am writing to you today to respectfully ask the Court to consider leniency in the sentencing of Ken Leech. My name is Julie Marquez, and I was the primary trading assistant for Mr. Leech during his employment at Western Asset. I testified in your courtroom at a hearing earlier in this case. I realize that Ken has pleaded guilty, and I understand the seriousness of these proceedings and appreciate the difficult responsibility before the Court. However, I feel compelled to write to you today to ask you to consider the whole person- not just the offense- in making your decision regarding sentencing. I feel the act to which Ken has pleaded guilty is contrary to the man I came to know.

For 25 years I worked alongside Mr. Leech at Western Asset, and for half that time I worked directly with Ken to assist him in entering his trades into the order management system. Initially upon being given this huge responsibility, after his previous assistant retired, I was a bit nervous. The notion that I was responsible for keeping up with the busy trading pace of the CIO was daunting. But Ken immediately made me feel at ease with his gentle demeanor and patience for my learning curve. He was never rude or short tempered, and he always treated me with a great amount of respect and understanding. And this continued throughout his entire tenure at Western Asset, and I observed this kindness being extended to everyone he worked with quite broadly across the firm.

Ken left a big impression upon me. I was constantly amazed at his incredible intelligence, his honesty and integrity. These are qualities I witnessed firsthand and will always remember. Upon trade execution brokers are required to send written confirmation of each trade. Oftentimes in doing so, they would have typographical errors, indicating a sell when should have been a buy, or stating the wrong price. Ken had the highest respect for the market and its participants, and he never sought to take advantage of someone’s mistake. He always sought clarification and the truth, and to have the record be correct.

Another trait of Ken's that greatly impressed me was his humility. Despite all his success, he never carried himself as someone who was above anyone else. In fact, I noticed he drove the same older model car for years, not because he had to, but because material possessions didn't seem to define him. He was approachable, down-to-earth, and never sought attention or status. Those small, everyday choices reflected the kind of person I came to know- someone who valued people far more than appearances.

I respectfully ask the Court to consider the many years during which Ken Leech positively impacted employees, colleagues, and those around him, along with his character and the totality of his life when determining an appropriate sentence. Thank you for taking the time to read my letter and for considering my perspective.

Respectfully,

Julie Marquez

Julie Marquez
Pasadena, California

# Exhibit 61

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods:

My name is Haley Martin. I respectfully submit this letter for the Court's consideration regarding the sentencing of Ken Leech. I have been in a committed relationship with Stephen Leech III (Ken's son), for well over a year, and during that time I have had the privilege of getting to know Ken and the rest of the Leech family.

I recognize the seriousness of the offense before the Court and understand the importance of accountability. My aim in writing this letter is to offer the Court my firsthand perspective on Ken's character, and to share my personal experience with Ken and the impact he has had on me.

Through my relationship with his son Stephen, I have come to know Ken as a generous and deeply family-oriented person. While I have no doubt that others will describe Ken's remarkable generosity on a grand scale (such as his work supporting the community after the Altadena fires, and his contributions to charity), what has always stood out to me about Ken is that the same charitable spirit which inspires those larger acts is woven into his everyday life. It is reflected in the way he treats people, in the small kindnesses he extends without expecting recognition, and in the genuine care he shows to everyone around him.

When Ken learned that my father was a lifelong Denver Broncos fan, he offered me his Chargers season tickets so that I could take my dad to see the Broncos play in Los Angeles in the fall of 2025. It may seem almost trivial to write about Ken giving me football tickets. But looking back now, after my father unexpectedly passed away this past May, I can't express how grateful I am for that gift. With one simple act, Ken gave me one of the last joyful moments with my father before my father's terminal lung cancer diagnosis changed every aspect of my life. That memory that helped sustain me as my father's caregiver through failed treatments, lengthy hospital stays, and through the inexpressible pain of watching him slowly fade away from the vibrant man he was.

My father did not receive his diagnosis until March of 2026 (months after Ken gave me the tickets), so Ken had no way of knowing how much those tickets would impact me. But the seemingly small act of kindness and subsequent impact reflects how Ken moves through the world. I had only been in a relationship with Stephen for a few months at the time. When Ken learned he could create a meaningful memory for the someone his son had only recently begun dating, he acted without a second thought. He didn't just give me football tickets, he gave me an experience I will carry with me for the rest of my life.

Ken's generosity and compassion was on display throughout my father's illness. When the Leech family heard that I was struggling to navigate my father's end of life care and affairs, Ken offered to simplify the process by connecting me to an elder care coordinator and ensured I had the support needed for an overwhelming situation. When my father finally passed, Ken contributed to my father's memorial expenses. His support during that period meant a great deal to me and my family. These gestures reflected the person I have come to know–someone who quietly shows up for others and offers support without expecting anything in return.

