# Volume I

***United States v. Leech*, No. 24 Cr. 658 (GHW) (S.D.N.Y.)**
**Volume I – Exhibits Cited in the Sentencing Memorandum on Behalf of S. Kenneth Leech II**

| Exhibit No. | Document |
|---|---|
| **Letters** | |
| 1. | Leech, Ken |
| 2. | Leech, Eileen Stueck |
| 3. | Dovetta, Catherine L. |
| 4. | Leech III, Stephen K. |
| 5. | Agregado, Liza |
| 6. | Aicher, Kathleen R. |
| 7. | Alexander, Dan |
| 8. | Anderson, Keith T. |
| 9. | Anderson, Louise Tucker |
| 10. | Arnold, Bruce R. |
| 11. | Ashworth, Rev. Tiffany |
| 12. | Bachmann, Peter |
| 13. | Balcazar, Andres Sanchez |
| 14. | Bazdarich, Michael J. |
| 15. | Bekbosunov, Timur |
| 16. | Bernardi, Marzo |
| 17. | Brandlin, Eilley |
| 18. | Britton Jr., Anthony “Tony” |
| 19. | Brooks, Brian P. |
| 20. | Brown, Gordon S. |
| 21. | Bruce, Robert Clark |
| 22. | Buchanan, Michael C. |
| 23. | Bush, Rollin |
| 24. | Cantz, Robert |

| Exhibit No. | Document |
|---|---|
| 25. | Catalan, Caroline C. |
| 26. | Choi, Jae |
| 27. | Chotiner, Dr. Jennifer |
| 28. | Cook, Thomas G. |
| 29. | Crowell, Rev. Cynthia W. |
| 30. | De Mello, Rajeev |
| 31. | Dovetta, Nicolas |
| 32. | Eafanti, Michelle |
| 33. | Ehrlich, Kevin |
| 34. | Fan, Derek |
| 35. | Fink, Darin T. |
| 36. | Fink, Kevin |
| 37. | Fisk, Eliot |
| 38. | Flick, Jim |
| 39. | Freebes, Linda |
| 40. | Freedman, Mark |
| 41. | Glaze, Samuel F. |
| 42. | Goettler, Peter N. |
| 43. | Grannis, Scott F. |
| 44. | Green, Dr. Alan |
| 45. | Greetham, Christopher |
| 46. | Hales, Jonathan |
| 47. | Harker, Ilene S. |
| 48. | Healy, James P. |
| 49. | Hirschmann, James W. |
| 50. | Hutson, Tracey A. |
| 51. | Katerjian, Rev. Megan |
| 52. | Kripalani, Ranjit (Ron) |

| Exhibit No. | Document |
|---|---|
| 53. | Larson, Michael |
| 54. | Leech, Darryl C. |
| 55. | Leech, Katy |
| 56. | Lindbloom, Mark |
| 57. | Lippman, David |
| 58. | Marchosky, Ernest |
| 59. | Marki, Frederick |
| 60. | Marquez, Julie |
| 61. | Martin, Haley |
| 62. | Matthews, Catherine |
| 63. | McCourt, John W. |
| 64. | McNamara, Dennis J. |
| 65. | Meidl, Karen |
| 66. | Miller, Bill |
| 67. | Mims, Pamela Ann |
| 68. | Mullet, Scott |
| 69. | Murphy, Jennifer W. |
| 70. | Murphy, Virginia W. |
| 71. | Nelson, Susan |
| 72. | Orswell, John E. |
| 73. | Patterson, Elizabeth L. |
| 74. | Powell, Karlen |
| 75. | Quinn, Norman P. |
| 76. | Roffina, Rev. Michael J. |
| 77. | Saltzman, Cantor Mark |
| 78. | Schlichter, Detlev |
| 79. | Scholnick, Julien |
| 80. | Schucking, Ivor |

| Exhibit No. | Document |
|---|---|
| 81. | Schulte, Holly |
| 82. | Senft, Dexter |
| 83. | Sibbrel, Robert |
| 84. | Sibley, Cel |
| 85. | Smith, Ian J. |
| 86. | Snoke, Rosemarie |
| 87. | Stringfield, Casey |
| 88. | Stueck, Clifford |
| 89. | Stueck, Florence |
| 90. | Stueck, Jill |
| 91. | Stueck, John J. |
| 92. | Stueck, Kathleen M. |
| 93. | Stueck, Lois |
| 94. | Stueck, Nannette A. |
| 95. | Sylvester, Dr. Lisa |
| 96. | Trepp, Suzanne |
| 97. | Walsh, Stephen A. |
| 98. | White, Paul M. |
| 99. | Wilson, Steven |
| 100. | Winston, Kenneth |
| 101. | Wright, Joy |
| 102. | Wynstock, Dr. Lori J. |
| 103. | Yamamoto, Dylan J. |
| **Other** | |
| A. | Morningstar Announces 2004 Fund Manager of the Year Awards |
| B. | Morningstar Announces 2014 U.S. Fund Manager of the Year Award Winners |
| C. | Email from K. Leech to S. Walsh, Subject: press |

# Exhibit 72

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods:

I am writing to respectfully request leniency for S. Kenneth "Ken" Leech. As a former FBI Special Agent with 15 years of experience investigating white-collar crime, it is rare for me to advocate on behalf of someone who has pled guilty to the crime of obstructing a proceeding before the Securities and Exchange Commission.

I realize obstruction of a federal proceeding is a serious crime, as I investigated hundreds of cases involving bank embezzlement, political corruption, labor racketeering, and environmental crimes during my career. But I am writing to you today to provide you with some insight into Ken's true character that I hope you will consider in making your decision with regard to sentencing.

I have known Ken for about 30 years, as we attend the same church (Trinity Presbyterian Church in Pasadena, California). In the late 1990s, Ken and I served together on the Session as Ruling Elders. Ruling Elders are elected by other members of the congregation to serve on the Session, which is essentially a "Board of Directors," overseeing the business of running the church such as preparing a budget, working with community partners and maintaining the buildings and grounds.

For at least the past three decades, Ken and his wife, Eileen, have quietly and faithfully contributed to ministries that provide food, shelter, disaster relief, and support to vulnerable neighbors. Their giving reflects who they are: compassionate, humble people who believe in strengthening their community. Their generosity-both personal and philanthropic-has supported countless individuals and organizations.

Judge Woods, I respectfully ask you to consider the totality of Ken's life, character, and community service. I believe that granting him leniency will allow him to continue contributing positively to the community and lives of many others.

Thank you for your time and consideration.

Sincerely,

John E. Orswell

[redacted]

Arcadia, CA [redacted]

[redacted]

# Exhibit 73

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

August 28, 2026

Dear Judge Woods,

I am writing to ask for a degree of leniency for Kenneth Leech. I have known the Leech family for many years through Trinity Presbyterian Church, where I served as an elder and where Ken is a faithful attendee, participant and supporter of Trinity. I first met Ken's wife, Eileen, and we became friends but I discovered that Ken's spirit is such that any friend of his wife's is going to be his friend as well.

I do understand that Ken is guilty and I am not questioning that. What I want to do is to describe him in my context in order to demonstrate that this behavior is not the Ken I, and so many others, know and respect. That Ken is a man of integrity, high ethical standards, and a compassionate heart. Let me provide some examples.

First, Ken is a devoted family man. One of the best ways to observe that is through his two children, now responsible adults. The quality of their character is obvious, and I would trace its development directly to the modeling from Ken and from Eileen as well. They hold their parents' values and integrity and demonstrate it through their own life choices. However, when I say family man, I need to expand that, as Ken has, to include all members of the family he married into. He is so firmly supportive of them! One of the more recent things that touched me is his support, financial and otherwise, for the publication of his father-in-law's memoirs, after Cliff's death. It meant the world to Cliff's widow and their children. This support also included throwing a party to celebrate the printing, and providing a copy for each attendee. It sounds like a small thing, but believe me, it makes a statement about his kindness.

Second, Ken cares about his community and gets involved in the things he believes in. The one involvement I have observed most closely is his support for Los Angeles Children's Chorus. His daughter Catherine is a gifted vocalist and came up through the LACC program, but his support for the program expanded beyond simply supporting his daughter's involvement. A few years back, because of that support, he and Eileen were named as the honorees at the yearly LACC Gala (along with the composer John Williams, which should tell you something!). This was well after Catherine was no longer singing with the

chorus. I was privy to the discussion that came beforehand, though, when they were deciding whether they should agree to be honored. They are humble people and this debate was so symbolic of that. Much of what they do is behind the scenes and I only hear because of some coincidental occurrence. For instance, they support Door of Hope, which is a faith-based transitional housing program for families in the Pasadena area, but the only reason I know that is because the Executive Director mentioned them to me, and thought I knew already. I was on the Board of Door of Hope at the time, but the Leeches did not tell me this.

My third point is completely subjective, but I think it is fair. I have some amount of experience in judging human nature. I worked as a faculty member and administrator in theological education for twenty-two years. One of my tasks was assessing candidates for ministry. It is not easy to make such an evaluation but over the years I came to recognize the presence of qualities like honesty, self knowledge, and integrity, and to notice their absence as well. Following that, for five years I served as Director of Accrediting for the Association of Theological Schools in North America. In this role, I was pretty constantly on the road, and deeply involved in assessing what was happening in a particular seminary/ divinity school. I became pretty good at recognizing honesty and integrity in a school's leadership, and recognizing as well when that was not the case. I am retired now, but that ability is one of the reasons I now stand with and for Ken. In my experience of him over the years, I have come to trust his values, his ethics, and his integrity. I will continue to do so.

Thank you for allowing me a space to speak privately, as a friend of Ken's. I would be glad to answer any questions if that would be helpful.

Respectfully,

Elizabeth L. Patterson
[redacted]

# Exhibit 74

July 21, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods,

My name is Karlen Powell. I worked at Western Asset for nearly two decades, most recently leading the firm's global client service and sales support organization. During my time at Western Asset, I worked with Ken Leech and had the opportunity to know him as a colleague, a leader, and someone who helped shape the firm's culture. I understand that Ken has pleaded guilty to an offense, and I respectfully write to share my firsthand experiences with him and to ask that you consider the person I have known over many years as you determine an appropriate sentence.

I joined Western Asset in its Client Service department in 2008 as a very green 24-year-old, and I knew virtually nothing about fixed income investing. One of the first things that struck me about Western Asset was its culture. It was remarkably flat for an organization with so many accomplished professionals. Regardless of title or seniority, people genuinely invested their time in helping others learn.

Only a few months into my career, I found myself attending client meetings with Ken. He was already regarded as one of the industry's premier fixed income investors. Around the firm, people often joked that he had "written the book" on options trading because he had authored a widely read industry paper on Treasury options when that market was still in its infancy. Given this reputation, I expected someone intimidating and inaccessible. Instead, I met someone who was humble, approachable, and genuinely interested in helping others learn. He asked about my background and patiently answered questions that, looking back, were embarrassingly basic. He never made me feel as though I had not earned the right to be in the room.

As my responsibilities grew, I had the privilege of supporting many of Western Asset's largest institutional clients. Ken consistently made himself available to prepare for client meetings, review portfolio positioning, discuss investment guidelines, and think through investment opportunities that best aligned with each client's objectives. No matter how busy he was, he believed clients deserved thoughtful preparation, honest dialogue, and direct access to the people responsible for managing their assets. That commitment was never performative; this was simply how he approached his responsibilities every day.

I also watched Ken lead through one of the most difficult periods in modern financial markets. During the Global Financial Crisis, I attended Board meetings and client reviews where investment decisions made by Western Asset's entire investment team were scrutinized in extraordinary detail. Ken never distanced himself from difficult outcomes. As the firm's investment leader, he accepted responsibility, patiently explained the team's thinking, and relied on the perspective that only decades of experience navigating multiple market cycles can provide. Yet when markets recovered and successes followed, he was always quick to recognize the contributions of others rather than himself. He carried the burden of leadership during difficult periods and shared the credit during successful ones.

One memory of Ken has stayed with me over the years because I think it captures his character. In 2021, Western Asset celebrated its 50th anniversary with a small gathering in the courtyard of our headquarters. During a lighthearted conversation, someone jokingly referenced the extreme excesses of Wall Street in the 1990s. Ken quietly stopped the conversation and said, "That's never been who we are. That's not what we do. We stay focused on our clients, and that's how you build something that survives 50 years." It was a brief exchange that could easily have passed unnoticed. Even in a moment of celebration, he felt it was important to reinforce that Western Asset's identity was built not on ego or trading bravado, but on humility, integrity, and serving clients. Those values were not just words; they defined the culture he helped build.

That is the Ken I came to know over nearly two decades. He was an old-school investor who would occasionally walk into client meetings with ink smudged on his hand or shirt because he had been scribbling investment ideas with his left hand moments before. I remember someone who treated people with respect regardless of title, who cared deeply about clients, and who demonstrated through his actions what professionalism, humility, and stewardship looked like.

For that reason, the allegations and media coverage of the past several years have been difficult for me to reconcile with the person I came to know throughout my career. They simply do not reflect the character, values, intellect, and leadership I witnessed firsthand over many years.

Thank you for allowing me to share my perspective. As you determine an appropriate sentence, I respectfully ask that you also consider the decades during which Ken devoted himself to his clients, treated colleagues with respect, and helped build a culture that shaped not only my career, but the careers of many others who were fortunate enough to work alongside him.

Thank you for your consideration.

Respectfully,

Karlen Powell
Pasadena, California
[redacted]

# Exhibit 75

July 15,2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods,

My name is Norman Quinn, and I am a 72-year-old retired financial futures broker who lives in Chicago, Illinois. I am writing on behalf of my good friend and former client, Ken Leech, to share information about Ken's character that I hope you will consider when considering the appropriate sentence.

I met Ken over 40 years ago, when I was a young futures broker just starting out on the floor of the Chicago Board of Trade, and he was a trader for First Boston in New York. When Ken joined Western Asset Management in Pasadena, he continued to do business with me and although our relationship was conducted mostly over the phone, we quickly became close friends. In those early years, Ken patiently shared his market knowledge and experience at a time when I had very little of my own. I was not the only young broker he took under his wing; he was a great mentor and role model to a number of other brokers learning the ropes in the still-new world of financial futures.

Our friendship was never only about markets. Over the decades, our families came to know one another, and we shared occasional family get-togethers that both my children and I still cherish as some of our warmest memories. Ken has also been a caring and compassionate presence in my life through some of my hardest moments. When I went through a divorce, and again when I lost a loved one, Ken listened to me with real compassion and spoke to me in ways that eased my pain and helped me believe that better days were ahead. I have missed talking with my friend over these past few years and long for the day when we can visit and catch up on our grandkids and life.

In my experience, Ken has always been an intelligent, good-hearted, empathetic and compassionate man, which is somewhat rare in the financial markets. Over my career, I came to know a great many Wall Street traders and portfolio managers and saw firsthand how easily some of them lost touch with their values as they succumbed to the money and perks that came with success. Ken was never one of these people. In all the years I have known him, he has been honest, humble, generous, and compassionate — a person who genuinely cared about treating people fairly and doing the right thing. I understand that nobody is perfect. But I can honestly say that the conduct to which Ken has pled guilty is simply not consistent with the man I have known and trusted as a friend and client for over four decades.

I believe that Ken has already endured significant pain, shame and stress and know he will carry the consequences of this case for years to come. Ken is a loving husband, father, and grandfather, and his family and friends hope for the chance to have him back in their lives as soon as possible. I know in my heart the sooner he can return to his family and friends and begin to rebuild his life, the happier and better off we will all be.

I hope that you will consider this information about Ken's good character as you determine the appropriate sentence. Thank you very much for your time and for your consideration of this letter.

Respectfully,

Norman P. Quinn
[redacted]
Chicago, IL
[redacted]

P.S. I have a hard time imagining how difficult your job must be. Although I imagine it feels very rewarding, at times I'm sure the decisions feel very onerous. This is the first time I've given thought to it. I am grateful for what you do.

