MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

ELKAN ABRAMOWITZ
RICHARD F. ALBERT
ROBERT J. ANELLO*
KATHLEEN E. CASSIDY
BENJAMIN S. FISCHER
CATHERINE M. FOTI
CHRISTOPHER B. HARWOOD
LAWRENCE IASON
BRIAN A. JACOBS
TELEMACHUS P. KASULIS
KAREN R. KING
THOMAS A. McKAY
ROBERT M. RADICK*
JONATHAN S. SACK**
EDWARD M. SPIRO
JEREMY H. TEMKIN
RICHARD D. WEINBERG
LISA ZORNBERG

565 FIFTH AVENUE
NEW YORK, NEW YORK 10017
(212) 856-9600
FAX: (212) 856-9494

www.maglaw.com

WRITER'S CONTACT INFORMATION

jsack@maglaw.com
(212) 880-9410

COUNSEL
PIPPA HYDE***
KEFIRA WILDERMAN

RETIRED/PARTNER EMERITUS
PAUL R. GRAND

ROBERT G. MORVILLO
1938-2011
MICHAEL C. SILBERBERG
1940-2002
JOHN J. TIGUE, JR.
1939-2009

*ALSO ADMITTED IN WASHINGTON, D.C.
**ALSO ADMITTED IN CONNECTICUT
***ALSO ADMITTED IN ENGLAND AND WALES

November 12, 2026

**VIA ECF**
The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

**Re: *United States v. Leech*, No. 24 Cr. 658 (GHW) (S.D.N.Y.)**

Dear Judge Woods:

We represent S. Kenneth Leech II, the defendant in the above-captioned case, who is scheduled to be sentenced by Your Honor on November 23, 2026. We write in reply to the government's sentencing submission of November 4, 2026, and to advise the Court of the recent settlement of a parallel civil case brought against our client by the Securities and Exchange Commission ("SEC").

In its sentencing submission, the government asks the Court to impose a sentence above the stipulated Guidelines range of 6–12 months largely based on conduct relating to charges that will be dismissed and on Ken's senior position at Western.[1] It seeks this upward variance despite the following:

- Ken is 72 years old and has led a life of remarkable decency and generosity as demonstrated by the nearly 200 letters of support submitted to the Court;[2]
- The Probation Office has recommended a sentence of time served;

[1] Citations in the form of "Gov't Ltr.," "Def. Mem.," and "Hr'g Tr." refer to the government's sentencing letter (ECF No. 202), defense sentencing memorandum (ECF No. 193), and June 1, 2026 evidentiary hearing transcript, respectively. The transcript is not yet available on the docket.

[2] After we filed our sentencing submission, we received an additional letter from James G. Hayes. That letter is submitted herewith as Exhibit 1.

- The Guidelines commentary states that a sentence "other than a sentence of imprisonment . . . is generally appropriate" for zero-point offenders who, like Ken, have a Guidelines range in Zone B, U.S.S.G. § 5C1.1, cmt. n.9;
- The significant collateral consequences of the prosecution, including public disgrace, infamy in his former industry, and enormous pain and lasting harm that Ken's conviction has caused him, his family, and his former colleagues;
- The settlement of the SEC case, pursuant to which Ken agreed to pay a $3 million civil penalty and be permanently barred from the securities industry; and
- The unwarranted disparities that an upward variance would create.

For the reasons set forth in our initial sentencing submission and those discussed in this letter, we respectfully urge the Court to adopt the Probation Office's recommendation and impose a sentence of time served.

## I. The Limited Nature of the Obstruction Does Not Support an Upward Variance

We do not dispute that obstructing an SEC investigation is a serious offense. The question, however, is whether anything about Ken's offense takes it outside the ordinary Section 1505 case already addressed by the Guidelines. Nothing does.