I would be remiss if I did not also acknowledge that this case and legal process have been ongoing throughout the entire time I have known Ken, and I have witnessed the toll that the uncertainty and stress have taken on Ken and his family. I mention this not to suggest that accountability is unfair, but because it provides important context for the experiences I have described. Every act of kindness I have witnessed occurred while he was carrying the weight of this case. Even during the months leading up to trial, while my own family was navigating my father's illness and death, Ken continued to be present, thoughtful, and generous toward those around him. My father ultimately passed away on April 30, and his service was held on May 30. A reasonable person may have assumed that, as Ken was preparing for a June 15 trial date, he would understandably be less engaged with the affairs of those around him, yet despite all of the prep and stress he was carrying, Ken still continued to remain present for those around him.

Perhaps most reflective of Ken's character in my eyes however is the relationship between Ken and his son Stephen. I love and deeply respect Stephen, and I believe the person he is, in many ways, a reflection of values instilled in him by Ken. His son is thoughtful, compassionate, hardworking, and selfless. While every individual is responsible for their own choices, I believe parents play a significant role in shaping the character of their children, and I have seen that influence firsthand in Stephen.

As adults, many people experience complicated relationships with their parents, and some ultimately become estranged because of painful family circumstances. The fact that Stephen and the rest of the Leech family have continued to support Ken through this challenging chapter speaks to the strength of the relationship they have built over the course of their lives. At an age when many adult children are shifting their priorities to their own jobs, families and lives, Stephen has put significant portions of his own life on hold, stepping away from his career and going so far as to move back into his parents house for lengthy periods during this process in order to support Ken. This sacrifice isn't an obligation, it reflects the genuine love, respect and the impact that Ken has had on Stephen as a father.

I understand that the Court must sentence him based on the law and the facts of this case. I respectfully ask that, in doing so, the Court will also consider the entirety of his life, quiet acts of generosity, the strength of the family he has built, the compassion he has shown to others, and the profoundly positive impact he has had on those fortunate enough to know him personally.

Thank you for your time, your consideration of my perspective, and your service to the administration of justice.

Respectfully,

Haley Martin

Haley Jane Martin

# Exhibit 62

20th July, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan
U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods,

I write in a personal capacity as a long-term colleague and friend of Ken Leech. I had the privilege of working closely with Ken for over 28 years as a Senior Portfolio Manager in Western Asset's Global Investment Team, based in London. I understand Ken has pleaded guilty to obstructing a proceeding before the Securities and Exchange Commission. However, based on my personal and professional experience working with Ken, I view this behaviour to be deeply out of character. I am writing with some information which I hope will provide you with a broader understanding of Ken's character and work ethic and respectfully ask for your leniency with regard to his sentencing.

Ken demonstrated exceptional leadership, strategic vision and unwavering integrity. His ability to navigate complex market environments with precision and foresight were instrumental to the success of our business. Ken fostered a culture of investment curiosity, teamwork and collaboration. He led the investment team with humility, treating colleagues at all levels with respect and transparency. He was an honest and reliable boss. Ken was a strong mentor for me personally, taking pride in my professional development. He was especially thoughtful and understanding of the demands I faced working in a full-time investment role while raising my children, who also viewed Ken as a kind and generous man.

I feel fortunate to have benefited from Ken's insight, investment expertise, leadership and friendship for the significant majority of my career.

Thank you for your consideration in reviewing this letter,

Yours sincerely,

CMatthews

Catherine Matthews

[redacted]

# Exhibit 63

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods:

I have known S. Kenneth Leech for the half of my life. I have a unique perspective on my relationship with Kenny I would like to share with you.

Kenny was my benevolent leader during my seven year career at Western Asset Management Company as an executive in client service. After leaving Western Asset Management, later in my career, as a managing director at Jefferies Capital, Barclays Capital and The Royal Bank of Canada for these global investment banks on Wall Street, Western Asset Management was a client and a trading counter party for over ten years.

Kenny's integrity driven compass was always the endearing driving force behind the way we conducted business and treated our clients during my career at Western Asset. Then working for Western Asset as my client, as their counter party on the "sell side" Western Asset's trading desk treated "the street" as a partner and was a collaborative experience. Western Asset has always been first class inside and out. That golden standard always started with Kenny from the top down.

Kenny knew everyone's name and was always thoughtful and considerate, he never played favorites. He was always fair and an absolute gentleman. His respect and care for the trading desk, the cleaning professionals, the operations professionals, security professionals, the graphic professionals, support professionals, client service professionals etc. was always the same way with respect and a smile "how are you, how is your family" he cared about people first.

In private, I asked Kenny one time early in my career, "what can I do to make Western Asset better"? Kenny said "you're doing a fine job Jackson" then he followed by saying "don't ever forget, our clients are our family, Western Asset is our family. Simply be committed to the family, take care of our clients and take care of your fellow colleagues".

It was an honor to work for him and an honor to cover the Western Asset trading desk.

I know Kenny's entire family. Kenny is generous and philanthropic. Kenny is compassionate and empathetic. Simply put, Kenny is an authentic gem of a human being. To say it is a privilege to have him as a cherished friend for 28 years would be a significant understatement, it is an absolute blessing.

In closing, I know his character and I stand behind his character. Integrity driven, dedicated to people and defines the word "class".