# Exhibit 76

**The Reverend Michael J. Roffina**
[redacted]
**Pasadena, California** [redacted]

July 17, 2026
The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods,

I write on behalf of Mr. Ken Leech. I have known the Leech family for close to 30 years. Ken's son went to the school where I served as Director of Human Development and taught 9th grade world history. Ken's and his family faithfully attends the Presbyterian church where I served as the pastor.

I am aware that he pleaded guilty. I am asking you to be merciful and lenient in regards to his sentence considering Ken's decades of service and generosity.

I write as Ken's former pastor because Ken is a deeply spiritual person. He is a great husband, and a wonderful dad. Ken is unpretentious, humble, and modest. His wife and daughter have sung in the choir. Ken is an extremely generous person with his time and his financial support of the school, the church, and other community organizations. Ken has helped to keep Trinity Presbyterian Church thriving. He looks for ways to serve others and the community. He has been an Elder at Trinity providing wisdom and expertise.

Simply put, Ken is a wonderful person who is kind, respectful, and gracious with all those he meets.

Thank you, Judge Woods, for your time and careful consideration of this matter.

Sincerely,

Michael J. Roffina

The Reverend Michael J. Roffina

# Exhibit 77

July 11, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl St.
New York, New York 10007

Dear Judge Woods:

I am writing this letter on behalf of Kenneth Leech with information that I hope you will take into consideration as you make your decision regarding the sentencing for the offense to which he has recently pled guilty.

I have been a Cantor in the Jewish faith for over fifty years. Contemporaneously, I have also been an owner and the CFO of Silver Birches, an event design and production company based in Pasadena, California for over forty-five years. I live in the Pasadena/Altadena area where Ken resides and where he has worked for many decades as well. I have known Ken and his family for nearly thirty years both as my client and as my good friend. My company has worked for Ken and with his company, Western Assets on numerous projects and events from the beginning of our relationship. Silver Birches has also designed and produced many joyous family occasions for him and his family over the same period. Ken has always shown impeccable integrity and consistent professional acuity in all of our business transactions and personal interactions from inception to completion. Every experience I have with Ken has further confirmed to me that he is a man whose honesty and compassion are unparalleled.

One of his most outstanding qualities, aside from his honesty, is his humble approach to life. The character of this man could not be better illustrated than in the manner in which he supports and generously donates to countless charitable organizations. Wherever and whenever people are in need, Ken is always there to help, to give generously and to provide his full and unequivocal support. I have had the privilege of directly witnessing his generosity and patronage vis a vis the various non-profits and charities that I engage with and manage on a daily basis. No matter what the organization is or the sum he chooses to donate, his demeanor is always one of modesty, and his preference and modality of service is to remain anonymous and unheralded.

Ken and his wife Eileen are the much needed and appreciated champions of numerous local musical, cultural, educational and arts organizations. Again, he never desires (and in fact tries to avoid) any form of public credit or acknowledgement. He only wishes to be of service in whatever way he can. However, those of us who know him and work with him regard him as the pinnacle of an exemplary citizen. Even though he would never toot his own horn, I can. The LA Children's Chorus, Boston Court Performing Arts Center, Los Angeles Master Chorale, and Door of Hope are but a few of the non-profit organizations I know from personal experience he has selflessly supported for many years.

Ken and his family are also deeply engaged with several churches, spiritually based communities and other organizations outside of their own church. Although they are not members, they saw and felt the desperate need of the community at St. Marks Episcopal Church that burnt to the ground in the devastating Altadena fires. They quietly and generously stepped up to donate to the rebuilding effort without being asked and without any public display or recognition. The Leeches have also supported Congregation Kol Ami in West Hollywood where I am the Cantor Emeritus. They are not members there either, nor are they Jewish, but they have provided consistent financial sustenance to this small temple by supporting its sacred mission, innovative music and social awareness programs that has served the LGBTQ community at large for over thirty years. The family is a stalwart supporter of Sanctuary for Humanity, a non-profit that I created 12 years ago to promote interfaith understanding and multicultural healing within multiple local communities through music, education and conversation. The events are presented all over the Los Angeles area and the dialogue continues due at least in part to his unflinching support. Additionally, Ken and Eileen are the founding donors and continuing supporters that launched Prima Voce Emerging Artists ten years ago. It is a non-profit educational program that was created to train and develop young classical singers as they transition out of universities and into their professional careers. PVEA continues to enable the success of young artists as evidenced by its now, illustrious alumni and thanks to the generosity and guidance of Ken and his family.

I have witnessed the powerful influence and impact that Ken exerts and exudes over and over again with his energy and in his deeds. I have felt and seen how the fabric of our society is directly influenced by the compassionate and positive actions that Ken fosters and does for others every single day of his life.

Based on my knowledge and personal relationship with Ken, the acts to which he has pleaded guilty are not consistent with any aspect of his prior history or with the exemplary character of the man that I know to be Ken Leech. I ask you to take these statements and his countless good deeds into consideration as you contemplate your sentencing. I hope that you can be as lenient with him as it would be consistent and proportionate to the enormous kindness and generosity that he has shown for so many others throughout his entire life. There is still so much more goodness that Ken can and wants to do for our world. I pray that he will soon be able to continue his work and to support the many causes that truly enable the just and productive society we all seek.

Respectfully

Cantor Mark Saltzman
Cantor Emeritus, Congregation Kol Ami
[redacted]

# Exhibit 78

Detlev S. Schlichter
[redacted]
London [redacted]
United Kingdom
30 August 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods:

I am writing to you on behalf of Ken Leech, who, I understand, pleaded guilty to obstructing proceedings before the Securities and Exchange Commission, and who you will sentence soon.

My name is Detlev Schlichter. I am 62 years old and a resident of London, England. I have known Ken for 25 years.

I first became Ken's colleague in 2001 when I joined Western Asset as a portfolio manager in London. I ultimately became the head of the London investment team. While I was never based in Western's head office in Pasadena, California, and while my direct reporting line was to deputy chief investment officer, Steve Walsh, my interactions with Ken as the firm's chief investment officer over a period of 8 years were frequent, ranging between twice a week and almost daily, depending on circumstances. I left Western Asset in 2009 to write a book on economics, but Ken and I did stay in touch. I re-joined Western Asset in 2018, albeit not as a portfolio manager but a client service executive.

Over the 25 years I have known Ken and interacted with him in both professional settings and many personal encounters, I invariably experienced him to be a person of strong character and the highest personal integrity. My picture of him, formed over many years and through many different situations, stands in stark contrast to the crime he has admitted to.

Please allow me to give a few examples from both professional and personal situations to hopefully convey my deep impression of Ken's character.

Ken's superior intellect and his passion and talent for investing made him a natural leader of an investment organisation. Ken always led by example and with a quiet authority. He invariably was at his desk on the Pasadena trading floor at 5:30 am, in time for the opening of financial markets in New York. His focus on his portfolios was complete, and so was his commitment to achieving the best possible returns for the clients who had entrusted their capital to Western Asset. His high personal and professional standards earned him the respect and loyalty of clients and colleagues alike. I often sought Ken's counsel in matters of investing as well as when dealing with personnel issues in my team. I always valued his opinions. His advice was always thoughtful, well-considered and intelligent

The investment management industry is obsessed with size, and "assets under management (AUM)" is considered a mark of success. In 2005, Western Asset's then parent, Legg Mason Inc., was considering the acquisition of Citicorp's asset management business and the subsequent integration of the bond funds with Western Asset, a transaction that would ultimately double Western Asset's size and turn it into a truly global firm. Ken harboured deep reservations about this transaction as it risked changing Western Asset's unique corporate culture and diverting energies away from managing the funds of existing clients. He laid out his well-considered concerns in a personal letter to Legg Mason's founder and chairman, Chip Mason. I think it is characteristic of Ken that his integrity demanded that he voice his concerns, and do so in a responsible and appropriate manner to the relevant people, but that when he failed to win the argument and the transaction went ahead, he did his utmost to help make it work.

I left Western Asset in 2009 to write a book on economics. Although we were no longer colleagues, Ken kindly agreed to review an early draft of my book, and when the book was published by Wiley & Sons in 2011, he also agreed to provide a testimonial for the book's cover. I don't think Ken agreed with all my conclusions, but his endorsement was genuine, thoughtful, and supportive, without betraying his own views.

That same year my wife's mother died of cancer, and Ken, who had met my wife when I had taken the family to Pasadena in 2001, and again a few years later during a business trip to London, wrote her a personal and heart-felt letter of condolences.

His family has always been of the greatest importance to Ken: his wife, Eileen, his daughter, Catherine, and his son, Stephen. A few years ago, he mentioned to me that the only project that could entice him to apply his investment skills outside Western Asset, the firm he had spent his entire career building, was to help his son in his endeavour to found and grow his own investment company.

Of all the people I met over my 36 years in the investment business, Ken Leech is certainly one of the most impressive, not only in terms of intellect and investment skill, but equally as a person of strong character, high standards, and personal integrity.

I respectfully ask that you take Ken's entire character into consideration, and that you exercise mercy and leniency when sentencing him.

Respectfully,

Detlev Schlichter

# Exhibit 79

July 16, 2025

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods:

My name is Julien Scholnick and I am a current portfolio manager at Western Asset ("Western" or "WA") and a former colleague of Ken Leech ("Ken"). I am fifty-one years old and I started working at Western (Pasadena office) in 2003 as an investment analyst on our trading floor. From my first role as an analyst, until Ken's retirement from the firm, I either supported Ken or worked directly with Ken on our broad market suite of portfolios. Those portfolios included Core, Core+, Intermediate and short duration strategies. Specifically, my involvement with Ken included co-managing (along with other members of our team) several of our mutual funds, our separately managed broad-market institutional accounts, as well as serving on WA's US Investment Strategy Committee and WA's Market Credit and Risk Committee.

While I acknowledge and understand that Ken has pleaded guilty to an offense, I am writing to you to provide some additional information about Ken, and it is my hope that you will take this added information into consideration when making a decision regarding sentencing. I would like to stress that while I fully understand the gravity of the situation, I feel that given my long and close professional relationship with Ken, the additional insight I have to offer is worthwhile in helping to paint a more complete picture of Ken's character and his commitment to Western's clients.

From my earliest days at Western, what stands out to me has been Ken's approachability, kindness, humility, and his commitment to his fiduciary duties. No matter what your position at WA, Ken always had time to listen to you, to thoughtfully answer your questions, and to provide his perspectives. This was certainly true in my case, and over the years we worked together I approached Ken with many questions, which while I am sure were obvious to him, he was always patient in his explanations. This was also true when it came to our clients. No matter who the client was - it could have been one of our largest

institutional clients with assets in the multiple of billions, or it could have been a small client invested in one of our co-mingled funds, Ken was always willing to take the time to speak with them and to spend as much time as needed to fully answer their questions and concerns in a satisfactory way. Participating in many of these client calls and meetings with Ken over the years, I can attest to the appreciation that these clients had for the time he spent with them. This was one reason, among many, that Western retained such long-standing relationships. Furthermore, while Ken's insights and perspective on the markets were in-demand, his preference was to share his thoughts in written commentaries and via webcasts, as opposed to more public venues, such as TV. This was a prime example of his humility and his desire to remain 'behind-the-scenes' as much as he could, letting his actions and his performance speak for themselves, and letting others take on more 'public' communication roles.

Additionally, in his internal communications and dialogues with Western employees Ken always emphasized the importance of putting our clients first, above all else. Not only was this straightforwardly the right thing to do he would stress, but there would come times when our performance would be lagging and it would be the goodwill and the trust that had been built up over the prior years and decades that we would have to fall back on in order to maintain the relationships. And this was precisely what happened. I can think back to many of the difficult market environments when performance was challenged in the short run and the countless calls and meetings that Ken and all of us would have with our clients. And time and time again, the response was often that "we understand what you are telling us about the current situation, we appreciate your candor and the time that you are taking to answer our questions and concerns, and we trust you."

Working so closely together for so many years as I did with Ken, and as so many others at Western did as well, it was inevitable that there would also be interactions away from work that shed light on Ken's kindness, empathy, and generosity. I can think back to one situation that involved a colleague of ours at WA. This individual ended up extremely sick, and I know personally that Ken spent countless hours visiting him in the hospital. He never made a big deal about it, rather it was just the right thing to do. Another instance I can recall is attending a fundraising event for one of the many organizations that Ken supported. He was gracious with his time and stayed up much later than would be normal, knowing that the next morning he would have to be at his desk at 5:00 a.m. But that was emblematic of the type of person he was. One more personal anecdote – Ken's kids both attended a Waldorf school, which has a very unique philosophy and curriculum. When my wife and I were deciding where to have our kids start school, Ken spent a significant amount of time with us discussing the merits and considerations of a Waldorf education.

We greatly appreciated his perspectives on this matter, which ultimately helped us to make an informed decision that has turned out to be great for our family.

Based on the time spent over the past two decades of working very closely with Ken, I can say that the acts to which he has pleaded guilty are inconsistent with his prior history, behavior, and overall character. I hope that this letter has been informative in providing additional details about Ken, how he has conducted himself professionally and personally, and the commitment he has shown to his clients and to his colleagues. And I respectfully ask that this letter be taken into consideration and that leniency be shown in imposing sentence.

Respectfully,

Julien Scholnick
385 E. Colorado Blvd.
Pasadena, CA 91101

# Exhibit 80

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 1007-1312

Dear Judge Woods,

I worked as a credit analyst for almost 16 years at Western Asset Management Company (WAMCO) from 2009-2024. Throughout that period, I worked closely with the CIO Ken Leech while at WAMCO. I had a very good working relationship with Ken. I always regarded Ken as the brains behind the historical success as WAMCO. Ken was always easy to work with since he had a wicked dry sense of humor combined with a unique calmness, an extremely quick mind and humility.

My strongest memory of Ken occurred on Monday March 20th, 2023 when Credit Suisse collapsed. WAMCO had an extremely large exposure to Credit Suisse's bonds and my boss Ryan Brist (Investment Grade Portfolio Manager and Deputy CIO at WAMCO) announced the size of our losses on Monday March 20th to our colleagues. Immediately following this meeting, Ken Leech asked me to meet with him privately. Ken proceeded to put his arm around me and he said "You are the best analyst that I have ever worked with and hold your head up high. No one could have predicted this outcome and I believe in you. We will be alright so get back to work." Amidst a very difficult situation, Ken ensured that I felt supported and that I was a valued member of the team.

I hope this letter will be considered when deciding Ken's sentencing.

Ivor Schucking

Ivor Schucking

Global Head Of Investment Grade Credit Research

Vanguard

# Exhibit 81

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/17/2026

RECEIVED
AUG 11 2026
GREGORY H. WOODS
U.S. DISTRICT JUDGE
S.D.N.Y.

August 4, 2026

The Honorable Gregory H. Woods
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

**Re:** *United States v. S. Kenneth Leech, II*
Case No. 24-cr-658

Dear Judge Woods:

I am writing in support of Stephen Kenneth Leech, II, whom I have always known as Ken. I hope to share a personal perspective about the kind of man Ken has been to my brother and our family.

I understand that Ken is before the Court because of serious mistakes and that he has accepted responsibility for his actions. I am not writing to excuse what happened. I am writing because the Ken I have known for many years is a good, kind, and humble man whose influence on my brother's life was profound.

My late brother worked alongside Ken for many years. Their relationship grew far beyond that of employer and employee. Ken became his mentor, trusted advisor, dear friend, and, in many ways, a brother to him. My brother often spoke about how much he respected Ken, not only because of his intelligence and professional success, but because of the way he treated people.

Ken believed in my brother, encouraged him, and helped guide him toward a successful career. He gave my brother confidence in his abilities and opportunities that changed the direction of his life. Our family will always be grateful to Ken for the role he played in helping my brother become the man he was.

Ken has always struck me as a man of intelligence, humility, kindness, and quiet strength. He did not need attention or recognition. He simply helped people. He shared what he knew, encouraged others to succeed, and treated people with dignity and respect.