Ken pleaded guilty to giving false and misleading testimony about his allocation practices during one day of SEC testimony. He accepts full responsibility for doing so. The offense conduct was relatively narrow. Ken did not destroy documents, fabricate evidence, or attempt to influence witnesses. Moreover, the government has not argued that Ken's testimony materially affected the course or outcome of the SEC investigation, such as by causing the SEC to abandon a line of inquiry, overlook evidence, or change its focus or conclusion. Def. Mem. at 47–48. Significantly, consistent with the plea agreement, the Probation Office determined that the enhancement for conduct resulting in "substantial interference with the administration of justice" does not apply. PSR ¶ 24.[3]

The government argues that Ken's senior position at Western takes his offense conduct out of the mine-run of obstruction cases. It points to his years in the industry, his notice of the investigation, his representation by counsel, and the warnings he received about false statements. Gov't Ltr. at 10–14. But many witnesses in SEC investigations are industry professionals who

---

[3] The government refers to two portions of the August 2024 Wells Submission to the SEC. Gov't Ltr. at 4–5, 8, 12. Ken regrets that the Wells Submission suggested that his allocation decisions were based solely on pre-execution trading considerations. The government does not, however, argue that the Wells Submission materially affected the course or outcome of the SEC investigation. The two quoted excerpts are a far cry from the sort of obstructive conduct that warrants a sentencing enhancement, *see* U.S.S.G. § 2J1.2(b)(3), let alone an upward variance. They are also less severe than the obstructive conduct that in other cases did *not* lead to a term of imprisonment. *See* Def. Mem. at 53–54.

appear with counsel after receiving the same warnings. If those features justified an upward variance, nearly every defendant who lies in SEC testimony would warrant one. Sophistication, representation, and warnings are the ordinary features of testimony and, in some cases, obstruction before the SEC, and the Guidelines should be understood to account for them. *See Rita v. United States*, 551 U.S. 338, 350 (2007) (because the Guidelines "seek to embody the § 3553(a) considerations, both in principle and in practice," it is "fair to assume that the Guidelines, insofar as practicable, reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives"). Moreover, far from justifying an upward variance, Ken's seniority made the collateral consequences of this prosecution more severe, including by making him notorious in the industry. *See infra* at 5.

None of the government's authorities supports an upward variance. As discussed *infra* at 6 & Appendix A, the cases cited by the government involve different offenses, multiple counts of conviction, and far more serious conduct. Gov't Ltr. at 12–13. Apt comparators—sentences imposed in Section 1505 cases, including ones involving obstructing the SEC—have resulted in no or minimal incarceration. Def. Mem. at 53–54.

The government ignores altogether the Commission commentary calling for "a sentence other than . . . imprisonment" for defendants like Ken. U.S.S.G. § 5C1.1, cmt. n.9; *see* PSR ¶ 77; Def. Mem. at 40–41. In any case, as both the Supreme Court and the Sentencing Commission have emphasized, non-incarceratory sentences are punitive and meaningful. *See Gall v. United States*, 552 U.S. 38, 48 (2007) (probationary sentences "substantially restrict . . . liberty"); U.S.S.G. ch. 5, pt. A, introductory cmt. (2026) ("Each of the available sentencing options—imprisonment, probation, and fines—serves a punitive function . . . .").

## II. The Government's Cherry-Picking Allegations Do Not Justify an Upward Variance

The government also asks the Court to impose an above-Guidelines sentence for obstruction based on the cherry-picking allegations that it agreed to dismiss. But it concedes that Ken "did not plead guilty to that offense," Gov't Ltr. at 14, and the Probation Office made no findings regarding the alleged cherry picking, Def. Mem. at 40 n.16; *see* PSR ¶¶ 11, 16.[4] As the Court knows from the extensive pretrial briefing, the defense vigorously disputed the cherry-picking allegations and was prepared to challenge them at trial. The government opted not to try the fraud charges. We respectfully submit that disputed allegations contained in to-be-dismissed fraud charges, which would have required a multi-week trial, should not serve as the basis for a sentence above the range applicable to the count of conviction.