Thank you in advance for taking your time to read my letter. Please allow my sincere heart felt letter to resonate with you and helpful when exercising your judgment.

Respectfully,

John W. McCourt

[redacted]

# Exhibit 64

July 14, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods:

This letter regards Ken Leech, who has pled guilty to obstructing an SEC proceeding. I understand he is scheduled for sentencing before you on October 30, 2026.

I have known Ken for 25 years. We met in 2021 when I joined Western Asset Management Company in Pasadena where Ken was senior portfolio manager at the time. For a couple of years, I worked in the Analytics/Risk department, with regular interaction with Ken. Later, I was placed within the Investment department, working directly under Ken. I retired in April 2023, having worked over 15 years under Ken in a variety of roles. I retired as the Director of Portfolio Operations (essentially the chief operations officer for the global investment team). I served on various senior committees and the Executive Committee which comprised of the top six executives which included the CEO and Ken in his role of Chief Investment Officer.

On a professional basis, I judged Ken to be a person of high integrity, with a focus on client outcomes. His attitude, shared throughout the firm, was to put client interests first, and in so doing Western would do well. Never did I see any actions motivated by direct personal gain. He was vary gracious with co-workers, albeit a bit shy at times. Never boastful.

During our long time as professional colleagues, we faced many tough investment periods, including the Great Financial Crisis (2007-2009), the market collapse in the first months of COVID (2020) and several more. Excruciating times with clients on hyper alert. Ken unstintingly stayed forward thinking, working through client concerns, explaining investment decisions (especially those that had produced recent losses), and searching for information, including "what were we missing". Never a hint of acting against what he perceived to be in clients' interests, and always willing to face and answer questions. Never did I hear him tell a client anything he didn't believe in. He never spoke with certainty, but with conviction, explaining, in his estimation, if he (or more broadly, Western) were wrong, here is the likely downside, measured against an estimated upside. As an investor with a long term record, and long term client relationships, he knew portfolio losses or underperformance (relative to a benchmark) can not be avoided, but would need to be managed through. Never did I see or suspect, nor did I have any reason to believe, that Ken would act except with utmost integrity, despite the pressures of the market.

On a personal basis, I know him to be a dedicated husband to Eileen and dad to Stephen and Catherine. Ken, with his wife, has been generous in support of the Los Angeles Children's Choir, where Catherine trained for years. Ken served for many years as a trustee for Flintridge Preparatory School.

I am hopeful this letter will give some understanding of Ken as a colleague and as a person.

Respectfully,

Dennis J. McNamara

[redacted]

# Exhibit 65

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods:

My name is Karen Meidl, and I am writing this letter to provide a character reference for Mr. Ken Leech. I am 57 years old, and I currently reside in Manhattan Beach, California. I am a former colleague of Mr. Leech, working together from 1993 to 2012 at Western Asset. I started at the company as a receptionist then transitioned to trading operations, and finally progressed to a trading assistant, where I worked closely with Mr. Leech. I retired from Western Asset in 2012 to become a full time stay at home mom.

My intentions for writing this letter are to provide an honest representation of my experience working with Mr. Leech throughout my time at Western Asset. I am aware and acknowledge that Mr. Leech has pleaded guilty to obstructing a SEC investigation. I would like to share some personal memories on his behalf that I hope you may consider in your decision regarding his sentencing.

When I first met Mr. Leech, one of the most defining aspects of his personality was the respect he showed to myself and to others. I was brand new in my career and coming into this industry with no experience, so having someone like Mr. Leech as a mentor meant a lot to me. To this day I still refer to him as Mr. Leech to reciprocate the respect that he gives me. He was always kind and helpful, especially as a senior level professional, he was constantly willing to advise and provide guidance to myself and other junior level colleagues no matter how insignificant the question may have been.

When I first started on the trading desk at Western Asset, I was working with many senior level portfolio managers and senior level trading assistants. Some of my colleagues called me by a nickname. I would like to specifically acknowledge that Mr. Leech always called me by my first name. I believe this was because he was a true gentleman and true professional.

Mr. Leech was an exemplary role model on the trading desk and always demonstrated a strong commitment to both professional and personal goals and responsibilities. He was also highly regarded and respected by other departments of the company. I would often see him help answer requests from these departments as time permitted throughout the day. He was always willing to assist in any way possible.

Mr. Leech was a devoted family man. Early on, before I had my daughter, I would notice how he had a deep admiration and love for his wife Eileen, and his two children, Catherine and Stephen.

When Western Asset had events that included family, I could see how committed he was to his family. Whether it was at a Holiday Party for the company or the Rose Parade celebration for clients and employees, he would always engage with his family. I admired seeing this from him as it was something I hoped for in the future with a family of my own. He was a great role model on a personal level.

Mr. Leech was also respected at his church. I believe he and his family were very involved in his church community. He kept this somewhat private in his professional life as he was not boastful about his faith. I had a very specific experience in this regard. Very shortly after I retired in 2012 my husband was diagnosed with [redacted] Thankfully it was benign, but he had to have an emergency surgery to have it removed. It was successful, and after months of recovering my husband made a full recovery. Of course, our family and friends were a huge support. I later found out from a former colleague that Mr. Leech had put my husband's name on a prayer chain at his church. I was so touched to know that he would think of us at this very difficult time. He did this purely out of the goodness of his heart. I will always be grateful for this very genuine and kind gesture.