The clearest example of Ken's character came after he had retired.

When my brother unexpectedly passed away, our family was devastated. There was only one person I believed could give his eulogy and truly do justice to his life, and that person was Ken. Ken understood my brother's professional journey, his accomplishments, and the man he had become.

When I asked Ken to give the eulogy, he agreed without hesitation.

His words that day were heartfelt, genuine, and filled with love. He honored my brother in a way no one else could have. He gave our family comfort during one of the most difficult moments of our lives, and I will never forget what he did for us. He had no obligation to take on that responsibility. He did it because he loved my brother and because that is the kind of man he is.

Ken is also a devoted family man. The love he has for his family has always been clear. He is a man who cares deeply about the people in his life and who has quietly made a positive difference in the lives of others without expecting praise or recognition.

I know that Ken must answer for the mistakes he has made. I also know that those mistakes are not the whole of who he is. In my personal experience, Ken is a good man who found himself in a very bad situation. He has spent many years mentoring others, helping people succeed, and showing kindness when it mattered most.

Because of Ken, my brother found a career he loved and confidence in himself. Because of Ken, our family received an unforgettable act of compassion when we were grieving. That is the Ken I know and the man I will always remember.

I respectfully ask that you consider the person Ken has been throughout his life, the good he has done for others, and the positive influence he has had on my brother and our family.

Thank you for taking the time to read my letter and consider my personal experience with Ken.

Respectfully submitted,

Holly Schulte
[redacted]
St. Clair Shores, MI [redacted]
[redacted]

# Exhibit 82

July 31, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods,

My name is Dexter Senft. I am 74 years old and I live in Saratoga Springs, New York. I spent 42 years working on Wall Street for several banks and investment banks, most recently Morgan Stanley, where I was a Managing Director. I am a long-time friend of Ken Leech. I am aware that Ken has pleaded guilty to obstructing an SEC investigation. I write today to provide you with information that I hope will be helpful in your sentencing decision.

By way of background, I was graduated summa cum laude by Rice University in Houston, with degrees in mathematics, mathematical sciences and economics. I considered applying for a job at NASA but instead took a job offer in 1974 from The First Boston Corporation in New York. I was assigned to work in the newly created Fixed Income Research department, as its second employee.

Fixed income securities include bonds of all types (e.g. government, corporate, municipal), mortgages, and derivatives of those products (futures, options and swaps). These products traded over the counter – i.e., they had no exchange and no ticker of transactions. The goal of fixed income research was to track market prices, analyze historical patterns in those prices to determine trends, and make trade recommendations to customers as well as to our own traders.

My early work at First Boston focused on mortgage securities, yield curves and hedging strategies. I published my results in the form of weekly commentaries and longer reports that educated readers on the workings of mortgage securities, which were in their infancy.

In 1977, I accompanied a sales person to The National Bank of Detroit (NBD), a valued client of First Boston. NBD was anxious to learn more about mortgage securities so our sales person arranged for an in-person visit at their offices. The usual protocol for such meetings was for me to fly in, speak with the client for perhaps 45 minutes and then have the sales person take everyone to a fancy lunch where he would pitch other products and services.

NBD had several people in attendance, including their senior portfolio managers. Among the junior people in attendance was Ken Leech, a relatively new hire out of Wharton. Ken had clearly read the research, had many good questions, and was noticeably disappointed when it was time for lunch. Ken said something to the effect of, “Too bad we didn’t order burgers in.” I jumped on that as fast as possible, making it clear that I’d like nothing better than keeping the meeting going over burgers. That is how Ken and I started a friendship that is now in its 50th year. The burgers were enjoyed by all except the sales person.

As Ken and I got to know each other, my manager and I decided to recruit Ken to First Boston, and in 1980 he joined us as a new member of Fixed Income Research. Ken and I were both interested in fixed income options (i.e., options on bonds) – me for their mathematics of valuation and risk management, Ken for their use as a tool to craft bond portfolio risk along lines not previously available to traders or portfolio managers. We co-authored a paper titled “Fixed Income Options” – one of the first research papers on the subject. It became very popular, resulting in our traveling the country to present our results, in group settings and with customers one on one. I’ve witnessed Ken’s style hundreds of times. He is very engaging and if given the opportunity will regale the room with stories that are both educational and humorous. He is a great listener and will not beat around the bush when answering questions. He never pretends to know what he doesn’t, but his self-effacing nature often has him saying he “doesn’t know much” about something when he usually knows more than the others in the room.

Shortly after our travels for this paper, our career paths diverged. Ken pursued proprietary futures and options trading, whereas I remained in Research. We continued to work as a team and our relationship was symbiotic. Using the mathematical tools developed by Research, Ken could seek out trading opportunities wherever options were either over- or under-valued and commit First Boston’s capital accordingly. Ken’s deep knowledge of options enabled him both to take on new risks and hedge the risks already on First Boston’s books. He was very successful. Ken proved that options (and futures) trading was not like throwing darts. His systematic approach put the odds in his favor – not on every trade, but in the aggregate.

Ken’s experience at NBD and First Boston instilled in him the ethics of institutional over-the-counter trading. In this world, transactions were (and are) typically quite large, often in the tens of millions of dollars. At that time, they were transacted almost exclusively by telephone. If one of the parties on the phone made a bid to buy something (or an offer to sell something) and the other party simply uttered the word “Done”, that became a binding contract. There was no way for either party to back out or change the terms. Anyone who tried to renege on a verbal transaction, or who developed a pattern of claiming he or she was misunderstood on the phone, quickly discovered that other firms would stop wanting his or her business. Ours was in industry in which our word was our bond.

This doesn't mean mistakes weren't made. In fixed income markets, the procedure for dealing with mistakes is simple: 1) admit the mistake; 2) reverse the erroneous trade; and 3) book the correct trade. Step 1 was difficult for many people, and step 2 was often costly. Ken was a true professional in dealing with mistakes.

Over the years, my career took me from First Boston to Lehman Brothers to Barclays Capital and finally to Morgan Stanley. I managed diverse businesses in addition to Fixed Income Research, including Mortgage Finance, Global Economics, Strategic Investments, Crypto Currency and ultimately, Electronic Trading for bonds and foreign exchange.

Meanwhile, Ken enjoyed great success in trading and portfolio management, rising to become the Chief Investment Officer at Western Asset Management. Ken was elected to the Fixed Income Analyst Society Hall of Fame, and he was recognized in the financial press as one of the most successful fixed income managers in the country. However, Ken never wanted accolades. When Western Asset acquired the Citibank bond portfolio, Fortune Magazine published a cover story describing Ken as "The New King of Bonds." Ken was especially unhappy with that moniker because he felt it was grossly unfair to the dozens of people on his Western Asset team that made him successful.

Ken and I communicated frequently and visited regularly, in part because we were good friends and bridge partners who traveled to tournaments around the country, in part because our families were close, and in part because Ken and Western Asset were my clients. I made numerous visits to Pasadena both to present my research work and to consult on both investment and technology matters. These visits were often to meet with others at Western Asset, including portfolio managers, technology and operations people. As a result, my knowledge of Ken, his investment approach and his management style increased both by direct observation and through the eyes of his teammates. Ken always stood out as a first-class citizen – the sort of person everyone trusted and was proud to know. Some specifics:

- Ken is highly ethical in all his endeavors. His word is his bond. He owns up to mistakes and takes responsibility for himself and his team. Of course, Ken's guilty plea is the most recent example of him owning a mistake, but there's an anecdote that I particularly enjoy. A junior trader at Western Asset once made the mistake of buying Enron notes for the charitable foundation of a prominent businessman. This person's greeting to Ken, when they met for the first time, was "So you're the guy who bought Enron." Ken could have offered any number of excuses or placed the blame elsewhere, but his response was simply to say, "Yes".

- Ken has a strong moral compass. He is a regular church goer and is a stalwart of the Trinity Presbyterian Church of Pasadena. He has a charitable foundation that contributes to the arts and the underprivileged. He champions personal liberty and responsibility. He believes in redemption. I know of at least two underperforming Western Asset employees who were given extra chances by Ken, primarily because they displayed the right values and work ethic.

- Ken has integrity at all turns. His “old school” values are to do it right, acknowledge mistakes, and fix the problem as opposed to the blame. He gives credit to others and leads by example. He is self-deprecating and humble, and has built an organization with an open process, with many eyes looking at decisions and trades, and he encourages people to speak up if they spot potential problems.

- Ken truly values his role as a mentor. I’ve witnessed several junior staffers grow to senior positions under Ken’s guidance and tutelage. He delegates authority but not responsibility. He “manages by wandering around” and is available and approachable.

I believe you will hear from many other witnesses who can confirm and elaborate upon all of these qualities of Ken. He rose to the top of his profession because of his intelligence, great work ethic, loyalty to colleagues and the firms where he worked, total commitment to his clients, and the trust and respect of the people with whom he worked.

As Ken’s friend of 50 years, I have observed the devastating toll this case has had on Ken and his family. It has been heartbreaking to watch as he lost the career he loved and the reputation he valued, while spending almost 3 years convicted in the court of public opinion and in the press.

In closing, I believe that Ken Leech is very deserving of leniency, and I respectfully submit this for Your Honor’s consideration.

Sincerely,

Saratoga Springs, New York

# Exhibit 83

July 20, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan
U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods:

I am a former colleague of Ken Leech, and we worked together for more than 20 years. During that time, I served in a variety of leadership roles within the Human Resources department at Western Asset Management. For the last six years of my tenure with the firm, I held the position of Global Head of Human Resources.

Over those two decades, I had the privilege of working closely with Ken and observing him firsthand as a leader, colleague, and mentor on countless occasions. The culture at Western Asset Management can best be described as collegial, ethical, collaborative, high-performing, and humble. The firm received numerous "Best Places to Work" awards from *Pensions & Investments* magazine, reflecting the strength of its workplace culture and values. Ken was instrumental in cultivating Western's culture and values.

Throughout my more than 30 years in the human resources profession, I have come to understand that organizational culture originates with senior leadership. Over the years, Ken consistently exemplified the qualities that defined Western Asset Management and helped earn its reputation as one of the most respected firms in the industry. An example of Ken's leadership style can be shown through the annual compensation process. This process was built around ensuring that all employees were paid consistent with Western Asset Management's compensation philosophy (based on individual, team and company performance and external market comparators). The process was designed so that all employees were paid according to Western's compensation philosophy before Ken's compensation was determined. Throughout all the years that I oversaw the compensation process, Ken was an active participant, advocating for a fair outcome for each member of the Investment Management team. While it's true that there were some years when Ken received significant bonus packages (and in some years his bonus was $0), this was always after all other employees were paid. There are countless current and former employees, including myself, who owe Ken a tremendous debt of gratitude for his leadership, mentorship, guidance, and wisdom.

I understand that Ken recently pleaded guilty to a charge of obstruction. To me, this offense conduct is inconsistent with the characteristics of honesty and integrity that I observed over the many years of working with Ken. I respectfully ask that, in considering his sentence, you take into account the 30 months during which he endured this investigation, as well as the profound and positive impact he has had on so many individuals throughout his career and within the broader community.

Sincerely,

Robert Sibbrel
Senior Vice-President, Human Resources
Franklin Templeton

# Exhibit 84

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods:

My name is Araceli "Cel" Sibley. I worked at Western Asset for almost three decades, from April 1992 to July 2021. This is the only company I have worked for since I graduated from college. While I started as a Marketing and Client Service Manager at the firm, I became part of the Investment Team in 1993 as a Portfolio Analyst, promoted to Manager of that group until I became a Research Analyst in the High Yield and Bank Loan Investment Team from 1999 until I decided to retire early after the Covid pandemic in 2021.

Throughout my entire career in Finance, I have always felt that Ken Leech has supported both my personal and professional development. Of the investment professionals during my tenure at the firm, he is the reason why I stayed in the industry and at Western Asset as long as I did.

When I started in the firm in 1992, Ken already had a stellar track record on Wall Street. Although he could be deemed as intimidating due to his professional accomplishments, even with his decades of experience over me, he never treated me as a kid. Even though I was a woman and an immigrant, he never treated me as a minority in the Investment Team. In a hyper-competitive environment of the Trading Desk, I have never felt "less" because from the very beginning until my retirement in mid-2021, he treated me as a colleague.

Though the years, I have never seen the trappings of success around him. None of the fancy cars, fancy clothes or fancy mansions typically associated with his peers from this industry. Because of the non-existence of "flashy" things, I was able to relate despite his intelligence and stature that were beyond my own.

I've encountered his humanity away from the office as well. In December 1993 when I got married, Ken and his wife Eileen attended my wedding in Pasadena to help fill up my side of the church, since most of my family and friends were back home in the Philippines unable to attend. When my husband decided to become a chef at a local

restaurant, they made sure to dine at his new venture and even decided to host Ken's 50th birthday at the restaurant. Although my husband and I were not part of the Leech's inner circle, they never missed sending Christmas Cards to let us know they were always there for us.

I have experienced happiness with the Leech Family at various celebrations like the Rose Parade office parties, birthdays and even his daughter's first solo recital at Walt Disney Hall. I have experienced sadness as well when we mourned the passing of our dear colleagues, Kent Engel in 1999 and Ed Moody in 2015, together. Through the good and bad days, Ken has always shown his care for those around him. Rank and file were words foreign to him. I remember one instance at an ex-colleagues's sister's memorial service in 2019 when he was offered to sit up front in the pews, he looked at us and said "I'm staying here with my people" and remained behind with us.

As his sentencing draws near, I am writing you this letter to highlight the Ken Leech that I know. As CIO, he was the Boss but he was never bossy. Never seeking the limelight and always in the background, he was kind, humble, protective, and always one who would give people a chance. How else would I have thrived in an industry known to be cutthroat and inhospitable to women and minorities, especially back in the 90s when there were no role models to guide a young immigrant girl like myself through the intricacies of Wall Street? Because there was someone named Ken Leech on the Trading Desk at Western Asset who gave me that chance.

Thank you Your Honor for listening. Please take into consideration my story as a testament of Ken's character in making your decision with regard to his sentencing.

Respectfully Yours,

Cel Sibley
[redacted]
South Pasadena, CA [redacted]

# Exhibit 85

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

August 18, 2026

Dear Judge Woods:

My name is Ian J. Smith. I am 45 years old and I live in Thousand Oaks, California, with my wife and three young children. I enlisted in the Army after high school and served as a Ranger. During my time in service to our nation, I deployed to Iraq three times between 2003 and 2005. Afterwards, I went to college on the GI Bill and have spent the 16 years since in fixed income investment management.

I worked for Ken Leech for nearly ten years at Western Asset Management. I understand that he has pleaded guilty to obstructing a proceeding before the Securities and Exchange Commission, and that you will sentence him. I am not writing to persuade you about the case, I am writing because I knew him well for a long time, and I think there are things about him you should have in front of you before you decide.

I joined Western Asset in November 2010 as an associate on the client service and marketing team, and I first met Ken about a year later. I then moved to the product group, which sits between client service and investment management. My background was not the background of someone who works for a fixed income portfolio manager of his stature. I had no pedigree, no connections and nobody was going to introduce me to him. He watched me work for nearly three years before he put me on his desk in September 2013. He hired me based off the work he had seen me do.

That was the last easy thing about working for him. He was the most demanding person I have ever worked for, and I say that having served under men who sent me into combat. He was first into the office and last out of it. He read everything. He sent his thinking at all hours and expected you to have thought about it by morning. He was not hard on people out of malice, he was hard because he believed the job carried an obligation, and he held himself to it before he held anyone else to it.

What stayed with me most, though, has nothing to do with markets. In 2014 I was given tickets to a Rose Bowl game. I took my grandfather who was 92 years old at the time. He grew up in Burbank in the 1920s and 30s and had always wanted to see a game at the Rose Bowl. It never happened. He was a Marine in the Second World War and still carried Japanese shrapnel in his hip. By 2014 he could not manage stairs nor get out of his wheelchair without aid.