### A. The Dismissed Charges Should Not Drive the Sentence

The alleged cherry-picking conduct is separate from the sole count of conviction, and it would not be appropriate to sentence Ken based on conduct the government chose not to attempt

[4] The PSR accurately characterizes the parties' positions with respect to the cherry-picking allegations, and neither party believes a hearing is necessary with respect to those allegations.

to prove to a jury. The fraud allegations do not constitute relevant conduct with respect to the obstruction offense. The applicable Guideline, Section 2J1.2, does not consider whether the defendant committed an alleged underlying offense, the investigation of which the defendant obstructed, except under narrow circumstances that the parties agree do not apply here. *See* U.S.S.G. § 2J1.2(b)(1)(C); *id.* § 2J1.2(c). This indicates that the nature of alleged underlying offenses should not be considered here and in like circumstances. *See Rita*, 551 U.S. at 350; *cf. Erlinger v. United States*, 602 U.S. 821, 832 (2024) (detailing the Framers' concern "that the punishments courts issue are not the result of a judicial 'inquisition' but are premised on laws adopted by the people's elected representatives and facts found by members of the community").

**B. Neither Ms. Snoke Nor Ms. Marquez "Detected" Anything Improper**

The government contends that two of Ken's trading assistants "detected the defendant's scheme to specifically allocate winning trades to his favored funds." Gov't Ltr. at 9.

The record shows otherwise. The only support the government cites for this assertion is a single instant-message exchange between Rosemarie Snoke and Julie Marquez. Gov't Ltr. at 9. Contrary to the government's reading, the exchange reflects the assistants' desire to have the trade allocated where Ken intended. This is consistent with their statements that 50/50 default allocations were rare, and they and Ken sought to avoid default allocations if possible. Simply put, neither Ms. Marquez nor Ms. Snoke suspected, let alone "detected," that Ken was steering winning trades to Macro Opps.[5] To the contrary, Ms. Snoke told the government that she had "[n]o previous concerns about [Ken's] allocations," Gov't Snoke Interview Notes (Mar. 5, 2024), 3500 No. 3611-001, at 5, and Ms. Marquez testified that her "only complaint" was that Ken called in his allocations late, Hr'g Tr. 88–89. Both have since written powerful letters of support. ECF Nos. 194-2 (Ex. 60, Julie Marquez letter), 194-3 (Ex. 86, Rosemarie Snoke letter).

**III. The Government Ignores Ken's Remarkable Character and Good Works**

Section 3553(a)(1) requires the Court to consider not only "the nature and circumstances of the offense" but also "the history and characteristics of the defendant." The government recites that standard, Gov't Ltr. at 10, and then all but ignores its second half. The Supreme Court has long recognized that sentencing requires an "individualized assessment" of the person before the Court, not only of the offense. *United States v. Jones*, 531 F.3d 163, 170 (2d Cir. 2008) (quoting *Gall*, 552 U.S. at 50); *see Koon v. United States*, 518 U.S. 81, 113 (1996) ("It has been uniform and constant . . . for the sentencing judge to consider every convicted person as an

[5] According to Section 3500 material, both Ms. Marquez and Ms. Snoke were asked during pretrial interviews about the instant-message exchange now cited by the government. Neither said the messages reflected their "detection" of a scheme to favor Macro Opps. Gov't Marquez Interview Notes (Mar. 26, 2026), 3500 No. 3577-012, at 2; Gov't Snoke Interview Notes (Mar. 26, 2026), 3500 No. 3611-013, at 2; Gov't Snoke Interview Notes (May 4, 2026), 3500 No. 3611-014. We will provide copies of these materials if the Court wishes to review them.

individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.").

The government brushes aside the nearly 200 letters submitted on Ken's behalf, describing them as "attesting to [Ken's] integrity and reputation in the industry." Gov't Ltr. at 15–16. The letters are detailed, firsthand accounts from people who have known Ken across every part of his life, from childhood to the present: his family, lifelong friends, colleagues, clients, competitors, neighbors, and clergy, among others. They describe a man who quietly paid for a friend's life-saving medical treatment, furnished an apartment for a fire victim he had never met, spent years caring for aging relatives, and insisted on sharing credit for positive performance with his colleagues, while taking sole responsibility when performance was poor. Def. Mem. at 16–17, 22, 27–28, 30–32, 44.