I do not see Mr. Leech as often as I would like to since I retired. I started a new chapter in my life focusing on my family as my priority. I have seen Mr. Leech a few times over the years, I recall once at a Celebration of Life for a former colleague and then another time at an Anniversary Party for Western Asset. At each meeting, Mr. Leech was genuinely interested in how my family, and I were doing. He would ask about my husband's health and wellbeing and my daughter's interests. He would also share with me how his family was doing. I was very happy to see him and be able to catch up on our lives.

This is the man I know, he was my mentor, a former colleague and a true gentleman, professionally and personally. I ask you whole heartedly to take this letter into consideration when imposing a sentence and ask for leniency for Mr. Leech.

Respectfully,

Karen Meidl 8/28/26

Karen Meidl

[redacted]

# Exhibit 66

September 9, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods,

I am a friend and former colleague of Ken Leech. I was the CEO and Chief Investment Officer (CIO) of Legg Mason Capital Management (LMCM) during the time Ken was the CIO of Western Asset Management. LMCM was Legg Mason's largest equity fund manager and its most profitable subsidiary and Western was its largest bond manager during the time Ken and I overlapped as CIO of LMCM and Western respectively. We held these roles for probably close to 30 years. We spoke at client and industry investment conferences, as well as giving talks or sitting on panels together in the US and overseas. Although Ken worked in Pasadena at Western's headquarters and I worked in Baltimore at Legg's offices, we frequently discussed investments, economic conditions, and government and Federal Reserve actions as they related to stocks and bonds, sharing our views on investment strategy and how we could best achieve our clients' investment objectives.

I was stunned when Ken was charged with wrongdoing pursuant to his duties as CIO of Western. I thought there must be some mistake that would end up being rectified since Ken was as professional and honorable as anyone I knew in my over 40 years in the investment business, a judgment shared by all of the experienced and respected figures in our business who knew Ken. Ken had the distinction of being elected to the Fixed Income Hall of Fame (others have no doubt mentioned this), a rare honor that takes into account not only one's record as an investor, but one's stature as an industry leader and one's personal reputation as someone who embodies the highest standards of the profession.

As you know, Ken vigorously denied he took actions that violated his fiduciary duties and he chose to contest the charges against him. Doing so cost him, his family, and Western dearly. Just being charged with a crime in this industry is tantamount to a conviction. The business Ken led lost hundreds of billions of assets as clients fled the firm. Ken's reputation as one of the best and most trustworthy stewards of clients' assets in the industry was destroyed and cannot be recovered. His agreeing to plead guilty to a single

charge of obstruction of an SEC investigation is understandable, if tragic, as it forever besmirches a career of honorable and distinguished service.

When Ken asked if I would serve as a character witness in connection with sentencing, I immediately said yes. I presume you have received many letters from Ken's friends and colleagues, both personal and professional, recounting their experiences with him over the years.

I would like, though, to go beyond the remit of vouching for his character and address the charges brought against him.

As I thought more about this case, I became increasingly troubled by many of its aspects. Ken's prosecution is the third time very prominent and senior investors whom I knew well have been charged with violating the law. They had several things in common: they were at the end of a long and distinguished career, they were well known in the investment business, they were in their seventies or older, and they had an unblemished record of honesty and integrity. Including Ken, all three vigorously denied and contested the charges, spending a great deal of time and their personal money to do so.

What I find troubling here is that in these three cases the defendants were all elderly men with distinguished investment records and were known and admired not just for their investment record but for their honesty and integrity. Faced with the prospect of potentially a lifetime in prison all agreed to settle their cases.

Warren Buffett's late partner Charlie Munger used to say, "show me the incentive and I will tell you the behavior." The incentive of the prosecution is to get convictions. A prosecutor who rarely got convictions would not remain a prosecutor for long. Getting prominent defendants convicted or at least to pay a penalty for their wrongdoing sends an important signal that no one is above the law.

People who break the law, whether by speeding, or fraud, or other proscribed activities, typically have a history of such behavior. They do not go from following the rules scrupulously over a lifetime to suddenly, late in life, begin to break them with impunity. It's possible of course, but not very likely. There is nothing in Ken's long record that suggests he behaved other than honorably and with integrity. Why would he suddenly follow a different course at the end of his career?

Well, one reason might be that he panicked. Western was undergoing a period of investment under-performance which was resulting in client losses and thus revenue losses for the firm. But there is no professional investor of any substantial tenure and experience who has not had to deal with this issue. Ken had faced this before. Client and

firm losses were not new at Western (nor any other investment management firm of long standing) and he soldiered through them with grace and professionalism.