Ken found out and he got my grandfather into the box, where he did not have to leave his chair. Moreover, Ken sat down next to him and stayed there the entire game bringing him food and

drinks while thoroughly enjoying the repartee. He did not work the room, he did not take calls, he spent the afternoon with an old Marine he had no reason to spend it with, and he made sure the man had the day he had waited eighty years for.

My grandfather talked about it until he died.

I include that story because Ken had nothing to gain from it. I was nobody at the firm. My grandfather was not a client. There was no one to impress and nothing to win. That is the man I worked for.

In May of 2023 I left Western Asset to go to work for another firm. My role was to be a Senior Vice President at KKR's Insurance company – Global Atlantic. As I was leaving, Ken gave me a list of books he thought I should read and why. He felt these would not only help me grow my knowledge of the market, they would help me avoid pitfalls that could cause me to lose money for clients.

Ken had a large effect on my life and on my career. He gave me a start that nobody else in the industry would have given me, and he made me better at my work than I would have been without him. What he has admitted to is inconsistent with the man I knew across those years, and it is not consistent with the way I saw him treat people who could do nothing for him.

I know the decision in front of you is yours alone, and I am not going to presume to tell you what it should be. I ask only that you take this letter into account, that you weigh the whole of the man's life alongside the conduct he has admitted, and that you extend him such mercy as you find appropriate.

Thank you for your time.

Respectfully,

Ian J. Smith

Ian J. Smith

# Exhibit 86

August 7, 2026

The Honorable Gregory H. Woods

United States District Judge

Southern District of New York

Daniel Patrick Moynihan U.S. Courthouse

500 Pearl Street

New York, New York 10007-1312

Dear Judge Woods,

My name is Rosemarie Snoke. I am a former colleague of Ken Leech at Western Asset. I am 65 years old and live in Glendora, CA. I have worked in the banking, finance and investment industries for my entire 45+ year career.

I am aware that Ken Leech has pleaded guilty to an offense. I am writing to you in hopes that my positive words and experiences will be considered when it comes time for his sentencing.

I worked at Western Asset for 28 years as manager of trading operations on the trading floor. Of those years, I saw and worked with Ken on almost a daily basis. Both a long term and positive respectful relationship it was. Ken's virtues are many and I would very much like to speak to them.

The first thing I must say is that Ken, above all, is a stellar individual in so many ways. Everyone matters to him. He has no ego. In an industry where that characteristic is so prevalent, and can be hurtful or demeaning, Ken is most definitely an outlier. There was never an instance in our long-term relationship where I felt degraded, disregarded or disrespected. It was a pleasure to be around Ken in whatever capacity.

You can have a discussion with Ken no matter the subject and he will listen. While it may be interrupted for some reason, he will never not come back to resume it. Ken is genuinely a kind person in every way. Attention and respect are two very important facets of a working relationship.

Ken is one of the most honest people I know in the investment management industry. He stands up for his colleagues. Never one to not “fall on the sword” if an error is made even if others may be involved.

There are many things I remember about Ken while in the office that bring me a smile:

1. He would always wear his Thurman Munson jersey on opening day of baseball season. Walking onto the trading floor in his business attire and a baseball jersey on top of it. Classic!
2. Ken and his handful of always sharpened pencils. Some people use stress balls, coin or keys, etc. in their hands to manage any stress. It was Ken and his pencils. A forever memory for me.
3. There was a Monroe calculator on his desk. Really an ancient piece of equipment. There are people I worked with at Western Asset who had no clue what a Monroe was. I did which reveals my age. I always giggled inside when I walked by Ken and he was using his Monroe. Probably would be referred to as prehistoric now. A real dinosaur. I used a Monroe as a part-time bank teller while in college. Ken knew what they were and so did I. We had a one-up on others! Silly really but a memory nevertheless.

Ken was generous in so many ways and I don’t mean that in a financial way. He was most “generous” with his interest in other people. Again,as noted above, no matter who you were and in what way you interacted with Ken, you mattered.

Ken’s personality was priceless. Funny as all get-out! I would sometimes think who could have reacted to a funny situation and with a funny return comment in an impossibly quick manner as Ken did. Really a funny man in situations that were just very meaningless but comical nevertheless.

Thankfully, my family nor I ever really needed anything where Ken could play a helpful role on a personal basis. I always knew that if we did, he would be there to help. He truly cared about all.

Ken has the utmost integrity. He is one of a kind. Honest to the core. It would be hard to emphasize that anymore but I will reiterate, honest to the core, He was always genuine and really cared about people. I know of no one in my world, other than my own family, I could say the same about. I have two daughters and I have always told them no matter what you choose to do in your life, above all, be honest be a good person to others. That is Ken.

The acts of which Ken has pleaded guilty do not coincide in any way with the man I have known for 28+ years. There is no other man I respect more in a professional way. He is

intelligent, honest, humble and respectful. Four traits, any one of which may be hard to find in another, I see all in Ken. He is truly one of a kind.

I do hope my words will be considered when determining sentencing and that you may consider leniency when determining the outcome. Thank you for your time.

Respectfully,

Rosemarie Snoke

Rosemarie Snoke.

# Exhibit 87

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods:

My name is Casey Stringfield, and I am writing to respectfully share my perspective on my uncle, Ken. He is my father's older brother and has been a constant presence in my life for as long as I can remember. Although our families have lived on opposite sides of the country—my family in Augusta, Georgia, and his in Pasadena, California—he and his family always made every effort to remain closely connected to ours. Distance never prevented them from showing up for birthdays, holidays, vacations, and the moments that mattered most.

When I think of Uncle Ken, I don't think of one defining event. I think of a lifetime of small moments that reveal the kind of man he is. Whether he was playing basketball with my cousins and me, swimming, or helping us with our matching Barney outfits as children, he was always fully present. He never treated family time as an obligation—it was something he genuinely valued.

One memory has stayed with me for years. During a family ski trip to Mammoth Mountain, I fell trying to get onto the ski lift. Before I even had time to react, Uncle Ken was right behind me, helping me back to my feet while my father worked to stop the lift. Moments later, my cousin Catherine fell as well, prompting the lift operator to jokingly yell, "Maybe this family should stick to the bunny slope!" We all burst into laughter, and it is still a running joke in our family today. While it may seem like a small story, it perfectly reflects who Uncle Ken has always been—calm, dependable, and the first person to help when someone needs him.

That same character has been evident in much more significant moments. When my nephew was diagnosed with [redacted] at just seven years old, Uncle Ken quietly helped my brother with medical expenses during an unimaginably difficult time. When I graduated from college, he gave me a generous gift that helped me furnish my first apartment. Those acts were never done for recognition or praise. They were simply who he is.

Despite being one of the most intelligent and accomplished people I know, Uncle Ken has always remained remarkably humble. He has never measured success by recognition or accolades, but by how he treats people. He taught our family that kindness, generosity, and integrity matter far more than titles or accomplishments. One of the unexpected gifts he gave me was introducing me to a love of sports, not simply as competition, but as something that brings people together. This also helped strengthen my lifelong relationship with my cousin Stephen and created memories our family still shares today.

Watching Ken become a grandfather has only reinforced everything I have known about him throughout my life. The same patience, love, and dedication he showed our family decades ago are now evident in the way he loves and supports his grandchildren. Family has always been at the center of who he is.

For more than thirty-five years, I have known Uncle Ken as a compassionate, humble, dependable, and generous man. His character has not been demonstrated through a few isolated acts, but through decades of consistently caring for the people he loves and quietly helping others without expecting anything in return.

I understand the Court has a difficult responsibility and must consider many factors. I respectfully ask that you consider my experiences with Ken as you determine an appropriate sentence. Thank you for taking the time to read my letter and for considering my perspective.

Respectfully,

Casey Stringfield

Casey Stringfield
[redacted]

# Exhibit 88

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, NY 10007-1312

Dear Judge Woods,

My name is Clifford Stueck. My purpose in writing to you today is to offer my personal and heartfelt perspective on my uncle, Ken Leech, the person, and loving uncle I have known for the past 26 years, which is the entirety of my life. I understand that my uncle has pleaded guilty to obstructing a proceeding before the Securities and Exchange Commission. I respectfully submit this letter for the Court's consideration as it determines an appropriate sentence.

Throughout my life, my Uncle Ken has been a constant source of kindness, wisdom, and compassion, not only to me but to all who have been fortunate enough to know him. While Uncle Ken's career accomplishments speak for themselves, his true character and light are most evident in the quiet moments when no one is watching. His generosity to me personally, and to his friends and our family, is nothing short of legendary. Whether he is sharing guidance drawn from personal experience, offering encouragement, or simply being present when someone he cares for is feeling the weight of life's pressures, Uncle Ken has a unique ability and sincere desire to listen deeply, understand others' personal situations, triumphs, and struggles, and respond in ways that leave them feeling heard, valued, and respected. He is a quietly empathetic man who is quick to share his own humbling life experiences as a way of letting others know they are not alone in their struggles.

During my growing up, Uncle Ken always made me feel that anything was possible. From the very beginning, he encouraged my childhood dream of working in the field of space exploration and advanced scientific research. One of the greatest examples of my uncle's generosity to me personally was his offer to finance my New Jersey high school education, knowing my specific goals and aspirations despite living 3,000 miles away. He believed that attending a school with rigorous academic requirements, smaller class sizes, more individualized attention, healthy competition, and a curriculum that could be tailored to my interests would give me the best chance of achieving my lofty goals. Uncle Ken never viewed this life-shaping gift as something that deserved recognition or praise. In fact, whenever I tried to thank him, he seemed uncomfortable. He helped me simply because he wanted the best for me and genuinely cared about my future, without expecting anything in return. His belief in me gave me confidence at a formative time in my life when self-esteem was in short supply and I will always be grateful for the opportunities his generosity made possible.

Today, I am in the final phase of completing my Ph.D. in Aerospace Engineering at Georgia Institute of Technology. I am excited about the future and the opportunities before me to make a meaningful impact in advancing space exploration for the betterment of society These opportunities were made possible in large part, because this kind and loving individual paid attention to a little boy's wildest dreams and believed they should be nurtured.

Beyond his financial support, my uncle invested his time and love in the small things that form life's most cherished memories. He took me to countless baseball games over the years, creating some of my favorite childhood memories. Although he had moved to California long before I was born, and most of the games we attended were Dodgers games, Uncle Ken never lost his lifelong love of the New York Yankees. Sharing that passion with him became a special part of our relationship. Those moments were about much more than baseball. They reflected his desire to be present, to create lasting memories, and whenever possible, to help others experience their hearts' desires. That consistent kindness, generosity, and personal involvement are the qualities that define my uncle far more than the conduct that brings us before the Court today.

My Uncle Ken is a living example of what it means to lead with faith, compassion, and generosity. The lessons he has taught me are engraved in me and will continue to serve as the model by which I intend to live my life. I hope this letter conveys the deep respect and admiration I have for my uncle, as well as the lasting impact he has had on my life. Thank you for taking the time to consider my thoughts. I respectfully ask that when imposing Ken's sentence, the Court consider the kindness, generosity, and compassion he has shown throughout his life.

Respectfully,

*Clifford Stueck*

Clifford Stueck
[redacted]

# Exhibit 89

Florence Stueck, LMFT, MS
[redacted]
Sierra Madre, CA[redacted]

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

August 16, 2026

Dear Judge Woods,

I am writing a character reference for Ken Leech. I am his sister-in-law, and I have known Ken most of my life, as I met him when I was a little girl in the 1980s. Ken and my sister Eileen kindly welcomed me into their home and I lived with them and their two children for about a year when I was going through a challenging life transition in my twenties. They provided me with a sanctuary while I figured out my next steps in life. We have also been close neighbors for the past 10 years. I know Ken has pleaded guilty, but I wanted to share a bit about who he is as a person, in hopes that it might be useful to you as you decide on his sentence. I am a Licensed Marriage and Family Therapist currently practicing in California. I have extensive experience working in the LGBTQIA+ community, and most of my expertise is in working with underserved populations and helping people to heal from trauma.

Ken considers the older adults in his life in meaningful and impactful ways. He ensured my father, a man of great character and a distinguished Korean War veteran (two Purple Hearts, and the Bronze Star Medal with "V" for Valor), had top-notch medical care and support while he had a progressive, years long cognitive decline and a losing battle with dementia. Further, I have seen first-hand Ken as not only providing healthcare support to several family elders, two of his aunts - Miriam and Polly - and my mother Lois, but meaningfully also treating them with kindness, worthiness and dignity. Ken prioritized providing an inviting place for these folks to be for holidays and milestone events. A repeated image comes to my mind of Ken over the years, driving over an hour to collect and return Aunt Polly, pushing her wheelchair over the difficult sloping terrain of the yard and bypassing multiple stairs to get her to these festive gatherings. This would be repeated in reverse on their way out going downhill. Ken would smile and joke with her and I surmise she actually loved the adventure of those 'off-roading' moments.

When Ken and Eileen renovated their home, he made sure to install an elevator from the basement entry to the main floor specifically for the folks in his life who had mobility issues. My mother Lois is one of those people, she turns 90 this year, and she still relies on Ken for stable housing and financial support for numerous services, allowing her to feel more independent and age in a safe place she loves. My wife Jen and I live next door to my mother and over the years, we have seen Ken spend time with her helping her to navigate confusing financials and other paperwork. This was especially

noteworthy right after my father died, as I was grateful to Ken for providing my mom comfort during a chapter of acute loss.

For over four decades, Ken time and again has demonstrated to me, he is a caring, responsible, and a generous individual. Ken was extremely supportive of my soccer career and not everyone at that time was appreciative of female athletes. I was a young girl playing mostly on boys teams until I was 13 and later at Wesleyan University where I was recently inducted into their athletics Hall of Fame. Ken would periodically come to my games in support and I remember him giving me big warm hugs and words of encouragement after my matches. Ken went out of his way to ensure I had a seat at the watershed moment where the United Stated Women's National Team won the World Cup Women's final in 1999 at the Rose Bowl, knowing how meaningful it would be for me. Having been in leadership roles on the soccer field myself, I know a bit about what genuine mentorship and guidance looks like, and Ken's quiet altruism represents who he is. Ken has never been a person who boasts about his money. I believe that Ken's style is rooted in seeing the merits of others, rather than in having power himself.

Ken's goodness is also illustrated through his enduring support of a cause close to my heart: dogs, and the people whose lives they change. Long before I became a psychotherapist, I spent several years managing a non-profit called k9 Connection, an organization that paired at-risk teenagers from local high schools and community centers with shelter dogs who would ultimately be adopted into forever homes. Ken and I have always shared a love of dogs, spending countless hours trading dog stories and throwing balls in the yard for whichever dog happened to be around. Ken's support went well beyond our friendship: he donated to k9 Connection every year, attended our fundraiser, and showed up at several student and dog graduations, cheering enthusiastically in support.

Lastly, as a trauma-informed clinician, I have been encouraged to view my patients not as merely the consequences of some of their lifelong unfortunate choices, but as sentient, adaptable beings capable and deserving of growth. As harrowing as this time has been for Ken, I have increasingly seen him evolve. While it is difficult to see someone you love breathe in the pain of this experience, I have also recognized him gaining more insight into the aching of this world and how its brokenness impacts all of us. I have seen his awareness and empathy expand and he has developed a capacity to turn his personal hurt into a stronger connection with all human beings. I offer for you to please consider my brother-in-law as a whole, rather than based on a singular event. I believe that good people who make mistakes deserve compassion on their journey of learning difficult lessons in this life. I want the Court to know, from my heart, that these actions do not reflect the man I know. I've seen his kindness, his connections to his family and friends, and his willingness to help people and animals. What happened here doesn't erase any of that. It breaks my heart to see him struggling with the consequences of this, but I have not lost faith in who he is - and I hope the Court can see the same goodness in him that I have witnessed for over four decades.