Without any basis to dispute a single account in these letters, let alone the collective judgment the letters reflect, the government implies that the letter writers were simply fooled. Gov't Ltr. at 16 ("[W]hile Leech could outwardly present the image of a trustworthy asset manager to co-workers and clients, behind the scenes he . . . secretly . . . favored certain strategies over others."). They were not. Nine of the writers are current or former Western employees who appeared on the government's own trial witness list. Def. Mem. at 4 n.2. Nor can an image supposedly crafted for "co-workers and clients" explain away the decades of private kindness and service described in scores of other letters.

The offense to which Ken pleaded guilty is serious, but it does not erase a lifetime of dedication and decency documented by nearly 200 people who know him best.

## IV. The Collateral Consequences of This Prosecution Already Afford Adequate Deterrence and Promote Respect for the Law

The government does not dispute that incarceration is not necessary for specific deterrence. Rather, it argues that anything less than an above-Guidelines prison sentence would "send a poor message to other investment managers," given Ken's stature and "notable public presence in the industry." Gov't Ltr. at 14. Yet it never acknowledges the devastating collateral consequences Ken has already suffered. His career and reputation are destroyed, the firm he helped to build greatly diminished, and his family made to suffer through no fault of their own. Precisely because of Ken's "notable public presence," these consequences have played out in the financial press. No one in the industry could miss this message. The enormous and public collateral consequences Ken and his family have suffered from the investigation and conviction satisfy the need to afford general deterrence and to promote respect for the law.[6]

---

[6] Nor does the government engage with the research showing that general deterrence depends on the certainty of punishment, not its severity, and that harsher sentences yield little if any added deterrent effect. Def. Mem. at 57–58. Here, certainty has been established in the most public

**V. An Upward Variance Would Create Unwarranted Disparities**

As demonstrated in our main submission, Sentencing Commission data show that incarceratory sentences are rarely imposed on defendants situated similarly to Ken. Def. Mem. at 50–53. Upward variances are rarer still.[7] The government's letter does not address any of these data and cites no contrary statistics. Instead, it relies on eight Second Circuit appeals involving 12- to 60-month sentences for defendants convicted of different offenses, sentenced under different Guidelines editions, with different Guidelines ranges, on readily distinguishable records, and in other districts. Gov't Ltr. at 12–13. Each is inapposite. Five involved multiple counts of conviction, five involved materially higher Guidelines ranges, four went to trial, and two involved *downward* variances. *See* Appendix A.

Just three of the eight cases cited by the government involved defendants with Guidelines ranges equal to or lower than Ken's range of 6–12 months. They are readily distinguishable. *See* Sent. Tr., *United States v. Gangapersad*, 19 Cr. 004 (WFK) (E.D.N.Y. Dec. 12, 2022), ECF No. 244 at 11, 29, 33–34 (12-month sentence for § 1001 conviction at trial; defendant "initiated the chain of events leading to the attempted murder" of an FBI agent and then lied to investigators, thereby "impairing the investigation . . . in the critical hours following the attack"); Sent. Tr., *United States v. Vogler*, 16 Cr. 6100 (DCL) (W.D.N.Y. Oct. 25, 2017), ECF No. 80 at 2–3, 10, 14 (18-month sentence for § 1001 conviction; court focused on defendant's "30 year incredible pattern of violating the law . . . even on supervised release," including 42 convictions for, among other things, assault, grand larceny, burglary, and escape); *United States v. Barresi*, 361 F.3d 666, 668–69 (2d Cir. 2004) (21-month sentence for § 1001 conviction; defendant lied to FBI immediately after 9/11 terrorist attack, "diverting" FBI "from the pursuit of bona fide information on the attacks" and causing substantial harm). The contrast with the present case could not be more stark: Ken's offense was not related to violence and did not materially impair an investigation, he took responsibility by pleading guilty, and he has no criminal history.

The cases cited in our memorandum, by comparison, are on point. They include every sole-count Section 1505 conviction since the year 2000 in the Southern and Eastern Districts of New York, and they show that defendants who engaged in obstruction similar to or more

---

way possible. The government's authorities, which involved insider trading and broad statements about white-collar deterrence, do not suggest otherwise.