As John Maynard Keynes, himself one of the great investors, who managed Cambridge University's endowment during the Depression (in addition to being the greatest economist of the 20th century) said, "it is the duty of every serious investor to suffer grievous losses with great equanimity." Ken did so in previous instances of poor performance and losses. It is not credible that he somehow panicked in circumstances similar to those he had dealt with before and began to behave in ways that were at odds with his lifetime record.

What about his incentives? Perhaps they were structured in ways that encouraged him to favor one group of clients over another because he would receive higher compensation if those clients did better than other clients because they generated higher fees. No, Ken was almost certainly compensated according to the total results of the firm and not by the results of client categories.

One of the allegations made by the prosecution is that Ken systematically allocated profitable trades to clients who paid higher fees, and losing trades to lower fee-paying clients. It was Ken's practice to allocate trades at the end of the trading day and not when the trades were made during the day. He therefore knew which trades had gains, if any, and which had losses, if any.

Left unasked or ignored was this question: why were some clients paying higher fees than other clients? The answer is that the only reason one set of clients with similar assets being managed would pay different fees than other clients with similar assets is that those clients had different investment objectives, different time horizons, different risk tolerances and different tax situations. Clients whose situations were the same would pay the same. These "most favored nation" clauses were standard fare in investment management agreements, i.e. one could not charge one client less than another whose situation was the same. As I understand the charges, Ken supposedly disfavored Western's Core and Core Plus clients, which were the firm's longest standing clients, who made up a substantial portion of the firm's assets under management, to favor clients in a risky, global macro product. For several reasons, however, the asset management business depends on clients who invest significant assets over many years, even if they pay lower management fees.

Perhaps most important: my understanding of the case is that the prosecution appeared to find the unequal allocation of trades with unrealized first day gains and losses by fee type at the end of each day to be the allegedly illegal activity. But, the profitability (or

lack thereof) of an investment is not known until the investment is closed out. Trades are marked to market each day until they are closed out via sale (for longs) or purchase (for shorts). Given that realized and not unrealized positions are what matter, any theory of why Ken might have engaged in dishonest conduct did not make any sense to me.

Judge Woods, thank you for reading this and I hope you will consider these points. As I think is clear, I continue to have the highest respect for him as a colleague, investment professional and personal friend notwithstanding his guilty plea. As you make your ruling, I hope you will see that he has suffered enough, as has his family, and the price he's paid in the loss of his reputation, of his business, and of his livelihood is sufficient to compensate for the wrongdoing alleged.

Let me close with this: Ken may have lost his reputation because of the charges against him. But as John Wooden, the legendary basketball coach, said "your reputation is merely what others think you are; your character is what you really are."

I am proud to be a friend of Ken's, who always was, and remains, a person of character.

Respectfully,

Bill Miller

Bill Miller

# Exhibit 67

# PAMELA MIMS

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods:

My name is Pamela Ann Mims. I have been a self-employed Productivity & Efficiency Consultant for the past 35 years. I am 73 years old, was born and raised in Pasadena, California, and have lived here all my life. I am writing on behalf of my friend, Ken Leech. I understand that Mr. Leech has pleaded guilty, and I fully respect the judicial process. My purpose in writing is simply to share my firsthand knowledge of Ken's character and the person I have come to know over the past fifteen years, in the hope that you will consider my observations as you determine an appropriate sentence.

I have known Ken personally for fifteen years through weekly visits to his home, where I help him and his wife organize their home office paperwork and records. During these years working with Ken and his wife, I have come to know him not only as a client and friend, but as a man of extraordinary compassion, humility, generosity, and unwavering commitment to helping others, and as someone with a quiet sense of humor that makes me laugh. My perspective is based not on isolated encounters, but on fifteen years of watching how he consistently treats people, including me.

Throughout the years, I have watched Ken support charitable organizations through financial contributions, nonprofit board service, and by generously sharing his professional knowledge and resources whenever he believed he could make a meaningful difference. He has never done these things for recognition. He simply wants to help people and make a difference for them, which I greatly admired. I especially saw this following the devastating Eaton Fire. While schools, community buildings, and homes had been destroyed, Ken provided substantial financial assistance to several organizations and individuals working to rebuild. I also witnessed him personally help people who had lost everything, asking for nothing in return.

On a deeply personal level, Ken quite literally changed the course of my life. In 2013, I was diagnosed with [redacted] I was self-employed, uninsured, and unable to afford the specialized medical care I desperately needed. Without my asking, Ken and his wife quietly financially supported me so I could see a specialist at USC Keck Medical Center. Because of their generosity, I was able to see a specialist and receive the treatment that ultimately saved my life, and I have remained in remission since 2014. I will never forget that act of compassion.

Several years later, when I was driving a car with nearly 300,000 miles on it, Ken again stepped forward without hesitation. He gave me one of his own vehicles that he was not driving so I could safely continue working. A few years after that, when my daughter was driving an unreliable vehicle, he once again generously provided her with a dependable car so she could continue getting to work safely. It wasn't about the cars. It was about what those acts said about his heart. When Ken sees someone in need, he quietly steps in and helps.