Very Respectfully,

Florence Stueck

Florence Stueck, LMFT, MS

# Exhibit 90

Jill Stueck
[redacted]
Scotch Plains, NJ [redacted]
July 20, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, NY 1007-1312

Dear Judge Woods,

I am writing on behalf of my brother-in-law, Ken Leech, whom I have had the privilege of knowing for more than 30 years. Ken's wife, Eileen, and my husband, John, are siblings and over the course of these many years I have come to regard Ken as a beloved family member. My purpose in writing is to share my perspective on Ken's character, his values, and the quiet but meaningful ways he has supported the people in his life. I understand that Ken has pleaded guilty to obstructing a proceeding before the Securities and Exchange Commission. As Your Honor considers his sentence, I wish to offer a few firsthand examples of the person I know him to be.

I first met Ken back in 1995 when I began dating my husband John and was invited to a family brunch that Ken and Eileen hosted in Connecticut in honor of Eileen's and John's parents' wedding anniversary. That special gathering was my introduction to Ken's generosity and to the care he and Eileen have always taken to keep the family close and connected, even while living on separate coasts. While I have had the pleasure of being included in many similar gatherings since then, I still remember that first one because Ken had a way of making everyone feel welcome and included. He pays attention to people—not in a showy way, but in the quiet, thoughtful way of someone who notices what makes others feel comfortable and like they matter.

Over the years, I came to know Ken not only as someone who had earned significant professional success, but as someone who distinguished himself through his discipline, work ethic, and leadership. Because his success was hard-earned and self-made, I valued his guidance and paid attention to the ways in which he approached challenges: thoughtfully, directly, and with a genuine desire to help others succeed. I have seen Ken support countless people over the years, and I most appreciate how he has never made a person feel smaller by helping them or left them feeling incapable of helping themselves. Instead, he has a remarkable ability to recognize what a situation calls for and to step in, when he can, with sound judgment, experience, and resources in ways that are specific, meaningful, and empowering.

I saw this first-hand by the way he supported our mother- and father-in-law. Recognizing the high cost of living in the state of California where he had made his home, Ken purchased a condo not far from his and Eileen's home so they could live close to their daughters and grandchildren, while still maintaining their independence. Later, he purchased the condo next door and rented it to Eileen's youngest sister at a greatly reduced rent so she too could be near her parents and support them as they aged. To me, those actions reflect not only Ken's financial generosity, but also an intrinsic understanding of family, dignity, and the importance of family at a vulnerable stage of life.

I also experienced Ken's kindness directly during one of the most challenging periods in my own life. About fifteen years ago, my job was eliminated when I was the main provider for my two young sons and my stay-at-home husband. Without hesitation, Ken sent us a check to help us avoid draining our savings while I was looking for new employment. As significant as that financial help was, what I remember most is the letter he included. It was filled with empathy, understanding, and genuine care. He shared that he too had experienced a similar setback earlier in his own life and wanted to ease the burden he knew I was carrying. That gesture has stayed with me because it showed me Ken's heart: practical, compassionate, and deeply aware of another person's fear and vulnerability.

Ken has also created joyful memories for my family that I will always treasure. For my mother's 80th birthday, he arranged a special family celebration in New York City, her favorite place in the world, bringing together my brother, sister, my husband John, our children, and me. Her birthday fell on Thanksgiving, when the city feels especially alive and celebratory. The timing was especially meaningful because she was undergoing chemotherapy at the time for a second bout with breast cancer. It became the happiest and most memorable birthday celebration of her life. Ken made that possible not because he was expected to, but because he wanted my mother to feel cherished and understood the importance of creating a moment of joy for her during a difficult time.

These examples are only a small sampling of the Ken Leech I have come to know and love over the course of many years. Ken is the person who shows up when someone is struggling, who helps quietly, and who gives without expecting anything in return. His generosity is not performative; it is simply who he is. It serves as testimony to his deep-seated loyalty, attentiveness, compassion, and commitment to family, friends, and acquaintances in ways that have enduring impact.

I respectfully ask the Court to consider the full person before it: a man who has spent his lifetime supporting and strengthening others, and responding to people in need with humility, compassion, and generosity.

Thank you for your time and thoughtful consideration.

Respectfully,

Jill Stueck

[redacted]

# Exhibit 91

John Stueck
[redacted]
Scotch Plains, NJ [redacted]
July 12, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, NY 10007-1312

Dear Judge Woods,

I am Ken Leech's brother-in-law. I am 65 years old, a middle school custodian in Edison, New Jersey, and I reside in Scotch Plains, New Jersey.

I understand that Ken has pleaded guilty, and I am writing to you now to respectfully ask the Court to consider the perspective I offer in this letter as it determines an appropriate sentence.

When I think about the people who have had the most positive impact on my life and the lives of my children, my brother-in-law Ken is at the top of the list. I first met Ken more than forty years ago, when he and my sister Eileen began dating. Four decades is long enough to see a person's true character revealed through countless ordinary moments. What stands out most about Ken is not any single act, but the steady, consistent, and unwavering way he shows up for others. Ken is someone who pays attention to those around him. He is quick to celebrate another's triumphs, and just as quick to notice when someone is struggling, when a family member needs support, or when a friend is quietly falling behind.

Over these years I have watched him step in again and again, not with grand gestures or public displays, but with thoughtful, personal acts of kindness that have brought a much-needed smile to someone's face. In my own family, Ken's impact has been profound. When my sons were approaching high school, Ken took the time to understand who they were as individuals - their strengths, their challenges, their dreams, and their potential. He encouraged my wife and me to consider a school environment for them where they would receive more individualized attention, and he made that opportunity possible.

It hasn't just been financial support; it is mentorship too. In the case of my younger son JJ, who went on to pursue a degree in finance, Ken continues to make himself available as a sounding board, ready to share his experiences and provide guidance whenever asked on everything from

college course selections and advanced certifications, to advice on internships, book recommendations on various business and finance topics, and most recently, helping him navigate critical early career decisions. He has become a trusted voice in both my boys' development; someone they continue to look to for wisdom and perspective. It speaks volumes to me how willingly and quickly both my boys each seized the opportunity to write to you on their uncle's behalf. It is a testament to the strong bonds of love and respect between them and their uncle.

I have seen Ken do the same for countless others. He has supported my aging parents, helping them live out their retirement years in a place of security and relative comfort. When my dad was diagnosed with advanced Alzheimer's back in 2019 after being found by the police wandering the streets overnight on multiple occasions, Ken paid for his care at the assisted living, memory care facility right up the street within walking distance of my mother's apartment. Understanding that my siblings and I were in periods of our lives where for one reason or another, taking on the financial burden of his care would have been extremely difficult, Ken never asked for a single contribution from us. He just did what needed to be done, not out of any sense of duty, but instead out of the love and respect he had for his children's grandparents.

For the entire time I have known him, Ken has done what he does quietly, without seeking recognition or expecting anything in return. His generosity is rooted in empathy and a genuine desire to help people find their footing and move forward with dignity.

In recent years, I've watched Ken step into one of the most meaningful roles of his life: becoming a grandfather. He now has two grandchildren - a lively four-year-old boy and a one year old baby girl. They have brought out an entirely new dimension of who he is. The same patience, steadiness, and quiet generosity he has shown throughout his life are now being poured into these little ones. He reads to them, plays with them, and talks to them in a way that shows how deeply he understands the importance of nurturing a child's confidence and curiosity. What strikes me most is how much he wants to share the best parts of himself with them, his gentleness, his humor, his belief in the potential of every person. These are gifts that only a grandfather can give, and they are gifts that will shape who these children become. These early years are when a grandparent's influence can have the greatest impact, and every day he is able to be present in their lives is invaluable.

It is for these reasons that I respectfully ask the Court to consider the man I have known for more than forty years as it determines an appropriate sentence. The kindness, generosity, and steadfast support he has shown to my family and so many others have defined his life far more than this single chapter. I remain deeply grateful for the positive influence he has had on my

children, my parents, and me, and I hope he will be able to continue sharing those same gifts with his grandchildren and his family, and the many people whose lives he has touched.

Thank you for taking the time to consider my perspective and for your thoughtful consideration of this letter.

Respectfully,

*John J. Stueck*

John J. Stueck
[redacted]

# Exhibit 92

July 13, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods:

I am writing to request leniency and mercy for Ken Leech. Ken is my sister's husband. He has been a brother to me for more than 40 years.

Many years ago, I was an administrator at the University of San Francisco School of Law. During that time, I had the opportunity to hear Justice Anthony Kennedy speak when he visited the school. Before his talk I became momentarily famous for introducing the early arriving Justice to the two custodians who were standing with me discussing last minute clean up opportunities. For some reason many people, including the Dean, found this to be hilarious and not a little inappropriate. I have to say, the Justice was gracious and took it in stride. Later in the day, I felt a little less concerned about whether I had committed an administrative faux pas when I had the opportunity to hear the Justice give his address. He spoke movingly and with conviction about the broken incarceration system in the United States. He spoke not only about the system, but about individuals, and what it means to be stripped of your essential liberties. I was impressed that someone on the Supreme Court would focus and be engaged in drawing attention to ways our justice system could be improved. I was touched by his address, but it felt worlds away from my life. At the time, I thought it was just a high-minded concept; something meant for other people. Now I have been thinking about it daily.

I understand that my brother-in-law, Ken, has pleaded guilty to an offense. I understand that he will be sentenced. I have to say that I never saw this coming. It's truly unimaginable. In all the years I have known Ken, I have never seen him do anything inappropriate, or act in any way that was self-serving. I currently work as executive assistant to the president for a large non-profit (The Huntington Library, Art Museum, and Botanical Gardens in San Marino, CA), and in addition to my role at the law school that I wrote about above, I also spent five years at an investment bank, Robertson Stephens Inc., in San Francisco. I recognize that senior executives, particularly those with heavy financial responsibilities, work in complex environments with considerable challenges. I have worked closely with many high-powered people and have witnessed what elements are most likely to create successful and compelling leaders. I can state

unequivocably that I often wished I had had the privilege of working with someone as thoughtful, considerate, and driven by good intentions as Ken Leech.

There are dozens, no, hundreds of ways Ken has enhanced my life and the lives of my family through his quiet acts of kindness and support. Ken was there when I was devastated after my divorce, when my father died, and when my mother needed many resources after my father's death. One thing I will never forget is how he stood by me after my long-time partner's death by [redacted]. How he encouraged me to write and give the eulogy, something I had not believed I could do. And it meant so much to me when he told me afterwards how proud he was of me for delivering a speech that delivered the full story of who my partner was – the delightful and fun parts as well as the challenges. Do you know how uplifting it is to hear praise from someone you respect? Ken is the kind of person whose encouragement means so much. There are often people you can depend on to enjoy the good times, and just a small handful you can count on to slog through with you during the tough times. I don't think anyone in history has had a better brother-in-law. I couldn't have wished for someone more kind, more generous, more humble, more dedicated to family, or more valuable to me in this life.

When I moved to southern California to be closer to my family during our father's illness and death, I started attending the same church as my sister and Ken, along with my niece and nephew, and now Ken and Eileen's grandbabies. It has been a joy to engage again with my faith and to see my family there on Sundays. I've been thinking a lot about Romans 5:3-4, which I paraphrase as …we also glory in our trials and tribulations, because we know that suffering produces perseverance; perseverance builds character; and character produces hope. And hope does not disappoint.

When I was young, I envisioned my life as all sunshine and rainbows, but of course it ends up being so much more complicated and grittier than that. What has gotten me through is hopefulness. In that spirit, I humbly request that you consider Ken's lifetime of acting with sincerity, compassion, and generosity, and recognize his many beautiful qualities when you make your decision about his sentencing.

With respect,

Kathleen M. Stueck

[redacted]
Sierra Madre, CA [redacted]

# Exhibit 93

Lois Stueck

[redacted]
Sierra Madre, CA [redacted]

September 1, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse 500
Pearl Street
New York, New York 10007-1312

Dear Judge Woods:

I am writing to you regarding my son-in-law, Stephen Kenneth Leech, who will come before your Court for sentencing later this year.

Ken and my oldest daughter, Eileen Catherine Stueck, were married on July 20, 1985. So, Ken has been a loved and admired member of our "Stueck Family" for more than 40 years.

My husband, Cliff Stueck, and I met in November 1952, shortly before Cliff, then a young 2nd Lieutenant U.S. Army, was about to depart for Korea where he had volunteered to serve during the Korean War. He served with honor and was awarded the Bronze Star with "V" for Valor as well as two Purple Hearts and the Combat Infantry Men's badge. I wrote to him every day he was overseas. He was a quiet hero, always telling me in his return letters of the Korean people, and his hopes for Korea's postwar time of peace. We were married in 1956 and had six children. He was a computer scientist and a successful Vice President of an international air transport company. Cliff died on June 16, 2021, three years after an Alzheimer's diagnosis. I was a teacher of English as a Second Language in Connecticut schools, and later the First Selectman of a small town in Connecticut.

So, when Ken Leech joined our family, I immediately and happily recognized that Ken shared the qualities of good character, quiet dignity, honesty and loving kindness that my husband had always possessed.

Through the years as Ken's success in the business world became obvious, he never talked about himself, or his clients or investments, and the young people in the family would ask him about the bond market, he would respond with kindhearted good humor. He would say something funny but then change the conversation. Ken was never comfortable talking about himself or his work. The only way we learned of awards he received would be if someone heard or read about them and told us.

After Ken and Eileen and their two children moved to California, Cliff and I often traveled cross country to visit and eventually we retired, rented a condo and joined them and our other daughters in California.

When the condo was put on the market and we could not afford to buy it, Ken purchased it so we would not have to move. When I insisted on paying rent, he reduced it below what we had been paying, which preserved our dignity. Later, when Cliff could no longer manage the stairs, Ken purchased a one story in the same complex for us. In addition, Ken purchased an additional condo for a young family member in order to assist me and my husband. Then Ken and Eileen helped me with Cliff's move to a dementia care facility nearby. Ken helped us financially with the cost of care, but more importantly also with frequent visits and all kinds of physical and emotional support. Sometimes I would go to visit Cliff and Ken would already be there on his own. If there was ever a family thing, Ken and Eileen would always show up. It was not something he had to do but he did. It always touched my heart.

Recently, they completely renovated my condo to enable me with my handicap issues to remain independent as I approach my 90th birthday this year. I'm still here and love it.

Ken was always thoughtful and helpful in the community as well. When a young friend of their children was killed in Afghanistan, Ken supported the memorial but also gave of his time and financial support to the parents and was there for them when they needed help.

I've observed Ken as he has made life better for numerous people, the community and his Church. He has been blessed with two grandchildren who have brought great joy and purpose to his life. He loves being their grandfather and is devoted to them and the strong bond they have is evident in their joy and happiness when they are together. I hope that Ken, alongside his wife Eileen, will have a future filled with all the blessings he has given to others returned to him in full measure.

I ask that you please consider this letter and exercise leniency in sentencing Ken.

Respectfully,

Lois Stueck

Lois Stueck

[redacted]

# Exhibit 94

July 31, 2026

# The Honorable Gregory H. Woods

UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF NEW YORK
DANIEL PATRICK MOYNIHAN U.S. COURTHOUSE
500 PEARL STREET
NEW YORK, NEW YORK 10007-1312

Dear Judge Woods,

I am writing in support of Kenneth Leech as you consider sentencing in his case. I know that he had he has plead guilty to the crime of obstructing a proceeding before the Securities and Exchange Commission and will be sentenced this fall. I hope that my letter will help you ascertain Ken's true character as you make your decision regarding his sentencing.

I want to be candid about the nature of my relationship with Ken. I am a first cousin to Ken's wife, Eileen, and our families have always been very close even though we have lived on opposite coasts for many years. Still, despite the longevity of our relationship, we have not spent a great deal of time together. As a result, I am unable to address every aspect of his life, career or the circumstances surrounding this case. I do feel that despite the distance, I can speak to what I have witnessed of his character. I first met Ken at his sister in law's wedding in 1985. I have always found Ken to be warm, friendly, kind, genuine, and unpretentious. As his career took off, you could only see how humble a man he really is, never flashy or acting in any way superior to others. Some years ago, while visiting his brother-in-law, John, we were discussing the care of his parents after they had moved to the west coast. Ken and Eileen have always taken such great care of their family members and I found myself asking John, "Is Ken as wonderful a person as he seems?" John just laughed and said, "Yes, he truly is."