[7] Over FY 2021–2025, less than 2 percent of defendants nationwide sentenced under Section 2J1.2 with a total offense level of 10 and a Criminal History Category of I received an upward variance or departure. *Id*. at 52–53. Although the Commission does not publish equivalent statistics for the Southern District, courts in this District impose upward variances in just 1.6 percent of *all* cases. U.S. Sent'g Comm'n, *Statistical Information Packet: Fiscal Year 2025, Southern District of New York* 12 table 8, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2025/nys25.pdf (last visited Nov. 9, 2026).

extensive than Ken's received no or minimal terms of imprisonment.[8] Def. Mem. at 53–54. Adopting the Probation Office's recommendation of time served would be consistent with the Section 3553(a)(6) imperative to "avoid unwarranted sentencing disparities."

## VI. The Full Resolution of the SEC's Claims Weighs Against an Upward Variance

Finally, Ken has settled the civil case brought by the SEC. On October 7, 2026, at the request of the parties, Judge Failla entered a Final Judgment ordering Ken to pay a civil penalty of $3 million and permanently barring him from serving as an officer or director of either a public company or a registered broker-dealer. Final Judgment as to Defendant Stephen Kenneth Leech, *SEC v. Leech*, 24 Cv. 9017 (KPF) (S.D.N.Y. Oct. 7, 2026), ECF No. 30. In a separate administrative order, the SEC barred Ken from associating with any investment adviser. *In re Leech*, Investment Advisers Act Release No. 7026, Admin. Proc. File No. 3-22774 (Oct. 14, 2026). Pursuant to Ken's agreement with the SEC, he did not admit the allegations in the SEC's complaint and, consistent with the fact that Ken did not profit from the alleged conduct, the Final Judgment did not include disgorgement. This settlement is yet another significant collateral consequence that Ken has borne. It also means that Ken has reached a full and final resolution with the SEC, the victim of the obstruction, which further supports a sentence of time served.

## VII. Conclusion

The government's request for an above-Guidelines sentence rests chiefly on allegations underlying charges it agreed to dismiss. It disregards the Probation Office's recommendation that the Court impose a sentence of time served, the Guidelines' presumption against a sentence of imprisonment for defendants like Ken, and the sentences routinely imposed on similarly situated defendants. Ken is a 72-year-old first-time offender who, as demonstrated in nearly 200 letters to the Court, has lived a life marked by kindness, generosity, and service to others. He has already suffered enormous consequences, including being permanently barred from the industry and work that he loves, suffering personal and public humiliation, and paying a $3 million civil penalty. For the reasons set forth above and in our sentencing memorandum, we respectfully urge the Court to impose a sentence of time served.

[8] The government asserts: "As defendant notes, many of his Section 1505 sentencing citations do not provide enough factual information about the sentences and their underlying facts to be helpful to the Court . . . ." Gov't Ltr. at 14 n.1 (citing Def. Mem. at 54 & nn. 40, 41). This criticism is unavailing. As we explained, our treatment of two of the five Section 1505 cases was limited by the fact that "[f]urther details . . . are sealed or otherwise not available on the docket." Def. Mem. at 54 nn. 40, 41. As noted above, the defense memorandum addressed *every* case since 2000 in both the Southern and Eastern Districts of New York in which Section 1505 was the sole count of conviction, and it provided greater detail about those cases than did the government's discussion of the inapposite cases addressed above.

Respectfully submitted,

MORVILLO ABRAMOWITZ
GRAND IASON & ANELLO P.C.

/s/ *Jonathan S. Sack*
Jonathan S. Sack
Jeremy H. Temkin
Samuel W. Magaram
565 Fifth Avenue
New York, NY 10017
(212) 880-9410
jsack@maglaw.com

WACHTELL, LIPTON, ROSEN & KATZ

/s/ *Joon H. Kim*
Joon H. Kim
51 West 52nd Street
New York, NY 10019
(212) 403-1238

*Attorneys for Defendant S. Kenneth Leech II*

cc: AUSA Peter J. Davis (via ECF)
AUSA Thomas S. Burnett (via ECF)