Most recently, after the Eaton Fire, a close friend of mine whom Ken has never met lost her home and all her possessions to the fire. When I mentioned this to Ken, he immediately wanted to help. Ken completely furnished her apartment, providing a bed, living room furniture, kitchen supplies, linens, a television, and other necessities so she could begin rebuilding her life with dignity. Once again, he never asked for recognition or expected anything in return. To this day, my friend does not know that it was Ken Leech who was responsible.

These are not isolated stories. They are simply examples of the kind of man Ken has been during the fifteen years I have known him. He has always been the first person I have known to step forward when someone is struggling, never expecting recognition or repayment. These are only a few examples. I have seen with my own eyes the difference Ken has made in the lives of so many people, including my own.

I have also always admired and respected Ken for his unwavering devotion to his family. He is a true family man. Throughout the fifteen years I have known him, I have watched him consistently put his family first. He and his family share an exceptionally close bond, and I have always admired the love and respect they have for one another. In the last three years, I have enjoyed seeing him embrace his role as a new grandfather to a three-year-old grandson and a one-year-old granddaughter. His two grandchildren clearly bring him tremendous joy, and he treasures every opportunity to spend time with them. Despite the demands of a very successful and busy career, I have never seen him lose sight of what matters most to him—his family. His family has always been the center of his life, and I have always admired him for that.

After knowing Ken for fifteen years and seeing the way he has lived his life, I can honestly say that the conduct to which he has pleaded guilty is completely inconsistent with the man I know. The Ken I know is a man of integrity, compassion, generosity, and service to others.

Thank you for taking the time to read my letter. I respectfully ask that you consider the man I have come to know over the past fifteen years—his compassion, generosity, integrity, devotion to his family, and the countless ways he has quietly helped others. I hope these observations will be taken into consideration as you determine an appropriate sentence, and I respectfully ask that you extend mercy and leniency.

Respectfully,

Pamela Ann Mims

Pamela Ann Mims

# Exhibit 68

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods:

I am writing to offer character reference and unequivocal support for Ken Leech. I have known Ken (who I call Kenny when 1-on-1) for more than 30 years. First as a boss and mentor in the investment management business and, eventually, as a dear friend.

Ken has always been someone to take ownership for his actions, so I'm not surprised he has taken responsibility and plead guilty to this charge. I'm not as familiar with the detailed nuances of his case, but can write about the person I've known for the past 30+ years.

Ken and I worked together at Western Asset Management in Pasadena from 1992 – 2000. I started as a 22-year-old in an entry level position. It was my first full-time job out of college. At the time, Ken was the Director of Portfolio Management and a member of the Executive Board. At many organizations, individuals in Ken's role would not be fraternizing with newbies in my position, especially from other departments. But that's not Ken. He didn't differentiate between eager and inexperienced young workers or seasoned executives in upper management when it came to being kind and supportive. And it wasn't just about work. Ken has a great sense of humor and wit. He was approachable and inquisitive about my personal life in a very supportive way. As a new employee at my first job, to have someone of Ken's caliber ask genuinely about my weekend, or how my fiancé was doing, or my family in Seattle, it made life and work feel welcoming.

As my time and responsibilities at Western Asset grew, I had the opportunity to work closely with Ken on several high-profile projects. In each case, he always had the client's best interests in mind. Perhaps the highlight was when we worked together to develop new risk management tools to apply to client portfolios during the 1998 financial market crisis created by the near collapse of Long-Term Capital Management. As global market turmoil increased, he felt that the systems and models Western Asset had in place at the time were not sufficiently producing the risk profiles and scenarios that our client's deserved during that short, but high volatility, period. As such, Ken enlisted me to help him build, from scratch, better models and analytical tools to provide the best investment management possible to clients during that market crisis.

As our time together at Western Asset increased, the mentorship relationship added a friendship component. Ken and his wife Eileen would have me and my wife Jenelle (a 2nd grade teacher) over for dinner at their house. The Leech's had two young children and Eileen would enjoy talking to Jenelle about the classroom and education. Ken and I would talk subjects from sports, to investment markets and life on the east coast vs west coast.

In 2000, Jenelle and I had our first child and decided to relocate to the Seattle area (where I grew up). Western Asset did not have remote jobs at the time and I received an offer from a Seattle investment firm that allowed me to come home and raise my growing family here.

On my final day at Western Asset, Ken sent me a kind, sincere and inspiring email. I printed and still have it today, 25+ years later. Occasionally, when I'm feeling less chipper, I break out my copy and read. Here are some excerpts:

"It is with deep personal regret that I bid you farewell from Western Asset.....The people who are the most valuable are your teammates who help you produce.....Everyone smiles upon victory, but it's the digging out of the trenches that counts. More than all your varied skill sets, it has been your 'can do' attitude which became your trademark...." He knew I had career aspirations to join and help a smaller firm grow. He added, "...being involved in the creation of a successful franchise from the ground floor is the most valuable route of all...I give you my fondest blessing. Good luck."

In the years knowing Ken, I've found him to be honest, respectful, dependable, and compassionate. He consistently demonstrates integrity in personal and professional interactions. Ken supports friends, colleagues, family and strangers in need. I have benefited from his direct kindness, generosity, loyalty, mentorship and friendship.