What I can say is that, in the interactions I have had with Ken over the years, I have always seen without question his devotion to his wife and family. Every conversation with Ken I have had always exhibits his exceptional character. He is someone I would choose to be my friend

without question and I am thrilled to say is my family. He is so wonderfully kind and generous to all who cross his path. At his father-in-law's funeral, he was talking to me about how grateful he had been to be invited to my wedding in 1985 and how he couldn't believe a "boy from Syracuse" could be attending such a spectacular event. I had to laugh at him because I had in recent years attended his daughter Catherine's wedding which was such a magnificent occasion filled with the warmth and spirit of family and friends. It was a time too of heartache, as both my Uncle Cliff, Ken's father-in-law and my father, George were suffering from the effects of dementia and it was the very last time they would ever be together. To watch them sit in wonder as the beauty and sentiments of the day unfolded, and to see them laugh as the family gathered around them was a gift I will never forget.

Ken is a soft spoken, and a true family man. I could not have wished for Eileen to have spent her life with anyone else. He has taken great care of his immediate and extended family and has consistently been a loyal husband and father. He always treats all of us with kindness, care and respect.

This case has put a great toll on the emotional well-being of Ken, his wife and children as well as their immediate family members who have always counted on Ken for his magnanimous support. I hope that when you consider Ken's true nature and positive character traits that you will show leniency in your sentencing.

RESPECTFULLY,

Nannette A. Stueck

NANNETTE A. STUECK

# Exhibit 95

Dr. Lisa Sylvester
Chair, Vocal Arts and Opera Department
Thornton School of Music, University of Southern California
Music Director, Saint Mark's Episcopal Church, Altadena, CA

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl St.
New York, New York 10007

Dear Judge Woods:

I am writing this letter on behalf of Kenneth Leech with information that I hope you will take into consideration as you make your decision regarding the sentencing for the offense to which he has recently pled guilty.

My name is Lisa Sylvester and I am on the faculty of the Thornton School of Music where I serve as Chair of the Vocal Arts and Opera Department. I am also the Music Director of St. Mark's Episcopal Church, Altadena. Our church building and the buildings on the entire campus were burned in the Eaton Fire.

I came to know the Leech family through Ken's daughter, Catherine, approximately 10 years ago. At that time, Catherine was pursuing a singing career and I collaborated with her on a recital program. The recital was part of a series of concerts featuring Emerging Artists in the Southern California region. It was through the generosity of Ken and Eileen that this series was able to be established and flourish for 10 years.

Fast forward to January 2025 and the Eaton Fire – in this tragic event, St. Mark's Church and School completely perished. Catherine and I had rehearsed in that church for the concert we had given nearly ten years prior. In an even more significant gesture of generosity, and concern for our Church and School, Ken and the Leech family sent a considerable donation to the rebuild effort. This donation came after not having been in direct contact with the family for several years. Ken and the Leech family recognized a devastating loss to a community that had been connected to his daughter some years prior, and still sent a *sizable* donation. I was completely surprised about this act of radical kindness when it arrived.

I provide this letter to ask that you take these examples of Ken's generosity and kindness in consideration as you contemplate your sentencing. It is my sincerest hope that you might be able to show leniency in your final assessment of his case, given the examples of generosity and kindness Ken Leech has demonstrated over the course of his life thus far.

Sincerely,

Dr. Lisa Sylvester

# Exhibit 96

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods,

My name is Suzanne Trepp, and I am a research analyst at Western Asset. I joined the firm on March 1, 1997, and during that time I had the privilege of working with Ken Leech for more than twenty-five years. I write this letter solely in my personal capacity, based on my own experiences with Ken over nearly three decades.

I understand that Ken has pleaded guilty to a criminal offense. I do not write to minimize the seriousness of that fact or to comment on the legal proceedings. Rather, I hope to provide the Court with my firsthand observations of the person I came to know throughout our many years working together. Based on my experience, the conduct to which Ken pleaded guilty is inconsistent with the character, humility, and leadership, that I consistently observed since joining Western Asset in 1997.

For the first five years of my career at Western Asset, I worked as a Client Service Executive and traveled extensively with Ken to meet with clients. Those trips gave me an opportunity to observe not only his investment expertise, but also his character. What always stood out to me was his humility. After periods of strong investment performance, he rarely focused on the market calls that proved successful. Instead, he would begin discussions by examining the decisions that detracted from performance and what could be learned from them. That willingness to openly acknowledge mistakes set a tone that emphasized continuous learning rather than ego.

In 2001, I joined Western Asset's high yield investment team. Ken set the example for everyone around him through his extraordinary work ethic, arriving at the trading desk before most employees each morning, often by 5:15 a.m. Despite serving as the firm's Chief Investment Officer, he was remarkably approachable. Rather than isolating himself in an executive office, he preferred to sit on the trading floor, engaging with portfolio managers, traders, and analysts in thoughtful discussions about markets and investment ideas.

As the analyst responsible for covering high yield retailers, I periodically discussed my views with Ken whenever developments affected the sector. Although he had decades more experience than I did, he always treated my opinions with respect. We did not always agree, but I never felt dismissed. Instead, he encouraged thoughtful debate and welcomed differing viewpoints if they were supported by careful analysis. That environment helped me grow professionally and gave me confidence as an analyst.

What impressed me even more than his investment abilities was the work culture he created. Earlier in my career, I had worked in an environment where ego often overshadowed collaboration, but Western Asset was different. Ken fostered a culture built on humility, intellectual curiosity, accountability, and mutual respect. Admitting mistakes was viewed as an opportunity to improve and that philosophy influenced the entire investment team by creating a workplace where people genuinely wanted to contribute to one another's success.

Ken's humility extended well beyond the investment floor. Every day, he would buy his lunch in the company cafeteria and mingle with employees from every department rather than separating himself because of his position. During Western Asset's annual Rose Parade event, attended by hundreds of clients and employees, Ken made a point of spending time not only with clients but also with employees and their families. My family attended several of those events, and I was always touched that despite the hundreds of people he encountered, he remembered the names of my husband and our two sons. Those small gestures reflected genuine kindness rather than obligation.

Although Ken was frequently invited to appear on CNBC and Bloomberg Television because of his reputation in the investment community, he was never interested in personal recognition. Instead, he consistently emphasized Western Asset's collaborative investment process and credited the firm's success to the team rather than to himself. In an industry where individual recognition is often highly valued, his willingness to share credit with others left a lasting impression on me.

One event that especially reflects Ken's character occurred in 2015 following the passing of Ed Moody, the individual who recruited Ken to Western Asset in 1991 and who was deeply admired throughout the firm. More than fifty current and former colleagues traveled to Detroit to attend Ed's funeral. Ken and several members of his family traveled alongside the rest of us on a commercial flight. It may seem like a small detail, but it reflected something I had witnessed throughout my career—despite his accomplishments and professional stature, he never sought special treatment.

I also had the privilege of attending the Los Angeles Children's Chorus Bel Canto Gala in March 2016, where Ken and his wife, Eileen, were honored alongside composer John Williams for their longstanding support of the organization. Until that evening, I had not fully appreciated the extent of their generosity or the many years they had quietly devoted to supporting the arts and opportunities for young people. What struck me most was that I had never once heard Ken speak about these contributions himself. His generosity was something he practiced quietly, without seeking recognition.

Over the years, I have been approached about opportunities to join other investment firms. However, I would not have remained at Western Asset for nearly three decades were it not for the culture and leadership that Ken fostered. His humility, professionalism, and respect for others made Western Asset a place where I wanted to spend the remainder of my career.

I recognize that the Court must sentence Ken based upon the law and the facts of this case. I simply hope that, in doing so, the Court will also consider the person I had the privilege of knowing for nearly thirty years. Ken is a leader who treated people with respect, who worked harder than anyone around him, who accepted responsibility for mistakes, who quietly gave back to his community, and whose humility left a lasting impact on those who worked with him.

Thank you for considering my perspective.

Respectfully,

Suzanne Trepp

Suzanne Trepp

[redacted]

# Exhibit 97

July 20, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan
U.S. Courthouse
500 Pearl Street
New York, NY 10007-1312

RE: Ken Leech

Dear Judge Woods:

My name is Stephen Walsh. I am a former colleague and good personal friend of Ken Leech. I currently live in Boulder, Colorado. I retired in 2014 after working 30 years in the investment business, the last 24 of those years with Ken at Western Asset.

I am aware that Ken has pleaded guilty to the charge of Obstruction of Justice. My purpose in writing is to give you some perspective on how I know and think about Ken that I hope you will consider in making your decision with regard to his sentencing.

Ken and I began in 1990/1991 as senior portfolio managers on the investment team at Western Asset. I then served for over a decade as Deputy Chief Investment Officer for Ken during his initial tenure as CIO, and for a brief period when Ken returned from medical leave, he worked for me before I retired in 2014.

In that time of working very closely with Ken, I came to know and admire his incredible investment talent and financial intelligence. He is easily the smartest investor I have ever known in my 30 years in the investment business . While Western Asset had a very strong investment team, Ken was the person most responsible for the investment results that drove Western's success. More importantly, I came to know and admire the true person of Ken Leech and from that built an enduring and strong friendship with Ken and his family that continues until today.

In an industry known for its egos, vying for the spotlight and advancement, Ken was the opposite. Ken is a gentle, truly humble, and self-effacing person with a

very easygoing, approachable quality about him that made him easy to be around and work for and with.

During the time period from 1992-2008, Western Asset experienced unparalleled success with assets under management growing from $3 billion to $600 billion. With that growth came awards and attention, and yet, Ken remained the same person. Through periods of good performance and bad performance Ken was a constant. Ken didn't seek or want the limelight at Western or in the industry. Requests to be on TV were turned down and given to others at the firm. I don't believe Ken ever used the studios built in the office. When growth of the firm required Western to design new offices, Ken really struggled with the concept of him having a large office on the executive floor after spending years sharing an office off the trading floor in the old headquarters.

In my long tenure working for Ken as Deputy CIO, Ken never acted with a heavy hand of power instead internally, and externally treated me almost as a Co-CIO. His management style was collaborative, team-oriented, open and honest.

Another characteristic of Ken's was his kindness and care for the people he worked with. I'd see it in how he treated members of the investment team, clients, and Wall Street firms that did business with Western. I also experienced his kindness firsthand. When Ken was named to the Fixed Income Hall of Fame, at the dinner honoring Ken, he took time, when he didn't need to, to say very kind words about me and my contribution to the firm.

Lastly, on two difficult occasions in my life, Ken' true character came through. When my father passed in 2018, Ken, who had lost both his parents, wrote me a beautiful, heartfelt note that expressed very personally what I was experiencing and needed to hear. Then, in this past year, I lost my wife, and Ken and his family were at the funeral. At what had to be the most difficult time in his own life, he again wrote me a handwritten note, and with great empathy and compassion expressed words of comfort.

While it can be easy for anyone who does not truly know Ken to assume he is just another successful, wealthy, self-seeking investment star, I and those that have worked for and with him, and those that have a relationship with Ken, know that is not the case. Ken has spent his career making those around him better and has a humility and care for others not often seen in people of his success.

Respectfully,

Stephen A. Walsh

# Exhibit 98

27 July, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods,

I am writing on behalf of Ken Leech over whose legal case you now preside. While I am unfamiliar with the details of the case, I hope I might provide some insight into Ken's character and leadership.

From 2004 until my retirement in 2015, I worked as Head of Human Resources at Western Asset Management, based in Pasadena. During that time, I partnered with Ken and other senior executives in leading his team and the firm. I assisted with recruitment and training, employee relations, and compensation.

Prior to joining Western, I performed a similar HR role at TCW and PIMCO Advisors LP. In both roles, plus Western, I have engaged with the top leaders in all of fixed income asset management. Three of those leaders, at some point, have been called by finance media the "King of Bonds". These three, and several others of my acquaintance have been regular guests on CNBC or quotation sources in the Wall Street Journal. Through holding companies, merger activity, and career movement, I have engaged on HR matters with top people at Allianz Global Investors, CitiGroup Asset Management, Credit Suisse, Crescent Capital, DoubleLine, Janus, Legg Mason, NFJ, Nicholas Applegate, Oppenheimer Capital, Pacific Investment Management Company, PIMCO Equity Advisors, RCM, Trust Company of the West, Wells Fargo and others.

During my time with leaders in these firms, I met many portfolio managers with a "Masters of the Universe" attitude, who advocated for as much personal reward as possible. I also observed that trading desks in each asset manager develop their own personality, taking their cues from and operating inside bounds set by the CIO. There is truth in the notion of "knife fight" or "spitting contest" or other, more crude metaphors applied to the atmosphere on these desks.

Often my interaction with investment leaders was in the design and administration of compensation plans, or in negotiation of pay as part of recruitment.

Having engaged with all of these people in all of these firms, about Ken Leech I can say this:

1. I know of no executive or investment leader in the industry more ethically correct than Ken, in company obligations to clients or to regulators, and holding his or her team to the same standards.

2. I never heard any statement or observed any action from Ken, in an effort to increase his personal compensation.

3. Ken was compensated by the firm more as a partner, based on overall company results; and not based on individual trades, investment ideas, or portfolio performance. The compensation

program at Western is designed in such a way that Ken could take no investment action that could result in a direct change in his personal compensation.

Among the people whom I know who function at or above Ken's level in the industry, I cannot make the same three above statements, in this way, about any other person.

To give an example for context, Ken once contacted me outside office hours to discuss the performance of a portfolio manager. This very capable PM had constructed a successful and profitable trade in a client portfolio. This trade, although technically compliant with written client investment guidelines, employed a high level of leverage that exceeded the spirit of the risk intentions of the agreed investment strategy for that client. Ken concluded that Western needed to communicate to the client about the trade, and explain Western's actions to mitigate future risk. We decided to release the PM from Western before the start of the next day's trading. That PM has gone elsewhere and continued to profitably deploy his particular type of trading, and he has stayed on relatively good terms with colleagues at Western. The client was satisfied with the overall outcome of the event. Importantly, Ken's actions in this matter signaled to the desk his commitment to operate trading as a team, within both the letter and intent of investment guidelines.

In another instance, as a result of Western's 2005 merger with CitiGroup Asset Management (CAM), Western doubled its AUM and acquired several PM's with a successful track record and a level of fame with clients and prospects. Some of these PM's, however, were accustomed to operating independently as a "star", building a sort of fiefdom in their own teams, and being compensated with line-of-sight reward for investment success.

Ken and other leaders traveled to the new offices of CAM to explain Western's culture and approach to investing, which includes sharing and attacking the strength of investment ideas as a team, while treating people with respect. Bonus compensation, while influenced by investment returns vs peer groups and benchmarks, also compared to market pay studies; yet further reflecting team play and other discretionary factors such as participation in prospect and client meetings. Most importantly, there was no star system at Western — the firm communicated to clients that investment results were not driven by any one individual. Ultimately, some CAM employees chose to leave, on good terms. Those who stayed did embrace Western's investment approach and culture, as presented and modeled by Ken.

Bonus compensation for Ken Leech reflected his general management role of CIO. After all others were paid at year end, any residual funds allocable for bonuses were divided among a small group usually limited to the CIO, CEO and possibly the Deputy or Co-CIO. In market downturn years, such as the 2008 finance crisis, Ken's compensation was reduced to a small percentage of that from other years.

Compensation for Ken was structured such that he was paid based on team results as a whole, and not on individual strategies, trades, or clients.

Whatever penalty you adjudicate to be applicable in this matter, please consider that, as a result of the case Ken has already been punished with the loss of his function at Western, lost current and future compensation that might have accrued from that function, but finally at Ken's age possibly the end of his career.