# Appendix A

| Case | Counts of Conviction | Offenses | Guidelines (months) | Trial / Plea | Sentence (months) | Notes |
|---|---|---|---|---|---|---|
| *Sampson*[1] | 3 | 18 U.S.C. § 1503<br>18 U.S.C. § 1001 | 37–46 | Trial | 60 | Organized multifaceted scheme to obstruct justice |
| *House*[2] | 4 | 18 U.S.C. § 1503<br>18 U.S.C. § 1001 | 121–151 | Trial | 48 | Downward variance |
| *Smith*[3] | 2 | 18 U.S.C. § 1623<br>18 U.S.C. § 1512 | 70–87 | Plea | 48 | Downward variance |
| *Templar*[4] | 2 | 18 U.S.C. § 1001 | 21–27 | Plea | 36 | Extensive criminal history, including sodomy of seven-year-old victim |
| *Perez*[5] | 2 | 31 U.S.C. § 5316<br>18 U.S.C. § 1001 | 24–30 | Trial | 24 | Bottom of Guidelines range |
| *Barresi*[6] | 1 | 18 U.S.C. § 1001 | 0–6 | Plea | 21 | Addressed *supra* at 6 |
| *Vogler*[7] | 1 | 18 U.S.C. § 1001 | 4–10 | Plea | 18 | Addressed *supra* at 6 |
| *Gangapersad*[8] | 1 | 18 U.S.C. § 1001 | 0–6 | Trial | 12 | Addressed *supra* at 6 |

[1] *United States v. Sampson*, 898 F.3d 287 (2d Cir. 2018); Def. Sent. Mem., *Sampson*, 13 Cr. 269 (DLI) (E.D.N.Y. May 5, 2016), ECF No. 243; Gov't Sent. Ltr., *Sampson*, 13 Cr. 269 (DLI) (E.D.N.Y. May 12, 2016), ECF No. 246.

[2] *United States v. House*, 636 F. App'x 50 (2d Cir. 2016); Sent. Tr., *House*, 12 Cr. 074 (WMS) (W.D.N.Y. Apr. 9, 2014), ECF No. 137; Gov't Sent. Mem., *House*, 12 Cr. 074 (WMS) (W.D.N.Y. Jan. 29, 2014), ECF No. 97.

[3] *United States v. Smith*, 20-3704, 2022 WL 1053263 (2d Cir. Apr. 8, 2022); Judgment, *Smith*, 19 Cr. 146 (LJV) (W.D.N.Y. Oct. 20, 2020), ECF No. 66; Sent. Tr., *Smith*, 19 Cr. 146 (LJV) (W.D.N.Y. Oct. 16, 2020), ECF No. 77; Gov't Sent. Mem., *Smith*, 19 Cr. 146 (LJV) (W.D.N.Y. June 8, 2020), ECF No. 48.

[4] *United States v. Templar*, 486 F. App'x 224 (2d Cir. 2012); Judgment, *Templar*, 10 Cr. 421 (DNH) (N.D.N.Y. Aug. 24, 2011), ECF No. 18; Sent. Tr., *Templar*, 10 Cr. 421 (DNH) (N.D.N.Y. Aug. 15, 2011), ECF No. 21; Gov't Sent. Mem., *Templar*, 10 Cr. 421 (DNH) (N.D.N.Y. July 29, 2011), ECF No. 13.

[5] *United States v. Perez*, 325 F.3d 115 (2d Cir. 2003); Gov't Br., *Perez*, 02-1240 (2d Cir. Sept. 11, 2002), 2002 WL 32390936; Appellant Br., *Perez*, 02-1240 (2d Cir. Aug. 8, 2002), 2002 WL 32390937. Although the parties' appellate briefs indicate that the Guidelines range was likely 24–30 months, we could not confirm that figure from the district court or Second Circuit docket.

[6] *United States v. Barresi*, 361 F.3d 666 (2d Cir. 2004).

[7] *United States v. Vogler*, 763 F. App'x 18 (2d Cir. 2019); Sent. Tr., *Vogler*, 16 Cr. 6100 (DCL) (W.D.N.Y. Oct. 25, 2017), ECF No. 80.

[8] *United States v. Gangapersad*, 22-3171, 2023 WL 8540428 (2d Cir. Dec. 11, 2023); Sent. Tr., *Gangapersad*, 19 Cr. 004 (WFK) (E.D.N.Y. Dec. 12, 2022), ECF No. 244.