I respectfully ask the court to consider Ken's full character and attributes when making its decision.

Thank you for your time in reading my letter.

Best Regards,

Scott Mullet

[redacted]

# Exhibit 69

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods:

I am a friend and longtime colleague of Mr. Ken Leech. I am the CEO of a small investment firm as well as a Trustee of a mutual fund family. I am 61 years old and live with my husband in Annapolis, Maryland.

I know Ken has plead guilty to an offense. I would like to tell you about my experience with Ken over many years, how he has inspired and helped me and many others. I hope you will consider these things as you make your decision about Ken's sentence.

I have known Ken for almost 30 years. Ken's former employer, Western Asset Management (Western), was a subsidiary of Legg Mason, Inc. until 2020 when Legg Mason was bought by Franklin Resources. I first met Ken in the 1990's when Ken was Western's Chief Investment Officer and I was working in another Legg Mason subsidiary. Ken was at that time, and for all the years I knew him, a very well-regarded, highly respected investment leader known for his self-effacing manner and dry wit. We first met briefly at a corporate event, and he took the time to know me a little even though my work had nothing to do with his. I was proud to be present when Ken was inducted into the Fixed Income Hall of Fame in 2007. I continued to see him periodically as Western and Legg Mason grew.

In 2015, when I was the Chief Administrative Officer of Legg Mason, Inc, I received an offer from Western's CEO, Jim Hirschmann, to join Western as Chief Operating Officer. Throughout the process of considering this new role, I looked to Ken for insight and advice, which he generously gave me. Everything I saw and learned during this time affirmed Ken's reputation as a brilliant investor, a caring leader and wonderful person; Ken was a big reason I felt Western would be a great place to work. I decided to join.

Once I accepted Jim's offer and moved to California, Ken and his wife Eileen made a point of helping our family adjust to a new life. Ken spent time with one of my sons to help him consider which high school might be the best place for him. Ken and Eileen showed us neighborhoods and highlights of the area. Their support was far beyond what I expected and was instrumental to helping my family feel welcome.

At Western, I was a member of the firm's Executive Committee along with Jim (CEO), Ken (CIO), and a few others. We discussed policies for the firm as a whole and worked through difficult issues that couldn't be resolved at other levels. Again and again I saw Ken emphasize

our duty to our clients, to put their interests first, to go above and beyond to answer client questions and address concerns. Ken personally provided regular updates to our clients. I saw him always present our results objectively, making it clear when we underperformed and what we got wrong. Ken took responsibility himself for our shortcomings, while giving members of his team credit for what we got right. I personally heard many grateful comments from his team about his leadership style and temperament.

On employee issues, Ken was a vocal advocate for employees at all levels, and especially for those who were not in senior roles but had contributed meaningfully to the firm's culture, day to day operations and client experience.

Once, a mid-level manager with long tenure at the firm spoke inappropriately in anger to another employee. I was responsible for addressing this issue. When I discussed it with Ken, he pointed out to me that this incident was very unusual for this employee and could be a sign of distress. We investigated further and found this was indeed the case, which helped us develop a fair and effective way to handle the issue. Ken's great care toward employees taught me a lot about how to make this part of Western's culture.

In my experience over these many years, Ken has consistently been a person of exemplary conduct and character. He's been a role model for me and an inspiring friend. He has made a positive difference in my life and in many others. His conduct in this matter to which he has plead guilty is, in my experience, completely out of character with all that I have observed of him over many years. I humbly ask that you consider leniency for him.

I sincerely appreciate the opportunity to share my thoughts with you.

Respectfully,

*Jennifer W Murphy*

Jennifer W. Murphy

[redacted]

# Exhibit 70

July 15, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U. S. Courthouse
500 Pearl Street
New York, New York 10007-1321

Dear Judge Woods:

I am writing to share my thoughts on Ken Leech in advance of his sentencing.

After a career as a high end retail buyer in NYC and a move to the Syracuse, NY area, I became what I refer to as a "professional volunteer" in our children's school district, raising money for various activities, serving on administrative search, capital project and safety and security committees. I ultimately served for 15 years on the Jamesville-Dewitt Central School District Board of Education, most of those years as either Vice President or President. By pure coincidence, this happens to be the same school district Ken graduated from.

Everyone should be as lucky as I am to have a friend like Ken Leech!

I met Ken Leech through mutual friends in the fall of 1979, almost 47 years ago, in New York City. I was working as a department manager for Burberry's of London and going through a divorce. Ken was thinking of a job change with a move from Grosse Point, MI to NYC. We became instant friends! We were in our mid 20's and with our little circle of friends, had the city at our fingertips.

Ken probably had a crush on me but instead of acting on it, he became my protector of sorts. He shielded me from unwanted attention in bars or clubs. He made sure I got home safely at the end of every evening and that I was always included in the making of plans. He was a gentleman in every sense of the word! His chivalry, kindness, thoughtfulness, and friendship were a privilege to accept and not something I took lightly. When I met my future husband within our circle and Ken was the first one I told of the proposal. His was the approval I wanted from within my circle of friends, and I trusted and valued his opinion, especially when my future was on the line.