I am aware that Ken Leech has entered a plea of "Guilty" in this proceeding, and that you are responsible for passing sentence. Based on my association with Ken, notwithstanding the specifics of the case I can

say that any wrongdoing in a regulatory or a legal matter is totally inconsistent with Ken's character and his ethical and interpersonal expectations of those on his team. This is a good man.

Thank you for your consideration.

Sincerely,

Paul M. White
Head of HR – Retired

[redacted]
American Fork, UT [redacted]
Mobile: [redacted]

# Exhibit 99

The Honorable Gregory H. Woods
United States District Judge Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods,

I am Steven Wilson. I am writing on behalf of Ken Leech, who will appear before your court for sentencing. I recognize that he pleaded guilty to the charge for which he is being sentenced.

Ken is my oldest friend. We met in kindergarten and have been friends ever since. That is 66 years of uninterrupted friendship. We have followed each other's lives through every stage from childhood to our senior citizen status. About me, I am a medical doctor. My specialty is pathology (hospital not forensic). I have been practicing for 41 years. I live in the Pittsburgh area. We traded advice in our respective professions. The type of financial advice he gave me was, of course, in the public domain. He guided me on aspects of asset allocation and the role bonds play in setting up a retirement plan.

I knew his parents, Stephen and Alma Leech. I know his brother Darryl and even his Newfoundland dog, Kim. We played snow football (in Syracuse/Dewitt, it is a good winter sport), basketball in his driveway and golf together (although he was always a better golfer than me). We spent many hours playing bridge. I was with him and our mutual friends when I visited him at Penn and when we sampled the fun life touring around Manhattan in the 80s. His wife, Eileen, is sweet, very smart and has been totally supportive of Ken for more than four decades.

When I heard about all the problems Ken had with the SEC, I was incredibly surprised. No matter how successful, Ken has been in his chosen profession, he is the same person I knew when he was a boy and a young man. He is absolutely unpretentious. When we talked about bonds he loved going into the details of how to evaluate particular bonds and preferred stock in an investment portfolio. Little did I know at the time, that I was talking to someone so highly regarded nationally and internationally. In retrospect, the fact that he has been always available for me with my little questions about investing or some of my personal struggles; demonstrates his generosity and his modesty. My impression is that he has the demeanor of a professor. He lives well but is not materialistic. I never heard him brag or show off the trappings of wealth. Only recently, did I learn how outstanding his reputation had been in the world of bond investing. He truly loves trading and analyzing bonds. I am certain that financial gain was not his primary motivation. I know he feels fortunate that he could provide for his family doing something he loves and matches his skills. I can relate to this. Even though I am his age, I continue to practice pathology because I like doing it. The people and doctors I serve, have confirmed that they trust my judgment. Money is not a factor for me and I am sure it is the same for Ken. The Ken that I have known since kindergarten is generous, modest, and always puts integrity first.

Your Honor, I hope when you determine Ken's sentence, you take into account that he has lived a long life honorably, he has been there when it counted, and he has been a great husband and father. I will be his friend until our last days. I ask that you please show leniency in sentencing him.

Respectfully,

Steven Wilson, M.D.

[redacted]

Indiana, PA [redacted]

# Exhibit 100

Kenneth Winston
[redacted]
Shelter Island, NY [redacted]

August 1, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods:

I am writing in support of S. Kenneth Leech ("Ken") as you consider his sentence. I understand he has pleaded guilty to obstructing a proceeding before the Securities and Exchange Commission.

I was the Chief Risk Officer of Western Asset Management from October 2008 to December 2018. In this capacity I worked closely with Ken for ten years, starting in 2009 when he returned from a leave due to a throat condition.

Ken and I met frequently to discuss investment risk issues. I would describe him as a "bond nerd" – he lived and breathed the fixed-income markets. Even after decades as a Chief Investment Officer, he retained a childlike glee and wonder at the complexity of the global financial structure. He clearly felt lucky that he could spend his days solving investment puzzles and that when he got it right, his work had a positive impact on economic welfare.

I always found Ken to be reasonable and honest. We might disagree on issues, but he was always open to discussion and once we agreed on a way forward, he would stick to it.

Western Asset's clients included central banks all over the world, and from time to time Ken and I would travel together to places like Costa Rica and Mexico to make presentations to our clients, either to update them on our work or to pitch for new business.

Although I never talked with him about it, I think Ken was a little nervous at these high-stakes presentations. But once he started talking about the financial markets, he waxed eloquent. Our clients could see not only his deep knowledge of the markets, but also his fascination and love for them.

I left Western Asset at the end of 2018 to become an academic – I am now a Lecturer in Economics at Caltech and an Adjunct Professor of Mathematics at NYU. I was shocked to hear of the charges against Ken in 2024. I worked in the financial industry for decades, and there were some former colleagues that I wouldn't have been surprised to hear of getting into trouble. But Ken was not someone I would have expected to cross any legal lines.

I have no ongoing connection with Western Asset or to Ken. But I agreed to write this letter because I believe, based on ten years of working together, that Ken is a person of good character. The act he has pleaded guilty to is highly inconsistent with his behavior during the time I worked with him. I hope that you see fit to take this into account in your sentencing decision.

Respectfully,

Kenneth Winston

[redacted]

# Exhibit 101

September 11, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street, NY, NY 10007-1312

Dear Judge Woods:

My name is Joy Wright, and I am writing to offer my perspective on the character of Mr. Kenneth Leech. I worked with this gentleman for twenty years. I served as his back-up assistant in New York when he was visiting our office. Throughout our time working together, I addressed him as "Mr. Leech" out of respect and my own traditional upbringing, having grown up in Jamacia. Although he encouraged me on several occasions to use his first name, I continued to address him formally because it reflected the regard I had for him. He never challenged that choice — instead, he honored it.

During my years supporting him, I experienced a difficult period in my personal life. [redacted] and at the time I was overwhelmed, frightened, and trying to understand what this diagnosis meant for my future. Unbeknownst to me, his chief assistant had informed him of my condition.

On one of his frequent visits to the office, after I handed him a report, he asked me to sit down. He then spent the next thirty minutes speaking to me not as an executive, but as a human being [redacted] His words were calm, thoughtful, and sincere. In that moment, he gave me something I desperately needed — reassurance, guidance, and hope.

That conversation changed my life. It helped me move from fear to action. It reminded me that I was not alone. And it showed me the depth of his decency, empathy, and respect for the people around him, regardless of their position.

I understand the seriousness of the circumstances before the Court. My intention is not to excuse or diminish them, but to share the truth of the person I knew for two decades — someone who treated me with dignity, who respected my values, and who extended compassion at a time when I needed it most.

Thank you for considering my perspective. I respectfully ask that you please exercise leniency in sentencing Ken.

Respectfully,

Joy Wright

# Exhibit 102

Lori J. Wynstock, M.D.- Your Personal Care Practice
950 S Arroyo Pkwy, Ste 330
Pasadena, CA 91105
Ph: 626-793-1055 Fax: 626-793-8013
e-mail: [redacted]

September 15, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

I am writing to the Court in my capacity as the personal physician of Ken Leech, whom I have treated and monitored since 2019. I am a board-certified internist practicing in Pasadena, California. I write to provide the Court with an accurate picture of Mr. Leech current health so that it may be considered in connection with sentencing.

Mr. Leech is 72 years old. He carries several ongoing medical conditions that require consistent monitoring, specialized care, and strict adherence to a carefully managed treatment regimen.

**Barrett's Esophagus with Chronic Active Inflammation**

Mr. Leech was diagnosed with Barrett's esophagus in 2007. Barrett's esophagus is a serious condition in which the normal tissue lining the esophagus is replaced by tissue similar to the intestinal lining, a process known as intestinal metaplasia. This condition is clinically significant because it is a recognized precursor to esophageal adenocarcinoma, a form of cancer. Mr. Leech's most recent upper endoscopy, performed on November 21, 2024, confirmed the continued presence of Barrett's esophagus with chronic active inflammation, reactive epithelial changes, and intestinal metaplasia highlighted by specialized staining. While no dysplasia (the cellular changes that signal a progression toward cancer) has been detected to date, this is a condition that demands vigilant, ongoing surveillance.

Mr. Leech undergoes periodic upper endoscopies to monitor for any signs of dysplastic progression, with his next procedure scheduled in approximately three years. He takes [redacted] twice daily to manage acid reflux and protect the esophageal lining, and he must follow a carefully controlled GERD diet. Any interruption or inconsistency in this medication regimen or dietary plan could exacerbate inflammation, accelerate tissue changes, and increase the risk of progression to a more dangerous stage of disease. Timely access to his gastroenterologist, Dr. Waleed Shindy, is essential should any new symptoms develop between scheduled surveillance procedures.

[redacted]

The November 2024 endoscopy also revealed a [redacted] This contributes to Mr. Leech's gastroesophageal

[redacted], were identified in the stomach and biopsied. [redacted] require continued observation over time.

**Stress-Related Health Concerns**

Mr. Leech has experienced significant stress-related health effects, including chronic sleep disruption. Stress is not merely a matter of discomfort for Mr. Leech; it has measurable consequences for his overall health. Prolonged stress and poor sleep are well-documented contributors to immune suppression, cardiovascular strain, and gastrointestinal inflammation -- each of which is directly relevant to Mr. Leech's existing conditions. His Barrett's esophagus, in particular, is sensitive to the physiological effects of sustained stress and disrupted sleep. I have been working with Mr. Leech to manage these issues through lifestyle modifications, but a stable and low-stress environment is an important part of that effort.

In sum, management of Mr. Leech's medical conditions require an integrated approach involving multiple specialists, strict medication schedules, dietary controls, periodic invasive surveillance procedures, and a stable daily routine. Consistency in his care is essential to preventing the progression of a precancerous condition and to managing the interrelated gastrointestinal and cardiovascular risks he faces. I respectfully ask the Court to consider the significance of these health needs when determining an appropriate sentence.

I am available to provide any additional information the Court may require.

Respectfully submitted,

Lori J Wynstock MD

Lori J. Wynstock, M.D.

# Exhibit 103

Dylan J. Yamamoto
[redacted]
Pasadena, California [redacted]

August 2, 2026

The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007-1312

Dear Judge Woods:

My name is Dylan J. Yamamoto. I am 35 years old and live in Pasadena, California. I write to you to request that you exercise leniency and mercy in imposing any sentence on Ken Leech. I have known Ken for over 30 years, as the father of one of my lifelong friends; as a professional colleague and boss; and finally, as a benefactor, both to me and to many others.

Although I understand that Ken has pleaded guilty to obstructing a procedure before the SEC, I ask that you consider Ken's decades of generosity and leadership in making your decision with regard to sentencing.

In short, over the years, I have had the privilege and honor of knowing Ken in many different capacities, and he has never failed to demonstrate generosity, graciousness, honor, humility, and steady judgment. I first met Ken through his son Stephen, with whom I have been friends since preschool. In that capacity, I have been able to encounter and observe Ken as a devoted family man who is kind, reliable, and closely involved with his family (which now includes two young grandchildren), while maintaining a thriving, high-pressure career in the highest stratum of the investment world. Despite his elite professional performance and credentials, Ken is also a great man with whom to watch a baseball game or share a pizza from Domenico's, a favorite neighborhood restaurant.

Although my parents went to college, I do not come from a background with many high level, white collar professionals, and as I have attempted to pursue a career, Ken has proved invaluable to me as a resource, even though he had little to gain for himself. By my college years, I did not yet know Ken very well, but I had a clear sense that he was incredibly accomplished (a Bloomberg story dubbing him the "New King of Bonds," not his own self-promotion, was how many of us discovered his success). Therefore, in the midst of the Great Recession, as I struggled to find a foothold in the professional world, I reached out to Stephen to ask if Ken knew anyone at all with whom he could connect me.

Not only did Ken respond, but he directly helped me obtain a coveted summer internship at Western Asset Management, the firm he had turned into a giant. Through that internship, I was introduced to exceptional financial minds and was able to learn how to be a professional. Furthermore, once I was there, Ken took time out of his schedule to have lunch with me, and gave me a number of books he recommended, including Nassim Taleb's *Fooled By Randomness*, which has shaped my thinking ever since.

Two years later, after finishing college at the University of Chicago, I needed a job. In the aftermath of the financial crisis, it was still a difficult job market, and my family was dealing with

the death of one grandfather and the deteriorating health of my other grandfather. Again, Ken helped me to secure a full-time position at Western Asset, which provided me with some financial stability and enabled me to help my own family as well. During my two years at the firm, I could directly see the culture of professional excellence, collegiality, and teamwork that Ken had built. The firm was both highly successful and a place where people would work for decades, which is a rarity in any field, and especially finance. At Western Asset, no one had anything negative to say about Ken, and the environment was much more warm, collegial, and open that at similar firms. This was a result of Ken's leadership.

Nevertheless, Ken never thrust himself in front of the cameras or claimed credit for the firm's success, and that spirit of generosity has informed my own attitude as I have progressed in my own career, first at Western Asset and now as an attorney. Whatever success I have achieved must certainly be attributed in part to the leg up that Ken gave me early on, when I desperately needed it and when he could have easily declined.

Yet this is the manifest theme with Ken: he and his family continuously—but quietly—help family, friends, and strangers when they could easily turn away. I have only learned more recently, after many years of friendship, and often hearing secondhand, of the numerous and profound acts of generosity Ken and his family have made. Ken helped our high school weather the storm of the 2008 financial crisis, such that it continues to thrive. Ken helped me at the beginning of my own career, and I am sure he has helped many others. And, as another example, I understand that Ken's and his family's support is crucial to the survival their longtime church, Trinity Presbyterian Church in Pasadena.

To the extent that his good works are not better known to the public (or indeed even to longtime friends of the family like me), it is not for lack of good works, but because Ken has never sought recognition, thanks, or a favor in return for his generosity. For decades, Ken's name has not been on the side of a building, and his face has not been in the news, because he has pursued virtue and excellence—both professional and philanthropic—without seeking the spotlight or reward.

Consequently, I humbly request and strongly urge that you exercise leniency and mercy in sentencing Ken.

Respectfully,

Dylan J. Yamamoto

# Exhibit A

JANUARY 3, 2005

# Morningstar Announces 2004 Fund Manager of the Year Awards

CHICAGO, Jan. 03, 2005 – Facing an uncertain market in 2004, the best mutual fund managers demonstrated the kind of prowess, strategy and agility required to serve investors well. To recognize the best of these top performers, Morningstar, Inc., a leading provider of investment research, today announced its 2004 Fund Manager of the Year awards for portfolio managers in three categories: domestic stock, international stock, and fixed income.

- **Domestic-Stock Fund Manager of the Year:**
  Brian Berghuis
  T. Rowe Price Mid-Cap Growth (RPMGX)
- **International-Stock Fund Manager of the Year:**
  Bryan C. Cameron, Mario C. DiPrisco, Jacob M. Gofman, John A. Gunn, Gregory R. Serrurier, Diana S. Strandberg, and Kouji Yamada
  Dodge and Cox International Stock (DODFX)
- **Fixed-Income Fund Manager of the Year:**
  Ken Leech and team
  Western Asset Core Bond (WATFX)

“2004 had a dismal beginning and strong ending,” said Kunal Kapoor, director of mutual fund analysis for Morningstar, Inc. “Many great fundamental managers posted stellar returns, making this year full of good candidates for our Fund Manager of the Year award. As always, we didn’t simply rely on short-term performance; we rewarded those who have demonstrated an ability to make money for investors during many different market cycles. We also picked managers who keep shareholders’ best interests in mind and have the courage to stand by their investing strategies regardless of whether they are in fashion.”

**Domestic-Stock Fund Manager of the Year:**
**Brian Berghuis**
**T. Rowe Price Mid-Cap Growth (RPMGX)**

Brian Berghuis has built an impressive record at T. Rowe Price Mid-Cap Growth since the fund's launch in 1992. The fund returned more than 18 percent in 2004, and during the trailing 10 years, it has returned nearly an annualized 16 percent, placing in the top 5 percent of the mid-growth category.