My relationship with Ken is non-professional but I fondly recall enjoying a lengthy conversation where Ken explained the bond market to me. What I remember most about that conversation was his absolute passion for math and the bond market. I had not begun investing at that point, but I realized that Ken possessed the qualities that I would want in a broker; intelligence, integrity, honesty, and trust. About 10 years ago, I asked Ken when he was

going to retire and he responded that he still loves what he does. His passion still came through!

Ken has become far more than a friend over the years. He is family! Uncle Ken. Our friend circle began getting married and moving to Connecticut. We began having children. My husband, Kevin, and I chose Ken as our daughter, Alison's godfather. We knew he possessed the spiritual and ethical qualities that would help guide Alison along life's path. Their relationship has blossomed! Our families have moved around the country, but our friendships have only grown. We have vacationed together in the Outer Banks, Hilton Head, LA, NYC, and Syracuse. We have remained very close and attended funerals and weddings as one family. When Alison got married and rose to offer a toast to their guests, she dubbed Ken and our little circle of core family friends as "Faux Family," a title we all wear proudly! Ken demonstrated through deeds and practice to our children that love, loyalty, and respect for others are the traits required to be a member in good standing of our faux family!

Kevin and I watched Ken as he embraced his wife, Eileen's, family. He encouraged them to join them in LA to keep the family close. He made certain they had homes nearby and in some cases, helped them with employment, all with exceptional love and compassion which continues to this day. Instead of making Eileen's family feel like he was doing a favor, he made them feel valued, important, and loved beyond imagination. We were fortunate to know Ken's parents as well as his brother Daryl. We witnessed Ken care for his aging parents in Syracuse, visiting them often until their deaths. He continues to visit aging relatives in Syracuse to their absolute delight, taking them to restaurants or places they fondly recall from the years when Ken was young. He is indeed a "family first" kind of person.

Ken is a man of faith, attending church regularly. He is a listener. I have never heard him judge anyone unfairly. Ken will look for the best in anyone. He seeks to understand what someone might need and acts on it to the best of his ability. He is genuinely caring and he has shared his good fortune. I know he was particularly generous in his community following the devastating wildfires of 2025 in the Pasadena area.

Our daughter, Alison, Ken's goddaughter, is fighting a serious illness right now and is not up to getting a letter completed in time. Alison currently is a nuclear engineer with Xcel Energy in Minneapolis. She spent 5 years as a lieutenant in the US Navy, serving as a nuclear engineer at Naval Reactors and later working on a PhD in business. She asked me to add to my letter that she loves spending time with Uncle Ken in deep conversation. Their minds work the same way. She only knows him to be loving, kind and generous, fair and fun!

Ken has always been as honest as the day is long. His moral and ethical character is what has made him so respected by friends and colleagues around the world. I state this unconditionally and without reservation.

I am reminded of a line from Theo of Golden by Allen Levy. This line struck me the minute I read it as a lesson that I need to remember: bad mercy is always better than bad justice.

Respectfully,

Virginia W. Murphy

Virginia W. Murphy
[redacted]
Fayetteville, NY
[redacted]

# Exhibit 71

July 21, 2026

The Honorable Greogry H Woods
United States Distrcit Judge
Southern District of New York
Daniel Patrick Moynihan U.S Courthouse
500 Pearl Street
New York, NY 10007

Dear Judge Woods,

I have known Ken Leech for more than 33 years. When I first moved to Pasadena, Ken and his family welcomed me with kindness and made me feel at home. From the very beginning, they opened their hearts to me, and over the years we have built a lasting friendship.

Throughout those years, I have come to know Ken as a kind, generous, and compassionate man who is always willing to help others. He has been a loyal friend—someone people can depend on during both joyful times and life's greatest challenges. I have witnessed countless acts of kindness.

One example that has stayed with me occurred when my family was forced to evacuate our home because of a fire in 1993. Ken and his family were among the first people we turned to, offering us support, comfort, and friendship during a very difficult time. That generosity reflected the person Ken has always been.

I have also been fortunate to develop a close friendship with his wife, Eileen. Over the years, our families have remained close as we raised our children together, sharing many of life's milestones and challenges. This long friendship has given me the opportunity to see firsthand the values that guide Ken's life.

Ken has always treated others with respect, dignity, and compassion. He genuinely cares about his friends, neighbors, and members of the community, often putting the needs of others before his own. His integrity, generosity, and willingness to help those around him have earned him the respect and admiration of so many who know him.

I understand the seriousness of these proceedings and have great respect for the Court's responsibility. I simply wanted to share my personal experience with Ken's character. The man I have known for more than three decades has consistently demonstrated kindness, loyalty, compassion, and a deep commitment to his family, friends, and community. I respectfully ask that the Court consider the many years he has spent making a positive difference in the lives of others.

Thank you for taking the time to consider my letter and for the thoughtful attention you give to these difficult matters.

Respectfully,
Susan Nelson
Susan Nelson