Berghuis looks for companies with strong long-term growth potential, such as Nucor and BJ Services, but is careful to not overpay for them. He has consistently posted above-average returns and has shown an ability to manage the fund during down markets. Most recently, the fund rebounded solidly from the bear market, posting sound returns in 2003 and 2004. Berghuis has thus been able to produce five years of strong relative performance.

"Berghuis' record is an indication of his stock-picking prowess," Kapoor said. "He didn't throw his investing discipline out the window to chase hot Internet stocks. Like other T. Rowe Price managers, he has done an excellent job of staying focused on fundamentals and risk. Moreover, he is a strong voice for corporate governance."

**International-Stock Fund Manager of the Year:**
**Bryan C. Cameron, Mario C. DiPrisco, Jacob M. Gofman, John A. Gunn, Gregory R. Serrurier, Diana S. Strandberg, and Kouji Yamada**
**Dodge and Cox International Stock (DODFX)**

Unlike some firms, Dodge and Cox's team of analysts compile their research on a global sector basis, so the same pool of analysts provides ideas for all the firm's offerings. The results have been remarkable: In a little less than four years, the firm has become a force in the foreign-stock arena. The fund is still relatively young, but its 32 percent return in 2004 lands at its category's top, and its trailing three-year return of nearly 20 percent ranks in its group's top quintile.

The team looks for moderately priced stocks with strong management, and it is focused on the long term. For example, amid the negative news surrounding pharmaceutical stocks in 2004, the team added to positions in Bayer and GlaxoSmithKline, showing the

conviction required to wade into a sector where few others are going.

“One of the key differences at Dodge and Cox is its extremely low fees,” Kapoor said. “Many fund companies pad their earnings by raising fees on foreign funds because the market will bear it. This firm charges only 0.82 percent, compared with a category average of 1.55 percent. With these high fees, investors have to ask themselves why they would pay more elsewhere. It wouldn’t be for expertise, because the Dodge and Cox managers have that in spades, and it is not honest shareholder communication and topnotch stewardship, because in those respects, you can’t improve much on Dodge and Cox.”

**Fixed-Income Manager of the Year:**
**Ken Leech and team**
**Western Asset Core Bond (WATFX)**

As one of the largest managers of bonds for institutions in the United States, Western Asset is not well known among individual investors. Yet, it has become one of the most formidable fixed-income firms around. A unit of Legg Mason, the firm has relied on considerable resources to post its impressive 10-year record on the Core Bond Fund. During that stretch, the fund placed in the intermediate bond fund category’s top 2 percent. This team was also a runner-up for Fixed-Income Manager of the Year in 2003.

Led by chief investment officer Ken Leech, the fund’s management team repositions the fund based on top-down analysis and consistently adds value by finding bonds that perform a little better than their credit ratings suggest. Although the fund has a high minimum investment of $1 million, investors can purchase it through some fund supermarkets in smaller increments.

“The top bond shops remain consistently dominant, and previous fixed-income winners continue to post outstanding returns year in and year out,” Kapoor said. “This year we recognize another great fund shop – Western Asset Management. Its flagship fund, the Core

Bond Fund, was up 5 percent in 2004 and has posted outstanding returns for the long term. The fund has produced top-quartile returns in four of the past five years and above-average returns in seven of the past eight years."

**Runners-Up for 2004**

Chris Davis and Ken Feinberg, co-managers of Selected American Shares (SLASX), were runners-up for the domestic-stock category. The Causeway International Value (CIVVX) team, composed of James Doyle, Harry Hartford, and Sarah Ketterer, were runners-up for the international-stock category. Dan Fuss, winner of the 1995 Fixed-Income Manager of the Year award, and Kathleen Gaffney, his co-manager at Loomis Sayles Bond (LSBRX), were runners-up in the bond category.

Established in 1988, the Morningstar Fund Manager of the Year award recognizes portfolio managers who demonstrate excellent investment skill and the courage to differ from the consensus to benefit investors. To qualify for the award, managers' funds must have not only posted impressive returns for the year, but the managers also must have a record of delivering outstanding long-term performance and of aligning their interests with shareholders'. The Fund Manager of the Year award winners are chosen based on Morningstar's proprietary research and in-depth evaluation by its senior analysts.

For the complete report, go to:

For a list of past and present winners, go to:

Calendar-year results for 2004 are based on preliminary data.

**About Morningstar, Inc.**

Morningstar, Inc. is a leading provider of independent investment research in the United States and in major international markets. The company offers an extensive line of Internet, software, and print-based products and services for individuals, financial advisors, and institutions. Morningstar tracks more than 100,000 investment offerings, including stocks, mutual funds, and similar vehicles. The company has operations in 16 countries.

# # #

©2005 Morningstar, Inc. All rights reserved.

# Exhibit B

JANUARY 21, 2015

# Morningstar Announces 2014 U.S. Fund Manager of the Year Award Winners

Download this Press Release PDF

CHICAGO, Jan. 21, 2015—Morningstar, Inc. (NASDAQ: MORN), a leading provider of independent investment research, today announced its 2014 U.S. Fund Manager of the Year award winners. The winners will be featured in live segments on CNBC this afternoon. The awards acknowledge managers who not only delivered impressive performance in 2014, but who have also shown excellent long-term risk-adjusted returns and have been good stewards of fund shareholders' capital. This is the 28th year Morningstar has presented Fund Manager of the Year awards.

To recognize outstanding fund managers each year, Morningstar selects leaders in five categories: domestic stock, international stock, fixed income, alternatives, and allocation. The 2014 Fund Manager of the Year award winners in the United States are:

**Domestic-Stock Fund Manager of the Year: The team from PRIMECAP (Theo Kolokotrones, Joel Fried, Al Mordecai, Mohsin Ansari, and James Marchetti)**

**Recognized for:**
**PRIMECAP Odyssey Aggressive Growth (POAGX)**
**PRIMECAP Odyssey Growth (POGRX)**
**PRIMECAP Odyssey Stock (POSKX)**
**Vanguard Capital Opportunity (VHCOX)**
**Vanguard PRIMECAP Core (VPCCX)**
**Vanguard PRIMECAP (VPMCX)**

The PRIMECAP team runs six funds, three PRIMECAP funds and three subadvised Vanguard funds. All six funds have a Morningstar Analyst Rating™ of Gold, the company's highest Medalist rating, with Positive scores for all five pillars—Process, Performance, People, Parent, and Price. In 2014, all of the funds generated returns greater than 13.5 percent, ranking in the 11th percentile or better

in their categories; four of the six finished in the top 1 percent of their categories. Three of the managers have more than $1 million invested in each of the six funds, and two managers have between $100,000 and $500,000 invested in each. The PRIMECAP team previously won Morningstar's Domestic-Stock Fund Manager of the Year award in 2003 for Vanguard PRIMECAP and Vanguard Capital Opportunity.

"The long-term record of these winning PRIMECAP funds is outstanding. The team has made a lot of money for many people at a low cost. All six funds place in the top 5 percent of their categories over the trailing 10-year period, and Vanguard PRIMECAP and Vanguard Capital Opportunity have 15-year records that respectively rank in the top 2 percent and top 1 percent of the large-growth category," Jon Hale, Morningstar's director of manager research, North America, said. "The PRIMECAP team's patient strategy paid off in a big way in 2014 with their large holdings in pharmaceutical and biotechnology stocks like Biogen Idec, Amgen, and Eli Lilly, which gained more than 20 percent each last year. Their airline holdings were also successful, as top holding Southwest Airlines more than doubled and United Continental Holdings, Delta, and American Airlines each gained more than 60 percent."

**International-Stock Fund Manager of the Year: Charles Pohl, Diana Strandberg, and team, Dodge and Cox International Stock (DODFX)**
The nine-person Dodge and Cox International Stock Policy Committee runs this fund, and each of the members has been with Dodge and Cox for more than a decade. The managers follow a patient value strategy with low turnover, as demonstrated by a few of their previously unpopular holdings. The team bolstered its position in ICICI Bank in 2013 when the price was tumbling, and the stock soared in 2014. Hewlett-Packard stock, which the managers stuck with during the years when most investors shunned it, also rose significantly. The fund also saw double-digit gains from long-time pharmaceutical holdings Novartis and Roche. Dodge and Cox International Stock has a Gold Analyst Rating from Morningstar with Positive ratings for all five pillars and lands in the top decile of the foreign large-blend category for the three- and five-year periods as well as for 2014. The team also won this award in 2004.

“It was a challenge for international-stock funds to achieve gains in 2014, as many economies were sluggish, foreign currencies stumbled, and unrest in Ukraine and Russia negatively affected European companies. Dodge and Cox International Stock managed to end the year in the black with a 0.1 percent return versus the 3.9 percent loss of the MSCI ACWI ex-US Index and the category’s 5.0 percent decline,” Hale said. “Over the long term, the fund has posted strong returns and continues to land in the top quartile of its category, even though it is now the fourth-largest international-stock fund in the United States. In a move to protect current fund shareholders, the fund closed to new investors earlier this month.”

**Fixed-Income Fund Manager of the Year: Ken Leech, Carl Eichstaedt, and Mark Lindbloom, Western Asset Core Bond (WACSX) and Western Asset Core Plus Bond (WAPSX)**
Silver-rated Western Asset Core Bond and Western Asset Core Plus Bond follow a straightforward process and bounced back from losses in 2008 to both land in the top decile of the Morningstar intermediate-term bond category over the past five years. For the trailing 10-year period, Western Asset Core Bond’s 5.1 percent return places the fund in the top quartile of the category, while Western Asset Core Plus Bond’s 5.7 percent return landed in the top decile. In 2014, the funds each gained more than 7.5 percent, beating both the category and the benchmark and benefiting from a contrarian position on long-term interest rates and security selection in the non-agency mortgage and investment-grade credit sectors. Leech and his team also won the award in 2004 for Western Asset Core Bond.

“The performance of Leech, Eichstaedt, and Lindbloom really stood out in 2014, even as the Federal Reserve’s quantitative easing program ended, long-term bond yields continued to fall, and a sell-off occurred in the broader emerging-markets space. Over the last few years, the team has deftly steered through rocky periods in the bond market,” Hale said. “The firm is supported by more than 40 analysts, and the team has an average of 20 years of experience. Leech has been with Western since the early

1990s, Eichstaedt since 1994, and Lindbloom, with 30 years of investment experience, since 2006."

**Alternatives Fund Manager of the Year: Robert T. Jones and Ali Motamed, Boston Partners Long/Short Equity (BPLSX and BPLEX)**
Robert Jones took the reins at Boston Partners Long/Short Equity in 2004, and Ali Motamed has been with the fund since 2003; Motamed was named a portfolio manager in 2013. Morningstar recently upgraded the fund's Analyst Rating to Silver from Bronze, with Positive ratings for four of the five pillars. The fund has shown solid long-term performance, and its alpha generation, or outperformance relative to its level of market risk as measured by beta, was particularly attractive from 2008 through 2014. In 2014, the fund's 4.7 percent return was particularly notable given its low average net exposure of 34 percent and a weekly beta for the year of only 0.12. The firm has a history of closing funds before becoming too unwieldy, and Boston Partners Long/Short Equity has been closed to new investors since 2010.

"The management team isn't afraid to make drastic moves to benefit fund shareholders. For example, the fund added an array of small-cap stocks to the portfolio starting in 2008, leading to unrivaled success in 2009 and 2010. More recent performance has generated a large amount of alpha, with success from short holdings in 3D Systems, Netflix, and Twitter," Hale said. "Both Robert and Ali are committed to the strategy, each investing more than $1 million. We recently upgraded our Parent pillar rating to Positive for Boston Partners because we've seen the firm deliver a clear and consistent research process to produce good outcomes for fund shareholders."

**Allocation Fund Manager of the Year: Anne Lester and team, JPMorgan SmartRetirement Target-date Series (JSIIX, JSFIX, JTTIX, JNSIX, JSMIX, SRJIX, SMTIX, JSAIX, JTSIX, and JFFIX)**
By the end of 2014, target-date funds represented the largest category in the allocation space with more than $700 billion in assets and approximately $50 billion in inflows last year. Anne Lester has led the JPMorgan SmartRetirement team since the series' inception in 2006, and all of the fund's managers have spent their investment

careers at J.P. Morgan. The series' glide path has a more conservative bent and is more diversified than many of its peers. With a Silver Morningstar Analyst Rating, the series also has Positive ratings for all five pillars after Morningstar upgraded the Parent pillar in December 2014. In 2014, each fund in the series returned more than 5 percent, and the three-year annualized return is between 7 and 17 percent for each fund. This is the first time a target-date fund series has won Morningstar's Allocation Fund Manager of the Year award.

"The team has navigated various market environments with great success and posted outstanding performance in 2014. Strategic asset allocation, manager selection, and tactical decisions all contributed to the series' strong showing last year," Hale said. "In 2014, its funds, on average, ranked in the 8th percentile of their respective peer groups and outperformed their category averages by 2.2 percentage points. Since the series' inception, the average rank of its funds has never fallen into the bottom third on a calendar-year basis."

For Morningstar's article about the winners, please visit . For the complete list of past and current winners, go to .

Established in 1988, the Morningstar Fund Manager of the Year award recognizes portfolio managers who demonstrate excellent investment skill and the courage to differ from the consensus to benefit investors. The Fund Manager of the Year award winners are chosen based on Morningstar's proprietary research and in-depth qualitative evaluation by its manager research analysts. To qualify for the award, managers' funds must have not only posted impressive returns for the year, but the managers also must have a record of delivering outstanding long-term risk-adjusted performance and of aligning their interests with shareholders'. Nominated funds must be Morningstar Medalists—a fund that has garnered a Morningstar Analyst Rating of Gold, Silver, or Bronze. The criteria are available . For more information about the Morningstar Awards, please visit .

**About Morningstar, Inc.**
Morningstar, Inc. is a leading provider of independent investment research in North America, Europe, Australia, and Asia. The company offers an extensive line of products and services for individual investors, financial advisors, asset managers, and retirement plan providers and sponsors. Morningstar provides data on approximately 479,000 investment offerings, including stocks, mutual funds, and similar vehicles, along with real-time global market data on more than 13 million equities, indexes, futures, options, commodities, and precious metals, in addition to foreign exchange and Treasury markets. Morningstar also offers investment management services through its investment advisory subsidiaries and had approximately $169 billion in assets under advisement and management as of Sept. 30, 2014. The company has operations in 27 countries.

*Analyst Ratings are subjective in nature and should not be used as the sole basis for investment decisions. Analyst Ratings are based on Morningstar's current expectations about future events and therefore involve unknown risks and uncertainties that may cause Morningstar's expectations not to occur or to differ significantly from what was expected. Morningstar does not represent its Analyst Ratings to be guarantees nor should they be viewed as an assessment of a fund's or the fund's underlying securities' creditworthiness. The references above should not be considered a solicitation by Morningstar to buy securities.*

# # #

©2015 Morningstar, Inc. All Rights Reserved.

MORN-R

# Exhibit C

**From:** Leech, S. Kenneth [/O=WESTERN ASSET/OU=PASADENA/CN=RECIPIENTS/CN=[redacted]]
**Sent:** 5/12/2011 9:25:18 AM
**To:** Walsh, Stephen A. [redacted]@westernasset.com]; Hirschmann, James W. [redacted]@westernasset.com]
**Subject:** press

I jus saw the Asian investor piece---and it is horrible--I don't know where the king of bonds stuff came from--I did the interview in brazil, then one in Singapore--and this is the first one on which I was bagged. ( I did ask Jim F if I had to do it--he said yes--so my continuing desire to escape the press is at least noted on the record).

As o the "step down" quote---my memory is that after Henry's long introduction---he was joking about a good time to be sick as e were doing the get to know everybody preliminary s,all talk. at least he mentioned that it was joking in the article--but still very much out of context.

I am always mildly uncomfortable with these--and if there is concern, and certainly getting a sensational king of bonds headline doesn't help the firm with its desire to showcase depth in Asia --I am obviously more than willing too abstain.